# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| IN RE:  EQUIFAX, INC. CUSTOMER DATA SECURITY BREACH LITIGATION | MDL No. 2800 |

## APPLICATION TO APPOINT DANIEL S. ROBINSON AS PLAINTIFFS' CO-LEAD COUNSEL OR STEERING COMMITTEE MEMBER

## I.        INTRODUCTION

Pursuant to Case Management Order Nos. 1 and 2 (Dkt. 19 and 87), Daniel S. Robinson of Robinson Calcagnie, Inc., counsel of record for Plaintiff Grant Avise (*Grant Avise v. Equifax, Inc.*, Case No. 8:17-cv-01563), respectfully submits this application for appointment as Co-Lead Counsel on behalf of consumers, a member of the Plaintiffs' Steering Committee ("PSC"), or any other position the Court deems appropriate for this multidistrict litigation.[1]

This case presents a large and ascertainable nationwide class whose personal and financial information was negligently released by one of the country's largest credit bureaus.  Given the sensitive nature of the information involved and the historic size of the class, it is imperative that the Court selects plaintiffs' counsel

---

[1] Mr. Robinson submits this application on his own, having made no agreements or arrangements with any other counsel, except for the promise to work cooperatively with any and all counsel appointed to leadership.

with the requisite experience, resources, and competency to effectively litigate this action to a just conclusion.

Mr. Robinson humbly submits that his experience successfully leading, litigating, and resolving data breach cases—including the only other high-profile credit bureau data breach case (*In re Experian Data Breach Litigation*, Case No. 8:15-cv-01592-AG-DFM (C.D. Cal.))—militates in favor of his appointment as Co-Lead Counsel or a PSC member in this action.  As demonstrated below, Mr. Robinson possesses (1) a willingness and ability to commit to the time-consuming nature of this case; (2) an ability to, and history of, working cooperatively with others in data breach litigation, including opposing counsel; and (3) an access to adequate resources to ensure this litigation will advance in a timely manner.

In the last seven years, Mr. Robinson has served as Lead or Co-Lead Counsel in five data breach cases where he has successfully advocated for millions of data breach victims:

- *In re Experian Data Breach Litigation*, Case No. 8:15-cv-01592-AG-DFM (C.D. Cal.): Interim Co-Lead Counsel managing a PSC of seven firms in a class action against Experian, one of the three major credit bureaus like Equifax, alleging Experian permitted unauthorized parties to acquire the personal information of nearly 16 million consumers;

- *Yahoo! Inc. Private Information Disclosure Cases*, JCCP No. 4895

2

(Super. Ct. Cal. Orange Cnty.): Interim Co-Lead Counsel managing a PSC of six firms in a class action against Yahoo! Inc. ("Yahoo") alleging Yahoo's inadequate data security resulted in multiple data breaches, including a breach affecting more than three (3) *billion* Yahoo user accounts;

- *In re 21st Century Oncology Customer Data Security Breach Litigation*, Case No. 8:16-md-2737-MSS-AEP (M.D. Fla.): Interim Co-Lead Counsel managing a PSC of ten firms in a class action against 21st Century Oncology ("21st Century") alleging 21st Century's negligence resulted in the unauthorized acquisition of 2.2 million patients' personally identifiable information ("PII") and protected health information ("PHI");

- *St. Joseph Health System Medical Information Cases,* JCCP No. 4716 (Super. Ct. Cal. Orange Cnty.): Co-Lead Class Counsel managing a PSC of seven firms in a certified class action alleging violations of the California Confidentiality of Medical Information Act ("CMIA"), Cal. Civ. Code. § 56.10, due to St. Joseph Health System's failure to maintain and secure health information of nearly 31,000 patients that were accessed by unauthorized parties, including Google and other search engines. Mr. Robinson and his team secured a record settlement,

which included payments of at least $242 per Class Member; and

- *Blue Cross of California Website Security Cases*, JCCP No. 4647 (Super. Ct. Cal. Orange Cnty.): Lead Class Counsel managing three firms in a class action against WellPoint/Anthem Blue Cross alleging the company disclosed the PHI of over 640,000 consumers on the Internet. Mr. Robinson secured a settlement of millions of dollars in benefits for the Class.

Indeed, Mr. Robinson may be one of the few applicants who has both won class certification and defeated a motion for summary judgment in a data breach case. If appointed as Co-Lead Counsel or a PSC member, Mr. Robinson believes his experience, along with the financial and attorney resources available to Robinson Calcagnie Inc., will help ensure the effective and efficient litigation of this matter.[2]

## II.   DISCUSSION

### A.   Mr. Robinson Understands and Will Commit the Time and Resources Needed to Lead, Litigate, and Resolve This Case

Many aspects of this MDL involve issues similar to other data breach class actions Mr. Robinson has handled, including the claims pled, the types of information disclosed, the security vulnerabilities at issue, the nature of the

---

[2] Attached as Exhibit 1 is a copy of Robinson Calcagnie, Inc.'s firm resume.

4

disclosing entity's business and relationship with class members, and the fact other entities have brought claims.

Mr. Robinson's data breach and leadership experience allows him to understand the appreciable time, energy, and resources necessary to effectively lead a data breach case of this nature. Mr. Robinson can commit that, despite his other leadership roles addressed below, he is able to commit the necessary time, energy, and resources to effectively lead this litigation to resolution.

At present, Mr. Robinson is Interim Co-Lead Counsel in the following data breach class actions: *Yahoo! Inc. Private Information Disclosure Cases*, *In re 21st Century Oncology Customer Data Security Breach Litigation*, and *In re Experian Data Breach Litigation*. In the *Yahoo* case, which was filed in 2016, Mr. Robinson and his six-firm PSC have been able to survive pleading challenges and are presently in active discovery. The *21st Century* case was recently stayed due to a Chapter 11 bankruptcy filing. However, Mr. Robinson and his ten-firm PSC hired competent bankruptcy counsel to help drive the case to a favorable bankruptcy settlement where the data breach action is permitted to move forward. In the *Experian* case, filed in 2015, Mr. Robinson and his seven-firm PSC survived pleading challenges, litigated discovery disputes, conducted extensive document review (of nearly 50 custodians) and depositions, worked up experts, and prepared class certification briefing before the parties reached a resolution earlier this year. Mr. Robinson is also Class Counsel

in *Sheri Dodge, et al. v. PHH Corporation, et al.*, Case No. 8:15-CV-01973-FMO-AFM (C.D. Cal.), where in 2017 he secured a $17 million settlement on behalf mortgage borrowers alleging violations of the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601 *et. seq.*

Mr. Robinson has already demonstrated a serious level of commitment and dedication to this litigation, having met and conferred with Equifax's counsel telephonically and in writing, and having provided Equifax's counsel with an evidence preservation demand, a model ESI Order and a model Protective Order (both based on *Experian*).[3] Mr. Robinson has also contributed content and revisions that, under David J. Worley's leadership, were incorporated into Plaintiffs' Preliminary Status Report and Case Management Order No. 1. He has lectured to groups of Plaintiffs' counsel in Georgia and California concerning aspects of the Equifax data breach, and has actively worked to promote inclusion of all plaintiffs' firms in discussions with Equifax's counsel.

Mr. Robinson's data breach experience has also allowed him to work with some of the best industry and technology experts in the country – including the *Experian* case which involved complex computer-related issues within the context of a leading credit bureau. He strongly believes, based on what he already knows

---

[3] Attached as Exhibit 2 is copy of the evidence preservation demand letter provided to Equifax's counsel.

about the breach at issue, that he will be able to prove key factual issues quickly and effectively. If selected, Mr. Robinson would immediately commence an investigation focused on gathering information regarding the extent and duration of the breach, understanding the root cause of the breach and what actions or inactions may have contributed to it, identifying other contributing factors beyond the Apache Struts software vulnerability, establishing a timeline of the company's knowledge of the vulnerabilities, determining the type of confidential information involved, evaluating whether personally identifiable information from the breach has been made available for purchase on the Dark Web, and finding the identities of potential third-party witnesses that may be in possession of relevant, discoverable information. Like many high-stake cases involving exceptional lawyers on both sides, Mr. Robinson believes plaintiffs in a data breach action must be capable of proving their case thoroughly before the parties can achieve a meaningful resolution that compensates consumers, financial institutions, investors, and other victims. Mr. Robinson humbly submits that his experience in litigating and resolving similar cases over the years evidences his willingness and ability to commit the time and resources necessary to lead, litigate, and resolve this important case.

