**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| _____ | ) | MDL Docket No. 2800 |
| In re: Equifax, Inc. Customer | ) | Case No.: 1:17-md-2800-TWT |
| Data Security Breach Litigation | ) | |
| | ) | CONSUMER ACTIONS |
| _____ | ) | |

**Appendix to
The Susman Group's
Joint Consumer Track Leadership Application**



FROM LEFT TO RIGHT: PARTNERS GEOFFREY HARRISON, VINEET BHATIA, SHAWN RAYMOND, ERICA HARRIS, NEAL MANNE, LEXIE WHITE AND MAX TRIBBLE.

# DON'T MESS WITH
# TEXAS

## How Susman Godfrey Became America's Leading Trial Firm

By Katrina Dewey

**Judge Lee Rosenthal's Houston court-room was packed earlier this year, largely with troops of drab-suited** bureaucratic lawyers defending Harris County's prac-tice of jailing thousands of low-risk folks arrested for minor charges like unpaid tolls - and then holding them for months by setting bail amounts they could not possibly pay.

Across the aisle, Alexandra "Lexie" White, a Susman Godfrey partner, was one of four pro bono lawyers challenging the constitutionality of this bail system. Representing those who had been arrested, she showed a video of a probable-cause hearing at which a

homeless man charged with sleeping under a bridge had his bail set at $5,000.

She quietly rose to examine the county's expert witness who supported the practice.

So, sir, she asked, is it true that you see the cash bail system as a "budgeting tool for the poor," helping a person by keeping her cash resources out of reach?

This was not White's first rodeo.

White grew up in courtrooms in Baton Rouge. She remembers sitting in front of counsel table, in a chair to the side, watching her father preside over a civil court dispute in which a lady was suing her landlord for emotional distress because a cleaning crew had forgotten a boa constrictor in her apartment while she was away.

PHOTO BY: FELIX SANCHEZ

App. 1



Though White's family has roots in the law, her upbringing was "a lot of love" but not a lot of money. She used her talent as a competitive swimmer to win a scholarship to college and then returned to Baton Rouge where she set new marks in almost every class she took at Louisiana State University Law School. She graduated first in her 2004 class, clerked for the 9th Circuit, and then joined Susman Godfrey.

Within months of joining, she went to trial – her second – with the one and only Steve Susman, with whom she collaborated to prepare every witness and craft every argument. When the judge asked Susman on the first day of trial if he was ready to give the opening statement, Susman rose, smiled, and drawled, "Your Honor, Ms. White will be delivering the opening." After taking a deep breath, she did.

"We like to take risks," says Neal Manne, Susman Godfrey's Houston-based managing partner.

That attitude has made Susman Godfrey the nation's most elite litigation firm. Pick your metric – money, U.S. Supreme Court clerks, bet-the-company cases, percentage of partners in trial annually – the firm runs circles around everyone else. In fact, with 93 percent of its attorneys having held federal clerkships (that's 96 of 103 lawyers and all of its partner-track associates) it beats by a handy margin even the justices of the U.S. Supreme Court's own mark of 66 percent.

In 2016 alone, Susman Godfrey won more than $1 billion in verdicts and settlements for its clients. And it posted a remarkable "in-trial" rate of 44 percent, meaning a staggering 44 percent of its partners and associates were in trial in 2016. Compare that with your average litigation firm.

To explain Susman Godfrey to Big Law is a little bit like trying to explain Lyle Lovett to fans of the Beastie Boys. You have to be able to hear what you're listening to and understand where it comes from in order to understand why Susman Godfrey is unique, special and without peer as an American law firm that excels in courtroom battle.

You also have to know about a little boy named Louis, and why partners wander over to baseball fields for no particular reason. You need to understand a brotherhood that includes sisters and how loyalty and fun can create more profitability than any fancy-ass, hourly-billing law firm consultant could ever conjure. Read on and you will.

The firm plays off the board, as it has since maverick Steve Susman opened his doors in 1980.

Watching Steve Susman in trial – such as when he represented Frank McCourt in his divorce - you know you are in the presence of greatness. He is of an era that produced two or three enduring legends, among the best ever at their craft. That's indisputable. Where Susman

stands alone is in founding a firm that has become much better than its original footprint.

He started out clerking for U.S. Supreme Court Justice Hugo Black and teaching at University of Texas Law School before helming an antitrust case for purchasers of corrugated boxes. He won $550 million and understood that his success should come from his results rather than his effort. There's a sturdy Chevy truck in that recipe: federal clerkship, Texas and bet on yourself, even if there are today Rauschenbergs hanging on the wall.

Others quickly signed on. Rather than joining the big Texas firms, Lee Godfrey, Parker Folse, Mark Wawro, and a rustle of other smart graduates of, primarily, the University of Texas School of Law, bought into the Susman vision in the early days. It was big and bold, like Susman, and leavened by the elegant Godfrey. The contingent fee work had swagger, but necessitated the firm taking some small, not necessarily good cases to keep the lights on and everyone occupied. The vision was awesome, but the business model was a work in progress.

Enter Neal Manne. From the year the firm opened, Susman had his eye on the fellow Texan. Typical Susman, he would not let go. Manne had grown up in blue-collar Baytown and set things on fire in Austin during law school. Manne was graduating in 1980, and Susman called and asked him to come interview. Manne was flattered but told Susman no. "I'm not going to practice in Houston. You're busy and I'm busy. I don't want to waste your time or mine." Not even remotely deterred, Susman responded, "Fine. But at a certain point you'll change your mind, and call me, and we'll talk about it."

Manne clerked for 9th Circuit Judge William Norris, then moved to D.C. where he worked at a Big Law firm before eventually becoming Chief Counsel to the U.S. Senate Judiciary Subcommittees on Juvenile Justice and on Constitutional Law. He then became Chief of Staff to Senator Arlen Specter. "During my six years in D.C.," Manne recalls, "I would periodically get a random phone call from Steve Susman, who I still had never laid eyes on, and he would bark into the phone, 'Manne, are you ready to get a real fucking job yet?'"

In 1988, Manne said yes, joining Folse, his best friend from law school, in Houston. Manne brought not only political dexterity but a polish and sophistication that would amplify the firm's corporate base, creating tremendous ballast for its expanding caseload of contingency work. He has an extraordinarily broad litigation portfolio, including Chevron, for whom he is helping lead the defense in the climate change litigation. For more than a decade he has been one of Wal-Mart's go-to litigators, having tried major cases for it across the country and in Puerto Rico. His partners elected him a managing partner in 2011 and have re-elected him ever since.

App. 2



**Susman Godfrey has exported its trial expertise from deep in the heart of Texas to offices in California, Washington and New York.**

Somehow, the added responsibilities of managing the firm have not cut into his career-long devotion to pro bono and public interest cases. In the last three years alone, Manne has defeated an effort by the State of Texas to block Syrian refugees from resettling in the state, successfully represented an exonerated Death Row inmate in having his prosecutor disbarred for life, and led the bail reform case against Harris County – resulting in the release of thousands of low-risk defendants and the overturning of the unconstitutional system.

Max Tribble, another young lawyer, also joined Susman in 1988 after graduating from Harvard Law School. The die was cast for the next era of winning at the firm, pairing Susman's own penchant for swinging for the fences with a turbo-charged group of risk takers who loved calculated risk and brought a set of skills and swagger that are unsurpassed.

Tribble, Geoffrey Harrison, and Vineet Bhatia are the dream team for whom any major firm would trade its current 50-year-old partner ranks. And with good reason; they are the bank. Over two decades of practicing together, they have formed an enduring friendship. Their families all have second homes in Telluride because they like to hang out together. They are unique as individuals and a powder keg as trial lawyers.

Tribble is the most senior of the three, and combines a technical mind with a special appreciation for risk taking. He grew up on the East Side of Houston, the only child of a couple who ran a chain of bowling alleys. He learned to count cash at the age of four, rolled a million quarters from the pinball machines, and learned to ride a bike in the bowling alley. His interest in business and entrepreneurship came honestly and led him to study business at Harvard and then go to law school. As he was graduating in 1988, he heard about a unique young firm in his hometown that liked to take risks.

"Susman Godfrey was revolutionary," he says, recalling the norm for most serious firms was lockstep compensation for partners. "We've always valued business genera-

tion, performance and results. We structured everything about the firm based on winning for clients."

Tribble has handled hundreds of disputes, many of them involving patents and intellectual property, and is also handling the world's largest trust dispute, representing a grandson of the late J. Howard Marshall.

Among his strokes of genius was the realization, while representing Emerson Electric in the early 1990s, that Susman Godfrey could carve out a huge niche by adding its courtroom panache to the toolkit of patent litigation. "I felt our firm would have a real competitive advantage because, while very smart and knowledgeable about the technology, many patent lawyers at the time did not have our level of experience in front of juries and judges."

That approach has led him to slice a hefty swath through technology-driven litigation, both in joint ventures with patent firms and independently, winning more than $1B in patent litigation. He's taken on Apple, Samsung, American Express, Google and Intel – the latter on behalf of MicroUnity for which he won $300M in licensing fees. He represented Barcelona-based Fractus, S.A. against the entire cell phone industry to enforce Fractus' antenna patents. While the rest of the industry paid to license the patents before trial, defendant Samsung unwisely chose to fight. Tribble won $38M against them. To date, Tribble has recovered over $100 million in settlements and licenses for the company. In the next year, he has trials scheduled for House Canary against Title Source Inc., and the Marshall trust battle.

Geoffrey Harrison, possessed of a "dare me" personality and a business-driven mind, came to Susman Godfrey at the urging of the guy he calls "Big Daddy Susman." After studying business at Penn (where he was a champion debater), he went to University of Chicago Law School, where he was a moot court champion. A professor in the law and economics program and 7th Circuit Judge, Diane Wood, invited her fellow Texas alum Steve Susman to lecture, and he figured he'd seek out the best 1L while he was there. Courtesy of the law review managing editor, Susman reached out to Harrison and asked him to clerk with the firm the following summer.

The two are kindred spirits, and Harrison has reveled in the trials he's handled with Susman, Godfrey, Manne, and others since the day he joined in 1993 following a clerkship for the chief judge of the 11th circuit. He made partner in 1996, early and in record time.

Whereas Steve Susman gave Lexie White little notice that she would be delivering the opening statement, Lee Godfrey gave Harrison an entire lunchtime of notice that he'd be taking the next witness in one of his earliest trials. "Usually, people have plenty of notice. But sometimes opportunities present themselves. The question is: Are you the kind of person who will rise to



the occasion or shrink from it?" says Harrison. "Around here, we rise."

Northeast-born and Texas-raised, Harrison has compiled an astounding track record of wins mixing commercial litigation and public interest cases. He was named Houston's Hero in 2015 for his work upholding Houston's Equal Rights Ordinance in a lawsuit seeking its repeal.

He has won hundreds of millions of dollars in verdicts and settlements, netting $50M for Apache Deepwater in an offshore well-abandonment case in the Gulf in 2015. Harrison and his team of Bill Merrill, Ashley McMillian and Abby Noebels took on Texas legend David Beck in the case. And true to the Susman Godfrey playbook, Harrison carefully cultivated meaningful roles for every member of the team, including its most junior member, Noebels, whose witnesses kept getting cut. The Sunday

of a lawyer when he enrolled at Columbia Law School in 1987. He was one of a couple Indian law students. A skilled debater, he won admiration at Wachtell early on but found himself drawn to the plaintiffs' side of cases. Although he and Wachtell typically represented defendants, he had a rare chance to work as plaintiff's counsel for Philip Morris when it sued ABC for reporting it had spiked its cigarettes with nicotine.

When Bhatia decided to move to Susman in 1995, his work for Philip Morris was an issue. Susman was considering representing the state of Texas as a plaintiff in the Tobacco Wars. Ultimately the firm solved the potential conflict by defending Philip Morris instead, marking one of its first major forays into big defense work – and locking up one of the nation's soon-to-be best trial lawyers. The relationship resulted

> ## " USUALLY, PEOPLE HAVE PLENTY OF notice. But sometimes opportunities present themselves. The question is: Are you the kind of person who will rise to the occasion or shrink from it?

before the last week of trial, Harrison was home when he received a revised witness list that showed Noebels' final witness was gone. He called her immediately.

"She had noticed and she didn't say but you could tell she was disappointed. So she was mighty pleased when I said, 'Why don't you take one of my witnesses?'" recalls Harrison. "That, I think, is a part of Steve Susman's continuing influence on how I, and I believe others, view our roles in the firm: to bring along the generation behind us as stand-up trial lawyers."

Harrison has three jury trials and two arbitrations set for 2018, with hundreds of millions of dollars in dispute. In a comment that would be startling elsewhere but underscores the ties at Susman Godfrey, one partner said of Harrison, "I'd take a bullet for him."

Bhatia is the only lawyer to have lateralled between the nation's two most exclusive law firms – moving from Wachtell to Susman in 1995. Born in Lucknow, India, to a family of doctors, he had no perspective on the job

in Bhatia serving as one of the lead lawyers defending Philip Morris, and also provided Susman Godfrey with its earliest experience using large fixed fees in defense cases rather than hourly billing – a practice that is now a mainstay of the firm.

Bhatia has gone on to play a key role in building up the firm's defense practice for clients including Genworth Financial, Equitas, Lyondell, and Kellogg Brown Root, while winning over $1B in verdicts and settlements for clients including Lyondell and Masimo. He's currently preparing for trial in Northern California in early 2018 on behalf of a hosting provider that claims Machine Zone – maker of Game of War and Mobile Strike – defrauded his client.

"What I would say about our firm is that our work in plaintiff's cases teaches us to be lean and to focus on the issues that really matter. That translates into how successfully we handle defense cases," says Bhatia, who brought experience and Fortune 500 clients from Wachtell.

App. 4



His first big contingency win was for Lyondell, where he won a $22M award at age 37. With a 30 percent contingent fee, for roughly $300,000 in lawyer time he obtained a fee of more than $6M for the firm. Under the firm's compensation system, Bhatia was paid the lion's share of that fee, and he was off and running.

The trio of Tribble, Harrison, and Bhatia, anchored by Manne, catalyzed Susman's risk taking into a durable machine that now has more than 30 partners who generate multimillion-dollar fees year in and year out. As Lee Godfrey retired and Steve Susman reached his mid-70s, Susman Godfrey has transcended the persistent question of firms founded by legendary lawyers: Does anything come next?

For the Susman Godfrey of 2017, the answer is a resounding yes from a firm well stocked with big rainmakers in four nationwide offices who handle a diversified mix of cases for plaintiffs and defendants, most of it on various non-hourly arrangements. Even most of its defense work, for mega-clients like General Electric, Chevron and Wal-Mart, is done on monthly fixed-fee arrangements rather than by the hour. Each partner can determine her or his portfolio of risk, allowing room for partners who are less risk tolerant while letting those who go big put all their chips on the table.

