# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

|  |  |
|---|---|
| ) | |
| ) | |
| IN RE: EQUIFAX, INC., ) | MDL Docket No. 2800 |
| CUSTOMER DATA SECURITY ) | No.: 1:17-md-02800-TWT |
| BREACH LITIGATION ) | |
| ) | CONSUMER ACTIONS |
| ) | |
| ) | |

# APPENDIX TO THE APPLICATION
# OF STEVEN F. MOLO FOR APPOINTMENT
# TO THE CONSUMER PLAINTIFFS' STEERING COMMITTEE

Steven F. Molo
MOLOLAMKEN LLP
430 Park Avenue
New York, New York 10022
Tel.: (212) 607-8160
Fax: (212) 607-8161
smolo@mololamken.com

# **TABLE OF CONTENTS**

**Document**                                                               **Page**

*Lawdragon*, "Lawyer Limelight: Steve Molo" (Oct. 4, 2016) .................................. 1

*The National Law Journal*, "Litigation Boutiques Hot List: MoloLamken – A Fanatical Approach to Preparation" (Feb. 3, 2014) .............................................. 6

*The National Law Journal*, "Appellate Hot List: MoloLamken" (Nov. 2017) ......... 8

*The National Law Journal*, "Litigation Boutiques Hot List" (Feb. 8, 2016) ........... 9

Letter to Plaintiffs' Counsel in Equifax Inc. Consumer Data Breach Litigation from Steven F. Molo re: Litigation Hold (Oct. 11, 2017) ......................................... 12

Letter to Equifax Inc. and King & Spalding LLP from Steven F. Molo re: Notice to Preserve Evidence (Sept. 26, 2017) ................................................................... 13

Letter to King & Spalding LLP from Steven F. Molo re: Protective Orders (Oct. 16, 2017) ............................................................................................................ 17

*Thomson Reuters Forum*, "How MoloLamken Plays Larger Than Its Size" (2015) ............................................................................................................... 18

MoloLamken 2018 Vault Profile Highlights .......................................................... 21

*Benchmark Litigation*, MoloLamken: Benchmark Analysis ................................... 23

*Benchmark Litigation*, Benchmark Featured US Firm – MoloLamken (Jan. 13, 2016) .................................................................................................... 25

*Leading Lawyers Magazine—Business Edition*, "Steve Molo: They're Building It in NY, DC and Chicago" (2014) ....................................................................... 26

Selected Biographies of MoloLamken Partners ......................................................29

   Steven F. Molo..........................................................................................29

   Jeffrey A. Lamken ....................................................................................34

   Megan Cunniff Church ...........................................................................39

   Thomas J. Wiegand..................................................................................40

   Justin B. Weiner.......................................................................................42


Selected Biographies of MoloLamken Associates .................................................43

   Allison Mileo Gorsuch.............................................................................43

   Rayiner Hashem.......................................................................................44

   Daniel Michaeli........................................................................................45

# LAWDRAGON

## Lawyer Limelight: Steve Molo

By John Ryan  |  October 4, 2016



*Photo by Greg Endries.*

Steven Molo acknowledges that it may have appeared a little crazy to start a law firm in the wake of the financial crisis, a venture he took on with appellate specialist Jeffrey Lamken. But it turned out to be a shrewd move for the talented litigators and entrepreneurs – building a thriving practice that has allowed them to take on the cases they want. For Molo, a perennial Lawdragon 500 member, that can include anything from plaintiff-side work over mortgage-backed securities to defending corporate executives or politicians in criminal cases.

"I am one of the very lucky people who can say I love what I do and believe this is the career I'm supposed to have," Molo says of being a trial lawyer.

A graduate of the University of Illinois College of Law, Molo cut his teeth as a prosecutor and then at the Biglaw firms of Winston & Strawn, where he served on the executive committee, and Shearman & Sterling before co-founding MoloLamken in 2009. The firm has offices in New York, Chicago and Washington, D.C.

**Lawdragon**: Your recent high-profile cases – the defense of New York politician Sheldon Silver, the NFL concussion litigation and mortgage-backed securities cases – point to the broad diversity of the types of criminal and civil matters you handle.  Can you talk a little bit about

how you decide what cases to take on? Is it just what happens to really draw your intellectual and subject matter interest?

**Steven Molo**: We look for matters – and it seems like matters look for us – in which we provide the greatest value. Sometimes it is about a case having our intellectual or subject-matter interest, but it is also about what we can bring to a matter.

We bring highly experienced courtroom advocacy skills and a strategic approach. Clients tell us that is not all that common. We work very hard at that – including in our recruiting and training of associates.

And, of course, we will share risk, investing in cases we believe in alongside our clients. While many clients – companies, foreign sovereigns, investors, executives, inventors – come to us directly, we take great pride in the fact that much of our work is referred to us by other lawyers. We often partner with other firms and, recently, one of the truly great global firms retained us as its counsel in a significant matter.

**LD:** As a lawyer for players who opposed the NFL concussion settlement, do you have any comment on recent developments?

**SM:** The 3rd Circuit recently affirmed the settlement. We are grateful that District Court Judge Anita Brody, who devoted tremendous time and thoughtful effort to the matter, gave us a voice in the case. A number of substantial improvements were made in direct response to our objections. They likely increased the value of the settlement by over $100 million and brought additional relief to class members suffering severe injuries. It is our sincere hope this gets resolved in short order and class members can begin benefitting from the relief the settlement can provide.

**LD:** The Sheldon Silver case seemed to present a tough challenge with public opinion so overwhelmingly negative toward politicians – especially those in office a long time. Do you have a shot on appeal?

**SM:** Absolutely. The Supreme Court's recent decision in the McDonnell case will be a major factor. We have raised a number of other significant issues and believe the law is on our side.

**LD:** From an outsider's perspective, it seems a little counterintuitive to have started your own firm not long after the start of the financial crisis, given that you and Jeff were both doing well at big firms. Why start a new firm then?

**SM:** Counterintuitive? Many people thought we were crazy. Both Jeff and I had established careers with excellent firms. But we also both had an overwhelming desire to create a firm that would be first, grounded in excellence in advocacy, and second, entrepreneurial and able to turn that excellence into financial success.

http://www.lawdragon.com/2016/10/04/lawyer-limelight-steve-molo/

The timing actually was great because many clients were in the midst of re-thinking their relationships with outside firms. The crisis also provided a lot of opportunities to get hired on complex financial-services-related litigation and investigations. And, of course, if you were willing, as we were, to sign your name on a lease in Midtown Manhattan or Foggy Bottom, real estate was reasonably priced.

**LD:** If you had to give one or a few pieces of advice to lawyers considering starting their own firm, what would you say?

**SM:** First – have a well-defined vision of what you want to be. Commit to it and let it drive every decision you make – hiring, compensation, client selection, office location and design, what your website looks like. Define your culture, build it, and live by it.

Second – recognize execution is as important as strategy. That often means basic blocking and tackling – billing and collecting, moving along the interview process, being sure the team has the technology and other tools needed to do the job well.

Third – take calculated risks and be prepared to adjust and move forward if things don't go as planned. You can always find a reason not to do something that involves risk – adding a new partner, experimenting with a different fee structure, undertaking a new marketing initiative.

If you think things through, some risks will pay off and you will profit and grow. Yet, others won't and you cannot beat up yourself or, more importantly, others in the firm when that happens. We are big on what the military calls "after action reviews." We try to take the time to evaluate what occurred and learn from our failures as well as our successes.

**LD:** I would assume that hiring and staffing is of extreme importance for a lean firm like yours, given the types of cases you handle, and that the opponent law firms will often be much larger. What has been your philosophy in terms of the type of lawyers you have looked to build with, in terms of both skill set and personality?

**SM:** Our firm begins and ends with our people. We look for people who are bright and have had some accomplishments in terms of academic success, a judicial clerkship, maybe government service. But that's only the beginning. We've spent a lot of time – working among ourselves and with consultants – to develop an interviewing regimen designed to identify people who will thrive in our culture. That means a demonstrated interest in the kind of work we do, an ability to communicate well, a commitment to teamwork, an appropriate level of confidence and presence that will play well with clients and other lawyers, and an entrepreneurial spirit.

Candidates interview with every partner and associate. We are open and direct with them about who we are and how we work, and we encourage them to be honest with themselves and with us in response. It takes a lot of time but it's worth it.

**LD:** Backing up a bit, was this the type of practice you envisioned having while in law school? Did you always want to be a trial lawyer going back even farther?

**SM:** Yes. I am one of the very lucky people who can say I love what I do and believe this is the career I'm supposed to have. I am fortunate that Jeff Lamken, a tremendously talented lawyer, shared a vision to form the firm and that we have an outstanding team devoted to making MoloLamken a world-class litigation firm. I feel the firm provides a tremendous vehicle for the full employment of my talents and I hope that that's true for every lawyer who joins us.

**LD:** You are known as a great courtroom advocate. How does a younger lawyer today develop those skills?

**SM:** Getting on your feet in court, of course, is the best way to learn. It is not always easy to get the opportunity. Our people have no choice. They all attend NITA [National Institute for Trial Advocacy] when they start with us and then they're off to the front lines. One of our mid-level associates cross-examined seven witnesses in a criminal case I tried to a jury in federal court in Chicago earlier this year. But you can learn a lot from watching great lawyers, reading transcripts, and reading books about trials. You have to be committed and seek out opportunities, and be ready to run with the ball when it is handed to you.

**LD:** Is there a single tip for successful advocacy that you can share?

**SM:** To quote Mies van der Rohe, "Less is more." Too many lawyers wallow in the minutiae and lose perspective. In the end we are there to persuade rather than to prove we are right – if that makes sense. As humans we communicate through narratives. Great advocates – at both the trial and the appellate level – are great story tellers who are able to clearly and simply set out a path for a jury or court to follow and decide in their favor. That means intellectual honesty and editing. Having the confidence and good sense not to introduce eight documents because the point is better made with two, or to drop a final argument in a brief because there's no way it will carry the day is the mark of good advocacy. Fortunately for our firm and for me, it's far less common than you might think.

**LD:** Was there a mentor in the prosecutor's office in Chicago, or perhaps in your early days at Winston & Strawn who was particularly influential in your development as a litigator?

**SM:** Wow. There's always a risk in answering a question like this that you will forget to mention someone or their name will be edited out. I've had some wonderful people generously provide me with insight and guidance throughout my career. Paul Biebel, who just retired as the Presiding Judge of the Cook County Circuit Court Criminal Division, was an early mentor who let me learn by doing. Winston & Strawn's Chairman, Dan Webb, has been an important influence. I worked for him for about five years as an associate and a junior partner – we tried several major cases together. Judge Joel Flaum on the 7th Circuit and Ty Fahner at Mayer Brown have been there throughout my career. Gary Naftalis, Greg Joseph, Bill Pratt, and Bob Fiske all have been terrific influences since New York became a bigger part of my practice. And when we

started the firm, people like Steve Susman, Mark Kasowitz, Fred Bartlit, Mike Lynn and others around the country were supportive and helpful.

**LD:** Can you share a fellow trial lawyer you have come up against in court whom you admire, and why?

**SM:** Another risky one. Rather than a lawyer, I will give you a firm – Jenner & Block. They have been opposite me more times than any other single firm throughout my career. We've had some great battles – the Ron Perelman case against Morgan Stanley; Paul Smith and I spent a day arguing some of the key issues early in the RMBS litigation; the last case I tried at Winston & Strawn had [former Jenner chair] Jerry Solovy representing a hedge fund suing my client, UBS. As a young government lawyer I dealt with Bert Jenner on a case. He then sponsored my admission to the U.S. Supreme Court bar. We've also been on the same side in some important matters. They are smart, tough advocates. Well – now I have irritated my friends at the other great litigation firms throughout the country.

# THE NATIONAL
# LAW JOURNAL

FEBRUARY 3, 2014

An **ALM** Publication

# LITIGATION BOUTIQUES HOT LIST

**SPECIAL REPORT** | At the 10 law firms spotlighted here, it's all about skill, not size. The lawyers at these litigation shops, all of which have fewer than 51 attorneys, are as clever at practicing on paper as they are at wooing a jury. Many of these lawyers have honed their craft at the biggest and best firms in the nation and have opted, once they've gained crucial work experience, for a small-firm career. We've highlighted the special strategies and creative approaches they used in 2013 to help set precedent, right wrongs and save the day for the client.



**MOLOLAMKEN**

# A Fanatical Approach To Preparation

In early 2013, the Lao People's Democratic Republic changed attorneys in a dispute in New York federal court over how the Southeast Asian nation would pay a $56 million arbitration judgment against it.

It was a sobering assignment for the Laotian government's new counsel, MoloLamken. The case was complex, the cli-

ent was new to U.S. litigation and MoloLamken's chief witness was a Laotian official who spoke English, but not well.

Despite the obstacles, MoloLamken attorneys Steve Molo and Robert Kry persuaded the court to deny sanctions against their client. Although the case continues (the court is considering a motion to set

aside the arbitration award), it exemplifies MoloLamken's broader litigation strategy.

The firm is fanatical about preparing its cases, staying focused on the outcome instead of the process and keeping distractions at bay. That formula has served the young firm well. Molo and Jeff Lamken launched their boutique with



STEVE MOLO, LEFT, AND JEFF LAMKEN

## TRIAL TIPS

■ Assume from the outset that the case will be tried.

■ Eliminate the distractions. The trial team should function with military precision. Anticipate and accommodate all of the logistics for the trial team so you can focus on preparing for testimony and arguments.

■ Focus on the story. As humans, we communicate through narratives.

