## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORHTERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| In Re: Equifax, Inc. Customer Data Security Breach Litigation | ) ) ) ) ) ) ) | MDL Docket No. 2800 No.: 1:17-md-2800-TWT  CONSUMER ACTIONS |

**APPLICATION FOR THE APPOINTMENT OF SPECTOR, ROSEMAN & KODROFF P.C., COUNSEL FOR A DIRECT CONTRACT PLAINTIFF, AS INTERIM CO-LEAD COUNSEL OR, IN THE ALTERNATIVE, APPOINTMENT TO THE CONSUMER ACTION'S STEERING COMMITTEE**

Pursuant to Case Management Order ("CMO") Nos. 1 (ECF No. 23) and 2 (ECF No. 87) and Fed. R. of Civ. P. 23(g), Plaintiff Anthony Mirarchi submits this memorandum of law in support of his motion to appoint Spector, Roseman, & Kodroff P.C. ("SRK") as: (1) Interim Co-Lead Counsel in the Consumer Actions or, in the alternative, (2) a member of the Consumer Action's Steering Committee.

## INTRODUCTION

This litigation arises from a massive data breach at Equifax, Inc. ("Equifax" or the "Company") that compromised the private data of millions of consumers, many of whom may have been unaware that Equifax was quietly collecting their personal financial data.  Plaintiff Mirarchi is member of a much smaller class of

plaintiffs that voluntarily provided their personal financial data to Equifax as part of a direct contact that he entered into with Equifax.

Within the Consumer Actions, there is a sub-group of claimants who paid for products and services from Equifax to protect against, among other things, identity theft.  Plaintiff Mirarchi brought suit on behalf of himself and all persons who entered into a ***direct contract*** with Equifax for credit monitoring and identity theft protection.  Given the unique posture of these claims, Plaintiff Mirarchi sought a separate track for his claims (the "Contract Claims").  On January 9, 2018, this Court determined that these Contract Claims did not require a separate track, but noted that it "can always revisit this issue if it becomes a problem." Status Conf. Hr'g Tr. 18:5-16, Jan. 9, 2018.

If a conflict arises later in the litigation between direct contract purchasers and consumers, it will be challenging to appoint new counsel who has not been fully involved in the litigation from its inception.  By appointing SRK as a Co-Lead Counsel or as a member of the Consumer Action's Steering Committee, this Court can prevent any complications that may arise from a conflict between claimants who have a direct contractual relationship with Equifax and those who do not.  SRK will use its considerable expertise in class action and multidistrict litigation to litigate efficiently and effectively, will assist the Court in advancing the case, and will advocate for and protect the interests of the proposed Class.

Plaintiff Anthony Mirarchi has and will continue to be represented by the law firms of SRK and Faruqi & Faruqi, LLP ("Faruqi"), with Faruqi having an office in Atlanta.

This litigation is likely to be long and complex, involving extensive discovery, intricate issues of fact and law, and substantial damages. Thus, in accordance with Rule 23(g) and CMO No. 1, it is imperative that Interim Lead Counsel, and any member of the Plaintiffs' Steering Committee, be exceedingly competent and capable of recovering the maximum possible relief for the entire class. SRK meets these prerequisites in every respect. SRK has been at the forefront of class action and consumer litigation for over twenty-five years. SRK has prosecuted some of the largest consumer, antitrust, and securities fraud class action cases and has received praise from judges and colleagues alike for its efficiency, professionalism, and vigorous dedication to class representation. SRK brings a level of professionalism and in-depth knowledge of contemporary and highly relevant case law that is unmatched in class action and multidistrict litigation. SRK knows the discovery challenges, the expert challenges, and the briefing challenges that are sure to face Plaintiffs in this case, and they are prepared to face these challenges.

Plaintiff Mirarchi thus moves this Court to appoint SRK as Interim Co-Lead Lead Counsel for the Consumer Actions or, in the alternative, a member of the Consumer Actions' Steering Committee.

