# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| **In re: Equifax, Inc., Customer Data Security Breach Litigation** | **MDL No. 2800**<br>**1:17-MD-2800-TWT** |

## APPLICATION FOR APPOINTMENT OF BENJAMIN L. BAILEY, BAILEY & GLASSER LLP, TO PLAINTIFFS' STEERING COMMITTEE FOR THE CONSUMER PLAINTIFF CLASS

## I.   INTRODUCTION

In accordance with Case Management Order # 2, I respectfully request that the Court appoint me and my law firm, Bailey & Glasser LLP, to the Plaintiffs' Steering Committee the Court chooses in this matter. We represent Philip Cole, a Massachusetts resident who filed his class action against Equifax on September 11, 2017. *Cole v Equifax*, *Inc*., 1:17-cv-11712-RGS (D. Mass.).

It was through an application and vetting process like this Court has created in CMO #2 that Judge Breyer appointed me to the plaintiffs' steering committee in *In re: Volkswagen "Clean Diesel" Marketing, Sales Practices and Products Liability Litigation* (MDL No. 2672 CRB). I also served on the plaintiffs' economic loss steering committee in the *Toyota Sudden Unintended Acceleration MDL*, 8:10-ml-02151 (C.D. Cal.) (Selna, J.). In that litigation, Bailey & Glasser ("B&G") was the only law firm to have individuals on both executive committees established by the court. In 2013, as certain bellwether cases were getting ready for trial, Judge Selna appointed my partner Eric Snyder, a lawyer with an engineering degree, to the plaintiffs' steering committee for personal injury/wrongful death cases.

I understand that the Court will appoint lawyers, as opposed to law firms, to the plaintiffs' steering committee, but if I were to be appointed I would heavily

rely upon several of my partners who have a great deal of experience and expertise in litigating complex nationwide class actions. B&G approaches each complex case with a collaborative team that is put together based on particular lawyers' affinities and expertise. In this case, if I were to be appointed, my team would be composed of my partners in the Boston, Massachusetts office, John Roddy and Elizabeth Ryan, and John Barrett, from our Charleston, West Virginia office, who is also the firm's president and chief operating officer.[1] For that reason, my application for the plaintiffs' steering committee incorporates a synopsis of major cases that these lawyers have been involved in which demonstrates the capabilities they, and my firm, would bring to the steering committee.

## II.   RESOLVING THE EQUIFAX DATA BREACH WILL REQUIRE BOTH COLLABORATION AND CONFRONTATION

### A.   RESOLVING THE EQUIFAX CONUNDRUM

It is more than an understatement to say that this case is unique. But it is similar to the Volkswagen Clean Diesel litigation because the challenge will be to craft a fair and reasonable solution to the enormous and confounding problem Equifax has created. It remains to be seen how Equifax will respond, but the

---

[1] My biography is attached as Exhibit 1. Descriptions of Barrett, Roddy and Ryan's backgrounds can be found respectively at:
http://www.baileyglasser.com/attorneys/detail/biography/19/John%20W.%20Barrett
http://www.baileyglasser.com/attorneys/detail/biography/60/John%20Roddy
http://www.baileyglasser.com/attorneys/detail/biography/61/Elizabeth%20Ryan.

ultimate outcome of this case will not hinge on whether particular claims under the Fair Credit Reporting Act, state unfair and deceptive practices laws, or privacy-based claims are dismissed or upheld. The congressional inquiries, ongoing investigations by state and federal enforcement agencies, and this massive MDL will not collectively end in anything approaching a decision or resolution absolving Equifax of liability. The legal and political headwinds that Equifax now faces are much too powerful. And its experienced lawyers recognize that, regardless of their ability to perhaps win a procedural battle or two, a consensual resolution will be necessary to ultimately keep the company, and likely the entire industry, a going concern.

This reality strongly suggests that the direction this case should take is like that of *Volkswagen* – with creative, reasonable and experienced lawyers, working in tandem with state and federal enforcement authorities, collaborating to craft a resolution that is fair and economically viable going forward. This is the scenario that B&G lawyers have encountered, and successfully navigated, in a number of cases since 1998. The Volkswagen case is only the most recent and of course largest example.

