1

1           IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF GEORGIA
2                   ATLANTA DIVISION

3

4   IN RE: EQUIFAX, INC. CUSTOMER      )
    DATA SECURITY BREACH LITIGATION    )
5                                      ) Case No. 1:17-MD-2800-TWT
                                       )
6                                      ) February 9, 2018
                                       ) 10:09 a.m.
7   _____) Atlanta, Georgia

8

9                      -  -  -

10

            TRANSCRIPT OF THE HEARING ON APPLICATIONS FOR
11                    LEADERSHIP POSITIONS
          BEFORE THE HONORABLE THOMAS W. THRASH, JR.,
12                 U.S. DISTRICT COURT JUDGE

13

                       -  -  -
14

15

16

17

18

19        *Proceedings recorded by mechanical stenography*
            *and computer-aided transcript produced by*
20
                   SUSAN C. BAKER, RMR, CRR
21                   2194 U.S. COURTHOUSE
                  75 TED TURNER DRIVE, S.W.
22                   ATLANTA, GA  30303
                     (404) 215-1558
23              *susan_baker@gand.uscourts.gov*

24

25

1    APPEARANCES OF COUNSEL:

2    **On behalf of the Plaintiffs:**

3    Tina Wolfson
     Ahdoot & Wolfson, P.C.
4

     Robin Frazer Clark
5    Robin Frazer Clark, P.C.

6    Mark S. Goldman
     Goldman Scarlato & Penny, P.C.
7

     Thomas V. Girardi
8    Girardi & Keese

9    Steven P. Gregory
     Gregory Law Firm, P.C.
10

     Troy N. Giatras
11   The Giatras Law Firm, PLLC

12   Daniel S. Robinson
     Robinson Calcagnie, Inc.
13

     Shane Fredrick Langston
14   Langston & Langston, PLLC

15   W. Pitts Carr
     W. Pitts Carr and Associates, P.C.
16

     Jed Davis Manton
17   Harris Lowry Manton, LLP

18   Stephen D. Susman
     Susman Godfrey
19

     Rosalee B.C. Thomas
20   Finkelstein Thompson, LLP

21   Steven F. Molo
     Molo Lamken, LLP
22

     Sherrie R. Savett
23   Berger & Montague

24   William H. Murphy, III
     Murphy Falcon & Murphy, P.A.
25

```
 1    Jason R. Doss
      The Doss Firm, LLC
 2
      Stuart A. Davidson
 3    Robbins Geller Rudman & Dowd, LLP

 4    Vincent J. Esades
      Heins Mills & Olson P.L.C.
 5
      Dianne M. Nast
 6    NastLaw, LLC

 7    Melvin B. Hollowell
      The Miller Law Firm, P.C.
 8
      Jonathan Wesley Johnson
 9    Jonathan W. Johnson, LLC

10    Michael A. Galpern
      Locks Law Firm, LLC
11
      Daniel Mirarchi
12    Spector Roseman & Kodroff

13    Robert A. Magnanini
      Stone & Magnanini, LLP
14
      Richard P. Rouco
15    Quinn, Connor, Weaver, Davies & Rouco, LLP

16    Gary S. Graifman
      Kantrowitz, Goldhamer & Graifman, P.C.
17
      Michael Richard Cashman
18    Hellmuth & Johnson, PLLC

19    Benjamin L. Bailey
      Bailey & Glasser, LLP
20
      Leonard A. Bennett
21    Consumer Litigation Associates, P.C.

22    David James Worley
      Evangelista Worley, LLC
23
      Benjamin A. Gastel
24    Branstetter Stranch & Jennings, PLLC

25    Roy E. Barnes
      The Barnes Law Group, LLC
```

```
 1   Kenneth S. Canfield
     Doffermyre Shields Canfield & Knowles, LLC
 2
     Amy E. Keller
 3   DiCello Levitt & Casey, LLC

 4   Norman E. Siegel
     Stueve Siegel Hanson, LLP
 5
     Scott Edward Cole
 6   Scott Cole & Associates

 7   Joseph P. Guglielmo
     Scott & Scott, Attorneys at Law, LLP
 8
     Gary F. Lynch
 9   Carlson Lynch Sweet & Kilpela & Carpenter, LLP

10   Jeremiah Lee Frei-Pearson
     Finkelstein, Blankinship, Frei-Pearson & Garber, LLP
11
     Michael Lee McGlamry
12   Pope McGlamry, P.C.

13   Ranse M. Partin
     Conley Griggs Partin, LLP
14
     Rosemary M. Rivas
15   Levi & Korsinsky, LLP

16   Judith Germano
     Germano Law, LLC
17
     Willem Jonckheer
18   Schubert Jonckheer Kolbe & Kralowec, LLP

19   Michael Eidson
     Colson Hicks & Eidson
20
     Sarah Westcot
21   Bursor & Fisher

22

23

24

25
```

1    **On behalf of the Defendant:**

2    David Lewis Balser
     King & Spalding, LLP
3
     Phyllis Buchen Sumner
4    King & Spalding, LLP

5    Sidney Stewart Haskins, II
     King & Spalding, LLP
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings held February 9, 2018, Atlanta, Georgia,

2     10:09 a.m., in open court.)

3          THE COURT:  The fire marshal would be appalled.  I

4     tried to move this to the ceremonial courtroom where we'd have

5     more space, but they have got a naturalization service going on

6     there.  So we're stuck here.

7          All right.  This is a hearing on the applications for

8     leadership positions on the Plaintiffs' side in this case, In

9     Re: Equifax, Inc. Customer Data Security Breach Litigation,

10    Case Number 17-MD-2800.

11         When I scheduled this hearing, my hope and intention

12    was that I'd be able to hear from those who were applying for

13    leadership positions and make a decision and announce at the

14    conclusion of the hearing.  I did that expecting there would be

15    maybe 10 or 12 applications for leadership positions.  Instead,

16    I have 45.

17         So I would still like to finish this today.  That

18    will only be possible, if it is possible -- and that's a big if

19    -- everyone exercises extraordinary restraint in terms of the

20    length of your presentations.  Those of you that have practiced

21    before me know that the prize does not go to the lawyer who

22    speaks the longest or the loudest.  In fact, the ability to be

23    direct and succinct is a quality of advocacy that I think is

24    grossly undervalued but that I certainly recognize.  So we will

25    proceed.

Case 1:17-md-02800-TWT   Document 230   Filed 02/12/18   Page 7 of 139

7

1          It's also hot in here.  We have asked to get the air

2    conditioning turned down, but with this many people it may be

3    difficult.

4          So in the order I issued yesterday, I said that I

5    would hear from the applicants in the order in which their

6    application is listed on the public docket.  And that's what I

7    intend to do and fully intend to go all day or as long as any

8    of us can stand it.

9          Mr. Canfield?

10         MR. CANFIELD:  Yes, Your Honor.

11         THE COURT:  Could you come up to the podium, please.

12         So I have spent an enormous amount of time reviewing

13   the applications this week; and anyone that just repeats what

14   you said in your application is wasting your time, everyone

15   else's time and my time.  Yesterday a FedEx package was

16   delivered to me, and I thought it was one of my usual greetings

17   from a pro se litigant that I get often and didn't pay too much

18   attention to it until after I finished reviewing the

19   applications.

20         And then I did read it, and the FedEx package

21   contained a letter that says:  "Dear Judge Thrash, I'm writing

22   to Your Honor about the Equifax data breach case.  Enclosed

23   please find a transcript and order from the *Anthem* data breach

24   case which involves the work of Cohen Milstein, Stueve Siegel

25   Hanson, Girard Gibbs and Lieff Cabraser.  Also enclosed are a

1    bankruptcy filing and a complaint" -- accusing the person whose

2    name I'm not going to read -- "of bankruptcy and loan fraud.

3    These firms are applying to lead the Equifax case but did not

4    provide you with the enclosed information of which you should

5    be aware.  Thank you for your attention, your service and

6    looking out for the Equifax data breach victims.  Sincerely, a

7    concerned citizen."

8            The Equifax package has what appears to be a return

9    address of P. Johnson and an address in Minneapolis, Minnesota.

10   And included was a complaint in a bankruptcy case, a voluntary

11   petition for bankruptcy, a transcript of the hearing before

12   Judge Koh in the *Anthem* case on February the 1st, 2018, and a

13   copy of Judge Koh's order granting a motion to appoint a

14   special master in that case.

15           My courtroom deputy clerk, Ms. Sewell, also got an

16   e-mail this morning opposing your application, Mr. Canfield.

17   So I'm going to let you look at all this stuff and decide how,

18   if any way, you want to respond to it.

19           And, Mr. Balser, at some point in time if you want to

20   see it, I will let you look at it also.  Y'all are down the

21   list so --

22           MR. CANFIELD:  Hopefully we will be reached today,

23   Your Honor, which gives us a little time to look at this which

24   is --

25           THE COURT:  You are 187, and I am starting at 130.

1   So you will have some time to look at it.  I saw it so late

2   yesterday I didn't have time to put anything on the docket or

3   do anything other than look at it, but I did look at it.

4          MR. CANFIELD:  Thank you for bringing it to our

5   attention, Your Honor.

6          THE COURT:  All right.

7          All right.  First on the list is Tina Wolfson's

8   application to be lead counsel for the consumer.

9          Mr. Balser?

10          MR. BALSER:  Your Honor, I conferred with Mr. Worley;

11   and we thought just as a housekeeping matter we might just

12   dispose of the securities lead Plaintiff application before we

13   dive into the consumer applications.  Your order was entered

14   not only on the consumer docket but also on the securities

15   docket.  Mr. Mixson is here on behalf of the Plaintiff.  Alex

16   Peurach is working on the securities litigation.  I think all

17   we -- I think my understanding is there's a non-contested

18   application for lead Plaintiff status.  So if it suits Your

19   Honor, we could dispose of that and those people could go, and

20   at least we'd have two fewer people in the courtroom.

21          THE COURT:  That's at least progress, Mr. Balser.  So

22   ordered.  I understand that's not contested.  And we will deal

23   with that appropriately.  Thank you, Mr. Balser.

24          MR. BALSER:  So may they be excused, Your Honor?

25          THE COURT:  Certainly.

1          Ms. Wolfson?

2          MS. WOLFSON:  Good morning, Your Honor.  My name is

3     Tina Wolfson.  I'm a partner at the firm of Ahdoot & Wolfson,

4     and I'm applying to lead the consumer case.  First of all,

5     thank you for not going in alphabetical order.

6          We are here to help Your Honor select the best

7     counsel for the extremely important task of representing 145

8     million victims of the Equifax data breach case.  This task is

9     even more important now that the Consumer Financial Protection

10    Bureau's investigation has been halted.  And without that

11    investigation, there can be no enforcement action.  So it's

12    going to be up to the lawyers for the Plaintiffs here and the

13    state attorney generals to get justice for these victims.

14          I know Your Honor understands that this task is about

15    the best interest of the class.  It's not about all the lawyers

16    you see here or any politics that may go on behind closed

17    doors.  I read some rhetoric in the group applications

18    basically asking you not to break up the band.  I think you

19    should ignore that, Your Honor.  I guarantee you that whoever

20    you pick, however you decide to mix and match us we are all

21    going to get along.  And if you give me the privilege of being

22    a leader of that band, I can personally guarantee it.

23          I think it's going to take experience, efficiency,

24    personal accountability and transparency to lead this case.  I

25    have been doing privacy cases for the consumers since the late

1  '90s.  I have done significant work in most of the largest data

2  breach cases such as *Target*, *Home Depot*, *Premera*, *Neiman*

3  *Marcus*.  But my work as lead counsel in the *Experian* data

4  breach case which has recently concluded with a settlement is

5  what sets me apart.

6        Along with my incredibly talented co-lead counsel,

7  Dan Robinson, who is also here today, I have thought about,

8  researched, analyzed, briefed and argued so many of the unique

9  issues that are going to come up in this case, unique legal

10  issues having to do with the Fair Credit Reporting Act, the

11  Gramm-Leach-Bliley Act; unique factual issues having to do with

12  the type of information that these credit bureaus collect, how

13  they store them, how they maximize the profit on using that

14  data and the uncanny similarity as to how the breach occurred.

15        In both cases, there was a very simple fix available

16  through software updates.  It was as easy as putting a bandage

17  on a cut.  Both credit bureaus were warned about this and

18  simply failed to implement the easy fix.

19        I'm intimately familiar with the technological

20  aspects involved in conducting the necessary discovery to put

21  these facts forward for Your Honor and for the jury.  And there

22  will also be a lot of unique discovery issues, the ESI

23  protocol, how many -- which custodians to search,

24  proportionality issues, privilege issues regarding the forensic

25  reports.  All of these things are going to come up.  They have

1    been litigated in *Experian*, and these are just some of the
2    examples.
3              The class deserves this type of high specialization.
4    The cure should fit the ailment here.  And this high level of
5    experience and high specialization will also lead to efficiency
6    because we have done this already in *Experian*.  The class
7    should not have to pay for having the wheel reinvented.
8              But also efficiency is just simply how I do business.
9    We are a small firm, eight lawyers; but we make a big impact.
10   Just as an example, in the *Neiman Marcus* case there were eight
11   Plaintiffs' firms working on that case.  But the seminal
12   decision in front of the Seventh Circuit establishing Article
13   III standing whether or not the actual harm from a data breach
14   materialized that was the product of two attorneys, myself and
15   my partner, Ted Maya.  You don't need a huge army if you have
16   the right person at the helm.
17             And if you appoint me, Your Honor, I will be
18   personally responsible for many efficiency protocols like those
19   we implemented in *Home Depot* before Your Honor.  I served on
20   that PSC.  And I will personally look over who's doing the
21   work, what is the rate that they are charging, is this the
22   appropriate person to do this.  Bottom line is when you get our
23   fee petition there will be no surprises.
24             Finally, personal accountability and transparency.
25   The way I wrote my application is what I can tell you how I

1    will lead this case.  There's no padding.  There's no fudging.

2    There's no unnecessary self-aggrandization.  For example, I

3    didn't cite *Anthem* even though our firm was one of the first

4    firms to actually file that case, and I technically did work on

5    the case before lead was appointed.  But I didn't cite that

6    because once lead was appointed we were out.  And I think Your

7    Honor expects personal responsibility and transparency, and the

8    class deserves it.

9          Thank you so much.

10         THE COURT:  Thank you, Ms. Wolfson.

11         Next is Robin Frazer Clark.

12         MS. CLARK:  Good morning, Your Honor.

13         THE COURT:  Good morning, Ms. Clark.

14         MS. CLARK:  May it please the Court.  I'm Robin

15   Frazer Clark.  And I, like you once were, am a Georgia trial

16   lawyer.  And what I'd like to tell the Court is what I would

17   bring to the leadership counsel, and that is a vast experience.

18         I have looked around -- I know every Georgia lawyer

19   in here -- looked around, and with the exception of maybe the

20   governor and Mr. Mixson, I think I have tried more cases in the

21   state of Georgia than anybody in this room with the exception

22   of His Honor.  So I bring a lot of trial experience and

23   knowledge and wisdom that accompanies that to this case.

24         I'm the only person to my knowledge that has been the

25   president of Georgia Trial Lawyers, president of the State Bar

1    of Georgia and president of Atlanta Lawyers Club.  And what

2    that brings with it is ability to work with all types of

3    lawyers.  When I was president of the State Bar of Georgia, you

4    know, it's 47,000 members.  And it's not just Plaintiffs'

5    attorneys.  It's everybody, prosecutors, government lawyers,

6    defense lawyers, everyone, including judges, state court

7    judges.  And that gave me a lot of wisdom and actually

8    humility, very honored and humbled to have served.

9            But the Court's -- one of the Court's criteria is to

10   be able to get along with other people.  Let me tell you as

11   president of the State Bar of Georgia with 47,000 members and

12   the Atlanta Lawyers Club with our members of every type of law

13   you have to be able to do that, to bridge the gap, build a

14   consensus and work together, find common ground to work

15   together.  And that's what I do, Your Honor.

16           I'd just like to give one example of that building

17   consensus and being able to find the common ground to reach a

18   goal.  Prime example is when I was president of the state bar

19   the Supreme Court of Georgia came out with a case, *First*

20   *American Title v. Villanueva*.  I don't know if the Court

21   remembers that case.  But it permitted an assignment of a legal

22   malpractice action to an estranged third party who had no

23   connection to the original case.

24           And we felt that was bad for lawyers in Georgia and

25   bad for citizens, and we needed to get a law passed to change

1   that.  But that case came out on the 32nd day of the

2   legislative session.  But I reached out to Governor Deal's

3   lawyer at that time, Randy Evans.  And if you look at Mr. Evans

4   and you look at Robin Frazer Clark, most people would think

5   those are like oil and water, politically different, would

6   never get along.

7          But Mr. Evans and I worked together, in eight days

8   passed a law that prohibits assignment of legal malpractice

9   cases.  And Mr. Evans and I found common ground and worked

10  together even though people from the outside would think that

11  would never happen.  But that's a prime example of my

12  experience serving the bar and how that has resulted in change

13  for the positive.  So I bring that experience and that wisdom.

14  I'd like to believe in this august group that also brings a

15  sense of humility.

16         I'm a sole practitioner, but I have firms with me

17  willing to work with me on this case.  But I bring the sense of

18  humility; and I represent typically the normal, everyday,

19  walking-around Georgia citizen.  And there is nothing more

20  humbling than to be able to represent someone like that in our

21  courts who has been injured.

22         So, Your Honor, I ask that you appoint me to the

23  leadership counsel for what I bring, a vast sense of trial

24  experience, knowing Georgia, knowing Georgia citizens and a

25  sense of humility.

1        Thank you, Your Honor.

2        THE COURT:  Thank you, Ms. Clark.

3        Next is Mark Goldman.

4        MR. GOLDMAN:  Morning, Your Honor.

5        THE COURT:  Good morning, Mr. Goldman.

6        MR. GOLDMAN:  My name is Mark Goldman.  I am from the

7   Goldman Scarlato & Penny firm out of the very unusually happy

8   Philadelphia area, applied for a position on the steering

9   committee.  I have over 30 years' experience as a class action

10  attorney.  And since the *Target* data breach in 2013, I have

11  been working quite a bit on data breach cases.  I am sole lead

12  counsel on two of them, one pending in state court here in

13  Georgia and one further along -- we are settling it now -- in

14  Michigan.

15       As lead counsel in these cases, I have dealt with all

16  aspects of data breach cases from vetting the proper claims to

17  asserting the complaints to responding to motions to dismiss

18  and the very nuanced standing on damages issues, leading

19  discovery, vetting and working with experts and solving the

20  law.  I have learned that these are always hard-fought cases.

21  They require true dedication.  And these are cases that are

22  incredibly important to our clients.

23       In addition to the two cases that I'm lead counsel

24  on, I have worked on numerous others -- it's in my papers --

25  including the *Anthem* case.  In the *Anthem* case, my firm

1    represented 21 of 106 class representatives.  And my main job

2    in that case was to prepare these witnesses and defend them as

3    each one of them were deposed.

4         Lead counsel in that case asked me to help them

5    prepare and defend some of the other firm's clients, and I did

6    so.  I would really welcome the opportunity to do that again in

7    this case as a member of the steering committee.  This process

8    has helped me understand that in cases like this people,

9    particularly elderly people, are very concerned, not just those

10   who have experienced identity theft but those who are waiting

11   to see if it's going to happen to them too.

12        I have worked with many people in this room.  I

13   welcome the opportunity to work with them again.  There's

14   outstanding talent here.  And everything else is in my

15   application.

16        Thank you.

17        THE COURT:  Thank you, Mr. Goldman.

18        Next is Mr. Thomas Girardi.

19        MR. GIRARDI:  Good morning, Your Honor.

20        THE COURT:  Good morning.

21        MR. GIRARDI:  This is very nice.  I would very much

22   appreciate being considered for this nice position.  I have

23   gone through several of these cases.  I'm very familiar with

24   the law, standing, et cetera.  I was the architect of

25   resolution to try to take care of down-the-stream damages that

1    could happen to people.

2              I was a past president of the International Academy

3    of Trial Lawyers, past president of the American Board of Trial

4    Advocates.  And I think I truly know how to get along with

5    people which would be very important in this particular case.

6              Some nice things have happened to me.  The Super

7    Lawyers named me the number one lawyer in southern California

8    for the past five years in a row.  And, indeed, I was given a

9    nice award of lawyer of the decade by the International Society

10   of Professionals.

11             But I would do -- I would be very dedicated to this.

12   It's a very interesting case, very complicated case.  And the

13   main reason I'd like to be appointed is my wife went to the

14   school of architects and people here in Atlanta, and she

15   thought this would be a great opportunity for her to get back

16   to Atlanta and see all her old friends.

17             Anyway, Your Honor, I'd love to be considered.  But,

18   quite frankly, I know most of these folks here.  And I think

19   you could throw a dart and there would be a great committee

20   that would work.

