```
 1                IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
 2                       ATLANTA DIVISION

 3

 4

 5   IN RE:  EQUIFAX, INC. CUSTOMER  ) Case No. 1:17-MD-2800-TWT
     DATA SECURITY BREACH LITIGATION )         1:17-CV-3463-TWT
 6                                    )         1:18-CV-317-TWT
                                      )
 7                                    ) September 26, 2018
                                      ) 11:00 a.m.
 8   _____) Atlanta, Georgia

 9

10

11                          -   -   -

12

13          TRANSCRIPT OF THE STATUS CONFERENCE PROCEEDINGS
             BEFORE THE HONORABLE THOMAS W. THRASH, JR.
14                   U.S. DISTRICT COURT JUDGE

                            -   -   -
15

16

17

18        Proceedings recorded by mechanical stenography
            and computer-aided transcript produced by
19

20              WYNETTE C. BLATHERS, RMR, CRR
                   Official Court Reporter
21                  2314 U.S. Courthouse
                   75 Ted Turner Drive, SW
22                 Atlanta, Georgia  30303
                      (404) 215-1547
23            wynette_blathers@gand.uscourts.gov

24

25
```

APPEARANCES OF COUNSEL:

**On behalf of the Plaintiffs (MDL Litigation):**

Kenneth S. Canfield
Doffermyre Shields Canfield & Knowles, LLC

Joseph P. Guglielmo
Scott & Scott, Attorneys at Law, LLP

Norman E. Siegel
Stueve Siegel Hanson, LLP

Stephen J. Kane
City of Chicago, Dept. of Law

**On behalf of the Defendant (MDL Litigation):**

David Lewis Balser
Phyllis Buchen Sumner
Sidney Stewart Haskins, II
King & Spalding, LLP

**On behalf of the Plaintiffs (Securities Litigation):**

James Harrod
Bernstein Litowitz Berger & Grossmann, LLP

Gary F. Lynch
Carlson Lynch Sweet & Kilpela & Carpenter, LLP - PA

Amy E. Keller
DiCello Levitt & Casey

**On behalf of the Defendant (Securities Litigation):**

Michael R. Smith
King & Spalding, LLP

B. Warren Pope
King & Spalding, LLP

1  APPEARANCES OF COUNSEL: (Cont'd)

2

3  **On behalf of the Plaintiffs (Derivative Litigation):**

4  Joseph H. Weiss (Telephonically)
   WeissLaw, LLP

5
   Joshua M. Rubin

6  WeissLaw

7
   **On behalf of the Defendants (Derivative Litigation):**

8
   David M. Chaiken

9  Troutman Sanders, LLP

10 April Elliott
   Wilmer Hale, LLP

11
   Scott Sherman

12 Nelson Mullins

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    Wednesday Morning Session

 2                     September 26, 2018

 3                         11:00 a.m.

 4                         -   -   -

 5                 P R O C E E D I N G S

 6          COURTROOM DEPUTY:  All rise.  United States District

 7   Court for the Northern District of Georgia is now in session,

 8   the Honorable Thomas Thrash presiding.

 9          THE COURT:  Thank you.  Be seated.  All right.  This

10   is the case of In Re:  Equifax Customer Data Security Breach

11   Litigation, Case No. 17-MD-2800; In Re:  Equifax, Inc.

12   Derivative Litigation, Case No. 18-CV-317; and In Re:  Equifax

13   Securities Litigation, Case No. 17-CV-3463.

14          This is a status conference being held at my request.

15   First, let me ask counsel for the parties who expect to

16   actually participate in the status conference today to

17   identify yourself by name and the party you represent.

18          MR. CANFIELD:  Good morning, your Honor.  I'm Ken

19   Canfield, co-lead counsel for plaintiffs in the consumer

20   track.

21          THE COURT:  Good morning, Mr. Canfield.

22          MR. SIEGEL:  Good morning, your Honor.  Norman

23   Siegel, co-lead counsel for the consumer track.

24          THE COURT:  Good morning, Mr. Siegel.

25          MR. BALSER:  Good morning, your Honor.  David Balser
```

1  on behalf of Equifax.

2  THE COURT:  Good morning, Mr. Balser.

3  MS. SUMNER:  Good morning, your Honor.

4  Phyllis Sumner on behalf of Equifax.

5  THE COURT:  Good morning, Ms. Sumner.

6  MR. HASKINS:  Good morning, your Honor.  Stewart

7  Haskins also on behalf of Equifax.

8  THE COURT:  Good morning, Mr. Haskins.

9  MR. LYNCH:  Your Honor, good morning.  Gary Lynch on

10  behalf of financial institution plaintiffs.

11  THE COURT:  Good morning, Mr. Lynch.

12  MR. GUGLIELMO:  Good morning, your Honor.  Joseph

13  Guglielmo with Scott & Scott, co-lead counsel for the

14  financial institution plaintiffs.

15  THE COURT:  Good morning, Mr. Guglielmo.

16  MR. KANE:  Your Honor, Steve Kane on behalf of the

17  City of Chicago.

18  MR. HARROD:  Your Honor, James Harrod, lead counsel

19  for plaintiffs in the securities action.  Good morning.

20  MR. RUBIN:  Good morning, your Honor.  Joshua Rubin

21  of WeissLaw on behalf of the lead derivative plaintiffs.

22  Mr. Weiss is out of the country, and he's appearing by

23  telephone.

24  THE COURT:  Your name again, sir?

25  MR. RUBIN:  Joshua Rubin.

```
 1              THE COURT:  Good morning, Mr. Rubin, Mr. Weiss.
 2              MR. WEISS:  Good morning, your Honor.  I appreciate
 3  the opportunity to participate by telephone.  I'm sorry I
 4  can't be there in person.  Hopefully it's never going to
 5  happen again, but I am out of the country and I just couldn't
 6  make it.
 7              THE COURT:  I understand, Mr. Weiss.
 8              MR. POPE:  Good morning, your Honor.  Warren Pope on
 9  behalf of Equifax and certain individual defendants in the
10  securities litigation and the derivative litigation.
11              MR. CHAIKEN:  Good morning, your Honor.  David
12  Chaiken, Troutman Sanders, on behalf of Richard Smith in the
13  securities class action and shareholder of the derivative
14  litigation.
15              MS. ELLIOTT:  April Elliott, WilmerHale, on behalf of
16  Ms. Stock in the derivative action.
17              MR. SHERMAN:  Scott Sherman from Nelson Mullins also
18  on behalf Elane Stock in the derivative action.
19              THE COURT:  All right.  Unless somebody feels very
20  strongly that this is not the appropriate thing to do, my
21  intention was to hear from counsel in the MDL case first, then
22  the derivative case, and then finally the securities
23  litigation.  Mr. Canfield.
24              MR. CANFIELD:  Your Honor, the first item on the
25  agenda is the status of the motions to dismiss and the
```

1  scheduling of oral argument, assuming the Court wants us to

2  present oral argument.

3      The parties have discussed the issue and the last

4  brief -- we're assuming that the Court wants to hear argument

5  in the motions to dismiss, in the consumer track, the

6  financial institutions track in the small business case all at

7  the same time.  The last brief is scheduled to be filed on

8  November 1st.  The Court will obviously need some time to read

9  all this paper that's being filed and to digest it, and then

10  depending on how long the Court needs for that process, the

11  parties are prepared to present argument.

12      Our joint proposal to the Court is that in the

13  consumer track and in the financial institutions track each

14  side would get one hour to argue their positions, and then

15  with regard to the small business complaint, each side would

16  take a half an hour.  And then with regard to the day that the

17  oral argument would occur, our proposal is that the Court

18  figure out the time frame that the argument should take place,

19  provide us with some available dates on the Court's schedule,

20  and the parties will coordinate to pick a date that works for

21  us as well as for the Court.

22      THE COURT:  Well, Mr. Canfield, there are conflicting

23  considerations at work here.  Number one, I do frequently find

24  oral argument to be helpful to me.  Sometimes it can even

25  change the outcome rather drastically.  So from that

1   standpoint, I would certainly be inclined to schedule oral

2   argument if the parties want it.  The competing consideration

3   is that having to schedule oral argument in a case like this

4   where it's going to be lengthy and where so many people are

5   involved, that can actually delay in getting out an order.

6        And for all the reasons that you've outlined in your

7   letter here, I don't think the plaintiffs feel that a delay is

8   in their interest.  And you may or may not know I've

9   tentatively scheduled the trial in *Androgel* to start

10   February 25th, and we've blocked out three weeks for that.

11   And I've got this enormous, enormous Gangster Disciples RICO

12   case that I've got to try some time next year.  So next year

13   is already a train wreck, and we're not even in it yet.

14        MR. CANFIELD:  Well, Judge, I'm here to present a

15   joint proposal, so I can't speak for everybody in terms of

16   whether the collective wisdom is to ask for oral argument

17   or -- withdraw a request for oral argument or not.  What I

18   would suggest the Court do is to give us a time frame and some

19   dates, and in the process of back and forth between counsel

20   for the parties, we can discuss whether or not we still

21   believe oral argument is necessary.  And assuming the

22   consensus is that we want oral argument, then we'll get back

23   to the Court with one of the dates.

24        Now, obviously if the Court doesn't want oral

25   argument, that's a totally different --

