**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| IN RE: EQUIFAX, INC. CUSTOMER DATA SECURITY BREACH LITIGATION | MDL Docket No. 280 |
| | Case No. 17-MD-2800 |
| | Chief Judge Thomas W. Thrash, Jr. |

**SOVEREIGN TRIBAL GOVERNMENT'S BRIEF IN SUPPORT OF
MOTION TO ESTABLISH SEPARATE INDIAN TRIBAL
GOVERNMENTS TRACK**

Plaintiff Fond du Lac Band of Lake Superior Chippewa (U.S. Dist. Ct., MN No. 0:18-cv-02381, transferred to MDL 2800 by CTO-25 on August 29, 2018), Plaintiff St. Croix Chippewa Indians of Wisconsin (U.S. Dist. Ct., WIW No. 3:18-cv-00547, transferred to MDL 2800 by CTO-25 on August 29, 2018), and Plaintiff Red Cliff Band of Lake Superior Chippewa (U.S. Dist. Ct., WIW. No. 3:18-cv-00903, transferred to MDL 2800 by CTO-32 on January 10, 2019) (collectively hereinafter the "Moving Tribal Governments") respectfully request this Court to issue an Order establishing an Indian Tribal Governments Track within this MDL.[1] Any other approach would marginalize the principles and

---

[1] *See* Exhibit 1: Certificate of Conference.

roles of tribal sovereignty, tribal culture, strong *parens patriae* interests by tribes in all financial matters affecting their  tribal members, and potentially frustrate a broad array of federal laws including federal treaties and statutes.[2] This Memorandum Brief sets forth the Moving Tribal Governments' points and authorities in support of a separate Indian Tribal Governments Track.

I.   **A Review of Indian Tribal Nations and Federal Indian Law and Policy Favors the Creation of a Separate Indian Tribal Governments Track.**

Indian tribal governments are sovereigns within the borders of the United States. Tribal sovereignty comes, first and foremost, from tribal law. Indian tribes are "'separate sovereigns pre-existing the Constitution.'" *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014) (*quoting Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978)). Tribes persist as "'distinct, independent political communities, retaining their original natural rights' in matters of local self-government." *Santa Clara Pueblo*, 436 U.S. at 55 (*quoting Worcester v. Georgia*,

---

[2]   The Honorable Aaron Polster, U.S. District Judge, N.D. Ohio, in the *In re Prescription Opiates Litigation*, MDL No. 2804, established an independent Indian Tribe Track well after the constitution of that MDL for many of the same reasons as stated in this Brief. In fact, much of the content in this Brief was taken directly from the amicus brief filing by over 400 Tribes in response to various motions to dismiss filed by the Defendants in MDL No. 2804. While the undersigned counsel participated in that amicus brief, a remarkable document in and of itself, authorship attribution is due to all of the law firms that participated in that brief.

31 U.S. (6 Pet.) 515, 519 (1832)). There can be no question that Indian Tribes make up a unique category of litigants in the instant litigation.

The United States government extends formal recognition to 573 tribal entities, known as "federally recognized tribes." *See* Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 83 Fed. Reg. 34863 (July 23, 2018). As a result of federal recognition, all recognized tribes maintain "a government-to-government relationship" with the United States, which in turn "recognizes the sovereignty of those tribes[.]" FEDERALLY RECOGNIZED INDIAN TRIBE LIST ACT OF 1994, PL 103–454, November 2, 1994, 108 Stat. 4791. Tribes are certainly unlike any other category of litigant in the Equifax MDL.

When the United States organized itself under the Constitutional Convention, Tribes were not parties to the Convention, and unlike the States, Tribes did not consent to incorporation into the United States or surrender *any* sovereign rights as part of that Convention. *See, e.g.*, *Bay Mills Indian Cmty.*, 572 U.S. at 789-90. For tribes, the Equifax data breach is another challenge in a series of external threats challenging the tribes' sovereignty and their unique culture of governance and ways of life. The importance of these historical lessons must not

be lost in the context of anything a tribe does, including litigation.

