# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| IN RE: EQUIFAX, INC. CUSTOMER DATA SECURITY BREACH LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL FINANCIAL INSTITUTION ACTIONS | MDL Docket No. 2800<br><br>No. 1:17-md-2800-TWT<br><br><br>Chief Judge Thomas W. Thrash, Jr. |

# FINANCIAL INSTITUTION PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR LEAVE TO AMEND

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

FACTUAL BACKGROUND .............................................................................4

PROCEDURAL HISTORY ...............................................................................7

LEGAL STANDARD .........................................................................................8

ARGUMENT AND CITATION OF AUTHORITY ........................................9

I.     Plaintiffs Have Adequately Alleged Their Article III Standing ....................9

     A.    Each FI Plaintiff Pleads Concrete, Particularized, and Actual Injuries with Specificity ......................................................................9

     B.    FI Plaintiffs' Out-of-Pocket Costs Spent Responding to the Equifax Data Breach Constitute Injuries-in-Fact Sufficient to Establish Article III Standing ............................................................11

           1.    FI Plaintiffs Suffered Injury-in-Fact by Incurring Direct, Out-of-Pocket Costs Associated with Canceled and Reissued Payment Cards, Fraudulent Banking Activity, Abandoned Credit Applications, Staff Hiring or Retraining, and Purchasing Identity Theft Prevention Services and Cyberinsurance – All in Direct Response to the Equifax Data Breach. .............................................................................12

           2.    The Injuries the FI Plaintiffs Have Already Suffered Are Traceable Directly to the Equifax Data Breach ......................23

           3.    FI Plaintiffs' Injuries Can Be Redressed by a Favorable Judicial Decision ..................................................................26

     C.    The Association Plaintiffs Have Article III Standing ........................27

           1.    The Association Plaintiffs Adequately Allege Diversion of Resources ..........................................................................27

           2.    The Association Plaintiffs' Equitable Claim Does Not Require Member Participation ..............................................28

II.     Plaintiffs' Claim Seeking Reasonable Attorneys' Fees and the Expenses
        of Litigation Pursuant to O.C.G.A. §13-6-11 Is Well-Pleaded Because
        Equifax Exhibited Bad Faith by Failing to Implement the Most Basic &
        Necessary Precautions to Safeguard PII & PCD ...........................................30

CONCLUSION ......................................................................................................31

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Arcia v. Fla. Sec'y of State,*
  772 F.3d 1335 (11th Cir. 2014) ...................................................................27, 28

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)..............................................................................................9

*Attias v. Carefirst, Inc.,*
  865 F.3d 620 (D.C. Cir. 2017)............................................................................21

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007)..............................................................................................9

*City of Atlanta v. First Nat'l Bank of Atlanta,*
  246 Ga. 424 (1980) .......................................................................................30, 31

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013).............................................................................................12

*Common Cause/Georgia v. Billups,*
  554 F.3d 1340 (11th Cir. 2009) ..........................................................................28

*David G. Brown, P.E., Inc. v. Kent,*
  274 Ga. 849 (2002) .............................................................................................30

*Delgiudice v. Primus,*
  679 Fed. Appx. 944 (11th Cir. 2017)....................................................................9

*Fla. Ass'n of Med. Equip. Dealers, Med-Health Care v. Apfel,*
  194 F.3d 1227 (11th Cir. 1999) ..........................................................................25

*Focus on the Family v. Pinellas Suncoast Transit Auth.,*
  344 F.3d 1263 (11th Cir. 2003) ..........................................................................23

*Foman v. Davis,*
  371 U.S. 178 (1962)..............................................................................................8

*Galaria v. Nationwide Mut. Ins. Co.*,
    663 Fed. Appx. 384 (6th Cir. 2016)....................................................22

*Georgia Republican Party v. Sec. & Exch. Comm'n*,
    888 F.3d 1198 (11th Cir. 2018) ........................................................29

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)..................................................................27, 28

*Honggui Xie v. Ahn*,
    No. 1:16-CV-3451-RWS, 2017 WL 7660394 (N.D. Ga. Nov. 6,
    2017) ..............................................................................................26

*Hunt v. Wa. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977)........................................................................28

*In re Apple iPhone Antitrust Litig.*,
    No. 11-CV-06714, 2013 WL 4425720 (N.D. Cal. Aug. 15, 2013).............10, 11

*In re: The Home Depot, Inc., Customer Data Sec. Breach Litig.*,
    No. 1:14-md-2583-TWT, 2016 WL 2897520 (N.D. Ga. May 18,
    2016) .........................................................................................14, 30

*In re Managed Care Litig.*,
    298 F. Supp. 2d 1259 (S.D. Fla. 2003) ............................................29

*In re Zappos.com, Inc.*,
    888 F.3d 1020 (9th Cir. 2018) ....................................................10, 21

*King v. Burwell*,
    759 F.3d 358 (4th Cir. 2014), *aff'd*, 135 S. Ct. 2480 (2015)............................20

*Kroma Makeup EU, Ltd. v. Boldface Licensing + Branding, Inc.*,
    No. 6:14-cv-1551-ORL, 2015 WL 1708757 (M.D. Fla. Apr. 15,
    2015) ..............................................................................................18

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)..................................................................23, 26

*Nat'l Parks Conservation Ass'n v. Norton*,
    324 F.3d 1229 (11th Cir. 2003) ......................................................29

*Native Am. Arts, Inc. v. Bud K Worldwide, Inc.*,
    No. 7:10-CV-124 (HL), 2011 WL 2692962 (M.D. Ga. July 11,
    2011) ...................................................................................................26

*Nickens v. Equifax Info. Servs., LLC*,
    No. 1:13-CV-0333-TWT-ECS, 2013 WL 4786975 (N.D. Ga. Sept.
    6, 2013) (Thrash, J.)..............................................................................8

*Oliver v. SD-3C LLC*,
    No. C 11-01260 JSW, 2015 WL 10890656 (N.D. Cal. Sept. 30,
    2015) ...................................................................................................11

*Remijas v. Neiman Marcus Grp., LLC*,
    794 F.3d 688 (7th Cir. 2015) ..............................................................22

*Resnick v. AvMed, Inc.*,
    693 F.3d 1317 (11th Cir. 2012) .............................................15, 23, 24

