1

1    IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF GEORGIA
2                ATLANTA DIVISION

3

4    IN RE: EQUIFAX, INC. DATA SECURITY   ) Case No. 1:17-MD-2800-TWT
     BREACH LITIGATION                    )
5                                         ) December 14, 2018
                                          ) 9:34 a.m.
6    _____     ) Atlanta, Georgia

7

8              TRANSCRIPT OF THE MOTION HEARING
          BEFORE THE HONORABLE THOMAS W. THRASH, JR.,
9                 U.S. DISTRICT COURT JUDGE

10

11   APPEARANCES OF COUNSEL:

12   **On behalf of the Plaintiffs:**

13        Roy Barnes, Esq.
          Kenneth Canfield, Esq.
14        Joseph Guglielmo, Esq.
          Amy Keller, Esq.
15        Gary Lynch, Esq.
          Norman Siegel, Esq.
16

     **On behalf of the Defendant:**
17
          David Balser, Esq.
18        Stewart Haskins, Esq.
          Phyllis Sumner, Esq.
19

20
             *Proceedings recorded by mechanical stenography*
21           *and computer-aided transcript produced by*

22              SUSAN C. BAKER, RMR, CRR
                 OFFICIAL COURT REPORTER
23            2110 FIRST STREET, SUITE 2-194
                 FORT MYERS, FL  33901
24                (239) 461-2064

25

2

1          (Proceedings held December 14, 2018, Atlanta,

2    Georgia, 9:34 a.m., in open court.)

3          THE COURT:  All right.  This is the case of In Re:

4    Equifax Data Security Breach Litigation, Case Number

5    17-MD-2800.

6          First let me ask counsel for the parties who

7    anticipate participating in the argument today to introduce

8    yourself and the parties you represent.

9          MR. CANFIELD:  Good morning, Your Honor.  Ken

10   Canfield, co-lead counsel for the consumer Plaintiffs.

11         THE COURT:  Morning, Mr. Canfield.

12         MS. KELLER:  Morning, Your Honor.  Amy Keller, also

13   co-lead counsel for the consumer Plaintiffs.

14         THE COURT:  Morning, Ms. Keller.

15         MR. SIEGEL:  And Norman Siegel, co-lead counsel for

16   the consumer Plaintiffs.  Good morning.

17         THE COURT:  Good morning, Mr. Siegel.

18         MR. BARNES:  Roy Barnes for the consumer Plaintiffs.

19         THE COURT:  Mr. Barnes.

20         MR. GUGLIELMO:  Morning, Your Honor.  Joseph

21   Guglielmo on behalf of the financial institution Plaintiffs.  I

22   am here with my colleague, Gary Lynch.

23         THE COURT:  Good morning, gentlemen.

24         MR. BALSER:  Morning, Your Honor.  David Balser, King

25   & Spalding, on behalf of the Equifax Defendants.

3

1                   THE COURT:  Mr. Balser.

2                   MS. SUMNER:  Good morning, Your Honor.  Phyllis

3      Sumner on behalf of the Equifax Defendants.

4                   THE COURT:  Morning, Ms. Sumner.

5                   MR. HASKINS:  Morning, Your Honor.  Stewart Haskins

6      on behalf of Equifax as well.

7                   THE COURT:  Morning, Mr. Haskins.

8                   All right.  I think I said I was going to give one

9      hour per side for the consumer Plaintiffs' case, one hour per

10     side for the financial institutions and 30 minutes per side for

11     the small business Plaintiffs.

12                  Everybody understand that?

13                  MR. SIEGEL:  Yes, Your Honor.

14                  MR. BALSER:  Yes.

15                  THE COURT:  All right.  This is a hearing on the

16     Defendant's motions to dismiss in this case.

17                  Mr. Balser, what's your plan here?

18                  MR. BALSER:  Good morning, Your Honor.

19                  Plan is that we would start if it suits Your Honor

20     with the motion to dismiss in the consumer class action.  I'll

21     be arguing on behalf of Equifax in that motion.  We would then

22     turn to the small business motions to dismiss which Mr. Haskins

23     would handle and then proceed to the financial institutions'

24     motion to dismiss which Ms. Sumner will handle.

25                  Is that acceptable to Your Honor?

4

1          THE COURT:  That's fine.

2          So I'll hear from you, and then I'll hear from the

3   Plaintiffs on the consumer case.

4          MR. BALSER:  Correct.  And then any short rebuttal

5   that might be necessary.

6          THE COURT:  Fine.

7          MR. BALSER:  To correct my friend, Mr. Canfield.

8          THE COURT:  I'm sure much correction will be

9   necessary.

10          MR. BALSER:  Your Honor, before I get into the

11   details of the argument, I wanted to frame the issues up as we

12   see them from a big-picture perspective.  In 2017, Equifax,

13   like many of our nation's corporations, was the victim of a

14   criminal hacking.  This was a highly publicized data breach

15   that involved the theft of certain information of over 145

16   million people.

17          Importantly for this case, and a fact not always

18   reported by the press accounts of the case, the criminals stole

19   the data from Equifax, Inc. and not from Equifax Information

20   Systems.  That's an important point here for this case because

21   Equifax, Inc. is not a credit reporting agency, and the

22   information taken did not include any consumer credit files.

23          As a result of the widespread and frequent hacking of

24   which U.S. corporations are falling victim, there are ongoing

25   policy debates about how best to address these issues.  And

5

1    it's important to emphasize that these are to a large extent

2    policy debates.  And, of course, it's not the role of the

3    courts but the role of legislature to decide policy.

4            Consumer fraud statutes, statutes governing credit

5    reporting agencies and traditional tort theories are not

6    designed to address the complex issues raised by data breach

7    cases.  And this is so because, unlike a typical case,

8    Defendants in these data breach cases are victims of crimes, as

9    are the Plaintiffs.  And in many of these cases, the Plaintiffs

10   have no tangible injury that they can point to.  And,

11   respectfully, that is the case here.

12           So we're here today to focus on the law, primarily

13   Georgia law, and Georgia law as it now stands.  We're not here

14   to focus on issues of policy.  And as I'm going to discuss in

15   detail, and as my colleagues will also point out in their

16   arguments, the data breach claims that the Plaintiffs assert

17   here do not fit within the statutes and the traditional tort

18   theories that they rely upon.

19           So with that overview, I'd like to just turn to the

20   allegations in the case with a short background of what brings

21   us here today.  As I mentioned, 2017 criminal hackers accessed

22   Equifax, Inc.'s system through a web portal.  Immediately upon

23   discovering that hack, Equifax took quick action to stop the

24   intruders and add additional defenses and immediately hired a

25   cybersecurity firm Mandiant to assist with the forensic review.

6

1          Equifax diligently investigated and reported to the

2    public and relevant stakeholders what it had found.   It

3    investigated the scope of the breach.   It identified

4    substantially all of the affected consumers.   It set up a

5    dedicated website and call center to answer consumers'

6    questions.   It promptly announced the breach both in the

7    national press and in written notifications to state and

8    federal regulatory bodies and mailed notifications to consumers

9    whose payment card information or dispute documents had been

10   accessed.

11          Equifax went further than just that.   Equifax then

12   offered an unprecedented protection package.   And when I say

13   unprecedented, it truly is unprecedented what Equifax did in

14   the wake of this data breach.

15          First thing that Equifax did is offered a robust

16   package of credit monitoring and identity theft protection

17   services free of charge to all consumers in the United States,

18   whether or not their personal identifying information had been

19   stolen in the breach.   And among the features of what Equifax

20   offered for free to the public was three-bureau credit

21   monitoring, free Equifax credit reports, identity theft

22   insurance and internet scanning for Social Security numbers.

23   Millions of consumers signed up and registered for these

24   services.

25          And then on top of that, in January of this year

1    Equifax rolled out a free service allowing U.S. consumers to

2    lock and unlock their Equifax credit reports.  And that can be

3    done from an app on your phone.  You can download the app, and

4    you can control from the app on your phone when and how to

5    unlock your own credit files at Equifax.

6            So, of course, we're here today because in the wake

7    of the breach, as in every breach, class actions are

8    immediately filed.  In fact, the first class action was filed

9    the day that the breach was announced.  The Judicial Panel for

10   Multidistrict Litigation consolidated these cases in front of

11   Your Honor which led to the filing of a 556-page consolidated

12   consumer class action complaint asserting 99 claims for relief

13   on behalf of a putative nationwide class and numerous

14   subclasses.  And we've moved to dismiss that complaint in its

15   entirety.  That motion is fully briefed, and that's what brings

16   us here today.

17           It's important as Your Honor goes through this

18   complaint and analyzes our motion to point out that the claims

19   here are brought by 96 different individual consumers from 50

20   different states alleging different claims and different

21   purported harms.  This is not the typical class action where

22   you have one or two named Plaintiffs who assert essentially the

23   same claims.  These are really 96 different Plaintiffs all

24   consolidated together in one complaint that have very, very

25   different claims, including very different claims of purported

8

1    injury.  And it would take many, many, many hours to parse

2    through all of the variances that exist with respect to these

3    claims.  We've tried to do this at a very, very high level.

4             Just to orient Your Honor to this, this is an

5    eye-killer.  This is a spider chart that we put together.  On

6    the outside here are each of the 96 Plaintiffs in the case.

7    And what we've done on the right is to try to put in buckets

8    the types of harm that these 96 different Plaintiffs have

9    alleged and to show Your Honor graphically how different some

10   of these claims are.

11            For example, 16 of the Plaintiffs have alleged

12   pre-breach payments for credit monitoring or similar services.

13   So these are people who signed up for credit monitoring and

14   allege that as a result of their buying credit monitoring

15   service somehow we breached their contracts as a result of the

16   data breach that occurred.

17            There are 52 different Plaintiffs who have made

18   claims for post-breach mitigation expenses.  There are 89

19   Plaintiffs who seek reimbursement for time and effort resulting

20   from the aftermath of the breach.  There are 39 Plaintiffs who

21   have alleged identity theft.  And all -- there are three who

22   have alleged payment card fraud, although none of those three

23   alleges that they were not reimbursed for whatever fraud

24   occurred on the credit cards.  And all 96 of the Plaintiffs

25   have alleged they have been harmed simply by the compromise of

1    their PII and the risk of future harm.

2           So that's what we're dealing with.  So when you parse

3    through these claims and you analyze the sufficiency of the

4    complaint, it really is a very difficult task unfortunately

5    because you have to look at all these different, disparate

6    allegations that are being made by each of the different

7    Plaintiffs.

8           I want to spend just a minute on who the Defendants

9    are because, as I said at the outset, this is important.

10   Equifax, Inc. is named.  Equifax is a leading global provider

11   of information, human resources and data analytics services for

12   businesses, governments and consumers.  It is not a credit

13   reporting agency.

14          Equifax, Inc. has two subsidiaries which were named

15   in the lawsuit, Equifax Information Services which is a

16   national consumer reporting agency that stores and furnishes

17   consumer reporting data, and then Equifax Consumer Services

18   which offers certain services to consumers like the credit

19   monitoring product that we've been sued on.  It's very

20   important to note that it is the information stored on Equifax,

21   Inc.'s servers that was accessed in the breach.  Information

22   from Equifax Information Services was not accessed during the

23   data breach, and that is not contested.

24          Here's what I want to do, Your Honor.  This is just a

25   roadmap of where I'm going to go in the next 45 minutes or so.

10

1    I want to start with Plaintiffs' FCRA claims.  I want to then

2    talk generally about those allegations of harm that I outline

3    on that spider chart.  I want to spend some time on their

4    negligence claims.  I want to touch on the negligence per se

5    claims, the GFBPA claim, the unjust enrichment claim, the

6    contract claims, the uniform deceptive acts and practices

7    claims brought under other states' statutes and finish up with

8    the data breach notification claims and explain why in our view

9    none of these allegations and none of these claims states a

10   claim under Rule 12.

11         Let's start with the FCRA claims.  Plaintiffs'

12   primary FCRA claim -- and this is the Fair Credit Reporting

13   Act -- is under Section 1681(b) of that statute.  What 1681(b)

14   of the FCRA says is that any consumer reporting agency may

15   furnish a consumer report under the following circumstances and

16   no other, and then it lists the circumstances in which a CRA

17   like Equifax Information Services is permitted to release a

18   credit report or credit information and credit file respecting

19   the consumer.

20         So what's Plaintiffs' theory here?

21         Plaintiffs' theory is that by virtue of the theft by

22   a criminal of information at one level up at Equifax, Inc. that

23   Equifax furnished consumer data to the thieves and, therefore,

24   violated Section 1681(b).  But it's very clear that Section

25   1681(b) renders a CRA liable only if it furnishes a consumer

11

1    report to a third party.

2           That didn't happen here.   There was no furnishing,

3    and there was no consumer report.   Therefore, there is no

4    claim.

5           So let's take those one at a time.   Let's start with

6    the furnishing claim.

7           This is not the first time Plaintiffs in a data

8    breach case have alleged -- a data breach case involving a CRA

9    have alleged that based on negligence of the CRA or such gross

10   negligence that the theft of the information was essentially

11   tantamount to a furnishing of information, but every single

12   court that has addressed that argument has rejected it out of

13   hand.   Courts have unanimously held that the term "furnishing"

14   requires that a CRA intentionally disclose information and that

15   information stolen from a CRA is not information that the CRA

16   furnished.

17          And we've cited the *Galaria v. Nationwide Mutual* case

18   in our papers, the *Experian Data Breach* case which held that

19   stolen data was not furnished and the *Combined Insurance*

20   *Company of America* case which collects a number of other cases

21   that so hold.   Importantly, Plaintiffs cite no cases that hold

22   otherwise.

23          So that really ends the inquiry on the FCRA claim.   I

24   mean, it is -- the Court would have to break with every other

25   court and ignore purposes of the statute and clear language of

12

1   1681(b) to find that the victim of a criminal hack is

2   furnishing information voluntarily to the criminal, and that's

3   what they're asking you to do.

4           Secondly, even if the Court could get over that

5   hurdle -- and, respectfully, we don't think you should even try

6   -- the stolen information here is not a consumer report under

7   the FCRA such as to support a 1681(b) claim.  The stolen PII

8   here largely consists of names, birth dates, Social Security

9   numbers, addresses, phone numbers and driver's license numbers

10  which courts refer to as header information.  None of that

11  information is a consumer report because none of it bears on

12  consumers' creditworthiness, character or motive of living.

13  And we have cited not only the statute but the *Network* case and

14  other cases in our motion at page 14 that make clear that

15  header information is not a consumer report for purposes of

16  1681(b).

17          Plaintiffs also assert a claim -- certain Plaintiffs

18  assert a claim under 1681(e) of the FCRA which requires that

19  every consumer reporting agency shall maintain reasonable

20  procedures designed to limit the furnishing of consumer reports

21  to the purposes listed under Section 1681(b) of this title.

22  And, not surprisingly, courts have held that in order for a

23  Plaintiff to bring a 1681(e) claim they must first show that

24  the reporting agency released a report in violation of 1681(b).

25          And for the reasons I explained a minute ago, that is

1    that there was no furnishing and the information taken wasn't a

2    consumer report, Plaintiffs cannot establish the underlying

3    requisite showing under 1681(b) to support a 1681(e) claim.

4    And Plaintiffs do not contend otherwise.  That is, they don't

5    contend that if we prevail on the 1681(b) claim that there is

6    no 1681(e) claim.  That is a prerequisite to recovering under

7    1681(e) that we've furnished a consumer report which did not

8    happen here.

9           Two of the Plaintiffs, two of the 96, have alleged

10   claims under 1681(g).  That is a provision that requires CRAs

11   upon request to clearly and accurately disclose to the consumer

12   all information in the consumer's file at the time of the

13   request, including identifying each person that procured a

14   consumer report by name, address and phone number.  So the

15   purpose of this statutory provision is if, say, Macy's makes a

16   credit inquiry on my credit file and I ask the CRA to disclose

17   who has pulled my credit, they have to tell me name, address,

18   phone number of the Macy's outlet that pulled my credit.

19          Here the allegation is that we violated 1681(g)

20   because we didn't tell consumers who asked who the identity of

21   hackers were that took their information.  Of course, we don't

22   know who the identity of the hackers are; so we can't comply

23   with their tortured reading of the statute.

24          Criminals here did not procure a consumer report.  We

25   can't be required to identify criminal hackers we don't know

1    the identity of.  It kind of illustrates the absurdity of the

2    argument.  Essentially, they are arguing from an impossible

3    interpretation of the statute.  It just doesn't make any sense.

4    I mean, that's clearly not the purpose.

5            And so this is kind of a -- I mean, to say these are

6    strained arguments would, I think, be charitable.  And I think

7    we should ask ourselves why they brought these claims, why did

8    they throw these into the complaint.

9            The reason that they did is that the FCRA carries

10   with it statutory penalties, and the statutory penalties range

11   from $100 to $1,000 per violation.  There are 145 million

12   putative class members here.  So if Your Honor were to break

13   with every other court that has addressed this issue and permit

14   the FCRA claims to remain in this complaint, they would have a

15   claim that would be between 14-and-a-half billion and 145

16   billion dollars against Equifax without having to show any harm

17   or injury, alleged sufficient injury as they have to do under

18   other statutes in tort theories to support the claim.  So it's

19   a Hail Mary, and the Court should reject it out of hand.

20           That leads us to the allegations of harm that they do

21   make which are insufficient, and I think it does explain why

22   they would love to avail themselves of the statutory penalties

23   because they have a very difficult time alleging cognizable

24   harm for many of the Plaintiffs.  I'm not going to go through

25   all of the deficiencies in the allegations of harm, but I want

1   to highlight four of them.

2         All the Plaintiffs' tort claims, including their

3   claims for negligence and violation of consumer protection

4   statutes, require a showing of injury.  The injuries that

5   Plaintiffs alleged here for the most part, and the ones I'll

6   touch on, are not legally cognizable harms under Georgia law.

7   As I mentioned at the outset, the Plaintiffs here are not

8   fungible.  The Court has to look at each individual's

9   allegations of harm in each of their claims, or really more

10  accurately here each individual's failure to allege the

11  requisite harm, to make a showing of a claim under Georgia law.

12        The four different kinds of harm that I want to focus

13  on that are alleged throughout many of the individuals' claims

14  here are injuries that they claim arise from the mere

15  compromise of the PII, unspecified future harms, mitigation of

16  future harms and nominal damages.  None of those theories

17  supports a claim under the tort theories they allege under

18  Georgia law.

19        Georgia courts have consistently held that the

20  compromise of personally identifying information standing alone

21  is not an injury sufficient to support a tort claim.  We have

22  cited the *Finnerty* case, the *Rite Aid* case and the *Collins* case

23  for that proposition.

24        Georgia law similarly does not permit recovery based

25  on the fear of future harm.  In Finnerty, the Court of Appeals

1   said a fear of future damages there from the misuse of personal

2   information is too speculative to form the basis of recovery.

3   And courts around the country have recognized that mitigating

4   future harms is not sufficient injury unless the harm is

5   imminent.  And the Georgia Court of Appeals in the *Collins* case

6   recently agreed saying that, "Prophylactic measures such as

7   credit monitoring and identity theft protection and their

8   associated costs, which are designed to ward off exposure to

9   future speculative harm, are insufficient to state a cognizable

10  claim under Georgia law."

11          And here I think it's important to note that

12  immediately, as I pointed out from the beginning, immediately

13  we offered and provided to every citizen in the United States

14  free credit monitoring, free identity theft protection so that

15  Plaintiffs -- so consumers would not have to spend to mitigate.

16  But even if they had gone -- and some allege they did go out

17  and buy their own credit monitoring or identity theft

18  protection -- the law is clear that unless harm is imminent

19  those are normal mitigating steps that reasonable people should

20  take, and they are not damages that are caused and compensable

21  resulting from the breach.

22          This rule, this rule that mitigation injuries are not

23  cognizable, applies equally to time and effort and monetary

24  expenditures.  The majority of courts -- in the *Wendy's* case

25  that we cited the court said that the majority of courts in

17

1    data breach cases have held that the cost to mitigate, the risk

2    of future harm does not constitute an injury unless the future

3    harm being mitigated against is itself imminent.

4              And the complaint here, Your Honor, you can read all

5    565 pages.  I don't recommend it, you know, unless you're

6    sleepy but -- or you want to go to sleep.  But the complaint is

7    devoid of facts suggesting that any future harm is imminent or

8    even likely.  For example, there's no allegation, nor really

9    could there be, of facts showing that the criminal hackers

10   intend to use Plaintiffs' personally identifying information to

11   commit more crimes.

12             It's interesting that, you know, we're now over a

13   year in and the grave harm that folks were concerned about, and

14   rightfully so, has not fallen or hasn't -- there's no evidence

15   that there's been some huge dump of -- or sale or effort by the

16   criminal hackers here to misuse the Plaintiffs' information.

17   And there is no allegation in the complaint that any such harm

18   is imminent.  Therefore, Plaintiffs can't rely on time and

19   money spent mitigating those theoretical future harms as an

20   injury.

21             And they've come up with a new theory that at a

22   minimum they are entitled to nominal damages, but Plaintiffs

23   have to establish an injury even to secure nominal damages.

24   They can't use nominal damages as a substitute for showing an

25   actual injury.  There's a good quote here from *Rite Aid* that I

1    think actually quotes *Palsgraf* that says "Proof of negligence

2    in the air, so to speak, will not do."  There's got to be an

3    injury that's tied causally to the breach.  So for those

4    reasons, just from an overarching perspective when you look

5    across your tort claims or statutory claims or common law

6    claims, there are many, many of these Plaintiffs' claims are

7    insufficient as a matter of law just based on their failure to

8    allege cognizable injury required by Georgia law.

9            Where I want to spend a few minutes now, Your Honor,

10   is on the negligence claim.  And I think this is a very -- you

11   know, this is a very interesting place we find ourselves with

12   the negligence claim given the recent Court of Appeals decision

13   in the *McConnell* case.  And I do want to walk through in some

14   detail both Your Honor's holding in *Home Depot* and how

15   *McConnell* lines up against that and our view of what the case

16   law is and isn't now on negligence claims in Georgia.

17           There's no dispute that Georgia common law governs

18   the negligence claim.  The Plaintiffs agree with us on that.

19   We recognize that in *Home Depot* Your Honor found a duty to

20   safeguard personal information exists.  What the Court said --

21   what you said in your *Home Depot* opinion was that Georgia law

22   imposes a duty to take reasonable steps to avoid foreseeable

23   harms caused by third-party criminal acts.  And Your Honor

24   relied on the *Bradley Center v. Wessner* case in support of that

25   holding.  And I am going to -- I do want to talk about the

1    *Wessner* case in some detail in a minute.

2              Now, of course, Your Honor did not have the benefit

3    of the Court of Appeals' decision in *McConnell III* when *Home*

4    *Depot* was decided.  And I think it's fair to say that Your

5    Honor sitting as essentially a state court judge under eerie --

6    in *Home Depot* was making an eerie prediction as to what Georgia

7    law would be, and I understand why the Court ruled the way it

8    did.  But we now some years later have a definitive statement

9    from the Georgia Court of Appeals as to what the law in Georgia

10   is on negligence in the data breach context which the Court did

11   not have the benefit of when *Home Depot* was decided.

12             And *McConnell III* which was just issued this year

13   held that Georgia law does not recognize the legal duty to

14   safeguard personal information.  What the *McConnell* court said,

15   and I quote, "A duty of care to safeguard personal information

16   has no source in Georgia statutory or case law."  And a

17   negligence claim based on such duty did not survive a motion to

18   dismiss in that case.  And *McConnell* we contend is fully in

19   line with an unbroken string of authority in Georgia that the

20   *McConnell* case relied on, including the *Jenkins* case and the

21   *Cleveland* case.  The Georgia Supreme Court has held that a

22   court should not create a new duty absent a statutory

23   pronouncement or longstanding case law, and *McConnell III*

24   correctly recognized that there is no statute or longstanding

25   case law that supports imposing a duty to safeguard personal

20

1    information here.

2              So clearly *McConnell III* is at odds with *Home Depot*.

3    So what do the Plaintiffs do?  What do they say?

4              Well, they point back to Your Honor's decision in

5    *Wessner*.  And what the Court -- what you said in *Home Depot*

6    relying on *Wessner* was that Georgia law recognizes a general

7    duty to all the world not to subject them to an unreasonable

8    risk of harm.

9              But I want to take a minute and talk about the

10   *Wessner* case.  *Wessner* was a case in which Mr. *Wessner* and

11   Ms. *Wessner* who were married were having marital problems, and

12   apparently the reason they were having marital problems is that

13   Ms. *Wessner* was having an affair.  Mr. *Wessner* checked himself

14   into the Bradley Center which is a hospital for people with

15   mental issues.  And after the first time he was discharged, he

16   attempted to commit suicide.  Two weeks later he voluntarily

17   checked himself back into the Bradley Center.

18             And the facts in *Bradley* indicate that as a condition

19   of his voluntary submission to the Bradley Center he,

20   Mr. *Wessner*, submitted himself to the control of the treating

21   physician and the hospital.  That is, the hospital had control

22   over whether Mr. *Wessner* could leave the facility and under

23   what circumstances.

24             While he was there the second time, he made

25   statements to members of the staff that he intended to cause

1    harm to his wife.  Notwithstanding the fact that he had told

2    them that he intended to harm his wife, the treating physician

3    who had control over Mr. *Wessner* and the hospital gave him a

4    weekend pass, two-day pass without any conditions.  He promptly

5    went and got his gun, found his wife and her boyfriend and shot

6    them both and killed them.

7            A wrongful death suit was brought by Ms. Wessner's

8    son against the Bradley Center alleging that because the

9    Bradley Center had control over Mr. *Wessner*, knew that he

10   intended to cause harm and was dangerous to his wife, yet

11   nevertheless permitted him out of -- to escape their control

12   and get a weekend pass, they were responsible for the death.

13   The defense in that case was this is really a medical

14   malpractice case, and you can't extend the duty of a doctor or

15   hospital beyond the relationship with a patient.

16           And the Supreme Court when it looked at the case said

17   that this is not a malpractice case.  This is a case that can

18   be analogized to cases under the restatement where when a

19   person has control and responsibility for a third party, knows

20   that third party's dangerous, yet unleashes them, they have a

21   duty to take steps to mitigate and try to prevent the harm.

22           That's what happened in *Wessner*.  And some of the

23   language in *Wessner*, I think, is particularly instructive.  The

24   Supreme Court in that case said that -- I was reading this last

25   night and was struck by the language.  What the court said is

22

1   -- and it was in response to the argument that Bradley Center

2   made that this is really a malpractice case that the language

3   that Your Honor picked up on and relied on in the *Home Depot*

4   case came from.

5          What they said is that -- and I'm quoting here --

6   "The legal duty in this case did not arise out of this

7   consensual transaction between doctor and patient, however, so

8   there is no basis for requirement of privity.  The legal duty

9   in this case arises out of the general duty one owes to all the

10  world not to subject them to an unreasonable risk of harm.

11  This has been expressed as follows.  Negligence is conduct

12  which falls below the standard established by law for

13  protection of others."

14         They went on to say, next paragraph, "We believe the

15  Court of Appeals properly identified the legal duty in this

16  case in that 'where the course of treatment of a mental patient

17  involves an exercise of control over him by a physician who

18  knows or should know that the patient is likely to cause bodily

19  harm to others, an independent duty arises from that

20  relationship and falls upon that decision to exercise that

21  control with such reasonable care as to prevent harm to

22  others.'"

