## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| In re: Equifax Inc. Customer Data Security Breach Litigation | MDL Docket No. 2800<br>No. 1:17-md-2800-TWT<br><br>CONSUMER ACTIONS<br><br>Chief Judge Thomas W. Thrash, Jr. |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR
## MOTION TO DIRECT NOTICE OF PROPOSED SETTLEMENT

After nearly two years of hard fought negotiations, the parties have reached an historic settlement to resolve consumer claims arising out of the 2017 Equifax data breach. The Settlement creates a non-reversionary fund of $380.5 million to pay benefits to the class, including cash compensation, credit monitoring, and help with identity restoration. If needed, Equifax will pay another $125 million for cash compensation and potentially much more if the number of class members who sign up for credit monitoring exceeds 7 million. Equifax also must spend a minimum of $1 billion to improve its data security. The total cost to Equifax thus is at least $1.38 billion and might be significantly more. The benefit to the class is even greater. The retail cost of buying the same credit monitoring services for the entire class alone would exceed $282 billion ($1,920 times 147 million class members).

The Settlement also has an innovative notice program, which takes advantage of tools used in modern commercial and political advertising to maximize engagement and participation, and an easy-to-use claims program.  Both programs were designed with input from the Federal Trade Commission, the Consumer Financial Protection Bureau, and representatives of 50 Attorneys General, who have entered into their own settlements with Equifax and agreed that the fund in this case – as originally negotiated by Class Counsel and as supplemented by relief the regulators obtained – will be the vehicle for all consumer redress necessitated by the breach.

The Settlement is fair, reasonable, and adequate and meets the requirements of Rule 23(e).  Plaintiffs thus move for an order directing class notice and scheduling a final approval hearing.  In support of the motion, Plaintiffs submit the Settlement Agreement (Ex. 1); a proposed order directing notice that has been approved by Equifax (Ex. 2); and declarations from Class Counsel (Ex. 3), the proposed Notice Provider (Signal Interactive Media LLC) (Ex. 4), the proposed Settlement Administrator (JND Legal Administration) (Ex. 5), Mary Frantz, a cybersecurity expert (Ex. 6), James Van Dyke, a credit monitoring expert (Ex. 7) and Layn Phillips, the retired federal judge who mediated the settlement. (Ex. 8)

## FACTUAL BACKGROUND

### A.    Overview of the Litigation

On September 7, 2017, Equifax – one of the country's three major credit reporting agencies – announced criminals had stolen from its computer networks personal information pertaining to about 147 million Americans.  More than 300 class actions filed against Equifax were consolidated and transferred to this Court, which established separate tracks for the consumer and financial institution claims and appointed separate legal teams to lead each track.  (Ex. 3, ¶¶ 9-10)

In the consumer track, on May 14, 2018, Plaintiffs filed a 559-page consolidated amended complaint, which named 96 class representatives and asserted common law and statutory claims under both state and federal law. Equifax moved to dismiss the complaint in its entirety, arguing *inter alia* that Georgia law does not impose a legal duty to safeguard personal information, Plaintiffs' alleged injuries were not legally cognizable, and no one could plausibly prove an injury caused by this data breach as opposed to another breach.  The motion was exhaustively briefed during the summer and early fall of 2018 and, on December 14, 2018, was orally argued. On January 28, 2019, the Court largely denied the motion.  Equifax answered on February 25, 2019.  (*Id.*, ¶¶ 11-14)

While the motion was pending, the parties spent a great deal of time

preparing the way for formal discovery and, beginning shortly after the answer was filed, began producing extensive documents and electronic information.  By the end of March, 2019, Plaintiffs had reviewed in excess of 500,000 documents and noticed depositions of Equifax and several key former employees. Aggressive discovery efforts continued up until the case settled.  (*Id.*, ¶¶ 16-17)

### B.   <u>Mediation and Settlement</u>

In late September, 2017, Equifax's counsel contacted several lawyers who had filed cases in this Court to discuss the possibility of an early settlement.  Those contacts led to the formation of a team made up of many of the nation's most experienced data breach lawyers that later applied for and was appointed by the Court to lead the consumer track and serve as Interim Consumer Class Counsel pursuant to Fed. R. Civ. P. 23(g).  (*Id.*, ¶ 18)

The parties retained Layn Phillips, a former federal judge, to serve as mediator.  Judge Phillips is perhaps the country's preeminent mediator in major civil litigation and has successfully mediated several data breach cases, including *In re Anthem Customer Data Breach Security Litigation*, the largest consumer data breach settlement until this one. (*Id.*, ¶ 19) After receiving detailed mediation statements from each side setting out their views of the facts and law, Judge Phillips convened the first mediation on November 27 and 28, 2017 in California.

