# Exhibit  4

Declaration of Jim Messina,
Signal Interactive Media, LLC

*In re: Equifax Inc. Customer Data Security Breach Litigation*,
No. 17-md-2800-TWT (N.D. Ga.)

Plaintiffs' Motion to Direct Notice of Proposed Settlement

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| In re: Equifax, Inc. Customer Data Security Breach Litigation | MDL Docket No. 2800<br><br>No. 1:17-md-2800-TWT<br><br>This document relates to:<br><br>CONSUMER CASES |

## DECLARATION OF JIM MESSINA REGARDING
## <u>PROPOSED NOTICE TO PUTATIVE CLASS MEMBERS</u>

1.     I am a co-founder of Signal Interactive Media, LLC ("Signal"), which, subject to the approval of the Court, has been selected by the parties to serve as the Notice Provider in connection with the proposed settlement in this case.  I make this Declaration based upon my personal knowledge, information provided to me by my associates and staff in the ordinary course of business, and information reasonably relied upon by experts in the fields of advertising media and communications.

2.     The purpose of this declaration is to set forth Signal's experience and capabilities; describe the proposed Notice Plan; demonstrate why the plan is the best practicable means of informing class members about the settlement, their

options, and the benefits available to them; and explain how the plan takes advantage of modern techniques routinely used in commercial and political advertising to best target and reach class members and maximize their participation.

3.      The proposed Notice Plan, which is attached as an exhibit to the settlement agreement, was designed by Signal in collaboration with the parties to the settlement and with input from representatives of the Federal Trade Commission and the Consumer Financial Protection Bureau.  JND, the proposed Settlement Administrator and a recognized expert in its own right in the field of providing notice in class actions, also was consulted and has been tasked with certain responsibilities under the plan, including identifying email addresses for class members not maintained by Equifax, transmitting emails to class members, and maintaining the settlement website.

4.      The plan provides for:  (a) individual direct notice via email to all class members whose email addresses can be identified with reasonable effort, as well as follow up emails during the Initial and Extended Claims Periods; (b) a sophisticated digital notice campaign targeted to reach 90 percent of all class members approximately 8 times before the Notice Date and approximately 6 additional times during the remainder of the Initial Claims Period; (c) continuation

of the digital campaign during the Extended Claims Period, which among other things will target class members who search online for help remedying identity theft; and (d) radio advertising and a paid advertisement in a national newspaper to reach class members who are less likely to use email or the Internet.

5.      The effectiveness of the notice campaign – that is, Signal's ability to target notice to class members where they are most likely to see and respond to it – will be enhanced by pre-campaign testing using focus groups and a national opinion survey.  Signal will also continuously monitor the results of the campaign as it is ongoing and use those results to determine which of the proposed email notices and digital advertisements are most effective and which digital platforms are delivering the best outcomes.  And, at the conclusion of the program, Signal will be able to use data analytics to evaluate and report to the Court regarding the effectiveness of the notice efforts.

6.      The Notice Plan described above is consistent with the guidelines issued by the Federal Judicial Center, *see* Federal Judicial Center, "Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide" (2010), providing, among other things, that a reasonable notice program should reach between 70 and 95 percent of the class, that notices come to the attention of the class, that notices are informative and easy to read, and that all of the rights and

3

options are easy to act upon.

7.     The Notice Plan is also consistent with the best practices in the field of consumer outreach, notice, and advertising and is consistent with the "Duke Standards" relating to the means, format, and contents of settlement notice.  *See* Bolch Judicial Institute, Duke Law School, *Guidelines and Best Practices Implementing 2018 Amendments to Rule 23 Class Action Settlement Provisions* (August 2018).

8.     And, perhaps most importantly, the proposed Notice Plan constitutes the best notice practicable under the circumstances and meets all of the requirements of Fed. Civ. P. Rule 23 and the Due Process Clause of the U.S. Constitution.

<u>**Signal's Background and Experience**</u>

9.     Signal was co-founded in 2014 by Matt Garretson and me.  Mr. Garretson is a lawyer who founded the Garretson Resolution Group in Cincinnati, Ohio.  He has extensive experience administering hundreds of complex mass tort and class action settlements over the last fifteen years, spanning dozens of contries and millions of potential class members. In 2016 alone, Mr. Garretson oversaw more than thirty litigation settlement programs, which paid out more than $3.2 billion in claims.  Mr. Garretson's bio is attached as Exhibit 1.

