1          UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF GEORGIA
2               ATLANTA DIVISION

3

4
   IN RE:  EQUIFAX, INC., CUSTOMER )      Case Number
5  DATA SECURITY BREACH LITIGATION )
                                    )      1:17-md-2800-TWT
6  _____ )

7

8

9

10            Transcript of a motion hearing

11    before the Honorable Thomas W. Thrash, Jr., Chief Judge

12            July 22, 2019; 11:02 a.m.

13                  Atlanta, Georgia

14

15

16

17

18

19  (Appearances on page two)

20

21     Proceedings recorded by mechanical stenography,
    transcript produced by computer.
22  _____

23            Diane Peede, RMR, CRR, CRC
              Federal Official Court Reporter
24          75 Ted Turner Drive, SW, Suite 2194
                Atlanta, Georgia  30303-3309
25

```
1    Appearances:

2    Counsel for Plaintiffs:        Kenneth S. Canfield
                                     Amy E. Keller
3                                    Norman E. Siegel
                                     Roy E. Barnes
4                                    David J. Worley
                                     James Tribble
5

6    Counsel for the Bureau
        of Consumer Financial
7       Protection:                  Akash Desai
                                     Jenelle M. Dennis (phone)
8                                    Richa Dasgupta (phone)
                                     P. Solange Hilfinger-
9                                       Pardo (phone)
                                     Emily Mintz Sachs (phone)
10

11   Counsel for the Federal
        Trade Commission:            Jacqueline K. Connor (phone)
12                                   Anna M. Burns (phone)
                                     Tiffany George (phone)
13                                   Cathlin Tully (phone)

14

15
     Counsel for Defendant:          David Balser
16                                   Phyllis Sumner
                                     Elizabeth Adler
17                                   Robert Griest
                                     Michelle Kisloff
18                                   Edith Ramirez (phone)

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1

2      (Call to the order of the Court.)

3      THE COURT:  Well, based on what happened in this

4  case last week, it looks like the best way for me to handle

5  my cases is simply to leave town, spend a week fishing in

6  Colorado and New Mexico, come back and everything's just

7  resolved.

8      (Courtroom laughter.)

9      THE COURT:  All right.  This is a hearing on the

10  request to preliminarily approve the proposed class action

11  settlement and the Plaintiffs' motion to direct notice of the

12  settlement to the class.

13      First, let me ask counsel for the parties who

14  expect to participate in this hearing to identify yourselves

15  for the record and the parties you represent.

16      MR. CANFIELD:  Good morning, Your Honor.  Ken

17  Canfield, co-lead counsel for the Consumer Plaintiffs.

18      THE COURT:  Good morning, Mr. Canfield.

19      MS. KELLER:  Good morning, Your Honor.  Amy Keller,

20  also co-lead counsel for the Consumer Plaintiffs.

21      THE COURT:  Good morning, Ms. Keller.

22      MR. SIEGEL:  And good morning, Your Honor.  Also

23  co-lead counsel, Norm Siegel for the Consumer Plaintiffs.

24      THE COURT:  Good morning, Mr. Siegel.

25      GOVERNOR BARNES:  Roy Barnes for the Plaintiffs.

1     THE COURT:  Good morning, Mr. Barnes.

2     MR. DESAI:  Your Honor, this is Akash Desai for the

3  United States.  We are local counsel for the Bureau of

4  Consumer Financial Protection, who have filed an action this

5  morning and a proposed stipulated order.

6     Also participating by telephone for the bureau are

7  enforcement attorneys Jenelle Dennis, Richa Dasgupta, Solange

8  Hilfinger-Pardo, and Emily Mintz Sachs.

9     THE COURT:  Good morning, Mr. Desai.

10    MR. BALSER:  Good morning, Your Honor.  David

11  Balser, King and Spalding, on behalf of Equifax.

12    THE COURT:  Good morning, Mr. Balser.

13    MS. SUMNER:  Good morning, Your Honor.  Phyllis

14  Sumner on behalf of Equifax.

15    THE COURT:  Good morning, Ms. Sumner.

16    MS. KISLOFF:  Good morning, Your Honor.  Michelle

17  Kisloff of Hogan Lovells, on behalf of Equifax.

18    THE COURT:  Good morning.

19    All right.  As I said, this is a hearing on the

20  motion.

21    MS. CONNOR:  Your Honor.

22    THE COURT:  Yes.

23    MS. BURNS:  I'm sorry to interrupt.  This is Anna

24  Burns from the Federal Trade Commission participating by

25  telephone, and I believe that we have attorneys in Washington

1  as well participating, if they'd like to introduce

2  themselves.

3           THE COURT:  All right, Ms. Burns.

4           MS. CONNOR:  Good morning, Your Honor.  Jacqueline

5  Connor for the Federal Trade Commission.

6           MS. GEORGE:  Good morning, Your Honor.  Tiffany

7  George for the Federal Trade Commission.

8           THE COURT:  Good morning.

9           MS. TULLY:  Good morning, Your Honor.  Cathlin

10 Tully for the Federal Trade Commission.

11          THE COURT:  Good morning.

12          MS. RAMIREZ:  Good morning.  This is Edith Ramirez

13 on behalf of Equifax.

14          THE COURT:  Anybody else?

15          (No response.)

16          THE COURT:  All right.  As I said, this is a

17 hearing on the request to preliminarily approve the class

18 action settlement of the Consumer Class and the Plaintiffs'

19 motion to direct notice to the proposed settlement class,

20 which is our Docket Number 739.

21          All right.  Mr. Canfield, it's the Plaintiffs'

22 motion.  Are you going to go first?

23          MR. CANFIELD:  I am, Your Honor.  As the Court is

24 aware, but let me be formal about it, on behalf of the

25 parties and all the counsel in this case, I'm pleased to

inform the Court that, subject to your approval, we've agreed to settle the consumer claims arising out of the 2017 Equifax data breach.

The proposed settlement before the Court is historic.  Not only does the class relief dwarf that in any prior data breach case, the settlement creates an unprecedented notice program to engage the class and maximize their participation.

Let me give you the top line numbers.  The settlement creates a non-reversionary consumer restitution fund that will be used to pay cash compensation to class members, provide credit monitoring, and help class members navigate the maze they face when they're victimized by identity theft.  The initial amount of the fund is $380.5 million.

If needed, Equifax will pay up to another $125 million in additional cash compensation.

Equifax will also pay potentially much more if the number of class members who sign up for credit monitoring exceeds seven million.  That amount is uncapped.  So whether people get credit monitoring doesn't depend on an expectation of a low claims rate, and they're not ratcheted down if a lot of people file claims.  If all 147 million class members want credit monitoring, Equifax is going to pay for it.

The settlement also requires Equifax to meet

comprehensive data security standards that will be audited by outside experts, and its compliance will be subject to this Court's enforcement power through a consent order in this court.  And Equifax is required to spend a minimum of $1 billion over five years to improve its cybersecurity.

The total cost to Equifax from the consumer settlement is thus at least 1.38 billion and could be significantly more, depending on the number of class members who choose to participate.

The value of the settlement to class members is much greater.  Just let me give you an example of one of the benefits.

Credit monitoring.  The retail price to a class member, if the class member wanted to go out on the market and buy the same credit monitoring services that are available under the settlement, that price would be roughly $1,920.  So if each class member did that, the total cost for the entire class would exceed $282 billion.

We're here, obviously, for the Court to consider whether to notify the class of the settlement and present their views on whether the Court should approve the proposal at the final approval hearing.

Notice is appropriate if the Court finds it's more likely than not that the settlement will be approved and a class certified and the proposed notice and claims programs

satisfy Rule 23.

If the Court makes those findings, it should issue an order directing notice to the class and setting a final approval hearing.

All counsel who are before the Court today believe that the Court should issue such an order.  And Plaintiffs and Equifax have agreed upon a proposed order for the Court's consideration that was submitted with the papers we filed this morning.

We know those papers were large.  It's another 500-page-plus filing that the Plaintiffs have made.  We're prepared today to walk the Court through the filings to the extent they bear upon the issues that are before the Court for consideration.

Mr. Siegel will cover the history of the negotiations and the terms of the relief.

Mr. Siegel was chair of the Plaintiffs' settlement committee and led the negotiations from our side of the table.  As much as any one person is responsible from the Plaintiffs' side for where we are today, it is Mr. Siegel and his leadership that has brought us here.

I will talk then about the notice program.  Ms. Keller will address the claims and administrations process. And Governor Barnes will finish up with some closing comments, and I'm interested to hear what they are because I

1   have no idea what he's going to say.

2              THE COURT:  He may not either.

3              (Courtroom laughter.)

4              MR. CANFIELD:  I'm sure he doesn't.

5              Before turning things over to Mr. Siegel and with

6   the Court's indulgence, I'd like to share a few personal

7   comments with the Court.  The settlement is the product of

8   negotiations that started soon after the breach was

9   announced.  The process was the most difficult and

