# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

|  |  |
| --- | --- |
| In re: Equifax Inc. Customer Data Security Breach Litigation | MDL Docket No. 2800 No. 1:17-md-2800-TWT  CONSUMER ACTIONS  Chief Judge Thomas W. Thrash, Jr. |

## PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS TO THE CLASS REPRESENTATIVES AND SUPPORTING MEMORANDUM OF LAW

The proposed settlement that Class Counsel negotiated to resolve the consumer claims in this case is historic, exceeding the value of all previous consumer data breach settlements combined. Equifax will pay $380.5 million into a non-reversionary fund (and up to $125 million more, if needed, for out-of-pocket claims); at least another $1 billion for improved data security; and as much as $2 billion more, depending on the number of credit monitoring claims. Class members are eligible to claim up to $20,000 in out-of-pocket losses; ten years of credit monitoring (having a retail value of $1,920 per class member and $282 billion for the entire class) or modest alternative cash compensation for those who prefer their existing credit monitoring service; payment for time spent dealing with the breach; and seven years of identity restoration services to help redress the effects of identity theft—available

to all class members without the need to file a claim.

To compensate them for this extraordinary result, Class Counsel request a $77.5 million fee and reimbursement of $1,248,033.46 in current expenses, pursuant to settlement provisions that were negotiated only after all other terms of relief for the class. The fee—representing 20.36% of the $380.5 million cash fund, 5.6% of Equifax's minimum cash commitment, and about 1.2% of the fund plus the value of the benefits already claimed—is reasonable under the percentage approach, which is the exclusive method in this Circuit for calculating fees in a common fund case such as this one. A lodestar crosscheck, though not required, also supports the fee. And, the expenses were reasonably incurred on behalf of the class. The request for fees and expenses should therefore be approved.

The Court also should approve service awards of $2,500 to each class representative, as provided by the settlement, to compensate them for their efforts on behalf of the class. The awards are warranted legally and factually.[1]

---

[1] In support of this motion, Plaintiffs rely upon materials submitted in support of their motion to direct notice to the class, including declarations from Class Counsel (Doc. 739-4), Mary Frantz (Doc. 739-7), James Van Dyke (Doc. 739-8), and Layn Phillips. (Doc. 739-9) Plaintiffs also are submitting along with this motion a supplemental declaration from Class Counsel (Ex. 1) and declarations from two fee experts, Professor Robert Klonoff (Ex. 2) and Atlanta lawyer Hal Daniel. (Ex. 3)

## **FACTUAL BACKGROUND**

Consistent with the 2018 amendments to Rule 23 requiring "front loading" of information pertaining to a proposed class action settlement, Plaintiffs' memorandum supporting their motion to direct class notice describes the background of this litigation and Class Counsel's work up to the filing of that motion. (Doc. 739-1) In this brief, Plaintiffs summarize their previous work, describe the additional work Class Counsel have done since the Court directed notice, and address the future time and expenses they anticipate spending throughout the process of settlement approval and claims administration.

### A.      **Overview of the Litigation**

On September 7, 2017, Equifax announced a data breach affecting the personal information of about 147 million Americans. After the more than 300 class actions filed against Equifax were consolidated here, the Court appointed Class Counsel to prosecute the consumer claims. (Doc. 232) Class Counsel vetted thousands of plaintiffs; conducted a detailed factual investigation; engaged data security and damages experts; researched potential claims in every state; and on May 14, 2018, filed a 559-page consolidated amended complaint. Equifax moved to dismiss all 99 counts, arguing *inter alia* that Georgia law imposes no legal duty to safeguard personal information and that Plaintiffs' alleged injuries were neither

legally cognizable nor proximately caused by the breach. On January 28, 2019, the Court largely denied the motion. Equifax then answered. (Ex. 1, ¶¶ 4-7)

While the motion was pending, the parties spent a great deal of time preparing the groundwork for formal discovery and, beginning shortly after the answer was filed, began producing extensive documents and electronic information. Plaintiffs reviewed in excess of 500,000 pages of information, interviewed key witnesses, and noticed several critical depositions. Aggressive discovery efforts continued until the case settled. (*Id.*, ¶¶ 8-10)

### B.   Mediation and Settlement

In September 2017, Equifax and Class Counsel began settlement discussions and retained prominent mediator and former federal judge Layn Phillips, who has presided over settlements of several major data breach cases. (*Id.*, ¶ 12) After much preparatory work and briefing, Judge Phillips convened the first mediation on November 27 and 28, 2017. The session ended with little prospect of an early settlement, but a framework for future dialog. (*Id.*, ¶¶ 12-13; Doc. 739-9, ¶¶ 9-10)

