# EXHIBIT 2

## Declaration from Professor Robert Klonoff

*In re: Equifax Customer Data Security Breach Litigation,*
No. 17-md-2800-TWT (N.D. Ga.)

Plaintiffs' Motion for Attorneys' Fees, Expenses, and
Service Awards to the Class Representatives

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

In re Equifax Inc. Customer
Data Security Breach Litigation

MDL Docket No. 2800
Case No. 2:14-MD-02591-JWL-JPO

CONSUMER ACTIONS

Chief Judge Thomas W. Thrash, Jr.

## DECLARATION OF PROFESSOR ROBERT H. KLONOFF RELATING TO ATTORNEYS' FEES, EXPENSES, AND INCENTIVE PAYMENTS

**TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................... 1

II.  QUALIFICATIONS ...................................................................... 1

III. MATERIALS RELIED UPON ...................................................... 14

IV.  BACKGROUND OF THIS LITIGATION AND SETTLEMENT ...... 14

   A. Background of the Litigation .................................................. 15

   B. Terms of the Proposed Settlement ........................................ 20

V.   SUMMARY OF OPINIONS ......................................................... 26

VI.  DETAILED DISCUSSION OF OPINIONS ................................... 28

   A. The Attorneys' Fees Requested by Class Counsel Are Reasonable ... 29

     1. A 20.36 Percent Fee Award Is Supported by the Eleventh Circuit's Benchmark ... 29

     2. The True Fee Award Requested Is Far Less than 20.36 Percent of the Benefits to the Class ... 32

     3. The Requested Fee Is Supported By the Eleventh Circuit's *Camden I* Factors ... 35

       a. Time and Labor Required ................................................ 36

       b. Novelty and Difficulty of the Questions ......................... 38

       c. Skill Required ................................................................. 41

       d. Preclusion of Other Employment Due to Acceptance of the Case ... 50

       e. Customary Fee ............................................................... 52

       f. Whether the Fee Is Fixed or Contingent ........................ 53

       g. Time Limitations Imposed by the Client or the Circumstances ... 54

       h. Results Obtained, Including the Amount Recovered for the Clients ... 55

       i. Experience, Reputation, and Ability of Attorneys .......... 58

       j. Undesirability of the Case ............................................. 58

k.  Nature and Length of Professional Relationship With the
    Clients                                                          59

l.  Fee Awards in Similar Cases                                      59

4.  The Percentage Requested Is Supported by Fee Awards in Other
    Class Actions, Including So-Called "Mega-Fund" Cases             60

5.  A Lodestar Cross-Check Is Neither Necessary Nor Appropriate      73

6.  In Any Event, a Lodestar Analysis Supports the Fees Requested    77

a.  The Hours Spent by Class Counsel Are Reasonable                  78

b.  The Billing Rates Proposed by Class Counsel Are Reasonable       79

c.  Additional Expected Hours Should Be Included                     88

d.  The Multiplier Is Reasonable                                     89

e.  The Multiplier Is Reasonable in Comparison With Other
    "Mega-Fund" Cases                                                94

7.  Conclusion on Attorneys' Fees                                    96

B.  The Out-of-Pocket Expenses Sought by Class Counsel Are
    Reasonable                                                       96

C.  The Proposed Incentive Payments to the Class Representatives Are
    Reasonable                                                       99

VII. CONCLUSION                                                      104


APPENDIX A: Curriculum Vitae                                         106

APPENDIX B: Materials Considered                                     125

ROBERT H. KLONOFF, under penalty of perjury, declares as follows:

## I.  INTRODUCTION

1.  Class counsel are seeking an award of attorneys' fees of $77.5 million in connection with the proposed settlement of the Equifax data breach litigation.  I have been asked by class counsel to opine on the reasonableness of those requested attorneys' fees (assuming that this Court ultimately approves the settlement as fair, reasonable, and adequate).  I have also been asked to opine on the reasonableness of the $1,248,033.46 in expenses requested by class counsel, and the $2,500 proposed incentive payments to each of the 96 class representatives.  I am offering my opinions for the Court's consideration based on my background and experience.  I recognize, of course, that my role is limited and that this Court will make the ultimate decision.

## II.  QUALIFICATIONS

2.  I have served as an expert in numerous class action cases.  I am currently the Jordan D. Schnitzer Professor of Law at Lewis & Clark Law School and have held that position since June 1, 2014.  This is an endowed, tenured position at the rank of full professor.  From July 1, 2007, to May 31, 2014, I served as the Dean of Lewis & Clark Law School, and I was also a full professor at Lewis & Clark during that

time.  Immediately prior to assuming the deanship at Lewis & Clark, I served for four years as the Douglas Stripp/Missouri Professor of Law at the University of Missouri-Kansas City School of Law (UMKC).  That appointment was an endowed, tenured position at the rank of full professor.  Before joining the academy, I served for more than a dozen years as an attorney with the international law firm of Jones Day, working in the firm's Washington, D.C. office.  For most of that time, I was an equity partner at the firm.  (I continued to work at Jones Day while I was employed at UMKC; my status with the firm during that period changed from partner to of counsel.)  While working at Jones Day (before joining the UMKC faculty), I also served for many years as an adjunct professor of law at Georgetown University Law Center.  Before joining Jones Day, I served as an Assistant United States Attorney and as an Assistant to the Solicitor General of the United States.  Immediately after graduating from law school, I served as a law clerk for Chief Judge John R. Brown of the U.S. Court of Appeals for the Fifth Circuit.  I received my law degree from Yale Law School.

3. In my various academic positions, I have taught (among other subjects) complex litigation, class actions, civil procedure, federal courts, and federal appellate procedure.

4.  In September 2011, the Chief Justice of the United States appointed me to serve a three-year term as the academic voting member of the Judicial Conference Advisory Committee on Rules of Civil Procedure ("Advisory Committee").  The Advisory Committee considers and recommends amendments to the Federal Rules of Civil Procedure.  Only one civil procedure professor in the United States is selected by the Chief Justice to serve in that role during any three-year term.  In May 2014, the Chief Justice reappointed me to serve a second three-year term on the Advisory Committee.  I completed that service in May 2017.  (The maximum period of service on the Advisory Committee is six years.)  I also served on the Advisory Committee's Class Action Subcommittee, which took the lead for the full Advisory Committee on proposed amendments to the federal class action rule, Federal Rule of Civil Procedure 23.  Those amendments became effective on December 1, 2018.

5.  I served for five years as an Associate Reporter for the American Law Institute's class action (and other multi-party litigation) project, *Principles of the Law of Aggregate Litigation*.  I was the principal author of Chapter 3, which addresses class action settlements and attorneys' fees.  The ALI project was unanimously approved by the membership of the American Law Institute at its

annual meeting in May 2009, and was published by the American Law Institute in May 2010.  It has been frequently cited by courts and commentators.[1]

6.  I have close to 40 years of experience as a practicing lawyer.  I have had eight oral arguments before the U.S. Supreme Court, and numerous oral arguments in other federal and state appellate courts throughout the country, including oral

---

[1] *See*, *e.g.*, *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 331 (3d Cir. 2019); *Smith v. Bayer Corp.*, 131 S. Ct. 2368, 2381 n.11 (2011); *Keepseagle v. Perdue*, 856 F.3d 1039, 1069–70 (D.C. Cir. 2017) (Brown, J., dissenting); *In re Google Referrer Header Privacy Litig.*, 869 F.3d 737, 744, 749 (9th Cir. 2017); *Baker v. Microsoft Corp.*, 797 F.3d 607, 615 n. 5 (9th Cir. 2015), *rev'd on other grounds*, 137 S. Ct. 1702 (2017); *Hill v. State Street Corp.*, 794 F.3d 227, 229, 231 (1st Cir. 2015); *In re BankAmerica Corp. Secs. Litig.*, 775 F.3d 1060, 1063–67 (8th Cir. 2015); *In re Nexium Antitrust Litig.*, 777 F.3d 9, 19–20 (1st Cir. 2015); *In re Trans Union Corp. Privacy Litig.*, 741 F.3d 811, 813 (7th Cir. 2014); *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 171–72 (3d Cir. 2013); *Ira Holtzman, CPA v. Turza*, 728 F.3d 682, 689–90 (7th Cir. 2013); *In re Lupron Mktg. & Sales Practices Litig.*, 677 F.3d 21, 32–33 (1st Cir. 2012); *Klier v. Elf Atochem N.A., Inc.*, 658 F.3d 468, 474–75 nn.14–16 (5th Cir. 2011); *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1039 n.2 (9th Cir. 2011); *Cabiness v. Educ. Fin. Solutions, LLC*, No. 16-cv-01109-JST, 2018 WL 3108991, at *8 n.4 (N.D. Cal. June 25, 2018); *Keepseagle v. Vilsack*, 118 F. Supp. 3d 98, 116 (D.D.C. 2015); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1355–56 (S.D. Fla. 2011); Richard Marcus, *Revolution v. Evolution in Class Action Reform*, 96 N.C. L. REV. 903, 927–28, 933 n.161, (2018); Sergio J. Campos, *Mass Torts and Due Process*, 65 VAND. L. REV. 1059, 1063 (2012); Tanya J. Monestier, *Transnational Class Actions and the Illusory Search for Res Judicata*, 86 TUL. L. REV. 1, 66 (2011); Rhonda Wasserman, *Cy Pres in Class Action Settlements*, 88 S. CAL. L. REV. 97, 111 (2014); Ryan C. Williams, *Due Process, Class Action Opt Outs, and the Right to Sue*, 115 COLUM. L. REV. 599, 649–50 (2015).

arguments in eight federal circuits.  As an attorney at Jones Day, I personally handled more than 100 class action cases, mostly (but not entirely) on the defense side.

7. I have lectured and taught on class actions and other litigation topics throughout the United States and abroad, including presentations at law schools in Cambodia, Canada, China, Colombia, Croatia, Ecuador, Germany, India, Israel, Italy, Japan, the Philippines, Russia, South Korea, Taiwan, and Turkey.  Over the years, I have frequently appeared as an invited speaker at class action symposia, conferences, and continuing legal education programs.[2]

8.  I co-authored the first casebook on class actions, and I am now the sole author of that book:  *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West 4th ed. 2017).  I am also the sole author of the Nutshell on class actions: Robert H. Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (West 5th ed. 2017).  These texts are used at law schools throughout the United States and have been cited by many courts and commentators.[3]  I am also the author

---

[2] Examples of those courses and speaking engagements are contained in my attached curriculum vitae (Appendix A).

[3] *See, e.g.*, *Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432, 468 (1st Cir. 2013) (citing *Nutshell*); *Culver v. City of Milwaukee*, 277 F.3d 908, 913 (7th Cir. 2002) (citing *Nutshell*); *Adams v. United Services Automobile Ass'n*, No. 2:14-CV-02013, 2016 WL 1465433, at *7 (W.D. Ark. Apr. 14, 2016) (citing *Nutshell*), *rev'd on other grounds*, 863 F.3d 1069 (8th Cir. 2017); Libby Jelinek, *The Applicability*

of a forthcoming (December 2019) West Nutshell on federal multidistrict litigation, and the author of a chapter—focusing on the United States—for a forthcoming (2020) book by Cambridge University Press on class actions throughout the world. In addition, I have authored or co-authored numerous scholarly articles on class actions and other topics.[4]   I also serve on the advisory board of the Class Action Litigation Report, a Bloomberg/BNA publication.

---

*of the Federal Rules of Evidence at Class Certification*, 65 UCLA L. REV. 280, 286 n.27, 291 n.65, 316 n.206 (2018) (citing casebook and *Nutshell*); Jaime Dodge, *Privatizing Mass Settlement*, 90 NOTRE DAME L. REV. 335, 337 n.12 (2014) (citing casebook); Vaughn R. Walker, *Class Actions Along the Path of Federal Rule Making*, 44 LOY. U. CHI. L.J. 445, 449 n. 17 (2012) (citing *Nutshell*); Richard A. Nagareda, *The Preexistence Principle and the Structure of the Class Action*, 103 COLUM. L. REV. 149, 151 n.5 (2003) (citing casebook); Kenneth S. Rivlin & Jamaica D. Potts, *Proposed Rule Changes to Federal Civil Procedure May Introduce New Challenges in Environmental Class Action Litigation*, 27 HARV. ENVTL. L. REV. 519, 521 n.10 (2003) (citing *Nutshell*).

[4] My writings have been frequently cited.  For example, my 2013 article, *The Decline of Class Actions*, 90 WASH. U. L. REV. 729 (2013), has been cited dozens of times by courts and commentators.  *See, e.g.*, *Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 484 & n.18 (3d Cir. 2018); *In re National Football League Players' Concussion Injury Litig.*, 775 F.3d 570, 576 (3d Cir. 2014); *Eubank v. Pella Corp.*, 753 F.3d 718, 719 (7th Cir. 2014) (Posner, J.); *In re Johnson*, 760 F.3d 66, 75 (D.C. Cir. 2014); *Wendell H. Stone Co., Inc. v. PC Shield Inc.*, No. 18-cv-001135, 2018 WL 6065408, at *2 (W.D. Pa. Nov. 19, 2018); *In re Aetna UCR Litig.*, No. 07-cv-03541-KSH-CLW, 2018 U.S. Dist. LEXIS 111130, at *43 n.15 (D.N.J. June 30, 2018); *Dickens v. GC Services Limited Partnership*, 220 F. Supp. 3d 1312, 1324 (M.D. Fla. 2016), *vacated on other grounds*, 706 F. App'x 529 (11th Cir. 2017); *In re Kosmos Energy Ltd. Sec. Litig.*, No. 3:12-cv-373-B, 2014 WL 1095326, at *2 n.20 (N.D. Tex. Mar. 19, 2014); Pamela K. Bookman, *The Arbitration–Litigation*

*Paradox*, 72 VAND. L. REV. 1119, 1143 n.146 (2019); David C. Miller, *Abuse of Discretion and the Sliding Scale of Difference: Restoring the Balance of Power Between Circuit Courts and District Courts for Rule 23 Class Certification Decisions in Oil and Gas Royalty Litigation*, 103 IOWA L. REV. 1811 *passim* (2018); Libby Jelinek, *The Applicability of the Federal Rules of Evidence at Class Certification*, 65 UCLA L. REV. 280, 297 n.101 (2018); Andrew D. Bradt & D. Theodore Rave, *Aggregation on Defendants' Terms:* Bristol-Myers Squibb *and the Federalization of Mass Tort Litigation*, 59 B.C. L. REV. 1251, 1261 n.39, 1266 n.78, 1286 n.196 (2018); Joseph A. Seiner, *Tailoring Class Actions to the On-Demand Economy*, 78 OHIO ST. L.J. 21, 25 n.14, 32 n.54 (2017); Brian T. Fitzpatrick, *Justice Scalia and Class Actions: A Loving Critique*, 92 NOTRE DAME L. REV. 1977, 1979 (2017); Deborah R. Hensler, *From Sea to Shining Sea: How and Why Class Actions Are Spreading Globally*, 65 KAN. L. REV. 965, 965 n.2 (2017); Richard Marcus, *Bending in the Breeze: American Class Actions in the Twenty-First Century*, 65 DEPAUL L. REV. 497, 497 & n.2 (2016); Maureen Carroll, *Class Action Myopia*, 65 DUKE L.J. 843, 846 n.8, 876–78 & nn.181, 183 & 190–93, 881 nn.211 & 213, 883 n.225 (2016); Claire E. Bourque, Note, *Liability Only, Please—Hold the Damages: The Supreme Court's New Order for Class Certification*, 22 GEO. MASON L. REV. 695, 698 n.29 (2015); Martin H. Redish & Julie M. Karaba, *One Size Doesn't Fit All: Multidistrict Litigation, Due Process, and the Dangers of Procedural Collectivism*, 95 B.U. L. REV. 109, 110 n.2 (2015); Robert G. Bone, *The Misguided Search For Class Unity*, 82 GEO. WASH. L. REV. 651, 654 n.6 (2014); David Freeman Engstrom, *Private Enforcement's Pathways: Lessons From Qui Tam Litigation*, 114 COLUM. L. REV. 1913, 1920 n.17 (2014); Howard M. Erichson, *The Problem of Settlement Class Actions*, 82 WASH. U. L. REV. 951, 956 n.20 (2014); Arthur R. Miller, Keynote Address, The Preservation and Rejuvenation of Aggregate Litigation: A Systemic Imperative, 64 EMORY L.J. 293, 294 n.7 (2014); Linda S. Mullenix, *Ending Class Actions As We Know Them: Rethinking the American Class Action*, 64 EMORY L.J. 399, 403 n.14 (2014); Stephen R. Subrin & Thomas O. Main, *The Fourth Era of American Civil Procedure*, 162 U. PA. L. REV. 1839, 1853 n.80 (2014); Erin L. Geller, *The Fail-Safe Class as an Independent Bar to Class Certification*, 81 FORDHAM L. REV. 2769, 2775 n. 38 (2013); Arthur R. Miller, *Simplified Pleading, Meaningful Days in Court, and Trials on the Merits: Reflections on the Deformation of Federal Procedure*, 88 N.Y.U. L. REV. 286, 314 n.105 (2013); D. Theodore Rave, *Governing the Anticommons in Aggregate Litigation*, 66 VAND. L. REV. 1183, 1186 n.5 (2013); Brandon L. Garrett,

9.  In October 2014, I was elected to membership in the International Association of Procedural Law (IAPL), an organization of preeminent civil procedure scholars from around the world.  I was selected in a competitive process to present a scholarly article on class actions at the May 2015 Congress of the IAPL, an event held once every four years.

10.  I have testified as an expert (in person or by declaration) in numerous class action cases and in other cases raising civil procedure issues.  Between 2011 and the present, I testified in the following cases:

- *In re Chrysler-Dodge-Jeep Ecodiesel Marketing, Sales Practices, & Products Liability Litigation*, No. 3:17-md-02777-EMC (N.D. Cal.) (submitted expert declaration on settlement fairness dated 4/25/19);

- *The Doan v. State Farm General Insurance Co.*, No. 1-08-CV-129264 (Cal. Sup. Ct. Santa Clara Cnty.) (submitted expert declaration on settlement fairness, attorneys' fees, expenses, and incentive payments dated 1/16/19);

- *In re Syngenta AG MIR162 Corn Litigation*, No. 2:14-MD-02591-JWL-JPO (D. Kan.) (submitted expert declaration on attorneys' fees, expenses, and incentive payments dated 7/10/18; submitted supplemental declaration dated 8/17/18);

---

*Aggregation and Constitutional Rights*, 88 NOTRE DAME L. REV. 593, 610 n.82 (2012); Richard Marcus, *Still Confronting the Consolidation Conundrum*, 88 NOTRE DAME L. REV. 557, 560 n.17, 589 n.154 (2012); *Hearing on "The State of Class Actions Ten Years after the Class Action Fairness Act" Before the Committee on the Judiciary, Subcommittee on the Constitution and Civil Justice* (U.S. House of Representatives, Feb. 27, 2015) (statement of Prof. Patricia W. Moore), at 2 n.4.

- *In re Chinese-Manufactured Drywall Litigation*, MDL No. 2047 (E.D. La.) (submitted expert declarations on attorneys' fees issues dated 05/04/17 and 08/01/18;

- *Jabbari v. Wells Fargo & Co.*, No. 15-cv-02159-VC (N.D. Cal.) (submitted expert declaration on class certification, settlement fairness, attorneys' fees, expenses, and incentive payments dated 1/19/18; submitted supplemental declaration dated 5/21/18);

- *Lynch v. Lynch*, No. F.D. 14-6239-006 (Pa. Ct. Comm. Pl., Allegheny Cnty.) (submitted expert declaration on the nature of class action law practice in the context of a divorce proceeding involving a class action attorney, dated 9/05/17);

- *In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Products Liability Litigation*, No. 3:15-md-02672-CRB (N.D. Cal.) (submitted expert declaration addressing objections by class members to proposed 3.0-liter and Bosch settlements, dated 4/28/17);

- *State of Louisiana & Vermilion Parish School Board v. Louisiana Land & Exploration Co., et al.,* No. 82162 (15th Judicial Court, Parish of Vermilion) (submitted expert declaration on attorneys' fees issues dated 3/9/17);

- *Thacker v. Farmers Insurance Exchange*, Case No. 2006CV342 (Dist. Ct. Boulder County, Colo.) (submitted expert declaration on class certification issues dated 1/24/17);

- *In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Products Liability Litigation*, No. 3:15-md-02672-CRB (N.D. Cal.) (submitted expert declaration addressing objections by class members to proposed 2.0-liter settlement, dated 9/30/16);

- *In the Matter of Gosselin Group*, No. 15/3925/B (Antwerp Court of First Instance, Belgium) (submitted expert declaration discussing the role of U.S. federal appellate courts in the factfinding process, dated 9/27/16);

- *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, Nos. 12-970, 15-4143, 15-4146, and 15-4645 (E.D. La.) (submitted expert declaration on class certification,

settlement fairness, and attorneys' fees relating to proposed Halliburton/Transocean class settlement, dated 8/5/16);

- *Ben-Hamo v. Facebook, Inc. and Facebook Ireland Ltd.*, No. 46065-09-14 (Central District Court, Israel) (submitted expert declaration on behalf of Facebook, Inc. and Facebook Ireland Limited addressing various issues of U.S. civil procedure and class action law, dated 9/3/15);

- *Skold v. Intel Corp.*, Case No. 1-05-CV-039231 (Super. Ct. of Cal., Santa Clara County) (submitted expert declaration on class settlement approval, attorneys' fees, and incentive payments dated 12/30/14);

- *In re National Football League Players' Concussion Injury Litigation*, No. 2:12-md-02323-AB (E.D. Pa.) (submitted expert declaration on class certification, class notice, and settlement fairness dated 11/12/14);

- *MBA Surety Agency, Inc. v. AT&T Mobility, LLC*, Case No. 1222-CC09746 (Mo. 22d Dist.) (submitted expert declaration on class certification and settlement fairness dated 2/13/13; submitted supplemental declaration dated 2/19/13; testified in court on 2/20/13);

- *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, No. 2:10-md-02179-CJB-SS (E.D. La.) ("*Deepwater Horizon*") (submitted expert declarations on class certification, settlement fairness, and attorneys' fees for the economic and property damages settlement (Doc. No. 7104-3) and class certification, settlement fairness, and attorneys' fees for the personal injuries settlement (Doc. No. 7111-4), both dated 08/13/12; submitted supplemental expert declarations for both class settlements (Doc. No. 7727-4: economic) and (Doc. No. 7728-2: medical), both dated 10/22/12);

- *Robichaux v. State of Louisiana, et. al.* (No. 55,127) (18th Judicial Dist. Ct., Iberville Parish, La.) (submitted expert declaration on attorneys' fees dated 2/20/12; gave deposition testimony on 3/7/12; testified in court on 4/11/2012); and

- *In re AT&T Mobility Wireless Data Services Sales Tax Litigation*, MDL No. 2147, Case No. 1:10-cv-02278 (N.D. Ill.) (submitted expert

declarations on settlement fairness (Doc. No. 163-3) and attorneys' fees and incentive payments (Doc. 164-1), both dated 03/08/11; testified in court on 3/10/11.

11. Courts reviewing class action settlements and attorneys' fees issues have relied extensively on my testimony.  For example, in the *Deepwater Horizon* MDL litigation, Judge Carl Barbier cited and quoted my Declarations (relating to a proposed settlement with British Petroleum) more than 60 times in his two opinions analyzing class certification and fairness.[5]  In a later order in that MDL, Judge Barbier repeatedly cited my Declaration (which I filed in connection with a class settlement involving Transocean and Halliburton).[6]  In the *Volkswagen "Clean Diesel"* MDL litigation, Judge Charles Breyer repeatedly cited and quoted my two Declarations in his three opinions—relating to the 2.0-liter VW class settlement, the 3.0-liter VW class settlement, and the class settlement with VW's co-defendant,

---

[5] *See In re Deepwater Horizon*, 910 F. Supp. 2d 891, 903, 914–16, 918–21, 923–24, 926, 929–33, 938, 941, 947, 953, 955, 960, 962 (E.D. La. 2012) (approving economic and property damages settlement), *aff'd*, 739 F.3d 790 (5th Cir. 2014); *In re Deepwater Horizon*, 295 F.R.D. 112, 133–34, 136, 138–41, 144–45, 147 (E.D. La. 2013) (approving medical benefits settlement).

[6] *See* Order and Reasons, Case No. 2:10-md-02179-CJB-JCW (Doc. 22252) (E.D. La. 02/15/17); *available at* http://www.laed.uscourts.gov/sites/default/files/OilSpill/2152017OrderAndReasons%28HESI%26TOsettlement%29.pdf (last visited July 7, 2018).

Bosch.[7] In the *Syngenta GMO Corn* MDL litigation, Judge John Lungstrum cited my two Declarations (on attorneys' fees issues) numerous times in his two opinions.[8] Indeed, Judge Lungstrum credited my opinions on attorneys' fees over the contrary opinions of five experts retained by various objectors.[9] In the *AT&T Mobility* MDL litigation, Judge Amy St. Eve (now a Judge on the Seventh Circuit) cited and quoted my Declarations more than 20 times in approving a class settlement and awarding attorneys' fees.[10] In the *Wells Fargo Unauthorized Accounts* litigation, Judge Vince

---

[7] *See In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Prods Liab. Litig.*, No. 3:15-md-02672-CRB, 2016 WL 6248426, at *18, *19, *20 (N.D. Cal. Oct. 25, 2016), *appeal filed*, No. 16-17185 (9th Cir. Nov. 29, 2016); Order Granting Final Approval of the Consumer and Reseller Dealership 3.0-Liter Class Action Settlement, Case No. 3:15-md-02672-CRB (Doc. 3229) (filed 05/17/17), at 34, 35, 38; Order Granting Final Approval of the Bosch Class Action Settlement, Case No. 3:15-md-02672-CRB (Doc. 3230) (filed 05/17/17), at 18.

