# EXHIBIT 3

## Declaration from Harold T. Daniel, Jr.

*In re: Equifax Customer Data Security Breach Litigation,*
No. 17-md-2800-TWT (N.D. Ga.)

Plaintiffs' Motion for Attorneys' Fees, Expenses, and
Service Awards to the Class Representatives

## DECLARATION OF HAROLD T. "Hal" DANIEL. Jr.

I, Harold T. Daniel, Jr., submit this declaration pursuant to 28 U.S.C. Sec. 1746.

1.     My name is Harold T. Daniel, Jr.  I am a member of the State Bar of Georgia

       (admitted 1970).  I am a graduate of Emory University School of Law.

2.     I served as President of the State Bar of Georgia (1994-1995) and President

       of the Lawyers Club of Atlanta (1983-1984).  I am a member of the Atlanta

       Bar Association and of the American Bar Association (member, Standing

       Committee of the Federal Judiciary, 2000-2003).  I am a Fellow of the

       American College of Trial Lawyers, a Fellow of the International Academy

       of Trial Lawyers and a Fellow of the American Bar Foundation.  I am a

       Master Barrister of the Joseph Henry Lumpkin American Inn of Court

       (sponsored by the University of Georgia School of Law).  I have served on

       the faculty of the Emory University of Law Trial Techniques Program, and I

       frequently lecture on the subject of Business Litigation at the Vanderbilt

       University School of Engineering.  I have written and lectured for various

       continuing legal education programs sponsored by the Institute of

       Continuing Legal Education in Georgia and for other organizations.  I am an

       author of a chapter entitled "Litigation Management by Law Firms" in

       Business and Commercial Litigation in Federal Courts, Fourth Edition

(Thomson Reuters 2016).  I have been rated by my peers for listing in *Best Lawyers in America* for Commercial Litigation and for Bet-the-Company Litigation.  I have an "AV" rating in the Martindale-Hubbell law directory.  A true and correct copy of my CV is marked Exhibit "A," attached hereto and made a part hereof.

3.     I have engaged in the private practice of law in Atlanta, Georgia since 1970.  My practice has been devoted almost exclusively to trial and appellate litigation, representing plaintiffs and defendants, with substantial concentration on complex business litigation.  From 1970 to July 1, 1994, I practiced in a small "litigation boutique" law firm in Atlanta, first in a general civil practice and later concentrating my practice in civil business litigation.  The firm changed names on several occasions.  When I commenced the practice of law in 1970, the firm was known as Webb, Parker, Young & Ferguson.  After two other name changes, the firm was known as Webb & Daniel from 1983 until merger with Holland & Knight LLP on July 1, 1994.  Webb & Daniel never had more than 12 lawyers.

4.     From July 1, 1994, to August 1, 2019, I practiced law in the Atlanta office of Holland & Knight LLP, first as an equity partner and later as of counsel.  Holland & Knight is an international law firm with approximately 1300

lawyers located in cities throughout the United States and in some foreign countries.

5.    On August 1, 2019, I resigned my position at Holland & Knight and commenced the practice of law in Atlanta as a sole practitioner at Harold Daniel Law LLC.

6.    At Webb & Daniel, I handled major civil business litigation in a small firm setting.  Among other matters, I handled the following major cases between 1983 and 1994:

- *Osterneck* v. *Barwick Industries*, 825 F.2d 1521 (11th Cir. 1987), cert. granted sub nom. *Osterneck* v. *Ernst & Whinney*, 56 USLW 3831 (1988) (federal securities and fraud; 13- week jury trial).

- *Beckham Petroleum*, et al. v. *Citizens and Southern National Bank*, [U. S. District Court for the Northern District of Georgia, Case No. 1-84-cv-00328-RHH (1987); (fraud, tortious interference with business relations, RICO; four-week jury trial, settled after jury verdict on liability).

- *Southern Engineering Company* v. *Gross*, et al., 410 S.E.2nd 747 (Ga. 1991) (breach of fiduciary duty, misappropriation of corporate opportunities and fraud; nine-week jury trial).

- U.S. *Anchor Manufacturing* v. *Rule Industries*, et al., 7 F3d 1163 911 Cir. 1993), 443 S.E. 2d 833 (Ga. 1994), 27 F.2d 521 (11th Cir. 1994) (antitrust and breach of fiduciary duty; seven-week jury trial).

- *Williams* v. *Dresser Industries*, 120 F.3d 1163 (11th Cir. 1997) (fraud; eight-week jury trial).

In three of the cases listed above, I represented plaintiffs; in the other two, I represented defendants.

7.   At Holland & Knight, I continued to represent clients in complex business litigation. Among other matters, I handled the following major cases from 1994 to 2019:

- *SunBank*, N. A. v. *Retirement Facility* at *Palm-Aire*, *Ltd.*, 698 So.2d 832 (Fl. 2004) (breach of contract, lender liability; one-week jury trial);

- *Dresser-Rand Company* v. *Virtual Automation*, Inc., 361 F.3d 831 (5th Cir. 2004) (breach of contract, fraud and misappropriation of confidential information; one-week jury trial);

- *Acuity Brands*, Inc. v. *Thomas & Betts*, *Inc.*, U. S. District Court for the Northern District of Georgia, Case No. 1:05-cv-228 BBM (2005) (breach of contract; one-week bench trial); and

4

- *Discrete Wireless*, Inc. v. *Coleman Technologies. Inc.*, 422 Fed.Appx. 777 (11th Cir. 2011) (breach of contract and promissory estoppel; one-week jury trial).

In two of these cases, I represented plaintiffs; in the other two, I represented defendants.

8. Additionally, I have represented clients in major litigation that did not go to trial, including *In re Sykes Enterprises, Incorporated*, U. S. District Court for the Middle District of Florida (class action, federal securities); and *In re Mayflower PLC*, U. S. District Court for the Northern District of Georgia (breach of contract, federal securities law counterclaim; over 80 depositions taken on two continents).

9. My current standard hourly rate is $1,050 per hour. This has been my standard hourly rate for approximately two years. I routinely charge this hourly rate to clients.

