IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION



| | |
|---|---|
| IN RE EQUIFAX, INC., CUSTOMER DATA SECURITY BREACH LITIGATION | MDL DOCKET NO. 1:17-md-2800-TWT<br><br>CONSUMER CASES |

## MOTION[1] TO STRIKE KLONOFF DECLARATION [Doc. 858-2]

*Pro* Se Class Member Shiyang Huang moves to STRIKE Mr. Klonoff's Declaration [Doc. 858-2]. Recycling broken records from "Case No. 2:14-MD-02591-JWL-JPO"[2] does not work. Since this Court should DENY settlement-class certification, it needs not to reach Attorney's Fee at all. But in any case, ***arguendo***,

1. This Declaration fails Daubert's ***reliability*** for expert testimony. This Court needs to "exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards"[3]—this *amicus brief* has no reliable methodology

2. Head-on with merits, this "amicus brief" acts as the careless credit rating agencies that blessed low-quality mortgages bonds in Great Recession. Its conclusions flatly contradicted shared standards in Federal Appeal Courts.

---

[1] CERTIFICATION OF SERVICE: I certify a copy of this motion is served to this Court, and to the Settlement Administrator, P.O. Box 91318, Seattle, WA 98111. Participants in the case will be served by the settlement administrator and CM/ECF.
[2] Klonoff Decl. [Doc. 858-2] at 2. (Cover Page).
[3] Ellis v. Costco Wholesale Corp., 657 F.3d 970, 982 (9th Cir. 2011) (citing Kumho Tire Co. v. Carmichael, 526 US 137, 145, 147-49 (1999)

1

## ARGUMENTS

### I.   THIS MOTION IS NOT A PART OF SETTLEMENT OBJECTION

Pro Se Objector wants to address settlers' *ad hominem* attacks beforehand to save postage. While 25-page objection limit is objectionable, Objector met that standard. This motion is solely to STRIKE Klonoff Decl. alone, not an objection.

### II.   REJECTING CLASS CERTIFICATION MOOTS FEE TALKS

If this Court DENIES sprawling settlement-class asked by wannabe class counsel, then Klonoff Decl. is essentially **moot**. "[I]t is obvious after Amchem that a class divided between holders of present and future claims ... requires division into homogeneous subclasses... to eliminate conflicting interests of counsel."[4] "[Amchem] is sound because there was a real expectation that the exposure-only plaintiffs would [be injured] after the date specified in the settlement.... [N]o exposure-only plaintiff could estimate with any certainty the extent of his or her future injury, the settlement offered no assurance that sufficient funds would remain to protect the interests of that group."[5] Target was a bank cards breach in Target stores (which victims can remedy by cancelling cards and asking a new one

---

[4] In re Target Corp. Customer Data Sec. Breach Litig., 892 F.3d 968, 974 (8th Cir. 2018). (quoting Ortiz v. Fibreboard Corp., 527 U.S. 815, 856 (1999))
[5] Id. at 975 (citing Amchem Prods. v. Windsor, 521 US 591 (1997)).

for free from card issuers), Target actually distinguished precisely ***why social security data damage fails Predominance for Class Certification.*** While currently-injured plaintiffs may ask up to $20,000 now, no guarantee protects currently-uninjured plaintiffs after the "credit monitoring" runs out shortly.

### III. THIS COURT SHOULD PROTECT ABSENTEE CLASS

Every unreasonable dollar to Plaintiff lawyers, in common-fund settlement, is a dollar that ***could instead go to class members***. Mr. Klonoff was paid to cheer Plaintiff lawyers' *cash* portion of proposed "fund", leaving exposure-onlys **with worthless relief**. But under Rule 23(e), "[district] courts, in their role as a fiduciary and guardian for the unrepresented class members, must apply careful scrutiny . . . to guard against settlements that may benefit the class representatives or their attorneys at the expense of absent class members"[6]. Fiduciary scrutiny against excessive attorney fees asks "highest degree of vigilance in scrutinizing proposed settlements...term[ing] the district judge... [of] a fiduciary of the class, who is subject therefore to the high duty of care that the law requires of fiduciaries." [7]

---

[6] Managed Care Advisory Group, LLC V. Cigna Healthcare, Inc., ___ F.3d ___ 2019 WL 4464301 (11th Cir. Sep. 18, 2019) (citing U.S. v. City of Miami, 614 F.2d 1322, 1331 (5th Cir. 1980)
[7] Reynolds v. Beneficial Nat. Bank, 288 F.3d 277, 279-80 (7th Cir. 2002) (Posner, J.) (collecting consensus amongst circuits)

