# Appendix 2

Supplemental Declaration of
Professor Robert Klonoff

*In re: Equifax Inc. Customer Data Security Breach Litigation*,
No. 17-md-2800-TWT (N.D. Ga.)

Plaintiffs' Motion for Final Approval of Settlement

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| In re Equifax Inc. Customer<br>Data Security Breach Litigation | MDL Docket No. 2800<br>Case No. 2:14-MD-02591-JWL-JPO<br><br>CONSUMER ACTIONS<br><br>Chief Judge Thomas W. Thrash, Jr. |

## SUPPLEMENTAL DECLARATION OF PROFESSOR ROBERT H. KLONOFF RELATING TO CLASS SETTLEMENT APPROVAL AND OBJECTIONS

**TABLE OF CONTENTS**

I.   INTRODUCTION                                                          1

II.  QUALIFICATIONS                                                        1

III. MATERIALS CONSIDERED                                                  2

IV.  BACKGROUND OF THIS LITIGATION AND SETTLEMENT                          2

V.   SUMMARY OF OPINIONS                                                   3

VI.  DETAILED DISCUSSION OF OPINIONS                                       3

   A. Fairness of the Class Settlement                       3

      1. The Recently Adopted Rule 23(e)(2) Factors Support the
Settlement                                                                4

         a. Adequate Representation by Class Counsel and the
Class Representatives                                                      5

         b. Arm's-Length Negotiations                     6

         c. Adequacy of Relief Provided to the Class      7

            i.   Benefits Provided by the Settlement    7

            ii.  Risk, Costs, and Delay of Trial and Appeal    8

            iii. Distribution of Relief and Processing of Claims    9

            iv. Attorneys' Fees                        9

            v.  Side Agreements                         10

         d. Equitable Treatment of Class Members          10

      2. The Eleventh Circuit's *Bennett* Factors Support the Settlement    11

         a. Likelihood of Success at Trial                11

         b. Range of Possible Recovery
AND
c. Point on or Below the Range of Possible Recovery at
Which a Settlement Is Fair, Adequate, and Reasonable                       12

         d. Complexity, Expense, and Duration of Litigation    13

         e. Substance and Amount of Opposition to the Settlement    13

      f.  Stage of the Proceedings         16

   3.  Additional Factors Identified in the Case Law Support the
      Settlement       16

      a.  Absence of Fraud or Collusion Behind the Settlement   17

      b.  Involvement of a Neutral and Experienced Mediator   17

      c.  Involvement and Support of Regulators   18

 B. The Objections Raised Against the Settlement Lack Merit and Do
    Not Justify Disapproval   18

   1.  Challenges to the Fairness of the Settlement   18

      a.  Generalized or "Pie in the Sky" Challenges to the Magnitude
         of the Settlement   24

      b.  Challenges to the Alternative Cash Payment Option   28

      c.  Challenges to the Free Credit Monitoring and Identity Theft
         Insurance Option   39

      d.  Challenges to Procedures for Filing Objections   46

      e.  Miscellaneous Challenges to Fairness   50

   2.  Challenges Based on Class Certification   53

   3.  Challenges to Attorneys' Fees   59

      a.  Percentage Method   60

      b.  Lodestar Cross-Check   64

      c.  Miscellaneous Arguments   66

   4.  Challenges to Expenses and Incentive Payments   68

VII.   CONCLUSION   72

ROBERT H. KLONOFF, under penalty of perjury, declares as follows:

## I.  INTRODUCTION

1.  On October 29, 2019, I filed a Declaration addressing the reasonableness of the attorneys' fees, out-of-pocket expenses, and incentive payments requested by class counsel.  *See* Decl. of Robert H. Klonoff Relating to Att'ys Fees, Expenses, & Incentive Payments (Dkt. No. 858-2, Ex. 2) (hereinafter "Klonoff Oct. 29 Decl.").  I have now been asked by class counsel to opine on:  (1) the fairness of the proposed class action settlement, and (2) the objections lodged by class members relating to the fairness of the settlement, class certification, attorneys' fees, expenses, and/or incentive payments.  As I noted in my prior Declaration, I recognize that my role is limited and that this Court will make the ultimate decision on whether to approve the settlement, attorneys' fees, expenses, and incentive payments.

## II.  QUALIFICATIONS

2.  I set forth my qualifications in my prior Declaration.  *See* ¶¶ 2–14 & App. A (curriculum vitae).  As noted in that Declaration, my testimony on the fairness of class settlements—including my analysis of settlement-related objections—has been relied upon by numerous federal judges in complex MDL cases.

1

## III.  MATERIALS CONSIDERED

3.  In addition to the materials listed in my initial Declaration (*see* Klonoff Oct. 29 Decl. ¶ 15 & App. B), I have considered:

- all objections filed by class members;
- the Equifax Settlement Website (including the updated class notice);
- near-final drafts of briefs to be filed on December 5, 2019, by class counsel; and
- the Declaration of Joe Ross (filed contemporaneously).

## IV.  BACKGROUND OF THIS LITIGATION AND SETTLEMENT

4.  In my initial Declaration, I discussed the relevant background of this litigation and the terms of the settlement.  *See* Klonoff Oct. 29 Decl. ¶¶ 16–34.  I incorporate that discussion herein and provide any additional relevant background in the discussion below (Section VI).

5.  I am advised that class members have filed 1,106 objections relating to the fairness of the settlement, class certification, attorneys' fees, expenses, and/or incentive payments.  Of these objections, I am advised by class counsel that 718 were generated through an automated "chatbot" and may not meet the Court's standards for valid objections.  I am also advised that, as of the date of this Declaration, over 15 million class members have filed claims under the settlement and 2,770 class members have opted out of the settlement.[1]

---

[1] In providing these figures, and in citing individual objections, I do not purport to opine on the procedural validity of specific objections, opt-outs, or claims.

## V.  SUMMARY OF OPINIONS

6.  In my view, the settlement is fair, reasonable, and adequate under (1) the recently amended Rule 23(e)(2) factors; (2) the factors established by the Eleventh Circuit for evaluating the fairness of a class settlement (often referred to as the "*Bennett* factors"[2]); and (3) various additional relevant factors identified in the case law.

7.  I have reviewed the 1,106 objections that were filed by class members.  In my view, for the reasons discussed in Section VI(B), those objections do not warrant disapproval of the settlement or rejection of the requested attorneys' fees, expenses, or incentive payments.

## VI.  DETAILED DISCUSSION OF OPINIONS

8.  In Subsection A, I explain my opinion on the fairness of the class settlement. In Subsection B, I address the objections filed by class members.

### A. Fairness of the Class Settlement

9.  Federal Rule of Civil Procedure 23(e) provides that a proposed settlement may be approved "only after a hearing and only on finding that it is fair,

---

[2] *See Bennett v. Behring Corp.*, 737 F.2d 982 (11th Cir. 1984).

reasonable, and adequate."[3]   The December 2018 amendments to Rule 23 added several factors (discussed below) that courts must consider in making that determination.   Additionally, in the Eleventh Circuit, the fairness of a settlement is analyzed using a variety of factors established by the case law (often referred to as the "*Bennett* factors"[4]).   Finally, several other factors are sometimes addressed in the case law.   In the discussion below, I analyze the facts of this case based on the Rule 23(e)(2) factors, the *Bennett* factors, and other relevant factors identified in the case law.

### 1.  The Recently Adopted Rule 23(e)(2) Factors Support the Settlement

10.  Under amended Rule 23(e)(2) (effective December 1, 2018), in considering whether a settlement is fair, reasonable, and adequate, the Court must consider a number of factors.[5]   Those factors address whether:

(A)   the class representatives and class counsel have adequately represented the class;

(B)   the proposal was negotiated at arm's length;

(C)   the relief provided for the class is adequate, taking into account:

---

[3] FED. R. CIV. P. 23(e)(2).

[4] *Bennett v. Behring Corp.*, 737 F.2d 982 (11th Cir. 1984).

[5] I served as the academic member of the Civil Rules Advisory Committee (and as a member of the Class Action Subcommittee) during the consideration and drafting of the December 1, 2018 amendments to Rule 23.

(i)    the costs, risks, and delay of trial and appeal;

(ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii)    the terms of any proposed award of attorney's fees, including timing of payment; and

(iv)    any agreement required to be identified under Rule 23(e)(3); and

(D)    the proposal treats class members equitably relative to each other.

11. In my opinion, the settlement is fair, reasonable, and adequate based on those factors. I address each factor in turn below.

### a. Adequate Representation by Class Counsel and the Class Representatives

12. In my opinion, class counsel are highly respected and experienced and have substantial prior experience in high-profile data breach cases. *See* Klonoff Oct. 29 Decl. ¶¶ 54–57. They vigorously represented the class throughout this litigation against one of the top law firms in the country, King & Spalding. *See id.* ¶¶ 59–61. They devoted thousands of hours to prosecuting this case and ultimately achieved an historic settlement. *See id.* ¶¶ 28–30, 44–47, 50, 72–73. They successfully defeated Equifax's exhaustive motion to dismiss the complaint. *See id.* ¶¶ 18, 51–52. They diligently pursued discovery and participated in extensive settlement

negotiations under the supervision of the mediator, retired Federal Judge Layn Phillips (*see id.* ¶¶ 18–23, 51), who characterized their advocacy as "outstanding," and noted that all counsel "represented their clients with tremendous effort, creativity, and zeal."[6]

13. The 96 class representatives (including at least one representative from each of the 50 states plus the District of Columbia) have likewise adequately represented the class. They provided documents and other information to class counsel, participated in discovery, and consulted extensively with class counsel during settlement negotiations. *See Klonoff Oct. 29 Decl.* ¶¶ 120, 123–126.

### b. Arm's-Length Negotiations

14. In my opinion, the 16 months of negotiations were conducted at arm's length. Judge Phillips noted that "the arguments and positions asserted by all involved were the product of much hard work, and they were complex and *highly adversarial*."[7] As noted in my initial Declaration (*see Klonoff Oct. 29 Decl.* ¶ 20), the parties reached several impasses in settlement negotiations before ultimately reaching an agreement. Moreover, the adoption of the settlement by the regulators,

---

[6] Decl. of Hon. Layn Phillips (Ret.) ¶ 14 (Dkt. No. 739-9) (filed July 22, 2019) (hereinafter "Phillips Decl.") (emphasis added).

[7] *Id.* ¶ 9 (emphasis added). *See also id.* ¶ 14 (noting that the negotiations involved "zeal[ous]" advocacy).

as discussed further in ¶ 38, provides additional confirmation that the settlement was the product of arm's-length negotiations.

### c.  Adequacy of Relief Provided to the Class

### i.  Benefits Provided by the Settlement

15.  As I explained in my initial Declaration (*see* Klonoff Oct. 29 Decl. ¶¶ 28–30, 44–47, 72–73), the benefits provided by this settlement are enormous and historic.  Monetary and non-monetary benefits provide value to the class worth well over $5.76 billion.[8]  Among many other benefits, each member of the 147.4 million member class is eligible to claim free credit monitoring services and identity theft insurance worth almost $2,000, even though it is arguable that most class members suffered only nominal damages.  Indeed, as I explained in my initial Declaration (*see id.* ¶ 73), much of the relief most likely would not have been available even if the class had gone to trial and prevailed.  As I emphasized in my initial Declaration (*see id.* ¶¶ 44–46), this settlement is worth billions of dollars.

---

[8] I am advised that, since the date of my initial Declaration, many more class members have come forward to claim the credit monitoring and identity theft insurance option.  And I expect that more class members will claim that option before the January 22, 2020 deadline to file claims.  Thus, the total value provided by the settlement continues to increase.

### ii.  Risk, Costs, and Delay of Trial and Appeal

16.  Although this is by no means the first data breach case, it is certainly one of the most challenging and pervasive, affecting about 147.4 million class members. Equifax raised a number of difficult legal issues, as I previously explained (*see id.* ¶¶ 52–53).  Class counsel took a serious risk that the litigation could terminate in Equifax's favor based on the many arguments for dismissal raised by Equifax's counsel, King & Spalding.  Likewise, class counsel took a great risk that, at trial, King & Spalding could have convinced the trier of fact to award little or no damages to individual class members, except for those who could establish that they were victims of identity theft as a result of the breach.  Despite this risk, class counsel expended large amounts of time and well over a million dollars in expenses (*see id.* ¶¶ 50, 116).

17.  Ultimately, the settlement allows both sides to avoid the risks, costs, and delay of trial and appeal.   The settlement provides "timely, certain, and meaningful" recovery, whereas litigation "is uncertain, would entail significant additional costs, and . . . would substantially delay any recovery achieved."[9]  Here, the class will receive timely and certain recovery.  Moreover, even if class counsel

---

[9] *In re High Tech Employee Antitrust Litig.*, No. 11-cv-02509-LHK, 2015 WL 5159441, at *4 (N.D. Cal. Sept. 2, 2015).

had prevailed at trial and on appeal, class members could have ended up with a much less substantial recovery than this impressive settlement provides.  *See* Klonoff Oct. 29 Decl. ¶ 73.

### iii. Distribution of Relief and Processing of Claims

18. Class members will have until January 22, 2020, to claim benefits (although no claim form is required to access the identity restoration services).  *See* Klonoff Oct. 29 Decl. ¶ 28.  As noted, as of the date of this Declaration, more than 15 million class members have submitted claims.

### iv. Attorneys' Fees

19. As discussed in detail in my initial Declaration (*see id.* ¶¶ 44–47, 72–73), the attorneys' fees sought ($77.5 million) are very modest in comparison with the total relief afforded to the class, both monetary and non-monetary.  Such relief is worth well over $5 billion. *See id.* ¶¶ 44–46.  Fees work out to just over 1 percent of benefits.  *See id.* ¶¶ 46–47.[10]  Indeed, the attorneys' fees sought are modest (20.36 percent) even if the focus is solely on a percentage of the $380.5 million

---

[10] As noted (¶ 15 n.8), I am advised that many more class members have claimed the valuable credit monitoring and identity theft insurance benefit offered by the settlement (and I expect that more will do so prior to the January 22, 2020 deadline), further increasing the settlement's value and decreasing the fee percentage.

minimum monetary fund created by the settlement (*see id.* ¶¶ 40–115).

