# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

|  |  |
|---|---|
| In re: Equifax Inc. Customer Data Security Breach Litigation | MDL Docket No. 2800<br>No. 1:17-md-2800-TWT<br><br>CONSUMER ACTIONS<br><br>Chief Judge Thomas W. Thrash, Jr. |

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS

Plaintiffs previously demonstrated that a $77.5 million fee, $1,248,033.46 in expenses, and $2,500 service awards are well-justified and equivalent to or below typical awards. (Doc. 858) That only 38 of 147.4 million class members (0.000026 percent or just 1 of every 3.9 million class members) objected to these requests is further evidence of their reasonableness. *See, e.g.*, *In re the Home Depot, Inc., Customer Data Sec. Breach Litig.*, 2016 WL 6902351, at *4 (N.D. Ga. Aug. 23, 2016) (objections from an "infinitesimal percentage" of the class "indicates strong support"). The small number of objections runs the gamut, but all lack merit. The requested fee, expenses, and service awards thus should be approved.

Most of the objectors (28 of the 38) refer to the requested fee in conclusory, albeit derogatory, terms or contend it is disproportionate based on a

misunderstanding of the settlement.[1] The others (mostly lawyers, including several with a history of filing meritless objections) claim the fee should be substantially less than the request – anything from zero to $45 million – for a variety of reasons, including that: (1) the lodestar, not percentage, approach should be used; (2) Equifax should pay the fee outside the fund; (3) the proposed percentage is too high and the class benefit is illusory; (4) Class Counsel faced no risk, did little work, and are piggybacking on regulators' efforts; and (5) the lodestar calculation is inflated because the rates are too high, the time is duplicative, and future time is not compensable. A few objections are also made to the expenses and proposed service awards. Each of these objections is addressed below.

## ARGUMENT

## I.     Most of the Objections Are Conclusory and Unsupported

Most objectors who mention legal fees in their objections do not expressly oppose Class Counsel's request, give no reason why the lawyers should be paid less, and fail to propose an acceptable amount. Rather, they simply comment negatively about the lawyers' compensation in general terms while voicing outrage about the

---

[1] Plaintiffs' exclude from their count of 38 fee objectors fifteen individuals who negatively referred to the payment of legal fees in the "personal note" section of the forms that were created online using a "chat-bot" and submitted *en masse* by Class Action, Inc. The validity of these "objections" has not yet been determined.

breach and those responsible; anger they will not receive the $125 payment they were allegedly promised; or ad hominem attacks on all those involved in this case, including the Court.[2] These objections are conclusory, bereft of legal support, and thus can be rejected without substantive analysis. *See, e.g., In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 909 F. Supp. 2d 259, 264 n.3 (S.D.N.Y. 2012).

More substantive are good faith objections that the requested fee dwarfs the amount received by individual class members. Typical of these objectors, Barbara Braid states: "I get a measly $125. I understand the attorneys in this matter will be receiving $80 million. Does this seem fair?" This objection and the others like it misconstrue the purpose of a class action, which is to make relatively small claims economically viable by spreading the litigation costs among a large group. The proper comparison is not between the lawyers' fees and any one individual's recovery, but the recovery for the class as a whole.

---

[2] Examples include Lee Adams ("Equifax moves on doing business as usual, the lawyers get their payday and regular people like me get screwed"); Evan Goldfine ("It seems like the attorneys are lining their pockets and the class is getting the short end of the stick"); and Grace Fryberger ("The Court, their entire bureaucracy [and] the network of seven-figure settlement attorneys … will be paid handsomely, even as we are not"). The fifteen chat-bot "objections" all fall into this category.

A similar, but equally flawed, objection is that the fee should be limited to the $31 million allegedly set aside to pay claims. This objection reflects a misunderstanding of the settlement. The benefit, including the cash distributions, *is* substantially more than the requested fee, which is why Class Counsel seek a percentage of the fund. Claims are not limited to $31 million. The entire $380.5 million fund (and up to $125 million more) will be used to benefit the class, including paying claims in cash for out of pocket losses, time, and alternative compensation and purchasing credit monitoring and identity restoration services. There is a $31 million cap for alternative compensation, but the cap will be lifted and a supplemental distribution made at the end of the extended claims period if funds are left over after all out of pocket claims have been paid.

## II.    Binding Precedent Requires Use of the Percentage Method

John Davis argues the fee must be calculated using the lodestar method because he disagrees with *Camden I Condo Ass'n v. Dunkle*, 946 F.2d 768 (11th Cir. 1991) and claims the case is no longer good law in light of *Perdue v. Kenny A. ex rel. Winn*, 579 U.S. 542 (2010). (Doc. 879-1 at 6-10) This argument is frivolous.[3]

---

[3] Three years ago, a federal magistrate judge rejected the same argument by Mr. Davis, and, in so doing, labeled him and others as "professional objectors who threaten to delay resolution of class action cases unless they receive extra compensation." *Muransky v. Godiva Chocolatier*, 2016 WL 11601079, at *3 (S.D. Fla. Sept. 16, 2016).