## B.   Mr. Robinson Will Work Cooperatively and Effectively with Others in This Case

The successful prosecution of complex data breach litigation depends, above

all, on developing a collaborative team of experienced data breach litigators with diverse perspectives and backgrounds.

Throughout his career, Mr. Robinson has worked cooperatively with others, including many of the plaintiffs' counsel appearing in this action. Mr. Robinson, as well as many attorneys at Robinson Calcagnie, Inc., have served in leadership roles in numerous MDLs and state coordinated proceedings, including those involving data breaches, automobile defects, pharmaceutical defects, and other types of consumer actions. For example, as Co-Lead Counsel in *Risperdal and Invega Product Liability Cases*, JCCP 4775 (Super. Ct. Cal. L.A. Cnty.), Mr. Robinson manages and oversees the work of over 70 Plaintiff law firms jointly prosecuting cases against Johnson & Johnson, Inc. on behalf of over 7,000 injured plaintiffs.

Mr. Robinson was previously a member of the Plaintiffs' Executive Committee in *In re Biomet M2A Magnum Hip Implant Products Liability Litigation*, Case No. 3:12-md-2391-RLM-MGG (N.D. Ind.), and *In re Heparin Products Liability Litigation*, Case No. 1:08-60000-JGC (N.D. Oh.). In these leadership roles, Mr. Robinson has worked cooperatively with other plaintiffs' counsel to lead the litigation for the benefit of all plaintiffs.

Here, Mr. Robinson understands that, given the scope and magnitude of this case, cooperation amongst plaintiffs' counsel will be key. Mr. Robinson supports the appointment of an experienced, inclusive, and diverse leadership structure to

advance the plaintiffs' case.  Appointed counsel must immediately begin vetting plaintiffs, analyzing potential claims, creating and implementing a discovery plan, drafting opposition briefs to 12(b)(1) and 12(b)(6) motions to dismiss, and map out a path to class certification and, ultimately, resolution.  Such tasks require cooperation and Mr. Robinson's ability to cooperate and collaborate with his colleagues will help him lead, or contribute meaningfully as a PSC member, in this important litigation.

### C.   Mr. Robinson Has Extensive Experience Litigating Privacy Cases and Data Breach Class Actions

Mr. Robinson's involvement in data breach litigation began in the early 2000's when he served as an Assistant District Attorney in the New York County District Attorney's Office under the Hon. Robert M. Morgenthau.  Mr. Robinson was chosen to be a member of the office's Identity Theft Unit, one of the first prosecutorial units in the country aimed exclusively at prosecuting complex cases involving the theft and use of personal identifying information.  After working for the District Attorney's office, Mr. Robinson worked as a litigation associate at O'Melveny & Myers LLP, where he helped advise corporations on network and data security issues.

As discussed above, Mr. Robinson currently serves as Interim Co-Lead Counsel in the *In re Experian Data Breach Litigation*, where he has obtained

multiple favorable decisions during the course of the litigation, including (1) an order granting in part and denying in part Experian's motion to dismiss, which largely favored plaintiffs by rejecting Experian's argument the economic loss doctrine precluded any negligence claim; (2) an order requiring a "soft custodian cap of 50" custodians whose electronically stored information would be produced; and (3) an order rejecting Experian's request to permit relevancy redactions.  After the production and review of over 300,000 pages of discovery, several depositions taken by Mr. Robinson, and nearly a year of negotiations (including two mediations and a settlement conference before the Honorable Jay C. Gandhi), the parties reached a settlement in principle.

Mr. Robinson also currently serves as Interim Co-Lead Counsel in *Yahoo! Inc. Private Information Disclosure Cases*, where he has successfully obtained a decision largely overruling Yahoo's demurrer (motion to dismiss), allowing negligence, invasion of privacy, and other claims based on California consumer protection statutes to proceed.   Mr. Robinson also currently serve as Interim Co-Lead Counsel in the *In re: 21st Century Oncology Customer Data Security Breach Litigation*, where he briefed and argued against the defendants' motion to dismiss. Prior to a ruling on that motion, 21st Century filed for bankruptcy, which resulted in a stay in the district court proceedings.  Mr. Robinson assisted in navigating the bankruptcy proceedings, which resulted in a settlement with the debtors, allowing

the case to proceed in the district court.

Mr. Robinson also previously served as Co-Lead Class Counsel in *St. Joseph Health System Medical Information Cases*, a coordinated class action in Orange County Superior Court.  This litigation resulted in multiple favorable decisions, including (1) denials of the defendants' demurrer as to the majority of plaintiffs' claims, (2) denial of the defendants' motions for summary judgment and adjudication as to all claims, and (3) certification of a statewide class encompassing roughly 32,000 patients.  Those successes resulted in a settlement with the following groundbreaking benefits for the class: (1) a non-reversionary $7,500,000 cash payment ($242.17 for the 30,969 class members); (2) a $3,000,000 fund to reimburse class members for identity theft losses and certain out-of-pocket expenses that resulted from or were incurred as a result of the data breach; (3) a claims period for identity-theft losses spanning six years; (4) acknowledgment that the prior year of identity theft and credit monitoring services offered by defendants was due to plaintiffs' discovery of the data breach (valued at over $4,500,000); and (5) extensive remedial measures taken by defendants as a result of the litigation enhancing the security of patients' private information (valued at over $17,000,000).

Mr. Robinson has also previously served as Lead Class Counsel in another data breach class action, *Blue Cross of California Website Security Cases*, in which plaintiffs alleged that the defendant, WellPoint, Inc. (Anthem Blue Cross), failed to

11

adequately protect the confidential personal and medical information of over 600,000 customers, enrollees, and subscribers. During that litigation, Mr. Robinson successfully obtained a temporary restraining order against WellPoint regarding the "continued public disclosure" of health insurance applications that contained private and confidential medical and financial information. The litigation not only put an end to the breach, but it also (1) revealed the cause of WellPoint's failure to implement proper security measures; (2) led to heightened customer security measures at WellPoint; and (3) resulted in a nationwide settlement conferring substantial benefits to the Settlement Class, including two years of credit monitoring and a $5,000,000 fund for reimbursement of losses and expenses.

In successfully litigating, leading, and settling many of these cases, Mr. Robinson's ability to implement discovery plans that streamline the issues, identify the most important evidence for each element, and create an understandable proof outline will be equally important for this case. For example, in the *St. Joseph* case, Mr. Robinson took 13 of the 15 liability depositions that built the evidence needed to win the case. In data breach cases, he focuses on defendants' security logs, policies and procedures, security audit/investigation reports, network and security upgrades, and other evidence essential to proving plaintiffs' case. Mr. Robinson is up-to-date on the current state of data breach law, industry standards for computer and network security, as well as state and federal regulatory requirements. He is

actively briefing and litigating many of the same issues that will likely be involved in this case.

Mr. Robinson's institutional knowledge and focused discovery plans will help to keep costs low while maximizing recovery for plaintiffs. He has access to a team of the country's preeminent experts on data breach issues, including a former S.D.N.Y U.S. Attorney who specializes in cyber security, two former FBI agents skilled at modern breach ESI collection and analysis, and other experts knowledgeable in data security regulations, network protocols, and the black market for stolen PII on the Dark Web.

The breadth and depth of Mr. Robinson's experience in this specialized and complex area strongly supports his appointment as leadership for the proposed Class.