It also built out from its Texas base, spurred in part by the tort reform that swept through Texas in the 1990s. One of its earliest stars, Parker Folse (a clerk to then-U.S. Supreme Court Justice William Rehnquist), moved to Seattle to open the firm's first non-Texas office in 1995. The firm opened in Los Angeles in 1998 under class-action powerhouse Marc Seltzer, and in 2006, the firm opened in New York, where it has flourished under Bill Carmody and collected Supreme Court clerks as if it were a hobby.

The firm has evolved, but what has not changed at all is the raw desire to win. To win to make money. To win to help your client. To win to be the best. To win because it's so fun to celebrate.

To win.

Winning Susman Godfrey style is bigger, badder, and more fun than at any other firm. It's celebrated in grand style in far-flung places by entire trial teams after a trial victory or big settlement. It's celebrated with an annual good-natured, unofficial competition among the Tribble-Harrison-Bhatia-Robert Rivera crew, with Bacchanalias at Carbone and other outrageously amazing restaurants and resorts. It's the lifeblood of the firm. In most cases, the partner who brings in the win gets a huge cut of the payout. And, unlike other major law firms, there are neither 100 partners upstream stepping on the haul nor the sense that such windfalls will never happen again.

There may be no better illustration of the larger-than-life nature of law practice at Susman Godfrey than Bill


**Los Angeles partner Kalpana Srinivasan**

Carmody, whose own story as an audacious outsider rivals that of his firm. The former Tulsa bartender and Merchant Mariner became Susman Godfrey's least likely partner – no clerkship – through big trial wins, risk-taking, and wooing of Steve Susman. After practicing for years in Dallas, including at his own firm, Carmody agreed to move to Susman's fledgling New York office in 2007. What started as a couple cubbyholes somewhere on Park Avenue is today the swankiest office on 6th Avenue, from which Carmody, Jacob Buchdahl, and a host of other stars represent GE, Dan Loeb and, most recently, lead Uber in its battles with Waymo.

"When I got off the plane at LaGuardia, I only had one good friend in New York: Daniel Boulud. Daniel is one of the best chefs in the world, but he wasn't going to give us any legal work. So the truth is, I didn't have many wild dreams at that point," says Carmody. "Susman Godfrey lawyers had handled cases across America – including NYC – but we had no beachhead here. For the first bunch of years, Steve, Jacob Buchdahl, and I were completely occupied with the challenge of the moment, which was getting to the point where we had our legs underneath us – the challenge of letting the best legal market in the country know that the best trial firm was in town and open for business."

Since then, owing to its people, the New York office has found nothing but success, says Carmody. Of the 24 lawyers in the New York office, six have clerked for the Supreme Court, and a seventh is on his way to clerk for Justice Elena Kagan.

"All of our New York lawyers are of the highest caliber, and are all incredible people too. And their efforts on behalf of our clients are unsurpassed. When the pressure is on, it's 24/7, where all of us are making personal sacrifices for the good of our clients. When you add the





**Seattle partner Parker Folse**

fact that we genuinely like and respect each other, too, you couldn't ask for more," says Carmody. And, to bring things full circle, the firm's epic holiday party for the legal community each December is catered by Carmody's old pal, chef Daniel Boulud.

The gatekeeper for entry into the nation's most elite lawyer club is Erica Harris, a longtime Houston partner. She only interviewed with Susman Godfrey at the urging of her UT classmate, Steve Susman's son Harry, and she has watched as the firm has become a ridiculously impossible place to get a job.

"Harry came up to me one day when I was in my suit and said, 'My dad's got this firm and they don't have enough women signed up to interview. Would you do me a favor and just take a half an hour? You could fit it in here.'"

From the start, in a sea of firms that all seemed alike, Susman Godfrey struck her as different. She flew to Houston and had dinner with Neal and Nancy Manne. Neal is a fairly persuasive lawyer, of course, but absolutely no one can resist Nancy. Because she liked the couple and wanted to build a friendship, Erica decided to accept a summer job. After graduating second in her class from Texas in 1996, she clerked for Judge Rosenthal and then completed a fellowship at University of Virginia Law School, thinking it would bolster what she thought would become a career in legal academia. Instead, she was drawn back to law practice, and in 1998 joined Susman Godfrey.

Joining Susman Godfrey meant she was making $10,000 less than her other options. "That was a big deal to my household, which was a 'what do we have in the refrigerator' home. My parents didn't understand," she says. Her first week, she got on two trial teams and argued a motion with Rivera. And she never looked back. She's invalidated trademarks, won hundreds of millions

for clients, and has been called "the best damn lawyer in Houston." She epitomizes the firm's philosophy of allowing each lawyer to calibrate her own risk as a trial lawyer, while at the same time overseeing recruiting, including the 13 lucky lawyers who joined this year. While they are all standouts (and federal clerks), she noted one lawyer's answer when she asked: Why him?

"I have grit," he said. He liked sitting down and staying with a problem until it was figured out. That was the right answer.

If you want to talk grit, you need look no further than Los Angeles standout Kalpana Srinivasan, a 2004 Stanford Law School graduate who started her professional life as a policy reporter with the AP in Washington, D.C. She clerked for 9th Circuit Judge Raymond Fisher, then chose Susman Godfrey because she wanted a firm where she could have more impact early on. Her fellow clerks went to big firms and dug into discovery; Srinivasan flew to Minnesota.

As she tells it, Manne called her shortly after she joined the firm, looking for help in a statewide class action he was defending for Wal-Mart. His strategy involved finding some good store-level witnesses from Northern Minnesota.

Says Srinivasan, "I was sort of stunned that, sight unseen, the managing partner of the firm was like, 'Go find and pick out the trial witnesses for my case.' I said, 'Okay, here I go.'"

In her large, rented SUV, she spent weeks traversing the frozen tundra from Shakopee to White Bear Lake to Owatonna, eating pie late at night with Wal-Mart employees. But here's what sets Susman Godfrey apart: when the case was tried the next year, Srinivasan presented the witnesses at trial.

That latitude, as well as the people, was what attracted her to Susman Godfrey. Before she joined, she flew to Houston to meet the partners and was struck by their caliber as lawyers and more. "They excel in so many different things. They're incredible lawyers. They're also great skiers. Some of them are first-class runners. And I realized this group just has a passion for so many things," she says.

Law, of course, among them. To keep such a talented and driven group of people focused and incentivized, money matters. The firm pays top dollar of $300,000 or more for Supreme Court clerks. Under the firm's system, partner compensation has nothing to do with seniority; there are no points or shares. On January 1 of each year, every partner starts out even, and compensation for that year depends solely on the partner's performance - and results - for the year. No one keeps track of vacation time, and each partner decides for herself how much to work and on which cases. Part-

PHOTO BY: JEFFREY LUKE



ners can earn seven figures without bringing in any business at all but, since the firm has few long-term clients, there is a very strong incentive for rainmaking. In this meritocracy, where each year stands alone, it's not uncommon for a very young partner to be among the most highly paid. And that says a lot at a firm where, because of its extraordinary business model, there have been many years where a partner made $5 million, $10 million, or even substantially more.

The firm's monetary engine – and its democracy – is on full display every Wednesday at noon, Houston time. That's when all lawyers have a phone call about potential matters and decide which cases to accept. The bar is incredibly high, since the firm is deciding whether to invest its contingent time, and often its out-of-pocket cash. Despite the high stakes, the decisions are one person one vote; an associate who has been at the firm two weeks gets the same vote on these decisions as Susman or Manne – and is expected to take the responsibility seriously. Manne calls it "one of the ways we try to make our lawyers feel personally invested in the success of the firm, right from the start."

While he was elected to lead a firm that was already abundantly successful, the understated Manne never viewed staying the course as the goal. "Businesses are organic. Law firms have to grow or you can't keep attracting the very best people – who are the only people we want," he says. His two primary goals when he became a managing partner were to re-calibrate the already entrepreneurial compensation system to make it more transparent and objective, and to "make the firm look different" in terms of gender and ethnic diversity. The first was achieved quickly, and there has been steady progress toward the second.

The firm's mix of fee arrangements has moved steadily away from hourly work. More than 80 percent of the firm's revenues now derive from contingent, monthly-fixed or hybrid fees, with less than 20 percent coming from traditional hourly fees.

And then there's the personal. Manne and his wife Nancy are an emotional core of the firm, where family is a center rather than a burden. At Susman, family provides real values you go home to at night, values that resonate in who you are, as a person and a law firm partner.

Which brings us to King Louis. King Louis is not Steve Susman's password. He is, instead, a very real little boy who had a very, very rough first 82 days of life. He's three now and really likes when Dad reads him Goodnight Moon. He especially likes negotiating with Dad on an extension to each day's statute of limitations.

Dad is partner Shawn Raymond, who learned first-hand what the legal system looked like growing up. His dad was an algae specialist in Hawaii. He moved the family to Colorado, where he tried to build an oyster farm. Huh? For Raymond, this meant that the first appellate decision he read was one deciding whether it was OK that the bank took away his family's livelihood and his Dad's dream. Raymond joined Teach for America for two years and lived in a rural town in the Mississippi Delta called Sunflower, where he was later inspired to create the Sunflower County Freedom Project to help kids who truly have nothing.

After winning moot court championships in his first two years at UT Law School, Raymond won a fellowship that allowed him to advocate for children in Mississippi. In 2000, Manne persuaded Raymond to join the firm. But first, Manne gave him a little negotiating tip: Raymond needed to ask Susman Godfrey to help Raymond buy a plot of land in Sunflower, Mississippi, so that his Sunflower County Freedom Project could take root and flourish. Like a signing bonus from the heart.

Raymond has grown into one of the firm's up and coming leaders. He's won big trial verdicts and won acclaim for his community service. And he and his wife Alicia have four sons. Some afternoons Bhatia will just stroll over to the baseball field to see how the Raymond boys are swinging that day.

That's how the Susman crew rolls. And it shows in every line of the words Raymond wrote to the firm as he visited the critically ill Louis over his first 82 days of life. Louis suffered an array of life-threatening illnesses, most pointedly a chronic inability to breathe on his own. Over the ensuing weeks, four people were allowed to be designated permanent visitors and, not surprisingly, Susman Godfrey was well represented. The visitors included Neal and Nancy Manne (limited to four permanent visitors, Raymond persuaded the hospital that Neal and Nancy were only one person, a tribute to his skills as an advocate but also an apt metaphor for the Mannes). The firm's attorneys would come by at all hours as Raymond spent his evenings with Louis, writing a string of email updates to the firm during his endless hours at the hospital.

On May 8, 2014, Raymond gave the toughest closing argument of his life. Drawing inspiration from John Belushi's "Nothing Is Over Until We Decide It Is" classic in Animal House, Raymond told Louis he had a tough day ahead. His 83rd on this planet, for those keeping score. "If you can't start breathing on your own tonight, these kind folks are going to perform a tracheotomy tomorrow morning."

That night, King Louis took over his own breathing. And the Susman Godfrey team cheered like it had won another billion dollars.



**Portfolio Media. Inc. | 111 West 19th Street, 5th Floor | New York, NY 10011 | www.law360.com**
**Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com**

## Class Action Group Of The Year: Susman Godfrey

By **Michael Macagnone**

*Law360, Washington (January 16, 2018, 3:50 PM EST)* -- Susman Godfrey LLP continued to push for victories in class actions varying from auto parts purchasers to film animators in the past year, proving the firm's role as a litigation powerhouse and landing it among Law360's Class Action Practice Groups of the Year.

The firm has racked up a number of victories in the past year — from helming broad multidistrict litigation in In Re: Automotive Parts Antitrust Litigation to copyright claims against companies like Spotify and Sirius XM — without a dedicated class action group. Marc Seltzer, a partner at Susman Godfrey's Los Angeles office, said the firm's focus on litigation of all kinds has carried through to class actions, including work that put him on Law360's 2017 Competition MVPs.



"We pride ourselves on being trial lawyers who can take on any kind of case," Seltzer said. "Our attorneys work on a wide variety of cases, not just class actions, representing both plaintiffs and defendants."

Seltzer serves as co-lead counsel in In Re: Automotive Parts Antitrust Litigation, in which he represents end-payor plaintiffs who allege a global cartel of auto parts makers conspired to fix prices on various components. Seltzer spotlighted the auto parts litigation as "one of the most complex set of class actions ever litigated," with 41 separate class actions across 75 different defendant groups. As part of the sprawling ongoing litigation, payors have secured more than $900 million in settlements.

He was also appointed co-lead counsel for a class of approximately 10,000 animation employees alleging that companies such as Disney, Pixar, DreamWorks, Lucas Films and Sony agreed to not hire employees from the other firms.

The animators accused multiple entertainment companies — including Dreamworks Animation SKG Inc., Twentieth Century Fox Film Corp. subsidiary Blue Sky, Sony Pictures Imageworks Inc. and Sony Pictures Animation Inc. — of entering into secret "gentlemen's agreements" not to actively solicit one another's employees in order to suppress salaries across the industry.

Blue Sky and the Sony Pictures companies agreed to settle for a combined $19 million in March 2016, court records show. DreamWorks reached its deal in October, and last February,

Disney, Pixar and Lucasfilm, along with Two Pic MC LLC, reached their own $100 million settlement, according to case filings.

Susman Godfrey helped secure approval of the settlements last year, over the objection of producers who claimed they were unfairly cut out of the deal.

The firm has also made substantial steps in In re: Qualcomm Patent Licensing Antitrust Litigation, in which partner Kalpana Srinivasan was named co-lead plaintiffs' counsel and to the steering committee for plaintiffs. Srinivasan said the case involves a huge amount of discovery work and case management skills.

In that suit, plaintiffs allege Qualcomm used its dominance to strong-arm device makers into paying higher royalties and agree to anti-competitive licensing terms; the pared-down indirect purchaser claims recently survived a motion to dismiss.

"The technology changes and how we handle the demands of more complicated and complex litigation changes," Srinivasan said. "That all sort of evolves over time but at the end of the day understanding the case's critical facts and legal issues don't change."

Susman Godfrey's victories include novel litigation over copyright claims against Sirius XM and Spotify, and the teams on those suits included Steven Sklaver, a partner at the firm's Los Angeles office. Sklaver said that entertainment actions like the Flo & Eddie Inc. v. SiriusXM Radio Inc. cases are "novel and challenging," combining applications of traditional copyright law to changing technology with high-stakes litigation.

"We are talking about novel technology both in the Sirius XM and Spotify [litigation] applied to well-founded, we think, intellectual property law, so it is very interesting to get involved in litigation at the intersection of both old and new," Sklaver said.

He pointed out that entering into the high-low settlement in the days before a scheduled trial in the Flo & Eddie litigation helped maximize the class' recovery. In that case, the compensation was pegged to several appeals, two of which went against the class, he said.