—STEVE MOLO, JEFF LAMKEN

## FIRM FACTS

**Founded:** 2009 ■ **Largest office:** New York ■ **Total No. of Attorneys:** 21 ■ **Partners:** 9 ■ **Associates:** 10

five attorneys in 2009. It now has 21 staff attorneys and five wins before the U.S. Supreme Court.

MoloLamken starts with deep conversations with the client that lead to a tight focus on outcomes. Next, the firm writes a detailed project-management plan, complete with a timeline. The plan helps MoloLamken manage the details, avoid surprises and anticipate legal issues.

The firm then masters the evidence. Finally, its attorneys practice in moot court, not once but twice. A MoloLamken attorney in oral argument is going through the material for the third time. At that point, Lamken said, "You're not surprised."

MoloLamken has figured in prominent cases. When Congress blocked cost-of-living pay raises for federal judges, prompting several jurists to file a class action, MoloLamken weighed in with an amicus brief on behalf of the Federal Judges Association.

The lead attorney for the judges, Chris Landau of Chicago-based Kirkland & Ellis, said MoloLamken advanced a statutory argument that proved instrumental in his clients' victory. "They were the most effective amicus that I ever had," Landau said.

Retired U.S. District Court Judge John Martin, now a partner at New York-based Martin & Obermaier, was brought in by MoloLamken to work on an investigation and a big securities case. "They're willing to bring in other people to work with them," Martin said. "That's a very good thing that not a lot of people do."

—GEORGE ERB

Reprinted with permission from the February 3, 2014 edition of THE NATIONAL LAW JOURNAL © 2014 ALM Media Properties, LLC. All rights reserved. Further duplication without permission is prohibited. For information, contact 877-257-3382, reprints@alm.com or visit www.almreprints.com. #005-02-14-11



# THE NATIONAL LAW JOURNAL

NOVEMBER 2017

An **ALM** Publication

# APPELLATE HOT LIST | A SPECIAL REPORT

Our 2017 special report features an elite group of lawyers and law firms that posted hard-fought wins at the U.S. Supreme Court or in federal circuit courts. How do they do it? Luckily, these appellate aces offer great advice: listen to colleagues, answer the question, read good writing and, in oral argument, position yourself like a jazz musician—always be ready to improvise. Presenting this year's honorees in their own words, edited for clarity and length.

—Lisa Helem

## MoloLamken

■ **TELL US ABOUT YOUR TOP U.S. SUPREME COURT OR FEDERAL CIRCUIT COURT VICTORY OVER THE PAST YEAR AND HOW YOU AND YOUR TEAM ACHIEVED THE WIN.** Our top Supreme Court win was *Hasty v. Abbasi*. Early on, we identified cert.-worthy issues of interest to the Supreme Court, carefully positioning them on appeal. When the Second Circuit panel partially ruled against us, we obtained a six-judge dissent from denial of rehearing en banc virtually urging the Supreme Court to take the case. Careful coordination with government counsel (including OSG), and a highly effective petition, prompted the Supreme Court to grant review on three questions presented. Exhaustive research and a meticulously crafted



Jeffrey Lamken

argument led to complete victory on the merits for our client.

■ **HOW DID YOUR FIRM APPROACH APPELLATE SUCCESS OVER THE PAST YEAR?** In every case, we invest the creativity, thought, time, and energy

necessary to produce high-caliber, game-changing legal work. We have only "A" teams—no "B" teams—and senior lawyers are deeply involved in the details at each step of each engagement.

■ **WHAT PRACTICE ADVICE WOULD YOU GIVE YOUR YOUNGER SELF?**

1. Listen and hear: Understanding the views of each team member, especially perspectives contrary to your preconceptions, is critical.

2. A good brief arranges the best arguments to tell a coherent and compelling story. Great briefs also subtly motivate courts, giving them ownership of your issues.

*Response submitted by Jeffrey Lamken, a partner at MoloLamken.*

Reprinted with permission from the November 2017 edition of THE NATIONAL LAW JOURNAL © 2017 ALM Media Properties, LLC. All rights reserved. Further duplication without permission is prohibited.
For information, contact 877-257-3382, reprints@alm.com or visit www.almreprints.com. #005-10-17-18

9



# THE NATIONAL
# LAW JOURNAL

FEBRUARY 8, 2016

An **ALM** Publication

# LITIGATION BOUTIQUES HOT LIST

## A SPECIAL REPORT



**STEVEN MOLO AND JEFFREY LAMKEN**
**MOLOLAMKEN**



FEBRUARY 8, 2016

# LITIGATION BOUTIQUES HOT LIST | A SPECIAL REPORT

They may be small, but their cases are as big as they come. This week, we spotlight 10 litigation boutiques with up to 50 lawyers who enjoyed stand-out accomplishments in 2015. These firms, located on either coast or points in between, secured key victories—whether in monetary terms or by establishing important precedent at the trial or appellate level. Most of the wins were on the defense side, and the outcomes affected banking and finance sectors, pharmaceuticals and life sciences, international law, employment law, technology, manufacturing and more.

Their clients often are heavyweights, including major sports leagues, pop artists and industry leaders. We also asked these attorneys to provide some insight into what's made them successful, and the advice they've found most useful in steering their careers. Some practitioners received words of wisdom while they were mere children; others did so when they were still in law school or just starting to practice law.

The NLJ based its Litigation Boutiques Hot List selections on nominations submitted by the firms themselves and our own reporting.

# MoloLamken

MoloLamken is a boutique with big bandwith. In 2015, its 26 lawyers took on clients ranging from former National Football League players to the former speaker of the New York Assembly and the central bank of Iran. The full gamut of litigation—from intellectual property to securities and white-collar defense—came through the firm's doors in New York, Washington and Chicago.

But the mix of cases is not that new for the six-year-old firm, co-founder Steven Molo said. "We're advocates first, subject-mat-

ter experts second." Co-founder Jeffrey Lamken said the variety of cases is part of "what makes it a fun practice."

Fun was on Lamken's mind when he left Baker Botts to create the boutique firm with Molo in 2009. Recalling the days when he was at a seven-lawyer firm in D.C., Lamken said at the time, "We want to do something that was that fun, that high-powered."

Some of the firm's marquee cases involving unpopular clients last year were high-profile as well

as high-powered. Molo represented Sheldon Silver, the former New York Assembly speaker in what The New York Times described as the biggest corruption trial in New York in decades. Silver was convicted Dec. 1, though Molo said "the case is not over."

As for Lamken, he argued before the U.S. Supreme Court for Bank Markazi, the Iranian central bank, in a dispute over compensating the victims of Iran-backed terrorism. He told the justices that Congress interfered with the judiciary's powers by



FEBRUARY 8, 2016

passing a law that required certain frozen Iranian assets to be made available to victims in pending litigation. "Congress cannot limit its legislation to one and only one case such that it dictates the outcome," Lamken argued.

Both houses of Congress joined the Obama administration—a rarity—in filing briefs against Lamken's client. Some legislators thought it was remarkable that the Iranian government was even allowed to appear in U.S. courts.

"It didn't occur to me for a moment that the bank was not entitled to make its case before U.S. courts," Lamken said. As for representing an unpopular client, Lamken said, "For the system to work right, people need to be represented."

The families and victims seeking compensation in the Iran case were represented by former U.S. Solicitor General Theodore Olson, now a Gibson, Dunn & Crutcher partner. Olson had high praise for Lamken, who worked for him in the SG's office.

"Jeff is an outstanding lawyer with excellent judgment, poised, thoughtful, highly professional, gracious and a good friend," Olson said. "We often work on the same side, and he has helped us often with moots."

Also last year, Molo represented former football players who objected to the class action settlement with the NFL over the lingering effects of concussions. Lamken argued before the U.S. Court of Appeals for the Federal Circuit in a closely watched software patent case in the wake of the Supreme Court's 2014 *Alice v. CLS Bank* decision.

"It was an incredible year, but one to be proud of," Molo said.

—TONY MAURO

## FIRM FACTS
- **Largest offices:** D.C., New York
- **Total attorneys:** 26
- **Partners:** 8
- **Associates:** 13

## BEST ADVICE RECEIVED
Paul Larkin and Irv Gornstein, former assistants to the U.S. solicitor general, provided Jeffrey Lamken with some valuable insight into the profession, he said. "Advocacy is truth serum, so it is not enough to understand, to explain, to argue," they told him. "You have to believe. And you have to know what made you believe, so you can help others come to believe as well."



Reprinted with permission from the February 8, 2016 edition of THE NATIONAL LAW JOURNAL © 2016 ALM Media Properties, LLC. All rights reserved. Further duplication without permission is prohibited. For information, contact 877-257-3382, reprints@alm.com or visit www.almreprints.com. # 005-03-16-02

12



Steven F. Molo
MoloLamken LLP
430 Park Avenue
New York, NY 10022
T: 212.607.8170
F: 212.607.8161
smolo@mololamken.com
www.mololamken.com

October 11, 2017

**VIA EMAIL**

Plaintiffs' Counsel
Equifax Inc. Consumer Data Breach Litigation

   Re: Litigation hold

Dear Counsel,

   Like you, we have filed a class action against Equifax based on its massive data breach. Immediately after we filed suit, we sent a document preservation notice to the company and to King & Spalding.   We have also spoken with King & Spalding to confirm receipt and to establish a point of contact to address these issues.

   To assist in our collective efforts, I am attaching a copy of the notice we sent.

       Very truly yours,

       Steven F. Molo

Enclosure

cc:  Stephen D. Susman, Susman Godfrey LLP
    James E. Butler Jr., Butler Wooten & Peak LLP

13

# MOLOLAMKEN

Steven F. Molo
MoloLamken LLP
300 North LaSalle Street
Chicago, IL 60654
T: 312.450.6700
F: 312.450.6701
smolo@mololamken.com
www.mololamken.com

September 26, 2017

**VIA FEDEX**

John J. Kelley III
Corporate Vice President and Chief Legal Officer, Equifax Inc.
1550 Peachtree Street, N.W., H46
Atlanta, GA 30309-2402

Phyllis B. Sumner
King & Spalding LLP
1180 Peachtree Street
Atlanta, GA 30309

      **Re:  Notice to Preserve Evidence**

Dear Mr. Kelley and Ms. Sumner:

      We represent Plaintiffs Marc LaGasse and Andrea E. Petrungaro, individually and on behalf of those similarly situated, in connection with their class action lawsuit against Equifax Inc. and Equifax Information Services, LLC (collectively, "Equifax") concerning the Equifax data breach announced on September 7, 2017 (the "Data Breach").  The suit has been filed in the U.S. District Court for the Northern District of Georgia, Case No. 17-cv-3745.  The complaint is enclosed with this letter.

      Equifax has a legal duty to locate and preserve all evidence relevant to this lawsuit. Accordingly, we expect Equifax (a) to immediately suspend the automated and manual destruction of any and all electronic and/or paper documents, data, and information (hereinafter "documents") relating to Equifax's data security practices, websites and servers, and the Data Breach and (b) to order its employees to retain any such documents, wherever stored, including on work and personal computers and mobile devices.

      The relevant evidence that must be preserved includes, but is not limited to, the following categories of documents, the production of which will be demanded as soon as discovery commences under LR 26.2(A).  Unless otherwise specified, the requests will be for the period from January 1, 2013 up to and including the present.

1.  All documents concerning the Apache Struts CVE-2017-5638 vulnerability, Equifax's awareness of the vulnerability, and Equifax's efforts to identify affected websites and to respond to the vulnerability.

2.  All communications concerning the Data Breach, including but not limited to communications recognizing the Data Breach, communications concerning Equifax's response to the Data Breach, and communications identifying the cause of the Data Breach.

3.  Documents sufficient to show the portions of Equifax's websites that were compromised in the Data Breach.

4.  Documents sufficient to show the individuals responsible for securing those portions of Equifax's websites that were compromised in the Data Breach, including organization charts.

5.  Documents sufficient to identify the traffic logs, access logs, activity logs, server hard drives, server backups, and files concerning the Data Breach.   We also request that all such logs, hard drives, backups, and files be preserved.

6.  Documents sufficient to identify databases exposed to potential access by hackers.  Such databases should be preserved as well.

7.  Documents sufficient to identify the individuals whose personal data was exposed in the Data Breach.

8.  Documents sufficient to show the categories of personal data exposed in the Data Breach.

9.  Documents sufficient to show those responsible for any investigations of the Data Breach, including organization charts.

10. All documents reviewed or prepared in the course of any investigations of the Data Breach, including any investigations by Mandiant.

11. All documents relating to the "short-term remediation steps" indicated in Equifax's September 15 statement.

12. All documents relating to the "long-term security improvements" indicated in Equifax's September 15 statement.

13. All documents used in the preparation of public communications about the Data Breach, including draft press releases.

14. All documents concerning Equifax's efforts to notify consumers about the Data Breach.

15. All documents concerning Equifax's hiring of outside vendors to provide information technology security services or to advise on information technology security.

16. Documents sufficient to identify all outside vendors that provided or advised on information technology security.

15

17. All documents relating to benchmarking, or comparisons, of Equifax's data security with the data security of other organizations or data security industry standards.

18. The human resource files, performance reviews, and records relating to complaints concerning personnel with supervisory responsibilities over Equifax's information technology operations, including Susan Mauldin and Dave Webb.

19. Documents sufficient to show the policies, procedures, and practices of Equifax relating to data and network security.

20. All documents concerning internal or external audits of Equifax's data and network security.

21. All communications with federal, state, and local governments and regulatory authorities in the United States and other countries regarding the Data Breach.