## FACTUAL BACKGROUND

On September 7, 2017, Equifax issued a press release revealing to the public for the first time that "a cybersecurity incident potentially impacting approximately 143 million U.S. consumers" had occurred from mid-May through July 2017 and exposed sensitive information of the affected consumers (the "Data Breach"). Equifax stated in the press release that the "information accessed primarily includes names, Social Security numbers, birth dates, addresses and, in some instances, driver's license numbers.   In addition, credit card numbers for approximately 209,000 U.S. consumers, and certain dispute documents with personal identifying information for approximately 182,000 U.S. consumers, were accessed."  In the wake of that shocking disclosure, various outlets reported that Equifax had in fact ignored warnings about vulnerabilities in its data security systems, leaving its customers and the public at large at a heightened risk that their Personal Identifying Information ("PII") would be stolen and misused.

In excess of three hundred complaints against Equifax from both consumers and financial institutions are currently pending before this Court.  At the January 9, 2018 hearing, SRK argued that Plaintiff Mirarchi's claims are unique since, unlike

other consumer plaintiffs, his claims arise from the contract he entered into with Equifax for credit monitoring and identity theft protection before the Data Breach occurred.  Not only did Equifax fail to perform its obligations under this contract, it is still charging Plaintiff Mirarchi for these services, almost all of which it is now providing free of charge to other consumers whose data was compromised.  This Court determined that these Contract Claims are not situated so differently that separate representation is merited at this point in the litigation, but that it "can always revisit this issue if it becomes a problem."  Status Conf. Hr'g Tr. 18:5-16. For the reasons articulated herein, Plaintiff Mirarchi believes that separate representation for the Contract Claims is necessary, and should be appointed at this stage in the proceedings.

## **ARGUMENT**

### I.      **Appointment of Co-Lead Counsel is Critical to the Management and Success of Complex Litigation**

Under Rule 23, "the Court may designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action." Fed. R. Civ. P. 23(g)(3).   "[D]esignation of interim [class] counsel clarifies responsibility for protecting the interests of the class during precertification activities, such as making and responding to motions, conducting any necessary discovery, moving for class certification, and negotiating settlement."  Manual for Complex Litigation, Fourth § 21.11.   "The multiplicity of suits requires that the

district court be allowed to combine procedures, appoint lead counsel, recognize steering committees of lawyers, limit and manage discovery, etc., to minimize expense to all litigants and to provide judicial efficiency." *In re Linerboard Antitrust Litigation*, 292 F. Supp. 2d 644, 653 (E.D. Pa. 2003) (citation omitted). Moreover, in complex matters such as this, one of the key organizational tools the district court has is to appoint seasoned lead counsel. *See* Manual for Complex Litigation, Fourth §§ 10.224, 21.272. Lead counsel is charged with the ultimate responsibility of acting for and in the best interest of the group throughout the entire litigation process. *See id*. at § 21.272. As such, it is the duty of the Court to appoint lead counsel who are fully capable and qualified to fairly and adequately represent all parties on their side. *See id.* at §§ 21.271, 21.272.

There is no question that, as counsel to Plaintiff Mirarchi, SRK will litigate this matter zealously, efficiently, and competently, and in the best interests of each member of the Contract Class. For over 25 years, SRK has served as lead counsel or co-lead counsel in numerous large, complex class actions and recovered hundreds of billions of dollars for class members.

## II. Fundamental Differences of Contract Claims Require Appointment of Co-Lead Counsel or, in the alternative, a Member of the Steering Committee

In its marketing materials, Equifax states: "***You'll feel safer with Equifax***. We're the leading provider of data breach services, serving more than 500

organizations with security breach events everyday.   In addition to extensive experience, Equifax has the most comprehensive set of identity theft products and customer service coverage in the market." Based on these and other representations, Plaintiff Mirarchi and other similarly situated plaintiffs purchased products and services from Equifax—which situates them differently from claimants who did not similarly engage Equifax.  As discussed below, Plaintiff Mirarchi possesses breach of express contract claims and other causes of action that other claimants do not.  In addition, plaintiffs that contracted with Equifax suffered damages unique from other claimants because they provided even more PII to Equifax than passive consumers whose data was collected.  And most significantly they are still paying for identity-theft protection services that Equifax is now providing for free to anyone whose data was compromised.