### B.    WILLINGNESS TO TRY CLASS ACTION CASES PROVIDES NEGOTIATING STRENGTH

In emphasizing the wisdom of adopting a collaborative approach at the inception of this litigation I do not mean to suggest that the initial stages of the process will not involve significant contested discovery concerning the nature, extent and cause of the breach (or breaches, as there were prior intrusions of lesser magnitude). To be effective these discovery forays *should* provoke contested proceedings. If they do not then the questions being asked are either misdirected or not sufficiently probing.

Good defense counsel will test the willingness of plaintiffs' lawyers to do the hard work of preparing to prove their case at trial, even if such a trial seems very unlikely. Only by fully preparing as if trial is inevitable can plaintiffs' counsel ensure that they fully understand the salient facts and are armed with the necessary information to negotiate the best settlement possible under the circumstances. Having a demonstrated ability to try – and win – a class-action trial is a relatively rare skill, and provides substantial negotiating leverage.

On this score my partner John Barrett led a team that recently won a jury verdict on behalf of a class of consumers who signed on to the National Do Not Call Registry, but were nevertheless subject to innumerable calls from telemarketers pitching them subscriptions to Dish Network's satellite television

service. *Krakauer v. Dish Network. L.L.C.,* Case No. 1:14-CV-00333-CCE-JEP
(M.D. N.C.). The B&G team litigating the Dish case took it to trial and this
summer won a jury verdict of more than $20 million for the class. John Roddy,
from our Boston office, was a member of that team and successfully argued the
class certification motion. The Dish team then obtained an order from the court
trebling the jury verdict, bringing the total damages to more than $61 million. This
Court certainly understands how rare it is to award treble damages to an entire
class. I highlight this result because it exemplifies the level of expertise my firm
can bring to the plaintiffs' steering committee.

Prior to the Dish victory partners in our Washington D.C. office won a trial
verdict of almost $30 million in *Brundle v. Wilmington Trust,* Case No. 1:15-cv-
1494 (E.D. Va.). We represented participants in the company's employee stock
option plan. The B&G trial team proved that Wilmington Trust, the ESOP trustee
for Constellis Group, Inc., a Virginia-based private security firm, caused the ESOP
to purchase $200 million-plus of Constellis stock at an inflated price. Judge Leonie
M. Brinkema ruled that Wilmington "damaged the ESOP by agreeing to overpay
$29,773,250.00 for the stock," and in so doing violated federal pension law and
trustee duties under the Employee Retirement Income Security Act.

### C.     *VOLKSWAGEN* SERVES AS AN INSTRUCTIVE TEMPLATE

The Volkswagen resolution process, which involved many of the same plaintiffs' lawyers and firms seeking to work in this case, highlights the means and manner by which an experienced plaintiffs' steering committee and lead counsel can work with defense counsel, government enforcement authorities, and each other to bring a case to a swift and fair resolution. Teams of lawyers on the *Volkswagen* PSC with discrete tasks, assigned by Elizabeth Cabraser as lead counsel, handled the pleadings, the briefing, discovery, trial preparation, and multiple settlement negotiations almost simultaneously. My firm and I worked extensively with the engineers who uncovered the emissions problem, conducted tutorials for all the plaintiffs' lawyers and for the Settlement Master on how VW's diesel engines were designed to work (or not), and used that same knowledge to help craft complaints, discovery, and ultimately portions of the class notices explaining the settlement. I participated in multiple phases of the negotiations, with VW and with government agencies, which led to the settlement involving the 3.0 liter engines. A detailed description of that process could someday be a book, which I won't write here. But it is that kind of experience, and that willingness to work in a virtual law firm to achieve meaningful results for all our clients and the other parties which my firm and I offer to the Court.

### III.     BAILEY & GLASSER MEETS THE RULE 23 STANDARDS FOR INTERIM COUNSEL

Rule 23(g) provides guidelines for the appointment of lead counsel and executive committees of lawyers who will work with lead counsel. A court "may designate interim counsel to act on behalf of the putative class before determining whether to certify the action as a class action." Fed. R. Civ. P. 23(g). When multiple related cases are pending, "the selection and activity of class counsel are often critically important to the successful handling of the class action." Fed. R. Civ. P. 23(g). Adv. Cmtee. Notes; *see also Manual for Complex Litigation (Fourth)* § 21.271 (2004). The *Manual* explains that "[e]arly organization of the counsel who have filed the various cases transferred or consolidated for pretrial purposes is a critical case-management task." *Id*. § 22.62.