21             Thanks very much.

22             THE COURT:  Thank you, Mr. Girardi.

23             Next is Lou Marino.

24             MR. GREGORY:  Your Honor, Steven Gregory.  That may

25   be my Plaintiffs.  I'm not sure, but I think that's one of my

1    Plaintiffs' names.

2              THE COURT:  That's right, Mr. Gregory.  This is

3    actually you.

4              MR. GREGORY:  I'll be Mr. Marino if you like, but

5    Steven Gregory from Birmingham, Alabama, Your Honor.  And we

6    filed over there --

7              THE COURT:  Steven Gregory.

8              MR. GREGORY:  That's correct, for the Davis, Marino,

9    Anthony and Huey Plaintiffs.  I'm applying for a position, Your

10   Honor, on the steering committee.

11             Your Honor, this case it seems to me is different

12   from most of the other data breach cases that I have seen and

13   read about primarily for two reasons.  One is a qualitative

14   reason in that with some of the other cases, a department store

15   case or an internet service provider or a big-box case, the

16   stolen data in those cases were ancillary to the core business

17   of the company.  Here, though, the stolen data are the core

18   business of Equifax.  And it seems to me that that raises the

19   standard of care that might need to be applied here.

20             It's also different in a quantitative sense in that

21   it's a very large case.  There have been larger ones in terms

22   of the number of class members, but 145 million class members

23   is not a small case.  And it's also different somewhat in scope

24   in that the data stolen were almost comprehensive data.  Almost

25   everything that a data thief could dream of apparently was

1    downloaded in this particular case.

2         So it seems to me in a resolution of this case

3    because of that, because of the scope, because of the size is

4    going to have to pass muster not just with all of us and Your

5    Honor but also with a lot of other people who will look at it

6    in terms of regulatory people in Washington, Congress, but,

7    most importantly, those class members.  So whatever resolution

8    there is needs to be commensurate it seems to me with the size

9    and scope of the data breach.

10        Your Honor, on page 4 of my application, I cite to a

11   recent article.  It's last year in the Vanderbilt Law Review by

12   a law professor who the title of the article is *Monopolies in*

13   *Multidistrict Litigation*.  So I would submit to Your Honor that

14   in part using those arguments that she makes in that article

15   the leadership structure here would benefit from the inclusion

16   of a lawyer or two with broad experience in class action

17   litigation but lawyers who are not necessarily the key players

18   in data breach litigation, particularly, Your Honor, because as

19   I mentioned this case is different in scope and size from other

20   data breach cases it seems to me.

21        And, Your Honor, my qualifications and my experience

22   are outlined in the application and in the CV that I attached

23   to the application.  And I would respectfully request that Your

24   Honor appoint me to the steering committee.

25        Thank you, Your Honor.

1          THE COURT:  Thank you, Mr. Gregory.

2          Next is Troy Giatras.

3          MR. GIATRAS:  Giatras, Your Honor.

4          THE COURT:  Giatras.  Mr. Giatras.

5          MR. GIATRAS:  Thank you, Your Honor.  And may it

6    please the Court.  I am Troy Giatras representing multiple

7    states and jurisdictions, and I respectfully request the Court

8    to appoint me to the steering committee in this case.  Through

9    three decades of legal experience in negligence, class action

10   and trial-to-verdict cases will allow me to make valuable

11   contributions and provide excellent legal services to the

12   Plaintiffs' case.

13          Very recently, Your Honor, I had the privilege of

14   establishing the data breach precedential standard in federal

15   court before the U.S. Court of Appeals for the District of

16   Columbia.  And I have argued personally before the United

17   States Supreme Court and have had victories in capital crime

18   criminal cases.  Difficult tasks are not beyond my capability.

19          This Court maintained a relatively small steering

20   committee in the *Home Depot* case.  But given that Equifax will

21   exceed by at least ten times the number of victims, this

22   steering committee can and should be slightly expanded with a

23   few attorneys that will actually roll up their sleeves, put in

24   the time themselves and personally perform the work.  And I am

25   one of them.

1          For over 20 years, I have been responsible for the
2    reputation, work ethic and financial success of my firm.  I do
3    not take any of them lightly because no matter what happens
4    here today I will still be responsible for all of them and my
5    family tomorrow.  On Monday I have the privilege of having my
6    18 -- my son turn 18.  He will register not only to vote but
7    also for the draft.

8          The cases and causes that I have taken up over my
9    legal career are not accolades for me.  Instead, I hope that
10   they are an inspiration for service for both my sons.  I have
11   built a practice of not living beyond my means; and that allows
12   me the flexibility to invest the time, money and resources in
13   the good fight and not just the fight that makes ends meet.

14         If I'm appointed, I will take my responsibility
15   serious and I will pour my energy, time and my resources and
16   creativity in this case, all the while while working with a
17   team collectively.  I will be the attorney on the case, I will
18   be the responsible one for the work, and I will be the attorney
19   that pulls my weight.  I can bring ideas to the team that I
20   believe can streamline and reduce unnecessary work, thereby
21   maximizing the possible recovery for the class.

22         We must be mindful, Your Honor, that we are the
23   stewards of the clients' potential future recovery; and we must
24   use our resources wisely.  I motion the Court for a position on
25   the Plaintiffs' steering committee so that I can work

1    collectively and efficiently with a team that this Court

2    selects.  And if appointed, I will not cause the Court to

3    regret its decision and I will work with the team.

4             Thank you, Your Honor.

5             THE COURT:  Thank you, Mr. Giatras.

6             Next is Mr. Daniel Robinson.

7             MR. ROBINSON:  Morning, Your Honor.

8             THE COURT:  Good morning.

9             MR. ROBINSON:  Counsel.

10            Your Honor, my name is Dan Robinson from Robinson

11   Calcagnie.  I am applying for the position of co-lead of the

12   PSC.  Mindful of Your Honor's comments, I just want to make a

13   couple points.  Before I do, I just want to say you are blessed

14   with so many experienced lawyers, many of which I have worked

15   with and I hope to be able to work with again today in this

16   case.

17            I do believe data breach experience is critical.  I

18   think that I found ever since I was a prosecutor doing identity

19   theft cases in New York County a data breach case is kind of

20   like an individual case.  You still have to prove it up.  You

21   still have to be able to show Defendants that you have proof to

22   cause them to achieve a resolution.

23            I think that commitment to work up a case was

24   instrumental in our ability to settle the *St. Joseph's* case.

25   It was 31,000 individuals whose medical information was

1    released.  We got them amongst other benefits $242 per person.

2    It was a very good settlement for the class.  As well as, as

3    Ms. Wolfson mentioned, a recent settlement in *Experian* which

4    was another credit reporting agency breach, Your Honor.  And

5    that was under two years in which we settled it.

6            I think if you ask the courts that I have worked with

7    and worked for they will tell you that I work hard, I submit

8    good briefs and I get along well with everyone on Plaintiffs'

9    counsel and defense counsel because that respect is critical to

10   achieving a just resolution for the class.

11           The other thing I want to say, Your Honor, is that I

12   just want to extend my personal commitment to work as hard as

13   possible, to always make sure that the Plaintiffs' side is

14   being collaborative and cooperative and to achieve the most

15   just and meaningful resolution possible for this class.

16           Thank you.

17           THE COURT:  Thank you, Mr. Robinson.

18           Next is Shane Langston and Rebecca Langston.

19           MR. LANGSTON:  If it please the Court, Your Honor.

20   I'm Shane Langston.  I filed a petition, joint petition on

21   behalf of myself and my law partner wife, Rebecca Langston,

22   Langston & Langston.  We have law offices in Mississippi and

23   Texas.  We have four lawyers in our firm.  We are affiliated in

24   this litigation with the firm Bailey & Galyen in Texas who have

25   offices in many cities in Texas and an office in California.

1          Your Honor, I'm past president of the Mississippi

2    Trial Lawyers.  My partner wife is past president of the

3    Mississippi Trial Lawyers.  She's also immediate past president

4    of Western Trial Lawyers.  Troy who just spoke to Your Honor is

5    current president of Western Trial Lawyers.  He's from West

6    Virginia, so it's not just west.  But she's also past

7    chairperson of -- chairwoman of the Women's Caucus of the AAJ,

8    the associate -- American Association For Justice, Your Honor,

9    which has about a thousand women strong in that organization.

10   She's also past president of the Council of Presidents of AAJ

11   which includes all 50 state presidents.

12         I say that, Your Honor, because we've -- as to point

13   out that we can and we do work with many of the lawyers in this

14   courtroom and have worked with them successfully, and we commit

15   to continue working with them if we are chosen to be on the

16   steering committee.  That's what our application requests, Your

17   Honor, to be on the steering committee.

18         Your Honor, I will be brief.  We only -- we have made

19   a commitment, my law firm has, to this litigation already.  We

20   have -- I don't have any deals with any of these lawyers in the

21   courtroom as far as fee splitting or working on cases.  But I

22   do bring to this table, Your Honor, 2,000-plus individual

23   clients that we represent, Equifax consumer victims, Your

24   Honor.

25         And I say that, and Rule 23 of the Manual of Complex

1    Litigation doesn't -- one of the criteria is not how many

2    clients you represent.  I understand that.  But we have made a

3    tremendous commitment already, Your Honor, in interviewing

4    these clients, getting data from these clients, getting

5    documents from these clients.

6          One of the big issues in this case will be Article

7    III standing, concrete injuries and traceability.  And we've

8    got a tremendous amount of data that we've already spent

9    hundreds and hundreds of hours gathering, Your Honor.  And

10   we've spent thousands of dollars.  Not only have we devoted

11   many of our full-time staff to this litigation, including the

12   four lawyers in my firm which have been to Atlanta on the

13   Equifax litigation conference, but we've hired two additional

14   staff that have been devoted solely to the Equifax litigation

15   in gathering this data that I think would be very helpful to

16   the litigation steering committee and the leadership.

17         Your Honor, we'd request that the Court consider our

18   appointment to the steering committee.  And I will make, of

19   course, a commitment to Your Honor and to my distinguished

20   colleagues that we will devote our human resources and our

21   finances to advance this litigation on behalf of our clients.

22         And I will end by saying I don't have the

23   qualification as my colleague, Tom Girardi; but I did introduce

24   him once as a speaker at a legal convention.  So I got that

25   going for me.

1          Thank you, Your Honor.

2          THE COURT:  Thank you, Mr. Langston.

3          Next is Gardy & Notis.

4          Are they a pass?

5          (No response.)

6          Next is Pitts Carr.

7          MR. CARR:  Thank you, Judge.  I am Pitts Carr.

8          You will be happy to know I am going to be very brief

9     indeed.  I had everything I could say really about my

10    background in the application, and I'm not going to repeat

11    that.

12         I want to emphasize that I'm applying as an

13    individual only in the event that the Susman group is not

14    certified by the Court or appointed by the Court as a group.

15    The only other thing I would say is I have served many of the

16    judges in this court over many years as liaison counsel and

17    also as lead counsel in many cases, so I don't need any

18    on-the-job training.  I would be honored to serve if you

19    thought I was worthy of it and would do everything I possibly

20    can to honorably serve and ably serve the Court and the

21    clients.

22         Thank you.

23         THE COURT:  Thank you, Mr. Carr.

24         Next is Stephen Lowry of the Harris Lowry Manton firm

25    and William Murphy.

1          MR. MANTON:  Thank you, Your Honor.  Jed Manton on

2     behalf of Steve Lowry's application for leadership on the

3     committee or as liaison counsel.  The applications also have to

4     do with Miles Clark who is seeking petition to be on the

5     Plaintiffs' committee -- steering committee.

6          Mr. Lowry had travel today that took him out of the

7     country and certainly apologizes for his inconvenience for not

8     being here.  This will be the first time I have ever spoken

9     about my partner where the rules of ethics and duty of candor

10    to the Court apply.

11         Having said that, I will absolutely say that

12    Mr. Lowry would be a wonderful candidate for this Court and our

13    entire firm is standing behind him.  He does bring a unique set

14    of experience mainly based on the verdicts that he has obtained

15    in Georgia.  He received the highest verdict in the state of

16    Georgia in 2016, has had numerous verdicts in the eight-figure

17    areas across a wide spectrum of cases from medical malpractices

18    to product liability to federal tort claims act cases where he

19    presented the facts either to a jury or to a judge in the FTCA

20    cases.

21         With the trial experience, I think it will aid and be

22    efficient for the discovery process.  Having a lawyer who is

23    looking at the ultimate end goal of how the information is

24    presented to a jury aids in knowing what paths need to be go

25    down, what past awards can be, you know, foregone because it

1    may not be useful for obtaining the information for the

2    ultimate trial.

3              Our firm would be honored to participate in this

4    case.  We have a wealth of experience in complex litigation

5    through a number of different areas.

6              I'm also proud to support Miles Clark's application

7    for the Plaintiffs' steering committee.  Mr. Clark from Nevada

8    brings a unique aspect of intense background into the FCRA

9    aspect of the claims and in specifically the 1681(g) portion of

10   the claims which are somewhat different and have been laid out

11   in our application related to some of the other data breach

12   issues.  I think having someone on the steering committee with

13   a passion for that particular aspect of this case will be

14   helpful for the class as a whole.

15             Appreciate your time, Your Honor.

16             THE COURT:  Thank you, Mr. Manton.

17             All right.  Next is the Susman group's joint

18   application.

19             MR. SUSMAN:  Your Honor, I speak on behalf of the

20   Susman group.  I am applying to be lead counsel.  Our liaison

21   counsel will be Mr. Carr.  And there are six others who are

22   listed in our application who would seek to serve on a steering

23   committee which I would be honored to lead.

24             There are four reasons that set our group apart from

25   the other applicants.  Ours is, first, the only group that

1    proposes a single lead counsel.  I believe that having a single

2    lead counsel would best promote the interest of the class, an

3    efficient and effective management.  A single leader encourages

4    movement, not meetings.  No private client would tolerate

5    litigation by a committee.

6         Second, though our group is the smallest, we probably

7    have more trial lawyers than any other group.  We know how to

8    cut through the noise of discovery and focus on what is

9    actually necessary.  If Equifax isn't willing to pay for the

10   harm it has done, we will be able and ready to try the case and

11   try it quickly.  There is nothing like an early trial setting

12   plus lawyers who do not flinch and are willing to go to a jury

13   trial to get a good settlement.

14        Third, and most importantly, we are the only group,

15   Your Honor, to propose a cap on fees based upon the actual

16   benefits accepted by the class, a deal that is both novel and

17   extremely competitive, something that would be considered by

18   private clients would be the first consideration in selecting a

19   trial lawyer.  And we are the only group that proposes case

20   management protocols that will allow us to produce a great

21   result for the class at the least cost.

22        Finally, we are the group that has done the most to

23   start the litigation by hiring the nation's most prominent

24   experts and academic experts and testifying experts.  We have

25   retained them.  They are ready to go for us.  We do not see any

1   of the other applications identifying any experts that they

2   have hired or even saying whether they have hired them.  The

3   Susman group is led by trial lawyers who will focus on doing

4   what's necessary and only what's necessary to get the case

5   ready for trial, not padding hours.

6           I have, Your Honor, had the privilege of starting a

7   law firm, a commercial litigation boutique.  We have been in

8   existence for 40 years.  We have 130 lawyers.  Almost 99

9   percent of our associates and partners clerked for a federal

10  judge or Court of Appeals judge at the Supreme Court, more

11  ex-Supreme Court clerks per capita than any other firm in the

12  country.

13          And they have come with me and stayed with me because

14  I'm fair, I give them good work, exciting work, and I let the

15  young lawyers have a stand-up role in court.  They get better

16  experience.  That's why we are attracting and keeping for so

17  many years such highly qualified people.  And if I have done it

18  with my law firm, I think I can do it with an ad hoc law firm

19  created of the lawyers in this room, all of whom I would be

20  happy to work with in trying to bring this case to a fast and

21  inexpensive conclusion.

22          Among the lawyers we have assembled, several are

23  applying on their own; and you will hear from them briefly.

24  Ms. Savett, Ms. Nast and Mr. Molo will address you briefly on

25  the list down; so I won't repeat anything on their behalf.

1            Mr. Schaffer, Mr. Goldenberg and Mr. Mason, their

2     credentials are described in our papers.  They are all

3     competent lawyers with a vast amount of data breach litigation.

4     As I said, we have hired and added to our team as of counsel

5     the country's leading academic on privacy law, Professor Neil

6     Holland, of the University of Pennsylvania.

7            Ours is the only group that has proposed specific

8     staffing rules.  Efficient staffing is in my DNA as a trial

9     lawyer who has spent my time representing individual Plaintiffs

10    in the commercial litigation on a contingent-fee basis.  I am

11    responsible for an idea called Trial by Agreement which is a

12    little website, trialbyagreement.com, which has been adopted

13    widely.  Lawyers should make agreements, should not fight.

14    There should not be discovery disputes.  It's a waste of time.

15    What counts is what happens when you get in trial.  Ninety-five

16    percent of what happens before you get to trial doesn't matter,

17    and any trial lawyer knows that.

18            We believe in one task, one lawyer, one lawyer per

19    deposition.  No one will be paid to observe.  And if the Court

20    approves of the idea, we will agree at the beginning how the

21    fee would be divided so no lawyer in the group will have any

22    incentive to do unnecessary work to run up their lodestar and

23    thereby claim a bigger portion of whatever fee you award.

24            Focus and efficiency lead to speedy results for

25    clients.  We would like to see this case brought to a

1   conclusion by the end of the year.  We are ready to move

2   quickly.

3            Just to give you an idea of the reasonableness of our

4   fee proposal, we'd cap our fee at 15 percent of any cash

5   recovery plus 2 percent of any non-monetary relief actually

6   received by the class.  If you looked and compared that with

7   the *Anthem* case where Judge Koh last week was very upset with

8   what the lawyers from the Plaintiffs' side had done in that

9   case -- her transcript is quite something to read -- she

10  chastised the lawyers for employing 49 different law firms, in

11  addition to the four she appointed, and for submitting a fee

12  request for 38 million dollars.

13           Under our proposal, the fee request would have been

14  capped at 15.5 million dollars.  That's a big difference and

15  something that the Court should consider in hiring a law firm

16  and law firms to represent half of America.

17           The experts we have hired and we list in our

18  application is Lukasz Lenart, the lead developer for Apache

19  Struts; Stephen Slater, the leading security expert and

20  consultant who is highly qualified.  Steven Weisman is a noted

21  speaker and author on the subject of identity theft.

22           We have the expertise, Your Honor.  We have done the

23  work.  We are ready to go.  We are ready to have our Rule 26

24  conference as soon as we are appointed.  We will not use any

25  kind of cases that are not advanced by intricate organization

1    charts or proliferating the titles of lawyers on the

2    Plaintiffs' side.  That doesn't move the ball forward at all.

3         And, Your Honor, I'd be honored to serve as lead

4    counsel of this group or in any capacity -- or as lead counsel

5    with any other one you might -- anyone else you might appoint.

6    And you will as I say be hearing from those in our -- on our

7    steering committee who also would apply individually for a

8    position if the Court does not decide to select the Susman

9    group.

10        Thank you, Your Honor.

11        THE COURT:  Thank you, Mr. Susman.

12        Next is Rosalee Thomas and Finkelstein Thompson.

13        MS. THOMAS:  Good morning, Your Honor.  May it please

14   the Court.

15        THE COURT:  Morning.

16        MS. THOMAS:  Rosalee Thomas with my associate, Ebony

17   Branch, of Finkelstein Thompson, LLP.  And we respectfully

18   request that I and/or Finkelstein Thompson be appointed a

19   member of the Plaintiffs' steering committee.

20        As illustrated in our application and our firm

21   résumé, our firm, Finkelstein Thompson, has been practicing

22   class action litigation and data breach cases for over 40

23   years.  We have the willingness and ability to commit time and

24   resources to this case.  We were one of the pioneering firms to

25   file data breach cases.  In fact, Finkelstein Thompson

1    represented consumers in two of the first data breach cases in
2    the Ninth Circuit which found standing for data breach victims.
3           Additionally, we are located in Washington, D.C.; so
4    should there be any congressional hearings or any regulatory
5    hearings that a PSC member has to attend we are conveniently
6    located in Washington, D.C.  But equally as important, Your
7    Honor, is the fact that our firm offers something that a lot of
8    firms don't which is diversity.
9           Women and minorities are often underrepresented in
10   these MDL leadership structures.  Our firm offers fully
11   qualified minority women attorneys, including
12   Caribbean-American, African-American and Asian-American women,
13   one of whom speaks Cantonese which may prove helpful for the
14   data breach victims.  And we think it's important that this MDL
15   structure promotes effective communications with minority
16   communities.  This is especially important because the data
17   shows that minorities are often the ones being defrauded.  So
18   it's important that the MDL and the leadership structure
19   represents the minorities who are directly affected by this
20   data breach.
21          So we ask that the Court consider this factor in
22   selecting its PSC memberships and appointing myself and/or
23   Finkelstein Thompson for the PSC.
24          THE COURT:  Thank you, Ms. Thomas.
25          All right.  Next is Steven Molo.