```
 1            THE COURT:  No, I'm in favor of it.  You know, I do
 2   it regularly in my bigger cases, but there is a downside.
 3            MR. CANFIELD:  Understood, Judge.  You've made that
 4   clear, and, unfortunately, I can't speak for everybody because
 5   my marching orders were to present the proposal that I just
 6   presented.
 7            THE COURT:  All right.  Anybody else want to say
 8   anything on the plaintiffs' side?  Mr. Balser?  Ms. Sumner?
 9            MR. BALSER:  Your Honor, on the subject of oral
10   argument, I do think both sides believe that it would be
11   helpful to the process to have the time to wade through the
12   arguments, and we've got a 99-count complaint in the consumer
13   case, lengthy motions and briefs on both sides.  So I think it
14   probably would be helpful to help distill the arguments and
15   certainly to address any questions that the Court has or
16   concerns or issues.  I think it might actually streamline the
17   process.
18            If the Court -- and one thing that had occurred to me
19   and I've found helpful, sometimes before an oral argument the
20   Court will let the parties know particular issues that are on
21   the Court's mind to help hone and frame the arguments that the
22   Court most wants to hear about.
23            So I could envision a scenario in which the briefing
24   is done in November.  There is a lot to wade through, as
25   Mr. Canfield notes, but if we were looking at some argument
```

1    date in December at some point, if the Court's schedule would

2    permit that, then if there were some interim period where the

3    Court sometime in advance of the argument could let us know

4    what it's most interested in hearing about, then we could try

5    to make it as productive as possible.  And it may actually

6    assist in getting an order framed more quickly than the Court

7    might otherwise have the time to do without the benefit of

8    argument.

9        So I do think it would be helpful, and I think the

10   parties are committed to working together to schedule

11   something that makes sense for the Court.  So it's certainly

12   not our intention to delay an order by requesting the

13   argument.  We're just trying to be as helpful as we can to the

14   Court in wading through what are some very knotty and

15   difficult legal issues.

16       THE COURT:  Well, Mr. Balser, I assume that you're

17   going to want to have equal time.

18       MR. BALSER:  We will want to have equal time.

19       THE COURT:  Which, if my math is correct, would add

20   up to five hours.

21       MR. BALSER:  Your math is correct, your Honor.

22       THE COURT:  All right.  Well, I will tentatively try

23   to find a day in December to do this, and God have mercy on

24   us.  All right, Mr. Canfield, Item No. 2.

25       MR. CANFIELD:  I know this is one of your favorite

1   subjects, your Honor, but we appreciate the Court's

2   willingness to hear us on these two related issues.  The

3   parties have tried to resolve both of them.  We've been

4   negotiating about the NDA issue since mid May.  We've had no

5   success.  So as far as the plaintiffs are concerned, we're at

6   an impasse on both issues, and we need direction from the

7   Court in order to know how to proceed.  Some background about

8   how we got to where we are now may be useful for the Court to

9   appreciate.

10          After the Court appointed leadership in the consumer

11   and FI tracks, plaintiffs' counsel began discussing case

12   management issues, including a schedule for discovery.  Our

13   preference as plaintiffs counsel would have been to move

14   forward with discovery quickly before memories fade, employees

15   move on, and evidence is lost.  And generally in our

16   experience the earlier that discovery begins the sooner cases

17   get resolved.  But we're well aware of the automatic stay that

18   this Court has built into its local rules, and we're well

19   aware that the Court's preference is to put off discovery

20   until after a ruling on any motions to dismiss.  We also knew

21   Equifax was going to oppose any earlier discovery.

22          So we proposed a compromise approach to avoid the

23   dead time while waiting for the Court's ruling on the motion

24   to dismiss.  We suggested that the parties deal with as much

25   of the prediscovery stuff that needs to be dealt with before

1   effective -- discovery effectively can begin, and that

2   includes reaching agreement on all the various case management

3   orders, such as a confidentiality ESI protocol and the like;

4   doing much of the meeting and conferring and negotiating about

5   written discovery, such as negotiating search terms and

6   custodians for electronic searches.

7          And then with this stuff out of the way when the

8   formal discovery period opened after the Court's ruling on the

9   motions, discovery could actually begin immediately, and

10  Equifax would know the documents that we want.  We knew what

11  search terms and custodians were going to be used.  The

12  searches could be done.  And all of that delay that's

13  typically billed into discovery at the beginning of a big case

14  would be avoided.

15         We were optimistic that this compromise approach

16  would be agreeable to Equifax.  The Court adopted it in *Home*

17  *Depot*, and many of the same lawyers are involved in both

18  cases.  And, in fact, Equifax did agree with this approach,

19  which was built into the joint preliminary plan and scheduling

20  plan and the various CMOs that the parties have jointly

21  proposed and the Court entered.

22         For example, the joint preliminary report lists the

23  proposed discovery orders that the parties would negotiate and

24  dates for them to be submitted.  CMO No. 4, the discovery

25  protocol that was entered in April, early April, directs the

1  parties to attempt to reach agreement on search methodologies.

2  The parties were directed to exchange certain information

3  about custodians and a general description of where their ESI

4  is kept, and that CMO requires the producing party in

5  discovery to propose a list of search terms.  And the parties

6  are to agree and to confer about them to see if they can reach

7  an agreement.  That's clearly set out in CMO No. 4.

8           This same process is built into the stipulation and

9  order for the production of documents and ESI that was entered

10  by the Court about six months ago.  And in that order

11  paragraph 30 provides, the parties have begun to meet and

12  confer, as directed by the Court, relating to the process of

13  searching for documents responsive to discovery, including

14  specifically the identification of search terms and custodians

15  to the extent that they're necessary in responding to specific

16  discovery requests.  The Court expects that the parties will

17  continue to meet and confer on this issue to ensure that

18  discoverable responsive non-privileged documents are

19  identified and produced as efficiently as possible.

20           Now, the parties have done a great job dealing with

21  all the proposed discovery orders.  We got the ones negotiated

22  that we anticipated and the Court directed us to do, and there

23  really wasn't an awful lot of disagreement about that.  But

24  we've made virtually no progress and no effective process

25  negotiating search terms and custodians or reached any

1  agreements regarding how documents are going to be produced.

2          There are two big problems.  The schedule required

3  that the plaintiffs serve their written requests for

4  production, which we did at the end of June.  Then the parties

5  were to meet and confer about that document and the search

6  terms and custodians by the end of July.  There was one

7  telephone meet-and-confer session before the end of July and

8  nothing since.

9          At that meet-and-confer session the plaintiffs told

10 Equifax that it would be very useful if Equifax would provide

11 us with some documents so that we could meaningfully know

12 which custodians' records had to be searched and what search

13 terms would be useful in identifying the documents that bear

14 upon the issues in the case.  Equifax sat on that and didn't

15 get back to us until last week and said they weren't willing

16 to produce anything.  They also told us that they weren't

17 going to produce any search terms, a list of search terms, but

18 they would consider a list of search terms that the plaintiffs

19 propose.

20          That's a significant problem, also doesn't comply

21 with the court order, but we're not asking for an order that

22 compels Equifax to give us a list of search terms.  I'm sure

23 it was an oversight.  Equifax is going to comply with a court

24 order, and we haven't had a chance to remind them about it

25 yet.  But they can go ahead and give us a list of search

1  terms, but it doesn't really help us.  We don't have the

2  knowledge or the information to evaluate any list that Equifax

3  may give to us, and we certainly don't have information or

4  knowledge to produce our own list.

5       The Court should be able to understand how difficult

6  it is for plaintiffs' counsel to figure out how to search

7  Equifax's own records regarding an incident without any

8  knowledge of how Equifax keeps its records, how people

9  communicate, what terms they use in describing what takes

10  place within the company.  And there's nothing unusual about

11  this case.  Every -- virtually every case where you have a big

12  corporation as a defendant it's hard for plaintiffs to try to

13  figure out and evaluate the search terms and custodians.  And

14  it matters because if you screw up the list of search terms

15  and custodians and you overlook some key elements of the case,

16  you may, as a plaintiff, be unable to prove some of your

17  allegations because you inadvertently did not get the

18  information that you need.  That's true in any case.

19       But this case is even more difficult for us to come

20  up with search terms and custodians because according to media

21  reports and a civil lawsuit that was filed in connection with

22  the insider trading charges that were brought, Equifax used

23  code words within the company to describe its activities

24  following their disclosure of the breach but before the breach

25  was publicly announced.  And according to one of the

1    documents, there was a reference to a project Sparta.  And if

2    Equifax set up its communication so that it's own employees

3    couldn't figure out what was going on, how is it possible for

4    plaintiffs' lawyers to try to get the same information?  We

5    never would have thought that you need the search on the term

6    Sparta, and so we basically lack fundamental information.

7         The problem is compounded because of the NDA issue.

8    In many cases plaintiffs are able to go out and interview

9    former employees, find out the basic facts relating to what's

10   going on in a corporation, and use that information to

11   negotiate with the defendants over search terms and

12   custodians.  We can't do that.  We tried, but we ran up

13   against the NDAs, which I'll talk about in a moment.

14        So where does all this leave us?  We're under a court

15   order to negotiate search terms and custodians so that the

16   document production goes smoothly, but that's negotiations

17   going nowhere.  And it's not going to go anywhere until we

18   have some basic information about what happened at Equifax.

19        So what plaintiffs tried to do in order to comply

20   with the Court's order and move the litigation along, which is

21   in our interest, is we came up with a list of very limited

22   targeted discovery that we thought would help us in being able

23   to do what the Court has directed us to do.  So we put the

24   list together of the four items that were in our letter, and

25   we spent a lot of time figuring out what we were going to put

1   on the list because our intent was to try to come up with