Following the Revolutionary War of 1776 and adoption of the United States Constitution in 1789, United States Indian policy largely facilitated the wholesale transfer of Indian lands and resources to white settlers. Nevertheless, treaties between the United States and Indian tribes served as formal recognition of tribal sovereignty. This understanding was reflected in the Constitution itself, which reserves for Congress the exclusive power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. CONST. art. I, § 8, cl. 3.[3]

Since the Constitution, federal Indian policy has been inconsistent. There are conflicting policy goals embodied in a myriad of judicial decisions, Acts of Congress, executive orders, administrative rules and decisions, federal agencies and departments, with an entire chapter in the United States Code devoted to almost every aspect of tribal existence. In conjunction with these federal forces, the actions of state governments and private individuals, often seeking to encroach

---

[3] The apportionment clauses, by excluding "Indians not taxed" from the population count for purposes of representation in Congress, also appears to recognize the separate political status of tribes. *Id.* art I, § 2, cl. 3, *superseded by id.* amend. XIV, § 2 (apportioning representation according to population, "excluding Indians not taxed").

upon or profit from tribal land and resources through fraud, coercion, or outright violence, have left an indelible mark on Indian life over the years.

In the 19th century, the United States continued to enter into various treaties -- taking tribes under its "protection," providing annuities, payments, goods and supplies, and initiating various health and educational services or resources – in exchange for settlement rights to vast quantities of land and peace commitments.[4] The origins of many of the federal service programs for Indians today, including health care programs for Indians, can be traced to these treaty promises as well as the broader federal trust responsibility, which itself arose in part from the development and implementation of federal Indian laws and policies that otherwise benefitted white Americans at the expense of tribal interests. Thus, these trust services are viewed by tribes as a continuing obligation arising from the cession of vast amounts of land and other historical dealings.[5]

---

[4] *See, e.g.*, Treaty with the Six Nations, preamble, Oct. 22, 1784, 7 Stat. 15, 15 ("The United States of America give peace to the Seneca's, Mohawks, Onondagas and Cayugas, and receive them into their protection[.]"); Treaty with the Flatheads, etc., arts. I, V, Flatheads-U.S., July 16, 1855, 12 Stat. 975, 975–77 (promising "to erect a hospital, keeping the same in repair, and provided with the necessary medicines and furniture, and to employ a physician" for a period of 20 years).

[5] *See* COHEN'S HANDBOOK, § 1.03[1]; 25 U.S.C. § 1901 (Supp. IV 2016) ("Congress, through statutes, treaties, and the general course of dealing with Indian

Despite the early treaties, which reserved homelands and exclusive jurisdictional authority for many tribes within the states that had formed around them, Andrew Jackson infamously pursued his Indian removal policy leading to the Trail of Tears and other forced marches from the southeast to the new Indian Territory west of the Mississippi River. Instigated by the states and endorsed by Congress in the Indian Removal Act of May 28, 1830, ch. 148, 4 Stat. 411, this separatist policy was designed to rid the new states of rival sovereigns and open up tribal homelands for white settlement and commercial exploitation. Repeatedly, Indian ownership and treaty rights to land were ignored by surveyors, speculators, and settlers. Rather than step in to police the wrongdoing of its citizens, the United States pushed the tribes westward to accommodate State and private interests in tribal resources. Indian people were removed from their homelands and separated, yet those who survived reestablished themselves as fully functional tribal entities in their new homelands.

In pursuit of Manifest Destiny coupled later with the California Gold Rush, the United States generally sought either to exterminate native populations through

---

tribes, has assumed the responsibility for the protection and preservation of Indian tribes and their resources[.]").

war (an effort that largely failed, but not without devastating costs) or confine them to reservations.  In the midst of this turmoil, federal policy shifted to assimilation. Congress declared the end of treaty making in 1871. Act of Mar. 3, 1871, ch. 120, § 1, 16 Stat. 544, 566 (codified as amended at 25 U.S.C. § 71 (2012)). Congress then passed the General Allotment Act, or Dawes Act, of 1887. General Allotment Act of 1887 (Dawes Act), ch. 119, 24 Stat. 388 (codified as amended at 25 U.S.C. §§ 331–358 (2012)). The Dawes Act provided for the breakup of tribally owned reservation lands by allotting them to individual Indian owners, in order to speed the "civilization" of Indians by attempting to demolish communal life. "Surplus" lands, or unallotted tribal lands, were ceded or sold off to non-Indian settlers and corporations, while allotted lands were taken out of trust and frequently acquired by opportunistic non-Indians through purchase, fraud, and other "legal" and illegal means. Consequently, the Indian land base dwindled from 138 million acres in 1887 to 48 million acres by 1934. Although the policy of allotment was later repudiated, its legacy can still be seen in the high fractionalization of ownership and the jurisdictional "checkerboard" of many reservations.