*Rogers v. Nacchio*,
    241 Fed. Appx. 602 (11th Cir. 2007)..................................................8, 9

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016)........................................................................12

*Susan B. Anthony List v. Driehaus*,
    134 S. Ct. 2334 (2014)........................................................................12

*Town of Chester, N.Y. v. Laroe Estates, Inc.*,
    137 S. Ct. 1645 (2017)........................................................................12

## Statutes, Rules & Regulations

United States Code
    15 U.S.C. §§1643 & 1693g .............................................................16, 17

Federal Rules of Civil Procedure
    Rule 8 ..................................................................................................11
    Rule 15 ..................................................................................................8
    Rule 15(a)(2) .........................................................................................8

Code of Georgia
O.C.G.A. §13-6-11 ...................................................................................4, 30, 31

Financial Institution Plaintiffs ("FI Plaintiffs") and the Association Plaintiffs (collectively, "Plaintiffs") respectfully submit this Memorandum of Law in support of their Motion for Leave to Amend ("Motion").

## INTRODUCTION

There is no question that the Equifax data breach resulted in the compromise of payment card data ("PCD") and highly sensitive personally identifiable information ("PII") of over 147 million U.S. consumers – roughly 46% of the U.S. population and nearly 60% of all adults in the U.S. (the "Data Breach").  In ruling on Equifax's Motion to Dismiss Plaintiffs' Consolidated Amended Complaint, the Court held that those FI Plaintiffs who did not allege any payment-card related injuries fell short of satisfying the standing requirements of Article III, as they had not alleged an injury that was concrete, particularized, actual, or imminent.  ECF No. 539 ("MTD Op.") at 11-12.  In so holding, the Court stated:

> The Plaintiffs do not identify a single actual instance of identity theft of one of their customers that can be traced to the Equifax Data Breach.  The Plaintiffs do not identify a single fraudulent account that has been opened using data from the Data Breach . . . .  None of the Financial Institutions except the Card Issuers allege that they have actually experienced fraudulent accounts or other fraudulent activity.

*Id*.  The Court further held that FI Plaintiffs had failed to allege that the injuries complained of were fairly traceable to the Data Breach.  *Id*. at 17.  Similarly, the Court held that the Association Plaintiffs did not adequately allege Article III

1

standing because they had not identified that any one of their members had been injured by the Data Breach.  *Id*. at 19-20.

To cure the deficiencies the Court identified, Plaintiffs now move for leave to amend their pleading.  Plaintiffs' Proposed Second Amended Complaint (the "SAC") is attached as Exhibit 1.  A redline identifying the changes between Plaintiffs' Consolidated Amended Complaint (ECF No. 390) (the "Amended Complaint") and Plaintiffs' SAC is attached as Exhibit 2.  In the SAC, beyond asserting the allegations the Court previously held to be sufficient as to FI Plaintiffs that issued payment cards compromised in the Data Breach, Plaintiffs' amended allegations include additional specificity as to the other injuries they have suffered as a result of the Data Breach.  These allegations demonstrate that Plaintiffs satisfy Article III's standing requirements.

Specifically, the SAC alleges that FI Plaintiffs already have experienced fraudulent banking activity and/or have: incurred direct, out-of-pocket costs to cancel and reissue payment cards compromised in the Data Breach; incurred direct, out-of-pocket costs to reimburse customers whose payment cards were compromised in the Data Breach for fraudulent transactions; incurred direct, out-of-pocket costs to reimburse customers whose PII was stolen in the Data Breach for fraudulent transactions and fraudulent banking activity made on their accounts;

incurred direct, out-of-pocket costs to purchase identity authentication, identity theft protection, or fraud detection and prevention services as a result of the increased fraudulent banking activity attributable to the Data Breach; suffered lost revenues associated with abandoned credit applications from customers who froze their credit reports in direct response to the Data Breach; and spent money hiring or retraining staff and altering their customer verification procedures in response to the Data Breach. *See* SAC ¶¶11-21. FI Plaintiffs now detail the specific facts regarding fraudulent banking activity associated with the Equifax Data Breach, including the amounts of out-of-pocket losses incurred, the specific products and services purchased, and increased time and resources spent for additional staff and training to guard against further fraudulent banking activity. *Id*.

Plaintiffs respectfully submit that these allegations directly address the Court's opinion relating to FI Plaintiffs' prior failure to satisfy Article III and demonstrate that the specific harms FI Plaintiffs have suffered constitute injury-in-fact, are traceable to the Equifax Data Breach, and are redressable by a favorable ruling from this Court.

Additionally, the Association Plaintiffs have bolstered their allegations to cure the separate standing deficiencies the Court previously identified. *See* MTD Op. at 19-20. Specifically, the SAC identifies the specific FI Plaintiffs that each

3

Association Plaintiff counts as a member and also alleges specific facts with respect to each Association Plaintiff's diversion of resources. ¶¶24-29. Finally, to clarify their prior pleading, Plaintiffs have added a count in the SAC to specifically plead their entitlement to reasonable attorneys' fees and the expenses of litigation under O.C.G.A. §13-6-11. *See* MTD Op. at 62; SAC Count 10. Plaintiffs seek leave to amend their pleading to place these well-pleaded allegations squarely before the Court so that their injuries may be redressed.

## FACTUAL BACKGROUND

The Equifax Data Breach was the direct result of Equifax's affirmative misconduct and longstanding refusal to take the steps necessary to properly protect PII and PCD. In the months leading up to the Data Breach, Equifax's deficient data security measures led to multiple security breaches that compromised consumer PII. ¶¶4, 96-101. Numerous research analysts and security experts specifically warned Equifax that its security measures were deficient and left the company "vulnerable to data theft and security breaches." ¶104; *see also* ¶¶102-110. Despite these warnings, Equifax continued to actively mishandle its data security and failed to take the most basic steps to correct known vulnerabilities or otherwise ensure that the PII and PCD it maintained was secure.