23         It went on to say, "We agree with appellant," which

24  is Bradley Center, "that as a general rule there is no duty to

25  control the conduct of third persons to prevent them from

1   causing physical harm to others.  We find, however, that one of

2   the exceptions to that rule applies here because of the special

3   relationship which existed between appellant and appellee's

4   father.  One who takes charge of a third person whom he knows

5   or should know to be likely to cause bodily harm to others if

6   not controlled is under a duty to exercise reasonable care to

7   control the third person to prevent him from doing such harm."

8              That is the *Wessner* case.  And since *Wessner* has been

9   decided, both the Court of Appeals and the Supreme Court have

10  limited *Wessner* to its facts and apply that case only where the

11  Defendant exercised control over the person that caused the

12  harm.  Equifax here, of course, did not exercise any control

13  over the criminal hackers who infiltrated its systems, nor do

14  the Plaintiffs allege that we controlled them.

15             So *Wessner* as the fountainhead of the decision in

16  *Home Depot*, I think, especially in light of the *McConnell*

17  decision bears another look.  And I think it is not -- it

18  doesn't stand for the proposition that Plaintiffs have argued

19  that it does, and I think a careful reading of that case and

20  the cases that have cabined it which we point out in our

21  opening brief at pages 30, 31 and Footnote 8 are worth looking

22  at.

23             So the next point I would make is, of course,

24  *McConnell*, the *McConnell* court had the benefit of *Wessner* and

25  still had -- it still held that there's no duty to safeguard

24

1    personally identifiable information.  Plaintiffs try to

2    distinguish *McConnell* and try to reconcile it with *Home Depot*

3    by arguing that the data breach in *McConnell* was not

4    foreseeable.  And they contend that *McConnell III* stands only

5    for the limited proposition that there's no duty in the context

6    of an unforeseeable data breach.  That's how they tried to

7    parse it.

8            And you'll see in Mr. Canfield's slide, one of his

9    slides -- I think one of the benefits of getting these early is

10   we have a chance to look at them -- you're going to see a quote

11   on this foreseeability issue that the Plaintiffs rely on.  And

12   they did this in their response brief.  But that quote that

13   he's going to show you comes from *McConnell I* which has been

14   superseded by *McConnell III*.  And the language that he points

15   to in the slide deck is not in the *McConnell III* decision.

16           Now, we don't know why the Georgia Court of Appeals

17   decided to excise the argument on foreseeability that the

18   Plaintiffs are going to rely on.  It might be, and I suggest it

19   very well could be, that they went back and looked at the

20   actual complaint that was filed in *McConnell* which we have

21   attached as an exhibit to our reply brief which shows that, in

22   fact, the *McConnell* Plaintiffs did allege foreseeability.

23           In paragraphs 26 and 27, *McConnell* alleged that it

24   was reasonably foreseeable that Defendant's failure to

25   safeguard and protect Plaintiffs' and the other class members'

25

1    personal information would result in unauthorized third parties

2    gaining access to Plaintiffs' and the other class members'

3    personal information.  And the Court of Appeals, of course, on

4    a motion to dismiss was required to accept those allegations

5    for purposes of the appeal.  So based on the language in the

6    complaint that they had before them, *McConnell III* cannot

7    properly be limited to just unforeseeable data breaches and

8    that is not a valid basis upon which to distinguish *McConnell*.

9         Now, as the Court knows, as we've pointed out,

10   *McConnell III* has been accepted for certiorari by the Georgia

11   Supreme Court.  But absent persuasive evidence the Georgia

12   Supreme Court would rule otherwise, this Court is bound to

13   follow the Georgia Court of Appeals' decision.  And even in the

14   face of the grant of cert, the Georgia Court of Appeals has

15   held that their own decisions remain binding precedent until

16   such time as they are modified or reversed by our Supreme

17   Court.

18        So we respectfully contend, Your Honor, that based on

19   the law as it now stands in Georgia Plaintiffs' negligence

20   claim fails as a matter of law and it ought to be dismissed.

21   At a minimum, I would say to Your Honor that you should wait to

22   see what the Georgia Supreme Court does with the *McConnell*

23   case.  We may get further clarity.  We may not.  But we know

24   that cert is being granted.  And I think given the uncertainty

25   in the law and the conflict between Your Honor's decision and

1    Judge Totenberg's decision in *Arby's* and what Judge Ellington

2    has ruled in the *McConnell* case, he wrote the opinion that at a

3    minimum the Court ought to wait.

4            And, of course, I'm glad Governor Barnes is here

5    because I think we all know Judge Ellington and he's an

6    esteemed jurist who Governor Barnes appointed to the Court of

7    Appeals in 1999.  He's an astute judge of judicial acumen.  And

8    I think if you read Judge -- if you read Judge Ellington's

9    opinion, it is a very well crafted and persuasive opinion.

10           So where do the Plaintiffs fall back?

11           They fall back to policy.  And --

12           THE COURT:  So did the Georgia Supreme Court identify

13   the issue that they were going to consider because there's a

14   sovereign immunity issue in there and the negligence issue?

15   Did they say which --

16           MR. BALSER:  They did.  They asked for briefing on

17   both issues.

18           THE COURT:  Both?

19           MR. BALSER:  So it could go a lot of different ways,

20   right?  And we just don't know what they're going to do.  I

21   mean, it's possible that they could dispose of -- they could

22   say that Court of Appeals got it wrong on sovereign immunity

23   and not reach the data breach question.

24           THE COURT:  And there we are.  We're no better off.

25           MR. BALSER:  Right.

27

1          Or they could take it on.  They could take both
2     issues on and say, Judge, now Justice, soon to be Justice
3     Ellington was right.  And absent a legislative -- clear
4     legislative pronouncement there is no -- we just don't know
5     what they're going to do.  But as the law stands right now,
6     *McConnell III* is binding, and it's clear.  And I understand it
7     may be unpalatable to some, but it is the law in Georgia as it
8     stands today.

9          There is one other point I would make about policy,
10    and it does go back to Judge Ellington's opinion.  Of course,
11    we cited the *Frye* case that says -- and it's axiomatic; and, of
12    course, the Court knows that it's the duty of the General
13    Assembly, not the Court's, to enact policy into law.  But in
14    the *McConnell III* case, Judge Ellington had a discussion --
15    after parsing through all the arguments and looking -- you
16    know, canvassing law in Georgia, looking for a potential duty
17    somewhere to safeguard PII and finding none, Judge Ellington
18    made the following observation.

19         He said, and I quote, "Given the General Assembly's
20    stated concern about the cost of identity theft to the
21    marketplace and to consumers, as well as the fact that it
22    created certain limited duties with regard to personal
23    information, for example, the duty to notify affected persons
24    of data breaches and the duty not to intentionally communicate
25    information such as Social Security numbers to the general

1    public, it may seem surprising that our legislature has so far

2    not acted to establish a standard of conduct intended to

3    protect the security of personal information as some other

4    jurisdictions have done in connection with data protection and

5    data breach identification laws.  It is beyond the scope of

6    judicial authority, however, to move from aspirational

7    statements of legislative policy to an affirmative legislative

8    enactment sufficient to create a legal duty."

9         I think that sums it up.  And that really harkens

10   back to the point I was trying to make at the outset that

11   really at bottom this is a policy debate, where do you put the

12   responsibility, where do you allocate the risk.  And that is a

13   policy decision that the Georgia legislature so far has not

14   undertaken, and it may be because they feel none is necessary

15   because they don't want to tax corporations with additional

16   burdens.  It may be that they just haven't considered.  But for

17   whatever reason, there is no statutory pronouncement and no

18   clear common-law duty established under Georgia law requiring

19   protection of the PII.

20        And, finally, last but not least, Plaintiffs have

21   failed to sufficiently allege any legal cognizable harm that

22   was proximately caused by Equifax.  And their failure to allege

23   causation is another reason why their negligence claim fails.

24        Very briefly, I know Your Honor is very familiar with

25   the economic loss rule.  If we're right that there is no duty,

1    the economic loss rule provides an additional ground on which

2    the negligence claim can be dismissed.  Of course, if Your

3    Honor finds that there is some independent duty in tort, you

4    have held in *Home Depot* that the economic loss rule would

5    because of an independent duty not provide a ground.  So I

6    think this claim, economic loss rule defense rises and falls on

7    whether or not the Court finds an independent legal duty that

8    would be contrary to what the *McConnell* court held.

9           So for all those reasons, Your Honor, we believe that

10   the negligence claim deserves a very hard look.  It either

11   ought to be dismissed now, or the Court ought to defer ruling

12   until the Georgia Supreme Court gives us more clarity in the

13   *McConnell* case.

14          I want to turn quickly to the negligence per se

15   claim.  Negligence per se claims have to be premised on a

16   specific duty.  The specific duty that -- and that duty has to

17   be expressly imposed by statute, and where the statutory duty

18   is too indefinite its violation cannot constitute negligence

19   per se.  Here what Plaintiffs point to is Section 5 of the FTC

20   Act, but there's nothing in the FTC Act that on its face

21   imposes a specific duty to have reasonable data security.

22          Plaintiffs identify no statutory text imposing with

23   any specificity any duty that they allege.  They point to

24   Section 5 of the act and similar state statutes without telling

25   us which ones to contend that those statutes impose a legal

1   duty to safeguard this information.  But the FTC Act does not

2   impose any such duty.  It's just an unfair deceptive practice

3   act statute.  And it says -- you know, prescribes unfair

4   deceptive acts or practices in or affecting commerce.

5          Now, again, we recognize that in *Home Depot* Your

6   Honor found that Section 5 of the FTC Act does support a

7   negligence per se claim.  But, again, we do have an intervening

8   decision, one very recent by the Eleventh Circuit in the *LabMD*

9   case that came out this year that we think warrants another

10  look at the negligence per se ruling in *Home Depot*.

11         And for purposes here, and while this isn't -- the

12  language we quote isn't the gist of the -- of what was at issue

13  in *LabMD* -- what was at issue in *LabMD* was whether an

14  injunction that had been issued was specific enough to be

15  enforced -- in the discussion and lead-up to the analysis of

16  the injunction at issue the Eleventh Circuit said that the only

17  possible source of standard of unfairness holding that a

18  failure to maintain a reasonably designed data security program

19  constitutes an unfair act or practice is the common law.  And

20  as we've just discussed, the common law based on *McConnell*

21  imposes no such duty as we have discussed.

22         Now, you may say -- and Plaintiffs may say, Well,

23  what does *McConnell* have to do with a federal act?  It's an FTC

24  -- you know, it's a federal statute.  Why are you imposing --

25  trying to impose *McConnell* as the common law?

1          And the answer to that is this is -- they are

2    bringing a negligence claim under Georgia law.  But they are

3    trying to rely on the FTC as the basis of that.  So I think you

4    have to look at the common law of Georgia.  And there are cases

5    that say in a -- whatever court you're in the courts of that

6    state are presumed to have decided they're common law properly

7    and appropriately and consistently with what the other 50

8    states would do.  There are cases to that effect.

9          So I do think *McConnell* is the place you have to go

10   to look at whether or not the common law -- I mean, they don't

11   even allege the Constitution or statute that provides the duty.

12   It's got to be common law.  And we say based on *McConnell*

13   common law doesn't support importing the vague language of

14   Section 5 of the FTC Act as a basis for a negligence per se

15   claim in Georgia.

16         So that's negligence per se claim.

17         Quickly, on the Georgia Fair Business Practices Act

18   claim, again, *McConnell III* confirms that the Georgia Fair

19   Business Practices Act claim does not impose the duty that

20   Plaintiffs allege.

21         Why do I say that?

22         Because the *McConnell III* court held that the

23   Plaintiffs' complaint was premised on a duty of care to

24   safeguard personal information that has no source in Georgia

25   statutory law.

1              Now, interestingly, in *McConnell* the Plaintiffs

2    pointed to provisions of the Georgia Fair Business Practices

3    Act as a basis upon which the Court could find a duty to

4    safeguard information.  Now, admittedly, those provisions that

5    were pointed to in that case are not the same provisions of the

6    GFBPA that Plaintiffs rely on here.  But the point is that

7    Georgia Court of Appeals in *McConnell* was aware the GFBPA had

8    claims in front of it and said directly that the duty of care

9    to safeguard personal information has no source in Georgia

10   statutory law.  And we contend that ends the inquiry on whether

11   they state a claim under the GFBPA.

12             There's another defect in the Plaintiffs' GFBPA

13   claims, and that is that they failed to plead reliance.

14   Georgia courts have held that reliance is an essential element,

15   and the statute requires reliance regardless of whether the act

16   at issue is alleged to be deceptive or unfair.  That's one of

17   the arguments the Plaintiffs make is they're making an unfair

18   claim, not a deceptive claim.  But the statute says that

19   Plaintiff must describe the unfair act or practice relied upon.

20             Here's the problem.  The Plaintiffs plead no facts

21   establishing reliance because most of the class members here

22   allege that they didn't give Equifax their personal information

23   at all, much less in reliance on any unfair or deceptive act of

24   Equifax.

25             You know, most of these cases arising under both

1    GFBPA or under these uniform deceptive practice acts deal with

2    some transaction where a consumer was purportedly misled.  Here

3    the allegations are that the Plaintiffs through this credit

4    reporting ecosystem didn't have a direct relationship with

5    Equifax.  Their PII was given to Equifax by banks and other

6    intermediaries and, therefore, there is -- they can't allege

7    reliance because they didn't do anything.  They had no specific

8    undertaking with Equifax that could give rise to an unfair

9    deceptive act directed at them.  And, therefore, they aren't

10   able to plead the requisite reliance to support the claim.

11           THE COURT:  Mr. Balser, it's fine with me whatever

12   you want to do.  Do you want me to let you know how much of

13   your hour you have left?

14           MR. BALSER:  Sure.

15           THE COURT:  And then if you go over your hour, take

16   that time either from Ms. Sumner or Mr. Haskins?  How do you

17   want me to do that?

18           MR. BALSER:  Yes, let's do that.

19           MS. SUMNER:  Your Honor, I object.

20           MR. BALSER:  I don't want to stop.  Where are we?

21           THE COURT:  All right.  You got nine minutes of an

22   hour left.

23           MR. BALSER:  Okay.

24           THE COURT:  And any excess time I will take away from

25   Ms. Sumner.

1          MR. BALSER:  All right.  I will do my best to finish

2    in nine minutes.  It gets quicker from here.

3          Let's talk about unjust enrichment quickly.  So we've

4    got two sets of Plaintiffs here.  We've got non-contract

5    Plaintiffs, and that's the bulk of the Plaintiffs.  And we've

6    got Plaintiffs who have contracts with Equifax.

7          The non-contract Plaintiffs did not confer anything

8    of value on Equifax for the reason I just explained.  They

9    didn't give PII to Equifax.  Third parties did.  And the

10   contract Plaintiffs are barred as a matter of law from pleading

11   unjust enrichment.

12         Kind of black-letter case law, to recover for unjust

13   enrichment a Plaintiff has to allege that she provided

14   something of value to the Defendant with the expectation that

15   the Defendant would be responsible for the cost thereof.  Here

16   there was -- this is not a case where someone said, Hey, I'm

17   giving you my PII and expect you to pay me for it and you

18   didn't.  That's the quintessential unjust enrichment claim.

19   And that's why the claim fails for the non-contract Plaintiffs.

20   They allege they didn't give Equifax PII at all.

21         On the contract claims, there's no dispute that we

22   had a contract with the contract Plaintiffs; and a party can't

23   plead unjust enrichment in the alternative when a valid

24   contract exists.  And, again, that's black-letter law in

25   Georgia.

35

1          Quickly on the contract claims, who are these

2    contract Plaintiffs?

3          These are consumers who purchased Equifax credit

4    monitoring or identity theft protection services before the

5    breach.  There's no allegation in the complaint that the

6    Plaintiffs failed to receive the services that they bought from

7    Equifax.  So they got credit monitoring, and they got identity

8    theft protection that they paid for.  There's no contention

9    that we breached the contract in that way.

10          What are they alleging?

11          They are alleging that somehow Equifax's privacy

12   policy has been embedded or incorporated or somehow in the

13   ether tethered to their contract in a way that gives them a

14   contract claim based on the privacy policy.  But even if that

15   were right, which it's not, the privacy policy does not impose

16   the duty that Plaintiffs assert here.

17          So they've got to plead a contract with certainty and

18   completeness.  They haven't done that.  They've sued for breach

19   of this privacy policy that's extrinsic to these contracts, was

20   not incorporated in the contracts.  And each of these relevant

21   contracts have a merger clause disclaiming all representations

22   that aren't made on the face of the contract.

23          In any event, even if the privacy policy were somehow

24   to be embedded as part of the contract, Equifax makes clear in

25   the privacy policy that it cannot ensure or warrant the

1  security of any information you transmit to us.  So even if the

2  privacy policy were a contractual undertaking, there is no

3  contractual obligation in that policy to support the

4  Plaintiffs' contract claims.  So those claims should also be

5  dismissed.

6          They also have an implied contract claim, but when

7  there's an express contract you can't have an implied contract.

8  That's black-letter law also.

9          Quickly on the -- quickly on the UDAP claims, now,

10  Your Honor, in our brief we laid out nine separate reasons why

11  the UDAP claims should be dismissed.  And you will be very

12  pleased to know I'm not going through all nine of those.  I am

13  going to touch very briefly on a few of them.

14          The first is that Plaintiffs seek an extraterritorial

15  application of other states' consumer protection statutes which

16  they cannot do under the commerce clause.  The commerce clause

17  prohibits application of a state statute to commerce that takes

18  place wholly outside of the state's borders.  The allegations

19  here are that they had no -- the Plaintiffs had no relationship

20  with Equifax, most of them.  And they have conceded that the

21  conduct that they are complaining about which is the data

22  breach took place entirely in Georgia.  And, therefore, under

23  the commerce clause in the cases we cite the extraterritorial

24  application of other states' laws is not permitted.

25          And, of course, all of these statutes have -- most of

1    the statutes, not all, have a fraud component; and with the

2    fraud component comes a 9(b) requirement that fraud be pled

3    with particularity.  And for the reasons we have outlined in

4    our brief, 9(b) has to be complied with; and the allegations

5    here simply do not comply with the pleading requirements under

6    9(b).

7            And, as I've also discussed already with respect to

8    the non-contract Plaintiffs, they have failed to plead -- a lot

9    of these state statutes require some transaction with the

10   Defendant.  I bought their product, and I was misled.  Here

11   most of the non-contract Plaintiffs have failed to plead

12   transactions with Equifax because they didn't have any

13   directly.  And those are fatal to the state law claim, the

14   other state statutory claims that those Plaintiffs bring.  And,

15   as I have already discussed, there are defects in the way that

16   they allege injury which is not sufficient under Georgia law.

17           So, quickly, Your Honor, to the last but not least,

18   the claim based on data breach notification laws, Plaintiffs 12

19   -- Plaintiffs sue under 12 different statutes that do not

20   provide a private right of action.  No Plaintiff has pleaded --

21   and no Plaintiff has pleaded any facts showing that any delay

22   in notification under these statutes resulted in an injury.

23           These statutes that are outlined here either facially

24   do not permit a private litigant to sue, or courts have so

25   held.  So any claims for breach, private claims brought under

38

1    those statutes, fail as a matter of law.  And, regardless, no

2    Plaintiff has alleged any injury resulting from the delay in

3    notification.

4            Just to point out here, the delay in notification

5    they are complaining about is 41 days, 41 days from the date

6    that Equifax discovered the breach until they give

7    notification, during which time Equifax is doing all those

8    things I outlined in the beginning, trying to figure out what

9    happened, who is affected and the like.  Many of those statutes

10   have a 45-day grace period.  So in order to prevail, they'd

11   have to prove that 41 days was unreasonable under the

12   circumstances.  We don't even get there because there is no

13   allegation that as a result of the delay of 41 days as opposed

14   to some other time that they say would have been reasonable has

15   caused any particular injury.

16           So to sum it up, Your Honor, as I said at the

17   beginning, the Plaintiffs' claims do not fit within the

18   statutes and the common-law tort theories that they assert.

19   There has been no furnishing of the credit report.  There are

20   no cognizable injuries.  There's no legal duty to support a

21   negligence claim.  There's no consumer fraud.  So under the

22   current state of the law in Georgia, which is where we are and

23   where the Plaintiffs asked this case to be moved to, the

24   Plaintiffs fail to state a claim; and the complaint should be

25   dismissed in its entirety.

39

1          THE COURT:  Thank you, Mr. Balser.

2          MR. BALSER:  Thank you.

3          THE COURT:  Let's take a ten-minute break.  And then

4     I will hear from you, Mr. Canfield.

5          Court's in recess for ten minutes.

6          (A short recess was taken.)

7          THE COURT:  Mr. Canfield, are you next?

8          MR. CANFIELD:  I am, Your Honor.

9          We plan to split up the argument on the motion to

10    dismiss in three ways.  I'll be addressing the facts, the

11    claims for negligence, the negligence per se and the issue of

12    injury.  Ms. Keller will deal with the other issues on the

13    consumer complaint.  Then Mr. Siegel and Governor Barnes will

14    split the small business complaint argument.

15          It would be helpful if the Court would let me know

16    when I have used 45 minutes of my argument.  Mr. Siegel and

17    Mr. Barnes have agreed to cede me some of their time.  I'm not

18    sure that I will need it, but it would help if I have some

19    notice about where I am.

20          Let me begin with a major theme that underlies all of

21    our presentations.  Almost all of the major issues raised by

22    Equifax are not new in this district.  The same arguments were

23    made and found to be unpersuasive or expressly rejected in one

24    or both of this Court's decision in *Home Depot* and Judge

25    Totenberg's decision in *Arby's* which Equifax totally ignores.

1        Those decisions here in *Home Depot* and *Arby's* are

2   consistent with decisions in dozens of cases around the

3   country.  Both in *Home Depot* and in *Arby's*, the court allowed

4   the Plaintiffs' claims for negligence and negligence per se to

5   proceed, as well as claims under state unfair trade practices.

6   Both decisions found that there's a legal duty under both the

7   common law and Section 5 of the FTC Act requiring a major

8   company to use reasonable data security measures.  Both cases

9   held that the economic loss rule is not applicable under these

10  circumstances, and both cases found that data breach victims

11  who have incurred time and money to rectify or mitigate the

12  substantial risk of fraud have been injured.

13        Equifax can win its motion to dismiss only if it

14  convinces the Court that its prior decision in *Home Depot* and

15  Judge Totenberg's decision in *Arby's* were wrong.  Equifax

16  hasn't even come close to doing that.  In its briefing, it

17  largely minimizes both decisions and makes the same arguments

18  as if it were writing on a blank slate.

19        Its essential position is that there are three

20  decisions that occurred after the *Home Depot* decision that

21  somehow changed the law -- the *McConnell* case, the *Collins* case

22  and the *LabMD* case in the Eleventh Circuit.  Those cases don't

23  do that.  *McConnell* and *Collins* specifically distinguish these

24  -- the decisions in *Arby's* and *Home Depot* and say that there

25  are different facts and circumstances involved.

41

1          Judge Totenberg in *Arby's* specifically found that

2    *McConnell* was a starkly different case.  And the Eleventh

3    Circuit's decision in *LabMD* nowhere holds that there's no duty

4    under Section 5 imposed on Equifax to use reasonable data

5    security standards and doesn't hold that the FTC can't regulate

6    that duty.

7          So we believe the Court can go ahead and decide the

8    pending motions without waiting for further developments of the

9    law in Georgia or the Eleventh Circuit.  Mr. Balser's correct

10   *McConnell* is subject to review by the Georgia Supreme Court

11   under cert.  He didn't mention that the *Collins* case is also

12   subject to a pending cert petition as well.  But as we say, we

13   believe the Court can go ahead and decide these issues.

14         Let me turn now to the facts, not just to provide

15   some background, but because the issues raised by Equifax

16   dealing with negligence, duty and injuries are dependent on the

17   facts.  We had extensive factual allegations in our 560-page

18   complaint, and they are very detailed about what happened.  We

19   know a lot more as a result of the report that was released on

20   Monday by the Republican staff of the U.S. House Oversight

21   Committee, and that simply amplifies the accuracy of the

22   allegations in our complaint and adds further details.

23         So let me give you basically a high-level review.

24   Equifax is one of the three major credit reporting agencies.

25   That fact is of major significance.  Equifax is not a state

1  bureaucrat who inadvertently sent out an e-mail containing
2  somebody's personal information, a bank that failed to redact a
3  Defendant's Social Security number in a court filing or a
4  merchant that failed to protect the numbers on its -- the
5  credit card numbers of its customers.  Equifax's entire
6  business is to gather massive amounts of the most confidential
7  consumer data on almost all Americans, and under highly
8  regulated circumstances it's allowed to disclose that data to
9  those with a need to know in connection with financial
10  transactions.  That confidential consumer information is
11  critical to the entire functioning of the American economy, and
12  keeping it confidential is essential to allow the American
13  economy to proceed.
14        As a result, Equifax and other credit reporting
15  agencies are a high-value target for cyber criminals and, as
16  the House Committee report put it, have a "heightened
17  responsibility to protect consumer data by providing
18  best-in-class data security."  Over the years, Equifax has
19  acknowledged and accepted this heightened security.  It's
20  declared in securities filings that the protection and
21  safeguarding of consumer information is paramount to Equifax,
22  and it's touted its commitment to protecting the privacy of
23  personal information.
24        Even after the 2017 breach that's brought us all
25  together, Equifax's CEO acknowledged that heightened

1   responsibility to protect consumer data when he testified

2   before Congress.  Here's what he said:  "We at Equifax clearly

3   understood that the collection of American consumer information

4   and data carries with it enormous responsibility to protect

5   that data.  We did not live up to that responsibility."

6           That admission is an understatement if there ever was

7   one.  Equifax's failure, systemic failures at the heart of the

8   company, led to perhaps the most serious data breach in our

9   nation's history in both the type of data that was stolen and

10  in the extent of the corporate misconduct that allowed it to

11  occur.

12          The immediate cause of the breach was Equifax's

13  failure to install a security patch on the Adobe Struts

14  software that he used -- that it used.  Equifax knew of the

15  need to install the patch.  It was told to install the patch.

16  It was warned by the federal government that if it didn't

17  install the patch cybersecurity -- cyber criminals were active

18  and could get into their systems.

19          And internally Equifax took some action.  They had a

20  meeting about it.  They sent an e-mail to 450 people, told them

21  you got to fix this patch.  Nobody did it.  A few months later

22  hackers exploited the vulnerability in that specific -- that

23  that specific patch was designed to fix, took advantage of

24  other weaknesses in Equifax computer systems, maneuvered around

25  the systems undetected for two-and-a-half months and stole the

1    Social Security numbers and other confidential data belonging

2    to roughly half of all Americans, that information that some

3    commentators have referred to as the crown jewels of the

4    American financial system.

5           Equifax had software in place that would have allowed

6    them to see what the hackers were doing, but the software was

7    inactive.  That's because the security certificate which was

8    needed to allow it to work had expired 19 months previously,

9    and Equifax never bothered to do that.  And at the time they

10   had over 300 other security certificates that they had allowed

11   to expire.  The only reason Equifax finally discovered that the

12   breach was taking place is somebody got around to installing

13   that certificate.  And when he did that, the software did its

14   job and they learned about the hackers.