The session ended with the parties being far apart and little prospect of an early settlement, but with a framework for a future dialog.  (Ex. 8, ¶¶ 9-10)

Following the Court's appointment order, the parties renewed discussions, both directly and with the assistance of Judge Phillips, in an attempt to resolve such issues as the benefits that would be provided to class members, the size of a settlement fund, and the extensive business practice changes needed to reduce the risk of another data breach.  In this process, Class Counsel were advised by leading cybersecurity experts, consulted with consumer advocates, and benefitted from significant informal discovery Equifax provided, including face-to-face meetings with both side's experts to discuss how the breach occurred and Equifax's remedial efforts.  (Ex. 3, ¶¶ 22-23)

During the course of 2018, Class Counsel collectively spent more than a thousand hours preparing for and participating in settlement talks, struggling to reach agreement with Equifax on a comprehensive term sheet. (*Id.*, ¶ 21) Mediation sessions on May 25, 2018, August 9, 2018, and November 16, 2018, resulted only in incremental movement.  According to Judge Phillips:

> [W]hile productive in some respects, these additional sessions were, like the first session, difficult and adversarial, and the session on November 16, 2018 ended with a substantial chasm remaining between the parties' respective settlement positions.

(Ex. 8, ¶ 10)  In late 2018, the parties informed Judge Phillips they were at impasse

and settlement talks ceased.  (*Id.*, ¶ 11)

In February, 2019, after this Court's ruling on Equifax's motion to dismiss, the parties restarted negotiations.  Judge Phillips convened what proved to be the final mediation session in California on March 30, 2019.  After getting consensus on the non-monetary terms, the parties reached an impasse on the amount of the settlement fund.   Late in the evening, Judge Phillips made a double-blind "mediator's proposal," which both sides accepted, and the parties executed a binding Term Sheet at about 11 p.m., subject to approval by Equifax's board of directors, which was received the following day.  (*Id.*, ¶ 12; Ex. 3, ¶¶ 27-31)

In the March 30 Term Sheet, the parties committed to cooperate in drafting a comprehensive agreement containing more detail and usual provisions; to present any disputes to Judge Phillips for final determination; and to submit the agreement to the Court for preliminary approval 90 days later.  The parties also agreed to allow Equifax to share the Term Sheet with federal and state regulators and to consider in good faith – but without having to accept – any changes the regulators proposed. (Ex. 3, ¶ 32)  This provision is consistent with guidance provided by the Federal Judicial Center regarding solicitation of the views of federal and state regulators regarding class action settlements.  *See* Federal Judicial Center, *Managing Class Action Litigation: A Pocket Guide for Judges* (2010) at 26-27.

The regulators proposed several changes to the substantive terms of the Term Sheet.  A few were relatively minor (making clear that consumers could recover for time in 15 minute intervals and increasing the dollar amount of one benefit) while others provided additional relief ($70.5 million for the fund that included money another year of 3-bureau monitoring and, if needed, $125 million more to pay excess out-of-pocket claims; 6 years of 1-bureau monitoring through Equifax; and expansion of the Extended Claims Period).  Plaintiffs accepted all those proposals.  However, Plaintiffs opposed other proposed changes Class Counsel believed would be the subject of criticism and, in certain instances, might lessen the class benefits in the Term Sheet they had negotiated.  (Ex. 3, ¶ 33)

The provisions Plaintiffs opposed triggered a new round of difficult negotiations with Equifax that lasted over two months and delayed submitting an agreement to the Court.  Several weeks ago, after the issues were satisfactorily resolved, Plaintiffs focused on working with Equifax and the regulators to refine the notice and claims programs. After numerous conferences with Equifax and the regulators, and an "all hands" meeting in Washington D.C. on July 16, the parties were finally able to execute the Settlement Agreement.  (*Id.,* ¶ 34)

## C.    The Terms of the Proposed Settlement

The following are the material terms of the Settlement:

### 1.   The Settlement Class

The proposed Settlement Class is defined as follows:

The approximately 147 million U.S. consumers identified by Equifax whose personal information was compromised as a result of the cyberattack and data breach announced by Equifax Inc. on September 7, 2017.