10.     My background is in politics, where over more than 25 years I became an expert in reaching and motivating targeted audiences through mass media.  As President Obama's 2012 campaign manager, I merged media, analytics, and politics in an unprecedented way, focusing on targeted email, social media, and digital messaging.  Google's Executive Chairman Eric Schmidt called it "the best-run campaign ever."  In 2013, I founded the Messina Group.  In addition to serving as a campaign advisor to politicians such as British Prime Ministers David Cameron and Theresa May, my group designs and implements media plans for non-profits and major corporations, ranging from top film studios and publishers to international airlines.  My bio is attached as Exhibit 2.

11.     Our goal in founding Signal was to apply the same techniques used in contemporary commercial and political advertising to the process of providing notice in class actions.  Historically, notice programs in class action settlements often have involved a single notice to each class member with little follow up over time, placement of ads in publications that do not effectively reach many class members, and, even if the programs have a digital component, the results of the digital campaign fall short because of the lack of appropriate targeting and messaging.  We believe that if contemporary developments in the fields of public opinion research and consumer behavior -- including qualitative and quantitative

testing -- are properly used to select the most effective messaging and communication outlets, there will be better notice programs, class members will be more aware about a settlement, and their participation rates will increase.

12.    We use these same techniques in connection with our commercial and political work.  We believe fundamentally that all messages should be tested, re-tested, and refined and targeted effectively for maximum engagement and measurement.  For instance, the same advertisement that works for a 35-year-old mom in rural Ohio likely will not work with a 21-one year single male in New York City.  In this process, we use a few key tactics described below:

- **Focus groups**.  Depending on the project, we choose focus group locations that provide us the most representative sample of our targeted group.  Focus groups enable us to listen to different groups of people, hear their views and – crucially – their language on the topic at hand, and then test different strategic hypotheses and messages with them.  We oversee and view these focus groups in person, working with local facilities. We have built these types of focus groups in many different nations and are accustomed to creating and facilitating groups that capture cultural and regional nuance and that provoke honest and insightful discussion.

- **<u>Surveys</u>**.  In conjunction with our focus groups, we field a messaging survey through multiple modes of contact (face to face, online, and phone depending on what works best in a given environment).  The survey allows us to understand messages that work, as well as how best to target different groups of people.  In addition, it allows us to determine primary news and information sources and better target individual communication channels to subgroups.

- **<u>Data Analytics</u>**.  Understanding the demographics of the target audience is part of our strategy.  To do that, we use data the client has available and information in our proprietary consumer file.  Our consumer file contains over 1,400 data points that are publicly available on over 250 million Americans, including demographic information and consumer purchasing habits based on surveys, credit card transactions, loyalty card information, magazine subscriptions, and other sources.  We match this information to profile our target audience and analyze its demographics and behavior.  This allows us to understand more about the group and reach them more effectively.

- **<u>Digital Advertising and Beyond</u>**.  While the research portion takes place, we simultaneously begin our work online.  One of the keys to

engagement and response is producing the right content at the right frequency. Learning the types of content that resonates with our audience allows us to continually increase engagement and growth. To achieve this objective, detailed content analytics and tests are essential. We do the same type of work through other mediums, including email and newspaper and radio advertising.

- **<u>Message Refinement through Digital Channels</u>**. A testing protocol to measure the effectiveness of different social media messages, messengers, and timing is another key part of our strategy. Facebook, for example, is a very effective tool that allows us to segment our audiences and measure the relevance, sentiment, and engagement around different messages. The results of initial testing provide a clear path forward for the social media strategy, but testing continues throughout the entire campaign. We are continually analyzing what ads work best with what groups and adjusting accordingly.

13.     Signal and its people responsible for the Notice Plan have used the techniques and methods described above in designing and implementing hundreds of media campaigns in our commercial and political work. In so doing, we have supervised over $1.1 billion in paid advertising around the world.

Case 1:17-md-02800-TWT  Document 739-5  Filed 07/22/19  Page 10 of 34

14.     Much of this work is done on a confidential basis and cannot be publicly disclosed.  However, here is one typical example of what we do.  A major American food manufacturing company asked us to develop ad campaigns to targeted audiences so they could learn more about what to say and how to say it, with the goal of finding out how to best get their products into the hands of customers who would most like to have them.  Over the course of four months, our team developed hundreds of ads geared towards dozens of audience groups that we identified through social listening and consumer modeling.  We then targeted the ads among audience groups to determine which were most effective and crafted new ads with identify messages, creatives, and images that proved to be most effective based on specific products and advertising goals.