10  contentious in which I have ever been involved, particularly

11  over the last few months.

12             At the same time, this case has been one of the

13  most personally rewarding cases in my career.  We have a

14  phenomenal team of Plaintiffs' lawyers, and I didn't

15  recognize it, how good everybody was, until we got through

16  this case.  We've developed tremendous trust in each other,

17  and we have relationships that will last a lifetime.

18             In many ways, we are the proverbial band of

19  brothers and a sister.  And in that regard, the Court may not

20  have been aware, I certainly wasn't, but when you appointed

21  Ms. Keller as co-lead in this case, at 34, she was the

22  youngest woman ever named to the leadership of an MDL.  And

23  based on what's happened since, the Court did not make a

24  mistake.

25             Ms. Keller has done more than carry her own weight.

1    She's done the same job as a lawyer who's nearly twice her

2    age, and in many ways she's done it better.

3          And this Court has also started a trend.  Ms.

4    Keller was appointed to lead the Marriott data breach

5    recently, data breach case in the District of Maryland.  And

6    with her talent, I expect that's just the second of many to

7    come.

8          There was equally a great team of defense lawyers

9    in this case.  We started these negotiations, as I said, a

10   long time ago, and we began the journey with the folks from

11   King and Spalding, and we've gotten to this point with them.

12         And I want to personally commend Mr. Balser, Ms.

13   Sumner, Ms. Adler, and Mr. Haskins, who's not here, for the

14   way they handled this matter.  We had enormous respect for

15   them and their firm before this case started.  Our respect

16   has only grown as a result of the experiences that we've

17   shared.

18         Despite the enormous pressure we were all under,

19   trying to do our best for our clients, particularly over

20   these last few months, the folks at King and Spalding have

21   conducted themselves with the utmost professionalism,

22   cordiality and collegiality.  It's hard to imagine that

23   Equifax could have been represented by better lawyers.

24         With that, Your Honor, I'd like to turn things over

25   to Mr. Siegel to start the deal with the details of the

1  settlement.

2          THE COURT:  Mr. Siegel.

3          MR. SIEGEL:  Thank you, Your Honor.  May it please

4  the Court.  I, of course, join in all of Mr. Canfield's

5  remarks about the process that led us here today.

6          I'm going to turn to a little bit more of the

7  minutia to make sure that we are making our record for

8  Rule 23 purposes, and that will begin with the dreaded

9  PowerPoint, which I promise only to refer to in passing as

10 much as possible.

11         I have a hard copy if you would prefer one.  I can

12 hand it up.

13         (Hands to the courtroom deputy.)  Thank you.

14         As Mr. Canfield started us off, the purpose today

15 is to ask the Court to issue notice.

16         The parties have agreed to a notice order that's

17 submitted to the Court.  I have hard copies here as well.

18 I'm happy to work through the specific elements of that

19 notice order, which I'm going to do in the PowerPoint; but

20 also if there's any questions about any of the paragraphs set

21 forth therein, we'll be happy to address them.

22         In terms of sort of the blocking and tackling of

23 the rule, the first step is to determine in any class action

24 whether notice is appropriate.  That's now bound in

25 Rule 23(e) that says notice is appropriate, again, if it's

more likely than not that the Court will finally approve the settlement as fair, reasonable and adequate and certify a settlement class.

The elements of Rule 23(e)(2), in considering whether the settlement is fair, reasonable and adequate, talks about whether the class was adequately represented, whether the settlement was negotiated at arm's length, whether the relief is adequate, which will be most of my remarks this morning. And as part of that, part C of Rule 23(e)(2), you have to look at the cost, the risk, the delay of trial and appeal, and the method of distribution of that relief, in addition to any attorneys' fees. Finally, whether the class members are treated equitably under the settlement.

So part one under the inquiry in Rule 23, as you'll see in the notice order, is the certification of a class. The class here is quite large, as you know, and it's defined as -- we have it on slide three in the Settlement Agreement, and that is the approximately 147 million U.S. consumers identified by Equifax whose personal information was compromised as a result of the cyberattack and data breach announced by Equifax on September 7th, 2017.

We explain in our papers how this class, as defined, meets the elements of Rule 23(a):  numerosity, commonality, typicality, and adequacy of representation.

It also meets the requirements of 23(b)(3) in that the common issues predominate.  And, of course, it is our view that a class action is the superior way to resolve this complex litigation.

Certifying a class for settlement purposes in data breach cases is quite common.  Your Honor, of course, did it when I stood up here several years ago in the Home Depot litigation.

Judge Koh in Anthem is another good reference point.  Judge Koh just on Friday preliminarily approved and issued the notice order in the Yahoo case.  And Anthem and Yahoo are probably, at least in time and scale, the closest analogs to the case before this Court, and we think certification is therefore appropriate as part of the preliminary process.

All right.  The second element of Rule 23(e) talks about whether the relief is adequate and the Court's finding ultimately that it is more likely than not that the settlement and final approval will be determined to be fair, reasonable and adequate.

And we want to walk through the process because, as Mr. Canfield alluded to, it was a lengthy one.  It was arduous.  It was contentious but always professional.  But in the timeline, we think that the end result really burnished the quality of the result here.

1     What we wanted just to lay out here in a very

2 general way was the last 16 months or so, 18 months from when

3 Equifax announced the breach in September of 2017.

4     You'll notice there in late fall of 2017, before

5 the case was transferred, we actually had our first mediation

6 with Judge -- retired Judge Layn Phillips.  Judge Phillips,

7 as we explain in our papers, is a very experienced mediator,

8 a former federal judge in Oklahoma who has great experience

9 in the data breach field, including mediating Anthem.

10     We discussed early on in the case whether there was

11 a path to resolution, even before the JPML heard the case and

12 decided to send it to Your Honor, and we had these

13 preliminary discussions and part of those preliminary

14 discussions and that first mediation back in November of 2017

15 centered around what we crafted our demand, our structure for

16 settlement, and that structure for settlement essentially had

17 three top-level buckets that Mr. Canfield alluded to.

18     One is a cash fund that would pay for out-of-pocket

19 losses associated with the breach, but also pay for lost

20 time.  And I'll get into that in a little more detail.

21     The second bucket dealt with the provision of

22 providing a monitoring service and a quality monitoring

23 service for each and every one of the 147 million class

24 members who are victims of the breach.

25     As another component of that, we wanted restoration

services.  And the difference there, as I'll explain, is restoration services are available to the entire class, whether or not they sign up for monitoring.

And then the third bucket, as Mr. Canfield mentioned, were these business practice changes.  We knew from day one post-announcement, once these cases were filed, that trying to figure out a way to try to work with Equifax, work with our own experts to figure out how we can have a structure to this settlement that would ensure that we do whatever we can do as civil litigants to make sure a breach like this does not happen again at Equifax, and that was a core goal of ours from day one and certainly was part of what we were proposing in that first mediation back in November of 2017.

As I'll explain, all of those elements carried through the previous two years leading to the settlement that's being presented to the Court today.

If you skip ahead to that January 2018 time frame, after the panel sent the case to Your Honor, as Mr. Canfield alluded to, there was an appointment order.  The appointment order we think at the time, but as Mr. Canfield said, in hindsight, put together probably the best lawyers in the field for a data breach case.

We have the leaders of the Anthem data breach case, which several of us were involved in, but led by Andrew

1    Friedman, who was lead counsel.  We had John Yanchunis, who

2    led the Yahoo case, which was approved just Friday, and

3    several others that had a very deep background in litigating

4    and settling data breach cases, figuring out what the relief

5    clients wanted in response to an event like this.  Those

6    resources were pooled to begin a very, very rigorous,

7    in-depth case investigation.

8         We engaged the best experts in the field related to

9    damages, data security, monitoring products, to make sure

10   that when this day came today, we'd be prepared to tell the

11   Court that we were delivering the best data breach settlement

12   that we were able to, and hoped to top those that came before

13   us, which is exactly what we've done.

14        Your Honor knows that in May, we filed the 559-page

15   Consolidated Amended Complaint.

16        I note our papers -- this is not intentional -- in

17   support of this settlement was only 554 pages.  So we were

18   five pages short of the Complaint.  But I do think it speaks