After Class Counsel's leadership appointment, the parties renewed settlement discussions, both directly and with Judge Phillips, focusing on the individual benefits, the size of the fund, and needed business practice changes. In the process, Class Counsel were advised by leading cybersecurity experts; consulted with dozens

of consumer advocates, Congressional staff, and state attorneys general; and conducted substantial informal discovery, including meetings with both sides' experts to discuss the cause of the breach and Equifax's remedial efforts. (Doc. 739-4, ¶¶ 22-23; Ex. 1, ¶¶ 13-14)

Throughout 2018, Class Counsel worked almost continuously preparing for and participating in settlement talks and related meetings, struggling to reach agreement with Equifax on a comprehensive term sheet. (Doc. 739-4, ¶ 21) Mediation sessions on May 25, 2018, August 9, 2018, and November 16, 2018, resulted only in incremental movement. In late 2018, the parties informed Judge Phillips they were at impasse and settlement talks ceased. (Doc. 739-9, ¶ 11)

In February 2019, after Equifax's motion to dismiss was denied, negotiations resumed. Judge Phillips convened what proved to be the final mediation on March 30, 2019. After getting consensus on all terms other than the size of the fund (including the individual relief and extensive business practice changes), the parties again reached impasse. Late in the evening, Judge Phillips made a "mediator's proposal," which both sides accepted. The parties executed a binding Term Sheet around 11 p.m. on March 30, subject to approval by Equifax's Board of Directors, which occurred the next day. (*Id.*, ¶ 12; Doc. 739-4, ¶¶ 25-31)

The Term Sheet, which is attached to Class Counsel's latest declaration (Ex. 1, Ex. B), largely achieved the major goals Plaintiffs pursued from the beginning of the negotiations, namely obtaining cash compensation for those who suffered out-of-pocket losses and spent time as a result of the breach, providing high quality credit monitoring and identify restoration services to all class members, and requiring Equifax to invest in its cybersecurity infrastructure and comply with comprehensive data security standards enforceable via court order. (*Id.*, ¶ 16)

In addition to specifying the relief, the Term Sheet committed the parties to draft a comprehensive agreement; present any disputes to Judge Phillips for final resolution; and file the agreement and a motion for an order directing notice within 90 days. The parties also agreed to share the Term Sheet with the Federal Trade Commission, the Consumer Financial Protection Bureau, and state Attorneys General and to consider any changes the regulators proposed. (*Id.*, ¶ 17 & Ex. B) This agreement is consistent with judicial guidance regarding the solicitation of regulators' views. *See* Federal Judicial Center, *Managing Class Action Litigation: A Pocket Guide for Judges* (2010) at 26-27 ("*FJC Pocket Guide*") (Ex. 1, ¶ 17)

The regulators proposed a package of changes, some of which were minor, while others provided more substantial relief, including increasing the fund from $310 million to $380.5 million. Plaintiffs supported the changes benefitting the class,

but opposed others that might diminish relief available under the Term Sheet. Plaintiffs' opposition triggered two months of difficult negotiations, which were resolved when Equifax and the regulators agreed to modifications ensuring class members were not made worse off. (*Id.*, ¶¶ 18-20; Doc. 739-4, ¶ 33)

On July 19, 2019, Plaintiffs and Equifax executed the settlement agreement. Plaintiffs submitted the agreement and moved for an order directing class notice on July 22, 2019. After a hearing, the motion was granted the same day. (Doc. 742)

### C.   Class Counsel's Work on Behalf of the Class

Class Counsel's substantial work in delivering this settlement is well documented in their declarations. (Doc. 739-4; Ex. 1) In the months since the Court approved notice, Class Counsel have remained hard at work. For example, Class Counsel swiftly addressed initial confusion about the benefits available to class members caused by misleading media coverage of regulators' early announcements of the settlement, ensuring that those who had filed claims before the approved notice program began were given a chance to amend their claims. (Ex 1, ¶¶ 21-24) Class Counsel have also spent considerable time overseeing the claims and notice programs; communicating with JND, Signal, defense counsel, and regulators (including through weekly conference calls); answering hundreds of questions from class members; evaluating and responding to objections; and working on the papers

to be filed before the final approval hearing. (*Id.*, ¶ 25)

Class Counsel's work will not end once the settlement is finally approved or even after any appeals are resolved. Class Counsel's oversight obligations and other responsibilities will continue until the settlement is fully implemented, which will not occur until many years in the future. The initial claims period does not end until January 2020, and will be followed by a four-year extended claims period. Identity restoration services will be available to class members for three more years after that. And, the notice program will continue throughout this entire seven-year period. Moreover, once the settlement administrator begins verifying the millions of claims that have been and will be made, Class Counsel will need to monitor the process, communicate with impacted class members, and participate in the dispute resolution process established by the claims protocol. (Ex. 1, ¶ 26)

<u>ARGUMENT AND CITATION OF AUTHORITY</u>

I.      <u>The Requested Fee is Reasonable Under the Percentage Method</u>

  A.      <u>The Common Benefit Doctrine and Eleventh Circuit Law</u>

It is well established that counsel whose work results in a substantial benefit to a class are entitled to a fee under the common benefit doctrine. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). The doctrine serves the "twin goals of removing a potential financial obstacle to a plaintiff's pursuit of a claim on behalf of a class

and of equitably distributing the fees and costs of successful litigation among all who gained from the named plaintiff's efforts." *In re Gould Sec. Litig.*, 727 F. Supp. 1201, 1202 (N.D. Ill. 1989). The doctrine also ensures those who benefit are not "unjustly enriched." *Van Gemert*, 444 U.S. at 478.