[8] *See In re Syngenta AG MIR 162 Corn Litig.*, No. 2:14-md-02591-JWL-JPO, slip op. at 26, 32 & n.11, 34 n.13 (D. Kan. Dec. 12, 2018) (Dkt. No. 3849) (granting final approval of class settlement and awarding total attorneys' fees); *In re Syngenta AG MIR 162 Corn Litig.*, No. 2:14-md-02591-JWL-JPO, slip op. at 9–11 & n.6 (D. Kan. Dec. 31, 2018) (Dkt. No. 3882) (allocating attorneys' fees among common benefit counsel and individually retained private attorneys).

[9] *In re Syngenta AG MIR 162 Corn Litig.*, No. 2:14-md-02591-JWL-JPO, slip op. at 9–11 (D. Kan. Dec. 31, 2018) (Dkt. No. 3882).

[10] *See In re AT&T Mobility Wireless Data Svcs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 956–59, 961, 963–65 (N.D. Ill. 2011) (approving class settlement); *In re AT&T Mobility Wireless Data Svcs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1032 n.3, 1034–35, 1037, 1040, 1042 (N.D. Ill. 2011) (awarding attorneys' fees).

Chhabria cited my testimony in ordering that objectors to the class settlement post an appeal bond.[11]   And in *Skold v. Intel Corp.*, Judge Peter Kirwan cited my Declaration in approving a class settlement and awarding attorneys' fees.[12]

12.  I have done extensive work in the area of attorneys' fees.  In addition to my expert witness work, I have litigated attorneys' fees issues in private practice, have worked on such issues in my role as Associate Reporter for the ALI *Aggregate Litigation* project, and have addressed attorneys' fees issues in my academic writings.[13]   In those various tasks, I have developed expertise in attorneys' fees concepts, such as percentage of the fund and the lodestar.  I have extensive

---

[11] *See Jabbari v. Wells Fargo & Co.*, No. 15-cv-02159-VC, slip op. at 14 (N.D. Cal. June 14, 2018) (Dkt. No. 271), *available at* https://www.courthousenews.com/wp-content/uploads/2018/06/Wells-Fargo-settlement.pdf.

[12] *See Skold v. Intel Corp.*, No. 1-05-CV-039231 (Cal. Super. Ct. Santa Clara County) (Jan. 29, 2015), at 7, *available at* http://lawzilla.com/blog/janet-skold-et-al-vs-intel-corporation/.

[13] *See, e.g.*, ROBERT H. KLONOFF, CLASS ACTIONS AND OTHER MULTI-PARTY LITIGATION: CASES AND MATERIALS 632–49 (West 4th ed. 2017) (overview of attorneys' fees issues); ROBERT H. KLONOFF, CLASS ACTIONS AND OTHER MULTI-PARTY LITIGATION IN A NUTSHELL 351–56 (West 5th ed. 2017) (similar); Robert H. Klonoff & Mark Herrmann, *The Class Action Fairness Act: An Ill-Conceived Approach to Class Settlements*, 80 TULANE L. REV. 1695 (2006) (discussing attorneys' fees issues in the settlement context); PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION §§ 3.08, 3.13 (Am. Law Inst. 2010) (addressing attorneys' fees in class actions and other aggregate litigation).  In addition, my forthcoming text on federal multidistrict litigation will have an entire chapter devoted to attorneys' fees, expenses, and incentive payments.

knowledge of typical hourly rates for attorneys and paralegals in class action litigation. I have served as counsel and as an expert in class action cases throughout the United States, and have gained knowledge of hourly rates during that work. I have also gained familiarity with hourly rates of legal personnel through my work as a scholar.

13. I am being compensated for my work at my standard 2019 rate of $835 per hour. Payment is not contingent on the substance of my opinions.

14. Additional information regarding my qualifications and experience—including a list of my publications—can be found in my curriculum vitae, attached hereto as Appendix A.

## III.  MATERIALS CONSIDERED

15. In addition to reviewing cases and materials in other class actions, I considered numerous documents filed in, and pertaining to, the instant case in the course of preparing my Declaration. *See* Appendix B (listing those documents).

## IV.  BACKGROUND OF THIS LITIGATION AND SETTLEMENT

16. This Court is thoroughly familiar with the background of this litigation. Thus, I focus only on those facts relevant to my opinions in this matter. The factual

statements in this Declaration are based on the case-specific materials that I have considered, which, as noted, are listed in Appendix B.

### A. Background of the Litigation

17.  On September 7, 2017, Equifax announced the theft of data pertaining to approximately 147 million Americans.  Subsequently, more than 300 class action suits filed in federal court were consolidated in this Court by the Judicial Panel on Multidistrict Litigation.  This Court created two tracks:  one for consumer claims and one for claims by financial institutions.  Separate leadership teams were appointed for each track.  The instant settlement involves the consumer track.

18. On May 14, 2018, plaintiffs filed a 559-page consolidated amended complaint, raising both federal and state law claims.  Equifax's motion to dismiss the complaint in its entirety was largely denied after extensive briefing and oral argument.  Equifax filed its answer on February 25, 2019.  After the answer was filed, the parties engaged in extensive discovery, and plaintiffs' counsel reviewed more than 500,000 documents.

19.  While motions practice and discovery were occurring, the parties were also involved in settlement discussions.  In September 2017, Equifax's counsel contacted two plaintiffs' lawyers in the litigation to explore whether early settlement

discussions might be warranted.  The result was the creation of a team of plaintiffs' lawyers to evaluate the prospects of early negotiations.  This Court subsequently appointed those lawyers to lead the consumer track and serve as interim class counsel for that track.

20.  The parties retained retired Federal Judge Layn Phillips to serve as mediator. Judge Phillips has mediated a number of high-profile cases, including the *NFL Concussion Litigation*, the *Anthem Data Breach Litigation*, the *High Tech Employees Antitrust Litigation*, and the *Merck Vioxx Securities Litigation*.  The initial mediation sessions in late November 2017 revealed that the parties were far apart.  Talks continued, however, and during 2018, while the litigation proceeded, plaintiffs' counsel spent thousands of hours preparing for and participating in settlement talks.  The parties made progress in mediation sessions in May, August, and November of 2018, but ultimately reached an impasse regarding the amount of relief to be made available to the class.  The parties renewed settlement talks after the Court denied Equifax's motion to dismiss, with discussions taking place in February and March 2019, again with Judge Phillips's assistance.  Although the parties reached a consensus on non-monetary terms, they were still far apart on the monetary components.  On March 30, 2019, Judge Phillips made a double-blind

16

mediator's proposal, which both sides accepted, and a binding term sheet was prepared that day (and approved by Equifax's board of directors the following day).

21. The binding term sheet embodied the key settlement terms, including a settlement fund of $310 million (which I understand is the largest in any data breach litigation); reimbursement of class members' out-of-pocket losses up to $20,000; three years of credit monitoring for class members who file claims and select that option; identity restoration services for at least 7 years for all class members, regardless of whether they file claims; and injunctive relief requiring Equifax to substantially improve its data security (including a requirement that it spend at least $1 billion on such improvements over five years).   Plaintiffs secured other substantial benefits under the binding term sheet, including a provision that Equifax cannot seek to enforce any arbitration clause in connection with any Equifax product that has been offered in response to the data breach as of the date of the settlement agreement or that is provided under the settlement.  The term sheet also provided that class counsel would seek $77.5 million in attorneys' fees and up to $3 million in expenses.  I understand that the parties did not negotiate over fees until the other terms had been resolved.

22. The parties agreed to work together to draft a comprehensive agreement, to present any disputes to Judge Phillips for final determination, and to submit the

proposed settlement to this Court for preliminary approval within 90 days. Recognizing the value of governmental input, the parties also agreed that (1) Equifax could share the term sheet with federal and state regulators that were separately investigating Equifax, and (2) the parties would, in good faith, consider suggested changes offered by those regulators. At the same time, either side's rejection of additional terms proposed by the regulators would not impact the enforceability of the binding term sheet, including the benefits to class members outlined above.

23. The regulators proposed a set of changes to the settlement. Class counsel agreed with many of the proposed changes, including one to increase the fund from $310 million to $380.5 million, but disagreed with certain proposed changes that, in their view, could have made class members worse off. The proposed changes necessitated a new and intense round of settlement negotiations with Equifax and the regulators, lasting more than two months and involving numerous meetings. All issues were finally resolved in July 2019, and plaintiffs' counsel and Equifax executed a settlement agreement on July 22, 2019. *See* ¶¶ 27–33 (discussing terms of settlement). Class counsel advise me that, but for their central role during this final round of negotiations, the increase in the settlement fund for which the regulators served as a catalyst would not have occurred.

24.  In his Declaration discussing the settlement and the negotiations leading up to that settlement, Judge Phillips noted that "the advocacy on both sides of the case was outstanding,"[14] and that during the 16 months of negotiations, the parties "represented their clients with tremendous effort, creativity, and zeal."[15]  Judge Phillips further noted that the outcome was "the direct result of all counsel's experience, reputation, and ability in complex class actions including the evolving field of privacy and data breach class actions."[16]

25.  On July 22, 2019, plaintiffs filed their motion for preliminary approval of the settlement and to direct notice of the proposed settlement to the class.[17]  As suggested by the December 1, 2018 amendments to Federal Rule of Civil Procedure 23, plaintiffs "frontloaded" the approval process by providing extensive information and documentation supporting the settlement, including declarations from several experts regarding the fairness of the proposed settlement and the comprehensiveness of the proposed notice plan.

---

[14] Decl. of Hon. Layn Phillips (Ret.) ¶ 14 (Dkt. No. 739-9) (filed July 22, 2019) (hereinafter "Phillips Decl.").

[15] *Id.*

[16] *Id.*

[17] *See* Pl.'s Mot. to Direct Notice of Proposed Settlement to the Class (Dkt. No. 739) (filed July 22, 2019).

26.  On July 22, 2019, after a thorough hearing, this Court granted preliminary approval, directed notice to the class, and set a schedule for objections, opt-outs, briefing on attorneys' fees, and briefing on the fairness of the settlement.  Under that schedule, class counsel's motion for attorneys' fees, expenses, and incentive payments is due on October 29, 2019.  Class members must file objections to the settlement (and to class counsel's request for attorneys' fees) by November 19, 2019.[18]  Class counsel's motion for final approval of the settlement is due on December 5, 2019.

### B. Terms of the Proposed Settlement

27.  The class is defined as the roughly 147 million consumers identified by Equifax whose personal information was compromised by the data breach announced by Equifax on September 7, 2017.  Excluded are Equifax, affiliated entities and individuals, the Court, its staff, and their immediate families.[19]

---

[18] Because the deadline for filing objections to attorneys' fees has not yet expired, I will address objections relating to attorneys' fees in a supplemental declaration. The objections submitted to date, however, make only vague and conclusory assertions that the attorneys' fees requested are excessive.  As a result, those objections do not undercut the opinions I articulate in this Declaration.

[19] I have informed class counsel that I and my immediate family are renouncing any claims that we might have as potential class members, given my role as an expert in this case.

28. The settlement contains numerous elements, including the creation by Equifax of a non-reversionary fund of $380.5 million to benefit class members. More specifically, benefits to class members include: (1) reimbursement of up to $20,000 for losses fairly traceable to the breach (*e.g.*, costs of freezing or unfreezing a credit file, buying credit monitoring service, or out-of-pocket losses from identity theft or fraud), and payments to Equifax during the prior year for credit monitoring or identity theft protection; (2) up to 20 hours of compensation for taking preventive measures or otherwise dealing with the data breach (at $25 per hour); (3) four years of three-bureau credit monitoring and identity protection through Experian (conservatively worth $1,200 per class member[20]) and six additional years of one-bureau credit monitoring through Equifax (conservatively worth $720 per class

---

[20] *See* Class Counsel's Decl. in Support of Pl.'s Mot. to Direct Notice of Proposed Settlement to the Class ¶ 38 (Dkt. No. 739-4) (filed July 22, 2019); Adriana Belmonte, *Equifax Settled Its Big Data Breach Lawsuit. Here's How Much Consumers Could Get*, HUFFINGTON POST (July 24, 2019), https://www.huffpost.com/entry/how-to-get-equifax-money-data-breach-lawsuit_l_5d38bd4b e4b004b6adba579a ("As a result of the settlement, class members can obtain four years of three-bureau credit monitoring and ID protection . . . worth $1,200.").

member[21]);  (4) \$1  million  in  identity  theft  insurance  covering  four  years;[22]

(5) alternate compensation of up to \$125 for class members who already have credit

monitoring; and (6) seven years of identity restoration services through Experian for

all class members regardless of whether they file claims.[23]  Class members will have

---

[21] *See See* Class Counsel's Decl. in Support of Pl.'s Mot. to Direct Notice of Proposed Settlement to the Class ¶ 38 (Dkt. No. 739-4) (filed July 22, 2019); Belmonte, *supra* note 20 ("Plus, [class members] can get another six years of one-bureau credit monitoring through Equifax, valued at \$720."). Indeed, the total value of the credit monitoring benefits has been estimated to be significantly higher. *See, e.g.*, Dave Lieber, *Should You Apply for Cash or Free Credit Monitoring in the Multi-Million Dollar Equifax Settlement?*, THE DALLAS MORNING NEWS (Aug. 8, 2019, https://www.dallasnews.com/news/watchdog/2019/08/08/should-you-apply-for-cash-or-free-credit-monitoring-in-the-multi-million-dollar-equifax-settlement/ (estimating the value of free credit monitoring under the settlement to be \$2,400 per class member who chooses that option).

[22] Three-Bureau Credit Monitoring Services at 2 (Dkt. No. 739-2, Ex. 4); *Equifax Data Breach Settlement*, FED. TRADE COMM'N, https://www.ftc.gov/enforcement/cases-proceedings/refunds/equifax-data-breach-settlement (last visited Oct. 25, 2019).

[23] The scope of certain benefits may vary depending on how many class members file particular claims. Thus, out of the \$380.5 million settlement fund, up to \$38 million is available to pay class members at \$25 per hour for time spent taking preventative measures or dealing with identity theft (up to \$31 million during the initial claims period, and then up to an aggregate cap of \$38 million including claims made during the extended claims period, which will run for four years after the initial claims period ends). If claims for time spent dealing with the breach exceed those caps, class members will be paid pro rata for their time based on the settlement funds available, although if money remains in the \$380.5 million fund after the extended claims period ends, class members with valid claims for time may receive an additional pro-rata distribution. *See* Settlement Agreement at 15–16. Additionally, a total of \$31 million is available for class members who already have a credit

until January 22, 2020, to claim benefits (although, as noted, no claim form is required to access the identity restoration services).  Equifax has also agreed to pay up to $125 million more to satisfy claims for out-of-pocket losses if the $380.5 million fund is exhausted, resulting in a total potential fund available to the class of $505.5 million.[24]  On the other hand, if money remains in the fund, the claims period will be extended up to four years to enable class members to recover out-of-pocket losses.  Money not claimed in the extended claims period will be used initially to lift the caps for alternative compensation and time, then to purchase three additional years of identity restoration services, and then to extend the length of credit monitoring for those who signed up for it.  Under no circumstances will any of the funds revert to Equifax.

---

monitoring service and choose the cash payment option.  Payments will be $125 per class member who chooses this option, or a lesser amount depending on how many qualifying class members select the cash option.  After the extended claims period is over, if money remains in the $380.5 million settlement fund, class members who elected the cash option may receive an additional pro rata distribution.  *See id*. at 18–19.

[24] *See id*. at 10 ("In addition to the [$380.5 million] Fund, Equifax Inc. agrees to pay up to [$125 million] in additional amounts for valid Out-of-Pocket Losses submitted during both the Initial Claims Period and the Extended Claims Period in the event the [$380.5 million] fund is exhausted.").

29.  In addition to the above benefits, Equifax has agreed to the entry of a consent order that will require it to spend at least $1 billion for cybersecurity over five years and to comply with comprehensive data security requirements that plaintiffs negotiated with Equifax, with the assistance of data security expert Mary Frantz. Frantz noted in her Declaration, filed in conjunction with plaintiffs' motion for preliminary approval, that those obligations undertaken by Equifax "provide a substantial benefit to the Class Members that far exceeds what has been achieved in any similar settlements."[25]

30.  These elements of the settlement require Equifax to pay a minimum of $1.38 billion.  This figure, however, does not fully capture the potential benefits available to the class.  As noted, class members can choose either (1) the monetary option ($125 or less, depending on how many class members choose that option), or (2) free credit monitoring services worth $1,920 per class member ($1,200 + $720). Although it is likely that only a fraction of the class will choose to submit claims, the fact remains that class counsel secured an agreement by Equifax to provide free credit monitoring services to as many as 147 million people.  I am advised that as of the date of this Declaration, about 3 million class members have submitted claims

---

[25] Decl. of Mary Frantz ¶ 66 (filed July 22, 2019) (Dkt. No. 739-7).

requesting free credit monitoring, worth nearly $6 billion.  The number of claimants is likely to grow substantially by the January 22, 2020 deadline for submitting claims.

31.  With respect to class notice, the settlement encompasses a state-of-the-art notice program, paid for by Equifax, to ensure the widest possible effort to notify this very large class, including multiple emails, a digital and social media campaign, and radio and print advertising.

32.  Under the settlement, plaintiffs' counsel can request attorneys' fees up to $77.5 million, reimbursement of litigation expenses up to $3 million, and incentive payments for the class representatives totaling up to $250,000.  Equifax has agreed not to oppose those requests for attorneys' fees, expenses, and incentive payments.

33.  Under the settlement, the class will release Equifax from all claims that were brought or could have been brought in connection with the specific data breach at issue.  The class does not release any claims other than those directly related to the data breach in question.

34.  Class counsel now seek attorneys' fees of $77.5 million, which represents 20.36 percent of the $380.5 million fund.[26]  They also seek $1,248,033.46 in expenses, and incentive payments for the class representatives totaling $240,000 ($2,500 per representative).  For the reasons expressed below, I believe that all of these requests are reasonable.

## V.  SUMMARY OF OPINIONS

35.  **Attorneys' Fees.**  In my view, the amount requested as attorneys' fees— $77.5 million, which is 20.36 percent of the $380.5 million minimum fund—is reasonable.  Under the percentage-of-the-fund method applied in common fund cases, a 20.36 percent fee award is well below the Eleventh Circuit's 25 percent benchmark, and is justified by the so-called *Camden I* factors.[27]  Such an award is also supported by numerous other cases in the Eleventh Circuit and nationwide,

---

[26] Class counsel's fee request represents 25 percent of the original $310 million fund established by the March 30, 2019 binding term sheet.  Although class counsel spent substantial time and effort improving the settlement following execution of the initial binding term sheet, they agreed to cap their fees at $77.5 million, or 25 percent of the original $310 million cash fund (as reflected in the binding term sheet).  As I explain below, in my view, a fee award of 25 percent of the full $380.5 million fund would have been fully justified here.  Class counsel's fee request, however, recognizes that the regulators were a catalyst in increasing the settlement fund, although (as noted in ¶ 23) the increase could not have been secured without the substantial negotiation efforts of class counsel.

[27] *See Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991).

including so-called "mega-fund" cases (*i.e.*, those above $100 million), in which courts have awarded comparable and significantly higher percentages. Moreover, as I explain below, the overall benefits to the class vastly exceed the $380.5 million fund. And while some of the relief (such as more than $1 billion in structural changes by Equifax to prevent future data breaches) benefits the class in a non-monetary fashion, courts have repeatedly held that non-monetary benefits may be considered in assessing the reasonableness of fees. Thus, the actual ratio of attorneys' fees to class benefits is far lower than 20.36, and in fact may be closer to 1 percent.

36. I do not believe that a lodestar cross-check is necessary or appropriate. In any event, I have performed a lodestar cross-check based on class counsel's time through September 30, 2019, and I believe that the relevant figures (31,011.90 total hours, a blended rate of $676.72, and a total lodestar of $20,986,357.80—resulting in a multiplier of just over 3.69 to reach the fees requested by class counsel) justify the 20.36 percent sought under the percentage method. A multiplier of 3.69 is in line with or below multipliers in many similar cases, including mega-fund cases. And the multiplier is well below 3.0 if class counsel's substantial anticipated future hours are included in the cross-check calculation.

37. **Out-of-Pocket Expenses.**  In my view, the out-of-pocket expenses sought by class counsel are reasonable.  Those expenses currently total $1,248,033.46, which represents less than 0.35 percent of the $380.5 million minimum cash settlement fund.  They are made up of expenses essential to most major class actions, such as expert witness fees, legal research costs, electronic document hosting costs, travel expenses, and mediation fees.

38. **Incentive Payments.** In my view, the proposed incentive payment of $2,500 for each of the 96 class representatives is reasonable.  The representatives provided valuable information regarding the impact of the data breach, participated in discovery, and worked with class counsel in crafting the settlement.

## VI.  DETAILED DISCUSSION OF OPINIONS

39.  In the remaining sections of this Declaration, I explain in detail my opinions on: (1) the reasonableness of the attorneys' fees requested by class counsel; (2) the reasonableness of the out-of-pocket expenses requested by class counsel; and (3) the reasonableness of the proposed incentive payments to the class representatives.

## ATTORNEYS' FEES

### A. The Attorneys' Fees Requested by Class Counsel Are Reasonable

40.  As noted, class counsel are seeking $77.5 million in attorneys' fees.  That amount represents 20.36 percent of the $380.5 million minimum fund.  As I discuss below, however, it represents far less than 20.36 percent of the total benefits that class counsel achieved for the class.  In this section, I explain in detail why I believe that class counsel's request for fees is reasonable.  First, I explain that the percentage is supported by the Eleventh Circuit's benchmark.  Second, I explain why the request is actually far less than 20.36 percent when the total benefits to the class, both monetary and non-monetary, are considered.  Third, I explain why the requested fee is supported by the Eleventh Circuit's *Camden I* factors.  Fourth, I explain why the requested fee award is supported by awards in other class actions.  Fifth, I explain why there is no need to conduct a lodestar cross-check here.  Finally, I opine that, in any event, a lodestar cross-check supports the reasonableness of the fees requested here.

### 1.  A 20.36 Percent Fee Award Is Supported by the Eleventh Circuit's Benchmark

41.  In the Eleventh Circuit, "attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the

class."[28]   Indeed, "[the] percentage of the fund [approach] is *the exclusive method for awarding fees in common fund class actions*."[29]

42.  It is well settled within the Eleventh Circuit that "25% of the fund [is] viewed as a benchmark percentage fee award" in common fund cases.[30]  Significantly, courts in the Eleventh Circuit have often awarded fees well above the benchmark.  As one court in this Circuit has noted, "courts across the country have, in the class action settlement context, *routinely* awarded class counsel fees in excess of the 25 percent benchmark, even in so-called mega-fund cases [cases involving funds of more than $100 million]."[31]   Another court in this District recently noted, in awarding

---

[28] *Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991).

[29] *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1362 (S.D. Fla. 2011) (emphasis added).

[30] *In re Rayonier Inc. Sec. Litig.*, No. 3:14-cv-01395-J-32JBT, 2017 WL 4542852, at *1 (M.D. Fla. Oct. 5, 2017).  *Accord, e.g.*, *James D. Hinson Elec. Contracting Co., Inc. v. BellSouth Telecomm. Inc.*, No. 3:07-cv-00598-TJC-MCR, 2012 WL 12952592, at *2 (M.D. Fla. July 30, 2012) (recognizing "benchmark of 25 percent approved by the Eleventh Circuit in *Camden I*"); *Williams v. Mohawk Ind., Inc.*, No. 4:04-cv-00003-HLM, 2010 WL 11500061, at *10 (N.D. Ga. July 22, 2010) (noting that "*Camden I* set a twenty-five percent [fee] as an appropriate benchmark" in common fund cases); *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 695 (N.D. Ga. 2001) (to the same effect).

[31] *Montoya v. PNC Bank, N.A.*, No. 14-cv-20474, 2016 WL 1529902, at *23 (S.D. Fla. Apr. 13, 2016) (citation and internal quotation marks omitted; emphasis in original).

attorneys' fees of 29.6 percent in a data breach case, that "[t]his percentage falls within the range routinely awarded in the Eleventh Circuit."[32]   And the Eleventh Circuit itself has upheld a district court's fee award calculated based on a presumptive percentage of 30 percent of a common fund.[33]

43. Even putting aside the substantial benefits secured by class counsel in addition to the minimum cash fund of $380.5 million (*see* ¶¶ 44–47), 20.36 percent of the common fund is well below the Eleventh Circuit's benchmark.  In my opinion, the facts and circumstances of this case would have easily justified an award of 25 percent of the $380.5 million fund ($95.125 million), not just 20.36 percent of that fund.  *See* ¶¶ 48–79 (discussing *Camden I* factors).  By seeking only 20.36 percent of the fund, counsel are taking no credit for the fact that the fund was increased from $310 million to $380.5 million.  This is true even though—despite the role of the regulators as the catalysts for that increase—class counsel themselves led the

---

[32] *In re Arby's Restaurant Grp., Inc. Data Security Litig.*, No. 1:17-cv-01035-WMR, 2019 WL 2720818, at *2 (N.D. Ga. June 6, 2019) (citations omitted).