10. In my law practice, I have had occasion to hear sworn testimony and to review itemized billing statements for fees and expenses submitted by lawyers in connection with (a) civil litigation involving claims for the recovery of legal fees and expenses; (b) application for the payment of legal fees in the United States Bankruptcy Court; and (c) services rendered by

lawyers as expert witnesses on the subject of attorney's fees. I have been qualified as an expert witness to testify in numerous courts on the subject of attorney's fees, including the United States District Court for the Northern District of Georgia, the United States District Court for the Southern District of Texas, the United States District Court for the Central District of California, Fulton Superior Court, DeKalb Superior Court, Cobb Superior Court and other courts. I have served as an arbitrator in the State Bar of Georgia's Fee Arbitration Program on numerous occasions. And I was appointed as a Special Master by the Supreme Court of Georgia in a disciplinary matter of the State Bar of Georgia. See *In the Matter of Denise L. Majette*, 757 S.E.2d 114 (Ga. 2014).

11.    In the course of performing the above services, I have reviewed invoices submitted to clients for fees and costs at various dates between 2017 and 2019 by many law firms, including:

- King & Spalding LLP
- DLA Piper (US) LLP;
- Bondurant Mixon & Elmore LLP;
- Dentons;
- Bryan Cave LLP;

- Barnes & Thornburg LLP;

- Morris, Manning & Martin;

- Polsinelli; and

- Ichter Davis, LLP.

12. I have also researched information about hourly rates charged by attorneys that is publicly available, including:

- A survey by the National Law Journal ("NLJ") that reported hourly rates for law firms in 2016 and 2017. I noted in the 2016 NLJ survey that the partner rates at King & Spalding ranged from $810 to $1250, or an average of $925. In 2017, partner rates at King & Spalding were reported by the NLJ to range from between $775 and $1,435, or an average of $1,000. Associate rates at King & Spalding in 2016 were reported by the NLJ to range between $400 and $600, with an average of $530, and in 2017 to range between $525 and $790 with an average of $525.

- Reported rates in the data-breach field. For example, one attorney who has practiced in data security cases in this district and in this circuit "typically charged" clients at the rate of $1,550 per hour. *See* "Star lawyer leaves Ropes to launch Boston office for Orrick," Boston

Business Journal, Jan. 2, 2019,

https://www.bizjournals.com/boston/news/2019/01/02/star-lawyer-

leaves-ropes-to-launch-boston-office.html (last visited Oct. 28, 2019);

*see also LabMD, Inc. v. FTC*, No. 16-16270 , Doc. 150, ¶32 (noting

that senior partner's current hourly rate in October 2018 was $1,550

and that one attorney's rate who became licensed in 2011 was

$920.00).

13.   Based upon my research and experience, I have prepared a chart showing

reasonable hourly rates being charged for services of attorneys and

paralegals in the Atlanta, Georgia area in 2019 at firms of the type that

handle litigation of the complexity and magnitude of this case.  A copy of

this chart is marked as Exhibit "B" attached hereto and made a part hereof.

I note that the rates on this chart are not the highest or lowest rates being

charged in the Atlanta, Georgia area in 2019, but instead reflect a typical

range.  Hourly rates are subject to agreement between the client and their

lawyer and represent a matter of choice by the parties.  In my opinion, the

hourly rates listed on Exhibit "B" are typical of rates being charged by

attorneys at various experience levels in this market in 2019.  The research

and experience specified above has informed my opinion about the reasonableness of the fee requested by Class Counsel in this matter.

14.    In forming my opinions, I have also considered the materials that are listed on Exhibit "C" of this declaration.  In particular, I have reviewed time and expense reports of plaintiffs' counsel (hereinafter sometimes referred to as "Class Counsel").  I noted that time was recorded in segments of 1/10 of an hour and that the time reports included adequate descriptions of the work done by attorneys and paralegals for the plaintiffs. I have noted that the rates for some of the lawyers and paralegals reported in this case are below market in the Atlanta, Georgia area for such a complex case.

15.    Also, I interviewed Kenneth S. Canfield regarding the history of the litigation, the organization of the multi-district proceeding, the negotiations that led to the March 30 settlement that Class Counsel initially reached with Equifax and the modifications to that settlement later agreed upon, and the other work that was done by Class Counsel.

16.    Based upon all the above, my opinions in this case are as follows: the requested fee represents a reasonable fee as a percentage of the fund; the time devoted to this case by plaintiffs' counsel was reasonable; the hourly rates reported by plaintiffs' counsel are reasonable; the requested fee is

reasonable under a lodestar cross-check, although such a cross-check is not
required; and that the expenses for which plaintiffs' counsel seeks
reimbursement are reasonable.

17.   In forming my opinions on this matter, I considered each of the factors to be
considered in determining the reasonableness of a fee.  *See, e.g., Camden I
Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768 (11th Cir. 1991); *Johnson v.
Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974, abrogated on
other grounds, *Blanchard v. Bergeron*, 489 U.S. 87, 94, 109 S.Ct. 939, 103
L.Ed.2d 67 (1989)); Georgia Rules of Professional Conduct 1.5. With
respect to the factors listed in *Camden I* and *Johnson*, I noted the following:

   **(a)    The time and labor required**

18.   Plaintiffs' lawyers have recorded more than 31,000 hours on this litigation
through September 30, 2019 and will spend more before the litigation is
concluded.  Equifax was represented by two of the leading law firms in the
United States—King & Spalding and Hogan Lovells—and the work that
Plaintiffs' Counsel devoted to the case was justified because of the way in
which the case was defended and the quality of the result.  For example,
because of the magnitude of this case, it was necessary to negotiate protocols
to persuade the trial judge to adopt case management orders that dealt with a

lot of the preparatory work needed before formal discovery was opened. The parties negotiated a series of protocols to govern discovery, exchanged requests for production of documents and attempted to agree upon search terms and a list of custodians that would be used in electronic searches.

19.     Then after discovery actually commenced, plaintiffs' counsel reviewed approximately 500,000 pages of documents in Equifax's initial production (along with thousands of native files including presentations and databases). Plaintiffs' counsel also produced documents to Equifax and began an effort to review highly confidential documents in a "reading room" controlled by Equifax.  Additionally, counsel for the plaintiffs were involved in extensive settlement negotiations and mediations over a period of 18 months.  The mediations were conducted on six days on five occasions—November 27 and 28, 2017, May 25, 2018, August 9, 2018, November 16, 2018, and March 30, 2019—in California and New York. To prepare for settlement negotiations, Class Counsel received advice from cybersecurity experts, consumer advocate and consumer groups, and elected officials.