## IV. KLONOFF BRIEF IS SIMPLY A PAID AMICUS BRIEF

Mr. Klonoff's amicus brief is miles away from an expert testimony. He is undisputedly a law professor, and it is equally obvious that he was handsomely paid by Plaintiffs to sing a tune – although recycling arguments from "Case No. 2:14-MD-02591-JWL-JPO". Mr. Klonoff is certainly not here to save absent class members—Award-winning movies "The Big Short" and "Inside Job" know why: "The guys who taught these things tended to get paid a lot of money being consultants... [P]rofessors don't live on a faculty salary."[8] His favortism for fees, is also understandably rational – "If [he doesn't] work with them, they'll go to [his] competitors", also "selling ratings for fees."[9] None of that satisfies Daubert test.

## V. KLONOFF BRIEF FATALLY RELIED ON FICTITIOUS "$380.5 MILLION" BASIS FOR ALL THE ARGUMENTS

Klonoff relied on counsel's dream—absentees got something for nothing.[10] But nobody begged to be a data breach victim. Rather, class counsel should thank million of absentees for *economical scale* – otherwise, they're welcomed to litigate 96 figurehead plaintiffs to judgment to start lodestar fights under Equifax protest.

---

[8] Sonic Picture Classics. Movie "Inside Job" Screenplay at 61.
https://www.sonyclassics.com/awards-information/insidejob_screenplay.pdf
[9] Charles Randolph and Adam McKay, Movie "The Big Short" Screenplay at 70.
https://s3.amazonaws.com/thescriptlab/screenplays/2015/the-big-short.pdf
[10] Klonoff Decl. at 61, 108; Also See Doc. 858 at 25.

4

Mr. Klonoff repeatedly cites $380.5 million, ignorant of settlers' fictitious "coupon inflation" – cramming pointless relief to exposure-only "losers" without out-of-pocket loss now. Or else, settlement should **at least** give $380.5 million cash to the class first, hurdle-free – instead of reselling credit monitoring for profits.

Regardless of claims by Mr. Klonoff to liberally award attorney fees, "[a]ctive judicial involvement in measuring fee awards is singularly important to the proper operation of the class-action process... In a class action, the district court must ensure that... attorney fees are fair and proper whether the fees come from a common fund or are otherwise paid."[11] "When the class attorneys succeed in reaping "a golden harvest of fees" in a case involving a relatively small recovery, the judicial system and the legal profession are disparaged...This embarrassment is rooted in the fact that the bitterest complaints about the legal profession from laymen are directed at the windfall fees and featherbedding that lawyers have managed to perpetuate through ...their influence with the judiciary."[12]

## VI. UNRELIABLE KLONOFF DECL. ALSO FAILED IN MERITS

On merits, Klonoff Decl. is helping this Court deny class certification.[13]

---

[11] Committee Notes on Rule 23 - 1998 Amendment at Subd. 23(h).
[12] Piambino v. Bailey, 757 F.2d 1112, 1144 (11th Cir. 1985)(cleaned up).
[13] Amchem, 521 US at 619. ("Settlement is relevant to a class certification.")

"The reality is that… this settlement gives preferential treatment to class counsel while only perfunctory relief to unnamed class members."[14]—cash trail tells it all.

### A. Many Circuits Reduce Percentage-Based Attorney Fees for "Megafund"

Unlike *cherry-picked* samples in Klonoff Decl., many circuits expressed concerns for class litigator's crocodile tears in "mega-fund" attorney fee requests.

> 7th Cir: "Eisenberg and Miller find that the mean award from **settlements in the $100 to $250 million range is 12% and the median 10.2%.** All three articles find that the percentage of the fund awarded to counsel declines as the size of the fund increases……**[I]t is almost as expensive to conduct discovery in a $100 million case as in a $200 million case**…. **hard to justify awarding counsel as much of the second hundred million as of the first**. The justification for diminishing marginal rates applies to $50 million and $500 million cases too, not just to $200 million cases… **[D]istrict court needed data rather than cherry-picked examples**" [15]
>
> 9th Cir. / 3d Cir.: "[W]here awarding 2[0]% of a "megafund" would yield **windfall profits for class counsel in light of the hours spent on the case,** courts should adjust the benchmark percentage or employ the lodestar method instead….
> [B]asis for inverse relationship between size of fund and percentage awarded for fees is that "in many instances the increase in recovery is **merely a factor of the size of the class and has no direct relationship to the efforts of counsel**"[16]