### v. Side Agreements

20.  I know of no side agreements.  I understand that, as is often done in class settlements, the parties submitted to the Court *in camera* specific provisions allowing termination of the settlement if more than a certain number of class members opt out and a cap on notice spending is exceeded.

### d. Equitable Treatment of Class Members

21.  The class members are all treated the same.  All class members are eligible to claim the various benefits provided by the settlement if they meet the requirements, including compensation for out-of-pocket losses, compensation for time spent responding to the breach, and free credit monitoring and identity theft insurance worth almost $2,000 (or, alternatively, a cash payment of up to $125). *See id.* ¶ 28.  Moreover, all class members—even those who do not submit claims—benefit from the various non-monetary aspects of the settlement, including major changes in business practices that Equifax will implement at a cost of at least $1 billion.  *See id.* ¶¶ 28–29.

* * *

22. In sum, analysis of the factors set forth in Rule 23(e)(2) supports the

fairness of the settlement.

### 2.  The Eleventh Circuit's *Bennett* Factors Support the Settlement

23.  In the Eleventh Circuit, courts assess the fairness of a class settlement using the six factors established in *Bennett v. Behring Corp.*[11]  Those factors—which overlap somewhat with the Rule 23(e)(2) factors—are:

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.[12]

24.  In my opinion, these factors support the settlement.  I address each factor in turn below.

### a.  Likelihood of Success at Trial

25.  The outcome of a trial is never certain.  A jury might well have concluded that the real culprit was the perpetrator of the data breach and that Equifax was itself a victim of that wrongdoing.  And even if plaintiffs could have proven that Equifax was liable for allowing the data breach to occur, there were substantial questions regarding whether (1) class members were injured, and (2) any alleged

---

[11] 737 F.2d 982 (11th Cir. 1984).

[12] *Id*. at 986.

identity theft suffered was caused by this data breach (as opposed to one of the many other data breaches in recent years). *See* Klonoff Oct. 29 Decl. ¶¶ 52–53, 73.

### b. Range of Possible Recovery
### AND
### c. Point on or Below the Range of Possible Recovery at Which a Settlement Is Fair, Adequate, and Reasonable

26. "District courts often consider [these] two factors together because they are related."[13]  In analyzing these factors, "the benefit th[e] settlement provides to the class, both in terms of injunctive and monetary relief, should be compared with the likely recovery for the class at trial."[14]

27. For those class members who have not suffered identity theft, recoverable damages could well have been quite small or even nonexistent.[15]  For most class members, available damages would have been far less than the value of just one of

---

[13] *Amason v. The Pantry, Inc.*, No. 7:09-cv-02117-RDP, slip op. at 18–19 (N.D. Ala. July 3, 2014) (Dkt. No. 114) (citing case law).

[14] *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 689–90 (N.D. Ga. 2001). *Accord, e.g.*, *Knight v. Alabama*, 469 F. Supp. 2d 1016, 1034 (N.D. Ala. 2006).

[15] Although some states arguably provide for statutory penalties, it is an open question whether Article III standing can be satisfied for class members who have not suffered actual injuries.  For examples of cases stating that mere fear of identity theft does not create Article III standing, *see, e.g.*, *Beck v. McDonald*, 848 F.3d 262, 272 (4th Cir. 2017); *Fero v. Excellus Health Plan, Inc*., 236 F. Supp. 3d 735, 755 (W.D.N.Y. 2017); *Green v. eBay Inc.*, No. 14-cv-01688, 2015 WL 2066531, at *4–6 (E.D. La. May 4, 2015); *Adkins v. Facebook, Inc*., No. 3:18-cv-05982-WHA, slip op.at 12 (N.D. Cal. Nov. 26, 2019) (Dkt. No. 261).

many benefits under the settlement—the free credit monitoring and identity theft insurance (worth almost $2,000).  *See* Klonoff Oct. 29 Decl. ¶¶ 28, 73.

### d.  Complexity, Expense, and Duration of Litigation

28.  Had this case proceeded to trial, it would have been complex, time consuming, and expensive.  Yet, because the private information of millions of class members was compromised, a prompt and effective remedy was essential.  Class counsel achieved that objective, securing a multi-billion-dollar settlement in about two years.

### e.  Substance and Amount of Opposition to the Settlement

29.  As noted (¶ 5), out of a class of 147.4 million, only 1,106 class members (just 0.00075 percent of the class) have objected to the settlement in some form.[16] That 0.00075 percent figure is extraordinarily small for such a high-profile, widely discussed settlement.  While a low objection rate might be expected in some cases, such as those involving only minimal publicity, this case provides valuable

---

[16] This figure includes all objections, whether or not they are ultimately determined to be valid.  Although I do not purport to opine on the validity of any individual objection, I note that a large number of objections (718) were submitted through an automated "chatbot" and may not meet this Court's standards for valid objections.  *See* ¶ 5 & n.1.

benefits to class members and has been the subject of extensive media coverage.[17]

A robust notice program also ensured that class members had a high likelihood of

receiving actual notice of the settlement.[18]   Surely, if there was widespread

dissatisfaction with the settlement, one would have expected to see many more

objections.   Numerous courts in the Eleventh Circuit and elsewhere have

recognized that such a low number of objections weighs in favor of the fairness of

the settlement.[19]

---

[17] *See, e.g.*, Adriana Belmonte, *Equifax Settled Its Big Data Breach Lawsuit. Here's How Much Consumers Could Get*, HUFFINGTON POST (July 24, 2019), https://www.huffpost.com/entry/how-to-get-equifax-money-data-breach-lawsuit_l_5d38bd4be4b004b6adba579a; Stacy Cowley, *Equifax to Pay at Least $650 Million in Largest-Ever Data Breach Settlement*, N.Y. TIMES (July 22, 2019), https://www.nytimes.com/2019/07/22/business/equifax-settlement.html;   Dave Lieber, *Should You Apply for Cash or Free Credit Monitoring in the Multi-Million Dollar Equifax Settlement?*, THE DALLAS MORNING NEWS (Aug. 8, 2019, https://www.dallasnews.com/news/watchdog/2019/08/08/should-you-apply-for-cash-or-free-credit-monitoring-in-the-multi-million-dollar-equifax-settlement/;   Bev O'Shea, *How to Navigate the Equifax Data Breach Settlement Offer*, ABC NEWS (July 26, 2019), https://abcnews.go.com/Business/wireStory/navigate-equifax-data-breach-settlement-offer-64582951.

[18] The settlement includes a cutting-edge notice program (paid for by Equifax), including multiple email notices, an extensive digital and social media campaign (including Google "pay-per-click" ads and postings on Facebook, Instagram, and Twitter), and radio and print advertising.  *See* Notice Plan (Dkt. No. 739-2, Exs. 6 & 6A–6F & 7A–7B).

[19] For some examples of the many cases so stating, *see, e.g.*, *Gunthert v. Bankers Standard Ins. Co.*, No. 5:16-cv-00021-MTT, 2019 WL 1103408, at *4 (M.D. Ga. Mar. 8, 2019); *Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 694 (S.D. Fla. 2014); *In re Motorsports Merch. Antitrust Litig.*, 112 F. Supp.

30.  Similarly, I am struck by the low number of opt-outs in this case.  Only 2,770 class members have opted out, representing just under 0.0019 percent of class members.  Like the number of objections, the number of opt-outs in this case is relevant in assessing the reaction of the class.[20]

31.  These objection and opt-out numbers are among the lowest percentages I have seen in my four decades of practicing, teaching, and researching in the field of class actions.  Such low numbers are especially significant given the various efforts to encourage objections and even generate them electronically.[21]

---

2d 1329, 1338 (N.D. Ga. 2000); *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 318 (3d Cir. 1998).

[20] For some examples of the many cases so stating, *see, e.g.*, *Gunthert v. Bankers Standard Ins. Co.*, No. 5:16-cv-00021-MTT, 2019 WL 1103408, at *4 (M.D. Ga. Mar. 8, 2019); *Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 694 (S.D. Fla. 2014); *Francisco v. Numismatic Guar. Corp. of Am.*, No. 06-cv-61677, 2008 WL 649124, at *12 (S.D. Fla. Jan. 31, 2008); *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 318 (3d Cir. 1998).

[21] For example, an opinion piece in the New York Times encouraged class members to file objections, *see* Charlie Warzel, *Equifax Doesn't Want You to Get Your $125.  Here's What You Can Do*, N.Y. TIMES (Sept. 16, 2019), https://www.nytimes.com/2019/09/16/opinion/equifax-settlement.html, and an automated online "chatbot" was created to generate objections electronically, *see* YOU HAVE THE RIGHT TO OBJECT. CLARENCE CAN HELP!, https://nothanksequifax.com/ (last visited Dec. 3, 2019).

32. With respect to the merits of the class member objections, I address those objections in detail below.  *See* ¶¶ 39–119.

### f.  Stage of the Proceedings

33. The data breach at issue occurred on September 7, 2017, just over two years ago.  Clearly, the resolution of this massive and complex case was achieved with remarkable speed.  On the other hand, that timeline does not mean that the negotiations were ill-informed or precipitous.  As noted in my initial Declaration (*see* Klonoff Oct. 29 Decl. ¶¶ 18–24, 50–53), the parties conducted discovery, litigated a comprehensive dispositive motion, and participated in protracted and contentious settlement discussions.

* * *

34. In sum, it is my opinion that the Rule 23(e)(2) factors and the *Bennett* factors strongly favor approval of the settlement.

### 3.  Additional Factors Identified in the Case Law Support the Settlement

35. In addition to satisfying the Rule 23(e)(2) and *Bennett* factors, this settlement is supported by several other criteria (related to the Rule 23(e)(2) criteria) identified in the case law:  (1) the absence of fraud or collusion, (2) the

involvement of a neutral and experienced mediator, and (3) the involvement and support of government regulators.[22]

### a.  Absence of Fraud or Collusion Behind the Settlement

36. As discussed above (¶ 14), it is my opinion that this settlement was a product of arm's-length negotiations and is free from fraud or collusion.

### b.  Involvement of a Neutral and Experienced Mediator

37. As noted, retired Federal Judge Layn Phillips—an experienced mediator (*see* Klonoff Oct. 29 Decl. ¶ 20)—was heavily involved in the settlement negotiations.  Indeed, it was Judge Phillips's late-night, "double-blind mediator's proposal" that led to the execution of a binding term sheet in March 2019, even though the parties had been far apart in the months leading up to the final

---

[22] *See, e.g.*, *George v. Academy Mortgage Corp.*, 369 F. Supp. 3d 1356, 1369 (N.D. Ga. 2019) (assessing "the existence of fraud or collusion behind the settlement" and noting that "mediation with an experienced mediator . . . further confirms that the process was procedurally sound and not collusive"); *Morgan v. Pub. Storage*, 301 F. Supp. 3d 1237, 1247 (S.D. Fla. 2016) (noting that the "assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive" (citation and internal quotation marks omitted)); *Braynen v. Nationstar Mortg., LLC*, No. 14-cv-20726, 2015 WL 6872519, at *6–7 (S.D. Fla. Nov. 9, 2015) (noting that government support for a settlement is a "powerful indici[um] that the settlement is fair, reasonable, and adequate and deserves final approval").

mediation session.[23]

### c.  Involvement and Support of Regulators

38.  Although class counsel did the vast majority of the heavy lifting, government regulators were involved in the later stages of settlement discussions, adding an additional basis for confidence that class members were treated fairly.

## B. The Objections Raised Against the Settlement Lack Merit and Do Not Justify Disapproval

39.  As noted, a total of 1,106 objections have been lodged in this case by class members.[24]   In this section, I address those objections.[25]   In doing so, I have grouped the objections into the following general categories:  (1) fairness of the settlement;  (2) class  certification;  (3) attorneys'  fees;  and  (4) expenses  and incentive payments.

### 1.  Challenges to the Fairness of the Settlement

40.  Before  addressing  specific  objections,  I  wish  to  acknowledge  the

---

[23] *See* Phillips Decl. ¶¶ 7–12.

[24] As noted (¶ 5 n.1), I do not purport to opine on the timeliness or procedural validity of these objections.

[25] I do not purport to address every objection, but I do address those that, in my view, are the most plausible—or are relevant because they show that a number of the objections are conclusory, based on erroneous facts, or seek relief that is not possible or feasible.

understandable anger of class members who learned that their personal information has been compromised.[26]   By endorsing this settlement, I am not in any way approving of Equifax's alleged misconduct.  I understand that some class members are anxious to seek retribution.  Contrary to the premise of a number of objections, however, it is not the function of a private settlement to remove Equifax officials from their jobs,[27] to ensure that those officials are criminally prosecuted or incarcerated,[28] to force Equifax to cease all operations,[29] or to strip Equifax

---

[26] One objector, for example, states:  "I have never objected to a class action settlement before, but I felt motivated to write to the court about this settlement because I have experienced significant stress as a result of the data breach." Rachel Wise Obj. at 1.

[27] *See, e.g.*, George Bruno Obj. at 1 (arguing that the settlement should include "termination of employment" of Equifax management, removal of board members, [and] barring board members from serving on other boards for 10 years"); James Morris Obj. at 2 (Equifax's leadership "should be removed and replaced" and "barred from any work involving sensitive personal information").