*Camden I* is binding precedent. *Perdue*, which construes a fee-shifting statute, does not apply to fees in a common fund case. *In re Home Depot, Inc. Customer Data Security Breach Litig.*, 931 F.3d 1065, 1084-85 (11th Cir. 2019).

## III.   That the Fee Will Be Paid Out of the Fund is Not Objectionable

Several class members do not object to the fee amount, but to its payment from the settlement fund. According to these objectors, the Court should punish Equifax by ordering the company to pay the fees separately. But this Court cannot order Equifax to pay more. *See, e.g., Howard v. McLucas*, 597 F. Supp. 1504, 1506 (M.D. Ga. 1984) ("[T]he court's responsibility to approve or disapprove does *not* give this court the power to force the parties to agree to terms they oppose") (emphasis in original), *rev'd in part on other grounds*, 782 F.2d 956 (11th Cir. 1986). And, having created a common fund, Class Counsel are entitled to be paid from the fund. That is the purpose of the common fund doctrine, spreading the litigation costs proportionately and preventing those who benefit from being unjustly enriched. *See, e.g., Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).

## IV.   The Requested Fee is Justified Under the Percentage Method

Two objections – one by Christopher Bandas[4] and Jerome Froelich and one

---

[4] Mr. Bandas is a notorious serial objector, has a long history of unethical conduct, and is subject to an injunction restricting his firm's ability to object in class actions. (App. 1, ¶¶ 61-62) *See, e.g., Clark v. Gannett Co.*, 122 N.E. 3d 376, 380 (Ill. Ct.

on behalf of Ted Frank and David Watkins – claim the fee should be limited to 10% of the cash benefit. Because they disagree about the benefit amount, one says the fee should be $31 million and the other says it should be $16.27 million. (Doc. 880 at 14; Doc. 876 at 24) Neither is correct.

## A.    The Fee Should Not be Limited to 10% of the Class Benefit

In *Camden I*, the Eleventh Circuit noted that fees typically range from 20 to 30%, suggested the benchmark is 25%, and directed district courts to select the appropriate percentage based on the *Johnson* factors and the facts of the case. 946 F.2d at 774-75. Ignoring most of the *Johnson* factors, Mr. Bandas and Frank/Watkins wrongly argue that 10% is justified here because Class Counsel faced little risk; the case settled in less than two years; the non-monetary benefit is illusory; and awards in other "megafund" cases do not support a higher percentage.

### (1)    Class Counsel Faced Substantial Risk

Frank/Watkins argue that a 10% fee is "more than fair" in this case given its "minimal risk" as evidenced by the fact that over 40 lawyers applied for leadership

---

App. 2018) (Bandas has "earned condemnation of [his] antics from courts around the country. Yet, [his] obstructionism continues.") Mr. Froelich has worked with Mr. Bandas twice in unsuccessfully objecting to fees in this district. In one of the cases, Mr. Bandas was accused of unethical conduct, *Markos v. Wells Fargo Bank, N.A.*, Case No. 1:15-cv-01156-LMM (Doc. 61), although the motion was later withdrawn. *Id.*, 2017 WL 416425, at *4 n. 3 (N.D. Ga. Jan. 30, 2017).

positions. (Doc. 876 at 19) That claim makes little sense. Lawyers' willingness to apply for leadership hardly means success was assured (or that a similar number would have applied if they had known the potential for a substantial fee would be limited). Regardless of the number of applications, this was undeniably a risky case when filed and is even riskier today, particularly in light of the Georgia Supreme Court's recent decision in *McConnell*. (App. 3, ¶ 23; Doc. 858-2, ¶ 52) Indeed, just last week, in another data breach case, a court ruled a plaintiff could not represent a (b)(3) class because he "incurred zero out-of-pocket expenses as a result of this breach" and could not recover merely for a "*risk* of future identity theft". *Adkins v. Facebook, Inc.*, No. 3:18-cv-05982-WHA, slip op.at 12 (N.D. Cal. Nov. 26, 2019) (Doc. 261) (emphasis in original). If the settlement is not approved and litigation resumes, a similar ruling would leave most class members without a remedy. And that is only one of the many remaining legal hurdles. The reality is data breach litigation remains uncertain and underdeveloped, making it far riskier than other consumer class actions. This argument should be rejected.