### D. Robinson Calcagnie, Inc. Has Extensive Experience in Complex Cases and Adequate Resources to Advance the Litigation

Robinson Calcagnie, Inc. is a 25-attorney firm that specializes in representing plaintiffs in complex, multiparty litigation. It has the resources to handle a case of this magnitude from beginning to end. At trial, the firm has obtained some of the most significant verdicts in consumer protection litigation, including:

- *Grimshaw v. Ford Motor Co.*, 119 Cal. App. 3d 757 (Ct. App. 1981): Lead Trial Counsel in unprecedented $128 million verdict in the landmark Ford Pinto fire case where a thirteen-year-old boy suffered

severe burns when the 1942 Ford Pinto in which he was a passenger burst into flames in a rear-end collision;

- *Eva Echeverria et al. v. Johnson & Johnson et al.*, Case No. BC628228, JCCP No. 4872 (Super. Ct. Cal. L.A. Cnty.):  Lead Trial Counsel in $417 million verdict against Johnson & Johnson for allegations that its talcum powder caused Ms. Echeverria to develop terminal ovarian cancer, and Johnson & Johnson failed for years to warn that talc was linked to an increased risk of ovarian cancer;

- *Anderson v. General Motors*, Case No. BC116926 (Super. Ct. Cal. L.A. Cnty.):  Co-Lead Trial Counsel obtaining a $4.9 billion verdict against General Motors for the victims of an explosion of a Chevrolet Malibu that caused severe burns to four children;

- *Barnett et al. v. Merck & Co. Inc.*, Case No. 2:06-cv-00485-EEF-DEK (E.D. La.): Lead Trial Counsel obtaining a $51 million verdict against pharmaceutical manufacturer Merck & Co. Inc., for failing to warn about the increased risks of heart attack and stroke related to the arthritis drug Vioxx, which caused a 62-year-old retired FBI agent who took the drug for osteoarthritis to suffer a heart attack.

In addition to the previously mentioned litigations, Robinson Calcagnie, Inc. attorneys have served as either lead counsel, or in another leadership role, in the

14

following class actions and other complex litigations:

| Case Title | Case No. | Firm Position |
|---|---|---|
| *In re: General Motors LLC Ignition Switch Litigation* | 14-MD-2543-JMF (S.D.N.Y.) | Plaintiffs' Executive Committee |
| *In re Tobacco I Cases* | JCCP No. 4041 (Super Ct. Cal. S.D. Cnty.) | Co-Lead Counsel |
| *Rivera v. Bio-Engineered Supplements & Nutrition, Inc.* | No. SACV 07-1306 JVS (RNBx) (C.D. Cal.) | Plaintiffs' Lead Counsel |
| *In re: Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation* | 8:10ML02151 JVS (FMOx) (C.D. Cal.) | Plaintiffs' Co-Lead Counsel for Personal Injury Cases |
| *In Re Zoloft (Sertraline Hydrochloride) Products Liability Litigation* | No. 12-md-2342-CMR (E.D. Pa.) | Plaintiffs' Co-Lead Counsel |
| *Yaz, Yasmin and Ocella Contraceptive Cases* | JCCP No. 4608 (Super. Ct. Cal. L.A. Cnty.) | Plaintiffs' Co-Lead Counsel |
| *In re DePuy ASR* | No. 10-md-2197 (N.D. Oh.) | Plaintiffs' Executive Committee |

| Case Title | Case No. | Firm Position |
|---|---|---|
| *In re Biomet M2a Magnum Hip Implant Products Liability Litigation* | 3:12-MD-2391 (N.D. In.) | Plaintiffs' Executive Committee |
| *In re Heparin Products Liability Litigation* | 1:08-60000-JGC (N.D. Oh.) | Plaintiffs' Executive Committee |
| *Risperdal® and Invega® Product Liability Cases* | JCCP No. 4775 (Super. Ct. Cal. L.A. Cnty.) | Plaintiffs' Co-Lead Counsel |
| *Dodge, et al. v, PHH Corporation, et al.* | 8:15-01973 FMO (AFMx) (C.D. Cal.) | Plaintiffs' Interim Co- Lead Counsel |

If appointed to leadership, Robinson Calcagnie, Inc. will commit the same resources and effort to this case as it has committed to other successful litigation. The firm's 40 years of results demonstrate a consistent willingness to commit all resources necessary to achieve a just resolution.[4]  The firm has agreed to make this litigation a major focus of its efforts and will cooperate with all counsel selected to leadership by this Court.

---

[4] For instance, in *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation*, Case No. 8:10ML02151 (C.D. Cal.), where Mark P. Robinson, Jr., Senior Partner at Robinson Calcagnie, Inc. was appointed Co-Lead Counsel by the Hon. James V. Selna, the firm advanced over $5.5 million in costs over three years of litigation.

### E. The Robinson Calcagnie Fee Proposal

If selected, Robinson Calcagnie, Inc. would help establish a fee schedule that would set the following rates in the event of a settlement: (1) a billing rate of partners capped at $800 per hour; (2) a billing rate for associates capped at $550 per hour; and (3) a billing rate for paralegals and assistants capped at $250 per hour.

## III.   CONCLUSION

Based on the foregoing, Daniel S. Robinson respectfully requests that the Court appoint him as Co-Lead Counsel on behalf of consumers, a member of the PSC, or any other position the Court deems appropriate, to assist in coordination and management of this multidistrict litigation.

Dated: February 2, 2018                             Respectfully submitted,

                                        By:    /s/ Daniel S. Robinson_____
                                               Daniel S. Robinson
                                               **ROBINSON CALCAGNIE, INC.**
                                               19 Corporate Plaza Drive
                                               Newport Beach, CA 92660
                                               Tel: (949) 720-1288
                                               Fax: (949) 720-1292

                                               *Counsel for Plaintiff Grant Avise*

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 2, 2018, I electronically filed the foregoing document through CM/ECF System, which will provide electronic service notification to all counsel of record registered as CM/ECF users, and that a courtesy copy will be served on Court chambers.

Respectfully submitted this 2nd day of February 2018.

*/s/ Daniel S. Robinson*
Daniel S. Robinson

18

# EXHIBIT 1

## ROBINSON CALCAGNIE, INC.

19 CORPORATE PLAZA DRIVE, NEWPORT BEACH, CA 92660
TELEPHONE: (949) 720-1288  •  FACSIMILE: (949) 720-1292
WWW.ROBINSONFIRM.COM

# Firm Resume

Headquartered in Newport Beach, California, the law firm of Robinson Calcagnie, Inc. is a nationally recognized leader in representing plaintiffs in consumer class actions, catastrophic injury, and wrongful death cases.  As one of the nation's leading class action and product liability firms, the firm's attorneys and staff have built of a reputation for success in all areas of civil litigation, including numerous high-profile cases.  In 1979, Founding and Senior Partner Mark P. Robinson, Jr., obtained an unprecedented $128 million award in the landmark Ford Pinto fire case of *Grimshaw v. Ford Motor Company* (119 Cal.App.3d 757), which at that time was the largest jury verdict in a personal injury case.

Since 1979, the firm has become known for providing the highest quality legal representation and leadership in coordinated Multidistrict Litigation cases, and for obtaining substantial jury verdicts, judgments, and settlements for its clients.

**RC ROBINSON CALCAGNIE, INC.**

## RECENT LEADERSHIP POSITIONS

**Consumer Litigation**

### Mark P. Robinson, Jr.

- *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs. & Prods. Liab. Litig.*, MDL No. 2151, United States District Court, Central District of California (Co-Lead Counsel)
- *In re GM Ignition Switch Litig.*, MDL No. 2543, United States District Court, Southern District of New York (Plaintiffs' Executive Committee Member)
- *In re Bridgestone/Firestone Inc., Tires Prods. Liab. Litig.*, MDL No. 1373, United States District Court, Southern District of Indiana (Plaintiffs' Steering Committee Member)
- *In re Tobacco II Cases* (2009) 46 Cal. 4th 298, San Diego County Superior Court (Lead Trial Counsel)
- *County of Los Angeles v. R.J. Reynolds, et al.* (Co-Lead Counsel)
- *Gray Davis, et al. v. R.J. Reynolds, et al.* (Co-Lead Counsel)
- *People of the State of Calif. v. Atlantic Richfield Co.* (Lead Associate Counsel for Orange County District Attorney)
- *People of the State of Cal. v. Shell* (Lead Associate Counsel for Orange County District Attorney)