"It was a good idea we entered into that settlement, as the class might have gotten no compensation if not for that settlement," Sklaver said.

In the Spotify litigation, Susman Godfrey's team helped secure a $43 million settlement last year that is still subject to court approval. The deal resolves two proposed class actions filed in January 2016 by Camper Van Beethoven lead singer David Lowery and singer-songwriter Melissa Ferrick saying Spotify had chosen to "infringe now, apologize later," rather than go through the effort of fully licensing the band's music.

--Additional reporting by Melissa Lipman, Cara Bayles, Diana Novak Jones, Bill Donahue and Darcy Reddan. Editing by Catherine Sum.

All Content © 2003-2018, Portfolio Media, Inc.



**Portfolio Media. Inc. | 111 West 19th Street, 5th Floor | New York, NY 10011 | www.law360.com**
**Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com**

## Class Action Group Of The Year: Susman Godfrey

By **Diana Novak Jones**

*Law360, Chicago (January 26, 2017, 2:23 PM EST)* -- During a year marked by millions in settlements for auto part customers, rock stars and animators, Susman Godfrey LLP's success in a series of complex — and wildly different — class actions earned it a place among Law360's Class Action Practice Groups of the Year.

But the award may be a bit of a misnomer, as Susman Godfrey doesn't organize itself into practice groups. It's that decision partner Marc Seltzer credits with why the firm is able to handle such a wide variety of industries in its class action work.



"We do all different kinds of commercial civil litigation," Seltzer told Law360. "I think that gives us a generalist experience and approach to practicing law. We really have a unique perspective on how these cases can be litigated efficiently."

The firm used its adaptability to take on several high-profile class actions in the entertainment industry last year, an industry that Susman Godfrey partners said represents a relatively new addition to the firm's stable of fields.

Susman Godfrey served as co-counsel to a class of musicians led by 1960s rock band The Turtles, suing Sirius XM over royalties after the satellite radio provider played their songs. Though their music was recorded before 1972 and so doesn't fall under federal copyright law, a California federal judge ruled in 2014 that Sirius was liable for royalties for the public performance of those songs.

Gradstein & Marzano PC teamed up with Susman Godfrey after that ruling to help protect the certified class and try the case if necessary, according to Steven Sklaver, a Susman Godfrey partner who worked on it. Susman Godfrey isn't shy about taking class actions to trial, Sklaver told Law360, which he said is likely part of why Sirius ultimately agreed to settle in November.

Under the deal, Sirius agreed to pay up to $99 million in both retroactive and future royalties to The Turtles and other artists with pre-1972 recordings. The settlement does allow Sirius to appeal the judge's ruling on its liability for public performance, but will award the class an additional $5 million and a 2 percent increase in the royalty rate if the ruling is upheld.

"We are first and foremost a trial law firm," Sklaver said, adding that a trial holds defendants' feet to the

fire. "We believe that approach adds value to a case. We're willing to take that risk to drive up the value and benefits for the class."

The Sirius deal wasn't the only one Susman Godfrey negotiated in 2016 ahead of a scheduled trial.

The firm secured nearly $70 million in settlements last year as co-counsel for a class of animators and visual effects employees who sued several of Hollywood's biggest movie studios over claims the studios had a "gentleman's agreement" not to poach each other's employees or get into bidding wars to hire them.

In the most recent settlement, announced in October, Dreamworks Animation SKG Ltd. agreed to pay the class $50 million to end their claims, a payout that the class said represented about 40 percent of what Dreamworks' actions cost its animators.

Earlier in 2016, the class negotiated a $6 million agreement with Twentieth Century Fox Film Corp. subsidiary Blue Sky Studios and a $13 million deal with Sony Pictures Corp. units Sony Pictures Imageworks Inc. and Sony Pictures Animation Inc.

The Walt Disney Co. and Lucasfilm Ltd. are among the studios still involved in the suit, which was filed in September 2014.

But despite the big names involved, Susman Godfrey's entertainment industry actions aren't the biggest cases it took on last year. The entertainment settlements were negotiated while the firm took a starring role in massive multidistrict litigation against auto part manufacturers in Michigan federal court.

In that litigation, which involves more than 30 related actions involving different components of automobiles, Susman Godfrey is among several firms representing consumers who purchased or leased cars containing parts made by manufacturers that allegedly worked together to rig bids and fix prices.

The end payor purchaser class counsel team on the MDL, which includes both Sklaver and Seltzer, has so far negotiated approximately $673 million in partial settlements on behalf of the consumer class.

The settlements were scattered throughout last year, with some companies, like Japanese bearing manufacturer NTN Corp., signing off on several separate deals for allegations about different components.

The firm's history in class actions — and its ability to adapt quickly to serving clients in varying industries — comes down to a single specific skill, Sklaver told Law360.

"What we do have is an ability to take a complex, thorny problem, analyze it and present it in a clean, simple manner," Sklaver said.  While the firm uses it in all the work it does, "that skill set applies in class actions. The stakes get bigger."

--Additional reporting by Bill Donahue, Kat Greene, Eric Kroh and Kelly Knaub. Editing by Jack Karp.

All Content © 2003-2017, Portfolio Media, Inc.

### Susman Godfrey L.L.P.

Susman Godfrey L.L.P. is a firm of 130 lawyers with offices in Houston, New York, Seattle and Los Angeles. Ninety percent (90%) of our lawyers served as law clerks for federal judges after law school, including nine (9) who clerked for Justices of the United States Supreme Court. Since its founding in 1980, Susman Godfrey and its attorneys have served as lead counsel in hundreds of class actions and other complex commercial cases in courts across the United States. Susman Godfrey's practice is dedicated to exclusively to litigating and trying lawsuits.  The firm has represented clients in some of the largest and most complex cases ever brought and demonstrated that it has the skill, experience and resources to handle such cases effectively and efficiently. Susman Godfrey's extraordinary track record is reflected in the numerous awards for excellence it has received, including being recognized as: "Class Action Group of the Year" (*Law 360*, annually 2017-2018); "America's Leading Trial Firm" (*LawDragon*, 2017); "Most Feared Plaintiffs Firm" (Law360, annually 2014-2016); "America's Elite Trial Lawyers" (*The National Law Journal*, 2014); "Plaintiffs Hot List" (*The National Law Journal*, 2015); "Top Litigation Boutique" (*Vault,* annually 2012-2016); and "Litigation Boutique of the Year" (*The American Lawyer*, 2009).

Among the firm's most significant class actions are:

| Case & Judge presiding | Role & Results |
|---|---|
| *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices and Products Liability Litigation,* (C.D. Cal.) (Selna, J.) | Co-lead counsel for class plaintiffs. Obtained settlement valued by the Court at $1.6 billion. |
| *In re Automotive Parts Antitrust Litigation,* (E.D. Mich.) (Battani, J.) | Co-lead counsel for end payor class plaintiffs.  Obtained partial settlements of approximately $1 billion. |
| *In re Animation Workers Antitrust Litigation,* (N.D. Cal.) (Koh, J.) | Co-lead counsel for class plaintiffs. Obtained settlements of approximately $168 million. |
| *In re Libor-based Financial Instruments Antitrust Litigation,* (S.D.N.Y.) (Buchwald, J.) | Co-lead counsel for over-the-counter class plaintiffs. Obtained partial settlements of $250 million |
| *The Dial Corporation et al. v. News Corporation et al.*, (S.D.N.Y) (Pauley, J.) | Co-lead counsel for class plaintiffs. Obtained settlement of $244 million. |
| *White vs. NCAA* (C.D. Cal.) (Fairbank, J.) | Co-lead counsel for class plaintiffs. Obtained settlement of $228 million. |
| *Processed Egg Products Antitrust Litigation,* (E.D. Penn.) (Pratter, J.) | Co-lead counsel for plaintiffs. Obtained partial settlements of $135 million. |
| *Flo & Eddie Inc. v. Sirius XM Radio Inc.,* (C.D. Cal.) (Gutierrez, J.) | Co-lead counsel for class plaintiffs. Obtained settlement of $99 million. |
| *Korean Air Antitrust Litigation*, (C.D. Cal.) (Otero, J.) | Co-lead counsel for class plaintiffs. Obtained settlement of $86 million. |
| *Van Roden, et al., v. Termeer, et al.,* (S.D. N.Y.) (Stanton, J.) | Co-lead counsel for class plaintiffs. Obtained settlement of $64 million. |
| *Ferrick v. Spotify,* (C.D. Cal.) (O'Connell, J.) | Co-lead counsel for class plaintiffs. Obtained a settlement of $43 million. |
| *In re Corrugated Container Antitrust Litig.* (S.D. Tex) (Singleton, J.) | Lead counsel for class plaintiffs. Obtained settlements of more than $350 million. |
| *In re Vitamins Antitrust Litigation,* (D. Minn.) (Hogan, J.) | Co-lead counsel for class plaintiffs. Obtained settlements in excess of $1 billion. |

| *In re Korean Air Lines Co., Ltd.* *Antitrust Litigation,* (C.D. Cal.) (Otero, J.) | Co-lead counsel for class plaintiffs. Obtained settlement of $86 million. |
|---|---|
| *Schulein, et al. v. Petroleum Development Corp., et al.,* (C.D. Cal.) (Guilford, J.) | Lead counsel for class plaintiffs. Obtained settlement of $37.5 million. |

The following Susman Godfrey lawyers will assist Mr. Susman in this litigation:

**Marc Seltzer** (Los Angeles), one of the firm's most senior lawyers with 45 years of experience in prosecuting and defending complex commercial cases in state and federal courts throughout the United States. He has served as lead counsel and as a member of the plaintiffs' steering committees in numerous MDL and class action proceedings, including *In re Animation Workers Antitrust Litigation*, *In re Toyota Motor Corp. Unintended Acceleration*, *In re Automotive Parts Antitrust Litigation*; *In re General Motors LLC Ignition Switch Litigation*; and *White v. NCAA*.  Mr. Seltzer is a Life Member of the American Law Institute and a member of the Advisory Board of the American Antitrust Institute.  He was honored as a "Competition Law MVP" (*Law360*, 2017), a "Giant Slayer" (*The Recorder,* 2017)*,* and a "Class Action MVP" (*Law 360*, 2013). He has also been named as one of the top plaintiffs' attorneys in California (*The Los Angeles Daily Journal*, 2016).

**Ophelia Camiña** (Houston), one of the firm's most senior lawyers with 35 years of experience litigating complex commercial cases in both state and federal

courts throughout the United States. Ms. Camiña was inducted into the Texas Verdicts Hall of Fame for her $239 million jury verdict in *Dillard's, Inc. vs. i2 Technologies, Inc.*, which was the eighth largest in the United States in 2010. She was also named "Litigator of the Week" (*Texas Lawyer*, 2014) based on obtaining a $15 million jury verdict in *GlobeRanger vs. Software AG*.  She is consistently named to the list of *SuperLawyers* in Texas including to the Top 50 Women Lawyers in Texas, Top 100 Lawyers in Dallas, and Top 100 Lawyers in Houston.

**Steven Shepard** (New York), with 10 years' experience, Mr. Shepard has demonstrated his abilities in litigating complex commercial and class action cases. Mr. Shepard led the team that obtained a favorable settlement in a "bellwether" case in *In re: General Motors LLC Ignition Switch Litigation*.  Mr. Shepard also helped secure a $450 million settlement from Novartis Pharmaceuticals and other defendants in one of the largest settlements ever awarded to a single whistleblower in a False Claims Act case.  Prior to joining the firm, Mr. Shepard clerked for Justice Anthony Kennedy (2008-2009) and Ninth Circuit Judge Alex Kozinski (2007-2008).

## CASE LIST OF
## Carr & Weatherby, LLP

Carr & Weatherby, LLP (formerly Carr & Palmer, LLP) (the "C&W"), founded by W. Pitts Carr in Atlanta, Georgia, in 1973, is a civil trial firm with recognized practices in the areas of complex litigation, including antitrust, securities, environmental, toxic tort, product liability, and transportation law. Alex D. Weatherby joined the firm in 2010. The firm operates from offices in Atlanta with clients represented throughout the United States. The mission of the firm is to provide clients with exceptional legal services and representation in a cost-effective and timely fashion. Their objective is achieved by aggressively gaining control of cases from the beginning. Once contacted by a client, the firm develops a strategic approach to the case and immediately conducts an investigation to gather the relevant information. To assist in this effort, the firm calls on a team of experts and investigators from its established network. The firm's prompt effort enables them to devise a strategy for its clients to bring the case to a successful resolution.

C&W is comprised of leading attorneys recognized for excellence in their practice areas. The firm's cornerstone is professionalism and high ethical standards, as illustrated by its listing in *The Martindale-Hubbell Bar Register of Preeminent Lawyers*, which selects and recognizes the nation's law firms that meet the highest ethical standards. W. Pitts Carr, the firm's founder, and the firm itself are listed in *The Best Lawyers in America*.

C&W is committed to providing quality and cost-effective legal counsel and services to its clients.  Complex cases for which C&W has served as counsel include:

### A. Representative Class Actions in which C&W Has Represented the Plaintiff Class

<u>Etzel v. Hooters of America, LLC</u>, Case No. 1:15-cv-0155-LMM, U.S. Dist. Court for Northern District of Georgia – The Firm served as Co-Lead Counsel in this nationwide class action, asserting a claim for violation of the TCPA against one of the largest restaurant chains in America. This litigation resulted in a

settlement valued in excess $1.4 million, which is pending before the court now for final approval.

In Re The Home Depot, Inc., Customer Data Security Beach Litigation (Financial Institution Track), Case No. 1:14-md*-02583-TWT, U.S. Dist. Court for Northern District of Georgia - Served as Co-Liaison Counsel in this nationwide class action, asserting claims on behalf of all financial institutions whose customers' cards were compromised by the Home Depot Data Breach in 2014. This multi-district litigation has been settled, and the settlement has been preliminarily approved. The settlement is valued in excess of $25 million.

In Re Food Service Equipment Hardware Antitrust Litigation, Case No. 1:10-cv-1849-WSD, U.S. Dist. Court for Northern District of Georgia - Served as Liaison Counsel in this Federal antitrust case involving price-fixing and related issues. This case resulted in class certification and the recovery of damages on behalf of the class, in the millions of dollars.

In Re Immucor, Inc. Securities Litigation, Case No. 1:09-cv-2351-TWT, U.S. Dist. Court for Northern District of Georgia - Served as Liaison Counsel in this Federal securities case, involving a securities class action. This case resulted in a settlement, in the millions of dollars for the class.

Edgar "Bo" Pounds et al v. Cobb Energy Management Corporation et al, Case No. 07-1-9408-48, Superior Court of Cobb County, Georgia - Served as Lead Class Counsel in a derivative action brought by members of the Energy Management Corporation ("EMC"), addressing conflicts of interest, transfer of the EMC's employees of assets to a for-profit entity, and by-law issues. The case resulted in a recover of $120,000,000.00 of assets, return of the employees to the EMC, revision of the by-laws, replacement of the Board via elections conducted pursuant to the bylaws, and the resignation of the CEO.