22. Documents sufficient to identify all government and regulatory entities that have requested information from Equifax regarding the Data Breach.

23. All communications with investors and holders of Equifax corporate debt regarding the Data Breach and Equifax's data security practices.

24. Documents sufficient to show the policies, procedures, and practices of Equifax relating to the cataloguing of software and supporting frameworks used by Equifax servers and systems, including any resulting catalogues and reports.

25. Documents sufficient to show the policies, procedures, and practices of Equifax relating to the monitoring of Equifax servers for unusual access patterns, including notifications generated by any automated monitoring software.

26. All documents concerning actual or suspected security breaches of Equifax servers other than the Data Breach, including communications concerning Equifax's responses and any investigations.

27. All documents concerning Equifax's awareness of, and response to, to the cross-site scripting vulnerabilities described in a September 12, 2017 ZDNet article found at http://www.zdnet.com/article/equifax-freeze-your-account-site-is-also-vulnerable-to-hacking/ and on the vulnerability-tracking website Open Bug Bounty (https://www.openbugbounty.org).

28. Documents sufficient to identify Equifax Inc.'s management personnel and structure, including organization charts.

29. Documents sufficient to identify Equifax Information Services, LLC's management personnel and structure, including organization charts.

To facilitate discovery, we will seek early disclosure of witnesses likely to have key documents and relevant testimony.  We will seek from you the identities of the following key witnesses through interrogatories should they not be provided in your initial Rule 26 disclosures:

1. Individuals responsible for Equifax's data security policies and procedures.

2. Individuals responsible for securing the website(s) compromised in the Data Breach.

3. The members of the "Equifax Security team" referenced in Equifax's statements about the Data Breach.

4. Individuals whom the September 15 Equifax statement describes as having "observed suspicious network traffic" on July 29, 2017.

5. Individuals who were aware of the suspicious traffic and Data Breach between July 29 and August 2, 2017.

6. Outside vendors hired to advise or provide services relating to Equifax's data security.

7. Individuals responsible for hiring outside information technology security vendors.

8. Individuals responsible for developing and implementing "short-term remediation steps" and "long-term security improvements" described in Equifax's September 15 statement.

9. Individuals responsible for the "personnel changes" described in Equifax's September 15 statement.

10. Individuals responsible for communicating with government and regulatory authorities regarding Equifax's data security or the Data Breach.

11. Individuals responsible for communicating with investors and holders of Equifax's corporate debt regarding Equifax's data security or the Data Breach.

Thank you for your immediate attention to this matter.

Sincerely yours,

Steven F. Molo

Enclosure

cc:     James E. Butler, Jr. (without enclosure)
        Stephen D. Susman (without enclosure)
        Shawn Baldwin (with enclosure)

17

**ML MOLOLAMKEN**

Steven F. Molo
MoloLamken LLP
430 Park Avenue
New York, NY 10022
T: 212.607.8170
F: 212.607.8161
smolo@mololamken.com
www.mololamken.com

October 16, 2017

**VIA EMAIL**

David L. Balser
King & Spalding LLP
1180 Peachtree Street
Atlanta, GA 30309
dbalser@kslaw.com

      **Re:  Protective Orders**

Dear Mr. Balser:

      We have collected the protective orders that were entered in other major data breach cases.  Enclosed are copies of those orders in the following cases:

- *In re Experian Data Breach Litigation*, No. SACV 15-1592 AG (C.D. Cal. July 22, 2016)
- *In re Ashley Madison Consumer Data Security Breach Litigation*, No. 4:15MD2669 JAR (E.D. Mo. July 22, 2016)
- *In re Anthem, Inc. Data Breach Litigation*, No. 15-MD-02617-LHK (N.D. Cal. Sept. 21, 2015)
- *In re: The Home Depot, Inc., Customer Data Security Breach Litigation*, No. 1:14-md-02583-TWT (N.D. Ga. Aug. 26, 2015)
- *Corona v. Sony Pictures Entertainment Inc.*, No. 2:14-cv-09600-RGK-E (C.D. Cal. May 29, 2015)
- *In re Target Corporation Consumer Data Security Breach Litigation*, No. 0:14-md-02522-PAM (D. Minn. June 25, 2014)

      We would be happy to discuss these with you if you wish.

                      Very truly yours,

                      Steven F. Molo

Enclosures

cc:    Stephen D. Susman, Susman Godfrey LLP
        James E. Butler Jr., Butler Wooten & Peak LLP




# HOW MOLOLAMKEN PLAYS LARGER THAN ITS SIZE

*By Cindy Larson*

**Super Lawyers talked with Steve Molo and Jeff Lamken, founders of the litigation boutique MoloLamken, about their decision to leave large law and form their own firm.** Molo was a partner at Shearman & Sterling LLP in New York and Lamken was a partner at Baker Botts in Washington, D.C. before joining forces in October 2009. The firm handles complex business litigation, IP litigation, and white-collar defense and investigations in the US for clients around the world. They try cases and argue appeals, as well as handle arbitrations. The firm has offices in New York, Chicago, and Washington, D.C.

**SUPER LAWYERS:** *How did you connect?*

**STEVEN MOLO:** We worked together on the Ron Perelman Morgan Stanley case in Palm Beach. We both were brought in after things went sideways based on problems with e-discovery and the judge had all but directed a verdict on liability as a sanction. The jury awarded $1.6 billion in compensatory and punitive damages against Morgan Stanley but we got that reversed and judgment entered in our client's favor.

**SL:** *How did that experience lead to the creation of the firm?*

**JEFFREY LAMKEN:** We actually worked together with four or five other firms on the Perelman case, but only top people from each firm. It was a great experience, and we thought, wouldn't it be great if you would have a firm made up of a small, professionally elite team really focused on results for the client?

**SL:** *Both of you left successful large-firm practices to open your own firm in the midst of a market decline. What motivated you to do it then?*

**LAMKEN:** We saw the market decline caused by the financial crisis as a great opportunity to launch a firm in which we could align our economic interests with those of our clients. The financial pressure caused by the crisis had a lot of people questioning the traditional big law model. People seemed receptive to something new.

**SL:** *What did you hope to accomplish that you couldn't at a large firm?*

**MOLO:** Well, the absence of conflicts was a big part of it — the ability to bring significant cases that you could never do at a large firm. And, of course, we now have the freedom to bet on ourselves with fee



**Steven F. Molo and Jeffrey Lamken** are the founding partners of litigation boutique MoloLamken LLP. Molo graduated from the University of Illinois College of Law. He began his career in Chicago as a prosecutor and was a partner and member of the executive committee at Winston & Strawn. He then spent five years as a partner at Shearman & Sterling LLP in New York. Lamken is a graduate of Stanford Law School. He clerked for Judge Alex Kozinski on the US Court of Appeals for the Ninth Circuit and Justice Sandra Day O'Connor of the Supreme Court of the United States. He served as an Assistant to the Solicitor General and was the chair of the Supreme Court and Appellate Practice at Baker Botts in Washington, D.C.

arrangements that reward success as opposed to time spent.

**LAMKEN:** Foremost in our thinking — and central to what Steve just mentioned — we have been able to build a team of A-plus people with our own strong culture and shared vision and approach to winning cases for our clients.

**SL:** *How would you describe that culture?*

**MOLO:** Our culture is open and collaborative — always trying to get the most out of each member of the team but recognizing that the team is far more effective than the sum of its parts. We also are entrepreneurial — with everyone from the two of us to our newest associates playing a role in identifying new opportunities and developing business.

**SL:** *How do you recruit and hire talent?*

**LAMKEN:** Our typical new associate is two to four years out of law school and has clerked for at least one judge, often two. They interview with every lawyer in the firm as well as with a consultant who helps us with professional development.

**MOLO:** Everyone we see has great credentials, but we are looking for maturity, self-awareness, an appropriate level of self-confidence. We highly value creativity – the ability to contribute to game-changing ideas, which is not something many law firms say.

**SL:** *What is your model for fee arrangements?*

**MOLO:** The model is one of flexibility and adaptability. The key is having our interests aligned with those of our client. The first question we

## *"We highly value creativity – the ability to contribute to game-changing ideas, which is not something many law firms say."*

ask any prospective client is, what does success look like? Then it is a question of how much risk will we be taking, what resources will we need to commit, how long is the matter going to last. We tend to spend a lot of time on due diligence.

**LAMKEN** We often use flat fees paid once, or monthly, or at milestones within a case, with a bonus payment for achieving a particular result. There can be an extensive range of bonuses based on outcomes. It is helpful for the client to have some skin in the game. Some matters we handle on a full contingency.

**SL** *Your firm has 23 lawyers, yet you compete on matters with the largest of large law. How do you staff?*

**LAMKEN** Leanly and thoughtfully. With each case, we try to have the right mix of resources and skill sets in place, while still allowing our people opportunities to grow professionally. It is not a question of who is available to work on a given matter. It is about ensuring that the right resources are in place. That is why we take so much care in the hiring process.

We also train people. That means with programs like the National Institute for Trial Advocacy (NITA) training and the mentoring that occurs in small teams.

**SL** *What does your docket look like now?*

**MOLO** We have some amazing work, including nine cases on behalf of investors in mortgage-backed securities – each seeking between $200 million and $1.5 billion in

damages. Williams & Connolly, Jenner & Block, and Davis Polk oppose us. We have substantial plaintiff's whistleblower cases in Boston and Los Angeles in which Covington is our opponent. We represent criminal defendants in a major public corruption case in the Southern District of New York and a major health care fraud case set for trial later in the year in Chicago. We have a securities fraud case for a major Citigroup investor seeking $850 million and Paul Weiss is our opponent. We represent Laos in a Foreign Sovereign Immunity Act case against King & Spalding. There are four patent suits for an inventor of real-time data technology in Delaware with Wilson Sonsini and Morgan Lewis opposing us. We're the lead objector in the National Football League concussion litigation. That's a partial list.

**LAMKEN** In the courts of appeals, our cases run the gamut. We have a wide range of patent appeals for plaintiffs in the Federal Circuit – appeals that pit us against the likes of Weil, Morrison & Foerster, King & Spalding, and Baker & McKenzie. We are also on the defense side in patent appeals for companies like Qualcomm. We usually have a role in something in the Supreme Court.

**SL** *How often do you partner with other firms?*

**LAMKEN** All the time. One of the great benefits of being focused and committed to excellence is if we need to go deeper or broader in a given case, we are free to work with people who are expert and

the right fit rather than "someone down the hall."

**MOLO** A big percentage of our work is with other firms. Some of our plaintiff's work has us joint-venturing on a case or set of cases to share risk and the work.

Frequently, when a case looks like it will go to trial or there's an adverse ruling in the trial court, a client recognizes it needs experienced trial or appellate counsel. We were hired on three high-profile trials within the last year within four months of the trial date. We were also hired on a significant Federal Circuit appeal after briefing and within 60 days of argument. Sometimes we work with another firm on those cases and sometimes we replace them altogether.

We do a fair amount of work with non-US clients and often we work with their home country counsel. We pride ourselves on playing well with others. ●



# MoloLamken

## **2018** VAULT PROFILE HIGHLIGHTS



## #8 LITIGATION BOUTIQUES

**MIDSIZE QUALITY OF LIFE RANKINGS**

**#2** Quality of Work
**#9** Compensation

**TOP 150 UNDER 150**

### FIRM INFO

**CONTACT INFO**

430 Park Avenue
New York, NY 10022
Phone: (212) 607-8160
www.mololamken.com

**LOCATIONS**

New York, NY • Washington, DC • Chicago, IL

**PRACTICE AREAS**

Appeals • Arbitrations • Complex Business Litigation • Intellectual Property and Technology • Internal Investigations • Securities Litigation • White Collar Defense and Investigations

**THE STATS**

**No. of attorneys:** 35
**No. of offices:** 3
**Managing Partners:**
Steven F. Molo & Jeffrey A. Lamken
**Recruiting Chair:** Ben Quarmby

**EMPLOYMENT CONTACT**

Ben Quarmby, Partner
(212) 607-8157
careers@mololamken.com

## THE SCOOP

In less than a decade of existence and with only 35 attorneys, MoloLamken has quickly made a name for itself among the heavy hitters of boutique litigation shops. With offices in three of the country's major metropolises—New York, Chicago, and Washington, DC—MoloLamken's attorneys focus on complex business litigation, white-collar criminal defense, and intellectual property.

## What Recession?

Superstar attorneys Steven Molo and Jeffrey Lamken took a gamble and left prestigious and well-established BigLaw firms to start their own boutique and did so at a rather perilous moment: in October of 2009, in the midst of the recession. Molo had spent just over five years as a litigation partner at Shearman & Sterling. He'd been a senior litigator and member of the Executive Committee of Winston & Strawn prior to that, and had begun his career as a prosecutor in Chicago. Meanwhile, Lamken was busy heading the Supreme Court and Appellate Practice at Baker Botts, after serving as an Assistant to the Solicitor General. The two met representing Morgan Stanley during its successful hundred billion-dollar-appeal against financier Ron Perelman, and bonded over a mutual belief that complex litigation would be more efficiently carried out by eliminating unnecessary overhead. Thus, the small firm with a flexible billing structure—charging clients primarily based upon the results achieved rather than the hours billed—was born.

Molo and Lamken's gamble paid off. Within less than two years, MoloLamken had made its mark, winning six cases in the U.S. Supreme Court and achieving success in other trial and appellate courts. The firm is known for its meticulous attention to detail and for pushing cases toward trial, where its stars can shine. They have represented everyone from Fortune 500 companies to foreign banks, hedge funds, whistleblowers, Wall Street brokers, the former U.S. Attorney General, and foreign governments.