First, based on his contract with Equifax, Plaintiff Mirarchi was in direct privity with the Company—leading to differing claims for standing and damages as compared to other members of the Consumer Class without a contract.  Notably, Plaintiff Mirarchi has standing to bring a breach-of-express-contract claim against Equifax.  For example, Equifax required Plaintiff Mirarchi to affirmatively assent to the Product Agreement and Privacy Policy, which included representations regarding Equifax's security protocols and its practices regarding privacy and data security.  By ignoring specific warnings about its vulnerabilities and implementing

inferior security measures for the protection of its customers' PII, Equifax breached the terms of its contract with Plaintiff Mirarchi as well as additional representations solely made to those who purchased Equifax's products and services.  These breach of contract claims, if successful, will lead to unique damages available only to those who have an agreement with Equifax and which are potentially adverse to other consumers.  In addition, prosecution of these Contract Claims will require, among other things, discovery unique to them, such as the existence of a valid contract, its material terms, compliance of those terms by the parties, and any working drafts, internal communications, or any modifications to the agreements to say the least.  These breach of contract claims may also lead to the pleading of a class period that diverges from one alleged by other members of the Consumer Class.

Second, Plaintiff Mirarchi has sustained—and continues to sustain—another type of economic damage because he is paying for products and services that Equifax is now providing for free to consumers affected by the Data Breach. Plaintiff Mirarchi has been an Equifax customer since at least January 2011, and has since then paid—and continues to pay—Equifax nearly $240 each year for its Complete Premier Plan—many services of which are now offered for free for one year to general consumers whose PII was compromised.  More specifically, when the Data Brach was first disclosed, Equifax offered all consumers a service it

called "TrustedID Premier," which includes monitoring of Equifax, Experian and TransUnion credit reports; copies of Equifax credit reports; the ability to lock and unlock Equifax credit reports; identity theft insurance; and Internet scanning for Social Security numbers.  Equifax nevertheless saw fit to continue charging and collecting fees for these same services—cornerstones of Equifax's paid offerings—from Plaintiff Mirarchi while donating them to other consumers, which is alleged to be part of Equifax's wrongful conduct in Plaintiff Mirarchi's complaint.  Not only do these facts differentiate Plaintiff Mirarchi and the Contract Claims from other consumers, but discovery related to these damages will also diverge materially from what the Consumer Class will seek.  For instance, the contract claims will seek, at minimum, discovery on the pricing of these agreements and any discussions or internal communications about whether (or how) offering Trusted ID Premier to consumers whose data was compromised would affect its agreements with customers paying for these analogous products and services.  Such issues have no bearing on the Consumer Class at large and thus will not be pursued by those parties.

Finally, another factor that situates Plaintiff Mirarchi differently from the Consumer Class is that the Product Agreement and Privacy Policy enabled Equifax to compile greater amounts of information concerning Plaintiff Mirarchi and the Contract Class members—far more than was at risk of exposure for the Consumer

Class.  For example, the Product Agreement authorized the Company to obtain (i) "credit information from one or more consumer reporting agencies"; (ii) "'non-public personal information', 'personal information', and/or 'highly restricted personal information'" as defined by statute; and (iii) "other personal information." Even more concerning, Equifax's Privacy Policy provided that when consumers register to use its website or services, Equifax will collect the customer's identifying information, including "(1) information you provide directly to us; (2) information we may collect automatically, such as through cookies; and (3) other information, such as information about your device, location information, information from social networking services, and information from other sources." Equifax's Privacy Policy goes as far as to say that "[w]e collect information from you when you use this Website [connected to Equifax's personal products]."