In appointing class counsel, the court "must consider:"

(i)    the work counsel has done in identifying or investigating potential claims in the action;

(ii)    counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

(iii)  counsel's knowledge of the applicable law; and

(iv)  the resources that counsel will commit to representing the class.

Fed. R. Civ. P 23(g)(1)(A).

### A.   BAILEY & GLASSER WAS AMONG THE FIRST TO IDENTIFY CLAIMS AND FILE A CLASS ACTION

There are no substantive factors which distinguish any firm in the MDL regarding the identification and investigation of these claims. Virtually all firms are on the same footing, having read of the breach in the news media, investigated the effects on potential plaintiffs independently, and alleged facts based on publicly disclosed information, with most cases being filed within approximately two weeks of the breach becoming public knowledge on September 7, 2017. Nevertheless, we were among the first to file a case. *Cole v. Equifax* was filed on September 11, 2017.

### B.   OUR FIRM AND HIGHLIGHTS OF RELEVANT EXPERIENCE

B&G is a 60+ lawyer firm with offices in the District of Columbia and seven states, mostly east of the Mississippi. My legal experience extends well beyond large class actions. I founded B&G in 1999 with my partner Brian Glasser. Before that, I was a federal prosecutor, spent four years as counsel to the Governor of West Virginia, and then ten years in a large West Virginia-based defense firm. I'm fortunate to have had a diverse career representing both plaintiffs and defendants in consumer, commercial, environmental, products liability and criminal cases. I have tried dozens of cases to verdict. I am AV rated in Martindale Hubbell, and am first-tier rated in Chambers U.S.A.'s Guide to America's Leading Business Lawyers.

John Barrett led a B&G team in a nationwide class against H&R Block on behalf of consumers challenging the legality of a refund anticipation loan product. *Cummins v. H & R Block, Inc.*, No. 03-C-134 (Kanawha Cnty., WV) (Bloom, J.). This case was ultimately settled on a multistate basis after several abortive attempts by other lawyers to settle on much less favorable terms were rejected by the federal court in Chicago. *See Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 284–85 (7th Cir. 2002) (describing one of three rejected settlement proposals made by prior plaintiffs' counsel because of the suspicion of collusion: "in the suspicious circumstances that we have recited the judge should have made a greater effort (he made none) to quantify the net expected value of continued litigation to the class, since a settlement for less than that value would not be adequate"). The total settlement was $62.5 million, $30 million of which went to the West Virginia class led by B&G.

John Barrett also leads a B&G team which currently serves as lead and liaison MDL counsel on behalf of a nationwide class of consumers pertaining to violations of the Telephone Consumer Protection Act. *In Re: Monitronics Internat'l, Inc., Tel. Consumer Prot. Act Litig.*, MDL No. 1:13MD2493 (N.D. W. Va.) (Bailey, J.) (proposed $28 million settlement awaiting final approval).

### C.    REPRESENTING GOVERNMENTAL INTERESTS, AND COORDINATING CONSOLIDATED CLASS ACTIONS WITH PARALLEL GOVERNMENT ENFORCEMENT ACTIONS

In addition to the work I did in *Volkswagen* and *Toyota*, I am also serving as liaison counsel for multiple state court cases with the federal litigation arising from a massive and catastrophic water contamination that occurred in Charleston, West Virginia, in which we had a final approval hearing on February 1st. *Good, et al. v. American Water Works Co., Inc.,* 2:14-cv-01374 (S.D. W. Va.) (Judge John T. Copenhaver, Jr., for whom I clerked). And B&G is recognized by government authorities as desirable class action counsel. For example, I successfully represented the State of West Virginia in *In Re Microsoft Corp. Antitrust Litig*., MDL No. 1332 (D. Md.) (Motz, J.), and am presently prosecuting antitrust cases for the State of West Virginia and multiple local governments against a cohort of paving companies. *City of Charleston, et al. v. West Virginia Paving, Inc., et al.*, Civil Action No. 16-C-1552 (Cir. Ct. Kanawha Cnty.) (lead of consolidated actions); *State of West Virginia, ex rel. Patrick Morrisey, Attorney General, et al. v. Oldcastle, Inc., et al.,* Civil Action No. 17-C-41 (Cir. Ct. Kanawha Cnty.).

The other two B&G partners on the team I would bring to this case, my Boston partners John Roddy and Elizabeth Ryan, [2] have worked in tandem with state Attorneys General, the FTC and other government agencies in several high profile national class actions since the late 1990s.[3] Three of those cases exemplify their experience working with state and federal enforcement agencies in a scenario likely to reoccur here given the interest and involvement in this case of what seems like the entire apparatus of state and federal government.