1          MR. MOLO:  Morning, Your Honor.

2          THE COURT:  Good morning.

3          MR. MOLO:  I'm Steve Molo.  And I'm here with my

4    partner, Meghan Church, who is seated here in the first row of

5    the jury box.  Our firm, Molo Lamken, has offices in New York;

6    Washington, D.C. and Chicago.  And we do three things.  We do

7    business litigation, we do intellectual property litigation,

8    and we do white-collar defense and investigations.  And we do

9    that in courtrooms across the country from the trial courts all

10   the way to the Supreme Court of the United States, and we do

11   that for clients around the world.

12         Now, we support Steve Susman and the team that has

13   been compiled under Mr. Susman's leadership.  Immodestly, I'd

14   say that any member of our team, of the Susman team is

15   qualified to serve as lead counsel; but collectively we felt

16   that Mr. Susman would be the best leader and a single leader

17   would be key.  If, in fact, the Court decides that you don't

18   want to pick a slate or pick our slate, our firm would

19   appreciate being considered and would like to be appointed to

20   whatever leadership for this case that you have so that we can

21   participate in vindicating the rights of the millions and

22   millions and millions of Americans that have been harmed by

23   conduct that has been admitted to and resulted in firing the

24   CEO of this matter.

25         Now, my firm and I personally have put a great deal

1    of time and effort and money into this case already.  With

2    Mr. Susman, the experts that he identified, we have actually

3    gone into our pockets and paid these people some money and we

4    have retained them.  And these are the best people in the world

5    to help with this case.  No other group I don't think -- I have

6    seen that people have referred to experts, but no one has

7    actually identified what they've done in that sense.

8         Second, we have actually thought through -- at the

9    time we filed the complaint in September, we thought through

10   what is the proof in this case actually going to look like at

11   trial, what would it actually look like and what discovery

12   needs to be done to make that happen.  And in September we sent

13   a letter to King & Spalding and to Equifax and said, you know

14   what, here are the documents, the categories of documents that

15   we want you to hang onto, to freeze.  We are going to be asking

16   for these.  Here are the categories of individuals that we are

17   going to depose.  We've thought through the case at a level

18   that, again, it doesn't seem apparent from any of the other

19   applications people have -- maybe they have done it, but they

20   haven't explained it -- to be able to move forward with this

21   case promptly.

22        And, last, we have researched and identified claims

23   that no one else has brought.  There are claims that we intend

24   to bring in the amended complaint that we have not seen brought

25   in any other data breach cases or certainly not in these cases.

1          Now, there's a -- obviously a group of very

2     experienced and talented lawyers in this room seeking to have a

3     position to be on this committee.  And most of them from my

4     review -- and I have read every one of their applications --

5     they tout data breach experience.  Some of those cases, some

6     data breach cases turned out very well.  Some of them didn't

7     turn out so well.

8          And data breach experience I think is extremely

9     important.  It should be part of the mix here.  But as the

10    fiduciary of the class, this Court is charged with fielding the

11    best team that's going to represent this class and bring swift

12    justice and square off against one of the finest law firms in

13    America in King & Spalding.

14         The stakes are very high.  You can say -- I don't

15    mean to minimize it.  This is sort of like the Super Bowl of

16    data breach cases.  But no Super Bowl has been won by a team

17    comprised of 11 left tackles going out onto the field.  And

18    when I look through those applications, I see a lot of left

19    tackles.  There's a lot of people with the same sorts of

20    experience.

21         Our firm brings something different to benefit the

22    class.  We have the proven ability to get complex cases from

23    the filing to trial as shown by some of the work already that

24    we have done in the case.  Secondly, we have the capacity to

25    successfully brief and argue complex cases, nuanced issues that

1    the class is going to have to prevail on.  There's some very

2    significant legal issues here, and sometimes those issues as

3    they have been decided in other circuits and in other district

4    courts haven't gone so well for the Plaintiffs.  We are the

5    only firm that I have seen in any of the applications that has

6    a very experienced Supreme Court advocate in my partner, Jeff

7    Lamken, and has the track record of success that we have in

8    Courts of Appeals and in the Supreme Court of the United States

9    to deal with these sorts of nuanced issues.

10            And, last, we have the demonstrated willingness to

11   fight for the very best deal for the class.  Our work in the

12   NFL case paints that picture quite clearly, what we were able

13   to achieve after everyone else said this was the best that

14   could be done.  We are selective about the work that we do.  We

15   only want to be involved where we can add value.  We believe

16   that we can certainly do that here, and we would be honored to

17   be given the opportunity to come forth and seek justice for

18   this class.

19            Thank you.

20            THE COURT:  Thank you, Mr. Molo.

21            Next is Sherrie Savett.

22            MS. SAVETT:  Good morning, Your Honor.

23            THE COURT:  Good morning.

24            MS. SAVETT:  I am Sherrie Savett, chairwoman of

25   Berger & Montague.  I fully support the application of Stephen

1    Susman for sole lead counsel and his group.  His group includes

2    six PSC members.  I am one of those members.  If the Court does

3    not appoint the Susman group as a group, I would like to be

4    considered a leader in this case as a lead counsel or a member

5    of the PSC.

6          Why should this Court select me among all these

7    excellent lawyers to lead this case?

8          The short answer is, one, I have data -- data breach

9    experience.  I have been involved in seven data breach cases

10   and, most particularly, co-lead counsel in the seminal *TJX*

11   case, the first major data breach case, and the currently

12   pending *Experian* case which was referred to by Ms. Wolfson and

13   Mr. Robinson.  I'm on the PSC there.

14         Number two, my firm has 62 lawyers and a 45-year

15   track record of success in class actions.  We have abundant

16   human and financial resources to prosecute a case of this

17   magnitude and complexity.

18         Three, Berger & Montague has significant and

19   successful jury trial experience in class actions.  Very few

20   lawyers have actually tried class actions.  We have.  In the

21   *Rocky Flats* case which was just resolved after 26 years in the

22   federal court, went up to the Tenth Circuit twice and there was

23   cert applied to for in the Supreme Court when it settled, we

24   tried the case to a jury and achieved a verdict of over 500

25   million dollars.  Ultimately, we settled this case for 375

1    million dollars.  And the members of our class received a
2    hundred percent of their losses.
3            I have personally started trial in two class actions
4    which settled in the middle of trial successfully.  And I took
5    another case up to the eve of trial literally two days before
6    the trial was to start, and that was also successfully settled.
7    We know, those of us that approach these cases with the
8    attitude that the case can be tried, that preparing a case for
9    trial is the very best way to get a great settlement and, as
10   Mr. Susman said, moving it swiftly and quickly and not being
11   afraid to go to trial.
12           I have appeared before Your Honor so that you have
13   seen my work.  I served as lead counsel in two securities fraud
14   class actions, the *ValuJet* case and *Carley Capital v. Deloitte*
15   *& Touche*.  I argued and defeated Defendants' motions to
16   dismiss.  Your Honor authored reported decisions on both of
17   those motions, and both cases resulted in favorable
18   settlements.  That was in the year 2000.  We have all become a
19   bit older since then.
20           THE COURT:  And I'm a lot grayer.
21           MS. SAVETT:  I support the conservative fee structure
22   of the Susman group.  The fee proposal is not dependent on
23   lodestar but instead is linked to actual results received by
24   the class.  I would like to briefly drill down on a couple of
25   these points.  My data breach experience will be invaluable to

1    this case.

2         *TJX* was really the first major data breach case.

3    Hackers stole the personal information of 45 million consumers.

4    So it was a big case, not as big as this one; but it was a very

5    big case.  The case settled for benefits of over 200 million

6    dollars.  The benefits were two years of credit monitoring and

7    identity theft insurance, an 18 million dollar fund to

8    compensate consumers for out-of-pocket losses and time spent

9    mitigating the breach and injunctive relief to strengthen *TJX's*

10   data security system.  This settlement structure has been used

11   as a template for most subsequent data breach settlements.  It

12   really became the model for settlements.

13        Former Chief Judge William Young of the District of

14   Massachusetts praised the result as an excellent settlement

15   containing innovative and groundbreaking elements.  My current

16   involvement in Experian informs me as well.  As Ms. Wolfson

17   said, *Experian* involves many of the same factual issues, legal

18   claims, damage theories and defenses as Equifax.

19        I have produced excellent results for Plaintiffs in

20   class actions for over 40 years while working collaboratively

21   with many fine lawyers on both the Plaintiffs and the defense

22   side.  I was lead or co-lead counsel in dozens of class actions

23   that settled for tens to hundreds of millions of dollars.

24   These include some of the nation's largest securities fraud

25   class actions.  Examples are the *Rite Aid*, *Waste Management*,

1    *CIGNA* and *MetaFix* cases, each of which settled for between 93

2    and 334 million dollars.

3            Last, many judges have specifically praised my work

4    in class actions; and I have included their quotes in my

5    submission.  It would be a privilege and an honor to apply my

6    lifetime of experience and expertise to seek a just recovery

7    for the millions of consumers who have been harmed by this

8    massive and serious data breach.

9            Thank you.

10           THE COURT:  Thank you, Ms. Savett.

11           Ladies and Gentlemen, let's take a ten-minute break.

12   Court's in recess for ten minutes.

13           (A short recess was taken.)

14           THE COURT:  All right.  Next is Roxanne Conlin.

15           Is Ms. Conlin here?

16           (No response.)

17           All right.  Then next is Mr. William M. Murphy.

18           MR. MURPHY:  Good morning, Your Honor.

19           THE COURT:  Good morning, Mr. Murphy.

20           MR. MURPHY:  It's a pleasure to be here.  I

21   appreciate the opportunity to address you and introduce myself.

22   My name is William H. Murphy, III.  I have applied to be lead

23   counsel in this matter.

24           As we were preparing my papers, Your Honor, and as I

25   was working with my team, I told them that our job was to

1    convince you that I was the right person at the right time in

2    the right moment to lead this case.

3              Why am I the right person?

4              I am well qualified and uniquely qualified for

5    reasons that I will share with you.  I have led multiple

6    complex class actions as lead counsel to successful and

7    extraordinary resolution.  But I may be the only person in the

8    room other than the defense lawyers who has led the defense of

9    multibillion-dollar consumer class actions, a class that

10   extended across the country in multiple jurisdictions for

11   multiple Defendants.

12             I have led deliberations among CEOs.  I have made

13   presentations in the boardroom, and I have strategized with

14   general counsel.  That has given me a unique understanding,

15   Your Honor, an insight into the arc of these cases and what

16   drives Defendants.  That perspective has driven how we approach

17   our Plaintiffs' cases.  And I think the results speak for

18   themselves.

19             Secondarily, Your Honor, trial experience matters.

20   We have heard other applicants say it, but it bears repeating.

21   I have participated in hundreds of trials, mostly jury trials,

22   in federal and state courts as either lead counsel, co-lead,

23   second chair and trial gopher, all types of cases, adversary

24   proceedings and bankruptcy, federal criminal trials that went

25   on for four or five months, complex civil cases in state and

1   federal courts.

2          In every case that we take, we work to prepare for

3   trial from the beginning.  And we are constantly working to

4   build a winning case at trial, constantly thinking about things

5   like proof, like the credibility of witnesses and our trial

6   teams cutting through the noise of discovery.  And as a

7   third-generation lawyer, Your Honor, I have been taking

8   cross-examination lessons since I was five.  Having reviewed

9   most of the applications, both our experience and our approach

10  sets us apart.

11         Why is this the right moment?

12         Much has been written about the stranglehold of a

13  handful of firms on complex MDLs and about the shocking absence

14  of diversity and lack of women and people of color in the

15  leadership of these cases.  Many of the firms before you today

16  have as a result of this built impressive track records and

17  bring to you rich résumés and applicable experience.  But often

18  class members are deprived of the benefit of the unique and

19  rich experience that a lawyer like me, like Ms. Savett and

20  others bring to bear in approaching these cases in

21  understanding how diversity is helpful, how diverse jurors and

22  Plaintiffs think about things, how to make effective

23  credibility challenges.  And the list goes on and on.  And all

24  of that matters, Your Honor.

25         Your Honor, I have worked against or alongside many

1    of the lawyers in this room, Norm Siegel, Andy Friedman,

2    Sherrie Savett.  And I don't envy you this choice you must

3    make, but it must be made.  And you, Your Honor, have also

4    asked us to make sure to inform the Court that we are able to

5    collaborate and work cooperatively.  And many of the lawyers I

6    just mentioned and others in the room can attest to my

7    collaborative spirit, my drive to achieve the best result from

8    wherever it may come on a team and, yes, my absolute desire to

9    win.

10            Why is this the right time?

11            Given the scholarly articles and the pronouncements

12   of many courts, the JPML and the Duke study in which Your Honor

13   participated leads us to one fundamental question:  If not now,

14   when?

15            And I believe the time is now, Your Honor.  It is

16   particularly important here that if you track U.S. demographics

17   we have as many or more than 19 million African-American

18   Plaintiffs, class members; and that matters.  There must be

19   credibility in the result.  The members of the class nationwide

20   must feel that they were represented.  And when and if this

21   case is resolved by settlement, that settlement must be sold as

22   fair, equitable, reasonable to a broad spectrum of people.  And

23   our firm is unique in having the credibility and the civil

24   rights profile and the background to be able to do that across

25   the entire spectrum of the class.

1          But I'm not asking you to appoint me because I'm

2    black, Your Honor.  I'm asking you to appoint me because I am a

3    first-rate trial lawyer with a real track record and a uniquely

4    valuable defense experience who happens to be black which

5    brings to the table a rich and different perspective, a rich

6    and different history, a rich and different experience which

7    would bring and add tremendous value to this case.

8          I thank you, Your Honor; and I appreciate your

9    consideration.

10          THE COURT:  Thank you, Mr. Murphy.

11          Next is Jason Doss.

12          MR. DOSS:  Thank you, Your Honor.  My name is Jason

13    Doss.  I'm the small business Plaintiffs' counsel.  I represent

14    the small business Plaintiffs in this case that consist of

15    approximately 28 million businesses as well as their business

16    owners.

17          My case is one of a kind.  I have listed -- I am

18    listed on Exhibit 1B of CMO-2.  And we are -- I am also the

19    only attorney that represents the small business Plaintiffs in

20    this case.  So I think these cases illustrate the importance of

21    diversity, diversity in thought and diversity in background.

22    And I think that's what I bring to the table here.  And I'm

23    trying to protect my clients' interests.

24          I presented the Court two days ago with a chart, a

25    diagram that I hope the Court reviewed and looked at.  But it

1    basically illustrates how different and diverse this case is

2    and how different it is from other cases because of the fact

3    that Equifax's data was stolen.  That's their whole business

4    model was to take information without the consent of any

5    consumer.  So this is not necessarily a consumer transaction.

6    And they took the information, they determine who gets credit

7    and who doesn't get credit, and they sell that information at a

8    profit.

9             Businesses are treated differently than individuals.

10   Businesses have their own credit scores.  Businesses have their

11   own credit reports.  But unlike consumers who get free credit

12   reports for their personal credit, businesses have to pay for

13   those reports.  And they are about $99 apiece.  That's what

14   Equifax charges.

15            When this case was announced or when Equifax

16   announced this data breach, it announced just like every other

17   Defendant does when they have a breach they're going to offer

18   free credit monitoring or some sort of a service to the harmed

19   consumers.  Nothing was offered to the small businesses.  So

20   even today as we're sitting here in this courtroom, if a

21   business wants to do credit monitoring they have to pay $5.99 a

22   month from Equifax to do that.

23            I say that because I think that this case is unique

24   and separate independent counsel is needed to represent the

25   business credit relief interests of these small business

1    Plaintiffs.  The reason for that is that the relief that is

2    very valuable to a small business has zero value to a class

3    member who was harmed in Equifax but is not a business owner at

4    all.  So, in other words, a free business credit report has

5    zero value to an individual consumer that does not own a

6    business.

7            Similarly, the relief that could be valuable to an

8    individual non-business owner it may have very limited value to

9    a business.  And that includes, for example, credit freezes.

10   It's a good thing for consumers to be able to freeze and

11   unfreeze their personal credit.  It has very limited value,

12   though, for a business because anyone who runs a business knows

13   it's going to disrupt operations to be able to have to freeze

14   and unfreeze your credit.

15           A lot of the people that I'm seeking to represent are

16   the clothing shops that operate on a revolving line of credit.

17   One of my clients, Kademi, is from Mississippi.  It's a gift

18   shop.  They operate on a revolving line of credit.  They can't

19   sit there and freeze and unfreeze their credit because they

20   would go out of business.

21           Business credit identity theft and business credit --

22   business identity theft and other similar frauds are a real

23   problem.  And as I stated in my application, a stunning fact

24   that I actually learned after we filed the case is that if a

25   business is hacked and is a victim of business identity theft

1    they typically go out of business within six months.  So you

2    think about that.  Employees, you build a whole brand in the

3    community that's based on your honor and it all goes away

4    because of somebody that hacked the business owner's personal

5    identifiable information.

6              So we believe that the group is very large.  We have

7    filed two cases.  We represent 16 individual business owners as

8    well as 16 different and diverse business entities that

9    includes partnerships, corporations, limited liability

10   companies and things like that.  I think it's very important on

11   the front end to get this set up correctly, and it's going to

12   take diverse thinkers to be able to do that.

13             I have a very strong background, and I am a

14   nationally recognized financial fraud attorney.  I have

15   represented investors all over the country and in other

16   countries.  I have done it for 15 years.  I have seen the harm

17   that fraud can cause a family.  And I think that gave me the

18   insights to be able to empathize and kind of take a step back

19   when this data breach case was announced that I saw something

20   no one else in this room saw, and that is that there's an

21   additional class of people who are harmed and they need

22   protections.  And I'm seeking to do that.

23             I have applied to be co-lead counsel even though I

24   understand I'm one person.  I have a firm I have support for.

25   I'm willing to do everything I can to protect their interests.

1    But I think being co-lead counsel with someone who is

2    protecting the consumer relief's interests would be a very good

3    way for the Court to structure this leadership.  And the reason

4    for that is we have to think about things like who are going to

5    be these named Plaintiffs.  It just can't be non- -- all the

6    non-business-owning consumers.  It has to consist of probably

7    non-business-owning individuals, business-owning individuals

8    and business entities so that every group is protected.

9            I have already demonstrated a willingness and ability

10   to work with others.  Prior to the first hearing we had, I

11   worked with all the great lawyers in this room to work out that

12   CMO-2 language because I think we needed more time to determine

13   whether or not my case should go forward on a separate track or

14   as a subclass.  I don't necessarily have a preference.  I just

15   want to make sure that we think through this and get it right

16   on the first time right at the beginning.  Because if we don't,

17   there's going to be problems that come up along the way.  And I

18   just hope -- and I'll end there.

19           Your Honor, please, I will do my best to represent

20   these unique businesses.  And I respectfully request that you

21   appoint me as co-lead counsel of this case.

22           Thanks.

23           THE COURT:  Thank you, Mr. Doss.

24           Next is the application of Stuart Davidson of Robbins

25   Geller and Thomas Loeser of Hagens Berman and others' joint

1    application.

2         MR. DAVIDSON:  Good morning, Your Honor.  May it

3    please the Court.  My name is Stuart Davidson.  I am a partner

4    at Robbins Geller in their Boca Raton, Florida, office.  I am

5    standing here on behalf of myself, Mr. Thomas Loeser, a former

6    federal cyber prosecutor with the Department of Justice who is

7    a partner at Hagens Berman seeking co-lead counsel on behalf of

8    the consumer Plaintiffs as well as on behalf of the entire

9    Robbins Geller/Hagens Berman group.

10        If I can just ask my colleagues to stand so I can

11   introduce Your Honor to them.  On your right, Your Honor, is

12   Mr. Nicholas Diamand who is a partner at Lieff Cabraser.  Next

13   to him is Ms. Cari Campen Berg -- Cari Campen Laufenberg, a

14   partner at Keller Rohrback.  And next to her is Ms. Jennifer

15   Joost, a partner at Kessler Topaz.

16        And Your Honor may also already be familiar with my

17   partner, John Herman, from my firm's Atlanta office who we have

18   asked the Court to appoint as co-liaison counsel.  Mr. Herman

19   has tried several cases before Your Honor, so we'd ask for his

20   appointment as well.

21        Your Honor, I could spend the next few minutes

22   talking about my experience and my colleagues' experience in

23   data breach cases and privacy cases and class actions

24   generally; but I'm not going to do that.  Each of us has worked

25   with most, if not all, of the outstanding lawyers in this

1    courtroom, Your Honor.  And no one here will question our

2    abilities, no one here will question our experiences, and no

3    one here will question our commitment to our clients and the

4    classes that we represent.

5             But despite all that experience, Your Honor, you

6    probably don't recognize any of our faces and you probably

7    don't recognize --

8             THE COURT:  I recognize Mr. Herman.

9             MR. DAVIDSON:  Except for Mr. Herman.  That's an easy

10   face to recognize.  But you won't recognize our names or our

11   faces for the rest of us; and that's really the reason why I'm

12   standing here before you, Your Honor, because I believe very

13   strongly that now is the time for the next generation of

14   lawyers to take leadership roles in MDL cases and complex class

15   actions.