2   discovery methods that would impose little or no burden on

3   Equifax while getting us the information we need to do what

4   the Court has directed us to do.

5          So that list includes the documents that Equifax has

6   already produced to government authorities.  They should be

7   electronically available.  Seeing those documents is obviously

8   going to let us get up to speed on what happened.  I suspect

9   that that's going to get us most of where we need to go to be

10  able to meaningfully do what we're supposed to do, but there

11  will probably still be some holes.

12         So that's why we wanted to have the ability to

13  require some limited third parties who have information and

14  who already had received document preservation subpoenas to go

15  ahead and produce their documents.  And we didn't give the

16  Court a list of all of those third parties, but what we

17  propose is that if the Court allows us to do this, we'll meet

18  and confer with Equifax and I'm sure we'll figure out an

19  agreement on what specifically it is that we want and how

20  we'll go about doing that.

21         The third thing we've requested is one limited

22  30(b)(6) deposition into the basic kind of information that we

23  need to fill in the holes that's not apparent from the

24  documents, if we get those documents, or to get us the other

25  information that we would require.  We're not talking about a

1  lot of time.  We're not talking about a lot of people, one

2  basic 30(b)(6) deposition.

3        And then, lastly, because we've been frozen out on

4  being able to effectively communicate with former employees,

5  we request up to four depositions of former employees, which

6  we won't need if the Court gives us relief from the NDA.

7  Equifax has said no to all this.  It's left us in a quandary,

8  and that's why we decided to make the request that we did.

9        Now what has Equifax had to say about all this?

10  What's their position?  Based on their letter, the first thing

11  they do is make what's essentially a waiver argument, and they

12  point out that the scheduling agreement was negotiated by the

13  parties and entered by the Court.  And it says that discovery

14  doesn't open until after the motion to dismiss rulings.  But

15  the scheduling order in paragraph 10 on page 20 expressly

16  states -- and I'm quoting -- counsel for the parties may seek

17  leave from the court to conduct limited early discovery prior

18  to commencement of formal discovery.

19        So we're just doing exactly what the Court said we

20  could do, and it's bill into the order.  We couldn't get the

21  information we needed.  We couldn't get it voluntarily.  So

22  we're seeking very limited relief from the Court's discovery

23  stay.

24        The next thing that Equifax says is they cite the

25  *Chudasama* case from the Eleventh Circuit, seemingly for the

1   proposition that motions to dismiss should always be resolved

2   before discovery begins, but that's not what that Court says

3   or what that case says.  It was a very unusual case and in

4   which the Court essentially turned over its courtroom to the

5   plaintiff's lawyer, and he ran roughshod over the whole

6   process.  And a default judgment was entered against the

7   defendants for failing to respond to discovery, all before any

8   ruling on a motion to dismiss had occurred.

9        And subsequent cases from a variety of courts in this

10  circuit made clear that that case doesn't impose some sort of

11  an ironclad rule.  And the upshot is the Court clearly has the

12  discretion to allow the limited relief that we're requesting,

13  if the Court decides that's what should happen.  There's no

14  rule in the Eleventh Circuit that would prevent it, and

15  there's case law that supports it.  And it's been done in many

16  other cases.

17       The third thing Equifax says is they cite several

18  cases denying requests for documents produced in government

19  investigations on the ground that a defendant only has to

20  respond or shouldn't have to respond to a broad request like

21  that, but instead the plaintiff has to identify the specific

22  categories of documents that are sought.  And then the

23  defendant can go and look in those documents and produce them.

24  There are cases that say that.  That's not the universal rule

25  or even necessarily the majority rule.  Many cases hold the

1   other way.

2          Many of the cases cited by the defendants, in fact,

3   suggest that there were particular circumstances in those

4   cases that required the Court to rule the way it did.  And if

5   the Court is concerned about those cases in any -- the parties

6   can brief them, but we don't think that it really matters

7   because we have served specific discovery requests.  We did it

8   last June.

9          And while it's hard to believe that Equifax produced

10  any documents to the government that aren't covered by one of

11  the requests that we've made, if Equifax wants to reorganize

12  those documents and produce some in response to our specific

13  requests rather than just turning over what it's already

14  produced, that's up to them.  But to the extent there's a

15  burden in that process, the burden is one that's being

16  voluntarily assumed by Equifax.  It's not one that we're

17  seeking to impose on Equifax.  But even that shouldn't be that

18  burdensome because these documents are all, I'm sure,

19  available in electronic form and indexed so that whatever

20  culling needs to occur could happen fairly quickly.

21          Lastly, Equifax cites a transcript from the initial

22  conference in the *Androgel* case in which this Court ruled that

23  documents that had been produced to the FTC by the defendants

24  didn't need to be provided to the plaintiffs prior to the

25  ruling on the motions to dismiss.  This Court is aware I made

1  that argument.  The Court disagreed with me.  The Court

2  declined to allow us to get those documents for a variety of

3  different reasons.  But *Androgel's* were a different case, and

4  it's hardly a very good case to support Equifax's position.

5  In that case the parties didn't agree to engage in a

6  meet-and-confer process before the rulings on the motion to

7  dismiss.  It wasn't ordered by the Court, and when we ended up

8  turning to the question of search terms and custodians, then

9  negotiations took six to nine months.  And as the Court is

10  well aware, it was a difficult and lengthy process.

11        There was a lot of flailing around, even after a lot

12  of discovery had already occurred.  And the discovery in

13  *Androgel* seemed never ending.  It just went on and on.  And

14  I'm not saying that the Court's denial of my request that we

15  get the FTC documents is responsible for what happened in

16  *Androgel*, but I do say that if we had started a meaningful

17  meet-and-confer process way back when in the early stages of

18  the case, that the case would have been handled by the parties

19  much more efficiently.  And we wouldn't have had to take so

20  much of the Court's time in the process.

21        THE COURT:  It was a painful experience for me.

22        MR. CANFIELD:  It was painful for everybody.  And

23  what we're trying to do is avoid that in this case.  The

24  reality in a large case like this one is that the major factor

25  determining the length of time needed for discovery is the

1    amount of time that the defendant needs to produce the

2    relevant documents and data.  That's just a reality.  In most

3    cases like this the plaintiffs don't have that much in the way

4    of discovery so the burden is on the defendants.  And so how

5    efficiently and how long it takes them to produce what they've

6    got is the -- is really the determining factor.  And they

7    can't produce documents until there's been an agreement on

8    search terms and custodians.

9          Once an agreement is reached, it takes time for the

10   defendants to run the searches and produce the documents that

11   are requested.  The plaintiffs need time to review those

12   documents, and most of the key depositions aren't scheduled

13   until the documents have been reviewed.  That's a long

14   process, and I obviously don't know when the Court will rule

15   on the motions to dismiss.  It sounds like next year is going

16   to be tough.  If it is similar to what happened in *Home Depot*,

17   assuming the Court denies the motions to dismiss, we may not

18   be starting discovery until sometime next fall, two years

19   after the data breach occurred.

20         But what I do know is that if the parties can

21   meaningfully negotiate search terms and custodians now and in

22   the interim, we're likely to reduce the amount of time it's

23   going to take this case by a lot.  I don't know exactly how

24   much, but it's going to make it a lot -- move a lot more

25   quickly.  And I know that without the kind of factual

1  information that we don't have and that we're seeking, we're

2  not able to proceed in any meaningful way with that process.

3        So that's why we ask that the Court grant the limited

4  relief that we've asked for, recognizing that it's not

5  something that the Court frequently does, but in this case

6  it's called for to avoid the kinds of problems we had in

7  *Androgel*.

8        That's all I've got to say on the discovery relief

9  issue.  I can turn to the NDA issue now or the Court can hear

10 from Mr. Balser on the discovery issue before I move on.

11       THE COURT:  Let's do it now.

12       MR. CANFIELD:  Okay.

13       THE COURT:  Mr. Canfield is going to do the NDA issue

14 now.

15       MR. CANFIELD:  On the NDA issue, our investigators

16 have tried to interview numerous former employees.  A number

17 of these former employees are willing to talk, but they

18 mention that they had signed an NDA when they left Equifax.

19 We terminated the interviews, and we didn't want to run afoul

20 of either the NDAs or do anything that would suggest we had

21 acted inappropriately.  And after it had happened several

22 times, we approached defense counsel to see if Equifax would

23 agree on the terms of a proposed order that would deal with

24 the situation.

25       So say that was in mid May.  We don't have an

1   agreement.  We're at an impasse.  We don't think that there's

2   any prospect that there will be an agreement without a major

3   change in the parties' positions, and we don't think that's

4   likely to happen.  So we need the Court's direction.

5        I'll let Equifax speak for themselves obviously in

6   more detail, but as I understand their position, Equifax

7   doesn't contend that its NDAs preclude its former employees

8   from talking to us.  Their concern is to protect privileged

9   information so that's not disclosed, and they want to maintain

10  the confidentiality of that information so that it doesn't

11  become public.  We don't have a problem with either one of

12  those things.

13       We agree that Equifax has a legitimate concern about

14  protecting privileged and confidential information.  That

15  would be so even if the NDAs didn't exist.  Our investigators

16  are trained to identify themselves, state the purpose of the

17  call, not ask for or allow the person being interviewed to

18  share privileged information, and to treat the information

19  they obtain as confidential.  And we've never had any

20  hesitancy about formalizing that training in an order.

21       The dispute between the parties and the reason we

22  haven't been able to agree is Equifax has insisted upon other

23  conditions that we contend don't have anything to do with

24  protecting confidential or privileged information and Equifax

25  knows won't be acceptable to us.  Example, they want

1  plaintiffs' counsel to identify in advance each former

2  employee we intend to interview and to give them the dates we

3  intend to conduct the interviews on.  They've requested that

4  we agree to a requirement that we give Equifax in advance a