The allotment era also saw the rise of federal domination of life on the reservations and the suppression of tribal governments. The Bureau of Indian

Affairs (BIA), originally housed in the War Department, was transferred to Interior in 1849 and became the primary administrative force in Indian country, squelching as much as possible the exercise of tribal cultural practices, religions, and governing authority. As Congress later noted, "[o]fficials of the BIA assumed the role of colonial administrators on the reservations and administered programs and services on the reservations under a policy which later became known as 'paternalism.'" *See* H.R. REP. NO. 93-1600 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7775, 7781. Federal domination included Indian schools, infamous for removing young children from their homes, cutting their hair, punishing them for speaking their native languages, subjecting them to unspeakable abuse, and generally attempting to "kill the Indian . . . and save the man."[6] Tribal citizens and communities today still suffer from the horrible legacy of the boarding school system and the violent loss of Indian children from their families, communities, and cultures, and from intergenerational trauma associated with historical attempts to destroy indigenous ways of life.

---

[6] Richard H. Pratt, *The Advantages of Mingling Indians with Whites* (1892), *in* AMERICANIZING THE AMERICAN INDIANS: WRITINGS BY THE "FRIENDS OF THE INDIAN" 1880-1900, at 261 (Francis Paul Prucha ed., 1973). Captain Pratt was the founder of the Carlisle Indian School in Pennsylvania.

In 1934, Congress reversed the policy of allotment by passing the Indian Reorganization Act (IRA or Wheeler-Howard Act). 48 Pub. L. No. 73-383, Stat. 984–88 (1934) (codified as amended at 25 U.S.C. §§ 461–479 (2012)). The IRA authorized the Secretary of the Interior to take Indian lands into trust (and thus off state and local tax rolls). 25 U.S.C. § 465; *see also Carcieri v. Kempthorne*, 497 F.3d 15 (1st Cir. 2007). Yet less than ten percent of the land lost to allotment has been restored. *See* S. REP. NO. 112-166, 5 (2012). For the most part, in order to restore their own homelands to tribal control, tribes must now purchase that land on the open market, with their own resources, then petition the Secretary to take the land into trust. It is a protracted and expensive process governed by regulations that, among other things, requires the Secretary to solicit and consider the views of neighboring non-Indian governments. 25 C.F.R. §§ 151.1 – 151.15 (2014).

The IRA attempted to revitalize tribal self-government by providing for formal adoption of tribal constitutions, tribal corporations, and formal tribal membership enrollment procedures. 25 U.S.C. § 476. Two decades after enacting the IRA, Congress shifted course once again and embarked on the Termination Era, during which the United States formally repudiated government-to-government relations with over 100 Indian tribes, thus ending their federal

recognition as tribes. *See* H.R. Con. Res. 108, 67 Stat. B132, 83d Cong. (Aug. 1, 1953) (enacted). The goal of termination was to end federal supervision and control over the Indian "wards," weaken tribal governments, and assimilate individual Indians, often through government-sponsored relocation programs that moved Indians from reservations to large cities such as Los Angeles, Chicago, and Minneapolis.

By the Civil Rights era of the 1960s, Indian activism and the utter failure of termination policy combined to form the emergence of recognition of Indian tribal rights to self-determination.  In 1970, tribal leaders persuaded President Richard Nixon to commence a new era of federal Indian policy.[7] President Nixon acknowledged the corrosive effects of termination on tribal communities, as well as the failures of the paternalistic federal bureaucracy. The solution was neither termination nor assimilation—which amounted to the same thing—but tribal self-determination.