On September 7, 2017, Equifax announced that between May 13 and July 30, 2017, hackers exploited a known vulnerability in Equifax's U.S. web server software to gain access to and steal the PII of approximately 147 million U.S. consumers – roughly 46% of the U.S. population and nearly 60% of all adults in U.S. – at least one family member in every household.  ¶¶3, 139-40.  The Equifax Data Breach is arguably the most damaging data breach in the nation's history and was the direct result of Equifax's actions, which left critical systems vulnerable to attack.  ¶¶3, 158, 161, 164-66.  Specifically, Equifax failed to patch known vulnerabilities in Apache Struts, an open-source application framework that supports Equifax's online dispute portal web application.  ¶¶112-129.

On March 7, 2017, the Apache Struts vulnerability was discovered and several entities, including The Apache Foundation, the U.S. Department of Commerce's National Institute of Standards and Technology, and the U.S. Department of Homeland Security's Computer Emergency Readiness Team, immediately issued public warnings regarding the vulnerability.  ¶¶122-123.  On that same day, The Apache Foundation also made available various patches and workarounds that eliminated the vulnerability.  ¶123.

Equifax acknowledged that its security team "was aware of this vulnerability [with Apache Struts] at that time [in March 2017]" and that the patches provided

by The Apache Foundation would have eliminated the vulnerability.   ¶125. Although Equifax ran security scans on March 15, 2017 that could have alerted Equifax to the Apache Struts vulnerability, Equifax's practice of not maintaining proper security certificates prevented it from detecting the Apache Struts vulnerability and directly led to the hackers' ability to exploit the vulnerability and gain access to Equifax's servers.  ¶127.  Equifax did not discover the Data Breach until July 29, 2017, over four and a half months after the Apache Struts vulnerability was announced.  ¶142.  Compounding Plaintiffs' injuries, Equifax failed to publicly disclose the breach for another thirty days.  ¶¶142-49.

FI Plaintiffs are financial institutions that provide a range of financial services, including deposit accounts, payment cards, lending, and other credit-related facilities, to consumers whose PII was compromised in the Data Breach. ¶¶11-21, 180.   Financial services industry organizations, regulators, security experts, and commentators all recommended that financial institutions take various measures to protect consumers whose PII was compromised in the Data Breach. ¶¶181-201.  In fact, as set forth in the SAC, FI Plaintiffs already have experienced fraudulent banking activity using PII compromised in the Data Breach and/or incurred direct, out-of-pocket costs as a result of the Data Breach.  ¶¶11-21, 210-215.

The Association Plaintiffs are industry organizations that advocate for and offer various services to their respective financial institution members, such as FI Plaintiffs and the Class. ¶¶22, 24-29. As set forth in the SAC, the Association Plaintiffs have standing to pursue their claims as their members include the FI Plaintiffs that have been harmed by the Data Breach, and, additionally, the Association Plaintiffs have had to divert resources in response to the Data Breach. ¶¶24-29.

## PROCEDURAL HISTORY

Plaintiffs filed their Amended Complaint on May 30, 2018. ECF No. 390. On July 16, 2018, Equifax filed a motion to dismiss the Amended Complaint in its entirety. ECF No. 435. By Order dated January 28, 2019, the Court granted in part and denied in part Equifax's motion to dismiss. MTD Op. The Court held that FI Plaintiffs who incurred costs to cancel and reissue payment cards compromised in the Data Breach had Article III standing to pursue their claims ("FI Card Issuers"), and further held that the vast majority of Plaintiffs' claims for relief were well-pleaded. *Id*. at 8-9. The Court, however, also held that FI Plaintiffs that did not incur costs related to compromised payment cards or fraudulent banking activity had not alleged Article III standing. And finally, the Court held that the Association Plaintiffs failed to adequately allege Article III standing because they

7

did not allege that any FI Plaintiff who was a member of that Association had been injured or incurred costs related to compromised payment cards. *Id*. at 9-20. This Motion and the submission of Plaintiffs' SAC followed.

## LEGAL STANDARD

Rule 15 directs the Court to "freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2); *Foman v. Davis*, 371 U.S. 178, 182 (1962) ("[T]his mandate is to be heeded."). Because Rule 15 "severely restricts the district court's freedom," there must be "a substantial reason" for denying a request for leave to amend. *Nickens v. Equifax Info. Servs., LLC*, No. 1:13-CV-0333-TWT-ECS, 2013 WL 4786975, at *4 (N.D. Ga. Sept. 6, 2013) (Thrash, J.). Accordingly, leave to amend should not be denied except "(1) where there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed; (2) where allowing amendment would cause undue prejudice to the opposing party; or (3) where amendment would be futile." *Rogers v. Nacchio*, 241 Fed. Appx. 602, 609–10 (11th Cir. 2007).

The legal sufficiency of Plaintiffs' claims has been addressed by the Court only once. *See generally* MTD Op. Thus, Equifax cannot credibly claim "there has been undue delay, bad faith, dilatory motive, or repeated failure to cure

8

deficiencies" or that it would suffer any "undue prejudice." *Rogers*, 241 Fed. Appx. at 610. The proposed amendment also is not futile because, as explained herein, the added allegations fully address the deficiencies the Court identified. An amendment is futile only "when the complaint as amended would still be properly dismissed." *Delgiudice v. Primus*, 679 Fed. Appx. 944, 949 (11th Cir. 2017). That is, the amendment suffices if the allegations state a "plausible" claim for relief, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and provide fair notice of the claim and the grounds upon which it rests. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The SAC meets this standard.

## ARGUMENT AND CITATION OF AUTHORITY

### I.   Plaintiffs Have Adequately Alleged Their Article III Standing

#### A.   Each FI Plaintiff Pleads Concrete, Particularized, and Actual Injuries with Specificity

In its prior ruling, the Court expressed concern that FI Plaintiffs' allegations concerning the substantial risk of future fraudulent activity they faced might be "discounted" in light of FI Plaintiffs' uniform allegations of harm. MTD Op. at 13. Recognizing the Court's concern, FI Plaintiffs have told their individual stories. ¶¶11-21. The SAC now alleges that they have experienced fraudulent activity and alleged in detail the specific range of out-of-pocket costs Plaintiffs have incurred in response to the Equifax Data Breach.