15          Equifax has publicly suggested that the breach

16   occurred because of human error, one individual's failure to

17   install that patch.  As grossly negligent as that failure was,

18   the problem at Equifax was much more serious.

19          The facts as alleged by Plaintiffs which this Court

20   must accept as true are that Equifax totally abrogated its

21   responsibility for data security, has known for years that its

22   data security systems were inadequate, knew that the company

23   was at a risk of a major data breach, and yet did little or

24   nothing.  And we contend that's a result of incompetence, lack

25   of accountability and a corporate culture that minimized the

45

1     importance of data security.

2           Let me give you a few salient facts that we have

3     alleged that would support that.  In August 2016, a year before

4     the breach, a financial indexing firm publicly assigned

5     Equifax's data security efforts and gave it a rating of zero on

6     a scale of one to ten.  And they issued the same report a month

7     later -- or a month before the breach started.  The situation

8     hadn't been fixed.

9           Also, a month before the breach, Cybernance, another

10    cybersecurity analysis firm, rated the danger of a major data

11    breach at Equifax within the next year as 50 percent.  And

12    another independent reviewer gave Equifax a grade of F for

13    application security and D for its failures in patching

14    software.

15          It wasn't just outside reviewers.  A couple of years

16    before the breach Equifax had an audit done that disclosed

17    massive problems in its process and procedures for fixing

18    patches on software.  They knew it had to be done, and they

19    just didn't do it.  As the House Committee concluded in its

20    report, had the company taken action to address its observable

21    security issues prior to this cyber attack, the data breach

22    could have been prevented.

23          Now, the impact of that breach wasn't limited to

24    Equifax.  Consumers have been -- have suffered damages that we

25    have alleged and been exposed to a substantial and imminent

risk of harm.  One analyst noted soon after the breach was announced that, "On a scale of one to ten in terms of risk to consumers, this is a ten."  And so long as Social Security numbers are an essential part of our economy, those people, the half of the American public whose Social Security numbers have been publicly disclosed, are at risk for identity theft and fraud.

You know, Mr. Balser said that after the breach has occurred Equifax was gravely concerned about the risk to consumers and through its public statements and actions it demonstrated that it was concerned about the substantial risk that consumers faced.  It set up a website and told consumers to spend their time checking to find out if they had been affected; and consumers spent time figuring out if they were affected and, if they were, trying to figure out what they needed to do to protect themselves.  Equifax advised consumers to mitigate the risk by freezing their credit.

Equifax made credit freezing free at Equifax, but that's not enough to protect consumers.  A consumer has got to freeze credit at all three credit bureaus, and that takes time. It takes roughly an hour or so on the phone with one of these credit reporting agencies.  And there's a cost involved, anywhere from 10 to 40 dollars per transaction depending on the state you lived in at the time.  And people have to continue to freeze and unfreeze their credit if they apply for loans, want

1    to buy a car, that sort of thing.  So it costs a lot of money.

2          Mr. Balser pointed out Equifax also made its own

3    credit monitoring services to consumers who wanted to sign up

4    for it.  Millions did.  But there were a lot of consumers who

5    didn't trust Equifax and they didn't want to use Equifax's

6    credit monitoring services.  So they had to go and buy similar

7    services elsewhere.  And so they incurred that cost to protect

8    themselves to do what Equifax said they should do, but they

9    just didn't trust Equifax to do it right.

10         So in addition to the time and money that consumers

11   have done to minimize this substantial risk that Equifax knew

12   about and told consumers about, we have alleged that consumers

13   have been victimized already by fraud and identity theft.  We

14   have alleged that the information that's been stolen is already

15   being used by consumers.  We have lots of examples that -- I

16   never counted them, but Mr. Balser said 39 of our class

17   representatives have alleged that they have already been

18   victimized by identity theft.  And I'll just give you a few

19   examples.

20         John Simmons who is a Georgia resident had

21   unauthorized accounts opened in his name, and his home loan was

22   delayed because his credit score dropped.

23         Alan Levino was notified through the mail that his

24   debit card he had previously used to unfreeze his credit at

25   Equifax was compromised in the breach.  He has had unauthorized

1    charges on that same debit card since the breach occurred.

2            James McGonagal has had more than ten unauthorized

3    credit card accounts opened in his name using the information

4    that was stolen in the Equifax breach.

5            And Jennifer Twedodle has had unauthorized accounts

6    opened in her name using information that was stolen in the

7    breach, and her credit score dropped 79 points as a result of

8    fraudulent charges.

9            That's it.  Those are the two big buckets, taking

10   steps and incurring costs to mitigate the harm that Equifax

11   told them they should do and the harm that they have incurred,

12   the actual money that they have spent trying to clean up these

13   fraudulent episodes that they've been subjected to.

14           That's basically my overview of the facts.  Let me

15   turn to the negligence claim.

16           Equifax's first argument, as the Court has heard, is

17   that it has no duty, no legal duty to protect all this

18   confidential information that it collects, an argument that

19   flies in the face of what its CEO told Congress.  Regardless,

20   the argument is simply wrong.  In *Arby's* Judge Totenberg held

21   "that allegations that a company knew of a foreseeable risk of

22   its data security systems are sufficient to establish the

23   existence of a plausible legal duty and survive a motion to

24   dismiss."

25           This Court reached the same conclusion.  The rulings

49

1    in both *Home Depot* and *Arby's* are founded in a well-established
2    legal principle that is incorporated in the *Restatement of*
3    *Torts* and recognized by the Georgia courts that there is a
4    general duty one owes to all the world not to subject them to
5    an unreasonable risk of harm.  That duty extends to harm that
6    is foreseeable, and the duty is discharged by exercising the
7    same degree of care that ordinarily prudent persons would
8    exercise under the same or similar circumstances.
9            That's our case.
10           And this Court's decision in *Home Depot* and the
11   *Arby's* decisions aren't the only data breach cases that have
12   used this general duty owed to the entire world to recognize
13   that a negligence claim can be brought.  *Target*, for example,
14   was one.  So this Court was on sound legal ground in doing what
15   it did in *Home Depot*, as was Judge Totenberg and all the other
16   judges around the country.
17           In its briefing, *Home Depot* made a bunch of different
18   arguments for why the Court -- why the law doesn't support
19   that, but the only one that I'm really going to address is its
20   new argument that the *McConnell* case means this Court got it
21   wrong.  And they're just -- Equifax's reliance is misplaced.
22           *McConnell*, as Judge Totenberg held, is starkly
23   different both on the facts and on the law.  On the facts, a
24   state employee inadvertently sent out an e-mail to a thousand
25   people that contained some sensitive information about people

1    who had dealings with the Department of Labor.  As Judge

2    Totenberg noted, there were no allegations of known security

3    deficiencies, no involvement of criminal hackers, no questions

4    whether the disclosure was foreseeable.  It's not just an issue

5    of foreseeability.  It's the issue that this is -- it wasn't a

6    data breach case.  It was somebody just inadvertently sent out

7    an e-mail.

8            And the Georgia Court of Appeals in *McConnell I*

9    itself distinguished *Home Depot* on that basis and said those

10   allegations aren't this case.  It is one thing to hold that an

11   individual state bureaucrat or the agency for which he works

12   has no duty, no legal duty to maintain the confidentiality of

13   sensitive information.  It's another thing to hold that one of

14   the three major credit reporting agencies is authorized by --

15   has no duty.  And these factual differences matters.  Existence

16   of a legal duty is not decided in a vacuum.

17           *McConnell* is also different on the law.  What the

18   court did is to focus on two Georgia statutes, the Georgia data

19   breach notification statute and the Georgia statute that

20   precludes the intentional disclosure of Social Security

21   numbers.  And it focused on those statutes, and it said there's

22   nothing in those statutes that imposes liability when a state

23   employee sends out an e-mail.

24           Significantly, the general duty one owes to the

25   entire world that this Court and others have relied on was not

1    addressed in *McConnell III*, the only opinion that sort of rides

2    at this point.  It was briefly addressed in a footnote in

3    *McConnell I*, but it was pulled out when they reissued their

4    opinion.  Obviously, we don't know why that was.  But there's

5    no indication either certainly in *McConnell III* that it has

6    anything to do with the general duty.  It certainly didn't

7    overrule or attempt to overrule *Bradley Center v. Wessner*, and

8    it didn't limit *Bradley v. Wessner* to the facts in the way that

9    Mr. Balser has contended and which our argument was made in the

10   *Home Depot* case and in the *Arby's* case and this Court and Judge

11   Totenberg found to be unpersuasive.

12          The issue under *Wessner* can involve the question of

13   whether there's a duty to control somebody that might commit a

14   criminal act or do something that results in some injuries, but

15   it can result in other ways.  The Defendant doesn't have to

16   control a third party, and that's not -- we're not alleging

17   that Equifax failed to control a third party.  We're alleging

18   that Equifax failed to meet its own duty to prevent this data

19   breach.

20          There are lots of decisions both in the Georgia

21   courts and in this court in which the general duty has been

22   applied in situations well outside of the circumstances in the

23   *Bradley Center* case.  There is a case in which a tire retailer

24   was held to have a duty that extended not just to the person

25   who bought the tire but to passengers in a car that was -- that

52

1   ended up in a wreck as a result of a defective tire.  And there

2   are lots of other circumstances.

3          But I want to call the Court's attention to the

4   Eleventh Circuit's decision in *Braun v. Soldier of Fortune*

5   *Magazine*.  And the cite is in our -- the slides that we've

6   furnished the Court.  It's not cited in our brief.

7          But in that case, the Eleventh Circuit affirmed a

8   wrongful death judgment against *Soldier of Fortune Magazine*

9   which the jury found had published what in effect was a

10  personal services ad for a hit man going out to kill somebody;

11  and the family of the victim filed a lawsuit.  The magazine

12  offered -- or argued it had no duty.  And the Eleventh Circuit

13  disagreed, finding that the duty arose from the same principle

14  that this Court used in *Arby's* and *Home Depot* and recognized by

15  the Georgia courts, namely the general duty to avoid subjecting

16  others to an unreasonable risk of harm.

17         And in interpreting Georgia law and citing to Georgia

18  cases, the Eleventh Circuit fleshed out a little bit about what

19  this general duty means.  And it said that the Georgia courts

20  apply a risk utility test in determining what's an unreasonable

21  risk of harm.  Let me quote from the Eleventh Circuit.  It

22  said, "A risk is unreasonable if it is of such magnitude as to

23  outweigh what the law regards as the utility of the Defendant's

24  alleged negligent conduct.  Simply put, liability depends upon

25  whether the burden of the Defendant of adopting adequate

1   precautions is less than the probability of harm from the

2   Defendant's unmodified conduct multiplied by the gravity of the

3   injury that might result from the Defendant's unmodified

4   conduct."

5          The risk utility analysis obviously depends on the

6   factual conduct.  And because the *McConnell* court never even

7   addressed this general duty, we don't know how it would have

8   come out on this risk utility analysis.  But the outcome seems

9   fairly obvious.  In *McConnell*, one person sending out an e-mail

10  and the relative risk was relatively minor, not stolen by

11  hackers, no evidence or reason to believe that anyone had ever

12  used it.  It's just an e-mail had been sent.

13         In this case, the risk that criminals would steal

14  Plaintiffs' confidential information as I mentioned was

15  enormous; and the extent of that harm that would have been

16  inflicted if such a data breach occurred obviously was massive.

17  And it was so massive that a number of commentators, including

18  the House Committee in its report, have recommended that the

19  use of --

20         MR. BALSER:  Your Honor, I'm going to object right

21  here.  I let him say it once, but that report's not in the

22  motion to dismiss record.  It should not be referred to and

23  should not be considered by the Court on this record.

24         THE COURT:  All right.  Mr. Balser, I'll give the

25  argument the weight and credit that it's due.

54

1          MR. BALSER:  Thank you, Your Honor.

2          MR. CANFIELD:  Regardless of what the House Committee

3     said --

4          THE COURT:  Go ahead, Mr. Canfield.

5          MR. CANFIELD:  -- the recommendation is that the use

6     of Social Security numbers to identify consumers for purposes

7     of financial transactions be reduced, if not eliminated.

8          And can you imagine the expense that's going to go

9     into that?

10         And it ought to be taken into account in this risk

11    utility analysis.

12         Accordingly, nothing in *McConnell* is inconsistent

13    with this Court's reliance on the general duty in both *Home*

14    *Depot* and *Arby's*.

15         Let me move to the economic loss rule, and there's

16    not a lot of reason to spend a lot of time on it.  Both this

17    Court and Judge Totenberg rejected it, its application in a

18    data breach case like this one.  Equifax is not arguing

19    anything that's new.

20         I just want to make two points.  The economic loss

21    rule only applies when there are contracts, and lots of cases

22    have made that clear.  There's a Court of Appeals decision in

23    Georgia that sort of suggests that that might extend to a tort

24    case under certain circumstances.  But when you dig into that

25    case -- and they've cited it, and I think you ought to read it

55

1   -- that that's not really what it holds.  And it makes sense

2   that it's limited to contract cases because the whole policy

3   principle underlying the rule is that when the parties are in a

4   contract with each other they can allocate the risk between

5   themselves in the contract.  And if there's no contract,

6   there's no way of doing that.

7        Second, the economic loss rule doesn't apply when the

8   tort claim is based on the breach of a legal duty arising

9   independent of the contract.  And that's the case here, not

10  just on a -- under the general duty but also under Section 5 of

11  the FTC Act.

12       Let me turn to negligence per se.  Georgia law

13  recognizes that a Plaintiff has a claim for negligence per se

14  if the Defendant violates a standard of conduct that's imposed

15  by law.  Section 5 of the FTC Act imposes a standard as to

16  reasonableness in the FTC's words on its website, "A company's

17  data security measures must be reasonable in light of the

18  sensitivity and volume of consumer information that it holds,

19  the size and complexity of its data operations and the cost of

20  available tools to improve security and reduce vulnerability."

21       This Court, *Arby's* -- and Judge Totenberg in *Arby's*

22  and other courts have held that Section 5's standard of conduct

23  can be enforced through a negligence per se claim.  All of the

24  claims that Equifax makes now were previously expressly

25  rejected and were found unpersuasive.  Section 5 is not

56

1  specific enough to be enforceable.  But in *Teague v. Keith* the

2  Georgia Supreme Court specifically held that where a statute

3  provides a general rule of conduct, although amounting only to

4  a requirement to exercise ordinary care, the violation thereof

5  is negligence per se.

6          They also claim that the obligation to use reasonable

7  care with regard to data security isn't expressly set out in

8  the statute.  It's not required to be set out.  Congress

9  delegated to the FTC to flush out the meaning of unfair and

10  deceptive trade practices through directives and litigation

11  which is what the FTC has done.  And Georgia law is

12  specifically clear that you don't have to have a statute to

13  have a claim for negligence per se.  All you need to have is a

14  directive or standard imposed by law.

15          So the only new argument that Equifax makes is this

16  *LabMD* decision.  That case doesn't involve a negligence per se

17  claim.  It doesn't hold that the FTC cannot regulate the lack

18  of reasonable data security measures under Section 5, and it

19  doesn't hold that there's no duty with regard to data security

20  under Section 5.

21          The issue in *LabMD* was whether the cease-and-desist

22  order that the FTC had imposed on *LabMD* after a data breach was

23  specific enough to be enforced by a court.  The Eleventh

24  Circuit held that the order was not because the order merely

25  required *LabMD* to adopt a reasonable data security program

57

1   without spelling out the particular things *LabMD* had to do to

2   meet its obligations under the order.  And according to the

3   Eleventh Circuit, without detailed obligations specified in the

4   order a court wouldn't know who -- and there was a dispute

5   about what was reasonable -- the Court wouldn't know who was

6   right.

7           And, in fact, the Eleventh Circuit had a long,

8   lengthy hypothetical about what would happen if the issue was

9   litigated and gave us an example what would happen if the FTC

10  and *LabMD* disagreed about what was reasonable and put on

11  experts supporting each other's positions.  The Eleventh

12  Circuit said the court can't be in the position of trying to

13  figure out which expert is right because it could put the court

14  in the position of essentially having to oversee *LabMD's* entire

15  data security operation.

16          That's obviously not the situation here.  Our

17  negligence per se claim does not require this Court to design

18  the data security program or oversee how that program would be

19  implemented by Equifax.  Rather, the Court will instruct the

20  jury that under Section 5 Equifax had a duty to use reasonable

21  data security measures; and it will be up to the jury to

22  determine based on all the evidence whether Equifax met its

23  duty.  It's what juries do all the time.  So the case does not

24  say what Equifax is saying here, and certainly the Federal

25  Trade Commission does not read *LabMD* in the way that Equifax

58

1    does.

2              As noted in the House Committee report --

3              MR. BALSER:  Same objection, Your Honor.

4              THE COURT:  Same ruling.

5              MR. CANFIELD:  Equifax has made the following

6    disclosure in a recent SEC filing:  "On June 13, 2018, the CFPD

7    and the FTC provided us with notice that the staffs of the CFPD

8    and FTC are considering recommending that their respective

9    agencies take legal action against us and that the agencies may

10   seek injunctive relief against us as well as damages and civil

11   money penalties."

12             So it would be a very strange thing if the FTC is

13   moving forward, imposed this duty that the law recognizes on

14   Equifax, but the Plaintiffs in this case for some reason can't

15   enforce the same duty through a negligence per se claim.  And,

16   regardless, even if Equifax were right, which it's not, that

17   somehow Section 5 can't be enforced through a negligence per se

18   claim, the standard of care that the FTC has adopted, the

19   reasonableness standard, is still relevant in analyzing whether

20   there's a legal duty in a negligence case.  The specific

21   situation was addressed by the Georgia Court of Appeals in

22   *Brock v. Avery* which is cited by Equifax, and in that case the

23   Defendant argued that a statute that the Plaintiff contended

24   had been violated was not specific enough to be enforced.

25             What the Court of Appeals said is, "A violation of

1    that statute would not constitute negligence per se as it's too

2    indefinite for enforcement, but it does furnish a rule of civil

3    conduct under the circumstances of each case, and the jury may

4    find negligence in fact as a result of its violation."

5              That's our situation.  So Equifax can't just make the

6    FTC -- Section 5 of the FTC Act go away.  We think it can be

7    enforced through a negligence per se claim as this Court has

8    already held.  If not, it's relevant to the duty analysis.  And

9    that argument was never considered in any of the cases that --

10   certainly *McConnell* or any other case that Equifax relies on.

11             I want to move on now to Equifax's last argument that

12   I'm going to address that no Plaintiff has suffered legally

13   cognizable harm.  And I think, as Mr. Balser conceded, each

14   class representative has alleged that each of them have been

15   injured, each has incurred time and money as a result of the

16   breach either to rectify identity fraud that's already occurred

17   or to mitigate the substantial risk that identity fraud will

18   occur in the future.

19             The overwhelming majority of courts have held that

20   such allegations are sufficient to create standing or survive a

21   motion to dismiss on the merits.  The *Resnick v. AvMed* case in

22   the Eleventh Circuit says Plaintiffs allege that they have

23   become victims of identity theft and have suffered monetary

24   damages as a result.  This constitutes an injury in fact.

25             I didn't hear Mr. Balser say anything to the

1   contrary.  And, in fact, during his presentation he said that

2   the *Collins* case that he was going after in his argument with

3   regard to damages generally only dealt with a portion of

4   Plaintiffs' allegations of damage.  And I presume the ones that

5   they're not contesting are the allegations that people have

6   actually spent money to rectify fraud that has already

7   occurred.  There's not much doubt that that's an injury that's

8   cognizable under any state's laws.

9          This Court dealt with a situation in connection with

10   the financial institutions in *Home Depot*.  Judge Totenberg also

11   dealt with it with regard to damages that had been suffered by

12   consumers.  And she held that allegations of monetary losses,

13   including, "Unauthorized charges on their accounts, theft of

14   their personal financial information and costs associated with

15   detection and prevention of identity theft are sufficient to

16   survive a motion to dismiss."

17          And we've cited many, many other cases in both

18   districts and circuit courts that have reached the same

19   conclusion.  In its briefing, Equifax tries to avoid this case

20   law by not challenging the standing of any Plaintiff since a

21   lot of these cases involve standing issues, but they instead

22   argue that on the merits Plaintiffs' allegations are

23   insufficient under Georgia law to satisfy the injury elements

24   of our claims.  But that effort to redefine the injury analysis

25   and to avoid all of the contrary law is unavailing and doesn't

61

1    make much sense.

2            As the Seventh Circuit held in the *Barnes & Noble*

3    case, "To say that Plaintiffs have standing is to say that they

4    have alleged injury in fact.  And if they have alleged injury

5    -- if they have suffered injury, then damages are available."

6    And then Judge Totenberg went further and specifically held

7    that the types of injuries that we allege are legally

8    cognizable in Georgia, not as a matter of standing but as a

9    matter of Georgia substantive law.

10           So I'm not quite sure I understood this spider chart

11   that Equifax has put together or what its purpose was.  It

12   showed that all the Plaintiffs are injured.  It tried to break

13   down the types of injuries into -- in different ways.  But the

14   way that I think the Court can do it is to look at three

15   different buckets.  One is time and money that's already been

16   spent, that's been spent dealing with fraud that's already

17   occurred.  The second bucket are the mitigation risks that

18   Plaintiffs have incurred to protect themselves against the

19   substantial risk of future harm like buying credit monitoring

20   services, freezing and unfreezing their credit.  And then the

21   third bucket involves nominal damages.  And I'll talk about

22   each one of those three.

23           Let me start with the first one, actual out-of-pocket

24   losses and time spent rectifying fraud that's already occurred.

25   None of the cases that Equifax cites say that damages that fall

62

1    under that bucket are not recoverable.  The cases simply hold

2    that no actual identity theft or fraud had occurred in those

3    cases.  And if there wasn't any actual identity theft or fraud

4    that occurred, obviously there wasn't any out-of-pocket loss

5    that was spent on those cases.

6         Their first case is the *Finnerty* case.  That was the

7    case in which a bank included a Plaintiff's Social Security

8    number in a complaint filed in court.  And the court held that

9    there was no evidence or reason to believe anyone other than

10   the parties ever saw the Social Security number, and certainly

11   there was no evidence that it had ever been used.

12        *Rite Aid*, the other one, big one that they relied on

13   involved a pharmacy that was going out of business.  And it

14   sold all of its customers' pharmacy records to another pharmacy

15   that was in the same town, and a class action was brought

16   saying that it violated the rights of the customers involved.

17   And the court held that both pharmacies were required by law to

18   keep the records confidential, and the Plaintiff admitted he

19   had no evidence that any other authorized person had seen the

20   records, and he didn't allege that he had any actual financial

21   injury as a result of the sale.  Those cases simply don't hold

22   what Equifax wants this Court to believe they say.

23        THE COURT:  Mr. Canfield, you asked me to notify you

24   at the 15-minute mark.  You are there.

25        MR. CANFIELD:  Okay.  Thank you, Judge.

63

1          The second bucket is the mitigation costs.  Equifax

2    doesn't dispute that a substantial risk of harm will justify

3    mitigation expenses.  It can't.  The Supreme Court has held

4    that they can.  It's well recognized under the law.  The

5    *Restatement of Torts*, Section 919, specifically recognizes that

6    people have a right to recover mitigation expenses if they're

7    reasonably incurred to avert harm.  And whether there's a

8    substantial risk of harm -- or where there is a substantial

9    risk of harm courts almost universally hold that mitigation

10   costs are recovered.

11          The issue, thus, is whether the risk of harm is

12   substantial and if that risk was substantial whether the

13   Plaintiffs acted reasonably in incurring these mitigation

14   costs.  Those are fact issues that can't be resolved on the

15   basis of the pleadings, and certainly it's plausible that in

16   the face of one of the most serious data breaches in our

17   nation's history that consumers faced a substantial risk of

18   harm that justified them taking action to protect themselves.

19          In its brief, Equifax goes beyond saying there's no

20   substantial risk of harm, that Plaintiffs haven't alleged it.

21   They actually make the statement, "It is not likely that any

22   Plaintiff will suffer future harm from the Equifax data

23   breach."  That's another example of Equifax saying one thing to

24   this Court and something totally different to the public and

25   the regulators.

64

1         After the data breach, Equifax didn't say to

2    consumers, Your confidential information was stolen.  But don't

3    worry.  There's no substantial risk that anybody's ever going

4    to use it.  They didn't tell regulators, No harm, no foul, it's

5    unlikely anybody's going to get hurt.

6         They took the exact opposite approach.  They warned

7    consumers.  They advised consumers about the risk.  They touted

8    their efforts to fix the problems to prevent that risk from

9    occurring in the future.  And Mr. Balser's told you about what

10   they did.  That demonstrates that Equifax knew that there was a

11   serious and substantial risk, and it certainly makes our

12   allegation that that risk exists to be plausible.  And as a

13   result, this Court would act inappropriately if it dismissed

14   our claims.

15        Equifax's position here is particularly out of line

16   for another reason.  For years Equifax has sold its own

17   identity theft protection services, including credit

18   monitoring.  In order to sell them those services, it didn't

19   tell consumers data breaches aren't really a problem, but if

20   you have got a little bit of concern maybe you can buy our

21   product.  They touted the importance of protecting yourself

22   from a data breach.  And their advertising talked about the,

23   quote, great risks for identity theft and fraud that result

24   from the data breach.

25        Now, Equifax's entire argument on mitigation risk

65

1   deals with *Collins*; and *Collins* can be explained very easily.

2   As the quote that Mr. Balser put up said, the court in that

3   case determined that the risk of harm was speculative, not

4   substantial.  It didn't do a substantial risk analysis, but it

5   said it's speculative because there's absolutely no allegation

6   that any criminal had ever used the information and no

7   Plaintiff argued that they hadn't actually been victimized by a

8   data breach which are the facts here.  And, in fact, *Collins*

9   distinguished *Arby's* on that very ground, said it's a different

10  case.  There were no allegations in *Collins* that the Defendant

11  had advised the people that had had their information stolen to

12  take action and protect themselves and no allegations, as I

13  said, that there was -- that would otherwise support

14  substantial risk.

15          But regardless of the fact that it is distinguishable

16  both on the facts and the law, there's another reason not to

17  rely on it.  The case is not binding precedent.  There was a

18  dissent.  It's physical precedent under the rules of the

19  Georgia Court of Appeals.  The decision only has the same

20  effect as a decision from a court from a state other than

21  Georgia.  It's persuasive, the Court can deal with it, but it's

22  not bound by it.  And in light of all the other decisions that

23  -- elsewhere that have held in favor of Plaintiffs' position in

24  this case, *Collins* is relatively unimportant.

25          There's another reason.  There's a pending cert

66

1    petition in *Collins*, and that yet hasn't been decided.  So we

2    don't know what the final word is going to be on that

3    particular issue.  But as we said before, it's not necessary to

4    wait.  It's such a different case it really doesn't affect this

5    one.

6              Now, let me talk briefly about the third bucket.

7    Separate and apart from actual costs that are incurred

8    remedying or mitigating fraud, the Georgia law allows damages

9    where no actual -- nominal damages where no actual damage flows

10   from an injury.  So the question here is whether in the absence

11   of any actual damages Plaintiffs have suffered an injury as a

12   result of Equifax's conduct that would allow for a jury to

13   impose nominal damages.  That question is not addressed by any

14   Georgia case whether information that is stolen by a criminal

15   for the purpose of committing fraud creates an injury to that

16   Plaintiff as a result of that theft when the theft is allowed

17   to take place because of the Defendant's negligence.