Excluded are Equifax, its affiliated entities and individuals, the Court and its staff, their immediate families, and anyone who validly opts out.  (Ex. 1 at 7)

### 2.   The Settlement Fund

Equifax initially will pay $380.5 million into the fund for class benefits, fees, expenses, service awards, and notice and administration costs; up to an additional $125 million if needed to satisfy excessive claims for Out-of-Pocket losses; and potentially $2 billion more if all 147 million class members were to sign up for credit monitoring (at a rate of about $16.4 million per million enrollees over 7 million). (Ex. 3, ¶ 37)  No proceeds will revert to Equifax.  (Ex. 1 at 15) The specific benefits available to class members include:

- Compensation of up to 20 hours at $25 per hour for time spent taking preventative measures or dealing with identity theft.  Ten hours can be self-certified, requiring no documentation.

- Reimbursement of up to $20,000 for documented losses fairly traceable to the breach, such as the cost of freezing or unfreezing a credit file; buying credit monitoring services; out of pocket losses from identity theft or fraud, including professional fees and other remedial expenses; and 25 percent of any money paid to Equifax for

8

credit monitoring or identity theft protection subscription products in the year before the breach.

- Four years of three-bureau credit monitoring and identity protection services through Experian ($1,200 value) and an additional six years of one-bureau credit monitoring through Equifax (valued at $720).

- Alternative compensation of $125 for class members who already have credit monitoring or protection services in place.

- Identity restoration services through Experian to help class members victimized by identity theft for seven years, including access to a U.S. based call center, assignment of a certified identity theft restoration specialist, and step by step assistance in dealing with credit bureaus, companies and government agencies.

(Ex. 3, ¶ 38) Class members will have six months to claim benefits, but need not file a claim to access identity restoration services. If money remains in the fund, there will be a four-year Extended Claims Period during which class members may recover for Out-Of-Pocket losses and time spent rectifying identity theft that occurs after the end of the Initial Claims Period. Any money that is not claimed in the Extended Claims Period will first be used to purchase up to three years of additional identity restoration services (for a total of ten years) and then to extend the length of credit monitoring for those who signed up for it. (*Id.*, ¶ 43)

### 3.    Proposed Injunctive Relief

Equifax has agreed to entry of a consent order requiring the company to spend a minimum of $1 billion for cybersecurity over five years and to comply

with comprehensive data security requirements Plaintiffs negotiated with the assistance of Mary Frantz, a renowned expert.  Equifax's compliance will be audited by independent experts and subject to this Court's enforcement powers. (Ex. 3, ¶ 44)  This relief is substantial and significant.  According to Ms. Frantz:

> [I]mplementation of the proposed business practice changes should substantially reduce the likelihood that Equifax will suffer another data breach in the future. These changes address serious deficiencies in Equifax's information security environment. Had they been in place on or before 2017 per industry standards, it is unlikely the Equifax data breach would ever have been successful. These measures provide a substantial benefit to the Class Members that far exceeds what has been achieved in any similar settlements.

(Ex. 6, ¶ 66)  Ms. Frantz describes the specifics in her declaration.  (*Id.*)

### 4.    Proposed Notice and Claims Program

A key feature of the settlement is a first-of-its-kind Notice Program (Ex. 6 to the Settlement Agreement) that uses modern testing, targeting, and messaging techniques to more effectively engage the class and increase participation.  The program, developed by Class Counsel and Signal with input from JND and regulators, consists of:  (1) four emails sent to those whose class members' email addresses can be found with reasonable effort, which is expected to exceed 75 percent of the class; (2) an aggressive digital and social media campaign designed to reach 90 percent of the class an average of eight times before the Notice Date and six more times by the end of the Initial Claims Period; (3) radio advertising

and a full-page ad in *USA Today* to reach those who have limited online presence; and (4) continued digital advertising for seven years during the Extended Claims Period and until identity restoration services are no longer available.  (Ex. 3, ¶ 46)