15.     The techniques we have used in our commercial and political work have been shown to be effective in class action notice programs, increasing class member awareness and participation rates.  The best example is *Pollard v. Remington Arms Company*, 320 F.R.D. 198 (W.D. Mo. 2017), a product liability class action alleging that seven million Remington firearms were defective and posed a serious safety risk.  In preliminarily approving a proposed settlement that provided class members an opportunity to have the defect repaired for free, the court authorized a traditional notice campaign consisting of direct mail, social

media advertising, and publication in consumer magazines that ran for three months.   Only 2,327 class members submitted claims, causing the judge overseeing the settlement, the Honorable Ortrie D. Smith of the Western District of Missouri, to decline final approval of the settlement and order the parties to implement a more effective notice program.

16.   Signal was retained to design and implement the supplemental notice program.  We designed the program using many of the techniques described above, including employing data analytics to define and identify the makeup of the consumers in the class, creating ads targeted to those consumers, and testing the ads among three cohorts of roughly 150,000 potential class members.  Following media testing and court approval, the media effort began on September 19, 2016 and ran through October 23, 2016.   During this 35-day period, class members submitted an additional 8,021 claims (an 118 percent increase in claims over the 35-day period compared to the previous 374-day period) and claims have since grown to more than 26,000, marking a more than 1,000 percent increase in claims over what resulted from the initial notice program.   The effectiveness of the campaign is demonstrated by the following chart:



17.     In finally approving the settlement after the initial results of the supplemental notice program became apparent, Judge Smith emphasized the efficacy of the social media campaign Signal designed and implemented:

> One of the lynchpins of the supplemental notice utilized by the parties was their targeted social media campaign. Through this method of notice, the notice reached more than four million individuals, and the advertisements were clicked more than 375,000 times... Given the popularity of social media in the United States, the use of targeted social media to notify class members was yet another reasonable component of the notice plan... .

*Pollard v. Remington Arms Company*, 320 F.R.D. at 212.

## The Notice Plan Proposed for this Case

18.     Work on the Notice Plan began more that eight months ago.   On November 13, 2018, Signal responded to a confidential request from the parties

soliciting bids for a notice program to be used if on-going settlement negotiations in this case came to fruition.  Our proposal set forth in some detail what we believed would be an effective notice program and the proposal has subsequently been refined a great deal.  In particular, over the past several months, we have spent hundreds of hours working with the parties and other stakeholders to reassess and modify aspects of the Notice Plan, create and revise protential advertisements and other messaging, and otherwise prepare for the plan's implementation. The proposed plan has been vetted by the parties, JND (another recognized expert in the field of class action notice) and consumer experts at the Federal Trade Commission and Consumer Financial Protection Bureau.  I also understand that representatives of the offices of forty-eight State Attorneys General were afforded an opportunity to provide input.

19.    The major elements of the program involve a two-week period of research and testing; direct notice through email to those class members for whom email addresses can be identified through reasonable efforts; digital advertising during the Initial Claims Period through Facebook, Search (Google, Yahoo, and Bing), Twitter, and Display; paid advertising using *USA Today* and radio; and a digital advertising effort during the Extended Claims Period.  Provisions are also

included for additional notice methods, depending on the results of the notice campaign, subject to further approval from the Court.

20.    The program ensures that the class receives constitutionally adequate notice by the Notice Date, which occurs 60 days from the date of the Court's order approving the program.  That will allow class members to timely exercise their options to exclude themselves from the settlement or to object to the settlement if they so choose.  Our intent in continuing to send emails and place digital ads after the Notice Date is to reinforce the earlier notice efforts, remind class members about the benefits available to them under the settlement, and maximize participation by increasing awareness and alerting class members when the claims deadline is about to expire.

21.    All of the forms of notice have been written in plain English and comply with the applicable requirements of Rule 23.