19   to the scale of this litigation.  Right?  The size of the

20   Complaint was driven in large part by the factual record we

21   were able to develop.  Of course, the number of plaintiffs

22   from each and every state and the settlement meets that

23   scale.  It's, as we've said several times already, the

24   largest data breach settlement recorded to date.

25        That, of course, led to Equifax filing their

1    motion.  And as the Court is well aware, there was full

2    briefing on the motion to dismiss.  Throughout that period we

3    continued to try to mediate the case with Judge Phillips

4    through the summer and into the fall of last year.

5            And then we argued those cases in December of last

6    year and the parties were still very far apart.  In Judge

7    Phillips' declaration, which is attached to our motion, he

8    explains the fits and starts, the progress of the good-faith,

9    arm's-length negotiations, but ultimately the really stalling

10   out when we came here and argued those motions, and we

11   continued to talk.

12           I directed dialogue with the King and Spalding

13   lawyers, including Mr. Haskins, who's not here today, to try

14   to keep a little fire, a little flame there to hope we can

15   try to resolve the case, but it was clear that we would need

16   an order from Your Honor, which we received in January of

17   2019.  That did a couple of things.  One is it allowed us

18   under the Northern District rule to have full-on discovery.

19           We received an initial 500,000 pages, which we

20   reviewed.  We started scheduling depositions.  We looked at a

21   ton of documents that were in electronic form outside of that

22   production, and continued to dialogue about potential

23   settlement.

24           Now, this entire time, in the context of

25   settlement, we had -- in addition to all the mediations you

see on the timeline, we had just scores of conversations, meetings, meetings in Atlanta with Equifax's counsel, our technical experts, their technical experts, again, all in an effort to reach the day where we could reach a final settlement agreement.

In March of this year, the parties agreed to mediate for a fifth time before Judge Phillips.  We had a lengthy meeting the night of the 29th to try to resolve many of the business practice terms, and then we spent the day on the 30th working diligently on the monetary terms.

And we executed on March 30th, 2019, a binding term sheet, an enforceable settlement with Equifax to resolve this litigation.  That contained all of those elements, those three buckets that I explained from the start and put us in a position to enforce that deal as to Equifax.

We also agreed that we would listen to and consider any proposals by the federal and state regulators that were also looking at Equifax and their conduct related to this breach.

And so we had an enforceable agreement.  A component of that agreement was we would consider, but were not obligated, to take on any provision suggested by the regulators and that's what happened.  The regulators made several proposals.  We accepted some, rejected others.  It was all in the construct of our settlement and the three

buckets.

But because we did not agree on everything squarely and the regulators weren't participating in our negotiations, that led to an extended period since March, where we were negotiating now with the regulators and Equifax, and ultimately had several meetings in Washington, D.C., with many of the folks on the phone, productive conversations but difficult ones because there were new discussions of terms, some of which, as I said, we readily accepted, others which needed a little more refinement before we viewed them in the best interest of the class.  But those discussions and the regulators on the phone were quite helpful in bringing the final resolution to the case and the settlement that is in front of the Court.

I should also mention the idea of going to the regulators, even though they do not have a case on file. It's not a situation where there's a regulatory action that is filed, like an antitrust case and then a civil lawsuit that files it.  It's perhaps a little bit of the reverse, at least from our perspective.  We were aggressively litigating the case, reached the settlement in March, and then began this discussion with the regulators.  And I think that kind of construct is contemplated by the Federal Judicial Center pocket guide, which talks about inviting the regulators' opinions on class action settlements.

1          So we were happy to have their input and, as I

2     said, quite pleased that we were able to work out our

3     differences and reach the settlement presented to the Court

4     today.

5          So I'm going to skip over slide five, for the most

6     part.  These are the top line numbers that Mr. Canfield

7     mentioned:  A $380.5 million fund, an additional $125 million

8     available for out-of-pocket losses.  Again, all in the

9     framework we set out in the fall of 2017.

10         The settlement achieves the litigation goal of,

11     again, securing that monetary relief for out-of-pocket losses

12     but also time spent.  It achieves the goal of providing

13     really credit monitoring, robust credit monitoring.  As Mr.

14     Canfield said, that the cost to Equifax could go

15     significantly higher if everybody signs up for this

16     monitoring.

17         So anybody who can hear my voice, that is the best

18     way, in our view, to make the best of this settlement is to

19     take this quality monitoring that's provided under the

20     settlement.  And as Mr. Canfield said, if sign-ups exceed

21     seven million people, Equifax may have to pay additional

22     funds for folks who sign up in excess of seven million.  We

23     certainly hope that's the case.  As Mr. Canfield will talk

24     about in a little bit, the notice program, we think, will

25     help drive those claims.

1          The settlement also provides alternative relief.

2    If somebody has monitoring and they just like it and don't

3    like what we're offering, they can make a cash claim in lieu

4    of monitoring for $125.

5          The settlement also achieves the litigation goal of

6    providing that seven years of access to identity restoration

7    services.  Again, this is a critical component, in our view,

8    because it allows class members to access a call center if

9    they do have an event two years down the line, three years

10   down the line, five years down the line, even if they don't

11   make a claim and even if they don't sign up for credit

12   monitoring.

13         So if those folks do have an event, they're going

14   to be able to contact somebody to help them with assistance

15   with any sort of identity theft or fraud issue.

16         The next bullet point is the business practice

17   changes.  I mentioned that we engage an expert.  Her name is

18   Mary Frantz.  I'll talk about this in a little more detail,

19   because it was such a critical component from day one.

20         We have very specific obligations and undertakings

21   for Equifax.  As part of that, as Mr. Canfield said, they're

22   obligated to spend a billion dollars to meet those standards.

23   Spend more, if necessary, but we also have a consent order,

24   as I'll walk through as well, that attaches to those business

25   practices changes mandated by the agreement.

1          As a result of this process, the components of the

2     relief I described and I'll go through in more detail, the

3     notice plan in particular, the claim form, the settlement

4     website all received input and support from the Federal Trade

5     Commission, the CFPB, and the attorneys general from forty-

6     -- it's actually 48 states, two territories.

7          Finally, and again from class counsel's perspective

8     critically, this settlement has been approved by settlement

9     class representatives from every state.  There were two we

10    could not get ahold of.  So nobody has opposed it.

11         There is one that we just got ahold of this

12    morning, Margaret Hinkle, who we will add to Exhibit 10 as a

13    settlement class representative who supports this agreement.

14         Let me break down a little bit further these three

15    buckets.  The first bucket is this monetary bucket.  So just

16    graphically, Your Honor, any claimant can make all the claims

17    you see there on slide seven up to $20,000 for out-of-pocket

18    losses, $500 for lost time, the ten years total of credit

19    monitoring, and then seven years of restoration services.

20    And then in terms of what can be in that $20,000, it's

21    anything tethered to the breach.  So this is a non-exclusive

22    list here on slide eight.

23         If you spent money freezing or unfreezing your

24    credit, if you purchased credit monitoring in response to the

25    breach, if you have unreimbursed costs because of identity

theft or fraud following the breach, sort of associated miscellaneous expenses responding to the breach, professional fees, and then 25 percent of any Equifax product you purchased.

Now, again, this is a non-exclusive list, and the reason we set it up as a non-exclusive list is we don't know every category of damage that folks may have related to the breach, either to date or in the future, and therefore wanted to make sure this was open-ended.  As long as it's fairly traceable to the breach, folks will be able to make that claim, again, up to $20,000.

So this is also controlled by a claims protocol that we worked on with the regulators -- this is Exhibit 9 to the Settlement Agreement -- which really explains the open-ended nature of that claims process.

The second significant component of this ability to make a claim that I mentioned is time.  Your Honor, when we started doing these data breaches, for me probably with the Target data breach, the main complaint people have is, "I'm not really out of pocket dollars.  I am out of pocket time. I've spent a lot of time dealing with this, and that is my harm."