The controlling authority in the Eleventh Circuit is *Camden I Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774-75 (11th Cir. 1991), which holds that fees in common fund cases must be calculated using the percentage rather than the lodestar approach. *Camden I* does not require any particular percentage. While noting awards typically range from 20% to 30% and suggesting 25% is the benchmark, the court stated: "There is no hard and fast rule … because the amount of any fee must be determined upon the facts of each case." 946 F.2d at 774; *see also, e.g.*, *Waters v. Int'l. Precious Metals Corp.*, 190 F.3d 1291, 1294 (1999). In selecting the percentage in a particular case, a district court should apply the factors from *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717 (5th Cir. 1974), as well any other pertinent factors. *Camden I*, 946 F.2d at 776.

Following *Camden I*, percentage-based fee awards in the Eleventh Circuit have averaged around 33% of the class benefit. *See, e.g.*, *Wolff v. Cash 4 Titles*, 2012 WL 5290155 at *5-6 (S.D. Fla. Sept. 26, 2012) (noting that fees in this Circuit are "roughly one-third"); T. Eisenberg, et al., *Attorneys' Fees in Class Actions: 2009-*

*2013*, 92 N.Y.U. Law Rev. 937, 951 (2017) (the median fee from 2009 to 2013 was 33%); B. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010) (during 2006 and 2007 the median fee was 30%); Decl. of H. Hughes, *Champs Sports Bar & Grill Co. v. Mercury Payment Systems, LLC*, No. 1:16-CV-00012-MHC (N.D. Ga.) (Doc. 82-1 at 4-5) (90% of the hundreds of common fund settlements a leading Atlanta mediator has negotiated provide for a fee of one-third of the benefit).[2]

## B.   The Percentage of the Class Benefit Requested by Class Counsel

The requested fee is 20.36% of the $380.5 million fund.[3] (Ex. 1, ¶ 28) But that percentage is not a true measure because it fails to account for other settlement benefits. When the other benefits are considered, the fee is much lower—as little as

---

[2] In that case, this court awarded a fee of one-third of the $52 million cash settlement. *Champs Sports Bar*, 275 F. Supp. 3d 1350, 1356 (N.D. Ga. 2017).

[3] In the March 30 Term Sheet, Plaintiffs agreed to seek a $77.5 million fee, or 25% of the original $310 million fund. (Ex. 1,¶ 28) In the settlement agreement, Class Counsel agreed to the same fee (Doc. 739-2 at 25-26), foregoing compensation for the substantial work they did and the benefits they added after the regulators became involved. A larger fee of 25% of the $380.5 fund would have been justified. (Ex. 2, ¶ 43) Where, as here, "private class action litigation may pave the way for government enforcement," a court may reward the private attorneys for their "groundbreaking work." (*FJC Pocket Guide*, at 36-37) While regulators were the catalyst for increasing the fund, Class Counsel played a crucial role, integrating the additional money into the settlement and ensuring the class did not have to give up any benefits in exchange for the extra cash. (Ex. 1, ¶ 29)

a few percentage points or even less.

One conservative way to value the benefits conferred on the class is to look at the amount Equifax will have to pay for them. In addition to paying $380.5 million for the fund, at a minimum Equifax must spend another $1 billion for cybersecurity above its budgeted baseline, which benefits the class by reducing the risk of another data breach and thus should be considered. (Ex. 2, ¶ 45) *See, e.g., Camden I*, 946 F. 2d at 755 (authorizing consideration of non-monetary benefits). The requested fee is 5.6% of Equifax's minimum expenditure of $1.3805 billion. This does not even take into account that Equifax may have to pay still more depending on the number of claims that are filed (up to $125 million if needed for out-of-pocket claims and as much as $2 billion if more than seven million class members sign up for credit monitoring). (Ex. 2, ¶ 45; Doc. 739-4, ¶ 37)

The settlement's benefits can also be calculated based upon their value to class members. In addition to the $380.5 million fund and the reduced risk of another data breach at Equifax, the settlement provides other valuable benefits. Most significantly, the opportunity to claim free credit monitoring—without any limitation or cap—is a concrete benefit of value to all 147 million class members.[4]

---

[4] That a class member fails to file a claim does not mean the class member failed to receive a benefit or that Class Counsel's fee should be affected. *See, e.g., Van Gemert*, 444 U.S. at 480 (class members' "right to share the harvest of the lawsuit,