[33] *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1294 (11th Cir. 1999) (noting that "the majority of common fund fee awards fall between 20% and 30% of the fund," and affirming district court's fee award based on a presumptive percentage of 30 percent (citations and internal quotation marks omitted)).

negotiations that ultimately resulted in the larger (and still non-reversionary) fund.[34]

## 2. The True Fee Award Requested Is Far Less than 20.36 Percent of the Benefits to the Class

44.  It is fundamental that when non-monetary benefits inure to the class, those benefits should count in calculating the percentage of the benefit requested by class counsel.  As the Eleventh Circuit noted in *Camden I Condominium Association, Inc. v. Dunkle*, one of "[t]he factors which will impact upon the appropriate percentage to be awarded as a fee" is "any non-monetary benefits conferred upon the class by the settlement[.]"[35]  Numerous courts have reiterated this fundamental point.[36]

---

[34] It is appropriate, in reviewing attorneys' fees sought by class counsel, to "scrutinize the activities of government actors that may have facilitated or enhanced the outcome . . . ."  BARBARA J. ROTHSTEIN & THOMAS E. WILLGING, FED. JUDICIAL CTR., MANAGING CLASS ACTION LITIGATION: A POCKET GUIDE FOR JUDGES 37 (3d ed. 2010), *available at* https://www.fjc.gov/sites/default/files/2012/ClassGd3.pdf. Nonetheless, no law suggests that private counsel must forfeit fees related to a fund just because government regulators also had some role in creating the fund.

[35] 946 F.2d 768, 775 (11th Cir. 1991).

[36] *See, e.g., Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1243–44 (11th Cir. 2011) (upholding 25 percent fee award plus "$1.5 million payment . . . designed to compensate class counsel for the non-monetary benefits they achieved for the class"); *George v. Academy Mortg. Corp. (UT)*, 369 F. Supp. 3d 1356, 1376 (N.D. Ga. 2019) ("Although the monetary benefit of the Settlement Fund alone justifies Class Counsel's [33 percent] attorney's fees, the Court also considers the value of the non-monetary relief that Plaintiffs achieved for the Class Members . . . ."); *Cox v. Cmty. Loans of Am. Inc.*, No. 4:11-cv-00177-CDL, 2016 WL 9130979, at *2 (M.D. Ga. Oct. 6, 2016) ("Courts may also consider the non-monetary relief

45. Here, although class counsel seek fees representing 20.36 percent of the minimum cash fund created by the settlement, Equifax has significant obligations under the settlement that far exceed that minimum cash fund.  Such obligations include the expenditure of $1 billion to overhaul its data security (a commitment of a magnitude never before achieved in a data breach case, *see* ¶ 29).  This overhaul will inure to the benefit of the class, and thus is properly considered under the case law.  As a result, guaranteed commitments by Equifax total $1.38 billion, which means that the actual fee calculated as a percentage of Equifax's minimum cash commitment is only 5.6 percent.  And this does not take into account Equifax's commitment to provide an additional $125 million to the fund if needed to compensate class members for out-of-pocket losses.

---

provided to the Class as part of the settlement pie. . . . And when analyzing the value of the non-monetary benefits, courts should consider changes to a defendant's business practices." (citations and internal quotation marks omitted)); *In re Checking Account Overdraft Litig.*, No. 1:09-md-02036-JLK, 2013 WL 11319244, at *12 (S.D. Fla. Aug. 2, 2013) (noting that, "[w]hen using the percentage-of-the-fund approach, courts compensate class counsel for their work in extracting non-cash relief from the defendant"); *Mashburn v. Nat'l Healthcare, Inc.*, 684 F. Supp. 679, 692–94 (M.D. Ala. 1988) (noting that, although "the non-monetary benefits conferred upon the class by the settlement," such as changed business practices by the defendant, "do not create a fund from which fees may be paid to class counsel[,] . . . the fact that such additional benefits were achieved for the class is a factor which should be considered in determining what appropriate percentage fee should be awarded out of the settlement fund" (paragraph break and citation omitted)).

46.  But even the $1.38 billion figure does not begin to represent the total benefits of the settlement to the class. Most significantly, every class member who chooses free credit monitoring receives a benefit that is conservatively worth $1,920 (*see* ¶ 28).  As a result, for every 1 million class members who file claims for credit monitoring, the direct benefits to the class will increase by nearly $2 billion.  As noted (*see* ¶ 30), as of the date of filing of this Declaration, about 3 million class members have submitted claims requesting free credit monitoring.  This means that the benefits claimed *thus far* just for the credit monitoring benefit are worth around $5.76 billion.  Because the claims period does not expire until January 22, 2020, it is almost certain that the final number will be significantly higher.  But even just using the $5.76 billion figure, when combined with the minimum $1.38 billion benefits, the percentage fee would be just over 1 percent.

47.  I mention these examples to illustrate that the 20.36 percent number is extremely conservative.  The true percentage (when looking at the full panoply of benefits to the class) will be just over 1 percent (or even less given that (1) other class members likely will claim credit monitoring,[37] and (2) class counsel have not

---

[37] Although I am not relying on the unrealistic possibility that all class members will claim the free credit monitoring, it is instructive to note that if all 147 million class members *were* to file claims for credit monitoring, as the settlement allows, the

attempted to put a value on some benefits, such as seven years of identity restoration services).  Thus, while the remainder of my Declaration focuses primarily on the 20.36 percent figure in explaining why the fee request is reasonable, my opinions apply *a fortiori* when one considers that the true ratio of attorneys' fees to class members' benefits is much lower than that.

### 3. The Requested Fee Is Supported by the Eleventh Circuit's *Camden I* Factors

48.  Although the benchmark is a useful tool, "the amount of any fee must be determined on the facts of each case."[38]   In the Eleventh Circuit, the facts and circumstances are assessed by looking at 12 specific factors (and others that may apply).  These so-called *Camden I* factors (also referred to as the *Johnson* factors), were adopted by the Eleventh Circuit in *Camden I Condominium Association, Inc. v. Dunkle*,[39] and are based in part on the Fifth Circuit's opinion in *Johnson v. Georgia*

---

total value of that benefit to class members would be about $282 billion.  Class counsel's $77.5 million fee request would thus amount to only about 0.02 percent of just those benefits.

[38] *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1359 (S.D. Fla. 2011).

[39] 946 F.2d 768 (11th Cir. 1991).

*Highway Express, Inc.*[40]  These 12 factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the relevant questions; (3) the skill required to properly carry out the legal services; (4) the preclusion of other employment by the attorney as a result of his acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the clients or the circumstances; (8) the results obtained, including the amount recovered for the clients; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and the length of the professional relationship with the clients; and (12) fee awards in similar cases.[41]

49. In my opinion, the *Camden I* factors, taken as a whole, support the reasonableness of the 20.36 percent fee award requested in this case.  I address each factor separately below.

### a.  Time and Labor Required

50.  This case has required (and will continue to require) substantial work by class counsel.  As set forth more fully below (*see* ¶¶ 51, 95–97), class counsel have devoted 31,011.90 hours to the case through September 30, 2019.  They expect to have more time between now and final approval, and they further expect to devote

---

[40] 488 F.2d 714, 717–19 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989).

[41] *George v. Academy Mortg. Corp. (UT)*, 369 F. Supp. 3d 1356, 1376 (N.D. Ga. 2019).  *Accord, e.g.*, *Champs Sports Bar & Grill Co. v. Mercury Payment Sys., LLC*, 275 F. Supp. 3d 1350, 1356 (N.D. Ga. 2017).

at least 10,000 future hours to implement the settlement (assuming that final approval is granted).

51.  Class counsel performed numerous functions leading to the settlement.  First, they investigated the facts underlying the historic Equifax data breach and, I am advised, vetted thousands of potential class representatives.  Class counsel ultimately drafted a 559-page consolidated class action complaint containing 99 separate counts, including numerous specific counts on behalf of various state-specific subclasses.  The complaint relied not only on federal law but also on the laws of all 50 states, the District of Columbia, Puerto Rico, and the Virgin Islands.  Second, class counsel responded persuasively and effectively to Equifax's omnibus motion to dismiss all counts of the consolidated complaint.  Class counsel prevailed on virtually every major point, thereby ensuring that the case could go forward.  Third, class counsel and their team conducted wide-ranging discovery, reviewing more than 500,000 documents and interviewing numerous witnesses, including several current and former employees of Equifax.  Fourth, class counsel conducted skillful and protracted mediation sessions under the auspices of retired Judge Layn Phillips. In addition to negotiating with Equifax's lawyers, class counsel interfaced with the Federal Trade Commission (FTC), the Consumer Financial Protection Bureau (CFPB), and other regulators to seek (and, on a number of issues, implement) the

regulators' suggestions.

### b. Novelty and Difficulty of the Questions

52.  Although this is by no means the first data breach case, it is certainly one of the most challenging and pervasive, affecting about 147 million class members. Equifax raised a number of difficult legal issues.  As noted, in June 2018, Equifax's counsel, King & Spalding, filed a comprehensive motion to dismiss the consolidated consumer complaint, raising numerous arguments for dismissing all of plaintiffs' 99 claims for relief in the consolidated 559-page complaint.  Some of these arguments, in my view, were substantial (even though most ultimately did not prevail).  For instance, in response to plaintiffs' claim that the class members' personally identifying information (PII) was compromised, Equifax argued that the vast majority of class members could show only a *risk* of identity theft, as opposed to actual identity theft, and thus did not allege a legally cognizable injury.[42]  Equifax cited substantial support for its argument, including cases from the Georgia Court of

---

[42] *See* Mem. of Law in Supp. of Mot. to Dismiss Consolidated Consumer Class Action Complaint at 16–24 (Dkt. No. 425-1); *see also* David Balser et al., *INSIGHT: Data Breach Litigation Trends to Watch*, BLOOMBERG LAW (Mar. 4, 2019), https://news.bloomberglaw.com/us-law-week/insight-data-breach-litigation-trends-to-watch (discussing circuit split on this issue).

Appeals and the U.S. Court of Appeals for the Seventh Circuit.[43]  Equifax also cited

authority for the point that the mere fear of future injury (*i.e.*, that identity theft could

occur in the future) was too speculative.[44]  Equifax further argued that money spent

to mitigate future risk of harm was not recoverable.[45]  In addition, Equifax argued

that plaintiffs had failed to allege that Equifax proximately caused the class

members' injuries, given (1) the "'dozens' of other data breaches dating back to

2013 in which the PII of billions of individuals was stolen,"[46] and (2) the fact that

the real culprit was the unidentified thief who accessed Equifax's computers without

---

[43] Mem. of Law in Supp. of Mot. to Dismiss Consolidated Consumer Class Action Complaint at 16–18 (Dkt. No. 425-1) (citing, *inter alia*, *McConnell v. Dep't of Labor*, 814 S.E.2d 790, 799 (Ga. Ct. App. 2018 ("[A] duty of care to safeguard personal information . . . has no source in Georgia statutory or caselaw."), *aff'd*, *Dep't of Labor v. McConnell (McConnell III)*, 828 S.E.2d 352, 358, (Ga. 2019) (affirming that there was no "duty to protect [class members'] information against negligent disclosure"); and *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 634–35, 640 (7th Cir. 2007) ("Without more than allegations of increased risk of future identity theft, the plaintiffs have not suffered a harm that the law is prepared to remedy.")).

[44] Mem. of Law in Supp. of Mot. to Dismiss Consolidated Consumer Class Action Complaint at 18 (Dkt. No. 425-1) (citing, *inter alia*, *Torres v. Wendy's Co.*, 195 F. Supp. 3d 1278, 1284 (M.D. Fla. 2016) ("The majority of courts in data breach cases have held that the cost to mitigate the risk of future harm does not constitute an injury . . . unless the future harm being mitigated against is itself imminent.")).

[45] Mem. of Law in Supp. of Mot. to Dismiss Consolidated Consumer Class Action Complaint at 19 (Dkt. No. 425-1).

[46] *Id*. at 21.

permission.[47]  Finally, Equifax addressed the complaint count by count, arguing that all of plaintiffs' claims were legally flawed for additional reasons.[48]  The King & Spalding motion was very thorough and impressive.  Only the most skilled plaintiffs' counsel would have been capable of responding effectively to so many credible arguments.

53.  The difficulty of these legal issues is reflected in the fact that this Court's Opinion and Order on the motion to dismiss totaled 80 pages.  Although the Court permitted the bulk of plaintiffs' claims to go forward, it did agree with Equifax with respect to certain claims.  Moreover, the difficult nature of the legal issues is reflected in the fact that, on pivotal issues of Georgia law, the Georgia Court of Appeals and Georgia Supreme Court have disagreed with some of this Court's determinations.[49]

---

[47] *Id*. at 21–22.

[48] *Id*. at 24–70.

[49] *See McConnell v. Dep't of Labor*, 787 S.E.2d 794, 797 & n.4 (Ga. Ct. App. 2016) (distinguishing this Court's prior holding in *In re The Home Depot, Inc. Customer Data Security Breach Litig.*, No. 1:14-md-02583-TWT (N.D. Ga. May 18, 2016), on its facts, and noting that "we are not bound to follow the district court's interpretation of Georgia law" with respect to whether a legal duty to protect customers' personal information exists), *vacated on other grounds*, 805 S.E.2d 79 (Ga. 2017), *aff'd in part & rev'd in part on other grounds*, 814 S.E.2d 790, 799 (Ga. Ct. App. 2018 ("[A] duty of care to safeguard personal information . . . has no source

### c.  Skill Required

54.  Data breach cases are complex and require a high degree of skill.  It is no
coincidence that the lead plaintiffs' attorneys[50] have significant prior data breach
experience.   Co-lead counsel all have outstanding reputations and have been
appointed to leadership roles in numerous other class actions and MDLs, including
a number of other data breach cases.   Norman Siegel, for example, devotes an
extensive portion of his practice to data breach cases, and held leadership roles in
both the *Target* and *Home Depot* data breach cases.[51]   He also played a role in the
*Anthem*, *Office of Personnel Management*, and several other data breach MDLs.[52]
Kenneth Canfield has served in leadership roles in a number of MDLs, including the

---

in Georgia statutory or caselaw."), *aff'd*, 828 S.E.2d 352, 358 (Ga. 2019) (affirming
that plaintiff "ha[d] not shown that the Department owed him or the other proposed
class members a duty to protect their information against negligent disclosure");
*Collins v. Athens Orthopedic Clinic*, 815 SE.2d 639, 644 (Ga. Ct. App. 2018) ("[T]he
fact of compromised data is not a compensable injury by itself in the absence of
some loss or damage . . . ." (citation and internal quotation marks omitted)), *review
granted* (Ga. Apr. 29, 2019).

[50] *See* Order (Dkt. No. 232) (filed Feb. 12, 2018) (appointing consumer plaintiffs'
co-lead counsel, consumer plaintiffs' co-liaison counsel, and consumer plaintiffs'
steering committee).

[51] *See Norman E. Siegel*, Stueve Siegel Hanson, http://www.stuevesiegel.com/
attorney/Siegel (last visited Oct. 25, 2019).

[52] *See id*.

*Home Depot* and *Arby's* data breach cases.[53]  Although Amy Keller is younger than the other leadership attorneys, she too has impressive experience litigating data breach cases, including service as co-lead counsel in the *Marriott International* data breach case.[54]

55.  Co-liaison counsel included former Georgia Governor and State Senator Roy Barnes.[55]  Barnes has long been viewed as a leading lawyer in Georgia[56] and held

---

[53] *See Kenneth S. Canfield*, Doffermyre Shields Canfield & Knowles, LLC, http://www.dsckd.com/attorneys/?action=display&attorney_id=3 (last visited Oct. 25, 2019) (*Home Depot*); Shayna Posses, *Arby's Must Extend Info Search in Data Breach Dispute*, Law360 (Aug. 17, 2018), https://www.law360.com/articles/1074406/arby-s-must-extend-info-search-in-data-breach-dispute (*Arby's*).

[54] *See Amy E. Keller*, Dicello Levitt Gutzler, https://www.dicellolevitt.com/attorney/amy-e-keller/ (last visited Oct. 25, 2019).

[55] I am advised that, although the Court's February 12, 2018 order designated Barnes as co-liaison counsel, he ultimately played a major role in the litigation, similar to the roles of the three co-lead attorneys.  Nonetheless, I refer in this Declaration to the leadership attorneys' roles as set forth in this Court's February 12, 2018 order.

[56] *See, e.g.*, Tom Crawford, *Georgia Report: Roy Barnes Proves that Bipartisanship Is Still Possible*, Flagpole (Nov. 8, 2017), https://flagpole.com/news/georgia-report/2017/11/08/roy-barnes-proves-that-bipartisanship-is-still-possible (quoting Georgia lawyers and politicians lauding Barnes as "one of the greatest minds [they have] ever known," and a "damn good lawyer" and noting that even as "just a 25-year-old prosecutor" in Georgia, "you could tell that Barnes was going to be a good one").

leadership positions in the *Home Depot* and *Arby's* data breach cases.[57]

56. Members of the plaintiffs' steering committee have similarly impressive experience. For example, Andrew Friedman has served as co-lead counsel in the *Anthem* and *Marriott International* data breach cases, and served on the plaintiffs' steering committee in the *Home Depot* data breach case.[58] Similarly, Eric Gibbs has been appointed to leadership roles in numerous class actions and MDLs, including the *Anthem*, *Vizio*, *Adobe*, and *Banner Health* data breach cases.[59] And James Pizzirusso leads Hausfeld's consumer protection practice group and has been appointed to leadership positions in many major class actions and MDLs—including the *Target*, *Kmart*, *Home Depot*, *Wendy's*, *Premera Blue Cross*, and *Arby's* data breach cases.[60] Other members of the plaintiffs' steering committee brought

---

[57] *See* Decl. of Roy E. Barnes at 2–3, *In re Arby's Restaurant Grp., Inc. Data Security Litig.*, No. 1:17-mi-55555-WMR (N.D. Ga.) (Dkt. No. 462-2) (filed May 7, 2019) (noting leadership roles in *Arby's*, *Home Depot*, and numerous other class actions).

[58] *See Andrew N. Friedman*, COHEN MILSTEIN, https://www.cohenmilstein.com/professional/andrew-n-friedman (last visited Oct. 25, 2019).

[59] *See Eric Gibbs*, GIBBS LAW GRP., https://www.classlawgroup.com/attorneys/gibbs/ (last visited Oct. 25, 2019).

[60] *See James J. Pizzirusso*, HAUSFELD, https://www.hausfeld.com/our-people/james-j-pizzirusso?lang_id=1 (last visited Oct. 25, 2019).

similarly impressive experience to this case.[61]

57.  In addition, class counsel have received recognition in a number of lists

identifying exceptional lawyers, including the "The Best Lawyers in America,"[62]

---

[61]  *See, e.g.*, *Our Team: Ariana J. Tadler*, TADLER LAW LLP, https://
www.tadlerlaw.com/profile/ariana-tadler/ (last visited Oct. 25, 2019) (listing Ariana
Tadler's leadership roles in major class actions and MDLs, including appointment
to the plaintiffs' steering committees in the *Marriott International* and *Target* data
breach cases and appointment to the plaintiffs' executive committee in the *Yahoo!*
data breach case); Marianne Kolbasuk McGee, *Data Breach Litigation Trends:
Attorney John Yanchunis Discusses the Latest Lawsuits*, BANK INFO SECURITY (June
5, 2018), https://www.bankinfosecurity.com/interviews/analysis-data-breach-
litigation-trends-i-4010 (noting that John Yanchunis "has represented plaintiffs in
many of these class action cases," including the *Premera Blue Cross* and *Target* data
breach cases); *Jason R. Doss, President*, PIABA FOUNDATION, https://
piabafoundation.org/jason-r-doss-president/ (last visited Oct. 25, 2019) (providing
overview of Jason Doss's experience, including appointment as co-lead counsel in
the *Allianz Life Insurance* litigation).

[62]  The Best Lawyers in America are selected based on a peer-review process
"designed to capture, as accurately as possible, the consensus opinion of leading
lawyers about the professional abilities of their colleagues within the same
geographical area and legal practice area." *Methodology Process*, BEST LAWYERS,
https://www.bestlawyers.com/methodology (last visited July 7, 2018).  Attorneys on
plaintiffs' team who have been named to The Best Lawyers in America include
(among others) Roy Barnes, Kenneth Canfield (previously designated "Lawyer of
the Year" for Appellate Practice), Norman Siegel (recently designated "Lawyer of
the Year" for Class Action Litigation), and John Yanchunis.

"Chambers USA Guide,"[63] "Super Lawyers,"[64] and "Rising Stars."[65]   Many have

achieved other prestigious honors.[66]

---

[63] Chambers USA Guide selects and ranks lawyers based on extensive interviews of clients and other lawyers to assess "their legal knowledge and experience, their ability, their effectiveness and their client-service." *Methodology*, CHAMBERS & PARTNERS, https://chambers.com/research/methodology (last visited Oct. 25, 2019). Kenneth Canfield is one of five Atlanta lawyers (along with Equifax counsel David Balser of King & Spalding) to receive the highest ranking for litigation, and Ariana Tadler has the highest national ranking for e-discovery.

[64] Super Lawyers are selected each year based on an extensive research and peer-evaluation process.  They represent the top five percent of attorneys in each state and practice area.   *See Selection Process Detail*, SUPER LAWYERS, https://www.superlawyers.com/about/selection_process_detail.html (last visited July 7, 2018).  Attorneys on plaintiffs' team who have been selected as Super Lawyers include (among others) Roy Barnes, Kenneth Canfield, David Worley, Jason Doss, Andrew Friedman, Eric Gibbs, Amy Keller, Adam Levitt, Norman Siegel, James Pizzirusso, and Ariana Tadler.

[65] Attorneys under 40 years of age or in practice for ten years or less are eligible to be designated Rising Stars if they have not been designated Super Lawyers.  The Rising Stars selection process is similarly based on independent research and a peer-evaluation process. Only 2.5 percent of eligible lawyers are designated Rising Stars. *See The Rising Stars Selection Process*, SUPER LAWYERS, https://www.superlawyers.com/about/selection_process_detail.html (last visited July 7, 2018).  Attorneys on plaintiffs' team who have been selected as Rising Stars include (among others) David Berger, Jason Doss, Simon Grille, Amy Keller, and J. Cameron Tribble.

[66] For example, Eric Gibbs was named "California Lawyer of the Year" in 2019 and was recognized by Law360 as a "Cybersecurity and Privacy MVP" in 2018 and a "Consumer Protection MVP" in 2016.  *See Eric Gibbs*, GIBBS LAW GRP., https://www.classlawgroup.com/attorneys/gibbs/ (last visited Oct. 25, 2019).  David Worley has been named one the "100 Most Influential Georgians" multiple times. *See David Worley*, EVANGELISTA WORLEY LLC, http://www.ewlawllc.com/

58. An important factor in evaluating a proposed fee award is the quality of opposing counsel.  For example, in awarding attorneys' fees of 31.33 percent of a $1.06 billion common fund in *Allapattah Services, Inc. v. Exxon Corp.*, a district court in this Circuit emphasized that "Exxon hired some of the most able lawyers and experts in America and spared no expense in doing so."[67]  In *Walco Investments, Inc. v. Thenen*, another district judge in this Circuit stated:  "Given the quality of defense counsel from prominent national law firms, the Court is not confident that attorneys of lesser aptitude [than class counsel] could have achieved similar results."[68]  Similarly, in awarding attorneys' fees of 33⅓ percent in *Dartell v. Tibet Pharmaceuticals, Inc.*, a federal judge in New Jersey  noted that "the quality and vigor of opposing counsel is relevant when evaluating the quality of services rendered by [class counsel]. . . . The performance and quality of defense counsel . . .

---

attorney-david-worley.html (last visited Oct. 25, 2019).   Andrew Friedman was recognized by Law360 as a "Data Privacy and Security MVP" in 2018.  *See Andrew N. Friedman*, Cohen Milstein, https://www.cohenmilstein.com/professional/andrew-n-friedman (last visited Oct. 25, 2019).   And, John Yanchunis and James Pizzirusso have been named by the *National Law Journal* as "Trailblazers" in the field of cybersecurity.  *See NLJ Special Supplements*, Law.com/Nat'l L.J., https://www.law.com/nationallawjournal/static/nlj-special-supplements/ (last visited Oct. 25, 2019).

[67] 454 F. Supp. 2d 1185, 1207 (S.D. Fla. 2006).

[68] 975 F. Supp. 1468, 1472 (S.D. Fla. 1997).

favors a finding that [class counsel] prosecuted this case with skill and efficiency."[69]

Numerous other courts have applied similar reasoning.[70]

59.  As noted, in the instant case, Equifax is represented by King & Spalding, a

prestigious international law firm headquartered in Atlanta, with more than 1,000

---

[69] No. 14-cv-03620, 2017 WL 2815073, at *9–10 (D.N.J. June 29, 2017) (citations and internal quotation marks omitted).