20.     All that work was before the execution of the binding term sheet on March 30, 2019.  Thereafter, counsel for the plaintiffs embarked on a lengthy and contentious multi-lateral negotiation to reduce the term sheet to the

Settlement Agreement and Release, as described in the Declaration of Class

Counsel in support of Preliminary Approval.  This required evaluating and

negotiating proposed revisions to the binding term sheet resulting from

Equifax's negotiations with various regulators, and numerous conference

calls and in-person meetings with Equifax and the regulators who were

parties to their own consent orders with Equifax. During this process,

counsel for the plaintiffs twice met with Equifax and various regulators in

Washington, D.C., to negotiate the substantive terms of the settlement.

21.    Class Counsel have continued to work diligently on behalf of the Class after

the Order directing notice.  Notably, shortly after that Order and before the

Court-approved notice was sent out, Class Counsel worked to address a

widespread misperception created by media coverage of regulators'

announcements regarding the settlement that anyone could receive $125

simply by filing a claim.  Within days after the settlement website went live

and before the Court-approved notice program had even started, millions of

people filed claims for "alternative compensation" in lieu of credit

monitoring.  Class Counsel moved with alacrity to ensure class members

were explicitly notified that there would likely be a significant pro rata

reduction to the alternative compensation payments.  Importantly, Class

Counsel moved to ensure that such claimants would have the ability to apply that knowledge to amend their claims from alternative compensation to credit monitoring.

22. The amount of work conducted so far by plaintiffs' counsel is what I would expect given the history of this litigation and settlement process. Class Counsel expect to spend a significant amount of time in the future to implement the settlement. Class Counsel estimate they will spend at least 10,000 hours on the case over the course of the next seven years as the settlement is being approved and consummated.  Given the history of the case, with so many critical and sensitive issues, I would also expect a great deal of the work to have been conducted by the senior attorneys.  The allocation of work in this case seems appropriate; therefore, the total lodestar in the amount of $20,986,357.80, representing the work that has already been done through September 30, 2019, and the estimated future work of $6,767,200.00 is in line with my expectations, supporting the reasonableness of the requested fee under a "lodestar cross-check."  I note that in the Eleventh Circuit, a "lodestar cross-check" is not mandatory but permissible in certain cases; the multiplier here is well within the accepted range.

### (b)   The novelty and difficulty of the questions

23.   This case involved a number of novel and difficult legal and factual issues.

First, in order to prevail on the motion to dismiss, Class Counsel had to deal

with a serious question of whether Equifax had a legal duty under Georgia

law to safeguard the confidential personal information stolen in the breach.

In *McConnell* v. *Dept. of Labor*, 337 Ga. App. 457, 787 S.E.2d 794 (2016),

the Georgia Court of Appeals had held that there was no general duty to

protect confidential personal information, which Equifax argued barred

Plaintiffs' claims in this case.  The Georgia Supreme Court ("Supreme

Court") had granted certiorari in the *McConnell* case, and Class Counsel

filed an amicus brief in the Supreme Court.  At the time of settlement, no

decision had been rendered by the Supreme Court, and the outcome of the

appeal was uncertain.  On May 20, 2019, the Supreme Court issued an

opinion that affirmed the Georgia Court of Appeals. *Dep't of Labor v.*

*McConnell (McConnell III)*, 828 S.E.2d 352, 358, (Ga. 2019).

24.    Second, there was a serious question under Georgia law as to whether most

class members had suffered a legally cognizable injury.  In *Collins* v. *Athens*

*Orthopedic Clinic*, 347 Ga. App. 13, 815 S.E.2d 13 (2018), the Georgia

Court of Appeals held that precautionary measures to protect against the risk

14

of future harm from a criminal data breach were not recoverable under Georgia law.  The Supreme Court had accepted certiorari in the *Collins* case, but no decision had been issued at time of settlement.  An adverse ruling in *Collins* may have left most of the class without a remedy, at least with respect to some of their claims.

25.    Third, proof of causation would have been a major challenge.  It may have been difficult to find direct evidence linking any particular episode of identity theft to information stolen in the Equifax data breach as opposed to some other data breach.  And prevailing on potential legal arguments that such evidence was not needed would have been uncertain.

26.    Finally, setting aside the merits of the case, the settlement negotiations were difficult and complex.  Indeed, after the parties agreed upon a binding term sheet on March 30, 2109, negotiations involving Plaintiffs, Equifax, and federal and state regulators that led to the eventual settlement agreement were perhaps even more difficult, intense, and complex  than the prior negotiations between Plaintiffs and Equifax. There was little precedent to guide the actions of Class Counsel with regard to the interests and involvement of the regulators under the facts of this case and history of this

litigation, requiring that they demonstrate a commendable amount of patience, creativity, judgment, and skill.

**(c)   The skill requisite to perform the legal services properly**

27.   Effective and proper representation in any complex consumer class action requires the highest level of skill. This is magnified when the case is of national significance and subject to intense scrutiny, as here.  The case has involved complex issues of law, fact, and procedure.  Adding to the difficulty, Equifax had the benefit of elite legal representation.  It was necessary for the plaintiffs to be represented by lawyers who have the skill and expertise to handle a complex data breach class action lawsuit as well.  I am personally acquainted with some of the lawyers who have represented the plaintiffs in this action, and I have investigated the qualifications of the others.  In my opinion, these lawyers possess the requisite skill and experience to properly prosecute this action, and these lawyers demonstrated those skills in securing the result they were able to obtain for the class.

28.   For example, when over 300 cases filed nationwide were consolidated, the first major task was to file a consolidated amended complaint.  This was a massive undertaking and required investigating the underlying facts, vetting several thousand potential class representatives and researching legal

theories under federal law and the laws of all 50 states.  The consolidated

amended complaint was about 550-pages long, named 96 class

representatives and asserted numerous statutory and common law claims

under both federal and state laws.  Thereafter, Class Counsel was required to

defend against a motion to dismiss.  The motion to dismiss was extensively

briefed, and an oral argument of approximately three hours duration was

held in December 2018.  The ruling of the Court largely denied the motion

to dismiss, reflecting the skill and abilities of Class Counsel.