---

[14] In re Dry Max Pampers Litig. 724 F.3d 713, 718 (6th Cir. 2013)
[15] Silverman v. Motorola Solutions, Inc., 739 F.3d 956, 958-959 (7th Cir. 2013) (Easterbrook, C.J.) (emphasized) (Citing many academic studies on "megafund"). Also see Goldberger v. Integrated Resources, Inc., 209 F.3d 43 52-53 (2d Cir. 2000)
[16] In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 942 (9th Cir. 2011) (quoting In re Prudential Ins. Co. Am. Sales Litig., 148 F.3d 283, 339 (3d Cir. 1998) (emphasized)

> 3d Cir: "[District court concluded that] class counsel "would have negotiated a fee of at least 10 to 15% of the recovery…We question the significance of this inquiry to class action lawsuits of this magnitude. While such private fee arrangements might be appropriate in smaller class actions or litigation involving individual plaintiffs, **we do not believe they provide much guidance in cases involving the aggregation of over 8 million plaintiffs**…"[17] (emphasized)

> 9th Cir:"Calculation of the lodestar…provides a check on the reasonableness of the percentage award. Where [lawyers' investment of time] is minimal, **as in the case of an early settlement, the lodestar calculation may convince a court that a lower percentage is reasonable**." [18] (emphasized)

> 2d Cir: "Public policy concerns oftentimes redefine the focus of the court… district court's decision in favor of **protecting the instant class from an excessive fee award militates against awarding attorneys' fees based purely on economic incentives**…We agree. […]
> **The percentage used in calculating any given fee award must follow a sliding-scale and must bear an inverse relationship to the amount of the settlement.** Otherwise, those law firms who obtain huge settlements, whether by happenstance or skill, will be over-compensated to the detriment of the class members they represent."[19] (emphasized)

### B. Klonoff's Incentive Award Analysis Is Also Unreliably Flawed

First, incentive awards are against "consistently followed"[20] common-fund doctrines of the U.S. Supreme Court. Klonoff then missed the point on conflict of interests, and badly misread Radcliffe v. Experian Info. Sols. Inc., 715 F.3d 1157

---

[17] In re Prudential, 148 F.3d at 340.
[18] Dennis v. Kellogg Co., 687 F. 3d 1149, 1160 (9th Cir. 2012)
[19] Wal-Mart Stores, Inc. v. Visa USA, Inc., 396 F.3d 96, 122 (2d Cir. 2005)
[20] Alyeska Pipeline Serv. Co. v. Wilderness Soc., 421 U.S. 240, 257-258 (1975)

(9th Cir. 2013): More than singling-out the rare "conditional incentive", 9th Circuit slammed abuse of incentive awards to control named plaintiff puppets altogether -

> "...**[T]he significant disparity between the incentive awards and the payments to the rest of the class members further exacerbated the conflict of interest** caused by the conditional incentive awards. As the district court below noted, **"[c]oncerns over potential conflicts may be especially pressing where, as here, the proposed service fees greatly exceed the payments to absent class members**." Id. at 1165. (emphasized). (Also cited/quoted In re Dry Max, 724 F.3d 713)

Lastly, Klonoff's *cy pres* arguments are also unhinged and unreliable. See Klonoff Decl. at 108 n.170. Klonoff cited Lane v. Facebook, 696 F.3d 811 (9th Cir. 2012) as support to incentive awards, but incentive awards were never raised on appeal – Klonoff made up a nod from 9th Circuit. His *cy pres* footnote also backfired—as *cy pres* is another collusion device in class-action settlements. See Marek v. Lane, 134 S.Ct. 8, 9 (2013) (Roberts, C.J., on denial of certiorari to Lane v. Facebook) (citing "more fundamental concerns surrounding the use of [*cy pres*] in class action litigation"); Frank v. Gaos, 139 S.Ct. 1041, 1048 (2019) (Thomas, J., dissenting standing ruling and focused on *cy pres* abuse). Or, In re Google Inc. Cookie Placement Consumer Priv. Litig., 934 F.3d 316 (3d Cir. 2019) (reversed class settlement when sketchy *cy pres* recipients have ties to litigating parties)

**To Conclude**, Unreliable Klonoff Decl. [Doc. 858-2] should be STRICKEN.

Dated: November 8, 2019                              Respectfully Submitted,

                                                     Shiyang Huang (*Pro Se*)

SHIYANG HUANG
2800 SW ENGLER CT
TOPEKA, KS 66614

Clerk of the Court
Attn: 1:17-MD-2800-TWT
United States District Court
Northern District of Georgia
75 Ted Turner Dr., SW
Atlanta, GA 30303-3309

CLEARED
NOV 1 2 2019
U.S. Marshals