[28] *See, e.g.*, Christie Biehl Obj. at 1 & Jeffrey Biehl Obj. at 2 (both arguing, in the context of this private lawsuit, that "[a]ll of the leadership should be given a jail sentence of at least 30 days and fined $1,000,000.00 dollars each to pay the Court for disbursement to the people injured"); George Bruno Obj. at 1 ("Criminal prosecution [of Equifax management and board members] should also be considered."); Patrick Frank Obj. at 1 (arguing that Equifax's "officers [should be] tried and jailed if convicted"); Noah Levinson Obj. at 1 ("I demand . . . criminal charges against Equifax and their negligence.").

[29] *See, e.g.*, Christie Biehl Obj. at 1 & Jeffrey Biehl Obj. at 2 (both arguing that "Equifax should be ordered by the Court to be dissolved and banned from operating"); Stuart Bobb Obj. at 1 ("The price for Equifax's behavior should be the inability of Equifax to continue as a business."); Douglas Chabot Obj. at 1 (arguing that Equifax should "go out of business"); Patrick Frank Obj. at 1 (arguing that

19

officials of their personal assets.[30]

41. Rather, the Court's function is to determine whether the relief afforded to the class is "fair, reasonable, and adequate."[31]   A settlement, by definition, is a compromise.[32]   A case can only settle if the defendant agrees.   If class counsel's demands are unreasonable or excessive, no settlement will be achieved.

---

"[t]he company should be dissolved"); John Grenier Obj. at 1 (arguing that the Court should "close [Equifax] down"); Paul Nowyj Obj. at 1 (urging the Court to "liquidate the company and divide the proceeds among the victims").

[30] *See, e.g.*, Christie Biehl Obj. at 1 & Jeffrey Biehl Obj. at 2 (both arguing that Equifax leadership's "assets should be seized just as drug criminals' assets are seized as necessary to pay the Court"); David Goering & Sonja Peterson Obj. at 1 ("Bankruptcy for the company and every person in the chain of command leading to the breach is an appropriate outcome."); Steven Klotz Obj. at 2 ("The settlement … provides for insufficient punitive damages against any officer or responsible stakeholder in the penalized company."); Witold Szymanski Obj. at 1 ("Equifax and its executives should be paying exemplary and punitive damages."); Ruth Zamoyta Obj. at 1 (stating, with respect to Equifax officials:  "Let THEM lose their houses.  Let THEM lose their jobs.  Let THEM lose their college savings.  Let THEM default on their medical bills." (uppercase in original)).

[31] Fed. R. Civ. P. 23(e)(2); *Bennett v. Behring Corp.*, 737 F.2d 982, 984 (11th Cir. 1984).

[32] *See, e.g.*, *Faught v. Am. Home Shield Corp.*, No. 2:07-cv-01928-RDP, 2010 WL 10959223, at *20 n.14 (N.D. Ala. Apr. 27, 2010) ("[I]t can always be said by those acting as Monday Morning quarterbacks that a settlement could be improved . . . .  But the fact remains that while this settlement (like all others) is not perfect, it is fair, adequate, and reasonable."), *aff'd*, 668 F.3d 1233 (11th Cir. 2011); *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) ("[W]hether a settlement is fundamentally fair within the meaning of Rule 23(e) is different from the question whether the settlement is perfect in the estimation of the reviewing court.").

42. In the discussion below, I address a host of individual objections. Before doing so, however, several overarching points should be noted.

43. First, many objections insist on relief that class counsel could never realistically obtain even if the case were successfully litigated through trial and appeal. *See* Klonoff Oct. 29 Decl. ¶ 73. And while many objections assume that the Court can simply force Equifax to pay out more money, it is fundamental that "the power to approve or reject a settlement negotiated by the parties before trial does not authorize the court to require the parties to accept a settlement to which they have not agreed."[33] Moreover, as discussed below (¶ 48), many objectors seek amounts that vastly exceed Equifax's entire net worth.

44. Second, virtually all of the objectors focus exclusively on the sufficiency of the cash payment option or the sufficiency of the alternative to the cash payment option, free credit monitoring and identity theft insurance.[34] These objections

_____

[33] *Evans v. Jeff D*, 475 U.S. 717, 726 (1986). *Accord, e.g.*, *Howard v. McLucas*, 597 F. Supp. 1504, 1506 (M.D. Ga. 1984) ("[T]he court's responsibility to approve or disapprove does *not* give this court the power to force the parties to agree to terms they oppose." (emphasis in original)), *rev'd in part on other grounds*, 782 F.2d 956 (11th Cir. 1986).

[34] Moreover, although I refer to the "free credit monitoring and identity theft insurance option," virtually all objectors who address this option focus only on the credit monitoring aspect and ignore the $1 million in identity theft insurance provided along with it. Credit restoration service is also typically ignored.

simply ignore all of the other monetary and non-monetary benefits under this settlement.   As I have explained (*see* Klonoff Oct. 29 Decl. ¶¶ 44–46), this settlement is worth more than $5 billion in total.   For this reason, objections that ignore the totality of the relief cannot be taken seriously when they characterize the settlement as "grossly inadequate,"[35] "beyond ridiculous,"[36] woefully inadequate,"[37] a "slap on the wrist,"[38] a "token penalty,"[39] or "a punishment equivalent to a speeding ticket."[40]   It is not persuasive to focus only on one piece of a multi-faceted settlement and then to summarily declare the entire settlement inadequate.

45.  Third, even focusing on just the cash versus credit monitoring component, many objectors focus just on one and not on the other.[41]   But an argument that the

---

[35] Richard Schumacher Obj. at 1.

[36] Charles Reed Obj. at 1.

[37] Chidozie Ugwamba Obj. at 1.

[38] Susan Kurtz Obj. at 1; Raymond LeBlanc Obj. at 1; Drew Lindgren Obj. at 1.

[39] Douglas Karo Obj. at 1.

[40] Trinity Tuttle & Benjamin Reynoso Obj. at 1.

[41] As some of the many examples of objections focusing just on the cash option, *see* Jeffrey Brown Obj. at 1; John Judkins Obj. at 1; Marilyn Keats Obj. at 1; Jordan Kocak Obj. at 1; John Liska Obj. at 1.  As some of the many examples of objections focusing just on the credit monitoring and identity theft insurance option, *see* Lori Capron Obj. at 1; John Crowell III Obj. at 1; Jill Gambaro Obj. at 1; Linda Moore Obj. at 1; Jonathan Namovic Obj. at 1.

cash option is deficient is not credible without the recognition that there is another option, credit monitoring that is worth almost $2,000.  And an argument that the objector does not need credit monitoring and identity theft insurance is incomplete if it does not acknowledge that a cash option is also available.

46. Fourth, those class members who were unsatisfied with the terms of the settlement—and who believed they could do better in contested litigation—had the opportunity to opt out of the settlement.[42]  No class member was forced to participate in this settlement.  And there can be no serious doubt that class members had many opportunities to learn about the settlement and to opt-out if they were unhappy with it.  As noted, in addition to widespread publicity in newspapers, magazines, television and radio programs, and across the internet (*see* ¶ 29 & n.17), a robust notice program was designed and implemented to ensure that class members were aware of this settlement and had an opportunity to opt out if they were unhappy (*see* ¶ 29 & n.18).[43]  In short, every member of the class had

---

[42] *See, e.g.*, *Greco v. Ginn Dev. Co., LLC*, 635 F. App'x 628, 635–36 (11th Cir. 2015) ("If [objector] was displeased with the consideration provided to him under the settlement . . . he was free . . . to opt out of the settlement."); *Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1242 (11th Cir. 2011) (to the same effect); *Lee v. Ocwen Loan Servicing, LLC*, No. 14-cv-60649, 2015 WL 5449813, at *13 (S.D. Fla. Sept. 14, 2015) (to the same effect).

[43] The notice specifically informed class members:  "You can exclude yourself from the settlement by informing the Settlement Administrator that you want to

the option to opt out and litigate separately.

### a. Generalized or "Pie in the Sky" Challenges to the Magnitude of the Settlement

47. A number of objectors complain generally that the settlement is insufficient.[44]   Such objections are conclusory, offering no analysis as to what would constitute an acceptable settlement.   As noted (¶ 44), virtually all of the

---

'opt-out' of the settlement. . . .   [T]his . . . option . . . allows you to retain your rights to separately sue Equifax for claims related to the Data Breach."  Long-Form Notice at 2 (Dkt. No. 739-2, Ex. 7-A).

[44] *See, e.g.*, Richard & Donna Bartlett-May Obj. at 1 (stating, with no analysis, that "[t]his settlement is not fair, adequate or reasonable"); Emma Britton Obj. at 1 (calling the settlement "a joke"); Devin Calcut Obj. at 1 ("This agreement does nothing to compensate the victims fairly and further victimizes us."); Austin Douglas Obj. at 1 ("[A]fter reviewing the proposed settlement I don't find it sufficient.  In light of the harm suffered by members of the class and the extent of the defendant's wrongdoing the proposed settlement is not adequate."); Erwin Estes Obj. at 1 (asserting with no analysis that "the current settlement is unfair and inadequate"); Edward Frank Obj. at 1 (arguing without analysis that "an insufficient amount of money was allocated to compensate the number of individuals in the class"); Chris Hisamone Obj. at 1 ("Equifax should pay more!"); Joel May Obj. at 2 (complaining that the settlement is insufficient because "Equifax deserves a penalty that hurts their bottom line"); James Mindling Obj. at 1 (complaining that the settlement "isn't sufficient to be a punitive measure"); Catherine Sancimino Obj. at 1 (asserting with no explanation that "the terms for monetary compensation are not fair"); Jack Smith Obj. at 1 (asserting with no analysis that that the settlement "is NOT SUFFICIENT" (uppercase in original)); Trinity Tuttle & Benjamin Reynoso Obj. at 1–2 (arguing that Equifax is being "given an easy-out to settle their abhorrent crime"); David Wittman Obj. at 1 ("The settlement is inadequate given the gravity of the breach.").

objections simply ignore the settlement's substantial non-monetary benefits.[45]  And

many objections are premised on other fundamental misunderstandings of the

terms of the settlement.[46]

48. Beyond this, some objectors seek settlement amounts that are absurd on

their face—sums that are many multiples of Equifax's entire net worth of $16.74

---

[45] *See, e.g.*, Heather Case Obj. at 1 ("I do not believe that the initial settlement
amount of 380.5 million dollars . . . is adequate . . . ."); Helen Coxhead Obj. at 1
(calling the cash payment or credit monitoring options "unacceptable" without
acknowledging any of the other benefits under the settlement); Douglas Karo Obj.
at 1 (complaining that "Equifax remains in business without having to make
substantive and costly changes to its policies and procedures," ignoring the
settlement's requirement that Equifax spend $1 billion to do just that); Chris King
Obj. at 2 (ignoring everything but the cash fund in complaining that the settlement
provides only about "$2 per class member"); Stephen Rogers Obj. at 1 (calls for
the settlement to "include commitments by Equifax detailing precisely the steps it
is taking and will continue to take to prevent this type of breach from ever again
occurring," ignoring the settlement's requirement that Equifax spend $1 billion to
do so); Amita Seshadri Obj. at 1 (complaining that the settlement works out to
"just $2.87 per victim"); Nathan Speed Obj. at 1 (objecting to the "$700 million"
settlement); Gregory Uselmann Obj. at 1 (ignoring the $1 billion remedial
obligation of Equifax and asserting that "[t]here is nothing here to encourage
greater safeguarding of customer data").

[46] *See, e.g.*, Scott Anecito Obj. at 1 (complaining that "[t]he cash fund in the
settlement is for $32 million"); Zachary Deschaux Obj. at 1 (complaining that the
settlement only provides free credit monitoring for the first 7 million people to
claim it); Mohammed Hussain Obj. at 1 (referring to the "$31 million" settlement);
David Law Obj. at 1 (complaining that the sum total of benefits under the
settlement is "only $31 million"); Q.A. Marshall Obj. at 1 (referring to "$31
million" settlement); Troy Scheffler Obj. at 6 ("If settlement funds remain, the
ATTORNEYS get paid more!  Say what girlfriend?" (uppercase in original)); Ezra
Tucker Obj. at 1 (complaining that the settlement does not provide for any
compensation "to an individual who experiences identity theft").

billion.[47]   For instance, some objectors claim that, to constitute a fair settlement, Equifax must pay out more than a trillion dollars (as much as $10,000 for each of the 147.4 million class members).[48]   And, as noted (¶ 40), a number of objectors explicitly demand that Equifax be dissolved or forced into bankruptcy; that Equifax's board members and employees be removed, disciplined, fined, and/or stripped of their personal assets; or that Equifax officials responsible for the data breach be criminally prosecuted.

49.   Additionally, several objections are vague, incomprehensible, or merely *ad*

---

[47]   *See* Equifax Net Worth 2006–2019, MACROTRENDS, https://www.macrotrends.net/stocks/charts/EFX/equifax/net-worth (last visited Dec. 3, 2019) ("Equifax net worth as of December 03, 2019 is $16.74B.").

[48]   *See, e.g.*, Emma Britton Obj. at 1 (proposing that each of the 147.4 million class members receive $10,000, for a total settlement of $1.47 trillion—over 86 times Equifax's net worth—and proposing that the payments be entirely tax free); Norma Kline Obj. at 2 (urging that Equifax pay $5,000 per class member—$740 billion total, or over 43 times Equifax's net worth—into an escrow account); Mark Mills-Thysen Obj. at 1 (arguing that "[e]ach member of the affected public should receive a cash payment of no less than $10,000.00," for a total settlement of $1.47 trillion—again over 86 times Equifax's net worth); Vijay Srikrishna Bhat Obj. at 1 (arguing that each of the 147.4 million class members should receive $1,200, for a total settlement of $176.4 billion—over 10 times Equifax's net worth); John Szum Obj. at 1 ("My proposed settlement is that everyone, all 147 million, gets enough money to purchase their own credit monitoring service for the next ten years at no less than $10,000 per person [$1.47 trillion total].  That's $1,000 every year for 10 years for every person affected.  This is paid in cash only, not some weird bullshit bureaucrats come up with like the current settlement.  This money will be tax free from all levels of government . . . .").