### (2) The Percentage Should Not Be Reduced Because the Case Settled in Less than Two Years

Mr. Bandas' claim that a lower percentage is required because the case settled early flies in the face of the judicial policy favoring early settlements and would undercut a major justification for the percentage approach, which is to align the

interests of the class and their counsel. *See, e.g.*, *In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d 1330, 1349, 1362 (S.D. Fla. 2011); *Mashburn v. Nat'l Healthcare, Inc.*, 684 F. Supp. 679, 690-91 (N.D. Ala. 1988) (one goal of using the percentage approach is to encourage early settlement). For that reason, Judge May recently rejected the same argument made by Mr. Bandas in another case, stating:

> Judicial economy encourages efficiency and discourages litigation for the sole purpose of driving up fees. The mere fact that the parties were able to reach an excellent settlement quickly should not work as a penalty to Class Counsel.

*Markos v. Wells Fargo Bank, N.A.*, 2017 WL 416425, at *4. So should this Court.

### (3)     The Non-Monetary Benefits Support a Larger Percentage

Under the percentage approach, "courts compensate class counsel for their work in extracting non-cash relief from the defendant in a variety of ways." *In re Checking*, 2013 WL 11319244, at *12 (S.D. Fla. Aug. 2, 2013). If the non-monetary relief can be reliably valued, courts can include such relief in the fund and award counsel a percentage of the total. *Id.*; *George v. Acad. Mortgage Corp. (UT)*, 369 F. Supp. 3d 1356, 1379-80 (N.D. Ga. 2019); *see also Poertner v. Gillette Co.*, 618 Fed. Appx. 624, 628-29 (11th Cir. 2015), *cert. denied sub nom.*, *Frank v. Poertner*, 136 S.Ct. 1453 (2016). If it cannot be reliably valued, such relief is a factor in selecting the right percentage. *See, e.g.*, *Camden I*, 946 F.2d at 774.

Consistent with the foregoing authority, the value of the non-monetary benefits in this case can either be added to the cash fund, as discussed below, or taken into account by increasing the percentage that otherwise would be used. Mr. Bandas and Frank/Watkins, nonetheless, urge this Court to disregard the non-monetary benefits almost entirely because those benefits allegedly are of little value. This Court should not do so. *See, e.g.*, *Poertner*, 618 Fed. Appx. at 630 (rejecting a similar objection by Mr. Frank because he disregarded the settlement's substantial non-monetary benefits, which he wrongly claimed were illusory).

The objectors blithely write-off Class Counsel's historic achievement in obtaining sweeping injunctive relief and requiring Equifax to spend $1 billion on data security and related technology, contending it has no value whatsoever because Equifax is the real beneficiary and only agreed to those terms to avoid litigation risk. (Doc. 876 at 24 n. 5; Doc. 880 at 17) That contention is nonsense.

Courts routinely compensate class counsel for obtaining similar business practice changes.[5] *See, e.g.*, *In re Anthem Inc. Data Breach Litig.*, 2018 WL

---

[5] Both objectors wrongly rely on *Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071, 1079 (9th Cir. 2017). In that case, the court noted "the settlement's injunctive relief is worthless to most members of the class" and merely required the defendant to do what it was already doing. In contrast, the injunction in this case benefits every class member, requires massive changes, compliance will be independently verified, and non-compliance is subject to the Court's enforcement powers.

3960068, at *28 (N.D. Cal. Aug. 17, 2018) (mandatory minimum expenditure for cybersecurity was "properly considered in determining an appropriate attorneys' fees award"); *Ingram v. The Coca-Cola Co.,* 200 F.R.D. 685, 689-90 (N.D. Ga. 2001) (programmatic changes to reduce racial discrimination supported an upward adjustment from the benchmark); *see generally Home Depot*, 2016 WL 6902351, at *4 (two years of enhanced cybersecurity measures was a valuable class benefit).

That Equifax may also benefit makes no difference. Defendants almost always benefit by doing the right thing (just as they presumably benefit by paying cash in exchange for a release). The key question is whether the class is better off. In this case, that is undeniable as the business practice changes will immediately benefit all class members by reducing the risk of another breach. And, according to a top cybersecurity expert, Equifax's commitment to spend $1 billion will ensure adequate funding to secure class members' personal information long after this case is resolved. (Doc. 739-7, ¶ 56) Similarly, that Equifax agreed to avoid litigation risk does not mean Class Counsel have no entitlement to a fee; rather, Equifax's motivation is what triggers Class Counsel's entitlement. *See Poertner,* 618 Fed. Appx. at 629 (rejecting a similar objection by Mr. Frank and holding that the defendant's business practice changes were a settlement benefit because the changes were "motivated by the litigation").

Furthermore, neither Mr. Bandas nor Frank/Watkins properly account for the credit monitoring offered to class members. Mr. Bandas does not recognize it has any value beyond the cost to be paid from the fund for the first seven million claims. Frank/Watkins argue it is not even worth that, asserting its true value is only $15 million ($5 per class member multiplied by the roughly three million claims made to date) because free credit monitoring is widely available and class members prefer alternative compensation. According to Frank/Watkins, Class Counsel should only receive $1.5 million (10% x $15 million) for achieving that benefit. (Doc. 876 at 23) Both objectors are wrong.