### Daniel S. Robinson

- *St. Joseph Health System Medical Information Cases*, JCCP No. 4716, Orange County Superior Court (Co-Lead Counsel)
- *Blue Cross of California Website Security Cases*, JCCP No. 4647, Orange County Superior Court (Lead Counsel)
- *In re Experian Data Breach Litigation*, Case No. 15-cv-1592, United States District Court, Central District of California (Interim Co-Lead Counsel)
- *Dodge v. PHH Corporation, et al.*, 8:15-cv-01973, United States District Court, Central District of California (Interim Co-Lead Counsel)
- *In re 21st Century Oncology Customer Data Breach Litigation*, MDL 2737, United States District Court, Middle District of Florida (Interim Co-Lead Counsel)
- *Yahoo! Inc. Private Information Disclosure Cases*, JCCP No. 4895, Orange County Superior Court (Co-Lead Counsel)

RC **ROBINSON CALCAGNIE, INC.**

## Defective Drugs and Devices

### *Mark P. Robinson, Jr.*

- *In re Actos (Pioglitazone) Prods. Liab. Litig.*, MDL No. 2299, United States District Court, Western District of Louisiana (Plaintiffs' Executive Committee Member)
- *In re Bextra and Celebrex Mktg., Sales Pracs. & Prods. Liab. Litig.*, MDL No. 1699, United States District Court, Northern District of California (Plaintiffs' Steering Committee Member)
- *In re DePuy Orthopaedics, Inc., ASR Hip Implant Prods. Liab. Litig.*, MDL. No. 2197, United States District Court, Northern District of Ohio (Plaintiffs' Executive Committee Member)
- *In re Medtronic, Inc. Sprint Fidelis Leads Prods. Liab. Litig.*, MDL No. 1905, United States District Court, District of Minnesota (Plaintiffs' Steering Committee Member)
- *In re Vioxx Prods. Liab. Litig.*, MDL No. 1657, United States District Court, Eastern District of Louisiana (Plaintiffs' Steering Committee Member)
- *In re Yasmin and YAZ (Drospirenone) Mktg., Sales Pracs. & Prods. Liab. Litig.*, MDL No. 2100, United States District Court, Southern District of Illinois (Plaintiffs' Steering Committee Member)
- *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, MDL No. 2342, United States District Court, Eastern District of Pennsylvania (Co-Lead Counsel)
- *In re Zyprexa Prods. Liab. Litig.*, MDL No. 1596, United States District Court, Eastern District of New York (Plaintiffs' Steering Committee Member)

### *Daniel S. Robinson*

- *In re Biomet M2a Magnum Hip Implant Prods. Liab. Litig.*, MDL No. 2391, United States District Court, Northern District of Indiana (Plaintiffs' Executive Committee Member)
- *In re Heparin Prods. Liab. Litig.*, MDL No. 1953, United States District Court, Northern District of Ohio (Plaintiffs' Executive Committee Member)
- *In re Actos (Pioglitazone) Prods. Liab. Litig.*, MDL No. 2299, United States District Court, Western District of Louisiana (Plaintiffs' Steering Committee Member)
- *Risperdal® and Invega® Product Liability Cases*, JCCP No. 4775, Los Angeles County Superior Court (Co-Lead Counsel)

ROBINSON CALCAGNIE, INC.



19 Corporate Plaza Drive
Newport Beach, CA 92660
(949) 720-1288
mrobinson@robinsonfirm.com

Practice Areas

Product Liability
Personal Injury
Consumer Class Actions
Pharmaceutical and Medical
    Device

Education

**Stanford University** – B.A.,
1968, Economics

**Loyola Law School** – J.D.,
*cum laude*, 1972

**Mark P. Robinson, Jr.**
*Founding and Senior Partner*

Mark P. Robinson, Jr. is the founder and senior partner of Robinson Calcagnie, Inc. Mr. Robinson earned his Bachelor of Arts degree from Stanford University and graduated *cum laude* from Loyola School of Law. His legal practice is devoted to consumer safety and he has worked on thousands of products liability cases, including the landmark Ford Pinto case, *Grimshaw v. Ford Motor Company*, where a jury in Orange County, California, awarded $128 million in compensatory and punitive damages. The verdict was recognized by the Association of Trial Lawyers of America as one of the ten most significant civil trials of the past millennium.

Mr. Robinson's other significant trials include: *Anderson v. General Motors*, where a Los Angeles jury awarded $4.9 billion to burn victims in an automobile crash; *Barnett v. Merck*, a $51 million verdict in New Orleans federal court against the manufacturer of the prescription drug Vioxx; *Ketchum vs. Hyundai*, where a Los Angeles County jury awarded $15 million to a young boy paralyzed by a defective seat belt during a collision; *Oliver vs. Nissan*, where a jury returned a $9 million verdict in a product liability action in Los Angeles County; *Siu v. General Motors*, a $9 million judgment in a product liability action in San Diego; *Fair v. Ford*, a $12 million award in a wrongful death action in Kentucky arising from a post-collision fire involving a school bus; and *Solorio v. Nissan, et al.*, an August 9, 2016 $46 million verdict in a leg-off personal injury action in Riverside County.



Publications

*The Death of the Civil Jury Trial*, Los Angeles Daily Journal (2014)
*Why We Need Trial Lawyers*, Wall Street J. (Feb. 24, 2010)
*Catalyst for Change: How Products Liability Litigation Has Made Products Safer*, Advocate, CAOC (Mar. 2010)

Mr. Robinson was the 2014 National President of the American Board of Trial Advocates (ABOTA), a national association of experienced trial lawyers and judges with chapters in all 50 states. He is a Fellow of the American College of Trial Lawyers, a highly selective professional society of trial lawyers and judges (including the justices of the United States Supreme Court) whose members are selected only by invitation. He is a past president of the Orange County Chapter of the American Board of Trial Advocates. In 2011, he was chosen to serve on the Judicial Council of California Court Case Management Internal Committee. In 1999, he was elected to serve as President of the Consumer Attorneys of California (CAOC), formerly the California Trial Lawyers Association.

In June of 2013, Mr. Robinson received the Philip Burton Lifetime Legal Achievement Award from Consumer Watchdog, a national non-profit organization which advocates for taxpayer and consumer interests. In 2011, he was inducted by the California Bar Association Litigation Section into their Trial Lawyer Hall of Fame. In 2010, as well as in 1999, Mr. Robinson received the California Attorney of the Year (CLAY) Award, presented annually by California Lawyer magazine to attorneys whose achievements have made a profound impact on the law. In 2008, he was named California ABOTA Trial Lawyer of the Year for California, and was also honored by the Anti-Defamation League (Orange County/Long Beach) with the Marcus Kaufman Jurisprudence Award. In 2007, he received the Champion of Justice Award from the Civil Justice Program in Southern California.

RC ROBINSON CALCAGNIE, INC.



19 Corporate Plaza Drive
Newport Beach, CA 92660
(949) 720-1288
drobinson@robinsonfirm.com

Practice Areas

Product Liability
Personal Injury
Consumer Class Actions
Consumer and Data Privacy
Pharmaceutical and
Medical Device

Education

**Williams College** – B.A.,
1988

**Loyola Law School** – J.D.,
2003

Bar Admissions
2004, New York
2006, California
2011, Pennsylvania

## Daniel S. Robinson
*Partner*

Daniel S. Robinson is a partner at Robinson Calcagnie , Inc., focusing on civil litigation. He is admitted to practice law in New York, Pennsylvania and California. Dan believes in the true administration of justice for victims of negligence and wrongdoing. Dan has conducted several trials to date, including a 17-day trial in 2010 where a Los Angeles jury awarded a verdict of $14,548,350.76.

Most of Dan's practice focuses on complex litigation.  In 2017, he was appointed Interim Co-Lead Counsel in *Dodge v PHH Corporation, et al.*, 8:15-cv-01973, by the Hon. Fernando M. Olguin. In 2014, Dan was appointed Co-Lead Counsel in the *Risperdal® and Invega® Product Liability Cases*, JCCP No. 4775, by the Hon. William F. Highberger. In 2012, Dan was appointed to the Plaintiffs' Executive Committee in the *Biomet M2a Magnum* MDL by the Hon. Robert L. Miller, Jr. In 2012, Dan was appointed to the Plaintiffs' Steering Committee in *In re Actos Product Liability Cases*, JCCP No. 4696, by the Hon. Kenneth R. Freeman. He was also selected to the Plaintiffs' Steering Committee in *In re Fosamax/Alendronate Sodium Drug Cases*, JCCP No. 4644. In 2009, Dan was appointed to the Plaintiffs' Executive Committee for the Contaminated Heparin Litigation, MDL 1953, by the Hon. James G. Carr.