Southern States Police Benevolent Assn., Inc. et al. v. Point Blank Body Armor, Inc., Seventeenth Judicial Circuit in and for Broward County, Florida – C&W served as Lead Class Counsel to a class of law enforcement officers and agencies who purchased defective ballistic protection vests containing Zylon®. The case resulted in a nationwide class settlement in 2006 that provided replacement vests and other benefit to law enforcement officers with a total economic value of approximately $50,000,000.00 million.

<u>Thomas Kiefer et al. v. Protective Products International</u>, Seventeenth Judicial Circuit in and for Broward County, Florida – C&W served as Lead Class Counsel to a class of law enforcement officers and agencies who purchased defective ballistic protection vests.  The case resulted in a nationwide class settlement in 2006 that provided replacement vests and other benefit to law enforcement officers with a total economic value in excess of $1,500,000.00.

<u>Scott Martin et al. v. Gator Hawk Armor, Inc.</u>, Fourth Judicial Circuit in and for Duval County, Florida – C&W served as Lead Class Counsel to a class of law enforcement officers and agencies who purchased defective ballistic protection vests.  The case resulted in a nationwide class settlement in 2006 that provided replacement vests and other benefit to law enforcement officers with a total economic value in excess of $3,300,000.00

<u>Southern States Police Benevolent Assn., Inc. et al. v. Armor Holdings, Inc., Armor Holdings Products, LLC and Safari Land Ltd., Inc.</u>(Armor II), Fourth Judicial Circuit in and for Duval County, Florida – C&W served as Lead Class Counsel to a class of law enforcement officers and agencies who purchased defective ballistic protection vests.  The case resulted in a nationwide class settlement in 2005 that provided replacement vests and other benefit to law enforcement officers with a total economic value in excess of $33,000,000.00.

<u>Steven W. Lemmings et al. v. Second Chance Body Armor, Inc., Toyobo Co., Ltd et al.</u>, District Court for Mayes County, Oklahoma, Case No. CJ-2004-62 – C&W served as Co-Lead Class Counsel to a nationwide class of law enforcement officer and agencies who purchased defective ballistic protection vests containing Zylon®.  The case resulted in a nationwide settlement in 2005 that provided $29,000,000.00 in cash to the Class.

<u>Southern States Police Benevolent Assn., Inc. et al. v. Point Blank Body Armor, Inc.</u>, Seventeenth Judicial Circuit in and for Broward County, Florida – C&W served as Lead Class Counsel to a class of law enforcement officers and agencies who purchased defective ballistic protection vests containing Zylon®.  The case resulted in a nationwide class settlement in 2005 that provided replacement vests and other benefit to law enforcement officers with a total economic value of approximately $2,000,000.00 million.

Southern States Police Benevolent Assn., Inc. et al. v. Armor Holdings, Inc., et al.(Armor I), Fourth Judicial Circuit in and for Duval County, Florida – C&W served as Lead Class Counsel to a class of law enforcement officers and agencies who purchased defective ballistic protection vests containing Zylon®. The case resulted in a nationwide class settlement in 2004 that provided replacement vests and other benefit to law enforcement officers with a total economic value in excess of $20,000,000.00 million.

In Re: Atlanta Waste Services Antitrust Litigation, C-83-796A (N.D. Ga.). The firm acted as Liaison Counsel in this antitrust class action in which recovery was made in excess of $1.1 million.

In Re: Pontiac 6000 Litigation. In this nationwide Moss-Magnuson Act Case, the firm was one of several firms representing a class action which resulted in recovery for plaintiffs and partial recall of the subject vehicles.

In Re: Flight International Securities Litigation. The firm served as liaison counsel in this national securities class action resulting in a recovery of $5.4 million on behalf of the class.

In Re: DCA Securities Litigation, U.S. Dist. Court for Northern District of Georgia, The firm served as lead counsel in this national securities class action. The case was settled for $6.25 million.

In Re: C & S/Sovran Shareholder Litigation, U.S. Dist. Court for Northern District of Georgia, The firm represented plaintiffs in this nationwide securities fraud case which was filed as a class action. This case was concluded in 1994 for approximately $9 million.

In Re: KnowledgeWare Securities Litigation, U.S. Dist. Court for Northern District of Georgia, The firm served as co-lead and liaison counsel in this nationwide securities fraud class action which was concluded for approximately $4 million.

In Re: KnowledgeWare Shareholder Litigation II, U.S. Dist. Court for Northern District of Georgia, The firm served as co-lead and liaison counsel in this nationwide securities fraud class action which was concluded for approximately $18 million.

In Re: National Data Corporation, U.S. Dist. Court for Northern District of Georgia, The firm served as liaison counsel in this national securities fraud class action. The case resulted in a settlement of $6.95 million.

In Re: T$^2$ Medical, Inc. Shareholder Litigation, U.S. Dist. Court for Northern District of Georgia, The firm served as co-lead counsel and liaison counsel in this national securities fraud class action which was concluded for cash and securities valued at approximately $50,000,000.00.

In Re: Domestic Air Transportation Antitrust Litigation, U.S. Dist. Court for Northern District of Georgia, The firm served as liaison counsel and part of a leadership committee of five firms representing the plaintiffs in this national antitrust class action. The case resulted in a settlement valued at approximately $250,000,000.00.

Farrington v. ConAgra, Inc., Superior Court of Vigo County, Indiana, The firm served as lead counsel representing plaintiffs in this commercial fraud case filed in the State of Indiana which was concluded for $2.9 million.

In Re: Vista 2000, Inc. Securities Litigation, U.S. Dist. Court for Northern District of Georgia, The firm served as co-lead counsel in this securities fraud class action which was concluded in exchange for 40% of the defendant corporations outstanding stock.

In Re: 1996 Medaphis Securities Litigation, U.S. Dist. Court for Northern District of Georgia,  The firm served as Liaison Counsel in this securities fraud class action. The case resulted in a settlement valued at $80,000,000.00.

In Re: Carpet Antitrust Litigation, U.S. Dist. Court for Northern District of Georgia,The firm served as co-lead counsel for plaintiffs in this nationwide antitrust class action which has been concluded for $50,000,000.00.

In Re: Blue Cross\Blue Shield of Georgia, Superior Court of Fulton County, Georgia, The firm served as lead counsel for plaintiff charities attacking the conversion of Blue Cross/Blue Shield from a charitable organization under the laws of the State of Georgia to "for profit status." The case concluded for cash and securities valued at approximately $119,000,000.00.

App. 20

<u>In Re: G&W Noteholder Litigation</u>.   The firm served as co-lead counsel for plaintiffs in this nationwide negligent misrepresentation and breach of fiduciary duty class action.   The case resulted in a recovery of $2.2 million from the fiduciary defendant.

<u>In Re: Pediatric Services of America Securities Litigation</u>, U.S. Dist. Court for Northern District of Georgia,  The firm served as liaison counsel for plaintiffs in this nationwide securities fraud class action resulting in a recovery of approximately $3,000,000.00.

**B. Non-Class Actions in which C&W Has Represented Large Plaintiff Groups**

<u>Mildred Pipkin, et al. v. Colonial Motor FreightLines, Inc., et al.,</u> Superior Court of Scotland County, NC. The Firm successfully represented approximately 150 property owners whose private water wells were contaminated by leaks from a nearby truck stop.

<u>Louise Brusher, et al. v. Alternate Energy Resources, Inc.,</u> Superior Court of Richmond County, Georgia. The Firm successfully represented approximately 50 property owners whose groundwater and wells were contaminated by discharges from a solid recycling plant.

<u>Alice Massa, et al. v. Peabody Coal Company,</u> United States District Court for the Northern District of Indiana. The Firm successfully represented approximately 100 property owners whose homes were damaged by blasting, dust and noise from a Peabody Coal Company surface mine.

<u>McCutchanville United Methodist Church, et al. v. Amax Coal Company,</u> Superior Court of Gibson County, Indiana. The Firm successfully represented approximately 100 property owners whose homes were damaged by blasting from Amax Coal Company surface mine.

<u>Glenn W. Brown, et al. v. Bulk Distribution Centers, Inc.,</u> Superior Court of Fulton County, Georgia -- The Firm successfully represented approximately 20 plaintiffs in the Underwood Hills neighborhood of Atlanta, Georgia, in an action against Bulk Distributors, Inc., due to its releasing of toxic fumes and chemicals into the environment in the plaintiffs' neighborhood.

**Levin, Sedran & Berman**

Levin Sedran & Berman ("LSB") is one of the nation's preeminent and most experienced plaintiff class-action firms with extensive experience and expertise in consumer protection, data breach, privacy, products liability, antitrust, securities and other complex class-action litigation. LSB has been appointed lead counsel or to other leadership positions in hundreds of cases, including in  more than twenty five MDLs, and is presently serving or has served in such positions in several of the largest pending class actions nationwide. *See e.g.*, *In re Chinese-Manufactured Drywall Product Liab. Litig.,* MDL No. 2047 (E.D. La.) (LSB appointed Lead Counsel); *In re Nat'l Football League Players' Concussion Injury Litig.*, MDL No. 2323 (E.D. Pa.) (LSB appointed to Plaintiffs Steering Committee and Subclass Counsel for Settlement); *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL 2179 (E.D. La.) (LSB appointed as Special Counsel to the Plaintiffs' Fee and Cost Committee); *In re Air Cargo Shipping Servs. Antitrust Litig.*, MDL No. 1775 (E.D. N.Y.) (LSB appointed Co-Lead counsel); and *In re Wells Fargo Insurance Marketing Sales Practices Litigation,* MDL No. 2797 (C.D.Ca.) (LSB appointed to Plaintiffs' Executive Committee).

As a result of its success representing consumers in complex litigation throughout the country, LSB has been distinguished as a Tier I class-action firm in the Best Law Firms rankings published in the U.S. News and World Report Best Law Firms.  It also ranked LSB Tier I for personal injury and mass tort firms.  LSB was also named to THE NATIONAL LAW JOURNAL's insurance list of *America's Elite Trial Lawyers* in 2014. Members of LSB are listed in the LEGAL 500, LAW DRAGON 500, Martindale Hubbell's *Directory of Preeminent Attorneys*, as was in Best Lawyers In America. Id. LSB pioneered the use of class actions and mass actions in the United States and its work has resulted in numerous record-breaking recoveries over the past three decades. Just for example:

*In re: Asbestos School Litigation*, No. 83-0263 (E.D. Pa.) (LSB as member of Executive Committee and Lead Trial Counsel obtained a certification of a nationwide class and settlement on behalf of school districts);

*In re: Diet Drug Product Liability Litigation*, MDL No.: 1203 (E.D. PA) (LSB as Co-Lead Counsel obtained a $6.75 billion dollar settlement on behalf of consumers who ingested  Fen Phen);1

*In re: The Exxon Valdez,* No. 89-00095 (D. Alaska) (LSB as a member of the Trial and Discovery Committee represented fishermen, native corporations, native villages, native claims and business claims in this mass tort.  After a jury trial, Plaintiffs obtained a judgment of $5 billion in punitive damages - at the time the largest punitive damage verdict in U.S. history. Later reduced to $507.5 million by the U.S. Supreme Court).

*In re: Chinese-Manufactured Drywall Product Liability Litigation*, MDL No.: 2047 (E.D. La.) (LSB as Lead Counsel along with Liaison Counsel and the PSC obtained inter-related

---

1 That prolix settlement has received favorable comments by academia. *See* Nagareda , R., "Autonomy, Peace, and 'Put' Options in the Mass Tort Class Action, " 115 Harv.L.Rev. 747, 756 (2002).

settlements involving various suppliers, builders, installers, insurers and manufacturers of Chinese drywall valued in excess of $1 billion dollars).

*In re: The Vioxx Product Liability Litigation*, MDL No.: 1657 (E.D. La.) (As a member of the PSC and Plaintiffs□Negotiating Committee, LSB was instrumental in achieving a $4.85 million dollar settlement on behalf of consumers who ingested Vioxx).

*In re Air Cargo Shipping Servs. Antitrust Litig.*, MDL No. 1775 (E.D. N.Y.) (As Co-Lead counsel in the decade long air cargo antitrust litigation LSB obtained 28 inter-related settlements against air cargo service providers totaling $1.2 billion dollars).

*In re: National Football League Players□Concussion Injury Litigation*, MDL No.: 2323 (E.D. Pa.) (As Subclass Counsel along with Lead Counsel obtained an uncapped settlement     valued in excess of $1 billion dollars on behalf of NFL football players).

These are a just a few examples of cases LSB was instrumental in the negotiations, structure and administration of MDL class and global settlements. LSB is repeatedly recognized by courts across the country for its work product and success in handling complex class-action cases. A few examples for the court's consideration:

In the *Lazy Oil Co. v. Witco Corp., et al.*, C.A. No. 94-110E (W.D. Pa.) (Plaintiffs' Co-Lead Counsel) the district court made the following comments concerning the work of Co-Lead Counsel: "[t]he Court notes that the class was represented by very competent attorneys of national repute as specialists in the area of complex litigation. As such, Class Counsel brought considerable resources to the Plaintiffs' cause. The Court has had the opportunity to observe Class Counsel first-hand during the course of this litigation and finds that these attorneys provided excellent representation to the Class.  The Court specifically notes that, at every phase of the litigation, Class Counsel demonstrated professionalism, preparedness and diligence in pursuing their cause."

In *In re: Orthopedic Bone Screw Products Liability Litigation*, MDL No. 1014 (E.D. Pa.) (Plaintiffs' Lead Counsel), the Court stated: "the Court also finds that the standing and expertise of counsel for [plaintiffs] is noteworthy.  First class counsel is of high caliber and most PLC members have extensive national experience and similar class-action litigation."

In *In re: Consumer Bags Antitrust Litigation*, Civil Action No. 77-1516 (E.D. Pa.) (Plaintiffs' Lead Counsel), Judge Louis Bechtel stated that "Each of the firms and the individual lawyers in this case have extensive experience in large, complex antitrust and securities litigation." Furthermore, the Court notes that the quality of the legal services rendered was of the highest caliber.

In *In re: Diet Drugs Product Liability Litigation*, MDL No. 1203 (E.D. Pa.) (Plaintiffs' Co-Lead Counsel), the the court stated: "The Court recognized the 'remarkable contribution' from Levin Sedran & Berman in the creation of the largest nationwide personal injury settlement to date."

App. 23

In *In re: Summers v. Abraham Lincoln Savings and Loan Association*, 66 F.R.D. 581, 589 (E.D. Pa.), the court stated: "There is no question that Plaintiff's counsel is experienced in the conduct of the class action . . .".