## No Rookies in the Lineup, Please

The firm started out with just five lawyers and has more than quintupled in size. MoloLamken is looking to climb higher up the double-digit ranks, and has set an ultimate size goal of 40-50 lawyers. But don't scramble for that resume just yet: you'll need to rack up a good few years as an associate at a larger firm first—and judicial clerkship experience is preferred. MoloLamken's high-stakes, complicated cases and consequent premium on experience mean it doesn't hire associates fresh out of school.

## Connoisseurs of Complex Litigation

The firm is known for taking on bet-the-farm cases, which is to be expected considering some of its partners' experience. Before founding the firm, Steven Molo represented Deutsche Bank against Donald Trump; partner Justin Shur prosecuted John Edwards while Deputy Chief of the DOJ's Public Integrity Section; Megan Church prosecuted former Chicago Schools CEO, Barbara Byrd-Bennett, as an AUSA. MoloLamken represents both plaintiffs and defendants in litigation, and certainly isn't afraid of challenging the status quo. The firm has taken on corporate giants the likes of JP Morgan Chase, Citicorp, Groupon, and Michael Lewis, the bestselling author of The Big Short, Moneyball, and The Blind Side. It also appears regularly in the U.S. Supreme Court.

## GETTING HIRED

*Vault's Verdict:* Consistent with its reputation as an elite litigation shop, MoloLamken looks for the cream of the lateral market crop, especially those with a clerkship or two under their belts. Because the firm is a tight-knit group, personality is closely evaluated before an offer is extended.

Excerpted from Vault.com. Reprinted with permission. © Copyright 2017 Vault.com, Inc. Photocopying is illegal and expressly forbidden.

22

**MOLOLAMKEN** | **2018** VAULT PROFILE HIGHLIGHTS

### Hiring Process

- "Every candidate usually interviews with every attorney at the firm. That process ensures that any hire meshes well with the firm. The firm prizes the usual qualities of top-notch candidates (e.g., sharp intellect, hardworking, etc.) as well as enthusiasm for the practice of law. The attorneys here really enjoy litigating cases."

- "The firm cares a lot about pedigree—almost everyone went to a top-14 law school and clerked for one or more federal judges, and transcripts matter even for relatively experienced candidates. We look for good writers who are hungry for substantive and varied litigation experience."

### Lateral & Clerk Integration

- "When I first started at the firm, I was staffed on cases with another associate so that I wasn't totally thrown into the deep end. I was also assigned an associate mentor who helped enormously. The firm did not have an HR staff person when I first started, but we have since hired someone who has improved the onboarding process enormously."

### OUR SURVEY SAYS

*Vault's Verdict:* For a firm that's less than a decade old, MoloLamken has gotten a lot right in a hurry. Associates appreciate working on high caliber cases in a team-oriented atmosphere, and the slightly-above-market compensation doesn't hurt either. However, associates would like to see an increase in transparency, more formal training, and better family leave policies.

### Satisfaction

- "I wouldn't want to practice law at any other firm."

- "I can't imagine having a better firm job, and especially more substantive responsibility, at this stage of my career. The work is varied and interesting, and demands on associates' time are not unreasonable."

- "Wonderful colleagues. Meaningful, interesting work."

### Firm Culture

- "The firm provides associates with significant freedom. It promotes a flat structure, eliminating bureaucracy and taking seriously everyone's views. I've not had a bad experience working with anyone."

- "There are frequent informal gatherings to get lunch, at least in the Chicago office. The office is quite social. The annual retreat is a great opportunity to get to know and socialize with associates from the other offices."

- "At least in DC, the firm's culture is not overly social, although the firm sponsors dinners and happy hours every couple of months. People are on the whole very nice to each other."

### Associate/Partner Relations

- "Partners treat associates very well—I've never seen a partner raise his voice, and partners value associates' opinions and work product. Associates are trusted to do a tremendous amount of substantive work from Day One. Because I haven't been here for very long, I

have limited ability to comment on transparency. The firm holds quarterly firm-wide meetings and an annual retreat at which firm performance and finances are discussed. A formal performance review process was only recently implemented."

### Hours

- "There is more than enough work to go around, but hours are manageable. Partners try to respect vacation and weekends."

### Compensation

- "The compensation is more than generous—usually, a step above Cravath. To encourage hard work all around, bonuses are tied to the firm's performance as a whole."

### Quality of Work

- "All associates are given substantive work, such as drafting briefs, conducting depositions, managing cases, etc. Because our firm and our teams are so small, there are very few layers of hierarchy, and each person is solely responsible for a part of the litigation."

- "I spend almost all of my time on substantive work. Fresh off of a couple of clerkships, I was drafting full appellate briefs and trial motions, and taking the lead on client interviews. In the coming months, I will be making a presentation to the Department of Justice and second-chairing a pro bono trial."

- "The quality of the work could hardly be better. All work helps to move cases forward. Associates are asked to write briefs—and I mean the entirety of briefs—attend client meetings, and take depositions almost from the time they walk in the door. Very little to no time is spent reviewing documents or writing memos."

### Training & Mentoring

- "The firm is dedicated to giving associates all the resources they need in order to develop professionally. Upon joining the firm, all associates participate in NITA deposition and trial training. There are also extensive opportunities for informal training—associates are encouraged to join client meetings, participate in depositions, attend arguments, etc. Partners keep track of associates' professional development and are always helping associates seek out the experiences that the associates want."

### Career Outlook

- "Promotion to partnership is very realistic (consideration after 7 years out of law school and 3 years at the firm). Some have left to government roles but this seems less common than at BigLaw."

### Pro Bono Commitment

- "Many of us have briefed and argued or will brief and argue pro bono appeals at the 7th Circuit, something that is very much encouraged. We're also taking on some immigration cases."

### Diversity Efforts

- "The number of women at the firm has increased dramatically since I've been here, and we hired our first woman partner [last] year. The firm is also enormously supportive of its LGBT associates. One area that the firm should improve is its family leave policy. The secondary parent only gets two weeks of leave (well below our peers) while primary parents get 16 weeks."





# MoloLamken: Benchmark Analysis

## Top Boutiques

A litigation boutique with offices in New York, Chicago and DC, MoloLamken has quickly become a favorite among the crowded field of litigation shops. The firm earns rave reviews from clients and peers. One client states succinctly, "These are the best litigators in New York and DC, with reach to London and Singapore. The lawyers are skilled in court appearances and write exceptional, gifted briefs."

New York figurehead **Steven Molo** is called "an outstanding advocate and fearless in court" by a satisfied client. "He is focused and resolute. He took our case and honored every promise made." A peer, viewed by many as one of New York's top trial lawyers, views Molo as "every bit my equal. He is quite talented." In perhaps his highest-level appointment in terms of client repercussions, Molo represents Martin Winterkorn, former CEO of Volkswagen, in connection with the U.S. investigations into alleged misrepresentations by Volkswagen concerning its compliance with U.S. EPA vehicle emissions standards. Molo also represents two Teva subsidiaries in an action for fraud and breach of contract arising out of their $2.3 billion acquisition of a Mexican pharmaceutical company. After the transaction closed, Teva discovered that the sellers had perpetrated a long-running fraud at the company, obtaining fraudulent registrations from Mexican regulators by submitting falsified product formulations and test results, and then engaging in a sophisticated scheme to conceal the violations from regulators during audits. Molo also represents the hedge funds Prosiris and Tilden Park in contested proceedings concerning the distribution of the proceeds of the $9 billion settlement between holders of residential mortgage-backed securities and Bank of America/Countrywide. The issue was whether bonds held by the clients allowed for a recovery by classes of bondholders other than the most senior class. In April 2017, the court issued a ruling favorable to the firm clients.

In the firm's DC capacity, **Jeffrey Lamken** is heralded as "a real appellate strategist, and very pleasant to work with. Lamken represents Merck in an appeal to the Federal Circuit from an order barring Merck from asserting two of its patents against Gilead Sciences. Lamken is drafting the appellate briefs and will argue the case in the Federal Circuit. Merck's patents concern innovative chemical compounds for treating Hepatitis C, and the matter is valued at $200 million.

24

Molo and Lamken acted in tandem, successfully representing three whistleblowers in federal and California state qui tam cases which were settled in the last quarter of 2015. The federal case, brought under the False Claims Act, resulted in a $102 million civil settlement, and the California case, brought under the California Insurance Fraud Prevention Act, resulted in a historic $23.2 million settlement. The whistleblowers, former Warner Chilcott employees, exposed the company's use of illegal kickbacks and inducements to influence doctors to use the company's products. As a result of the whistleblower allegations, the company and its former president face federal criminal charges.

# BENCHMARK LITIGATION Ⓑ

# Benchmark Featured US Firm – MoloLamken

Wednesday, January 13, 2016



A litigation boutique with offices in New York, Chicago and DC, MoloLamken has quickly become a favorite among the crowded field of litigation shops. The firm earns rave reviews from clients, one of whom testifies, "They mounted a stellar series of arguments that have materially benefited us. Their business model is unique. Partners bill at similar rates to other top-tier firms, but one sees cost-saving since the associates are of a much higher caliber and therefore much more productive. MoloLamken has demonstrated that they are honorable and have elan. If you find yourself the focus of litigation, it is a firm you want in your Rolodex." Another client confirms, "Their work was so exceptional in one matter they handled for me that I expanded their role not only in that case, but added them as counsel in the other pending arbitration as well. In my opinion they are one of the top litigation firms in the US. They have brilliant lawyers, with courtroom savvy and the best brief writing teams you can find." New York figurehead **Steven Molo** is called "an outstanding advocate and fearless in court" by a satisfied client. "He is focused and resolute. He took our case and honored every promise made." Molo represented seven former NFL players who objected to the landmark class-action settlement for players sustaining concussions. He also represents plaintiff investors in 10 pending cases against mortgage originators and other responsible parties involved in residential mortgage backed securities securitizations. Damages at issue in each of the 10 cases range from $200 million to in excess of $1.4 billion. In the DC office, **Jeffrey Lamken** earns plaudits for his appellate specialty, which has found him frequently arguing in front of the US Supreme Court on cases spanning a vast spectrum of subject areas.

26



# Steve Molo

## They're Building It in NY, DC and Chicago
by Paul Dailing

In 2009, the recession that had been plaguing the United States for two years went international, with the global GDP dropping for the only time since the IMF started keeping records in 1980.

In October 2009, U.S. unemployment hit 10 percent for the first time since 1983, according to the Bureau of Labor Statistics.

So, of course, October 2009 is the month Steven F. Molo decided to leave a plum position as a litigation partner in the Wall Street powerhouse firm Shearman & Sterling to strike out on his own.

"And not only that, we went out and signed leases for space in Washington, in the Watergate, and in New York in midtown Manhattan," Molo, one of the founding partners of **MoloLamken LLP**, recalls, chuckling. "There were people who thought we were crazy. I think many of them were polite about it, and maybe didn't say it directly to our faces. Although, a few did."

Not only was it a big risk for Molo and Jeffrey Lamken, but the firm they wanted to form was also a new kind, one that started with five lawyers practicing only the type of law they wanted to practice.

"We had a very, very clear view of what we wanted to do," Molo says. "We wanted to do complex business litigation, we wanted to do white collar defense, we wanted to do intellectual property litigation. And we've gone on to do exactly that in major cases."

Five years later, no one thinks Molo and Lamken are crazy anymore. The firm has grown to 22 attorneys, with more to come this year, and added an office in Chicago. MoloLamken takes on clients from around the world but has still stayed close to the ideals of its founders.

That was the plan from the beginning, Molo says.

"We thought 'Wouldn't it be great to have a firm where you had basically A-plus people, you were able to remain not necessarily small, but at least not so large that you couldn't control the quality of the people that you have, you would not have a lot of conflicts, you could take on interesting work, and also be able to bet on yourself financially based on the quality of the team?'"

It's an ambitious laundry list, but one Molo's colleagues feel he has accomplished.

"Steve is among the very best trial lawyers I have seen," says MoloLamken partner Justin Shur. "He is a tenacious fighter, but always charming and engaging. We recently tried a case together, where I was able to see those qualities in action. On cross-examination, Steve eviscerated the government's primary cooperator so deftly that the government

## Leading Lawyers

abandoned the witness's testimony in closing arguments, while at the same time managing to create a rapport with the jury."

Molo has accomplished these things through tremendous preparation, a creative eye, and by, he says, putting the right team around him.

"I and our law firm, MoloLamken, are basically the alternative to settlement," Molo says. "We have developed an incredible team of people who are not just talented, but very hard working, and they're creative. Where we add value to our clients is being able to quickly and effectively put together a litigation strategy and go execute on it."

**Boxcars and Biographies**

Molo was raised on the South Side of Chicago, the oldest of four children and the only boy. His parents taught him the value of hard work, his mother in administrative positions in credit unions and his father rising to management positions both in his factory and in his union. The elder Molo became president of his United Steelworkers Local at the age of 23.

"He didn't have a college degree, but he basically worked in, first a foundry, and then a plant that built boxcars," Molo says. "He had a management job involving industrial engineering, time study, that sort of thing. And I painted boxcars and built boxcars for a couple of summers while I was in college."

Even as a child, Molo was interested in the law, his bookshelf filled with legal biographies like Edward Bennet Williams' *One Man's Freedom*, Louis Nizer's *My Life in Court* and Adela Rogers St. Johns' *Final Verdict*, about her father, Earl Rogers.

"I would read books about lawyers, and courtroom lawyers, and thought that it would be an exciting and interesting way to live your life," Molo says. "It also provided an opportunity to sort of advance socially, to get ahead in your profession. And one that interested me, so that was pretty much what I had my sights set on from a pretty young age."