## III.   SRK Satisfies the Requirements for Interim Co-Lead Counsel (or a member of the Consumer Class' Steering Committee) to Represent the Interests of Plaintiffs with Contract Claims

It is well established that the appointment of lead counsel is appropriate to ensure efficient representation of the class.  The Federal Rules of Civil Procedure recognize the importance of appointing lead counsel to act on behalf of a putative class by expressly granting courts the power to appoint interim class counsel *before* determining whether to certify the action as a class action.  Rule 23(g)(1) provides for the appointment of class counsel at the time a class is certified, and

Rule 23(g)(3) provides for the appointment of interim counsel on behalf of a putative class. While neither Rule 23(g) nor the Advisory Committee Notes explicitly set forth the standards to be applied in choosing interim class counsel, courts have held that the same factors that apply in choosing class counsel at the time of class certification apply in choosing interim class counsel. *See In re Amla Litig.*, 320 F.R.D. 120, 121 (S.D.N.Y. 2017) ("When appointing interim class counsel, courts generally look to the same factors used in determining the adequacy of class counsel under Rule 23(g)[.]") (citation omitted).

In selecting class counsel, the Court should consider: (l) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources counsel will commit to representing the class. *See* FED. R. CIV. P. 23(g)(1)(A)(i-iv). The Court may also consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class. *See* FED. R. CIV. P. 23(g)(1)(B). This Court has embraced this standard, specifically stating that it will consider attorneys' "(1) willingness and ability to commit to a time-consuming process; (2) ability to work cooperatively with others; (3) professional experience in this type of litigation; and (4) access to sufficient resources to advance the litigation in a timely manner." CMO No. 1 at 6.

Moreover, "'[i]f more than one adequate applicant seeks appointment, the court must appoint the applicant best able to represent the interests of the class.'" *Boggs v. Chesapeake Energy Corp.*, 286 F.R.D. 621, 624 (W.D. Okla. 2012) (quoting Fed. R. Civ. P. 23(g)(2)).  As set out in detail below, SRK meets all the relevant criteria.

**A.    SRK Has Performed Significant Work In Identifying and Investigating Potential Claims in This Action**

Prior to filing a complaint on behalf of Plaintiff Mirarchi, SRK conducted a detailed preliminary investigation before coming to the determination that Equifax breached various duties to its direct customers.  In that vein, SRK reviewed news reports, the Company's press releases, and Congressional hearings regarding the Data Breach, researched experts' analysis of the nature of the Data Breach and the vulnerabilities that enabled it, and investigated the legal issues likely to arise in relation to potential claims against Equifax.  Through that investigation, SRK identified the claims that it believes have the best prospect for providing a remedy to Equifax's direct customers.  Crucially, such claims—which are based primarily on principles of contract law—have been largely overlooked by other complaints on file.  Indeed, the very nature of the primary damages alleged by Plaintiff Mirarchi is entirely distinct from that of the Consumer Class: the Contract Class paid for services which it did not receive (and which are now being offered for free to non-customers affected by the Data Breach), whereas the Consumer Class has

been put at a severely heightened risk of becoming victims of identity theft.  While Plaintiff Mirarchi has suffered the harm to which the wider Consumer Class has been exposed, the contract-related damages constitute an additional basis for damages not covered by the vast majority of complaints in the Consumer Class. SRK's efforts thus weigh in favor of appointing it as Interim Co-Lead Counsel or, in the alternative, a member of the Consumer Actions' Steering Committee to represent plaintiff Mirarchi and other similarly situated plaintiffs that have these distinct Contract Claims.

### B.      SRK is Knowledgeable of the Applicable Law

It is crucial to the success of this matter that this Court appoint seasoned lead counsel such as SRK, which is prepared for the monumental tasks ahead, including class certification, proving liability, and securing the maximum possible recovery for those harmed by the Data Breach.  Having thoroughly investigated and researched the claims and likely defenses in this litigation, SRK is well prepared to pursue the interests of Equifax customers harmed by the Data Breach.