> Equifax said it was facing more than 240 lawsuits seeking class action status, as well as investigations from a plethora of regulatory and law enforcement agencies. All 50 state attorneys general have demanded information, Equifax said, as have the Federal Trade Commission, the Consumer Financial Protection Bureau, the Securities and Exchange Commission and regulators in Britain and Canada.

https://www.nytimes.com/2017/11/09/business/equifax-data-breach.html

*See, e.g.*, the Massachusetts Attorney General's enforcement action,

*Commonwealth of Massachusetts v. Equifax, Inc.*, Civil No. 1784-CV-03009

(Suffolk Superior Court, Sept. 19, 2017). And Congress retains an ongoing

---

[2] Mr. Roddy and Ms. Ryan were two of the named partners in Roddy, Klein & Ryan, a five lawyer consumer class action firm in Boston. They joined Bailey & Glasser as partners in 2011 to open our Boston office.

[3] For the past two decades John Roddy has educated other class action lawyers, from both sides of the fence, in his role as a co-chair of the Practising Law Institute's *Institute on Consumer Financial Services Litigation*, held annually in New York, New York, Chicago, Illinois and San Francisco, California. Both John and Elizabeth have written and spoken on consumer protection law for the National Consumer Law Center, PLI, Legal Services, and other groups.

interest. *See* https://www.warren.senate.gov/?p=press_release&id=1954 (Sen. Warren's questions to Equifax CEO).

In *In re Sears, Roebuck and Co. Bankruptcy Debtor Reaffirmation Litig.*, MDL 1185 (D. Mass.), a consortium of 50 state Attorneys General led by Massachusetts, and the FTC, worked together with Mr. Roddy and Ms. Ryan and their co-counsel in discovery, negotiations, and the crafting of a landmark settlement agreement, approved by Chief Judge Patti B. Saris, which paid the class more than $171 million in cash and provided another $130 million in debt relief to the nationwide class. All of these benefits were provided automatically, without claim forms, so the entire class benefit went directly to affected consumers. Importantly, that case was brought to successful conclusion within approximately fourteen months of its inception, demonstrating the ability to craft a speedy yet fair resolution to a far-flung class. In *Sears*, each class member received more than 100% of their cash damages, an exceedingly rare result in a class action settlement.

Similarly, as co-lead counsel in a case involving mortgage loan servicer Fairbanks Capital, Roddy, Klein & Ryan successfully resolved the case within the economic constraints of Fairbanks' looming insolvency because of the enormous potential liability created by its egregious abuses. Equifax here faces a bet the company scenario as well, as its total liability is well beyond its economic reach.

Although not a formal MDL, in *Curry v. Fairbanks Capital Corp., et al.*, Case No. 03-12219, Judge Douglas Woodlock consolidated almost 50 class actions nationwide seeking remedies for homeowners victimized by Fairbanks milking them for hundreds of millions of dollars in illegal servicing fees.

In that case, John Roddy and Elizabeth Ryan worked with the FTC and state AGs to do a forensic accounting analysis showing how much Fairbanks could afford to pay to resolve the case globally, while still preserving its ability to continue as a going concern. Aggressive litigation seeking more than the consulting economists counseled would have spelled economic disaster for Fairbanks. Working collaboratively with the regulators, they negotiated the ultimate settlement simultaneously with an FTC Consent Order entered in a parallel case, *United States of America v. Fairbanks Capital Corp.*, Case No. 03-12219-DPW. This global settlement of the parallel public and private actions seeking remedies for Fairbanks' abusive home mortgage servicing practices provided almost $50 million in compensation to settlement class members, and enhanced opportunities for defaulting homeowners to avert foreclosure, regain their economic footing, and keep their homes. Judge Woodlock commended Fairbanks' class counsel for resolving the case in this fair, practical, and again, expeditious manner.

13

There were approximately 80 class actions filed against Ameriquest, perhaps the most notorious of the predatory mortgage lenders of the mid-2000s. In *In re Ameriquest Mortgage Co. Mortgage Lending Practices Litig.*, CA No. 05-07097, MDL 1715 (N.D. Ill.), RKR was again co-lead counsel and worked with state AGs to craft a settlement that provided for $22 million in cash to consumer homeowners nationwide, as well as sweeping practice changes that abolished Ameriquest's predatory business model.[4] Ameriquest was effectively insolvent by the time this settlement was reached, so that $22 million was as much as could be obtained for the victimized homeowners.