16            I know that the federal judiciary is concerned about

17   so-called repeat players who keep getting appointed time and

18   again to lead these large cases.  And I would imagine, Your

19   Honor, that as a judge that would make things quite difficult

20   because on the one hand you, of course, want to appoint lawyers

21   with proven experience and track records and resources and

22   successes to make sure that the class is properly represented.

23            But on the other hand, Your Honor, you want to give

24   new lawyers an opportunity to lead cases and show that they too

25   can achieve success in these types of cases.  And I

1   respectfully suggest that my appointment and the appointment of

2   my colleagues -- these are experienced and outstanding women

3   and men from powerhouse law firms around this country -- can

4   satisfy both of those important goals.

5           And although I am on the executive committee in the

6   *Yahoo* data breach case and my colleagues are in leadership

7   roles in other data breach cases like *21st Century*, the truth

8   is, Your Honor, that for years each of us has worked behind the

9   scenes and side by side with our more notable named partners,

10  Paul Geller, Steve Berman, Elizabeth Cabraser, Joe Rice.  These

11  folks were always the leaders, and it was us in these cases

12  like *Sony* data breach and the *Volkswagon Clean Diesel* case and

13  now the national opioids case that most of our firms are now

14  leading.  They were all the -- they were the names.

15          But as I'm sure Your Honor can appreciate that in

16  these mega-cases that our firms do day in and day out like

17  *Volkswagon* and *Opioids* it's partners like us who are the

18  workhorses.  We're the ones that do the heavy lifting day in

19  and day out to help the firm and to help our notable named

20  partners achieve those successes.  So despite our experience

21  and despite our qualifications and our deep knowledge of the

22  law, we are -- that we are deeply proud of, all of those

23  successes that our firms have achieved, we are not repeat

24  players.  But we are dependable, we are experienced, we are

25  knowledgeable, and we are resourceful players.  Therefore, I'm

1    humbly asking Your Honor to appoint me and my colleagues as

2    members of the Robbins Geller/Hagens Berman group as members of

3    the leadership group for the consumer Plaintiffs in this case.

4         And to be clear, Your Honor, we are not seeking

5    leadership roles exclusively.  We understand that there are

6    many highly qualified lawyers in this courtroom, many of whom

7    are my close, dear friends for the Court to choose from.  And

8    we all each of us both individually and collectively, Your

9    Honor, would be honored to serve alongside any of the

10   applicants that you choose.

11        Your Honor, as Winston Churchill once said, we make a

12   living by what we get, but we make a life by what we give.  And

13   I guarantee you with every fiber of my being that each of us

14   will give everything we have, everything we have for you, for

15   the class, for the Plaintiffs, for our clients if you give us

16   that opportunity.

17        I sincerely believe that younger but experienced

18   partners who have worked for years behind the scenes to help

19   obtain successful recoveries for class members should have an

20   opportunity to show that they too can lead a case.  And it does

21   bear mentioning, of course, that each of us work at firms that

22   are the largest and most successful class action firms in the

23   country.  Each of our firms individually have the resources to

24   go up against a firm like King & Spalding; and collectively,

25   though, we are a powerful force.

1          So I fully understand, Your Honor, the great

2    responsibility that comes with a leadership appointment.  And I

3    ask Your Honor to trust my colleagues and myself with that

4    great responsibility.  We will not let you down if you give us

5    that opportunity.

6          So I thank you very much for your time and for the

7    opportunity.  I really do appreciate it.

8          THE COURT:  Thank you, Mr. Davidson.

9          All right.  Next is Vincent Esades.

10          MR. ESADES:  Good morning, Your Honor.  I can still

11   say that.  Vincent J. Esades from Heins Mills & Olson in

12   Minneapolis, Minnesota.

13          I think it's become apparent from already the people

14   that have spoken that I don't think Your Honor can make a

15   mistake today in the appointment.  There's just extremely

16   talented people here today.  I had the pleasure of serving as

17   the sole lead counsel on the *Target* data breach case, and I

18   personally had the opportunity to work with many people in this

19   room.  Many of whom I worked with could independently have

20   served as lead in the *Target* case, but we collaterally I

21   thought did an excellent job, and I think that's one of those

22   prime duties as a lead counsel.

23          I set forth my qualifications and everything else

24   that I needed to say in my papers.  So I thank Your Honor for

25   the opportunity to introduce myself, and that's all I have.

1          THE COURT:  Thank you very much, Mr. Esades.

2          Next is the application of Buether Joe & Carpenter.

3          Anybody here for that group?

4          (No response.)

5          Next then is the application of Dianne Nast.

6          MS. NAST:  Just one more minute to say good morning,

7    Your Honor.  Then it will be good afternoon.

8          I haven't had the opportunity to appear before you.

9    I did have the enormous pleasure of appearing for four years

10   before Judge Shoob who I know we lost last year.  He -- if

11   that's what Georgia is like, he was an amazing judge.

12         As has been mentioned, I am supporting the slate --

13   the Susman slate.  I don't usually support slates because often

14   they are put together based on debts owed or promises made for

15   future.  That wasn't done here.  This slate that has been

16   suggested to Your Honor is composed of very serious, highly

17   professional lawyers, any one of whom could carry this case.

18         I put in my own application in the event that the

19   Court does not pick the Susman slate.  The Court was very

20   generous with the page numbers that you gave us for submitting

21   our applications.  So in my application I have set forward in

22   some detail a good sample of my professional experience, of my

23   work with the bar which has been substantial and my awards and

24   recognitions.

25         My firm has the -- like most of the firms that have

```
 1    spoken today has the financial resources and the personnel
 2    resources to conduct this case successful to litigation -- to
 3    conclusion.  I pledge as I did in my papers that I will
 4    continue to work as I have always done cooperatively with
 5    anyone Your Honor appoints and with the defense counsel.
 6              I will rely on my papers, and I pledge to the Court
 7    that if I am chosen I will devote my personal resources and
 8    those of my firm to bring this case to a quick as possible and
 9    successful conclusion either by judgment or by settlement.
10              Thank you.
11              THE COURT:  Thank you very much, Ms. Nast.
12              Next is Melvin Hollowell.
13              MR. HOLLOWELL:  Ready, Your Honor.  I think I will be
14    the first to say good afternoon, Your Honor.  Melvin Butch
15    Hollowell with The Miller Law Firm in Detroit, Michigan.  I
16    serve as the managing partner of the firm's Detroit office.
17    And I'm here with my partner, Sharon Almonrode, who heads the
18    firm's class action department.  And here we are respectfully
19    requesting appointment to Plaintiffs' steering committee.
20              Just very briefly, Your Honor, Miller Law Firm based
21    in Michigan is one of the leading class action firms in the
22    country.  We represent the Plaintiffs in the *Baker* case now in
23    the Eastern District of Michigan.  And for over 20 years, we
24    have served as lead or co-lead on numerous complex national
25    class action matters across the country and have recovered over
```

1    three billion dollars in class actions for our clients.

2    Representative of those are the *AIG* case, the *Wells Fargo* case

3    or *General Motors* case or even the *EpiPen* case now where my

4    partner serves on the Plaintiffs' committee.

5          We bring extraordinary in-house capabilities and

6    resources such as e-discovery so that we can handle millions of

7    pages of documents and be able to make sense of them for the

8    Court and for the Plaintiffs in this case.  So I have been the

9    managing partner of the firm effective of January 1 of this

10   year.  Through December 31 of last year, I finished serving out

11   a four-year term as the corporation counsel for the City of

12   Detroit which is the city's chief legal officer under Mayor

13   Duggan and what's going on there.  But in both the private and

14   public sector throughout my career, 33 years, I have handled

15   class action matters with outstanding results.

16         I have a little bit of a different perspective as I

17   was looking at the case, Judge.  And that is in March of 2014

18   we had a very significant data breach matter that involved the

19   City of Detroit.  So there was malware that came from a former

20   Soviet Republic in Kazakhstan which affected 1,700 of our

21   firefighters and EMS workers.  And they employed what was

22   called the Cryptolocker virus which basically locks down the

23   account.  And as a general rule, it's used to ransom the

24   account.  But as in this case, it exposes the firefighters' or

25   the EMS workers' Social Security numbers, birthday, bank

1    account records and the like.  It's very serious.

2            And so under the Michigan statute -- and I examined

3    statutes across the country -- under the Michigan statute, it

4    calls for prompt disclosure.  So on the inside working with the

5    mayor and advising the head of the city council and working

6    with our IT director our belief was that we needed prompt

7    disclosure, and what that meant was going public.  And I held a

8    press conference within 24 hours of that data breach to, one,

9    inform those individuals whose data had been compromised; two,

10   to inform the public so that it was a transparent process;

11   number three, to provide the kind of credit counseling that was

12   available.  And we were able to put a circle around those

13   individuals and to protect that data.  But it's important on

14   the disclosure piece.

15           I wanted to mention that and also that I have deep

16   experience in running a very significant law firm, 70-plus

17   lawyers.  I oversaw the nation's largest municipal bankruptcy.

18   By the way, we posted three-plus years of balanced budgets and

19   we'll be out of receivership in March.  And in that process,

20   going to the issue of making sure that the Plaintiffs in this

21   case are in their fee petition maximizing the return, at the

22   end of the bankruptcy it was pretty much all done except for

23   the lawyers getting paid and the consultants.  And we had

24   actuaries involved as well and others.  And the fee examiner

25   had presented his report.  I objected to that report in front

1    of the Honorable Steven Rose who now stepped down, as well as

2    in front of Chief Judge Jerry Rosen because I felt the bills

3    were outrageously high.

4            Instead of trying that case in federal court, the

5    chief judge ordered that it be mediated.  And so for two weeks,

6    I spent holed up in the federal district courthouse.  And the

7    result was we got 20 million dollars back for the taxpayers,

8    and that goes to a firefighter or a police officer, and it was

9    a very significant recovery.  So I know how to sharpen a pencil

10   is what I'm saying.

11           In terms of the damages on this, so I've dedicated

12   most of my career, the better part of 20 years, as general

13   counsel of the NAACP.  In Detroit it's the largest chapter in

14   the United States.  In fact, it's the -- it's larger than the

15   national NAACP.  I have served also for the better part of ten

16   years on the national NAACP legal committee.  I have litigated

17   these consumer issues in the federal courts very regularly,

18   particularly as it relates to consumer issues.

19           I did by appointment of the governor serve as the

20   consumer representative for the people of the state of Michigan

21   and was also appointed as consumer representative to the

22   National Association of Insurance Commissioners.  I authored a

23   330-page report dealing with issues just like this for

24   consumers on credit scoring and the like.  And so what we need

25   to make sure is that in the -- particularly in the damages

1    phase that we are representing those, not just those of color

2    but working class individuals who have been impacted by these

3    kinds of data breaches.

4            I will say also that we have had an outstanding track

5    record of working with all the fine lawyers in this room.  By

6    my count, 22 out of 45 we have worked with cooperatively and

7    would certainly be willing and look forward to doing so in the

8    future.  And, therefore, Your Honor, I respectfully request

9    this Honorable Court to grant this application for appointment

10   to the leadership council.

11           THE COURT:  Thank you, Mr. Hollowell.

12           Next is Jonathan W. Johnson.

13           MR. JOHNSON:  Thank you, Your Honor.

14           May it please the Court.  I'm applying to be

15   considered for a member of the Plaintiffs' steering committee.

16   My goal is simply to be of service to the class and my clients.

17   I'm a solo practitioner.  I represent 16 consumer Plaintiffs,

18   and I'm local counsel to Mark Geragos for the Geragos firm with

19   five additional Plaintiffs.

20           I'm a local attorney.  I'm here in Atlanta.  My

21   office is about 20 minutes away from Equifax.  And,

22   accordingly, I won't have any travel expenses incurred if I

23   need to take depositions here.  Coincidentally, my spouse used

24   to be employed at Equifax as a financial analyst.

25           I'm a certified public accountant which may also be

1    relevant to this case.  And I have agreed to cap any fee

2    request I would make in this case to an hourly rate of $390, so

3    I'm not seeking any kind of enhanced fee or award.  My primary

4    goal is simply to be of service to the class.

5            I have 25 years of experience litigating a variety of

6    cases, including MDL cases.  I recently concluded approximately

7    200 cases in the MDL related to the British Petroleum

8    explosion.  And I have worked with some of the attorneys in

9    this room before, and I am happy to pledge to commit to

10   cooperate with anybody the Court selects.

11           That's it, Your Honor.

12           THE COURT:  Thank you, Mr. Johnson.

13           MR. JOHNSON:  Thank you, sir.

14           THE COURT:  Next is Michael Galpern.

15           MR. GALPERN:  Good afternoon.  May it please the

16   Court and counsel.  My name is Michael Galpern, co-managing

17   partner at the Locks Law Firm.  And I'm here on my application

18   for PSC membership.

19           Judge, I'm not applying to be the lead or co-lead.  I

20   think that there are other people who have practically more

21   experience than I do in data breach.  However, I am not without

22   experience in data breach.  My firm and I are on the PSC in *In*

23   *Re Experian*.  Two counsel have already addressed that.  I have

24   been on the PEC in the *Yapstone* data breach.  And I'm currently

25   involved with a number of counsel in this room on several other

1   data breach cases.  So we certainly have deep and wide

2   experience in data breach.

3         I have also been appointed lead or co-lead counsel in

4   10 or 12 consumer classes throughout the state of New Jersey,

5   all of which are documented in my application.  I've been

6   appointed by Judge Simandle to lead or co-lead several consumer

7   classes, by Judge Martini, by Judge Patty Shwartz in New Jersey

8   on several other cases.

9         Some of my experience is a bit unique in this

10   department, and we haven't heard counsel speak too much of

11   this.  I was an adjunct professor of law for eight years at

12   Rutgers University, and I think that part of being a good trial

13   lawyer is the ability to teach.

14         The other thing I'd like to highlight, Judge -- and

15   it's been said by a couple members who spoke this morning -- is

16   trial experience is important.  Trial experience is

17   indispensable.  I have lived my life by the motto of John

18   Kennedy -- I don't negotiate cases out of fear, but I don't

19   fear to negotiate.  Every case that I have ever settled in my

20   life, whether it's been a single class -- a single case or a

21   single class I believe has been thoroughly and excellently

22   prepared.

23         I have personally tried over 40 trials in my career.

24   I have sat second chair.  I have been the gopher as it's been

25   referred to on a number of other cases.  But I have handled on

1    a first-chair basis complex litigation trials, including class

2    actions, including mass tort trials throughout the state and

3    the federal courts of New Jersey as well as elsewhere.

4           I have handled every single aspect of a mass tort and

5    a data breach.  With regard to mass torts, I have done things

6    such as document review.  I have taken fact witness

7    depositions.  I have taken expert witness depositions.  I have

8    tried the cases.  I have negotiated the MDLs.

9           Counsel from Chicago, Mr. Molo, mentioned you don't

10   need 11 left tackles.  You don't.  But you need two good left

11   tackles.  And I have served the position of left tackle; and I

12   could serve the position of running back, quarterback or wide

13   receiver.  I know how to work in a collegial environment, Your

14   Honor.

15          I spent a year as a president of the New Jersey

16   Association of Justice, our trial lawyer group.  I was able to

17   management the complexities and the egos and the point of views

18   of 2,500 lawyers in the state of New Jersey.  I have spent a

19   year trying a -- leading a national group of trial lawyers,

20   Worker Injury Litigation Group, WILG.  Once again, I brought

21   into a room either telephonically or in person over a hundred

22   -- hundreds of our members and non-members all involved in

23   similar issues to advance our agenda.

24          I know how to deal in a collegial environment, and I

25   know how to be a team player.  I have worked on numerous PSCs

1    in mass torts.  I have worked on numerous class actions.  I
2    have worked on numerous data breaches.  And I don't need to be
3    lead counsel, but I do believe my experience will lend itself
4    to moving this case forward.
5              I understand that we are going to get one bite of the
6    apple when it takes a deposition.  I have taught dozens of CLEs
7    on taking depositions.  I understand we are going to have
8    limited interrogatories.  I have taught numerous CLEs on how to
9    take effective discovery.
10             Judge, just like everybody who stood before me, I
11   pledge to you that if I'm honored to be on this PSC you won't
12   regret your decision.  I will give it 110 percent.  I will be
13   personally responsible for each and every component of my work.
14             And, lastly, Your Honor, I understand that Your Honor
15   is tasked with the task of appointing individual PSC members;
16   but undoubtedly PSC members have to rely on their office for
17   support.  The Locks Law Firm has been doing mass tort class
18   action work for over 50 years.  It's in our DNA.  We have
19   offices in Philadelphia, offices in New Jersey, offices in New
20   York.  We handle not only individual cases but mass tort cases
21   of every size and every variety, and we have been involved in
22   quite a few of them.
23             I am not one of the repeat players when it comes to
24   PSC.  I don't apply to every PSC, and I certainly don't get
25   appointed to every PSC.  But in this case respectfully,

1    although you've heard and seen many fine lawyers, many of whom

2    I consider my friends, I do believe I have some unique

3    experience that can help move this case forward; and I pledge

4    to bring that experience each and every day on this PSC.

5              Thank you for your time.

6              THE COURT:  Thank you, Mr. Galpern.

7              All right.  Next is the application of Spector,

8    Roseman & Kodroff.

9              MR. MIRARCHI:  Good afternoon, Your Honor.  My name

10   is Daniel Mirarchi, and I'm from the firm of Spector Roseman &

11   Kodroff.  I am here with Robert Killorin from Faruqi & Faruqi.

12             Your Honor may not remember, but I had the

13   opportunity to address you at the last status conference in

14   January.  And I was here to request that claims brought by

15   Plaintiffs who purchased credit monitoring and identity theft

16   protection directly from Equifax and didn't receive those

17   benefits proceed on their own track.  I also submitted a report

18   pursuant to Case Management Order Number 1 to support that

19   position.

20             Your Honor decided against separating the contract

21   cases at that time.  We understand and obviously respect the

22   Court's decision.  But the contract claims are distinct, Your

23   Honor; and we respectfully request that they receive separate

24   representation.  And my firm stands ready to serve as either an

25   interim co-lead counsel or in the alternative as a member of

1    the steering committee.

2           Now, I think I am roughly the 26th speaker up here;

3    and nobody has mentioned these contract claims yet, Your Honor.

4    And I think that's an indication of the type of treatment they

5    will get moving forward.  And these claims are distinct, and

6    differences will manifest themselves early in the case right

7    from drafting the initial pleadings all the way down through

8    discovery and if settlement negotiations are reached at

9    settlement negotiations and trial.

10          I also will rely on the application that we filed

11    with respect to my firm.  But I'd like to point out that

12    Spector, Roseman & Kodroff and Faruqi & Faruqi have prosecuted

13    large and oftentimes groundbreaking consumer, antitrust and

14    securities litigation class actions; and a lot of those also

15    included privacy and data breach cases as well.  So we

16    understand and can handle the intellectual, time and financial

17    demands that prosecuting these cases will require.  In other

18    words, we will commit the necessary resources.

19          And, finally, Your Honor, I have not personally

20    worked with a lot of the lawyers in this room; but I have

21    worked with members of their firms in other cases or my firm

22    has worked with either their firm or members of those firms as

23    well.  So as our track record suggests, we will be able to work

24    alongside anybody Your Honor appoints to lead the case.

25          Thank you.

1              THE COURT:  Thank you, Mr. Mirarchi.

2              All right.  Next is the application of David Stone

3    and Robert Magnanini.

4              MR. MAGNANINI:  Yes, Your Honor.  Thank you.  Bob

5    Magnanini from Stone & Magnanini.

6              Your Honor, like yourself, I think I'm a believer in

7    British Prime Minister Benjamin Disraeli who apologized to the

8    queen once for saying, "I'm sorry I wrote you such a long

9    letter; I didn't have time to write a short one."  So I'm just

10   going to tell you what you are going to get from us if we're

11   put on as lead counsel or Plaintiffs' steering committee.

12             We have laid out the numerous class action matters we

13   have been involved in.  Our office used to be the New Jersey

14   office of Boies Schiller & Flexner.  Prior to that, I worked

15   with Mike Chertoff from the U.S. Attorney's Office before he

16   became Homeland Security secretary.  So we come at consumer

17   protection in cases like this in a slightly different manner.

18             We are a somewhat unique firm.  We are half billable

19   and half contingent.  And half or most of our contingent work

20   is either class action or False Claims Act work.  The False

21   Claims Act is we bring cases on behalf of consumers but based

22   on the federal or state governments making improper payments to

23   people.  In those cases, we've gotten recoveries of three

24   billion dollars and two billion dollars.  Now, those cases have

25   taken 12 and 13 years to do which this case certainly doesn't

1   need.

2           This is a pretty unique case in that Equifax affects

3   about half of the country.  Oddly enough, no one in my family

4   was affected by Equifax.  Although, I was affected by a prior

5   data breach case where the Office of Personnel Management left

6   my top-secret information on their server which apparently they

7   tell me the Chinese now have for my service as a

8   counterterrorist guy for 30 years in the Army.