5  list of all the questions we intend to ask their former

6  employee, and they want us to agree in advance that we will

7  not ask the former employees about any information that is

8  known to the former employee that occurred after the end of

9  July of 2017 when Equifax itself began to discover that it had

10 been breached but long before it was public knowledge.

11         If we agree to these conditions, there's little doubt

12 about what's going to happen.  Equifax is going to contact

13 each former employee we identified and conduct its own

14 interview using the questions we've provided.  The likely that

15 the former employee won't want to talk with us likely will

16 increase either to avoid the hassle, to curry favor with a

17 former employee, or simply to avoid having Equifax know he or

18 she cooperated with us.

19         Even if the employee does agree to talk to us, the

20 chances that we're going to get the former employee's

21 independent recollections as opposed to some sort of rehearsed

22 version like you would get at a deposition, is going to go

23 down.  And the price for all these restrictions is that we

24 have to share the price for the restrictions and for the

25 ability to talk to the former employees, is we have to share

1    with Equifax our impressions about which former employees are

2    important and which questions are important.  And for us that

3    price is not worth the potential benefit.

4          So what we have done is to propose an order that's

5    set out in our letter that we believe protects the interest of

6    all involved.  It protects Equifax's interest in

7    confidentiality and in protecting its privileged information.

8    It protects the interest of former employees who may or may

9    not want to talk to us, and it allows us to try to discover

10   the information that we need to do what the Court has directed

11   us to do.

12         So if the Court has concerns about all that, we can

13   go through a briefing process if it's necessary.  It will just

14   cause more delay, but we're certainly willing to do it.  We

15   don't think it's necessary.  If the Court does have concerns

16   about the order that we've proposed, we believe that the more

17   efficient and speedier approach that saves the resources of

18   the parties and the Court so you don't have to make a decision

19   in this area, would be to simply lift the discovery stay for

20   the sole purpose of allowing the plaintiffs to depose former

21   employees.

22         That way we get the information we want in the way we

23   want it while Equifax will be able to object on the record to

24   any questions that it believes are appropriate, and there will

25   be a record if there's a disagreement so that the Court can

1  rule.  That's the -- if the Court has any concern about our

2  order, we would ask that you simply lift the stay with regard

3  to former employees so we can get the information we need.

4  That's all I have to say, Judge.  Thank you for your time.

5           THE COURT:  Mr. Balser.

6           MR. BALSER:  Thank you, your Honor.  I am going to

7  respond to Mr. Canfield's arguments regarding the effort to

8  lift the discovery stay, and Ms. Sumner is going to respond to

9  the issue relating to the NDAs, if that is satisfactory to the

10 Court.

11          THE COURT:  That's fine.

12          MR. BALSER:  Your Honor, Eleventh Circuit precedent

13 Scheduling Order and Local Rule 26.2 prohibit pre-answer

14 discovery.  Plaintiffs acknowledge this.  They acknowledge

15 that Rule 26.2 prohibits pre-answer discovery.  The timing

16 limitation that's set forth in Local Rule 26.2(a) is also

17 specifically provided for in the scheduling order that the

18 parties negotiated and agreed to and that the Court entered.

19 At page 17 of the joint preliminary report and discovery plan,

20 the beginning of fact discovery is -- and I quote -- 30 days

21 after the answer is filed in the consumer track or the

22 financial institution track, whichever is later.  That's what

23 we agreed to do.

24          I want to talk a minute about the Eleventh Circuit

25 cases that we cited in our letter brief.  The *Chudasama* case

1    that Mr. Canfield referenced has some language that I think is

2    instructive here and explains the rationale for preventing

3    discovery before we know what the operative claims in the

4    complaint would be, and that was a strange case, as

5    Mr. Canfield noted.  That was a case in which the district

6    court sanctioned the defendant for failing to comply with

7    various discovery requests.

8         The Eleventh Circuit reversed the trial court's

9    decision and held, among other things, that discovery

10   shouldn't have even begun in the case because the defendant's

11   motion to dismiss was pending and because the nature of the

12   permissible claims was unknown at the time the discovery was

13   being propounded.

14        And one of the things the Eleventh Circuit said --

15   and I quote -- is allowing a case to proceed through the

16   pretrial processes with an invalid claim that increases the

17   cost of the case does nothing but waste the resources of

18   litigants in the action before the Court, delay resolution of

19   disputes between other litigants, squander scarce judicial

20   resources, and damage the integrity and the public's

21   perception of the federal judicial system.  We cited the

22   *Roberts v. FNB* case, which is the most recent Eleventh Circuit

23   case affirming *Chudasama*.  That was a case in which the

24   district court stayed discovery pending a motion to dismiss,

25   and the Eleventh Circuit affirmed that and noted that is

1 generally what should be done.

2          Plaintiffs' letter brief argues that there's good

3 cause to depart from the local rule, but it ignores both the

4 scheduling order and the Eleventh Circuit precedent.  The

5 Eleventh Circuit precedent, the local rule, and the scheduling

6 order prohibiting pre-answer discovery exists to protect

7 defendants like Equifax from engaging in substantive discovery

8 before the parties know what, if any, claims will be

9 litigated.

10          The consumer complaint here, as I mentioned before,

11 contains 99 alleged causes of action, all with different

12 elements that may require different discovery.  We filed what

13 we believe is a meritorious motion to dismiss each of those

14 claims, and we filed a motion to dismiss each of the claims

15 asserted in the financial institution complaint.  The Court's

16 ruling on those motions will shape the scope of any

17 permissible discovery here.

18          To put it succinctly, the plaintiffs have not shown

19 good cause to deviate from the local rule and from the

20 agreed-upon schedule here.  In their letter brief they cite

21 three authorities for the Court to consider, and none of those

22 authorities helps.  They cite the *Merial v. Fidopharm* case,

23 which is a case that Judge Jones had.  We also cited that

24 case, and that's a case in which the Court considered various

25 factors to be considered when deviating from the local rule.

1  And chief among them was whether there was a preliminary

2  injunction pending.  That was a case in which Judge Jones did

3  allow limited discovery because it was needed for a

4  preliminary injunction hearing before an answer had been

5  filed.

6       They also cite to Local Rule 26.2(b) which states

7  only that the Court may in its discretion shorten or lengthen

8  the time of discovery or, of course, 26.82 specifically says

9  that discovery begins 30 days after the appearance of the

10 first defendant by answer.  And they cite *White v. Georgia*,

11 which is a case that Judge Duffey had in which Judge Duffey

12 acknowledged that he had the authority to stay discovery

13 pending a motion to dismiss, and he ended up granting that

14 stay.

15      The general rule didn't apply there because -- the

16 general stay of discovery didn't apply because one defendant

17 in that case had answered, but he exercised his discretion to

18 stay discovery pending a motion to dismiss even though there

19 had been one defendant who answered.  Those are the three

20 authorities they cite in their brief in support of their

21 request to deviate from the local rule.

22      And as we point out, your Honor, in our letter brief,

23 even if they could make a showing to deviate from the local

24 rule, which they have failed to do, the plaintiffs' discovery

25 requests here are improper.  They seek the documents that

1  Equifax produced to government regulators without regard to

2  whether the documents were relevant to particular claims in

3  this case, and of course it's not yet known which of those

4  claims, if any, will go forward.  There are ample cases,

5  legion cases -- a legion of cases that stand for the

6  proposition that clone discovery, that is, discovery that asks

7  for all documents produced in connection with an investigation

8  or other litigation is improper because it does not tailor the

9  request of the Rule 26 standard.  Courts across the country

10 have recognized that and refused to allow such requests, yet

11 those are the exact requests that are made here.

12        When properly tailored, plaintiffs' requests for

13 documents are nothing more than normal document requests, and

14 we would be under the extreme burden of having to undertake a

15 review in production of responsive documents just as we would

16 in any other production, which is exactly what the parties

17 agreed in the scheduling order would not happen until answers

18 are filed.

19        So the contention that this is simple and we can just

20 push a button and if we want to cull out, well, that's not a

21 burden they're seeking to impose, kind of misses the step that

22 their requests are overly broad and not narrowly tailored.

23 And Courts across the country have said that's not a proper

24 means of seeking discovery.  So in order to do what they want

25 us to do, we would have to undertake significant time, effort,

1  and expense, which may be all for naught depending on what the

2  Court decides on our motion to dismiss.

3        The next point I think, your Honor, that I want to

4  make -- and it does go to some of the points that Mr. Canfield

5  was talking about with respect to *Androgel* -- there's no

6  reason to allow premature discovery here now.  It's not

7  necessary to advance the case.  Why do I say that?  For many

8  of the reasons that Mr. Canfield articulated and what the

9  parties have agreed to do in the scheduling orders and other

10 case management orders that the Court has entered.

11        The Court has already ordered a host of prediscovery

12 tasks aimed at ensuring that discovery begins promptly and

13 runs efficiently, including negotiating proposed protective

14 order, which has been done, negotiating an ESI protocol.  And

15 I will say, your Honor, today is the first time we have heard

16 anything about an issue of an impasse or some problem with the

17 ongoing discussions with respect to search terms.  And I would

18 respectfully submit that the conversations have been not

19 between Mr. Canfield and me but between Mr. Guglielmo and his

20 team and Ronnie Solomon, who's our ESI discovery partner at

21 King & Spalding.

22        There have been discussions.  The discussions, as I

23 understand it, did occur in July.  We heard -- they said we

24 haven't done anything.  We heard nothing from them until just

25 before this status conference, so last week they picked this

 1  issue back up.  And I would respectfully submit this is a

 2  Trojan horse.  They are manufacturing an issue that doesn't --

 3  it's not a real issue, in order to get discovery that they

 4  want.  I mean, what they're saying is we can't figure out the

 5  search terms, so we need discovery to figure out what the

 6  search terms should be.  It's just backwards.

 7        We are committed to continuing the dialogue that's

 8  required under the case management orders that have been