In 1975, Congress enacted the Indian Self-Determination and Education Assistance Act (ISDEAA), Pub. L. No. 93-638, 88 Stat. 2203 (codified as amended

---

[7] PRESIDENT NIXON'S MESSAGE TO CONGRESS TRANSMITTING RECOMMENDATIONS FOR INDIAN POLICY, H.R. DOC. NO. 91-363, at 3 (1970) [hereinafter NIXON'S MESSAGE TO CONGRESS].

at 25 U.S.C. §§ 5301–5399), bringing in the modern, long-awaited policy of self-determination. The ISDEAA allows tribes to operate federal programs for Indians (including health programs) by contracting with the federal government to carry them out, "[i]n effect . . . step[ping] into the shoes of the federal [agencies]" that formerly provided those programs and services.[8] The tribal assumption of federal programs under the ISDEAA began with self-determination contracting under Title I, unique government-to-government agreements. While they are legally binding to the same extent as regular contracts, *see Cherokee Nation of Okla. v. Leavitt*, 543 U.S. 631, 638–39 (2005), they differ significantly from ordinary government procurement contracts. ISDEAA contracts are generally exempt from the Federal Acquisition Regulations and other Federal contracting or cooperative agreement laws, 25 U.S.C. § 5324(a)(1), and contract proposals cannot be declined by the Secretary except for specific reasons provided in the statute. 25 U.S.C. § 5321(a). Tribes have the right to reallocate funds awarded in a contract, provided the reallocation does not "have an adverse effect on the performance of the contract," 25 U.S.C. § 5325(o), and to redesign any non-construction program. 25 U.S.C. §

---

[8] Geoffrey D. Strommer & Stephen D. Osborne, *The History, Status, and Future of Tribal Self-Governance Under the Indian Self-Determination and Education Assistance Act*, 39 Am. Indian L. Rev. 1, 21 (2015).

5324(j). These rules reflect the fact that tribes carrying out programs under the ISDEAA are not mere contractors, but sovereign governments carrying out ancient governmental functions. Congress later expanded the ISDEAA via the Tribal Self-Governance Demonstration Project under Title III, then the permanent Self-Governance programs under Titles IV and V.[9]

Through self-determination contracts and self-governance compacts under the ISDEAA, tribal governments carry out a broad range of governmental services directly for their tribal members. These include, among others, health care, law enforcement, tribal courts, social services, and child welfare programs. Further, self-determination policy is reflected in additional legislation that empowers tribal governments to play a greater role in the provision of trust services to their communities, like the Native American Housing and Self-Determination Act ("NAHASDA"), 25 U.S.C. § 4101 *et seq*.

Perhaps the most significant of self-determination legislation is the Indian Child Welfare Act ("ICWA"), 25 U.S.C. § 1901 *et seq*. Congress recognized "that

---

[9] *See* Strommer & Osborne, *supra* note 7, at 30–31 ("'Self-governance' refers both to the broad principle that tribes have the right to govern themselves, and to particular statutory rights enabling them to do so through the use of federal program funding.").

there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children[.]" 25 U.S.C. § 1901(3). This allowed Tribes to halt decades of unwarranted removals of Indian children from Indian families by non-Indian child welfare agencies and private adoption agencies, in many cases aided by the states and state courts. *See* 25 U.S.C. § 1901(4), (5) (Congressional findings). In a tragic reflection of the earlier boarding school policies, studies referenced in ICWA's legislative history revealed that large numbers of Indian children (between 25% - 35%) were being separated from their parents, extended families, and communities, with an overwhelming percentage (approximately 90%) placed outside of their families and communities—even when relatives were available. *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32–33 (1989). The ICWA confirms exclusive tribal court jurisdiction over on-reservation child custody matters, 25 U.S.C. § 1911(a); establishes a presumption for transfer to tribal court jurisdiction over off-reservation cases involving Indian children, 25 U.S.C. § 1911(b); and establishes preferences for placement of Indian children in foster care and adoptions, 25 U.S.C. § 1915.

## II.    Factual Issues Unique to Indian Tribes in the Equifax Litigation

The claims of Indian tribes in this litigation present unique factual issues

and require special discovery considerations. The vulnerability of Native Americans to security data breaches and the adverse consequences to each tribe and its members produce greater financial hardship among Indian tribal members already living in poverty. These concerns are not presented, or at least not presented so clearly and uniquely, by other tracks of litigation in MDL 2800.

American Indian youth need special protection provided by the tribe of which they are members. They have the lowest high school graduation rate at 69%, well below the national average. Policies in the 1800s resulted in tribes being forced to move away from their homeland into rural areas and underpopulated communities; therefore today, many tribal members must travel a great distance to access essential services such as food and retail shopping. This requires even more reliance by tribal members on maintaining security for their online identities and personal information in order to securely transact their business over the internet.