Like FI Card Issuers' allegations of harm caused by the compromise of PCD in the Data Breach, FI Plaintiffs now plead specific examples of harm stemming from the compromise of PII in the Data Breach.  Each FI Plaintiff specifically alleges not just that they incurred out-of-pocket costs as a direct result of the Equifax Data Breach, but each FI Plaintiff identifies the specific actions the have already taken for which they seek redress.  These detailed allegations demonstrate not just that FI Plaintiffs have suffered a concrete and particularized injury, but as recognized in *In re Zappos.com, Inc.*, 888 F.3d 1020, 1027-28 (9th Cir. 2018), confirm that FI Plaintiffs face a substantial and continuing risk of future harm stemming from Equifax's compromise of both PCD and PII.

FI Plaintiffs' amended allegations are far more detailed than the generalized allegations that other courts have rejected as insufficient, as espoused in cases that Equifax cited in support of its motion to dismiss the Amended Complaint.  ECF No. 435 at 14.  For example, *In re Apple iPhone Antitrust Litig.*, No. 11-CV-06714, 2013 WL 4425720 (N.D. Cal. Aug. 15, 2013) challenged Apple's purported monopolization of an aftermarket for iPhone applications.  No plaintiff there, however, alleged that they purchased any such applications.  Judge Rogers held that the plaintiffs could not establish Article III standing "with collective allegations that they have been deprived of lower cost alternatives, [or] paid higher

prices for Apple-approved applications . . . ." *Id.*, at *6 (decrying that none of plaintiffs' allegations "speak to named Plaintiffs' standing with respect to the ***applications aftermarket claims***").[1]  Similarly, in *Oliver v. SD-3C LLC*, No. C 11-01260 JSW, 2015 WL 10890656 (N.D. Cal. Sept. 30, 2015), the plaintiffs were indirect purchasers of SD cards who primarily alleged a conspiracy to fix prices. After the court rejected the price-fixing claim, it dismissed the remaining allegations, which focused on the increased cost to competitors, because plaintiffs could not explain "why (absent the price-fixing claim) [defendant's conduct] would result in raised prices for SD Cards manufactured and sold by Defendants themselves and indirectly purchased." *Id.*, at *5.  FI Plaintiffs' allegations here are substantially more detailed than the generalized allegations rejected in *Apple* and *Oliver*, and are more than sufficient to give Equifax fair notice of the FI Plaintiffs' claims and the grounds upon which they rest.  Plaintiffs have thus satisfied their burden to plead their allegations in conformity with Rule 8.

### B.    FI Plaintiffs' Out-of-Pocket Costs Spent Responding to the Equifax Data Breach Constitute Injuries-in-Fact Sufficient to Establish Article III Standing

To establish Article III standing, a plaintiff must have "'(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant,

---

[1]    Unless otherwise indicated, emphasis is added and citations are omitted.

and (3) that is likely to be redressed by a favorable judicial decision.'"  *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017).  Plaintiffs' allegations satisfy each element.

> **1.    FI Plaintiffs Suffered Injury-in-Fact by Incurring Direct, Out-of-Pocket Costs Associated with Canceled and Reissued Payment Cards, Fraudulent Banking Activity, Abandoned Credit Applications, Staff Hiring or Retraining, and Identity Theft Prevention and Cyberinsurance Purchases – All in Direct Response to the Equifax Data Breach.**

For an alleged injury to constitute "'injury-in-fact,'" it must be "'concrete, particularized, and actual or imminent.'"  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  For an injury to be concrete, "it must actually exist," in that it is "'real,' and not 'abstract.'"  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (recognizing that the risk of real harm can satisfy the concreteness requirement). An injury is particularized so long as it affects the plaintiff "'in a personal and individual way.'"  *Id.* at 1548.  Finally, the requirement of imminence serves to "'ensure that the alleged injury is not too speculative for Article III purposes.'" *Clapper*, 568 U.S. at 409.  Allegations of "'future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur.'"  *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014); *Clapper*, 568 U.S. at 414 n.5 (a substantial risk that a harm will occur "may

prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm," conferring standing).

As set forth in the SAC, FI Plaintiffs already have experienced fraudulent banking activity using PII compromised in the Data Breach and/or incurred direct, out-of-pocket costs as a result of the Data Breach.  FI Plaintiffs each allege an injury-in-fact because they detail the specific out-of-pocket costs they incurred that are traceable to the Equifax Data Breach.  In addition to alleging that the FI Card Issuers incurred the costs of canceling and reissuing payment cards compromised in the Data Breach (¶¶11, 12, 17-21, 214), FI Plaintiffs allege several direct out-of-pocket costs that constitute injury-in-fact, including: (i) the costs to reimburse customers whose data was compromised in the Data Breach for fraudulent banking activity on their accounts (¶¶15, 17, 20, 213); (ii) lost revenues due to abandoned credit applications from customers who froze their credit reports in the wake of the Data Breach and were subsequently unable to timely unfreeze their credit reports (¶¶13, 14, 16, 18, 21, 215); (iii) the costs to alter customer verification procedures and retrain staff regarding these enhanced procedures (¶¶14-18, 20, 21); (iv) the costs to purchase enhanced identity authentication, identity theft protection, or fraud detection and prevention services (¶¶11-16, 18-21, 212); and (v) the costs to purchase cyber security insurance in response to the Data Breach (¶14).  Like the

costs the FI Card Issuers allege stemming from the compromise of their PCD, each of these harms have been pleaded with specificity and constitutes a concrete, particularized, and actual injury.

As the Court previously held, FI Plaintiffs' allegations relating to the costs to cancel and reissue payment cards compromised in the Data Breach and to reimburse customers for fraudulent transactions on those compromised payment cards are sufficient to establish Article III standing.  MTD Op. at 8-9; *In re: The Home Depot, Inc., Customer Data Sec. Breach Litig.*, No. 1:14-md-2583-TWT, 2016 WL 2897520, at *3 (N.D. Ga. May 18, 2016).  These allegations remain in the SAC and continue to establish Article III standing as to the FI Card Issuers.

FI Plaintiffs also specifically allege in the SAC that they have incurred direct out-of-pockets costs to reimburse customers whose data was stolen in the Equifax Data Breach for fraudulent banking activity.   The Court had previously characterized FI Plaintiffs' allegations regarding fraudulent banking activity as conjectural and hypothetical because, months after the Data Breach, FI Plaintiffs did not "identify a single actual instance of identity theft of one of their customers."  MTD Op. at 11.  The SAC addresses this concern by identifying the fraudulent banking activity that has occurred that is associated with customers whose PII was compromised in the Data Breach.  ¶¶15, 17, 20, 213.