18             There are good reasons to hold that there is an

19   injury allowing -- that would allow nominal damages under those

20   circumstances.  Judge Koh in the *Anthem* case held that the loss

21   of consumers' confidential data is a sufficient injury.  And in

22   Georgia the law infers some damage from the invasion of a

23   privacy right that would allow nominal damages, and that's what

24   we allege to be the case here.

25             I'm going to sit down now, Judge, and let my

67

1    colleagues take it from here.  Thank you very much.  It's been

2    an honor arguing in front of you today.

3              THE COURT:  Thank you, Mr. Canfield.

4              Ms. Keller?

5              MS. KELLER:  Good morning, Your Honor.  Amy Keller

6    for the consumer Plaintiffs.  And I will be brief.

7              So I'd like to begin my discussion by focusing on

8    Plaintiffs' FCRA claims.  FCRA's purpose is to protect the

9    privacy of consumer data and limit the circumstances under

10   which it can be disseminated by consumer reporting agencies

11   such as Equifax.  Plaintiffs allege that Equifax violated FCRA

12   by furnishing Plaintiffs' consumer reports in violation of

13   1681(b).  Nothing in FCRA authorizes the CRA to furnish

14   consumer reports to unauthorized or unknown entities.

15             Plaintiffs have alleged that Equifax failed to

16   maintain reasonable procedures designed to limit furnishing of

17   consumer reports to the purposes listed under Section 1681(b),

18   and that's in violation of Section 1681(e).  Plaintiffs allege

19   that Equifax was both negligent as well as willful and reckless

20   in failing to maintain these safeguards.

21             Now, Equifax's counsel claims that this is a Hail

22   Mary pass.  Your Honor, to the contrary.  While we haven't seen

23   circumstances as egregious as this one in other cases, Congress

24   passed a statute to govern how CRAs must handle our most

25   sensitive data.  Equifax did not meet the bar set by Congress.

68

1          Now, first, Your Honor, the Court should not accept

2     Equifax's invitation to let it evade liability under the FCRA

3     through corporate segmenting.  You heard from Mr. Balser that

4     there's an important distinction regarding from which entity

5     the data was actually obtained.  But Plaintiffs have raised a

6     question of fact in their complaint regarding Defendant's

7     corporate structure alleging that Equifax, Inc. and its

8     subsidiaries, Equifax Information Services, LLC and Equifax

9     Consumer Services, LLC, operate together as an integrated CRA.

10    In fact, its front-facing consumer websites don't distinguish

11    between ECS, EIS or Equifax, Inc.  And Equifax itself admits

12    that EIS is a CRA.

13          The complaint contains allegations regarding that the

14    companies freely share FCRA restricted information, profits,

15    management and operate as one entity and one CRA and alter egos

16    of one another.  Those are paragraphs 116 through 121.  Indeed,

17    even as the House Oversight Committee called Equifax a CRA --

18    and I acknowledge the previous objection that makes reference

19    to the House Oversight Committee report -- and acknowledge that

20    Equifax --

21          THE COURT:  Mr. Balser, they can easily add that by

22    amendment.  So I'm not going to make a big issue out of it.  I

23    understand your objection.

24          MR. BALSER:  All right.

25          MS. KELLER:  And Equifax's ACIS -- that's the

69

1     Automated Consumer Interview System; that was the tracking

2     system that was breached in this case -- was developed to meet

3     the requirements of the FCRA.  As the cases that Equifax cites

4     on this issue demonstrate, the Court should visit this issue on

5     summary judgment.  It would be inappropriate to dismiss

6     Plaintiffs' claims against any of the Equifax entities for the

7     FCRA because one may or may not be a CRA at the motion to

8     dismiss stage when there's a question of fact that's been

9     raised in the complaint.

10          Your Honor, turning to Equifax's furnishing argument.

11    So Equifax claims that it didn't furnish the reports because

12    the attackers stole information from Equifax.  The Fair Credit

13    Reporting Act does not define what it means to furnish, so

14    courts have typically looked at the case law to determine this.

15          Now, to make this argument, Equifax relies upon

16    several cases -- the *Nationwide Insurance* case, *Experian* and

17    *Dolmage*.  But those cases demonstrate the vast factual

18    differences between typical data breach cases and the

19    incredibly unique set of circumstances in front of Your Honor.

20    For example, in the *Nationwide Insurance* case the Plaintiffs

21    only allege that *Nationwide* had been a victim of the breach and

22    that because of the breach *Nationwide* must not have had certain

23    industry standard cybersecurity safeguards in place.  But the

24    proposed first amended complaint based all of this on

25    assumptions.

1          In *Experian*, Your Honor, Plaintiffs pointed to prior

2   data breaches and interviews from frustrated former employees

3   who felt that advances to cybersecurity efforts had been

4   stymied by the company.  The *Experian* consolidated amended

5   complaint never specifically said what led to the breach in

6   that situation.

7          And then in *Dolmage* a third-party vendor's employee

8   copied sensitive information onto its computer which was then

9   made available on the internet.  The company, *Combined*

10  *Insurance*, did not engage in the conduct; and the Plaintiff in

11  that complaint did not even allege that the company was, in

12  fact, a consumer reporting agency.

13         Contrast those fact patterns with the one before you,

14  Your Honor.  The cases do not counsel supporting dismissal at

15  this stage.  If anything, those cases demonstrate that our case

16  is more egregious.  None of the cases concern a specific threat

17  that could have been fixed with a specific patch when if

18  applied could have completely prevented the specific breach

19  here from occurring.

20         The situation becomes even more extreme because, as

21  my colleague, Mr. Canfield, explained earlier, Equifax ignored

22  warnings of its lax cybersecurity.  Congressman Greg Walden

23  said it's like the guard at Fort Knox forgot to lock the doors

24  and failed to notice the thieves were emptying the vaults.

25  Actually, it's more than that, Your Honor.  The guards were

1    warned about the thieves that were right outside.  They were

2    warned that the doors didn't lock.  They didn't bother to fix

3    the locks, and they didn't even bother to check that they were

4    being robbed.

5           Now, whether Equifax's actions rise to the level

6    necessary to constitute furnishing, it's not something the

7    Court need decide today.  The Court need only determine that we

8    have alleged enough to raise a plausible argument that

9    Equifax's elected course of conduct amounted to some act that

10   resulted in the transmission of this data to wrongdoers.  If

11   the Court is not satisfied, we could likely allege more based

12   upon the House Oversight Committee report -- and, again, we

13   acknowledge the objection -- Senator Warren's report and

14   whatever remains outstanding from other governmental agencies

15   and lawmakers.

16          We are not asking the Court to depart from

17   established precedent.  We are acknowledging that the precedent

18   does not match the circumstances in this case.

19          THE COURT:  Ms. Keller, it's fine with me; but your

20   hour is up.  So are other Plaintiffs going to cede you some of

21   their time?

22          MR. SIEGEL:  I have, Your Honor.

23          THE COURT:  All right.  Fine.

24          Go ahead, Ms. Keller.

25          MS. KELLER:  And, Your Honor, I will quickly breeze

72

1    through the rest of this.

2            Equifax next argues that the very reason why it

3    assembled all of this information to determine the

4    creditworthiness of the 148 million Americans whose personal

5    information was compromised should be ignored because it

6    doesn't constitute a consumer report.  But the FCRA defines

7    consumer report very broadly saying written, oral or other

8    communications of any information by a consumer reporting

9    agency bearing on a consumer's creditworthiness, credit

10   standing, credit capacity, character, general reputation,

11   personal characteristics or mode of living.

12           In fact, Your Honor, *Parker v. Equifax* -- that's a

13   case upon which Equifax relies -- says that depending on

14   context header data may well function effectively as a consumer

15   report.  Based upon this definition, Your Honor, the Court can

16   look at our complaint and see numerous instances of information

17   constituting a consumer report.  There are specific examples

18   within the class of individuals whose information goes to mode

19   of living, credit capacity or creditworthiness.

20           For example, the class consists of a large number of

21   consumers who had their credit card information compromised.

22   That they had a credit card surely goes to their

23   creditworthiness or their credit capacity.  And those

24   individuals whose driver's licenses were stolen that

25   information goes toward mode of living that they were able to

1    obtain a driver's license.

2         *TransUnion v. FTC* says that the definition of

3    consumer report does not seem very demanding, and almost any

4    information about consumers arguably bears upon their personal

5    characteristics or mode of living.  In that case, Your Honor,

6    the Court found that lists containing only a person's name,

7    address and whether, for example, he or she had a credit card

8    was enough to make the information a consumer report.

9         Your Honor, turning to Equifax's argument that it did

10   not know the identity of the hackers and, accordingly, an

11   expectation that Equifax follow the law and provide adequate

12   disclosures of the breach would somehow be absurd, we don't

13   need to get into the identity of the hackers today.

14   *FTC v. Citigroup* says that a motion to dismiss is not a legal

15   procedure to resolve issues of fact and whether the identities

16   of the hackers were known or not.  Plaintiffs allege that

17   Equifax deprived consumers of their right to receive clear and

18   accurate disclosures in violation of 1681(g).

19        Your Honor, turning next to the Georgia Fair Business

20   Practices Act claims, my colleague has already engaged in a

21   fulsome recitation of *McConnell* and the issues regarding duty

22   related to *McConnell*.  However, Equifax has also challenged

23   Plaintiffs' Georgia Fair Business Practices Act claims because

24   of *McConnell*.  However, instead of looking at *McConnell* which

25   Mr. Balser recognized does not concern the same instances of

74

1   the Georgia Fair Business Practices Act, the Court should

2   instead look to *Arby's* which we have brought up to the Court in

3   Mr. Canfield's argument.

4          In *Arby's*, the Court determined that in order to

5   ensure that consumers are protected the GFBPA must be strictly

6   construed against a business which engages in unfair or

7   deceptive acts and that the act seeks to prohibit.  In that

8   case again, Your Honor, it distinguished *McConnell* finding that

9   there were no similar allegations of a known security

10  deficiency in the *McConnell* case.  Accordingly, there's no need

11  to stretch the holding in *McConnell* to fit this case when

12  *Arby's* is on point.

13         Your Honor, I briefly want to address reliance under

14  the GFBPA.  Equifax attempts to evade liability for its

15  wrongdoing by arguing that Plaintiffs have not relied upon the

16  numerous misrepresentations about security that it made in its

17  advertisements, its website and its written materials.

18  Equifax's numerous misstatements about security aside, had

19  Equifax actually informed consumers and the public that it

20  failed to install patches on high-risk vulnerabilities,

21  Plaintiffs allege that it would not have been able to be in

22  business.  And that's paragraph 374.  The companies such as the

23  financial institutions that furnished data to Equifax would

24  have stopped, and Equifax would have been required to adopt

25  reasonable security measures.

1          Accordingly, even though you don't have to show

2    reliance for omissions-based claims or claims of unfairness as

3    *Arby's* and *Anthem* have stated previously, there would have been

4    no need.  Equifax would not have been in business.

5          Your Honor, Equifax also argues for the dismissal of

6    Plaintiff's UDAP claims for several reasons.  But these claims

7    are largely based upon Section 5 of the FTC Act and are similar

8    to the Georgia claims.  None of the cases Equifax cites would

9    prevent states from ensuring that its residents have the

10   protections provided by those states if an out-of-state

11   tortfeasor were to cause injury to them.

12         Other cases such as *Target* have allowed other such

13   claims to proceed past the dismissal stage.  Your Honor, there

14   would be no need for the Court to evaluate these issues now.

15         And to the extent Equifax tries to inject other

16   arguments into their presentation as to why dismissal of these

17   and the data breach notification statutes would be improper,

18   the Plaintiffs will refer the Court to their extensive briefing

19   in appendices regarding these issues in addition to the other

20   issues Equifax raised in their argument concerning disclosure

21   of the contract claims and other claims.

22         If the Court has any questions, I would be happy to

23   answer them.  But for now I will go sit down.

24         THE COURT:  Thank you, Ms. Keller.

25         MS. KELLER:  Thank you.

1          MR. BALSER:  Your Honor, Ms. Sumner informs me I have

2     three minutes left on my time.  I don't think I am going to be

3     able to make it.

4          THE COURT:  I don't think you do.  I think you are on

5     Ms. Sumner's time now.

6          MR. BALSER:  I will be brief.  Well, I think some of

7     it can come from Mr. Haskins.  They can fight it out.

8          MR. HASKINS:  I object, Your Honor.

9          MR. BALSER:  I want to start where Ms. Keller spent

10    most of her time which is on the FCRA claims.  The courts have

11    unanimously held that the FCRA does not apply in the data

12    breach context.  Theft of data is not furnishing for purposes

13    of the FCRA.  And there is no case that holds that the kind of

14    header information that was taken here, the names, addresses,

15    Social Security numbers, constitutes a consumer report.

16         There is no case that says the fact that you have a

17    credit card constitutes a consumer report.  There is no case

18    that says whether or not you have a driver's license makes that

19    information into a consumer report.  There just is no 1681(b)

20    claim here, and without a 1681(b) claim there cannot be a

21    procedures claim under 1681(e).

22         There's a little bit of bootstrapping going on saying

23    there wasn't adequate safeguarding and protections in

24    practices.  But in order to make that allegation under the

25    FCRA, there has to have been an improper furnishing of a

1    consumer report; and that just hasn't happened.

2              And two other points on the FCRA claims.  The point

3    that Ms. Keller made about allegations in the complaint that

4    Equifax, Inc. and EIS are alter egos and the like, it doesn't

5    matter.  Even if the data had been taken from EIS as opposed to

6    Equifax, Inc., the data still wasn't furnished.  It's stolen.

7    And the information that was taken still was not a consumer

8    report.  It was header information.

9              So whether or not it was EIS, you know, their

10   allegations of alter ego don't get them over the hurdle of

11   1681(b).  There's a reason why every single court that has been

12   faced with these kinds of allegations, and they always allege

13   that the company was negligent, could have done or should have

14   done more such that it constituted furnishing, that every court

15   has rejected it because the purpose of the statute is to deal

16   with voluntary submissions of credit information pursuant to an

17   authorized request.  That's what these statutes are designed to

18   govern, not a theft by a third party.

19             Finally, on the FCRA points, it is absolutely

20   appropriate for this Court to deal with those claims on a

21   motion to dismiss.  They are facially inadequate claims, and

22   they should be dismissed under 12(b)(6).  There's no factual

23   discovery needed to determine that under the facts and

24   circumstances here there was no furnishing of a consumer

25   report, and those claims ought to be dismissed.

1          Very quickly I want to just address a couple of the

2     other points that Mr. Canfield made.  One of them was this

3     citation of the Court to the *Braun v. Soldier of Fortune*

4     *Magazine* case.  It was not in the briefing they raised today.

5     That case raised a very different issue than what we are faced

6     with.  That case dealt with under what circumstances a magazine

7     can be held liable for negligently publishing a murder-for-hire

8     ad.  It has nothing to do with our case.

9          The Plaintiffs argue that the Court should adopt

10    *Braun's* risk utility balancing test to find a duty here, but

11    we've got *McConnell* that says there is no duty.  So it doesn't

12    help them.  And even though *Braun* did cite *Wessner*, *Braun* was a

13    1992 case.  And the Eleventh Circuit has since explained that

14    *Wessner* stands only for the control exception to the general

15    tort rule.  And I would point that since this is a new case I

16    want to give you a new cite.  This is cases they rely on.  Take

17    a look at *Smith v. United States*, 873 F.3d 1348 at 1352, 2017

18    Eleventh Circuit case that cabins *Wessner* to the control

19    exception.

20         And, you know, to go back to *Wessner*, I think the

21    point -- I mean, you heard Mr. Canfield say we are not alleging

22    a failure to control under *Wessner*.  And I think that ends the

23    inquiry because *Wessner*, the language in *Wessner* and the duty

24    in *Wessner* as explained by the Supreme Court in *Wessner* was,

25    and I quote, "Where the course of treatment of a mental patient

79

1   involves an exercise of control over him by a physician who

2   knows or should know that the patient is likely to cause bodily

3   harm to others, an independent duty arises from that

4   relationship and falls upon the physician to exercise that

5   control with such reasonable care as to prevent harm to others

6   at the hands of the patient."

7          And over time the courts, both the Georgia courts and

8   the Eleventh Circuit, have recognized that was the basis upon

9   which *Wessner* was decided was control over someone who could do

10  injury.  And that is -- as we heard Mr. Canfield say, they are

11  not alleging that here, nor could they because, of course, we

12  didn't have control over the criminal hackers.

13         Just very briefly on the -- it's a pointy-headed

14  point, but I want to make the point.  Mr. Canfield cited the

15  Court to the *Barnes & Noble* case for the proposition that

16  Equifax's failure to challenge Article III standing means that

17  they have actually pled cognizable injury under Georgia tort

18  law, and that just isn't so.

19         First, I would say in the *Dieffenbach* case, that

20  *Barnes & Noble* case, that case involved a specific California

21  statute in which the Seventh Circuit held that the injury

22  requirement under that statute was coextensive -- was no more

23  onerous than the Article III injury requirement.  And Georgia

24  law under *Collins* requires more.  In fact, the Eleventh Circuit

25  in the *Wooden v. Board of Regents* case at 247 F.3d 1262 has

80

1    said that whether a Plaintiff has standing is, and I quote,

2    "conceptually distinct from whether the Plaintiff is entitled

3    to prevail on the merits."

4             We have also cited the *Caudle v. Towers Perrin* case

5    which is a data breach case where the court found that the

6    Plaintiff had satisfied Article III standing but that his

7    negligence claim failed because he had not established a

8    sufficient injury under the future-risk-of-harm prong.

9             So, Your Honor, for all the reasons that we argued in

10   our briefs and in my opening argument, and for the reasons

11   stated here, we ask the Court dismiss Plaintiffs' consumer

12   complaint.

13            THE COURT:  Okay.  I need to take at least a short

14   break.

15            Mr. Siegel, Mr. Barnes, what's your pleasure?  Do you

16   want to take a lunch break?  You want to try to finish your

17   part before lunch?

18            MR. SIEGEL:  I think Mr. Haskins is up next with

19   their motion on the small business claim.  So starting after

20   lunch is fine so we don't break it up, but we will leave it to

21   the pleasure of the Court.

22            MR. HASKINS:  Absolutely, Your Honor, whatever is

23   your pleasure.

24            THE COURT:  Well, my preference would be to take a

25   ten-minute break, hear from you, take a lunch break and y'all

1    come back.  But if you want me to --

2              MR. SIEGEL:  That's fine too.

3              THE COURT:  If you want to try to finish it all

4    before lunch, I'm willing to do it.

5              MR. SIEGEL:  I think the lunch break will allow

6    Governor Barnes and I to fit into the smaller space we have

7    been assigned now, Your Honor.

8              MR. BARNES:  I doubt that.

9              MR. SIEGEL:  I should say allow me to fit into the

10   smaller space.  So that's acceptable, Your Honor.

11             THE COURT:  Okay.  Well, I need to take a ten-minute

12   break.  So we will be in recess for ten minutes.

13             (A short recess was taken.)

14             THE COURT:  Mr. Haskins, Mr. Balser used nine minutes

15   of somebody's time.  Is it you or Ms. Sumner?

16             MR. HASKINS:  So he used five minutes of Ms. Sumner's

17   time and four of mine.

18             THE COURT:  All right.

19             MR. HASKINS:  That was bitterly negotiated.

20             THE COURT:  All right.  You've got 26 minutes.

21             MR. HASKINS:  Thank you, Your Honor.

22             Your Honor, we're going to turn the page here a

23   little bit and talk about some different claims that have been

24   alleged in this case by a different group of Plaintiffs by the

25   same lawyers who represent the consumers.  Now, these claims

82

1    have been filed by a handful of small businesses.  They filed a

2    separate complaint.  And as you can see here, we have the class

3    definition.  They are seeking to represent a nationwide class

4    of businesses that have relied upon their owners' personal

5    credit to obtain financing where the owners' personal

6    information was compromised in the data breach.

7          But I think it's important, Your Honor, to understand

8    that the filing of that separate complaint doesn't mean that

9    these are separate and independent claims.  In fact, they are

10   not.  They are entirely derivative of the consumer claims, and

11   it's no accident that they are represented by the exact same

12   lawyers before this Court today.  And I think that conclusion

13   becomes very clear if we take a look at the nature of the

14   claims that they've alleged.  But it's important to see what

15   they haven't alleged.

16         First, the small business Plaintiffs don't allege

17   that any information that belonged to them, to the businesses,

18   was compromised in the Equifax data breach.  That's a critical

19   point.  There's no allegation that any information that

20   belonged to these Plaintiffs was actually compromised or stolen

21   from Equifax.

22         Second, the small business Plaintiffs don't allege

23   that their own financial information is at risk.  In other

24   words, they are not claiming that there's a risk of some

25   business identity theft.  So rather than seeking to pursue

1    claims based on injuries that might happen to them, to their

2    businesses resulting from the misuse of their information, what

3    the small business Plaintiffs ask this Court to accept is that

4    they have a potential injury that might result from the

5    potential misuse of their owners' information.

6            Obviously, those are pretty speculative claims.  And,

7    of course, those business owners on which they base their

8    claims are consumers.  And those consumers fall squarely within

9    the class of consumer Plaintiffs that -- the consumer

10   Plaintiffs in this case and the consolidated consumer complaint

11   that's brought on behalf of.  And as a result, many, if not

12   all, of the reasons that Mr. Balser gave today for dismissal of

13   the negligence, negligence per se and the other claims that are

14   brought by these small business Plaintiffs also apply with

15   equal force to the claims of these small business Plaintiffs.

16           But, in fact, the reasons for dismissal of these

17   small business claims are even stronger.  And I think it's

18   important for the Court to consider and recognize that no court

19   has ever recognized the duty or the theory of liability that

20   the small business Plaintiffs are trying to offer here.

21           And let's put that in context.  Keep in mind that

22   what we have had over the last several years have been -- we

23   have had several years of data breach litigation, including

24   some in this court, all across the country that has involved

25   hundreds of millions of consumers.  Yet not a single court has

1    extended liability for the compromise of that consumer data to

2    the small businesses that those consumers may also have a

3    relationship with.  There's no basis for extending that

4    liability under Georgia law or any other law, and this Court

5    should not be the first Court to recognize those speculative

6    claims.

7          So rather than re-plow the ground that Mr. Balser

8    already hit this morning, what I'd like to do is take a look at

9    the claims.  Of course, they largely mirror the claims that

10   have been brought by the consumer Plaintiffs.  But I want to

11   focus on the defects that are unique to the small business

12   Plaintiffs.  And the first of those is the fact that these

13   Plaintiffs actually lack standing to even bring these claims.

14         Now, of course, I'm sure Your Honor is very familiar

15   with the jurisdictional standard here.  But just to confirm,

16   Article III standing, of course, requires an injury, requires

17   traceability and it requires redressability.  And here the

18   small businesses' claims should be dismissed because they fail

19   to allege an injury in fact that's fairly traceable to the

20   conduct of Equifax.

21         Now, let's start with the injury requirement.  Now,

22   to confer standing under Article III, the Supreme Court has

23   made it clear an alleged injury must be actual or imminent.

24   And also -- and this is important in this case -- the injury

25   can't be conjectural or hypothetical.  And the small business

1    Plaintiffs here don't allege any actual injury, and we will

2    talk about the two types of injuries that they do allege.  But

3    instead they claim that their businesses have been exposed to

4    an increased risk of harm, of future harm.  But if we're

5    talking about an imminent injury, the Supreme Court has

6    repeatedly held that an imminent injury must be certainly

7    impending.

8            So let's take a look at what the Plaintiffs have

9    actually alleged and see if they meet that standard.

10           They do not.

11           What the small business Plaintiffs have alleged is

12   that their owners' data was stolen -- again, the owners' data,

13   not the small businesses themselves.  And the small businesses

14   also then allege that the theft of that data causes them to

15   face an increased risk of harm to their business operations.

16           But that increased risk of harm is far different from

17   the increased risk of harm that Mr. Canfield discussed this

18   morning or that has been found in other data breach cases.

19   Rather, the risk of harm here is that their own business

20   information -- it's not that their own business information

21   will be misused, but they are at risk because their owners'

22   information will be misused.  That is a step that is far more

23   remote than any court has recognized in any other data breach

24   case.

25           And then, finally, the small business Plaintiffs

1    allege that they have spent time and money specifically on

2    business credit reports and monitoring their own financial

3    accounts.

4            So the small business Plaintiffs' injuries fall into

5    two categories.  They have got a risk of harm, then they've got

6    their mitigation expenses which is purchasing of a business

7    credit report.

8            So if we want to actually understand what they have

9    alleged with respect to their risk of harm requirement, I think

10   it's easiest to see this in the context of one of the named

11   Plaintiffs in the case.  Here we have the business Plaintiff

12   Martin's Auto Repair which is a Georgia partnership alleged in

13   the complaint.  And the complaint says that Martin's Auto

14   Repair relies on the personal credit of Teresa Sue Martin and

15   William Marvin Martin, Jr., individuals whose personal

16   information was compromised in the Equifax data breach to

17   obtain and maintain its own credit.  The breach has, thus,

18   jeopardized not only their personal credit but also the

19   creditworthiness and continued operations of Martin's Auto

20   Repair.

21           So there we see the derivative nature of their claim.

22   But, more importantly, what we see is that Martin's Auto

23   doesn't actually allege any actual injury, only jeopardy.  And

24   it's jeopardy to their credit.  But for that jeopardy to occur

25   -- we have to unpack now a little bit -- let's see what that

87

1    risk actually is.  And what we see is it's a series of events

2    that would result in the injury, not an actual injury.

3          So the first step that would have to occur is the

4    thief would have to use Ms. Martin's stolen information from

5    Equifax to open a fraudulent account in her name.  And, of

6    course, the thief could have obtained that information from a

7    variety of other sources, including many of the other data

8    breaches that occurred.  And, in addition, there are many uses

9    that thieves and fraudsters have to information that is stolen

10   of the type that was stolen from Equifax in this case.  It's

11   not only stolen for the purposes of opening a fraudulent

12   account in someone's name.

13         And, interestingly enough, this is actually the event

14   and the risk of harm that Mr. Canfield and the consumers are

15   claiming.  All of the other events that we are going to look at

16   here, these are all additional events that would have to occur

17   before the small business Plaintiffs in this case could

18   actually suffer an injury.  So let's see what those other

19   events are.

20         Well, the fraudulent account reported would have to

21   be reported on Ms. Martin's credit file before that fraud was

22   detected.  And, of course, there are many safeguards in place

23   to try to ensure that that fraudulent information is not

24   reported.

25         In addition, there would have to be a negative impact

1   on Ms. Martin's personal credit score before the fraud is

2   detected.  Once again, the mere opening of a new account,

3   particularly if the account is not unpaid, is unlikely to have

4   any impact on their credit score, much less a negative.

5          Then Martin Auto would have to apply for a loan using

6   Ms. Martin's credit before that credit is detected.  And then,

7   finally, the creditor would have to deny Martin Auto credit or

8   offer it on less favorable of terms again before that credit is

9   -- that fraudulent account was detected.

10         So what we have here is a bunch of things that have

11  to happen before an injury could occur.  There's no allegation

12  that any of these events have actually occurred with respect to

13  the Martins or with respect to any of the Plaintiffs in the

14  case.  In fact, that's all we have is speculation which means

15  that all of these injuries are hypothetical.  And I think it's

16  very easy to see that these injuries are so hypothetical when

17  we see what the Plaintiffs don't allege.