The proposed emails and ads (attached as exhibits to the Notice Plan) will be tested for effectiveness by using focus groups, conducting a national survey of 1,600 likely class members, and sampling their impact on small subsets of the class.  And, the ads will be targeted based on testing results, demographics, and other data. (Ex. 4*, ¶¶* 23-28)  Once the full-scale digital campaign is launched, Signal will use available empirical data to continuously adjust the ads and where the ads are placed to maximize their impact and drive claims. (*Id.,* ¶ 5) If the empirical data shows additional measures are needed, the notice program will be supplemented with the Court's approval.   (*Id.,* ¶ 44)

The claims process similarly draws upon the most up-to-date techniques to facilitate participation, incorporating input from regulators, including a link to a settlement website (which has been optimized for use on mobile devices as well as personal computers) in all emails and digital advertising; the ability to file claims and check on the status of those claims electronically; and a call-center with a chat feature to assist class members. (*Id.,* ¶ 31, 35; Ex. 5, ¶¶ 29, 31)  JND, the proposed Settlement Administrator, is a widely-regarded expert with the experience to

handle a case of this magnitude.  (*Id.,* ¶¶ 6-10; Ex. 3, ¶ 48)

### 5.    Attorneys' Fees and Expenses and Service Awards

Class Counsel may request a fee of up to $77.5 million, which represents 25 percent of the original settlement fund as specified in the Term Sheet, without consideration of the additional relief obtained by regulators, and reimbursement of up to $3 million in litigation expenses. Services awards totaling no more than $250,000 also may be requested. Equifax does not oppose these requests. Class Counsel will move for fees, expenses and service awards at least 21 days before the Objection Date. (*Id.*, ¶ 49)

### 6.    Releases

The class will release Equifax from claims that were or could have been asserted in this case and in turn Equifax will release the class from certain claims. The releases are detailed in the settlement agreement. (Ex. 1 at 20-22)

## ARGUMENT

### I.    The Court Should Direct Notice to the Class

Approval of a proposed settlement is a two-step process. First, the court decides whether the proposed settlement is "within the range of possible approval," *Fresco v. Auto Data Direct, Inc.*, 2007 WL 2330895, at *4 (S.D. Fla. May 11, 2007), to decide "whether to direct notice … to the class, invite the class's

reaction, and schedule a final fairness hearing." 4 *Newberg on Class Actions* §

13:10 (5th ed. 2015). Second, at the final approval hearing, the court decides if the

settlement is fair, reasonable, and adequate. *Id*.

A court has broad discretion over this process. *See, e.g.*, *In re Motorsports*

*Merchandise Antitrust Litig.*, 112 F. Supp. 2d 1329, 1333 (N.D. Ga. 2000). In

exercising this discretion, some courts in the Eleventh Circuit have authorized

notice "where the proposed settlement is the result of the parties' good faith

negotiations, there are no obvious deficiencies and the settlement falls within the

range of reason." *See In re Checking Account Overdraft Litig.*, 275 F.R.D. 654, 61

(S.D. Fla. 2011). Other courts have considered the so-called *Bennett* factors

customarily used at the final approval stage.[1]  *See, e.g., Columbus Drywall &*

*Insulation, Inc. v. Masco Corp.,* 258 F.R.D. 545, 558-59 (N.D. Ga. 2007).

The December, 2018 amendments to Rule 23 provide explicit new

instructions, requiring notice be issued if the court is "more likely than not" to

finally approve the settlement and certify a settlement class. Rule 23(e)(1)(B).

The amendments specify that before finally approving a settlement, a court should

---

[1] The *Bennett* factors include: (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the range of possible recovery at which a settlement is fair, adequate, and reasonable; (4) the anticipated complexity, expense, and duration of litigation; (5) the opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

consider whether (1) the class was adequately represented; (2) the settlement was negotiated at arm's length; (3) the relief is adequate, taking into account the costs, risks, and delay of trial and appeal, how the relief will be distributed, the terms governing attorneys' fees; and any side agreements; and (4) whether class members are treated equitably relative to each other. *Id.*

Since the 2018 amendments, the few courts in this Circuit that have addressed the issue consider both new Rule 23(e) and the *Bennett* factors. *See Grant v. Ocwen Loan Servicing, LLC*, 2019 WL 367648, at *5 (M.D. Fla. Jan. 30, 2019); *Gumm v. Ford*, 2019 WL 479506, at *4 (M.D. Ga. Jan. 17, 2019).  In this brief, Plaintiffs will analyze the new Rule 23(e)(2) factors and rely on case law interpreting the *Bennett* factors, which are substantially similar.  Regardless of what factors are used, notice of this settlement is appropriate.