22.    I discuss each component of the proposed Notice Plan in more detail below.

## The Initial Testing Period

23.    Signal will put together a demographic profile of the settlement class using survey data and drawing on the proprietary database of consumer information Signal maintains that I described above.  This database, which

contains consumer information on 201.6 million individuals purchased from Experian, is derived from the  same sources used by Equifax, such as credit card companies, banks, and real estate transactions.

24.    Signal also will convene a series of ten focus groups comprised of a representative cross-section of the class across the country. Each group will last approximately two hours, be professionally moderated, and consist of approximately eight participants. These focus groups will help us understand the demographic makeup of the class; potential class members' level of relevant knowledge, awareness, and interest; and which of the forms of notice approved by the Court are most effective.

25.    At the same time, we will conduct a statistically significant survey of 1,600 class members that will provide further information about the potential class members and, among other things, be of help in identifying what media sources are used across the various demographics, learning which class members are least likely to be found online, and assessing the best way to reach those class members.

26.    Finally, Signal will conduct early testing of the Court-approved ads that we believe will work best based on the focus groups and survey results.  We will also test the proposed subject lines in the Court-approved email messages by sending the emails to a small subset of the class and determining which ones are

most effective in causing class members to open the emails.  Based on the empirical results of those tests, Signal will begin to define and optimize the variables affecting the effectiveness of the various forms and channels of notice.

27.   All of the ads, email subject lines, and content of the emails to be tested are attached as exhibits to the Notice Plan.  If the Court declines to approve any of them, the ones that are not approved will neither be tested nor used in the notice program.

28.   We also intend to test the effectiveness of video ads that can be posted on social media sites.  Use of video is important because it customarily produces higher response rates.  According to comScore, online video reaches up to 95 percent of adults each month.  The scripts for the proposed video ads are included in Exhibit F to the Notice Plan.  Once the scripts have been approved, the video ads will be produced and presented to the parties for their approval.  No video ad will be tested or otherwise used until and unless the finished production has received such approval.

## Direct Email Notice

29.   We will send at least four email notices to the class.  The first will be sent as soon as practical after the order approving the plan is issued and substantially before the Notice Date.  The body of the email will consist of the

short form notice, either in text or text with visual images.  Two other emails will be sent during the Initial Claims Period – one approximately in the middle of the period and the other approximately two weeks before the end of the period.  The purpose of these two emails is to remind class members who have not yet filed a claim of the benefits available to them under the settlement and alert them to the upcoming claims deadline.  A fourth email will be sent at the beginning of the Extended Claims Deadline to inform class members that they have additional time to submit claims for certain future losses.  The content of all four emails is set forth in Exhibit A to the Notice Plan.

30.    Signal has prepared approximately four different subject lines for each of the four proposed emails, which are set out in Exhibit A to the Notice Plan. Each of the subject lines will be tested for effectiveness in the initial testing phase. The results of that testing will determine the subject lines that will actually be used when the emails are sent. We also anticipate running a series of tests with emails sent to different groups to ensure that the most effective strategies are being used to avoid spam filters and increase open rates.

31.    Emails will contain a link directly to the settlement website maintained by the Settlement Administrator, facilitating the ability of class members to access the website and file electronic claims.  The emails will also

contain a link that Spanish-speaking class members may click to access the Spanish-language portion of the website.

32.     The emails will be sent by or under the immediate direction of JND, the Settlement Administrator, to an email list that it will build. Within five days after the order approving notice has issued, Equifax will provide to JND a list of class members, which will include each class member's email address if known or reasonably available to Equifax. JND will then supplement the email list by obtaining email addresses from a third-party vendor and potentially from Signal, which maintains its own proprietary database of consumer email addresses.

33.     Email delivery can fail for a variety of reasons, such as an invalid email address, rejection as potential spam by the recipient's internet service provider, or rejection by the recipient's computer or network filters. JND will employ techniques to attempt to resolve deliverability problems with the emails to be sent in the notice program and use reasonable efforts to obtain updated email addresses for class members whose emails are returned as undeliverable. JND will also take steps to educate class members about the problem of phishing as discussed in the Notice Plan.

34.     I understand that JND, in its declaration to be submitted in connection with the motion seeking approval of the notice plan, will describe in

more detail the email notice program that it will undertake and oversee.