So we have in this settlement the ability for folks to claim up to 20 hours of time associated with dealing with the breach.  Half of that time can be self-certified and

doesn't require documentation.  And I included a quote from Judge Bredar, who's the chief judge in the District of Maryland.  I had a much smaller, 60,000 class member data breach settlement before Judge Bredar that was finally approved last week.  This was a class of eye doctors.  The testing organization lost its data.  They had a breach of sensitive information.

We had a time component, and he latched onto this. And I do think it conveys probably as good as anybody that the concept of time, that recovery for time dealing with the data breach is beneficial for those who often have little in the way of out-of-pocket losses but who are required to spend tremendous amounts of time dealing with the effects of the data breach. Again, this is another element that we think makes this settlement truly historic.

The second bucket is the credit monitoring.  Again, four years of Experian, three-bureau monitoring, six years of single bureau provided by Equifax.  The elements of those are in Exhibit 4 to the Settlement Agreement.

We attached to our motion the declaration of James Van Dyke, who explains why this monitoring service in particular meets the needs of this class.  This is, again, a high-quality product that we want every single 147 million class member to sign up for because it is a great value and does really address the harms related to what was compromised

1    in this breach.

2            And, again, if class members already have another

3    product and they want to make an alternative claim for cash,

4    they can claim $125.  If we stay on course and we're able to

5    get this settlement approved finally by the end of the year,

6    that would basically provide monitoring for a decade through

7    about 2023.  Again, historic relief.

8            The identity restoration services.  Again, I

9    mention that's just the access to the call center for the

10   next seven years.

11           Let me explain a little bit about the claims

12   periods.  The initial claims period is six months.  So folks

13   will have six months to sign up for the credit monitoring

14   product.  If you sign our order today -- I hope I'm not being

15   too presumptuous, but the claims would start immediately.

16   The website is ready to go.  We have spooled everything up

17   and it is ready.  Operators are literally standing by, if

18   Your Honor sees fit to sign the order.

19           But that period when you do sign it will start the

20   six-month period.  If there's funds left over at the

21   conclusion of that six-month period, there will be an

22   additional four years extended claims period for folks to

23   make claims for out-of-pocket losses and time.

24           If there's still money left over four and a half

25   years from now, we have specifically addressed how that money

will be spent and distributed.  First, it'll go for identity restoration services, extending that seven-year period up to ten years.  So that would be through about 2030.  And then it would add additional monitoring.

I'm sorry.  I need to correct the record.  The first step is it removes the caps on time and alternative compensation, which are at 38 and 31 million dollars, respectively.  So if there's money left over after that period, those caps come up first.  Then the identity restoration addition, followed by the additional monitoring.

The third bucket, which I've already touched on, is the data security and business practice commitments.  This is, again, a critical component.  Mary Frantz, our expert, has submitted a declaration explaining the importance of these modifications.  This is Exhibit 6 to our memorandum.

The specific obligations of Equifax are set forth in Exhibit 2 to the Settlement Agreement.  And the specific elements are also contained in a proposed consent order that is Exhibit 3 to the Settlement Agreement.

And you can see there on slide 14 some of the things for which we negotiated, again with the significant assistance of a very, very well-known, highly-trained technical expert, to address vulnerabilities that Equifax had in data security.

And the purpose of the obligations under the

1   Settlement Agreement, contractual but also this consent

2   order, is to give that some teeth.  We want to make sure

3   that, again, as civil litigants, we are doing everything in

4   our power to make sure that the class is protected from

5   another data breach.  And through Ms. Frantz's assistance,

6   and her declaration explains it in technical detail, why

7   these changes are so important.

8          And we appreciate Equifax's willingness to engage

9   in that and ultimately agree to these changes.  I think they,

10  too, agree that changes needed to be made and are taking

11  those on.

12         So the collection of relief here, Your Honor,

13  again, truly, truly historic.

14         We've attached to our papers as Exhibit 3 a

15  declaration from counsel, and the exhibit to that exhibit is

16  a chart of data breach cases and how they were resolved with

17  claimants in excess of ten million.

18         And if you look at that on any level, on any

19  metric, this settlement that we're presenting to the Court

20  today is larger by several orders of magnitude; and as Mr.

21  Canfield's opening remarks made clear, we're very proud of

22  the result and think that the class will be substantially

23  benefited by the settlement.

24         The last slide in my presentation is service awards

25  and attorneys' fees.  This is another component of Rule 23(a)

consideration.  The last point is probably the most
important, which is we will need to make a separate
application, which we will do at least 21 days before the
objection deadline.

        The fees that we will seek is up to the amount
agreed to in the -- or Equifax has agreed not to oppose in
the agreement we struck at the end of March.  It is tethered
to our agreement before any involvement of any regulators.

        And we will also seek 21 days before the objection
deadline service awards for all those class representatives
that step forward.

        If Your Honor does not have any other questions on
the substantive relief, I'd like to hand it back to Mr.
Canfield, who will talk about the notice program.

        THE COURT:  All right.  Thank you, Mr. Siegel.

        MR. SIEGEL:  Thank you, Your Honor.

        THE COURT:  Mr. Canfield.

        MR. CANFIELD:  Your Honor, the parties have
presented the Court with a notice plan that we believe and
the experts agree satisfies all requirements of due process
and Rule 23.

        The plan was originally developed by class counsel
and the designated notice provider, Signal Interactive Media,
and it was refined in cooperation with Equifax and consumer
experts at the FTC and CFPB.

The plan is set out in detail in Exhibit 6 to the
Settlement Agreement and explained in further detail by
Signal's co-founder Jim Messina in a declaration that's
attached to the briefs that Plaintiffs filed this morning.

The notice program that we're presenting is really
a first-of-its-kind effort.  Oftentimes in class actions,
traditionally the notice programs haven't been particularly
effective, and the problem seems to be getting worse as
people are changing how they get their information.  Mail and
postcards often are discarded, unopened as junk mail.  Class
members may never see newspaper ads.  And while courts are
increasingly approving digital notice efforts, the results
commonly fall short.

A lot of notice efforts have drawn criticism,
judicial criticism because the claims rates have not been
large enough to indicate that the class was really engaged.

The notice plan that we're proposing tries to
improve on past efforts by trying something different, and
the underlying premise is that class members can be better
engaged and claims rates will increase if modern technologies
developed in commercial and political advertising are applied
to the world of class actions.

These key techniques involve the use of focus
groups, national surveys, opinion surveys to find out where
people in the class get their information and what messaging

works for particular class members.  The same message is not going to engage a single woman in New York City in the same way that it might a rancher in the rural part of Texas.

Once that initial qualitative research has been done, the messaging is then going to be tested by sending it out to small subsets of the class and, through empirical data, finding out what works with particular people, and then based on that information, a classwide notice program will be launched and Signal will continue to monitor empirical data about what's happening and what isn't, and then adjust the messaging and the targeting and where ads are placed, as needed, to try to improve the results.

There is a real-world example that shows these techniques can work, and that is the case called Power versus Remington Arms.  And in that case, the Court preliminarily approved a settlement and authorized a three-month traditional notice campaign that involved direct mail, magazine publication and social media publication.

After those three months, the claims rate was so low that the Court declined final approval and ordered supplemental notice.

Signal was retained by the parties to do that supplemental notice, and using some of the same techniques that we propose to be used here, they did the supplemental notice.

And this chart that is up on the screen now shows what the impact of the kind of techniques that we're proposing to use here can have.  And if you see that along this timeline, the blue line shows the number of claims that were filed over a period from May to December.  And in the traditional notice period, there were relatively few claims.