The value can be readily determined based on the retail price that a class member would pay for the same credit monitoring services: $1,920 per class member, or $282 billion for the entire class. While not all class members will sign up for credit monitoring, almost three million already have done so, collectively claiming services worth nearly $6 billion. The requested fee is roughly 1.2% of the cash fund plus the nearly $6 billion in credit monitoring class members have already claimed. (Ex. 1, ¶ 30) Including the value of the additional credit monitoring claims that likely will be made before the January 2020 deadline, the seven years of identity restoration services available to all class members without the need to file a claim, and other settlement benefits causes the requested fee to be roughly 1%, or even much less, of the full panoply of relief. (Ex. 2, ¶ 47; Ex. 3, ¶ 47)[5]

_____

whether or not they exercise it, is a benefit of the fund created by the efforts of ... class counsel"); *Waters v. Int'l Precious Metals Corp.*, 190 F.3d at 1295-97 ("class counsel are entitled to a reasonable fee based on the funds potentially available to be claimed, regardless of the amount actually claimed"); *Poertner v. Gillette Co.*, 618 Fed. App'x. 624, 628-29 & n. 2 (11th Cir. 2015).

[5] More class members will undoubtedly sign up for credit monitoring before the January 2020 deadline. For every one million class members who sign up, the direct benefit to the class will increase by roughly $2 billion. While Class Counsel do not seek to justify their fee request based on the unrealistic notion that all class members will claim credit monitoring, every class member has the opportunity to do so and thus has received a benefit. The requested fee is 0.027% of that benefit. Moreover, the settlement provides other non-monetary benefits that Class Counsel have not attempted to quantify, such as a provision precluding arbitration clauses under some circumstances and the additional year of TrustedID services that Class Counsel

### C.    The Fee is Reasonable and Supported by the *Johnson* Factors

Whether the requested fee is considered to be as much as 20.36% of the $380.5 million minimum fund or as little as 1%, or less of the total benefits available to the class, the requested fee is reasonable and supported by the *Johnson* and *Camden I* factors. These factors are discussed below.[6]

### (1)    *The Time and Labor Involved*

Co-Lead Counsel and those under their direction have spent over 31,000 hours in the massive effort described above. (Ex. 1, ¶ 42) The vast majority of the work was done by Class Counsel and other PSC firms and allocated to those able to do the work most efficiently. (*Id.*, ¶¶ 44-47) Class counsel estimate they will spend at least another 10,000 hours over the next seven years in connection with final approval, managing the claims process, and administering the settlement. (*Id.*, ¶ 48) This work is reasonable and justified in view of the issues, the complexity and importance of the case, the manner in which the case was defended, and the result. (*Id.*, ¶ 42; Ex.

---

negotiated so that class members who accepted Equifax's offer in the immediate aftermath of the breach to receive that service for free can continue to receive it while the settlement is finalized. (Ex. 1, ¶ 31)

[6] Two of the factors do not apply and thus can be disregarded: the undesirability of the case and the nature of the attorney-client relationship. *Johnson* noted that civil rights attorneys who accept unpopular cases may suffer hardships deserving of a higher fee, which Class Counsel did not suffer. Second, Class Counsel did not have continuing relationships with the named plaintiffs that would have caused them to offer a volume discount or reduced fee to obtain future business.

2, ¶¶ 49-50, 105; Ex. 3, ¶ 22)

### (2)     The Novelty and Difficulty of the Questions

This unprecedented case presented many novel and difficult legal questions, such as whether Equifax had a duty to protect Plaintiffs' personal data and whether Plaintiffs' alleged injuries are legally cognizable and were proximately caused by the Equifax breach. (Ex. 1, ¶¶ 32-33; Ex. 2, ¶ 52; Ex. 3, ¶¶ 23-26) Indeed, the duty and injury questions were being litigated in the Georgia appellate courts during the pendency of this case, causing Class Counsel to file an amicus brief before the Georgia Supreme Court in *Ga. Dept. of Labor v. McConnell*, 305 Ga. 812 (May 20, 2019), and the questions largely remain unanswered. (*Id.*; Ex. 1, ¶ 32) Other novel and difficult questions resulted from the sheer size of the litigation, the number of Americans impacted by the breach, and the highly technical nature of the facts. Determining and proving the cause of the breach and developing cybersecurity measures to prevent a recurrence were particularly challenging. The post-Term Sheet settlement process also raised novel and difficult questions. (*Id.*, ¶ 33) All these questions substantially increased Class Counsel's risk and the litigation's complexity. (*Id.*; Ex. 2, ¶¶ 52-53; Ex. 3, ¶¶ 23-26)