[70] *See, e.g.*, *Billitteri v. Sec. Am., Inc.*, Nos. 3:09-cv-01568-F & 3:10-cv-01833-F, 2011 WL 3585983, at *7 (N.D. Tex. Aug. 4, 2011) ("Because of the extremely effective work of opposing counsel . . . the skill required here . . . certainly justifies the contemplated [fee] award."); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 510 (S.D.N.Y. 2009) (emphasizing, in awarding attorneys' fees of 33⅓ percent of a $510 million fund, that class counsel "were pitted against . . . prominent national defense firms" and the favorable settlement achieved "against such formidable opponents [was] an impressive feat"); *In re OSB Antitrust Litig.*, No. 06-cv-00826 (D. Pa. Dec. 9, 2008) (Dkt. No. 947) (noting, in awarding attorneys' fees of 33⅓ percent, that "counsel for Defendants—dozens of extremely distinguished lawyers from across the country—skillfully and vigorously opposed [class counsel]"); *Schwartz v. TXU Corp.*, No. 3:02-cv-2243-K, 2005 WL 3148350, at *29–30 (N.D. Tex. Nov. 8, 2005) ("The standing of opposing counsel should be weighed in determining the fee, because such standing reflects the challenge faced by plaintiffs' attorneys.  The ability of plaintiffs' counsel to obtain such a favorable settlement for the Class in the face of such formidable legal opposition confirms the superior quality of their representation."); *In re Equity Funding Corp. Sec. Litig.*, 438 F. Supp. 1303, 1377 (C.D. Cal. 1977) ("[P]laintiff's attorneys in this class action have been up against established and skilled defense lawyers, and should be compensated accordingly."); *Arenson v. Bd. of Trade*, 372 F. Supp. 1349, 1354 (N.D. Ill. 1974) (emphasizing, in awarding attorneys' fees to class counsel, that "attorneys for the defendants represent the cream of the antitrust bar in the United States").

attorneys in 20 different offices worldwide.[71]  The firm has been widely recognized as one of best corporate law firms in the nation (indeed, in the world).[72]  But my view of King & Spalding stems not just from its reputation.  I worked for many years as co-counsel with King & Spalding attorneys when I was a partner at Jones Day.  I can attest to King & Spalding's extraordinary capabilities in bet-the-company cases. The firm has represented numerous mega-corporations, such as Monsanto, Coca-Cola, Johnson & Johnson, Halliburton, Delta Airlines, Microsoft, Toyota, ConocoPhillips, General Electric, Chevron, United Parcel Service (UPS), Google, and General Motors.[73]

60.  King & Spalding's lead attorney on the instant *Equifax* data breach litigation is David Balser.  Balser has vast experience representing major companies in high-stakes litigation, including other data breach cases (*e.g.*, *Delta Airlines* and *Capital One*), and cases involving securities, government investigations, and breaches of

---

[71] *See About*, KING & SPALDING, https://www.kslaw.com/pages/about (last visited Oct. 25, 2019).

[72] *See 2018 Firm Highlights*, KING & SPALDING, https://www.kslaw.com/annualreview2018/2018-firm-highlights.html (last visited Oct. 25, 2019) (citing myriad awards and other recognition received by the firm).

[73] *See Clients: King & Spalding*, LAW360, https://www.law360.com/firms/king-spalding/clients (last visited Oct. 25, 2019).

contract.  He "leads the firm's national class action practice" and "has successfully defended more than 50 class actions."[74]  He has been recognized for many years in Chambers USA, Best Lawyers in America, Benchmark Litigation, and Super Lawyers, and has spoken and written extensively on class actions and business litigation issues, including a recent article on data breach litigation.[75]  He is a Fellow in the prestigious American College of Trial Lawyers, and he has been recognized in various publications as one of the best lawyers in the State of Georgia.[76]

61. Phyllis Sumner, another attorney heavily involved in the case for King & Spalding, leads the firm's international "data, privacy, and security practice" and served as lead defense counsel in the *Home Depot* data breach MDL and the *Sears/Kmart* data breach class action.[77]  She has also received widespread recognition and numerous awards, including the Law360 "Cybersecurity and

---

[74] *David L. Balser*, KING & SPALDING, https://www.kslaw.com/people/david-balser (last visited Oct. 25, 2019).

[75] *See id.*; David Balser et al., *INSIGHT: Data Breach Litigation Trends to Watch*, BLOOMBERG LAW (Mar. 4, 2019), https://news.bloomberglaw.com/us-law-week/insight-data-breach-litigation-trends-to-watch.

[76] *See David L. Balser*, KING & SPALDING, https://www.kslaw.com/people/david-balser (last visited Oct. 25, 2019).

[77] *See Phyllis B. Sumner*, KING & SPALDING, https://www.kslaw.com/people/phyllis-sumner (last visited Oct. 25, 2019).

Privacy MVP" award and recognition as a Super Lawyer.[78]

62.  Moreover, in addition to King & Spalding, class counsel had to deal with the introduction of another prestigious law firm—Hogan Lovells—when the regulators' proposals were introduced into the settlement discussions.[79]

63.  The fact that class counsel achieved such an impressive settlement against such formidable adversaries is a testament to class counsel's skill.

### d.  Preclusion of Other Employment Due to Acceptance of the Case

64.  This case clearly interfered with class counsel's ability to take on other work, as reflected in the time logged by the various leadership attorneys and law firms. Co-lead attorneys Kenneth Canfield, Norman Siegel, and Amy Keller detail in their declaration (filed in support of their motion for attorneys' fees) the enormous efforts

---

[78] *See id.*

[79] *See, e.g.*, *Hogan Lovells US LLP*, VAULT, https://www.vault.com/company-profiles/law/hogan-lovells (last visited Oct. 25, 2019) (calling Hogan Lovells a "global megafirm" ranking "#1" among the "Best Law Firms for Privacy & Data Security"); *Class Actions and Group Litigation*, HOGAN LOVELLS, https://www.hoganlovells.com/en/aof/class-actions-and-group-litigation (last visited Oct. 25, 2019) (detailing the firm's complex litigation experience).  Hogan Lovells's team was led by Michelle Kisloff, an experienced litigator in data breach cases. Kisloff served as defense counsel in the *Anthem* data breach litigation and was named a "Privacy and Cybersecurity MVP" by Law360 in 2018.  *See Michelle A. Kisloff*, HOGAN LOVELLS, https://www.hoganlovells.com/en/michelle-kisloff (last visited Oct. 25, 2019).

undertaken by plaintiffs.  Looking at the lead law firms' work through September 2019, Stueve Siegel Hanson has logged more than 6,400 hours since the inception of the case; Doffermyre Shields Canfield & Knowles has logged more than 2,800 hours; and DiCello Levitt Gutzler has logged more than 4,200 hours.  Co-liaison counsel, the Barnes Law Group, has logged more than 3,100 hours.  Other firms that have logged significant numbers of hours include Hausfeld (2,274 hours), the Gibbs Law Group (2,305); Cohen Milstein (1,444); Milberg Tadler (1,661); the Doss Firm (1,141); and Morgan & Morgan (1,604).  All of these firms were appointed as members of the plaintiffs' steering committee.

65.  Ultimately, this case has been a huge resource drain on the various plaintiffs' law firms involved, and has significantly impeded the ability of those firms to take on other work.  The bulk of the work (over two-thirds of the hours) in this complicated and high-profile litigation was conducted by only 20 timekeepers, mainly prominent partners at the various law firms.  These lawyers, in many instances the rainmakers and most highly recognized lawyers in their firms, were thus severely hampered in their ability to take on other work, impacting their law firms in a significant way.  I have no doubt that such commitment was necessary to achieve this impressive settlement.  Class counsel knew going into the case that Equifax would leave no stone unturned in its efforts to prevail, and class counsel had

to be prepared to litigate hard on multiple fronts, including discovery, trial preparation, motions practice, and class certification.

### e. Customary Fee

66.  Numerous courts have looked to the customary fees negotiated in private fee agreements.   As one court in this Circuit has explained, "when deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time."[80]

67.  In individual contingency-fee contracts, the attorneys' fees percentage is typically 33⅓ percent, although it can rise to 40 percent or more.[81]   The requested

---

[80] *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1211 (S.D. Fla. 2006).  *Accord, e.g.*, *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 635 (7th Cir. 2011) ("To determine the market for attorney's fees, the court should look to actual fee contracts that were privately negotiated for similar litigation . . . ."); *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992) ("The object in awarding a reasonable attorneys' fee . . . is to simulate the market."); *RJR Nabisco Inc. Sec. Litig.*, Fed. Sec. L. Rep. (CCH) ¶ 94, 268 (S.D.N.Y. 1992) (noting that "what should govern [fee] awards is . . . what the market pays in similar cases").

[81] *See, e.g.*, *Howell v. Phoenix Life Ins. Co.*, No. 1:07-cv-0014-WBH, 2013 WL 12200650, at *6 (N.D. Ga. Mar. 26, 2013) ("[O]ne third of [the recovery] . . . is the benchmark contingency fee in private litigation cases."); *Pinto v. Princess Cruise Lines, Ltd.*, 513 F. Supp. 2d 1334, 1341 (S.D. Fla. 2007) ("In private litigation, attorneys regularly contract for contingent fees between 30% and 40% directly with their clients."); *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992) (the

20.36 percent fee of the minimum cash fund is thus well below the fee percentage customarily set by private agreement.

### f.  Whether the Fee Is Fixed or Contingent

68.  The fees in this case were contingent.   Courts in the Eleventh Circuit recognize that "[a] contingency fee arrangement often justifies an increase in the award of attorneys' fees."[82]  As one court in this District has stated, "[t]he contingent

---

"usual range for contingent fees is between 33 and 50 percent"); *In re Urethane Antitrust Litig.*, No. 2:04-md-01616-JWL, 2016 WL 4060156, at *5 (D. Kan. July 29, 2016) ("[A] one-third fee is customary in contingent-fee cases, and indeed that figure is often higher for complex cases or cases that proceed to trial."); *Sanchez v. Roka Akor Chicago LLC*, No. 14-cv-04645, 2017 WL 1425837, at *6 (N.D. Ill. Apr. 20, 2017) (collecting cases noting that the usual contingent fee percentage is between 33⅓ percent and 50 percent); *Montague v. Dixie Nat'l Life Ins. Co.*, No. 3:09-00687-JFA, 2011 WL 3626541, at *3 (D.S.C. Aug. 17, 2011) ("A 33% fee award from the common fund in this case is consistent with what is routinely privately negotiated in contingency fee litigation."); Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study* 35 (Cornell Law Faculty Publications, Paper 356, 2004), *available at* https://scholarship.law.cornell.edu/facpub/356/?utm_source=scholarship.law.cornell.edu%2Ffacpub%2F356&utm_medium=PDF&utm_campaign=PDFCoverPages ("Substantial empirical evidence indicates that a one-third fee is a common benchmark in private contingency fee cases."); Eric Helland et al., *Contingent Fee Litigation in New York City*, 70 VAND. L. REV. 1971, 1971 (2017) (study finding that, in New York, contingent fees "are almost always one-third").

[82] *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 548 (S.D. Fla. 1988), *aff'd*, 899 F.2d 21 (11th Cir. 1990).  *See also, e.g.*, *Yates v. Mobile Cnty. Personnel Bd.*, 719 F.2d 1530, 1534 (11th Cir. 1983) (holding that fee enhancement was proper because the fee was "wholly contingent").

nature of fees . . . should be given substantial weight in assessing the requested fee award. . . . The higher payment due under a contingency fee reflects the fact that the lawyer will realize no return for his investment of time and office expenses in the case [if] he loses."[83]

69.  In addition, as described in detail in ¶¶ 87, 107, and 110, class counsel incurred significant risk in undertaking this litigation.

### g.  Time Limitations Imposed by the Client or the Circumstances

70.  Class counsel had to work under significant time pressure, focusing simultaneously on extensive discovery, complex dispositive motions (with rapidly evolving law), and intensive, protracted settlement discussions.  Moreover, given the massive nature of the data breach, class counsel wanted to achieve a prompt resolution that would ensure protection for class members going forward.[84]  This

---

[83] *In re Friedman's, Inc. Sec. Litig.*, No. 1:03-cv-03475-WSD, 2009 WL 1456698, at *3 (N.D. Ga. May 22, 2009) (citations and internal quotation marks omitted).

[84] *See, e.g.*, *Hapka v. CareCentrix, Inc.*, No. 2:16-cv-02372-KGG, 2018 WL 1879845, at *3 (D. Kan. Feb. 15, 2018) (noting that the time limitations factor "supports Class Counsel's application for attorneys' fees" because, "[g]iven the nature of this [data breach] case, it was important for Class Counsel to litigate this case on an expedited schedule" to, *inter alia*, "rectify losses already incurred" and "allow Settlement Class Members to enroll in Credit Monitoring Services, which will help mitigate future harms").

required substantial investments of time (as much as 2,000 hours per month by class counsel during critical periods).  And once the parties signed the binding term sheet, they had only 90 days under their agreement to negotiate with the regulators and present the settlement to this Court for preliminary approval.

71.  Courts have emphasized similar litigation pressures in awarding attorneys' fees.  For example, in *Johnson v. Georgia Highway Express, Inc.*, the court noted that "priority work that delays the lawyer's other legal work is entitled to some premium."[85]   And in *Allapattah Services, Inc. v. Exxon Corp.*, the court cited the "frantic pace" of the litigation in "giv[ing] significant weight to this factor in setting the [fee] percentage."[86]

### h.  Results Obtained, Including the Amount Recovered for the Clients

72.  Here, class counsel successfully negotiated what I understand to be the largest data breach settlement in U.S. history.  As described above (*see* ¶¶ 28–30, 44–47), this settlement yielded historic monetary benefits and pathbreaking non-monetary benefits for the class, easily worth billions of dollars even under the most

---

[85] 488 F.2d 714, 718 (5th Cir. 1974).

[86] 454 F. Supp. 2d 1185, 1215 (S.D. Fla. 2006).  *Accord, e.g.*, *In re OSB Antitrust Litig.*, No. 06-cv-00826, slip op. at 5 (D. Pa. Dec. 9, 2008) (Dkt. No. 947); *Lucas v. Kmart Corp.*, No. 99-cv-01923, 2006 WL 2729260, at *6 (D. Colo. July 27, 2006).

conservative valuation.   In addition to benefiting from Equifax's unprecedented changes to prevent future data breaches, class members have achieved important individual benefits, including (among other benefits discussed above) the opportunity to claim credit monitoring services and identity theft insurance conservatively worth almost $2,000 per class member, reimbursement for all out-of-pocket losses resulting from the breach, and access to identity restoration services for 7 years for all 147 million class members regardless of whether they file claims. This is the polar opposite of a case in which class members end up with worthless coupons or other relief of little or no value.[87]

73.   It is also important to note that, in many ways, the benefits achieved in this case greatly exceed what class members could have reasonably expected to achieve at trial.   In addition to receiving various provable out-of-pocket losses, every class member is eligible for credit monitoring worth almost $2,000, a remedy that may not have been achievable at trial.   Likewise, the entire class benefits from the $1 billion investment by Equifax, yet another result that may not have been achievable

---

[87] *See, e.g.*, *Columbus Drywall & Insulation, Inc. v. Masco Corp.*, No. 1:04-cv-3066-JEC, 2012 WL 12540344, at *3 (N.D. Ga. Oct. 26, 2012) (noting that settlement did not involve "coupons or discounts on future purchases"); *First State Orthopaedics v. Concentra, Inc.*, 534 F. Supp. 2d 500, 521–22 (E.D. Pa. 2007) (emphasizing that settlement's "nonmonetary relief . . . provide[d] real benefits to the class" unlike "restricted coupons" or similar "essentially worthless" benefits).

at trial.   Moreover, at trial Equifax would have strenuously argued that the sole remedy was compensation for provable out-of-pocket costs, and that class members who had not suffered identity theft or could not show other relevant out-of-pocket costs should recover nothing (or, at most, nominal damages).   In short, the settlement here likely exceeds even the best-case scenario after a successful trial.   Such a settlement is rare.   Indeed, courts have repeatedly praised settlements that achieve only a fraction of what class members could have recovered at trial.[88]

74.   In short, the benefits obtained by class counsel are substantial, and weigh strongly in favor of the requested $77.5 million fee.

---

[88] *See, e.g.*, *Morgan v. Pub. Storage*, 301 F. Supp. 3d 1237, 1256 (S.D. Fla. 2016) (noting, in assessing the "results obtained" *Camden I* factor and awarding attorneys' fees of 33 percent, that class counsel "obtained a Settlement representing approximately 20% of the actual damages available at trial . . . —this is an excellent result"); *In re Checking Account Overdraft Litig.*, 830 F.Supp.2d 1330, 1346 (S.D. Fla. 2011) (praising settlement recovering between 9% and 45% of plaintiffs' damages as an "exemplary result"); *Saccoccio v. JP Morgan Chase Bank, N.A.*, No. 13-cv-21107, 2014 WL 808653, at *8 (S.D. Fla. Feb. 28, 2014) (approving settlement "[e]ven assuming that the monetary figure represents only 12.5% of Plaintiff's damages"); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) (approving settlement awarding 6–9% of investor losses in securities class action, and noting that median amounts recovered in shareholder class settlements were "2.7% in 2002, 2.8% in 2003, 2.3% in 2004, 3% in 2005, and 2.2% in 2006").

### i. Experience, Reputation, and Ability of Attorneys

75.  As noted in ¶¶ 54–57, class counsel are highly skilled and experienced class action attorneys, whose prior representations include many important class action and MDL cases.  And they were litigating against formidable defense counsel (*see* ¶¶ 58–63).

### j. Undesirability of the Case

76.  As a highly publicized case involving the largest data breach in history, it would be erroneous to call this case undesirable from plaintiffs' perspective.  At the same time, there were numerous features that raised red flags for all but the most successful and experienced plaintiffs' law firms.  There was no doubt from the moment of the data breach that Equifax would hire the best lawyers in the country and would spare no expense litigating the claims.  There was also no doubt that Equifax would raise every conceivable legal argument for dismissing the case (some of which were quite strong), that fact investigation would be protracted and time consuming, and that settlement discussions (if they occurred at all) would be contentious and difficult.  All of these risks materialized in this case.  Thus, the case could be handled only by lawyers who were willing to expend thousands of hours of attorney time and millions of dollars in expenses.  And in the class action context in particular, plaintiffs' counsel cannot commit to represent a class and then unilaterally

withdraw merely because the case gets too costly or difficult. An attorney who is appointed to represent a class under Federal Rule of Civil Procedure 23(a)(4) and 23(g) takes on a significant responsibility to represent the class forcefully and with full commitment. In short, this case was attractive only to lawyers with significant resources and relevant experience.

### k. Nature and Length of Professional Relationship With the Clients

77. Courts have generally given little weight to this factor or have stated that it is irrelevant or immaterial.[89] The Eleventh Circuit has stated that, where "[c]ounsel has no longstanding professional relationship with [the] client, . . . the factor is irrelevant."[90] Here, class counsel have no previous relationship with most of the 147 million class members. As a result, this factor is irrelevant.

### l. Fee Awards in Similar Cases

78. As I explain in detail below (*see* ¶¶ 80–89), the 20.36 percent fee requested

---

[89] *See, e.g.*, *Cabot E. Broward 2 LLC v. Cabot*, No. 16-cv-61218, 2018 WL 5905415, at *7 (S.D. Fla. Nov. 9, 2018) ("The nature and the length of the professional relationship with the client is a neutral factor." (capitalization omitted)); *Bruner v. Spring/United Mgmt. Co.*, No. 07-cv-02164-KHV, 2009 WL 2058762, at *9 (D. Kan. July 14, 2009) ("The meaning of this factor . . . and its effect on the calculation of a reasonable fee has always been unclear.").

[90] *Yates v. Mobile Cnty. Personnel Bd.*, 719 F.2d 1530, 1536 (11th Cir. 1983).

here is in line with percentages awarded in numerous other class actions, including mega-fund class actions.  Indeed, when the true percentage is used (*see* ¶¶ 44–47, discussing 5.6 percent and 1 percent figures), the fees requested are exceedingly low compared with other major class action cases.

* * *

79.  In sum, application of the *Camden I* factors demonstrates the reasonableness of the fees sought here.

### 4. The Percentage Requested Is Supported by Fee Awards in Other Class Actions, Including So-Called "Mega-Fund" Cases

80.  In my opinion, an award of 20.36 percent is in line with or below awards in other class actions that resulted in impressive settlements.  (Again, as noted in ¶¶ 44–47, the true percentage is far lower than the conservative 20.36 percent figure.)

81.  According to empirical studies, attorneys' fees of 20.36 percent are well below the mean and median fee awards in class actions.[91]  One study found that, in

---

[91] *See, e.g.*, Theodore Eisenberg, Geoffrey Miller & Roy Germano, *Attorneys' Fees in Class Actions: 2009–2013*, 92 N.Y.U. L. REV. 937, 947, 951 (2017) (finding average of 27 percent and median of 29 percent for 2009–2013 period); Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL LEGAL STUD. 811, 811, 833 (2010) (finding, for 2006–2007 period, average and median of about 25 percent); Theodore Eisenberg & Geoffrey Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J.

the Eleventh Circuit from 2006 to 2007, the mean percentage award was 28.1 percent and the median was 30.0 percent.[92]   Another study found that, from 2009 to 2013, the mean and median in the Eleventh Circuit were 30 percent and 33 percent, respectively.[93]   And as noted, the Eleventh Circuit's "benchmark" is 25 percent.  *See* ¶ 42.   As one court in this District recently stated, "[a]wards of up to 33% of the common fund are not uncommon in the Eleventh Circuit, and especially in cases where Class Counsel assumed substantial risk by taking complex cases on a contingency basis."[94]   Another district court within the Eleventh Circuit has noted that "numerous recent decisions within this Circuit have awarded attorneys' fees up to and in excess of thirty percent."[95]

---

EMPIRICAL LEGAL STUD. 248, 259 (2010) (finding, in 1993–2008 study, average fees of 24 percent and median fees of 25 percent); THOMAS E. WILLGING, LAURAL L. HOOPER & ROBERT J. NIEMIC, EMPIRICAL STUDY OF CLASS ACTIONS IN FOUR FEDERAL DISTRICT COURTS: FINAL REPORT TO THE ADVISORY COMMITTEE ON CIVIL RULES 151 (Fed. Judicial Ctr. 1996), *available at* http://www.uscourts.gov/sites/default/files/rule23_1.pdf (1996 study of four federal districts found that average and median awards ranged from 26 to 31 percent).

[92] *See* Fitzpatrick, *supra* note 91, at 836.

[93] *See* Eisenberg, Miller & Germano, *supra* note 91, at 951.

[94] *In re Arby's Rest. Grp., Inc. Data Security Litig.*, No. 1:17-cv-001035-WMR, 2019 WL 2720818, at *4 (N.D. Ga. June 6, 2019).

[95] *In re Checking Account Overdraft Litig.*, No. 09-md-02036-JLK, 2015 WL 12642178, at *15 (S.D. Fla. Apr. 2, 2015) (citing examples).

82.  I recognize that fee awards (as a percentage) generally tend to decline as the amount of the settlement increases, with the lowest percentage awards appearing in so-called mega-fund settlements.[96]  But 20.36 percent is in line with the mean and median even in mega-fund settlements involving common funds in the general range of the $380.5 million fund upon which the instant fee request is based.[97]  And there are numerous mega-fund cases with percentage awards comparable to or well above 20.36 percent.  As would be expected, those awards are based on a careful analysis of the specific facts and challenges of a given case.  For example, in *Allapattah*

---

[96] *See, e.g.*, Fitzpatrick, *supra* note 91, at 811 (noting that fee percentages are "inversely associated with the size of the settlement"); Eisenberg, Miller & Germano, *supra* note 91, at 947–48 (describing "scaling effect" where, "as [the] recovery amount increases, the ratio of the size of the attorneys' fee relative to the size of the recovery (*i.e.*, the fee percentage) tends to decrease").  Nonetheless, it should be obvious that a median means that half of the awards are *above* that amount and half are below.  And in the case of an average, the figure is also comprised of awards *above* and below that amount.  Indeed, in one study, more than one-third of all fee awards were 30 percent or higher.  *See* Fitzpatrick, *supra* note 91, at 834.

[97] *See, e.g.*, Eisenberg, Miller & Germano, *supra* note 91, at 947 (finding that average and median fees for settlements greater than $100 million—including settlements well over $380.5 million—varied from "a low of 16.6% in 2009 to a high of 25.5% in 2011"); Fitzpatrick, *supra* note 91, at 839 (in settlements between $250 million and $500 million from 2006 to 2007, mean percentage fee award was 17.8 percent and median was 19.5 percent).  Of course, the true percentage here, when all benefits to class members are considered, is far below even the low of 16.6 percent found in the Eisenberg, Miller & Germano study.  *See* ¶¶ 44–47.

*Services, Inc. v. Exxon Corp.*,[98] *In re Vitamins Antitrust Litigation*,[99] *Standard Iron Works v. ArcelorMittal*,[100] and *In re Flonase Antitrust Litigation*,[101] the courts awarded, respectively, 31.33 percent, 34.06 percent, 33 percent, and 33⅓ percent as attorneys' fees because of the complex issues involved, the quality of class counsel's work, and the results obtained.

83.   The above cases are just four examples.  In the table below, I have collected more than 40 mega-fund cases in which attorneys' fees of 25 percent or greater were awarded.  This table does not purport to be exhaustive.

**TABLE 1:   Fee Awards of 25 Percent or More in Mega-Fund Class Actions**

| Case | Recovery | Fee Award |
|------|----------|-----------|
| *Lobo Exploration Co. v. BP Am. Prod.*, No. CJ-1997-72 (Oka. Dist. Ct., Beaver Cnty. Dec. 8, 2005) | $150 million | 40 percent |
| *Simmons v. Anadarko Petroleum Corp.*, No. CJ-2004-57 (Okla. Dist. Ct., Caddo Cnty., Dec. 23, 2008) | $155 million | 40 percent |

---

[98] 454 F. Supp. 2d 1185 (S.D. Fla. 2006).

[99] No. MISC 99-197(TFH), 2001 WL 34312839, at *11–13 (D.D.C. July 16, 2001).

[100] No. 08-cv-05214, 2014 WL 7781572, at *1 (N.D. Ill. Oct. 22, 2014).