29.    All along the way, Class Counsel needed to coordinate with the other parties

in the related actions (including the Financial Institution Plaintiffs in the

MDL, and the parties to the securities and derivatives actions) for scheduling

and discovery purposes.  Without their skill and experience in such complex

litigation, the case was at risk of bogging down.

30.    Class Counsel also have demonstrated their skill and experience after the

execution of the term sheet.  For example, with little precedent to guide their

actions, Class Counsel negotiated with Equifax, two federal agencies, and

state attorneys general to reach the final settlement, as described above.  And

Class Counsel acted with urgency to address the issues that arose with

regard to the alternative compensation benefit by securing  court

authorization to notify the class of the issue and to allow claimants to amend

their claim.  This litigation has at all times required that the Class Counsel

coordinate with a multitude of different parties, each with their own

interests.  Class Counsel's efforts throughout have demonstrated a great deal

of skill and experience.

       (d)    **The preclusion of other employment**

31.     If Class Counsel had not taken on this case, they would have spent

significant time on other matters. This case has already been heavily

litigated for over two years, and years of work to finalize and implement the

settlement likely will follow.

       (e)    **The customary fee**

32.     In *Camden I,* the 11th Circuit noted that courts typically award between 20

and 30 percent of the benefits that go to the class as attorney's fees, that 25

percent was being seen as the "benchmark," and that the specific percentage

depends on the facts of the particular case. *Camden I*, 946 F.2d at 775 ("In

an effort to provide appellate courts a record for review of attorneys' fee

awards, district courts are beginning to view the median of this 20% to 30%

range, i.e., 25%, as a 'bench mark' percentage fee award which may be

adjusted in accordance with the individual circumstances of each case."); *see*

*also, e.g., Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1243 (11th Cir. 2011) (noting that it is "well-settled" that "25% is generally recognized as a reasonable fee award in common fund cases.").

33.    Empirical studies and district court decisions since *Camden I* show that the fees customarily awarded exceed 25 percent and, in fact, are closer to 30 percent or more. *See, e.g., Wolff v. Cash 4 Titles*, 2012 WL 5290155 at *5-6 (S.D. Fla. Sept. 26, 2012) (noting that fees in the Eleventh Circuit are "roughly one-third"); Eisenberg, et al., *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. Law Rev. 937, 951 (2017) (the median fee from 2009 to 2013 was 33%); B. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010) (during 2006 and 2007 the median fee was 30 %).

34.    By any measure, the requested fee falls comfortably within or well below the range of awards that are customarily made in this Circuit.  The requested fee represents 20.4% of the $380.5 million non-reversionary common fund established in the settlement agreement and the percentage drops to 15.34% if Equifax is required to pay an additional $125 million into the fund if needed to pay claims for out-of-pocket losses.  And, if as they should be under fee jurisprudence in this Circuit, the other benefits of the settlement in

addition to the cash settlement fund are considered, the percentage drops

even further. These other benefits include the value of the required business

practices changes and the mandated incremental expenditure by Equifax of

$1 billion for cybersecurity that are to be incorporated into a consent order;

the fact that all members of the class can access the credit restoration

services regardless of whether they make a claim; the market value of the

credit monitoring offered for class members; and the fact that Equifax would

pay for the cost of credit monitoring enrollees above seven million

individuals outside of the fund. When considering all these benefits to the

class, the percentage of the fee is far, far less than the benchmark and

substantially below the percentages used in customary fee awards. If the

Court only considers Equifax's $1.38 billion cash obligation under the

settlement, the fee requested is 5.6 percent. The percentage drops to roughly

1 percent or even less if other benefits are included.

      (f)    **Whether the fee is fixed or contingent**

35.    This action was prosecuted on a contingency fee basis. Without a recovery,

Class Counsel would have received nothing and sustained a substantial out-

of-pocket loss. Especially when considered with the preclusion of other

employment, Class Counsel assumed a high degree of risk in this

representation.

**(g)     Time limitations imposed by the client or the circumstances**

36.   At times during the litigation, Class Counsel were required to work under

considerable time pressure.  Given the size of the MDL and the proposed

class, any important filing deadline was inevitably a significant undertaking.

Additionally, before the final mediation session began in March 2019, Class

Counsel were determined to review all the documents that had been

produced to them by Equifax so as to have as much information as to

evaluate the merits of their case as possible.  As document production had

begun only on February 27, 2019, this work was done under serious time

constraints.

37.    Another complication in the settlement process was the negotiations

between Equifax and governmental regulators following the execution of the

term sheet on March 30, 2019.  I understand that these negotiations occurred

under considerable time pressure and, in fact, were all encompassing for

several months.

**(h)     The amount involved and the results obtained**

38.   The settlement provides for at least $380.5 million in cash and reduces the

risk of another data breach.  The amount of the minimum non-reversionary

fund is over three times higher than that of any other class settlement in a consumer data breach case. *See* Chart of Data Breach Settlement Involving Class of $10+ Million, a copy of which is marked Exhibit "D," attached hereto and made a part hereof.[1]

39.     Additionally, Equifax has agreed to pay up to $125 million more to satisfy claims for out-of-pocket losses above the $380.5 million, resulting in a total potential fund available to the class of $505.5 million. Even this figure does not reflect the full monetary benefits to the class. All class members are eligible to make a claim for credit monitoring services. As the retail value of this benefit is approximately $1,920 for each class member, the enormity of this benefit becomes quickly apparent. I understand that approximately three million class members, to date, have made a claim for credit monitoring services, meaning that class members have already claimed services with a market value close to $6 billion.

40.     The class in this case also obtained a substantial benefit that is not included in the settlement amount, to wit: Equifax agreed to business practice changes, including a commitment to spend at least $1 billion on

---

[1] I understand that this chart was prepared by plaintiffs' counsel in connection with their motion for issuance of class notice. (Doc. 739-4 at 40-45)

cybersecurity over the next five years.

41.     The size and scope of the results obtained support the requested fee.

### (i)     The experience, reputation and ability of the attorneys

42.     Equifax was represented by two of the leading law firms in the United

States.  In order to obtain proper representation, the plaintiffs needed

representation by lawyers and law firms of comparable experience and

ability. The legal team for the plaintiffs in this action includes some of the

leading class action lawyers and law firms in the United States. Layn R.