*hominem* attacks on the parties, the attorneys, or the Court.[49]

50.  It is fundamental that vague or conclusory objections should be summarily rejected.[50]   Moreover, a settlement that forces Equifax into bankruptcy is not a desirable outcome for the class.   Under a bankruptcy scenario, class members

---

[49] *See, e.g.*, Nancy & Gary Banks Obj. at 1 ("Equifax made a deal. It is up to them to live with the deal they made."); Paul Carlberg Obj. at 1 ("[T]he defendant has denied me the right to 'Life, Liberty, and the Pursuit of Happiness' through their careless and negligent actions."); Julie Engel Obj. at 1 (objecting rather than opting out, but stating, "Until there is a better long-term solution to their failure to protect my information, I will not settle"); Arlene Horowitz Obj. at 1 ("It appears that Equifax hopes we will just get tired and give up."); Barbara Korte Obj. at 1 ("I don't trust the parties in this settlement."); Cheryl Luc Obj. at 1 (making the puzzling argument: "Please consider giving me the compensation."); Lauren Mitchell Obj. at 1 ("[T]his promise of settlement was offered in bad faith."); Carol Sue Tittman Obj. at 2 (complaining that "for 6–7 years" she has had "many issues with her banking," which have "created havoc in [her] life," even though the data breach did not occur until September 2017); David Williams Obj. at 1 ("I don't trust them and doubt I'll get a dime though I've done nothing wrong."); Ronald Williamson Obj. at 1 (arguing that class counsel should receive only credit monitoring, not attorneys' fees, and asking, "What do you ***clowns in black gowns*** think of that???" (italics, boldface, and underlining in original)); *id.* (concluding the objection as follows: "Sincerely & Respectfully, Robert D. Williamson P.S.— The respectfully part is obviously sarcastic!" (paragraph break omitted)).

[50] *See, e.g.*, *Carter v. Forjas Taurus S.A.*, No. 1:13-cv-24583-PAS, 2016 WL 3982489, at *8 (S.D. Fla. July 22, 2016) (rejecting "conclusory objections"), *aff'd*, 701 F. App'x 759 (11th Cir. 2017); *In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 909 F. Supp. 2d 259, 264 (S.D.N.Y. 2012) ("[O]bjections [that] are conclusory and bereft of factual or legal support . . . are insufficient to weigh against a finding that the proposed settlement is fair and reasonable, and can be overruled without engaging in a substantive analysis.").

would end up with little or nothing.[51]   In any event, as noted (¶ 43), this Court cannot simply force Equifax to pay the enormous sums suggested by various objectors (even if the company had the assets to do so).   And Equifax never would have agreed to a settlement that forced it into bankruptcy.   The company would simply have litigated the case through trial, leaving most class members with the risk of receiving only nominal damages at best (*see* ¶¶ 16–17, 25, 27).

51. Finally, as noted (¶ 40), this is a private civil lawsuit; thus, objectors' arguments for criminal prosecutions or personal repercussions for Equifax board members, employees, and officials are misplaced.

### b.  Challenges to the Alternative Cash Payment Option

52. Numerous objections focus on the cash payment (up to $125) option offered to qualifying class members—*i.e.*, those who already have credit monitoring—as an alternative to the free credit monitoring and identity theft insurance benefit provided by the settlement.   As I have explained (*see* Klonoff Oct. 29 Decl. ¶ 28), each qualifying class member is given the option of selecting

---

[51] *See, e.g.*, *Juris v. Inamed Corp.*, 685 F.3d 1294, 1304, 1308 (11th Cir. 2012) (noting "a substantial risk that [the defendant's] bankruptcy would leave all class members with *nothing*" (citation omitted; emphasis added)); *In re: Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2016 WL 6248426, at *18 (N.D. Cal. Oct. 25, 2016) (to the same effect).

the cash payment or the far more valuable free credit monitoring and identity theft insurance.   The objections to the cash payment option take a variety of approaches.[52]

53. First, many objectors complain that class counsel, Equifax, and/or the Federal Trade Commission (FTC) misled them to believe that the cash option was a fixed $125, rather than potentially a much smaller amount.[53]

54. Second, a number of objectors complain that, because of the $31 million

---

[52] Importantly, virtually all of the objectors complaining about the cash payment option overlook the various other cash components of the settlement.   Many objectors erroneously argue that the cash payment option is the *only* monetary component of the settlement, when in fact the settlement includes a number of substantial cash benefits, including compensation for out-of-pocket losses, time spent responding to the breach, and expenses for credit monitoring and credit freezes following the breach.

[53] For example, one objector states that "many claimants were unfairly deceived by—and relied to their detriment upon—the FTC's original description of the settlement as free credit monitoring OR $125.00 per claimant."  Paula Kay Filseth Obj. at 2 (uppercase in original).   Another objector states that a benefit of $125 "was advertised on the homepage of the Settlement Website."  Joel Aaron Obj. at 1.  And another complains that the class notice "conveys the false impression that each class member will receive $125."   Chris King Obj. at 3.   Others raise nonspecific complaints that they were misled.  *See, e.g.*, Kathleen Schroeder Obj. at 1 ("We were told that we could make a claim for $125.").   Among many more examples of objections complaining about confusion over the amount of the cash payment option, *see, e.g.*, Amy Berg Obj. at 1; Deborah Boehm Obj. at 1; Devin Calcut Obj. at 1; Eric Einstein Obj. at 1; Sallie Foster Obj. at 1; Daniel Gilbert Obj. at 3–4; Eric Jensen Obj. at 1; Brian Rak Obj. at 1; William Shank Obj. at 1; Daniel Talero Obj. at 1; Andrew Zajac & Barbara Hueter Obj. at 1.

29

cap on total payments for the cash option, the amount recoverable by each class member will be far less than $125.[54]

55. Third, a number of objectors argue that the settlement should be rejected unless the fund is increased to guarantee $125 for each class member who chooses the cash option.[55]

56. Fourth, other objectors contend that even a cash benefit of $125 is deficient and that much larger payments must be guaranteed or else the settlement should be rejected.[56]

57. Fifth, several objections complain about the requirement that, to qualify for the cash benefit, a class member must demonstrate that he or she has credit

---

[54] *See, e.g.*, Clarence Anglin Obj. at 1; David Attig Obj. at 1; Deborah Boehm Obj. at 1; Daniel Boyd Obj. at 1; Barbara Braid Obj. at 1; Justin Cardoza Obj. at 1; Keith Comess Obj. at 1; Corinne Eisenstein Obj. at 1; Daniel Gilbert Obj. at 2; Catherine Hall Obj. at 1; David Hannum Obj. at 1; Benjamin Last Obj. at 2; Bradley Kukuk Obj. at 1; Joshua Levin Obj. at 1; Alexander Manter Obj. at 1; Joel May Obj. at 1; Beth Moscato Obj. at 1; Benjamin Nitkin Obj. at 1; Carol Norris Obj. at 1; Matthew North Obj. at 1; Billy Sheets Obj. at 1; Alan Sinclair Obj. at 1; Beth Stasiowski Obj. at 1; Milton Weedon, Jr. Obj. at 1; Christiana Wilson Obj. at 1; Daniel Yi-En Huang Obj. at 1; Amy Zinser Obj. at 1.

[55] *See, e.g.*, Jamie Benvenutti Obj. at 2; Amy Dickey Obj. at 1; John Fischer Obj. at 1; James Foster Obj. at 1; Horacio Gurrola Obj. at 2; Kevin Johnson Obj. at 1; Faith Martin Obj. at 1; Dean Patterson Obj. at 2.

[56] *See, e.g.*, Barbara Braid Obj. at 1; Becky Carpenter Obj. at 1; Donna Hay Obj. at 1; Dorothy McCall Obj. at 1; Filip Yip Obj. at 1; Amy Zinser Obj. at 1.

monitoring.  Some claim that the credit monitoring requirement makes no sense,[57] while others complain that the requirement was fraudulently added by the parties and the FTC because of the large number of claims for the cash option.[58]

58. In my view, these arguments are misplaced.  To begin with, complaints about the size of the alternative cash payment option are undercut by the fact that class members can instead choose free credit monitoring and identity theft insurance, worth almost $2,000.  Indeed, well over 3.3 million class members have already selected that option.  Thus, an attack on the amount of the cash payment option is substantially undercut by the fact that every class member can instead choose the credit monitoring and $1 million identity theft insurance option.  The cash payment option is simply that—an option.  Indeed, even at a full $125, the cash payment option is far inferior to the option of free credit monitoring protection and $1 million in identity theft insurance, which is worth almost $2,000. *See* Klonoff Oct. 29 Decl. ¶ 28 & nn.20–21.  The FTC strongly encourages class

---

[57] *See, e.g.*, John Balzar Obj. at 1; Mary Barnett Obj. at 1; Ken Berry Obj. at 1; Patrick Frank Obj. at 1; Matthew North Obj. at 1.

[58] *See, e.g.*, Alan James Obj. at 1 (complaining about "a mid-weekend email adding a new hurdle" that he "must prove that [he has] a credit monitoring service or else [his] claim will be denied"); Theodore Frank & David Watkins Obj. at 16–17 (accusing the parties of "attempt[ing] to throttle the number of cash claims" with this purportedly "new requirement").

members to select the credit monitoring and identity theft insurance option.[59]  And as I explain below (¶ 76), the greater value of the credit monitoring and identity theft insurance option is true even for class members who have already purchased credit monitoring service, since class members can almost certainly cancel the service they are paying for and rely on the free service and insurance instead.

59. While it would have been preferable, in an ideal world, to have a guaranteed alternative cash payment option of $125 for each class member selecting that option, it is virtually certain, given the contentiousness of the negotiations, that Equifax never would have agreed to such a proposal.[60] Moreover, while the ultimate alternative cash payments to qualified class members who choose that option likely will be relatively small, the fact is that most such

---

[59] *See* Robert Schoshinski, Assistant Director, Division of Privacy & Identity Protection, *Equifax Data Breach: Pick Free Credit Monitoring*, FED. TRADE COMM'N (July 31, 2019), https://www.consumer.ftc.gov/blog/2019/07/equifax-data-breach-pick-free-credit-monitoring (hereinafter "Schoshinski (FTC)") ("[T]he free credit monitoring is worth a lot more [than the cash option]—the market value would be hundreds of dollars a year. . . . [I]t monitors your credit report at all three nationwide credit reporting agencies, and it comes with up to $1 million in identity theft insurance and individualized identity restoration services."); Megan Leonhardt, *If You Want to Claim $125 from the Equifax Data Breach, You Have More Work to Do*, CNBC.COM (Sept. 9, 2019), https://www.cnbc.com/2019/09/09/equifax-settlement-you-need-to-update-your-claim-to-get-125.html (noting that "the FTC urged consumers to pick the free credit monitoring").

[60] If 147.4 million people each claimed $125, that would cost Equifax about $18.4 billion—more than $1 billion more than its net worth.  *See* ¶ 48.

class members would probably recover little, if anything, were they to go to trial. *See* ¶¶ 15–17, 25, 27.  And in any case, the settlement—viewed in its entirety— almost certainly offers greater benefits than class members could have achieved by winning at trial.  *See* Klonoff Oct. 29 Decl. ¶ 73.

60. With respect to the argument that a settlement benefit should not be calculated based on the number of class members who choose that benefit, there is nothing unusual about such a settlement.   Courts have upheld such terms.[61] Moreover, courts are particularly deferential in reviewing a contested term when class members are given a *choice* between that term and another term.[62]

61. With respect to the requirement that class members demonstrate that they have credit monitoring in order to select the cash benefit, I am not troubled by that requirement.  I am advised by class counsel that the whole purpose of that option is

---

[61] *See, e.g.*, *Lane v. Page*, 862 F. Supp. 2d 1182, 1219 (D.N.M. 2012) (approving class settlement where individual monetary recovery depended on "how many class members submit a claim").

[62] *See, e.g.*, *Berkley v. United States*, 59 Fed. Cl. 675, 711 (Fed. Cl. 2004) ("The terms of the proposed settlement offer sufficient options to address the needs of individual class members and the class as a whole.  Having the choice between [two distinct options] gives individual plaintiffs an opportunity to assess their own situations."); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 468 (D.N.J. 1997) (class settlement's provision of "the choice between obtaining (1) full rescission and restitution or (2) full benefit of the bargain relief" weighed in favor of fairness of settlement), *aff'd*, 148 F.3d 283 (3d Cir. 1998).

to give a cash alternative *to those who already have credit monitoring*.   The settlement protects class members by *not* letting them choose the cash payment when they would be left with no credit monitoring at all.   Had the settlement allowed class members to claim the cash option even if they did not have credit monitoring, it no doubt would have been criticized for failing to protect class members against identity theft.