The high quality credit monitoring offered here is far better than the free or low-cost services typically available. (App. 6) Moreover, courts have often recognized the benefit of credit monitoring, use its retail cost as evidence of value, and consider that value in awarding fees. *See, e.g., Chakejian v. Equifax Info. Servs., LLC*, 275 F.R.D. 201, 218 (E.D. Pa. 2011) (overruling an objection that the settlement offered "worthless credit monitoring services that no one wants" and valuing the services at their retail price in awarding a fee); *In re TJX Companies Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395, 409 (D. Mass. 2008) (the class-wide, $177 million retail value of the credit monitoring afforded by a settlement was used "as a benchmark against which to measure the award of attorneys' fees"); *Home*

*Depot*, 2016 WL 6902351, at *4; *Hutton v. Nat'l. Bd. of Exam'rs in Optometry, Inc.*,

2019 WL 3183651, at *7 (D. Md. Jul. 15, 2019); *Hillis v. Equifax Consumer Servs.,*

*Inc.*, 2007 WL 1953464, at *4 (N.D. Ga. June 12, 2007); *Anthem*, 2018 WL 3960068,

at *11. Objectors cite no contrary cases.[6]

### (4)    Other "Megafund" Awards Support the Requested Fee

Mr. Bandas and Frank/Watkins also argue that a 10% fee is merited because

this is a "megafund" settlement – usually defined as a settlement in excess of $100

million – and 10% allegedly is in line with typical awards in such cases. (Doc. 876

at 17-19; Doc. 880 at 12-15) However, the requested fee is only about 1% of the

roughly $6 billion in benefits that have already been claimed (Doc. 858-1, ¶ 30); if

Class Counsel were awarded 10% of those benefits, the fee would be much larger

than requested. Moreover, the assertion that the requested fee does not account for

the settlement size is off-base. Even calculated at 20.36% of the cash fund, empirical

---

[6] *Anthem* does not support the claim that credit monitoring is essentially worthless. While Judge Koh declined to include in the fund the class-wide, retail value of the credit monitoring offered by the settlement because "retail price is at best an inexact match to the actual value," she found that it was "certainly worth more to individual Settlement Class Members than the discounted rate paid for the services in bulk" and, as a result, considered its value to be a "relevant circumstance" in justifying a 27% award. *Anthem*, 2018 WL 3960068, at *7, 11; *see also Anthem*, 327 F.R.D. 299, 323 (N.D. Ca. 2018) ("the Court does not agree that the credit monitoring services under the settlement are of minimal value").

studies show that the request already is substantially below the 30% average award in the Eleventh Circuit. (Doc. 858-2 at 62 and n. 97; App. 3, ¶ 14)

No rule requires a decreased percentage in a megafund case. *See, e.g., In re AT&T Corp. Sec. Litig.*, 455 F.3d 160, 174 (3rd Cir. 2006) (awards in other megafund cases is only one factor in the fee analysis); (Doc. 858 at 20-21) (citing cases critical of reducing fees in megafund cases). Under *Camden I*, this Court must base its award on all of the *Johnson* factors, not just awards in similar cases. Other relevant factors support using a percentage above the benchmark in this case, including the value of relief, Class Counsel's skill and reputation, the customary fee, the risk presented, and the non-monetary benefits. (Doc. 858 at 13-21) These factors more than balance out any decrease that would otherwise be justified by the settlement's size. (App. 3, ¶¶ 13-19)

The objectors are also wrong about the percentage typically awarded in megafund cases. Indeed, in *Anthem,* the court surveyed awards in other large settlements and concluded: "***a percentage of 27% appears to be in line with the vast majority of megafund settlements***." *Anthem*, 2018 WL 3960068, *15-16 (emphasis added). Mr. Bandas and Frank/Watkins ignore this finding, even as they rely on *Anthem* for other purposes. Instead, the objectors cite three sources as support for using 10% – a 2010 empirical study and two older cases from this district, one

decided over 25 years ago. *See* T. Eisenberg and G. Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 Journal of Empirical Legal Studies 248 (2010); *Carpenters Health & Welfare Fund v. The Coca-Cola Co.*, 587 F. Supp. 2d. 1266 (N.D. Ga. 2008); *In re Domestic Air Transport Antitrust Litig.*, 148 F.R.D. 297, 350-51 (N.D. Ga. 1993).