Dan also handles cases involving significant privacy violations, class actions, and general business litigation. In 2017, he was appointed Co-Lead Counsel in *Yahoo! Inc. Private Information Disclosure Cases*, JCCP No. 4895, by the Hon. Thierry P. Colaw. In 2016, Dan was appointed Interim

ROBINSON CALCAGNIE, INC.

Publications

*Using Expert Witnesses*, Anatomy of a Personal Injury Lawsuit (AAJ Press 2015)

Co-Lead Counsel in *In re 21st Century Oncology Customer Data Security Breach* Litigation, MDL 2737, by the Hon. Mary S. Scriven; and Interim Co-Lead Counsel in *In re Experian Data Breach Cases* by the Hon. Andrew J. Guilford. In 2012, Dan was appointed Co-Lead Counsel in *St. Joseph Health System Medical Information Cases*, JCCP No. 4716, by the Hon. Kim G. Dunning. In 2011, Dan was appointed Lead Counsel in *Blue Cross of California Website Security Cases*, JCCP 4647.

In July 2017, Dan received the AAJ Above and Beyond Award. Dan has been honored by the Daily Journal as one of the Top 25 Plaintiffs Lawyers in California. He has been selected for The Best Lawyers in America©, a nationwide peer-reviewed survey, every year since 2013. Dan has been selected as a "Super Lawyer" by Super Lawyers Magazine every year since 2014 (Rising Star in 2013 and 2012). He was named as one of the Daily Journal's Top 20 Attorneys Under 40 in California in 2015, and in 2014 received the American Association of Justice Wiedemann & Wysocki Award for demonstrating a "commitment to the profession and support for improving the civil justice system." In 2012, The National Trial Lawyers named Dan as one of the Top 40 Lawyers Under 40 in the United States. Dan was awarded the 2011 Young Gun Award by the Orange County Trial Lawyers Association for "exceptional trial skills, ideals of legal ethics, and dedication to the principal of preserving access to a justice system for every person."

Before working at Robinson Calcagnie, Inc., Dan was a civil litigator at O'Melveny & Myers, LLP, where he handled matters of general business litigation. Before that, Dan served as an Assistant District Attorney in the New York County District Attorney's Office under the Hon. Robert M.

Morgenthau, where he conducted numerous criminal trials, investigations and grand jury proceedings in the Trial Bureau Division and the Domestic Violence, Public Assistance Fraud, Counterfeit Trafficking, and Identity Theft prosecution units.

Dan was appointed as the 2018 President of Project Youth OCBF's Society of Fellows. In 2017, Dan served as President of the Project Youth OCBF. He served as co-chair of the Public Law Center's (PLC) 2017 and 2018 Volunteers for Justice Dinner. Dan is also an elected member of the OCBA Board of Directors and has served on OCBA's Judiciary Committee, Civility Task Force, Mentoring Committee, 1L Kickstart Program, and the OCBA Charitable Fund Board. In 2016 and 2017, he co-chaired OCBA's Annual Judge Kenneth Lae Golf Tournament. He has served six years as co-chair of OCBF's OC Marathon Committee and as a member of its Higher Education Mentoring Committee. He is a member of the Board of Directors for Loyola Law School and CAOC. He is also a member of OCTLA, ABTL, and the Celtic Bar Association.

EXHIBIT 2

# RC ROBINSON CALCAGNIE, INC.

19 CORPORATE PLAZA DRIVE, NEWPORT BEACH, CA 92660
TELEPHONE: (949) 720-1288 • FACSIMILE: (949) 720-1292
WWW.ROBINSONFIRM.COM

PRESIDENT & SHAREHOLDER
MARK P. ROBINSON, JR.

KEVIN F. CALCAGNIE
JEOFFREY L. ROBINSON
ALLAN F. DAVIS
DANIEL S. ROBINSON*
*Admitted In CA, NY, PA
SCOT D. WILSON
SHANNON M. LUKEI
MICHELLE M. WEST

January 16, 2018

**Via Email and U.S. Mail**

Stewart Haskins II, Esq.
Robert Griest, Esq.
King and Spalding LLP
1180 Peachtree Street
Atlanta, GA 30309
SHaskins@kslaw.com
RGriest@kslaw.com

> Re:  **EVIDENCE PRESERVATION DEMAND**
> *Grant Avise v. Equifax, Inc.,* No. 8:17-cv-01563 (C.D. Cal. filed 9/9/17)
> Equifax, Inc. Data Breach Litigation, MDL No. 2800

Dear Mr. Haskins:

It was a pleasure talking with you today.  As you are aware, we represent Plaintiff Grant Avise in the above referenced matter, one of several class action cases filed against Equifax, Inc. ("Equifax" or "Defendant").  I am writing to formally demand Defendant preserve all evidence related to[1] this litigation in advance of our discussion of future orders governing the collection, storage and production of electronically stored information as well as "hard copy" documents in your clients' possession, custody or control.

Defendant is "under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, [or] is reasonably likely to be requested during discovery…" *Wm. T. Thompson Co. v. General Nutrition Corp., Inc.*, 593 F.Supp 1443, 1455 (C.D. Cal. 1984). *Accord Kronisch v. U.S.*, 150 F.3d 112 (2d Cir. 1998). This includes documents[2], communications[3], electronic data[4] and all other forms of information.

---

[1]  For the purposes of this letter, "relating to," "relate to," "referring to," "refer to," "reflecting," "reflect," "concerning," or "concern" means evidencing, regarding, concerning, discussing, embodying, describing, summarizing, containing, constituting, showing, mentioning, reflecting, pertaining to, dealing with, relating to, referring to in any way or manner, or in any way logically or factually connected to the matter described.

[2]  For the purposes of this letter, "documents" shall have the broadest possible meaning and interpretation permissible under the Federal Rules of Evidence, and shall include, without limitation, any written, printed, typed, photostatic, photographed,  recorded, computer generated, computer-stored, or otherwise maintained or reproduced communication or representation, any data compilation in any form, whether comprised of letters, words, numbers, pictures, sounds, bytes, emails, electronic signals or impulses, electronic data, active files, deleted files, file

*Grant Avise v. Equifax, Inc.*
EVIDENCE PRESERVATION DEMAND
January 16, 2018
Page 2

       The facts of this case are such that substantial discovery will be required.  To the extent that Defendant, or any of its parent companies, subsidiaries, divisions, agents, employees, third party contractors or information storage providers, has any such documents in its possession, custody or control[5], Plaintiff asks that you recognize your duty to preserve any and all potentially relevant information, information that potentially could lead to the discovery of admissible

---

fragments, or any combination thereof including, without limitation, all memoranda, notes, records, letters, envelopes, telegrams, messages, studies, analyses, contracts, agreements, projections, estimates, working papers, accounts, analytical records, reports and/or summaries of investigations, opinions or reports of consultants, opinions or reports of experts, opinions or reports of accountants, other reports, trade letters, press releases, comparisons, books, diaries, articles, magazines, newspapers, booklets, brochures, pamphlets, circulars, bulletins, notices, forecasts, drawings, diagrams, instructions, minutes of meetings or communications of any type, including inter- and intra-office communications, questionnaires, surveys, charts, graphs, photographs, films, tapes, discs, data cells, drums, printouts, all other compiled data which can be obtained (translated, if necessary, through intermediary or other devices into usable forms), documents maintained on, stored in or generated on any electronic transfer or storage system, any primary versions, drafts or revisions of any of the foregoing, and other writings or documents of whatever description or kind, whether produced or authorized by or on behalf of you or anyone else, and shall include all non-identical copies and drafts of any of the foregoing now in the possession, custody or control of you, or the former or present directors, officers, counsel, agents, employees, partners, consultants, principals, and/or persons acting on your behalf.

[3]  For the purposes of this letter, "communication" and/or "correspondence" means any oral, written or electronic transmission of information, including, without limitation, meetings, discussions, conversations, telephone calls, memoranda, letters, emails, text messages, conferences, presentations, seminars or any other exchange of information.