In certifying the class in *Weiss v. York Hospital*, Judge Muir found that "plaintiff's counsel are experienced in the conduct of complex litigation, class actions, and the prosecution of antitrust matters." *Weiss v. York Hospital*, No. 80-0134, Opinion and Order of May 28, 1981 at 4 (M.D. Pa. Mar. 1981). *See also*, *Weiss v. York Hospital*, 628 F. Supp. 1392 (M.D. Pa. 1986).

Austin Cohen a member of LSB will be working with Mr. Schaffer. Mr. Cohen has been practicing commercial litigation for nearly 20 years, specializing in antitrust class actions. During that time, as a member of LSB, he has served with Co-Lead Counsel in numerous complex class actions.  He recently served with Levin Sedran & Berman on the Executive Committee in *In re Target Corporation Customer Data Security Breach Litigation*, MDL 2522 (D. Minn.), representing a class of financial institutions seeking to recover costs due to Target Corporation's failure to implement proper data security protocols. Mr. Cohen also served with Levin Sedran and Berman as Co-Lead Counsel in *In re Air Cargo Shipping Services Antitrust Litigation*, MDL 1775 (E.D.N.Y.), representing a class of air freight shippers alleging international air cargo carriers conspired to fix prices and surcharges. Settlements in that litigation exceeded $1.25 billion.

Mr. Cohen has served as a lecturer at professional conferences and has written published articles regarding the admissibility of subsequent remedial modifications in products liability litigation (68 Pa. B.A.Q. 93), the enforceability of litigation confidentiality agreements (71 Pa. B.A.Q. 93), and federal tax issues related to the tax-exempt financing of University sponsored research facilities (23 The Exempt Organization Tax Review 445). Mr. Cohen has been rated as a Pennsylvania antitrust "SuperLawyer" and is AV Peer Review rated by Martindale Hubble. Mr. Cohen is licensed to practice in Pennsylvania and New Jersey.

### Charles Schaffer's Class Action Appointments

| Case | Role |
|---|---|
| *In re JP Morgan Modification Litigation,* MDL No. 2290 (D.C. Mass.) | Co-lead counsel |
| *Kowa, et. el. v. The Auto Club Group AKA AAA Chicago*, No. 1:11-cv-07476 (N.D. Ill.) | Co-lead counsel |
| *In re IKO Roofing Products Liability Litigation*, MDL No. 2104 (C.D. Ill.) | Co-lead counsel |
| *Yarbrough v. Martin's Famous Pastry Shoppe, Inc., Civil No. 11-cv-02144-JEJ (M.D. Pa.)* | Co-lead counsel |
| *Minor v. Congoleum Corporation*, Civil Action No.: 3:13-cv-07727-JAP-LHG (D.C. NJ) | Co-lead counsel |
| *Davis v. SOH Distribution Company, Inc.*, Case No. 09-CV-237 (M.D. Pa.) | Co-lead counsel |
| *Meneghin, v. The Exxon Mobile Corporation, et al.,* Civil Action No. OCN-002697-07 (Superior Court, Ocean County, NJ 2012) | Co-lead counsel |

| | |
|---|---|
| *Gwaizdowski v. County of Chester*, Civil Action No. 08-CV-4463 (E.D. Pa. 2012) | Co-lead counsel |
| *In re Pergerine Financial Group Customer Litigation*, MDL No. 12-5546 (N.D.Ill.) | Assisted lead counsel, de facto committee member |
| *In re MF Global Holdings LTD. Investment Litigation*, No. 12-MD-2338 (S.D.N.Y.) | Assisted lead counsel, de facto committee member |
| *In re CertainTeed Corporation Roofing Shingles Products Liability Litigation*, MDL No. 1817 (E.D. Pa.) | Discovery Committee Settlement Committee |
| *Gulbankian et. al. v. MW Manufacturers, Inc.*, Case No. 1:10-cv-10392-RWZ (D.C. Mass.) | Executive Committee |
| *Eliason, et al. v. Gentek Building Products, Inc., et al.*, Case No. 1:10-cv-2093 (N.D. Ohio) | Executive Committee |
| *Melillo, et al. v. Building Products of Canada Corp.*, Civil Action No. 1:12-CV-00016-JGM (D. Vt. Dec. 2012) | Executive Committee |
| *In re Wells Fargo Insurance Marketing Sales Practices Litigation*, MDL No. 2797 (C.D.Ca.) | Executive Committee |
| *In re: Citimortgage, Inc. Home Affordable Modification Program ("HAMP")* MDL No. 2274 (C.D. Ca.) | Executive Committee |
| *In re HardiePlank Fiber Cement Siding Litigation*, MDL No. 2359 (D.C. Minn.) | Executive Committee |
| *In re Navistar Diesel Engine Products Liability Litigation*, MDL No. 2223 (N.D. Ill.) | Executive Committee |
| *In re Azek Decking Sales Practice Litigation*, No. 12-6627 (D. NJ) | Executive Committee |
| *In re Pella Corporation Architect and Designer Series Windows Marketing Sales Practices and Product Liability Litigation*, MDL No. 2514 (D.C. SC) | Executive Committee |
| *In re Citimortgage, Inc. Home Affordable Modification Program ("HAMP")*, MDL No. 2274 (C.D. Ca.) | Executive Committee |
| *In re Carrier IQ Consumer Privacy Litigation*, MDL No. 2330 (N.D. Ca.) | Executive Committee |
| *In re Dial Complete Marketing and Sales Practices Litigation*, MDL No. 2263 (D. NH) | Executive Committee |
| *In re Emerson Electric Co. Wet/Dry Vac Marketing and Sales Litigation*, MDL NO. 2382 (E.D. Miss.) | Executive Committee |
| *In re Colgate-Palmolive Soft Soap Antibacterial Hand Soap Marketing and Sales Practice Litigation*, (D. NH) | Executive Committee |
| *In re Navistar Diesel Engine Products Liability Litigation*, MDL No. 2223 (N.D. Ill.) | Steering Committee |
| *Vought, et al., v. Bank of America, et al.*, No. 10-CV-2052 (C.D. Ill. 2013) | Discovery Committee Settlement Committee |
| *United Desert Charities, et al. v. Sloan Valve, et al.*, Case No. 12-cv-06878 (C.D. Ca.) | Executive Committee |
| *Gold v. Lumber Liquidators, Inc.*, No. 3:14-cv-05373 (N.D.Ca.) | Executive Committee |
| *In re CertainTeed Fiber Cement Siding Litigation*, MDL 2270 (E.D. Pa. 2014) | Discovery Committee Settlement Committee |

### *Whitfield Bryson & Mason, LLP*

With offices located in Washington, D.C., Raleigh, North Carolina, Madisonville, Kentucky, and Nashville, Tennessee, Whitfield Bryson & Mason LLP is dedicated to representing plaintiffs in class actions, mass torts and individual actions in courts throughout the United States.  Founded in January 2012, the firm was created by a merger of three firms with decades of experience representing plaintiffs in some of the largest and most complex class action cases in the country. Whitfield Bryson & Mason has recovered more than $1.5 billion for its clients and has received high recognition from Super Lawyers, Martindale-Hubbell, Law Dragon, Benchmark Litigation, U.S. News and World Report, Public Justice, *Business North Carolina* magazine, and *Washingtonian* magazine.

Some examples of Gary Mason's most relevant and significant class and collective cases include:

| Case & Judge presiding | Role & Results |
|---|---|
| *In re Google Buzz Privacy Litigation*, No. 5:10-cv-00672 (N.D. Cal) (J. Ware) | Co-lead counsel for class plaintiffs. Obtained settlement valued by the Court at $8.5 million. |
| *In re: Dept. of Veterans Affairs (VA) Data Theft Litig.*, No. 1: 2006-cv-00506, MDL 1796 (D.D.C.) (J. Robertson) | Co-lead counsel for plaintiffs. Obtained settlement of approximately $20 million and additional cy pres awards. |
| *In re: Adobe Systems Inc. Privacy Litigation*, No. 5:13-cv-05226 (N.D. Cal. 2015) (J. Koh) | Co-lead counsel for class plaintiffs. Obtained settlement requiring enhanced cyber security measures and audits. |
| *Galanti v. Goodyear Tire & Rubber* | Co-lead counsel for class plaintiffs. |

| *Co.*, No. 03-209 (D.N.J. 2003) (J. Maloan) | Obtained settlement of $330 million. |
|---|---|
| *Stillman v. Staples, Inc.*, Civil No. 07-849 (D.N.J. 2009) (M.J. Schwartz) | Co-lead counsel for FLSA collective action. Plaintiffs' trial verdict for $2.5 million; national settlement approved for $42 million. |
| *Craig v. Rite Aid Corporation*, Civil No. 08-2317 (M.D. Pa.) (J. Carlson) | Co-lead counsel for FLSA collective action and class action plaintiffs. Obtained settlement of $20.9 million. |
| *Staton v. IMI South, et al.* (Ky. Cir. Ct.) | Co-lead counsel for class plaintiffs. Obtained settlement of $30 million. |
| *Lubitz v. Daimler Chrysler Corp.*, No. L-4883-04 (Bergen Cty. Super. Ct, NJ 2006) (J. Moses) | Co-lead counsel for plaintiffs. Obtained settlement of $12 million. |
| *Sutton, et al. v. The Federal Materials Company, Inc., et al*, No. 07-CI-00007 (Kty. Cir. Ct) | Co-lead counsel for class plaintiffs. Obtained settlement of $10.1 million. |
| *Nichols v. Progressive Direct Insurance Co., et al.*, No. 2:06-cv-146 (E.D. Ky.) (J. Bunning) | Co-lead counsel for class plaintiffs. Obtained settlement of $3.75 million. |

Whitfield Bryson & Mason associate Jennifer S. Goldstein will assist Mr. Mason in this litigation. Ms. Goldstein is an associate in WBM's Washington, D.C. Office and focuses her practice on privacy and consumer product class action lawsuits. She has previously supported Mr. Mason in his capacity as Liaison Counsel in *In Re: U.S. Office of Personnel Management Data Security Breach Litigation*, No. 15-1393, MDL No. 2664 (D.D.C.), an ongoing case concerning the largest data breach involving the United States Government.

Ms. Goldstein joined Whitfield Bryson & Mason in 2016 after serving as Special Assistant to the Office of the Attorney General for the District of

Columbia; there, she defended the District and District agencies against employment, personal and intention tort, Section 1983, and constitutional law claims.  She received her law degree from Georgetown University Law Center, where she edited and published an article in the Georgetown Journal of Gender and the Law and won the 2014 UCLA School of Law Williams Institute Moot Court Competition on behalf of the Georgetown University Law Center Barrister's Counsel.

Ms. Goldstein's pro bono work has included: briefing and arguing a federal inmate's appeal before the U.S. Court of Appeals for the District of Columbia; drafting name and gender change requests for transgender individuals in need; and submitting U-Visa applications and civil protection orders for indigent survivors of violence.



Goldenberg Schneider, LPA

ONE WEST 4TH STREET, 18TH FLOOR                                   513-345-8291
CINCINNATI, OHIO 45202                                           WWW.GS-LEGAL.COM

     **GOLDENBERG SCHNEIDER, L.P.A**. was founded in 1996 and focuses on prosecuting actions primarily on behalf of plaintiffs in complex civil litigation and class actions.  The subject matter of the Firm's past and current representations is broad, ranging from privacy protection actions to employment and labor cases that include ERISA, FLSA, and discrimination, to actions for antitrust and securities violations.  The firm's attorneys are experienced in every level of the state and federal judicial systems in Ohio and the country, including specialized courts.

     The Firm has demonstrated its capability to successfully represent governmental entities, corporations, and individuals in the most complex of litigation.  Founding partner Jeff Goldenberg served as special counsel to the Ohio Attorney General in prosecuting Ohio's Medicaid recoupment action against the tobacco industry and has served as lead or co-lead counsel on numerous nationwide class actions. The tobacco Medicaid recoupment litigation settled in 1999, resulting in a recovery to the State of Ohio of more than $9.86 billion. Ohio and its citizens continue to benefit from the tobacco industry's historic concessions regarding youth smoking, advertising restrictions, and reformation of industry corporate culture.  Factoring in the substantial, if not immeasurable non-economic components of the settlement, which curb youth smoking and addiction, the settlement proceeds also are a multiple of twelve times larger than the prior largest Ohio-based settlement.

     Class actions in which one or more of the Firm's attorneys have acted as class counsel include the following:

> ➤ *In Re: Veterans' Administration Data Theft Litigation* – Goldenberg Schneider served as co-lead counsel for a nationwide class of 28.5 million veterans and current members of the military who were impacted by the August 2006 theft of personal data.  Multiple actions were consolidated by the Panel on Multidistrict Litigation and sent to the Federal District Court in the District of Columbia.  This action was successfully resolved with a $20,000,000 settlement.

➢ *Estep v. J. Kenneth Blackwell, Ohio Secretary of State* – Goldenberg Schneider served as co-lead counsel on this class action against former Ohio Secretary of State, Ken Blackwell, based upon a violation of privacy rights when personal information was unlawfully disclosed in public records accessible through the Secretary's website. The settlement required the Secretary of State to dramatically improve the protection of social security numbers.

➢ *In Re*: *Ford Motor Co. Spark Plug and 3-Valve Engine Products Liability Litigation* – Goldenberg Schneider serves as co-lead counsel for a national class comprised of approximately 4 million Ford vehicle owners who purchased or leased vehicles containing a 5.4 liter 3-valve engine equipped with defective spark plugs and related engine defects.  On January 26, 2016, after Plaintiffs had defeated Ford's motion for summary judgment, Judge Benita Pearson of the Northern District of Ohio granted final approval of a nationwide settlement that will provide reimbursement to class members for expenses related to spark plug replacement.

➢ *Bower v. MetLife* – Goldenberg Schneider served as co-lead class counsel on behalf of a nationwide class of beneficiaries of the Federal Employees Group Life Insurance (FEGLI) Policy, the world's largest group life insurance program.  Following Judge Sandra Beckwith's Order certifying the nationwide Class, the case was settled in 2012 for $11,500,000.

➢ *In Re: OSB Antitrust Litigation* – Goldenberg Schneider served on the trial team in a case that alleged illegal collusion and cooperation among the oriented strand board industry. The case was resolved through a series of settlements that collectively exceeded $120,000,000.

➢ *City of Cincinnati Pension Litigation* – Goldenberg Schneider and its co-counsel, with the assistance of U.S. District Court Judge Michael Barrett, successfully resolved a series of cases relating to the City of Cincinnati Retirement System, known as the CRS.  Judge Barrett granted final approval of the historic and landmark Settlement Agreement on October 5, 2015.   The settlement comprehensively reforms the CRS, establishes a consistent level of City funding, and reinstates several key provisions that were eliminated in 2011 changes for employees who were vested in the plan at that time. The

settlement benefits for the Current Employees Class members, for whom Goldenberg Schneider was approved as Class Counsel, are valued at approximately $50 million.