College took him to the University of Illinois, where he received his B.S. and his J.D. Then he returned to Chicago, joining the practice of law with a speed that might shock young attorneys today: Molo argued his first case in the U.S. Court of Appeals four days after becoming a lawyer.

"I might have had a long weekend off, and then I went to work in the Illinois Attorney General's Office for Ty Fahner, who was then the attorney general," Molo says. "And I got tremendous experience there. I mean, just outstanding experience it's very difficult for a young lawyer in the best of the law offices to get today. I tried criminal cases, I tried civil cases, I argued appeals, I wrote a brief that was argued in the United States Supreme Court less than a year after I graduated from law school."

While he relished his time on his feet in front of a jury, the young lawyer also enjoyed the more academic areas of law.

"Notwithstanding the fact that we were in

court a lot, I certainly took great pride in my brief writing and actually published a couple of law review articles while I was working at the Attorney General's Office at that time," Molo says.

In 1986, Molo joined Winston & Strawn, Chicago's oldest law firm. When Molo made partner in 1989 at the age of 32, *Chicago Lawyer*, a publication of Law Bulletin Publishing Company, profiled him, calling him a "practicing attorney with nitty-gritty street sense.

"Molo radiates a calm friendliness that could be mistaken for simplicity," the profile continued. "Opposing attorneys have made that mistake."

Those characteristics, particularly the calm friendliness and trustworthiness Molo conveys, are still evident in his practice today, says Gregory Joseph, a partner at New York- and London-based Joseph Hage Aaronson LLC and past president of the American College of Trial Lawyers.

"He is very creative in his approach to cases, and very successful in winning judges' confidence," Joseph says.

Joseph saw that trustworthiness in action when he and Molo were defending a sanctions hearing on behalf of separate clients last summer.

The judge was having trouble understanding Molo's client representative, who was fluent in English, but not a native speaker. As a courtesy, Molo began repeating his client representative's answers to the judge.

"She was so grateful that she asked him to do the same thing when the client was being crossed by the opponent," Joseph recalls. "That is a signal honor—the judge trusted him implicitly."

Molo did not abuse that trust by polishing or improving upon his client's responses to questioning. This honesty is typical of Molo, Joseph says.

"He was completely accurate in his translation, warts and all," Joseph says.

**Attention to Detail**

During his years at Winston & Strawn, Molo worked closely with firm partner, former U.S. Attorney for the Northern District of Illinois and current Winston & Strawn Chairman Dan Webb. Webb became a man Molo admired and whose career became a model for the younger lawyer.

"We tried a number of cases together, including a couple of very big cases, and I came to the recognition that if I wanted to be of a stature in the profession that would be approximating his, I couldn't just work for him," Molo says. "It was important for me to strike out on my own within the firm. And he was tremendously supportive of that, as were my other partners at Winston & Strawn."

The niche he developed within Winston & Strawn became the template for the work MoloLamken does today.

"As a result, I went about building my own practice there at the firm, doing pretty much the things that I still do today, which is a mix of complex civil litigation as well as white collar defense, and doing that both at the trial court level as well as with appeals," Molo says.

Molo rose in prominence at Winston & Strawn, joining the executive committee and becoming one of the largest equity holders in the firm in his last few years there. He would stay at the firm for 18 years.

"One day I got a phone call from a fellow who I knew from New York," Molo recalls. "We had done some programs together, and he had become a headhunter. He asked me if I'd be interested in talking to a firm that was really a New York-based firm but had an office in Chicago. And I wasn't really that interested in it."

There was some gentle prodding before Molo gave the idea another shot.

"And one thing led to another, and I talked to them," Molo says. "I wasn't really interested, but he said to me, 'You have already spent so



Molo with Professor Alan Dershowitz at a recent MoloLamken event at the Harvard Club in New York.

much time in New York on the cases that you have, now why don't you talk to some of the New York firms I know? I know that people would be really interested in talking with you.'"

One of the New York firms that was interested in talking with Molo also interested Molo a great deal.

"The Shearman & Sterling opportunity presented itself, and it was a pretty extraordinary opportunity," Molo says. "Shearman was then, and it is today, one of the preeminent transactional firms in the world. It certainly is a traditional Wall Street firm, but it has a tremendous global reach that was fueled when it was the principal counsel to Citicorp as Citicorp grew throughout the world."

Citigroup, as Citicorp became after a 1998 merger, was only one of the firm's high-profile clients. The global firm, with 18 offices everywhere from Abu Dhabi to Rome, was primarily transactional at the time and was looking to bolster its trial practice. After nearly two decades, he left Winston & Strawn.

**Two Big Risks**

Looking back on his time at Shearman & Sterling, two particular cases spring to mind for Molo. One involved a huge risk in a case. The second led to one of the biggest risks of his career.

The first case was when he and his co-counsel Elkan Abramowitz decided to try to convince the U.S. government they were just wrong.

David Stockman is a former congressman from Michigan who served as director of the Office of Management and Budget for four years under Ronald Reagan.

In 2007, Stockman, who had long since left public life, was charged with accounting fraud and securities fraud in connection with the bankruptcy of a portfolio company of his private equity firm.

"We took a look at the evidence and spent a lot of time with it, even though it was millions of pages of records, and concluded that there simply wasn't a crime committed," Molo recalls.

With their research showing the bankruptcy was due to industry decline rather than fraud, the pair opted for the risky path of being open with their findings.

"My co-counsel—a good friend in New York—and I, we joked that we were either going to be the absolute dumbest lawyers in America or the absolute smartest lawyers in America," Molo says, "because we took the government's evidence and made a very detailed white paper presentation to them, telling the government why it was that they were wrong."

The U.S. Attorney's Office in the Southern District of New York listened. "To its great credit," Molo says, the office decided to drop the case.

"Had we not convinced them, it would have exposed our entire defense to them. But we felt so strongly about it that we were able to do it. The government actually dismissed the charges," he says.

That level of research isn't surprising to Shur. He sees it every day at MoloLamken.

"Among other things, Steve focuses on preparation and collaboration. His level of preparation and attention to detail is second to none," Shur says. "He also has an amazing ability to distill the essence of a complex set of facts down to a few simple themes. Steve will then work closely with the rest of the team to further develop and test those themes."

The second of the two cases that spring to mind from Shearman & Sterling led to the biggest risk—the creation of MoloLamken.

It started with a call from former Morgan Stanley Chief Legal Officer Don Kempf.

"Don called me up and said, 'How quickly can you come to Florida, and how many people can you bring with you?'" Molo says.

**The Deck of a Sunken Submarine**

Molo arrived in Florida to find a case in tatters due to e-discovery sanctions.

A West Palm Beach jury was about to award a financier $1.6 billion over money lost in the 1998 sale of a camping supply company to one of Morgan Stanley's clients. The new team of attorneys Morgan Stanley brought down to Florida focused not only on sanctions, but also on excluded evidence.

They did this not to win the case, but to create an evidentiary record to use in the appeal they knew they would file.

"Basically what we did is build the case that the judge didn't allow to be put on," Molo says.

The judge allowed the new evidence to be filed, but followed through on her sanctions ruling. But the work the new team of attorneys did on the case led the appeals court to throw out the judgment—all of it.

"We got the judgment reversed. And not just reversed, but a judgment entered in favor of Morgan Stanley," Molo says. "They went from $1.6 billion liability to zero liability on the case."

It was a staggering victory for any attorney, but for Molo, the biggest professional win was meeting Jeffrey Lamken, with whom he would later form MoloLamken. He was then at the Washington, D.C., office of Baker Botts LLP.

"Jeff and I always joke when we tell people the story of the firm—that we met on the deck of a sunken submarine. It was so bad, the Morgan Stanley case was in such bad shape, that it was not just in a sunken submarine but on the deck of it," Molo says.

The two enjoyed working together, but more importantly had the same ideas about what their ideal firm was like: smaller, more experienced, more focused on interesting work and interesting cases.

"The opportunity to go on and create something is very exciting," Molo says. "To have a vision of what you think a law firm should look like and be, and then to go out and face the challenges and see it through, that is tremendously rewarding."

**A Different Approach**

In October 2009, as unemployment spiked and the recession went global, Molo and Lamken hung a shingle.

MoloLamken's different approach starts with how they hire associates. While larger firms hire dozens or even hundreds of associates fresh out of law school, MoloLamken simply doesn't.

"No matter how good they are, our philosophy is just that we don't hire associates out of law school," Molo says.

Typical new hires are about two to four years into their career. They have clerked for at least one, but often two federal judges, improving their research and writing skills along with their understanding about how the judicial system works and how judges think.

"By that point in time, they've probably sorted a few things out in their mind about the practice of law, and if they want to come work with us, it's because they really understand what it is that we do, and they see themselves as committed to that kind of practice," Molo says.

The approach is also collaborative, with new associates working directly alongside the more experienced partners. That collaboration—and Molo's attention to detail—continue even after associates become partners themselves, as Shur can attest.

"In preparing for a recent trial, for example, we locked ourselves in a conference room with a white board where we walked through every witness examination, exhibit and jury address to ensure our themes would be effectively presented throughout the trial so that they would resonate with and persuade the jury," Shur recalls.

New hires receive National Institute of Trial Advocacy training as soon as they join. Past experience in non-law fields is put to good use—the firm currently has one associate with a tech background and another who worked on a trading desk.

"I always feel that conventional wisdom gets conventional results," Molo says.

This new approach to associates is as valuable to the firm as it is to the young attorney, Molo says.

"One of my mantras to them is that we want them to be as good as they can be, as fast as they can be that," Molo says.

Molo has been married for more than 25 years to Dr. Mary Wood Molo, a reproductive endocrinologist. They have raised four children, all currently in college.

From reading biographies of trial lawyers to working in the Illinois Attorney General's Office four days out of law school, from partnerships at two of the world's largest and most influential firms to forming his dream organization "on the deck of the sunken submarine," Molo's legal life has kept him busy, successful and, above all, happy.

"The fundamentals of what I do essentially haven't changed since I was 25 years old," Molo says. "I love it just as much today as I did then, and hopefully everyone else around here feels the same way." ∎

This article originally appeared in *Leading Lawyers Magazine—Business Edition* for 2014 and has been reprinted with permission. © 2014 Law Bulletin Publishing Co.



# Steven F. Molo

Steven Molo, one of the country's leading courtroom advocates, is a founding partner of the national litigation boutique MoloLamken.  He represents corporations, boards, funds, investors, inventors, and individuals in complex business litigation, white collar criminal and regulatory matters, and IP litigation.  His client base is international.

Chambers and Partners calls him "fantastic in the courtroom"; a "fabulous courtroom litigator who lights up the room with his presence"; and "one of the most talented lawyers in the city." *Benchmark Litigation* – which named him one of the top 100 Trial Lawyers in America – calls him "an outstanding advocate and fearless in court."

For the past eight years he has been named to *Lawdragon*'s list of the 500 Leading Lawyers in America.  He has been recognized by *Super Lawyers*, *The Best Lawyers in America*, *Chambers USA*, *Benchmark Litigation*, *Euromoney*, and *Legal 500*, which includes him on its elite list of *Leading Trial Lawyers*, as well as other guides to the leaders of the legal profession.  *ACQ Magazine* recently named him New York Litigation Lawyer of the Year.

Mr. Molo regularly tries civil and criminal cases before juries and judges throughout the country.  He has extensive experience in post-trial and appellate advocacy as well.

He began his career as a prosecutor in Chicago, then practiced with Winston & Strawn, where he was a senior litigator and member of that firm's Executive Committee.  He spent five and a half years as a litigation partner with the Wall Street firm Shearman & Sterling before founding MoloLamken in October 2009.

He has been involved in some of the most complex legal issues in U.S. courts over the past 20 years.  Frequently, Mr. Molo and the firm are asked to work with other counsel in representing a client after a matter has been pending and the need for additional courtroom experience has become apparent.

He has represented many directors, CEOs, and other executives in a variety of sensitive matters.

The civil commercial matters he has handled include those involving issues of antitrust, breach of contract, fraud, shareholder rights, structured products and derivatives, insurance, RICO, mergers and acquisitions, real estate, insolvency and restructuring, defamation and privacy, securities, banking, and consumer fraud.  His cases frequently involve class actions as well as individual suits. He has testified as an expert on New York commercial law in the High Court of Justice in London.

His criminal matters have included those involving issues of antitrust, mail, wire, bankruptcy and securities fraud, health care fraud, insurance fraud, environmental crimes, obstruction of justice, tax fraud, and other complex crimes.  He frequently conducts internal investigations for management, boards, and audit committees.  He co-authored a leading treatise, *Corporate Internal Investigations*, and has been recognized as an expert in federal court where he has testified on that topic and corporate prosecutions.

Mr. Molo has also served as trial counsel in intellectual property matters including patent, trademark, trade dress, trade secret, and copyright cases.

He serves on the editorial advisory board of *Today's General Counsel* and speaks and writes extensively on the subjects of business litigation, corporate criminal liability, and trial and appellate advocacy.  He has commented on legal topics for CNN, CNBC, *The Wall Street Journal*, *The New York Times*, the *Chicago Tribune* and other news media.

He has taught or lectured at Northwestern University Law School, Loyola University of Chicago Law School, John Marshall Law School, SMU Law School, William & Mary Law School, the University of Illinois College of Law, and the National Institute for Trial Advocacy.  He is also co-author and general editor of *Your Witness: Lessons on Cross-Examination and Life from Great Chicago Trial Lawyers*.  For five years, he served as counsel to the Illinois Judicial Inquiry Board.  He is a fellow of the American Academy of Appellate Lawyers.  He is also a fellow of the American Bar Foundation.