SRK is a highly regarded and successful law firm with a nationwide practice that focuses on class actions and complex litigation, including antitrust, securities, and consumer protection claims.  *See* SRK Firm Résumé attached hereto as Exhibit A.  Moreover, SRK has critical experience in litigating data breach and privacy cases, which present unique and complex issues.  For example, in the first case of

its kind, SRK filed suit against Google arising out of the interception and collection of electronic communications by Google's Street View vehicles.  *See In re Google Inc. Street View Electronic Communications Litigation* (N.D. Cal.).  The action charges that Google's Street View vehicles not only collected images for inclusion in Google Maps and Google Earth, but also were secretly imbedded with a wireless sniffer system that intercepts electronic communications and other data transmitted over class members' wireless networks.  While Google issued press releases disclosing its intent to utilize the vehicles to take photos, it failed to disclose its intent to capture Wi-Fi data.  The complaint alleges that Google's unauthorized interception of private Wi-Fi communications violates the federal Electronic Communications Privacy Act, state wiretap statutes, and California's unfair business practices.  In a major victory for plaintiffs and consumer privacy rights, the 9th Circuit Court of Appeals agreed with plaintiffs' interpretation of the federal Wire Tap Act and affirmed the District Court's refusal to dismiss the action.

SRK was also appointed as a member of the steering committee in a data breach case brought by financial institutions involving Heartland Payment Systems ("Heartland").  *See In Re: Heartland Payment Systems Inc. Customer Data Security Breach* MDL No. 2046 (S.D. Tex.).  The defendants in that case were financial institutions who contracted with Heartland to process transactions made

by payment cards issued by the plaintiffs, giving it access to and possession of confidential personal and financial information of millions of consumers conducting business with the defendants' merchant customers.  In late 2007, unauthorized persons accessed Heartland's unsecure Payment Card processing system, resulting in the loss of confidential data associated with approximately one hundred thirty million payment cards.

Likewise, SRK represents banks in a class action lawsuit against Target that accuses the retail giant of ignoring warnings from as early as 2007 that the company's point-of-sale system was vulnerable to attack.  *See In re: Target Corporation Customer Data Breach* MDL No. 14-2522 (D. Minn).  SRK's suit alleges that Target's conduct put more than 40 million credit and debit card records at risk and compromised the personal information of up to an additional 70 million customers after Target's systems were penetrated by attackers during the approximate period of November 27, 2013 through December 15, 2013.

SRK also filed a class action lawsuit against all major manufacturers of "dynamic random access memory" ("DRAM"), alleging that defendants conspired to fix the prices they charged for DRAM in the United States and throughout the world.  The defendants, who collectively controlled over 70% of the market, secretly agreed to reduce supply in order to artificially raise prices.  In 2002, the U.S. Department of Justice launched a criminal investigation of the conspiracy to

fix prices.  In 2007, the case settled for more than $325 million.

### C.     This Court Should Appoint SRK Based on Its Experience, Competence, and Ability to Cooperate with Co-Counsel

SRK also has extensive knowledge of the class action and multidistrict litigation process and thus favors SRK as an appointment of Interim Co-Lead Counsel.  SRK attorneys have served as lead or co-lead counsel in numerous complex class actions, many of which were ground-breaking or precedent setting. These cases include:

- *In re Automotive Parts Antitrust Litigation*, MDL 12-2311 (E.D. Mich.). SRK has been appointed Interim Co-Lead Counsel for Direct Purchaser Plaintiffs for all product cases filed (currently 16 different cases with more to follow).  These massive price-fixing class actions are being brought on behalf of direct purchasers who were overcharged for various kinds of automotive parts, including wire harness products, heater control panels, instrument panel clusters, fuel senders, occupant safety restraint system products, bearings, air conditioning systems, starters, windshield wiper systems, windshield washer systems, spark plugs, oxygen sensors, fuel injection systems, alternators, ignition coils, and power window motors. SRK and its Interim Co-Lead Counsel on behalf of the Direct Purchaser Plaintiffs have defeated motions to dismiss filed to date in all product cases and have reached settlements with several defendants totaling more than $300 million.

- *In re Blood Reagents Antitrust Litigation*, MDL 09-2081 (E.D. Pa.).  SRK was appointed sole Lead Counsel in this nation-wide, price-fixing class action.  In January 2012, SRK negotiated a $22 million settlement with one defendant, and Judge DuBois certified plaintiffs' class in August 2012 (which was upheld on appeal).  The case is scheduled for trial early this year.