### D.     BAILEY & GLASSER HAS SUFFICIENT TIME AND RESOURCES TO BRING TO THIS CASE

B&G is well established, stable, and has the human and financial capital to fulfill the responsibilities of a leadership role in this case. In the *Toyota* sudden acceleration litigation, for example, B&G devoted over 7,900 common benefit hours to the MDL. B&G also spent over 11,000 hours on a state-court wrongful

---

[4] The third RKR partner, Gary Klein, was the lead within the firm in the Ameriquest case. After John and Elizabeth joined Bailey & Glasser, Mr. Klein ultimately took a position in the Massachusetts Attorney General's Office as Senior Trial Counsel, and RKR's two associates, Gillian Feiner and Shennan Kavanagh, now serve respectively as Chief of the False Claims Division and Deputy Chief of the Consumer Protection Division of the Massachusetts Attorney General's Office. Of note, Roddy was a former AAG in the Consumer Protection Division during Frank Bellotti's tenure as the Massachusetts Attorney General (1980-87). Elizabeth Ryan worked for the Legal Services Corporation in Washington, D.C. and then for the National Consumer Law Center in Boston before joining Roddy's firm in 1995.

death Toyota case which, by virtue of its extensive discovery and trial preparation, became a *de facto* bellwether and settled on the eve of trial. In *Volkswagen*, in a period of approximately two years, B&G invested over 10,000 hours in bringing the case to conclusion. In *Toyota* and *Volkswagen* combined, we advanced nearly $1.2 million in expenses.

Notably, our work in the Toyota MDL is now complete, save for one personal injury case, and the Volkswagen case is approaching the finish line. So we have the willingness, the time, and the resources to commit to this undertaking.

### E.   ABILITY TO WORK WELL WITH OTHERS

B&G fields a team of talented men and women who have worked successfully and collegially with many of the other plaintiffs' counsel expected to seek leadership positions in this case. Moreover, unlike many of the plaintiffs' firms in this litigation, B&G frequently represents defendants as well, and my partners who practice business and bankruptcy law keep us mindful of the needs and pressures on corporate defendants. I think our lawyers have the respect of their fellow counsel and the perspective required to work cooperatively with other counsel on both sides of the "v." This factor takes on particular import in a case as large and urgent as this.

To the extent that the Court may appoint a slate of lawyers who applied as a group which had agreed upon designated lead counsel and steering committee members, given my relationships with most of the lawyers and firms who fit that description, I am prepared to join an appointed slate should the Court deem my experience to be a useful adjunct to that group.

## IV.   CONCLUSION

My biography is attached, and a full description of B&G's accomplishments is available at www.baileyglasser.com. For the reasons outlined above, I respectfully ask the Court to appoint me to the Plaintiffs' Steering Committee.

DATED: February 2, 2018

By:  */s/ Benjamin L. Bailey*
Benjamin L. Bailey
bbailey@baileyglasser.com
John W. Barrett
jbarrett@baileyglasser.com
**Bailey & Glasser LLP**
209 Capitol Street
Charleston, WV 25301
Telephone: 304.345-6555
Facsimile: 304.342-1110

*/s/ John Roddy*
John Roddy
jroddy@baileyglasser.com
Elizabeth Ryan
eryan@baileyglasser.com
**Bailey & Glasser LLP**
99 High Street, Suite 304
Boston, MA 02110
Telephone: 617.439.6730
Facsimile: 617.951.3954

*Attorneys for Philip Cole*
*Proposed Plaintiffs' Steering*
*Committee Member*

## CERTIFICATE OF COMPLIANCE WITH RULE 5.1(B)

I hereby certify, pursuant to Local Rule 5.1, that this APPLICATION is prepared in accordance with LR 5.1(B). Specifically, the brief was prepared in Times New Roman 14 point font, with a top margin of 1.5 inches and all other margins of 1 inch.

*/s/ John Roddy*
John Roddy

## CERTIFICATE OF SERVICE

I hereby certify that on February 2, 2018, this APPLICATION was electronically filed using the CM/ECF system, which will send automatic email notification of service to all attorneys of record.

*/s/ John Roddy*
John Roddy