9           But, like I said, what I wanted to tell you was what

10  you get from us is we do the work ourselves.  The one thing

11  both of us learned in the law schools we went to was zealous

12  defense of the clients.  My partner was the general counsel at

13  the Yankees.  And while you all may not like the Yankees down

14  here, if you can work with George Steinbrenner you can work

15  with anybody.

16          As I said, I spent 30 years in the Army as a

17  counterterrorist and military intelligence officer, briefed at

18  the White House.  I briefed Tom Clancy for *Clear and Present*

19  *Danger*.  I was a ground commander at the World Trade Center.  I

20  have been to 78 countries working with foreign governments.

21  And I have never had anything more difficult than getting

22  NAMFCUs which are the National Association of Medicaid Fraud

23  Control Units to do one thing at one time which is settle a

24  case for the benefit of their populaces.  So if I can herd cats

25  like that, I'm sure I can help out here.  And as they say, you

1    always need somebody from New Jersey to get a dirty job done.

2              Thank you very much.

3              THE COURT:  Thank you, Mr. Magnanini.

4              Next is Richard Rouco.

5              MR. ROUCO:  Rouco, Your Honor.

6              THE COURT:  Rouco.

7              MR. ROUCO:  Good afternoon, Your Honor.  My name is

8    Richard Rouco.  I am a partner in the firm of Quinn Connor

9    Weaver Davies & Rouco which has offices in Birmingham and

10   Decatur, Georgia.  My application respectfully requests that I

11   be appointed to the Plaintiffs' steering committee, and I'm

12   going to rely on the application largely to set out my

13   credentials and experience in class action litigation.

14             I am co-counsel, Your Honor, in a case called *Rajput*

15   *v. Equifax* with the firm of Artrip and Mastando.  Mr. Rajput

16   purchased credit monitoring services from Equifax for about

17   three years prior to the data breach at issue in this case.  I

18   agree with Mr. Mirarchi that a separate -- at least a separate

19   representation in the Plaintiffs' committee -- in the

20   Plaintiffs' steering committee should be set out for

21   individuals that have these contract-type claims against

22   Equifax.

23             As a result, I respectfully request that the Court

24   grant our application to be appointed to the Plaintiffs'

25   steering committee in the capacity of a firm that's

1    representing or looking out for the interests of clients with

2    direct contract claims.

3          Thank you.

4          THE COURT:  Thank you, Mr. Rouco.

5          Well, I've heard 25 presentations; so we may make it.

6    But I think we need to break for lunch, and that's not going to

7    be easy for y'all.  Our cafeteria down on LP is not really

8    designed to serve this many people at one time.  And if you all

9    go down there, the whole thing will just collapse.

10          For those of you who are from out of town, there are

11    few options.  If you go out and turn right on Mitchell Street

12    and then walk over the bridge and take the first left, there's

13    the Elliott Street Pub, make really delicious sandwiches.  But

14    they are really good because they take great care and it takes

15    a little while to make them.

16          If you keep walking past the fire station, there's

17    Smoke Ring Barbecue which is pretty good barbecue.  You can

18    walk over to the Mercedes Stadium, and there's a restaurant in

19    there that's open for lunch called Auntie B's that's pretty

20    good.  And you can also walk over to CNN where there's a food

21    court.

22          The problem with all of those options is you are not

23    going to have time to go there, order and eat and be back by

24    1:30.  But if you want to do that and you have already spoken

25    and you want to have a decent lunch, that's fine.  And you are

1    not going to be penalized for getting back late, I promise you.

2    If you are way down on the list and you want to go and get a

3    decent lunch, you are not going to be penalized for getting

4    back late.

5            The only ones that will be penalized for getting back

6    late are the next ones on the list which is Mr. Graifman,

7    Mr. Hagstrom, Mr. Bailey and probably Mr. Bennett.  But anybody

8    else that wants to come in late it's not a big deal.  It's not

9    going to be a problem.  You're not going to get any demerits.

10           So let's take one hour for lunch, and we will resume

11   at 1:30.

12           Court's in recess until 1:30.

13           (A lunch recess was taken.)

14           THE COURT:  All right.  Next is Mr. Gary Graifman.

15           MR. GRAIFMAN:  Good afternoon, Your Honor.  Gary

16   Graifman, Kantrowitz Goldhamer & Graifman.  In light of Your

17   Honor's admonition, I skipped the barbecue lunch and ate

18   downstairs.

19           THE COURT:  Sorry about that.

20           MR. GRAIFMAN:  As class action Plaintiff lawyers, we

21   have the privilege and also a great responsibility to prosecute

22   these cases on behalf of a large number of consumers who have

23   been injured to seek compensation and equitable relief and in

24   this case consumers who have had their lives disrupted or worse

25   where you have a data breach of staggering magnitude in which

1   the holy trinity of personal identifying information was stolen

2   -- name, address, Social Security number, birth date and in

3   some cases driver's license information and credit card

4   information as well.

5             So it is with an understanding that this is a very

6   important case and with great humility that I apply for the

7   position on the steering committee.  And I can assure Your

8   Honor if I am appointed I will bring to bear the same

9   resourcefulness, experience, skill and commitment that I did

10  when Your Honor appointed me as a member of the *Home Depot*

11  steering committee in which I had the pleasure and privilege of

12  serving.

13            In that case, it was crucial that we demonstrate that

14  the company either knew or should have known of the security

15  vulnerability that led to the data breach.  And my firm and I

16  uncovered, documented and wrote for the most part that section

17  of the master complaint that dealt with the company's absolute

18  knowledge of that vulnerability; and we had the documents and

19  evidence to prove it.

20            And I raise that because as many attorneys here have

21  stated, I know being a trial attorney sometimes the valuable

22  method by which we focus our attention on really what's

23  important.  I've been doing class action litigation since the

24  1990s; but I also through that period and before tried complex

25  commercial litigation cases, perhaps one every two or three

1    years.  And it was -- I consider myself first a trial lawyer

2    and then someone with a substantial amount of class action and

3    data breach class action experience; and I believe that that

4    focus and approach is what allowed me to get the evidence that

5    we used as a team in the *Home Depot* case and led to, I believe,

6    a relatively quick and very substantial settlement.

7            It's that kind of focus also that makes me an

8    efficient lawyer.  And if Your Honor were to compare the

9    lodestar of the various members of the leadership structure in

10   the *Home Depot* case, you would find that I and my firm had one

11   of the lowest lodestars in the case.  And in light of the issue

12   with regard to *Anthem*, I think that might be one of the

13   considerations.  We didn't do any less work or any --

14   contribute anything less than any of the other members, I

15   believe; but we did do it in an efficient manner.

16           With regard to working with others, as I've said, I

17   have worked with a number of the firms here who are vying for a

18   position on the *Home Depot* case and in addition to those

19   attorneys who signed off on the Case Management Order Number 2

20   which I believe were about 62 firms.  I have worked directly

21   and personally with about half of those firms and still work

22   with a number of those firms in cases.

23           So I think that I would submit that I would be a very

24   valuable asset to the steering committee with any group or

25   group of individuals that Your Honor were to appoint in this

1   case, and I would be privileged to serve in that capacity

2   again.

3           Thank you.

4           THE COURT:  Thank you, Mr. Graifman.

5           Next is Richard Hagstrom with Hellmuth & Johnson.

6           MR. CASHMAN:  Good afternoon, Your Honor.  My name is

7   Michael R. Cashman.  I am appearing here for Mr. Hagstrom who

8   had an irreconcilable conflict and also for the Hellmuth firm

9   for our application to the Plaintiffs' steering committee on

10  the consumer group.  Mr. Hagstrom has over 40 years of

11  experience in complex commercial matters, and I have 27 years

12  working side by side with Mr. Hagstrom.

13          I'm just going to highlight a couple points since we

14  have had a lot of time already this morning and some

15  redundancy.  I want to emphasize, first of all, that we are

16  committed to the best interest of the class as demonstrated by

17  the fact that we're willing to try and have tried a class

18  action consumer case on more than one occasion that would be

19  similar to this.

20          And, specifically, we tried for three months a

21  consumer class action antitrust case against Microsoft on

22  behalf of the consumers in Iowa and seven weeks of trial

23  against Microsoft in Minnesota, both of which resulted in the

24  highest settlements in any state against Microsoft.  So we

25  believe that gives us a unique perspective on these kinds of

1   cases because we are willing to try the case, and we have tried

2   the case, and we know what it takes to prepare the case and put

3   it in a position either for the best result at trial or a

4   settlement.

5           The second point, Your Honor, that I would like to

6   make is that we have unique experience because through

7   Mr. Hagstrom's career and my career we have represented both

8   Defendants and Plaintiffs in class action work.  So we know

9   what the perspective is from the defense side and how to

10  achieve the best result on behalf of the class when we are

11  working for the Plaintiffs.

12          Thirdly, Your Honor, the diversity issue.  We aren't

13  repeat players in this area.  And, also, we think we need some

14  Minnesota nice involved in this to get some geographic

15  diversity from the Upper Midwest as we have consumers all over

16  the country.  And our experience would be unique and contribute

17  to a successful result in this case on behalf of the class.

18          We respectfully request appointment to the

19  Plaintiffs' steering committee.

20          THE COURT:  Thank you, Mr. Cashman.

21          MR. CASHMAN:  Thank you, Your Honor.

22          THE COURT:  Next is Benjamin Bailey.

23          MR. BAILEY:  Thank you, Your Honor.  And I appreciate

24  the warning about lunch.  I have been sitting in the furthest

25  corner for the duration of the thing, and it's an interesting

1    perspective.

2         I want to talk about three aspects or issues in the

3    case and what I would do with them if you were to put me on the

4    steering committee.  My law firm is based in Charleston, West

5    Virginia, and offices from Boston to Birmingham on the East

6    Coast.

7         King & Spalding is a thousand-lawyer firm.  They were

8    named by U.S. News & World Report the law firm of the year in

9    mass tort and class actions, top ten litigation powerhouse 2016

10   in Law 360 and data privacy group of the year by that same

11   organization.  The team you are putting together has to deal

12   with that for reasons that we would love to be on that team.

13        I have one thought about that team.  My firm working

14   with all kinds of people in this room over the course of the

15   years we try consumer cases.  We have resolved limited funds,

16   class actions.  And we have worked extensively with state

17   regulators in a case like this where their interests overlap.

18   We would like to do that again.

19        I called Rich Dubois at the National Consumer Law

20   Center yesterday.  And one of the things I would do if I'm not

21   on the committee that I would urge whoever is to do is to call

22   them and tap their expertise and make sure they're involved in

23   making sure whatever happens here is consistent with the goals

24   of protecting consumers across the country and in all the

25   several states.

1          Second, my law firm, I'm not sure who repeat players

2   are.  My law firm does Plaintiffs' work and defense work.  I

3   have tried Plaintiffs' cases, civil defense cases, criminal

4   cases and pro bono cases with The Innocence Project in the last

5   five years.  That's what we do.  We take these applications

6   seriously.  I don't apply for them all the time, and we only do

7   that when we think we have something to add.

8          In my application, I should have mentioned more fully

9   three folks in my law firm, Judge Tom Bennett who was the

10  bankruptcy judge in Jefferson County, Alabama, bankruptcy which

11  was the biggest municipal bankruptcy in history until our

12  friend from Detroit usurped his title; Kevin Barrett who is a

13  bankruptcy lawyer in New York; and our in-house financial

14  analyst, Pratik Budhdev.  That's spelled B-u-d-h-d-e-v.  They

15  are all on our website.

16         In a case like this where Equifax has estimated in

17  its securities filings that the damages are between 56 and 110

18  million dollars, even at the max that's only 75 cents a person.

19  So I submit to the Court that the usual damages models here

20  aren't going to apply.

21         And one of the things we have done in a bunch of

22  cases before and with these folks -- and I'm sure other firms

23  have -- but is anticipate issues that involve the size of the

24  company and its ability to meet with -- meet and deal with the

25  damages ramifications or structuring a way to go forward that

1    works for everyone.  We're comfortable doing that.

2          And the last thing I would like to mention, Your

3    Honor, and it's just -- it's something that I have seen in all

4    these cases that we have settled recently or when we are

5    dealing with classes that have been confronted with stuff that

6    technology can do to you and you don't know it was done, my

7    dad's 92 and my mom's 91.  When I left Cambridge,

8    Massachusetts, shortly after you did, our -- I feel like my --

9    our perspective on privacy and our sensibilities are different.

10         And one of the issues we have confronted in settling

11   cases recently and I promise the Court we'll work on here if I

12   get to do it is how to explain and make sure that the interests

13   of folks my parents' age or folks in our cohort are taken care

14   of in terms of explaining what happened, trying to find out

15   what happened to them and dealing with the very different

16   understanding of damages they face from those that are

17   confronted by the 20-year-olds and the 30-year-olds and the

18   other folks who are maybe more comfortable with the technology

19   and privacy and what all of that can do to you but where the

20   impacts on them are going to last -- could last their

21   lifetimes.

22         That's all I have.  Thank you for your time.

23         THE COURT:  Thank you, Mr. Bailey.

24         MR. BAILEY:  I'll go back to my corner.  Thank you.

25         THE COURT:  I think next is Mr. Leonard Bennett.

1          MR. BENNETT:  Good afternoon, Judge.  May it please

2     the Court.  My name is Leonard Bennett, and I'm speaking on

3     behalf of myself and a actually Fair Credit Reporting Act

4     consumer advocate competitor, Jim Francis.

5          I came in this room here, and I know two categories

6     of lawyers.  I know the Equifax lawyers because no one in the

7     history of that company has litigated as much and has taken as

8     many depositions, had as many class action settlements and been

9     beaten up so badly often by what has got to be the best defense

10     team amongst the major big threes.

11          And then I know a number of the lawyers either

12     themselves or by their law firm who have brought us in to

13     handle their Fair Credit Reporting Act part of the case.  They

14     are fantastic firms, and you have heard from them.

15          I know that in Governor Barnes' group who also like

16     me is on the National Consumer Law Center that you have just

17     heard about, partner's counsel, has Morgan & Morgan who has

18     brought us in to handle their Fair Credit Reporting Act class

19     cases in Florida and Cohen Milstein that brought me in to

20     co-counsel so they could adequately represent the attorney

21     general of Mississippi in litigation against the credit

22     reporting agencies.

23          My firm in Virginia, it's based -- we have three

24     offices.  It is based in Newport News.  We litigate nationally.

25     This Court has approved me twice as class counsel in Fair

1    Credit Reporting Act class cases.  We for quite sometime in all

2    of our discovery with Equifax, whether it's documents,

3    witnesses, databases, have flown back and forth between

4    Richmond and Atlanta quite so much.

5          You have my résumé -- 2017 consumer lawyer of the

6    year, the Board of Public Justice, the NCLC matter.  We give a

7    giant chunk of our fee away as I would if you appoint me here

8    for legal services and public interest work.

9          You have the PLI background, the fact that I was

10   asked 15 years ago by an Equifax defense lawyer to co-teach for

11   the Georgia State Bar, the CLE, and watch in the audience while

12   lawyers that still work for Equifax internally took notes as I

13   taught -- flattering.  And it was a new building.  It's

14   probably an old one now.  But I was offered the chance to take

15   my depositions in the Atlanta building.

16         My background as a class advocate at getting almost

17   maybe three-quarters or more of the multimillion-dollar Fair

18   Credit Reporting Act class cases, at negotiating real credit

19   monitoring, respectfully not the credit monitoring that was

20   obtained in *Home Depot* but real credit monitoring such as I

21   negotiated in a case that now is being administered for three

22   million Equifax consumers with no release and the prime,

23   full-bodied product, credit monitoring product that people pay

24   a lot of money for, not the one they construct to sell in data

25   breach cases, I have that background.

1           Jim Francis as well like me has tried class consumer

2      reporting cases.  He beat me now.  His verdict against

3      TransUnion last year was 60 million for 9,000 people in the

4      Central -- or the Northern District of California.

5           And if you don't choose me and if you don't choose

6      Jim to be on the steering committee despite our success, that

7      I'm certain will be a wise move but would not be a wise move if

8      you did not insist that amongst these fantastic slates that are

9      arguing to Your Honor that they have tremendous data breach

10     experience that you ensure that you have someone who actually

11     has fair credit experience, significant.

12          Here, with all due respect, the data breach part of

13     this case is easy.  Equifax has admitted essentially -- it

14     won't say negligence, but it has admitted the conduct.  No one

15     in this room would think that's the fight.  And there's no

16     doubt unlike some of the cases that have had standing issues

17     that this data was stolen, that there will be injury, not --

18     with all respect to the Defendant, this Court will not find

19     there is no injury there in this case.

20          The challenge is where this Court goes for a remedy.

21     Because with all due respect, a *Home Depot* remedy will not

22     work.  A hundred and forty-three million people can't claim in

23     for cash.  And as an identity theft specialist in here, they

24     may not suffer the harm until long after the injury event has

25     occurred and so couldn't establish the harm that was required

1    to claim in *Home Depot*.

2            This Defendant has already offered credit monitoring.

3    And even in our cases where we have included that, our *Soutter*

4    *v. Equifax* case settled for 90,000 Virginia consumers a few

5    years back.  Class members would get credit monitoring for two

6    or three years or get $182 cash.  And the credit monitoring has

7    now become almost valueless because it's so easy to get.  It's

8    so free, and so many people have it.

9            So the Court will have to oversee a remedy that

10   solves the problem going forward like the injunctions that we

11   negotiated that I wrote with the credit reporting agencies

12   regarding how bankruptcy data is reported, that I was doing

13   lunch with an industry competitor as to how judgments are going

14   to come off credit reports in complete fashion now.

15           You are going to need someone who can work on a

16   remedy.  And it doesn't have to be me, and I'm not here because

17   I need this Court to provide a means to staff all my associate

18   work.  They're busy.  But this Court has to insist that whoever

19   you appoint, Your Honor, builds that in, fair credit or

20   consumer reporting experience.

21           We endorsed a slate, the Robbins Geller slate,

22   because they committed to that process.  I'm confident that the

23   other slates, Mr. Worley's slate that follows this argument, to

24   the extent the Court is unsure, he has been fantastic in

25   herding cats between hearings -- and I'm sure the Court has

1    your own impressions that are all favorable -- or what would

2    follow with Governor Barnes's group, also good with all-stars.

3           The Court cannot go wrong on data breach experience

4    and a good-quality litigation, but you have to make sure that

5    this unique component is built in and that you receive a

6    commitment from whoever you appoint that that's going to be

7    happening.  If it does not happen to be Len Bennett, it should

8    be as Ben just said the National Consumer Law Center.

9           Shedding false modesty, I literally wrote the book on

10   discovery of Equifax -- literally.  The National Consumer Law

11   Center's treatise on consumer reporting, the chapter on

12   discovery I wrote -- you can tell because the public school

13   grammar faults that you may see in there -- and a subsection on

14   Equifax from scratch.

15          So you can't go wrong with us.  You can't go wrong

16   with the National Consumer Law Center or Mr. Francis or others

17   who may have that experience if they are there.  But you will

18   go wrong, Your Honor, if you do not require commitments from

19   whoever is your lead or co-lead or whoever's slate you choose

20   that Fair Report Credit Reporting Act competence, particularly

21   as to remedy, be built into their leadership structure.

22          Thanks, Judge.

23          THE COURT:  Thank you, Mr. Bennett.

24          Mr. Worley?

25          MR. WORLEY:  Good afternoon, Your Honor.

1            THE COURT:  Good afternoon.

2            MR. WORLEY:  I'm here today speaking on behalf of a

3       group, so I'd like to take a moment to introduce the members of

4       the group to the Court.  We have Ben Barnow and Tim Blood who

5       are proposed co-lead counsel; David Bain, our proposed liaison

6       counsel; and our proposed executive committee, Gayle Blatt,

7       William Federman, Janine Pollack, Judge Kevin Sharp and Lesley

8       Weaver.

9            I introduce these lawyers to you because these are

10      the lawyers who are going to be running the case.  These are

11      the lawyers that you are going to be looking to to protect the

12      interests of class members.  It's not going to be associates or

13      not other partners.  It's going to be these lawyers who are in

14      front of you today, and we thought it would be important to be

15      here.

16           We have very consciously put together a data breach

17      law firm, and we're asking you to hire us today or shortly

18      after today to represent the class members here.  We have a

19      very good mix of experiences.  We have specific and

20      complementary skills.  To name just two examples, Mr. Blood has

21      extensive experience coordinating private litigation with the

22      Federal Trade Commission.  Ms. Weaver has experience

23      coordinating with state attorney generals in the *Volkswagon*

24      litigation.  Those are both important qualities that will be

25      extremely useful in this case.

1          We have a record of efficiency.  We have a history of

2     lean but appropriate staffing.  We realize that class members

3     are being hurt as we speak, so we are committed to exploring an

4     early resolution of this matter if it's possible.  We bring two

5     major qualities to this case, an outstanding record of data

6     breach experience as set out in our papers and a record of

7     successfully resolving data breach class actions.