 9  entered, to discuss and negotiate search terms.  But, of

10  course, the time has not come to produce documents.  There is

11  no need today for search terms to be agreed upon.  But we have

12  never refused to produce search terms.  We have never refused

13  to have a dialogue with plaintiffs' counsel about search

14  terms.  This is not a real issue and yet they want -- that is

15  the justification that they are using to deviate from our

16  agreement on when discovery would occur and what the local

17  rule requires with respect to the stay of discovery.

18        So there has been meeting and conferring going on

19  with respect to document custodians, and, as Mr. Canfield

20  said, we've agreed on custodians and the ESI -- as I said, ESI

21  search term discussions.  We're prepared to continue the

22  dialogue.

23        So we believe that as that process plays out, unlike

24  the situation that Mr. Canfield described in *Androgel* -- and

25  thankfully it's a case that I don't really know anything

1  about.   Sounds like you and Mr. Canfield know quite a bit

2  about it and have been living it.   But this case is very

3  different.   I think the -- apparently there were lessons

4  learned from *Androgel*, which is why the Court has entered

5  orders in this case requiring the parties to clear a lot of

6  the discovery underbrush that would slow things down in the

7  event that the case is permitted to proceed after the motions

8  to dismiss are ruled on.   And we have --

9        THE COURT:   That's exactly why I did what I did,

10  Mr. Balser.

11        MR. BALSER:   And I understand that, and we have made

12  a lot of progress.   We've done a lot of things that in a

13  typical case where a motion to dismiss is filed you would

14  never do.   I mean, we have a protective order.   We have agreed

15  on the custodians.   We have been negotiating an ESI protocol.

16  We have four or five different case management orders that

17  have been entered.   We have been negotiating and have agreed

18  on most things.   I mean, we have worked well together, and,

19  frankly, we just do not think there's any kind of impasse or

20  justification based on sporadic discussions on ESI search

21  terms that would justify such a Draconian and expensive time

22  consuming result as the lifting of the stay of discovery.

23        And I would say, your Honor, I think I would be

24  remiss if I didn't say that, you know, we've got very

25  sophisticated plaintiffs' counsel who chose to file their

1  lawsuits here, and lawsuits were filed around this data breach

2  in every state in the United States.  And we all went before

3  the JPML, and lead plaintiffs' counsel here argued to get

4  these cases consolidated in the Northern District of Georgia

5  knowing what Rule 26(a)(2) says.

6       We also supported consolidation of these cases in the

7  Northern District of Georgia for many reasons, but one of

8  those reasons was the discovery stay that 26(a)(2) provides.

9  There are many other jurisdictions for which other counsel

10 lobbied and argued for before the JPML, which did not have

11 stays of discovery.  And if this had been a really critical

12 and important issue, my colleagues could have argued for and

13 sought consolidation in a district where pre-answer discovery

14 was permitted, but they didn't do that.

15      And those are the settled expectations of the

16 parties, based on the local rules, based on governing Eleventh

17 Circuit law, and based on the scheduling order that we all

18 agreed to.  And there's been no showing that comes close,

19 respectfully, to meeting the standard for disrupting the

20 settled expectations the parties have that are embodied in the

21 local rule that governs all proceedings in this action.

22      The last thing I would say, your Honor, is that with

23 respect to *Androgel*, you know, that is a case apparently where

24 there was not any activity called for before -- discovery

25 related activity called for required prior to an answer being

1  filed or a ruling on a motion to dismiss.

2        And to the extent that there was a suggestion in the

3  plaintiffs' letter brief that the timing of the motions to

4  dismiss and the ruling on the motions to dismiss is what

5  caused a delay there -- but we went and looked at the docket

6  on the timing there.  The motions to dismiss in *Androgel* were

7  fully briefed by December 21st, 2009, and they were decided on

8  February 22nd, 2010.  So they were decided in two months and

9  just -- and within four and a half months after the MDL was

10 established.  Whatever discovery delays existed and you folks

11 have been living through were not caused by delaying the --

12        THE COURT:  The motions to dismiss weren't the

13 problem.  It was a whole universe of other problems that arose

14 after the Supreme Court said we had to start all over five

15 years into the case.  I certainly know the difference between

16 the *Androgel* issues and what we're talking about today.

17        MR. BALSER:  So it's just a different kettle of fish

18 than what we've gotten here, especially given the productive

19 work that has been done collaboratively between the parties

20 pursuant to the Court's orders, including the scheduling order

21 that we all agreed to.

22        So in sum, your Honor, we think the Court should deny

23 this request to permit plaintiffs to engage in discovery, and

24 I would say if the Court is in any way inclined to consider

25 that request, we would request that the Court require them to

1  file a motion.  There is much more we can and would say in

2  opposition of this and would like to have an opportunity to

3  brief it if the Court is not prepared to just reject the

4  request on the letter briefs.

5          THE COURT:  All right, Mr. Balser.

6          MR. BALSER:  Thank you.

7          THE COURT:  Ms. Sumner.

8          MS. SUMNER:  Thank you, your Honor.  Phyllis Sumner

9  on behalf of Equifax.  I think I can say good afternoon now,

10 and I will address the issue with respect to the interview,

11 the proposed interviews of former employees.

12         Your Honor, respectfully, I think Mr. Canfield is

13 oversimplifying the issue that we are dealing with, and it

14 doesn't truly appreciate what Equifax has gone through with

15 respect to this security incident.  As I'm sure you would

16 appreciate, there has been significant internal investigations

17 and lawyer involvement, in fact, quite a few lawyers involved

18 in the investigation in the defense of Equifax since the

19 security incident occurred.

20         And what Mr. Canfield and his colleagues are

21 suggesting is that they have the ability to go in and speak

22 with former employees and understand when those issues

23 relating to attorney-client privilege may arise based on

24 questions that they've prepared without having any

25 understanding of what Equifax actually went through post

1  incident and including not only the investigation, but all of

2  the communications that lawyers, including myself and many

3  others, have had with those employees.

4      As a result of the incident, in fact, there are a

5  number of former employees that were employed by the company

6  prior to the security incident and are no longer with the

7  company.  There are employees who were involved during the

8  security incident response and are no longer employed.  But

9  they all were involved in attorney-client communications and,

10  in fact, preparing and doing work at the direction of lawyers.

11      So it's a very significant issue in terms of the post

12  breach and what was privileged and what was not privileged,

13  and this is going to be a sticky privilege, issue if we

14  continue on in this litigation, that we will have to deal

15  with.  But it's not something that, based on the very simple

16  outline that has been proposed, that we can expect plaintiffs'

17  counsel to go in and be able to sort through those issues or,

18  frankly, to expect former employees to understand those issues

19  and respond to questions post incident.

20      In addition, your Honor, many of these employees --

21  and I'm making assumptions because we have not had any

22  response to our request to have those individuals identified

23  so that we could have more substantive conversations about the

24  concerns that the company may have, but because we also are

25  aware of a number of investigations and advice that attorneys

1   were involved in pre-incident and, also, the fact that the

2   company has been defending litigation on a number of fronts

3   for several years.  And, in fact, our firm has been involved

4   in talking with a number of employees, many of whom are no

5   longer employed with the company who would have been involved

6   in receiving advice from us having those privileged

7   communications and would have worked at our direction relating

8   to other matters.

9          We don't know, based on the communications that we've

10  received from plaintiffs' counsel, whether the topics or the

11  questions that they've proposed would touch on that because

12  they have not been willing to provide us with any topics or

13  questions that they would cover with these former employees.

14         In addition, your Honor, there are a number of former

15  employees who did sign nondisclosure agreements, and it is

16  true that we have said that alone would not preclude the

17  interview of those former employees.  So we do have some

18  agreement.  Although Mr. Canfield said that we weren't able to

19  reach agreement, we have reached some agreements with respect

20  to understanding that we would be willing to allow those

21  interviews to proceed forward.  We just have to set

22  appropriate parameters to ensure that we protect important

23  sensitive and confidential information.

24         Some of the NDAs go beyond agreements with Equifax.

25  They involve agreements with third parties, and so we also

1  have to be careful about Equifax's obligations to third

2  parties and what Equifax has agreed not to disclose about

3  information.   And those employees may have been involved in

4  those nondisclosure agreements.   There are a number of

5  different nondisclosure agreements, and so it would depend on

6  which employees they identified as to even which nondisclosure

7  agreements would come into play.   This is a very complex issue

8  that continues to get more complex as we dig into the facts

9  without more information about what the plaintiffs envision.

10         Another issue which is of significant concern to the

11  company is the confidentiality around the company's security.

12  Obviously, your Honor, the company is very, very concerned

13  about sharing information that would allow others to

14  understand confidential and very sensitive information about

15  the security of the company.   That would include some of the

16  information that they would seek to obtain pre-breach as well

17  as post breach.   And I'm quite confident that the plaintiffs'

18  counsel would not want to introduce a vulnerability into

19  Equifax's security because they are asking individuals to

20  share information that is highly confidential and sensitive

21  information about security.

22         Again, we don't know what they intend to request

23  information about because they have not shared those topics or

24  the individuals.   But these are all concerns, real concerns,

25  that the company has about just opening the door to plaintiffs

1    in a very simplistic one, two, three, four, this is all we
2    need to tell the former employees, and now they should be
3    allowed to speak.
4         We have been engaged in significant conversations
5    with the plaintiffs' counsel about a process to protect some
6    of these significant concerns, and we do believe there was
7    some progress made all the way to the point where Equifax was
8    even willing to participate in a letter to help outline some
9    of these issues which may be much more productive for
10   plaintiffs' counsel than for them to tell former employees