Native people strive, daily, on every reservation, to protect their heritage and culture. Identity theft and security breaches make this daily task even harder to attain. Identity theft and identity fraud is exacerbated in an impoverished population where unemployment rates are as high as eighty percent (80%). Where

only a quarter of the population can come up with $2,000 in thirty (30) days in the event of a financial emergency makes this population prime for exploitation. "Native American[] populations may be less likely to use conventional banking and lending services" thus necessitating "the high use of alternative financial services among lower income households." *The Native American Experience: Understanding Financial Capability*, FINRA (Aug. 1, 2017), http:www.finra.org.

## III.    Legal Issues Unique to Indian Tribes

The consideration of many unique legal matters affecting only tribal governments is an important factor in establishing an Indian Tribal Governments Track.  A separate litigation track for tribes in MDL 2800 is essential because unique legal issues affect only tribal governments, and/or affect them in unique ways. While many are suggested by 25 U.S.C. § 2401, these broadly identified questions are among key legal issues that deserve the attention of lawyers focused on tribal governments in a separate track.

The first of these is the unique sovereignty that federally recognized Indian Tribes have within the United States, including the federal court system. Indian Tribes enjoy superior *parens patriae* with regard to their tribal members, unlike that of any state or even the federal government. This *parens patriae* authority

protects against any impingement of tribal sovereignty, including resolution of issues affecting tribal governments and tribal members. This authority requires consideration of long established federal judicial recognition of Indian tribes as "distinct, independent political communities" that are qualified to exercise the powers and prerogatives of self-government. *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 559 (1832); *United States v. Wheeler,* 435 U.S. 313, 322–23 (1978). The sovereignty that the Indian tribes retain is "unique." *Wheeler,* 435 U.S. at 323. Tribal sovereignty centers on Treaties, the land held by the tribe, and on the protection of tribal members within the reservation. *United States v. Mazurie,* 419 U.S. 544, 557 (1975) (tribes retain authority to govern "both their members and their territory"). "[T]ribes retain sovereign interests in activities that occur on land owned and controlled by the tribe." *Nevada v. Hicks,* 533 U.S. 353, 392 (2001) (O'Connor, J., concurring). As recognized by the treaties and laws of the United States, as well as the decisions of the United States Supreme Court, Indian tribe sovereignty is to be granted full force and effect.

The impact of the U.S. Constitution's Indian Tribes Interstate Commerce Clause must be considered and litigated on the liability issues, and while developing the structure of any solution impacting Indian tribes and their tribal

members. U.S. CONST. art. I, § 8, cl. 3; *See generally* G. Ablavsky, *Beyond the Indian Commerce Clause,* 124 YALE LAW J. 1012 (2015). Unique liability and damages issues interrelated with statutory tribal judicial systems, even the BIA's "Office of Tribal Justice Support" (25 USC § 3611), and the various tribal courts of the tribal governments must be addressed and resolved. Legal issues related to the placement and holding of assets in Trust for Native American Tribes must be considered. 25 USC § 2201 *et seq*. (Land); 25 USC §§ 4001 *et seq*. and §§ 4021 *et seq*. (Trust Funds and Trust Funds Management). Unique issues will arise and will be related to the guiding principle of sovereignty that Indian tribes have legal rights to make their own laws. *Nevada v. Hicks,* 533 U.S. 353 (2001). This was recently discussed by the Sixth Circuit in *NLRB v. Little River Band of Ottawa Indians Tribal Govt.,* 788 F.3d 537, 544 (6th Cir. 2015) (detailing expanse of tribal jurisdictional authority and its uniqueness).

It is well established that this Court, as the MDL Transferee Court, " . . . can employ any number of pretrial techniques — such as establishing separate discovery and/or motion tracks for each mutual fund family and/or separate tracks for the different types of actions involved—to efficiently manage this litigation." *In re Janus Mutual Funds Inv. Litigation*, 310 F. Supp. 2d 1359, 1361

(U.S.J.P.M.L. 2004); *In re Federal Home Loan Mortgage Corp. (Freddie Mac) Securities Litigation*, 643 F. Supp. 2d 1378, 1380 (U.S.J.P.M.L. 2009). This Court's authority is expansive and can be wielded creatively to achieve the objectives of centralization. *See In re Corrugated Container Antitrust Litigation*, 655 F.2d 748 (7th Cir. 1981), *on reh'g*, 661 F.2d 1145 (7th Cir. 1981), *aff'd*, 459 U.S. 248 (1983).