14

For example, Plaintiff Hudson River Community Credit Union spent $30,824 reimbursing customers whose PII was stolen in the Data Breach for fraudulent transactions. ¶17. For Plaintiff The Summit Federal Credit Union, the bill for fraudulent banking activity came to $10,000. ¶20. *See also* ¶15 (Plaintiff First Financial Credit Union reimbursed customers $2,500 for fraudulent banking activity on checking accounts). These actual harms are concrete and particularized.

As the Court recognized in its prior ruling, Plaintiffs who "have actually experienced fraudulent accounts or other fraudulent activity" allege an injury sufficient to establish Article III standing. MTD Op. at 12. FI Plaintiffs' allegations are also now much closer to the situation addressed in *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1323 (11th Cir. 2012). There, the Eleventh Circuit held that plaintiffs established Article III standing by alleging that their "cards were used to make unauthorized purchases" and that an account "had been overdrawn." *Id.* at 1322. Because the plaintiffs were victims of identity theft and had suffered monetary damages as a result, the Eleventh Circuit concluded that they suffered an injury-in-fact under the law. *Id.* at 1323. As alleged here, while FI Plaintiffs' customers became victims of identity theft in the wake of the Equifax Data Breach, it was the FI Plaintiffs – not their customers – that ultimately incurred direct, out-of-pocket costs due to the resulting fraudulent activity. ¶¶15, 17, 20, 50,

15

186, 213.  This is true regardless of whether the compromised data contributing to the fraudulent banking activity was PCD or PII.  Simply stated, the harm that FI Plaintiffs' customers suffered as a result of the Data Breach necessarily and unavoidably becomes a harm that FI Plaintiffs suffer because of FI Plaintiffs' regulatory obligations to reimburse their customers for fraudulent banking activity.  *See*, *e.g.*, 15 U.S.C. §§1643 & 1693g.  FI Plaintiffs' specific allegations that they incurred direct, out-of-pocket costs to reimburse their customers for fraudulent banking activity suffered in the wake of the Equifax Data Breach thus suffice to establish Article III standing.

FI Plaintiffs also allege that they have suffered monetary losses due to their customers abandoning applications for credit as a result of credit freezes implemented in the wake of the Equifax Data Breach.  ¶¶13, 14, 16, 18, 21, 215.  Following the Data Breach, Equifax advised FI Plaintiffs' customers to "[c]onsider placing a security freeze . . . on your credit report."  ¶203.  Plaintiffs also allege that as a direct response to the Data Breach, nearly one out of every five Americas – approximately 65 million individuals – froze their credit reports.  ¶206.  But as consumer reporting agencies have acknowledged, credit freezes can "interfere" with or "prohibit" certain credit applications that "are otherwise supposed to be quick and painless."  ¶205, 209.  Experts previously suggested that the combination

of credit freezes and FI Plaintiffs' revised customer verification processes, discussed below, "could discourage consumers from completing a loan application." ¶209. As alleged, these experts' concerns have been borne out.

Plaintiffs allege that customers who followed Equifax's advice and froze their credit reports in the wake of the Data Breach have abandoned credit applications costing FI Plaintiffs tens of thousands of dollars' worth of business. For example, in two separate instances, Plaintiff Financial Health Federal Credit Union had members with frozen credit reports abandon auto loan applications because the cars they wished to purchased were sold before the members could thaw their credit reports. ¶14. Collectively, Plaintiff Financial Health Federal Credit Union alleges that it has suffered lost revenues of approximately $13,000 due to abandoned credit applications from customers who froze their credit reports in the wake of the Data Breach and were unable to unfreeze their credit reports in a timely fashion. *Id.* Credit freezes implemented in the wake of the Data Breach continue to interfere with credit applications. Plaintiff Financial Health Federal Credit Union also alleges that while, prior to the Data Breach, auto loans were processed the same day, now, because of the added time it takes customers to unfreeze their credit reports, completing the same applications takes multiple days and increased staff time. *Id.*; *see also* ¶13 (two-week delay in renewing line of

credit cost Plaintiff DL Evans lost revenue of approximately $386.90 and increased operating costs of $37.65); ¶¶16, 18, 21.  This lost business is a direct consequence of the Data Breach and constitutes an injury-in-fact sufficient to confer Article III standing.  *Kroma Makeup EU, Ltd. v. Boldface Licensing + Branding, Inc.*, No. 6:14-cv-1551-ORL, 2015 WL 1708757, at *6 (M.D. Fla. Apr. 15, 2015) (plaintiff showed that it "suffered concrete and particularized injuries in the form of lost revenue [and], lost business").

As part of their efforts to respond to fraudulent banking activity associated with the Data Breach, FI Plaintiffs also modified and enhanced the ways in which they verified their customers' identities and implemented enhanced data security measures on their customers' accounts to prevent additional fraud.  FI Plaintiffs have spent tens of thousands of dollars to purchase third-party services to more securely verify their customers' identities or to detect and prevent fraudulent transactions.  ¶¶11-16, 18-21, 212.  For example, Plaintiff TruEnergy Federal Credit Union has, to date, spent approximately $10,500 purchasing a service to detect and prevent payment card fraud.  ¶21.  Plaintiff The First State Bank now uses a data validation service on all non-commercial lending applications at a cost of $50 per loan.  ¶16.  Plaintiff Consumers Cooperative Credit Union now spends $375,000 per year on an identity authentication and identity theft protection service

that leverages "out of wallet questions."  ¶12; *see also* ¶15 (Plaintiff First Financial

Credit Union purchased a similar service from Fidelity Information Services,

LLC).  As alleged, such questions "require consumers to provide more information

to prove their identity," like "What is your mortgage payment?" or "Did you own a

certain type of car?"  ¶209.  As reported in the American Banker, requiring

consumers to disclose additional information in response to out of wallet questions

"could lead consumers to abandon credit applications that are otherwise supposed

to be quick and painless, such as the process for obtaining instant retail credit."  *Id*.