18         They don't allege that any small business owner's

19  data was actually misused.  They don't allege that any of the

20  owners actually had their identity stolen.  There's no

21  allegation that any fraudulent accounts were opened using the

22  stolen owner's data, no allegation that any owner's credit

23  score or credit rating has declined, no allegation that any

24  small business Plaintiff has even applied for credit, Your

25  Honor.  And, finally, there's no allegation that any small

89

1   business owner's -- I'm sorry -- Plaintiff's application for

2   credit was declined.  In other words, what we have is a bunch

3   of events that would have to occur and have not occurred before

4   an injury would exist.

5           So what we have is just a hypothetical future injury,

6   not an actual one.  And as the Court, I'm sure, is aware, while

7   the Supreme Court has recognized that some threatened injuries

8   are sufficient to confer an actual imminent injury, not all of

9   them are.  In *Clapper*, the Supreme Court made it clear that

10  mere allegations of possible future injury just aren't enough;

11  and the reason why that's the case is because that's not

12  imminent.  In fact, what the Supreme Court has told us is that

13  an imminent injury has to be certainly impending.

14          Given the assumptions that we have to make to

15  identify any possible future injury for the small business

16  Plaintiffs' claims, we certainly can't describe them as

17  imminent or certainly impending.  And if we go through their

18  claims, in fact, you cannot describe any of these events or the

19  damages that they're seeking in this case without using the

20  word "if" -- if this happens, if the business depends on the

21  owner's creditworthiness, if the owner's creditworthiness has

22  been negatively impacted, if the creditor denies it.

23          Well, I would suggest to you, Your Honor, that if you

24  can only describe your injury by using the word "if" so many

25  times it's not certainly impending.  It's not an injury in

90

1   fact.  It's precisely the type of conjectural, hypothetical

2   injury that the Supreme Court has said in *Spokeo* and over and

3   over again is not sufficiently concrete to create an injury in

4   fact.

5           So risk of harm is not enough.  Let's take a look at

6   the other alleged injury that they have which is the money that

7   they have allegedly spent on mitigation expenses.  Here we have

8   again the allegation in the complaint from Martin's Auto

9   Repair, and it says that Martin's Auto Repair has reasonably

10  incurred costs in the form of a business credit report and

11  devotion of resources to monitoring its financial accounts

12  based upon the substantial risk of harm from the breach.

13          Now, the Supreme Court has recognized that mitigation

14  -- and some courts have recognized that mitigation expenses can

15  confer standing under certain circumstances, but it's really

16  only if there is a substantial risk that that threatened injury

17  would actually occur.  What's important -- and the Supreme

18  Court -- I'm sorry -- the Seventh Circuit has made this clear

19  -- is even in the *Neiman Marcus* case and the other cases the

20  Plaintiffs have cited that the mitigation expenses don't

21  qualify as actual injuries if the harm is not imminent.  And

22  what we don't have here is any allegation that there was an

23  imminent harm.  What we have is speculation that it could occur

24  instead.  That's not imminent.

25          In fact, as we talked about earlier, we've got all of

91

1    these events that have to occur before the injury would happen.

2    You can't describe these injuries as imminent.  You can't

3    describe them as certainly impending.  And there's no

4    substantial risk that they are going to occur.  As a result,

5    they don't support Article III standing or an injury

6    requirement.

7            And the final point I want to make on the mitigation

8    expenses injury that they are arguing is that the expenses that

9    the small businesses claim here actually would not prevent the

10   threatened harm that they allege.  Because keep in mind that

11   the only out-of-pocket expense that they allege is purchasing a

12   business credit report, but the business credit information was

13   not what was stolen in the breach.  The small businesses'

14   financial information is not what was taken from Equifax.

15   Rather, it was the owners' personal information that was taken

16   in the breach.

17           So as a result, it's the misuse of the owners'

18   information that the small business Plaintiffs should be

19   monitoring and should be tracking if they are, in fact,

20   concerned about this risk of harm.  If you recall our slide

21   earlier, what we were concerned about is how the thief was

22   going to use the owners' information.  That's what they should

23   be monitoring.  But spending money on a business credit report

24   and devoting time to monitoring the businesses' accounts is not

25   going to protect or prevent misuse of the owners' personal

92

1    credit.

2          So as a result, those mitigation expenses are not

3    going to prevent the threatened injury and they're not going to

4    convert those voluntary expenses that they incurred into an

5    actual injury that confers Article III standing on these

6    Plaintiffs.

7          Now, even if the Plaintiffs, the small business

8    Plaintiffs, could point to an injury, of course, that injury

9    has to be fairly traceable to Equifax's conduct here at the

10   data breach.  But it's important to keep in mind that when

11   examining this issue of traceability that a Plaintiff can't

12   rely on speculation about the unfettered choices made by

13   independent actors not before the Court to demonstrate

14   traceability.  That's what the Supreme Court told us in

15   *Clapper*.

16         But to tie the small business Plaintiffs' alleged

17   risk of harm here to the Equifax breach, the Court has to make

18   a variety of assumptions about persons or entities that aren't

19   in front of the Court.  Those would include the hacker, what

20   did the hacker do with the information; did they give it to the

21   thief; what did the thief do with the information; what did the

22   creditor do that the thief defrauded to open up a fraudulent

23   account; and the business owner themselves, what steps did they

24   take to prevent the misuse of their information or detect that

25   that information had been misused and was appearing on their

93

1    credit report before they went out and allowed the business

2    that they owned to apply for credit in their name; and then,

3    finally, the small business Plaintiffs' creditor.

4              So we have got all these independent actors.  And if

5    the small businesses ultimately down the road ever suffer any

6    injury, it's attributable to those -- the actions of those

7    individuals, not Equifax.

8              So in short, Your Honor, there's no Article III

9    standing here.  The Plaintiffs, small business Plaintiffs,

10   don't allege any actual injuries to support Article III

11   standing.  They don't plausibly allege that there's any

12   certainly impending injury or an imminent injury, much less a

13   substantial risk of one that would convert the voluntary

14   expenses that they've incurred into damages.  And those

15   injuries, even if they existed, they're not plausibly traceable

16   to Equifax's conduct.

17             Now, I'd like to turn just briefly and discuss the

18   specific causes of action that the small business Plaintiffs

19   have alleged.  Now, even if they had standing to pursue these

20   claims, what they don't have is a duty under Georgia law that

21   was violated.

22             Now, as Mr. Balser explained, if *McConnell III* is the

23   law in this state and there's no duty to safeguard a person's

24   PII under Georgia law, clearly these small business claims

25   would also fail.  They are derivative of those consumer claims;

1    but, in fact, they are even more remote because they would have
2    to show that there was a duty to protect a third party's PII.
3         So in that regard, what the Plaintiffs are really
4    asking this Court to do is go far beyond what the Court
5    rejected in *McConnell*.  And as a result, the outcome of
6    *McConnell* really doesn't even dictate the result in this case
7    even if it were overturned because even if the Supreme Court
8    reversed in *McConnell* then the small business Plaintiffs'
9    claims are still going to lack an actual duty.  They are going
10   to fail because there's no recognized duty to any third party
11   like them.
12        No court, and especially no Georgia court, has ever
13   recognized a duty owed to a small business to safeguard the
14   personal information that belongs to the owners of that
15   business.  That case just simply doesn't exist.  And as the
16   Court, I'm sure, is aware, the only way to create a duty under
17   Georgia law is either there's a statute or there's a case that
18   defines that duty.
19        In fact, the Plaintiffs have not even attempted to
20   cite to a statute or a case here that imposes that duty.
21   Rather, what they have done is argued that the harm here should
22   have been foreseeable.
23        Now, the concept of foreseeability is important in
24   Georgia tort law, but it certainly is not going to save their
25   negligence claim here.  Under Georgia law, foreseeability

95

1    doesn't create a duty.  We can't create a duty of care simply

2    because a potential harm was foreseeable.  Instead, under

3    Georgia law, foreseeability is going to help us define the

4    parameters if a duty exists.

5            But we have cited the *CSX Transportation* case in our

6    briefs, in our reply brief, to make that point clear.  But I

7    think it's an important concept for the Court, particularly

8    with respect to these small business claims.  Foreseeability is

9    going to limit the duty, but it's not going to create one.  But

10   that's exactly what these Plaintiffs are trying to get the

11   Court to do is expand the duty into areas that it's never been

12   taken before.

13           THE COURT:  Mr. Haskins, you have got five minutes of

14   your time left.

15           MR. HASKINS:  Thank you.

16           And then, of course, these Plaintiffs also tried to

17   rely on the *Wessner* case.  But as Mr. Balser pointed out, that

18   only applies where the Defendant exercised control over the

19   person that caused the harm.  As we talked about earlier, there

20   are many other individuals here that would have caused harm

21   besides the Plaintiffs -- besides Equifax itself and the

22   allegations that relate to that.

23           And then, finally, with respect to the negligence

24   claim, the Plaintiffs do not allege a compensable injury.  And

25   we just went through those injuries and the fact that they

96

1    didn't satisfy Article III standing requirements, and what I

2    think is important and significant is that the bar is actually

3    lower for alleging injury sufficient to pass Article III than

4    it is to support a negligence claim under Georgia law.  Or said

5    another way, the bar is higher for these Plaintiffs to

6    establish a negligence claim under Georgia law even if they had

7    standing.  And they don't.

8            And we have cited these cases.  And Judge Story in

9    his decision, he acknowledged, "No Georgia court has ever

10   adopted a theory of liability premised on mere increased risk

11   of suffering from a future injury."  That's exactly what the

12   Plaintiffs have alleged in this case.  That's their only real

13   injury.

14           And then Georgia courts don't recognize prophylactic

15   costs that are incurred to mitigate against future harms.

16   That's important because the costs in *Collins* in the recent

17   Georgia Court of Appeals decision were exactly the costs they

18   have alleged here which is credit monitoring expenses.  That's

19   not an injury under Georgia law.

20           So the negligence claim fails on that level.  The

21   negligence per se claim fails for the same reasons that

22   Mr. Balser covered.  There's no duty under Section 5 of the FTC

23   Act.  And it also fails, of course, for the same reasons that

24   the negligence claim fails.  There's no facts alleged showing

25   proximate cause and no actual damages.

1          Then let's turn briefly to the Fair Business
2    Practices Act claim.  Again, the act itself does not impose a
3    duty to safeguard personal identification information.  But
4    keep in mind that here the duty that they are alleging is even
5    more remote.  It would be imposing a duty on small businesses
6    to safeguard their owners' information.  That's not what the
7    act covers.
8          In addition, they failed to plead that they relied on
9    any misrepresentation by Equifax.  And, of course, they
10   couldn't.  That's a required element of a claim under the Fair
11   Business Practices Act.  But these small business Plaintiffs
12   don't allege they gave any information to Equifax, much less
13   that they gave it to them in reliance on a misrepresentation.
14   And, more importantly, it wasn't their information that was
15   stolen in the first place.  So that -- and this claim also
16   fails because they have no damages, and we have gone through
17   those.
18          Then, finally, Your Honor, they had a claim for
19   attorneys' fees.  Of course, that should be dismissed.  There's
20   clearly a bona fide controversy here.  And they didn't allege
21   that Equifax acted in bad faith in any way and, in fact, nor
22   could they.
23          So for all of those reasons, Your Honor, the small
24   business claim should be dismissed.
25          THE COURT:  Y'all want to take a lunch break?

1            MR. SIEGEL:  That would be fine, Your Honor.

2            THE COURT:  All right.  1:45?

3            MR. BARNES:  Fine.

4            MR. SIEGEL:  That sounds great.  Thank you.

5            THE COURT:  Court's in recess for lunch until 1:45.

6            (A lunch recess was taken.)

7            THE COURT:  You are next, Mr. Siegel.

8            MR. SIEGEL:  I am, Your Honor.  Good afternoon.  Norm

9    Siegel on behalf of the consumer Plaintiffs and specifically

10   the small business Plaintiffs for purposes of this argument.

11           Your Honor, I think Mr. Haskins gave a fair overview

12   of the claims brought on behalf of the small businesses.  We do

13   allege a class of small businesses like Martin's Auto Repair

14   referenced by Mr. Haskins that rely on the personal

15   creditworthiness of their owners to obtain credit.  The class

16   does also define who is not every business with an owner that

17   depends on credit.  Those are only owners like Ms. Martin where

18   their individual information was compromised in the Equifax

19   data breach.

20           So you have Ms. Martin on the one hand, one of the

21   148 million people who had their confidential information

22   compromised as a result of the breach, and a business on the

23   other hand that actually has quite a close nexus to Ms. Martin.

24   Both are harmed.  The first complaint we filed, the

25   consolidated complaint at 374 in the docket, is on behalf of

99

1    those individuals.  The second complaint we filed at 375 is, of

2    course, on behalf of these businesses.

3             These claims were alleged in original cases that were

4    filed in this MDL, and Your Honor placed those claims on behalf

5    of the small businesses under the consumer track.  And here we

6    are.  You assigned us to evaluate and bring those claims if we

7    thought they were appropriate, and we did.  And there was good

8    reasons to put these small business claims in the consumer

9    track.

10            The claims of these small businesses are tethered

11   very closely to the individuals who had their information

12   compromised.  And there's indeed a very close nexus between the

13   harm to the individuals and the harm to the businesses.  But

14   those businesses are separate entities with separate standing

15   that have separate damages and, therefore, separate claims and,

16   therefore, they are in a separate complaint brought on behalf

17   of the -- under the consumer rubric in this MDL.

18            THE COURT:  Well, let me ask you, Mr. Siegel.  So

19   when you take this job, you have to take it and with a vow of

20   poverty.  And so when my wife recently wanted to replace her

21   19-year-old car with not a new one but a newer one, she had had

22   -- she had frozen her credit.  So I had to sign the application

23   to get a loan to buy the car.

24            Now, she has got a close nexus to me.  She relies on

25   my credit.  But does that mean if my credit information is

1   stolen she would get to sue?

2          MR. SIEGEL:  Yeah, it's a fair question, Your Honor.

3   And I think the best thing I can do is direct your attention to

4   two things.  One is how we define the original complaint which

5   is it is only those people because we need to be able to

6   identify them with certainty that Equifax tells us are in the

7   148 million individuals who were breached --

8          THE COURT:  But then how do you identify the

9   companies?

10         MR. SIEGEL:  Right.  So this is a class certification

11  issue, so I would suggest it's a little bit putting the cart

12  before the horse.  But the way we have defined it is one is we

13  know who those individuals are because they are a subset of 148

14  million.  They own businesses that rely on those individuals

15  for credit.  So that is how we will be obligated to establish a

16  class when we get around to class certification.

17         But I do think it's important -- your question does

18  raise what I think is very important, something to be looked at

19  closely:  Okay.  What is not the nexus between Judge Thrash and

20  his spouse for purposes of the complaint, but what do we do,

21  what is the nexus between individuals and these businesses that

22  alleged harm in these underlying complaints in the MDL.

23         And I direct --

24         THE COURT:  When my son wanted to rent an apartment

25  in New York City, they wouldn't rent it to him unless I

101

1    cosigned and they pulled a credit report on me.

2              MR. SIEGEL:  Right.

3              THE COURT:  So there you are another, you know,

4    example of someone who may be depending on my credit.  But

5    would he be able to sue if my credit information was stolen?

6              MR. SIEGEL:  Your Honor, we will certainly consider

7    expanding the class definition when we get to class

8    certification.  We didn't think that was prudent based on the

9    original claims brought in this MDL.

10             THE COURT:  That's a very good response, Mr. Siegel.

11   I wouldn't have been smart enough to have thought of that on my

12   feet.

13             MR. SIEGEL:  I don't want to take too much credit for

14   that.

15             I do think that the key here from our perspective

16   when you assigned us to evaluate these claims is really

17   contained in a fairly narrow part of the complaint.  So if you

18   look at roughly paragraphs 190 to 210 in the small business

19   complaint, it goes through in detail why we were convinced that

20   this was worthy of bringing to the Court's attention and

21   seeking to bring a case on behalf of these small businesses.

22   And let me just summarize them quickly because I do have

23   limited time, and I know the governor is eager to come in

24   behind me here.

25             So the facts as we have alleged them that must be

1    taken as true here is that these businesses do have a very

2    close nexus to the individuals that own them.  In paragraphs

3    190 or so, we talk about the fact that the vast majority of

4    small businesses in the United States depend on the

5    creditworthiness of their owners, including personal guarantees

6    that Your Honor is familiar with for the businesses they own.

7    So when Ms. Martin wants to go buy mufflers for Martin's Auto

8    Shop, she obviously needs to extend -- the business needs to

9    extend -- secure credit, and that credit is secured based at

10   least in part on Ms. Martin's creditworthiness.

11           So when the breach happened, the small business

12   committees of both the Senate and the House issued a report

13   under Senator Shaheen's letterhead.  And maybe I can turn to

14   the Elmo.  It might be the quickest.

15           And what Senator Shaheen said was flagged

16   immediately, this issue that the availability of business

17   credit for small business owners is inextricably tied to their

18   personal credit score, and further expressed "grave concern

19   about the impact of the breach on small businesses."  So it was

20   clear to us post-breach that lots of people, including these

21   Senate House committees, were very concerned about the impact

22   not only on those 148 million individuals but also on these

23   small businesses because the credit of those businesses was

24   tied to their owners.

25           They go on to explain that the impact on these

103

1    businesses would be impactful, less favorable credit terms for

2    these businesses, higher interest rates, reduced cash flow,

3    jeopardizing collateral and ultimately putting these small

4    businesses at risk.  And you can see these -- this is the cover

5    page to the communication, the headline there that identity

6    theft is especially devastating for small business owners and

7    the availability of capital is tied to the personal credit

8    score.  So that is the nexus that convinced us that this was

9    worthy of the Court's time and our time in litigating this case

10   on behalf of these small businesses which had these distinct

11   injuries.

12          Now, it's not just Congressional committees and small

13   business organizations out there that recognized and

14   appreciated this nexus.  Equifax itself has for sometime

15   acknowledged and marketed products based on this nexus between

16   the credit of a small business and the credit of its owners.

17          Paragraph 201, for example, we talk about how Equifax

18   acknowledged in a white paper that the credit histories of

19   business owners are "an essential element for understanding the

20   business's credit risks."  In paragraph 202, Equifax actually

21   sells a business credit score -- I'm sorry -- business credit

22   report like an individual credit report.  This business credit

23   report includes information on the business's owners for "the

24   deepest level of insight into the validity, financial stability

25   and performance of the business."

1          Both before and after the breach, they stole

2    something called a business principal report.  And, Your Honor,

3    this was another significant fact for us that we think is

4    compelling here and hopefully addresses the Court's question at

5    least with respect to these small businesses that Equifax

6    itself was selling these products recognizing this nexus.  And

7    this is in paragraph 204.  I want to read it because I do think

8    it captures and answers a lot of those questions.

9          What Equifax is telling people, at the top there it's

10   a business principal report.  The subheading is Thoroughly

11   Assess Risk With a View Into Creditworthiness of Business

12   Owners and Principal Guarantors.  So when Ms. Martin calls up a

13   muffler manufacturer to get mufflers for Martin's Auto Shop,

14   Equifax is telling the muffler manufacturer, you know, you

15   should check this business principal report because that is

16   going to tell you in Equifax's words, if you go to the bottom

17   paragraph here, they draw on this information so you can gain

18   comprehensive information about the credit history of a

19   business principal.  Plus, you are alerted to potentially

20   fraudulent information about the individual that might require

21   further verification and whether the individual has a higher

22   potential for late payments.

23          So in that very communication that Equifax is making

24   to the muffler manufacturer and others, it is tethering this

25   exact credit of the business to that of the individual and

105

1    telling both Ms. Martin who owns Martin's Auto Shop, Martin's

2    Auto Shop as an entity, and the muffler manufacturer that they

3    all need to be concerned about Ms. Martin's credit.

4            They also sell -- this is in paragraph 205 --

5    something called a business risk score which they say evaluates

6    the credit of businesses based on the credit of the owner.  And

7    before and after the -- I'm sorry.  After the breach, at the

8    same time Equifax -- and Mr. Canfield talked about it; it's in

9    our complaint.  But at the same time Equifax was telling people

10   to take protective action to get -- make sure you check your

11   credit score, to freeze your credit, to monitor your credit.

12   Commentators in this -- in the small business community were

13   telling folks it's essential that small businesses do it too.

14           And so, as we allege in paragraph 209, these business

15   credit reports which sold for a hundred dollars were the types

16   of things that small businesses purchased to make sure that to

17   the extent that their credit was under attack because of a

18   fraudulent transaction they would be able to see that in how

19   Martin's Auto Shop was looking to their vendors like the

20   muffler manufacturer.  And so Equifax was well aware of what

21   Senator Shaheen put in her letter that there is a very close

22   relationship between these two, the owner and the business,

23   that the business would have independent harm, and Equifax was

24   profiting based on that relationship.

25           So all these facts in our view, Your Honor, we

106

1    believe this easily for purposes of standing, which is the main

2    argument advanced by Mr. Haskins this morning, it was

3    completely foreseeable that this breach would not only harm

4    these consumers but also that small businesses would spend

5    money to monitor their credit.

6          So let me just quickly speak to standing, and then I

7    am going to turn it over to the governor.  The test under

8    *Clapper* is whether there is a substantial risk of harm which

9    may prompt Plaintiffs to reasonably incur costs to mitigate or

10   avoid that harm.  And that's what I hope we just demonstrated,

11   that there was a substantial risk of harm both based on the

12   acknowledgment of everybody as alleged in the complaint that

13   these two things are related and that the fact that these

14   products were out there, including from Equifax inviting

15   businesses to buy monitoring and other products related to this

16   exact harm.

17         Once you get a substantial risk of harm which may

18   prompt these businesses to reasonably incur costs, and that's

19   what we allege that these named Plaintiffs have done, all of

20   the other series of improbable events that were in slide -- I

21   can't read it -- this one, these are -- these if's that

22   Mr. Haskins said, those are really questions of fact.  And once

23   that test is made -- once that test is met, that substantial

24   risk of harm which prompts Plaintiffs to reasonably incur

25   costs, you've satisfied standing both in this circuit and

107

1    really every other circuit who have considered it.

2              To borrow from *Home Depot*, the concept that

3    substantial risk plus mitigation costs equals injury in fact

4    for Article III, the quote there was, "Any cost undertaken to

5    avoid future harm from the data breach would fall under

6    Footnote 5 of *Clapper*, specifically as reasonable mitigation

7    costs due to a substantial risk of harm."  And we think the

8    factual allegations we have in our small business complaint are

9    entirely consistent with meeting that standard.

10             I want to say just one thing about duty as it relates

11   to the small businesses.  Mr. Haskins raised the *CSX* case a

12   couple of times, I think in slides 22 and 24.  And it's

13   throughout their briefing.  And I read that case again last

14   night, and I just want to comment on it briefly.

15             *CSX* was the Georgia Supreme Court trying to figure

16   out whether folks outside of the CSX facility could sue CSX if

17   they were exposed to asbestos from people coming and going from

18   the facility.  So these were not workers.  These were people

19   outside the facility.

20             And what the court aid is we are going to draw the

21   line in duty and foreseeability at the gates of this facility

22   because CSX isn't out there sprinkling asbestos over the

23   community outside of its factory.  And, therefore, we're going

24   to say that if somebody came into contact with a worker, got

25   asbestosis, we are going to draw the line and say there's no

108

1    duty to that person.

2            What we have here is so much different.  Based on

3    these factual allegations, everybody knew, including most

4    importantly Equifax, that these small businesses, they're in

5    the factory.  Right?  They have the same exposure as their

6    owners as it relates to the harm from this data breach.  And,

7    therefore, there is a duty owed.  They were foreseeable victims

8    of this breach and why we think this case should proceed beyond

9    a motion to dismiss.

10           Your Honor, I don't have anything further unless Your

11   Honor has questions.  I'm going to use whatever time I have

12   remaining to hand off to the governor.

13           THE COURT:  All right, Mr. Siegel.

14           MR. SIEGEL:  Thank you, Your Honor.

15           THE COURT:  Governor Barnes?

16           MR. BARNES:  How long did he leave me?

17           THE COURT:  He left you 12 minutes.

18           MR. BARNES:  Oh, that's good.

19           MR. SIEGEL:  That's what I promised the governor.

20           MR. BARNES:  Your Honor, you know, I have listened to

21   all of these esteemed lawyers all day here and I've listened to

22   them the last few months.  One of the things I try to teach

23   young lawyers that come out to practice with me is use a little

24   common sense and, even more, use the common law because the

25   common law is really common sense over the centuries.

1          Now, let me -- as you know, I drive an old, beat-up

2     pickup truck, a Ford pickup truck.  And let's assume that I

3     decided that I wanted to pretty it up a little bit and take

4     some of those dents out of it and I took it to a body shop down

5     there.  But at this particular body shop they left the garage

6     door open and the gate open out there.  And not only that, the

7     police had been by to see them two or three times and says you

8     better close that garage door, you better close that gate

9     because somebody's going to steal the cars in there.  And the

10    body shop owner says, Oh, don't worry about that.  And then

11    somebody came and stole my truck, an unknown person, a thief.

12         Would that body shop owner be responsible for my

13    truck?

14         Of course, he would because he did not use ordinary

15    diligence in looking after the property that was entrusted to

16    him that was mine.  Under my esteemed opponents' argument, you

17    could be responsible and I could recover for stealing my truck,

18    but I couldn't recover for the most precious and personal

19    things that I have -- my name, my information, my credit, my

20    health.  All of that information that was entrusted to them,

21    unlike the poor fella that's running the body shop, could not

22    be recovered.  And that just strains credibility, and it

23    strains common sense.

24         And, in fact, if Equifax had been in the body

25    business, they not only left the door open and left the gate

110

1    open; they put a sign on the expressway that says, "Next exit
2    if you want to steal Roy's truck."
3           And that is absolutely ridiculous.  There is a duty
4    when you have the care of somebody else's most precious
5    information.
6           Now, what's the other thing in common law in Georgia?
7           Andrew Jackson Cobb was a justice of the Supreme
8    Court.  He served from 1897 to 1907, ten years.  He wrote a
9    case, and it's been overlooked, and it's not briefed on either
10   side in my view to its full extent.  It's called *Pavich*, or
11   *Pavesich* some of them call it, *versus New England Life*
12   *Insurance Company*.  It was the first case in the country to
13   recognize that there was a right of privacy but also a right of
14   confidentiality, that is, in your own information.
15          The facts of it were they took a picture of old
16   Pavich.  New England Life did.  And they put it in one of their
17   advertisements, and he sued them.  He says you didn't have my
18   permission to take -- even though he is in the public, you
19   didn't have permission to use my picture.  And the Supreme
20   Court of Georgia in a unanimous decision later said that was
21   the first case and what he based the right of action on and
22   confidentiality and privilege.  They said, yes, there's a cause
23   of action there.
24          Now, if you can't take my picture without some duty
25   being breached, then how can you take my information or be so

111

1    negligent in using my information that others could?

2              That is -- boiled down to everything we have heard

3    today, everything we have heard today, that is the essence of

4    the case.  And when you have a duty that's been established and

5    you have a breach, the law in Georgia says -- in fact, there's

6    a code section out of it -- you know, Georgia codifies

7    everything.  If a case will stand still for five minutes, it'll

8    be codified.  They've got -- there's a statute that says the

9    law presumes damages from a breach of a duty -- presumes

10   damages.