### A.   <u>The Class Was Adequately Represented</u>

Adequacy of representation is an issue traditionally considered in connection with class certification and involves two questions: "(1) whether the class representatives have interests antagonistic to the interests of other class members; and (2) whether the proposed class' counsel has the necessary qualifications and experience to lead the litigation." *Columbus Drywall & Insulation, Inc.,* 258 F.R.D. at 555.  Here, the class representatives have the same interests as other class

members as they are asserting the same claims and share the same injuries. Further, the Court has already recognized Class Counsel's experience and qualifications in appointing them to lead the consumer track, and the record shows Class Counsel worked diligently to bring this case to resolution.  (Ex. 3, ¶ 61)

### B.    The Proposed Settlement Was Negotiated at Arm's Length

The Court can safely conclude this settlement was negotiated at arm's length, without collusion, based on the terms of the settlement itself; the length and difficulty of the negotiations; Judge Phillips' oversight, his description of what happened and the fact that the final fund amount resulted from a mediator's proposal; and the regulators' review and involvement.  *See generally Ingram v. The Coca-Cola Co.,* 200 F.R.D. 685, 693 (N.D. Ga. 2001) ("The fact that the entire mediation was conducted under the auspices of . . . a highly experienced mediator, lends further support to the absence of collusion.").

### C.    The Relief Is Fair, Reasonable, and Adequate

The Settlement is the largest and most comprehensive recovery in a data breach case by several orders of magnitude. (Ex. 3, ¶ 52)  Not only does the size of the fund dwarf all previous data breach settlements, the specific benefits compare favorably to what has been previously obtained, including:

- A sizeable, $20,000 cap on out of pocket losses.

15

- Compensation for up to 20 hours of lost time at $25 per hour.

- Four years of three-bureau credit monitoring that would cost each class member $1,200.

- An additional six years of one-bureau monitoring that would cost each class member $720.

- $125 in alternative compensation to those who already have monitoring.

- Reimbursement of 25 percent of the price paid by class members who bought identity protection services from Equifax in the year before the breach (notwithstanding that their claims were dismissed by this Court).

- Access to seven years of assisted identity restoration services.

(Ex. 3, ¶¶ 38, 52)  The Settlement also provides extraordinary injunctive relief, far beyond that obtained in any other similar case.  (*Id.*, ¶52, Ex. 6, ¶ 66)

Class Counsel, a group with extraordinary experience in leading major data breach class actions, strongly believe that the relief is fair, reasonable, and adequate.  (Ex. 3, ¶¶ 7-8, 60)  The Court may rely upon such experienced counsel's judgment. *See, e.g., Nelson v. Mead Johnson & Johnson Co.*, 484 F. App'x 429, 434 (11th Cir. 2012) ("Absent fraud, collusion, or the like, the district court should be hesitant to substitute its own judgment for that of counsel.")  The Court should also consider Judge Phillips' view after overseeing the negotiations:

> Based on my experience as a litigator, a former U.S. District Judge and a mediator, I believe that this settlement represents a reasonable and fair outcome given the parties' strongly held positions throughout the 16 months of negotiations. As such, I strongly support the approval of the settlement in all respects.

(Ex. 8, ¶ 13).

That the relief is fair, reasonable, and adequate is further confirmed by considering the four specific factors enumerated in new Rule 23(e)(2).

### (1)    The Risks, Costs, and Delay of Continued Litigation

The cost and delay of continued litigation are obviously substantial.  This is one of the most complex and involved civil actions pending in the federal courts.  But for the Settlement, the parties will incur tens of millions of dollars in legal fees and expenses in discovery and motions practice.  Trial likely will not occur until at least 2021 and appeals would delay a final resolution for another year.