## Digital Notice During the Initial Claims Period

35.     The proposed Notice Plan provides for extensive digital advertising, both before the Notice Date (when it is targeted to reach 90 percent of the settlement class) and continuing throughout the Initial Claims Period.   The potential ads Signal proposes to test for effectiveness and response rates are attached as Exhibit B to the Notice Plan.  The ads that will actually be placed will be chosen based on the testing results -- that is, we will place the ads that are most effective and have the strongest response rates.  Only ads that have been approved by the Court will be tested or used.  Each of the ads will link to the settlement website, affording class members easy access to information about the settlement and the opportunity to submit claims online.  The ads will be translated into Spanish and the Spanish language ads will be placed where appropriate.

36.     Digital media (and, more specifically, social networking sites such as Facebook) offers advanced capabilities over more traditional media forms that affect both efficacy and cost.  While a digital media campaign is underway, we can analyze empirical data measuring reach (the number of people who see an ad), impressions (the number of times the ad is displayed), and response rates (the number of times a viewer clicks on the ad).  Armed with this data, we can adjust

the mix of ads that are being used and where those ads are placed to maximize the effectiveness of the campaign, both in absolute terms and per-dollar spent.

37.    The digital channels to be utilized in providing notice are described below:

- **Facebook and Instagram.**  Facebook (and its affiliate Instagram) will form the cornerstone of the campaign.  It has the most sophisticated targeting capabilities and richest feature set.   Perhaps more importantly, over 200 million Americans use the platform.

- **Twitter.**  Twitter is another effective platform to reach Americans through digital means, particularly key influencers in the mainstream media who have the ability to amplify our notice efforts by reporting on the settlement and thus increasing awareness of the settlement among class members.

- **Google, Bing, and Yahoo Search.**   An effective digital notice campaign should be designed so that class members who are searching online for information relating to the settlement or identity theft can easily find that information and be directed to the settlement website.  The major search engines used by Americans are Google, Bing, and Yahoo.  We will use a cost-effective paid search strategy on

these three search engines to identify class members and notify them of the relevant information they need to be aware of the settlement, understand their options, and submit a claim if they choose to do so. More than any other digital advertising channel, testing and experimentation are critical for paid search.

- **<u>Display Advertising</u>**. Display advertising is an omnibus term for a variety of image, text, and video ads that appear near or in-line with web content.  Display ads are placed at the top of websites (banner ads), overlaid on web-video, alongside news articles, on mobile apps, and on virtually every other place consumers go on the web.  Signal will place display ads relating to the settlement using primarily two online display networks, Google Display Network and Facebook Audience Network.  Signal will ensure display ads do not appear on websites that are sensitive or inappropriate and will take steps to combat artificial traffic, mitigate fraud, and avoid spoofing.

38.	Our target is to create 892 million digital impressions on or before the Notice Date – 333 million on Facebook and related platforms (representing assumed activity of 2.5 impressions per class member at a 90 percent reach); 213 million impressions on Twitter (representing assumed activity of approximately

one impression per class member at a 90 percent reach), and 346 million impressions from display advertising (representing assumed activity of 2.6 impressions per class member at a 90 percent reach). During the remainder of the Initial Claims Period, the target is to create an additional 332 million impressions – 133 million on Facebook and related platforms, 106 million impressions on Twitter, and 93 million impressions on display advertising. Accordingly, the targeted total impressions during the Initial Claims Period will exceed 1.2 billion.

39.    The actual impressions for the specific platforms may differ from these targets because, as described above, the placement of specific advertising will be adjusted by Signal during the course of the campaign.

## **Paid Publication Notice**

40.    In addition to direct email notice and online digital advertising, the Notice Plan provides means to reach class members who may not have ready access to email or be exposed to digital media. Signal will place a full-page advertisement in *USA Today,* one of the three largest national newspapers read by approximately seven million Americans each day. The advertisement will run before the Notice Date. The content of the advertisement is contained in Exhibit C to the Notice Plan. Depending on the results of testing and the empirical data that will be available during the notice campaign, Signal may recommend that the

advertisement be placed in other publications.

41.     Signal will also produce and implement a radio advertising campaign to supplement direct, digital, and paid publication notice in areas with lower digital penetration.   The radio advertising campaign will occur before the Notice Date. The extent and scope of the campaign will be determined based upon the results of the testing phase and the empirical data that becomes available after the notice program begins.   Scripts for the radio advertisements are attached to the Notice Plan as Exhibit D.