At the time, the Court declined to approve the settlement and implemented the supplemental notice program. As Signal was going through its testing to figure out which messages work, you can see there's a little bump in the claims rate; and then when they implemented their full media campaign, claims skyrocketed.

So we believe these techniques will work and that we hope that they will have the same kind of impact in this case as they did in Remington.

Now, under the notice plan in this case, there are essentially two notice periods.  The first one is what happens by the notice date, which is a date 60 days before class members have to object or opt out, so that class members are informed about the settlement and they have an ability to decide whether they want to object or opt out.

In that first period, before the notice date, e-mail notice will be sent to all class members containing all of the information that Rule 23 requires, and as I say, that e-mail will be sent to all class members whose e-mail

1    addresses can be identified through reasonable efforts.

2         Equifax has many.  JND, the settlement

3    administrator, will be getting those e-mail addresses from

4    Equifax, and then from commercial sources buying e-mail

5    addresses for as many class members as can be obtained.

6    Signal also has a proprietary database of e-mail addresses

7    that will be used in the effort.

8         The record that we've submitted shows that JND

9    expects that they will get e-mail addresses for at least 75

10   percent of the class.  That's all they would commit to in

11   their declarations, but we anticipate that they will get a

12   higher percentage.

13        So that's the first e-mail before the notice date.

14        In addition, Signal is going to do an aggressive,

15   comprehensive digital advertising effort on Facebook,

16   Twitter, Instagram, Google, Yahoo and other programs or

17   platforms.

18        This plan is designed so that in that first initial

19   notice period, 90 percent of the class will be reached

20   through this digital advertising on average eight times.  And

21   some of that advertising is going to be videos.  There will

22   be clips that people can click on so that there will be an

23   actor and he'll explain something about what's going on.  And

24   the research shows that people respond a lot better to video

25   than they do to some ad.

And the important thing about both the e-mail and the digital noticing campaign is that a class member who gets an e-mail or sees an ad on Facebook can just click through, right through that ad straight to the settlement website and file a claim electronically.  So we've made that part as easy as possible.

The next thing that will be done before the notice date is that there will be radio, a national radio advertising campaign and some newspaper advertising to reach class members who don't use e-mails and have a digital -- don't have a digital presence, and that's one of the things that the focus groups and opinion survey will do is to identify those people and figure out where they get their information.

Now, layered on top of this plan is the immense coverage of the settlement that we expect is going to occur on national and local television, digital platforms and print media and --

THE COURT:  This is starting to sound like a presidential campaign, Mr. Canfield.

MR. CANFIELD:  We hope that -- it's not going to be that big, but we are trying to make a splash with the notice program, Judge.

I think it's safe to say that by the notice date, there will be few class members who have not heard about the

1    settlement.

2            After the notice date, during the initial claims

3    period that will run six months from when the Court enters

4    its preliminary approval order, the outreach program will

5    continue.  Class members will receive at least three

6    additional e-mails:  One midway through the initial claims

7    period;

8            One towards the end that's basically a reminder and

9    says the deadline's running out and you need to file a claim;

10   and,

11           One at the beginning of the extended claims period

12   to inform class members that that period is starting and to

13   let them know about their continuing ability to file claims.

14           Although less intense, digital ads will continue to

15   run through the initial claims period.  Again, it's designed,

16   the digital campaign, to reach 90 percent of the class an

17   average of six times.  So that by the end of the initial

18   claims period, 90 percent of the class will have been reached

19   on average 14 times through this digital program.

20           Mr. Siegel referred to the approval of the

21   preliminary -- preliminary approval of the Yahoo data breach

22   settlement that occurred in the last few days.

23           I haven't had a chance to study the Court's order

24   in that case, but my understanding is that the notice program

25   that she approved involved a similar use of e-mail and

digital, but the digital plan was designed to reach only 80

percent of the class an average of three times; and the

messaging was not going to be developed, tested and targeted

in the way that Signal is doing, and which we believe will

significantly enhance class member participation.

The digital advertising effort will continue after

the end of the initial claims period, although on a much,

much less intense basis.  In fact, the digital ads will

continue right up until the time that credit monitoring -- or

the identity restoration services are available to class

members.

And to give you an example of how Signal intends

that it would work, five years from now if somebody is a

victim of identity theft, they are unlikely to remember,

"Hey, five years ago I was told that if that happened to me,

I could go -- I had this service available that I could

consult with to help me navigate the process."

So they may go online and enter something like, you

know, "How do I deal with identity theft?"

If they do that on Google or Yahoo or some of the

other search engines, websites, there will be some digital

advertising that pops up and it says, "As a result of this

Equifax data breach settlement, you're eligible for free

services."

So we think that would be something that would be

useful to the class.  All of the proposed e-mails and advertisements that Signal will use are attached to the notice plan.  There are a lot of them.  It may be that Signal doesn't use them all.  It will depend on what the testing results show.

But no ads will be used for either testing or for actual sending to the class unless they have been approved by the Court.  And all of the parties have approved these ads. They have also passed muster with the federal regulators.

We're proud of this plan.  It took a lot of work. And while it's new, the Court can also -- and you have an attestation from Signal that it satisfies all due process requirements.

It's also been blessed by JND, the settlement administrator, which is a widely regarded, traditional notice expert in its own right that has handled hundreds of notice campaigns in traditional class actions.  And JND has submitted a declaration saying the notice plan meets all standards.

So we believe it will help set the benchmark for notice programs in future class actions, and we ask that it be approved by the Court.

And let me -- since I've got this PowerPoint that Mr. Siegel put together, we have some examples of the kinds of ads that will be used and tested, and these examples give

1    the Court some idea of how the ads differ.

2              So, for example, this ad that is up now is the kind

3    of ad that would be on Facebook and it tells the viewer that

4    their information may have been impacted by the data breach

5    and says, you know, find out if your information was

6    impacted, and they can click to see if they're a class

7    member.  That's one way to try to reach the class.

8              Another way is the next example, and another --

9    this is another example of a Facebook ad.

10             And you can see that instead of asking a consumer

11   whether they should click through to find out whether they're

12   a class member and doesn't really say much about the

13   settlement, it starts out with the description of the amount

14   of the fund, which may attract the attention of a potential

15   class member in a way than an ad that doesn't have that kind

16   of information wouldn't.

17             And you can see again it has a directive to claim

18   your class-action benefits under the proposed settlement, and

19   they can click right onto the settlement website.

20             And these other ads are similar examples.  The one

21   on -- that I have up on the screen now is an example of the

22   kind of ad that would be used as the deadline is approaching

23   at the end of the initial claims period and it informs the

24   class member that time is running out, and if you want to

25   make a claim, they need to do it now.

1          And then I thought I would give the Court some

2     sense of the kind of ads that when somebody goes online and

3     they're searching, there are ads that pop up.  These are

4     examples of banner ads, and as you can see, it has a little

5     bit of information about the settlement, designed to attract

6     the attention of the class member and cause them to click

7     through to get to the settlement website.

8          So that's basically the notice program, Judge, and

9     we urge the Court to approve it.

10          THE COURT:  Thank you, Mr. Canfield.

11          Ms. Keller.

12          MS. KELLER:  Good morning, Your Honor.  Amy Keller,

13     again, co-lead counsel for the Consumer Plaintiffs in the

14     Consumer Class Action.

15          Before I begin, I wanted to echo Mr. Canfield's

16     comments, and would add that being on this team and

17     representing the 147 million consumers affected by the data

18     breach has been probably the highest honor that I've had in