### (3)     The Skill Requisite to Perform the Legal Services Properly

This case required the highest level of experience and skill. Plaintiffs' legal

14

team includes some of the nation's best class action lawyers who collectively have handled more than 50 data breach cases, including all of the most significant ones. (Doc. 187; Doc. 739-4, ¶¶ 3-8; Ex. 2, ¶¶ 54-63; Ex. 3, ¶¶ 42-43) Such experience and skill was needed because some of the best corporate defense lawyers represented Equifax. (Ex. 2, ¶ 58) And, according to Judge Phillips, Class Counsel's skill and experience contributed directly to the results achieved:

> [T]he advocacy on both sides of the case was outstanding. Co-Lead Counsel for the Plaintiffs – Norman Siegel, Ken Canfield, and Amy Keller – and counsel from King & Spalding – David Balser, Phyllis Sumner, and Stewart Haskins and Michelle Kisloff from Hogan Lovells – represented their clients with tremendous effort, creativity, and zeal. All counsel displayed the highest level of professionalism in carrying out their duties on behalf of their respective clients and the settlement is the direct result of all counsel's experience, reputation, and ability in complex class actions including the evolving field of privacy and data breach class actions.

(Doc. 739-9 at ¶ 14)

### (4)   The Preclusion of Other Employment

But for this case, Class Counsel would have spent significant time on other matters. For many months, this case was all consuming. Nearly every major issue was potentially case-dispositive and thus demanded Class Counsel's full attention, unlike in many cases where substantial work can be delegated to less experienced lawyers. Because this time commitment precluded Class Counsel, including especially the most senior lawyers, from working on other matters, a larger fee is

justified. (Ex. 1, ¶ 35; Ex. 2, ¶¶ 64-65; Ex. 3, ¶ 22, 31)

(5)     *The Customary Fee*

Complex consumer litigation customarily is handled on a contingent fee basis because consumers are unwilling and unable to pay substantial hourly rates and the potential recovery does not justify the economic investment. Contingent fees in such cases typically range from 33.3% to 40% of the recovery. The requested fee is substantially below that range and much lower than contingent fees charged by Class Counsel in private litigation.  (Ex. 1, ¶ 36; Ex. 2, ¶ 67)

(6)     *Whether the Fee is Fixed or Contingent*

This action was prosecuted on a contingent basis. If Class Counsel had not achieved a recovery, they would have received nothing and, in fact, suffered a substantial out-of-pocket loss. (Ex. 1, ¶ 37) Such risk merits a higher fee:

> It is axiomatic that attorneys who work on a contingent-fee must charge a higher fee than those who work on a noncontingent-fee basis. . . . This "higher" fee … is not a bonus… From a pure dollars-and-cents economic view, this higher fee is the appropriate measure of a reasonable fee that is required in the marketplace of services: (1) to induce an attorney to agree to assume the risk that no compensation will be received unless she or he successfully achieves a benefit for the client; and (2) if ultimately successful, to compensate for the costs suffered and investment income forgone by delay in payment.

H. Newberg and A. Conte, 1 *Attorney Fee Awards* § 1.8 (3d ed.); *see, e.g.*, *In re Friedman's, Inc. Sec. Litig.*, 2009 WL 1456698, at *3 (N.D. Ga. May 22, 2009);

*Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 548 (S.D. Fla. 1988), *aff'd*, 889 F.2d 21 (11th Cir. 1990).

    *(7) Time Limitations Imposed by the Client or the Circumstances*

   Work done under significant time pressure is entitled to additional compensation and justifies a larger percentage of the recovery. *See, e.g.*, *Johnson*, 488 F.2d at 718 ("priority work that delays the lawyer's other legal work is entitled to some premium"); *Allapattah Services, Inc. v. Exxon Corp*., 454 F. Supp. 2d 1185, 1215 (S.D. Fla. 2006) (citing the "frantic pace" of the litigation in "giv[ing] significant weight to this factor in setting the [fee] percentage.") This case epitomizes one in which work was done under incredible time pressure as detailed in the supporting declarations. (Ex. 1, ¶ 39; Ex. 2, ¶ 70; Ex. 3, ¶ 36)

    *(8) The Amount Involved and the Results Obtained*

   This is the largest data breach settlement in history. The $380.5 million fund alone is more than the total recovered in all consumer data breach settlements in the last ten years. (Ex. 1, ¶ 27; Ex. 3, ¶ 38) Class members are eligible for an unprecedented package of benefits, including but not limited to cash compensation, ten years of credit monitoring worth more than $282 billion to the class, and seven years of identity restoration services. While the claims process is not complete, it is likely that those who file valid claims for out-of-pocket losses will be paid in full

with no *pro-rata* reduction; at least three million class members will claim credit monitoring services collectively worth nearly $6 billion; and more than $60 million will be paid for alternative compensation and time. And, *all* class members are entitled to identity restoration services without making a claim. (Ex. 1, ¶ 34)

In addition, Equifax has agreed to a consent order requiring it to comply with comprehensive cybersecurity standards, spend at least $1 billion to improve its data security, and have its compliance audited by independent experts. Violations of the consent order are subject to this Court's enforcement power. This relief is substantial and significant, going far beyond what has been done in other data breach cases. As explained by Mary Frantz, a leading cybersecurity expert:

> These changes address serious deficiencies in Equifax's information security environment. Had they been in place on or before 2017 per industry standards, it is unlikely the Equifax data breach would ever have been successful. These measures provide a substantial benefit to the Class Members that far exceeds what has been achieved in any similar settlements.