[101] 951 F. Supp. 2d 739, 747–49 (E.D. Pa. 2013).

| Case | Recovery | Fee Award |
|---|---|---|
| *Lauriello v. Caremark RX LLC*, No. 01-cv-2003-006630.00 (Ala. Cir. Ct., Jefferson Cnty. Aug. 15, 2016) | $310 million | 40 percent |
| *In re Merry-Go-Round Enterprises, Inc.*, 244 B.R. 327 (Bankr. D. Md. 2000) | $185 million | 40 percent |
| *In re Combustion, Inc.*, 968 F. Supp. 1116 (W.D. La. 1997) | $127 million | 36 percent |
| *In re: Managed Care Litig. V. Aetna Inc.*, No. 00-md-01334-MD-MOR, 2003 WL 22850070 (S.D. Fla. Oct. 24, 2003) | $100 million | 35.5 percent |
| *Haddock v. Nationwide Life Ins. Co.*, No. 3:01-cv-01552-SRU (D. Conn. Apr. 9, 2015) (Dkt. No. 601) | $140 million | 35 percent |
| *In re Vitamins Antitrust Litig.*, No. 99-197, 2001 WL 34312839 (D.D.C. July 16, 2001) | $365 million | 34.06 percent |
| *In re Syngenta AG MIR 162 Corn Litig.*, No. 2:14-md-02591-JWL-JPO (D. Kan. Dec. 12, 2018) (Dkt. No. 3849) | $1.51 billion | 33.33 percent |
| *DeLoach v. Phillip Morris Co.*, No. 1:00-cv-01235, 2003 WL 25683496 (M.D.N.C. Dec. 19, 2003) | $212 million | 33.33 percent |
| *In re Tricor Direct Purchaser Antitrust Litig.*, 1:05-cv-00340-SLR (D. Del. Apr. 23, 2009) (Dkt. No. 543) | $250 million | 33.33 percent |
| *In re Neurontin Antitrust Litig.*, No. 2:02-cv-01830 (D.N.J. July 6, 2014) (Dkt. No. 114) | $190 million | 33.33 percent |

| Case | Recovery | Fee Award |
|---|---|---|
| *In re Titanium Dioxide Antitrust Litig.*, No. 1:10-cv-00318 (D. Md. Dec. 13, 2013) (Dkt. No. 555) | $163.5 million | 33.33 percent |
| *In re U.S. Foodservice, Inc. Pricing Litig.*, No. 3:07-md-01894 (AWT) (D. Conn. Dec. 9, 2014) (Dkt. No. 521) | $297 million | 33.33 percent |
| *In re Urethane Antitrust Litig.*, No. 2:04-md-01616-JWL (D. Kan. July 29, 2016) (Dkt. No. 3276) | $835 million | 33.33 percent |
| *In re Relafen Antitrust Litig.*, No. 01-cv-12239-WGY (D. Mass. Apr. 9, 2004) (Dkt. No. 297) (direct purchaser litigation) | $175 million | 33.33 percent |
| *In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739 (E.D. Pa. 2013) | $150 million | 33.33 percent |
| *City of Greenville v. Syngenta Crop Prot.*, No. 3:10-cv-00188 (S.D. Ill. Oct. 23, 2012) | $105 million | 33.33 percent |
| *In re OSB Antitrust Litig.*, No. 06-cv-00826 (D. Pa. Dec. 9, 2008) (Dkt. No. 947) | $120.7 million | 33.33 percent |
| *In re Apollo Grp. Inc. Sec. Litig.*, No. 04-cv-02147-PHX-JAT, 2012 WL 1378677 (D. Ariz. Apr. 20, 2012) | $145 million | 33.33 percent |
| *In re Buspirone Antitrust Litig.*, No. 1:01-md-01413-JGK (S.D.N.Y. Apr. Nov. 18, 2003) (Dkt. No. 171) | $220 million | 33.30 percent |
| *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467 (S.D.N.Y. 2009) | $510 million | 33.30 percent |

| Case | Recovery | Fee Award |
|---|---|---|
| *Standard Iron Works v. ArcelorMittal*, No. 08-cv-05214, 2014 WL 7781572 (N.D. Ill. Oct. 22, 2014) | $164 million | 33 percent |
| *Dahl v. Bain Capital Partners, LLC*, No. 1:07-cv-12388 (D. Mass. Feb. 2, 2015) (Dkt. No. 1095) | $590.5 million | 33 percent |
| *San Allen, Inc. v. Buehrer*, No. CV-07-644950 (C.P., Cuyahoga Cnty., Ohio Nov. 25, 2014) | $420 million | 32.7 percent |
| *In re Auto. Refinishing Paint Antitrust Litig.*, No. MDL-1426, 2008 WL 63269 (E.D. Pa. Jan. 3, 2008) | $105.7 million | 32.7 percent |
| *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) | $1.06 billion | 31.33 percent |
| *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295 (1st Cir. 1995) | $220 million | 30.9 percent |
| *Weatherford Roofing Co. v. Employers Nat'l Ins. Co.*, No. 91-05637 (116th Tex. Dist. Ct., Dallas Cnty. Dec. 1, 1995) | $140 million | 30 percent |
| *In re (Bank of America) Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330 (S.D. Fla. 2011) | $410 million | 30 percent |
| *Tennille v. Western Union Co.,* No. 09-cv-00938-JLK-KMT, 2014 WL 5394624 (D. Colo. Oct. 15, 2014) | $180 million | 30 percent |
| *In re Linerboard Antitrust Litig.*, No. 98-cv-05055, 2004 WL 1221350 (E.D. Pa. June 2, 2004) | $202.5 million | 30 percent |
| *In re Home-Stake Prod. Co. Sec. Litig.*, MDL No. 153 (N.D. Okla. Jan. 2, 1990) | $185 million | 30 percent |

| Case | Recovery | Fee Award |
|------|----------|-----------|
| *In re (Chase Bank) Checking Account Overdraft Litig.*, No. 1:09-md-02036 (S.D. Fla. Dec. 19, 2012) (Dkt. No. 3134) | $162 million | 30 percent |
| *In re (Citizens Bank) Checking Account Overdraft Litig.*, No. 1:09-md-02036 (S.D. Fla. Mar. 12, 2013) (Dkt. No. 3331) | $137.5 million | 30 percent |
| *In re Informix Corp. Sec. Litig.*, No. 97-cv-01289-CRB (N.D. Cal. Nov. 23, 1999) (Dkt. No. 471) | $132.2 million | 30 percent |
| *Kurzweil v. Philip Morris Co., Inc.*, Nos. 94-civ-2373 (MBM), 94-civ-2546 (BMB), 1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999) | $123 million | 30 percent |
| *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166 (E.D. Pa. 2000) | $111 million | 30 percent |
| *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632 (N.D. Tex. Apr. 9, 2010), *as modified* (June 14, 2010) | $110 million | 30 percent |
| *In re Prison Realty Sec. Litig.*, No. 3:99-cv-00458 (M.D. Tenn. Feb. 9, 2001) (Dkt. No. 108) | $104 million | 30 percent |
| *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323 (S.D. Fla. 2001) | $110 million | 25 percent |

84.  These cases show that, even in mega-fund cases, there is nothing unusual about awards well above the 20.36 percentage requested here.  And the cases in the table are especially striking given that the 20.36 percent figure is extremely

conservative and does not account for the true value of the settlement to the class—including all monetary and non-monetary benefits.   In fact, as noted, the true percentage here is closer to 1 percent.  *See* ¶¶ 44–47.

85.  Moreover, given that mega-fund class actions are relatively less common than those with smaller recoveries, average and median fee percentages for those cases are subject to greater variation.[102]  Notably, a number of mega-fund settlements have been securities class actions, where average and median fee awards tend to be lower than the overall averages and medians.[103]  A reason for lower fees in securities cases, presumably, is that the crucial issue of class certification is generally less challenging in securities cases.[104]  Moreover, in some mega-fund securities cases,

---

[102] *See, e.g.*, *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, No. 2:10-md-02179-CJB, 2016 WL 6215974, at *16 (E.D. La. Oct. 25, 2016) (noting that in mega-fund cases "there are fewer percentage awards to serve as a benchmark; consequently, there is some variability in the percentages awarded in these cases"); Fitzpatrick, *supra* note 91, at 839 (noting that recoveries in the $1 billion to $6.6 billion range were subject to the largest standard deviation among fee awards).

[103] *See* Fitzpatrick, *supra* note 91, at 834.

[104] *See, e.g.*, *In re FedEx Ground Package Sys., Inc. Employment Practices Litig.*, No. 3:05-MD-527 RLM, 2017 WL 1735541, at *5 (N.D. Ind. Apr. 28, 2017) (noting, in awarding attorneys' fees of 30 percent and distinguishing lower fee awards in comparable securities cases, that "securities cases . . . differ . . . in many ways, not least of which that class certification in securities cases is nearly automatic under today's laws"); *see also* Robert H. Klonoff, *The Decline of Class Actions*, 90 WASH. U. L. REV. 729, 824 (2013) (noting that because "securities fraud suits . . . tend to

courts have pointed to the lack of complex legal and factual challenges in awarding lesser attorneys' fees.[105]

86. Attorneys' fee awards should bear a relationship to the degree of risk involved.[106]  Indeed, courts often point to the degree of risk taken on by class counsel in approving larger fee awards.  As one court noted in awarding attorneys' fees of 33 percent, "Courts recognize that the risk of receiving no recovery is a major factor in awarding attorneys' fees . . . .  [T]he riskier the case, the greater the justification for a substantial fee award."[107]  Another court suggested that "[a]ttorneys' risk is

---

involve overarching issues that impact all class members and seek damages that can be easily calculated," they "are commonly certified").

[105] *See, e.g.*, *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 742–43 (3d Cir. 2001) (noting that the case "was neither legally nor factually complex and did not require significant motion practice or discovery"); *see also In re IndyMac Mortg.-Backed Sec. Litig.*, 94 F. Supp. 3d 517, 525 (S.D.N.Y. 2015) ("[S]ecurities cases like this practically always settle, meaning that the risk of total non-recovery was almost nonexistent."), *aff'd sub nom.*, *DeValerio v. Olinski*, 673 F. App'x 87 (2d Cir. 2016).

[106] *See, e.g.*, Eisenberg & Miller, *supra* note 81, at 27, 38 ("Fees are . . . correlated with risk:  the presence of high risk is associated with a higher fee, while low-risk cases generate lower fees. . . . That fees are adjusted for risk is widely accepted in the literature.").  In their more recent study, Professors Eisenberg, Miller, and Germano found that "the association between risk and fee percentage continues in the 2009–2013 data."  Eisenberg, Miller & Germano, *supra* note 91, at 958

[107] *Montague v. Dixie Nat'l Life Ins. Co.*, No. 3:09-00687-JFA, 2011 WL 3626541, at *3 (D.S.C. Aug. 17, 2011).

perhaps the foremost factor in determining an appropriate fee award."[108]  Indeed, a number of the *Camden I* factors focus specifically on the risks imposed by the litigation.  *See* ¶¶ 48, 52–53, 64–65, 68, 76.

87.  An emphasis on risk is especially relevant in mega-fund cases, where class counsel often invest thousands of attorney and staff hours and millions of dollars in expenses.  For example, in awarding attorneys' fees of 33⅓ percent in *Heekin v. Anthem, Inc.*, the court noted that class counsel "had a great deal at stake . . . with the burden of advancing litigation costs of over $6 million" despite "the risk presented by [the] case."[109]  Here, class counsel have devoted over 31,011.9 attorney and staff hours and advanced $1,248,033.46 in expenses to date.  *See* ¶¶ 50, 116.

---

[108] *Francisco v. Numismatic Guar. Corp. of Am.*, No. 06-61677-CIV, 2008 WL 649124, at *14 (S.D. Fla. Jan. 31, 2008).  *Accord, e.g.*, *In re Ocean Power Technologies, Inc.*, No. 3:14-cv-03799, 2016 WL 6778218, at *28 (D.N.J. Nov. 15, 2016) ("Courts across the country have consistently recognized that the risk of receiving little or no recovery is a major factor in considering an award of attorneys' fees."); *Jenkins v. Trustmark Nat'l Bank*, 300 F.R.D. 291, 309 (S.D. Miss. 2014) (noting that "courts have found that class counsel ought to be compensated . . . for risk of loss or nonpayment assumed by carrying through with the case").

[109] No. 1:05-CV-01908-TWP, 2012 WL 5878032, at *3–4 (S.D. Ind. Nov. 20, 2012).  *Accord, e.g.*, *In re Tyco Int'l Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 260 (D.N.H. 2007) (noting that the case "involved a greater risk of non-recovery than other multibillion-dollar securities class action settlements" and emphasizing that, "[h]ad [class counsel] lost at summary judgment or fallen short of establishing liability at trial, they would have lost the tens of millions of dollars in expenses and all of the attorney time that they collectively invested in th[e] case").

The risks presented here support the argument that the fee award should not be lower than the mean or median award in a non-mega-fund case.

88.  Indeed, the very concept that percentage fees should decline as the size of the fund increases has been roundly criticized by a number of courts.  As one court in the Eleventh Circuit emphasized in awarding attorneys' fees of 31.33 percent of a $1.06 billion fund:

> [D]ecreasing the percentage awarded as the gross class recovery increases . . . is antithetical to the percentage of the recovery method adopted by the Eleventh Circuit in [*Camden I*], the whole purpose of which is to align the interests of Class Counsel and the Class by rewarding counsel in proportion to the result obtained.  By not rewarding Class Counsel for the additional work necessary to achieve a better outcome for the class, the sliding scale approach creates the perverse incentive for Class Counsel to settle too early for too little.[110]

Similarly, the Third Circuit has noted that the "position [that fees should decrease with the size of the fund] has been criticized by respected courts and commentators, who contend that such a fee scale often gives counsel an incentive to settle cases too early and too cheaply."[111]  And another district court in this Circuit, in awarding

---

[110] *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1213 (S.D. Fla. 2006).

[111] *In re Cendant Corp. Litig.*, 264 F3d 201, 284 n.55 (3d Cir. 2001).  *Accord, e.g.*, *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 303 (3d Cir. 2005), *as amended* (Feb. 25, 2005) ("[T]here is no rule that a district court must apply a declining

attorneys' fees of 30 percent of a $410 million fund, has stated:

> [C]ourts nationwide have repeatedly awarded fees of 30 percent or higher in so-called "megafund" settlements. . . . [T]he decreasing fee argument . . . fails to appreciate the immense risks undertaken by attorneys in prosecuting complex cases in which there is a great risk of no recovery.  Nor does it give significant weight to the fact that large attorneys' fee[s] serve to motivate capable counsel to undertake these actions.[112]

Many other courts have made the same or similar points.[113]  In my opinion, these

---

percentage reduction in every settlement involving a sizeable fund. . . . [T]he declining percentage concept does not trump the fact-intensive [attorneys' fees] analysis.").

[112] *In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d 1330, 1367 (S.D. Fla. 2011) (citations and internal quotation marks omitted).

[113] *See, e.g.*, *In re Syngenta AG MIR 162 Corn Litig.*, 357 F. Supp. 3d 1094, 1114 (D. Kan. 2018) ("[T]he Court does not agree that megafund cases should necessarily be subject to a diminishing scale by which the [fee] award percentage falls as the settlement amount grows. . . .  [The] use of such a scale fails to provide the proper incentive for counsel and is fundamentally at odds with the percentage-of-the-fund approach . . . ."); *In re Auto. Parts Antitrust Litig.*, No. 2:12-cv-00203, 2017 WL 3525415, at *2 (E.D. Mich. July 10, 2017) ("[T]here is no requirement that the Court necessarily apply a declining fee percentage based on the absolute dollar amount of [the settlement]. . . ."); *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, No. 2:10-md-02179-CJB, 2016 WL 6215974, at *16 (E.D. La. Oct. 25, 2016) ('[C]ourts have rejected a blanket rule that would automatically cap the fee percentage at a low figure when the class recovery is quite high."); *In re Linerboard Antitrust Litig.*, No. 98-cv-05055, 2004 WL 1221350, at *16 (E.D. Pa. June 2, 2004) (rejecting "sliding scale approach" as "economically unsound," and reasoning that "the highly favorable settlement was attributable to [class counsel's] skill and it is inappropriate to penalize them for their success").

courts have correctly refuted the view that fee percentages should necessarily decline with the size of the fund.

89.  In short, the requested fee of 20.36 percent of the $380.5 million fund fits comfortably within the case law.

### 5.  A Lodestar Cross-Check Is Neither Necessary Nor Appropriate

90.  Although the percentage-of-the-fund method is mandatory in the Eleventh Circuit in common fund cases (*see* ¶ 41), a few courts have nonetheless chosen to apply a "lodestar cross-check"—*i.e.*, an abbreviated lodestar analysis used to verify the reasonableness of attorneys' fees that were set using the percentage method.

91.  This Court is not required to conduct a lodestar cross-check, and in my

---

Likewise, several other attorneys' fees experts have opined that fee percentages should not necessarily be lower in mega-fund cases. *See, e.g.*, Decl. of Professor Geoffrey P. Miller at 11, *In re Takata Airbag Prods. Liab. Litig.*, No. 1:15-md-02599-FAM (S.D. Fla.) (Dkt. No. 2318-3) (filed Jan. 24, 2018), *available at* https://www.autoairbagsettlement.com/Content/Documents/Exhibit%20C%20to%20Response%20to%20Objections%20HN.pdf; Decl. of Professor Lucian A. Bebchuk at 11, *In re Enron Corp. Sec. Litig.*, No. H-01-3624 (S.D. Tex.) (filed Nov. 13, 2007), *available at* http://www.enronfraud.com/pdf/Bebchuk_Decl_with_Appendix_A.pdf; Decl. of Brian T. Fitzpatrick at 14 & n.4, *In re High-Tech Employees Antitrust Litig.*, No. 11-cv-2509-LHK (N.D. Cal.) (filed May 8, 2015), *available at* http://www.hightechemployeelawsuit.com/media/303927/15-5-8__1079__fitzpatrick_decl__motion_for_attorney_fees.pdf; Decl. of John C. Coffee, Jr. at 18–20, *Allapattah Servs., Inc. v. Exxon Corp.*, No. 1:91-cv-00986-ASG (S.D. Fla.) (Dkt. No. 2638) (filed Feb. 16, 2006).

opinion it should not do so here.  The problem with the lodestar approach is that it

places a premium on hours billed, as opposed to efficiency, and fails to ensure that

the interests of class counsel are aligned with those of the class.[114]  Indeed, courts in

the Eleventh Circuit have discouraged the practice of conducting a lodestar cross-

check, cautioning that such an approach simply re-introduces, through the back door,

the same undesirable incentives that the percentage method is meant to avoid.  For

---

[114] *See, e.g.*, *Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 773–74 (11th Cir. 1991) (adopting the percentage-of-the-fund method in common fund cases in large part because of "the emphasis placed by [the lodestar method] on the number of hours expended" rather than class counsel "attempting to increase the fund for the class, which in turn increases their own fee"); *McDaniel v. Cnty. of Schenectady*, 595 F.3d 411, 418 (2d Cir. 2010) ("The lodestar method . . . creates an incentive for attorneys to bill as many hours as possible, to do unnecessary work, and for these reasons also can create a disincentive to early settlement.  Under certain conditions, moreover, lodestar awards can create the near opposite incentive, encouraging attorneys to settle before trial even when it is not in their clients' best interest."); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 n.5 (9th Cir. 2002) ("[I]t is widely recognized that the lodestar method creates incentives for counsel to expend more hours than may be necessary . . . , [and] the lodestar method does not reward early settlement."); *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 721 (7th Cir. 2001) ("[T]he lodestar approach creates [an] incentive to run up the billable hours."); *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1268–69 (D.C. Cir. 1993) ("[U]sing the lodestar approach . . . attorneys are given incentive to spend as many hours as possible, billable to a firm's most expensive attorneys [and] . . . there is a strong incentive against early settlement since attorneys will earn more the longer a litigation lasts."); *Wilson v. EverBank*, No. 14-cv-22264, 2016 WL 457011, at *13 (S.D. Fla. Feb. 3, 2016) ("[C]ourts have called [the lodestar cross-check] into question because it creates an incentive to keep litigation going in order to maximize the number of hours included in the court's lodestar calculation.").

example, in awarding attorneys' fees of 30 percent in the $410 million *Bank of America Checking Account Overdraft Litigation* without conducting a lodestar cross-check, the court emphasized:

> The lodestar approach should not be imposed through the back door via a cross-check. Lodestar creates an incentive to keep litigation going in order to maximize the number of hours included in the court's lodestar calculation. In *Camden I,* the Eleventh Circuit criticized lodestar and the inefficiencies that it creates. In so doing, the court mandate[d] the *exclusive* use of the percentage approach in common fund cases, reasoning that it more closely aligns the interests of client and attorney, and more faithfully adheres to market practice. Under *Camden I*, courts in this Circuit regularly award fees based on a percentage of the recovery, without discussing lodestar at all.[115]

Thus, even when approving relatively high percentage fee awards, courts in the Eleventh Circuit have often declined to apply a lodestar cross-check.[116] Many other

---

[115] *In re Bank of Am. Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1362 (S.D. Fla. 2011) (emphasis in original; citations and internal quotation marks omitted). *Accord, e.g.*, *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1336 (S.D. Fla. 2001) ("The Court is mindful of the fact that this cross-check is not to be used as a backdoor avenue of using the lodestar method instead of the percentage of the fund method."); *Ramah Navajo Chapter v. Jewell*, 167 F. Supp. 3d 1217, 1242 (D.N.M. 2016) ("The lodestar analysis, even when used as a cross check to determine a reasonable percentage award, has the effect of rewarding attorneys for the same undesirable activities that the percentage method was designed to discourage, namely incentiviz[ing] [class counsel] to multiply filings and drag along proceedings to increase their lodestar." (citation and internal quotation marks omitted)).

[116] *See, e.g.*, *In re Checking Account Overdraft Litig.*, No. 09-md-02036-JLK, 2015 WL 12642178, at *10–11 (S.D. Fla. Apr. 2, 2015) (awarding fees of 30 percent

jurisdictions follow a similar approach.[117]

without performing lodestar cross-check, and emphasizing that, "[a]s the Eleventh Circuit has held, the percentage of the fund approach (as opposed to the lodestar approach) is the better reasoned in a common fund case" (citation and internal quotation marks omitted)); *Carpenters Health & Welfare Fund v. Coca-Cola Co.*, 587 F. Supp. 2d 1266, 1269–70 (N.D. Ga. 2008) (stating, in awarding fees of 21 percent, that a "lodestar [cross-check] in this instance is not particularly helpful . . . , and this Court will determine attorney fees based solely on what it determines to be a reasonable percentage of the settlement fund"); *Wilson v. EverBank*, No. 14-cv-22264, 2016 WL 457011, at *13–14 (S.D. Fla. Feb. 3, 2016) (awarding fees of 19.8 percent without performing a lodestar cross-check, and emphasizing that "the lodestar approach should not be imposed through the back door via a cross check" (citation and internal quotation marks omitted)); *Champs Sports Bar & Grill Co. v. Mercury Payment Sys., LLC*, 275 F. Supp. 3d 1350, 1356 (N.D. Ga. 2017) (awarding fees of 24 percent of common fund without conducting a lodestar cross-check); *George v. Acad. Mortg. Corp. (UT)*, 369 F. Supp. 3d 1356, 1375 (N.D. Ga. 2019) (awarding fees of 33 percent of common fund without conducting a lodestar cross-check); *Stahl v. MasTec, Inc.*, No. 8:05-cv-01265-T-27TGW, 2008 WL 2267469, at *2 (M.D. Fla. May 20, 2008) (awarding fees of 27.9 percent without performing lodestar cross-check); *Sands Point Partners, L.P. v. Pediatrix Med. Grp., Inc.*, No. 99-cv-06181, 2002 WL 34343944, at *3 (S.D. Fla. May 3, 2002) (awarding fees of 30 percent without performing lodestar cross-check); *see generally Marty v. Anheuser-Busch Companies, LLC*, No. 13-cv-23656-JJO, 2015 WL 6391185, at *2 (S.D. Fla. Oct. 22, 2015) (noting that "use of the lodestar cross-check is not mandatory" in the Eleventh Circuit).

[117] *See, e.g.*, *CompSource Okla. v. BNY Mellon, N.A.*, No. CIV 08-469-KEW, 2012 WL 6864701, at *8 (N.D. Okla. Oct. 25, 2012) ("[A] majority of circuits recognize that trial courts have the discretion to award fees based solely on a percentage of the fund approach and are not required to conduct a lodestar analysis in common fund class actions."); *Swedish Hosp. v. Shalala*, 1 F.3d 1261, 1266–70 (D.C. Cir. 1993) (lodestar analysis not required); *Bacchi v. Mass. Mut. Life Ins. Co.*, No. 12-11280-DJC, slip op at 7 (D. Mass. Nov. 8, 2017) (noting that lodestar cross-check is discretionary in the First Circuit); *Ramah Navajo Chapter v. Jewell*, 167 F. Supp. 3d 1217, 1241 (D.N.M. 2016) ("The Tenth Circuit has made it clear that

92.  I should also reiterate that efficiency and speed were essential here because class members' data was compromised.  Class counsel thus needed to secure relief and protection for the class as quickly as possible.  Reliance on the lodestar method would ignore that reality by penalizing class counsel for working to resolve the litigation expeditiously.  Given the special need for a prompt and efficient resolution, this case is especially ill-suited for the lodestar cross-check approach.

### 6.  In Any Event, a Lodestar Analysis Supports the Fees Requested

93.  Even if the Court were to conduct a lodestar cross-check, such an analysis, in my opinion, would only confirm the reasonableness of the 20.36 percent fee

---

district courts need not calculate a lodestar when applying the percentage method." (citing *Gottlieb v. Barry*, 43 F.3d 474, 487 (10th Cir. 1994))); *Smith v. Krispy Kreme Doughnut Corp.*, No. 1:05CV00187, 2007 WL 119157, at *3 (M.D.N.C. Jan. 10, 2007) (noting that "[i]t is not necessary for the Court to conduct a lodestar analysis" in the Fourth Circuit); *Laffitte v. Robert Half Int'l Inc.*, 376 P.3d 672, 688 (Cal. 2016) (noting that courts "retain the discretion to forgo a lodestar cross-check and use other means to evaluate the reasonableness of a requested percentage fee").