Phillips, a former federal judge who served as mediator in five mediation

sessions, stated:

> "… [T]he advocacy for both sides of the case was outstanding.  Co-
> Lead Counsel for the Plaintiffs—Norman Siegel, Ken Canfield and
> Amy Keller—and counsel from King & Spalding—David Balser,
> Phyllis Sumner, and Steward Haskins and Michelle Kisloff from
> Hogan Lovells—represented their clients with tremendous effort,
> creativity, and zeal.  All counsel displayed the highest degree of
> professionalism in carrying out their duties on behalf of their
> respective clients and the settlement was a direct result of all
> counsel's experience, reputation, and ability in complex class actions
> including the evolving field of privacy and data breach class actions."[2]

Class Counsel for the plaintiffs are the following:

---

[2] Declaration of Hon. Layn Phillips (Ret.), Exhibit 8 to Plaintiffs' Motion to Direct
Notice of Proposed Settlement filed 7/22/19.

- Kenneth S. Canfield, Doffermyre Shields Canfield & Knowles, LLC (Co-Lead Counsel).   Mr. Canfield has developed a national reputation in class action litigation and has served in leadership positions in many MDLs and class actions, including two data breach cases in this district—*Home Depot* (co-lead counsel) and *Arby's* (liaison counsel). He has been recognized through peer review processes for inclusion in The Best Lawyers in America, Chambers USA and other publications. He is a graduate of Dartmouth College, *summa cum laude*, and of Yale University Law School, where he was an editor of the Yale Law Journal.

- Amy E. Keller, DiCello Levitt Gutzler LLC (Co-Lead Counsel).   Ms. Keller is a partner in the Chicago office of DiCello Levitt Gutzler LLC and has had leadership roles in several nationwide cases, including co-leadership in the Marriott Data Breach MDL.   She also had other experience in data breach and privacy litigation.   She has served two terms as chair of the Chicago Bar Association Class Action Committee.   Ms. Keller is a graduate of the University of Michigan and of The UIC John Marshall Law School.

24

- Norman E. Siegel, Stueve Siegel Hanson LLP (Co-Lead Counsel). Mr. Siegel is a founding member of Stueve Siegel Hanson LLP, a 25-lawyer firm in Kansas City, Missouri with a national reputation in complex litigation. Mr. Siegel has successfully tried to verdict a large variety of cases. He has devoted much of his time to leading the largest data breach cases in the country, including *Home Depot* and *Target*, and he has worked alongside leadership in several other large MDLs, including *Anthem, Office of Personnel Management and Marriott*. Mr. Siegel is a graduate of Tufts University and of the Washington University in St. Louis, where he was an editor of a law journal.

- Roy E. Barnes Law Group, LLC (Liaison Counsel). Mr. Barnes, who served as Governor of Georgia from 1999 to 2003, is the founding member of the Barnes Law Group. He has more than 40 years of trial experience. He is a Fellow of the American College of Trial Lawyers and a Fellow of the International Academy of Trial Lawyers. He has been recognized through peer review processes for inclusion in The Best Lawyers in America and other publications. He has been appointed to leadership in numerous class actions, including *Home*

*Depot* (co-liaison counsel) and *Arby's* (co-lead counsel).  Mr. Barnes

has a B.S. and a J.D., with honors, from the University of Georgia.

43.    Each of these lawyers is in the very top rank of the plaintiffs' class action

bar.  They have displayed their skill and experience throughout this case as I

described above.

### (j)    Awards in similar cases

44.    Courts in the Eleventh Circuit routinely award 30% of the settlement benefit

in class actions as described above.  The requested fee is well below that

percentage, as I have noted.  The requested fee, whether narrowly viewed as

20.4% of the $380.5 million fund or a much smaller percentage of the total

relief is also lower than the percentages that have been used in other data

breach cases in this District.  *See In re Home Depot, Inc. Customer Data*

*Security Breach Litigation*, 1:14-MD-02583-TWT, 2016 WL 11299474, at

*2 (N.D. Ga. Aug. 23, 2016)  (awarding attorneys' fees in the consumer

track of "about 28% of the monetary benefit conferred on the Class."); *In re*

*Home Depot, Inc. Customer Data Security Breach Litigation,* :14-MD-

02583-TWT (Doc. 345 at 4) (as part of a percentage cross-check in awarding

fees to the lawyers in the financial institution track, the Court used one-third

of the class benefit in its calculation); Final Approval Order and Judgment,

*In re Arby's Restaurant Group, Inc. Data Security Litigation,* 1:17-cv-1035-WMR (Doc. 474 at 7) (approving a $980,000 fee representing roughly 30 percent of the $2 million cash fund and other benefits).

45.   Based on the foregoing, in my opinion, the amount of $77,500,000 is a reasonable amount of attorney's fees in this matter.  This amount is fully justified under the percentage of the fund approach because, among other reasons, results obtained for the class were extraordinary, Class Counsel took considerable risk in an area of unsettled law, and Class Counsel demonstrated exemplary skill in their handling of this litigation.   It is also my opinion that the requested fee is supported by a lodestar cross-check, although such a cross-check is not required.

46. Based on the foregoing, it is also my opinion that the amount of $1,248,033.46 is a reasonable amount of costs in the matter [through October 28, 2019 for the litigation fund and through September 30, 2019 for individual firm expenses] and consistent with what I would expect to see in litigation of this size and scope.

This 28th day of October 2019.

Harold T. Daniel, Jr.

EXHIBIT "A"

# HAROLD DANIEL LAW, LLC

Daniel House
119 The Prado NE
Atlanta, Georgia 30309-3327
404-372-4087
www.haldaniellaw.com
haldaniellaw@outlook.com

Harold T. Daniel, Jr. has practiced law in Atlanta, Georgia for more than 40 years.  He has represented plaintiffs and defendants in civil business litigation in federal and state courts and has tried approximately one hundred cases to juries in Georgia, Florida and Texas.  His cases have routinely involved complex factual and legal issues including antitrust, securities, RICO, business torts and commercial law.  He has also served as an arbitrator, mediator, special master and expert witness on the subject of attorney's fees and other matters related to the legal profession.