62.   Finally, I do not believe that the initial confusion by some class members about whether the cash option was a fixed $125 or "up to" $125 is a basis to reject the settlement.   It is my understanding that this confusion was caused, in large part, by press coverage of statements made by regulators even before class counsel presented the settlement for preliminary approval.   Many class members sought the alternative cash payment benefit (which they erroneously believed was a fixed $125) before the issuance of the class notice.[63]   On July 31, 2019, the FTC

---

[63] Michael Hiltzik, *Did the FTC Mislead Consumers About Its Equifax Data Breach Settlement? Yes!*, L.A. TIMES (Sept. 10, 2019), https://www.latimes.com/business/story/2019-09-09/hiltzik-equifax-data-breach-fine-print   (noting   that "countless Americans signed up for a $125 cash benefit plainly on the assumption that they'd get $125").   Indeed, Senator Elizabeth Warren wrote two letters to the FTC raising concerns and seeking answers to questions.   *See* Letter from Elizabeth Warren, U.S. Senator, to Andrew Katsaros, Inspector General, Fed. Trade Comm'n (Aug.   13,   2019),   *available   at*   https://www.warren.senate.gov/imo/media/doc/2019.08.13%20Letter%20to%20FTC%20IG%20on%20Equifax%20settlement.pdf; Letter from Elizabeth Warren, U.S. Senator, to the Hon. Joseph

subsequently clarified its prior statements to mirror the settlement agreement and approved class notice, which made clear that the amount received depended on how many class members chose the cash option.  *See* ¶ 63 (quoting settlement agreement and class notice).[64]   The settlement website always included the complete settlement agreement, which clearly stated that the alternative cash payment was "up to $125."  And I am advised by class counsel that, on August 1, 2019, the settlement website's front page was modified to make clear that the alternative cash payment option could be substantially less than $125 based on the number of claims.  *See* ¶ 65 (quoting revised language).

63.  I do not doubt that, in the early days after the settlement was announced, a number of class members selected the cash option based on an incorrect belief that they would definitely receive a fixed $125.  That confusion is unfortunate, but in my view it does not negate the overall fairness of the settlement.  Most of the criticism has been leveled against the FTC for the statements it made after the

J. Simons, Chairman, Fed. Trade Comm'n (Sept. 18, 2019), *available at* https://www.warren.senate.gov/imo/media/doc/2019.09.18%20Letter% 20to%20FTC%20re.%20additional%20Equifax%20settlement%20payout% 20steps.pdf.

[64] *See* Schoshinski (FTC), *supra* note 59 ("[P]eople who certify that they already have credit monitoring [can] claim up to $125 instead.  But the pot of money that pays for that part of the settlement is $31 million.  A large number of claims for cash instead of credit monitoring means only one thing:  each person who takes the money option will wind up getting only a small amount of money.").

settlement was reached, not against Equifax or class counsel. Indeed, the settlement agreement and long-form notice made it clear from the outset that the set-aside for paying the cash benefit was $31 million and that the amount paid to any class member depended on the number of class members who chose that option. Specifically, the original settlement agreement, executed on July 22, 2019, provided:

> Up to thirty-one million United States Dollars ($31,000,000) of the Consumer Restitution Fund will be used to provide Alternative Reimbursement Compensation [the cash payment option] . . . . If payments for Alternative Reimbursement Compensation under this provision exceed the cap set forth in the preceding sentence, then payments for such Alternative Reimbursement Compensation shall be distributed *pro rata* to those making valid claims for Alternative Reimbursement Compensation.[65]

Similarly, the original long-form notice stated: "If there are more than $31 million claims for Alternative Reimbursement Compensation, all payments for Alternative Reimbursement Compensation *will be lowered* and distributed on a proportional basis."[66]   Indeed, the long form notice specifically used the "up to" language, stating:

> If you already have some form of credit monitoring or protection, or

---

[65] Settlement Agreement & Release ¶ 7.5 (Dkt. No. 739-2, Ex. 1) (italics in original).

[66] Long-Form Notice at 9 (Dkt. No. 739-2, Ex. 7-A) (emphasis added).

would like to get a different credit monitoring service before submitting a claim, you may be eligible for cash *up to* $125 as an alternative to the free Credit Monitoring Services . . . .[67]

64. Thus, the settlement agreement and class notice were both clear that the amount of the cash option depended on how many class members chose that option. I see nothing to suggest a deliberate or malicious intent on the part of class counsel or Equifax to mislead class members. This is especially true given the transparent nature—in both the settlement agreement and the long form notice—of how the cash benefit would be calculated. A brief period of confusion that objectors blame on a government agency is no reason to reject a settlement reached between private parties.

65. Regardless of the source of the confusion regarding the cash benefit, the important point is that any confusion was promptly and explicitly cleared up. Most importantly, the parties added a sentence to the notice that appears on the settlement website, stating that: "The amount that you receive may be substantially less than $125 . . . ."[68]

---

[67] *Id.* at 1 (emphasis added).

[68] Settlement Notice at 1, Important Documents, EQUIFAX DATA BREACH SETTLEMENT, https://www.equifaxbreachsettlement.com/documents (last visited Dec. 3, 2019) (follow "Settlement Notice" hyperlink).

66. Finally, those class members who already submitted claims requesting the cash option, but who did so with the misunderstanding that they were entitled to a fixed $125, are free—prior to the January 22, 2020 clams deadline—to withdraw that choice and instead choose the much more valuable credit monitoring and identity theft insurance option.[69]   Indeed, the fact that class members who initially selected the cash option can change their minds moots a number of the objections.[70]

---

[69] *See, e.g.*, Schoshinski (FTC), *supra* note 59 ("[I]f you want to change your mind, you'll have a chance to switch to the free credit monitoring."); Brian Fung, *Regret Your Request for $125 from Equifax? You May Be Able to Change Your Choice*, CNN.COM (Aug. 2, 2019), https://www.cnn.com/2019/08/02/tech/equifax-check-claim-change/index.html ("Equifax data breach victims who filed for a $125 settlement check will have an opportunity to change their selection and opt for free credit monitoring instead.").

[70] For instance, objector Randall Thomas says that "[i]f the cash settlement option is as small as the FTC disclosures suggest, [he] would have preferred to take the 10 years of credit monitoring services."  Randall Thomas Obj. at 2.  Thomas and all other similarly situated class members still have the opportunity to choose the credit monitoring (and identity theft insurance) option instead of the cash option.

### c. Challenges to the Free Credit Monitoring and Identity Theft Insurance Option

67. A number of objectors challenge the credit monitoring and identity theft insurance benefit under the settlement.[71]

68. First, a number of objectors claim that 10 years of free credit monitoring has virtually no economic value on the market.[72]

69. Second, several objectors take precisely the opposite approach and argue that this benefit is indeed extremely valuable and should be offered for life, not just for 10 years.[73]

70. Third, at least one objector argues (again recognizing the value of the benefit) that free credit monitoring should be given to the entire 147.4 million class members, even if those who do not submit claims.[74]

---

[71] Almost none of the objections acknowledges that this option includes $1 million in identity theft insurance in addition to credit monitoring.

[72] *See, e.g.*, Christopher Andres Obj. at 5 (arguing that the value of the credit monitoring is "fraudulently inflated"); Tomoe Kaneko Obj. at 1 (incorrectly stating, without citing any examples, that "multiple companies offer credit monitoring on line for free").

[73] *See, e.g.*, Michael Brown Obj. at 1; Shea Richland Obj. at 1; Brian Rudo-Huff Obj. at 1; Clifford Short Obj. at 1; Donald Stubbs Obj. at 1; Trinity Tuttle & Benjamin Reynoso Obj. at 1–2. Some objectors seek money to purchase other credit monitoring services, *e.g.*, Sandra Brough Obj. at 1; John Szum Obj. at 1, but fail to note that the settlement provides reimbursement for credit monitoring services purchased in the wake of the Equifax data breach.

71. Fourth, a number of objectors claim that credit monitoring is not valuable *to them* because they already have it.[74] Many are no doubt paying for their existing service, or have an inferior service. Others claim that they already have *free* credit monitoring service.[76]

72. Finally, several objectors claim that credit monitoring by Equifax is worthless because Equifax cannot be trusted.[77]

73. In my view, these objections are not well taken. To begin with, there can be no serious dispute that the credit monitoring benefit is very valuable. That can be easily demonstrated by looking at the Internet and seeing how much such a

---

[74] *See* Booker Fulmore, Jr. Obj. at 1.

[75] *See, e.g.*, Barbara Braid Obj. at 1; Paula Filseth Obj. at 4; Kevin Graham Obj. at 1; Leanna Namovic Obj. at 1.

[76] For example, one objector states: "My data has been involved in multiple breaches from many firms . . . over the years. I have all the 'free' (and relatively useless) monitoring I need for years to come." Stuart Bobb Obj. at 1. *Accord, e.g.*, Kevin Graham Obj. at 1; Christian Pena Obj. at 1.

[77] *See, e.g.*, Douglas Chabot Obj. at 1 (arguing that credit monitoring from Equifax "seems ludicrous" because "[t]hey have already proved themselves incompetent"); Gary Love Obj. at 1 (arguing that Equifax cannot be trusted to provide credit monitoring); Beth Moscato Obj. at 1 (stating that the credit monitoring "will almost certainly be understaffed [and] underfunded"); Amita Seshadri Obj. at 1 (arguing that it is "moronic" to believe that credit monitoring by Equifax would be "adequate or appropriate"); Billy Sheets Obj. at 1 ("Why would anyone assume the company responsible for a data breach is capable of monitoring anything?"); David Simon Obj. at 2 (stating that he trusts "the so-called 'credit monitoring' agencies as far as [he] can throw them").

service costs.[78]   Indeed, a number of class members have done precisely that and have confirmed that this is a valuable benefit.[79]   Experian senior executive Joe Ross, whose Declaration is filed with class counsel's motion for final approval, explains that the Experian retail product most comparable to the free credit monitoring and identity theft insurance offered under the settlement costs $24.99 per month.[80]   Moreover, several courts have recognized the value of credit monitoring services.[81]   And the very fact that some class members urge that the

---

[78] For example, as of the date of this Declaration, LifeLock's website advertises the following prices (not including applicable taxes):  $8.49 per month during the first year ($11.99 to $14.99 per month thereafter) for its basic, one-bureau monitoring service; $17.49 per month during the first year ($22.99 thereafter) for its mid-level service; and $24.99 per month during the first year ($34.99 thereafter) for its premium, three-bureau monitoring service.  *See* LIFELOCK, https://www.lifelock.com/ (last visited Dec. 3, 2019).  IdentityGuard advertises, after discounts for annual billing, $7.50 per month for its "Value" service; $16.67 per month for its mid-level service; and $20.83 for its "Premier" service. IDENTITYGUARD, https://www.identityguard.com/ (last visited Dec. 3, 2019).

[79] *See, e.g.*, Lori Capron Obj. at 1 (noting that the cost of credit monitoring "averages ($20/month * 12) $240/yr"); Ronald Capron Obj. at 1 (same); Mandi Jo Hanneke Obj. at 4 (noting that credit monitoring service "start[s] as low as $99.99 per year" and that Experian's credit monitoring costs $199.99 per year).

[80] Decl. of Joe Ross ¶ 43 (filed contemporaneously).

[81] *See, e.g.*, *In re the Home Depot, Inc., Customer Data Sec. Breach Litig.*, No. 1:14-MD-02583-TWT, 2016 WL 6902351, at *4 (N.D. Ga. Aug. 23, 2016); *Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, No. 16-cv-03025-JKB, 2019 WL 3183651, at *5, *7 (D. Md. July 15, 2019); *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 323 (N.D. Cal. 2018).

benefit should be offered for life (or for all 147.4 million class members) totally refutes the argument that this is a worthless benefit.

74.  Although a wish list might well include credit monitoring for life, the issue is whether the 10-year benefit is fair, reasonable, and adequate.  I believe that it is.  As noted (¶ 15), most class members have suffered little damage, and thus the fact that a benefit worth almost $2,000 is being offered to all of the 147.4 million class members who submit claims is very generous.  I also have no concern about a requirement that class members seeking that benefit must submit claims.  Enrolling in credit monitoring necessarily requires disclosure of the enrollee's Social Security number, which no class member can be compelled to do.  And it is standard in class actions to require class members to submit claims in order to share in the recovery.[82]

75. As noted (¶ 72), some class members say they do not trust Equifax to provide credit monitoring.  For the first four years, however, the benefit consists of

---

[82] *See, e.g.*, *Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 696 (S.D. Fla. 2014); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 593 (N.D. Ill. 2011); *Milliron v. T-Mobile USA, Inc.*, No. 08-cv-04149-JLL, 2009 WL 3345762, at *6 (D.N.J. Sept. 10, 2009), *aff'd*, 423 F. App'x 131 (3d Cir. 2011); WILLIAM B. RUBENSTEIN, 4 NEWBERG ON CLASS ACTIONS § 12:18 (5th ed. 2019) (noting that "the vast majority of settlements require class members to file some sort of claim form").

three-bureau credit monitoring provided by Experian,[83] not Equifax.  Moreover, I do not believe that credit monitoring solely from Equifax is worthless.  Equifax continues to market and sell its credit monitoring service to the general public, and I have seen nothing to suggest that its service is fundamentally deficient or ineffective vis à vis competitors' products.  In any event, if particular class members believe otherwise, they are free to accept the cash benefit as long as they have credit monitoring protection, or to select only the three-bureau Experian product and forgo the Equifax monitoring altogether.  (Alternatively, they could have opted out of the class.)

76.  Although a number of class members say that they do not need the benefit because they already have credit monitoring, it is likely that class members who are already paying for credit monitoring can terminate those services at a specified point under their contract and rely instead on the free credit monitoring and identity theft insurance provided by this settlement, thus saving considerable sums of money going forward.  I have examined a number of credit reporting contracts, and it appears that there are several ways to seek refunds or at least to cancel the

---

[83] *See Frequently Asked Questions*, EQUIFAX DATA BREACH SETTLEMENT, https://www.equifaxbreachsettlement.com/faq#q-8 (last visited Dec. 3, 2019) (free credit monitoring provides "at least four (4) years of three-bureau credit monitoring services, provided by Experian").

service.[84]   Thus, many (if not most) objectors who are paying for another credit

monitoring service are simply wrong in saying that the credit monitoring and

identity theft insurance offered by Equifax is of no economic value to them.

Moreover, the settlement provides for reimbursement to class members who

purchased credit monitoring services in response to this data breach.