The study does not help the objectors. At Plaintiffs' request, one of its authors, Professor Geoffrey Miller of NYU Law School, reviewed the two objections. Based on his experience and empirical data, including a more recent study he co-authored in 2017, Professor Miller concluded the requested percentage is supported by the *Johnson* factors and consistent with similar megafund awards. (App. 3, ¶¶ 13-19, 29) Professor Miller also concluded that the statistics cited by the objectors are "pulled down" by the inclusion in the data set of much larger settlements and thus are not directly comparable to the requested fee. Isolating the similarly-sized settlements in the data (settlements from $325 million to $425 million), he determined the mean percentage in those cases was 19.7%. (*Id.* ¶¶ 16-17) That percentage, as he notes, is "remarkably close" to the 20.36% Class Counsel are requesting. (*Id.,* ¶ 17) According to Professor Miller, the objectors' argument is also flawed because it fails to account for risk and non-monetary benefits, which statistically justify a larger fee. (*Id.*, ¶¶ 22-28)

The two cases the objectors cite also are not much help to their argument. In *Domestic Air*, Judge Shoob awarded 5.25% (the percentage plaintiffs' counsel requested in that case) of a $305 million fund, relying on pre-1991 research showing that fees of 6 to 10% were then common in megafund cases. 148 F.R.D. at 351-52. There is no need for this Court to rely on pre-1991 research when more recent studies are available. In *Carpenters Health & Welfare Fund*, Judge Hunt awarded 21% of a $137.5 million fund, basing his award on an analysis of other megafund settlements he identified. 587 F. Supp. 2d. at 1271-72. His finding that 21% was typical suggests the data relied upon by Judge Shoob was outdated, even in 2008, and further supports the requested fee. Indeed, 21% is more than the percentage of the minimum cash fund requested here.

**B.     The Percentage Should Be Applied To the Entire $380.5 Million Settlement Fund and the Value of the Non-Monetary Benefits**

Mr. Bandas and Frank/Watkins also argue the percentage should not be applied to the entire $380.5 million settlement fund. Both exclude the $70.5 million added to the original deal Class Counsel negotiated because the extra money allegedly did not result from their efforts. Frank/Watkins also exclude the costs of notice and administration, the cost of purchasing credit monitoring, and most other benefits. And, both objectors exclude all non-monetary benefits. These arguments should be rejected.

### (1)    Class Counsel Should Be Compensated for Their Efforts in Securing the Additional $70.5 Million to the Fund

The claim that Class Counsel had nothing to do with adding $70.5 million to the settlement pot is contradicted by the record. The extra $70.5 million did not come about simply because the regulators told Equifax to pay it and Equifax agreed, all without any additional work by Class Counsel. Rather, the regulators and Equifax negotiated a "take-it-or-leave it" package of proposed changes that included the extra money, but also potentially made class members worse off. Class Counsel spent months negotiating with Equifax on these changes, and then with both Equifax and the regulators, so that the increased funds could be incorporated without adversely impacting the class. (Doc. 858-1, ¶¶ 18-19) If Class Counsel had not been so diligent, adding the extra money could have triggered objections, jeopardized the settlement's approval, and reduced the compensation for some class members. (App. 1, ¶ 18)

Furthermore, successfully resolving those problems did not ensure that the extra money would be available. That is because Equifax refused to execute the settlement until and unless it also reached separate agreements with the regulators, which it wanted to announce as part of a "global resolution," but Equifax was having difficulty reaching such agreements. Class Counsel forced the issue by setting a deadline and threatening to move to enforce the binding deal reflected in the term

sheet. Equifax signed the class action settlement shortly before the deadline was to expire. In all likelihood, had Class Counsel not set the deadline, the extra money would have never been obtained for the class. (*Id.*, ¶¶ 20-21)

Thus, without minimizing the role played by the regulators, Class Counsel share responsibility for increasing the size of the settlement fund and should be compensated for their efforts. *See Wal-Mart Stores, Inc. v. VISA U.S.A., Inc.,* 396 F. 3d 96, 122 (2d Cir. 2005) (that "the Government piggybacked off of plaintiffs' counsel's work" was a factor that justified an "extraordinary fee"). To do otherwise would significantly penalize Class Counsel. During the four month period after they executed the Term Sheet and were preoccupied by negotiating with Equifax and the regulators, Class Counsel spent 4,884 hours valued at over $3.5 million. (App. 1, ¶ 22)

**(2)    Notice and Administration Costs Should Not Be Excluded**

It has long been the practice in this Court to use the gross amount of a common fund in calculating a percentage-based fee award without deducting the costs of notice or administration. *See, e.g., George,* 369 F. Supp. 3d at 1366, 1375 (calculating fee on gross fund); *Home Depot,* 2017 WL 9605207, at *2 (N.D. Ga. Oct. 11, 2017), *rev'd in part on other grounds,* 931 F. 3d 1065 (11th Cir. 2019) (including administration costs in calculating the class benefit); *Champs Sports Bar*

*& Grill Co. v. Mercury Payment Systems, LLC*, 275 F. Supp. 3d 1350, 1356 (N.D. Ga. 2017) (fee paid from gross fund); *In re Domestic Air*, 148 F.R.D. at 354; *see also In re Arby's Restaurant Group, Inc. Data Security Litig*., 2019 WL 2720818, at *2 (N.D. Ga. June 6, 2019) (including notice and administration claims in the class benefit even though paid separately by the defendant). That is because notice and administration costs inure to the benefit of the class. *Id*.