[4]  For the purposes of this letter, "electronic data" or "data" means the original (native format), and any non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations, or highlighting of any kind) of writings of every kind and description whether inscribed by mechanical, facsimile, electronic, magnetic, digital, or other means.  Electronic data includes, by way of example only, computer programs (whether private, commercial, or work-in-progress), programming notes or instructions, activity listings of electronic mail receipts and/or transmittals, output resulting from the use of any software program, including word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail, operating systems, source code of all types, peripheral drivers, PIF files, batch files, ASCII files, and any and all miscellaneous files and/or file fragments, regardless of the media on which they reside and regardless of whether said electronic data consists in an active file, deleted file or file fragment.  Electronic data includes any and all items stored on computer memories, hard disks, CD or DVD disks, removable media such as thumb drives, external hard drives, Zip disks, Jaz cartridges, Bernoulli Boxes and their equivalent, magnetic tapes of all types, microfiche, punched cards, punched tape, computer chips, including, but not limited to EPROM, PROM, RAM and ROM, on or in any other vehicle for digital data storage and/or transmittal.  The term electronic data also includes all information conveyed in the metadata of any electronic files, including information concerning the file, folder, links, network locations, or other organizational descriptions associated therewith.  It includes any bank-up or redundant physical storage devices associated therewith.  It shall also mean and refer to any and all other magnetic, electronic or other storage media, cloud programs, network locations or devices used to store, collect or record electronic data.

[5]  For the purposes of this letter, "possession, custody or control" shall mean and refer to any documents directly or indirectly in Defendant's possession, custody or control.  A document is deemed to be in Defendant's "possession, custody or control" if is in Defendant's physical custody, or if it is in the physical custody of another person or entity and Defendant: (a) owns such document in whole or in part; (b) has a right by contract, statute or otherwise to use, inspect, examine or copy such document on any terms; (c) has an understanding, express or implied, that you may use, inspect, examine or copy such document on any terms; or (d) has, as a practical matter, been able to use, inspect, examine or copy such document when you have sought to do so.  Such documents shall include, without limitation, documents that are in the custody of Defendant's attorney(s), employees, staff, representatives and agents.

*Grant Avise v. Equifax, Inc.*
EVIDENCE PRESERVATION DEMAND
January 16, 2018
Page 3

evidence, and information reasonably likely to be requested in discovery. This includes, but is not limited to, all of the following:

1. Any and all documents related to the data breach first announced by Equifax on September 7, 2017, and further expanded upon on September 13, 2017, and October 2, 2017, in which Equifax acknowledged personal information, credit information and "dispute documents" were "accessed"[6]; (hereinafter, "the Data Breach");

2. Any and all communications, whether internal or external, between Equifax employees and other employees, independent contractors, or other third parties (including but not limited to the U.S. Department of Homeland Security and other government agencies) related to the Data Breach; to the Apache Struts product; the usage of Apache Struts software at Equifax before, during and after the Data Breach; potential vulnerabilities associated with "Apache", "Struts" or specifically the software known as "Apache Struts CVE-2017-5638";[7] and potential vulnerabilities with Equifax's consumer dispute web portal;

3. Any and all documents and communications, whether internal or external, related to the infrastructure, procedures, programs, intrusion detection devices, and policies Equifax used prior to, during and after the Data Breach to secure information, conduct security or vulnerability scans, to ensure installation of security patches, to detect missing patches or other vulnerability repairs, to detect exfiltration of information by unauthorized parties, or to detect "suspicious network traffic" as described by Equifax statements after the Data Breach;[8]

4. The custodial and personnel files (including the files of both domestic and foreign employees) of all current or former employee or independent contractor with any duties or responsibilities related in any way to the Data Breach; the events, protocols, procedures, decisions, tools, programs, patches and vulnerabilities that led to the Data Breach or to Equifax's failure to timely detect, evaluate, remedy, or disclose the Data Breach; the infrastructure, procedures, and policies Equifax used before, during and after the Data Breach to secure information;

---

[6] http://docs.house.gov/meetings/IF/IF17/20171003/106455/HHRG-115-IF17-Wstate-SmithR-20171003.pdf at pg. 2-3.
[7] https://blogs.apache.org/foundation/entry/media-alert-the-apache-software; https://cwiki.apache.org/confluence/display/WW/S2-045
[8] https://www.equifaxsecurity2017.com/2017/09/15/equifax-releases-details-cybersecurity-incident-announces-personnel-changes/; https://www.equifaxsecurity2017.com/frequently-asked-questions/#tab-2; http://docs.house.gov/meetings/IF/IF17/20171003/106455/HHRG-115-IF17-Wstate-SmithR-20171003.pdf at pg. 3.

*Grant Avise v. Equifax, Inc.*
EVIDENCE PRESERVATION DEMAND
January 16, 2018
Page 4

5. Any and all documents and communications, whether internal or otherwise, related to Equifax's actions upon discovering information related to the Data Breach, including, but not limited to, any and all internal communications, communications between Equifax and third parties or independent contractors, documents evidencing or related to sales of stock by current and former employees and independent contractors of Equifax,[9] and the retention and role of Mandiant and any other third parties, including, but not limited to, their identification of data breach victims and determination unauthorized parties had in fact accessed consumer data;[10]

6. Any and all documents and communications related to the data breach, including, but not limited to, Equifax's statements that:

   a. "The information accessed primarily includes names, Social Security numbers, birth dates, addresses and, in some instances, driver's license numbers. In addition, credit card numbers for approximately 209,000 U.S. consumers, and certain dispute documents with personal identifying information for approximately 182,000 U.S. consumers, were accessed";[11]

   b. Equifax first "learned of the incident on July 29, 2017, and acted immediately to stop the intrusion and conduct a forensic review," that there is "no evidence of unauthorized activity on Equifax's core consumer or commercial credit reporting databases," "this issue has been contained," [t]he vulnerability was Apache Struts CVE-2017-5638", the information of "a total of 145.5 million" U.S. consumers were "potentially impacted", that a "new credit lock and monitoring free service that Equifax will begin offering by January 31, 2018 . . . will empower consumers to control access to their Equifax credit file directly," and other statements made by Equifax at https://www.equifaxsecurity2017.com;

   c. Customers could access information about the Data Breach and Equifax at "securityequifax2017.com" instead of the actual site, www.equifaxsecurity2017.com[12];

---

[9] http://money.cnn.com/2017/09/08/investing/equifax-stock-insider-sales-hack-data-breach/;
http://nypost.com/2017/09/18/doj-launches-criminal-probe-of-equifax-executives/.
[10] http://docs.house.gov/meetings/IF/IF17/20171003/106455/HHRG-115-IF17-Wstate-SmithR-20171003.pdf at pg. 4.
[11] https://www.equifaxsecurity2017.com/2017/09/07/equifax-announces-cybersecurity-incident-involving-consumer-information/.
[12] http://www.slate.com/blogs/future_tense/2017/09/20/equifax_tweeted_the_
wrong_url_for_its_data_breach_website.html.

*Grant Avise v. Equifax, Inc.*
EVIDENCE PRESERVATION DEMAND
January 16, 2018
Page 5

      d.  "The human error involved the failure to apply a software patch to our dispute portal in March of 2017", an "individual did not ensure communication got to the right person to manually patch the [Apache Struts] application," and the human error was "subsequently followed by a technological error where a piece of equipment we use which scans the environment looking for that [Apache Struts] vulnerability did not find it," "it was this unpatched vulnerability that allowed hackers to access personal identifying information," and that consumers are at a heightened risk of fraud due to the data breach;[13] and

The Equifax employee responsible for the patching error is no longer employed, Equifax will likely profit from the Data Breach when the one-year free credit monitoring expires and consumers elect to pay for continued monitoring, and the purchase of LifeLock credit monitoring products benefits Equifax.[14]

7.    The custodial and personnel files (including current and former employees, independent contractors and domestic and foreign employees) of all persons with any information or knowledge potentially relevant to the allegations asserted in this action, including but not limited to actions alleging financial accounts opened in Plaintiffs' names,[15] actions alleging credit card accounts opened in Plaintiffs' names,[16] actions alleging loans attempted to be opened in Plaintiff's name,[17] actions alleging tax return fraud,[18] allegations of bank account fraud,[19] actions alleging credit card fraud,[20] and actions alleging consumer information being available for sale on the Dark Web.[21]

---

[13] http://docs.house.gov/meetings/IF/IF17/20171003/106455/HHRG-115-IF17-Transcript-20171003.pdf at 20:5-9, 84:13-18; http://docs.house.gov/meetings/IF/IF17/20171003/106455/HHRG-115-IF17-Wstate-SmithR-20171003.pdf at pg. 3; https://www.banking.senate.gov/public/index.cfm/hearings?ID=B61BB78D-CF34-4D54-B7F2-F7F982D77D6F at 72 min.