➢ *Continental Casualty Long Term Care Insurance Litigation* – Goldenberg Schneider served as co-lead counsel for a nationwide class of tens of thousands of individuals who purchased long term care policies from Continental Casualty (CNA). The lawsuit claimed that Continental Casualty wrongfully denied coverage for elderly policyholders.  The case was successfully resolved with a settlement valued at approximately $26,000,000.

➢ *Cates v. Cooper Tire & Rubber Company/ Johnson v. Cooper Tire & Rubber Company* – Goldenberg Schneider served as co-lead counsel for a class of more than a thousand Cooper Tire retirees who claimed that they were entitled to lifetime health care benefits from the company.  Goldenberg Schneider secured a judgment on the pleadings, certified the class, and ultimately resolved the case through a settlement valued at over $50,000,000.

➢ *In Re: Consolidated Mortgage Satisfaction Cases* – Goldenberg Schneider served as lead counsel on behalf of Ohio homeowners against some of the largest national and Ohio banking and lending institutions for their failure to timely record mortgage loan payoffs. The Firm was able to consolidate all twenty actions before one trial judge and successfully upheld all the class certifications before the Ohio Supreme Court.  These cases were resolved through multiple settlements valued at millions of dollars.

➢ *In re: Verizon Wireless Data Charges Litigation* – Goldenberg Schneider filed the first nationwide class action challenging Verizon Wireless' improper $1.99 data usage charges to certain pay-as-you-go customers.  Goldenberg Schneider, as a member of the Plaintiffs Advisory Committee, played an active role in this litigation which resulted in benefits to the Class in excess of $50,000,000 in refunds and reimbursement payments.

➢ *Daffin v. Ford Motor Company* – Goldenberg Schneider and its co-counsel successfully certified an Ohio statewide class on behalf of all Ohio purchasers or lessors of 1999 and 2000 model year Mercury Villager Minivans.  The U.S. Court of Appeals for the Sixth Circuit upheld the class certification, and the case was resolved through a settlement.

➢ *Meyer v. Nissan North America* – Goldenberg Schneider served as co-lead counsel on behalf of thousands of Nissan Quest minivan owners throughout the United States.  The suit alleged that the Quest minivan developed dangerous levels of carbon deposits in the

accelerator system causing the gas pedal to stick, resulting in a roadway safety hazard including documented accidents and injuries.  The case was resolved by a nationwide settlement that included the application of the vehicle warranty to remedy the problem as well as a refund of prior repair costs.

➢ *Parker v. Berkeley Premium Nutraceuticals* – Goldenberg Schneider served as co-lead counsel and certified three nationwide classes in a consumer fraud class action on behalf of purchasers of herbal supplements for false and unproven claims and deceptive credit card charging practices. This case was successfully resolved with a multi-million dollar settlement.  Moreover, class members retained all rights to recover a portion of the nearly $30 million that the U.S. Attorney General seized in a civil forfeiture action.  Goldenberg Schneider eventually recovered an additional $24,000,000 for the victims by prosecuting a successful Petition for Remission through the federal forfeiture proceedings.

➢ *Continental Casualty Long Term Care Insurance Litigation* ("Daluge Settlement") - Goldenberg Schneider serves as class counsel in this litigation on behalf of certain CNA Connecticut policyholders whose claims for stays at Managed Residential Care facilities were wrongly denied.  The Federal District Court in Connecticut certified this case as a class action in 2015 and recently granted preliminary approval to a class action settlement providing both damages and injunctive relief to the Class.

➢ *Carnevale FLSA Class Action* – Goldenberg Schneider served as co-lead counsel on behalf of employees working for a large industrial company that alleged violations of federal and state labor laws through the systematic misclassification of managers and other employees as salaried professionals.  This case was successfully resolved through the implementation of a multi-million dollar settlement.

➢ *Brenneman v. Cincinnati Bengals, Inc.* – Goldenberg Schneider served as co-lead counsel in an FLSA collective action and Rule 23 class action on behalf of Cincinnati Bengals cheerleaders who were improperly denied minimum wages.  The case was successfully resolved through mediation, which resulted in the creation of a $425,000 settlement fund.

The following lawyers at Goldenberg Schneider, L.P.A. will participate in this litigation:

**JEFFREY S. GOLDENBERG,** one of the firm's most senior lawyers with 24 years of experience, served as lead and/or co-counsel in numerous multi-million dollar complex civil cases throughout the United States, including Veterans Data Theft Litigation, Ford Spark Plug Litigation, Metlife FEGLI Litigation, Oriented Strand Board Antitrust Litigation, Continental Casualty Long Term Care Insurance Litigation, City of Cincinnati Pension Litigation, Enzyte Consumer Fraud Litigation, Carnevale FLSA Litigation, Styrene Railway Car Litigation, Ford and Nissan Auto Defect litigation, and Clayton Home Sales Tax Litigation.  Jeff presently serves as lead or co-counsel on Ford Spark Plug Litigation, Google Wiretapping Litigation, and Credit Life Insurance Litigation.  Jeff also served as Special Counsel representing the State of Ohio against the Tobacco industry and was part of the litigation team that achieved an unprecedented $9.86 billion settlement for Ohio taxpayers.  He also served as lead counsel on the In re Consolidated Mortgage Satisfaction Cases involving twenty separate class actions.  That litigation resulted in a significant Ohio Supreme Court decision defining key aspects of Ohio class action law.

**Todd B. Naylor**, with 20 years of experience, has represented the State of Ohio in a securities lawsuit relating to the merger of Exxon and Mobil.  Mr. Naylor has also represented multiple states, including Connecticut, in pharmaceutical pricing litigation.  Mr. Naylor served on the trial team in antitrust litigation involving the oriented strand board industry that resulted in an aggregate settlement of over $120,000,000.  Mr. Naylor presently serves as lead and/or co-counsel in numerous multi-million dollar complex civil litigation cases throughout the State of Ohio and nationwide, including the Ford F-150 spark plug defect litigation and the credit life insurance litigation.

**Robert B. Sherwood**, with 15 years of experience, has served as a member of legal teams prosecuting multi-million dollar antitrust class actions, including *In re Dynamic Random Access Memory* (DRAM) Antitrust Litigation, No.M-02-1486 (N.D. Cal.); *In re Carbon Black Antitrust Litigation*, MDL No. 1543 (D. Mass.); *In re OSB Antitrust Litigation*, No. 06-826 (E.D. Pa.); and *In re Mercedes Benz Antitrust Litigation*, No. 99-4311 (D. N.J.).

**Attorneys' Fee Awards in Large Data Breach Class Actions**

| Case & Breach Type | Settlement Benefits | Attorneys' Fee Award & Basis for Award |
|---|---|---|
| *In re: Anthem, Inc. Data Breach Litig.*, No. 15-md-02617 (N.D. Cal.).<br><br>Hackers stole 80 million Social Security numbers and other personal information. | **$115 million non-reversionary settlement fund**, to be used for the following:<br>• **$17 million** payment to vendor to provide **credit monitoring for 2-4 years** for 80 million class members. *See* Settlement Agreement ¶ 4.6 (Dkt. #869-8); Prelim. Approval Brf. at 1, 8 (Dkt. #869-5).<br>• **$13 million cash fund** for alternate compensation in lieu of credit monitoring. *See* Prelim. Approval Brf. at 9 (Dkt. #869-5); Settlement Agreement ¶¶ 3.2, 5.3 (Dkt. #869-8).<br>• **$15 million cash fund** for reimbursement of out-of-pocket losses including: 1) fraud losses, 2) protective measures, and 3) time spent remedying misuse of data related to breach. *See* Prelim. Approval Brf. at 1, 9-10 (Dkt. #869-5); Settlement Agreement ¶ 1.23 (Dkt. #869-8).<br>• **$5,452,500 fund** for additional credit monitoring and/or charitable contribution. *See* Prelim. Approval Brf. at 11-12 (Dkt. #869-5); Settlement Agreement ¶¶ 4.8, 7.1 (Dkt. #869-8).<br>• $23 million notice and claims administration costs. *See* Prelim. Approval Brf. at 10 (Dkt. #869-5).<br>• $37,950,000 Plaintiffs' attorneys' fees. *See* Prelim. Approval Brf. at 11 (Dkt. #869-5); Settlement Agreement ¶ 12.1 (Dkt. #869-8).<br>• $3 million Plaintiffs' litigation expenses. *See* Prelim. Approval Brf. at 11 (Dkt. #869-5); Settlement Agreement ¶ 12.1 (Dkt. #869-8). | Requested Award: $37.95 million (court approval of fee is pending; hearing set for February 1, 2017).<br><br>Per Plaintiffs' Fee Brief: Fee represents **33% of $115 million aggregate settlement value**, consisting of: (1) $17 million payment to credit monitoring vendor; (2) $13 million cash fund for alternate compensation in lieu of credit monitoring; (3) $15 million cash fund for reimbursement of out-of-pocket costs; (4) $5.5 million for additional credit monitoring and/or charitable contribution; (5) $23 million notice and claims administration costs; (6) $37.95 million attorney fees; (7) $3 million litigation expenses; (8) $597,500 Plantiffs' service awards. *See* Fee Brief at 1, 3-4, 15-16 (Dkt. #916-6); Prelim. Approval Brief at 1, 5, 9-12 (Dkt. #869-5); Settlement Agreement ¶¶ 3.2, 4.6, 4.8, 5.3, 7.1, 11.1, 12.1 (Dkt. #869-8).<br><br>Fee represents a 1.1 lodestar multiplier. Fee Brf. at 1, 17-20 (Dkt. #916-6). |

| Case & Breach Type | Settlement Benefits | Attorneys' Fee Award & Basis for Award |
|---|---|---|
| | • $597,500 Plaintiffs' service awards.  *See* Prelim. Approval Brf. at 5, 11 (Dkt. #869-5); Settlement Agreement ¶ 11.1 (Dkt. #869-8).<br><br>Injunctive relief via enhanced data security for 3 years. Injunctive relief is not included in $115 million settlement value.  *See* Prelim. Approval Brf. at 1, 6-7 (Dkt. #869-5); Fee Brf. at 5-6 (Dkt. #916-6). | |
| *In re: The Home Depot, Inc. Customer Security Breach Litig.*, No. 14-md-02583 (N.D. Ga.).<br><br>Hackers stole credit/debit card numbers for 40 million consumers, and email addresses for 53 million consumers. | **$13 million cash fund** to compensate for out-of-pocket costs and/or time spent responding to breach.  *See* Settlement Agreement ¶ 28; Fee Brf. at 3 (Dkt. #227-1).<br><br>**$6.5 million payment to vendor provide 18 months of "identity protection" services (similar to credit monitoring)** for all class members.  *See* Settlement Agreement ¶ 28; Fee Brf. at 3-4 (Dkt. 227-1).<br><br>Injunctive relief via enhanced data security for 2 years. *See* Settlement Agreement ¶ 31; Fee Brf. at 4-6 (Dkt. 227-1). | Award: $7.53 million.<br><br>Fee award represented **28% of $27 million aggregate settlement value**, consisting of: (1) $13 million cash fund; (2) $6.5 million payment to vendor for identity protection services; and, (3) $7,536,497 attorneys' fee award.  *See* Fee Brf. at 41 (Dkt. #227-1); Fee Order at 3-4 (Dkt. #261).<br><br>Court stated fee was reasonable even without taking into account the "retail value" of the identity theft monitoring "made available to the Class (which has a market value of $180 per enrollee)."  *See* Fee Order at 3-4 (Dkt. #261).<br><br>Court awarded a lodestar multiplier of 1.3.  *See* Fee Order at 3-4 (Dkt. #261). |
| *In re Target Corp. Customer Data Security Breach Litig.*, No. MDL 14-2522, 2015 WL 7253765 (D. Minn. | **$10 million common fund (non-reversionary)** to compensate class members for out of pocket costs and time spent addressing fraudulent charges. *Target*, 2015 WL 7253765, at *1.<br><br>Injunctive relief via enhanced data security.  *Target*, | Award: $6.75 million.<br><br>Fee award represented **29% of $23.3 million aggregate settlement value**, consisting of: (1) $10 million cash fund; (2) $6.57 million notice and claims administration costs; and, (3) $6.75 million |

| Case & Breach Type | Settlement Benefits | Attorneys' Fee Award & Basis for Award |
|---|---|---|
| Nov. 17, 2015).<br><br>Hackers stole credit/debit card numbers for 40 million consumers, and names, addresses, email addresses and phone numbers for 70 million consumers. | 2015 WL 7253765, at *1. | attorneys' fees. *See Target*, 2015 WL 7253765, at *2-3; *see also* Fee Brf. at 27 (Dkt. #482).<br><br>Fee award represented a .74 lodestar multiplier. *Target*, 2015 WL 7253765, at *3. |
| *St. Joseph Health System Medical Info. Cases*, Case No. JCCP 4716 (Cal. Superior Ct., Orange County).<br><br>Medical info. for 32,000 patients was publicly accessible on internet for 1 year. | **$7.5 million cash fund** to be divided among all class members. *See* Settlement Agreement ¶ 2.1; Settlement Notice pg. 1.<br><br>**$3 million claims-made fund** to reimburse identity theft losses and out-of-pocket expenses. *Id.*<br><br>**Credit monitoring for 1 year** offered to all class members, with retail value of $4.5 million. *Id.*; Settlement Agreement ¶ 2.4.<br><br>Injunctive relief via enhanced data security measures (estimated value of $13 million). *Id.* | Award: $6.87 million.<br><br>Fee award represented **17% of $39.5 million aggregate settlement value**, consisting of: (1) $7.5 million cash fund; (2) $3 million claims-made fund; (3) $4.5 million retail value of credit monitoring offered; (4) $13 million value of injunctive relief; (5) $169,032 notice and claims administration costs; (6) $6,877,309 attorneys' fee award; and, (7) $403,657 litigation costs. *See* Fee Order at 4-5; Settlement Agreement ¶¶ 2.1, 2.4.<br><br>Fee represented a 1.22 lodestar multiplier. *Id.* at 4-5. |
| *In re TJX Cos. Retail Security Breach Litig.*, 584 F. Supp. | **$18 million claims-made fund** to pay up to: (i) $10 million for class members who self-certify that they incurred out-of-pocket costs or lost time; (ii) $7 million for class members who submit documentary evidence | Award: $6.5 million.<br><br>Fee award was based on percentage-of-fund method for credit monitoring only (not claims-made fund), |