# Steven F. Molo

## Representative Matters

- An activist investor in a bench trial in Delaware bankruptcy court concerning equity rights

- Investors in residential mortgage-backed securities trusts in proceedings to determine the distribution of a $9 billion settlement among various classes of bondholders

- The former Speaker of the New York Assembly in a federal criminal jury trial on charges of public corruption

- A prominent doctor in a federal criminal jury trial on charges of health care fraud

- Several former NFL players in objecting to the fairness of the class action settlement of the "Concussion Litigation"

- Several trustees and investors in residential mortgage-backed securities trusts in a series of suits to recover for the diminution in the value of the trust as a result of the conduct of the parties originating the mortgage loans

- An activist investor in connection with a challenge to the corporate governance of one of the largest transportation companies in the United States

- An Asian government in litigation in the United States and United Kingdom relating to an arbitral award based on a dispute concerning the construction of a power plant and development of a mine

- A senior financial services executive in a federal criminal jury trial on charges of perjury and obstruction of justice

- Several groups in successfully challenging New York City's ban on super-sized sugary drinks

- Plaintiffs in a national consumer fraud class action based on a massive data breach

- A former pharmaceutical executive in prosecuting a whistle-blower claim

- An Israeli pharmaceutical manufacturer in prosecuting a $4+ billion claim for fraud and breach of contract based on its acquisition of a Mexican company

- A publicly traded media company in litigation relating to a $1.8 billion debt restructuring

- An investor seeking recovery of $800 million in losses on a "holder claim" based on decline in stock value of one of the world's largest banks during the financial crisis

- A former CEO of a publicly traded retailer in defending criminal securities fraud charges

- A former managing director of a leading investment bank in defending criminal securities fraud charges related to the sale of derivatives

- The former CEO of a European auto manufacturer in connection with a DOJ investigation of U.S. environmental laws

- A private equity firm in a lawsuit over post-closing purchase price adjustments in connection with the sale of a portfolio company

- A global consulting firm in investigating a senior executive's misconduct

- A CEO of a leading financial services firm in a dispute with a former firm member concerning investments

- A leading insurance company in investigating fraud by a major vendor and related civil litigation

- A Fortune 500 company in prosecuting a legal malpractice case against an Am Law 50 firm

- A senior executive of a Japanese manufacturing company in a price-fixing investigation conducted jointly by USDOJ and the JFTC

- A CDO management firm in connection with civil litigation and regulatory matters emanating from the global financial crisis

- A private Silicon Valley technology company in a bench trial against one of the world's largest banks based on events arising from an M&A transaction

- An inventor in prosecuting claims of patent infringement relating to real-time data technology



# Steven F. Molo

## Representative Matters, *continued*

- An investment bank in obtaining judgment in its favor and the reversal of a $1.6 billion jury verdict in a suit alleging fraud in connection with its role in a corporate acquisition

- A former CEO and private equity firm partner in obtaining dismissal of a federal indictment charging securities and bank fraud as well as obstruction of agency proceedings

- A former Foreign Service Officer and West Point graduate in a federal criminal jury trial on charges of bribery and conspiracy to facilitate the issuance of visas in violation of State Department policies

- The former CFO of a publicly traded technology company in a federal criminal jury trial and regulatory and civil proceedings based on alleged securities and accounting fraud

- A major broker-dealer in a civil jury trial in which a hedge fund claimed fraud in the sale of collateralized mortgage obligations

- A hedge fund in a suit in the Delaware Chancery Court challenging a gate and proposed restructuring of another fund in which it invested

- An entertainment company in a lengthy arbitration involving allegations of 10b-5 violations and other claims following an acquisition

- The world's largest insurance broker in a civil jury trial concerning senior executive compensation

- A leading real estate developer and its lender in a bench trial relating to a dispute with a major tenant

- A lending syndicate in defending multi-billion dollar tort claims and in prosecuting a personal guaranty action against a prominent real estate developer (and reality TV show host) relating to financing of 92-story building in Chicago

- Two non-U.S. financial institutions in connection with recovery actions and the defense of claims relating to Madoff

- The Illinois Senate relating to procedures for the impeachment trial of the Governor

- A non-U.S.-based insurance holding company in SEC and DOJ investigations into balance sheet fraud through finite reinsurance

- A New York real estate developer in investigating and reporting a Ponzi scheme fraud perpetrated by the client's former lawyer, the name partner of a prominent New York firm

- A senior mutual fund executive in an investigation by the SEC and New York Attorney General

- A midwest manufacturing company in an internal investigation and defense of an SEC investigation relating to insider trading

- A CEO in numerous shareholder and derivative actions, parallel SEC proceedings, and a trial before the bankruptcy court relating to allegations of fraud and breach of fiduciary duties following the discovery of accounting irregularities

- The nation's largest bar review course provider in a civil antitrust class action alleging a price-fixing and market allocation conspiracy and a separate civil antitrust class action alleging product tying

- A national insurance company in defending a federal grand jury investigation, state regulatory inquiries, consumer class actions, whistle-blower allegations, and media scrutiny emanating from claims handling practices following a major natural disaster

- A midwest manufacturing company in a DOJ grand jury investigation into price-fixing in the market for certain building supplies

- A publicly traded insurance broker in multiple consumer class actions alleging civil antitrust and RICO violations, as well as Attorney General and insurance regulatory investigations

- A national retailer in attempted nationwide consumer fraud class actions in multiple forums and Attorney General investigations

- A national publisher and sweepstakes company in an appeal of a class certification order in an attempted consumer class action



# Steven F. Molo

## Representative Matters, *continued*

- A group of mortgage lenders in an appeal of an order challenging certain lending restrictions

- A major broker-dealer in an appeal in litigation relating to sales practices that resulted in a challenge to certain whistle-blower legislation

- A majority shareholder of a public company in shareholder derivative litigation relating to Revlon duties and change of control

- An investment advisor and mutual fund company in a derivative suit alleging breaches of fiduciary duty relating to fund management

- A global pharmaceutical manufacturer in a federal grand jury investigation and civil litigation emanating from a foreign subsidiary's falsification of information to the FDA

- An internet telephone services provider in patent infringement litigation relating to the company's core technology

- A gaming company in defending allegations of trademark and trade dress infringement in injunction proceedings in the trial court

- A manufacturer of batteries in pursuing copyright, trademark, and trade dress claims relating to a well-known advertising campaign

- A licensor of an agribusiness technology in patent infringement litigation

- A rock star in defending copyright infringement allegations in the trial court and court of appeals

- A major political party in a trial before a three-judge federal district court relating to voter rights and legislative reapportionment issues

## Education

University of Illinois, College of Law, J.D.

University of Illinois, College of Communications, B.S.

## Honors & Awards

Recognized by peer and client review for inclusion by *The Best Lawyers in America* (New York: commercial litigation, white collar defense, appeals), *Chambers USA*, *Super Lawyers*, *Euromoney*'s *Guide to the World's Leading White Collar Crime Lawyers*, *Leading Attorneys* (business litigation, white collar criminal defense, antitrust, appeals), *Who's Who in America*, *Who's Who in the Law*, and *Who's Who in Business and Finance*

Named to the *Lawdragon 500 Leading Lawyers in America*, *Benchmark Litigation Top 100 Trial Lawyers in America*, and *Legal 500 Leading Trial Lawyers*

## Professional Affiliations

American Inns of Court Foundation, Trustee

United States Supreme Court Historical Society, Trustee

New York Inn of Court, Member (Past Vice President, Executive Committee)

Illinois Supreme Court Rules Committee, Member (2004-2010)

Seventh Circuit Bar Association (Past President)

Federal Bar Council, Member (Courts Committee)

Chicago Inn of Court, Member (Past President)

American, Illinois, and Chicago Bar Associations, Member

American Bar Association, Trial Attorney Advisory Board, Member

Association of the Bar of the City of New York, Member

Scribes, The Society of Legal Writers, Member

Economic Club of Chicago, Theodore Roosevelt Association, Member

University of Illinois College of Law Board of Visitors, Member

33



# Steven F. Molo

## Books

*Corporate Internal Investigations* (Co-author)

*Your Witness: Lessons on Cross-Examinations and Life* (General Editor and Author)

*Executive's Guide to Understanding the Laws Behind White Collar Crimes* (Chapter Author)

*Successful Partnering Between Inside and Outside Counsel* (Chapter Author)

*The Appellate Lawyer's Manual*

*The Executive's Desk Book on Corporate Risks and Response for Homeland Security* (Chapter Author)

*The Litigation Manual,* 2nd ed.

## Recent Articles

Brady *Summaries and the Obligation to Disclose Favorable Evidence,* 13 Crim. Litig. 10 (2012) (with Lucas M. Walker)

*Wrong, Maybe. But Is It a Crime?* Hedgeweek (Sept. 10, 2008)

*Find a Career, Not a Job,* N.Y.L.J. Mag. (May 2008)

*To Fight or Not to Fight,* N.J.L.J. (July 23, 2007)



# Jeffrey A. Lamken

Jeff Lamken, a nationally recognized appellate practitioner, has argued 23 cases before the United States Supreme Court and briefed dozens more on a wide range of topics, including administrative law, the First Amendment, antitrust, bankruptcy, civil rights, criminal procedure, energy, intellectual property, searches and seizures, separation of powers, and telecommunications.  He has handled matters in virtually all of the federal courts of appeals and many state appellate courts.  Mr. Lamken also develops, briefs, and argues critical motions in significant trial matters.

Before founding MoloLamken, Mr. Lamken headed Baker Botts' Supreme Court and Appellate Practice in Washington, D.C.  Mr. Lamken has served as an Assistant to the Solicitor General in the United States Department of Justice and was a partner in the Washington, D.C. litigation boutique Kellogg, Huber & Hansen. He clerked for the Honorable Sandra Day O'Connor of the U.S. Supreme Court and the Honorable Alex Kozinski of the U.S. Court of Appeals for the Ninth Circuit.

Since 2005, Mr. Lamken has been recognized each year by the *Chambers USA Guide to America's Leading Business Lawyers* (Nationwide) as a top appellate practitioner. The 2015 edition calls him a "really outstanding" practitioner, who is "incredibly knowledgeable and quick to understand issues," noting that "he is a fierce advocate" with a "very detailed" approach. The 2014 edition describes him as "a real leading player – a superstar lawyer."  In the 2011 edition, peers lauded Mr. Lamken as "a wonderfully talented appellate lawyer" and "a joy to work with."

Mr. Lamken received his J.D. from Stanford Law School, where he was the Nathan Abbott Scholar (highest cumulative GPA), a member of the *Order of the Coif*, and a Senior Editor of the *Stanford Law Review*. He was also awarded "Best Oral Advocate" in the annual Kirkwood Moot Court competition. Before attending law school, Mr. Lamken graduated with a B.A. in Political Science, *magna cum laude*, from Haverford College. There, he was awarded the Department Prize in Mathematics, earned the Kurzman Prize in Political Science, and was elected to the *Phi Beta Kappa* honor society.

## Selected Cases Argued Before the United States Supreme Court

- *Hasty v. Abbasi*, No. 15-1363 (U.S. June 19, 2017) (whether *Bivens* extends to conduct by prison officials in connection with the confinement of foreign nationals detained in a terrorism investigation)

- *Bank Markazi v. Peterson*, 136 S. Ct. 1310 (2016) (whether a statute that effectively directs a particular result in a single pending case violates the separation of powers)

- *First Am. Fin. Corp. v. Edwards*, cert. dismissed as improvidently granted, 132 S. Ct. 2536 (2012) (representing respondent) (whether Section 8 of the Real Estate Settlement Procedures Act of 1974 gives purchasers of title insurance Constitutional standing to sue title insurers absent an allegation that the insurers' statutory violations had any impact on the price or quality of the services)

- *Mac's Shell Serv., Inc. v. Shell Oil Prods. Co.*, 559 U.S. 175 (2010) (whether a franchisee may recover for "constructive termination" or "constructive nonrenewal" under the Petroleum Marketing Practices Act when the franchisee continues to operate the franchise)

- *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010) (whether the Sarbanes-Oxley Act, which created the Public Company Accounting Oversight Board, violates the separation of powers or the Appointments Clause of the U.S. Constitution)

- *NRG Power Mktg., LLC v. Maine Pub. Utils. Comm'n*, 558 U.S. 165 (2010) (whether the *Mobile-Sierra* doctrine, which protects the integrity of wholesale energy contracts, applies when a rate set by contract is challenged by an entity that was not a party to the contract)

- *BP Am. Prod. Co. v. Burton*, 549 U.S. 84 (2006) (whether the limitations period in 28 U.S.C. §2415(a) applies to federal agency orders requiring the payment of money claimed under a lease or other agreement)



# Jeffrey A. Lamken

## Selected Cases Argued Before the United States Supreme Court, *continued*

- *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113 (2005) (whether persons aggrieved by violations of the 1996 Tele-communications Act may bring an action for damages and attorney's fees under 42 U.S.C. §§ 1610, 1988)

- *Barnhart v. Thomas*, 540 U.S. 20 (2003) (whether a claimant's ability to perform her former job precludes an award of dis-ability benefits where that job no longer exists in significant numbers)

- *Overton v. Bazzetta*, 539 U.S. 126 (2003) (whether prisoners have a constitutional right to receive visits while incarcerated, and whether Michigan's prison policies violate such a right)

- *Wisconsin Dep't of Health and Family Servs. v. Blumer*, 534 U.S. 73 (2002) (whether the "income-first" methodology for determining eligibility is permissible under the Medicaid statute)