- *Washington Federal, et al. v. United States*, No. 13-cv-00385-MMS (Fed. Cl.).  SRK is currently serving as co-lead counsel in the *Washington Federal* action, representing financial institution Washington Federal, the

*City of Austin Police Retirement System*, and an individual investor.  The complaint alleges that the federal government's conduct in placing Fannie Mae and Freddie Mac into conservatorship in 2008, as well as subsequent actions the government took in its role as conservator, caused substantial harm to the companies' shareholders by destroying their rights and obliterating the economic value of their shares.  The class action seeks, among other relief, a monetary judgment against the United States for its role in effectively nationalizing these private, shareholder-owned corporations and failing to provide proper compensation to shareholders as required under the United States Constitution.  The parties have partially completed briefing on the government's motion to dismiss, but the action is currently stayed pending the completion of jurisdictional discovery in a related action.

- ***Avalon Holdings, Inc. v. BP, plc***, No. 10-md-2185 (S.D. Tex.).  This is a landmark *opt-in* proceeding against BP plc relating to the April 20, 2010 Deepwater Horizon disaster.  Like thousands of other investors excluded from the BP federal securities class action because of the Supreme Court's *Morrison* decision (because they purchased their BP shares abroad), many of SRK's institutional clients (both U.S. and overseas) were left without a remedy.  SRK thus initiated its action against BP as an opt-in proceeding, pleading claims under Texas law.   SRK was involved in securing a landmark victory in this proceeding.  First, it successfully urged the Court to reject applying the Securities Litigation Uniform Standards Act to bar claims pled under English law.   Then, in an unprecedented ruling post-*Morrison*, the Court struck down the defendants' contention that *forum non conveniens* prohibited non-U.S. plaintiffs from bringing their English law claims in Texas, when their shares were purchased in the U.S.  This helps ensure that all plaintiffs, irrespective of their domicile, have access to justice before U.S. courts whether their shares were purchased in the U.S. or abroad.

- ***In re Lupron Marketing and Sales Practices Litigation***, MDL No. 1430 (D. Mass.); ***In re Pharmaceutical Industry Average Wholesale Price Litigation***, MDL 1456, No. 01-CV-12257-PBS (D. Mass.); and ***New England Carpenters Health Benefits Fund v. First Databank, Inc. and McKesson Corp.***, C.A. 05-11148 (D. Mass.).  SRK initiated the private investigation and filed the first cases challenging the misuse of the "Average Wholesale Price" ("AWP") in selling pharmaceuticals.  SRK was co-lead counsel in the initial *Lupron* case, which resulted in a recovery of

$150 million for consumers and health plans.  SRK also served as co-counsel in the *AWP* and *McKesson* cases, in which a total of over $700 million was recovered for consumers and health plans against pharmaceutical companies, publishers and a wholesaler relating to manipulation of the AWP for hundreds of drugs.  Counsel also obtained from the publisher defendants an agreement as to how AWP prices would be reported in the future, which resulted in substantial cost savings and greater transparency for all purchasers of prescription drugs.

- ***McDonough, et al., v. Toys R Us, et al.*** (E.D. Pa.) (Brody, J.). SRK was appointed Co-Lead Counsel for six sub-classes of Babies "R" Us' customers, a rare case involving resale price maintenance in which a purchaser class was certified.  A settlement of $35.5 million was achieved on behalf of the sub-classes.

- ***In re Niaspan Antitrust Litigation*** **MDL No. 2460 (E.D. Pa) and *In re Suboxone Antitrust Litigation*** MDL No. 2445(E.D. Pa).  SRK was appointed to serve as Liaison Counsel for a purported class of end payors for the drugs Niaspan and Suboxone.  In each case, the complaint alleges that the end payors (consumers and healthplans) were overcharged by defendants' illegal efforts to keep generic versions off the market which caused the class to pay supra competitive monopolistic prices.