8          Collectively, we have resolved eight major data

9     breach class actions for well over 200 million class members.

10    Those settlements have received great acceptance by district

11    courts, and there has been no post-involvement -- I'm sorry --

12    no post-settlement involvement by the Circuit Courts of Appeals

13    in those cases.  We have done that by creating creative

14    settlements that have excellent results, that are class-member

15    focused, that result in broad participation by class members in

16    the claims.

17         Equifax is a unique case.  It requires that kind of

18    creativity to protect class members going forward.  And, as

19    Ms. Wolfson said, that's particularly important now that the

20    CFPB has pulled back.

21         Our group has also done substantial work in this

22    matter.  We've put a lot of effort into factual and legal

23    research on the claims in this case.  Like others we too have

24    filed multi-state complaints, and we have had discussions with

25    lawyers around the country about how to find the most

1    appropriate class representatives, including direct contracting

2    class members.

3          We have put a lot of extensive planning into this

4    matter, including how to eventually if it's possible that a

5    settlement can be achieved to shape that settlement so that the

6    claims rate will benefit the broadest number of class members.

7    We would be honored to be chosen to lead the case, and we're

8    available to answer any questions that the Court might have.

9          THE COURT:  Thank you, Mr. Worley.  And however this

10   comes out, let me express my appreciation to you for taking the

11   lead before the first case management status conference and

12   coordinating things with the other Plaintiffs' attorneys and

13   working out the Case Management Order Number 2.  I appreciate

14   that.

15         MR. WORLEY:  You are very welcome, Your Honor.  I

16   thank you for asking me to do it.

17         THE COURT:  All right.  Next is the application of

18   Gerard Stranch for Branstetter, Stranch & Jennings.

19         MR. GASTEL:  Good afternoon, Your Honor.  Ben Gastel

20   from Branstetter standing in for Mr. Stranch who has had an

21   irreconcilable conflict today.

22         Branstetter is one of the leading firms based solely

23   in the South.  We are in Nashville, Tennessee, doing complex

24   cases like this throughout the country.  We have done

25   meaningful and important work in complex cases and mass tort

1    cases throughout the country, including in *Volkswagon* and

2    *Anthem* and *NECC*.  Through that work, we have become great

3    friends with many of the fine lawyers in this room.  And we

4    would welcome the opportunity to work with any of them again in

5    pursuit of successful resolution of this case on behalf of the

6    consumer victims.

7              Thank you, Your Honor.

8              THE COURT:  Thank you, Mr. Gastel.

9              All right.  Next is the Barnes/Canfield group.

10             MR. CANFIELD:  Your Honor, the Court obviously has

11   before it lots of accomplished lawyers who want to lead the

12   consumer track in this litigation.  Our group has worked with

13   most of them.  Many are personal friends.  A large percentage

14   reached out to us before this litigation about working with us

15   and our group about the case.  Obviously, there are too many to

16   include everyone who's competent and qualified to appear in the

17   leadership structure of this case.

18             We believe the Court has several options available to

19   it -- there may be others -- to make its selection.  One

20   approach would be for the Court to pick and choose among the

21   various groups and applications that have been made by

22   selecting the individual applicants that the Court believes can

23   do the best job.  As other courts have recognized, there are

24   some problems with that approach.  The Court doesn't know the

25   lawyers, résumés don't necessarily tell you who a person is,

1    and personal qualities that are particularly important in

2    managing a piece of litigation like this are not readily

3    apparent.

4              The other approach, what the Manual on Complex

5    Litigation refers to as private ordering, allows the lawyers to

6    work among themselves to decide among themselves by the people

7    who best know the bar in this area to assemble for the Court's

8    consideration the best team for this particular litigation.

9    And if the Court feels that group needs to be expanded for

10   whatever reason, then additional lawyers can be added.

11             We don't propose to tell the Court which -- and we're

12   not presuming to tell the Court which of those approaches is

13   most appropriate.  Although, we believe that particularly in

14   this case with so many lawyers the Court would be better served

15   by following the private ordering approach that's endorsed by

16   the manual.

17             We believe that our group is the best suited to lead

18   this track and that the Court should appoint our group in its

19   entirety.  We will, of course, work with whoever the Court

20   decides in whatever capacity the Court determines is

21   appropriate.  And if the Court decides to break up groups, the

22   members of our group will willingly participate in any role

23   that the Court feels is appropriate.  But, as I say, we believe

24   we have the best group.  And if the Court decides to go with

25   the private ordering approach, the Court does not believe our

Case 1:17-md-02800-TWT   Document 230   Filed 02/12/18   Page 91 of 139

91

1    group is the best group, we would suggest that the Court

2    appoint some other group.

3          There's a reason that we are so strongly committed

4    and believe that the Barnes/Canfield group as it is and in its

5    entirety is the best to handle this case.  We deliberately

6    assembled our group from people who have -- to make up a team.

7    That was our goal.  And our team members were people who have

8    worked together in these kinds of cases in the past and each of

9    whom brings the right talents, the right data breach experience

10   and the personal qualities to most effectively prosecute this

11   case against this Defendant in this district.

12         Let me outline five reasons why we believe our group

13   is best suited.  First, I don't think that it can be questioned

14   but our group collectively has by far the most data breach

15   experience in this matter.  If the Court has looked at the

16   exhibit to our filings, it lists 54 data breach cases in which

17   group members have participated in leadership appointments.  In

18   36 of those cases, we have been appointed as sole lead or as

19   co-lead.  In many of those cases, we have both members of the

20   steering committee and lead counsel in the same case who are

21   part of our group.

22         Our group also includes lead counsel in the three

23   most recent and most significant settlements in data breach

24   cases, the two settlements that Your Honor approved in *Home*

25   *Depot* and the recent settlement in the *Anthem* case which is by

1   far the most significant settlement in any data breach case in

2   history.  No other applicant or group comes close to our

3   experience.

4          Second, this group has significantly advanced the

5   litigation to this point.  Procedurally, we filed the first

6   cases in this district.  Mr. Siegel led the effort to -- and

7   filed the petition before the JPML to ask that this litigation

8   be transferred here.  He's the one that argued in front of the

9   JPML and convinced the JPML to send the case here.

10         Once the case --

11         THE COURT:  When I heard about that, my first

12   inclination was to go out and buy two shares of Equifax stock.

13   I still think that might have been a good idea.

14         MR. CANFIELD:  Those of us in Atlanta would have been

15   very disappointed if you would have done that, Judge.

16         Once the cases were transferred here, Mr. Siegel and

17   I have worked with defense lawyers at King & Spalding on all

18   sorts of pretrial issues.  And Mr. Siegel in particular played

19   a very significant role in assisting Mr. Worley in carrying out

20   his duties as designated by CMO Number 1 and served as perhaps

21   the principal contact with the King & Spalding lawyers on that

22   matter.

23         Substantively, our group filed a new complaint in

24   November, the Allen complaint.  It is the only case that has

25   brought together individual Plaintiffs from every state, all 50

1    states.  Mr. Pizzirusso in our group and Ms. Keller took the
2    lead in vetting thousands of Plaintiffs to be able to put that
3    complaint together led by Mr. Barnes and PSC members
4    Mr. Yanchunis and Mr. Friedman.  We have also retained the key
5    database experts in this field to help us, and they have been
6    working with us actively.  They're not just retained.  They
7    have been doing a lot of work.  And it's true we didn't put
8    their names in our application, but we didn't feel it was
9    appropriate at this point in the litigation to tell the world
10   who was working with us.
11           Third, as I mentioned and I want to emphasize, we are
12   not a randomly or opportunistically assembled group.  We are a
13   collection of highly experienced lawyers with complementary
14   talents, and we have shown that by putting together and
15   ensuring the Court what our committee structure will be in this
16   litigation if we are honored enough to be selected in the lead.
17   Those assignments reflect work that's already being done, and
18   it reflects very conscious decisions to take advantage of the
19   particular talents of the people who make up our group.
20           Ariana Tadler who is on our proposed PSC will lead
21   our discovery team.  She's one of the country's authorities and
22   experts on e-discovery and has led the discovery in two of the
23   largest data breach cases in history, including *Target* and
24   *Yahoo*.  This is not a matter that is on-the-job training for
25   her.

1          Eric Gibbs who is also on our proposed committee is

2     responsible for chairing the class certification committee.

3     Mr. Gibbs is one of the few lawyers in the country who has

4     successfully gotten a consumer litigation class certified in a

5     data breach case.

6          Mr. Pizzirusso who will chair our Plaintiffs'

7     discovery committee will continue the role that he played in

8     connection with the Allen complaint in vetting any additional

9     Plaintiffs and being responsible for the discovery that's

10    directed at that.

11         Mr. Yanchunis who has worked with some of the world's

12    leading authorities in data breach areas, cases in the past

13    will serve as our expert.

14         Committee chair, Mr. Friedman, the chair of our

15    injunctive relief committee, is the architect of the *Anthem*

16    data breach.  He was the co-lead counsel in that case which is

17    by far the most comprehensive set of injunctive and data breach

18    security measures that have been adopted as part of the data

19    breach settlement.

20         Governor Barnes, in addition to his duties as liaison

21    counsel, will be responsible for coordinating with all the

22    state regulators and other governmental entities who are

23    investigating Equifax.  And he has obviously got extensive

24    political contacts across the country.

25         And in addition to serving as co-lead counsel, I'll

1    serve as chair of the law and briefing committee personally
2    doing the work just as I did in *Home Depot*.  We believe this
3    structure will work and it's efficient.
4            Fourth, our group is the most diversified slate by
5    gender, by race, geography, background and age and, thus, is
6    the only leadership group that fully satisfies the Duke
7    guidelines.  We are the only group that has a woman as a
8    proposed co-lead.  Ms. Keller is qualified in her own right but
9    obviously has diversity as a younger woman in a co-lead role.
10           We have identified Rodney Strong who is a prominent
11   African-American lawyer in Atlanta to serve as the state
12   coordinating counsel working with the judges and the litigants
13   in the Fulton County Superior Court where there are competing
14   data breach cases against Equifax pending.
15           Our slate includes several lawyers from firms that
16   have MDL experience but are not the type of repeat players that
17   some people have complained about.  We're a mix of small firms
18   and national powerhouses, and we've made a place in our slate
19   for the next generation of younger lawyers who have got a lot
20   of talent and are on their way up.  In short, the Court doesn't
21   need to appoint anyone to our group to satisfy the Duke
22   standards.
23           And, lastly, fifth, our group has longstanding
24   relationships built on trust and mutual respect with the
25   defense lawyers in this case and the specific lawyers at King &

1    Spalding.  These relationships go back decades and have come

2    about by working together on dozens of cases.  Just in the last

3    year or so members of our group have achieved a 20 million

4    dollar verdict in a wrongful death trial and settled three

5    class actions, including two data breach cases with King &

6    Spalding lawyers, including the lawyers who are here in this

7    courtroom.

8            Those relationships matter.  They matter not because

9    we can go out to lunch together.  They matter for the Court

10   because through relationships, through the ability to -- and

11   the longstanding working relationships that have evolved we can

12   prevent the kinds of issues that otherwise would end up before

13   the Court.  If we've got a discovery dispute, it's not going to

14   be here because lawyers are mad at each other or can't get

15   along.  It'll be here because there's a legitimate dispute that

16   can't be resolved without the involvement of the Court.  So

17   it's going to save a lot -- the Court a lot of time.

18           Relationships also matter in settlement.  Mr. Siegel

19   in addition to serving as co-lead counsel will chair our

20   settlement committee.  Mr. Siegel served in that role in the

21   *Home Depot* case as Your Honor knows, and he developed a very

22   good relationship with King & Spalding that will allow us to

23   engage Equifax early on in resolution discussions to deliver

24   needed financial and injunctive relief to the victims of this

25   unprecedented breach.

1          In short, the Court can be confident that if our

2     group is appointed in its entirety the litigation will be

3     zealously and professionally pursued, handled in a collegial

4     and ethical matter and conducted efficiently and effectively

5     consistent with this Court's expectations and standards which

6     we know well.

7          Let me lastly address the *Anthem* issue that's come

8     up.  I wasn't involved in the *Anthem* case.  Mr. Barnes wasn't

9     involved in the *Anthem* case either.  There were a lot of other

10    lawyers in this courtroom, by our count about 20 lawyers, not

11    necessarily in this courtroom, but applicants who participated

12    in *Anthem* in one way or another, including people from all of

13    the competing groups.  Our group has two of the four-member

14    leadership team that was specifically appointed by Judge Koh,

15    Andy Friedman who is one of two co-lead counsels -- his co-lead

16    is not seeking to participate in this case -- and Eric Gibbs

17    who was on the PSC.

18         I have read Judge Koh's order, and I have talked with

19    Mr. Friedman and Mr. Gibbs about what happened.  Apparently,

20    Judge, there were, as I said, four law firms that were

21    appointed to handle that case.  In a very short period of time

22    relatively, they took over 200 depositions, reviewed over four

23    million documents and put together the best settlement both

24    money-wise and injunctive relief-wise that's ever been achieved

25    in a data breach case.

1          Judge Koh recognizes their work and the nature of the

2     settlement in her order.  What happened was that Judge Koh was

3     apparently surprised and disappointed that there were lots of

4     other lawyers other than those four that she had named who had

5     participated.  Mr. Friedman and his co-lead thought that they

6     had been approved to use other lawyers, and so they submitted a

7     fee application.  Whether that was appropriate or not hasn't

8     been addressed by Judge Koh.  What I can tell you is that the

9     surprise that Judge Koh expressed when the fee application in

10    that case came in is not going to occur in this case.

11          THE COURT:  You can be sure of that.

12          MR. CANFIELD:  And there's a lot of reasons why,

13    Judge.

14          If you recall in *Home Depot*, we had a bunch of

15    protocols that we developed.  Those protocols required that

16    time be submitted quarterly, that any work had to be done by

17    somebody who wasn't appointed to the PSC had to be approved by

18    lead counsel.  We didn't allow the use of contract lawyers

19    without prior approval, and we didn't use any.

20          And, apparently, those things weren't done by Judge

21    Koh.  So I don't think that -- as I say, you can be assured

22    that that's not going to happen in this case.

23          THE COURT:  Well, I read that transcript of the final

24    settlement approval hearing -- I think that's what it was --

25    yesterday afternoon at a point in time where my eyes were

1    literally about to explode.  But, Mr. Canfield, you've been in

2    front of me enough to know that I don't ever want to have

3    something like that happen in front of me.

4         MR. CANFIELD:  You have my personal assurance that if

5    we are appointed it never will, Judge.

6         The way we construed this Court's order regarding

7    filing fee applications we didn't understand that members of

8    our team would be able to file individual applications as well

9    as a group application.  We thought that the Court was limiting

10   us to 25 pages and 50 pages for the entire group.

11        THE COURT:  Well, there was some confusion about

12   that; and I'm the cause of it.

13        MR. CANFIELD:  Right.  And what I was -- with the

14   Court's permission, what we would like to do is to have my two

15   other proposed co-leads stand up and very briefly introduce

16   themselves so the Court's aware of who they are; and then

17   Mr. Barnes would like a moment to address that information and

18   material that was presented to the Court yesterday by whoever

19   it was.

20        Incidentally, we did a little bit of investigation;

21   and we've found out that that Federal Express package

22   apparently started in New Jersey even though it has a return

23   address in Minneapolis, and the address in Minneapolis is a CVS

24   inside a *Target* store.  So somebody went to a lot of effort to

25   conceal their identity.

1          But at this point, Your Honor, let me ask Ms. Keller

2     to come up, speak very briefly, and then Mr. Siegel and

3     Mr. Barnes.

4          THE COURT:  All right.

5          MS. KELLER:  Thank you, Your Honor, for this

6     opportunity to address the Court and my colleagues.  Hopefully,

7     it's obvious that given my age and the help of a box of Lady

8     Clairol I have a lot fewer gray hairs than a lot of folks in

9     this room today.  My team has recognized the importance of

10    including individuals on our team who can identify with the

11    class we'll hopefully represent.  Many of the class members are

12    starting their careers, their families, buying homes for the

13    first time; and so they may experience identity theft in the

14    future and the threat of it for the rest of their lives.  My

15    team recognizes the importance of a mix of experience and the

16    perspectives and the diversity on our team, and hopefully Your

17    Honor will recognize that in our proposed slate as well.

18         Thank you, Your Honor, for this brief opportunity.

19         THE COURT:  Thank you, Ms. Keller.

20         MR. SIEGEL:  Good afternoon, Your Honor.  Norman

21    Siegel, proposed co-lead with the Barnes/Canfield group.

22         THE COURT:  Good afternoon, Mr. Siegel.

23         MR. SIEGEL:  The last time I stood at this podium,

24    Your Honor, I was proud to deliver the argument for final

25    approval of the *Home Depot* consumer data breach settlement.

1    That was back in August of 2016.  Your Honor, that was
2    approximately one year after our appointment as lead counsel.

3            And I feel I need to at least briefly explain why
4    when we filed those early cases in this case, in Equifax, we
5    asked the JPML and I argued before the JPML to send the case to
6    Your Honor.  And there was significant opposition.  I think
7    there was 18 different venues that were sought out for the
8    destination of this case.  My apologies that I was successful
9    in getting the case before the Court.

10           But the reason I thought it was appropriate, not only
11   because the Defendant was here but because of the result
12   achieved in *Home Depot* and the time in which we achieved it.
13   At the time it was regarded as one of the best, if not the
14   best, data breach settlements achieved to date.  It was viewed
15   by many in our business as a model of how to settle these
16   cases.  And we were indeed very proud to get it over the finish
17   line efficiently.

18           So that's the reason we're here.  That's the reason
19   we're all here.  And I think we have heard a lot about trial
20   talents, and I put our trial skills against anybody.  But I
21   think the reality is at this point in the case we have a local
22   rule in this district which says we are going to be probably
23   stayed on discovery for several months.  This time needs to be
24   used, and it needs to be used to settle the case.

25           And Mr. Canfield mentioned that I was the point

1    person in *Home Depot* with Ms. Sumner and Mr. Haskins, and

2    Mr. Balser has now been added to the mix.  And I would say we

3    had a professional relationship.  We were able to disagree

4    without being disagreeable.  But I do think that relationship

5    was very helpful in getting that -- getting that settlement,

6    that model settlement through in an efficient manner.

7              And that's why we're here as a group, Your Honor.

8    We're here to say that we are prepared to litigate this case.

9    We have the team to do it.  But we're also prepared once Your

10   Honor says go to try to bring relief to this class.

11             Thank you for the time, Your Honor.

12             THE COURT:  Thank you, Mr. Siegel.

13             MR. BARNES:  Your Honor, I won't take long.  Only

14   thing I want to kind of support is this team idea of putting

15   together a team rather than doing it by prompter order rather

16   than picking and choosing.  You know, when you put one of these

17   teams together, particularly in a case this big, it's kind of

18   like getting married.  You stay married because you work so

19   close together.  And with all due respect to my brothers and

20   sisters here, there's some I don't quite want to marry.  And so

21   I'd like for us to make sure that we can pick a group that we

22   know can work together.

23             And you're not going to have surprises in this case.

24   I think Mr. Canfield has talked to you about the case.  We did

25   the -- in our office, we did the time that we submitted to you

1    every quarter in *Home Depot*.  And there's not going to be any

2    surprises.  Now, we went through that.  We kicked out as we

3    went along.  If there was anything that we thought needed to be

4    written down, we did; and there was no problem with that.

5            Now, the last thing I want to talk about is this

6    *Anthem* business.  Now, I'm used to getting anonymous packages

7    in mailboxes overnight.  In fact, I've seen it several times

8    about me the night generally before the election accusing me of

9    some unnatural act that I have committed in some way or

10   another.  And I'm not saying that you should; but, you know, I

11   think you could look in this room and probably start a little

12   about who did what if you want to get a little rebuttal.

13           And there is nothing here.  If you're concerned about

14   it, we want to brief you fully on it.  But this business of

15   what I call attack without signing your name and without

16   putting up and being able to rebut things is a little unseemly

17   to me.  And I don't -- I don't appreciate it.  And I'm sure, of

18   course, I know the Court has to do it and they did exactly the

19   right thing in putting it on the record and everything else.

20   But these anonymous attacks I just don't think are appropriate

21   in this kind of case.  There's a lot -- there are good and

22   competent lawyers all through this.

23           And the last thing I'd say to you is you need

24   somebody that you're comfortable with in leading this case that

25   you can reach out and touch.  And with Mr. Canfield or me, you

1    can generally reach out in this courthouse and find one of us

2    if something has gone awry.  We think we have assembled the

3    right group, and we'd ask for your favorable consideration.

4              Thank you, Your Honor.

5              THE COURT:  Thank you, Governor Barnes, Mr. Canfield.

6              Mr. Balser, did they ever give you the stuff I got?

7    Are you interested in looking at it?

8              MR. BALSER:  I have not seen it yet, Your Honor; but

9    I will confer with Governor Barnes and work through that.

10             THE COURT:  Okay.

11             All right.  Next is Scott Cole.

12             MR. COLE:  Good afternoon, Your Honor.  May it please

13   the Court.  I'm Scott Cole from Scott Cole & Associates, and

14   I'm seeking appointment to the Plaintiffs' steering committee.

15             It's not meant to curry favor with the Court to say

16   that I recognize Your Honor has a difficult task ahead of him.