11   from their perspective that the NDA doesn't apply.
12        It seems liked it would actually be helpful to them
13   to be in a process where Equifax is involved in the
14   communications to those former employees to help them
15   understand that they can speak to plaintiffs' counsel with
16   some parameters and that the NDA would not preclude them from
17   doing that.  But the way that they propose it now has now
18   abandoned the direction that we had been discussing, and they
19   simply would be telling the former employee that they can
20   speak and the NDA would not preclude them from doing so.
21        So we had proposed a letter as well as had some
22   conversations about a script to address some of these
23   significant concerns.  We think we were having some productive
24   dialogue.  That dialogue was most recently information that we
25   had provided back on September 19th that was rejected, and so

1    we're here talking with you now.

2         I think there are a couple of things, your Honor,

3    that we would request you to think about.  One -- and this is

4    based on prior precedent in this court, in fact, a case that

5    Judge Duffey decided.  It is In Re:  Spectrum Brands, and that

6    was a matter in which Judge Duffey considered the plaintiffs'

7    request where they sought an order limiting the scope of a

8    confidentiality agreement or in the alternative, similar to

9    here, a lifting of the discovery stay to allow the plaintiffs'

10   counsel to proceed.  And in that matter Judge Duffey believed

11   that it was -- would be an impermissible advisory decision for

12   the Court to even consider that without having the

13   nondisclosure agreements before the Court and have a deeper

14   understanding of the issues.

15        So, your Honor, I think where we are here today, from

16   Equifax's position, we are asking you if you believe that this

17   is an issue that should be addressed and that you would be

18   inclined to consider an order that it needs to be fully

19   briefed, that this is something that the plaintiffs should

20   bring a motion, that we should have an opportunity to address

21   some of these very significant issues for Equifax.

22        And, frankly, we believe that it would be fruitful to

23   continue our conversations to see if we can get to a point and

24   an agreement where we felt like we were actually making

25   progress and setting up a process to allow them to continue

1  forward.  But if they don't believe that continued discussions

2  would be fruitful at this point, we believe it's very

3  important to move forward with a briefing and motion practice.

4  I'll pause there, your Honor, and ask if you'd like me to

5  address anything else at this point.

6        THE COURT:  Thank you, Ms. Sumner.

7        MS. SUMNER:  Thank you.

8        THE COURT:  Well, I really wanted to resolve this

9  disagreement today, but I don't think I can.  This has been --

10  the letters, the discussion today, have been helpful to me,

11  and I can say there's not going to be any blanket lifting of

12  the stay on discovery.  There may be a limited lifting of the

13  stay if I'm persuaded by motion and full briefing that there's

14  good cause to alter the scheduling order.

15        So, Mr. Canfield, you may be able to obtain some of

16  the relief you're seeking from me, but you'll have to file a

17  formal motion and brief the issues.  And I think the

18  discussion today should be helpful to you in terms of

19  particular points you may want to address in your briefing,

20  and a blanket lifting of the stay is off the table.  Limited

21  lifting is still on the table, and if y'all can negotiate and

22  make further progress than you apparently have in terms of the

23  background preparations for more efficient and more productive

24  discovery, if the motions to dismiss are denied, that would be

25  welcome by me.

1    So you file your motion.  I hope that the briefing on

2  that will be accomplished without any lengthy request for

3  extensions of time by either side so I can address the issue

4  as quickly as possible and we'll move on.

5    MR. CANFIELD:  Thank you, Judge.  We'll do that.  I

6  do have one request.  In getting into the case law, some cases

7  have focused on the specific terms of the NDAs at issue in

8  deciding how to deal with those.  We haven't seen any of the

9  NDAs that Equifax has with its former employees, and we'd

10  request that Equifax give us some exemplars of what those NDAs

11  say so that we can have a full record to brief this on for the

12  Court.

13    MS. SUMNER:  Your Honor, it would be very helpful if

14  they could identify some individuals so that we could actually

15  provide them an example of an NDA that would apply here.  As I

16  mentioned, the company has different confidentiality

17  agreements, some of which involve third parties.  So rather

18  than just blindly turning over NDAs that may be entirely

19  irrelevant, it would be helpful for them to at least provide

20  some sample listing of former employees so that we could base

21  their request on that.

22    MR. CANFIELD:  That's been the problem, Judge.  We

23  don't want to have to identify the former employees that we're

24  speaking to because they don't want Equifax to know they're

25  speaking to us.  So I didn't ask for all their NDAs.  I'm

1   asking just for exemplars.  They know who was involved in the

2   breach.  They know who's left since the breach.  Just give us

3   some examples of the kind of NDAs that are at issue, and if

4   there's a third party exemplar, they can give us one of those.

5   If there's just a normal NDA they use, we'd like an example of

6   that so that we know what we're talking about.

7         THE COURT:  Ms. Sumner, give the plaintiffs four of

8   the agreements of employees that you think the plaintiffs are

9   most likely to want to talk to.

10        MS. SUMNER:  Yes, your Honor.

11        THE COURT:  Anything else on this subject?

12        MR. CANFIELD:  Not from the plaintiffs, your Honor.

13        THE COURT:  All right.  Next -- well, I'm sorry, but

14  we're going to have to take a break, unless you think your

15  part of the agenda is going to be finished in the next five

16  minutes, Mr. Canfield.

17        MR. CANFIELD:  Mr. Siegel is handling the outstanding

18  motions part of our agenda, Judge.  I wouldn't anticipate that

19  it would take a lot of time.  But I'm not arguing it, so I

20  would defer to Mr. Siegel.

21        MR. SIEGEL:  And I in turn would defer to the City of

22  Chicago that's here to argue its first motion.  The remainder

23  on the list should be very brief, your Honor.

24        THE COURT:  All right.  Well, we're going to have to

25  take a break.  Let's take a ten-minute break.

1      COURTROOM DEPUTY:  All rise.  Court is in recess for

2  ten minutes.

3      (Brief recess.)

4      COURTROOM DEPUTY:  All rise.  This Court is again in

5  session.

6      THE COURT:  Thank you.  Be seated.  All right,

7  Mr. Siegel.

8      MR. SIEGEL:  Your Honor, Norm Siegel for the consumer

9  plaintiffs.  I think we've identified in our agenda motions

10  filed in this court that are at various stages.  The only one

11  that's fully briefed for the Court is the motion by the City

12  of Chicago to establish a separate track.  Counsel for the

13  City of Chicago is here.  If it pleases the Court, I propose

14  that he start us off on this motion.  Thank you, your Honor.

15      MR. KANE:  Thank you, your Honor.  Steve Kane for the

16  City of Chicago.  Chicago is asking for either a separate

17  track or a separate complaint within an existing track because

18  we'd like some control over government enforcement claims that

19  nobody else in this MDL is making.

20      Now, Chicago is a city of nearly 3 million people, so

21  just by virtue of our size and public status I think we have a

22  far greater interest in controlling our claims than any

23  particular individual plaintiff would.  And that's

24  particularly true because our claims differ from the claims

25  that are asserted on the consumer track, which is where

1   Equifax and plaintiffs want to put us.

2          First, we base all of our claims on a Chicago

3   ordinance.  It's not even cited in the consumer complaint.

4   And the ordinance differs from the statutes the plaintiffs

5   invoke because it doesn't require us to prove elements like

6   reliance, causation, injury.  We just have to prove an

7   unlawful or unfair practice under an Illinois statute.  And so

8   most of the arguments that Equifax has made in its motion to

9   dismiss just don't even apply to us.

10          Second, we want no part of plaintiffs' class

11   allegations.  Plaintiffs are currently just 96 people.  So

12   they need a class.  By contrast, the data breach probably

13   affected over a million or so Chicagoans, and our ordinance

14   requires a minimum fine of $2,000 per violation.  And each day

15   that the violation continues that's another fine.  So you can

16   see we don't need a class; we don't want a class.  And we'd

17   much prefer to have control over our own claims rather than

18   get caught up in plaintiffs litigating class issues.

19          Third --

20          THE COURT:  So, now, I assume that you've already had

21   a case in which you had filed a complaint that was transferred

22   here by the MDL panel.

23          MR. KANE:  That is correct, your Honor.

24          THE COURT:  So you've got a complaint.

25          MR. KANE:  We do have a complaint.  What we're

1  thinking of, if they're not a separate track but rather a

2  separate complaint, that it would be like the small business

3  complaint so that it would be within a track, but we would get

4  to litigate it concurrently with the other cases.  And I think

5  that's because we've got substantial claims here on behalf of

6  a very large city.  We've got different issues.  We don't want

7  part of this class that I think is going to slow us down.

8          THE COURT:  So I don't want to get into a full blown

9  oral argument on a motion that's already been fully briefed.

10  But does anybody oppose you having your own complaint?

11          MR. KANE:  Well, I don't think they oppose us having

12  our own complaint.  My understanding -- well, actually, I

13  shouldn't say that.  Equifax, I believe, in their opposition

14  did say they don't want a separate complaint.  My

15  understanding -- of course I'll let them speak for

16  themselves -- is that the consumer plaintiffs are fine with us

17  having a separate complaint, but they want us to wait for

18  litigation of their cases until we get to litigate our own.

19          We don't want to be sitting around waiting for class

20  issues that we don't care about to be litigated while we sit

21  on our hands basically.  That's why we want to get going on

22  the same track currently, so we can get to a resolution as

23  soon as we can.

24          Now, I should say Equifax seems to think that the

25  consumer complaint already encompasses our claims.  That is

1    not correct, your Honor.  The consumer complaint says it's
2    brought by individual plaintiffs on behalf of similarly
3    situated persons and supersedes complaints filed by natural
4    persons.  We're not a natural person, so the consumer
5    complaint is not asserting claims for us.  And, as I said, the
6    consumer complaint doesn't even mention the ordinance that we
7    base all our claims on, and it doesn't seek the civil fines,
8    that there's monetary relief that we are seeking.
9            I think plaintiffs' main point is, well, we all seek
10   the same discovery, but this is not about discovery.  I do
11   think the consumer plaintiffs will seek the same discovery we
12   want, and so from that point I get why we're here in an MDL.
13   But whether this should be a separate complaint is a different
14   question.  Given the scope of our claims alleging violations
15   against, I think, over a million Chicagoans, I think we'd like
16   more control than the usual plaintiff gets, and I also think