The question before this Court is not about the *authority* to create a separate Indian Tribal Governments track. It is about the *necessity* to do so. History, culture, predominant religious practices, forced government resettlement, greater distance to shopping and other necessities, poverty, and lower education rates all make problems of tribal governments unique. Superimposed upon these facts are laws enacted by Congress dealing with Native Americans and tribes.  Indian tribes and their members are vulnerable to fraud and identity theft.

The United States Congress recognized the unique circumstances, concerns, governance needs, financial considerations, and sociological circumstances of the Native Americans when it adopted "Indian Country" as a statutory term of art and developed a body of law to govern it. Title 25 of the United States Code is devoted to "Indians." No other ethnic group has a single title of the United States Code

devoted to it, yet "Indian Country" is defined. 18 U.S.C. § 1151. "Indian Country" and other definitions are laws that any solution must be built around.

Further, as sovereign governments, Indian tribes have the sovereign right to their own counsel, their own litigation autonomy, and their independent right to contract, including any resolution of the Tribes' claims in this litigation. With a separate Indian Tribal Governments Track, these unique sovereign interests can be protected and preserved.

Finally, this Court has already created two separate tracks for the consumer and financial institution actions. *See* Case Management Order 2, (Doc. No. 87). The creation of those separate tracks was a decision by this Court to manage this multidistrict proceeding in the most efficient manner. *Id*. pg. 2. Similar to these distinct tracks, an Indian Tribal Governments Track is needed within this MDL due to the inherently unique issues presented by the Tribes. Any other approach would marginalize the principles and roles of tribal sovereignty, tribal culture, strong *parens patriae* interests by Tribes in all financial matters affecting its Tribal members, and potentially frustrate a broad array of federal laws including federal treaties and statutes.

**Conclusion**

Fourteen (14) years after the Civil War ended, for the first time in American history, a Native American was considered a human being and not a savage under the law of the United States. This occurred when Chief Standing Bear of the Ponca Tribe sued in federal court in Nebraska for a writ of habeas corpus. *United States ex rel. Standing Bear v. Crook*, 5 Dill. 453 (Dist. Neb. 1879). The issue presented was whether Standing Bear was a human with legal standing under the Constitution. He was fighting his arrest for dragging the body of his son on a trellis from Oklahoma to his ancestral lands in northeast Nebraska for a proper, cultural burial. As a result of Standing Bear's victory establishing the humanity of Native American people under the Constitution, the "relocation" of Native American people stopped, as the federal court in Omaha enjoined the President of United States. An Indian Tribal Governments Track can provide the broadest and most intense look at the problem of Equifax's customer data security breach because of the defined nature of tribal governments, their sources of financial support, financial risk, and their unique sovereignty and status in the United States.

Respectfully submitted:

 **PLAINTIFFS**

**FOND DU LAC BAND OF LAKE SUPERIOR CHIPPEWA**

**ST. CROIX CHIPPEWA INDIANS OF WISCONSIN**

**RED CLIFF BAND OF LAKE SUPERIOR CHIPPEWA**
By ATTORNEYS FOR THE PLAINTIFFS:

   */s/ T. Roe Frazer II*
T. Roe Frazer II
Thomas Roe Frazer III
FRAZER PLC
1 Burton Hills Blvd., Ste 215
Nashville, TN 37215
(615) 647-6464
roe@frazer.law

J. Nixon Daniel, III
Mary Jane Bass
John R. Zoesch, III
BEGGS & LANE, RLLP
501 Commendencia St.
Pensacola, FL 32502
(850) 432-2451

Frederick T. Kuykendall, III
THE KUYKENDALL GROUP, LLC
P.O. Box 2129
Fairhope, AL 36533
(205) 252-6127
ftk@thekuykendallgroup.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record and all persons registered with the CM/ECF system in this Court.

*/s/ T. Roe Frazer II*