Frustrated customers often pin the blame for the annoyance and delay associated

with these enhanced verification processes on financial institutions, and not

Equifax.

Beyond just purchasing new verification tools, FI Plaintiffs necessarily had

to train or retrain staff in order to effectively use these new tools.  ¶¶4-18, 20, 21.

This training and retraining manifested as both direct, out-of-pocket costs, and

indirect costs such as lost staff time.  *Id*.   In the SAC, FI Plaintiffs now provide

specific allegations regarding these costs.  *Id*.

Certain FI Plaintiffs have also incurred out-of-pocket costs that are

associated with adding new staff to combat fraudulent banking activity in the wake

of the Data Breach.  ¶¶12, 13, 19, 20.  In the wake of the Data Breach, Plaintiff

Consumers Cooperative Credit Union added two new staff members, costing approximately $100,000, along with ten temporary customer services representatives. ¶12. Plaintiff Texas First Bank hired a new employee dedicated to cybersecurity and attempted fraud training. ¶19. The cost associated with performing these roles is approximately $20,000 per year. *Id.* Plaintiff DL Evans now spends an extra approximately $88 per month in personnel time to deter attempted fraudulent banking activity. ¶13; *see also* ¶20 (increased staffing costs Plaintiff The Summit Federal Credit Union approximately $55,000 per year).

Finally, Plaintiff Financial Health Federal Credit Union alleges that as a result of its customers' PII being compromised in the Data Breach, it incurred direct, out-of-pocket costs to purchase a cyberinsurance policy. ¶14. Because Plaintiff Financial Health Federal Credit Union purchased a cyberinsurance policy in direct response to the Equifax Data Breach, the costs associated with the purchase constitute a cognizable injury. *King v. Burwell*, 759 F.3d 358, 365 (4th Cir. 2014), *aff'd*, 135 S. Ct. 2480 (2015) (standing found where plaintiff was forced to "purchase a product they otherwise would not, at an expense to them").

These costs constitute independent injuries-in-fact because the risk they are meant to defray – that of future fraudulent banking activity leveraging PII and PCD compromised in the Data Breach – is substantial. In resolving Equifax's motion to

dismiss Plaintiffs' prior allegations, this Court favorably cited *Zappos.com*, 888 F.3d 1020. *Zappos*' resolution relied, in part, on the recognition that, in the context of a data breach, "the key injury . . . is the risk of being subject to identity theft, not actual identity theft." *Id.* at 1029 n.14; *see also Attias v. Carefirst, Inc.*, 865 F.3d 620, 629 (D.C. Cir. 2017) ("[A] substantial risk of harm exists already, simply by virtue of the hack and the nature of the data that the plaintiffs allege was taken.").

The Court's order resolving Equifax's motion to dismiss the consumer action relied on the same reasoning. There, the Court held that consumers "have been harmed by having to take measures to combat the risk of identity theft" and "by identity theft that has already occurred to some members of the class." ECF No. 540 at 17. As in the consumer action, "the compromise of a huge amount of personally identifying information by criminal hackers presents a much more significant risk of identity fraud." *Id.* at 18. But the FI Plaintiffs' injuries are even more direct and cognizable than the risk of harm faced by consumers. Given FI Plaintiffs' role as lenders and depositories for consumers' assets, and FI Plaintiffs' obligation to reimburse consumers for fraudulent banking activity, it is FI Plaintiffs that stand first in line to suffer the actual monetary harm caused by their customers' identity theft. When stolen data is used for identity theft, whether to fraudulently obtain credit or steal funds by accessing existing customer accounts, it

is FI Plaintiffs – not the consumer – that ultimately shoulder the loss.  ¶¶56-66.  As the SAC makes clear, FI Plaintiffs **already have** incurred losses due to fraudulent banking activity.  FI Plaintiffs will continue to bear the brunt of the substantial risk of harm stemming from future fraudulent banking activity resulting from the Data Breach.

While the Court previously held that the costs associated with "increased monitoring for fraudulent activity and communicating with customers, are no more than due diligence and business as usual in the digital age," MTD Op. at 12, it noted that its holding was made "[i]n [the] context" of allegations regarding fraudulent banking activity that the Court characterized as conjectural and hypothetical.  *Id.* at 11.  In light of the detailed allegations of fraudulent banking activity that already have occurred, the costs FI Plaintiffs have incurred to mitigate future fraudulent banking activities are cognizable.  *See Galaria v. Nationwide Mut. Ins. Co.*, 663 Fed. Appx. 384, 388 (6th Cir. 2016) ("[T]here is a sufficiently substantial risk of harm that incurring mitigation costs is reasonable"); *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 694 (7th Cir. 2015) (mitigation efforts may constitute cognizable Article III injuries where there is a substantial risk of harm).  Thus, the costs associated with these injuries are thus sufficient to confer Article III standing.

As described above, FI Plaintiffs' detailed allegations of the costs incurred in the wake of the Data Breach are sufficient to establish that they suffered injury in fact sufficient to confer Article III standing.

### 2. The Injuries the FI Plaintiffs Have Already Suffered Are Traceable Directly to the Equifax Data Breach

Traceability considers whether there is a "causal connection between the injury and the conduct complained of." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). An injury is "'fairly . . . trace[able]'" if it is connected to the "'challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" *Id.* (alterations in original).

As the Court recognized in resolving Equifax's motion to dismiss the consumer action, allegations that consumers suffered "fraudulent activity" or incurred "other costs in direct response to the Data Breach" were sufficient "to establish that the Data Breach was the proximate cause of this harm." ECF No. 540 at 23. That the Court addressed the consumer's allegations in the context of whether consumers satisfied proximate cause, rather than traceability, does not diminish its applicability to the Article III analysis. Quite the opposite. As the Eleventh Circuit has repeatedly held, "[a] showing that an injury is 'fairly traceable' requires *less* than a showing of 'proximate cause.'" *Resnick*, 693 F.3d at 1324; *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273

(11th Cir. 2003) (same).  Instead, "[e]ven a showing that a plaintiff's injury is indirectly caused by a defendant's actions satisfies the fairly traceable requirement." *Resnick*, 693 F.3d at 1324.  Plaintiffs meet this standard.