11             And that's the reason we have nominal damages.  They

12   are part of general damages, that is.  Nominal damages are part

13   of general damages.  If you can't prove it with specificity,

14   the jury -- you know, the jury is the ultimate one that

15   protects us all -- the jury can award nominal damages.

16             Now, I'm sorry there's 148 million of them and they

17   say it may cost us 14 billion dollars.  But you did it, and you

18   knew that you were at risk for it.

19             Now, the last thing I want to talk about just as a

20   little bit is, you know, I've been reading a lot this week

21   about lying to Congress.  You know, we've sent a fella off this

22   week for three years, a lawyer, because he lied to Congress.

23   And I have listened to all the lawyers up here say there is no

24   duty, Equifax had no duty.

25             This is what their CEO acting in the scope of his

112

1    employment told Congress:  "We at Equifax clearly understand

2    that the collection of American consumer information and data

3    carries with it enormous responsibility to protect that data.

4    We did not live up to that responsibility."

5          Now, certainly Mr. Smith didn't lie to Congress.

6    Certainly he didn't expose himself up there to being locked up

7    with Michael Cohen.  Certainly he didn't go up there and tell

8    them, listen, you know, we had this duty, and then come into a

9    courtroom with his lawyers and then say no duty.

10         Can you imagine what Congress would have done if the

11   same arguments had been made or the same statements had been

12   made before Congress that have been made in this courtroom by

13   his lawyers?

14         They would have skinned him alive.

15         So what we have here is nobody doubts there's a duty.

16   Common sense tells you there's a duty.  John Doe has a duty at

17   the body shop on my truck.  And they had legal possession of

18   one of -- my property.  And they trespassed on it, trespassed

19   on the case.  They didn't preserve it.  And they should be held

20   accountable before that jury.

21         Thank you, Your Honor.

22         THE COURT:  Thank you, Governor Barnes.

23         All right.  Who wants to follow that?

24         MR. BALSER:  I think I might need some more time from

25   Mr. Haskins.

113

1          MR. HASKINS:  Your Honor, he has already said it had

2    to be somebody with common sense; so that excludes me.

3          I think I have two minutes.  I will try to make it

4    very brief, Your Honor.

5          THE COURT:  All right, Mr. Haskins.

6          MR. HASKINS:  First, with respect to the small

7    business claims, let's take Governor Barnes's example.  What

8    the small business Plaintiffs are alleging, Your Honor, is not

9    just that the truck was stolen.  What they are really

10   contending is that Governor Barnes's son after the truck was

11   stolen has a claim because he can't deliver watermelons this

12   summer from his business.  And as Your Honor pointed out, if we

13   adopt the theory that the small business Plaintiffs are trying

14   to get this Court to adopt, it would expand liability beyond

15   any reasonable bounds.

16          That's what the Georgia Supreme Court has told us

17   over and over again you can't do.  We can't have this unlimited

18   series of Plaintiffs.  There's what foreseeability does.

19   That's what the scope of duty does.  That's what the *CSX* case

20   and the Georgia Supreme Court said in that case:  We have got

21   to cut it off somewhere, and we are going to cut it off at the

22   inception of when the duty exists.

23          With respect to what Mr. Siegel was talking about, he

24   put up this information about these business principal reports

25   that Equifax says.  There are three important things to keep in

114

1    mind about that, Your Honor.  Number one, not a single business

2    Plaintiff alleged that they purchased a business principal

3    report.  That's really all you need to know.  There's no

4    allegation in the complaint that they even purchased that

5    product.

6         Second, there's no reason why they should have.  The

7    business principal report is not a credit monitoring service

8    that's provided to businesses.  Rather, it's a tool that

9    commercial businesses use to decide do I want to do business

10   with a third party.  I don't buy it on myself.  I buy it on

11   someone who I want to do business with them.

12        Third, and this is probably the most important, Your

13   Honor.  To the extent there's any information, whether it's in

14   a business principal report or a consumer disclosure that's

15   provided to a consumer or a credit report about -- if there's

16   negative or fraudulent information on that credit file about a

17   business owner, if they have an injury, it belongs to the

18   business owner, not to the business.  These small business

19   claims are simply consumer claims masquerading as business

20   claims, and we shouldn't be fooled by the disguise.

21        Thank you.

22        THE COURT:  Ms. Sumner, are you next?

23        MS. SUMNER:  I am, Your Honor.

24        Ms. Sewell, if we could switch over.  Thank you.

25        MR. CANFIELD:  Your Honor, can you give us just a

1    second to vacate our spots so the financial institution lawyers

2    can come up?

3            MS. SUMNER:  Without starting the clock, Your Honor.

4            (Pause.)

5            THE COURT:  I think they're ready, Ms. Sumner.

6            MS. SUMNER:  Thank you, Your Honor.

7            I would like to address Equifax's motion to dismiss

8    the financial institution Plaintiffs' consolidated amended

9    complaint.  And, Your Honor, I'd like to begin with what this

10   case is not about because this case is not about payment cards.

11   Unlike *Home Depot*, *Arby's* and other financial institution data

12   breach cases, this case except for a very small portion of it

13   has nothing to do with stolen payment cards.

14           And, of course, we recognize that Your Honor was very

15   involved in the *Home Depot* case, as were a number of folks on

16   both sides of the "v" here.  But the circumstances are quite

17   different.  This is a very different legal theory and very

18   different factual allegations.  And, in fact, half of the named

19   financial institution Plaintiffs don't even allege that they

20   issued payment cards that were impacted by the Equifax breach.

21           So what does this mean as a result of what they are

22   alleging?

23           Unlike any prior data breach claim, the financial

24   institution Plaintiffs are seeking recovery for the alleged

25   loss of information that does not belong to them but belongs to

1    consumers.  So this is the most far-out theory of the day, Your

2    Honor.  As we go through this process, you will see with the

3    exception of a very limited set of payment cards here of about

4    200,000 there's nothing that relates to payment cards.

5         So, essentially, there is no hook here.  The

6    Plaintiffs have a hat.  They have tried to hang it on

7    something.  But they have thrown it up against the wall, and

8    the hat has fallen to the floor.

9         So now they have created a very boundless theory of

10   liability, and they allege that they are damaged because they

11   relied on the consumer information to conduct their business.

12        So what does that mean with their theory?

13        It means that any company, let's just say Company A

14   that relies on consumer information, would be entitled to bring

15   an action against any company, Company B, that suffers a data

16   breach which impacts the customers of Company A.

17        So if you take that out, what does that mean in other

18   contexts?

19        That means that a school that relies on student

20   information would have a claim against a company where there

21   was a data breach that involved the information of those

22   students, or it could mean an airline that had to verify

23   passengers.  If there was a data breach that involved the

24   consumer PII of those individuals, then they would have a

25   claim.  Or maybe it's a state government that uses information

1    to verify driver's licenses or tax information or even an

2    online merchant that verifies consumers using information that

3    was breached by another company.  By their theory, it would

4    practically increase this liability to any company that has a

5    data breach involving consumer information.  It has no bounds.

6            In addition, the financial institution Plaintiffs

7    include no specific factual allegations to support their

8    claims.  Not a single named financial institution Plaintiff

9    alleges a fraudulent account was opened because of the data

10   breach.  They don't allege a fraudulent charge was made because

11   of the data breach.  They don't identify one specific

12   communication to its customers as a result of the data breach

13   or one marginal additional dollar spent on data security as a

14   result of the data breach.

15           This is vastly different than the other financial

16   institution cases, including the *Home Depot* case.  As Your

17   Honor may remember, the allegations there involved millions of

18   impacted payment cards.  And there were allegations that those

19   cards were posted online for sale and that the cards that were

20   used for purchases at *Home Depot* were also subject to numerous

21   fraudulent charges.

22           There are no such allegations in this case.  At most,

23   the Plaintiffs provide some very generic allegations, for

24   example, discussing that they voluntarily investigated the

25   potential impact of the Equifax data breach, that they

118

1    voluntarily monitored their customers' accounts and that they

2    generally communicated to their customers after the data

3    breach.  It is facially inconceivable that all 46 named

4    financial institution Plaintiffs suffered that exact same harm.

5            Let's start with standing, and you've heard a good

6    bit about standing.  But let's focus on what it means to the

7    financial institution Plaintiffs.  And we're going to cover the

8    legal standard here, and what I will focus on are two factors:

9    One, the Plaintiffs' burden to show that it suffered an injury

10   in fact and that it's fairly traceable to the challenged

11   conduct of the Defendant as established by *Spokeo*.

12           Let's start with the fact that the financial

13   institution Plaintiffs did not allege sufficient plausible

14   factual allegations in order to demonstrate a cognizable injury

15   in fact.  To do that, they must show that its injury is

16   concrete and particularized and actual or imminent, not

17   conjectural or hypothetical.  So here the alleged harms are, in

18   fact, speculative and conjectural.  They haven't alleged that

19   any fraud has actually occurred, and they haven't alleged any

20   facts about costs that they had to incur.

21           And no court has ever recognized that a financial

22   institution's steps to take mitigation efforts voluntarily or

23   to incur costs relating to their security program involving

24   information that had nothing to do with their company but

25   involved consumer information, no court has recognized that

119

1   type of a theory that that would support a cognizable injury.

2          So let's focus specifically on what the generic

3   allegations include.  And these are repeated verbatim for each

4   financial institution Plaintiff in the complaint from 12 to 57.

5   Here's what they say, that the financial institution Plaintiffs

6   are subject to a greater risk of fraudulent banking activity,

7   though there is absolutely no allegation that any such

8   fraudulent activity actually occurred.

9          They say that they have incurred "costs related to

10  undertaking an investigation of the impact of the Equifax data

11  breach."  They say that they have incurred "costs related to

12  increased monitoring for fraudulent banking activity."  And

13  they say that they have incurred costs related to communicating

14  with customers regarding their concerns.

15         So what does this mean?

16         It means that they haven't alleged what they need to

17  support individual claims; and they can't rely on these

18  generic, collective allegations even if their theory is that

19  the negligence harmed them in uniform ways.  They're

20  impermissible, generic, collective allegations; and the

21  complaint just simply doesn't have the specific allegations

22  necessary with respect to each of these individual Plaintiffs.

23         So now what they can't do is they can't manufacture

24  standing by merely inflicting a harm upon themselves based upon

25  the fears of hypothetical future harm as is clear from *Clapper,*

1    and they can't mitigate efforts following a data breach just

2    because they believe that there's an increased risk of theft.

3    That is not enough to confer standing.  And, in fact, numerous

4    courts as reflected here have found that mitigation efforts

5    following a data breach are insufficient and an increased risk

6    of theft do not confer standing.

7            In addition, their theory that they were injured due

8    to legal compliance costs also fails because those legal

9    compliance costs do not constitute a cognizable injury.  They

10   allege in the most general terms that the GLBA and the SERA

11   required them, the financial institutions, to take certain

12   investigative steps.  And they can't show a harm unless there

13   is a real and immediate threat that a government or some agency

14   are going to take action against the financial institutions as

15   a result of Equifax's actions.

16           And there is no such threat here.  Merely the

17   compliance expenditures do not suffice, as is evident from this

18   Eleventh Circuit *Kawa Orthodontics* case.

19           So turning now to the fact that financial

20   institutions don't allege sufficient plausible factual

21   allegations demonstrating traceability, even if they could

22   prove an injury in fact, they can't prove that it was traceable

23   to the Equifax data breach.

24           The injuries the financial institution Plaintiffs

25   allege are merely increased fraud prevention measures due to

121

1   cybersecurity risks generally and their own speculation, their

2   own concern about future possible events.  They failed to

3   allege that the increased regulatory compliance costs that the

4   Plaintiffs claim that they may face are traceable to the data

5   breach.  What they really are arguing is that the costs that we

6   have today in the cyber world should be attributed to Equifax

7   because they decided to increase their security and take

8   certain steps, and that certainly is not sufficient to confer

9   standing.

10          Finally, on the standing issue, I'd like to turn for

11  a moment to the association Plaintiffs' lack of

12  representational standing.  As you know, a number of financial

13  institution associations that are essentially a trade group of

14  small banks have joined the financial institution complaint;

15  and they seek some -- essentially some unspecified equitable

16  relief.  But this subset too doesn't have standing because its

17  members otherwise must have standing to sue in their own right,

18  and their members don't as I just described.  The interest that

19  the Plaintiff associations seek to protect must be germane to

20  the association's purpose.  And, finally, neither the claim

21  asserted nor the relief requested must require participation of

22  the association's members.

23          Here you have this association Plaintiff group that

24  overlaps with the financial institution Plaintiffs, and they

25  don't have standing in their own right as we previously

122

1    discuss.  At best, each of the association Plaintiffs will vary

2    in terms of their own individualized circumstances; and those

3    have not been alleged in the complaint, so determining whether

4    each member of the association will require the Court to make

5    an individualized determination in each case.  And here you

6    don't have that information in the complaint.  And that is

7    supported by the Eleventh Circuit *Georgia Cemetery Association*

8    case.

9            In addition, they rely on a diversion of resources

10   theory.  In one conclusory allegation regarding the association

11   Plaintiffs, they argue that they diverted resources in response

12   to the Equifax data breach.  But, again, a general diversion of

13   resources is not enough to establish standing.  They don't have

14   any actual specific allegations to support it.

15           So, Your Honor, moving past standing, I will spend a

16   few minutes on the elements of the negligence claim which will

17   demonstrate that they also failed to satisfy the legal standard

18   in that case as well.  In order to plead a negligence claim, as

19   you know, they would have to show a duty.  There's been a lot

20   of discussion about duty today, and I would like to address the

21   specific duty issue with respect to the financial institution

22   Plaintiffs.

23           They'd have to demonstrate a breach of that duty,

24   causation of the injury alleged and then damages flowing from

25   that.  Here the financial institution Plaintiffs failed to

123

1    establish a duty owed by Equifax.  And here it's even more
2    attenuated than what you have heard described earlier which
3    Mr. Haskins addressed, and it's more attenuated than the issues
4    in *McConnell III*.  The financial institution Plaintiffs attempt
5    to distinguish *McConnell*, but they fail here.  And as you know,
6    in *McConnell* we're talking about that the Plaintiffs were able
7    to allege that it was their own information that was impacted.
8            Here we're not talking about the financial
9    institution information.  We're talking about consumer
10   information that the financial institutions argue that Equifax
11   had a duty to the financial institutions to protect.
12           In *Home Depot* and *Arby's*, it was the payment cards
13   issued by the financial institutions that you considered in the
14   *Home Depot* case for purposes of the duty.  Except for the very
15   small group here of payment cards -- and if you recall, it's
16   about 200,000 is what we're dealing with, which compared to the
17   numbers that they are alleging of consumer PII they should hold
18   Equifax accountable for, that's a very small group -- if you
19   set that aside, their claim is entirely derivative.  The
20   information belongs to third parties, does not belong to them,
21   belongs to customers and, in fact, the consumers who are
22   represented by their colleagues here in the consumer class
23   action.
24           In addition, they refer to intervening act cases; and
25   those do not apply here.  In a typical intervening act case a

124

1    Plaintiff suffers an injury to her person or property as the

2    direct result of a foreseeable criminal act.  And although

3    there was a criminal act here and, in fact, Equifax was a

4    victim of that criminal act, it's not the same as the

5    intervening cases that upon which the financial institutions

6    rely.

7            For example, they tried to analogize to a case where

8    a child was shot as a result of the parents allowing another

9    child to carry an air rifle.  And they refer to a case in which

10   a Plaintiff was struck by a drunk driver while working on a

11   construction site.  Those are all about harm, physical harm;

12   and those cases are not analogous here.

13           In addition, Equifax did not voluntarily assume an

14   otherwise nonexistent duty.  For there to be an assumed duty,

15   there must be a voluntary agency relationship; and there's not

16   one here.  Under Georgia law, even where a duty is assumed, it

17   can only be a duty to prevent physical harm to another person

18   or property.

19           And in the *Oakwood Mobile Homes* case, a Georgia case

20   that was decided by the Eleventh Circuit, the Eleventh Circuit

21   held that Georgia law has adopted the *Restatement of Torts*

22   governing and undertaking to protect another's property.  And

23   there an assumed duty is limited to protecting others from

24   physical harm to person or property.

25           There was obviously no harm to these physical

125

1    entities.  They are not people.  They can't be harmed in the

2    physical way as these other cases.  It simply doesn't apply.

3            Moving forward to the financial institutions, they

4    cannot meet their burden to show proximate cause.  So as is

5    clear from this Georgia case, before any negligence, even if

6    proven, can be actionable, that negligence must be the

7    proximate cause of the injuries sued upon.  Indeed, the

8    requirement of proximate cause constitutes a limit on legal

9    liability.  And that limit is so important in this case, Your

10   Honor, because of the theory that they're moving under is

11   limitless.  This is the type of language that demonstrates

12   there must be a limit.

13           And they can't point to a single case which has

14   allowed a similar theory to go forward.  And while it is

15   unprecedented, we looked at some somewhat analogous cases.  And

16   even in those cases, the claims were dismissed as we've

17   outlined in our brief.  So they cannot point to any that would

18   support that this claim should continue to move forward.

19           They can't establish proximate cause because their

20   claims are entirely derivative.  Again, it's the loss of

21   consumer information, not the loss of the financial institution

22   information.  What they are saying is that there is a ripple

23   effect, that way down the road that there may be some injury

24   caused to the financial institutions if a number of events take

25   place.

126

1          I'll go back to Mr. Haskins' "if" example.  It's "if"

2     a few more times with respect to the financial institutions.

3     And courts simply don't recognize claims of this kind of

4     purported derivative harm.

5          I will say before I move on on that there are

6     somewhat analogous theories in the tobacco litigation.  In

7     there Plaintiffs have sought to bring actions by third-party

8     payers where those payers argue that they are damaged because a

9     tobacco company harmed a patient and as a result of the cost

10    associated with that, so, for example, from a labor union

11    health and welfare funds that they should be compensated for

12    those harms.  And the courts have rejected those claims.

13         I will spend a minute or two talking about

14    foreseeability because, again, this is where they focus on

15    foreseeability without focusing on the second aspect of that

16    which is direct injury.  And Georgia cases support that you

17    must look at foreseeability and direct injury or remoteness

18    because they are distinct concepts.

19          And here in this *Laborers Local 17* case which is

20    similar to the *CSX* case which Mr. Siegel referenced was the one

21    with the asbestos case in where he was saying they are not

22    going to let the liability go outside the door, well, we'll far

23    outside the door with respect to the financial institution

24    Plaintiffs.  *CSX* definitely supports that their theory should

25    not go forward.

127

1          Proximate cause requires both foreseeability and

2     direct injury, and neither are here.  And that is consistent

3     with a variety of Georgia cases.  *Vadis Corporation* is a case

4     where this Court said we specifically reject the Plaintiffs'

5     argument which expands professional liability for negligence to

6     an unlimited class of persons whose presence is merely

7     foreseeable.  Same thing with *CSX*, rejecting mere

8     foreseeability is a basis for extending duty of care.

9          So the Plaintiffs clarify that what they are really

10    saying is that they are harmed because the financial

11    institutions rely on the personal information that "flows

12    within the nation's credit reporting and verification system."

13    But if you look at these cases, it's inconsistent with that

14    theory.

15         Putting aside, first of all, that, as Mr. Balser said

16    at the beginning of this, the credit information was not even

17    impacted as a result of this data breach.  There's a lot of

18    reference to the credit ecosystem and how the financial

19    institutions were impacted because that credit data was

20    impacted.  The credit data was not impacted.  The credit

21    database was not impacted.  So that is not even relevant for

22    purposes of this.  But, regardless, courts have consistently

23    dismissed such reliance arguments as reflected in these Georgia

24    cases.

25         In addition, financial institutions Plaintiffs'

128

1    allegations fail to demonstrate a cognizable injury which is

2    similar to some of the injury arguments that we've been talking

3    about.  But since a tort claim fails where liability is

4    established but no damages can be shown, it follows that

5    negligence must fail where no recoverable damages have been

6    pled.  And that is the case here.  Every named financial

7    institution Plaintiff makes the same allegation of injury,

8    direct out-of-pocket costs related to undertaking an

9    investigation of the impact.

10          But what investigation are we talking about?  Does

11   that mean someone within the financial institution sat at their

12   desk and did some research to see what impact it might have on

13   the organization?

14          We have no idea.

15          They also say increased monitoring of potentially

16   fraudulent banking activity, but we don't have any idea what

17   they mean by increased monitoring.

18          Did they go out and buy tools to monitor their

19   systems?  Did they hire more people?  Did they use manpower?

20          No idea.

21          They also say there are costs related to

22   communicating with customers regarding their concerns in light

23   of the Equifax data breach.  But we don't know what

24   communications were sent, who sent them, whether the

25   communications were different, whether they would have sent

1    communications regardless.  And, again, the harm was the same

2    alleged for every single financial institution Plaintiff.  And

3    surely they would not have been cooperating across all of those

4    named Plaintiffs to decide that they were going to take the

5    same exact actions.

6           The *Collins* case also applies to this situation where

7    it declined to find a cognizable injury in the face of

8    significantly stronger allegations than those at issue here.

9    And I'll remind Your Honor that *Collins* dealt with the

10   individual whose information was stolen, again, not a

11   third-party scenario like the financial institutions allege.

12   But there the Plaintiff alleged that her stolen personal

13   identifying information, including her Social, was posted for

14   sale on the dark web.  She argued that she -- alleged that she

15   incurred fraudulent charges on her credit card and that she

16   spent time placing a fraud or credit alert on a credit report,

17   a number of specific actions.

18          And still the court found that those were inadequate.

19   That's a far cry beyond anything that the financial

20   institutions even could think about alleging in their

21   complaint.  So there is no negligence claim.

22          Moving to the negligence per se claim, those also

23   fail.  Starting with the legal standard, the Plaintiff must

24   establish that a law was violated, the injured person falls

25   within the class of persons it was intended to protect, the

130

1    harm complained of was the harm the statute was intended to

2    guard against, and a causal connection between the negligence

3    per se and the injury.

4              First of all, we can just stop at this point and not

5    even go through the entire analysis because it goes back to the

6    standing causation and cognizable injury which we have already

7    talked about.  They haven't established it.  They haven't

8    established it.  They can't establish it.

9              And under Georgia law, negligence per se is not

10   liability per se.  They still have to prove proximate cause and

11   actual damage in order to recover.  And although there is a

12   tendency today for a thought that companies should be held

13   strictly liable once they have a data breach, there is this

14   assumption, well, it must have been unreasonable because a

15   breach occurred.  But that is not the standard.  And companies

16   can certainly have reasonable security programs and still

17   experience data breaches, as can our own government that has

18   experienced data breaches.

19             If you move beyond that and you look at the actual

20   acts alleged, the FTC Act does not apply to financial

21   institution Plaintiffs' claims.  And I'm not going to go back

22   over what Mr. Balser said about the FTC Act, but I do want to

23   raise one point which is specifically relevant to the financial

24   institutions.

25             Here, as is clear from the *SELCO* case, Section 5 in

131

1    particular seeks to protect consumers and competitors from

2    unfair trade practices.  And in that case, the court said

3    Plaintiffs have alleged no harm from the destruction of

4    competition and they are neither Defendant's consumers nor its

5    competitors, so they cannot recover under a theory of

6    negligence per se based on alleged violations of the FTC Act.

7    Here the financial institutions are neither Equifax's consumers

8    nor its competitors.  They cannot recover under the FTC Act

9    under negligence per se.  And, likewise, the GLBA which is the

10   other act they seek to travel under is insufficiently specific

11   to create such a duty.

12        As the *Wells Fargo Bank* court recognized, it's an

13   aspirational statement of congressional policy that cannot form

14   the basis of a negligence per se claim.  And the safeguards

15   rule in the GLBA is no more specific as a whole because it

16   simply sets forth the general requirements that covered

17   entities "develop, implement and maintain an information

18   security program."

19        Here the Plaintiffs don't include factual allegations

20   sufficient to show that Equifax breached the safeguards rule.

21   And, in fact, some of their own allegations in the complaint

22   reflect that Equifax did have an information security program.

23   They did.  They developed it.  They implemented it, and they

24   maintained it.  They may not think that it was reasonable

25   enough, but they certainly argue that Equifax had one.

132

1          So, Your Honor, the negligence per se claims fail;

2    and we move on to the claims of negligent misrepresentation.

3    Starting with the legal standard here as well, the essential

4    elements are that Defendant's negligent supply of false

5    information to foreseeable persons, known or unknown, and that

6    such persons must reasonably rely upon that false information

7    and they must demonstrate economic injury proximately resulting

8    from such reliance.

9          So they would have to plead the precise statements,

10   documents or misrepresentations made.  They would have to plead

11   the time, place and person responsible for the statements.

12   They would have to plead the content, manner in which these

13   statements misled the Plaintiffs and what the Defendant gained

14   by the alleged fraud.

15         Georgia law requires that the maker of the statement

16   also actually be aware that the third party will rely on that

17   information and that the known third party's reliance was the

18   desired result of the misrepresentation.  There's no allegation

19   in the complaint that addresses that issue.

20         Their generic allegations do not meet the pleading

21   standards for negligent misrepresentation.  Here's what they

22   allege with respect to those misrepresentations.  They say that

23   Equifax misrepresented that it would protect PII, including by

24   implementing and maintaining reasonable security measures.  And

25   they say that Equifax misrepresented that it would comply with

1    common law and statutory duties pertaining to the security of

2    PII.   But they don't include anything specific about how these

3    statements were made, to whom they were made, on what basis the

4    financial institutions relied on them and, importantly, that

5    Equifax made those representations with the intent that the

6    financial institutions would rely on them.

7            In addition, the financial institutions' theory of

8    recovery is unrelated to reliance on the misrepresentations

9    allegedly made by Equifax.   They talk about this credit

10   ecosystem, and they say that Equifax damaged the whole credit

11   ecosystem thereby damaging the Plaintiffs.   But they fail to

12   allege that they relied on any specific representation by

13   Equifax and, in addition, that their acts and what they did

14   would have been different regardless of whether Equifax made

15   those representations.

16           So they incur costs on a regular basis to participate

17   in this credit ecosystem.   They have to monitor their customer

18   accounts.   They have to communicate with their customers.   They

19   have to pay attention to threats.   They have to think about

20   what they need to do to investigate and improve their security.

21   They've alleged nothing that would indicate that they took

22   those steps that they did because of representations made by

23   Equifax.

24           The negligent misrepresentation claims fail.   I'm

25   going to move briefly to the specific statutory claims which

1   also fail.

2          They can't mask the pleading deficiencies that I have

3   been discussing by relying on miscellaneous state statutes.

4   None of the statutes on which the financial institutions rely

5   allow them to abrogate the same requirements of causation, of

6   standing, of injury.  So, again, right out of the box they are

7   not going to be able to pass muster with their very attenuated

8   theory.

9          In addition, they can't establish the crucial

10  elements; and their statutory claims fail.  I don't have enough

11  time, Your Honor, to go through the chart of all of those

12  claims that are in the complaint.  But we do have one attached

13  to our motion to dismiss, and we ask that you take a look at

14  those because it does reflect that -- and ties the reasons why

15  these claims fail.