The risks are also substantial.  If the Settlement is not approved, Equifax will surely renew its arguments under Georgia law that there is no legal duty to safeguard personal information after the recent decision in *Georgia Dep't of Labor v. McConnell*, 828 S.E.2d 352, 358 (Ga. 2019), which held under different facts that no such duty exists, and that Plaintiffs have not alleged any compensable injuries. *See Collins v. Athens Orthopedic Clinic*, 347 Ga. App. 13, 16 (2018), *cert. granted* (Apr. 29, 2019) (presenting the issue of whether a data breach victim may

recover damages without proof of actual identity theft).  Even if Plaintiffs prevail on those legal issues, they face the risk that causation cannot be proved, discovery will not support their factual allegations, a jury might find for Equifax, and an appellate court might reverse a Plaintiffs' judgment.

### (2)    The Method of Distributing Relief is Effective

The distribution process, developed with regulators' help, will be efficient and effective.  Class members can easily file claims, but a claim is not needed for identity restoration services.  Documentation requirements are not onerous, and not even required for many benefits. Class members can file claims in the Extended Claims Period to recover for losses that have not yet occurred; and, there is a friendly appeal process if a claim is denied.  (Ex. 3, ¶¶ 39-40)

### (3)    The Terms Relating to Attorneys' Fees are Reasonable

Class Counsel will request 25 percent of the $310 million settlement fund they negotiated in the Term Sheet. This request is consistent with *Camden I Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768 (11th Cir. 1991), which mandates use of the percentage method and noted 25 percent was then viewed as the "bench mark."  Following *Camden I*, fee awards in this Circuit average around one-third. *See Wolff v. Cash 4 Titles*, 2012 WL 5290155 at *5-6 (S.D. Fla. Sept. 26, 2012) ("The average percentage award in the Eleventh Circuit mirrors that of

awards nationwide—roughly one-third"); *George v. Acad. Mortg. Corp. (UT)*, 2019 WL 1324023, at *17 (N.D. Ga. Mar. 20, 2019); Eisenberg, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. LAW REV. 937, 951 (2017) (empirical study showing the median award in 11th Circuit is 33 percent). The fee is also supported by the value of the significant injunctive relief Class Counsel negotiated, as well as the tremendous value conferred on the class. *See, e.g., Camden I*¸ 946 F.2d at 774.

### (4)    Agreements Required to be Identified By Rule 23(e)(3)

The parties are submitting to the Court *in camera* the specific terms of the provisions allowing termination of the settlement if more than a certain number of class members opt out and a cap on notice spending is exceeded. Also, vendors providing services are subject to contracts relating to their obligations under the settlement. These provisions do not affect the adequacy of the relief.

### D.    Class Members are Treated Equitably Relative to Each Other

The proposed class members treat all class members equally. Each class member is eligible to receive the same benefits as other class members and no class members are favored over others. (Ex. 3, ¶ 59)

## II.    The Court Should Certify the Proposed Settlement Class

To issue notice under Rule 23(e), the Court should decide the proposed settlement class likely will be certified. Such a decision should not be difficult.

Settlement classes are routinely certified in consumer data breach cases, as this Court did in approving settlement in *Home Depot*.  *See, e.g., In re Home Depot, Inc. Customer Data Sec. Breach Litig.,* 2016 WL 6902351 (N.D. Ga. Aug. 23, 2016); *In re Anthem, Inc. Data Breach Litig.,* 327 F.R.D. 299 (N.D. Ga. 2018); *In re Heartland Payment Systems, Inc. Customer Data Sec. Breach Litig.,* 851 F.Supp.2d 1040 (S.D. Tex. 2012). There is nothing different about this case, which is demonstrated by examining the requirements of Rule 23(a) and (b).

### A.    <u>The Rule 23(a) Requirements Are Satisfied</u>

*Numerosity:* The proposed class consists of more than 147 million U.S. Consumers, indisputably rendering individually joinder impracticable.

*Commonality:* "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury, such that all their claims can productively be litigated at once." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-350 (2011) (internal citations omitted).  All class members suffered the same injury – exposure of their personal data in the Equifax breach – and are asserting the same legal claims.   Accordingly, common questions of law and fact abound. *See, e.g.*, *Home Depot,* 2016 WL 6902351, at \*2; *Anthem,* 327 F.R.D. at 309.

*Typicality:* This requirement is readily satisfied in data breach cases.  The class representatives' claims are typical of other class members because they arise

from the same data breach and involve the same legal theories. *See, e.g., Id.; Home Depot*, 2016 WL 6902351, at *2.