### Notice Efforts During the Extended Claims Period and Beyond

42.     Under the settlement, class members will be eligible to submit claims for out of pocket losses that they suffer during the four-year Extended Claims Period if funds remain available.   In addition, class members will be eligible to receive identity restoration services for seven years.   To take advantage of these benefits, class members need to be aware of them.   If the notice program ends with the completion of the end of the six-month Initial Claims Period, class members may not remember or be aware that they have a continuing opportunity to submit claims and get help if they are a victim of identity theft.   For this reason, the Notice Plan proposes to continue the notice program after the end of the Initial Claims Period, although at a less intense level.

43.     During the Extended Claims Period, so long as funds remain available to pay claims, Signal will continue to place digital advertising at a rate of approximately 160,000 impressions per month.  These ads will be tailored to the relief available during the Extended Claims Period.  Also, so long as class members remain eligible for identity restoration services, Signal will conduct a paid search strategy and use other digital means to target potential class members who are victims of fraud or identity theft.  The content for this additional digital advertising is attached to the Notice Plan as Exhibit E.

## Supplemental Notice Measures

44.     Depending on the effectiveness of the notice program in accomplishing its goals and reaching all members of the class as shown by testing and analysis of the empirical data generated during the program, Signal may recommend that supplemental notice efforts be made.  The parties have agreed to consider all such recommendations in good faith and, if they agree with Signal's recommendations, to seek approval from the Court to implement them.

## Conclusion

45.     I am confident that the proposed Notice Plan will effectively reach the settlement class; increase class members' awareness of the settlement, their options, and the benefits available to them; optimize the opportunity for

participation; deliver the best notice practical under the circumstances; and thus satisfy due process and the requirements of Rule 23.

46.     By taking advantage of modern techniques in commercial and political advertising as we have proposed and continuing to provide notice for a period of more than seven years, the Notice Plan substantially improves upon the notice programs that are customarily used in major class actions settlements.  In many ways, the program is unique.  My expectation is that the proposed Notice Plan, after its approval and implementation, will help to set the standard for future class action settlements and, in so doing, contribute to improving the effectiveness of notice programs and increasing claims rates in other cases.

47.     I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.


Signed on July 19, 2019 in San Francisco, CA.


_____
Jim Messina

# EXHIBIT 1

# Bio of Matt Garretson



**Matthew Garretson**

Matthew Garretson received a BA from Yale University, a law degree at Kentucky's Salmon P. Chase College of Law and a Masters in Theology from Chicago Theological Seminary.

Garretson has served as the special master or administrator of settlement funds and crisis response programs through the country in environmental disaster, product liability, civil rights, sexual abuse and other cases.  In this capacity, Garretson has substantial firsthand experience with the design, oversight and/or administration of hundreds of class action and mass tort resolution programs.

Garretson is also the author of a legal textbook published by West Publishing entitled "Negotiating and Settling Tort Cases," in addition to several articles regarding professional responsibility in settlements. He is a frequent speaker at Continuing Legal Education seminars regarding lawyers' professional responsibilities in class action and other mass tort matters, including The American Association For Justice, The American Bar Association, The Rand Corporation, DRI and dozens of state attorney associations.  Garretson also serves as a member of the Advisory Board for Rand Center for Catastrophic Risk Management and Compensation.

Garretson is the co-founder of Signal Interactive Media, a firm dedicated to improving the efficacy of class notice through contemporary data analytics and mass media.

He is also the co-Founder and former CEO of The Garretson Resolution Group, Inc ("GRG"), which provides lien resolution and complex settlement administration services in mass torts.  Garretson led GRG through two separate private equity transactions in 2008 and 2012 and thereafter transitioned leadership to a seasoned management team and exited that business. (GRG ultimately was acquired by Epiq Claims).

When he is not designing or overseeing settlement programs, Garretson spends his time pouring into AmarrasLead.org.  Amarras provides learning management systems for innovators and leaders of non-profit organizations operating in the Dominican Republic and Haiti with an emphasis on improving the well being of vulnerable youth, their families and their communities.

*Experience*

Garretson provides detailed design, coordination and oversight of complex operations in settlements to achieve controlled, predictable outcomes (e.g. notice/outreach, predictive claim progression, claim valuation methodology, settlement program integration and disbursement controls).