19     my life thus far.  So I would thank the Court for putting

20     together the team that it did and trusting us with the

21     important representation task that we have before us.

22          I also would like to address the Court in support

23     of the settlement and talk about briefly the claims

24     administration process.  It was important to us, Your Honor,

25     if we were negotiating settlement that had incredibly robust

benefits for the class and a really innovative notice program that had a targeted notice plan that would reach the class, that the consumers would actually be able to take advantage of those benefits and use a claims program that was easy to navigate, easy to explain, and easy to take advantage of.

We submitted bids to settlement administrators across the country, and it was subject to a highly competitive bid process. Given the nature of the case, of course, we were concerned about security. And JND has undergone rigorous reviews of its systems privacy policies and procedures; and based upon what we learned from JND, the parties were confident in supporting proposing their appointment to the Court as the claims administrator.

JND has been working very closely with Signal to develop a notice plan to ensure that not only does the class get e-mail notification of the settlement, but also that JND uses its expertise to approve what Signal is doing as well.

So as Your Honor heard from Mr. Canfield, JND will be responsible for sending out the notice to the settlement class members, which they have conservatively estimated they would be able to get the e-mail addresses from 75 percent of those class members. We anticipate, Your Honor, as Mr. Canfield said, that that number will go up significantly after JND has an opportunity to really dig into the class list and use third-party data courses to build out that

1    e-mail list.

2           As of right now, Your Honor, we have asked JND to

3    put up a landing page website available to informed consumers

4    before preliminary approval about the details of the proposed

5    settlement.

6           We are, as we speak right now in this courtroom,

7    working out the details of that landing page, and the parties

8    have been very hard at work to ensure that as much

9    information is available to consumers as possible, and that

10   process is an ongoing process, Your Honor.

11          As soon as preliminary approval is granted, Your

12   Honor, we will work to put up a full settlement website as

13   soon as possible following preliminary approval.  That

14   website will also be available in Spanish.

15          Recognizing the importance of security, Your Honor,

16   class counsel went out and purchased approximately 100

17   similar website URLs before this -- before we even

18   contemplated settlement in order to ensure that in the

19   future, spoofing and fraud attempts could be mitigated.  And

20   we're working with the regulators, including the FTC and the

21   CFPB, to identify any spoofing websites so that we can track

22   those very carefully and very clearly.

23          Your Honor, the website, the full website will be

24   up throughout the claims process.  So not only the initial

25   claims period but the extended claims period.  And then

beyond that, Your Honor, the website will be up to explain to consumers how they can take advantage of the identity restoration services.

It's important to us, Your Honor, that the consumers have a place where they can go where they can always receive information about the settlement, and we are prepared to ensure that the website stays updated with the information that consumers need.

As part of the settlement, Your Honor, we worked very closely with Equifax, JND and the regulators, who are on the phone now, to develop a claim form that was easy to understand and complete.

The claim form that you have attached to the filings we put before you, Your Honor, it's Exhibit 8 to our Settlement Agreement, will also be available online and optimized for mobile devices.  That means that if you're waiting in line at Starbucks for your coffee, you can file a claim for this settlement, Your Honor.  It is that easy to use, at least we hope.

There's also a look-up tool, Your Honor, that would allow class members to determine whether or not they were impacted by the initial data breach.  The look-up tool, JND worked very closely with Equifax to utilize their technology and to pull from Equifax's sources the class list using that technology so that class members could determine whether or

not they were impacted by the breach before they could make a claim.

The website also contains the ability for consumers to track the status of their claim so that they can see whether the claim was submitted, whether the claim was rejected, and how they can go about fixing that, or whether the claim was approved.

If a claim is rejected, Your Honor, attached to Exhibit 9 of the settlement agreement is a claims protocol. We negotiated that, Your Honor, with Equifax as part of our Settlement Agreement; and we took input from the regulators, including the CFPB, the FTC, and the state attorneys general to make sure that the claims protocol was as transparent as possible and that it was consistent and also allowed for cases -- close calls, Your Honor, where claims might be submitted right around the deadline or maybe not enough information was submitted, so that we could figure out what to do with those claims and treat everybody in the class fairly.

JND will use that claims protocol in processing claims so that we can be assured that the process is transparent as well as consistent.

Your Honor, there will also be available a toll-free number with interactive voice response technology available 24/seven, and then live operators available during

various business hours, depending on how many people call the line and when.

That interactive voice response technology as well as those live operators are standing by right now.  So if Your Honor grants preliminary approval today and people try calling the toll-free number, they will be able to get a live operator today.

JND will work with class counsel and Equifax to staff up or down the operators on the toll-free number so that we can make sure that we're as responsive as possible, including with the technology to receive callbacks in times where there are a lot of people making phone calls to the toll-free number.

E-mail support for class members is also available, and class members can also contact the settlement administrator by a secure form on the longer website.

Finally, Your Honor, class members will have a choice when it comes to their out-of-pocket losses as to how they will receive their class benefits.

It was important to class counsel, Your Honor, that when we negotiated a settlement, all class members would be able to take advantage of it, no matter what their circumstances.

As you may know, if individuals receive a check and they don't have a bank account, sometimes they have to pay a

1    fee to cash that check.

2              By allowing class members to select the option of a

3    payment card which never expires and does not charge class

4    members any fees, we can also accommodate those class members

5    who don't have checking accounts to make sure that they get

6    settlement options as well, and they don't have to come out

7    of pocket to receive those settlement benefits.

8              Class members, again, can select which option they

9    would like, and those distributions will be made to class

10   members to the address that they provide to JND.  And JND can

11   also update the class member's address via the secure claim

12   form on the website.

13             Your Honor, we've included with our PowerPoint

14   presentation here the various dates that would potentially

15   fall if Your Honor were to grant preliminary approval today.

16   That's the next slide.

17             And then I, being now the third co-lead counsel to

18   speak, it is my honor, I would guess, to introduce Governor

19   Roy Barnes, who it looks like will be giving a few words as

20   well.

21             Thank you, Your Honor.

22             THE COURT:  Thank you, Ms. Keller.

23             Governor Barnes.

24             GOVERNOR BARNES:  Your Honor, you know there are

25   some things in life that can't be involved with money.  This

is not one of them.  And it has been involved by money and it has been solved by lawyers working together.

This case could have been a monster, but this is a good example of what happens when you have lawyers on both sides that are competent and good lawyers and that don't fight each other but come to some conclusion.

We knew in the early parts -- it's been told to you by the timeline -- this case needed to be settled.  Equifax needed to pay and they needed to pay heavy.

However, it is counterproductive to put them out of business.  There are only three credit bureaus or credit companies, and if you put Equifax out of business, all you've done is incorporated and strengthened the remaining monopoly that exists.  And that was not a fair solution to consumers either.

So what has happened through all of this process is, using those touch points, that is, we want to make sure they pay every penny that they need to pay.  Secondly, it does not need to be hashed out in litigation that goes on ad nauseam.

I had a land dispute, land line dispute that I took in in the 1970s.  I finally got rid of it when I went to the governor's office and told them that I couldn't represent them anymore.  This case could have gone on as long, and that is counterproductive.

1          I think a lot of lawyers that you see and that come

2    before you do not realize the corrosive effect of time and

3    wearing out your clients and the clients not getting the

4    relief that they deserve.

5          So you've heard the outline of the case, and we

6    think it is very -- it has been very good, and we think it is

7    good.

8          We have been pleased to work with the regulators.