(Doc. 739-7, ¶ 66) The class will benefit well into the future from this relief.

Finally, class counsel negotiated a first-of-its kind notice program that uses modern techniques from the world of commercial and political communications to more effectively inform and engage class members, and a state-of-the-art claims process to facilitate and increase class member participation. (Doc. 739-1 at 10-12) The notice program and claims process are a direct benefit to the class.

18

In short, the results Class Counsel obtained—which in some instances provide relief that probably could not be achieved at trial—weigh strongly in favor of the requested fee. (Ex. 2, ¶¶ 72-73; Ex. 3, ¶ 41)

> (9)     *The Experience, Reputation, and Ability of the Lawyers*

As described elsewhere, Plaintiffs' legal team includes many of the nation's preeminent class action firms and lead counsel in all of the major data breach cases that have been filed to date and they face equally skilled and experienced defense counsel. This factor justifies a higher fee. (Ex. 2, ¶ 75; Ex. 3, ¶¶ 27-30, 42-43, 45)

> (10)    *Awards in Similar Cases*

The requested fee is in line with—if not substantially lower than—awards in other class actions that have resulted in similarly impressive settlements. (Ex. 2, ¶¶ 80-81; Ex. 3, ¶ 44) Even if the fee is based only on the cash fund, ignoring all other monetary and non-monetary benefits, the percentage is below the *Camden I* benchmark and substantially less than both the mean and median percentages that, according to empirical studies, are typically awarded. *See generally, e.g.*, *In re Arby's Rest. Grp., Inc. Data Security Litig.*, 2019 WL 2720818, at \*4 (N.D. Ga. June 6, 2019) ("Awards of up to 33% of the common fund are not uncommon in the Eleventh Circuit, and especially in cases where Class Counsel assumed substantial risk by taking complex cases on a contingency basis.")

That this case involves a fund of more than $100 million does not change the analysis. (Ex. 2, ¶¶ 82-87) Percentages typically awarded in such "mega-fund" cases are consistent with or higher than what Class Counsel are requesting, as shown by empirical studies (*id.*), and recognized by many courts. *See, e.g.*, *In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d 1330, 1367 (S.D. Fla. 2011) ("courts nationwide have repeatedly awarded fees of 30% or higher in so-called "megafund" settlements"). In any event, awarding lower percentages in mega-fund cases has been roundly criticized, in part because doing so undercuts the virtues of the percentage approach and fails to recognize that such cases are inherently more risky. (Ex. 2, ¶ 88) As one court in the Eleventh Circuit emphasized in awarding a fee representing 31.33% of a $1.06 billion fund:

> [D]ecreasing the percentage awarded as the gross class recovery increases . . . is antithetical to the percentage of the recovery method [in *Camden I*], the whole purpose of which is to align the interests of Class Counsel and the Class by rewarding counsel in proportion to the result obtained. By not rewarding Class Counsel for the additional work necessary to achieve a better outcome for the class, the sliding scale approach creates the perverse incentive for Class Counsel to settle too early for too little.

*Allapattah Servs.*, 454 F. Supp. 2d at 1213; *see also, e.g.*, *In re Checking*, 830 F. Supp. 2d at 1367 (recognizing that incentives for class counsel to invest their time and money are "blunted" when courts award lower percentages as settlements become larger); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 197

(E.D. Pa. 2000) (awarding a lesser percentage in a mega-fund case "fails to appreciate the immense risks" and gives insufficient weight to the fact that "large attorneys' fees" are needed to attract capable counsel).

### (11)   *The Economics Involved in Prosecuting a Class Action*

Another factor identified in *Camden I*, 946 F. 2d at 775—the economics involved in prosecuting a class action—further supports the requested fee. Class Counsel's business model involves prosecuting a relatively small number of major class actions, going for some time without revenue, and relying on periodic fee awards to pay overhead, generate profits, and finance the millions of dollars needed to cover litigation expenses. (Ex. 1, ¶ 38)

Accordingly, where, as in this case, the lawyers for a class have expended substantial amounts of time and money, a substantial award is both appropriate and necessary. Indeed, without such an award, the incentive to undertake a case of this magnitude against experienced and well-paid defense counsel will be undercut, discouraging competent lawyers from acting as private attorneys general, and thus weakening the deterrent impact of our laws. *See, e.g., Columbus Drywall & Insulation, Inc. v. Masco Corp.*, 2012 WL 12540344, at *1, 7 (N.D. Ga. Oct. 26, 2012); *In re Checking*, 830 F. Supp. 2d at 1367-68.