Likewise, other attorneys' fees experts have opined that courts should not use a lodestar cross-check when applying the percentage method.  *See, e.g.*, Decl. of Brian T. Fitzpatrick at 6–7, *In re High-Tech Employees Antitrust Litig.*, No. 11-CV-2509-LHK (N.D. Cal.) (filed May 8, 2015), *available at* http://www.hightechemployee lawsuit.com/media/303927/15-5-8__1079__fitzpatrick_decl__motion_ for_attorney_fees.pdf; Expert Report of Professor Charles Silver Concerning Attorneys' Fees & Expenses at 51–53, *Allapattah Servs., Inc. v. Exxon Corp.*, No. 1:91-cv-00986-ASG (S.D. Fla.) (Dkt. No. 2638) (filed Feb. 16, 2006).

requested.

94.  In the Eleventh Circuit, a lodestar cross-check involves "multiplying the number of hours reasonably expended by a reasonable hourly rate."[118]  The lodestar may then "be adjusted upward or downward for certain factors . . . , such as contingency and the quality of the work performed."[119]  I focus on those calculations below.[120]

### a.  The Hours Spent by Class Counsel Are Reasonable

95.  Class counsel have provided me with detailed time records, which they previously scrubbed down.  Through September 30, 2019, class counsel have spent just over 31,000 hours prosecuting this litigation.

---

[118] *W. Sizzlin Franchise Corp. v Maali*, No. 6:16-cv-002193-Orl-28GJK, 2018 WL 3843960, at *2 (M.D. Fla. July 23, 2018).

[119] *Camden I*, 946 F.2d at 772.

[120] Because this is a lodestar cross-check, rather than a full lodestar approach, the requisite analysis is much less rigorous.  *See, e.g.*, *Erica P. John Fund, Inc. v. Halliburton Co.*, No. 3:02-cv-01152-M, 2018 WL 1942227, at *9 (N.D. Tex. Apr. 25, 2018) ("[C]ourts using a lodestar as a cross-check to the percentage method have relaxed the degree of scrutiny applied to counsel's billing records."); *Tavares v. S-L Distribution Co.*, Inc., No. 1:13-cv-01313, 2016 WL 1743268, at *14 (M.D. Pa. May 2, 2016) (noting that a cross-check involves a "somewhat more relaxed standard" than a true lodestar approach); *In re Crocs, Inc. Sec. Litig.*, No. 07-cv-02356-PAB-KLM, 2014 WL 4670886, at *4 & n.4 (D. Colo. Sept. 18, 2014) (noting that the "cross-check calculation need entail neither mathematical precision nor bean counting" (citation omitted)).

96. In my opinion, class counsel conducted this litigation efficiently. It is notable that nearly all of the work in this case was performed only by those firms appointed by the Court to run the litigation. Over 93 percent of the hours were expended by those designated firms (including over 54 percent by the three co-lead firms plus the Barnes Law Group), indicating that class counsel was diligent in ensuring that the case was not overbilled by scores of lawyers.

97. The efficiency of class counsel's approach to the litigation is also reflected by the fact that only work assigned by lead counsel was considered for compensation.[121] Moreover, time records were regularly reviewed and periodically submitted to the Court.[122] In my experience, such a practice enables class counsel to monitor the workflow of the litigation and helps to ensure that all counsel adhere to their assigned tasks, thereby avoiding duplicative or unnecessary work.

### b. The Billing Rates Proposed by Class Counsel Are Reasonable

98. The designated hourly rates for class counsel range from $540 to $1,050 for

---

[121] *See* Order at 9–10 (Dkt. No. 232) (filed Feb. 12, 2018) ("[T]hose not serving in leadership positions must secure the express authorization of Co-Lead Counsel for any projects or work undertaken in this litigation.").

[122] *See id*. at 10 ("On a quarterly basis, beginning on April 30, 2018, and thereafter on the last business day of each July, October, January, and April, Co-Lead and Co-Liaison Counsel shall submit to the Court *in camera* reports reflecting hours billed in this matter by all Plaintiffs' counsel.).

partners (with only 9 senior partners who spent more than 50 hours on the case billing over $900); $250 to $864 for associates; $575 to $730 for of counsel; $100 to $260 for law clerks; and $115 to $325 for paralegals.  In the Eleventh Circuit, "[a] reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation."[123]  The "relevant legal community" is generally the place where the case is filed,"[124] but this case is an MDL involving a nationwide class action, highly specialized litigation, and cases transferred from numerous states throughout the country.[125]  In that circumstance, it is my opinion that the Court may view this case as one with a market that is national in scope.[126]  In any event, the rates are justified

---

[123] *Norman v. Housing Auth. of City of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988).

[124] *Heinkel ex rel. Heinkel v. Sch. Bd. of Lee Cnty.*, Fla., No. 2:04-cv-00184-FtM-33SPC, 2007 WL 2757366, at *9 (M.D. Fla. Sept. 20, 2007).

[125] *See* Transfer Order, *In re Equifax, Inc., Customer Data Sec. Breach Litig.*, MDL No. 2800 (J.P.M.L. Dec. 6, 2017) (Dkt. No. 550).

[126] *See, e.g.*, *In re Cook Med., Inc., Pelvic Repair Sys. Prod. Liab. Litig.*, 365 F. Supp. 3d 685, 701 (S.D.W. Va. 2019) ("MDLs encompass law firms from across the country and are national in scope.  When selecting an hourly rate for determining legal fees the court cannot consider just one market, because the relevant legal community is one national in nature . . . [and the court will] consider those rates selected in similar MDLs." (citation and internal quotation marks omitted; brackets and ellipses in original)); *In re Urethane Antitrust Litig.*, No. 2:04-md-01616-JWL, 2016 WL 4060156, at *7 (D. Kan. July 29, 2016) ("[T]he amounts at issue justified use of the best counsel charging the highest rates (just as [the defendant] used

even if the focus is just on this District.

99.   Notably, in other cases, courts in this District have awarded the plaintiffs'

law firms involved here hourly rates comparable to those designated in this case.

For example, in 2017, Ken Canfield of Doffermyre Shields Canfield & Knowles had

a rate of $750 per hour approved in this District,[127] and in August 2019, a court in

this District approved a requested fee award in which Canfield's time was valued at

$1,000 per hour.[128]   Also, partners at Evangelista Worley have had rates from $725

to $775 per hour approved in this District.[129]   Awards to the attorneys involved here

by courts in other districts are comparable.   For example, a court recently approved

rates between $750 and $985 per hour for partners at DiCello Levitt Gutzler

---

similarly high-priced counsel in the litigation)."); *In re Vioxx Prods. Liab. Litig.*, 760
F. Supp. 2d 640, 660 (E.D. La. 2010) ("[T]he attorneys come from states across the
country.   Thus a more national rate is the appropriate pole star to guide the Court.");
*see also* Manual for Complex Litigation, Fourth §14.122 (supporting use of national
rates "[i]n exceptionally complex national litigation").

[127] *See Smith v. Floor and Décor Outlets of Am., Inc.*, No. 1:15-cv-04316-ELR
(N.D. Ga. Jan. 10, 2017) (Dkt. No. 69).

[128] *See* Final Order and Judgment, *T.S. Kao, Inc. v. N. Am. Bancard, LLC,* No.
1:16-cv-04219-SCJ (N.D. Ga. Aug. 20, 2019) (Dkt. No. 137) (approving fee award);
Suppl. Decl. of Co-Lead Class Counsel ¶ 20, (Dkt. No. 131-2) (explaining that
Canfield's rate was $1,000 per hour); Decl. of Michael Bowers ¶ 23 (Dkt. No. 131-
3) (opining that the $1,000 per hour rate was reasonable).

[129] *See In re Arby's Rest. Grp., Inc. Data Sec. Litig.*, No. 1:17-cv-01035-WMR,
2019 WL 2720818 (N.D. Ga. June 6, 2019).

(including $985 for Adam Levitt and $750 for Amy Keller), and between $525 and $600 per hour for associates.[130]   Rates as high as $895 per hour for partners (including Norman Siegel, co-lead counsel here) and $625 per hour for associates have been approved for attorneys at Stueve Siegel Hanson.[131]   Courts have approved hourly rates as high as $900 for Cohen Milstein,[132] and courts have approved rates for Hausfeld LLP as high as $1,375 per hour for partners.[133]   Similarly, courts have

---

[130] *Simerlein v. Toyota Motor Corp.*, No. 17-cv-01091 (VAB), 2019 WL 2417404 (D. Conn. June 10, 2019).

[131] *See, e.g.*, *In re Syngenta AG MIR 162 Corn Litig.*, 357 F. Supp. 3d 1094, 1115 (D. Kan. 2018) (approving rates for attorneys at Stueve Siegel Hanson as high as $865 for partners—including Norman Siegel—and $625 for associates); *Hapka v. Carecentrix, Inc.*, No. 2:16-cv-02372-KGG, slip op. at 3 (D. Kan. Feb. 15, 2018), *available at* https://ecf.ksd.uscourts.gov/doc1/07914925572 (citing Pls.' Mem. in Support of Mot. for an Award of Attorneys' Fees, Expenses, & Costs to Class Counsel & a Class Representative Service Award at 13–20 (filed Dec. 8, 2017) (Dkt. No. 95)) (approving hourly rates as high as $865 for partners and $475 for associates); *Criddell v. Premier Healthcare Services, LLC*, No. 16-cv-05842-R-KS (C.D. Cal. Jan. 16, 2018) (Dkt. No. 64) (approving hourly partner rate of $825 and hourly associate rate of $395); *Spangler v. Nat'l Coll. of Tech. Instruction*, No. 14-cv-03005-DMS (RBB), 2018 WL 846930, at *2 (S.D. Cal. Jan. 5, 2018) (approving 2016 rates of $795 to $825 per hour for partners and $315 to $525 per hour for associates); *Larson v. John Hancock Life Ins. Co.* (U.S.A.), No. RG16813803 (Cal. Sup. Ct. Alameda Cnty May 8, 2018) (approving rates as high as $895 for partners and $550 for associates).

[132] *See In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*, No. 14-cv-02508, slip op. at 2–3 (E.D. Tenn. May 26, 2017) (Dkt. No. 503).

[133] *See In re Foreign Exchange Benchmark Rates Antitrust Litig.*, No. 1:13-cv-07789-LGS, 2018 WL 5839691 (S.D.N.Y. Nov. 8, 2018); *In re LIBOR-Based Fin.*

approved rates for Morgan & Morgan as high as $950 per hour for partners and $864 for associates.[134]  At Tadler Law, Ariana Tadler has received approval of $875 per hour, and Melissa Clark of that firm has received approval of $550 per hour.[135] Indeed, rates even higher than those requested here would be justified given the complicated, nationwide scope of this litigation.  *See* ¶ 98 & n.126.[136]

---

*Instruments Antitrust Litig.*, No. 1:11-md-02262-NRB (S.D.N.Y. Oct. 25, 2018) (Dkt. No. 2745).

[134] *See Finerman v. Marriott Ownership Resorts, Inc.*, No. 3:14-cv-01154-J-32MCR (M.D. Fla Aug. 15, 2018) (Dkt. No. 222).

[135] *See Jackson v. Wendy's Int'l LLC*, No. 6:16-cv-00210-PGB-DCI (M.D. Fla. Feb. 26, 2019) (Dkt. No. 157).

[136] *See, e.g.*, *In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Prods. Liab. Litig.*, No. 3:15-md-02672-CRB, 2017 WL 1047834, at *5 (N.D. Cal. Mar. 17, 2017) (hourly rates as high as $1,600 for partners and $790 for associates); *Nitsch v. DreamWorks Animation SKG, Inc.*, No. 14-cv-04062-LHK, 2017 WL 2423161, at *9 (N.D. Cal. June 5, 2017) (hourly rates for partners as high as $1,200); *Bishop v. Shorter Univ., Inc.*, No. 4:15-cv-00033 (N.D. Ga. Feb. 20, 2015) (Dkt. Nos. 91, 95) (approving 2015 rates as high as $950 per hour for partners in data breach case); *Abbott v. Lockheed Martin Corp.*, No. 06-cv-701-MJR-DGW, 2015 WL 4398475, at *3 (S.D. Ill. July 17, 2015) (awarding fees in ERISA class settlement of $974 per hour for attorneys with at least 25 years of experience and $826 per hour for attorneys with 15–24 years of experience); *In re High-Tech Employee Antitrust Litig.*, No. 11-cv-02509-LHK, 2015 WL 5158730, at *9 (N.D. Cal. Sept. 2, 2015) (approving billing rates for partners as high as $975 per hour); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 10-ml-02151-NS, 2013 WL 12327929, at *33 n.15 (C.D. Cal. July 24, 2013) (approving rates up to $950 per hour).  Rates for paralegals in other major class actions have ranged from $150 to $490 per hour.  *See, e.g.*, *In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Prods. Liab. Litig.*, No. 3:15-md-

100.  Here, despite the prominent lawyers involved, the highest rate proposed is $1,050 per hour, and only one attorney has designated that rate.  Moreover, only 12 lawyers who have spent at least 50 hours on this case have designated rates over $800 per hour.  Such rates are clearly reasonable when viewed in light of awards in comparable cases in this District and elsewhere.

101.  The rates proposed by class counsel are also very reasonable compared to rates for major defense firms.[137]  It is especially instructive, in gauging billing rates

---

02672-CRB, 2017 WL 1047834, at *5 (N.D. Cal. Mar. 17, 2017) ($150 to $490 per hour); Co-Lead Class Counsel's Pet. for An Award of Atty's Fees at Add. 1, Ex. C, *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 12-md-02323-AB (E.D. Pa.) (filed Feb. 13, 2017) ($215 to $325 per hour); *Astiana v. Kashi Co.*, No. 11-cv-01967-H (BGS), slip op. at 6 (S.D. Cal. Sept. 2, 2014) (Dkt. No. 241) ($245 to $315 per hour).

[137] *See, e.g.*, Martha Neil, *Top Partner Billing Rates at BigLaw Firms Approach $1,500 Per Hour*, ABA JOURNAL (Feb. 8, 2016), http://www.abajournal.com/news/article/top_partner_billing_rates_at_biglaw_firms_nudge_1500_per_hour (2016 American Bar Association report relying on public filings in Chapter 11 bankruptcy cases noted billing rates as high as $1,475 at Proskauer Rose; $1,450 at Ropes & Gray; and $1,425 at both Akin Gump Strauss Hauer & Feld and Skadden Arps Slate Meagher & Flom); Final Application of Gibson, Dunn & Crutcher LLP as General Bankruptcy and Restructuring Co-Counsel for Debtors and Debtors-in-Possession for Allowance of Compensation for Services Rendered and Reimbursement of Expenses Incurred for the Final Period Mar. 12, 2015–Nov. 19, 2015 at 4, *In re SRC Liquidation, LLC*, No. 15-10541-BLS (Bankr. D. Del.) (Dkt. No. 1404) (filed Dec. 15, 2015) (2015 fee application of Gibson Dunn revealing rates for partners in bankruptcy case as high as $1,475); Sara Randazzo & Jacqueline Palank, *Legal Fees Cross New Mark: $1,500 an Hour*, WALL ST. J. (Feb. 9, 2016), https://www.wsj.com/articles/legal-fees-reach-new-pinnacle-1-500-an-hour-

for class counsel, to look at rates for the firm actually representing the defendant in the litigation.[138]  Here, partners at Equifax's law firm (headquartered in Atlanta), King & Spalding, bill at substantially higher rates than class counsel have designated here.  For example, in a 2018 bankruptcy matter, partners at King & Spalding billed

---

1454960708?cb=logged0.10928983175737395 (confirming rates over $1,500 per hour billed by partners at DLA Piper).  Indeed, according to some sources, prominent partners at some top defense firms billed rates up to $2,000 per hour in 2014–2016. *See, e.g.*, Aebra Coe, *What Do the Highest-Paid Lawyers Make an Hour?*, Law360 (May 11, 2016), https://www.law360.com/legalindustry/articles/794929/what-do-the-highest-paid-lawyers-make-an-hour- (noting that research conducted by the BTI Consulting Group revealed that rates "reached $2,000 per hour" in 2016, up from the previous high of $1,600 per hour in 2015); Karen Sloan, *$1,000 Per Hour Isn't Rare Anymore*, Nat'l L.J. (Jan. 13, 2014), https://www.law.com/national lawjournal/almID/1202637587261/NLJ-Billing-Survey%3A-%241%2C000-Per-Hour-Isn%27t-Rare-Anymore/ (noting that "four-figure hourly rates for in-demand partners at the most prestigious firms don't raise eyebrows—and a few top earners are closing in on $2,000 an hour").

[138] *See, e.g.*, *Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 768 n.18 (7th Cir. 1982) ("The rates charged by the defendant's attorneys provide a useful guide to rates customarily charged in this type of case." (citation omitted)); *Ruiz v. Estelle*, 553 F. Supp. 567, 589 (S.D. Tex. 1982) ("In an action for which no adequate parallel can be found, the best example of a fee paid for similar work is that paid by opposing counsel in the same action."); *cf. I.W. v. School Dist. of Philadelphia*, No. 14-3141, 2016 WL 147148, at *13 (E.D. Pa. Jan. 13, 2016) ("Evidence of the hours expended by the non-prevailing party on the same task is relevant to the determination of whether the hours requested by the prevailing party are reasonable." (citations omitted)); *Mitroff v. Xomox Corp.*, 631 F. Supp. 25, 28 (S.D. Ohio 1985) ("Pertinent to any consideration of a reasonable amount of time expended in the prosecution of a law suit is the amount of time expended by the defendant in defending that law suit.").

at rates as high as $1,292 per hour, and associates billed rates as high as $607.75 per hour.[139]  In a 2017 bankruptcy matter in the Northern District of Georgia, King & Spalding billed as much as $980 per hour for partners and $775 per hour for associates.[140]  Even as far back as 2012, partners at King & Spalding were billing as much as $975 per hour, and associates were billing as much as $610 per hour.[141] Such figures are very instructive with respect to reasonable rates billed by lawyers in this District in difficult cases.  Equifax's other law firm, Hogan Lovells, bills at similarly high rates.[142]

102.  Class counsel's blended rate in this case is $676.72.  That rate is consistent with blended rates in several other major class actions.  For example, in *NFL*

---

[139] *See* Summary Sheet to First & Final Fee Application of King & Spalding LLP at 4, *In re Global Brokerage, Inc.*, No. 17-13532 (MEW) (Bankr. S.D.N.Y.) (Dkt. No. 77) (filed Mar. 5, 2018).

[140] *See* Final Application for Allowance of Attorneys' Fees and Reimbursement of Expenses Incurred by King & Spalding LLP, Counsel for Debtor at 10, *In re Astroturf LLC*, No. 16-41504-PWB (Bankr. N.D. Ga.) (Dkt. No. 467) (filed Aug. 4, 2017).

[141] *See* Debtors' Application Pursuant to Section 327(e) of the Bankruptcy Code at 11–12, *In re Arcapita Bank B.S.C.(c)*, No. 12-11076 (SHL) (Bankr. S.D.N.Y.) (Dkt. No. 149) (Filed May 17, 2012).

[142] *See, e.g.*, First Interim Fee Appl. of Hogan Lovells US LLP at 3, *In re VG Liquidation, Inc.* (Bankr. D. Del.) (Dkt. No. 501) (filed Oct. 11, 2018) (2018 hourly rates as high as $1,315 for partners and $810 for associates).

*Concussion*, the court approved a blended rate of $861.28 per hour for one prominent plaintiffs' firm (Seeger Weiss), and a blended rate of $623.05 per hour for all common benefit counsel.[143]   In *Talone v. American Osteopathic Ass'n*, the court recognized that a "blended rate of $687.84 [was] reasonable."[144]

103.  In any event, in my opinion, it is not useful to compare the blended rate here with the rates in other cases, especially those in which the tasks performed were very different.  Here, much of the work was, by its very nature, high-level and thus not suitable for paralegals or entry-level associates.   For example, only the most experienced plaintiffs' lawyers on the team played a role in the settlement negotiations overseen by Judge Phillips and in subsequent discussions involving the regulators.  Briefing and argument of the difficult legal issues raised by Equifax also required maturity and expertise and could not have been delegated to low-level attorneys or non-lawyers.  It should not be surprising, therefore, that all of the top

---

[143] *See In re Nat'l Football League Players' Concussion Injury Litig.*, No. 2:12-md-02323-AB, slip op. at 20-21 (E.D. Pa. May 24, 2018) (Dkt. No. No. 10019) (approving lodestar for Seeger Weiss); *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 2:12-md-02323-AB, 2018 WL 1635648, at *9 (E.D. Pa. Apr. 5, 2018) (approving blended rate of $623.05 per hour for all common benefit counsel).

[144] No. 1:16-cv-04644-NLH-JS, 2018 WL 6318371, at *17 (D.N.J. Dec. 3, 2018) (citation omitted).

five billers (all with more than 1,500 hours) are partners, and that among the top ten

billers, all but one are partners.  Given the nature of the tasks that make up many of

the hours spent by class counsel, the blended rate here is very reasonable.  Simply

comparing that number to other cases—in which the mix of tasks performed may be

very different—is not an especially probative exercise.[145]

### c.  Additional Expected Hours Should Be Included

104.  When calculating the lodestar, courts routinely take into account hours that

class counsel reasonably anticipate spending on the matter after final approval (*e.g.*,

hours to be spent on claims administration issues).[146]

---

[145] *See, e.g.*, *Young v. Polo Retail, LLC*, No. 02-cv-4546-VRW, 2007 WL 951821, at *7 (N.D. Cal. Mar. 28, 2007) ("[T]he central role of settlement negotiations in this litigation—and the central role of senior attorneys in those negotiations—suggest that typical blended hourly rates . . . are inappropriate here.").

[146] *See, e.g.*, *Davis v. Bank of Am., N.A.*, No. 05-cv-80806, 2006 WL 8433706, at *4 (S.D. Fla. June 30, 2006) (accounting for estimated "future work" in calculating "the potential lodestar for *all* of Class Counsel's efforts" (emphasis added)); *Tennille v. Western Union Co.*, No. 09-cv-00938-MSK-KMT, 2013 WL 6920449, at *3 (D. Colo. Dec. 31, 2013) (instructing plaintiffs to include in their lodestar calculation "an estimate of the future hours that will be necessary to carry the case to completion under the Settlement Agreement"); *Reyes v. Bakery & Confectionery Union*, 281 F. Supp. 3d 833, 853, 856–57 (N.D. Cal. 2017) (including estimated hours for "future work" related to, *inter alia*, "managing class members' claims"); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 2672 CRB (JSC), slip op at 8 (N.D. Cal. Mar. 17, 2017) (granting fee request reserving "an additional 21,000 hours to (1) guide the hundreds of thousands of Class Members through

105.  I am advised by class counsel that they expect to spend at least 10,000 hours in the future due to the size of the class, the fact that the extended claims period is set to last another 4 years, and the fact that the notice program and identity restoration services will extend for another 7 years.  This work likely will include overseeing the settlement administrator in ensuring that millions of claims are processed, and resolving the disputes that will inevitably arise as to specific claims. An estimate of 10,000 future hours is reasonable in my view.  And this estimate does not include additional time that class counsel will inevitably spend drafting the final settlement approval papers and preparing for and attending the final approval hearing.

### d.  The Multiplier Is Reasonable

106.  Based on the number of hours incurred through September 30, 2019, and the hourly rates proposed, class counsel's lodestar would be $20,986,357.80.  Class counsel are requesting fees of $77.5 million.  Thus, the multiplier for class counsel

---

[claims period]; (2) assist in the implementation and supervision of the Settlement . . . ; and (3) defend and protect the settlement on appeal, among other things" (citation and internal quotation marks omitted)); *In re AT&T Mobility Wireless Data Services Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1038 (N.D. Ill. 2011) (citing the "considerable ongoing efforts" required of class counsel to implement the settlement as a "factor [that] supports a generous reward").

would be just over 3.69, not counting future hours.  Counting 10,000 future hours (based on class counsel's estimate, *see* ¶ 105) at the blended rate to date, the multiplier would be just over 2.79.  In my view, either multiplier would be reasonable.

107.  In considering whether to apply a multiplier to class counsel's lodestar, courts in the Eleventh Circuit consider "several factors including, *inter alia*, the quality of the representation, the benefit obtained for the class, the complexity and novelty of the issues presented, the risk of nonpayment, and any delay in payment."[147]   In this case, for the reasons discussed in ¶¶ 48–79, those factors strongly support a significant multiplier.[148]   Indeed, had King & Spalding prevailed in its omnibus dispositive motion to dismiss, class counsel would have recovered nothing.  This case was risky and raised difficult legal issues.

---

[147] *Holman v. Student Loan Xpress, Inc.*, 778 F. Supp. 2d 1306, 1312 (M.D. Fla. 2011).

[148] This case involves a percentage of the fund; it is not a fee shifting case.  *Cf. In re The Home Depot Inc. Customer Data Security Breach Litig.*, 931 F.3d 1065, 1085–86 (11th Cir. 2019) (holding that multipliers for risk are not appropriate in fee-shifting cases, but that "it makes sense to draw a clear line between fee-shifting cases and common-fund cases").

108.   Moreover, multipliers in the 3.69 range are not uncommon.   In the Eleventh Circuit, "lodestar multipliers in large and complicated class actions range from 2.26 to 4.5 and . . . three appears to be the average."[149]   Indeed, "[i]n many cases, including cases in [the Eleventh Circuit], multipliers much higher than three have been approved."[150]   Courts in the Eleventh Circuit and elsewhere have approved similar or even greater multipliers in numerous other cases.[151]

---

[149] *Thorpe v. Walter Inv. Mgmt. Corp.*, No 1:14-cv-20880-UU, 2016 WL 10518902, at *7 (S.D. Fla. Oct. 17, 2016) (citations and internal quotation marks omitted).