## EXPERIENCE

**AUGUST 2019 – PRESENT**
**PARTNER, HAROLD DANIEL LAW, LLC**

**JULY 1994 – JULY 2019**
**PARTNER, HOLLAND & KNIGHT LLP**

**May 1970 – June 1994**
**WEBB & DANIEL (and predecessor firms)**

## EDUCATION

**EMORY UNIVERSITY, B.A POLITICAL SCIENCE**
**EMORY UNIVERSITY SCHOOL OF LAW, J.D.**

## REPRESENTATIVE ENGAGEMENTS

- Defended major law firms for alleged violations of federal securities laws and in litigation against the law firms for recovery of attorney's fees
- Represented an engineering company in a nine-week jury trial against former officers and directors for breaches of fiduciary duties, misappropriation of corporate opportunities and tortious interference with business relationships; favorable verdict affirmed on appeal to state's highest court
- Obtained favorable rulings on motions for summary judgment and settlement on very favorable terms for a public British corporation which was sued by a public U. S. corporation for fraud, breaches of fiduciary duties, promissory estoppel and breach of contract in connection with an acquisition; the litigation also included a counterclaim under federal and state securities laws
- Represented heirs of an estate in protracted litigation arising out of probate of a will, including favorable jury verdict against the executor for breaches of fiduciary duties
- After a jury trial of three and one-half months, obtained a multimillion-dollar securities fraud verdict in favor of the former owners of a manufacturing company; judgement was affirmed on appeal
- Represented a multinational manufacturing company in a two-month jury trial in a business fraud case involving the formation of a joint venture with a Japanese company; represented the client on appeal and obtained a total victory with $250,000 in costs awarded against the plaintiffs
- Defended a manufacturing company in a seven-week trial involving alleged violations of the Sherman Act; won a total victory on appeal
- Defended a public telecommunications company in a class action securities case; settled on favorable terms for client

## REPRESENTATIVE ENGAGEMENTS (cont.d)

- Represented a bank and four mutual funds in in a lender liability case in a Florida state court; obtained favorable jury verdict and denial of injunctive relief, both of which were affirmed on appeal
- Represented multinational re-seller of computer products in a jury trial for RICO violations against entities which had illegally obtained and used confidential pricing and customer information; obtained verdict, which was trebled, plus punitive damages and attorney's fees

### MEMBERSHIPS

- The International Institute for Conflict Prevention & Resolution (CPR), Distinguished Neutrals, General Commercial Panel and Banking, Accounting and Financial Services Panel
- State Bar of Georgia, past president, 1994-1995
- Lawyers Club of Atlanta, past president, 1983-1984
- American Bar Association, Standing Committee on Federal Judiciary, 2000-2003; Standing Committee on Federal Judicial Improvements, 1996-1999; Commission on Separation of Powers and Judicial Independence, 1996-1997
- American College of Trial Lawyers, Fellow
- International Academy of Trial Lawyers, Fellow
- American Bar Foundation, Fellow
- Joseph Henry Lumpkin American Inn of Court, Master Barrister
- Atlanta Bar Association
- Leadership Atlanta, 1998
- Georgia Legal Services Program, former Trustee and board chair
- Georgia Legal Services Foundation, Trustee
- Atlanta Girls' School, former Trustee and board chair
- The Children's School, former Trustee
- All Saints-Saint Luke's Episcopal Home for the Retired, Inc. (Canterbury Court), Trustee and former board chair
- Saint Luke's Episcopal Church, former member of Vestry

### HONORS AND AWARDS

- Boy Scouts of America, Eagle Scout; Whitney A. Young, Jr. Award, Atlanta Area Council, 2007
- State Bar of Georgia, Distinguished Service Award, 2001
- Georgia Legal Services Program, Champion of Justice award, 2016
- Martin Luther King Center for Nonviolent Change, Inc., Community Service Award, 1996
- The Best Lawyers in America guide, Commercial Litigation and Bet-the-Company Litigation, 2001-2020
- Martindale-Hubbell AV Preeminent Peer Review Rated
- *Lawdragon*, Leading 500 Litigators in America, 2006

### PUBLICATIONS

- Sikes v. Teleline, Inc.: The Eleventh Circuit Rejects "Fraud On The Market" Theory As Device To Certify Consumer Fraud And Civil RICO Class Action" (with James F. Bogan III), American Bar Association Section of Antitrust Law, Civil RICO Committee, *RICO News*, Fall 2002
- Litigation Management by Law Firms, Chapter 68, *Business and Commercial Litigation in Federal Courts, Fourth Edition*, Thomson Reuters 2016
- Ansley Park: Home to Historic Judicial Residences, *11th Circuit Historical News*, Spring 2016

EXHIBIT "B"

2019 RATES

| | |
|---|---|
| Paralegal | $300 |
| Junior Associate (1-5 years) | $400 |
| Senior Associate (5+ years) | $525 |
| Partner/Counsel (0-5 years) | $575 |
| Partner/Counsel (5-10 years) | $650 |
| Partner/Counsel (10-20 years) | $750 |
| Partner/Counsel (20-30 years) | $850 |
| Partner/Counsel (30+ years) | $1050 |

EXHIBIT "C"

1. Case Management Order No. 2
2. The Barnes/Canfield Group's Application for Appointment to Lead the Consumer Cases
3. Order Appointing Leadership
4. Case Management Order No. 3
5. Corrected Joint Preliminary Report and Discovery Plan
6. Case Management Order No. 4 (Discovery Protocol)
7. Stipulated Protective Order
8. Consolidated Class Action Complaint for Small Business Claims
9. Case Management Order No. 5
10. Motion to Dismiss Consolidated Consumer Class Action Complaint
11. Motion to Dismiss Consolidated Small Business Class Action Complaint
12. Consumer Plaintiffs' Memorandum of Law in Opposition to Equifax's Motion to Dismiss the Complaint
13. Consolidated Consumer Class Action Complaint
14. Reply Brief in Support of Equifax's Motion to Dismiss Consolidated Consumer Class Action Complaint
15. Small Business Plaintiffs' Memorandum of Law in Opposition to Equifax's Motion to Dismiss the Small Business Complaint
16. Consumer Plaintiffs' Notice of Supplemental Authority in Support of their Memoranda of Law in Opposition to Equifax's Motions to Dismiss the Consolidated Complaints
17. Reply Brief in Support of Equifax's Motion to Dismiss Consolidated Small Business Class Action Complaint
18. Plaintiffs' Motion for Limited Relief from Discovery Stay and Entry of Order Relating to Interviews of Defendants' Former Employees
19. Equifax's Opposition to Plaintiffs' Motion for Limited Relief from Discovery Stay and Entry of Order Relating to Interviews of Defendants' Former Employees
20. Reply in Support of Plaintiffs' Motion for Limited Relief from Discovery Stay and Entry of Order Relating to Interviews of Defendant's Former Employees
21. Plaintiffs' Notice of Supplemental Authority in Support of Their Motion for Limited Relief from Discovery Stay and Entry of Order Relating to Interviews of Defendants' Former Employees