77.  As noted (¶ 71), some class members say they do not need the settlement's

credit monitoring service because they already have *free* credit monitoring.   But

the free 3-bureau monitoring and $1 million identity theft insurance offered here is

much better than the free credit monitoring in some past data breach settlements,

---

[84] For instance, objectors Milton and Jacquelyn Weedon claim that they do not
need credit monitoring because they already have the service through Lifelock.
*See* Milton & Jacquelyn Weedon Obj. at 1.  LifeLock, however, has a 60-day
money back guarantee.  After that, each annual renewal is subject to a 60-day
refund of the annual fee.  In the case of a monthly membership, there is no refund,
but upon cancellation, the contract will not renew for the following month.  *See*
Cancellation, Return & Refund Policy, LIFELOCK, https://www.lifelock.com/legal/
refundpolicy/ (last visited Dec. 3, 2019).  Similarly, Identity Guard allows a full
refund within the first 30 days.  *See Cancellation and Refund Policy*, IDENTITY
GUARD, https://www.identityguard.com/refund-policy.html (last visited Dec. 3,
2019).  After that, a cancellation will not ensure a refund for the pre-paid term, but
it will ensure that the contract does not automatically renew.  *See id.*  Thus, it is
highly unlikely that any class member would need to pay independently for credit
monitoring services for more than a year.  After that period, such class members
can take advantage of the many years of free credit monitoring service and identity
theft insurance available under the settlement.

which is often just 1-bureau monitoring alone.[85]  Alternatively, class members can opt for the cash benefit.  Moreover, the settlement provides myriad benefits to class members wholly apart from the cash or credit monitoring benefit, including extensive non-monetary relief; identity restoration services for all class members; reimbursement for out-of-pocket losses and expenses (including money spent on credit monitoring in response to the breach); and up to 20 hours of compensation at $25 per hour for time spent responding to the breach.  *See* Klonoff Oct. 29 Decl. ¶¶ 28–29.[86]

78.  In addition, those who state that they already have free credit monitoring as a result of another data breach settlement are hardly in a position to complain. Having been victimized before, such class members would be hard pressed to prove at trial that their identity theft was caused by *this* data breach, as opposed to another data breach that compromised their personal information.

---

[85] *See* Decl. of Joe Ross ¶¶ 34–41 (filed contemporaneously).

[86] In addition to the benefits identified in my initial Declaration, the settlement also provides that all 147.4 million class members are eligible to place and remove freezes on their Equifax credit files at no charge for 10 years regardless of whether they file claims.  *See* Settlement Agreement ¶ 4.2 (Dkt. No. 739-2, Ex. 1).  And any class member who enrolled in Equifax's TrustedID Premier credit monitoring service following the breach will be provided with an additional year of credit monitoring services called IDNotify.  *See id.* ¶ 4.3.

79.  In short, I believe that the credit monitoring benefit is substantial and useful to virtually all class members.  It is especially generous considering that most class members arguably have suffered little, if any, actual damages.  *See* Klonoff Oct. 29 Decl. ¶¶ 52–53, 72–73.

### d.  Challenges to Procedures for Filing Objections

80.  Several class members complain about the procedures for filing objections. Thus, various objectors complain about having to supply deposition dates,[87] having to provide a signature even if they are represented by counsel,[88]  having to submit documentation to support their claims,[89]  and having to provide information about the number of prior objections in class actions.[90]  In my view, these objections are meritless.   Courts have repeatedly adopted a host of procedures to ensure that objections are authentic and that those submitting them are indeed members of the class.[91]

---

[87]  *See, e.g.*, Christopher Andres Obj. at 11–12; Theodore Frank & David Watkins Obj. at 13–14; Mikell West Obj. at 1, 8–9.

[88]  *See, e.g.*, Theodore Frank & David Watkins Obj. at 15.

[89]  *See, e.g.*, David Bratslavsky Obj. at 1; Shea Richland Obj. at 1.

[90]  *See, e.g.*, Theodore Frank & David Watkins Obj. at 14.

[91]  *See, e.g.*, Order Certifying a Settlement Class, Preliminarily Approving Class Action Settlement & Directing Notice to the Settlement Class at 10–12, *In re The Home Depot, Inc., Customer Data Security Breach Litig.*, No. 1:14-md-02583-

81. With respect to the requirement that an objector offer possible deposition dates, it applies only if "the objector intends to appear at the Fairness Hearing . . . through counsel . . . ."[92]  In my experience, the average objector in a consumer case very rarely appears or retains counsel to appear on his or her behalf.  Those who do appear are often serial objectors (acting as counsel for objectors or objectors themselves), such as Christopher Bandas, who has appeared here.[93]   Indeed,

---

TWT (N.D. Ga. Mar. 8, 2016) (Dkt. No. 185) (imposing numerous procedures and requirements); Order Granting Mot. for Prelim. Approval, Denying Mots. to Intervene, *Jabbari v. Wells Fargo & Co.*, No. 3:15-cv-02159-VC (N.D. Cal. July 8, 2017) (Dkt. No. 165) (same); Wells Fargo Unauthorized Accounts Settlement Notice at 21, *available at* https://wfsettlement.com/Portals/0/Documents/180403A-3125-Jabbari_Extended%20Claims%20Deadline%20LF%20Notice_English_KM_v3.pdf (same).

[92] Order Directing Notice at 10 (Dkt. No. 742).

[93] Bandas, a well-known "serial objector," has filed at least *81* objections to class settlements as of the date of this Declaration.  *See* Serial Objector Index, https://www.serialobjector.com/persons (last visited Dec. 3, 2019).  He has been repeatedly criticized and sanctioned by federal courts for filing frivolous objections to coerce payments from class counsel in exchange for withdrawing his objections. *See, e.g.*, *In re Gen. Elec. Sec. Litig.*, 998 F. Supp. 2d 145, 156 (S.D.N.Y. 2014) (noting that Bandas "has been repeatedly admonished for pursuing frivolous appeals of objections to class action settlements" and concluding that the objector's "relationship with Bandas, a known vexatious appellant, further supports a finding that [objector] brings this appeal in bad faith"); *In re Hydroxycut Mktg. & Sales Practices Litig.*, No. 09-md-2087 BTM (KSC), 2013 WL 5275618, at *5 (S.D. Cal. Sept. 17, 2013) (noting that "Mr. Bandas was attempting to pressure the parties to give him $400,000 to withdraw the objections and go away" and "was using the threat of questionable litigation to tie up the settlement unless the payment was made"); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 281 F.R.D. 531, 533 (N.D. Cal. 2012) ("Bandas routinely represents objectors purporting to challenge class

virtually all of the objectors in this case have stated in their objections that they do not intend to appear at the fairness hearing, through counsel or otherwise, and thus they have ignored the (inapposite) requirement to supply deposition dates.   In short, in my view, it is specious to argue that this requirement has deterred a significant number of objectors from coming forward.[94]

82.  The signature requirement is not the slightest bit burdensome and is designed merely to ensure that the objector is making the objection in his or her personal capacity and truly wishes to object to the settlement.  It thus serves a legitimate purpose.

83.  Likewise, the documentation requirement is merely designed to ensure that the objectors are class members and thus are entitled to object.  Were these class members to go to trial, they obviously would need to substantiate their claims.

84.  The requirement that objectors disclose objections they have made in other class actions is also entirely legitimate.  This Court is entitled to know whether an

---

action settlements, and does not do so to effectuate changes to settlements, but does so for his own personal financial gain; he has been excoriated by Courts for this conduct.").

[94] It should also be noted that the requirement does not provide that an objector who intends to appear through counsel *will* be deposed.  It merely asks for dates in the event that a party deems a deposition to be warranted.

objector has a pattern of opposing class settlements.[95]  So-called "serial objectors" are known for "routinely filing meritless objections to class action settlements for the improper purpose of extracting a fee rather than to benefit the Class."[96]  Some of those offenders have surfaced here.  *See* ¶ 81 & n.93.[97]  Indeed, serial objectors have become such a serious problem that the Advisory Committee on Civil Rules issued detailed proposed amendments to Rule 23 governing serial objectors, which were adopted by the Supreme Court.[98]  As noted (¶ 10 n.5), I served as the academic member of the Advisory Committee and Class Action Subcommittee during that time period.  I can say with certainty that this Court's efforts to identify possible serial objectors are entirely in line with the purpose of the Rule 23

---

[95] Nearly identical disclosures have increasingly been required.  *See, e.g.*, Order Certifying a Settlement Class, Preliminarily Approving Class Action Settlement & Directing Notice to the Settlement Class at 10–11, *In re The Home Depot, Inc., Customer Data Security Breach Litig.*, No. 1:14-md-02583-TWT (N.D. Ga. Mar. 8, 2016) (Dkt. No. 185) (requiring that objectors set forth detailed information about prior objections).

[96] *Chambers v. Whirlpool Corp.*, 214 F. Supp. 3d 877, 890 (C.D. Cal. 2016).

[97] In addition to Christopher Bandas, others submitting objections herein who have been listed as serial objectors on a website that collects such information include Robert Clore, Steven Helfand, John Davis, and George Cochran.  Clore, who works for Bandas's law firm, has filed at least 15 objections to class settlements as of the date of this Declaration; Helfand has likewise filed at least 15 such objections; Davis has filed at least 14; and Cochran has filed at least 12.  *See* SERIAL OBJECTOR INDEX, https://www.serialobjector.com/persons (last visited Dec. 3, 2019).

[98] *See* FED. R. CIV. P. 23(e)(5) and accompanying Advisory Committee Notes.

amendments.  For serial objectors, disclosure of all objections to class settlements during the past five years will—by definition—require some effort, if such objectors take the disclosure requirement seriously.  But for the average class member who is objecting because of a genuine belief that the settlement is deficient, this requirement is not burdensome at all.  Indeed, the vast majority of objectors in this case indicate in their objections that they have never objected in another class action.  In my opinion, there is no reason to believe that such a requirement has deterred legitimate objections.[99]

### e.  Miscellaneous Challenges to Fairness

85.  Various objectors have raised additional fairness concerns, none of which, in my opinion, undermines the overall fairness of the settlement.

86. First, some objectors complain that class members who do not submit claims get nothing.[100]  But it is common to require class members to submit claims

---

[99] *Bronson v. Samsung Electronics America, Inc.*, No. 18-cv-02300-WHA, 2019 WL 4738232 (N.D. Cal. Sept. 29, 2019), cited by two objectors (*see* Theodore Frank & David Watkins Obj. at 15), is inapposite.  *Bronson* does not address the requirement that past objections be disclosed.  The case stands only for the general (and in my view, reasonable) proposition that courts should avoid creating "onerous objection procedures."  2019 WL 4738232, at *5 (uppercase omitted).  In my view, the requirements here are not onerous but are reasonable and well justified.

[100] *See, e.g.*, Joel May Obj. at 2.

to participate in the benefits of a settlement. *See* ¶ 74 n.82 (citing authorities). In any event, the premise that class members who do not file claims get nothing is incorrect. As I have noted (¶¶ 18, 21, 77), various benefits under the settlement are available even to those who do not file claims. Such benefits include at least 7 years of identity restoration services, historic non-monetary relief (including Equifax's agreement to spend $1 billion over five years to improve its data security) that will benefit all class members, and the ability to freeze or unfreeze their Equifax credit files at no charge.

87. Second, a small number of objectors challenge the $25 hourly rate for time spent addressing identity theft concerns. For instance, one objector complains that the $25 per hour for time spent addressing the data breach and identity theft is "paltry."[101] In my opinion, these objections are meritless. The amount designated under the settlement for the hourly compensation is more than three times the federal minimum wage of $7.25 per hour.[102] And it is very close to the average

---

[101] *See* Jason Tapp Obj. at 1. *See also* Paul Hover Obj. at 1 (asking to be compensated "at [his] usual hourly rate for $225 for time spent")

[102] *See* Minimum Wage, U.S. DEPT. OF LABOR, https://www.dol.gov/general/topic/wages/minimumwage (last visited Dec. 3, 2019).

hourly wage in the United States of $27.16 (as of August 2018).[103]   It is highly doubtful that class members would have recovered much more than $25 per hour (or even that much) had they gone to trial.   And, of course, a settlement is a compromise and can provide for payments that are well below what might have been recovered at trial.   *See* ¶ 41 & n.32; Klonoff Oct. 29 Decl. ¶ 73 & n.88.   Thus, this objection is not well taken.

88.   Third, at least two objectors complain that notice was provided by email instead of U.S. Mail.[104]   But Rule 23 was amended in 2018 to make clear that email is a legitimate form of notice.[105]   The argument is especially weak here because one of these objectors explicitly acknowledges that he received and read

---

[103] *See* Megan Elliott, *How Much Does the Average American Get Paid Per Hour?*, CHEATSHEET.COM (Sept. 7, 2018), https://www.cheatsheet.com/money-career/how-much-does-the-average-american-get-paid-per-hour.html.

[104] *See* Booker Fulmore, Jr. Obj. at 1; Jonathan Loo Obj. at 1.

[105] *See* FED. R. CIV. P. 23(c)(2)(B) ("The notice may be by one or more of the following:  United States mail, electronic means, or other appropriate means."); FED. R. CIV. P. 23 advisory committee's note ("Subdivision (c)(2) is . . . amended to recognize contemporary methods of giving notice to class members. . . .  [I]t may sometimes be true that electronic methods of notice, for example email, are the most promising . . . .").

the email,[106] while the other acknowledges receiving notice of the settlement via the internet and at work.[107]

### 2. Challenges Based on Class Certification

89.  A small number of objectors argue that class certification is not proper here because there is just one omnibus class, as opposed to an overall class with multiple subclasses.[108]   One objection notes that the litigation involves statutes from 25 states, the District of Columbia, Puerto Rico, and the Virgin Islands, and that the consumer protection claims are from 33 states, the District of Columbia, and the Virgin Islands.[109]   According to the objection, the underlying state statutes vary in terms of the amount of statutory damages recoverable, if any, with some authorizing as much as $2,000 for a claim.[110]   Because different remedies are available in different states, the objection argues that subclasses, including separate representatives and counsel, are required to satisfy Rule 23(a)(4)'s adequacy of

---

[106] *See* Booker Fulmore, Jr. Obj. at 1.