The argument that notice and administration costs should be excluded has been routinely rejected. *See, e.g., In re Domestic Air,* 148 F.R.D. at 354*; In re Online DVD-Rental Antitrust Litig.,* 779 F.3d 934, 953 (9th Cir. 2015); *Caliguiri v. Symantec Corp*., 855 F.3d 860, 865 (8th Cir. 2017); *Anthem*, 2018 WL 3960068, at *8-9.[7] For example, in *Anthem*, more than 50 million class members were notified,

---

[7] The main case on which Frank/Watkins rely, *Redman v. RadioShack Corp.*, 768 F.3d 622, 630 (7th Cir. 2014), is readily distinguishable. *Redman* involved a coupon settlement, the proposed fee could be justified only by including notice and administration in the class benefit, and the court was concerned that class counsel thus would have a "perverse" incentive to increase those costs to justify a larger fee. This settlement does not include coupons, costs will be paid from a non-reversionary fund, there is an additional $125 million to pay out-of-pocket claims if the fund is exhausted, and Class Counsel selected the providers after a competitive bidding process. Moreover, adopting the *Redman* approach on these facts would incentive counsel to cut corners on notice and administration, hurting the class by lowering its awareness and participation and hindering the claims process. Unsurprisingly, other courts have declined to follow *Redman*. *See, e.g., Keil v Lopez,* 862 F.3d 685, 704 (8th Cir. 2017); *McDonough v. ToysRUs, Inc.,* 80 F. Supp. 3d 626, 654 n.27 (E.D Pa. 2015).

more than a million complex claims processed, and a call center with live operators was set up to answer class members' questions – all at a cost of roughly $23 million. The court overruled an objection to including the costs in the fund because the class allegedly did not benefit from these activities, explaining that the costs were critical to ensure class members were aware of the settlement and their claims were processed in a meaningful and significant way. *Id.* This Court should reject the argument for the same reason.

Indeed, there is another good reason for rejecting the argument here. Because an additional $125 million is available to pay out of pocket claims, notice and administration costs will not diminish the fund except in the unlikely event that both the fund and the extra $125 million are exhausted.

### (3) No Other Deductions Are Appropriate

Frank/Watkins further contend that much of the rest of settlement fund (even after deduction of the $70.5 million extra money and notice and administration costs) has no value to the class and thus cannot be used to support the requested fee. According to Frank/Watkins, the true size of the fund for fee purposes is only $162.74 million, which they calculate as follows: "$38M (cash for out-of-pocket) + $31M (alternative cash) + $15M (credit monitoring at $5 x 3M class members …) + $78.74M requested fees)". (Doc. 876 at 23-24) This calculation misrepresents the

settlement terms and otherwise makes no sense.[8]

The entire settlement fund (minus fees, expenses, services awards, notice and administration costs, and the cost of purchasing credit monitoring and identity restoration services) will be used to pay cash benefits to the class. The objectors make it appear otherwise only through a not-so-subtle sleight of hand. The settlement does not cap out of pocket claims at $38 million. That cap only applies to claims for time. The amount available for out of pocket claims is uncapped; and, as noted, if the $380.5 settlement fund is insufficient, Equifax will add another $125 million. The $38 million cap for time and the $31 million cap for alternative compensation also ensure that sufficient funds are available to pay out of pocket claims. If, at the end of the extended claims period, there is money remaining in the fund after all out of pocket claims have been paid, the caps will be lifted and a supplemental distribution made.

This is not the first time Mr. Frank has claimed a proposed fee is too big by distorting a settlement's benefits and disregarding the non-monetary relief. Mr. Frank did the same thing in another recent case and his objection was squarely rejected by the Eleventh Circuit, which explained:

---

[8] Frank/Watkins do not explain why they include in their calculation the requested fee plus expenses ($78.74 million). While Plaintiffs agree that the fee and expenses benefit the class, the objectors dispute the amount of the requested fee.

> Frank claims that the settlement is unfair because class counsel's slice of the settlement pie is too large (i.e., the fees-and-costs award is unreasonable). But this objection is based on Frank's flawed valuation of the settlement pie: limiting the monetary value to the amount of [the defendant's] actual payments to the class along with excluding the substantial nonmonetary benefit … .

*Poertner*, 618 Fed. Appx. at 630.  His objection here is even more flawed because he is so wrong about the relief.