[14] https://financialservices.house.gov/calendar/eventsingle.aspx?EventID=402360 at 270 min; https://www.banking.senate.gov/public/index.cfm/hearings?ID=B61BB78D-CF34-4D54-B7F2-F7F982D77D6F at 73 min.

[15] *Boundy, et al. v. Equifax*, No. 17-cv-03480 (N.D. Ga.); *Green, et al. v. Equifax*, No. 17-cv-03487 (N.D. Ga.); *Lynch, et al. v. Equifax*, No. 17-cv-00640 (E.D. Tex.); *McGonnigal, et al. v. Equifax*, No. 17-cv-03422 (N.D. Ga.).

[16] *Austin v. Equifax*, No. 17-cv-04045 (E.D. Pa.); *Schifano, et al. v. Equifax*, No. 17-cv-06996 (C.D. Cal.).

[17] *Schifano, et al. v. Equifax*, No. 17-cv-06996 (C.D. Cal.).

[18] *Wittenberg*, et al. v. Equifax, No. 17-cv-02694 (W.D. Tenn.) (two plaintiffs).

[19] *Chenault*, v. Equifax, No. 17-cv-03764 (N.D. Ga.); *Schifano, et al. v. Equifax*, No. 17-cv-06996 (C.D. Cal.); *Bethea, et al. v. Equifax*, No. 17-cv-00648 (E.D. Va.).

[20] *Bradley*, v. Equifax, No. 17-cv-07276 (D.N.J.); *Earl v. Equifax*, No. 17-cv-00513 (D.N.H.); *Rust, et al. v. Equifax*, No. 17-cv-03471 (N.D. Ga.).

[21] [19]*Smith, et al. v. Equifax*, No. 17-cv-02183 (N.D. Ohio); *Larson, et al. v. Equifax*, No. 17-cv-03905 (N.D. Ga.) (credit card info.).

*Grant Avise v. Equifax, Inc.*
EVIDENCE PRESERVATION DEMAND
January 16, 2018
Page 6

To the extent Defendant believes that the requests described herein exceed the requirements of federal law, promptly inform us so the parties may meet and confer on such issues.  If Plaintiff's requests appear less extensive than those required by federal law, Defendant has a duty to preserve all documents required by applicable law.

Furthermore, we ask that you confirm that you have informed Defendant and its executives, officers, employees, agents, and other key persons of their duty to preserve documents.  We assume you or other internal counsel has issued a litigation hold letter or other document retention notice (both hereinafter generically referred to as a "DRN").  As you are aware, issuing a DRN is simply the first step in complying with preservation obligations.  It is a litigant's counsel's continuing duty to:

> Oversee compliance with the litigation hold, monitoring the party's efforts to retain and produce the relevant documents. Proper communication between a party and her lawyer will ensure (1) that all relevant information (or at least all sources of relevant information) is discovered, (2) that relevant information is retained on a continuing basis, and (3) that relevant non-privileged material is produced to the opposing party.

*Zubulake* v. *UBS Warburg, LLC,* 229 F.R.D. 422, 432 (S.D.N.Y. 2004); s*ee also Telecom Intern, America, Ltd* v. *AT&T Corp.,* 189 F.R.D. 76, 81 (S.D.N.Y. 1999). "[I]t is *not* sufficient" for counsel "to notify all [Defendant] employees of a litigation hold and expect that the party will then retain and produce all relevant information. Counsel must take affirmative steps to monitor compliance so that all sources of discoverable information are identified and searched." *See Zubulake,* 229 F.R.D. at 432.

Further, the parties must meet and confer regarding the kinds of categories of documents and Electronically Stored Information ("ESI") that counsel has instructed Defendant to preserve and collect, which employees and representative were provided with DRNs, and what specific actions were undertaken by these individuals to prevent the spoliation of potentially relevant evidence and ESI in response to the DRNs.  The parties' discussions should be incorporated into a comprehensive preservation order.

At the appropriate time, Plaintiff may depose key persons on whether or not they received a DRN, when they received it, and whether or not they complied with their duty to preserve evidence and ESI.  Plaintiff will not agree to any artificial or arbitrary narrowing of the scope of preservation based on predictions of collection scope, such as key word or phrase searches.  Plaintiff demands preservation of all data in your possession, custody or control, whether the information is stored on dynamic, active, portable, off-line, archived, legacy or other systems.

Further, Defendant has a duty to preserve evidence and ESI from sources other than "active information systems."  While it is not our intent to disturb routine operations critical to Defendant's business operations, Plaintiff demands preservation of ESI on all media described herein.

*Grant Avise v. Equifax, Inc.*
EVIDENCE PRESERVATION DEMAND
January 16, 2018
Page 7

Specifically, Plaintiff demands that Defendant and its predecessors not modify, delete or otherwise alter (i.e., by data compression, disk de-fragmentation, periodic or manual purging of files or other optimization routines) any electronic data unless a computer forensic expert makes a mirror image of the electronic files and all metadata, follows proper preservation protocols for assuring the accuracy of the file (i.e., chain of custody), and makes the files available for litigation. The expert must make a mirror image of active files, restored versions of deleted files, and restored versions of deleted file fragments, hidden files, and directory listings. This includes, but is not limited to, preserving electronic data (stored in online or offline storage devices) that came from the following hardware systems, network locations or software applications:

1. *Data Systems*
   a. Database systems including, but not limited to, active, legacy, and archived databases.
   b. Special care should be taken to ensure that discoverable databases are not modified, altered or destroyed.
   c. Relevant table structures, relationships, and modification logs should be preserved from spoliation by inadvertent manipulation during the ordinary course of business and maintenance.
   d. Forensic, bit-by-bit copies of all spindle hard drives and solid-state drives, whether internal or external, should be made in order to preserve discoverable metadata, hidden, and deleted files which are likely to be overridden in the ordinary course of business.
   e. Database systems, including hardware and software, that are scheduled to be replaced or have been replaced should be preserved without recycling, refreshing, or re-zeroing drives in a manner that would destroy discoverable ESI or render the ESI unrecoverable unless a computer forensic expert first makes a bit-by-bit image of the electronic file, follows proper preservation protocols for assuring the accuracy of the file (i.e., chain of custody), and makes the files available for litigation along with the software to translate the data into useable information.
   f. We request that Defendant preserve copies of all applications and utilities that may be used to process electronic data discussed in this letter.
   g. We request that Defendant maintain an activity log of document modifications made to any electronic data processing system that may affect any system's capability to process any electronic data relating to the subject matter of the litigation.

2. *Email and Messaging Systems*
   a. Email and messaging systems include, but are not limited to, active, legacy, and archived email and messaging systems used by key persons to this litigation.
   b. Defendant and its predecessors have an obligation to preserve all potentially relevant internal and external emails and messages that were

*Grant Avise v. Equifax, Inc.*
EVIDENCE PRESERVATION DEMAND
January 16, 2018
Page 8

        sent or received including any attachments thereto in a manner that preserves all existing metadata and the parent / child relationship of all documents or attachments.

c.      Emails and messages must be preserved in electronic format, regardless of whether hard copies of the information contained therein exists.

d.      Special care should be taken to ensure that emails and messages are not modified, altered or destroyed in any way, shape or form.

e.      Emails and messages should also be preserved from spoliation in the format in which they are stored on computers[22] and separately for each custodian (i.e., agent, employee, representative, etc.). Mailboxes and message repositories on the central email and/or messaging system(s) should also be preserved from spoliation and protected against alteration by email and other users and automated retention policies undertaken in the ordinary course of business.

f.      Forensic, bit-by-bit copies of all spindle hard drives, solid state drives, external and internal drives, and all other drives should be made in order to preserve discoverable metadata, hidden files, and deleted files which are likely to be overridden in the ordinary course of business on the email and/or messaging system(s).

g.      Email and messaging systems, including hardware and software, that are scheduled to be replaced or have been replaced should be preserved without recycling, refreshing, or re-zeroing drives in a manner that would destroy discoverable ESI or render the ESI unrecoverable unless a computer forensic expert first makes a bit-by-bit image of the electronic file (*i.e.*, chain of custody), and makes the file available for litigation along with the software to translate the date into useable information.