| Case & Breach Type | Settlement Benefits | Attorneys' Fee Award & Basis for Award |
|---|---|---|
| 2d 395 (D. Ma. 2008)(Hackers stole credit card numbers for 45 million consumers, and driver's license numbers (which in some cases matched Social Security numbers) for 455,000 consumers). | of out-of-pocket costs or lost time; and (iii) $1 million for reimbursement of actual identity theft charges. *TJX*, 584 F. Supp. 2d at 400-01, 408-09. These benefits were offered to 45 million class members.<br><br>**Two years of credit monitoring** and identity theft insurance beyond TJX's original one year offer. This benefit was offered to 455,000 class members. *Id*. at 400.<br><br>Injunctive relief via enhanced data security. *Id*. at 401. | and lodestar analysis.<br><br>Court declined to include $18 million claims-made fund in its fee analysis. *Id*. at 401, 408-09.<br><br>$6.5 million fee award represented **3.7% of $177 million retail value of credit monitoring made available to class.**<br><br>Court stated it is "comfortable categorizing this litigation as creating $177,000,000 in potential [credit monitoring] benefits for the class using this figure as a benchmark against which to measure the award of attorneys' fees." *Id*. at 409.<br><br>Court approved 1.97 lodestar multiplier. *Id*. at 408. |
| *In re Dept. of Veterans Affairs (VA) Data Theft Litig*., 653 F. Supp. 2d 58 (D. D.C. 2009)(Thief stole hard drive from government employee's house which contained Social Security numbers, dates of birth, and names for 26.5 million class members). | **$20 million common fund** used for: 1) reimbursement of out-of-pocket costs for 26.5 million class members, 2) cy pres payment based on claims rate, 3) attorneys' fees and costs, and 4) notice and claims administration costs. *Dept. of Veterans Affairs*, 653 F. Supp. 2d at 59; *see also* Settlement Agreement ¶ 1-4 (Dkt. 53-2).<br><br>Fund was non-reversionary, with unclaimed funds donated to charity. *Id*. at *59. | Award: $3.6 million.<br><br>Fee award was based on percentage-of-fund method with lodestar cross-check. *Id*. at 60-61.<br><br>Fee award represented **18% of $20 million aggregate common fund**, which was used for: 1) cash payments to class members; 2) cy pres payment; 3) attorneys' fees and costs; and 4) notice and claims admin costs. *Id*. at 61.<br><br>Court declined objector's request to base fee solely on amount of funds *claimed* by class members. Court noted that the "national trend . . . is toward awards that represent a percentage of the total common fund, even |

| Case & Breach Type | Settlement Benefits | Attorneys' Fee Award & Basis for Award |
|---|---|---|
| | | when some portion of that fund will go to a *cy pres* beneficiary." *Id.* at 60.<br><br>Court approved a 2.0 lodestar multiplier. *Id.* at 61. |
| *In re Countrywide Fin. Corp. Customer Data Security Breach Litig.*, No. 3:08-MD-01998-TBR, 2010 WL 3341200 (W.D. Ky. Aug. 23, 2010)(Employee sold customers' Social Security numbers, bank account information, and other information to third parties). | **$6.5 million claims-made fund** to reimburse up to: (1) $5 million in identity theft losses for 17 million class members; and (2) $1.5 million in out-of-pocket costs for 2.4 million class members. *Countrywide*, 2010 WL 3341200, at *9 (final approval order); *In re Countrywide Fin. Corp. Customer Data Security Breach Litig.*, No. 3:08-MD-01998-TBR, 2009 WL 5184352, at *8 (W.D. Ky. Dec. 22, 2009) (preliminary approval order).<br><br>**Two years of credit monitoring** offered to 1.9 million class members. *Countrywide*, 2010 WL 3341200, at *9.<br><br>Injunctive relief via enhanced data security. *Countrywide*, 2009 WL 5184352, at *8. | Award: $3.5 million.<br><br>Fee award was based on percentage-of-fund method with lodestar cross-check. *Countrywide*, 2010 WL 3341200, at *9-10.<br><br>Fee award represented **20% of $17 million aggregate settlement value**, consisting of: (1) $6.5 million claims-made fund; (2) $7 million in anticipated credit monitoring claims using an estimated claims rate of 10% of 1.9 million class members; and, (3) $3.5 million attorneys' fees paid separately by Countrywide. *Id.* at *9.<br>Alternatively stated, $3.5 million fee award totaled **50% of anticipated credit monitoring claims,** and **54% of claims-made fund**.<br><br>Court approved a 1.2 lodestar multiplier. *Id.* at *11. |
| *Sony Gaming Networks and Customer Data Security Breach Litig.,* No. 11-md-2258, slip op. at ¶ 13 (S.D. Cal. May 4, 2015)(Hackers stole credit card | **$15 million in benefits via claims-made fund** consisting of: (1) $14 million in non-cash games and services available to 60 million Sony PlayStation network users; and (2) $1 million in cash to reimburse documented identity theft losses. *See* Defs.' Final Approval Brf. at 7, 9 (Dkt. #208).<br><br>Class members could choose from mix of free games or 3-month subscription to Sony PlayStation service. *Id.* | Award:  $2.75 million.<br><br>Court did not explain its basis for attorneys' fee award. *See Sony Gaming Networks and Customer Data Security Breach Litig.,* No. 11-md-2258, slip op. at ¶ 13 (S.D. Cal. May 4, 2015).<br><br>Per Plaintiffs' fee brief:  Plaintiffs sought fee via lodestar method only, not percentage-of-fund method. |

| Case & Breach Type | Settlement Benefits | Attorneys' Fee Award & Basis for Award |
|---|---|---|
| numbers and other accountholder information). | at 16. | *See* Pltfs.' Final Approval Brf. at 3, 22 (Dkt. #204-1).<br><br>Fee award represented a .8 lodestar multiplier. *Id.* at 3, 22. |
| *Lockwood v. Certegy Check Svcs., Inc*., No. 07-cv-1434, slip op. at 9 n.4 (M.D. Fla. Sept. 3, 2008)(Employee sold customers' checking account numbers, credit card numbers, dates of birth, and other information to third parties for marketing purposes). | **$5 million claims-made fund** to reimburse up to: (1) $4 million in identity theft losses; and (2) $1 million in other out-of-pocket costs. This benefit was available to 37 million class members. *See* Pltf.'s Final Approval Brf., Dkt. #88, at 1, 7-8.<br><br>**One year of credit monitoring** and **two years of bank account monitoring** made available to 4.25 million class members. *Id.* at 4-6.<br><br>Injunctive relief via enhanced data security. *Id.* at 8-9. | Award: $2.35 million.<br><br>Fee award was based on percentage-of-fund method with lodestar cross-check. *Lockwood v. Certegy Check Svcs., Inc*., No. 07-cv-1434, slip op. at 9 n.4 (M.D. Fla. Sept. 3, 2008); *accord* Tr. of Final Approval Hearing at 23:5-9 (Dkt. #103).<br><br>Court analyzed fee based on amount of credit monitoring/bank account monitoring *actually claimed* by class members, not merely *made available* to class. *Id.* at 9 n.4. Retail value of credit/bank account monitoring *actually claimed* by class totaled $4.4 million. *Id.* $2.35 million attorneys' fee represented **53% of $4.4 million value of credit/bank account monitoring actually claimed by class**. Court did not address whether $5 million claims-made fund impacted the fee award.<br><br>Court approved a 1.86 lodestar multiplier. *See* Tr. of Final Approval Hearing at 23:5-9 (Dkt. #103); *accord* Pltf.'s Final Approval Brf. at 22 (Dkt. #88). |
| *In re Michaels Stores Pin Pad Litig*., No. 11-cv-03350, slip op. ¶ 7 (N.D. Ill. Apr. 17, | **$600,000 settlement fund** to: (i) reimburse **out-of-pocket costs**, and (ii) fund **1-2 years of credit monitoring** for 95,000 class members. *See* Pltfs.' Fee Brf. at 3 (Dkt. #103). | Award: $1.2 million.<br><br>Court did not explain its basis for fee award. *In re Michaels Stores Pin Pad Litig*., No. 11-cv-03350, slip op. ¶ 7 (N.D. Ill. Apr. 17, 2013). |

| Case & Breach Type | Settlement Benefits | Attorneys' Fee Award & Basis for Award |
|---|---|---|
| 2013) (Hackers stole credit card numbers for 3 million consumers) | Non-reversionary fund where unclaimed funds were donated to charity.<br><br>Injunctive relief via enhanced data security. *Id*. at 4. | Per Plaintiffs' Fee Brief:  $1.2 million fee totaled **7.5% of $16 million value of 1 yr. of credit monitoring made available to class**. *See* Pltfs.' Fee Brf. at 6 (Dkt. #103).<br><br>Fee represented a 1.27 lodestar multiplier. *Id*. at 15. |

# Lukasz Lenart

Lukasz Lenart is an application developer in a wide variety of business applications, particularly experienced in client/server and relational database design using Java. His specialties include social insurance, automotive, production, purchasing, and banking. He has been the Lead Developer on the Apache  Struts project since 2011. He holds a Bachelor of Computer Systems  with an emphasis on Information Systems from the Academy of Computer Science and Management in  Bielsko-Biala, Poland.

## EDUCATION

Bachelor of Computer Systems, Academy of Computer Science & Management,  Poland, 2003.
Studied automation and robotics at the University of Technologies, Poland, 1998.
Additional formal training and teaching experience available on request.

## EXPERIENCE

2/2017 – present: BrainChangeContinental (BCC), CEO
Put on the Confitura conference, a Java Conference for Polish community.

12/2013 – present: Elemica (contractor via SoftwareMill), Scala Developer
Implementing a new supply chain operating network to connect suppliers all over the world.

12/2012 – 9/2013: UpNext (contractor via SoftwareMill), Java Developer
Implemented new features in a Push Notifications system, used to send notifications to phone apps.

3/2011 – 9/2012: First National Bank (contractor via SoftwareMill), Java Developer
Developed a collateral system, re-engineered existing application to add new functions.

10/2010 – present: SoftwareMill (contractor), Java Developer
Developed a document workflow system, created a Swing-based desktop client for file synchronization and a server REST API.

9/2010 – 2/2011: Attikis (contractor via SoftwareMill), Developer
Developed software to monitor home alarm systems and take action based on a defined set of  rules such as sending SMA, email, or calling over VoIP.

9/2007 – 9/2010: Nykredit (contractor via 7N), J2EE Consultant
Developed insurance offers & advice systems, created Web interface to a mainframe system allowing preparation of insurance offers for private and business customers, supported customer needs.

9/2007 – 9/2010: Nykredit (subcontractor) J2EE Consultant
Generated new development deals for a real estate development company that focuses on multi-family residential projects, including real-estate market analysis.

9/2007 – 9/2010: 7N Sp. Z o.o. (subcontractor), J2EE Consultant
Developed pension and insurance systems for large Danish bank.

7/2007 – 8/2007: CSC (employee), Application Developer

4/1999 – 6/2007: Delphi Automotive Systems (employee) Software Developer
Web/Workflow/Office developer, infrastructure engineer, information systems & services engineer. Created a dedicated workflow system to optimize and speed up document flow between different departments; developed applications to support shop floor operations; developed shop floor efficiency monitoring; collected and analyzed production data to generate reports for top management; provided network and user support; developed an HR support system; managed employee training and development of personal business plans; developed a warehouse management system; managed warehouse space; optimized production plans.

1/1998 – 4/1999: ZUS (employee), Computer Systems Engineer
Provided network and user support.

**VOLUNTEER WORK**

6/2010 – present: Apache Software Foundation
Apache Struts Lead Developer, Member & Struts PMC member.

1/2009 – present: Confitura conference (Java Conference for Polish community)
Main organizer, financial coordinator, contact with partners.

5/2008 – 12/2011: Java Developer's Network, Editor
Nonprofit web site reporting on Java related technologies.

**ORGANIZATIONS**

Apache Struts PMC, Member, 2010 – current.
Warszawa Java User Group, Board Member, 2008 – 2011.
Warsjawa 2009, Organizer and Lecturer, 2009.
Founder of Warsaw Design Patterns Study Group, 2008.

# Stephen Slater, Ph.D., CISSP

Dr. Stephen Slater is the founder and CEO of Security Compliance Corporation.  He has over 20 years' experience providing a range of consulting services in web application vulnerability assessments and penetration testing for some of the  world's top companies.  He holds CISSP[1] and SANS GPEN certifications.[2] He wrote the six-day SANS class SEC615 - Secure Internet Presence (LAMP) focusing on security web  application development and management.  He has also served as a Senior Instructor  for both the SANS Institute and the MIS Training Institute.

## EDUCATION

Ph.D. in Nuclear Engineering, Parallel Computing, University of California, Berkeley
Master of Science in Nuclear Engineering, University of California, Berkeley
Bachelor of Science in Nuclear Engineering, Oregon State University

## RECENT EXPERIENCE

2015 – present: Security Compliance Corporation, Founder & CEO
Creator of Access Auditor suite of security software products. Providing executive security consulting services for companies including Starwood Hotels, Jet.com,  Looker, and more.

2015: Jet.com *(Acquired by Wal-Mart),* Interim Chief Security Officer
Created a scalable security and risk management program; designed and presented long-term security strategy; implemented security defenses.

2010 – 2015: Responsys *(Acquired by Oracle),* Chief Security Officer
Created a complete information security program; implemented core IT security program for defense in depth; created an application and product security program.

2007 – 2010: Salesforce.com (CRM), San Francisco, CA, Information Security Director
Creator of five patent-pending products[3] for the world's leading cloud computing vendor; delivered information security strategies and technologies.

2003 – 2007: Visa, Foster City, CA, Chief Security Architect
Lead security architect for one of Visa's most visible customer-facing applications deployed to  over 10,000 banks and merchants worldwide.

## SELECTED HONORS

Awarded full support fellowships from National Science Foundation and US Department of Energy.

---

[1] ISC[2], Certified Information Systems Security Professional ("CISSP"),
https://www.isc2.org/Certifications/CISSP ("The CISSP is . . . the most globally recognized standard of achievement in the industry").
[2] SANS Institute, GIAC Penetration Tester ("GPEN"), https://pen-testing.sans.org/certification/gpen.
[3] Patents relate to securing chatter messages, chatter ranking, online fraud detection and prevention, security configuration auditing and risk analysis.

**Education & Experience – Anna M. Winningham, CISSP ®**

**Executive Vice-President, RCS**

Anna M. Winningham is a former Special Agent for the Federal Bureau of Investigation (FBI). During her 13 ½ year tenure with the FBI she served as a case agent and a Supervisory Special Agent, overseeing multiple long-term, complex investigations including organized crime, drug, counter-terrorism, kidnapping and extortion investigations. In her last assignment with the FBI, Ms. Winningham was the Supervisory Special Agent for the Crisis Response Squad of the Los Angeles Field Office. Her responsibilities included oversight and management of the Evidence Response Team, the Crisis Negotiations Team, the Special Weapons and Tactics Team, and the Weapons of Mass Destruction (WMD) response (which included all operational WMD components).