- *Barnhart v. Walton*, 533 U.S. 976 (2001) (whether a claimant is entitled to disability benefits if his inability to work lasts less than 12 months)

## Selected Party Briefs in the United States Supreme Court

- *Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012) (whether the term "individual" in the Torture Victim Protection Act extends beyond natural persons)

- *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011) (whether private securities fraud plaintiffs must prove loss causation to obtain class certification)

- *Jones v. Harris Assocs.*, 559 U.S. 335 (2010) (establishing the standard for determining whether an investment adviser's fees violate its statutory fiduciary duty to the fund it manages)

- *Price v. Vincent*, 538 U.S. 634 (2003) (whether reconsideration of an order granting a directed verdict of acquittal violates double jeopardy)

## Selected Amicus Briefs in the United States Supreme Court

- *Impression Prods., Inc. v. Lexmark Int'l, Inc.*, 137 S. Ct. 1523 (2017) (brief of amicus curiae Qualcomm, Inc., addressing whether the sale of a patented product exhausts U.S. patent rights despite use restrictions and conditions in the sales contract)

- *Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288 (2016) (brief of amicus curiae NRG Energy, Inc., addressing the scope of FERC's jurisdiction over, and federal preemption of, state energy initiatives)

- *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760 (2016) (brief of amici curiae economists addressing FERC's economic justifications for its regulation of demand-response payments)

- *Comptroller v. Wynne*, 135 S. Ct. 1787 (2015) (brief of amicus curiae U.S. Chamber of Commerce addressing whether a State can tax its residents on out-of-state income without providing a credit for out-of-state taxes)

- *Am. Broad. Cos. v. Aereo, Inc.*, 134 S. Ct. 2498 (2014) (brief of amicus curiae Cablevision Systems Corp. in a copyright challenge to Aereo's Internet television retransmission service)

- *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014) (brief of amicus curiae Yahoo! Inc. and other high-tech companies addressing the degree of particularity required for patent claims)

- *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014) (brief of amici curiae Microsoft Corporation, Adobe Systems Inc., and Hewlett-Packard Company addressing the patent eligibility of computer-implemented inventions under § 101 of the Patent Act)

- *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014), & *Highmark Inc. v. Allcare Health Mgmt. Sys. Inc.*, 134 S. Ct. 1744 (2014) (brief of amici curiae Yahoo! Inc. and other high-tech companies addressing the "exceptional case" standard for fee-shifting under § 285 of the Patent Act)



# Jeffrey A. Lamken

## Selected Amicus Briefs in the United States Supreme Court, *continued*

- *EPA v. EME Homer City Generation, LP*, 133 S. Ct. 2857 (2013) (brief of amicus curiae Chamber of Commerce in a suit challenging the EPA's rules implementing the interstate pollution restrictions of the Clean Air Act)

- *Genesis HealthCare Corp. v. Symczyk*, 133 S. Ct. 1523 (2013) (brief of amicus curiae DRI – The Voice of the Defense Bar addressing whether a putative class action can continue when the named plaintiff's claim becomes moot)

- *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) (brief of amici curiae Altria Group and other leading U.S. companies addressing the need for significant proof of a general policy of discrimination to certify an employment-discrimination class action)

- *Altria Grp. v. Good*, 555 U.S. 70 (2008) (brief of amicus curiae U.S. Chamber of Commerce addressing whether federal law preempts state-law fraud challenges to FTC-authorized statements in cigarette advertising)

- *Morgan Stanley Capital Grp. v. Pub. Util. Dist. No. 1 of Snohomish Cnty.*, 554 U.S. 527 (2008) (brief of amici curiae economists addressing the standard for abrogation of long-term energy contracts under the *Mobile-Sierra* doctrine)

## Representative Matters in the United States Courts of Appeals

- *NRG Power Marketing, LLC v. FERC*, 862 F.3d 108 (D.C. Cir. 2017) (whether FERC exceeded its authority under Section 205 of the Federal Power Act by imposing a substantially different rate scheme)

- *Advanced Energy Mgmt. Alliance v. FERC*, 860 F.3d 656 (D.C. Cir. 2017) (whether FERC properly approved changes to PJM's capacity performance rules)

- *In re Fairfield Sentry Ltd.*, No. 16-2127, — F. App'x — (2d Cir. June 12, 2017) (whether a U.S. bankruptcy court in a Chapter 15 case must defer to a foreign insolvency court's decision approving the foreign debtor's sale of U.S. assets)

- *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016) (whether (a) alleged misrepresentations regarding "liquidity risk" are actionable under the federal securities laws, and (b) loss-causation has been demonstrated where the stock price did not move in response to individual misrepresentations)

- *Drone Techs., Inc. v. Parrot S.A. and Parrot Inc.*, 838 F.3d 1283 (Fed. Cir. 2016) (whether the district court abused its discretion in entering a default judgment on liability as a discovery sanction)

- *McRo, Inc. v. Bandai Namco Games Am., Inc.*, 837 F.3d 1299 (Fed. Cir. 2016) (whether a patent for automatically animating the lip synchronization and facial expressions of 3-dimentional characters was directed to an unpatentable abstract idea)

- *Rubin v. Islamic Rep. of Iran*, 830 F.3d 470 (7th Cir. 2016) (whether 28 U.S.C. § 1610(g) provides a freestanding attachment immunity exception, and whether 28 U.S.C. § 1610(a) applies to a foreign sovereign's property only when the property is used in the United States by the foreign state itself)

- *Hourani v. Mirtchev*, 796 F.3d 1 (D.C. Cir. 2015) (whether the Racketeering Influenced and Corrupt Organizations Act extends to an alleged conspiracy to commit extortion abroad)

- *Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306 (Fed. Cir. 2015) (whether the Patent and Trademark Office properly defined "covered business method" patents subject to transitional review proceedings, and whether a patent for a computerized pricing engine is directed to patent-eligible subject matter)

- *Soverain Software LLC v. Victoria's Secret*, 778 F.3d 1311 (Fed. Cir. 2015) (whether an appellate decision sua sponte holding patent claims invalid has issue-preclusive effect in later litigation)

- *NES Fin. Corp. v. JPMorgan Chase Bank, N.A.*, 556 F. App'x 12 (2d Cir. 2014) (whether plaintiff in fraud action proved damages and justifiable reliance and whether the parties' contract required additional payments)



# Jeffrey A. Lamken

## Representative Matters in the United States Courts of Appeals, *continued*

- *New Eng. Power Generators Ass'n, Inc. v. FERC*, 757 F.3d 283 (D.C. Cir. 2014) (whether rules to mitigate uneconomic entry in ISO New England were arbitrary and capricious)

- *United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451 (4th Cir. 2013) (whether pharmaceutical company's promotion of a drug for off-label purposes caused false claims to be presented to the government in violation of the False Claims Act), cert. denied, 134 S. Ct. 1759 (2014)

- *Rambus Inc. v. Rea*, 527 F. App'x 902 (Fed. Cir. 2013) (whether substantial evidence supported the Patent and Trademark Office's finding that 25 patent claims were anticipated by an earlier patent)

- *United States v. Danielczyk*, 683 F.3d 611 (4th Cir. 2012) (whether, following *Citizens United*, the Federal Election Campaign Act's categorical ban on corporate contributions to candidates violates the First Amendment), cert. denied, 133 S. Ct. 1459 (2013)

- *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011) (en banc) (whether the elements of inequitable conduct should be made more exacting with respect to intent, materiality, and causation, and by excluding a "balancing" approach)

- *Arar v. Ashcroft*, 585 F.3d 559 (2d Cir. 2009) (en banc) (whether *Bivens* and the Torture Victim Prevention Act allow a foreign national claiming to have been tortured by foreign officials abroad to sue U.S. officials for alleged complicity), cert. denied, 560 U.S. 978 (2010)

- *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) (whether cable company's remote-storage DVR infringes copyrights by allowing customers to record programming and store their recordings in a remote location), cert. denied, 129 S. Ct. 2890 (2009)

- *AES Sparrow Point LNG, LLC v. Smith*, 527 F.3d 120 (4th Cir. 2008) (whether county law making it illegal to build a liquefied natural gas terminal in a particular location is preempted by the Natural Gas Act), cert. denied, 555 U.S. 888 (2008)

- *Kirch v. Liberty Media Corp.*, 449 F.3d 388 (2d Cir. 2006) (whether statements about a third-party can support a defamation claim, and whether plaintiff proved claims of tortious interference with contract and prospective economic advantage)

## Selected Amicus Briefs in the United States Courts of Appeals

- *Hickcox-Huffman v. U.S. Airways, Inc.*, 855 F.3d 1057 (9th Cir. 2017) (brief of amicus curiae Air Transport Association of America, Inc., addressing whether the Airline Deregulation Act preempts state-law claims arising out of delayed baggage)

- *ClearCorrect Operating, LLC v. Int'l Trade Comm'n*, 810 F.3d 1283 (Fed. Cir. 2015) (brief of amicus curiae Business Software Alliance addressing ITC jurisdiction over digital transmissions)

- *Beer v. United States*, 696 F.3d 1174 (Fed. Cir. 2012) (en banc) (brief of amicus curiae Federal Judges Association addressing cost-of-living adjustments for Article III judges), cert. denied, 133 S. Ct. 1997 (2013)

- *TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869 (Fed. Cir. 2011) (en banc) (brief of amicus curiae Association for Competitive Technology addressing the standard for judicial enforcement of patent injunctions)

- *Bus. Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011) (brief of amici curiae Institutional Investors, TIAA-CREF, and other funds addressing an SEC rule allowing shareholders to include director nominees in company proxy materials)



# Jeffrey A. Lamken

## Honors & Awards

Recognized as a Band 1 appellate practitioner, *Chambers USA Guide to America's Leading Business Lawyers* since 2005

Listed in *The Best Lawyers in America* since 2006

Recognized as a "Washington D.C. Super Lawyer" by *Law & Politics* since 2007

Named to the "Fab Fifty" list of 50 most promising young litigators under 45 by *American Lawyer*, 2007

Included on the *Washingtonian*'s Top Lawyers list since 2007

Named to the *Lawdragon 500 Leading Lawyers in America*

## Professional Affiliations

American Academy of Appellate Lawyers

Member, Edward Coke Appellate Inn of Court

Member, Giles S. Rich Inn of Court

Member, American Bar Association Litigation Section

## Clerkships

Law clerk to the Honorable Sandra Day O'Connor, United States Supreme Court

Law clerk to the Honorable Alex Kozinski, United States Court of Appeals for the Ninth Circuit

## Education

Stanford Law School, J.D., 1990

   *Order of the Coif*

   Nathan Abbott Scholar

   Senior Editor, *Stanford Law Review*

Haverford College, B.A., 1986, *magna cum laude*, political science

   *Phi Beta Kappa*

   Department Prize in Mathematics

   Kurzman Prize

39



# Megan Cunniff Church

Megan Cunniff Church is a highly accomplished trial lawyer who represents companies and individuals in high-stakes civil litigation and white collar criminal and regulatory matters. She conducts corporate internal investigations in the U.S. and abroad, and she advises clients on crisis and risk management.

Immediately prior to joining the firm, Ms. Church served as Deputy Chief of the Financial Crimes Section of the United States Attorney's Office for the Northern District of Illinois. In nine years as an Assistant United States Attorney, she investigated and prosecuted business crime, public corruption, financial fraud, narcotics violations, and organized crime. She served as first or second chair in 15 jury trials and one bench trial, and she successfully briefed and argued numerous matters in the United States Court of Appeals for the Seventh Circuit.

Previously Ms. Church was an associate with McDermott Will & Emery and Baker & McKenzie. She also served as a law clerk to the Honorable William J. Bauer of the United States Court of Appeals for the Seventh Circuit and to the Honorable Joan H. Lefkow of the United States District Court for the Northern District of Illinois.

## Representative Matters

- Represent plaintiffs in national consumer class action based on a massive data breach

- Represent corporate executive in DOJ investigation into alleged theft of trade secrets

## Honors & Awards

Cook County Crime Stoppers, Excellence in Law Enforcement Award, 2013

Chicago Crime Commission, Mitchell A. Mars Prosecutorial Excellence Award, 2008

## Professional Affiliations

Barrister, Chicago Inn of Court

Member, Seventh Circuit Bar Association

Member, Federal Bar Association

## Clerkships

Law clerk to the Honorable William J. Bauer, United States Court of Appeals for the Seventh Circuit

Law clerk to the Honorable Joan H. Lefkow, United States District Court for the Northern District of Illinois

## Education

Northwestern University School of Law, J.D.

Georgetown University, B.A.



# Thomas J. Wiegand

Tom Wiegand is a trial lawyer who represents clients across the country in complex business litigation, class actions, white collar criminal matters, personal and family trust disputes, antitrust matters, and state and federal government investigations.  Mr. Wiegand wrote his third-year thesis for Prof. Phillip Areeda, the author of the definitive treatise on antitrust law. After law school Mr. Wiegand worked with the negotiation think tank and consulting business of Prof. Roger Fisher, author of *Getting to Yes*.  Mr. Wiegand then gained his litigation and trial experience over 20 years at Winston & Strawn LLP before joining MoloLamken in 2011.

Mr. Wiegand has represented both plaintiffs and defendants in complex business litigation matters involving a wide variety of claims, including common law and UCC contract claims, statutory and common law fraud, fiduciary duty, and myriad federal and state statutory claims, including RICO, TILA, FCRA, the Lanham Act, the Sherman Act, and various securities laws. He also has represented clients in numerous state and federal class actions, including federal classes that are grouped through the federal Multidistrict Litigation Panel, which have involved cutting edge procedural and substantive issues.