- ***In re Abbott-Depakote Shareholder Derivative Litigation***, No. 11-cv-08114 (N.D. Ill.).  SRK filed a shareholder derivative action against several present and former members of Abbott Laboratories' Board of Directors on behalf of the company.  The lawsuit charged the company's board with mismanagement and breaches of fiduciary duty for causing or allowing Abbott Laboratories to engage in an unlawful 10-year off-label marketing scheme for its drug Depakote, which prompted a Justice Department investigation and ultimately required Abbott to enter into a Corporate Integrity Agreement and pay $1.6 billion—the second largest illegal pharmaceutical marketing accord in U.S. history.  Through SRK's efforts, the company agreed to implement sweeping corporate governance reforms including, among others, an extensive compensation clawback provision that goes beyond the requirements under the Dodd-Frank Act, the restructuring of a board committee now charged with specific legal and regulatory oversight, enhancing the role of the Lead Director, ensuring the "flow of information" from management to the Board with respect to compliance matters, and changing the "tone at the top."

- ***In re Parmalat Sec. Litig.***, No. 04 Civ. 0030 (LAK) (S.D.N.Y.). The *Parmalat* case, known as the "Enron of Europe" due to the size and scope of the fraud, resulted in a substantial monetary recovery for the class, as well as important corporate governance reforms. In that that securities class action, SRK represented a group of European institutional investors that served as lead plaintiffs. SRK and its co-counsel recovered more than $96.5 million, which included recovering money from Parmalat while in bankruptcy under a unique legal theory that used Italian bankruptcy law to secure funds not normally available to investors. Monies were also recovered from Parmalat's two auditing firms and two of its financial institutions. As part of the settlements with the two large European banks, American investors also were able to extract the endorsement of each bank to adhere to key corporate governance principles designed to advance investor protection and to minimize the likelihood of future deceptive transactions. This was the first time in a securities fraud class action that shareholders were able to negotiate corporate governance measures from a defendant that was not the issuer.

- ***In re OSB Antitrust Litig.***, Master File No. 06-CV-00826 (E.D. Pa.). SRK was lead counsel in this complex case against nine wood product makers. In August 2007, U.S. District Court Judge Paul Diamond certified the class and denied defendants' motions to dismiss for the second time; our complaint was one of the first in the nation to survive a challenge under *U.S. v. Twombly*. On the eve of trial, SRK settled the case on behalf of the class for more than $120 million.

- ***In re TriCor Antitrust Litig.***, C.A. No. 05-360 (D. Del.). A generic suppression case in which SRK was lead counsel for a class of consumers and third party payors which recovered $65.7 million (in addition to a separate substantial settlement amount recovered for certain insurance company opt-outs).

SRK's reputation for excellence has been recognized on numerous occasions by courts that have appointed the firm as lead counsel in major class actions. *See In re OSB Antitrust Litig.*, Master File No. 06-CV-00826 (E.D. Pa.) (Judge Diamond's December 9, 2008 Order, page 5, approving Plaintiffs' request for

attorneys' fees) ("Counsel have represented their clients with consummate skill and efficiency, bringing this massive matter to conclusion in less than three years. Lead Class Counsel—Jeffrey Corrigan and the other lawyers from [SRK]— performed brilliantly in this exceptionally difficult case."); *In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253418 at *4 (E.D. Pa. Aug. 3, 2007) ("At the outset of this litigation, I appointed [SRK] Lead Counsel for the Direct Purchaser Plaintiffs. . . . Counsel have vigorously and capably prosecuted this extremely demanding litigation."); *In re Parmalat Sec. Litig.*, No. 04 Civ. 0030 (LAK) (S.D.N.Y. Mar. 2, 2009) ("[Class Counsel] did a wonderful job here for the class and were in all respects totally professional and totally prepared.  I wish I had counsel this good in front of me in every case."); *In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D 180, 185 (D.N.J. 2003) ("Plaintiffs' counsel's conduct of this case to date has led to a sophisticated and professional exposition of the issues to the Court."); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, C.A. No. 03-4578 (E.D. Pa. May 19, 2005) ("Here, Plaintiffs' counsel are highly experienced in complex antitrust litigation, as evidenced by the attorney biographies filed with the Court . . . They have obtained a significant settlement for the Class despite the complexity and difficulties of this case."); and *In re Lupron Marketing and Sales Practices Litig.*, 345 F. Supp.2d 135, 137-38 (D. Mass. 2004)

("Counsel are among the most experienced lawyers the national bar has to offer in the prosecution and defense of significant class actions.").