17   Frankly, in reading all the applications, my eyes sort of

18   glazed over as I think you have alluded to earlier.  There are

19   a lot of qualified people in this courtroom right now.  But

20   among the best of the applications, I'm seeing sometimes very

21   little to distinguish them.  Some attorneys -- I won't talk

22   about people in this courtroom -- but people out there in the

23   rest of the legal profession oftentimes do things like try to

24   game the system, put advertising dollars toward publications

25   that will appoint them the best lawyer or a super lawyer or

1    things to that effect.

2            Others engage in particular areas of law like

3    national class actions that have a large footprint that will

4    affect a lot of people, millions of them sometimes, and as a

5    result achieve very large, huge settlements or judgments.  But

6    then they will turn around, they will tell you that that

7    footprint, that large settlement or judgment equates to them

8    putting in the best quality of work.  And I'm not saying those

9    are necessarily things that go hand in hand all the time.

10            Have I cited things like that in my application?

11            Yes, I have.  My application is full of successes.

12    Today I'm not asking that you ignore those successes, either

13    mine or others.  I'm asking you rather that you look at

14    something additionally, and that is initiative.

15            On December 8th, this Court in its Case Management

16    Order Number 1 asked Mr. Worley and those willing to work with

17    him to prepare certain documents, the preliminary report, the

18    Case Management Order Number 2.  I'm not sure if Mr. Worley --

19    or the Court knows this already, but Mr. Worley shortly after

20    that reached out to all the hundreds of lawyers that have filed

21    cases in this context and asked for participation, asked for

22    our help to come forward and assist him in assembling these

23    documents.  He asked anyone that was going to seek a leadership

24    role in this case to help him prepare the document to determine

25    the Plaintiffs' collective position with regard to case

1    management timetables, discovery matters, preservation of ESI,

2    and present that information either as a team or through him to

3    Equifax's counsel.

4            We worked for weeks on these projects through

5    countless e-mails, various large and smaller teleconferences

6    and other meetings without any promise of a leadership

7    appointment.  I'm not saying that stepping up at that time is a

8    prerequisite for standing up here today and arguing for

9    appointment as lead counsel, liaison counsel, Plaintiffs'

10   steering committee; but what I am saying is that there were

11   people that were given the chance to step up at one point in

12   time, and a lot of them elected not to be involved.  In my

13   opinion, that's not demonstrative of leadership.

14           A lot of individuals will tell you things like they

15   worked at big firms and that should mean something.  We also

16   might ask have they really distinguished themselves or have

17   they piggy-backed the reputations of the firms they have worked

18   for.  I think in any context you get a mixture of both, but

19   it's something to consider.

20           A lot of folks will say that they've served under a

21   steering committee before in various contexts.  I have done

22   many of those myself.  But you have to go a bit further than

23   that and investigate what did they really do on those steering

24   committees.

25           And then there are others, a few self-made, creative,

1    aggressive litigators like myself, people that have been

2    working real jobs since they were little kids -- I think I was

3    nine or ten when I first got mine, and it wasn't a babysitting

4    gig -- people that have stepped up in this courtroom and will

5    continue to step up and didn't just come here and submit a

6    résumé and an application for appointment to the committee but

7    have done work ever since this case began as we have.

8            There are lawyers here who have led in one shape or

9    form almost every one of the hundreds of class actions that

10   they have litigated.  I have done hundreds of class actions in

11   a variety of industries and have worked on a variety of

12   committees, and in one shape or form I have been in a

13   leadership role in the vast majority of them.  Those are the

14   people in my opinion, Your Honor, that should be leading this

15   case.  And there are very few of them.

16           I am passionate about the law, and I am passionate

17   about privacy rights, and I have litigated privacy rights in a

18   variety of contexts for a quarter century.  I'd be honored to

19   show my initiative to this Court if I were selected to be part

20   of this steering committee.

21           Thank you, Your Honor.

22           THE COURT:  Thank you, Mr. Cole.

23           Mr. Guglielmo?

24           MR. GUGLIELMO:  Yes, Your Honor.  Good afternoon.  My

25   name is Joseph Guglielmo.  I am with the law firm of Scott &

1    Scott.  I am speaking on behalf of the attorneys and the

2    clients comprising the CUNA/ICBA group who is seeking

3    appointment as lead counsel over the financial institution

4    track.

5            Your Honor, we have proposed as co-lead counsel

6    myself, Mr. Gary Lynch of Carlson Lynch; co-liaison counsel

7    MaryBeth Gibson of the Finley Law Firm and Mr. Gillen of

8    Withers, Lake & Gillen.  We have also proposed a steering

9    committee consisting of Arthur Murray of the Murray Law Firm

10   and Stacy Slaughter of Robins Kaplan as co-chairs; along with

11   Charles Van Horn of Berman, Fink & Van Horn; Hank Bates of

12   Carney Bates; Bryan Bleichner of Chestnut Cambronne; Karen

13   Riebel of Lockridge Grindal Nauen; Karen Halbert of the Roberts

14   Law Firm; and Brian Zimmerman -- I'm sorry -- Brian Gudmundson

15   of Zimmerman Reed.

16           Your Honor, the information at issue here, the

17   personal and payment card data that was compromised as a result

18   of the Equifax data breach, is the backbone of how financial

19   institutions like our clients determine whether to issue a

20   loan, a credit card and assess the creditworthiness of their

21   customers.  And we believe in looking, Your Honor, at those

22   issues and assessing the four criteria that you have set forth

23   in Case Management Order Number 1 in conjunction with Rule

24   23(g), along with the Manual on Complex Litigation, that our

25   group, the CUNA/ICBA group has the experience to address these

1    issues and understands the problems facing financial

2    institutions.

3           First and foremost, Your Honor, with respect to

4    experience, we believe we have unmatched experience in data

5    breach litigation on behalf of financial institutions.  We have

6    led and litigated every major successful financial institution

7    data breach case.  Myself, Mr. Lynch, along with Mr. Canfield

8    as you know, are co-lead counsel in the *Home Depot* case.  My

9    colleagues in our group are also leading actions, Your Honor,

10   against Arby's before Judge Totenberg here in this district.

11   We are also lead counsel, Your Honor, in the *Target* case, the

12   *Wendy's* data breach case, the *Chipotle* data breach case and in

13   *Eddie Bauer*, Your Honor.

14          With respect to those attorneys, I think no one else

15   can basically compare the résumés.  Those are obviously, Your

16   Honor, submitted with our application.

17          We also have a diverse group of attorneys, Your

18   Honor.  We have a strong base of Georgia lawyers along with

19   attorneys with a national presence.  We have ongoing and direct

20   relationships with clients, Your Honor, who have real

21   significant damages.  And I'm going to have Mr. Lynch speak

22   briefly at the end about the reasons and importance that the

23   clients have and the relationships that we have with these

24   clients and how it's going to be necessary to have these

25   clients involved every step of the way.

1          Your Honor, we represent the Credit Union National

2     Association, the Independent Community Bankers Association,

3     along with other state and regional credit union leagues, as

4     well as 60 financial institution Plaintiffs that filed

5     litigation in this court.  All of our clients are directly

6     related to us.  They have actually retained our firms within

7     our group.

8          And the reason why they have done that, Your Honor,

9     is because they have looked at the knowledge and experience and

10    they have looked at our track record.  They understand that we

11    understand how they work.  We understand the inner workings of

12    financial institutions.  We also understand the inner workings

13    of how data breach litigation works, Your Honor.

14         We have been in all of these cases.  We have taken

15    the key depositions.  We have argued motions not only before

16    Your Honor in -- with respect to the card brand settlements

17    that occurred a few years ago; we have also argued class

18    certification motions in the *Target* case, motions to dismiss in

19    all of these other data breach cases.  We understand these

20    issues, Your Honor.  We are, I believe, the lawyers that are

21    appropriate to run this case.

22         Your Honor, just touching briefly on some of the

23    other items, working collaboratively with others, I think our

24    group just so you know is a result of consensus and compromise.

25    This is not a preordained group.  We did not come together just

1  prior filing cases.  There are four distinct groups that filed

2  individual actions; and through the private ordering that

3  Mr. Canfield and others have discussed we came to determine who

4  would be best to run this litigation, who would be best to lead

5  this case.

6          A number of the lawyers that are in our group agreed

7  not to take lead positions, also agreed not to take any

8  position.  And let me be clear.  We have no fee deals or fee

9  agreements with any of the lawyers we are working with.  We are

10  all here to work to get what is best for the class and what is

11  best for our clients.

12          Your Honor, in working collaboratively, I can't say

13  enough.  We worked very collaboratively with Mr. Worley, with

14  Mr. Canfield, with Mr. Barnes, the folks that we worked with in

15  *Home Depot*.  I regard them as my friends and my colleagues.

16          We have also worked with a number of the other

17  attorneys that are making applications here.  Our firms worked

18  with a number of the class action firms that are here before

19  Your Honor.

20          Notably, Your Honor, we have also worked

21  collaboratively well with King & Spalding not only in the

22  context of this *Home Depot* case, but I believe we're one of the

23  only groups and only lawyers that have successfully litigated

24  and negotiated a settlement with King & Spalding in the *K-Mart*

25  data breach case.  There Ms. Sumner was lead counsel for

1    K-Mart, and we were able to successfully achieve a significant

2    result in the Northern District of Illinois on behalf of the

3    financial institutions.

4         Your Honor, I think just briefly touching on some

5    other issues, we have set forth a fee proposal similar to the

6    fee proposal that we had in *Home Depot* on normalizing rates.

7    We also submitted in connection with our application the

8    proposed time submission structure that Mr. Canfield already

9    noted to you, Your Honor.  We did not -- we want to be as

10   transparent as possible to not only the Court but to our

11   clients and the class.  So we have no issues with any sorts of

12   arrangements to make sure that the Court is fully apprised as

13   to who's working on the case and what they're doing.

14        Your Honor, I just -- in closing just ask you that

15   you appoint our group as lead counsel.  I just want to have

16   Mr. Lynch briefly discuss some of the issues that we've been

17   dealing with in *Home Depot* and other cases and how it really is

18   significant in dealing with these clients.

19        Thank you.

20        THE COURT:  Thank you, Mr. Guglielmo.

21        MR. LYNCH:  Good afternoon, Your Honor.

22        THE COURT:  Good afternoon, Mr. Lynch.

23        MR. LYNCH:  Your Honor, this is the first time I have

24   had an opportunity to speak to Your Honor.  Although I have

25   appeared in front of you many times, in the other occasions I

1   have been in front of you I have had the luxury of relying on
2   Mr. Canfield's eloquence.  I hope I can match what he has done
3   for us in the *Home Depot* case as I speak today.
4           I only want to speak to one point, and that is the
5   knowledge that we have gained and our group has gained over the
6   last several years in what we have done with regard to several
7   data breach cases, not just *Home Depot*, with regard to how our
8   clients function.  We have learned this industry.  We
9   understand the financial institutions and what they face in
10  dealing with breaches like this, payment card breaches as well.
11  We have sat with them and been an interface between them and
12  our experts.  We sat with their accounting departments and in
13  detail discussed with them their different types of damages
14  that they have as a result of these types of breaches.
15          We have discussed with them the things that they are
16  confronted with, the problems that they have to deal with.  And
17  we have been able to do that in the context both of determining
18  our damages for purposes of the mediation in *Home Depot*, but we
19  have also done it in the context of discovery.  I mean, our
20  clients trust us.  They understand what we are trying to do in
21  these cases.  And, more importantly, we have now learned what
22  their pressure points are.  We have learned what their
23  weaknesses are in terms of having to deal with the issues that
24  arise in the wake of these breaches and what it takes to get
25  through the discovery process.

1          In short, Your Honor, we think that that knowledge is

2     something that needs to be highlighted because we think we have

3     unparalleled experience in that regard.

4          Thank you, Your Honor.

5          THE COURT:  Thank you, Mr. Lynch.

6          Next is Jeremiah Frei-Pearson.

7          MR. FREI-PEARSON:  Good afternoon, Your Honor.

8          THE COURT:  Good afternoon.

9          MR. FREI-PEARSON:  I'm mindful of Your Honor's

10    guidance and the lateness of the hour, so I will be very brief.

11         Your Honor has many great options to choose from, a

12    lot of good lawyers that we have worked with.  But I think the

13    class's best interests are served by including me on the

14    leadership team.  My firm, Finkelstein, Blankenship,

15    Frei-Pearson & Garber, is a small firm; but we punch above our

16    weight.  We have had a lot of successes in data breach cases,

17    both cases where we are sole lead counsel and cases where we

18    have worked collegially with folks like Mr. Robinson,

19    Ms. Wolfson, Mr. Barnow, Mr. Blood, and other great lawyers on

20    this team.

21         I won't repeat what's in my application, but I will

22    just note yesterday I was in federal court in front of Judge

23    Schofield in New York where she preliminarily approved a

24    settlement where we made law in finding a New York statute

25    privately enforceable in the data breach context.  And Judge

1    Schofield pointed out that that was an excellent result.  And

2    if given the opportunity to be part of the team here, I think I

3    can also contribute to an excellent result in this case.

4         I promise if Your Honor gives me a role I will work

5    extraordinarily hard, I will work very efficiently, and I will

6    work collegially with all of my colleagues to achieve the best

7    possible result for the class.

8         I thank Your Honor very much for your attention.

9         THE COURT:  Thank you very much, Mr. Frei-Pearson.

10        All right.  Next is the application of the Atlanta

11   group.

12        MR. McGLAMRY:  Good afternoon, Your Honor.  Mike

13   McGlamry from Pope McGlamry.

14        THE COURT:  Good afternoon, Mr. McGlamry.

15        MR. McGLAMRY:  I just briefly want my group just to

16   stand up, the Atlanta group.  I'm not going to introduce

17   everybody at this point.  We obviously want to let the Court

18   know that we're all here in front of you.

19        And as I was sitting here today trying to listen to

20   everybody talk, there were various issues that came up that to

21   me interestingly enough dovetailed with what I had prepared to

22   say about why our group should be the group that you would

23   appoint on the financial side.  And I start with the prospect

24   that this is a unique case.  It's not every other data breach

25   case.  If you want every other data breach case, there's other

1    ways to go.

2         But this is Equifax which is a very prominent and

3    substantial company here in Atlanta.  They are defended by King

4    & Spalding, probably -- not to blow smoke, but probably the

5    most renowned, large corporate firm in Atlanta.  We are in the

6    Northern District of Georgia, and I think ultimately we will be

7    dealing with Georgia law.

8         And for that reason -- and we, I think, appropriately

9    named ourselves the Atlanta group -- that's why we ought to be

10   appointed.  And I will go through the steps or the reasons why

11   I think we should be there; but I believe it dovetails a lot

12   with what we have already heard about from other people, issues

13   that seem to be significant.

14        And let me first say that I think we approached this

15   a little bit different.  Ranse Partin and I who are applying as

16   co-lead for our group sat down and said how do we put together

17   a group for this case because that's your decision, Your Honor,

18   here about this leadership.  It's what is the best group of

19   lawyers for this case.  It's not for all other data breach

20   cases.  It's not for any other situation other than this case.

21        One of the reasons why I think it should be us and

22   what I have heard in terms of other discussion here today is

23   leadership.  I think we have that in myself and Ranse.  We are

24   from the Northern District of Georgia.  We are from prominent

25   firms here in Atlanta, and we have substantial experience with

1    King & Spalding.  I have litigated against King & Spalding for

2    30 years.  Stewart and I have litigated back when Stewart had a

3    full head of hair.  That's as long as we have been going at

4    this.  We have a very good relationship with them, and we

5    worked with them on all sorts of litigation.

6            In fact, I have been personally lead counsel in a

7    class action in the Northern District of Georgia against

8    Equifax.  We have that that we bring to the table.  We

9    recognize obviously that this is a data breach case.  And we

10   have looked and we have acquired and we have put together

11   people that have been involved in data breach cases, including

12   Mr. Partin, as well as Bob Kaplan from New York, Chris Hellums

13   and Doug Dellaccio, some of those individuals you have had

14   before you in the past.

15           Someone mentioned earlier that when you look at this

16   issue you should try and see if the Federal Credit Reporting

17   Act is adequately represented by either persons or theory or

18   involvement.  We have several lawyers in our group that that's

19   what they do is just FCRA.

20           You want to ask about do we have experience with the

21   financial institutions.  One of the things we went out and did

22   was we hired a local firm here, Taylor English and LeeAnn

23   Jones; and what they do is represent financial companies and

24   banks.  They've worked with those entities to do their data

25   situations and how do you react to issues with data situations.

1    We wanted that defense perspective as much as just having a

2    group of Plaintiff lawyers that have all done sort of the same

3    thing.

4            We wanted to have experience with Equifax.  I think

5    you have heard some of that today.  And in addition to my

6    involvement against them, we also have in our group Craig

7    Bertschi with McRae & Bertschi here in town.  Craig has

8    previously represented Equifax.  We cleared that with King &

9    Spalding.  He left doing that several years ago.  But I know

10   because personally when we sued Equifax I worked with Craig in

11   the discovery, in the electronic discovery.  And I think it

12   will be significant to have that piece in place when we sit

13   down in our conferences, when we put together ESI, when we look

14   at discovery, when we address the issue of proportionality that

15   we have somebody that has that kind of background.

16           I also think you've heard about people that have

17   already been involved in this in terms of already working with

18   this.  We identified in our papers that we also have worked

19   with experts.  We are doing that now.  We are working obviously

20   -- we have several credit union clients, and we are also

21   working with the National Federal Credit Union Association.  So

22   we have done that work.

23           We also were heavily involved I think Mr. Worley

24   would acknowledge in putting together and helping with CMO-2.

25   So we are prepared.  We are qualified.  We have I think all the

```
1    pieces that need to be put together for this case in this court
2    against this Defendant as they are defended.
3              And we don't have -- we don't have any other
4    obligation in another case that affects what happens here.
5    We're not bound by what might happen in that case or that case
6    or that case that we might have out there that would affect
7    this.  We don't have a client that there could be such an issue
8    with of how we're being represented in this case versus another
9    case.  We have put together this group for this case.  We
10   believe this is a unique case.  It's a Georgia case.  And we
11   have asked for Your Honor to put us together in that group.
12             In addition to sort of all those positions, we also
13   proposed Sutton Connelly with Cook & Connelly as our liaison.
14   He is also a Georgia lawyer.  We have young lawyers.  We have
15   older lawyers.  I was -- earlier when Mr., I think it was
16   Robinson, got up and talked about younger people I felt a
17   little bit offended.  But then I realized that I could get up
18   here and say, Your Honor, that when I was a very young, early
19   associate I worked for Mr. Carr.  So I am a part of that
20   younger -- I'm a part of that younger group.  We are diverse.
21   We have everything we would need to make this case in this
22   court work as best and as efficiently as it can.
23             I know Ranse also wants to make a few comments.  But
24   thank you, Your Honor.
25             THE COURT:  Thank you, Mr. McGlamry.
```

1          MR. PARTIN:  Good afternoon, Judge.  It's an honor to

2     be before you.  I have known you for 20 years, and I will say

3     that nobody on our team expects any preferential treatment or

4     has any presumption that that will give us an edge in this

5     application process.  What we know is that the Court wants to

6     pick the most competent team that can most efficiently and

7     effectively prosecute this case for the class of financial

8     institutions as we commit to do under Rule 23.

9          And we think we have assembled that team.  We think

10    it's important for the lead counsel in an Atlanta-based

11    litigation with an Atlanta Defendant and Atlanta defense

12    counsel, we think it's important for the class to have lead

13    counsel from Atlanta.  And that's why we put together this

14    team.

15         It's not just about the fact that we have an Atlanta

16    address.  It's the fact that we are here.  We know the Court.

17    We know the defense lawyers.  If King & Spalding is being

18    unreasonable, I can call up Mr. Haskins and meet him for a beer

19    and tell him to knock it out.  And, vice versa, if he thinks we

20    are being unreasonable, he can call up me and we can meet down

21    the street for a cup of coffee or a beer and he can tell me to

22    knock it out.  Those relationships go back 20 years.

23         But those factors, being in Atlanta, also go to

24    prosecuting the case efficiently and effectively.  And I know

25    the Court's concerned about that, and that's of keen interest

1    to us.

2              As you know, Judge, I was co-liaison counsel for the

3    financial institution side in *Home Depot*.  So I was charged

4    with compiling the billing statements which we did quarterly,

5    submitting those to you.  We reviewed those.  We compiled the

6    total hours worked on a monthly basis.  We computed the hourly

7    rate.  We capped the hourly rates, and we normalized the rates

8    so that you wouldn't have inflation based on geographic

9    differences.  We would do the same here.