17   it's important to keep our case distinct from the consumer
18   cases given all the individual -- all the differences, legal
19   differences, there are among the claims.
20           So I think those are our main points, your Honor.  If
21   you have any questions, I'm happy to answer them.
22           THE COURT:  Thank you, Mr. Kane.
23           MR. KANE:  Thank you very much.
24           THE COURT:  Mr. Balser, do you want to say anything
25   about this?

1          MR. BALSER:  Mr. Haskins is going to respond on our

2    behalf, your Honor.

3          THE COURT:  All right, Mr. Haskins.  Again, I'm not

4    expecting full blown oral argument.  I'm just trying to figure

5    out what I need to be doing in the next few weeks.

6          MR. HASKINS:  Understood, your Honor, and I'll try to

7    keep this very brief, as we have filed a response to the City

8    of Chicago's motion here to establish a separate track.  And I

9    will say just succinctly, your Honor, that we don't need a

10   separate track.  Let's start with the claims that the City of

11   Chicago is trying to pursue, which as counsel conceded, they

12   are pursuing on behalf of residents.  Of course those

13   residents are also consumers, and they are Illinois consumers

14   on behalf of who Mr. Siegel and others have pursued,

15   essentially identical claims.

16          Now, the City's claims are based on a City of Chicago

17   ordinance, but that ordinance is based upon the violations of

18   Illinois law.  And, specifically, in this case they allege the

19   violation of two Illinois statutes, the Illinois Personal

20   Information Protection Act and the Illinois Consumer Fraud

21   Act.  In other words, they have to prove violations of those

22   acts to prove a violation of the ordinance, and that's what

23   they've alleged.

24          Well, those acts may sound familiar to your Honor

25   because that's precisely the same acts that the consumer

1  plaintiffs in the consolidated complaint, that they filed

2  earlier this year in Counts 32 and 33, that they allege

3  violations on behalf of Illinois citizens.

4         So, in other words, the consumer plaintiffs in this

5  case, your Honor, have already alleged violations of the exact

6  same statutes on which the City of Chicago's claims are based

7  on behalf of the exact same folks.  In other words, City of

8  Chicago residents are also residents of Illinois.

9         So your Honor is going to have to determine, in

10 ruling on the motion to dismiss that Equifax has filed in this

11 case, as to whether or not those are viable claims and whether

12 or not they can establish violations of the Illinois Consumer

13 Fraud Act and of that Personal Information Protection Act.

14 But we don't need at this stage a new plaintiff interjecting a

15 new complaint on behalf of the exact same citizens pursuing

16 the exact same claims under the exact same laws.  That would

17 simply slow us down.

18        And, finally, your Honor, to the extent that there is

19 a complaint and that we don't need a separate track, nothing

20 has happened to that complaint.  It's essentially been stayed,

21 as the Court knows, pursuant to one of the early case

22 management orders that your Honor entered into.  It's no

23 different than many of the other cases that were transferred

24 as part of the MDL and then now have been stayed while the

25 Court prosecutes the MDL in the manner in which the CMOs have

1  already set forth.

2          And the arguments that the City has made here that

3  claim that there's some legal distinctions with respect to

4  their individual claims on behalf of the City, that's exactly

5  the argument that they made to the JPML, and the JPML rejected

6  it in overruling their opposition to transfer, because as I'm

7  sure the Court is familiar with, under Section 1407 the whole

8  purpose of transferring cases that arise from the same set of

9  facts and circumstances is to promote the just and efficient

10 resolution of those cases.

11         I would submit to you, your Honor, allowing control

12 by an individual plaintiff -- because that's all the City is

13 because the rest of their claims on behalf of these Chicago

14 residents are all subsumed by the consumer class action

15 complaint.  Allowing an individual plaintiff to have control

16 over discovery and other aspects of the case is exactly the

17 opposite of what consolidation and transfer under Section 1407

18 is designed to achieve.  In fact, it would be not only

19 inefficient but unjust to allow them to inject themselves into

20 the case at this stage.  Thank you, your Honor.

21         THE COURT:  Mr. Siegel, what do you say?

22         MR. SIEGEL:  Very briefly, your Honor.  I think you

23 put your finger on it, that there is a complaint in this MDL

24 that was sent pursuant to 1407.  That complaint is there.

25 What we were trying to discern is whether the City's claims

1  are on behalf only of the citizens, in other words, are they

2  just making claims on behalf of those citizens which are, in

3  fact, covered by our complaint or are they bringing claims

4  exclusively on behalf of the City of Chicago?  Is the City

5  seeking to recover?

6          To the extent they are, that complaint is there.  The

7  City has conceded discovery is the same, so we will be

8  pursuing that discovery.  We've indicated directly and in our

9  papers that we would certainly hear from the City if they had

10  specific discovery they wanted.  But in terms of the specific

11  request before the Court for a separate track, it's just

12  simply not necessary for those reasons.

13          There's another major practical thing coming down the

14  pike here.  We have a pending motion from the Block plaintiffs

15  claiming they need a separate track because they've sued

16  individuals.  That's not fully briefed yet, your Honor, so

17  it's not before the Court.  But that's coming.  We know Puerto

18  Rico, the commonwealth of Puerto Rico, filed a similar motion

19  to the JPML seeking to have their case outside of the MDL for

20  the same reasons the City of Chicago sought to have their case

21  outside of the MDL.  I suspect the JPML tomorrow will send

22  that case here.  Presumably they will want a separate track.

23  None of that is necessary given how we structured this.

24          Those cases can be litigated to the extent there are

25  things to litigate after our tracks have completed or moved

1 | down the road at least, but at this point the specific relief
2 | sought by the City should be denied.
3 |      THE COURT:  All right.  Well, I'll look at the
4 | papers, of course, and try to get out an order on this
5 | particular motion as quickly as I can.
6 |      MR. SIEGEL:  Thank you, your Honor.
7 |      THE COURT:  Do you need to say anything else about
8 | the Block case motion, Mr. Siegel?
9 |      MR. SIEGEL:  I think the only thing we need in Block
10 | is a, pursuant to CMO 5, is a schedule for us to respond to
11 | the motion for a separate track.  Do you want to speak to
12 | that, Stewart?
13 |      MR. HASKINS:  Yes, your Honor.  We would just ask for
14 | 45 days for the opportunity to respond to that.  The reason
15 | why we need a little bit additional time with respect to that
16 | motion is that Mr. Block has named some individual defendants
17 | in that case, and those individual defendants will need an
18 | opportunity to retain counsel and determine if they want to
19 | file their own responses to Mr. Block's motion for a separate
20 | track.
21 |      MR. SIEGEL:  No objection to 45 days.
22 |      THE COURT:  45 days is fine.
23 |      MR. HASKINS:  Thank you, your Honor.
24 |      MR. SIEGEL:  Thank you, your Honor.  And I think the
25 | others, the motions that we've identified on the agenda, are

1   going through the briefing process, and no further action is

2   needed today from the Court.  We're just flagging them for

3   ourselves and for the Court's benefit.  Thank you, your Honor.

4          THE COURT:  All right, Mr. Siegel.  Mr. Canfield, are

5   we down to the date of the next status conference?

6          MR. CANFIELD:  Almost.  There are a couple of

7   housekeeping issues that we would like to raise.  The first is

8   an item of information about which the Court is probably

9   already aware, but, if not, Judge Westmoreland has entered an

10  order staying the state court cases.  So they will not be

11  moving forward while the MDL is in process.

12         THE COURT:  I was not aware of that.

13         MR. CANFIELD:  Well, that's -- I'm glad we raised it.

14  The second issue relates to an issue that occurred yesterday

15  with regard to Mr. Worley sending out notice of a conference

16  call that's available to counsel if we want to participate by

17  phone rather than attend the hearing.  And if need be,

18  Mr. Worley can address this in more detail, but my

19  understanding is he has not sent the conference call

20  information to all the lawyers who have entered an appearance

21  in the case.  We're not even sending the conference call

22  information to all of the lawyers who have been appointed to

23  leadership.

24         We've done that because consistent with the Court's

25  order we didn't want to encourage people to listen in, when it

1   wasn't necessary that they do so, and then bill for that.  But

2   we wanted to comply with the direction of the Court, and so we

3   have a question.  And the question is, do we need to more

4   widely circulate the conference call information than we have

5   been doing or should we limit it to those people who have a

6   particular interest in participating in a hearing?

7          THE COURT:  Well, it should be limited to plaintiffs'

8   leadership counsel and others that the leadership thinks may

9   need to participate.  It was never intended to be everybody

10  that's involved in this case.  That's the whole point of

11  having leadership structure, is so everybody doesn't have to

12  do everything and bill for it and expect to be paid for it.

13         MR. CANFIELD:  Thank you, Judge.  That's the answer

14  that we were actually looking for, and that's what we will

15  continue to do.

16         That brings us to the date of the next status

17  conference and consistent with the way that we usually handle

18  these, the parties can work with Ms. Sewell to come up with a

19  date that meets with the Court's approval at an appropriate

20  time.  I think that it probably makes sense to have another

21  conference within the next 30 to 45 days, unless the Court is

22  going to schedule oral argument soon enough that it's not

23  necessary, but I believe the best thing to do would be to set

24  a date for oral argument to deal with the kinds of issues that

25  have been coming up at the ordinary course separate and apart

1  from the oral argument on the motions to dismiss.

2          THE COURT:  Well, we're going to have oral argument,

3  and it's going to be in December if a date can be found that

4  will suit all of y'all.  I don't have a trial calendar

5  published for December, so finding a day on my calendar should

6  be fairly easy.  So we're going to do that.  Do you think we

7  need a status conference in addition to that?

8          MR. CANFIELD:  I think it's helpful to move the case

9  along and because it always -- the existence of that date

10  tends to make people more reasonable and responsive to each

11  other.

12          THE COURT:  Fine.  We'll do it.

13          MR. CANFIELD:  And so if the Court can give us

14  something in mid November.  And if it's not necessary, we'll

15  cancel it.

16          THE COURT:  Fine.  Y'all get together with Ms. Sewell

17  after I leave the bench and see if you can find a date in mid

18  November for the next status conference.

19          MR. CANFIELD:  Thank you, Judge.  That completes the

20  status conference agenda.

21          THE COURT:  Okay.  Next is the In Re:  Equifax

22  derivative litigation.

23          MR. CANFIELD:  May we be excused in the consumer

24  track?

25          THE COURT:  Yes.