After the Data Breach, financial services industry organizations, such as the American Bankers Association and Credit Union Executive Society, financial services regulators, like the New York State Department of Financial Services, and security experts recognized that the Data Breach would subject financial institutions to increased attempts of fraudulent banking activity as well as new operational challenges – for example, increased credit freezes that would impact financial institutions' ability to extend credit.  ¶¶181-209.  Federal and state financial services regulators specifically recommended that financial institutions take various measures to protect customers impacted by the Data Breach.  ¶¶196-99.  The Department of Justice confirms that 86% of identity theft victims experience fraudulent banking and payment card transactions using their existing account information that has been compromised.  ¶184.  Equifax itself acknowledges that this type of harm is a reality for financial institutions when PII is compromised.  ¶¶188-90.  And, each FI Plaintiff already has experienced these and other injuries.  FI Plaintiffs allege that their respective members' PII was compromised in the Data Breach and that it experienced fraudulent banking

24

activity using the compromised PII and/or lost revenue as a result of abandoned credit applications because the customer's credit was frozen as a result of the Data Breach.  ¶¶11-21.  In addition, as a direct result of the Equifax Data Breach, FI Plaintiffs have had to spend money canceling and reissuing payment cards, reimbursing consumers for fraudulent charges that are tied to the Data Breach, purchasing identity authentication, identity theft protection, or fraud detection and prevention services as a result of the increased fraudulent banking activity attributable to the Data Breach, and retraining their staff and altering their customer verification procedures.  ¶¶11-21, 212-15.  Because FI Plaintiffs must reimburse their customers for any losses associated with fraudulent banking activity, FI Plaintiffs are the most directly injured by much of the harm caused by the Data Breach.  Accordingly, FI Plaintiffs' injuries are fairly traceable to the Equifax Data Breach.

Recognizing the Court's concern regarding the attenuated causal chain rejected in *Fla. Ass'n of Med. Equip. Dealers, Med-Health Care v. Apfel*, 194 F.3d 1227 (11th Cir. 1999), FI Plaintiffs' seek to recover costs associated with actual sums already spent because of the Data Breach.  Unlike in *Apfel*, FI Plaintiffs' injuries do not depend on an attenuated causal chain.  FI Plaintiffs' injuries already

have occurred, and the reason they occurred is the Equifax Data Breach.  ¶¶11-21, 210-15.  FI Plaintiffs have thus satisfied the traceability requirement.

### 3.   FI Plaintiffs' Injuries Can Be Redressed by a Favorable Judicial Decision

For an injury to be redressable, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561.

FI Plaintiffs ask the Court to enter a judgment providing for monetary damages, as well as declaratory and corresponding equitable relief.  ¶¶10, 260, 278, 292, 303-04, 319-20, 331-32, 344-45, 353-54, 355-62.   As to the monetary damages, FI Plaintiffs seek compensation for the out-of-pocket costs spent responding to the Equifax Data Breach, as discussed above.   An order awarding such costs would redress FI Plaintiffs' injuries. *Honggui Xie v. Ahn*, No. 1:16-CV-3451-RWS, 2017 WL 7660394, at *1 (N.D. Ga. Nov. 6, 2017) (where plaintiffs seek "monetary damages to address the monetary harm caused by Defendants' actions . . . there is a substantial likelihood that the relief sought will redress the injury.").   FI Plaintiffs also seek corresponding injunctive relief requiring Equifax to employ adequate security protocols consistent with industry standards to protect PII and PCD.   ¶¶355-62.   This, too, would redress FI Plaintiffs' injuries. *Native Am. Arts, Inc. v. Bud K Worldwide, Inc.*, No. 7:10-CV-124 (HL), 2011 WL

2692962, at *2 (M.D. Ga. July 11, 2011) ("[A]n award of damages and injunctive relief . . . if granted . . . would redress the injuries alleged."). FI Plaintiffs have thus satisfied the third and final Article III standing requirement.

### C.   The Association Plaintiffs Have Article III Standing

The Association Plaintiffs have standing "based on both a diversion-of-resources theory and an associational standing theory." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014).

### 1.   The Association Plaintiffs Adequately Allege Diversion of Resources

Under the diversion-of-resources theory, an organization has standing to sue when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

Each Association Plaintiff specifically alleges that it was forced to "divert and expend their own resources to assist members that have been harmed and continue to be harmed by the Equifax data breach." ¶¶24-29. As a result of the Equifax Data Breach, the Association Plaintiffs would have committed their resources to "advocacy, compliance, education and legislative efforts for its members." *Id*. Instead, the Association Plaintiffs detail how, in the wake of the Equifax Data Breach, they diverted their resources to fund activities they would not

27

normally undertake, including engaging in specific communications with their members about the Equifax Data Breach, sponsoring webinars related to the breach, and creating toolkits to help members formulate their own responses to the Equifax Data Breach. *Id.*

The time and money devoted to such actions represent more than mere setbacks to the Association Plaintiffs' "abstract social interests," *Havens Realty*, 455 U.S. at 379, but constitute concrete and particularized injuries sufficient to confer Article III standing.   *See Arcia*, 772 F.3d at 1340-42; *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009).

## 2.    The Association Plaintiffs' Equitable Claim Does Not Require Member Participation

An association also has standing to sue when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wa. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Plaintiffs satisfy all three prongs.

"[T]he rule in this Circuit is that organizational plaintiffs need only establish that 'at least one member faces a realistic danger' of suffering an injury." *Arcia*, 772 F.3d at 1342.  Plaintiffs recognize that as previously pleaded, the Court was

unable to determine whether any of the Association Plaintiffs represented members with Article III standing.   To remedy the previous deficiency, Plaintiffs now specifically plead which FI Plaintiff each Association Plaintiff counts as a member. ¶¶24-29. These allegations are sufficient to establish that each Association Plaintiff represents at least one member that has suffered harm, satisfying the first *Hunt* prong.  *Georgia Republican Party v. Sec. & Exch. Comm'n*, 888 F.3d 1198, 1203-04 (11th Cir. 2018).

The Association Plaintiffs also satisfy the second *Hunt* prong.   Each Association Plaintiff alleges that its purpose includes, among other things, "supporting initiatives that promote the financial stability of its members."  ¶¶24-29.  The interests pursued in this litigation are thus consistent with the Association Plaintiffs' purposes.  *See Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1244 (11th Cir. 2003).