16         But, frankly, they're just particularly unsuited for

17  the financial institutions.  These state-specific statutory

18  claims were not designed for this type of a scenario.  Many of

19  them on which the Plaintiffs rely require claims to be brought

20  by consumers because they are -- or relate to consumer

21  transactions.  We don't have any consumers involved in making

22  these claims with the financial institutions, and we don't have

23  consumer transactions at issue.

24         And they're not related to the consumption of Equifax

25  products or transactions with the Plaintiffs themselves, the

135

1    financial institutions.  And, in fact, many of these statutes

2    are actually consumer protection statutes, not financial

3    institution protection statutes.  So, Your Honor, those fail as

4    well.

5           And now we come full circle from where we began

6    because the last thing I would like to address are the

7    financial institutions' payment card claims.  The way that this

8    was set up you would think that this whole case was about 145

9    million credit cards and that's why we are here today because

10   the financial institutions would be seeking to hold Equifax

11   accountable for that.  But that's not why they're here.

12          You've heard their very attenuated theory regarding

13   the vast majority of their case.  There is one small component

14   where credit cards were involved.  Approximately 200,000 were

15   the number of cards involved.  And even with those they failed

16   to include sufficient allegations to state a claim with respect

17   to those payment cards.

18          So here's what they allege, the limited number of

19   named Plaintiffs who even have credit cards involved.  What

20   they allege is that they were informed by the card brands that

21   they had issued payment cards that may have been impacted in

22   the data breach.

23          So despite alleging that they were informed by the

24   cards, not one of them alleged that they had to actually refund

25   fraudulent charges made on a single one of those credit cards

136

or that they allege any specific cost associated with replacing

those impacted cards.  Certainly had they had the ability to

make those allegations, that subset of Plaintiffs would have

done so.  That's very different again from the *Home Depot* case

and the facts alleged in that case where the facts involved

allegations of cards being posted for sale online and

fraudulent credit card charges on the cards that were used at

the *Home Depot* stores and specific allegations around the

reissuance of those cards.

          The financial institution Plaintiffs' payment card

claims are also barred by the economic loss rule.  And the case

that is most on point is the *Schnuck Markets* case.  There tort

law does not recognize a remedy to cardholder banks against a

retail merchant who suffered a data breach above and beyond the

remedies provided by the network of contracts that link

merchants, card processors' banks and card brands to enable

electronic card payments.  And I know Your Honor learned quite

a lot about that process in the *Home Depot* case and the

contractual relationships amongst the various parties in that

context.

          Here the financial institution card Plaintiffs have

admittedly agreed that they are -- that Equifax and they are

subject to those card brand agreements.  Their own allegations

include that Equifax regularly accepts debit and credit cards

and that Equifax is subject to the payment card industry data

1    security standards.  So they recognize that that applies in

2    this circumstance.

3            And if you think about the holding in the *Home Depot*

4    case, the conclusion there that the economic loss rule did not

5    apply to payment card claims because Georgia law imposed an

6    independent duty to protect PII was clarified in *McConnell III*

7    which held that there is no such independent duty.  And, of

8    course, Mr. Balser spent quite a long time discussing the

9    *McConnell* case and where we are in the state of the law at this

10   point.

11           In addition, there's a recent decision out of the

12   District of Colorado involving the same actual Plaintiffs'

13   counsel in some of the -- some involved here and one of the

14   overlapping named Plaintiffs, Alcoa Community Credit Union,

15   where the court there in *the Bellwether Community Credit Union*

16   case dismissed payment card claims on the same grounds as

17   *Schnuck*.

18           Your Honor, that takes us to the final set of claims

19   for the financial institution Plaintiffs.  And all of these

20   claims fail, and we would ask Your Honor that you would dismiss

21   the complaint with prejudice.

22           Thank you, Your Honor.

23           THE COURT:  Thank you, Ms. Sumner.

24           MR. GUGLIELMO:  Your Honor, this is Joseph Guglielmo.

25   Before we begin, can we take a few-minute recess?

138

1          THE COURT:  Yes, I planned to whether you had asked

2     for it or not.  So I certainly intend to do it.

3          All right.  Let's take a 15-minute break.

4          Court's in recess for 15 minutes.

5          (A short recess was taken.)

6          MR. GUGLIELMO:  Good afternoon, Your Honor.  My name

7     is Joseph Guglielmo, and I am one of the co-lead counsel for

8     the financial institution Plaintiffs.  This afternoon, Your

9     Honor, Mr. Lynch and I have divided up the argument.  I am

10    going to be discussing the facts addressing the standing

11    issues, the negligent misrepresentation claims and then briefly

12    touch upon the state UDAP claims.  And Mr. Lynch is going to be

13    handling the argument with respect to the negligence and

14    negligence per se claims.

15         Your Honor, we are here on behalf of 46 financial

16    institutions who are credit unions and banks located throughout

17    the United States who are direct participants in the credit

18    reporting system, whose customers' personally identifiable

19    information, or PII, and payment card data, otherwise known as

20    PCD, were compromised by Equifax and who suffered out-of-pocket

21    direct losses as a result of Equifax's actions.  We are also

22    here on behalf of 24 national and state credit union

23    associations who bring those claims as associations for

24    declaratory and injunctive relief to require Equifax to

25    implement adequate data security measures and ensure that

1  financial institutions' customers' data is secure.

2          Your Honor, in listening to the hours of argument

3  that have gone on today, it's evident that there's a common

4  theme.  And the common theme is that the Defendants have

5  ignored the specific facts alleged in the complaint.  They have

6  attempted to ignore controlling case law.  And they have

7  essentially tried to argue that the actions here are different

8  than other data breaches, Your Honor.

9          They are different in that the harm here is far more

10 severe to financial institutions than just payment card data.

11 Payment card data can essentially be reissued.  What was at

12 issue here, Your Honor, is that Equifax engaged in one of the

13 largest and most damaging data breaches in the history of this

14 country given the magnitude and type of information that was

15 stolen.

16         Your Honor, credit is ubiquitous.  Americans rely on

17 credit in every facet of their lives.  We are here today

18 because the financial institutions are the entities that extend

19 this credit and are an integral part of the credit reporting

20 system.  We are also here today because Equifax has undermined

21 the credit reporting system directly harming the financial

22 institution Plaintiffs.

23         Your Honor, as this slide shows, the financial

24 institution Plaintiffs and Equifax are participants in the

25 credit reporting system.  In order for the financial services

140

1    industry to function, the credit reporting system relies on

2    data furnishers like the financial institutions and credit

3    reporting agencies like Equifax.

4            Equifax is a credit reporting agency that collects,

5    maintains, aggregates and sells sensitive personal information

6    on hundreds of millions of individuals.  Credit reporting

7    agencies such as Equifax compile PII and other personal

8    information obtained from data furnishers who are our clients,

9    and they create credit reports and other types of documents.

10           The information that Equifax collects and sells is

11   the backbone of the credit reporting system and the U.S.

12   economy.  Financial institutions both furnish and receive this

13   confidential PII from the credit reporting agencies about their

14   customers.  The financial institutions rely on the accuracy and

15   the integrity of the information supplied within the credit

16   reporting system to extend credit to their customers and

17   provide other financial services.

18           Your Honor, the accuracy, integrity and reliability

19   of the information within the credit reporting system is

20   essential for financial institutions to evaluate their credit

21   risk and ensure their fiscal soundness.  Financial institutions

22   need to know who they are extending credit to and the

23   creditworthiness of those individuals.

24           Equifax was entrusted with this sensitive personal

25   information and was responsible for maintaining and securing

1    the information.  The Equifax data breach compromised

2    Plaintiffs' customers' PII and PCD and thereby damaged the

3    entire credit reporting system which directly and proximately

4    caused injury to our clients.

5          Your Honor, as set forth in the complaint -- and I

6    know Ms. Sumner characterized our allegations as essentially

7    not specific or too specific or too more of the same -- Your

8    Honor, these injuries that we have suffered -- and I will set

9    them forth in this slide to you -- these are direct

10   out-of-pocket costs relating to the Equifax data breach, not

11   something else.  Plaintiffs extended -- sorry -- expended time

12   and money responding to the Equifax data breach.  They

13   implemented additional and enhanced security measures to

14   protect their customers' PII specifically in response to this

15   breach.  They responded to their customers' concerns regarding

16   their PII.

17         That takes time.  It takes effort.  It's an

18   out-of-pocket cost that they've incurred.  They investigated

19   the impact of the Equifax data breach.

20         Your Honor, this is not a voluntary cost.  The

21   Gramm-Leach-Bliley Act and the Fair Credit Reporting Act

22   require financial institutions to investigate the soundness and

23   safety of their customers' information.  And this was a direct

24   response to the Equifax data breach.

25         And then contrary to what Ms. Sumner said, we have

142

1    specific out-of-pocket costs relating to cancelling and

2    reissuing payment cards that were compromised from the Equifax

3    data breach and reimbursing our customers for fraudulent

4    transactions, again, on the compromised payment cards.

5              In addition to these out-of-pocket injuries, Your

6    Honor, the financial institutions have suffered an impending

7    risk of future harm, of fraudulent banking activity as a direct

8    result of the compromised PII; and they are entitled to

9    injunctive relief.  Again, these direct out-of-pocket costs and

10   harms are the quintessential injuries in fact that satisfy

11   Article III.

12             And, Your Honor, I'd like to point out in *Home Depot*

13   you made that exact same point.  You stated here, said here,

14   "The financial institution Plaintiffs have adequately pleaded

15   standing.  Specifically, the banks have pleaded actual injury

16   in the form of costs to cancel and reissue compromised --

17   reissue cards compromised in the data breach, costs to refund

18   fraudulent charges, costs to investigate fraudulent charges,

19   costs for customer fraud monitoring and costs due to lost

20   interest in transaction fees due to reduced card usage.  These

21   injuries are not speculative and are not threatened future

22   injuries but are actual current monetary damages.

23   Additionally, any costs undertaken to avoid future harm from

24   the data breach would fall under Footnote 5 of *Clapper*

25   specifically as reasonable mitigation costs due to a

143

1    substantial risk of harm."

2          Then you go on and you say, Your Honor, "These

3    injuries as pleaded are also fairly traceable to Home Depot's

4    conduct."

5          Your Honor, again, a component of the injury that our

6    clients suffered was payment card fraud losses and reissue

7    costs.  But the other costs, the time and money responding to

8    the breach, the additional enhanced data security measures,

9    those are very similar, if not identical, to the same costs we

10   pled there.  The specificity pled in this complaint was far

11   greater than the specificity pled in *Home Depot* where you said

12   that Plaintiffs had satisfied standing.

13         Your Honor, the injuries also are clearly traceable

14   to this breach and they're clearly traceable to Equifax's

15   inadequate data security measures that caused the breach.

16   Contrary to what Ms. Sumner said and what Equifax has said, the

17   financial institution Plaintiffs are the most proximate victim

18   of the Equifax data breach.  They're the entities that bear the

19   ultimate risk of loss.  When consumers have a fraudulent

20   charge, the financial institutions are the ones that reimburse

21   them.  The costs associated with protecting their -- the

22   customers' information fall squarely on the financial

23   institutions' shoulders, Your Honor.

24         So with respect to traceability, we think that we

25   clearly have satisfied that.  Defendant's arguments contradict

1    the factual allegations in our complaint that we took specific

2    steps in response to this breach to protect the PII and to

3    enhance data security measures.

4           Equifax, Your Honor, ignores some of the things they

5    said publicly.  And one of the things that they set forth --

6    and we have it in our complaint -- relates to how synthetic

7    identification or synthetic IDs can be created.  And those

8    basically, Your Honor, are when someone takes a stolen Social

9    Security number and basically opens up a number of credit card

10   accounts.  I think Mr. Canfield had mentioned that earlier.

11          One of the things that happens is they steal the

12   personally identifiable information, and they open up a number

13   of credit cards.  They open up a number of loans.  One of the

14   things that's mentioned in our complaint it's called bust-out

15   fraud.  What happens there is the financial institutions are on

16   the hook for all of those fraudulent transactions.  That's the

17   type of injury that our clients have suffered.  Financial

18   institutions are responsible for protecting the clients' data,

19   and they had to take steps in response to this breach.

20          In response to Defendant's arguments that Plaintiffs'

21   injuries are self-inflicted, it's simply wrong.  It's also

22   implausible for them to suggest that in response to the largest

23   theft of PII in the United States that financial institution

24   Plaintiffs would simply do nothing.  Defendant's argument, Your

25   Honor, also ignores controlling Eleventh Circuit authority in

145

the *Resnick* case which held in the context of a data breach
that traceability was established under similar facts as those
alleged in our complaint.  Like in *Resnick,* the Plaintiffs here
were direct and proximate victims.  They were required to
protect the PII and PCD which is the backbone of the credit
reporting system.  Defendants failed to secure the data, the
PII and PCD; and Plaintiffs were injured as they can no longer
rely on the accuracy and integrity of that information to
determine the creditworthiness and the identity of their
customers.

          Your Honor, one of the things I want to respond to is
the Defendants point out that we haven't pled specific
individual injuries.  It's simply not true.  If you look at the
paragraphs of the complaint, we set forth the types of
injuries.  And it's not unusual, Your Honor, that the financial
institution Plaintiffs suffered the same injuries arising out
of a singular breach; that they were required to do the same
things; that they would reissue cards, payment cards; that they
would suffer losses similarly.  So there's nothing unusual
about the allegations we pled.

          Again, our standing here is no different than in the
payment card context except that the data that was stolen here
cannot be replaced.  A financial institution can replace a
payment card.  They can issue new numbers.  They can't replace
someone's date of birth or Social Security number which is the

146

1   data used by our clients to verify the identity of their

2   customers.  So the harm to the financial institutions here is

3   far worse and lasting.

4           Your Honor, since Equifax doesn't challenge the third

5   prong, redressability, we believe that you can find that

6   Plaintiffs' allegations establish Article III standing like you

7   did in the *Home Depot* case.  And for the same reasons why the

8   financial institutions have standing, Plaintiffs' allegations

9   as to the associations, Your Honor, also likewise are

10  sufficient under two specific theories we have set forth, the

11  diversion of resources theory, Your Honor, which is set forth

12  in the *Havens* case and then under the associational standing

13  test which is in the *Hunt v. Washington State Apple Advertising*

14  *Commission*.

15          Your Honor, you looked at these same arguments and

16  rejected them in the *Home Depot* case finding that the

17  association Plaintiffs had sufficiently alleged standing.  We

18  believe you can do the same here.

19          As I said, Your Honor, we believe that Plaintiffs

20  have asserted their claims and have been harmed by Equifax's

21  conduct.  And we are here today to go to the legal claims, to

22  discuss the legal claims and seek redress for the injuries

23  Equifax has caused through compromising the data contained

24  within the credit reporting system.

25          And I'm going to turn to the representations, Your

147

1    Honor, because I think that's a very important point that we

2    have to discuss.  Contrary to the Defendant's arguments,

3    Equifax made a number of representations that it took

4    reasonable steps to ensure that the data it collected and that

5    they were entrusted to maintain was safe and secure.  And as we

6    will show, those statements were clearly false.

7            You know, I will point you to specific allegations,

8    Your Honor.  These are in our complaint, and so I want to just

9    highlight a few of them.  For example, Your Honor, Equifax

10   acknowledged that it was specifically required to comply with

11   federal and state laws to protect the sensitive data, including

12   the Gramm-Leach-Bliley Act, the Fair Credit Reporting Act, the

13   FTC Act and state UDAP statutes.

14           For example, on the first bullet, Equifax states in

15   their 10K -- and, again, Ms. Sumner said that they don't know

16   who made the statement, when the statement was made or where it

17   was made.  This is all in the complaint.  It's the 10K.  That's

18   their SEC filing.  It was the February 22, 2017; and it was at

19   page 10.  They said we are subject to numerous laws and

20   regulations governing the collection, protection and use of

21   consumer credit and other information and imposing sanctions on

22   the misuse of such information or unauthorized access to data.

23           Again, Your Honor, Equifax also acknowledged -- this

24   was foreseeable.  Equifax acknowledged that it was the target

25   of attempted cybersecurity threats and knew that financial

148

1    institution Plaintiffs would rely on its statements that it

2    would maintain this data and that it would be safe and secure.

3    It stated again in the 10K, "We are regularly the target of

4    attempted cyber and other security threats and must

5    continuously monitor and develop our information technology

6    networks and infrastructure to prevent, detect, address and

7    mitigate the risk of unauthorized access, misuse, computer

8    viruses and other events that could have a serious impact."

9        Again, these are their statements.  They are in their

10   SEC filings.  Financial institution Plaintiffs would not

11   provide information to a credit reporting agency that was not

12   obligated under the law to maintain the information as safe and

13   secure.  They would be violating the Gramm-Leach-Bliley Act and

14   Fair Credit Reporting Act and a number of other statutes.  So,

15   yes, we had to rely on the statements and, yes, we had to rely

16   on the fact that they, like the financial institutions, were

17   maintaining this data in a safe and secure manner.

18       Again, contrary to what was said earlier, financial

19   institutions, in fact, believed that they were doing these

20   things.  And Equifax understood that financial institutions

21   would rely.  It says, "Businesses rely on us for consumer and

22   business credit intelligence.  Our products and services enable

23   businesses to make credit and service decisions and manage

24   their portfolio risk."  Again, these are in the SEC filings,

25   Your Honor.

149

1          I'm just going to briefly touch on with respect to

2    this next slide a few of them.  I'm not going to go through all

3    of them in detail.  But Equifax represented specifically that

4    it was a trusted steward of credit information for thousands of

5    financial institutions.

6          Who else was the audience?

7          Then it goes on to say that it follows a strict

8    commitment to data excellence that helps lenders get the

9    quality information they need to help make better business

10   decisions.  It has security protocols and measures in place to

11   protect the personally identifiable information from

12   unauthorized access or alteration.

13         In light of these facts, Your Honor, Equifax's

14   argument that it made no representations regarding data

15   security measures or that Plaintiffs -- it's implausible that

16   Plaintiffs relied on such statements is simply not credible.

17   Clearly, the foregoing statements, Your Honor, establish that

18   Defendant made specific representations with two Plaintiffs

19   regarding security measures and that Equifax intended

20   Plaintiffs to rely on those statements when they were made.

21         The facts also demonstrate, Your Honor, that the

22   representations that it understood its duty to protect this

23   information and that it would, in fact, take necessary steps

24   were simply false.  One of the things that Ms. Sumner raised

25   was proximate cause.  Well, first of all, proximate cause, if

150

1    anything, is a question for the jury.  But here, Your Honor,

2    Equifax's actions are a "but for" cause for Plaintiffs' harm.

3            So I set forth a few of the things that Equifax did,

4    actions they took.  And you're very familiar with them, Your

5    Honor, because you have heard them a few times this morning

6    from our colleagues on the consumer side.

7            Equifax, not some other actor, had inadequate data

8    security measures.  Equifax, not some other actor, improperly

9    patched the Apache Struts vulnerability that left key systems

10   exposed and vulnerable to the threat that ultimately caused the

11   breach.  Equifax, not some other actor, chose not to update the

12   SSL security certificates.

13           Your Honor, these are basic industry standard

14   measures they basically did not follow.

15           Equifax lacked adequate network segmentation, and

16   that would have limited a hacker's access to the various

17   databases.  Equifax lacked file integrity monitoring which

18   would have alerted them to the exfiltration of this data.

19           So it's Equifax's actions that proximately caused

20   Plaintiffs' harm.  But for their actions, Your Honor, the data

21   breach would not have occurred and Plaintiffs would not have

22   incurred their direct out-of-pocket costs.

23           Basically, Your Honor, as set forth in our complaint,

24   Equifax prioritized their profits over protecting PII.  And

25   these facts again cannot be credibly disputed.  These facts,

151

1   Your Honor, also support Plaintiffs' negligent

2   misrepresentation claim.  I just want to respond briefly to one

3   or two points that were made.

4            Equifax again states that Plaintiff failed to

5   identify who at Equifax made the statements or when the

6   statements were made.  They rely on the *American Dental*

7   *Association* case.  Well, that's a case that's a RICO case.  It

8   talks about pleading requirements and pleading with specificity

9   under RICO.

10           You can look at that case as long as you -- as hard

11  as you want.  You're not going to find a negligent

12  misrepresentation claim in there.  So, in reality, we did plead

13  the specific facts of who.  It was Equifax in their SEC

14  filings.  We did plead when.  We set forth the specific details

15  of when they made those statements.  The argument is simply

16  nonsense.

17           So I think, Your Honor, we have pled the requirements

18  for the negligent misrepresentation claim.  There's nothing

19  more that's required.  The facts that I set forth that are in

20  the complaint that we highlighted, those facts also establish

21  Plaintiffs' unfair deceptive acts and practices or UDAP claims.

22           And before I turn my argument over to Mr. Lynch to

23  talk about negligence and negligence per se, I just want to

24  briefly address two arguments that were made by Equifax

25  regarding Plaintiffs' UDAP claims.  One is this

152

1    extraterritoriality argument.  Equifax basically argues that

2    Plaintiffs cannot bring non-Georgia UDAP claims because all of

3    the activity at issue occurred in Georgia and that there's

4    court authority that says that it can't be done.

5           Well, Equifax, number one, ignores Supreme Court

6    authority governing choice of law principles and seeks to

7    circumvent a traditional choice of law analysis set forth in

8    the *Hague* case.  It also -- like I said, it mischaracterizes

9    the facts.  I will give you one example.

10          Paragraph 405 relating to the FDUTPA claim, that

11   paragraph specifically states that the conduct at issue with

12   respect to the deceptive or UDAP statutes took place in Florida

13   and that Plaintiffs were injured in Florida.  So for Equifax to

14   stand up and say that the allegations and the facts only relate

15   to Georgia is just simply not supported by the actual

16   allegations in the complaint.

17          Your Honor, the other point I want to raise is that

18   Equifax states that *McConnell* requires dismissal of the

19   Plaintiffs' Georgia Fair Business Practices Act claim.  It

20   doesn't.  *McConnell*, as everyone knows, there was no Georgia

21   Fair Business Practices Act claim pled.

22          If you look at the *Arby's* decision, Your Honor, I

23   think that's obviously more on point there.  Judge Totenberg

24   upheld the GFBPA claim, and we think you should do the same

25   here.

153

1        Your Honor, we intend to rely on our papers with

2    respect to the specifics of the UDAP claims.  I just want to

3    point out one final thing.  Plaintiffs aren't required to plead

4    all the elements of fraud in connection with their UDAP claims.

5    The Defendants ignored this in their opposition, and they

6    ignored this in the argument.  Half of our state UDAP claims

7    are based on unfair conduct.  So you don't need to plead fraud

8    or the elements of fraud.  The other half of those claims are

9    based on deception; and they do not require, again, all the

10   elements of fraud.

11        So, again, you sustained similar claims, Your Honor,

12   the Massachusetts claim in *Home Depot*.  In *Target* the Minnesota

13   claim was upheld.  It was also upheld in *Home Depot*.  These

14   UDAP statutes claims are normally upheld in these contexts.

15        And, Your Honor, we again just rely on our papers

16   that the Plaintiffs have validly stated a declaratory judgment

17   act claim.  And unless you have any questions, I'm going to

18   hand over the argument to Mr. Lynch.

19        THE COURT:  All right.

20        MR. LYNCH:  Good afternoon, Your Honor.  Gary Lynch,

21   co-lead counsel for the financial institution Plaintiffs.

22        Your Honor, before I begin, I want to formally say

23   that I don't mind going last in a five-hour hearing.  I do want

24   to lodge an objection about having to go after Governor Barnes.

25        Much of what I'm going to say today is going to echo

154

1   many of the things that Governor Barnes said because I want to

2   talk about first principles because I think as it relates to

3   the negligence claim the first principles have been called out

4   today.  There's an elephant in the room that needs to be

5   addressed.

6          And the first one is this notion that there's not a

7   duty to act reasonably at all times.  I mean, there's a

8   fundamental tenet in negligence law, and it's the most

9   fundamental tenet of the common law, and that tenet is that an

10  actor that sets out on a course of conduct must do so with an

11  objectively reasonable level of care so as not to cause

12  foreseeable harm to foreseeable victims.  The Supreme Court of

13  Georgia has recognized this fundamental legal duty as a general

14  duty one owes to all the world not to subject them to an

15  unreasonable risk of harm.  That's the *Bradley Center v.*

16  *Wessner* case that we have been talking about.

17         That principle of law is what -- and that decision in

18  which it appears, which they cite other Supreme Court cases, I

19  believe, of Georgia over the years -- that's not limited to the

20  facts of any case.  That's just a general principle of common

21  law, and it probably exists in every single state in this

22  country.  It's the foundation of our common law.

23         And they quote -- and the Supreme Court of Georgia

24  quotes the *Restatement of Torts* in defining of this rule.  And

25  it says, and I'm quoting, "as conduct which falls below the

155

standard established by loss of protection of others against an
unreasonable risk of harm."  And that's the *Restatement* 2nd,
Section 282.

          The essential policy underpinnings of this common law
principle bear mentioning, and those underpinnings are that by
attaching liability to the failure to act reasonably the law
incentivizes those in a position of control of foreseeable risk
to actually do so.  This Court actually recognized that policy
in the *Home Depot* financial institutions decision with regard
to the motion to dismiss in that case.  In the *Home Depot* case,
this Court recognized it and said, quote -- no, it recognized
that when it held that to hold that no duty existed in the
context of a payment card data breach "would allow retailers to
use outdated security measures and turn a blind eye to the
ever-increasing risk of cyber attacks, leaving consumers with
no recourse to recover damages even though the retailer was in
a superior position to safeguard the public from such a risk."

          In Your Honor's quote right there from the *Home Depot*
decision, you've synthesized the very social policy
underpinnings of this fundamental tenet of the common law.
Like the payment card data breach at issue in *Home Depot*, this
case does not involve the creation of a new affirmative duty
but rather the application of traditional tort principles of
negligence to do a -- to a somewhat model factual scenario
created by the explosion in information technology over the

156

1    last few decades.  But development in technology is not grounds

2    to give Equifax immunity from the overarching, well-established

3    duty to act reasonably under the circumstances.

4            We all have that duty.  Equifax is not immune from

5    that.  And data breaches are a new occurrence over the last few

6    years.  That's true.  But automobiles were a new occurrence 100

7    years ago; and we applied basic, common sense principles of

8    negligence to how people drove automobiles once they were

9    invented and manufactured.  There's nothing new here.  The

10   principle of law applies.  The facts may change, the scenarios

11   may change, but that duty is always present.

12           To suggest that Plaintiffs in this case are

13   attempting to create and impose a new duty to protect PII

14   misses the mark completely.  The fact pattern is new.  We admit

15   that.  And it's becoming less new unfortunately as these data

16   breaches continue to occur.  But the duty Plaintiffs seek to

17   oppose here is as old as the common law itself.

18           Your Honor, again, one more time, when you act in our

19   society you must do so with a reasonable level of care to avoid

20   foreseeable risk to foreseeable victims.  That principle of law

21   is clearly the law of Georgia, and it's not going to change.

22   And, also, it couldn't be more benign.  That's a fairly basic

23   premise.

24           As I was reviewing the briefing of Equifax as it

25   relates to the negligence claims, it dawned on me that at the

157

1    end of the day the financial institution Plaintiffs are

2    basically being accused of being Mrs. Palsgraf.  That's what

3    they are saying.  And so accepting for a minute that this case

4    involves only an application of the longstanding general

5    principles of duty that it becomes clear that the existence of

6    a duty is not what's at issue.  Rather, the question is whether

7    the duty properly extends to the financial institutions in this

8    case.  Hence, the issue is one of foreseeability.