*Adequacy of Representation:* Plaintiffs do not have any interests antagonistic to other class members and have retained lawyers who are abundantly qualified and experienced, satisfying the adequacy requirement. (Ex. 3, ¶ 59)

### B.   The Requirements of Rule 23(b)(3) Are Satisfied

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members," and that class treatment is "superior to other available methods for fairly and efficiently adjudicating the controversy." One part of the superiority analysis – manageability – is irrelevant for purposes of certifying a settlement class. *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 620 (1997).

*Predominance:* The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." (*Id.* at 623) "Common issues of fact and law predominate if they have a direct impact on every class member's effort to establish liability and on every class member's entitlement to … relief." *Carriuolo v. GM Co.*, 823 F.3d 977, 985 (11th Cir. 2016). Here, as in other data breach cases, common questions predominate because all claims arise out of a common course of conduct by Equifax and the only

significant individual issues involve damages, which rarely present predominance problems. *See, e.g., Home Depot,* 2016 WL 6902351 at *2; *Anthem,* 327 F.R.D. at 311-16; *Brown v. Electrolux Home Products, Inc.*, 817 F.3d 1225, 1239 (11th Cir. 2016) (individualized damage generally do not defeat predominance).

**Superiority:** "The inquiry into whether the class action is the superior method for a particular case focuses on increased efficiency." *Agan v. Katzman & Korr, P.A.*, 222 F.R.D. 692, 700 (S.D. Fla. 2004). Litigating the same claims of 147 million American through individual litigation would obviously be inefficient. The superiority requirement thus is satisfied. *See Anthem,* 327 F.R.D. at 315-16; *Home Depot*, 2016 WL 6902351, at *3.

## III.   The Notice Plan and Administrator Should be Approved

The Settlement is historic, not only because of the relief provided, but because of its unprecedented notice program. Traditionally, notice often consisted of a single letter, which class members frequently discarded unopened as junk mail, and newspaper advertising, which many class members never saw. In recent years, the rules have been broadened to permit electronic and digital notice programs, but their results commonly fall short. The notice program here seeks to improve on these past results by trying something different. (Ex. 4, ¶ 11)

The notice program is outlined above and explained in detail by Jim

Messina, Signal's co-founder.  (*Id.*, ¶¶ 18-44)  The underlying premise is that class members will be more aware of the settlement and their participation rates will increase if modern advertising techniques are properly used to select the most effective messaging and communication outlets. That using these techniques can do better than traditional notice efforts was shown in *Pollard v. Remington Arms Company*, 320 F.R.D. 198, 212 (W.D. Mo. 2017), a case in which Signal was retained to do supplemental notice after the court refused to approve a settlement because three months of direct mail, magazine publication, and social media advertising had resulted in a low claims rate. (Ex. 4, ¶ 16-18).  The success of Signal's supplemental notice program is illustrated by this chart:



Citing Signal's efforts, the court ultimately approved the settlement. (*Id.*, ¶ 17)

Under Signal's plan in this case, by the Notice Date – set 60 days before the objection and opt out deadlines to give class members ample time to consider their options – almost all class members will be exposed to what is expected to be massive coverage of the settlement in television, digital, and print media; more than 75 percent of the class will receive at least one email containing all the information required by Rule 23; at least 90 percent will be reached on average eight times by digital advertisements; and class members less likely to use email or the internet will be reached by radio and newspaper advertising. (*Id.*, ¶¶ 28, 37, 39) All notices will be pre-tested and targeted, their effectiveness monitored on an ongoing basis, and the campaign adjusted to maximize reach and response.  (*Id., ¶* 26)  Further, notice will continue for seven years to remind class members of the available benefits, alert them to deadlines, and encourage claims.  (*Id.*, ¶¶ 41-42)

Rule 23 requires the Court direct to class members "the best notice that is practicable under the circumstances" and specifies certain information that must be included in plain, easily understood language.  Rule 23(c)(1)(B).  The Due Process Clause also requires that class members be apprised of the action and afforded an opportunity to present objections.  *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 812 (1985).  That the Notice Plan satisfies both of these requirements is confirmed by Signal, (Ex. 4, ¶¶ 8-44), and JND, an experienced class action notice provider in

its own right (Ex. 5, ¶ 9, 13), and supported by regulators' involvement.