Relevant experience in select high profile matters:

 **World Trade Center Disaster Site Litigation** (MDL Docket MC100, MC102 and MC103, United States District Court, Southern District of New York)

 **Deepwater Horizon Litigation** (MDL 2179, United States District Court, Eastern District Louisiana)

 **National Football League Players' Concussion Injury Litigation** (MDL 2323, United States District Court, Eastern District of Pennsylvania).

 **Archdiocese of Louisville** (In re: Roman Catholic Bishop of Louisville, Inc., Jefferson Circuit Court, Louisville, Kentucky).

 **Archdiocese of Cincinnati Claims Restitution Fund**

 **Cincinnati Policing** (Case No. C-1-99-3170, United States District Court, Southern District of Ohio)

 **Zyprexa Products Liability Litigation** (MDL 1596, United States District Court, Eastern District of New York)

 **Vioxx Products Liability Litigation** (MDL 1657, United States District Court, Eastern District of Louisiana)

 **Pelvic Repair System Products Liability Litigation**  [a/k/a Transvaginal Mesh] (MDL 2326, United States District Court, Southern District of District of West Virginia)

 **Avandia Marketing, Sales Practices, and Products Liability Litigation** (MDL 1871, United States District Court, Eastern District of Pennsylvania)

 **Actos Products Liability Litigation** (MDL 2299, United States District Court, Western District of Louisiana)

 **Remington Arms Company** (Case No. 4:13-CV-00086-OD (Western District of Missouri)

 **TK Holdings Inc. (a/k/a Takata Airbags** (Case No. 17-11375, United States Bankruptcy Court, District of Delaware)

*Speaking Engagements (re: Aggregate Settlements, Legal Ethics & Professional Responsibility)*

- AAJ Annual Meeting '03, '06, '08
- AAJ Hormone Therapy '04
- AAJ Mid-Winter '05, '06
- AAJ Weekend with the Stars '06

- AAJ Nursing Home Litigation Seminar '08
- AAJ Ski Medical Seminar '08
- AAJ Winter Convention '08, '13
- AAJ MSP Teleseminar '12
- American Bar Association Annual Convention '15
- Catholic Health Initiatives '08
- Colorado Trial Lawyers Association Winter Convention '09, '12
- Connecticut Trial Lawyers Association '09
- Consumer Attorneys of California '01, '03, '04, '06, '09
- Consumer Attorneys of Sonoma County '01
- DRI Annual Meeting '07
- DRI Mass Torts MSP Webcast '13
- Duke Law Center for Judicial Studies '16
- Florida Justice Association '09
- Georgia Trial Lawyers Association '08, '09
- George Washington University Law School '16
- Hamilton Country Trial Lawyers Association '05
- Harris Martin '13, '15, '15, '16
- Hormone Replacement Therapy Seminar '07
- Indiana Trial Lawyers Association '09
- Kansas Trial Lawyers Association '03, '04, '07
- Kentucky Academy of Trial Lawyers '06
- Kentucky Justice Association '08
- Louisiana State Bar Association Admiralty Symposium '07, '13, '14, '15
- Louisiana Bar Mass Tort Symposium '02, '04
- Louisiana State Bar Assoc. Complex Litigation Symposium '13, '16
- Louisiana Trial Lawyers Association Annual '07
- Mass Torts Made Perfect '03, '04, '06, '08, '13
- Mass Torts Made Perfect Judicial Forum '13
- Mealey's Lexis/Nexis Art of Negotiation '07
- Mealey's Lexis/Nexis Contingency Fees '07
- Mealey's Lexis/Nexis Ethics '07
- Mealey's Lexis/Nexis Client Expenses '06
- Mealey's Lexis/Nexis Emerging Drug and Devices '04
- Mealey's Lexis/Nexis MMSEA '08
- Mealey's Medicare & ERISA Liens: New Developments '09
- Mississippi Trial Lawyers Association '02
- Michigan Negligence Law Section '09
- Michigan Association for Justice '08
- Minnesota Trial Lawyers Association '09
- Montana Trial Lawyers Association '08
- New York Academy of Trial Lawyers '07
- Norfolk and Portsmouth Bar Association '03
- NABIS – Medical Issues in Brain Injury '05, '06, '07
- Ohio Academy of Trial Lawyers Annual '03, '04, '05, '06, '07
- Ohio Academy of Trial Lawyers Subrogation Seminar '06