9    We met last week in D.C.  We've had different meetings and

10   conference calls.  We'd have conference calls that we'd have

11   to take a break to go to the bathroom on.  And last week we

12   finally got together and we said we're going to hash this out

13   and we're not going to leave here until we get it done.

14         We were very kindly hosted up in D.C. by King and

15   Spalding's office there at a big convention room, I call it,

16   you know, where everybody sits on the other side and stares

17   at each other.

18         But that's not what happened in this case.

19   Everybody was convinced that this should work, and the

20   regulators -- I don't know if you've seen the petition and

21   the consent order.  We went through -- they asked us for our

22   input.  We asked them for theirs.

23         And so the agreement you have and the two consent

24   orders -- well, really, there will be a third from the

25   attorney generals, but those will be filed in state court, I

assume.  But the two consent orders from the CFPB and from the FTC incorporated what we were doing and what they were doing.  And I won't get into all the details, but there's funds that are going to be administered really through our fund, too.

And the regulators had -- you know, they had a different focus than we did, but we shared a common goal and that is for these who have been the victims of the data breach, that they get the full complement of financial and non-financial benefits, and that is put into effect at Equifax practices and procedures and protocols where this does not happen again.

As we've said, the regulators, we've worked together.  And the regulators' orders and our settlement work hand in hand.  You know how difficult that is with different groups that have different focuses.  But we're glad to be here and have a unified effort of us with the regulators and the regulators with us to say, Listen, what is being proposed to you both in this settlement and in the consent orders that will be presented to you by the regulators is the best and the best settlement in a data breach case that I have seen or ever been a part of it.

So we ask you to allow the preliminary approval.  We ask you to allow us to go forward with the notice.  We're going to keep you updated, as we're required to do.

1          The notice plan that has been outlined is something

2   that, as Mr. Canfield has talked about, has been long

3   negotiated, and we're very excited about how to do that.

4          And everything, every dot and every tittle has been

5   negotiated fully.  For example, we even got down to -- you've

6   seen the video things -- are the people there going to be

7   angry, smiling or neutral?  And we negotiated that and it

8   came forth and we have reached an agreement.

9          And I want to tip my hat to King and Spalding for

10  the work they've done in this case.

11         Now, don't take this in every case.  The next time,

12  I may be on you.

13         But in this case, we have -- we've worked very well

14  together, and the Plaintiffs' counsel have worked well

15  together.  And it's really what I consider -- I've been doing

16  this a long time -- to be the best example of

17  professionalism, keeping in mind the client and the victim

18  rather than the independent ideas of who wins on one side or

19  another.

20         Isn't that what law and justice should be about is

21  looking after the client and looking after all of these folks

22  that hire us and that they're responsible -- that the

23  defendants are responsible for, too?

24         I believe it is, and this is something I'm proud of

25  and I think it'll be -- I think it'll be an example in all

1  large cases in the future.  And maybe we'll have another one

2  together that we can resolve.

3       But at this point, this is a good settlement.  It's

4  got a good notice provision in it.  The lawyers have worked

5  long and hard on this.  The regulators have worked long and

6  hard on their part of this.  And we ask that you give

7  preliminary approval so that we can start the notice process.

8       Thank you, Your Honor.

9       THE COURT:  Thank you, Governor Barnes.

10      Let's take a ten-minute break, and then my plan is

11 to hear from Equifax, hear from the FTC and any of the other

12 regulators, and go from there.  So we'll be in recess for ten

13 minutes.

14      (Recess taken from 12:17 p.m. until 12:34 p.m.)

15      THE COURT:  Mr. Balser.

16      MR. BALSER:  Thank you, Your Honor.

17      Equifax is very pleased to have reached the global

18 settlement that has been announced today.  We always desired

19 and contemplated the global resolution.  And as Governor

20 Barnes indicated, the process by which we were able to

21 achieve this was a long one and an arduous one.

22      To be clear, we have been in negotiations with

23 Plaintiffs, as they've indicated, since almost the very

24 beginning, back in November of 2017.

25      We've also been involved in extensive negotiations

with the regulators for an extended period of time.  And
those negotiations have overlapped, although were separate
from the negotiations that were occurring with Plaintiffs.

So this has been a very difficult set of jets to
land on the aircraft carrier at the same time, and it did
take a tremendous amount of work and cooperation among all
the parties that are involved.

The Plaintiffs have been very worthy adversaries.
They are fierce advocates.  They are strong advocates for the
positions of their clients.  But I would echo the remarks
that were made:  that they have done their job in a
professional way.

We haven't agreed on much, and it took a long time
to get this thing over the goal line; but always were our
dealings with them professional, cordial and, I think, an
example of what you would hope negotiations in high-stake
litigation matters would be.

Just to give the Court a little bit of perspective
on what we're talking about here, of course, we've got before
Your Honor this motion for approval of a notice plan, and
this is a settlement that does resolve the Consumer Class
claims.

In addition, today the CFPB and the FTC have filed
Complaints and consent orders in the federal district court
here.  They have designated those Complaints as being related

to the MDL.  We would expect that those Complaints will be routed to Your Honor, those consent orders will be before Your Honor.  And we have agreed to the terms that are in those consent orders and are ready for the Court's approval upon your review.

The fact that those Complaints are in the queue doesn't in any way affect, in our view, the ability of the Court to enter an order preliminarily approving the notice plan, should the Court desire to do so today.

One of the things that has been so difficult is that while there is overlapping relief contained in the consent orders that are being filed, there's also additional relief that the regulators negotiated with Equifax, and that is what made these negotiations so difficult.  We had to make sure that the orders that we were negotiating with the CFPB, the MSAG Group and the FTC harmonized with the terms of the settlement that has been presented to Your Honor, and they do.

And there's been transparency now on both sides. So the Plaintiffs' counsel have seen the terms of the consent orders, and the regulators had transparency into both the term sheet and the final settlement agreement that has been entered into with the Plaintiffs.

So in addition to our resolution today with the Plaintiffs, CFPB and FTC, we have also announced settlement

1    with the New York Department of Financial Services, and we

2    have reached agreements, which will be reflected in

3    Complaints and consent orders, with 48 states and the

4    Commonwealth of Puerto Rico and the District of Columbia.

5              So I don't think any of those Complaints will be

6    before Your Honor -- none of them will be.  They will all be

7    filed in state courts.  But just so that Your Honor knows --

8              THE COURT:  I'll take credit for them, anyway.

9              (Courtroom laughter.)

10             MR. BALSER:  Please.  It was your leadership, Your

11   Honor, that led to our ability to do that.

12             So the point is to achieve a global settlement with

13   this many stakeholders, with this many different agencies and

14   able counsel looking out for the interests of their

15   respective organizations, and for us to have to harmonize,

16   negotiate and defend the company as best we could, it's been

17   a very long, hard, difficult process, and we are very pleased

18   that we have achieved what we've been able to achieve and

19   present for Your Honor's approval the Plaintiffs' motion that

20   reflects the Settlement Agreement that we've negotiated.

21             THE COURT:  Thank you, Mr. Balser.

22             Mr. Desai, do you want to speak on behalf of the

23   CFPB or the FTC?

24             MR. DESAI:  Thank you, Your Honor.  Just briefly on

25   behalf of the bureau, I'll note again that we have filed a

1    Complaint and proposed stipulated order this morning.   As

2    defense counsel noted, we're waiting for these items to be

3    routed to Your Honor; and once they are, we plan to file an

4    unopposed motion for entry of the proposed stipulated order

5    along with pro hac applications for each of the enforcement

6    attorneys for the bureau who are participating by telephone.

7              And, Your Honor, respectfully, if I may, I would

8    like to defer the rest of my comments to the attorneys on

9    behalf of the bureau who are appearing telephonically at this

10   time.

11             THE COURT:   That's fine.

12             MR. DESAI:   Thank you.

13             THE COURT:   So --

14             MS. DENNIS:   Good afternoon --

15             THE COURT:   -- please begin by giving your name and

16   the party you are representing.

17             MS. DENNIS:   Good afternoon, Your Honor.   Jenelle

18   Dennis on behalf of the Bureau of Consumer Financial