The *Camden I* and *Johnson* factors thus support the fee, as confirmed by Professor Klonoff, one of the country's leading class action authorities, and Mr. Daniel, a prominent Atlanta lawyer and fee expert. (Ex. 2, ¶ 49; Ex. 3, ¶¶ 17, 45)

## II.   The Requested Fee is Reasonable Under A Lodestar Cross-Check

The Eleventh Circuit has authorized courts to use the lodestar method as a cross-check on the reasonableness of a percentage-based fee. *Waters v. Int'l Precious Metals Corp.*, 190 F. 3d 1291 at 1298. But, a lodestar cross-check is not required. In fact, courts in this Circuit have discouraged the use of a lodestar cross-check, cautioning that doing a cross-check simply re-introduces the same undesirable incentives the percentage method is meant to avoid. For example, in awarding a fee of 30% from a $410 million settlement, one court explained:

> The lodestar approach should not be imposed through the back door via a cross-check. Lodestar creates an incentive to keep litigation going in order to maximize the number of hours included in the court's lodestar calculation. In *Camden I*, the Eleventh Circuit criticized lodestar and the inefficiencies that it creates. In so doing, the court mandate[d] the exclusive use of the percentage approach in common fund cases, reasoning that it more closely aligns the interests of client and attorney, and more faithfully adheres to market practice. Under *Camden I*, courts in this Circuit regularly award fees based on a percentage of the recovery, without discussing lodestar at all.

*In re Checking*, 830 F. Supp. 2d at 1362 (internal citations omitted).

If this Court decides to do a lodestar cross-check, the requested fee easily passes muster. As of September 30, 2019, Plaintiffs' counsel spent 34,284.8 hours

on this litigation, which were documented in quarterly reports filed *in camera* with the Court. Co-Lead Counsel personally reviewed more than 21,000 time entries and excluded 3,272.9 hours as duplicative, unauthorized, of insufficient benefit, or inconsistent with the billing protocol that they established at the outset of the litigation. The value of the remaining time (31,011.9 hours) is $20,986,357.80 calculated using current rates, which are reasonable and routinely approved in other class actions. (Ex. 1, ¶¶ 42-43; Ex. 2, ¶¶ 98-103; Ex. 3, ¶¶ 13, 16) In addition to time spent through the final approval hearing, Class Counsel estimate they will spend 10,000 hours over the next seven years to implement, and administer the settlement. This time has an expected value of $6,767,200.[7] (Ex. 1, ¶¶ 48-49) Class Counsel's current and expected future lodestar thus totals $27,753,557.80. (*Id.*, ¶ 49)

When the lodestar approach is used in common fund cases, courts typically apply a multiplier to reward counsel for their risk, the contingent nature of the fee, and the result obtained. Here, the requested fee represents Class Counsel's total

---

[7] The estimate of 10,000 future hours is conservative. After the final approval hearing, Class Counsel reasonably expect they will spend 2,500 hours dealing with objectors and handling any appeals. Further, if the four Class Counsel firms each spend only one hour per week on average overseeing the notice and claims processes and communicating with the various stakeholders over the next seven years, that is an additional 1,500 hours. Finally, if Class Counsel must engage with 1% of the expected claims as part of the claims review process, it is likely that Class Counsel will spend more than 10,000 hours in post-final approval time on claims review alone. (Ex. 1, ¶ 48)

lodestar (including future time) plus a multiplier of roughly 2.79, which is consistent with other cases. (Ex. 2, ¶¶ 106-14) *See, e.g., Columbus Drywall*, 2012 WL 12540344, at *5 & n. 4 (noting a multiplier of 4 times the lodestar is "well within" the accepted range and citing examples); *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 696 (N.D. Ga. 2001) (noting courts apply multipliers ranging from less than two to more than five); *Pinto v. Princess Cruise Lines Ltd.*, 513 F. Supp. 2d 1334, 1344 (S.D. Fla. 2007) (multipliers "'in large and complicated class actions' range from 2.26 to 4.5 while three appears to be the average").

## III.   **The Court Should Reimburse Class Counsel for Their Expenses**

The settlement agreement authorizes reimbursement of up to $3 million in expenses that Class Counsel reasonably incurred successfully prosecuting this action on behalf of the class. As of September 30, 2019, Class Counsel reasonably and necessarily incurred $1,248,033.46 in expenses for such items as court reporter fees; document and database reproduction and analysis; e-discovery costs; expert witness fees; travel for meetings and hearings; paying the mediator; and other customary expenditures. (Ex. 1, ¶ 50; Ex. 2, ¶¶ 116-18; Ex. 3, ¶ 46) The Court should thus approve Class Counsel's expense reimbursement request. *See, e.g., Columbus Drywall*, 2012 WL 12540344, at *7-8.