[150] *Pinto v. Princess Cruise Lines Ltd.*, 513 F. Supp. 2d 1334, 1344 (S.D. Fla. 2007) (citing numerous examples).

[151] *See, e.g.*, *Steiner v. Am. Broadcasting Co., Inc.*, 248 F. App'x 780, 783 (9th Cir. 2007) (upholding multiplier of 6.85 and emphasizing that it "f[ell] well within the range of multipliers that courts have allowed"); *In re Urethane Antitrust Litig.*, No. 2:04-md-01616-JWL, 2016 WL 4060156, at *7 (D. Kan. July 29, 2016) (noting that a multiplier of "4 or 5 would fall within the range of multipliers accepted by a number of courts in megafund cases"); *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 481 (S.D.N.Y. 2013) ("Courts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers."); *Been v. O.K. Indus., Inc.*, No. CIV-02-285-RAW, 2011 WL 4478766, at *11 (E.D. Okla. Aug. 16, 2011) ("A multiplier of four or less is commonly accepted as reasonable."); *In re Xcel Energy, Inc. Sec., Derivative & ERISA Litig.*, 364 F. Supp. 2d 980, 999 (D. Minn. 2005) (noting that numerous other courts "have approved attorney fees based on the percentage method that resulted in lodestar multipliers in excess of four" and citing cases).

109.   Additionally, courts have noted that higher multipliers may be justified if a settlement has "been achieved with unusual efficiency."[152]  Here, a global settlement applicable to 147 million class members was finalized in July 2019, less than two years after the data breach.  As noted (*see* ¶ 70), there was a particular need for speed and efficiency here, and class counsel worked under intense time pressures to reach an impressive result.  Such speed and efficiency weigh in favor of a 3.69 multiplier here.  Moreover, given that class members will receive relief *now* despite the fact that class counsel's work is far from over (*see* ¶ 105), it is proper to include future hours in the multiplier calculation (resulting in a true multiplier of 2.79).

110.   Ultimately, it would be unfair to rely solely on normal billing rates, without enhancement, in a situation where there was a significant possibility that class counsel would recover nothing.  Class counsel's designated hourly rates do not reflect that risk.  As noted, those rates are in line with (or below) those awarded to plaintiffs' firms (before factoring in a multiplier) in other major class actions.  *See* ¶¶ 99–100.  And they are comparable to or well below the rates charged by major

---

[152] *In re Fine Paper Antitrust Litig.*, 751 F.2d 562, 589 (3d Cir. 1984).  *Accord, e.g.*, *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 788 (S.D. Tex. 2008) (awarding multiplier of 5.21 in part because class counsel "achieved a top quality result with speed [and] efficiency").

defense firms, such as King & Spalding (*see* ¶ 101), even though those defense firms are paid those rates regardless of whether they win or lose.  As the court emphasized in the *Toyota Unintended Acceleration* case, a multiplier is awarded based on "all the circumstances of [the] litigation, particularly the risks."[153]

111.  As a court in this District noted in awarding fees in *Ingram v. The Coca-Cola Co.*, a multiplier as high as 4 was

> "reasonable considering . . . an early motion to dismiss by Coca-Cola [that] raised complicated issues . . . [;] prosecuting th[e] case required considerable time and labor, presented novel and difficult legal questions, and required a high level of legal skill[;] . . . many of the attorneys involved had to forgo other employment to pour their energies into this lawsuit[;] . . . [and class counsel] achieved a superior result for the class, including both monetary and injunctive relief."[154]

The instant case shares all of these features.

---

[153] *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 8:10-ml-02151-JVS (FMOx), 2013 WL 12327929, at *34 (C.D. Cal. July 24, 2013).  *See also, e.g.*, *Tennille v. Western Union Co.*, No. 09-cv-00938-MSK-KMT, 2013 WL 6920449, at *3 (D. Colo. Dec. 31, 2013) ("A multiplier is then added to [the] lodestar amount to account for risk."); *Lowery v. City of Albuquerque*, No. 09-cv-00457-JB/WDS, 2013 WL 1010384, at *44 (D.N.M. Feb. 27, 2013) (noting that class counsel "had to take considerable risks so its hourly rate should be more").

[154] 200 F.R.D. 685, 695–96 (N.D. Ga. 2001) (paragraph breaks omitted).

### e. The Multiplier Is Reasonable in Comparison With Other "Mega-Fund" Cases

112.  Multipliers comparable to and much higher than 3.69 have been approved in other mega-fund cases.  The table below provides several examples.

**TABLE 2: Multipliers of 3.69 or More in Mega-Fund Class Actions**

| Case | Recovery | Multiplier |
|---|---|---|
| *Stop & Shop Supermarket Co. v. Smith-Kline Beecham Corp.*, No. 03-cv-04578, 2005 WL 1213926 (E.D. Pa. May 19, 2005) | $100 million | 15.6 |
| *Lobo Exploration Co. v. BP Am. Prod.*, No. CJ-1997-72 (Oka. Dist. Ct., Beaver Cnty. Dec. 8, 2005) | $150 million | 8.7 |
| *In re Buspirone Antitrust Litig.*, No. 1:01-md-01413-JGK (S.D.N.Y. Apr. 18, 2003) (Dkt. No. 171) | $220 million | 8.46 |
| *In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587 (E.D. Pa. 2005) | $126.6 million | 6.96 |
| *In re Cendant Corp. Litig.*, 243 F. Supp. 2d 166 (D.N.J. 2003), *aff'd*, 404 F.3d 173 (3d Cir. 2005) | $3.18 billion | 6.87 |
| *In re 3COM Corp. Sec. Litig.*, No. C-97-21083 (N.D. Cal. Mar. 9, 2001) | $259 million | 6.67 |
| *In re Credit Default Swaps Antitrust Litig.*, No. 1:13-md-02476, 2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016) | $1.86 billion | 6.2 |
| *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752 (S.D. Ohio 2007) | $600 million | 6 |

| Case | Recovery | Multiplier |
|---|---|---|
| *In re Charter Commc'ns, Inc. Sec. Litig.*, No. 4:02-cv-01186-CAS, 2005 WL 4045741 (E.D. Mo. June 30, 2005) | $146.2 million | 5.6 |
| *Roberts v. Texaco*, 979 F. Supp. 185 (S.D.N.Y. 1997) | $115 million | 5.5 |
| *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008) | $7.22 billion | 5.21 |
| *DeLoach v. Phillip Morris Co.*, No. 1:00-cv-01235, 2003 WL 25683496 (M.D.N.C. Dec. 19, 2003) | $212 million | 4.45 |
| *Simmons v. Anadarko Petroleum Corp.*, No. CJ-2004-57 (Okla. Dist. Ct., Caddo Cnty., Dec. 23, 2008) | $155 million | 4.2 |
| *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319 (S.D.N.Y. 2005) | $3.42 billion | 4.03 |
| *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998) | $1.07 billion | 3.97 |
| *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, No. 02-cv-05575(SWK), 2006 WL 3057232 (S.D.N.Y. Oct. 25, 2006) | $2.65 billion | 3.69 |

113.  The above cases show that the multiplier here is very reasonable, even if the focus is just on other mega-fund cases.

114.  In short, given the risks and challenges undertaken by class counsel and the excellent work they performed, a multiplier of 3.69 is reasonable. *A fortiori*, if future hours are considered, a multiplier of 2.79 is eminently reasonable.

### 7.  Conclusion on Attorneys' Fees

115. It is my opinion that the attorneys' fees sought by class counsel are reasonable under the percentage-of-the-fund method, and would remain reasonable even if this Court were to conduct a lodestar cross-check.

## OUT-OF-POCKET EXPENSES

### B. The Out-of-Pocket Expenses Sought by Class Counsel Are Reasonable

116.  Class counsel seek out-of-pocket expenses in the amount of $1,248,033.46. It is well settled in the Eleventh Circuit and elsewhere that "class counsel's reasonable and necessary out-of-pocket expenses should be reimbursed."[155]

---

[155] *Carpenters Health & Welfare Fund v. Coca-Cola Co.*, 587 F. Supp. 2d 1266, 1272 (N.D. Ga. 2008). *Accord, e.g.*, *Wakefield v. Wells Fargo & Co.*, No. 3:13-CV-05053-LB, 2015 WL 3430240, at *6 (N.D. Cal. May 28, 2015) ("Class counsel are entitled to reimbursement of reasonable out-of-pocket expenses."); *Been v. O.K. Indus., Inc.*, No. CIV-02-285-RAW, 2011 WL 4478766, at *3 (E.D. Okla. Aug. 16, 2011) ("Attorneys who recover a common fund for a class are entitled to . . . reasonable . . . costs and expenses from the fund."); *Lucas v. Kmart Corp.*, No. 99-cv-01923-JLK-CBS, 2006 WL 2729260, at *9 (D. Colo. July 27, 2006) ("[A]n attorney who creates or preserves a common fund for the benefit of a class is entitled

117.  In my opinion, the expenses sought by class counsel are reasonable.  They represent less than 0.35 percent of the settlement fund.  (Again, this does not take into account the substantial additional money that Equifax has agreed to pay out if needed, the value of credit monitoring service already claimed by roughly 3 million class members, and the $1 billion that Equifax must spend to improve its data security, *see* ¶¶ 28–30, 44–47.)  The claimed expenses include over $466,000 in expert costs; over $167,000 in electronic research costs; and over $129,000 related to the numerous mediations overseen by Judge Phillips.  Other expenses include court fees, discovery costs, and travel.  Of course, class counsel incurred those expenses with no assurance that the case would ultimately succeed.

118.  In my experience, costs of this magnitude are well within or below the norm for major class actions.  For example, in the *Aetna Managed Care Litigation* in this

---

to receive reimbursement of all reasonable costs incurred."); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 534–35 (E.D. Mich. 2003) ("Under the common fund doctrine, class counsel is entitled to reimbursement of all reasonable out-of-pocket litigation expenses and costs in the prosecution of claims and in obtaining settlement, including expenses incurred in connection with document productions, consulting with experts and consultants, travel and other litigation-related expenses.").

Circuit, expenses were 6.5 percent of the settlement fund;[156] in the *Enron* case, expenses were 0.50 percent;[157] in *Visa Antitrust*, expenses were 0.55 percent;[158] in the *Tyco Securities Litigation*, expenses were 0.87 percent;[159] in *Dahl v. Bain Capital Partners, LLC*, expenses were 2.03 percent;[160] and in the *U.S. Foodservice Pricing Litigation*, expenses were 2.7 percent.[161]   Moreover, the amounts claimed in this case are for standard (and expected) expenses, and thus do not raise any red flags or concerns.

---

[156] *In re: Managed Care Litig. v. Aetna Inc.*, No. 00-md-01334-MD-MOR, 2003 WL 22850070, at *6 (S.D. Fla. Oct. 24, 2003) (approximately $6.5 million in expenses compared to $100 million settlement).

[157] *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008) (approximately $39 million in expenses compared to $7.2 billion settlement).

[158] *See In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003) ($18.7 million in expenses compared to $3.4 billion settlement).

[159] *See In re Tyco Int'l Ltd. Litig.*, 535 F. Supp. 2d 249 (D.N.H. 2007) ($28.9 million in expenses compared to $3.3 billion settlement).

[160] *Dahl v. Bain Capital Partners, LLC*, No. 1:07-cv-12388 (D. Mass. Feb. 2, 2015) (Dkt. No. 1095) ($12 million in expenses compared to $590.5 million settlement).

[161] *In re U.S. Foodservice, Inc. Pricing Litig.*, No. 3:07-md-01894 (AWT), slip op. at 7 (D. Conn. Dec. 9, 2014) (Dkt. No. 521) ($8.08 million in expenses compared to $297 million settlement).   Professors Eisenberg and Miller found that mean and median expenses awarded in all class settlements between 2003 and 2008 were 2.7 percent and 1.7 percent, respectively.   *See* Eisenberg & Miller, *supra* note 91, at 274.

119.   Because of the long period before this settlement is completely implemented, class counsel are likely to incur additional expenses for the benefit of the class.  I understand that class counsel may seek reimbursement for such expenses at a later date.  As long as those expenses are reasonably incurred for the benefit of the class and do not exceed the settlement agreement's $3 million cap, I see no concerns about awarding such expenses down the road.

## INCENTIVE PAYMENTS

### C. The Proposed Incentive Payments to the Class Representatives Are Reasonable

120.   The settlement agreement provides for incentive payments (also known as service awards) of $2,500 to each class of the 96 class representatives.  I am advised that all of these class representatives devoted substantial time and effort to this litigation, as requested by class counsel.  Among other things, I understand that each of these representatives provided details regarding the impact of the data breach, and also provided bank records, credit card statements, and in some instances facts about fraudulent conduct they experienced after the data breach at issue.

121.   In my opinion, this request for incentive payments (totaling $240,000 for the 96 representatives) is reasonable.

122.   In the Eleventh Circuit and elsewhere, incentive payments "compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation."[162]  In evaluating the reasonableness of proposed incentive payments, courts in the Eleventh Circuit consider a number of factors, including:

> (1) the actions the class representatives took to protect the interests of the class; (2) the degree to which the class benefitted from those actions; and (3) the amount of time and effort the class representatives expended in pursuing the litigation.[163]

Courts also consider the personal risk assumed by the class representatives.[164]  I

---

[162] *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1218 (S.D. Fla. 2006).  *Accord, e.g.*, *UFCW Local 880–Retail Food Emp'rs Joint Pension Fund v. Newmont Mining Corp.*, 352 F. App'x 232, 235–36 (10th Cir. 2009) (the purpose of incentive payments is to reward class representatives "for personal risk incurred by the [class representative] or additional effort and expertise provided for the benefit of the class"); *Hadix v. Johnson*, 322 F.3d 895, 898 (6th Cir. 2003) (noting that "incentive awards are efficacious ways of . . . rewarding individual efforts taken on behalf of the class," noting that "[n]umerous courts have authorized incentive awards," and citing cases approving incentive awards); *Lane v. Page*, 862 F. Supp. 2d 1182, 1234 (D.N.M. 2012) (noting that incentive payments serve "to compensate a class representative for risks they take and work they perform on behalf of the class").

[163] *George v. Academy Mortg. Corp. (UT)*, 369 F. Supp. 3d 1356, 1374 (N.D. Ga. 2019).

[164] *See, e.g.*, *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1218 (S.D. Fla. 2006) ("Incentive awards compensate named plaintiffs for . . . the risks they incurred during the course of the class action litigation."); *In re Motor Fuel*

address each of those factors below:

123. **Actions to Protect the Interests of the Class.** By providing key information regarding the impact of the breach, the class representatives established the factual predicate for the Court's finding that the plaintiffs had standing to pursue their claims. Moreover, each of the representatives has remained involved in the case, and assisted in tasks such as discovery and settlement. Class counsel could not have gone forward with the claims without the critical assistance of these representatives.

124. **Benefit to the Class.** As the court noted in *In re Linerboard Antitrust Litigation*: "the class representatives have conferred benefits on all other class members and they deserve to be compensated accordingly."[165] Here, the class representatives' efforts resulted in the largest data breach settlement to date, which will provide substantial benefits for class members. As noted, this case could not

---

*Temperature Sales Practices Litig.*, 271 F.R.D. 263, 293 (D. Kan. 2010) (noting that incentive awards are justified "to compensate [class representatives] for personal risk incurred"); *In re Auto. Refinishing Paint Antitrust Litig.*, No. MDL-1426, 2008 WL 63269, at *7 (E.D. Pa. Jan. 3, 2008) (awarding incentive payments of $30,000 to each class representative because of the risks incurred); *Van Vranken v. Atlantic Richfield Co.*, 901 F. Supp. 294, 299–300 (N.D. Cal. 1995) (noting that, in evaluating the reasonableness of incentive payments, courts consider "the risk to the class representative in commencing suit, both financial and otherwise").

[165] No. 98-cv-05055, 2004 WL 1221350, at *18 (E.D. Pa. June 2, 2004).

have been successfully resolved without the critical participation of these class representatives.

125. **Time and Effort.**  The declaration contemporaneously filed by class counsel details the time and effort (described above) that each class representative put into the case.

126. **Risk.**  The class representatives subjected themselves to discovery, including potentially intrusive inquiries into their private financial matters. Notwithstanding this reality, the class representatives willingly served the class.

127.  Moreover, the payments sought here are in line with (and in many instances, far less than) incentive payments awarded in major class actions in the Eleventh Circuit and elsewhere.   Indeed, courts have even awarded $100,000 or more to individual class representatives in a number of cases.  For instance, in *In re Urethane Antitrust Litigation*, the court awarded incentive payments as high as $150,000 to $200,000 out of a fund of $835 million.[166]  In *Boynton v. Headwaters, Inc.*, the court approved incentive payments of $100,000 out of a fund of $16 million, noting the

---

[166] No. 04-md-01616-JWL, slip op. at 2 (D. Kan. July 29, 2016) (Dkt. No. 3276).

"diligence" of the class representatives.[167]  Several other examples of large incentive

payments—much larger than those sought here—can be cited.[168]

128.  Finally, questionable circumstances that have caused courts to reject or

overturn incentive payments in other cases do not exist here.  In *Radcliffe v. Experian*

*Information Solutions Inc.*, for example, the Ninth Circuit overturned a class

settlement on the ground that the settlement agreement provided for incentive

---

[167] No. 10:2-cv-01111-JPM-EGB, 2012 WL 12546853, at *3 (W.D. Tenn. Mar. 27, 2012).

[168] *See, e.g.*, *Columbus Drywall & Insulation, Inc. v. Masco Corp*, No. 1:04-cv-03066-JEC, 2008 WL 11319972, at *3 (N.D. Ga. Mar. 4, 2008) ($100,000 incentive payments out of $37.25 million fund); *In re High-Tech Employee Antitrust Litig.*, No. 11-cv-02509-LHK, 2015 WL 5158730, at *17–18 (N.D. Cal. Sept. 2, 2015) ($100,000–$140,000 incentive payments out of $16 million settlement fund); *In re Titanium Dioxide Antitrust Litig.*, No. 10-cv-00318(RDB), 2013 WL 6577029, at *1 (D. Md. Dec. 13, 2013) ($125,000 incentive payment out of $163.5 million fund); *Ivax Corp. v. Aztec Peroxides, LLC*, No. 1:02-cv-00593, slip op. at 2 (D.D.C. Aug. 24, 2005) (Dkt. No. 78) ($100,000 incentive payments out of $21 million fund); *In re Neurontin Antitrust Litig.*, No. 02-cv-01830, slip op. ¶ 31 (D.N.J. Aug. 6, 2014) (Dkt. No. 114) ($100,000 incentive payments out of $190 million fund); *Marchbanks Truck Servs. v. Comdata Network, Inc.*, No. 07-cv-01078, slip op. at 2, 8 (E.D. Pa. July 14, 2014) (Dkt. No. 713) ($150,000 and $75,000 incentive payments out of $130 million fund); *Been v. O.K. Indus., Inc.*, No. 02-cv-00285-RAW, 2011 WL 4478766, at *12 (E.D. Okla. Aug. 16, 2011) ($100,000 incentive payments out of $15.6 million fund); *Velez v. Novartis Pharm. Corp.*, No. 04-cv-09194-CM, 2010 WL 4877852, at *4, *8, *28 (S.D.N.Y. Nov. 30, 2010) ($125,000 incentive payments out of $152.5 million fund); *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 2:12-md-02323-AB, 2018 WL 1635648, at *10–11 (E.D. Pa. Apr. 5, 2018) ($100,000 incentive payments out of $1 billion fund).

awards *only* if the class representatives supported the settlement, creating a "patent divergence of interests between the named representatives and the class."[169]   The incentive payments in the instant case, however, are not conditioned on support for the settlement.   Nor is this a settlement where the unnamed class members receive virtually nothing.[170]   The proposed $240,000 in total incentive payments represents only a tiny fraction (0.06 percent) of the minimum fixed fund of $380.5 million (which, again, does not include substantial non-monetary relief or possible additional cash payouts under the settlement, *see* ¶¶ 28–30).

## VII.  CONCLUSION

129.   In my opinion, the attorneys' fees, expenses, and incentive payments requested by class counsel are reasonable.

---

[169] 715 F.3d 1157, 1161 (9th Cir. 2013).

[170] Even in a case in which the settlement went entirely to a *cy pres* entity and attorneys' fees, the Ninth Circuit affirmed incentive payments.   *See Lane v. Facebook, Inc*., 696 F.3d 811, 817 (9th Cir. 2012).

\* \* \*

I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct based on information known to me.

Robert H. Klonoff

October 29, 2019

# APPENDIX A

# CURRICULUM VITAE

**ROBERT H. KLONOFF**
Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
Tel:  503-768-6601 (Office)
E-Mail:  klonoff@lclark.edu

Date of Birth:   March 15, 1955
Place of Birth:  Portland, Oregon

## EDUCATION:

J.D., Yale University, 1979

A.B., University of California, Berkeley, 1976, Majored in Political Science/Economics (Highest Honors)

## WORK EXPERIENCE:

### Current Position:

Jordan D. Schnitzer Professor of Law, Lewis & Clark Law School (since 2014)

### Prior Positions:

Dean of the Law School, Lewis & Clark Law School (2007-2014)

Douglas Stripp/Missouri Endowed Professor of Law, University of Missouri-Kansas City School of Law (2003-2007)

Jones Day, Washington, D.C. (Partner, 1991-July 2003; Of Counsel, 1989-1991, 2003- 2007)

Adjunct Professor of Law, Georgetown University Law Center (class action law and practice) (1999-2003)

Visiting Professor of Law, University of San Diego School of Law (1988-1989)

Assistant to the Solicitor General of the United States (1986-1988)

Assistant United States Attorney (Criminal Division, District of Columbia) (1983-1986)

Associate, Arnold & Porter, Washington, D.C. (1980-1983)

Law Clerk to the Honorable John R. Brown, Chief Judge, United States Court of Appeals for the Fifth Circuit (1979-1980)

Summer Associate, Baker & Botts, Houston, and Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C. (1978)

Summer Associate, Sidley & Austin, Washington, D.C. (1977)

## SPECIAL HONORS AND ACHIEVEMENTS:

Recipient, 2018 Albert Nelson Marquis Lifetime Achievement Award (in the field of law) from *Who's Who in America*

Member, 2011-2017, United States Judicial Conference Advisory Committee on Civil Rules (appointed by Chief Justice John G. Roberts, Jr., in 2011 as the sole voting member from the law school academy; reappointed May 2014 for a second three-year term)

Elected Member, International Association of Procedural Law

Selected in November 2013 for the J. William Fulbright Specialist Roster

Recipient, Oregon Consular Corps Award for Individual Achievement in International Outreach, Portland, Oregon (May 2013)

Associate Reporter, American Law Institute's *Principles of the Law of Aggregate Litigation* (class action project; drafts presented at several annual

meetings; final version approved by full ALI in May 2009 annual meeting and published in May 2010)

Fellow, American Academy of Appellate Lawyers

Life Fellow, American Bar Foundation

Academic Fellow, Pound Institute

Elected Member, American Law Institute

Recipient, 2007 Award for Outstanding UMKC Law Professor (based on vote of 3d year class)

2007 UMKC Law School Commencement Speaker (based on vote of 3d year class)

Recipient, 2006 UMKC Law School Elmer Pierson Teaching Award for Most Outstanding Teacher in the Law School (selected by the Dean)

Recipient, 2005 President's Award for Outstanding Service from the UMKC Law School Foundation

Reporter, 2005 National Conference on Appellate Justice (co-sponsored by the Federal Judicial Center, National Center for State Courts, and other organizations)

Co-Recipient, District of Columbia Bar's Frederick B. Abramson Award for Superior Service to the Community (June 1998)

Attorney General's Special Achievement Award for Outstanding Work as an Assistant to the Solicitor General of the United States (1986, 1987)

Attorney General's Special Achievement Award for Outstanding Work as an Assistant United States Attorney (1984, 1985)

The Benjamin N. Cardozo Prize for Best Moot Court Brief for Academic Year 1978-1979, Yale Law School

Semi-Finalist, Moot Court Oral Argument, Yale Law School (Fall, 1978)

Phi Beta Kappa

U.C. Berkeley's Most Outstanding Political Science Student (1976)

The Edward Kraft Award for Outstanding Work as a Freshman Student, U.C. Berkeley (1974)

## MEMBERSHIPS:

U.S. Supreme Court Bar

Various Federal Circuit and District Courts

District of Columbia Bar

Missouri State Bar

Oregon State Bar

Multnomah County Bar

American Law Institute

American Bar Association

American Bar Association Committee on Class Actions & Derivative Suits (Section of Litigation)

## PUBLICATIONS:

### Books:

Klonoff, *Federal Multidistrict Litigation in a Nutshell* (West 2019) (forthcoming)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (West 5th ed. 2017)

Castanias & Klonoff, *Federal Appellate Practice in a Nutshell* (West 2d ed. 2017)

Klonoff, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West 4th ed. 2017) (with teacher's manual)

Klonoff, *Introduction to the Study of U.S. Law:  Cases and Materials* (West 2016)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (Thomson West 4th ed.) (2012)

Klonoff, Bilich & Malveaux, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West 3d ed.) (2012) (with teacher's manual)

Klonoff (associate reporter), *Principles of the Law of Aggregate Litigation*, American Law Institute Publications (2010) (along with Samuel Issacharoff, reporter, and associate reporters Richard Nagareda and Charles Silver)

Castanias & Klonoff, *Federal Appellate Practice and Procedure in a Nutshell* (Thomson West) (2008)

Klonoff & Colby, *Winning Jury Trials:  Trial Tactics and Sponsorship Strategies* (NITA 3d ed.) (2007)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (Thomson West 3d ed.) (2007)

Klonoff, Bilich & Malveaux, *Class Actions and Other Multi-Party Litigation:  Cases and Materials* (Thomson West 2d ed.) (2006) (with teacher's manual)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (Thomson West 2d ed.) (2004)