22. Opinion and Order -- Consumer Cases
23. Opinion and Order – Small Business Cases
24. Amended Joint Preliminary Report and Discovery Plan
25. Defendants' Answer to Consolidated Consumer Class Action Complaint
26. Order denying the Plaintiffs' Motion for Limited Relief from Discovery Stay and Granting the Motion for Entry of Order Relating to Interviews
27. Class Counsel Statement
28. Docket Report
29. Plaintiffs' Motion to Direct Notice of Proposed Settlement to Class
30. Order Directing Notice
31. Preliminary Approval Hearing Transcript
32. Motion for Court Order Setting Deadline to ay Settlement Fee to Petitioning Parties
33. Amicus Brief filed in the Georgia Supreme Court on behalf of the Consumer Plaintiffs
34. Letter from Sen. Elizabeth Warren to Inspector General Andrew Katsaros
35. Final Term Sheet
36. Time and Expense Reports of Plaintiffs' Counsel

EXHIBIT "D"

**Chart of Data Breach Settlement Involving Class of 10+ Million**

| Case | Number of Class Members and PII Compromised | Monetary Settlement Benefits | Non-Monetary Security-Related Relief | Credit / Financial Acct. Monitoring |
|---|---|---|---|---|
| *In re: Yahoo! Inc. Customer Data Security Breach Litig.*, No. 16-md-02752-LHK (N.D. Cal.)<br><br>Preliminary approval granted: July 20, 2019 | Up to 194 million individuals w/ compromised email addresses, passwords, security questions and answers, and telephone numbers and dates of birth if provided | • $117.5 million cash fund which includes:<br><br>• Reimbursement of class members' out-of-pocket costs up to $25,000 and time spent remedying issues up to 15 hours with documentation and 5 hours without documentation at $25 per hour<br><br>• Alternative payments to class members w/ credit monitoring for $100 (can be increased to $358.80 per individual)<br><br>• 2 years of credit monitoring (to be extended if remaining funds)<br><br>• Compensate paid users of Yahoo! for up to 25% of the amounts they paid for email services<br><br>• Attorneys fees' up to $30 million and costs and expenses up to $2.5 million<br><br>• Notice and administration costs up to $6 million | • Increased security budget and security employee headcount<br><br>• Implementation of security program compliant with NIST Cybersecurity Framework<br><br>• Four years of third-party risk assessments<br><br>• Implementation of vulnerability management schedules requiring critical issues to be resolved on set schedule<br><br>• Implementation of enhanced intrusion and anomaly detection tools<br><br>• Employee security training<br><br>• Appointment of external Chief Information Security Officer board of advisors | Yes, 2 years of credit monitoring through AllClear ID that may be extended multiple years depending on remaining funds |
| *In re: Experian Data Breach Litig.*, No. 8:15-cv-01592 (C.D. Cal.) | 14.93 million individuals w/ compromised names, addresses, SSNs, | • $22 million cash fund which includes:<br><br>• Reimbursement of class members' | • Data security enhancements to Experian's network<br><br>• Remediation of identified | Yes, 2 years of credit monitoring through Identity Guard that may be extended if |

| | | | | |
|---|---|---|---|---|
| Final approval granted: May 30, 2019 | dates of birth, identification numbers, and other PII | out-of-pocket costs up to $10,000 and time spent remedying issues up to 7 hours with documentation and 2 hours without documentation at $20 per hour<br><br>• 2 years of credit monitoring at cost of up to $2.5 million depending on number of claimants<br><br>• Attorneys fees' up to $10.5 million and costs and expenses up to approx. $153,000 | vulnerabilities<br><br>• Heightened encryption throughout network and user database<br><br>• Implementation of Security First Program consisting of 82 security-related projects<br><br>• Hiring an additional 60 full-time security employees | certain conditions are met |
| *In re: Anthem, Inc. Data Breach Litig.*, No. 15-md-02617-LHK (N.D. Cal.)<br><br>Final approval granted: Aug. 15, 2018 | 79.15 million individuals w/ compromised names, dates of birth, SSNs, healthcare ID numbers, addresses, and other PII | • $115 million cash fund which includes:<br><br>• Reimbursement of class members' out-of-pocket costs up to $10,000 (up to $15 million of fund allocated for this purpose)<br><br>• Alternative payments to class members w/ credit monitoring for $50 (up to $13 million of fund allocated for this purpose)<br><br>• Access to fraud resolution services through Experian for all class members<br><br>• 2 years of credit monitoring at a cost of $17 million (to be extended | • Increased annual spending on data security for three years<br><br>• Implement cybersecurity controls and reforms recommended by Plaintiffs' cybersecurity experts<br><br>• Change data retention policies<br><br>• Follow specific remediation recommendations<br><br>• Perform annual IT security risk assessments and settlement compliance review | Yes, 2 years of credit monitoring through Experian that may be extended multiple years depending on remaining funds |