[107] *See* Jonathan Loo Obj. at 1.

[108]  *See* Christopher Andres Obj. at 22–23; Theodore Frank & David Watkins Obj. at 4–12.

[109] *See* Theodore Frank & David Watkins Obj. at 6.

[110] *See id.* at 9–11.

representation requirement.[111]   In my view, subclasses were not required here; indeed, subclasses would have imposed significant complications and would have rendered productive negotiations difficult if not impossible.

90.  As the Supreme Court explained in *Amchem Products, Inc. v. Windsor*,[112] adequacy concerns arise when a settlement includes both class members who have been injured and those who have not yet suffered injuries.  The interests of the two groups may conflict because class members who are currently injured have an interest in securing "generous immediate payments," while those who are not yet injured have an interest in "ensuring an ample, inflation-protected fund for the future."[113]  In *Ortiz v. Fibreboard Corp.*,[114] the Supreme Court reiterated that "it is obvious after *Amchem* that a class divided between holders of present and future claims . . . requires division into homogeneous subclasses under Rule 23(c)(4)(B), with separate representation to eliminate conflicting interests of counsel."[115]

91.  The argument here, in contrast with *Amchem* and *Ortiz*, is not about present and future claimants but about the purported need for 50+ subclasses to account for

---

[111] *See id*. at 12.

[112] 521 U.S. 591 (1997).

[113] *Id*. at 626–27.

[114] 525 U.S. 815 (1999).

[115] *Id.* at 856.

variations in state laws.  Analogous arguments were made without success in the massive *BP Deepwater Horizon* class settlement, in which I served as an expert on class certification and fairness.  There, two class settlements were negotiated:  one for economic injuries and one for personal injuries.  The economic injuries included monetary losses for businesses and individuals, real property damage, loss of opportunity for charter boat income, physical damage to vessels, loss of subsistence fishing, and loss of income from commercial fishing.[116]  The personal injuries included a variety of ocular, respiratory, dermal, neurological, and other conditions, both acute and chronic.[117]  In neither class were there any subclasses, even though each class encompassed multiple kinds of injuries.  Among the objections to the settlement was the argument that subclasses should have been created based upon the various types of injury to avoid conflicts of interest.  Judge Carl Barbier rejected those arguments.  He stated, in language that is directly applicable here, that "[i]f subclasses were entertained, there would be no principled basis for limiting the number of subclasses," and he concluded that creating subclasses for each type of injury, "each with separate class representatives and

---

[116] *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex., on Apr. 20, 2010*, 910 F. Supp. 2d 891, 903 (E.D. La. 2012).

[117] *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex., on Apr. 20, 2010*, 295 F.R.D. 112, 121–22 (E.D. La. 2013).

counsel . . . would have greatly complicated both the settlement negotiations and the overall administration of the litigation."[118]  Just as the mediator, Judge Phillips, ensured structural integrity in the instant case (*see* ¶ 37), Judge Barbier found that the presence of the magistrate judge guiding the *BP Deepwater Horizon* negotiations "ensured structural integrity during the negotiations" without the need for subclasses.[119]

92. The Eleventh Circuit, as well, in a case upon which objectors rely, has observed that *Amchem* and *Ortiz* "appear to hold that Rule 23(a)(4) calls for some type of adequate structural protection, which would include, *but may not necessarily require*, formally designated subclasses."[120]  Numerous other courts have made the same point.[121]  In other words, the courts are clear that subclasses

---

[118] 910 F. Supp. 2d at 920 (citations omitted).

[119] *Id.* at 918.

[120] *Juris v. Inamed Corp.*, 685 F.3d 1294, 1323 (11th Cir. 2012) (second emphasis added; citations omitted).

[121] In *In re Insurance Brokerage Antitrust Litigation*, the Third Circuit noted that, "[w]hile subclasses can be useful in preventing conflicts of interest, they have their drawbacks," including the potential to "create a 'Balkanization' of the class action and present a huge obstacle to settlement if each subclass has an incentive to hold out for more money."  579 F.3d 241, 271 (3d Cir. 2009) (alteration and citation omitted).  The Sixth Circuit has similarly stated that "[s]ubclassing . . . is appropriate only when the court believes it will materially improve the litigation." *Clark Equip. Co. v. Int'l Union, Allied Indus. Workers of Am.*, 803 F.2d 878, 880 (6th Cir. 1986).  And the Eighth Circuit has characterized as "untenable" the

are not required just because some sort of potential conflict is alleged.  Rather, courts have adhered closely to the circumstances and rationales in *Amchem* and *Ortiz*.[122]

93.  This case bears no resemblance to *Amchem* or *Ortiz*.  Here, objectors are asking for in excess of 50 subclasses, with at least 50 separate attorneys and class representatives.    Such  a  structure  is  purportedly  necessary  to  account  for differences in state laws.  But such a structure would render settlement negotiations or case administration exceedingly difficult, if not impossible.

94.  Moreover, the purported conflict is largely illusory.  As noted (¶ 15), most class members likely suffered only marginal injuries, if any.  And even those class

---

argument that "a conflict of interest requiring subdivision is created when some class members receive more than other class members in a settlement," noting that "almost every settlement will involve different awards for various class members." *Petrovic v. Amoco Oil Co*., 200 F.3d 1140, 1146 (8th Cir. 1999).

[122] The main case relied on by objectors, which is supposedly "directly on point," Theodore Frank & David Watkins Obj. at 7, is readily distinguishable.  In *In re Literary Works*, 654 F.3d 242 (2d Cir. 2011), a copyright case, there was a capped recovery that worked to the advantage of two groups of claimants but left the third group, which had no independent representation, with potentially no recovery.  Nothing like that situation exists here.

Also distinguishable is *West Morgan-East Lawrence Water & Sewer Authority v. 3M Co.*, 737 F. App'x 457 (11th Cir. 2018), *see* Theodore Frank & David Watkins Obj. at 8 (citing case), which also does not address the issue of state-specific subclasses in a nationwide class action.  Rather, it involved another sharp conflict between a small number of potential subclasses with very different claims at stake.

members who might be eligible for statutory damages would face extremely difficult Article III issues in pursuing their claims without a showing of actual injury. *See* ¶ 27 & n.15.

95. Also, in addition to structural integrity provided by the mediator, the class representatives themselves hail from every state and the District of Columbia, including all states in which statutory remedies are arguably available.

96. If objectors were correct about the need for subclasses here, then every multi-state class action settlement involving state law claims would be invalid without subclasses (with separate representatives and counsel) for each state. Scores of class settlements that have been approved and upheld on appeal would be invalid under such a rule, including *NFL Concussion*,[123] *Chrysler-Dodge-Jeep Ecodiesel*,[124] and *Volkswagen "Clean Diesel"*.[125]   Those cases all involved settlement formulas that were applied on a multi-state basis without variations that

---

[123] *In re Nat'l Football League Players Concussion Injury Litig.*, 307 F.R.D. 351 (E.D. Pa. 2015), *aff'd*, 821 F.3d 410 (3d Cir. 2016).

[124] *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 17-md-02777-EMC, 2019 WL 2554232 (N.D. Cal. May 3, 2019).

[125] *In re: Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2016 WL 6248426 (N.D. Cal. Oct. 25, 2016), *aff'd*, 895 F.3d 597 (9th Cir. 2018), *and aff'd*, 741 F. App'x 367 (9th Cir. 2018) (2.0-liter settlement); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2017 WL 2212783 (N.D. Cal. May 17, 2017) (3.0-liter settlement).

accounted for state law differences.  Those courts plainly understood that *Amchem* and *Ortiz* do not mandate subclasses just because the various state laws are not identical.

97.  In addition to arguing about the need for subclasses, some objectors make other class certification arguments.  Those arguments are likewise meritless.[126]

### 3.  Challenges to Attorneys' Fees

98.  A number of class members raise issues about the attorneys' fees sought by class counsel.  Some objectors focus on the percentage method and how it should be applied.  Other objectors focus on the use of the lodestar method as a cross check.  I address these objections below.

---

[126] Objector Shiyang Huang argues that predominance under Rule 23(b)(3) is not satisfied because the laws of multiple states are involved.  *See* Shiyang Huang Obj. at 17–19.  But numerous courts have held that this issue goes to manageability and that differences among state laws in the context of a class settlement do not defeat class certification.  *See, e.g.*, *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539 (9th Cir. 2019) (holding that variations in state law did not defeat predominance); *Sullivan v. DB Investments, Inc.*, 667 F.3d 273 (3d Cir. 2011) (similar).  Also meritless is the objection by Joe Manuel Cardador that the class should have been an opt-in class rather than an opt-out class.  *See* Joe Manuel Cardador Obj. at 1.  Classes under Rule 23 are either opt-out (Rule 23(b)(3)) or mandatory (Rule 23(b)(1), Rule 23(b)(2)).  Opt-in classes are only allowed by special statutes, such as the Fair Labor Standards Act.  *See* ROBERT H. KLONOFF, CLASS ACTIONS AND OTHER MULTI-PARTY LITIGATION IN A NUTSHELL 386–90 (West 5th ed. 2017).

### a. Percentage Method

99. No objector disputes my position (*see* Klonoff Oct. 29 Decl. ¶ 41) that in the Eleventh Circuit, use of the percentage method is mandatory. Several objections, however, focus on the application of that method.

100. Some objectors propose lower percentages than the percentage sought by class counsel, but their arguments for doing so are unpersuasive. For instance, two objectors arbitrarily argue that the proper percentage should only be 10 percent.[127] As I demonstrated, however (*see* Klonoff Oct. 29 Decl. ¶¶ 40–89), the percentage sought here, 20.36 percent of the minimum monetary fund, is very conservative under the case law. I presented detailed arguments why it makes no sense to reduce the percentage in so-called mega fund cases, arguments that the objectors ignore. And I demonstrated that the true percentage, when focusing on monetary and non-monetary benefits, is actually about 1 percent. *See id.* ¶¶ 44–47. Using

---

[127] *See* Theodore Frank & David Watkins Obj. at 17–20. *See also, e.g.*, Roberto Fillippelli Obj. at 1 (arguing that attorneys' fees should be "no more than 1%" (italics and capitalization omitted)). Other objectors urge specific dollar amounts rather than specific percentages. *See, e.g.*, Steven Helfand Obj. at 2–3 (urging a fee award of "at least $25 million to $30 million" but not "exceeding $45 million" and asserting that hourly rates should not exceed $500); Ludwig & Janice Stuart Obj. at 1 (urging $20 million for fees). And others object generally to the percentage sought without indicating what a fair percentage might be. *See, e.g.*, Cindy Mason Obj. at 1 (arguing that "the lawyers fees are disproportionate to the amount set aside for restitution"); Brian Witt Obj. at 1 (asserting with no analysis that the fees sought are "too much").

Theodore Frank's and David Watkins's percentage, and focusing on both monetary and non-monetary benefits, legitimate fees here would be about $576 million (and more as more class members file claims). That works out to more than seven times the amount sought by class counsel.[128]

101. Some objectors argue that attorneys' fees should be reduced from the amount requested because this is a so-called "mega-fund" case.[129] As I argued, however (*see* Klonoff Oct. 29 Decl. ¶¶ 82–88), it makes no sense to reduce the percentage of fees because a mega fund is involved.[130]

---

[128] These objectors argue that class counsel should not even be able to count all of the monetary benefits. They argue that $70.5 million of the $380.5 million was achieved entirely by the FTC and thus should not be deemed part of the fund created by class counsel. *See* Theodore Frank & David Watkins Obj. at 20. But that argument is incorrect; as I noted in my prior Declaration (*see* Klonoff Oct. 29 Decl. ¶¶ 23, 43), and as class counsel made clear (*see* Supplemental Decl. from Class Counsel ¶¶ 17–19 (Dkt No. 858, Ex. 1)), class counsel had the principal role in actually negotiating that additional sum with Equifax. The objectors also argue that notice and administrative expenses should not count as part of the fund (*see* Theodore Frank & David Watkins Obj. at 21), but numerous courts have held to the contrary. *See, e.g.*, *George v. Academy Mortgage Corp.*, 369 F. Supp. 3d 1356, 1375 (N.D. Ga. 2019).

[129] *See, e.g.*, Theodore Frank & David Watkins Obj. at 18; Mikell West Obj. at 12–15.

[130] I discuss numerous cases in which courts have rejected a rule requiring lower percentages for mega-fund cases, and I explain why such a rule would lead to perverse incentives. *See* Klonoff Oct. 29 Decl. ¶¶ 82–88. The objectors ignore my discussion, claiming instead that I "cherry-picked[ed]" the cases I cite. Theodore Frank & David Watkins Obj. at 19. But in *In re Syngenta AG MIR 162*

102.  In any event, when non-monetary benefits are considered, the percentage here (just above 1 percent) is among the smallest in any case applying the percentage method, including mega-fund cases.   No objector claims—or could claim—that a 1 percent fee award is excessive, even under the most rigorous and conservative treatment of attorneys' fees in mega-fund settlements.

103.  Although (as noted) no objector disputes that non-monetary benefits should count when setting fees, a few objectors argue that the $1 billion that Equifax must spend to upgrade its security should not count because the spending benefits Equifax.[131]  It is inconceivable, however, that Equifax would have agreed to spend $1 billion to upgrade its security were it not for this litigation.  Had it deemed such an expenditure to be in its interest, it would have made that investment long ago.