### (4)    The Value of Non-Monetary Benefits Should be Included

As noted above, courts consider the non-monetary relief "part of the settlement pie" when it can be reliably valued. *Poertner*, 618 Fed. Appx. at 628; *see, e.g., George,* 369 F. Supp. 3d at 1379-80; *In re Checking,* 2013 WL 11319244, at *12. No objector contends the injunctive relief is worth less than the $1 billion that Equifax minimally must spend; the only objection is that Equifax also benefits, which for reasons already described is irrelevant. Similarly, the right to claim ten years of credit monitoring can be readily valued at its retail value, as other courts have done. *See* Section IV.A.(3), *supra.* Considering the $1 billion in injunctive relief and the nearly $6 billion in credit monitoring claims already made, the percentage used to calculate the requested fee is quite modest.[9] (Doc. 858 at 12)

---

[9] Even if, as Frank/Watkins claim, the credit monitoring is worth only $5 per class member, that value justifies the requested fee. Using their valuation, the potential class-wide benefit is $735 million ($5 x 147 million). Under longstanding Eleventh Circuit precedent, the potential class-wide benefit, not just the amount claimed by

## V.    Objections to Class Counsel's Lodestar Should Be Rejected

No objector argues that a lodestar cross-check is mandated, or even explains why this case warrants a cross-check given the reasonableness of the percentage fee being sought. (App. 2, ¶ 106) Several objectors, however, dispute various aspects of the cross-check analysis. None succeeds.

One objector contends hourly rates should be capped at $500 because most ordinary people earn minimum wage or less than $20 an hour. The proper comparison, though, is to the prevailing rates in the legal community. By that standard, Class Counsel's rates are reasonable. (Doc. 858-2, ¶¶ 98-103)

Several objectors challenge Class Counsel's time, claiming it is inflated and duplicative, and demand that the Court closely examine the time records and order them to be produced for review by the class. A lodestar cross-check, however, does not require that time records be scrutinized or even reviewed. *E.g., Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000) ("[U]sed as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court. Instead, the reasonableness of the claimed lodestar can be tested by

_____

individual class members, is used to calculate the fee. *See, e.g. Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1295-97 (11th Cir. 1999); *Poertner*, 618 Fed. Appx. at 628-29 & n. 2. The value of credit monitoring alone thus would support a $73.5 million fee, even at just 10%.

the court's familiarity with the case."); *In re Checking,* 2013 WL 11319244 at *14 (declining to review billing records). Of course, the Court already has the records and can do whatever review is appropriate, but ordering the records be made public would serve no good purpose. Class Counsel have demonstrated the case was handled efficiently; they followed a strict protocol to prevent and disallow unauthorized time; 95% of the lodestar was incurred by the leadership firms, and other firms' time properly was limited to working with their clients, all named representatives. (Doc. 858-1, ¶¶ 44-47; Doc. 858-2, ¶¶ 95-97)

One objector claims that estimated future time cannot be considered. Yet, other courts have included future time in lodestar calculations (Doc. 858-2, ¶ 104), including this Court in the financial institutions track of the *Home Depot* data breach case. *See Home Depot*, 2017 WL 9605207, *1 (N.D. Ga. Oct. 11, 2017), *aff'd in part and rev'd in part*, 931 F.3d 1065, 1082 (11th Cir. 2019) (awarding the requested lodestar); (*Id.*, Doc. 336 at 2) (showing the requested lodestar included future time). This makes good sense. A cross-check does not involve "mathematical precision." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306 (3rd Cir. 2005). And, if the fee was lodestar-based Class Counsel would be entitled to file supplemental applications for future time. *See Cassese v. Washington Mut., Inc.*, 27 F. Supp. 3d 335, 339 (E.D.N.Y. 2014). Excluding future time thus would misapply the lodestar

methodology and needlessly penalize Class Counsel.

Finally, several objectors argue the proposed multiplier is too high and one claims *Perdue* bars the use of any multiplier. But Class Counsel have demonstrated that the multiplier is reasonable and within the typical range, even though multipliers tend to increase with a settlement's size.[10] (Doc. 858 at 24; Doc. 858-1, ¶¶ 104-14; App. 3, ¶ 21) *Perdue* is irrelevant in a common fund fee analysis. *See Home Depot*, 931 F.3d at 1084-85.

## VI.  Reimbursement of Class Counsel's Expenses

Two objectors challenge Class Counsel's expenses.[11] One says the total is simply "too much." The other speculates some computerized research charges might be overbilled and complains that the "miscellaneous" expense category is not broken down. Such vague assertions and speculation do not overcome the sworn testimony in the record that all of their expenses were reasonable. (Doc. 858 at 24; Doc. 858-1, ¶ 50; Doc. 858-2, ¶¶ 116-18; Doc. 858-3, ¶ 46)  Moreover, all the expenses are

---

[10] As explained in Class Counsel's supporting declaration, the current multiplier is approximately 3.5, and Class Counsel expects its final multiplier will be approximately 2.7. (App. 1, ¶ 73) Updated time summaries will be provided immediately prior to the fairness hearing.