3.     *Other Application Server Systems*

a.      Plaintiff understands Defendant may use proprietary and/or off the-shelf applications to facilitate the control of internal projects, product lifecycle management, personnel, organization, client management, regulatory compliance and other areas. Often applications have been updated from the mainframe/terminal system to a client/server system and the data created by these machines and software become unreadable or inaccessible. Therefore, it is important that application server systems, including hardware and software, that are scheduled to be replaced or have been replaced should be preserved without recycling, refreshing, or re-zeroing drives in a manner that would destroy discoverable ESI or render the ESI unrecoverable unless a computer forensic expert first makes a bit-by-bit image of the electronic files, follows proper preservation protocols

---

[22] For the purposes of this letter, "computer" shall mean and refer to all devices utilizing microchips to facilitate processing, analysis, or storage of data, including microcomputers (also known as personal computers), laptop computers, portable computers, notebook computers, tablets, handheld phones and communication devices, onboard vehicle "black boxes", minicomputers, network servers, and mainframe computers.

*Grant Avise v. Equifax, Inc.*
EVIDENCE PRESERVATION DEMAND
January 16, 2018
Page 9

for assuring the accuracy of the files (*i.e.*, chain of custody), and makes the files available for litigation along with the software to translate the date into useable information.

4. *Files Server Systems*

   a. File servers, including but not limited to, network[23] storage of shared, and personal folders and files for key personnel should be backed up on media marked specifically for litigation use.

   b. If Defendant uses file servers for online storage and/or other direct access storage devices, they must immediately cease modifying or deleting any electronic data unless forensically sound, bit-by-bit copies of all spindle hard drives and solid-state drives, whether internal or external, are first made in order to preserve discoverable metadata, hidden and deleted files which are likely to be overridden in the ordinary course of business.

   c. File servers systems, including hardware and software, that are scheduled to be replaced or have been replaced should be preserved without recycling, refreshing, or re-zeroing drives in a manner that would destroy discoverable ESI or render the ESI unrecoverable unless a computer forensic expert first makes a bit-by bit image of the electronic file, follows proper preservation protocols for assuring the accuracy of the file (*i.e.*, chain of custody), and makes the file available for litigation along with the software to translate the data into useable information.

5. *Portable Devices*

   a. Portable devices include, but are not limited to, laptops, tablet PC's, smart phones, tablets, and digital cameras.

   b. Forensic, bit-by-bit copies of all spindle hard drives and solid-state drives, whether internal or external, should be made in order to preserve discoverable metadata, hidden, and deleted files which are likely to be overridden in the ordinary course of business.

   c. Portable devises used by key persons that are scheduled to be replaced or have been replaced should be preserved without recycling, refreshing, or re-zeroing drives in a manner that would destroy discoverable ESI unless a computer forensic expert makes a bit-by-bit image of the electronic file, follows proper preservation protocols for assuring the accuracy of the file (*i.e.*, chain of custody), and makes the file available for litigation.

---

[23] "Network" means and includes any hardware or software combination that connects two or more computers together and which allows the computers to share or transfer data between them. For the purposes of this definition, the connection between or among the computers need not be either physical or direct, i.e., wireless networks, and sharing and/or transferring data via indirect routes utilizing modems and phone company facilities. In addition, there need not be a central file or data server nor a central network operating system in place, *i.e.*, peer-to-peer networks and networks utilizing a mainframe host to facilitate data transfer.

*Grant Avise v. Equifax, Inc.*
EVIDENCE PRESERVATION DEMAND
January 16, 2018
Page 10

6. *Personal Computers*

    a.    Personal computers include, but are not limited to, desktop computers of key persons, desktop computers of personal assistants to key persons, and terminals used by transient, terminated, or other personnel which may reasonably contain discoverable ESI.

    b.    Forensic, bit-by-bit copies of all spindle hard drives and solid-state drives, whether internal or external, should be made in order to preserve discoverable metadata, hidden, and deleted files which are likely to be overridden in the ordinary course of business.

    c.    Personal computers used by key persons that are scheduled to be replaced or have been replaced should be preserved without recycling, refreshing, or re-zeroing drives in a manner that would destroy discoverable ESI unless a computer forensic expert first makes a bit-by-bit image of the electronic files, follows proper preservation protocols for assuring the accuracy of the file (*i.e.*, chain of custody), and makes the files available for litigation.

    d.    Please immediately take the following steps with regard to all fixed drives attached internally, externally, physically and/or remotely by wired or wireless access to any personal computers used by any custodian under Defendant's control: (1) an exact mirror image must be made of all electronic data relating to the subject matter of the litigation; and (2) full directory listings (including hidden and deleted files) for all directories and subdirectories must be written.

    e.    Please immediately take the following steps with regard to all removable drives attached internally, externally, physically and/or remotely by wired or wireless access to any personal computers used by any custodian under Defendant's control: all removable electronic media, such as disks, magnetic tapes and cartridges, CDs, DVDs, external hard drives, USB devices (*e.g.* "thumb drives") and the like that existed before the delivery of this letter and that contain relevant data should collected, maintained intact and kept available during this litigation.

    f.    Please immediately take the following steps with regard to all other relevant devices used by any custodian under Defendant's control, whether it is internally, externally, physically and/or remotely attached by wired or wireless access to any system used by Defendant: all cellular phones, personal data assistants, text messages, web-based workspaces, network folders, voicemail messages, text messages (SMS or otherwise), instant messages and/or any other device that stores electronic information (*e.g.*, RAM on printing devices or FAX machines) and the like that existed before the delivery of this letter and that contain relevant data should collected, maintained intact and kept available during the pendency of this litigation.

*Grant Avise v. Equifax, Inc.*
EVIDENCE PRESERVATION DEMAND
January 16, 2018
Page 11

7.   *Audio recordings*
  a.   Audio recording include, but are not limited to, audio files from meetings, voicemail systems, telephone conversation recordings devices, and other voice recording systems.
  b.   Defendant and their predecessors should take reasonable steps to promptly make or collect any transcripts or text files of audio recordings containing potentially relevant information.

8.   *Offline Data Storage:*
  a.   Offline data storage includes, but is not limited to, backup and archival media, disks, magnetic, magneto-optical, and/or optical tapes and cartridges, DVDs, CD ROMs, and other removable media.
  b.   Defendant should immediately suspend all activity that might result in destruction or modification of all of the data stored on any offline media. This includes overwriting, recycling, or erasing all or part of the media.

The foregoing is not an exhaustive list of measures Defendant must to take to fulfill its obligation and duty to preserve potentially relevant evidence, information, and ESI.  Please note that any relevant electronic data created after receipt of this letter should also be preserved in a manner consistent with the directions in this letter.  The preservation of evidence and information is a critical component of any litigation, and Defendant's failure to properly do so may result in the imposition of sanctions in addition to other legal and equitable remedies.   To the extent you claim that you do not currently represent third party contractors related to this litigation, we demand that, due to Equifax's relationship with said individuals or entities, you inform all executives, employees, agents and representatives of said individuals and entities of our demand, advise them to adhere to the requests made in this letter, and inform us whether and to what extent any third parties refuse to comply with their obligations to preserve evidence. Finally, we ask that you do not start gathering any relevant documents or custodial files using search terms or other methodology until the parties have agreed upon a mutually acceptable document-collection protocol.

We look forward to meeting and conferring with you and your client on these important issues.

Very truly yours,

Daniel S. Robinson, Esq.