As an FBI Special Agent, Ms. Winningham gained extensive experience as an investigator, collecting and reviewing of evidence from multiple sources, and the utilization of multiple investigative techniques, to include physical surveillance, the collection of data from electronic devices (computers, phones, disk drives, etc.), the review of closed circuit television (CCTV) videos, the use of undercover persons and informants, the review of public documents, and many other types of techniques. As a result of her years working organized crime and drug investigations, she gained an expertise in the operations of criminal enterprises, to include street gangs, organized crime and entities involved in thefts.

In her post bureau career, Ms. Winningham obtained her private investigator's license through the State of California Bureau of Security and Investigative Services in 2005 and in 2006 was certified as a Certified Protection Professional ® (CPP) thru ASIS International (ASIS). Additionally, she has completed the International Information System Security Certification Consortium, Inc., (ISC)²® certification course and is certified as a Certified Information System Security Professional® (CISSP). Ms. Winningham stays current with the latest security practices and investigative procedures thru her long-term association with FBI executive management, as an active member of the Society of Former Special Agents and InfraGard (a non-profit organization serving as a public-private partnership between U.S. businesses and the FBI).

Following her career with the FBI, Ms. Winningham has been employed as a private investigator, and has conducted multiple investigations, during which she has obtained and reviewed evidence and information. Some of these cases have involved in-depth analysis of information and intelligence collected, to include the review of electronic information. Ms. Winningham has used this information to provide her clients with appropriate responses to situations including cyber compromises, civil and criminal litigation. Over the past 20 years, she has testified in both state and federal criminal and civil courts, and has served as an expert witness for counsel in Federal court regarding workplace violence and cyber breach matters.

Ms. Winningham has a bachelor's degree from the University of Texas – El Paso, where she specialized in Soviet and East European Politics, and completed Russian studies programs at both the US Army Russian Institute and Middlebury College. She is a military veteran, having served in the U.S. Army as an Ordnance Officer and was assigned to the 82nd Airborne Division for several years.

# STEVEN J. J. WEISMAN

## EDUCATION

\#      J. D. Degree, Boston College Law School, 1973
\#      B.A. Degree, U. of Massachusetts, 1970, major in Philosophy

## PROFESSIONAL AFFILIATIONS

\#      Member of Massachusetts Bar and Federal Bar
\#      Admitted to practice before the United States Supreme Court
\#      Member of the Massachusetts Bar Association and the American Bar Association

## EXPERIENCE

1973-1975    Attorney, Law offices of Paul T. Ford, Esquire, 49 South Pleasant, Amherst, Massachusetts (general practice of law).

1974-1975    Public Defender Holyoke, Massachusetts District Court.

1975-present  Sole practitioner (general practice of law).

1979-1984    Author of weekly newspaper column "You and the Law" in Amherst Bulletin newspaper.

1980-1982    Weekly legal commentator on television show "22 Alive" on station WWLP in Springfield, Massachusetts.

1982-2000    Talk show host of "Attorney Steven Weisman Show" on Boston radio station WRKO.

1990-1996    Temporary Faculty University of Massachusetts, Curry College and Boston University, instructing Business Law I, Constitutional Law, Advanced Constitutional Law, Legal Research, American Presidency and Legal Writing.

1998-2006    Adjunct Faculty Bentley College teaching Elder Planning, Marriage Separation and Divorce, Sports & Entertainment Law, Estate and Gift Tax

2000-2003    Talk show host of Live Money with Steve and Ginger on Boston radio station WBIX.

2000-2004    Daily legal commentaries on morning shows for Boston radio station WBIX

2001-2016    Co-host of nationally syndicated radio show "A Touch of Grey"

2005-present  Weekly commentator on legal matters for nationally syndicated "Good Day"

2007-present  Senior Lecturer at Bentley College

**SELECTED PUBLICATIONS**

1979-present  Author of numerous articles on legal matters, consumer matters and financial planning for various publications including the Boston Globe newspaper, Boston Magazine, US Air Magazine and Playboy Magazine.  Quoted in New York Times, Money Magazine, Washington Post, Business News Daily, Wall Street Journal, Chicago Tribune.  Interviewed on ABC, CBS, MSNBC, Fox News, ABC Nightline, CNN/fn,New England Cable News, CBS Morning News, ABC World News, NPR. Complete list available on request.

2007-present  Frequent appearances on radio and at conferences and in interviews to speak on identity theft, internet scams including NPR, CNBC, The Dr. Phil Show, The Wall Street Journal, and Barron's Magazine, Bottom Line Wealth Magazine.  Weekly commentator on scams and identity theft on WGGB, the ABC television affiliate for Springfield, Massachusetts. Complete list available on request.

1995-present  Legal Editor, Talkers Magazine

2002          Achievement in radio award-best afternoon radio show in Boston.

2003          Author, "A Guide to Elder Planning: Everything You Need to Know to Protect Yourself Legally and Financially" published by Prentice Hall.

2004          Author, "Fifty Ways to Protect Your Identity and Your Credit: Everything You Need to Know about Identity Theft, Credit Cards, Credit Repair and Credit Reports" published by Prentice Hall.

2007          Author, "The Truth About Avoiding Scams" published by Prentice Hall

2008          "The Truth About Avoiding Scams" chosen as one of the Top Ten Business Books of the Year by "Smart Money" Magazine

2013          Author of "50 Ways to Protect Your Identity in a Digital Age" published by Prentice Hall

2014-present  Correspondent for Newsmax television

2014          Author of "Identity Theft Alert" Published by Prentice Hall

2014-present Columnist for USA Today, bankrate.com & The Saturday Evening Post

# Robert Zeidman

**SUMMARY**

Robert Zeidman has management experience in the founding and daily operation of various high-tech companies as well as hands-on experience designing, analyzing, and reverse-engineering hardware and software. Mr. Zeidman is considered a pioneer in the fields of analyzing and synthesizing software source code and the creator of the field of Software Forensics. He regularly  teaches courses in these areas at universities and conferences throughout the world.

**EDUCATION**

Bachelor of Science with distinction in Electrical Engineering, 1981, Cornell University
Bachelor of Arts *cum laude* in Physics and with distinction in all subjects, 1981, Cornell University
Master of Science in Electrical Engineering, 1982, Stanford University

**RECENT EXPERIENCE**

10/1987 - present: Zeidman Consulting, Founder and President
Provide engineering hardware and software design services to companies; engineering support and expert witnesses for high-tech litigation.

8/2007-present: Software Analysis & Forensic Engineering Corporation, Founder and President
Created various patented software tools for intellectual property litigation for efficiently finding correlation between source  code files of different programs.

1/2002 - present: Zeidman Technologies, Founder and President
Created various patented software tools for embedded software development.

**RECENT SELECTED HONORS, AWARDS & DISTINCTIONS**

- Outstanding Engineer in a Specialized Field: For Pioneering Contributions to the Field of Forensic Software Analysis, IEEE Region 6 Central Area, 2015.
- Final Round, 2011 Jolt Awards, for the book *The Software IP Detective's Handbook: Measurement, Comparison, and Infringement Detection.*
- Outstanding Engineer in a Specialized Field: For Innovative Contributions in the Area of Forensic Software Analysis, IEEE Santa Clara Valley Section, 2010.

**RECENT SELECTED PUBLICATIONS**

Bob Zeidman, *Just Enough Electronics to Impress Your Friends and Colleagues*, Swiss Creek  Publications, Cupertino, CA, 2013, 214pp.

Bob Zeidman, *The Software IP Detective's Handbook: Measurement, Comparison, and  Infringement Detection*, Prentice-Hall, Upper Saddle River, NJ, 2011, 450pp.

Bob Zeidman, *Designing with FPGAs and CPLDs*, CMP Books, Lawrence, KS, 2002, 220pp.

Bob Zeidman, *Introduction to Verilog*, IEEE Press, Piscataway, NJ, 2000, 99pp.

Bob Zeidman, *Verilog Designer's Library*, Prentice-Hall, Upper Saddle River, NJ, 1999, 411pp.

# ANITA L. ALLEN
## VICE PROVOST FOR FACULTY
University of Pennsylvania
122 College Hall
Philadelphia, PA. 19104
Office: (215) 898-4032 Fax (215) 476-4771 anita.allen@upenn.edu

### HENRY R. SILVERMAN PROFESSOR OF LAW AND PROFESSOR OF PHILOSOPHY
3501 Sansom Street
Golkin Hall 235
Philadelphia, PA  19104
Office: (215) 898-9035 Fax: (215) 573-2025 aallen@law.upenn.edu


**Education:** Anita L. Allen is a JD graduate of Harvard Law School and holds a PhD in Philosophy from the University of Michigan.

**Current Employment:** Allen is Vice Provost for Faculty and the Henry R. Silverman Professor of Law and Professor of Philosophy at the University of Pennsylvania. She holds a secondary affiliation with the Department of Africana Studies and is a Senior Fellow of the Leonard Davis Institute of Health Economics. In her fifth year as university-wide Vice Provost for Faculty for Penn's twelve schools, she manages faculty appointments, promotions and tenure, reviews faculty salaries, oversees faculty benefits,  climate and diversity/inclusion initiatives, and also chairs the Provost's Arts Advisory Committee.

**Legal Academy Leadership**: Formerly a Deputy Dean at Penn Law School, Allen was the 2013 recipient of the annual A. Leo Levin Award for Excellence in an Introductory Course (Torts). She has overseen SJD theses of lawyers from Canada, Israel, Taiwan and China. Prior to coming to Penn, Allen was Professor and Vice Dean for Research and Scholarship at Georgetown University Law Center. She began her teaching career on the faculties of Carnegie-Mellon University and Pittsburgh Law School, and she has been a full-time visiting professor at Harvard Law, Yale Law, Villanova Law and Waseda University Law School, Tokyo. Allen was a fellow of the Law and Public Affairs Program at Princeton University. Allen is featured in a Penn Coursera MOOC, *Introduction to American Law*, lecturing on Torts. She served on the Association of American Law Schools' Executive Committee, after chairing its sections on Jurisprudence and Privacy and Defamation. Allen served on the founding Executive Committee of the interdisciplinary Association for the Study of Law, Culture and the Humanities, on the American Association of University Women's Legal Advisory Board and on American Association of University Professors' Litigation Committee.

**Legal Profession**: Allen is a member of the Pennsylvania and New York state bars. She was an Associate Attorney with Cravath, Swaine and Moore after graduating from Harvard, and was a Summer Associate with Milbank Tweed in New York and the former Gaston Snow in Boston. Today, she is an elected member of the American Law Institute. She offers CLE training for lawyers through the Practicing Law Institute in New York and for the federal and state judiciaries in Pennsylvania. Allen has served as an expert witness, and consults with law firms and lawyers on issues relating to professional ethics, bioethics, and data protection. She formerly served on the National Association of Women Lawyer's Supreme Court Committee.

Allen was appointed to the first Pennsylvania Continuing Judicial Education Board of Judges in 2016. Allen served several terms on the Board of the Bazelon Center for Mental Health Law and has served on the ACLU Privacy Committee. Today she serves on the National Academies Forum on Cyber Resilience, and the Board of the Electronic Privacy Information Center (EPIC). In June 2014, she received a Lifetime Achievement Award from EPIC for pioneering privacy scholarship and advocacy.

**Research and Impact**: Allen is an expert on privacy and data protection law and ethics, co-author of *Privacy Law and Society* (2016), a comprehensive textbook. Allen's sole-authored books include *Unpopular Privacy* (2011); *The New Ethics* (2004), *Why Privacy Isn't Everything* (2003), and *Uneasy Access* (1988). Allen's ideas have been published in the *Harvard Law Review Forum*, the *Stanford Law Review*, the *Chicago Law Review*, the *California Law Review*, and many other law journals; she has published more than 100 scholarly articles, essays and book chapters. She is frequently quoted in major media and has contributed opinion pieces to newspapers, magazines and blogs (e.g., *Daily Beast*, *Politico, Star-Ledger, O Magazine*), appeared on numerous television and radio programs, and lectured and taught nationally and internationally in Canada, China, Japan, Taiwan, and Israel and throughout Europe.

**Philosophy and Ethics**: Allen has served on numerous editorial, advisory, and non-profit boards relating to academic philosophy and practical and professional ethics. In 2017 Allen was elected Vice President and President Elect of the American Philosophical Association, Eastern Division. She has served on the Association for Practical and Professional Ethics' Executive Committee and the Hastings Center's Board of Directors. She has participated as an instructor in Penn's Bioethics Boot Camp for philosophy graduate students and in the summer program of Penn's Center for Neuroscience and Society. She is currently a Fellow of the Johns Hopkins University Humanities Center, and was a summer faculty member of the School of Criticism and Theory at Cornell University in 2016. She has been recognized by the Collegium of Black Women Philosophers and received the Alain Locke Award for Contributions to Legal Philosophy.

**Medicine and Health Care**: Allen was inducted into the National Academy of Medicine in 2016. Under both of President Barack Obama's terms of office, she served on the Presidential Commission for the Study of Bioethical Issues. She was a member of the recent American Psychological Association Commission on Ethics Processes, and is currently serving on the IRB of the NIH Precision Medicine Initiative, as well as on the Board of Directors of the WCG Foundation, a medical charity.

**Personal:** Allen was born in Port Townsend, Washington. She is married to an attorney and has two adult children. She enjoys gardening, art museums and travel; and is a member of the Bryn Mawr Presbyterian Church.

## Case Management Plan for Consumer Actions

This case management plan identifies the tasks necessary to efficiently coordinate and prosecute the litigation following consolidation through discovery and dispositive motions and those undertaken to date.

**Evidence Preservation:**
- Notice was sent to defendants' counsel and shared with plaintiffs' counsel.

**Fact Investigation**
- Questionnaire was prepared, distributed and information collected from plaintiffs.
- Continue investigation of factual sources.
- Prepare chronology of events and cast of characters.

**Legal Research/Substantive Briefing**
- Continue research to identify any state or federal cause of action not already asserted.
- Motions and other briefing to be undertaken as necessary.

**Consolidated Complaint**
- Continue preparation of consolidated complaint to include results of factual investigation and legal research.

**Case Management**
- Prepare Case Management Order specifying all events and deadlines.
- Discuss protocols with defendants' counsel to govern document preservation, a protective order, limitations on discovery and electronically stored information, including the identification of custodians, search terms and review techniques.
- Prepare preliminary report and discovery plan jointly with defendants' counsel.
- As directed, assist Court in coordinating remaining state cases.
- Establish, explain, and enforce time- and expense-keeping requirements.
- Identify and assign tasks as needed.
- After exchange of substantive documents, explore settlement through mediation and look for resolution opportunities throughout the litigation.

**Damages/Injunctive Relief &Expert Tasks**
- Continue to retain experts as needed.
- Continue to investigate categories of damages suffered and determine whether injunctive relief is appropriate and in the best interests of the Class members.