## Representative Matters

- Obtaining summary judgment on behalf of Atlas Van Lines defeating claims in two separate putative class actions under the Motor Carrier Act (*Mervyn v. Atlas Van Lines, Inc.*, 2017 WL 1437159 (N.D. Ill. Apr. 20, 2017) and *Mervyn v. Nelson Westerberg, Inc. and Atlas van Lines, Inc.*, 2016 WL 1270416 (N.D. Ill. Mar. 31, 2016))

- Representing RMBS Trustees in repurchase claims against originators of subprime home mortgage loans based on breaches of representations and warranties

- Obtaining at arbitration an order to refund client's entire investment in a feature-length film project based on the Pulitzer Prize-winning book *Interpreter of Maladies* (April 2015)

- Representing former NFL athletes in objecting to class settlement regarding concussions

- Obtaining favorable settlement for professional service firm against group of former employees and their new employer for breach of fiduciary duty

- Obtaining favorable settlement for group of Google employees who were sued by their former employer Groupon relating to a non-compete agreement

- Obtaining favorable settlement against ad agency and its client that infringed Car-Freshner's famous trademarks

- Defeating motion for class certification of a set of consolidated class actions involving the recall by the CPSC of over 4 million units of a children's arts and crafts toy (*In re Aqua Dots Prods. Liab.*, 270 F.R.D. 377 (N.D. Ill. 2010))

- Defeating named plaintiffs' motion for class certification involving claims of cybersquatting relating to domain names on the Internet (*Vulcan Golf, LLC v. Google Inc.*, 254 F.R.D. 521 (N.D. Ill. 2008))

- Winning summary judgment dismissing the claims against all named plaintiffs seeking to represent a putative class of home equity borrowers in Alameda County, California, against a consumer finance company

- Winning dismissal of the claims of a putative class action relating to accessing credit report information to advertise for loans (*Zawacki v. Discover Fin. Servs.*, No. 06 C 4925, 2007 WL 625454 (N.D. Ill. Feb. 23, 2007))

- Winning summary judgment dismissing all claims brought against UOP LLC by Archer Daniels Midland Company on UCC warranty theories

- Obtaining dismissal of a consumer class action against DaimlerChrysler in Cook County, Illinois (*Evitts v. DaimlerChrysler Motors Corp.*, 834 N.E.2d 942 (Ill. App. Ct. 2005))

- Defending Lear Corporation in federal court jury trial over a $75 million contract claim by a supplier

- Obtaining summary judgment against plaintiffs in Jefferson County, Mississippi, on behalf of a consumer finance company in a "mass joinder" fraud action



# Thomas J. Wiegand

## Representative Matters, *continued*

- Obtaining dismissal by the court of a federal RICO count at the conclusion of a six-week criminal trial (*United States v. Serpico*, No. 99 CR 570, 2001 WL 803703 (N.D. Ill. July 10, 2001))

- Representing Sears, Roebuck and Co. in several putative national consumer class action lawsuits and state attorney general investigations (including *Poe v. Sears, Roebuck and Co.*, No. 96-cv-358, 1998 WL 113561 (N.D. Ga. Feb. 13, 1998); *Kelly v. Sears Roebuck and Co.*, 720 N.E.2d 683 (Ill. App. Div. 1999); and *Feuerman v. Sears, Roebuck and Co.*, No. 96 Civ. 0120, 1996 WL 648966 (S.D.N.Y. Nov. 6, 1996))

- Representing Reader's Digest in its successful Illinois appeal that reversed a trial court's class certification decision

- Representing Interstate Brands in a 22-state product recall of Twinkies and other snack cakes due to allegations of improper asbestos removal from the bakery (including class actions and government investigations)

- Successfully representing Interstate Brands in a DOJ antitrust division contest over its acquisition of Continental Baking

- Defending Gateway, Inc. in a putative national class action of purchasers of a certain PC configuration, which concluded successfully when the trial court's certification of a nationwide class was overridden by the Seventh Circuit's direction that an arbitration clause had to be enforced and that a class arbitration was not permissible (*Hill v. Gateway 2000, Inc.*, 105 F.3d 1147 (7th Cir. 1997))

## Education

Harvard Law School, J.D.

Yale College, B.A., economics, *magna cum laude*

## Honors & Awards

Illinois *Super Lawyer*, 2009-2018

New York *Super Lawyer*, 2015-2018

## Professional Affiliations

Board of Governors, Seventh Circuit Bar Association

Member, CPLR Committee of the NY State Bar Association

Member, Chicago Inn of Court

Member, American Bar Association Litigation Section

Served on the board of the Antitrust and Unfair Competition Section of the Illinois State Bar Association

Serves on Board of Yale Crew Association

Served as a board member of Over the Rainbow Association and of Joseph Sears School



# Justin B. Weiner

Justin Weiner's practice focuses on complex business litigation, with a particular emphasis on litigation concerning structured finance, corporate finance, and patent litigation.  Mr. Weiner also has extensive experience in appellate litigation.

Prior to joining MoloLamken, Mr. Weiner was an associate in the Chicago office of Sidley Austin LLP.  He also served as a law clerk to Chief Judge Frank H. Easterbrook of the United States Court of Appeals for the Seventh Circuit and to Judge Milton I. Shadur of the United States District Court for the Northern District of Illinois.

Mr. Weiner is an active member of the Seventh Circuit Bar Association, serving as Illinois Chair on the Young Lawyers' Committee and co-Chair of the Association's publication, the *Circuit Rider*.  Mr. Weiner has also published a number of articles in the *Circuit Rider*.

## Representative Matters

- A major media company in litigation over a $1.8 billion debt refinancing

- Plaintiffs in a nationwide class action based on a massive data breach

- A global financial institution pursuing multiple RMBS "putback" suits against mortgage originators and other responsible parties in state and federal courts

- A major medical device company in patent litigation both in the district court and in the United States Court of Appeals for the Federal Circuit

- An amicus brief in the landmark patent case *Oil States Energy Services, LLC v. Greene's Energy Group, LLC* in the Supreme Court of the United States

- A wireless telecommunications company in patent litigation in the United States District Court for the Northern District of Illinois

- A major auto manufacturer in a products liability case in the Illinois Supreme Court

- A leading engineering firm in trade secret and unfair competition litigation in New York State Supreme Court

- A wireless telecommunications company in a breach of contract claim in the United States District Court for the Western District of Missouri

- A patent infringement suit relating to mobile real-time data technology in the United States District Court for the District of Delaware and the Patent Trial and Appeal Board

- A patent infringement suit in the International Trade Commission

- An amicus brief in the United States Court of Appeals for the Seventh Circuit to defend a Northern District of Illinois Judge's contempt judgment against a litigant

## Honors & Awards

FutureStar, *Benchmark Litigation*, 2018

Emerging Lawyer, *Leading Lawyers*, 2016, 2017

Rising Stars Under 40, *Benchmark Litigation*, 2016

40 Under 40, *Chicago Lawyer/Chicago Daily Bulletin*, 2016

## Clerkships

Law clerk to the Honorable Frank H. Easterbrook, United States Court of Appeals for the Seventh Circuit

Law clerk to the Honorable Milton I. Shadur, United States District Court for the Northern District of Illinois

## Education

The University of Chicago Law School, J.D.

   *Order of the Coif*

   Comment Editor, *University of Chicago Law Review*

University of Michigan, B.S.



# Allison Mileo Gorsuch

Allison Gorsuch's practice focuses on complex civil litigation, white collar matters, and appellate litigation.

Prior to joining MoloLamken, Ms. Gorsuch served as a law clerk to the Honorable Jeffrey A. Meyer of the United States District Court for the District of Connecticut and to the Honorable Christopher F. Droney of the United States Court of Appeals for the Second Circuit.

Prior to law school, Ms. Gorsuch obtained her Ph.D. in American history, writing her dissertation on the legal history of the early nineteenth-century American Northwest territories.

## Representative Matters

- Global financial institutions pursuing RMBS "putback" suits against mortgage originators and other responsible parties

- Shareholder seeking to appoint an equity committee in a prepackaged Chapter 11 bankruptcy in the Bankruptcy Court in the District of Delaware

## Clerkships

Law clerk to the Honorable Christopher F. Droney, United States Court of Appeals for the Second Circuit

Law clerk to the Honorable Jeffrey A. Meyer, United States District Court for the District of Connecticut

## Education

Yale Law School, J.D.

    Articles Editor, *Yale Law Journal*

    Yale University, M.A., with honors, Ph.D.

University of Michigan, B.A., *summa cum laude*



# Rayiner Hashem

Rayiner Hashem's practice focuses on complex civil litigation, patent litigation, and appellate litigation.

Mr. Hashem has served as a law clerk to the Honorable Dolores K. Sloviter of the United States Court of Appeals for the Third Circuit.  During law school, he also served as law clerk to former Commissioner Meredith A. Baker of the Federal Communications Commission.  Mr. Hashem holds a B.S. in Aerospace Engineering from the Georgia Institute of Technology.  Before attending law school, he was a software engineer at a wireless technology R&D firm.

## Representative Matters

- *Impression Prods., Inc. v. Lexmark Int'l, Inc.*, 137 S. Ct. 1523 (2017) – Drafted amicus brief on behalf of leading cellular wireless technology company in case addressing patent exhaustion doctrine

- *Oracle America, Inc. v. Google, Inc.*, No. 17-1118 (Fed. Cir.) – Drafted amicus brief on behalf of leading software company in case addressing copyright fair use

- *NATOA v. FCC*, 862 F.3d 18 (D.C. Cir. 2017) – Drafted briefs for cable television and broadband trade association as intervenor in case addressing powers of state and local television franchising authorities

- *NRG Power Marketing v. FERC*, 862 F.3d 108 (D.C. Cir. 2017) – Drafted briefs for leading energy company as petitioner in challenge to federal electricity market regulations

- *AEMA v. FERC*, 860 F.3d 656 (D.C. Cir. 2017) – Drafted briefs for energy-industry trade group as intervenor in challenge to federal electricity market regulations

- *United States Telecom Association v. FCC*, 825 F.3d 674 (D.C. Cir. 2016) – Drafted briefs for cable television and broadband trade association as petitioner challenging FCC's "net neutrality" regulations

- *United States Telecom Association v. FCC*, No. 15-1414 (D.C. Cir.) – Drafted brief for telecommunications industry trade group as intervenor in challenge to FCC "tech transitions" regulations

- *In re NFL Players Concussion Litig.*, 821 F.3d 410 (3d Cir. 2016) – Drafted briefs challenging final approval of class action settlement in mass tort case

- *In re New Jersey Tax Sales Certificates Antitrust Litig.*, No. 16-3965 (3d Cir.) – Drafted briefs challenging final approval of class action settlement in antitrust case

- *ClearCorrect Operating, LLC v. Int'l Trade Comm'n*, 810 F.3d 1283 (Fed. Cir. 2015) – Drafted amicus brief on behalf of software-industry trade association in case addressing ITC jurisdiction over digital transmissions

- Multinational oil and gas exploration and production company in patent infringement lawsuit

- Small R&D company and patent holder in patent infringement lawsuit against apparel manufacturers

- Patent holder in patent infringement lawsuit against financial technology companies

- Retired NFL football players objecting to class action settlement in mass tort litigation

- Homeowner objecting to class action settlement in antitrust litigation

- Corporate directors and officers in breach-of-fiduciary duty action brought by federal agency

- Leading defense contractor in internal investigation of embezzlement by employee

## Clerkships

Law clerk to the Honorable Dolores K. Sloviter, United States Court of Appeals for the Third Circuit

## Education

Northwestern University School of Law, J.D., *magna cum laude*

> Associate Editor, *Northwestern Journal of Technology and Intellectual Property*

Georgia Institute of Technology, B.S.



# Daniel Michaeli

Daniel Michaeli's practice focuses on complex civil litigation, white collar matters, and appellate litigation.

Prior to joining MoloLamken, Mr. Michaeli served as a law clerk to the Honorable Diane S. Sykes of the United States Court of Appeals for the Seventh Circuit. Before law school, he was a Fulbright research fellow in China and a research associate for the Council on Foreign Relations in Washington, D.C.  During law school, Mr. Michaeli interned at the Office of the Assistant Legal Adviser for International Claims and Investment Disputes at the U.S. Department of State and the General Counsel and China Affairs offices at the Office of the U.S. Trade Representative.

## Representative Matters

- Represent investors in multiple RMBS "putback" suits against mortgage originators and other responsible parties in state and federal courts

- Represent technology companies on copyright law issues relating to public performance and distribution rights, the Digital Millennium Copyright Act, and emerging technologies

- Represent investor in investment dispute with a foreign government under a bilateral investment treaty

- Represent plaintiffs in consumer class action based on a massive data breach

- Represent member and managers of limited liability company defending against allegations including fiduciary duty breaches before Illinois state chancery court

- Represented cable company in connection with potential proceedings before the Federal Communications Commission

- Represented criminal defendant on appeal before the United States Court of Appeals for the Seventh Circuit

- Represented medical doctor at jury trial for alleged solicitation of kickbacks and conspiracy before the Northern District of Illinois

## Clerkships

Law clerk to the Honorable Diane S. Sykes, United States Court of Appeals for the Seventh Circuit

## Education

New York University School of Law, J.D., *magna cum laude*

   *Order of the Coif*

   Florence Allen Scholar

   Articles Editor, *NYU Law Review*

Fulbright Research Fellow, China

University of Chicago, B.A., with Honors