### D.    SRK Will Commit Substantial Resources In Representing the Class

There can be no doubt that SRK has the necessary resources to commit to this litigation, as it has done on countless occasions during its more than twenty-five year history.  SRK is a well-established and successful law firm that has the personnel necessary to pursue a case of this magnitude.  The firm's resources are not merely financial, but also include substantial expertise and experience that will be an obvious benefit to the plaintiffs in this action.  *See*, *e.g.*, Exh. A.

SRK has assigned an experienced team to prosecute this case, and can and will assign additional lawyers as needed.  The legal team has substantial experience in not just the traditional duties of counsel under the rules of civil procedure, but the tasks peculiar to complex litigation such as finding and engaging highly qualified expert witnesses and consultants, handling depositions around the world, constructing electronic databases of discovery documents totaling millions of pages, and supervising large teams of lawyers analyzing discovery documents.  The ability of SRK to draw from this experience will allow it to streamline the litigation and create efficiencies unavailable to other firms.

Finally, Faruqi has advocated for consumers' rights for over 20 years, successfully challenging some of the nation's largest and most powerful

corporations for a variety of improper and negligent business practices. Importantly, Faruqi was recently appointed as co-lead counsel in both *In re The Home Depot, Inc. Shareholder Derivative Litigation* before this Court (1:15-cv-02999-TWT at Docket No. 32), and the *Arby's Restaurant Group. Inc. Data Security Litigation* currently pending in this District before Judge Amy Totenberg (1:17-cv-00514-AT at Docket No. 48). Through their efforts, attorneys at Faruqi have recovered hundreds of millions of dollars and other significant remedial benefits for their clients and class members. For example, the innovative settlement in the *Home Depot* action has been hailed as a "roadmap" for future data breach settlements. *See* Exhibit B. Faruqi resources and personnel necessary to serve as Local Counsel. The firms' resources are not merely financial, but also include substantial expertise and work product that has been developed in their other, similar cases that will be an obvious benefit to the Contract Claims. Further, as demonstrated in the Faruqi Résumé, the firm has extensive experience representing consumers in a variety of state and federal complex class actions, including in this District, at all stages of litigation from trial through settlement. *See* Exhibit C.

## **CONCLUSION**

For the foregoing reasons, Plaintiff Anthony Mirarchi asks this Court to appoint Spector, Roseman & Kodroff P.C. as: (1) Interim Co-Lead Counsel in the

Consumer Actions or, in the alternative, (2) a member of the Consumer Actions'

Steering Committee.

Dated: February 2, 2018                    Respectfully Submitted,

                                           **FARUQI & FARUQI, LLP**

                              By:   /s/ *Robert W. Killorin*
                                    Robert W. Killorin
                                    Georgia Bar No. 417775
                                    3975 Roswell Road, Suite A
                                    Atlanta, GA 30342
                                    Telephone:  (404) 847-0617
                                    Facsimile:  (404) 506-9534
                                    Email:      rkillorin@faruqilaw.com

                                    *Local Counsel*

                                    **SPECTOR, ROSEMAN & KODROFF,
                                    P.C.**

                                    Jeffrey L. Kodroff
                                    John A. Macoretta
                                    Daniel J. Mirarchi
                                    1818 Market Street, Suite 2500
                                    Philadelphia, PA 19103
                                    Tel.: (215) 496-0300
                                    Fax: (215) 496-6611
                                    jkodroff@srkattorneys.com
                                    jmacoretta@srkattorneys.com
                                    dmirarchi@srkattorneys.com

                                    *Attorneys for Plaintiff Anthony Mirarchi*