10             Somebody had proposed that we cap our fee, and I was

11   going to suggest that if King & Spalding will cap their fee we

12   may cap ours.  And I will have to give credit to Governor

13   Barnes for coming up with that over lunch.  But in any event,

14   Judge, we don't think a fee cap predetermined on the front end

15   is appropriate.  This Court has the discretion under the rules

16   in place to award a fee that's appropriate when and if that

17   becomes the issue.

18             But, Judge, I will just close by saying that we put

19   together this team intentionally.  We think this is a team that

20   combines both geographic proximity to the court and national

21   expertise that we will need to prosecute this case effectively

22   on behalf of the class.  And for that we ask you to appoint our

23   team, and we thank you for the chance to be considered.

24             THE COURT:  Thank you, Mr. Partin.

25             We've got six to go, and we're going to make it.  But

122

1    let's take a 15-minute break, and we will continue.

2              Court's in recess for 15 minutes.

3              (A short recess was taken.)

4              THE COURT:  All right.  Next is the application of

5    Craig Hemphill of CKH Legal.

6              Anybody here for Craig Hemphill of CKH Legal?

7              (No response.)

8              Next is the application of Rosemary Rivas and Judith

9    Germano.

10             MS. RIVAS:  Good afternoon, Your Honor.  My name is

11   Rosemary Rivas.

12             THE COURT:  Good afternoon, Ms. Rivas.

13             MS. RIVAS:  I am with the law firm Levi & Korsinsky.

14   I head the firm's consumer litigation group.  My co-counsel,

15   Judith Germano, will have some brief remarks as well.

16             Together Ms. Germano and I represent a strong

17   leadership team combining 40 years of experience in the areas

18   of consumer class action litigation, trial work and data

19   privacy and cyber security.  For myself, Your Honor, I have

20   been litigating consumer class cases for approximately 18

21   years.  I started working on data breach cases in 2007.  I was

22   appointed by Judge Breyer to the *Volkswagon* Plaintiffs'

23   steering committee.  My passion is representing consumers.  I

24   do my job well as reflected in my application papers.

25             If Ms. Germano and I are appointed as either co-lead

1    counsel or to the Plaintiffs' steering committee, we will

2    devote all the resources that are necessary, personnel and

3    financial.  We would hit the ground running based on our

4    experience.  We know the top experts in the industry.  We know

5    what discovery to pursue to prove the claims and the

6    appropriateness of class certification.  Whatever -- or whoever

7    the Court appoints as members of the PSC we would work very

8    well with them, and based on their skills we would create

9    committees and have those people head those committees with our

10   supervision.  And we would also implement protocols to ensure

11   that the case is efficiently managed and, of course, submit any

12   time reports that Your Honor requires.

13            I will now turn it over to my co-counsel.

14            MS. GERMANO:  Good afternoon, Your Honor.

15            I come to this case with a different perspective than

16   most, if not all, of the other attorneys here today.  My

17   passion and practice focuses on cyber security governance.  I

18   have been on the front lines working with companies and

19   individuals in preventing and responding to data breaches.  I

20   have collaborated with the government, including from the FTC

21   and the SEC in discussing appropriate ways to regulate cyber

22   security and address best practices to prevent the type of

23   catastrophic events as happened in the Equifax breach.  I have

24   also worked to educate consumers in preventing and protecting

25   themselves against identity theft and have prosecuted identity

1    theft cases since 2002.

2            I have been a litigator for 20 years and was a

3    federal prosecutor for 11 of those years where I was chief of

4    economic crimes at the U.S. Attorney's Office in New Jersey.

5    Together with Ms. Rivas, we understand the importance of a

6    streamlined and effective approach to tenaciously represent our

7    clients; and we would work collaboratively in addressing the

8    different skill-sets of our team and to maximize the efficiency

9    of bringing this case.  I have managed and led teams on very

10   complex investigations and prosecutions and worked with a

11   number of different types of attorneys in different backgrounds

12   for an effective result.

13           This case here, Your Honor, is an epic case where not

14   only millions of people have been harmed but it also is a

15   harbinger of how these cases are handled going forward as we

16   continue to see more and more data breaches.  And the

17   resolution that is made to remedy the harm that the Plaintiffs

18   suffered is critically important and requires a deep

19   investigation and approach in prosecuting the case to the

20   extent necessary and also a thoughtful and multifaceted effort

21   to achieve a very real and effective resolution.

22           Ms. Rivas and I together present a powerful

23   leadership team where we have a combined expertise in complex

24   civil Plaintiff class action and cyber security governance.  We

25   appreciate Your Honor considering our application.

1              THE COURT:  Thank you, Ms. Germano.

2              MS. GERMANO:  Thank you.

3              THE COURT:  Next is Thomas Demetrio, Kenneth Lumb and

4     William Gibbs.  Anybody here for that group?

5              (No response.)

6              Next is the application for Robert Schubert.

7              MR. JONCKHEER:  Thank you, Your Honor.  Willem

8     Jonckheer appearing for my partner, Robert Schubert, who could

9     not attend the hearing due to irreconcilable conflict.  I am

10    here to speak on his behalf and on behalf of my firm, Schubert,

11    Jonckheer & Kolbe.  We are a seven-person firm in San

12    Francisco.  We have been practicing complex litigation for over

13    35 years, most of those by Mr. Schubert and about 20 of those

14    with me in addition.

15             We represent the Plaintiff Goldweber.  We filed a

16    case in the Northern District of California.  We're applying

17    for a position on the steering committee for the consumer

18    track.

19             We submitted a detailed application.  I'd like to

20    just highlight three points that were made in there.  The first

21    is our role in the *Home Depot* data breach.  As Your Honor may

22    recall, there was a derivative litigation accompanying the

23    consumer and financial cases filed in this court; and our firm,

24    Schubert, Jonckheer & Kolbe, was appointed co-lead counsel for

25    the shareholders in that case.  And, of course, the theory in

1    that case was that the officers and directors of *Home Depot*

2    failed to appreciate the risks of imminent cyber attacks and

3    did not take steps necessary to protect the data of their

4    customers.  And the result was obvious what happened, and the

5    claim was that they damaged the company by permitting that to

6    occur.

7         Now, in that case, we were able to achieve a

8    settlement on behalf of the company.  But it's important

9    because the settlement obtained corporate governance

10   improvements at both the board and the management level, but

11   those served to benefit not just the company for preventing

12   future exposure but also consumers because the goal of the

13   improvements was to make sure something like this could not

14   happen again.

15        So in that respect, I think in terms of our

16   membership of the steering committee we can bring valuable

17   expertise and perspective to that part of the case because Your

18   Honor is aware data breach litigation, of course, can produce

19   substantial monetary results for the class.  But an important

20   component is remedial -- remedial steps that the corporation

21   needs to take in order to make sure that the same class members

22   aren't harmed again.

23        So in the *Home Depot* case, we retained our own cyber

24   security experts to review the current state of affairs and to

25   come up with civil solutions to the existing problems that were

1   still ongoing.  We met face to face with Home Depot's senior

2   management, the chief information security officer, and his

3   associates in order to get an understanding of the lay of the

4   land so that we could come up with a suitable framework and

5   have the company adopt certain remedial measures to protect it

6   and the consumers from a recurrence.

7          So we think that in addition to the monetary damages,

8   of course, in this regard we can make a substantial

9   contribution as a member of the steering committee to the

10  overall relief that -- to be obtained for the class.  And Your

11  Honor approved that settlement last October in this court.

12         Secondly, there's been prior reference in this

13  hearing to the *Anthem* litigation.  And, in particular, a prior

14  applicant referred to the scope and the size of the discovery

15  in that case.  And my firm participated in that process, quite

16  actively, including handling the documents, reviewing the

17  documents, preparing for depositions.  So in addition to the

18  kind of the top-level experience we have resolving

19  breach-related claims, we also have a lot of experience, hands

20  on, nuts and bolts, with the actual documents.  And I think as

21  we all know you need to have a handle of the key discovery and

22  to be able to prepare your case if you are going to get

23  anywhere in the case.  So we have -- having spent time doing

24  that, we think that's additional expertise we can bring to bear

25  here.

1           And my third -- my third point would be just to

2    highlight some of our experience as complex litigators.  And,

3    in particular, I would direct Your Honor's attention to my

4    description of the *Google* litigation in our application.

5    *Google* was a case we filed in 2010 on behalf of the class of

6    advertisers.  The claim was that advertisers placed their ads

7    with Google, that Google populated those ads on low-quality

8    websites and that advertisers would be required to pay for

9    clicks.  And we said -- our allegation was that that was

10   unlawful, that the placement was unlawful and the advertisers

11   were damaged.

12           I raise this because it was a nine-year litigation

13   that only just concluded.  Now, we're not -- that's not a goal

14   that we would try to have in this litigation obviously, Your

15   Honor.  But the point is we took the case through very

16   extensive discovery, a million pages of documents.  Highly

17   sophisticated expert reports were generated.  And it was a very

18   complex, technical case; and we took it through discovery.

19           We initially were unsuccessful at class cert, but we

20   petitioned the Ninth Circuit for review.  We won reversal at

21   the Ninth Circuit.  We defeated an en banc petition and then

22   also defeated a petition for cert to the Supreme Court.  And

23   once the case returned to the district court, it was promptly

24   settled for about 22 million dollars.  So we give you that

25   example as a nutshell of our tenacity and our ability to go toe

1    to toe with the well-heeled corporate Defendants much like the

2    ones that we are seeing in the courtroom today.  In addition,

3    our application lists certain additional complex cases in which

4    we've been heavily involved; and I think those reflect the same

5    thing that I just described.

6          So just to conclude, we look forward to an

7    opportunity to work with counsel that Your Honor appoints in

8    any leadership position, in any role.  We think we have a lot

9    to add.  And on behalf of Mr. Schubert and myself and my firm,

10   I respectfully request appointment to the steering committee

11   for the consumer cases.

12         Thank you.

13         THE COURT:  Thank you, Mr. Jonckheer.

14         Next is the application of Julie Braman Kane.

15         MR. EIDSON:  Your Honor, my name is Mike Eidson; and

16   I'm president of the law firm of Colson, Hicks & Eidson in

17   Miami, Florida.  I'm not going to talk about a slate of lawyers

18   because I'm not on one, but this decision rests in the sound

19   discretion of the Court.  I'm not going to talk about how we're

20   going to handle the case because it's late in the day.

21         I am in the fortunate position here today that I do

22   not have to stand here and try to brag about myself while

23   trying to maintain my professional decorum.  Instead, I am

24   going to brag about my longtime colleague.  I am here to

25   recommend to the steering committee my partner, Julie Kane, who

1   is a 25-year lawyer and a member of my law firm.  She is

2   perfect for this position.

3          Julie and I are both past presidents of the American

4   Association for Justice, formerly known as ATLA, the world's

5   largest trial bar and the organization dedicated to protect the

6   rights of consumers such as those injured in this very

7   multidistrict litigation.  In fact, Julie is the immediate past

8   president and made a commitment over a year ago to be at their

9   annual meeting this week halfway around the world.  Because

10  that commitment was so longstanding, I offered to appear here

11  in her place today.

12         There are many reasons why Julie and my law firm

13  should be on the steering committee.  First and foremost, she

14  is fully qualified and meets the criteria of the Court.  She

15  and my law firm have extensive experience in prosecuting large,

16  complex matters, including data breach matters, where Julie

17  currently serves on the steering committee of a major data

18  breach MDL in the Middle District of Florida.

19         What sets Julie Kane and my law firm apart from some

20  of the others is the proven ability to work well with lawyers

21  from across the country.  I personally have served as both the

22  chair of a major MDL, the *Ford/Firestone* litigation in

23  Indianapolis, for six years in the past and on executive

24  committees of MDLs.  From my experience, I can tell you that

25  the key to a successful Plaintiffs' leadership structure is

1    assembling a group of leaders that work well together.  We

2    pride ourselves on being a firm that's a team player with other

3    Plaintiffs' firms.  Julie's rise to become the president of the

4    leading and largest bar organization of Plaintiffs' trial

5    lawyers is just one indication of that.

6          We have been talking -- several lawyers have talked

7    about cats earlier today, and Julie is an extraordinarily

8    experienced cat leader.  In 2001 when our law firm filed the

9    *Menorah Gardens* class action where thousands of families were

10   terrified to learn that their loved ones' bodies had been

11   desecrated in their graves, Julie managed the class from the

12   very beginning both with technology and common sense.  She

13   tried a significant number of the individual cases through the

14   process set up in that class which represented 6,000

15   individuals, and at the end of the day she made sure that

16   everyone was satisfied that they got a fair shake.

17         She has continued managing large litigation.  When my

18   law firm was appointed receiver for Mutual Benefits Corporation

19   where tens of thousands of investors in fraudulently sold

20   viaticals were harmed, she managed the class again both with

21   technology and working efficiently with multiple law firms.

22   Our firm has been incredibly successful in these matters

23   because we are technologically savvy, thoughtful in managing

24   things not by billing thousands of hours but by pragmatically

25   figuring out how to handle these cases in the best interests of

1    the courts and our clients and our ability to fund these cases

2    as funding is needed.  As the president of this law firm, I can

3    assure you that our financial obligations will be met should

4    you appoint Julie for the steering committee.

5           Julie Kane herself is an extraordinary lawyer.  She

6    has tried dozens of cases in our firm.  She is at the very top

7    of her profession, recognized as such by every single rating

8    organization.

9           Last, but certainly not least, my law firm has been a

10   leader in diversity on purpose.  Of our 22 lawyers, half -- 12

11   of them -- are women.  And it has been my goal in building my

12   law firm over the past 40 years to ensure that we have a bench

13   of true talent that is also diverse.  The fact that Julie is a

14   woman should not overshadow that she is competent, capable,

15   experienced, knowledgeable in this field and the immediate

16   president and the past president of the trial lawyers who

17   protect the court and these laws.

18          As I mentioned, I have served in the leadership of a

19   number of MDLs in the past.  That gives me particular pride

20   that I am able to stand up here with confidence to recommend

21   you someone who is part of the next generation of leaders from

22   the Plaintiffs' trial bar.  And the fact that she is a woman

23   who also has all of these criteria make her an ideal

24   appointment for your steering committee.  I can guarantee you

25   that nobody will outwork her, you will have her complete and

1    total support 24-7 and that of my law firm should you appoint

2    her, and I respectfully urge you to do so.

3              Thank you very much, Your Honor.

4              THE COURT:  Thank you, Mr. Eidson.

5              Next is the application of Bursor & Fisher.

6              MS. WESTCOT:  Good afternoon, Your Honor.  Sarah

7    Westcot of Bursor & Fisher.

8              We seek appoint to the Plaintiffs' steering committee

9    for the consumer track.  And there are several factors in favor

10   of appointing Bursor & Fisher to this committee, factors that

11   set us apart from some of the firms that you have heard from

12   today.

13             We have extensive experience handling consumer class

14   actions and other complex litigation.  While we are a small

15   firm of 14 attorneys, class actions are the core of our

16   practice and we have a history of success.  We have been

17   appointed class counsel in 27 putative class actions since the

18   firm's founding in December 2010.  We have won 17 of 19

19   contested motions for class certification, and we've defeated

20   summary judgment in 11 of 12 instances.

21             We are able to handle cases efficiently and often

22   quickly, but we also have the experience necessary to litigate

23   to trial if necessary.  The attorneys at my firm have tried

24   five large-scale class action cases to trial, and we have

25   achieved awards ranging from 21 million to 299 million dollars.

1          We have been appointed lead or co-lead counsel to

2     three of the largest classes ever certified, *Nguyen v. Verizon*

3     *Wireless*, *Zill v. Sprint Spectrum* and *Hendricks v. StarKist*

4     *Company*.  The *StarKist* case resulted in a submission of 2.4

5     million claims from class members which is the largest number

6     of claims ever submitted in the history of Rule 23 class

7     actions.

8          We have experience also specifically with MDL

9     proceedings, most recently being appointed to represent the

10    class in the *Blue Buffalo Marketing and Sales Practice*

11    litigation.  Our leadership in that *Blue Buffalo* case

12    demonstrates our ability to work in collaboration with other

13    counsel, and we were able to obtain a nationwide class

14    settlement in that case that resulted in a 32 million dollar

15    cash settlement fund within two years of our filing of the

16    complaint.

17         We also have specific data breach and privacy

18    experience.  The case most analogous to the Equifax matter is a

19    case we filed against Michaels Stores in which Bursor & Fisher

20    was appointed co-lead counsel.  In that case, we represented a

21    nationwide class of consumers who made in-store purchases at

22    Michaels Craft Stores using their credit and debit cards and

23    had their private financial information breached as a result.

24         We were appointed by the court in that case as

25    co-lead counsel along with two other firms.  Issues of Article

1    III standing were raised and dealt with.  We defeated motions

2    to dismiss and were able to resolve the case within two years

3    of filing the complaint.  We negotiated a settlement on behalf

4    of 250,000 class members and obtained relief in the form of

5    monetary reimbursement for those who suffered monetary damage,

6    credit reporting services and were able to put in security

7    audits that would better protect customers in the future.

8              Bursor & Fisher has offices on both coasts, New York,

9    San Francisco, as well as an attorney that resides locally,

10   myself.  We can offer geographic diversity to the steering

11   committee that will be tasked with representing the interests

12   of a putative class that expands the entire country.  We also

13   represent clients in New Jersey, Illinois, Maryland and

14   California.

15             As far as investigating an identification of the

16   claims, we have already retained an expert in the field of

17   cyber security and computer forensics to assist us with

18   litigating this case; and we have already been in consultation

19   with that expert to guide our work to date.

20             We would ask that the Court appoint Bursor & Fisher

21   to the steering committee to put these qualifications to use in

22   representing the putative class.

23             Thank you.

24             THE COURT:  Thank you, Ms. Westcot.

25             I believe that I have now heard from all of the

1    applicants.

2              Well, thank you very much for your cooperation and

3    making it possible to do that.  I was thinking earlier today

4    that some people would say that if I thought I could hear from

5    45 applicants for Plaintiffs' leadership position in a case of

6    this size in one day that I'd lost my mind.  But we did it, and

7    I appreciate your cooperation.

8              I said earlier that my hope was to hear from

9    everybody and make a decision and announce it today.  I'm not

10   going to do that.

11             I had a criminal case earlier this week in which a

12   lady that I had sent to prison wanted to modify her conditions

13   of supervised release to allow her to live with her fiancé and

14   two teenage children.  And the Government filed a written

15   response opposing that because the fiancé was -- had a felony

16   conviction, and that's against our standard conditions to allow

17   a person on supervised release to associate with a felon.

18             And I couldn't figure out what to do about it reading

19   the papers; so I said, well, I'll just have a hearing.  I'll

20   just hear from these people, see what they have to say.  And so

21   I did.

22             And the Defendant, a young woman, sat in that witness

23   chair over there under oath and made such an eloquent plea for

24   being able to live with the father of her children in one home

25   and have a family united together, how important that was to

1    her.  And I had the boyfriend come up to the podium and swear

2    that he wasn't going to hurt her or hurt the children.  And in

3    the end, it was easy, an easy decision, let her live with her

4    -- the father of her children and, you know, try to get the

5    family back together.

6                 So the hearing made it really easy.  This hearing has

7    not made it any easier.  The amount of talent and experience

8    and ability that's here and that has spoken today is pretty

9    incredible, and it's not made my job any easier.

10                I forgot, Ms. Sumner, do you or Mr. Haskins want to

11   say anything?

12                MS. SUMNER:  Your Honor, first I will say I'm

13   relieved and I'm sure you are as well that I'm not going to go

14   through my qualifications to participate in this case.

15                I just have two requests for Your Honor.  One, we

16   certainly pledge to act with professionalism and civility as we

17   defend the company, and we know that you will appoint

18   leadership for the consumers and the financial institutions who

19   will do the same.  And we also ask that you consider relatively

20   small groups.  Given the number of lawyers in this room and the

21   number of excellent presentations, I know it will be difficult

22   to winnow it down to a group.  But for purposes of moving the

23   case forward, we ask for you to consider keeping the groups

24   relatively small.

25                Thank you, Your Honor.

1          THE COURT:  Thank you.

2          Well, as I said, I'm not going to make a decision or

3    announce a decision right at the moment.  I'm going to think

4    about it over the weekend.  There are a couple of little

5    things, relatively small things that I need to look at again.

6    And I hope that I will make a quick decision because I

7    recognize that really nothing can be done in this case until

8    the Plaintiffs' leadership is established and put in place.

9          So I'm going to take the weekend to think about it

10   and hope to get out an order very quickly.  And thank y'all

11   again.

12         Court's in recess until further order.

13         (Proceedings adjourned at 3:38 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT:

4    NORTHERN DISTRICT OF GEORGIA:

5

6              I hereby certify that the foregoing pages, 1 through

7    138, are a true and correct copy of the proceedings in the case

8    aforesaid.

9              This the 11th day of February, 2018.

10

11

12

13                   */s/ Susan C. Baker*
                  _____

14                   Susan C. Baker, RMR, CRR
                     Official Court Reporter
15                   United States District Court

16

17

18

19

20

21

22

23

24

25