```
 1            MR. CANFIELD:  And the financial institution track?
 2            THE COURT:  Yes.
 3            MR. CANFIELD:  Thank you, your Honor.
 4            MR. SIEGEL:  Thank you, your Honor.
 5            (Whereupon, some consumer track and financial
 6    institution track counsel exited the courtroom.)
 7            THE COURT:  Mr. Weiss, are you still on the phone?
 8            MR. WEISS:  Yes, I am, your Honor.
 9            THE COURT:  All right.  I'll hear from you first.
10            MR. WEISS:  Thank you, your Honor.  I appreciate it.
11    As you know, we represent the lead derivative plaintiffs,
12    Nancy and John Weyl.  And based upon the previous arguments,
13    your Honor has a lot to digest, and I'm not going to add to
14    the indigestion.  I can tell you that our agenda and the
15    report are really more straightforward, I think, without any
16    disputes.
17            As the Court presumably is aware, we filed the
18    consolidated derivative complaint on July 12th of this year,
19    and pursuant to a stipulation of the parties, the Court
20    entered an order that the defendants are not required to move
21    or answer until, I guess, until further order of the Court.
22            So what we've done in the interim, since the last
23    status conference, is we've had a continuing dialogue with
24    counsel for the Demand Review Committee to arrange a meeting,
25    and we have, in fact, had a productive telephonic meeting with
```

1   the committee on August 30th, 2018, in which I made a

2   presentation to the committee including input from our expert,

3   which I'll get to in a moment, your Honor.  And we've agreed

4   to have follow-up meetings and conversations which really will

5   be influenced by the decisions on the motions to dismiss the

6   securities and consumer cases.

7          As to the expert, your Honor, we've informed the

8   defendant -- and we're not trying to keep anything under our

9   sleeve here -- that we've retained as our experts the Chertoff

10  Group, which is a global advisory firm focused on security and

11  risk management.  The company was founded in 2009 by Michael

12  Chertoff, the former Secretary of the Department of Homeland

13  Security, and Secretary Chertoff still heads the firm and

14  recently published a book entitled "Exploding Data:

15  Reclaiming our Cyber Security in the Digital Age".

16         So we're going to be working with him, and we're

17  going to be working with Robert Anderson, who's a principal at

18  the Chertoff Group.  Mr. Anderson retired from the FBI after

19  over 20 years of service.  The last position which he held was

20  executive assistant director of the Criminal Cyber Response

21  and Services Branch of the FBI where he was responsible for

22  all criminal and cyber investigations worldwide, as well as

23  international operations, critical incidents response, and

24  victim assistance.

25         Some of the other principals at the Chertoff Group

1  whose expertise is available to us are General Michael Hayden,

2  the former Director of the CIA and NSA; Jayson Ahern, former

3  head of U.S. Customs and Border Protection; Jay Cohen, former

4  Under Secretary for Science and Technology at the Department

5  of Homeland Security and former Chief of Naval Research.

6           And I go through this, your Honor, because I think it

7  was helpful to us in the conversation that we had with the

8  Demand Review Committee, and we're going to be able to tap

9  into what is really a vast amount of talent and knowledge as

10 we continue on with this case, particularly together with our

11 expert when we have the opportunity hopefully in the future to

12 meet with the companies' in-house representatives, such as the

13 CISO and outside experts and others.

14          So, as I said, I think much of what we're doing is

15 probably going to be very influenced by the decisions on the

16 motions to dismiss in the consumer and securities cases, but

17 our points are very different obviously.  And hopefully the

18 cooperative engagement with counsel for the Demand Review

19 Committee and with counsel of the company will continue.

20 That's really all I have to say, your Honor, unless you have

21 any questions.

22          THE COURT:  Thank you, Mr. Weiss.

23          MR. WEISS:  Thank you.

24          THE COURT:  Mr. Sherman, are you here on the

25 derivative case?

1          MR. SHERMAN:  Yes, sir.

2          THE COURT:  Anything you want to say on behalf of

3    Equifax?

4          MR. SHERMAN:  I'll actually leave it to -- for the

5    Demand Review Committee, to my colleague, and actually Equifax

6    is represented separately by King & Spalding.

7          MR. POPE:  Mr. Pope on behalf of Equifax, your Honor.

8          THE COURT:  We had you in the wrong case, Mr. Pope.

9          MR. POPE:  Well, I'm in both cases, your Honor,

10   securities litigation and derivative litigation, but I

11   represent the company and certain individuals in derivative.

12   We have nothing to add to what Mr. Weiss said on this agenda,

13   and I'll turn it over to who represents the Demand Review

14   Committee, your Honor.

15         MS. ELLIOTT:  April Elliott on behalf of Ms. Stock

16   and the Committee.  We don't have anything to add either.

17         THE COURT:  All right.  Thank you.  So that's it for

18   the derivative case, Mr. Pope?

19         MR. POPE:  Yes, from our perspective, your Honor.

20         THE COURT:  All right.  Then we'll move on to the

21   securities litigation agenda.

22         UNIDENTIFIED COUNSEL:  Your Honor, is it okay if

23   we're excused, derivative counsel?

24         THE COURT:  Yes.

25         UNIDENTIFIED COUNSEL:  Thank you, your Honor.

1          (Whereupon, derivative counsel exited the courtroom.)

2          MR. HARROD:  Sorry, your Honor.  I know you're trying

3    to keep this moving.  James Harrod for lead plaintiff in the

4    securities case.  We have two agenda items.  I think we can

5    keep it short.  The first one is just a general status that

6    the motion to dismiss is now fully briefed.  The defendants

7    filed their reply brief in late August.  And I will -- to be

8    totally candid with your Honor, the defendants had previously

9    raised with us the idea of oral argument, and I was prepared

10   to take no position and to defer to the Court in the interest

11   of trying to figure out whether or not you thought it would be

12   helpful for us to present oral argument to you on the motion

13   to dismiss.

14          After hearing what you said earlier today with

15   respect to the MDL, my assumption is that you will also want

16   oral argument in the securities case.  And if that's true --

17          THE COURT:  Somebody go shut that door back there for

18   me, please.

19          MR. HARROD:  And the only thing that I would offer --

20   and I haven't talked to my colleagues who represent the

21   defendants -- is that I don't think we need to wait, and I

22   think it would probably be better to have an oral argument for

23   the securities cases sooner.  I would propose some time, I

24   guess, in October.  The motion has been, you know, fully

25   briefed now, so I think that would be appropriate if it's

1  consistent with your Honor's view that you expressed with
2  regard to the MDL and subject to counsel for the defendants,
3  you know, agreement and availability.  So we can work that out
4  and propose some dates to you if that's --
5          THE COURT:  Well, Mr. Harrod, unfortunately October
6  is another train wreck, but anyway we'll -- I'll see.
7          MR. HARROD:  Or, you know, November.  But I guess the
8  larger point was it probably, at least from my perspective,
9  and obviously it's up to you, it doesn't seem that -- at least
10 in terms of the legal issues, they are pretty distinct from
11 the legal issues in the MDL cases.  And that sounds like it
12 will be a very long day anyway, so it seems it would be
13 beneficial to not have the arguments on the same day.
14         THE COURT:  Not going to do it on the same day.
15         MR. HARROD:  All right.  The only other issue I have
16 on the agenda is with respect to your order of June 18th which
17 partially modified the PSRA discovery stay.  And we have
18 made -- I'm happy to report we have made some progress, and
19 your Honor has entered, I believe, three orders at this time,
20 a confidentiality stipulation, a proposed order for a
21 discovery schedule, and an ESI protocol.
22         One of the things that was provided for in your order
23 and this is -- that order is Docket Entry 64 in the securities
24 case, and on page 24 you directed the parties to meet and
25 confer regarding the custodians whose ESI will be searched and

1    what search terms will be used to search for ESI in response

2    to any initial requests for the production of documents and

3    report to the Court within 75 days of this order on any

4    disagreements or issues with respect to that process.

5            So on August 8th we served our first request for

6    production of documents on the defendants with the hope that

7    this would begin the process of a discussion regarding

8    custodians and search terms.  Contemporaneous with when we

9    served those requests, we asked defendants to make proposals

10   to us by September 17th.  We thought that would give them

11   enough time to put something together.  September 17th came,

12   and we didn't hear from them.  We followed up with them on the

13   18th and asked them if they would be providing some proposals.

14           In response they suggested we have a call, which we

15   had on Monday of this week, and prior to that I'd sent them an

16   email and said can you let us know if you're going to make a

17   proposal, can you let us know if you've exchanged information

18   regarding custodians and search terms with the MDL plaintiffs

19   and whether or not you'll provide that with us.  During the

20   call -- and I'll let Mr. Pope express the company's position.

21   But basically what they said was we'll give you what we've

22   given the MDL plaintiffs regarding custodians.  We have

23   collected documents regarding the data breach that is in a

24   comprehensive manner, and we expect that that will be the

25   starting point for any production that is made in the

securities case.

But when I asked them if they would give us the search terms and the custodians related to that collection, I think that their position is that they will not.  And so our view is that we can't identify disagreements to the Court about custodians, and we have made some progress.  They did give me the information from the MDL that they shared with the plaintiffs this morning, but I don't think that they're going to engage with us or provide us with the search terms that they used to collect the documents that they are going to rely upon in producing documents in the securities case.

So I think we need that because I can't identify search terms or disagreements regarding search terms if I don't know what search terms they've used to collect the documents that they're going to give to us or some subset of that that they're going to give to us.  So I think that I would like to have them directed to do that and that we be required, both of us, to meet and confer regarding that and report back to the Court in some period of time, 30 days, 45 days, and hopefully that will allow us to work towards this.

And the reason why this is important, it goes back to what you put in your order of June 18th modifying the stay.  And what we heard a lot from Mr. Canfield is that what we're trying to do with this process is to set up much of the background work that is required so that when and if discovery

1  does begin in the case, we won't lose months of that discovery

2  period trying to just set the groundwork for whose documents

3  and how we're going to find them.  That will have been done.

4  And so this is all directed at using the time we have now

5  while the motions to dismiss are pending to achieve that kind

6  of progress and as best we can come to an agreement or, if

7  not, identify disagreements and present them to your Honor.

8         That's all I had for today, so if you have any

9  questions.

10         THE COURT:  Mr. Pope.

11         MR. POPE:  Your Honor, very little from me.  I too

12  listened today thoroughly and intently.  As far as oral

13  argument, we'll confer with the plaintiffs.  November is fine

14  for us.  We'll get with Ms. Sewell on a date, and we

15  appreciate your willingness to consider that.

16         With respect to ESI, we just met and conferred

17  Monday.  We're months behind what happened in the MDL.  I

18  gave -- Mr. Harrod recommended to work with him.  If he wants

19  an order that we have to meet and confer within the next 45

20  days on these issues, that's fine.  I've got no objection to

21  that.  I want to meet and confer with him.

22         We've heard what the Court has said.  We haven't

23  taken any position on search terms.  This is very fluid, very

24  new.  And so, again, the idea is to meet and confer, we'll

25  meet and confer, but there's certainly no impasse now.  And we

1    are months behind the impasse that we saw today, if there is

2    such a thing in the other case.   That's all I've got, your

3    Honor.

4          THE COURT:   Well, I'll reiterate what I said in my

5    earlier orders in the securities litigation case, and that is

6    I want to see progress made.   And it doesn't sound like you're

7    at an impasse, but between now and the next status conference

8    I want some progress to be made.   And that's really about all

9    I'm going to say today.   But I learned from *Androgel*.   It was

10   a painful lesson, and I don't want it to happen again if I can

11   avoid it in Equifax.   And that's about all I'm going to say

12   more than what I've already said.

13         Anybody else want to say anything in the securities

14   case?   All right.   Then I think that takes care of all three

15   cases, and this status conference is concluded.   Court is in

16   recess until further order.

17         COURTROOM DEPUTY:   All rise.   Court is in recess.

18         (Whereupon, the proceedings were adjourned at 1:05

19   p.m.)

20                        -  -  -

21

22

23

24

25

```
 1                        REPORTERS CERTIFICATE

 2

 3

 4            I, Wynette C. Blathers, Official Court Reporter for

 5    the United States District Court for the Northern District of

 6    Georgia, with offices at Atlanta, do hereby certify:

 7            That I reported on the Stenograph machine the

 8    proceedings held in open court on September 26, 2018, in the

 9    matter of IN RE:  EQUIFAX, INC. CUSTOMER DATA SECURITY BREACH

10    LITIGATION, Case Nos. 1:17-MD-2800-TWT, 1:17-CV-3463-TWT,

11    1:18-CV-317-TWT; that said proceedings in connection with the

12    hearing were reduced to typewritten form by me; and that the

13    foregoing transcript (Pages 1 through 67) is a true and

14    accurate record of the proceedings.

15            This the 27th day of September, 2018.

16

17

18

19                          _____

20                          /s/ Wynette C. Blathers, RMR, CRR
                                 Official Court Reporter

21

22

23

24

25
```