The third *Hunt* prong also is met.  Members' participation is not required for the issues on which the Association Plaintiffs seek equitable relief – Equifax's legal duties regarding data security, the adequacy of its current security practices, and whether additional data security measures are needed.  These issues turn entirely on Equifax's conduct, not that of the Association Plaintiffs' members.  *See In re Managed Care Litig.*, 298 F. Supp. 2d 1259, 1307-08 (S.D. Fla. 2003) ("It is

well-established that an association may seek equitable relief on behalf of its members without running afoul" of the member participation requirement).

Thus, the Association Plaintiffs have standing to pursue their claim for equitable relief. *Home Depot*, 2016 WL 2897520, at \*5.

## II.   Plaintiffs' Claim Seeking Reasonable Attorneys' Fees and the Expenses of Litigation Pursuant to O.C.G.A. §13-6-11 Is Well-Pleaded Because Equifax Exhibited Bad Faith by Failing to Implement the Most Basic & Necessary Precautions to Safeguard PII & PCD

The SAC clarifies that Plaintiffs' request for reasonable attorneys' fees and the expenses of litigation pursuant to O.C.G.A. §13-6-11 stands as a separate and well-pleaded claim.

Under O.C.G.A. §13-6-11, reasonable attorneys' fees and the expenses of litigation may be recovered "where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." Bad faith refers to "the acts in the transaction itself prior to the litigation," *David G. Brown, P.E., Inc. v. Kent*, 274 Ga. 849, 850 (2002), and "differs from the negative idea of negligence, in that it contemplates a state of mind affirmatively operating with a furtive design or some motive of interest or ill will." *City of Atlanta v. First Nat'l Bank of Atlanta*, 246 Ga. 424, 425, n.3 (1980) (bad faith "imports a dishonest purpose or some moral obliquity, and implies conscious doing

of wrong, and means breach of known duty through some motive of interest or ill will").

Plaintiffs allege that Equifax's senior management ignored specific warnings that its systems were vulnerable to attack and refused to take the necessary steps to adequately protect consumer data.  ¶365.  As alleged, the Equifax Data Breach was a direct consequence of Equifax's deliberate decisions not to adopt recommended data security measures.  *Id.*  Had Equifax adopted reasonable data security measures, it could have prevented the Data Breach.  Instead, Equifax did not place a high priority on data security, took a careless approach to patching systems – including the ones responsible for causing the Data Breach – and failed to comply with industry standards of care to protect against known threats to its sensitive cache of PII.  ¶¶ 96-141, 154-68, 365-367.  As this Court has previously held, these allegations are sufficient to state a claim of bad faith under Section 13-6-11.  MTD Op. at 80.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion.

Respectfully submitted this 20th day of March, 2019.

 *s/ Joseph P. Guglielmo*
Joseph P. Guglielmo
**SCOTT+SCOTT ATTORNEYS AT**

**LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, New York 10169
Tel. 212.223.6444
jguglielmo@scott-scott.com

Gary F. Lynch
**CARLSON LYNCH SWEET KILPELA & CARPENTER, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, Pennsylvania 15222
Tel. 412.322.9243
glynch@carsonlynch.com

*Financial Institution Plaintiffs' Co-Lead Counsel*

Craig A. Gillen
**GILLEN WITHERS & LAKE, LLC**
3490 Piedmont Road, N.E.
One Securities Centre, Suite 1050
Atlanta, Georgia 30305
Tel. 404.842.9700
cgillen@gwllawfirm.com

MaryBeth V. Gibson
**THE FINLEY FIRM, P.C.**
3535 Piedmont Road
Building 14, Suite 230
Atlanta, Georgia 30305
Tel. 404.320.9979
mgibson@thefinleyfirm.com

Ranse Partin
**CONLEY GRIGGS PARTIN LLP**
4200 Northside Parkway
Building One, Suite 300

32

Atlanta, Georgia 30327
Tel. 404.572.4600
ranse@onleygriggs.com

***Financial Institution Plaintiffs' Co-Liaison
Counsel***

Arthur M. Murray
**MURRAY LAW FIRM**
650 Poydras Street, Suite 2150
New Orleans, Louisiana 70130
Tel. 504.525.8100
amurray@murray-lawfirm.com

Stacey P. Slaughter
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, Minnesota 55402
Tel. 612.349.8500
sslaughter@robinskaplan.com

Charles H. Van Horn
**BERMAN FINK VANHORN P.C.**
3475 Piedmont Road, Suite 1100
Atlanta, Georgia 30305
Tel. 404.261.7711
cvanhorn@bfvlaw.com

Allen Carney
**CARNEY BATES & PULLIAM, PLLC**
519 W. 7th Street
Little Rock, Arkansas 72201
Tel. 501.312.8500
acarney@cbplaw.com

Bryan L. Bleichner
**CHESTNUT CAMBRONNE PA**
17 Washington Avenue North

Suite 300
Minneapolis, Minnesota 55401
Tel. 612.339.7300
bbleichner@chestnutcambronne.com

Karen Hanson Riebel
**LOCKRIDGE    GRINDAL    NAUEN P.L.L.P.**
100 Washington Ave. S., Suite 2200
Minneapolis, Minnesota 55401
Tel. 501.812.5575
khriebel@locklaw.com

Karen S. Halbert
**ROBERTS LAW FIRM, PA**
20 Rahling Circle
P.O. Box 241790
Little Rock, Arkansas 72223
Tel. 501.821.5575
karenhalbert@robertslawfirm.us

Brian C. Gudmundson
**ZIMMERMAN REED LLP**
1100 IDS Center, 80 South 8th Street
Minneapolis, Minnesota 55402
Tel. 612.341.0400
brian.gudmunson@zimmreed.com

*Financial Institution Plaintiffs' Steering Committee*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to L.R. 7.1D, the undersigned certifies that the foregoing complies with the font and point selections permitted by L.R. 5.1B.  This brief was prepared on a computer using the Times New Roman font (14 point).

Respectfully submitted this 20th day of March, 2019.


*s/ Joseph P. Guglielmo*
Joseph P. Guglielmo

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 20, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

*s/ Joseph P. Guglielmo*
Joseph P. Guglielmo