9           Because I feel like Mrs. Palsgraf as I stand up here,

10   I think it's necessary to spend a few minutes talking about her

11   if you don't mind, Your Honor.

12          As you might recall, Your Honor, things didn't work

13   out too well for Mrs. Palsgraf.  So we don't really want to be

14   Mrs. Palsgraf.  But I want to talk about her situation and see

15   who remembers from first year of law school what the facts of

16   this case are about.  I am going to refresh your memory very

17   quickly.

18          THE COURT:  It involved a firecracker.  That's about

19   all I remember.

20          MR. LYNCH:  It certainly did.  It involved

21   explosives, and they were in that little package right here

22   being carried by a fella trying to catch that train.  And as

23   that train was taking off from the platform, he was running to

24   jump in the door, and a couple of the railroad employees tried

25   to help him.

158

1          And as they were helping him, the package which was

2     wrapped in newspaper fell on the tracks and exploded.  And the

3     explosion ended up rattling the stand or the scale over by

4     Mrs. Palsgraf here, fell on her and injured her.  And she was

5     two platforms away from where the train was and where the

6     explosion occurred.

7          Justice Cardozo in dealing with that fact pattern

8     took it as an opportunity to talk about how foreseeability

9     impacts the existence of a duty and how far a duty extends.  In

10    concluding that no duty was owed to Mrs. Palsgraf because she

11    was outside of the foreseeable zone of danger, he stated it

12    perfectly when he said in his decision, and I'm quoting, "The

13    orbit of the danger as disclosed to the eye of reasonable

14    vigilance would be the orbit of the duty."  And as it related

15    to Mrs. Palsgraf, he went on to say, "There was nothing in the

16    situation to suggest to the most cautious mind that the parcel

17    wrapped in newspaper would spread wreckage through the

18    station."

19         Well, as I said, Your Honor, the financial

20    institution Plaintiffs are not Mrs. Palsgraf.  And we have made

21    several more-than-plausible allegations, most of which are

22    admissions by Equifax, that establish that from Equifax's

23    standpoint we are absolutely in the foreseeable zone of danger.

24    And I'd like to demonstrate that by tampering with the *Palsgraf*

25    case a bit.

1          In *Palsgraf*, a key fact, if not the dispositive fact,

2     was that nobody knew or could reasonably expect that there were

3     explosives in that small package carried by the passenger

4     running to catch his train.

5          But what if everyone on the train platform knew that

6     he was carrying explosives?  What if they knew that as a matter

7     of fact the orbit of the danger extended all the way to where

8     Mrs. Palsgraf was standing?

9          And I'm suggesting that, Your Honor, because that's

10    our case.  Here everyone knows that PII is on the platform, and

11    everyone knows that PII is dangerous when compromised.  In

12    short, everyone knows, including Equifax, that the package

13    contains explosives.

14         As Cardozo said, the commonly understood orbit of the

15    danger defines the orbit of the duty.  The FI Plaintiffs are

16    within the orbit.  Equifax has admitted -- and this is in our

17    complaint, paragraph 133.  They have admitted, they have said,

18    and I'm quoting, "We are regularly the target of attempted

19    cyber and other security threats."  They know that is there.

20    They know the PII is sensitive.  They know that when it's

21    compromised it can cause harm beyond just the immediate

22    vicinity of where that package fell on that train station

23    platform.

24         And let me very quickly to give you another -- the

25    internet is a great thing, Your Honor.  You can pull all kinds

160

1    of information off of there.  This is another depiction of the

2    *Palsgraf* case.  And you can see in this case this was Justice

3    Cardozo's whole point was that because nobody knew that that

4    package was anything other than a package and didn't have the

5    ability to explode and detonate that the zone of danger as

6    those employees of the railroad were helping that passenger

7    board that train, the worst that could happen with anybody

8    being hurt was in that red circle because nothing was going to

9    explode reasonably foreseeably anyway.  Right?

10           And so that's what we're talking about here.  I'm

11   suggesting that if we would know as we know here, if we knew

12   then that there were explosives in that package, that red

13   circle would be much broader.  I would venture to say that it

14   would be at least that broad extending to where Mrs. Palsgraf

15   is standing.  And that's exactly where the financial

16   institutions stand in this case.

17           Everybody knows that PII is used as part of a credit

18   reporting system.  Everybody knows that it's sensitive and it's

19   sought after by cyber thieves.  So the compromise of that data

20   everybody knows is going to harm my clients' ability to verify

21   the identity of their customers, do credit checks on their

22   customers and engage in other banking activity with their

23   customers.  Just like when they compromised the payment cards

24   in the *Home Depot* case, the financial institutions were on the

25   hook to pay for any fraudulent activity that occurred on those

161

1    cards.  And because they had that obligation, they had the
2    obligation to replace those cards and incurred costs to do
3    that.

4            Same thing here.  Everybody knows we now have a
5    situation where with customers PII can't be relied on to
6    identify who they are.  That's how banks operate.  So now they
7    have to devise new ways to authenticate customers.  They have
8    to deal with the risk created by this data breach.  It's the
9    same exact thing as the payment card breach, Your Honor.

10           Let's keep going on with the *Palsgraf* analogy.
11   Hopefully, I won't beat it to death.  I have a couple more
12   points to make with it.  Also, in the *Palsgraf* case there was
13   no indication that the railroad had made any representations to
14   Mrs. Palsgraf about their ability to control the risk by having
15   this posted on the platform.

16           But what if the railroad company would have assured
17   Mrs. Palsgraf that, while there may be explosives on the train
18   platform, she need not worry because the railroad was a trusted
19   steward of explosives for thousands of passengers coming and
20   going from the train platform every day?

21           That's exactly what happened here.  Equifax has said
22   they are the trusted steward of credit information for
23   thousands of financial institutions and businesses.  And
24   Equifax has indicated that it takes this responsibility
25   seriously and follows strict commitment on data excellence.  In

162

1   fact, their CEO has said that securing data is the core value

2   of our company.  Imagine the outcome in Mrs. Palsgraf's case if

3   the railroad had told her that there are explosives on the

4   platform but not to worry because handling explosives is the

5   core value of the railroad.

6           Permit me to take up the case a bit more.  In

7   *Palsgraf*, all indications were that Mrs. Palsgraf was just a

8   normal passenger waiting for a train.

9           But what if Mrs. Palsgraf was not a normal passenger?

10  What if she was at the station to pick up and drop off packages

11  of explosives herself?  In fact, what if everyone on the

12  platform was there to either deliver or receive explosives

13  because the transportation of explosives was the railroad's

14  primary business?

15          Because that's the situation in this case.  Equifax

16  deals in PII.  The financial institutions deal in PII.  We use

17  PII to identify the consumers that we are analyzing to extend

18  credit to and to have other banking relationships with.  Their

19  reason for being on the platform is for the express purpose of

20  exchanging information with Equifax that requires the exchange

21  of PII in order to identify the consumers to whom the

22  information pertains.

23          But let's keep going.  What if safety experts for the

24  railroad in *Palsgraf* reviewed the railroad platform in the days

25  before the accident and told the railroad that there were holes

163

1    in the platform that needed to be patched and without those

2    patches the platform was unreasonably dangerous to handle

3    explosives but the railroad failed to heed those warnings?

4              Because that, again, is what happened here, Your

5    Honor.  Equifax was told there was a problem that made them

6    vulnerable to cyber attack and that they needed to take actions

7    to protect against the risk that PII would be compromised.

8    They didn't do anything.  They didn't patch the hole in the

9    platform.

10             And then, finally, in *Palsgraf* there was no

11   indication that the package of explosives had ever detonated

12   before.  But what if the railroad knew that on five previous

13   occasions packages had exploded on their train platform?

14             Because that's what happened here.  Equifax suffered

15   at least five previous data compromises.  If this Court is

16   looking to foreseeability to define the orbit of duty -- and I

17   respectfully suggest that it should and it needs to -- it need

18   not look much further than the allegations of our complaint.

19             So just to conclude with the analogy to the *Palsgraf*

20   case, Your Honor, unlike the railroad company in *Palsgraf*,

21   Equifax knew the dynamite was there.  They knew the sensitivity

22   and volatility of all the data it collected.  Unlike the

23   railroad company, Equifax knew from its constant back-and-forth

24   interactions with financial institutions the Plaintiffs were

25   the first and most likely to be harmed in the event of a major

164

1    breach.  They knew that Mrs. Palsgraf was within the circle of

2    where the explosives would hit.

3              Unlike the railroad company, Equifax had both general

4    and specific reasons to foresee the breach that ultimately

5    occurred.  In fact, Equifax knew that its practices were

6    generally inadequate, that it had suffered multiple criminal

7    data intrusions in the past, and that there was a specific

8    publicly known vulnerability, and that there was a way to patch

9    readily available to fix it.  But it didn't.  The financial

10   institutions are the most foreseeable victims of this breach,

11   Your Honor, because of the way they use PII.

12             Now, we heard Equifax's response today summarized by

13   Ms. Sumner.  Their primary response has been to say that it was

14   not the financial institutions' data that was compromised.  But

15   isn't that like telling Mrs. *Palsgraf* that it wasn't her

16   package that exploded?

17             The issue is not whose package it was.  The important

18   question is whether the financial institutions, or

19   Mrs. Palsgraf to continue the analogy, were in the zone of

20   danger.  Who owns the package has no relevance to that

21   analysis.  It's about foreseeability of harm.  We have alleged

22   enough specific facts about the credit system to show we are in

23   that zone of danger.

24             The notion also that was brought up today and it's in

25   the briefs that this is limitless liability, that anyone can

165

1    sue, that even conjecture of relying on PII, that's not the

2    financial institutions.

3         Let me show you what I'm going to refer back to, a

4    chart that Mr. Guglielmo has already shown you.  This is the

5    credit reporting system in America.  This is where Equifax

6    stands in that system.  But this is where the financial

7    institutions stand in that system as well.  They are providers

8    of information.  They are receivers of information.  And the

9    consumers are third parties in that system of the exchange of

10   information.

11        Equifax doesn't even really deal with consumers

12   directly as it relates to this function.  They deal with our

13   clients.  That's clear.  So the very notion that this is

14   limitless liability and we had no notion that there was

15   dynamite in that package, and let alone had any notion that

16   when it exploded it would hit Mrs. Palsgraf, that's not right.

17   That's not right.  They know exactly what the harm would be to

18   our clients if they mishandled that PII, and they knew exactly

19   the volatility of it and the harm it could cause.

20        Equifax's other response has been to suggest that

21   they're not responsible because it was a criminal attack, but

22   cyber attacks are different than just normal criminal acts.

23   Cyber attacks on IT systems are constant in our society.  They

24   occur multiple times every minute against every IT system in

25   America that has an internet connection.

166

1    This was a completely foreseeable, well-known

2    environment of risk.  The notion that it's a one-off criminal

3    act is not accurate.  It's an environment of risk that all

4    businesses live within.  It doesn't do them any good to say

5    that there's an intervening cause because there's a criminal

6    act.  The Georgia Supreme Court again in the *Wessner* case, and

7    I'm quoting, has indicated that the general rule that the

8    intervening criminal act of a third person will insulate a

9    Defendant from liability for an original act of negligence does

10   not apply when it is alleged that the Defendant had reason to

11   anticipate the criminal act.

12   We couldn't have more plausible allegations that this

13   Defendant had reason to anticipate the criminal act.  I mean,

14   you couldn't have -- they themselves have said -- they in their

15   10K say we are regularly targets of cyber attacks.  I can't

16   think of a better allegation than that to establish that this

17   Defendant actually had knowledge that there was going to be a

18   cyber attack.  They have admitted it.

19   And, by the way, Your Honor, that rule enunciated by

20   the Supreme Court of Georgia in the *Wessner* case with regard to

21   third-party crime just mirrors the *Restatement of Torts* 302(b)

22   which also as indicates in that *Restatement* section that you do

23   have a responsibility to conduct yourself reasonably to avoid

24   known risks even when those known risks involve known potential

25   criminal acts.

167

1          And totally aside from that, in any event, the

2     foreseeability of criminal conduct is generally for a jury's

3     determination rather than summary adjudication by the Court.

4     So even at summary judgment we would be arguing that it's for

5     the jury to decide but especially at the motion to dismiss

6     stage.

7          Your Honor, that takes me to the *McConnell* decision;

8     and this ground has been fairly heavily plowed I will

9     acknowledge.  And I want to thank Mr. Canfield for doing a good

10    job of it for us, and I want to echo everything that he

11    presented very well to the Court with regard to *McConnell III*.

12    But I want to also make one or two quick points myself on it.

13          *McConnell III* is the law of Georgia right now.  No

14    one is questioning that.  But it's not the law that controls

15    the decision of this Court.  And that's because, as Judge

16    Totenberg found in *Arby's*, there are clear bases for

17    distinction to that case.  And I am just going to list them

18    very quickly.

19          One is the foreseeability is so different here versus

20    what it was in *McConnell*.  In *McConnell*, there were no

21    allegations of previous incidents.  There were no known flaws.

22    There was no failure to implement reasonable security measures.

23    There was no investigation of how they were handling their

24    business and saying, hey, you have a problem.  There were no

25    red flags.  Nobody told them there was dynamite in the package.

1          Okay.  If you want to use the *Palsgraf* analysis,

2    *McConnell* is the situation where it's a plain,

3    newspaper-wrapped package nobody knows has dynamite in it.

4    There's no foreseeability.

5          That's not this case.  This case is a dynamite

6    transportation company.  Everybody knows there's dynamite.

7    Dynamite is everywhere.  It's going to explode if you're not

8    careful with it.  That's our case.  And they were told if

9    you're not careful it's going to explode, and it exploded.

10   They knew full well it was going to hit us.  That's the major

11   distinction from the *McConnell* decision.

12         There's also no allegations in *McConnell* that the

13   employee accidentally e-mailed a sensitive spreadsheet.  That

14   wasn't even part of the court's analysis.  And, as I said, it

15   contrasts to what we have here where we have a known security

16   risk, patches being suggested and all those warnings being

17   ignored.

18         The second basis for distinction with *McConnell*, Your

19   Honor, is that the Defendant in *McConnell* wasn't Equifax.  It

20   Department of Labor was the Defendant in *McConnell*.  It didn't

21   specialize in data trafficking.  It didn't make representations

22   about the security of its data practices like Equifax has.

23   Equifax made representations that data integrity is at the core

24   of their business.  The volume and sensitivity and black market

25   value of the data Equifax was holding also makes it more likely

1  than the Georgia Department of Labor being hacked that they

2  would be hacked.

3          And then, finally, this does echo what Mr. Canfield

4  pointed out.  *McConnell* didn't and couldn't overrule the

5  Georgia Supreme Court's investigation of the most general

6  principle of negligence law which is a general duty of care to

7  act reasonably at all times to alleviate foreseeable risk to

8  foreseeable victims.  *McConnell* doesn't really even analyze

9  that general duty of care.  That's a basis for distinction

10 that's important.

11         The *McConnell* court appears to be considering

12 affirmative duty of care in the context of managing PII

13 admittedly, but it's an affirmative duty of care trying to

14 establish that there's an obligation without looking to the

15 principles of foreseeability without invoking the general

16 principle of the common law that you have to act reasonably to

17 avoid foreseeable risk.  That's not this case.

18         The Supreme Court is going to hear the *McConnell*

19 case, Your Honor.  But one thing that I am very comfortable in

20 knowing, it's not going to change the fundamental tenet of the

21 common law of Georgia that you have to act reasonably at all

22 times to avoid foreseeable harm to others.  I don't expect that

23 to change anytime soon.  It's been in place for the history of

24 the common law.

25         Moving on to negligence per se, again, I'm going to

170

1    give a small shout out to Mr. Canfield for covering a lot of

2    what we want to say about the negligence per se claims.  He

3    pointed out aptly that this Court already addressed the

4    applicability of negligence per se in the context of Section 5

5    of the FTC Act in the *Home Depot* case.

6            For all the reasons there as to why the financial

7    institutions are covered by Section 5 and protected by that

8    section of the statute, they still exist now.  There's nothing

9    even about *McConnell* that changes that.

10           Our other basis for negligence per se, Your Honor,

11   very quickly is the Gramm-Leach-Bliley Act.  Equifax's primary

12   argument with regard to this is that the safeguards rule isn't

13   specific enough to set a standard of care.  And to support

14   that, they cite the *Wells Fargo v. Jenkins* case.  But,

15   interestingly enough, that case didn't address the specificity

16   of the safeguards rule.

17           If you look at Footnote 3 of that case, Your Honor,

18   you will see that.  The case only dealt with the statute

19   itself, very general statute.  The specificity provided by the

20   safeguards rule or regulations that implemented the statute,

21   they're irrelevant here.  That's what provides the specificity

22   of the Gramm-Leach-Bliley Act for our purposes and provides

23   protection to us.

24           It's that specificity that we are looking at in this

25   case.  There's more than one, but I am going to highlight this

1    one.  And that's the key requirement under the safeguards rule

2    that Equifax concedes is applicable to it, by the way, is that

3    Equifax developed an information security program appropriate

4    to its size and sophistication, the nature and scope of its

5    business and the sensitivity of the data it deals with.

6            Equifax failed grossly in its compliance with that

7    requirement.  We are entitled to use that statute and use it

8    under a negligence per se concept.

9            THE COURT:  Mr. Lynch?

10           MR. LYNCH:  Yes.

11           THE COURT:  Ten minutes.

12           MR. LYNCH:  In conclusion, Your Honor, Equifax's

13   motion seems to suggest that it has no duty to act reasonably

14   to avoid foreseeable harm to others.  That's an extremely novel

15   concept.  They have done a lot of talking about novel concepts.

16   They have done a lot of talking about deference to

17   legislatures, about policy.  But they are the ones that are

18   promoting a novel concept.  And that novel concept would be the

19   company, the size of Equifax and with the sophistication of

20   Equifax would be absolved and made immune from the general

21   responsibility and duty that we all have as citizens of our

22   country which is to conduct ourselves reasonably to avoid

23   harming others with what we do when that harm is foreseeable

24   and known and the victims are foreseeable and known.

25           That's what would be a remarkable decision to come

1   out of this Court, not the simple acknowledgment of that

2   general tenet of the common law but the idea that we could

3   immunize a company.  I would respectfully suggest, Your Honor,

4   to the extent this Court or any other court is thinking about

5   providing that type of immunity simply because of a novel fact

6   pattern that's something that should be left for the

7   legislature.  That's a change of the common law that should be

8   left for the legislature.

9           The common law controls this case.  There's nothing

10  novel about it, nothing novel about the application of the

11  common law here.  The only thing that would be novel is to

12  immunize the Defendant.

13          If you don't have any other questions, Your Honor,

14  that's it for me.

15          THE COURT:  Thank you, Mr. Lynch.

16          Ms. Sumner, you've got about 25 minutes of your time

17  left.  If you are going to use anything close to that, I need

18  to take a break.

19          MS. SUMNER:  Your Honor, I think it can be much

20  quicker than that amount of time.

21          THE COURT:  All right.

22          MS. SUMNER:  Thank you.

23          First, Your Honor, I'd like to start where I began my

24  argument, oh, I don't know, a couple of hours ago; and that is

25  to say this is not a payment card breach.  There was a lot of

173

1    discussion by the financial institution Plaintiffs' counsel

2    about payment card issues.  This is not a payment card breach.

3    There is one small component of this data breach that deals

4    with payment cards and their attempt to discuss some of the

5    potential alleged harms relating to cancelling or to dealing

6    with fraudulent transactions.  That's a very tiny piece.

7            And really you could split this case apart in that

8    you've got that one subset that deals with about 200,000 cards,

9    but everything else goes into the big bucket of very attenuated

10   theory where they argue that because their customers' PII was

11   compromised that they are damaged.  And that's where there

12   lacks specificity with respect to that.

13           They don't allege, frankly, even any particular

14   fraudulent transaction with respect to the payment cards and

15   they -- at most they say they might suffer fraudulent

16   transactions sometime down the road.  And one of the paragraphs

17   listed on the demonstrative of paragraph 237 simply references

18   to one commentator who simply predicts that the financial

19   institutions may suffer harm.  So they don't provide

20   specificity when it comes to satisfying the injury in fact

21   prong.

22           But with respect to traceability, they spoke to the

23   case *Resnick* and argued similarity.  Your Honor, the facts are

24   not similar in *Resnick*.  *Resnick* had two named Plaintiffs who

25   were individuals and who alleged with pretty specific

174

1    allegations that they personally suffered identity theft as a

2    result of the data breach in question.  So, again, in that case

3    they discuss credit cards and bank accounts being opened in

4    their name as individuals.

5              This is not the *Resnick* case, except for the fact

6    that at the outset of the *Resnick* case there were individuals

7    who didn't specifically allege identity theft, and they were

8    dropped from the lawsuit.  They were not able to continue on.

9    So the claims here by the financial institutions are more akin

10   to the Plaintiffs who were dropped out of the *Resnick* case as

11   opposed to the individuals who alleged very specific harm.

12             They also referenced a number of statements to

13   support what they argue were misrepresentations by Equifax.

14   But it's interesting if you look at the filings, Your Honor,

15   the statements that they started with it says, quoting Equifax,

16   "We are subject to numerous laws and regulations governing the

17   collection, protection and use of consumer credit and other

18   information and imposing sanctions for the misuse of such

19   information or unauthorized access to data."  They haven't

20   alleged that that is a misrepresentation.  It's a

21   representation that Equifax would be subject to numerous laws

22   and regulations.  They haven't alleged that that is false.  In

23   fact, that is true.

24             So there are several representations that they don't

25   even represent that they are false when made.  For example, we

175

1    are regularly the target of attempted cyber and other security

2    threats was included in another filing.  They don't argue that

3    that's false.  So it has -- it does not -- those types of

4    statements will not support a negligent misrepresentation.

5            In addition, they don't have allegations regarding

6    any particular financial institution that relied on any

7    misrepresentations even if they were false statements, nor have

8    they alleged that Equifax knew that in making representations

9    such as those that financial institutions would rely on them in

10   handling their own consumer data.

11           I'll move next to the "but for" argument because "but

12   for" does not mean proximate cause which is the actual standard

13   here.  And I believe that Governor Barnes referenced Professor

14   Prosser.  I'd like to reference him too.  There's one quote

15   that begins with, "The fatal trespass done by Eve was cause of

16   all our woe."  If I had more time, I'd argue about whether Adam

17   should be in that, Your Honor.  But I'll stick with -- I'll go

18   with the way it begins.  And the professor goes on to say, "But

19   any attempt to impose responsibility upon such a basis would

20   result in infinite liability for all wrongful acts and would

21   set society on edge and fill the courts with endless

22   litigation."

23           "But for" doesn't work because it just keeps going

24   and adding on, and that's what they are arguing here, and that

25   is unworkable.  What we need to be focused on is proximate

176

1    cause, and they haven't shown or alleged appropriate proximate

2    cause.

3            I'll spend a brief moment on *Palsgraf*.  I'll start by

4    saying I absolutely agree the financial institutions aren't

5    Mrs. Palsgraf, and the case is quite different.  I'm not sure I

6    followed all of the analogies to this scenario, but I will make

7    a couple of comments.

8            One, that involved a physical injury to

9    Mrs. Palsgraf; and she was a Plaintiff passenger of the

10   railroad.  And really that case was about joint and several

11   liability.  And the passenger with the fireworks and the train

12   employees helping that passenger who had the dynamite onto the

13   train, the argument was that there was negligence there.  And

14   the court held that the passenger's negligence didn't absolve

15   the train employee's negligence.

16           And one of the things that the court relied on in

17   reading from *Palsgraf*:  It must be remembered that the

18   Plaintiff was a passenger of the Defendant and entitled to have

19   the Defendant exercise the highest degree of care required of

20   common carriers.

21           The financial institutions aren't passengers of

22   Equifax.  They don't fit within the *Palsgraf* mold.  And even if

23   they try to stretch that case to apply it here and from a

24   danger-zone perspective, foreseeability is not enough.  They

25   have to show direct injury, and there is no direct injury here

177

1    to the financial institutions.

2            Your Honor, if I could refer you back to the first

3    page.  And I'm going to use the overhead here.  This was the

4    diagram that they relied upon in arguing about the credit

5    reporting system.  And, in fact, I believe this diagram

6    supports our argument because it proves the point that the

7    financial institutions are derivative.  The consumers are the

8    ones where the information is being impacted according to this

9    diagram, not the financial institutions.

10           And there's no allegation that any of the information

11   represented on those arrows, if you look at the credit reports

12   going from the CRAs to the lenders and you look at the trade

13   line history going to the CRAs from the lenders, none of that

14   was involved in the data breach because, as I mentioned before,

15   the credit reporting database was not impacted.  So that

16   information was not a part of this at all.

17           And even if we were to limit this theory to this

18   credit reporting ecosystem, here's how this theory would play

19   out.  Anyone in that bucket where it says national credit

20   reporting agency or credit reporting agency -- and, of course,

21   there are many credit reporting agencies.  There are several

22   very large ones, but there are many in that bucket.  And then

23   if you look at the bucket that says lender user data furnisher

24   where there are thousands and thousands in that bucket and you

25   see as demonstrated by those arrows if information was

178

1    compromised that involved credit reports or trade history, then

2    at that point either the lenders or the CRAs could be held

3    liable.

4          So, in fact, what they are suggesting in their theory

5    of liability is that if any credit reporting agency was

6    breached and any consumer PII was put at risk then every

7    financial institution would have the right to sue and recover

8    from that credit reporting agency.  But it flips the other way

9    because it would also mean that if any financial institution

10   had a data breach involving consumer PII upon which the credit

11   reporting agencies relied then they're damaged.

12         I don't think that that is what the named Plaintiffs

13   intended.  And I suspect that their brethren would not be very

14   pleased if they had a data breach and the theory was used to

15   say now you are beholden to everyone in that ecosystem who uses

16   that consumer information.  Because, of course, consumers use

17   different banks; so there may be a number of banks who use and

18   rely on the same consumer PII.

19         It gets very confusing fast, and it gets very remote

20   fast.  But the arguments that they are making and the theory is

21   boundless here.  And, Your Honor, it's not one that they can

22   cure.  And so we ask that this -- and we suggest to Your Honor

23   that this theory cannot survive, and we request that you

24   dismiss the financial institutions Plaintiffs' complaint with

25   prejudice.

179

1          Thank you, Your Honor.

2          THE COURT:  Well, it has been a long day; but the

3   oral argument has been useful to me.  And I hope it will result

4   in a better decision than might have been given otherwise.  So

5   thank you very much.  I'll get out a written order as soon as I

6   can.  And that concludes this hearing.

7          Thank you very much.  Court's in recess until further

8   order.

9          (Proceedings adjourned at 4:13 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

180

1                      C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT:

4    NORTHERN DISTRICT OF GEORGIA:

5

6              I hereby certify that the foregoing pages, 1 through

7    179, are a true and correct copy of the proceedings in the case

8    aforesaid.

9              This the 24th day of May, 2019.

10

11

12

13                   /s/ Susan C. Baker

14                   Susan C. Baker, RMR, CRR
                     Official Court Reporter
15                   United States District Court

16

17

18

19

20

21

22

23

24

25