The Court thus should approve the plan. *See, e.g.,* Rule 23(c)(1)(B) (authorizing notice by electronic or other appropriate means); *Home Depot,* 2016 WL 6902351, at *5 (notice reaching 75 percent of the class through email and internet advertising satisfied Rule 23 and due process); *Morgan v. Public Storage*, 301 F.Supp.3d 1237, 1261-66 (S.D. Fla. 2016) (notice primarily by email and newspaper advertising); *In re Pool Products Distribution Market Antitrust Litig.*, 310 F.R.D. 300, 317-8 (E.D. La. 2015) (email, digital ads, and print publication); *see generally* Federal Judicial Center, "Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide" (2010) (recognizing the effectiveness of notice that reaches between 70 and 95 percent of the class); R. Klonoff, *Class Actions in the Year 2026: A Prognosis*, 65 Emory L. J. 1569, 1650 & n. 479 (2016) ("Courts have increasingly utilized social media … to notify class members of certification, settlement, or other developments").

## CONCLUSION

For the reasons set forth above, Plaintiffs request the Court enter the order proposed by the parties directing the class be notified of the proposed settlement in the manner set forth in the Notice Plan and schedule a final approval hearing.

Dated: July 22, 2019                   Respectfully submitted,


*/s/ Kenneth S. Canfield*
Kenneth S. Canfield
Ga Bar No. 107744
**DOFFERMYRE SHIELDS**
**CANFIELD & KNOWLES, LLC**
1355 Peachtree Street, N.E.
Suite 1725
Atlanta, Georgia 30309
Tel. 404.881.8900
kcanfield@dsckd.com


*/s/ Amy E. Keller*
Amy E. Keller
**DiCELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street
Eleventh Floor
Chicago, Illinois 60602
Tel. 312.214.7900
akeller@dicellolevitt.com


*/s/ Norman E. Siegel*
Norman E. Siegel
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Tel. 816.714.7100
siegel@stuevesiegel.com


***Consumer Plaintiffs' Co-Lead Counsel***

*/s/ Roy E. Barnes*
Roy E. Barnes
Ga. Bar No. 039000
**BARNES LAW GROUP, LLC**
31 Atlanta Street
Marietta, Georgia 30060
Tel. 770.227.6375
roy@barneslawgroup.com

David J. Worley
Ga. Bar No. 776665
**EVANGELISTA WORLEY LLC**
8100A Roswell Road Suite 100
Atlanta, Georgia 30350
Tel. 404.205.8400
david@ewlawllc.com

***Consumer Plaintiffs' Co-Liaison
Counsel***

Andrew N. Friedman
**COHEN MILSTEIN SELLERS &
TOLL PLLC**
1100 New York Avenue, NW
Suite 500
Washington, D.C. 20005
Tel. 202.408.4600
afriedman@cohenmilstein.com

Eric H. Gibbs
**GIBBS LAW GROUP LLP**
505 14th Street
Suite 1110
Oakland, California 94612
Tel. 510.350.9700
ehg@classlawgroup.com

James Pizzirusso
**HAUSFELD LLP**
1700 K Street NW Suite 650
Washington, D.C. 20006
Tel. 202.540.7200
jpizzirusso@hausfeld.com

Ariana J. Tadler
**TADLER LAW LLC**
One Pennsylvania Plaza
New York, New York 10119
Tel. 212.594.5300
atadler@tadlerlaw.com

John A. Yanchunis
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Tel. 813.223.5505
jyanchunis@forthepeople.com

William H. Murphy III
**MURPHY, FALCON & MURPHY** 1
South Street, 23rd Floor
Baltimore, Maryland 21224
Tel. 410.539.6500
hassan.murphy@murphyfalcon.com

Jason R. Doss
Ga. Bar No. 227117
**THE DOSS FIRM, LLC**
36 Trammell Street, Suite 101 Marietta,
Georgia 30064
Tel. 770.578.1314
jasondoss@dossfirm.com

*Consumer Plaintiffs' Steering Committee*

Rodney K. Strong
**GRIFFIN & STRONG P.C.**
235 Peachtree Street NE, Suite 400
Atlanta, Georgia 30303
Tel. 404.584.9777
rodney@gspclaw.com

*Consumer Plaintiffs' State Court Coordinating Counsel*

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was filed with this Court via its CM/ECF service, which will send notification of such filing to all counsel of record this 22nd of July, 2019.

*/s/ Roy E. Barnes*