- Ohio Academy of Trial Lawyers Worker's Compensation '07
- Ohio Association for Justice '08, '09
- Insurance/Negligence Seminar '09
- Ohio State Bar Association Annual Convention '06
- Ohio Trial Advocacy Seminar '04, '06
- Oklahoma Trial Lawyers Association '07
- Perrin Conferences '12, '13
- Philadelphia Assn. for Justice '08
- Plaintiff Asbestos Litigation Seminar '07
- Professionally Speaking Seminar '07
- RAND Corporation '16, '17
- San Antonio Trial Lawyers Association '07
- Society of Settlement Planners '07
- TBI Symposium - Brain Injury Association of Ohio '04, '06
- TPL-COB National Conference '07
- Utah Bar Association Annual Seminar '05
- Utah Trial Lawyers Brain Injury '02, '03, '04, '05, '06, '07
- Utah Trial Lawyers Association Annual Convention '07
- Utah Association for Justice '09
- Virginia Trial Lawyers Association '05

*Publications*

- Negotiating and Settling Tort Cases, ATLA / West Publishing (2007). Updated 2013, 2015.
- A Fine Line We Walk: Counseling Clients About the "Form" of Settlement, 13 A.B.A. Prof'l Law. 4, 2002.
- Don't Get Trapped By A Settlement Release, Trial Magazine, September 2003.
- A Practical Approach to Proactive Client-Counseling and Avoiding Conflicts of Interest in Aggregate Settlements, The Loyola University Journal of Public Interest Law, Volume 6, 2004.
- Deferring Attorney Fees: Is There Now a Critical Mass of Enabling Legislation? Ohio Trial, Volume 14, Issue 2, 2005.
- Making Sense of Medicare Set-Asides, Trial Magazine, May 2006.
- What Does the Ahlborn Decision Really Mean? Ohio Trial, Fall 2006.
- Medicare's Reimbursement Claim - The Only Constant is Change, Ohio Trial, Spring 2007.
- One More Thing to Worry About in Your Settlements: The Medicare, Medicaid and SCHIP Extension Act of 2007, Philadelphia Trial Lawyers Association Verdict, Volume 2007, Issue 6.
- Act II – Reporting Obligations for Settling Insurers where Medicare is a Secondary Payer: The Medicare, Medicaid and SCHIP Extension Act of 2007, May 18, 2009.
- Easing Health Care Lien Resolution, AAJ Trial Magazine, October 2010.

- The Medicare, Medicaid and SCHIP Extension Act of 2007, Section 111 Reporting: One More Thing to Worry About in Your Settlements, March 2012.
- The SMART Act: How a New Federal Law Could Fast Track Your Settlements, 2013.

# EXHIBIT 2

# Bio of Jim Messina



**Jim Messina**

Jim Messina is an internationally recognized expert of reaching and informing target audiences through contemporary mass media.  As President Obama's 2012 campaign manager, Messina abandoned every step of a traditional presidential campaign and merged media, analytics, and politics in an unprecedented way.  Messina's approach to media established the modern presidential campaign—Google's Former Executive Chairman Eric Schmidt called it "the best run campaign ever."  Messina is recognized throughout the globe as a mass media and data analytics expert, and is engaged by several heads of state as well as Fortune 500 retailers across the globe.

Messina and his team have supervised over $1.1 billion in paid advertising across the globe.  Messina has experience in using all contemporary paid, earned, and owned media (including traditional print media and, more notably, contemporary digital media such as social networking using Facebook)..  His group currently designs media plans for political campaigns, non-profits, and leading corporations from top Hollywood studios to international publishers.  During the Obama Campaign, he saved $40 million by applying testing and data analytics to paid advertising.

Messina's "winning formula" is rooted in data analytics.  In developing media plans, his group is guided by the belief that data, analytics, and testing can deliver dramatic improvements in efficacy per dollar.  For example, to identify voters, his team compiled a score between 1 and 100 and predicted the vote for every single registered voter in Ohio—nearly 8 million people.  His ability to test and analyze data enabled him to predict the early voting results within 1 percentage point nationwide, and the total results within .2 percentage points in Florida, a state in which 8.4 million people voted.  As Time Magazine reported, "[A]ssumptions were rarely left in place without numbers to back them up."    Messina defined the modern approach to identify, reach, and effectively engage individuals through political advertising.