19   Protection.

20             As counsel has indicated, the agencies have

21   negotiated orders with Equifax that are consistent with the

22   relief that would be provided for in the class settlement,

23   both with respect to the relief available to consumers and as

24   well as the administration of that relief.

25             In our view, those orders can and should be entered

without delay, those orders being the age of the federal regulator's order, the account for the process of notice and consideration of final approval that will occur in the class action if preliminary approval is granted.

We can assure Your Honor that the agencies were not bystanders or observers in this process of reaching a negotiated global resolution.  Both agencies were actively investigating Equifax since the breach was announced, and both were also active participants in the negotiations that led to today, in particular in negotiating the relief available to consumers under the federal regulator orders, the information security measures that Equifax will be obligated to undertake, as well as the civil money penalty of $100 million reflected in the CFPB's orders.

As Mr. Desai noted, the bureau filed its Complaint this morning and a proposed stipulated order, and will in short order file an unopposed motion for entry of stipulated order.

As I mentioned, the parties have worked very hard to ensure that none of our orders are in tension with one another.  However, there are a number of provisions in the bureau's order which constitute unique relief under the agency's authority, such as the civil money penalties, our SCAFLA provisions, our recordkeeping and compliance reporting requirements.

1        We look forward to presenting Your Honor with that

2   motion shortly and answering any questions that the Court may

3   have about it.  And we would urge the Court to enter the

4   bureau's order quickly and without delay so that the

5   provisions are not delayed.

6        In sum, the bureau's position is that the relief

7   reflected in this order, again, is consistent with the class

8   action resolution and with the FTC's order and reflects an

9   appropriate resolution that is in the best interest of

10  consumers affected by the Equifax breach.

11            THE COURT:  Thank you.

12        Are there any of the other regulators or regulator

13  counsel that want to be heard?

14            MS. CONNOR:  Yes, Your Honor.  Good afternoon.  My

15  name is Jacqueline Connor, and I'm here on behalf of the

16  Federal Trade Commission.  Thank you for the opportunity to

17  speak today.

18        The FTC is the primary civil law enforcement agency

19  that protects the data security and privacy interests of

20  American consumers.  We started investigating the Equifax

21  data breach in September of 2017, and over the last almost

22  two years we have worked closely with other federal and state

23  regulators.

24        It is rare for the FTC to participate in a class

25  action, but we believe that it was important to do so in this

case because we believe that such a global resolution will provide the most comprehensive and rigorous relief to all consumers.

As class counsel and counsel for the Equifax have stated, the FTC and the CFBP have been involved in developing the notice and claims process, and the FTC has provided input based on our experience in communicating with and providing redress to American consumers.

I understand that you have not seen the FTC consent order yet, but I would like to highlight two things for Your Honor.

First, based on the extensive investigation we undertook and based on our experience, the FTC having brought more than 60 data security cases, we believe that the injunctive provisions in our order focusing on data security are vital to protecting the personal information Equifax collects from consumers; and,

Second, the consumer relief as written in our order is written in a way that Equifax can satisfy these provisions through the Consumer Class action.  As Ms. Dennis for the CFPB said, we do not believe that there is any tension between the federal regulator orders and the Consumer Class action settlement.

And, again, we believe that it is crucial that consumers only have one place to go to to get relief.

1          The FTC has written the order, however, in such a

2     way that it is meant to be independent from final approval of

3     the class.

4          I echo Ms. Dennis' request that our orders be

5     granted and entered as expeditiously as possible so that the

6     injunctive relief, particularly the data security

7     protections, can go into effect as soon as possible.

8          THE COURT:  Does anyone else want to be heard?

9          (No response.)

10          THE COURT:  All right.  Then, pursuant to

11    Rule 23(e)(1)(B), I'm going to preliminarily approve the

12    proposed class action settlement and order notice to be given

13    to the class members, and I'm going to grant the Plaintiffs'

14    motion to direct notice of the proposed settlement to the

15    class members.  I do so upon the express finding that I am

16    likely to be able to approve the proposed settlement under

17    Rule 23(e)(2) and certify the class for purposes of judgment

18    on the proposed settlement.  Considering the factors set

19    forth in Rule 23(e)(2), I think, as I said, approval of the

20    settlement is likely.

21          Second, I approve the proposed notice plan that is

22    set forth in the Plaintiffs' motion, and I approve the

23    settlement administration process proposed by the Plaintiffs.

24          As a footnote, I notice that we learned our lesson

25    in Home Depot and put a page limit on objections, which I

1    think was a good idea and shows we've learned things over the

2    years through this process.

3            So there's some dates that I need to establish

4    before entering the order.  So the first of those is the date

5    of the final approval hearing.

6            I believe that the Plaintiffs are proposing no

7    earlier than 150 days after today, from today.

8            MR. SIEGEL:  That's right, Your Honor.  So that

9    would be -- December 19th would be the first available date.

10           THE COURT:  So that's fine with me.  That's a

11   little close to Christmas and holiday travel.  I'm fine with

12   taking it over to early January.  But if that's the date you

13   want, Mr. Siegel --

14           MR. SIEGEL:  We've given up our holidays for this

15   case, Your Honor.

16           I think in terms of trying to deliver class relief

17   as quickly as possible, we'll take the first date that the

18   Court has available and adapt our schedules accordingly.  If

19   that's December 19th, I think we will eagerly take it.

20           THE COURT:  Is that a weekday?

21           THE COURTROOM DEPUTY:  Yes, a Thursday.

22           THE COURT:  December 19th, 2019.  10:00 a.m., 11:00

23   a.m.?  What's your pleasure, Mr. Siegel?

24           MR. CANFIELD:  10:00.

25           MR. SIEGEL:  10:00 is fine, Your Honor.

1        THE COURT:  10:00 a.m.

2        Okay.  Next, in paragraph 15 of your proposed order

3   is the opt-out deadline.

4        MR. SIEGEL:  Yes, Your Honor.  Actually, if I can

5   approach, Your Honor, the dates on that last slide that I

6   think are on the screen should match up, and we've confirmed

7   these dates with Defendant's counsel.

8        So the objection and opt-out deadline would be

9   November 19th, 2019.

10       THE COURT:  November 19, 2019.

11       MR. SIEGEL:  Yes, Your Honor.

12       THE COURT:  Are those all the dates?

13       MR. SIEGEL:  They are.  There's a schedule on the

14  last page of the notice order, which we can populate for the

15  Court, but that sets the CAFA deadline, the notice date.  All

16  the other dates should match up with what's on the screen,

17  Your Honor.

18       The only other date that is not -- that is

19  triggered by the final approval date is the deadline for us

20  to file a final approval motion.  That would be 14 days

21  prior.  So December 5th, 2019, would be the date we would

22  submit our final approval motion.

23       THE COURT:  All right.  Well, what I suggest, Mr.

24  Siegel, is you fill in these dates --

25       MR. SIEGEL:  We will.

1          THE COURT:  -- and submit a clean typewritten order

2     to me today, and I'll be glad to sign it.

3          MR. SIEGEL:  Perfect.  We'll do it.

4          THE COURT:  At another time, I may have some

5     additional comments, but I don't think those would be

6     appropriate today.

7          Because of the new Rule 23 amendments that went

8     into effect, I may try to issue a written order.  But I'm

9     preliminarily approving the settlement, preliminarily, and

10    granting the Plaintiffs' motion, whether I issue a written

11    order or not.

12         My criminal docket is a train wreck right now, and

13    that just may not be possible.  So --

14         MR. SIEGEL:  Understood, Your Honor.  Thank you.

15    We will get you this order.  And we appreciate the Court

16    accommodating us on short notice.

17         THE COURT:  All right.

18         Does that do what we need to do today?

19         MR. CANFIELD:  It does, Your Honor.

20         MR. BALSER:  Yes, Your Honor.

21         THE COURT:  All right.

22         Thank you very much.  And Court's in recess until

23    further order.

24         (Proceedings concluded at 12:54 p.m.)

25              - - - - - - - -

1                       Reporter's Certification

2    I certify that the foregoing is a correct transcript from the

3    record of proceedings in the above-entitled matter.

4                                    s/Diane Peede, RMR, CRR, CRC
                                     Official Court Reporter
5                                    United States District Court
     Date:   July 26, 2019          Northern District of Georgia

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25