## IV.    **The Court Should Approve the Requested Service Awards**

Courts routinely approve service awards to compensate class representatives for the services they provide and the risks they incur on behalf of the class. *See, e.g.*, *Ingram*, 200 F.R.D. at 695-96; *Allapattah Servs.*, 454 F. Supp. 2d at 1218; *In re Checking*, 2014 WL 11370115 at *12-13. The settlement agreement provides for a modest service award of $2,500 to each class representative, who devoted substantial time and effort to this litigation working with their lawyers to prosecute the claims and were instrumental in achieving a settlement benefitting the entire class. But for the class representatives' service, other class members would have received nothing. (Ex. 1, ¶ 52; Ex. 2, ¶¶ 120-28) Class Counsel thus request that payment of the service awards be approved.

## **CONCLUSION**

For the foregoing reasons, Class Counsel respectfully request that the Court approve the requested fee of $77.5 million, reimbursement of current expenses in the amount of $1,248,033.46 (subject to being updated before the final approval hearing), and services awards of $2,500 to each of the class representatives.

Dated: October 29, 2019                    Respectfully submitted,


                                           */s/ Kenneth S. Canfield*
                                           Kenneth S. Canfield
                                           Ga Bar No. 107744
                                           **DOFFERMYRE SHIELDS**
                                           **CANFIELD & KNOWLES, LLC**
                                           1355 Peachtree Street, N.E.
                                           Suite 1725
                                           Atlanta, Georgia 30309
                                           Tel. 404.881.8900
                                           kcanfield@dsckd.com


                                           */s/ Amy E. Keller*
                                           Amy E. Keller
                                           **DiCELLO LEVITT GUTZLER LLC**
                                           Ten North Dearborn Street
                                           Eleventh Floor
                                           Chicago, Illinois 60602
                                           Tel. 312.214.7900
                                           akeller@dicellolevitt.com


                                           */s/ Norman E. Siegel*
                                           Norman E. Siegel
                                           **STUEVE SIEGEL HANSON LLP**
                                           460 Nichols Road, Suite 200
                                           Kansas City, Missouri 64112
                                           Tel. 816.714.7100
                                           siegel@stuevesiegel.com


                                           ***Consumer Plaintiffs' Co-Lead Counsel***

*/s/ Roy E. Barnes*
Roy E. Barnes
Ga. Bar No. 039000
**BARNES LAW GROUP, LLC**
31 Atlanta Street
Marietta, Georgia 30060
Tel. 770.227.6375
roy@barneslawgroup.com

David J. Worley
Ga. Bar No. 776665
**EVANGELISTA WORLEY LLC**
8100A Roswell Road, Suite 100
Atlanta, Georgia 30350
Tel. 404.205.8400
david@ewlawllc.com

*Consumer Plaintiffs' Co-Liaison Counsel*

Andrew N. Friedman
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Avenue, NW, Suite 500
Washington, D.C. 20005
Tel. 202.408.4600
afriedman@cohenmilstein.com

Eric H. Gibbs
**GIRARD GIBBS LLP**
505 14th Street
Suite 1110
Oakland, California 94612
Tel. 510.350.9700
ehg@classlawgroup.com

James Pizzirusso
**HAUSFELD LLP**
1700 K Street NW Suite 650
Washington, D.C. 20006
Tel. 202.540.7200
jpizzirusso@hausfeld.com

Ariana J. Tadler
**TADLER LAW LLP**
One Penn Plaza, 36th Floor
New York, New York 10119
Tel. 212.946.9453
atadler@tadlerlaw.com

John A. Yanchunis
**MORGAN & MORGAN COMPLEX
LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Tel. 813.223.5505
jyanchunis@forthepeople.com

William H. Murphy III
**MURPHY, FALCON & MURPHY**
1 South Street, 23rd Floor
Baltimore, Maryland 21224
Tel. 410.539.6500
hassan.murphy@murphyfalcon.com

Jason R. Doss
Ga. Bar No. 227117
**THE DOSS FIRM, LLC**
36 Trammell Street, Suite 101
Marietta, Georgia 30064
Tel. 770.578.1314
jasondoss@dossfirm.com
***Consumer Plaintiffs' Steering
Committee***

28

Rodney K. Strong
**GRIFFIN & STRONG P.C.**
235 Peachtree Street NE, Suite 400
Atlanta, Georgia 30303
Tel. 404.584.9777
rodney@gspclaw.com

*Consumer Plaintiffs' State Court*
*Coordinating Counsel*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this motion and the accompanying memorandum of law have been prepared in compliance with Local Rules 5.1 and 7.1.

*/s/ Roy E. Barnes*
**BARNES LAW GROUP, LLC**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was filed with this Court via its CM/ECF service, which will send notification of such filing to all counsel of record this 29th of October, 2019.

*/s/ Roy E. Barnes*