Klonoff & Colby, *Winning Jury Trials:  Trial Tactics and Sponsorship Strategies* (Lexis Nexis 2d ed.) (2002)

Klonoff & Bilich, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West Group 2000)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (West Group 1999)

Klonoff & Colby, *Sponsorship Strategy: Evidentiary Tactics for Winning Jury Trials* (Michie Co. 1990)

### **Articles and Book Chapters:**

Klonoff, *International Handbook on Class Actions,* chapter on the Future of U.S. Aggregate Litigation, Cambridge University Press (forthcoming 2020)

*Application of the New Discovery Rules in Class Actions: Much Ado About Nothing,* 71 Vanderbilt L. Rev. 1949 (2018)

*Class Actions in the U.S. and Israel: A Comparative Approach*, 19 Theoretical Inquiries in the Law 151 (2018) (co-author)

*Class Actions Part II: A Respite from the Decline*, 92 N.Y.U. L. Rev. 971 (2017)

*The Remedy For Election Fraud Is A New Election,* Law 360 (July 20, 2017) (www.law360.com/whitecollar/articles/946569/the-remedy-for-election-fraud-is-a-new-election)

*Class Actions in the Year 2025: A Prognosis*, 65 Emory L.J. 1569 (2016)

*Why Most Nations Do Not Have U.S.-Style Class Actions*, 16 BNA Class Action Litigation Report, Vol. 16, No. 10, at 586 (May 22, 2015) (selected for presentation at the May 2015 World Congress of the International Association of Procedural Law, Istanbul, Turkey)

*Federal Rules Symposium: A Tribute to Judge Mark R. Kravitz -- Introduction to the Symposium*, 18 Lewis & Clark L. Rev. 583 (2014) (co-author)

*Class Actions for Monetary Relief Under Rule 23(b)(1)(A) and (b)(1)(B): Does Due Process Require Notice and Opt-Out Rights?*, 82 Geo. Wash. L. Rev. 798 (2014)

*The Decline of Class Actions,* 90 Wash. U. (St. Louis) L. Rev. 729 (2013)

*Reflections on the Future of Class Actions,* 44 Loy. U. Chi. L.J. 533 (2013)

*Richard Nagareda: In Memorium,* 80 U. Cin. L. Rev. 289 (2012)

*Introduction and Memories of a Law Clerk,* 47 Houston L. Rev. 529, 573 (2010)

*ALI's Aggregate Litigation Project Has Global Impact,* 33 ALI Reporter 7 (Fall 2010)

Book Review, *In the Public Interest,* 39 Env. Law 1225 (2009)

*The Public Value of Settlement,* 78 Fordham L. Rev. 1177 (2009)(co-author)

*Making Class Actions Work:  The Untapped Potential of the Internet,* 69 U. Pitt. L. Rev. 727 (co-author)(2008), adapted and published in 13 J. Internet Law 1 (2009)

*The Class Action Fairness Act:  An Ill-Conceived Approach to Class Settlements*, 80 Tul. L. Rev. 1695 (co-author) (2006)

*The Twentieth Anniversary of* Phillips Petroleum v. Shutts, *Introduction to the Symposium*, 74 UMKC L. Rev. 433 (2006)

*The Adoption of a Class Action Rule:  Some Issues for Mississippi to Consider*, 24 Miss. C. L. Rev. 261 (2005)

*Antitrust Class Actions:  Chaos in the Courts*, 11 Stan. J. L. Bus. & Fin. 1 (2005), reprinted in Litigation Conspiracy:  An Analysis of Competition Class Actions (Stephen G.A. Pitel ed. Irwin Law 2006), and 3 Canadian Class Action Review 137 (2006)

*The Judiciary's Flawed Application of Rule 23's "Adequacy of Representation" Requirement*, 2004 Mich. St. L. Rev. 671 (2004)

*Class Action Rules — Are They Driven by Substance?*, 1 Class Action Litigation Report 504 (Nov. 10, 2000) (co-author)

*Response to May 2000 Article on Sponsorship Strategy*, 63 Tex. B.J. 754 (Sept. 2000) (co-author)

*A Look at Interlocutory Appeals of Class Certification Decisions Under Rule 23(f)*, 1 Class Action Litigation Report 69 (May 12, 2000) (co-author)

*The Mass Tort Class Action Gamble*, 7 Metro. Corp. Counsel 1, 8 (Aug. 8, 1999) (co-author)

"Legal Approaches to Sex Discrimination" (co-author), in H. Landrine & E. Klonoff, *Discrimination Against Women:  Prevalence, Consequences, Remedies* (Sage Pub. 1997)

*Sponsorship Strategy:  A Reply to Floyd Abrams and Professor Saks*, 52 Md. L. Rev. 458 (1993) (co-author)

*A Trial Lawyer's Roadmap for Handling Bad Facts:  The Role of Credibility*, 16 Trial Diplomacy Journal 139 (July/Aug. 1993) (co-author)

*Opening Statement*, 17 Litigation 1 (ABA Spring 1991) (co-author)

Contributing Editor, *Criminal Practice Institute Trial Manual*, Young Lawyers Section, Bar Ass'n of D.C. (1986)

*The Congressman as Mediator Between Citizens and Government Agencies:  Problems and Prospects*, 15 Harv. J. Legis. 701 (1979)

*A Dialogue on the Unauthorized Practice of Law*, 25 Villanova L. Rev. 6 (1979) (co-author)

*The Problems of Nursing Homes:  Connecticut's Non Response*, 31 Admin. L. Rev. 1 (1979)

## SIGNIFICANT LEGAL EXPERIENCE:

Argued eight cases before the U.S. Supreme Court

Authored dozens of U.S. Supreme Court filings (certiorari petitions, certiorari oppositions, merits briefs, reply briefs)

Briefed and argued numerous cases before various U.S. circuit and district courts and state trial and appellate courts

Tried dozens of cases (primarily jury trials)

Handled more than 100 class action cases as counsel

Served as an expert witness in numerous federal and state class action cases, including the *British Petroleum Deepwater Horizon Oil Spill* litigation, the *National Football League Concussion* litigation, the *Volkswagen "Clean Diesel"* litigation, and the *Wells Fargo Unauthorized Accounts* litigation

Worked extensively with testifying and consulting experts on class action issues, including economists, securities experts, medical and scientific experts, and leading academics

Presented more than 100 cases to the grand jury while serving as an Assistant U.S. Attorney

Handled hundreds of sentencing hearings, preliminary hearings, and probation revocation hearings

## SIGNIFICANT TEACHING AND SPEAKING ENGAGEMENTS

Speaker, International Class Actions Conference, Vanderbilt Law School, Nashville, Tennessee, (Aug. 23, 2019)

Keynote Speaker, Pound Civil Justice Institute, Aggregate Litigation in State Court: Conference of State Court Appellate Judges,, San Diego, California (July 27, 2019)

Visiting Professor of Law, University of Bologna School of Law, Ravenna, Italy (July, 2019) (faculty member for summer program on Transnational Torts)

Visiting Professor of Law, University of Trento School of Jurisprudence, Trento, Italy (May, 2019) (taught Introduction to U.S. Law)

Visiting Professor of Law, Royal University of Law and Economics, Phnom Penh, Cambodia (April 2019)

Speaker, Impact Fund Class Action Conference, San Francisco, California (Feb. 22, 2019)

Speaker on Class Actions, 17th Annual Impact Fund Class Action Conference, San Francisco, California (Feb. 23, 2019)

Visiting Professor of Law, National Taiwan University, Taipei, Taiwan (December 2018) (taught course on U.S. Class Actions)

Speaker on the National Football League Concussion case, National Taiwan University, Taipei, Taiwan (December 20, 2018)

Speaker on Class Actions, Live Webinar Broadcast, Rule 23 Will Be Amended in Four Days: Are You Ready, American Bar Association (Nov. 27, 2018)

Speaker, American Bar Association's 22d Annual Institute on Class Actions, Chicago, Illinois (Oct. 18, 2018)

Speaker, MDL at 50 –The 50th Anniversary of Multidistrict Litigation, New York University School of Law, New York, New York (Oct. 12, 2018)

Visiting Professor of Law, University of Bologna School of Law, Ravenna, Italy (July 2018) (faculty member for environmental law program; lectured on environmental class actions)

Speaker on Class Actions, Freie University Faculty of Law, Berlin, Germany (June 26, 2018)

Visiting Professor of Law, Royal University of Law and Economics, Phnom Penh, Cambodia (April 2018) (taught course on Introduction to United States Law)

Co-Chair, Moderator, and Panelist, Posner on Class Actions, Columbia Law School, New York, New York (March 2, 2018)

Panelist on Civil Discovery, Vanderbilt University School of Law, Nashville, Tennessee (October 13, 2017)

Panelist on the Civil Rules Committee Process, University of Arizona College of Law, Tucson, Arizona (October 7, 2017)

Visiting Professor of Law, University of Bologna School of Law, Ravenna, Italy (July 2017) (faculty member for environmental law program; lectured on environmental class actions)

Visiting Professor of Law, University of Trento School of Jurisprudence, Trento, Italy (May 2017) (taught course on Introduction to U.S. Law)

Panelist on Class Actions, Beard Group, Class Action Money and Ethics Conference, New York, New York (May 1, 2017)

Visiting Professor of Law, Tel Aviv University, Tel Aviv, Israel (January 2017) (taught course on class actions)

Panelist on Class Actions, Tel Aviv University, Fifty Years of Class Actions – A Global Perspective (January 4, 2017)

Panelist on Class Actions, New York University Law School Conference on Rule 23@50, New York, New York (December 2, 2016)

Panelist on Class Actions, Appellate Judges Education Institute, Philadelphia, Pennsylvania (November 11, 2016)

Speaker on Class Actions, National Legal Aid Defender Association National Farmworker Conference, Indianapolis, Indiana (November 10, 2016)

Panelist on Class Actions, American Bar Association Class Action Institute, Las Vegas, Nevada (October 20, 2016)

Panelist, Duke University Law School Conference on Class Action Settlements, San Diego, California (October 6, 2016)

Fulbright Scholar, Hong Kong University School of Law (August-September 2016) (taught course on class actions and delivered campus-wide lecture on criminal procedure)

Visiting Professor of Law, National Taiwan University, Taipei, Taiwan (June 2016) (taught course on Introduction to United States Law)

Speaker on Class Actions, University of Zagreb Law School, Zagreb, Croatia (May 11, 2016)

Panelist on Civil Litigation, Association of American Law Schools Annual Meeting, New York, New York (January 8, 2016)

Visiting Professor of Law, Bahçeşehir University School of Law, Istanbul, Turkey (December 2015) (taught Introduction to United States Law)

Participant, Conference on Civil Justice (Pound Institute) Emory University Law School, Atlanta, Georgia (October 15, 2015)

Participant, Conference on Class Actions, Duke Law School, Arlington, Virginia (July 23-24, 2015)

Participant, Conference on Class Actions, Defense Research Institute, Washington, D.C. (July 23-24, 2015)

Participant, Civil Procedure Workshop, Seattle University Law School, Seattle, Washington (July 17, 2015)

Panelist on Class Actions, Annual Meeting, American Association for Justice, Montreal, Canada (July 12, 2015)

Speaker on Class Actions, International Association of Procedural Law, Istanbul, Turkey (May 28, 2015)

Panelist, Subcommittee on Class Actions of U.S. Judicial Conference Advisory Committee on Civil Rules, American Law Institute Annual Meeting, Washington, D.C. (May 17, 2015)

Moderator, Ethical Issues in Class Actions and Non-Class Aggregate Litigation, American Law Institute Annual Meeting, Washington, D.C., (May 17, 2015)

Visiting Professor of Law, University of Trento School of Jurisprudence, Trento, Italy (March 2015) (taught U.S. Class Actions)

Speaker on Class Actions, European University Institute, Fiesole, Italy (February 23, 2015)

Visiting Professor of Law, University of Notre Dame, Fremantle Australia (January 2015) (taught course on U.S. Civil Rights and Civil Liberties)

Visiting Professor of Law, Universidad Sergio Arboleda, Bogota and Santa Marta, Colombia (December 2014) (taught course on Introduction to United States Law)

Visiting Professor of Law, National Taiwan University, Taipei, Taiwan (November 2014) (taught course on Introduction to United States Law)

Panelist, American Bar Association, National Institute on Class Actions, Chicago, Illinois (October 23, 2014)

Visiting Professor of Law, East China University of Political Science and Law, Shanghai, China (October 2014) (taught U.S. Class Actions)

Visiting Professor of Law, Herzen State Pedagogical University of Russia, St. Petersburg, Russia (September 2014) (taught U.S. Class Actions)

Visiting Professor of Law, Royal University of Law and Economics, Phnom Penh, Cambodia (July 2014) (taught Introduction to United States Law)

Speaker on U.S. Legal Education, Universidad Sergio Arboleda School of Law, Bogota, Colombia (June 3 and 5, 2014)

Speaker on Class Actions, Superintendencia de Industria y Comercio, Bogota, Colombia (June 3, 2014)

Speaker on Class Actions and the Fukushima Nuclear Accident, Waseda University School of Law, Tokyo, Japan (January 24, 2014)

Speaker on Class Actions, Osaka Bar Association, Osaka, Japan (January 23, 2014)

Speaker on Class Actions, East China University of Political Science and Law, Shanghai, China (January 15, 2014)

Speaker on Class Actions, AmCham Shanghai, Shanghai, China (January 14, 2014)

Speaker on Development of Animal Law in the Legal Academy, 2013 Animal Law Conference, Stanford Law School, Palo Alto, California (November 25, 2013)

Speaker on U.S. Law and Legal Education, Royal University of Law and Economics, Phnom Penh, Cambodia (October 1, 2013)

Speaker on U.S. Law and Legal Education, Paññāsāstra University of Cambodia, Phnom Penh, Cambodia (October 1, 2013)

Speaker on U.S. Legal Education, International Association of Law Schools International Deans' Forum, National University of Singapore Law School, Singapore (September 26, 2013)

Speaker on Class Actions, Japan Federation of Bar Associations, Tokyo, Japan (September 19, 2013)

Speaker on Class Actions, Waseda University School of Law, Tokyo, Japan (September 19, 2013)

Speaker on Ethics of Aggregate Settlements, American Association for Justice Annual Meeting, San Francisco, California (July 22, 2013)

Speaker on the British Petroleum Class Action Settlement, International Water Law Conference, National Law University of Delhi, Delhi, India (May 31, 2013)

Speaker on U.S. Supreme Court Confirmation Process, Jewish Federation of Greater Portland's Food for Thought Festival, Portland, Oregon  (April 21, 2013)

Speaker on Class Actions, Class Action Symposium, George Washington University Law School, Washington, D.C. (March 8, 2013)

Speaker on Class Actions, Impact Fund Class Action Conference, Oakland, California (March 1, 2013)

Speaker on Class Actions, Hong Kong University Department of Law (November 15, 2012)

Speaker on Class Actions, Fudan University Law School (Shanghai, China) (November 13, 2012)

Keynote Speaker, National Consumer Law Center Symposium, Seattle, Washington (October 28, 2012)

Speaker, American Bar Association, National Institute on Class Actions, Chicago, Illinois (October 25, 2012)

Speaker, Conference on Class Actions, Washington University St. Louis School of Law and the Institute for Law and Economic Policy (April 27, 2012)

Speaker, Conference on Class Actions, Loyola Chicago School of Law (April 13, 2012)

Panelist on leadership and world peace with Former South African President F.W. De Klerk, University of Portland (February 29, 2012)

Panelist on class actions before the Standing Committee on Rules of Practice and Procedure, Phoenix, Arizona (January 5, 2012)

Speaker on Class Actions Lawsuits in the U.S., University of the Philippines, College of Law, Quezon City, Philippines (August 2011)

Speaker on Environmental Class Actions, Kangwon University Law School, Chuncheon, South Korea (August 2011)

Speaker on Class Actions, Federal Judicial Center Conference on Class Actions, Duke University School of Law (May 20, 2011)

Speaker, Conference on Aggregate Litigation, University of Cincinnati College of Law (April 1, 2011)

Speaker on Class Actions, Seoul National University School of Law (May 18, 2010)

Keynote Speaker (addressing US Supreme Court confirmation process), Alaska Bar Annual Meeting (April 28, 2010)

Speaker, Conference on the Future of Animal Law, Harvard Law School (April 11, 2010)

Speaker, Conference on Aggregate Litigation: Critical Perspectives, George Washington University Law School (Mar. 12, 2010)

Speaker, U.S. Supreme Court Confirmation Process, Multnomah County Bar Association and City Club of Portland, (Sept. 30, 2009)

Speaker on Class Actions, American Legal Institutions, and American Legal Education at National Law Schools of India in Bangalore, Hyderabad, Calcutta,  Jodhpur, and Delhi (August 2009)

Speaker, China/U.S. Conference on Tort and Class Action Law, Renmin University of China School of Law, Beijing, China (July 11-12, 2009)

Speaker on Class Actions, Southeastern Association of Law Schools annual meeting, Palm Beach, Florida (August 1, 2008)

Speaker on Class Actions, National Foundation for Judicial Excellence (meeting of 150 state appellate court judges), Chicago, Illinois (July 12, 2008)

Speaker on Class Actions, Practising Law Institute, New York, NY (July 10, 2008)

Speaker at Conference on Class Actions in Europe and North America, sponsored by New York University School of Law, the American Law Institute, and the European University Institute, Florence, Italy (June 13, 2008)

Speaker on Class Actions at the American Bar Association Tort and Insurance Section Meeting, Washington, D.C. (Oct. 26, 2007)

Speaker on Antitrust Class Actions at the American Bar Association's Annual Antitrust Meeting, Washington D.C. (April 18, 2007)

Chair, Organizer, and Moderator of Class Action Symposium at UMKC School of Law (April 7, 2006) (other speakers (26 in all) included, *e.g.*, Professors Arthur Miller, Edward Cooper, Sam Issacharoff, Geoffrey Miller, and Linda Mullenix, as well as several prominent federal judges and practicing lawyers)

Speaker on Class Actions, Missouri CLE (Nov. 18, 2005)

Speaker on Class Actions, Practising Law Institute (July 29, 2005)

Speaker on Class Actions, Kansas CLE (June 23, 2005)

Speaker on Class Actions at Bureau of National Affairs Seminar on the Class Action Fairness Act of 2005 (June 17, 2005)

Visiting Lecturer on Class Actions, Peking University (May 30-June 3, 2005)

Speaker on Oral Argument, American Bar Association 2005 Section of Litigation Annual Conference (April 22, 2005) (part of panel including Second Circuit Chief Judge Walker and several others)

Speaker on Class Actions, Federal Trade Commission/Organization for Economic Co-operation and Development, Workshop on Consumer Dispute Resolution and Redress in the Global Marketplace (April 19, 2005)

Speaker at Antitrust Class Action Symposium, University of Western Ontario College of Law (April 1, 2005)

Speaker at Class Action Symposium, Mississippi College of Law (February 18, 2005)

Speaker on Class Actions, Practising Law Institute (July 30, 2004)

Visiting Lecturer on Class Actions, Peking University (June 2004)

Visiting Lecturer on Class Actions, Tsinghua University (June 2004)

Speaker at Class Action Symposium, Michigan State University (April 16-17, 2004)

Speaker on U.S. Supreme Court advocacy, David Prager Advanced Appellate Institute (Kansas City Metropolitan Bar Association) (Feb. 27, 2004)

Speaker on Class Actions, Institute of Continuing Legal Education in Georgia (Oct. 24, 2003)

Speaker on Class Actions, Practising Law Institute (July 31, 2003)

Speaker on Class Actions, Practising Law Institute (Aug. 5, 2002)

Speaker on Class Actions, Practising Law Institute (Aug. 16, 2001)

Speaker on many occasions throughout the country on "Sponsorship Strategy" (1990-present) and advocacy before the U.S. Supreme Court (1988-present)

## OTHER PROFESSIONAL ACTIVITIES:

Member of American Bar Association Group Evaluating Qualifications of Merrick Garland to serve on the U.S. Supreme Court (reviewed Judge Garland's civil procedure opinions)

Advisory Board Consulting Editor, *Class Action Litigation Report* (BNA)

Advisory Board, The Flawless Foundation (an organization that serves troubled children)

Member, Board of Directors, Citizens' Crime Commission (Portland, Oregon) (2007-2011)

Served on numerous UMKC School of Law committees, including Programs (Chair), Promotion and Tenure, Appointments, and Smith Chair Appointment

Chair of pro bono program for all 27 offices of Jones Day (2000-2004); also previously Chair of Washington office pro bono program (1992-2003)

Member, Board of Directors, Bread for the City (a D.C. public interest organization providing medical, legal, and social services) (2001-2003)

Master, Edward Coke Appellate Practice Inn of Court in Washington, D.C. (other participants include Ted Olson, Seth Waxman, Ken Starr, Walter Dellinger, and several sitting appellate judges) (2001-2003)

Member, Board of Directors, Washington Lawyers' Committee for Civil Rights and Urban Affairs (2000-2003); Advisory Board Member (2003-present)

Member, D.C. Court of Appeals Committee on Unauthorized Practice of Law (1997-2000)

Handled and supervised numerous pro bono matters (*e.g.*, death penalty and other criminal defense, civil rights, veterans' rights)

Played a major role in establishing a walk-in free legal clinic in Washington, D.C.'s Shaw neighborhood

## **VOLUNTEER WORK:**

Numerous guest speaker appearances at public schools and retirement homes; volunteer at local soup kitchen; volunteer judge for Classroom Law Project.

## APPENDIX B

## MATERIALS CONSIDERED

In addition to reviewing cases and materials in other class actions, I considered the following documents filed in, and pertaining to, the instant case in the course of preparing my Declaration:

- **Court Filings (including accompanying exhibits and/or addendums) in** *In re Equifax Inc. Customer Data Security Breach Litigation*, **Case No. 1:17-md-02800-TWT (N.D. Ga.):**

  - Case Management Order No. 2 (Dkt. No. 87);

  - The Barnes/Canfield Group's Application for Appointment to Lead the Consumer Cases (Dkt. No. 187);

  - Order [Appointing Leadership Attorneys] (Dkt. No. 232);

  - Case Management Order No. 3 (Dkt. No. 248);

  - Corrected Joint Preliminary Report and Discovery Plan (Dkt. No. 255);

  - Case Management Order No. 4 (Dkt. No. 261);

  - Stipulated Protective Order (Dkt. No. 262);

  - Consolidated Consumer Class Action Complaint (Dkt. No. 374);

  - Case Management Order No. 5 (Dkt. No. 409);

  - Motion to Dismiss Consolidated Consumer Class Action Complaint (Dkt. No. 425);

  - Consumer Plaintiffs' Memorandum of Law in Opposition to Equifax's Motion to Dismiss the Complaint (Dkt. No. 452);

  - Reply Brief in Support of Equifax's Motion to Dismiss Consolidated Consumer Class Action Complaint (Dkt. No. 464);

  - Consumer Plaintiffs' Notice of Supplemental Authority in Support of Their Memoranda of Law in Opposition to Equifax's Motions to Dismiss the Consolidated Complaints (Dkt. No. 483);

- Plaintiffs' Motion for Limited Relief from Discovery Stay and Entry of Order Relating to Interviews of Defendants' Former Employees (Dkt. No. 488);

- Equifax's Opposition to Plaintiffs' Motion for Limited Relief from Discovery Stay and Entry of Order Relating to Interviews of Defendants' Former Employees (Dkt. No. 503);

- Reply in Support of Plaintiffs' Motion for Limited Relief from Discovery Stay and Entry of Order Relating to Interviews of Defendants' Former Employees (Dkt. No. 515);

- Plaintiffs' Notice of Supplemental Authority in Support of Motion for Limited Relief from Discovery Stay and Entry of Order Relating to Interviews of Defendants' Former Employees (Dkt. No. 532);

- Opinion and Order [re: Motion to Dismiss Consumer Cases] (Dkt. No. 540);

- Amended Joint Preliminary Report and Discovery Plan (Dkt. No. 547);

- Defendant's Answer to Consolidated Consumer Class Action Complaint (Dkt. No. 571);

- Order [re Plaintiffs' Motion for Limited Relief from Discovery Stay] (Dkt. No. 652);

- Plaintiffs' Motion to Direct Notice of Proposed Settlement to the Class (Dkt. No. 739);

- Order Directing Notice (Dkt. No. 742); and

- Class Counsel's Supplemental Declaration in Support of Plaintiffs' Motion for Attorneys' Fees, Expenses, and Service Awards to the Class Representatives (near-final draft dated October 28, 2019) (final draft to be filed contemporaneously).

▪ **Additional Documents:**

- *In Camera* Time and Expense Submission dated April 30, 2018;

- *In Camera* Time and Expense Submission dated July 31, 2018;

- *In Camera* Time and Expense Submission dated October 31, 2018;

- *In Camera* Time and Expense Submission dated January 31, 2019;

- *In Camera* Time and Expense Submission dated April 30, 2019;

- *In Camera* Time and Expense Submission dated July 31, 2019;

- Summary of Hours and Lodestar by Firm;

- Summary of Rates and Other Information for All Timekeepers;

- Summary of Expenses by Category;

- Final Time and Expense Detail Reviewed by Class Counsel;

- Final Term Sheet Dated March 30, 2019;

- Statement of Class Counsel Dated August 1, 2019;

- Letter from Elizabeth Warren, United States Senator, to Andrew Katsaros, Inspector General, Federal Trade Commission (dated August 13, 2019);

- PACER-CM/ECF Docket Report for *In re Equifax, Inc. Customer Data Security Breach Litigation*;

- Summary of Previous Court-Approved Hourly Rates for Leadership Firms; and

- Objections to Equifax Consumer Settlement Received Through October 24, 2019.