| | | if remaining funds)<br><br>• Attorneys fees' up to $37.95 million and costs and expenses up to $2.14 million[1]<br><br>• Notice and administration costs of $23 million | | |
|---|---|---|---|---|
| *In re: The Home Depot, Inc. Consumer Data Security Data Breach Litig.*, No. 1:14-md-02583 (N.D. Ga.)<br><br>Final approval granted: Aug. 23, 2016 | 40 million individuals with compromised payment card information<br><br>Up to 53 million with stolen email addresses | • $13 million cash fund<br><br>• $6.5 million for credit monitoring services separate from cash fund<br><br>• Up to $8.475 million in attorneys' fees and $300,000 in costs separate from cash fund[2]<br><br>• Notice and administration costs of $750,000 separate from cash fund<br><br>Total Value: 29,025,000[3] | • Appointment of Chief Information Security Officer<br><br>• Required product and data risk assessments<br><br>• Heightened vendor selection<br><br>• Dynamic security program implementation<br><br>• Employee education<br><br>• Enhanced security measures for payment cards | Yes, 18 months of identity protection services from Identity Guard |
| *In re: Target Corp. Customer Data Sec. Breach Litig.*, No. 14-md- 2522 (D. Minn.)<br><br>Final approval granted: Nov. 15, | Up to 110 million individuals with compromised payment card information | • $10 million cash fund<br><br>• Notice and administration costs of $6.57 million separate from cash fund<br><br>• Up to $6.75 million in attorneys' fees separate from cash fund<br><br>Total Value: $23,320,816[4] | • Appointment of Chief Information Security Officer<br><br>• Maintain written information security program<br><br>• Maintain process to | No |

---

[1] The full amount of fees and costs were not ultimately awarded.

[2] *Home Depot*, ECF No. 181-2 at ¶¶ 28, 38, 61.

[3] The full amount of fees and costs were not ultimately awarded, resulting in an actual total value of $28,468,800.97.

3

| | | | | |
|---|---|---|---|---|
| 2015 (affirmed on appeal June 14, 2018) | | | • monitor for and respond to information security events<br><br>• Employee security training | |
| *In re Sony Gaming Networks and Consumer Data Security Breach Litig.*, No. 3:11-md-02258 (S.D. Cal.)<br><br>Final approval granted: May 4, 2015 | 60 million individuals w/ compromised names, mailing addresses, email addresses, dates of birth, credit card information, login credentials, answers to security questions, purchase history | • No fund; claims-made settlement capped at $1 million with additional non-cash benefits<br><br>• Reimbursement up to $2,500 for class members with unreimbursed charges from identity theft (capped at $1 million)<br><br>• $14 million in non-cash benefits including free games, subscriptions, and credits for various subclasses<br><br>• Notice and administration costs of $1.25 million to be paid separately<br><br>• Attorneys fees' up to $2.67 million and costs and expenses of $77,724 to be paid separately | No | No |
| *In re: Heartland Payment Systems, Inc. Customer Data Security Breach Litig.*, 4:09-MD-2046 (S.D. Tex.)<br><br>Final approval granted: March 20, | 130 million individuals w/ compromised payment card information | • Settlement fund of $1 million and up to $2.4 million depending on number of claims<br><br>• Reimbursement of class members' out-of-pocket costs up to $175 or $10,000 in cases of identity theft and time spent remedying issues up to 5 hours with documentation at $10 per hour | • Class Counsel employed independent expert to review the actions taken by Heartland to enhance the security of its payment processing systems and determined Heartland took prudent and good faith measures to minimize likelihood of a future | No |

---

[4] *Target*, ECF No. 482 at 35; *see also* ECF No. 645 at 8 (Final Approval Order) (noting that fee award of $6.75 million was 29% of total monetary fund, equating to value of 23,275,862).

| | | | | |
|---|---|---|---|---|
| 2012 | | • Attorneys fees' up to $725,000 and costs and expenses up to $35,000 to be paid separately | intrusion | |
| *In re: Countrywide Financial Corp. Customer Data Security Breach Litig.*, No. 3:08-MD-01998 (W.D. Ky.)<br><br>Final approval granted: Aug. 23, 2010 | 17 million individuals w/ compromised names, SSNs, addresses, telephone numbers, credit and bank account information, and other financial information | • No fund; claims-made settlement capped at $6.5 million<br><br>• Reimbursement of losses attributable to identity theft up to $50,000 per incident (capped at $5 million)<br><br>• Reimbursement of out-of-pocket expenses incurred as result of identity theft (capped at $1.5 million)<br><br>• Notice and administration costs of approx. $6 million to be paid separately<br><br>• Attorneys fees' up to $3.5 million and costs and expenses up to $125,000 to be paid separately<br><br>• Service awards totaling $26,500 to be paid separately | • Enhanced security measures adopted by Countrywide and subject to confirmatory discovery | Yes, 2 years of credit monitoring  services from Experian offered to 1.85 million class members who did not receive prior offer from Countrywide |
| *In re Department of Veterans Affairs (VA) Data Theft Litig.*, No. 06-0506 (JR) (D.D.C.)<br><br>Final Approval granted: Sept. 11, 2009 | 26.5 million individuals with compromised names, dates of birth, and SSNs | • Settlement fund of $20 million<br><br>• Reimbursement of class members' out-of-pocket costs up to $1,500 with each claimant to receive a minimum of $75<br><br>• Balance paid to targeted military *cy pres* recipients<br><br>• Notice and administration costs to be paid from fund | No | No |

| | | | | |
|---|---|---|---|---|
| | | • Attorneys fees' of $3.6 million and costs and expenses of $157,076 awarded from fund | | |
| *In re TJX Companies Retail Security Breach Litig.*, No. 07-10162 (D. Mass.)<br><br>Final approval granted: Sept. 2, 2008 | 45.7 million individuals with compromised payment card information | • No fund; claims-made settlement capped at $10 million<br><br>• $15 check or $30 store voucher for class members who certify they made a purchase at TJX and spent more than $5 or 30 minutes as a result of the data breach (subject to $10 million cap with checks and vouchers credited as $30 against cap)<br><br>• Additional $15 check or $30 voucher for documented claims ($7 million cap on checks, no cap on vouchers)<br><br>• Reimbursement of driver's license replacement costs and unreimbursed losses greater than $60 resulting from identity theft available to approx. 455,000 class members whose ID was compromised<br><br>• Notice and administration costs of approx. $4.5 million to be paid separately<br><br>• Attorneys fees' up to $6.5 million and costs and expenses up to $155,000 to be paid separately | • Retain an independent expert to recommend data security practices to be adopted by TJX and accepted by Plaintiffs' expert<br><br>• Enhanced computer systems | Yes, 3 years of credit monitoring services from Equifax for the approx. 455,000 class members whose driver's license or military, tax or state identification number may have been compromised |