---

*Corn Litigation*, 357 F. Supp. 3d 1094 (D. Kan. 2018), another case in which I served as an expert, the court conducted its own thorough analysis and ultimately concluded that my mega-fund analysis was correct.  *See id.* at 1114–15 & n.11 (noting that "Professor Klonoff's declaration contains a list of over 40 megafund cases . . . involving fee awards of 30 percent or greater," concluding that "a diminishing scale by which the [fee] award percentage falls as the settlement amount grows . . . fails to provide the proper incentive for counsel and is fundamentally at odds with the percentage-of-the-fund approach[,]" and noting that "[a]dditional cases containing criticism of this approach are cited in Professor Klonoff's declaration").  Objectors simply ignore *Syngenta* and the myriad other recent cases I cite.

[131]  *See* Theodore Frank & David Watkins Obj. at 24 n.5; Mikell West Obj. at 17.

104.  Moreover, it is often the case that a company, as part of a settlement, will undertake a remedial effort that benefits class members but also benefits the company.[132]  And class counsel's data security expert has explained why the $1 billion relief would not have been undertaken by Equifax absent the coercion of this lawsuit:

> To ensure that Equifax is able to complete the broad-ranging security upgrades required in the Settlement Agreement, the parties agreed that Equifax will spend at least $1 billion on data security and related technology over the next five years.  This represents a substantial increase over Equifax's pre-breach security spending.  Further, in the course of my work, I have observed a pattern across many industries in which corporations provide ample funding to information security departments in the aftermath of a data breach. After a year or two, however, the companies drastically scale back information security funding, often before all of the planned security improvements have been completed. By requiring Equifax to spend at least $1 billion over five years, the Settlement Agreement aims to ensure that the business practice changes will be appropriately funded.[133]

105. The flaw in objectors' argument that the $1 billion in non-monetary benefits should not count in setting fees is underscored by a decision handed down

---

[132] The case of *Koby v. ARS National Services, Inc.,* 846 F.3d 1071 (9th Cir. 2017), cited by two objectors (*see* Theodore Frank & David Watkins Obj. at 24 n.5), is not on point.  There, the court noted that "[t]he settlement's injunctive relief is worthless to most members of the class . . . ."  *Id.* at 1079.  Here, by contrast, as noted by plaintiffs' data security expert, Mary Frantz, the $1 billion that Equifax must spend will benefit all members of the class and, indeed, is historic.  *See* Klonoff Oct. 29 Decl. ¶ 29.

[133] Decl. of Mary Frantz ¶ 56 (Dkt. No. 739-7, Ex. 6).

just days ago, *Adkins v. Facebook, Inc.*[134]   There, the district court, over Facebook's strenuous opposition, certified an injunctive class under Rule 23(b)(2) in which plaintiffs seek to compel Facebook to "implement and maintain reasonable security measures," including testing by third-party security auditors and correction of "any problems or issues detected by such third-party security auditors."[135]   Under objectors' theory, if plaintiffs win the case, class counsel will be entitled to *nothing* in attorneys' fees because the relief benefits Facebook. Obviously, Judge Alsup, who certified the class, is not assuming that class counsel are working pro bono or that Facebook's opposition is a bluff, and that Facebook in fact wants to lose so it can implement a remedy that will benefit it.[136]

### b.  Lodestar Cross-Check

106.  In my prior Declaration, I argued that no lodestar cross-check should even be required, but that, if one is conducted, it only supports class counsel's fee request.  *See* Klonoff Oct. 29 Decl. ¶¶ 90–114.  No objector argues that a lodestar cross-check is mandated, or even explains why this case warrants such an approach

---

[134] No. 3:18-cv-05982-WHA, slip op. (N.D. Cal. Nov. 26, 2019) (Dkt. No. 261).

[135] *Id.* at 14.

[136] One objector argues that the *Camden I/Johnson* factors should not apply. *See* John Davis Obj. at 8.  The argument is frivolous; countless courts in this Circuit and others have applied those factors, and they are controlling law here. *See* Klonoff Oct. 29 Decl. ¶ 48.

given the reasonableness of the percentage fee being sought.   A number of objectors, however, dispute various aspects of the lodestar cross-check analysis.

107.  First, one objector contends that the multiplier that I derive from a cross-check (3.69, based only on time spent by class counsel through September 2019) is too high.[137]   But I provide extensive case law and discussion as to why that multiplier is reasonable (*see* Klonoff Oct. 29 Decl. ¶¶ 106–114), and no objector grapples with my analysis, let alone provides compelling contrary authority.

108. Second, one objector argues that the fee should not include *any* multiplier.[138]  But that argument ignores the substantial risk that class counsel took that they could end up recovering no fees or expenses.  *See* Klonoff Oct. 29 Decl. ¶ 107, 110.

109. Third, a small number of objectors complain about the lack of documentation for the hours claimed and the fact that more than 60 law firms have submitted time.[139]   To begin with, the argument for massive documentation runs counter to the notion that a cross-check is a limited process, not a full blown

---

[137] *See* Mikell West Obj. at 18–20.

[138] *See* George Cochran Obj. at 1.

[139] *See, e.g.*, Theodore Frank & David Watkins Obj. at 24–25; Mikell West Obj. at 20–21.

lodestar analysis.  *See* Klonoff Oct. 29 Decl. ¶ 94 n.120 (citing cases).  Courts have not required the same level of documentation for a cross-check that would be required when the lodestar is the primary method.  *See id.*  Moreover, while 60 law firms contributed time, the vast majority of time was submitted by a small number of senior lawyers.  *See id.* ¶¶ 96, 103.  In my prior Declaration, I explained why the case was managed efficiently and why the number of hours is reasonable .  *See id.* ¶¶ 95–97.

### c. Miscellaneous Arguments

110.  In addition to the above arguments, various objectors advance a hodgepodge of additional arguments.  None has merit.

111.  First, one objector argues that attorneys' fees should be calculated based on the number of claims that are ultimately made.[140]  This approach makes no sense.  To begin with, just the claims filed to date (more than 17.5 million, including over 3.7 million seeking credit monitoring) more than justify the fees sought.  Moreover, this settlement fund is non-reversionary, and will go entirely to the class (other than fees, expenses, and incentive payments).  For that reason, there is no reason to link attorneys' fees to the number of claims made.  The

---

[140] *See* Eugene Mannacio Obj. at 4 ("Th[e] fee [would] be determined and paid only after class member claims had all been submitted.").

suggestion is particularly ill-advised here, since many of the settlement's benefits will go to all class members, regardless of whether they file claims. *See* ¶¶ 18, 21; Klonoff Oct. 29 Decl. ¶¶ 28–29.

112. Second, one objector argues that the class notice is defective because it does not indicate the amount of attorneys' fees that are being awarded.[141]  That argument makes no sense.  Attorneys' fees have not yet been determined by this Court, so it would be impossible for the notice to provide that information.  The notice does, however, make clear that class counsel will request up to $77.5 million in attorneys' fees.[142]  The objector complaining about the notice could have reasonably assumed that class counsel would request the full $77.5 million and could have argued—but did not—that such an amount (or even a lower amount) is excessive.[143]

---

[141] *See* Chris King Obj. at 3–4.

[142] *See* Long-Form Notice at 13 (Dkt. No. 739-2, Ex. 7-A) ("Class Counsel will ask the Court to award them attorneys' fees of up to $77,500,000 and reimbursement for costs and expenses up to $3,000,000 to be paid from the Consumer Restitution Fund.").

[143] The lone case upon which the objector relies, *Carlson v. Xerox Corp.*, 355 F. App'x 523 (2d Cir. 2009), directly contradicts his position.  In *Carlson*, the Second Circuit *affirmed* the adequacy of a class notice setting forth—like the notice in the instant case—only the *maximum* amount of fees to be sought by class counsel.  The notice in *Carlson* stated:  "Plaintiffs' Counsel are moving the Court to award

113. Third, one objector argues that the settlement should have included a provision for attorneys' fees *on top of* the fund established to compensate class members.[144]  This objection is groundless.  There is no rule in common fund cases that fees should be paid separately rather than out of the fund.  Indeed, the common fund doctrine is well established, and countless cases have recognized that awarding fees from a fund is entirely fair and equitable.[145]  I know of no authorities holding that separate payment of attorneys' fees, as opposed to payment out of a common fund, is required to ensure that fees are reasonable.

### 4.  Challenges to Expenses and Incentive Payments

114.  **Expenses.**  One objector challenges expenses generally, asserting with no explanation that they are "too much."[146]  Another asserts that some expenses for research may be excessive or are not listed in sufficient detail.[147]  These conclusory arguments can be summarily rejected.  *See* ¶ 50 & n.50.  Indeed, these objectors do

---

attorneys' fees not to exceed twenty percent (20%) of the Gross Settlement Fund . . . ." *Id.* at 525.

[144] *See* Helen Coxhead Obj. at 1.

[145] *See, e.g.*, *Staton v. Boeing Co.*, 327 F.3d 938, 967 (9th Cir. 2003) ("[T]he common fund doctrine ensures that each member of the winning party contributes proportionately to the payment of attorneys' fees.").

[146] Brian Witt Obj. at 1.

[147] *See* Mikell West Obj. at 21.

not even address my argument (*see* Klonoff Oct. 29 Decl. ¶¶ 116–119), or those by

class counsel, as to why the expenses are reasonable.

115. **Incentive Payments.**   Some objectors challenge the incentive payments

sought.   I explained in detail why, under the case law, the incentive payments

sought are reasonable. *See id.*   ¶¶ 120–128.   None of the objections convinces me

otherwise.

116. First, one objector, relying on the Supreme Court cases from the 1800s,

argues that incentive payments to class representatives are prohibited.[148]   This

argument is frivolous.   Those cases, from over a century ago, pre-date Rule 23 and

do not address the precise question here.   As I noted (*see* Klonoff Oct. 29 Decl.

¶ 127), numerous courts have approved service or incentive awards to class

representatives, in many instances well above the $2,500 per representative sought

here.   It is absurd to argue that district courts and federal circuits throughout the

country have all been violating U.S. Supreme Court authority for many decades, or

that this Court should simply ignore this overwhelming authority.[149]

---

[148] *See* John Davis Obj. at 10–18.

[149] The objector states that "[t]he Eleventh Circuit presents a unique case" with
regard to whether incentive payments are permissible, citing its decision to grant
en banc review in *Muransky v. Godiva Chocolatier, Inc.*, 922 F.3d 1175, 1180
(11th Cir.), *reh'g en banc granted, opinion vacated*, 939 F.3d 1278 (11th Cir.

117.  Moreover, the argument is unsound as a matter of policy.  In small claims class actions, it would be next to impossible to recruit class representatives to do the heavy (and time consuming) lifting without the prospect of incentive payments. Serving as a representative requires extensive time and effort, including responding to discovery, reviewing pleadings, weighing in on settlement terms, and many other tasks.   Numerous courts have recognized the importance of incentivizing class representatives to undertake this important work.  *See* Klonoff Oct. 29 Decl. ¶ 122 & n.162.

118.  One objector challenges the proposed incentive payments on the ground that the entire case, in reality, is driven by class counsel and that the representatives are merely figureheads.[150]  That argument ignores the fact that real parties are needed to satisfy Article III, to make out the elements of the claim, to produce evidence, to respond to discovery, and to monitor the actions of counsel. The fact that the lawyers do the lion's share of the legal work does not negate the

---

2019).  The issue on en banc review, however, is not whether the court properly upheld the district court's award of a $10,000 incentive payment to the class representative, but rather whether the class representative had Article III standing. *See* Nathan Hale, *11th Circ. to Revisit FACTA Standing Issue in Godiva Suit*, LAW360 (Oct. 7, 2019), https://www.law360.com/articles/1206772/11th-circ-to-revisit-facta-standing-issue-in-godiva-suit.  Thus, the objector's position that the permissibility of incentive payments to class representatives is in doubt pending an en banc decision in *Muransky* is incorrect.

[150] *See* Shiyang Huang Obj. at 16–17.

fact that class representatives serve a crucial role and invest significant time and effort litigating the case.

119. At least one objector argues that class counsel have not presented sufficient evidence to support the proposed incentive payments.[151]  That argument is meritless.  Class counsel were tasked with merely justifying $2,500 per class representative, and their explanation of what these class members did is more than ample to justify this modest amount for each class member.[152]  As class counsel note, the representatives provided detailed information and personal records to aid in proving the impact of the breach, participated in individualized discovery, and communicated with class counsel through all stages of the litigation, including settlement negotiations.[153]

---

[151] *See* John Davis Obj. at 18–20 (arguing that, "[e]ven assuming arguendo that the requested service awards were not prohibited by Supreme Court precedent," they are improper because "Plaintiffs have not presented evidence sufficient to support the awards").  *But see* Troy Scheffler Obj. at 7 (challenging incentive payments for being too *small*, noting that "[t]he representatives got hosed in this case").

[152] *See* Supplemental Decl. from Class Counsel ¶ 52 (Dkt No. 858, Ex. 1).

[153] *See id*.  One objector, Ronald Gilliland, argues that incentive payments gave the class representatives here a financial stake not to oppose a settlement, even if they believed that it was deeply flawed.  *See* Ronald Gilliland Obj. at 3.  But this argument could be made in any case; yet courts often award incentive payments, in some instances in amounts much larger than the $2,500 awards requested here. Courts do so because, absent some factual basis, they assume that class

## VII.  CONCLUSION

120.  It is my opinion that the settlement is fair, reasonable, and adequate.  The objections submitted do not change my opinion.  Nor do the objections change my opinion that the attorneys' fees, expenses, and incentive payments sought by class counsel are reasonable.

---

representatives act with integrity.  Gilliland incorrectly assumes, without any foundation, that the individuals who have stepped up here to serve the class, and who have devoted significant effort to doing so, will sell out 147.4 million people just to reap $2,500 each.

* * *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct based on information known to me.

_____

Robert H. Klonoff

December 5, 2019