[11] In connection with the fee application, Class Counsel reported that they had reasonably and necessarily incurred $1,248,033.46 in expenses. Class Counsel have reasonably and necessarily incurred an additional $42,002.70 in expenses, bringing the total requested expenses as of this filing to $1,290,036.16. (App. 1, ¶ 74) Updated expense figures will be provided immediately prior to the fairness hearing.

detailed in Class Counsel's *in camera* submissions.

## VII.  The Service Awards Are Appropriate

Mr. Davis, the serial objector, contends the longstanding practice of compensating class representatives for their service is prohibited by two Supreme Court cases from the 1800s. The argument has been rejected out of hand because the cases were decided before Rule 23 and involve different facts and circumstances. *See, e.g., Merlito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 96 (2d Cir. 2019). Mr. Davis also suggests each class member must document the specific amount of time they spent. This suggestion is meritless. (App. 2, ¶ 19) Class Counsel have sufficiently described the nature of their service. (Doc. 858-1, ¶ 52) Further evidence is unnecessary, particularly given the modest sums involved. *See, e.g., Home Depot,* 2016 WL 11299474, at *1 (N.D. Ga. Aug. 23, 2016) (awarding modest service awards to 88 class representatives based on a similar description of their service by their counsel).

## CONCLUSION

For the reasons set forth above and in their opening brief, Plaintiffs request that their motion for fees, expenses, and services awards be granted.

Dated: December 5, 2019  Respectfully submitted,

/s/ Kenneth S. Canfield
Kenneth S. Canfield
Ga Bar No. 107744
**DOFFERMYRE SHIELDS
CANFIELD & KNOWLES, LLC**
1355 Peachtree Street, N.E.
Suite 1725
Atlanta, Georgia 30309
Tel. 404.881.8900
kcanfield@dsckd.com

/s/ Amy E. Keller
Amy E. Keller
**DiCELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street
Eleventh Floor
Chicago, Illinois 60602
Tel. 312.214.7900
akeller@dicellolevitt.com

/s/ Norman E. Siegel
Norman E. Siegel
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Tel. 816.714.7100
siegel@stuevesiegel.com

***Consumer Plaintiffs' Co-Lead Counsel***

*/s/ Roy E. Barnes*

Roy E. Barnes
Ga. Bar No. 039000
**BARNES LAW GROUP, LLC**
31 Atlanta Street
Marietta, Georgia 30060
Tel. 770.227.6375
roy@barneslawgroup.com

David J. Worley
Ga. Bar No. 776665
**EVANGELISTA WORLEY LLC**
8100A Roswell Road Suite 100
Atlanta, Georgia 30350
Tel. 404.205.8400
david@ewlawllc.com

***Consumer Plaintiffs' Co-Liaison
Counsel***

Andrew N. Friedman
**COHEN MILSTEIN SELLERS &
TOLL PLLC**
1100 New York Avenue, NW, Suite 500
Washington, D.C. 20005
Tel. 202.408.4600
afriedman@cohenmilstein.com

Eric H. Gibbs
**GIRARD GIBBS LLP**
505 14th Street
Suite 1110
Oakland, California 94612
Tel. 510.350.9700
ehg@classlawgroup.com

James Pizzirusso
**HAUSFELD LLP**
1700 K Street NW Suite 650
Washington, D.C. 20006
Tel. 202.540.7200
jpizzirusso@hausfeld.com

Ariana J. Tadler
**TADLER LAW LLP**
One Penn Plaza, 36th Floor
New York, New York 10119
Tel. 212.946.9453
atadler@tadlerlaw.com

John A. Yanchunis
**MORGAN & MORGAN COMPLEX
LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Tel. 813.223.5505
jyanchunis@forthepeople.com

William H. Murphy III
**MURPHY, FALCON & MURPHY**
1 South Street, 23rd Floor
Baltimore, Maryland 21224
Tel. 410.539.6500
hassan.murphy@murphyfalcon.com

Jason R. Doss
Ga. Bar No. 227117
**THE DOSS FIRM, LLC**
36 Trammell Street, Suite 101
Marietta, Georgia 30064
Tel. 770.578.1314
jasondoss@dossfirm.com
***Consumer Plaintiffs' Steering
Committee***

Rodney K. Strong
**GRIFFIN & STRONG P.C.**
235 Peachtree Street NE, Suite 400
Atlanta, Georgia 30303
Tel. 404.584.9777
rodney@gspclaw.com

*Consumer Plaintiffs' State Court*
*Coordinating Counsel*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this reply brief was prepared in compliance with Local

Rules 5.1 and 7.1.

*/s/ Roy E. Barnes*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed with this Court via its

CM/ECF service, which will send notification of such filing to all counsel of record.

This 5th day of December, 2019.

> */s/ Roy E. Barnes*
> **BARNES LAW GROUP, LLC**
> 31 Atlanta Street
> Marietta, Georgia 30060
> Tel.770.227.6375
> roy@barneslawgroup.com