## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| In re: Equifax Inc. Customer Data Security Breach Litigation | MDL Docket No. 2800<br>No. 1:17-md-2800-TWT<br><br>CONSUMER ACTIONS<br><br>Chief Judge Thomas W. Thrash, Jr. |

## PLAINTIFFS' RESPONSE TO OBJECTIONS TO THE SETTLEMENT

Consumer Plaintiffs, through Consumer Plaintiffs' Lead Counsel, respectfully file this response to the objections filed by settlement class members. Even after a sustained effort by a handful of lawyers to drum up objections based on misleading or incorrect information, there are relatively few objections to this historic settlement. As explained in this response, the objections fail to establish the settlement is anything other than "fair, adequate and reasonable." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984).

Of approximately 147.4 million class members, at most 1,106 submitted objections—or, approximately 0.00075% of the class. A majority of those objections were received on two occasions following the promotion of false information in the national press. The first sizeable batch appeared after a *New York Times* opinion

piece encouraged class members to object based on the inaccurate assertion that the settlement included only $31 million to pay claims.[1] The second—718 of the purported objections—after an online "objector bot" was created by a class action claims aggregator, encouraged individuals to file objections based upon that same false and incomplete information about the settlement.[2] *See* App. 1, ¶¶ 49-59.

The remainder of the objections received in this case fall into a number of other categories outlined below—most the result of consumer confusion created by announcements of the settlement before the Court-approved Notice Plan was implemented. A small number of "serial" or "professional" objectors[3] and their

---

[1] Charlie Warzel, *Equifax Doesn't Want You to Get Your $125. Here's What You Can Do*, THE NEW YORK TIMES (Sept. 16, 2019), https://www.nytimes.com/2019/09/16/opinion/equifax-settlement.html (last visited December 4, 2019). He writes, "I reported on some fine print in the settlement suggesting that Equifax earmarked only $31 million for claims, meaning that if all 147 million people affected by the breach filed a claim, everyone would get just 21 cents." No mention was made of the other valuable benefits to the settlement, including the hundreds of millions of dollars available to pay out-of-pocket claims.

[2] Reuben Metcalfe, *You have the right to object to the Equifax settlement. Here's how.*, MEDIUM (Nov. 8, 2019), https://medium.com/@reubenmetcalfe/you-have-the-right-to-object-to-the-equifax-settlement-heres-how-4dfdb6cca663 (last visited December 4, 2019). Mr. Metcalfe writes: "The proposed settlement of $700M includes only $31M for cash payments."

[3] These objections are "typically made not for the benefit of the class, but solely to extract some sort of payment in exchange for dropping their objections." *In re Home Depot, Inc. Customer Data Security Breach Litig.*, 2016 WL 6902351, at *5 (N.D. Ga. Aug. 23, 2016). Class Counsel are presently engaged in discovery concerning these objections and will update the Court as necessary.

counsel have also made arguments—ranging from the relief not being enough on one hand to the case being incapable of class treatment on the other. None of these challenges withstand scrutiny.[4]

Class Counsel respond to the objections grouped by: (A) objections to the value of the settlement and benefits conferred on the class; (B) objections relating to class certification; (C) objections relating to the process for objecting; (D) objections relating to the process for opting-out; (E) objections to the Notice Plan; (F) objections to the claims process; and (G) additional comments about professional objectors. In responding to the objections, Class Counsel rely upon the Omnibus Declaration of Class Counsel (App. 1) as well as the declarations of Professor Robert Klonoff (App. 2); Professor Geoffrey Miller (App. 3); Jennifer Keough, JND Legal Administration (App. 4); Jim Messina, Signal Interactive Media (App. 5); and Joe Ross of Experian (App. 6). Objections relating to fees, expenses, and service awards are addressed in a separate brief.

---

[4] Class Counsel have reviewed each of the objections filed and grouped them into categories based upon the arguments made in those objections. Although the objections are generally referred to throughout this brief, Class Counsel also incorporate the chart that they created, attached to their declaration (App. 1) as Exhibit 9, to provide the Court with a summary of those objections.

### A. Objections to the Value of the Settlement and Benefits Conferred on the Class.

By any reasonable measure, the consumer settlement provides substantial relief that benefits class members now and in the future. Equifax initially will pay $380.5 million into the fund for class benefits, fees, expenses, service awards, and notice and administration costs; up to an additional $125 million if needed to satisfy further claims for certain Out-of-Pocket losses; and additional amounts as needed to purchase credit monitoring for all claiming class members. Class members may claim up to $20,000 for documented losses fairly traceable to the data breach, including mitigation costs; four years of three-bureau credit monitoring and identity protection services through Experian ($1,200 value) and an additional six years of one-bureau credit monitoring through Equifax (valued at $720); identity restoration services through Experian for all class members without making a claim; subject to aggregate caps, cash compensation for time spent, and cash payment as an alternative to claiming state-of-the-art credit monitoring services; and a judicially enforceable requirement that Equifax spend $1 billion for data security and related technology over five years and comply with comprehensive data security requirements negotiated by class counsel with assistance from a renowned cybersecurity expert.

As a preliminary matter, many good-faith objections express genuine frustration with Equifax's business practices and want Equifax to pay substantially more as punishment for its conduct. But when a settlement results from hard-fought litigation and negotiation, objections regarding the amount of the settlement do not provide a justification for its rejection unless the amount secured is unfair, unreasonable, or inadequate. *See Ressler v. Jacobson*, 822 F. Supp. 1551, 1552-53 (M.D. Fla. 1992) (judicial evaluation of a proposed settlement "involves a limited inquiry into whether the possible rewards of continued litigation with its risks and costs are outweighed by the benefits of the settlement"); *Figueroa v. Sharper Image Co.*, 517 F. Supp. 2d 1292, 1326 (S.D. Fla. 2007) (a court's role is not to "engage in a claim-by-claim, dollar-by-dollar evaluation, but rather, to evaluate the proposed settlement in its totality."). Objections that the settlement fund is too small for the class size, or that Equifax should be required to pay more to punish and deter future bad behavior, while understandable, do not take into account the risks and realities of litigation, and are not a basis for rejecting the settlement. In light of the material risks involved and the possibility that any of several adverse legal rulings would have left the class with nothing, class counsel would have been justified in settling for much less. *See Behrens v. Wohmetco Enters., Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1998), *aff'd*, 899 F.2d 21 (11th Cir. 1990); *Linney v. Cellular Alaska P'ship*,

151 F.3d 1234, 1242 (9th Cir. 1998) ("[T]he very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes.") (internal quotation omitted). As it stands, the settlement provides relief beyond what the class members could have obtained at trial.

Many objectors also ask the Court to rewrite the settlement, but that is not the Court's role. *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977). For example, objectors stated that the settlement should include: a long-term fund for "significant inflation-adjusted cash compensation from Equifax should they leak my data again any time within the next 20 years"[5]; "lifetime" credit and identity protection[6]; every class member should get a minimum payment (proposed amounts include, e.g., $10,000, $5,000, or $1,200);[7] and class members who freeze their credit should have a separate cash payment option.[8] In most cases, these objectors do not contend that the monetary relief is inadequate to compensate class members for harm caused by Equifax's alleged wrongs, making it hard to see how they are aggrieved. *See Brown v. Hain Celestial Grp., Inc.*, 2016 WL 631880, at *10 (N.D. Cal. Feb. 17, 2016) (citing *In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.*, 33 F.3d 29 (9th

---

[5] Objection of Tristan Wagner.
[6] *E.g.*, Objections of Francis J. Dixon III and Linda J. Moore.
[7] *E.g.*, Objections of Emma Britton, Norma Kline, and Vijay Srikrishna Bhat.
[8] *E.g.*, Objections of Gary Brainin and Sybille Hamilton.

Cir. 1994)).[9] Regardless, the Court can readily conclude that the settlement provides fair and adequate relief under all the circumstances.

Other settlement terms proposed in objections are of a regulatory or legislative nature, well beyond the power of the civil justice system: "Any settlement is inadequate if it allows Equifax to continue using my personal data without my express written consent"[10]; the board and officers should disgorge salaries and serve prison time[11]; and Equifax should be forced out of business.[12] While apparently sincere, these "suggestions constitute little more than a 'wish list' which would be impossible to grant and [are] hardly in the best interests of the class." *In re Domestic Air Trans. Antitrust Litig.*, 148 F.R.D. 297, 305 (N.D. Ga. 1993). Importantly, the laws in place would not even allow Class Counsel to achieve this type of relief at trial.

Class members also object to the existence of aggregate caps for cash claims for alternative reimbursement compensation and for time spent. However, these caps

---

[9] Those class members who were unsatisfied with the relief made available had the opportunity to opt out, weighing in favor of finding the settlement fair and adequate. *See, e.g.*, *In re Oil Spill By Oil Rig Deepwater Horizon on April 20, 2010*, 295 F.R.D. 112, 156 (E.D. La. 2013) ("Those objectors who are unhappy with their anticipated settlement compensation could have opted out and pursued additional remedies through individual litigation.").

[10] Objection of Susan S. Hanis.

[11] *E.g.*, Objections of Christie Biehl, Jeffrey Biehl, George Bruno, and Patrick Frank.

[12] *E.g.*, Objections of David Goering, Christie Biehl, and Jeffrey Biehl.

are a result of arm's-length negotiations aimed at ensuring out-of-pocket losses were fully compensated to the extent possible. As a result, class members with demonstrable out-of-pocket losses fairly traceable to the breach, including money spent for credit freezes or purchasing credit monitoring, will likely receive their entire approved claim (up to $20,000).[13] If money remains in the fund after the extended claims period, it will be used to lift the caps on alternative reimbursement compensation and claims for time spent and provide *pro rata* payments up to an amount that exhausts the fund. This was a carefully considered and fair distribution plan, which also provides that *all* class members are entitled to claim valuable three-bureau credit monitoring services, take advantage of identity restoration services, and benefit from the improved data security Equifax is required to employ under the settlement.

A number of objections take issue with the credit monitoring services made available under the settlement. Some object that credit monitoring is very valuable, and thus the settlement should pay for more monitoring extended further into the

---

[13] "Because many class members in data breach cases suffer very small losses, recovery of up to $10,000 per individual is more than sufficient to reimburse the Settlement Class Members for losses." *Home Depot*, 2016 WL 6902351, at *6 (internal citations and quotation marks omitted).

future. Others object that credit monitoring is not valuable at all, that free credit monitoring and credit freezes are already available to everyone, that the value of the offered monitoring is inflated to justify an inadequate settlement, that the actual cost to provide credit monitoring services is *de minimis*, and that the credit monitoring services are a marketing scheme designed to enrich Equifax and Experian at the further cost of consumer privacy.

Considering the wide range of views on the matter, the Court should consider the detailed information provided by Class Counsel and the declaration of the credit monitoring provider. [Doc. 739-4, ¶¶ 22, 27, 29, 42, 43; Doc. 739-2 at 99-106; App. 6, ¶¶ 10-43]. The three-bureau credit monitoring and identity theft protection service offered under the settlement, and claimed by millions, is far superior to "free" monitoring and has a significant cost and retail price, and under the settlement agreement cannot be used to market paid subscriptions. *See* App. 6, ¶¶ 33-43 (summarizing advantages of Experian credit monitoring and identity protection service over other services available). This Court has repeatedly lauded high-quality credit monitoring services as providing valuable class-member relief that would likely not otherwise be recoverable at trial. *See Home Depot*, 2016 WL 6902351, at *4 (overruling objections and finding that 18 months of credit monitoring and injunctive components of settlement are valuable class benefits); *Hillis v. Equifax*

*Consumer Servs. Inc.*, 2007 WL 1953464, at \*5 (N.D. Ga. June 12, 2007) (credit monitoring as part of settlement has substantial value). After careful consideration of the objections, the size and scope of relief secured by this settlement remains unprecedented and strongly supports final approval.

### B.     Objections to Class Certification.

As set forth in Plaintiffs' motion for class notice and motion for final approval, the proposed settlement readily meets Rule 23's requirements for class certification. The objections to certification assert that the class representatives and counsel are not "adequate" for purposes of Rule 23(a)(4) because: (1) the interests of class members who have already incurred out-of-pocket losses conflict with those who have incurred only a risk of future losses,[14] or (2) some state consumer protection laws implicate statutory penalties while others do not.[15] Thus, according to the objections, "fundamental" intraclass conflicts between subgroups exist, requiring numerous subclasses with separate counsel for each. Courts have soundly and repeatedly rejected these objections as erroneous expansions of the Supreme Court's decisions in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999).

---

[14] Objection of Shiyang Huang [Doc. 813 at 5-7].
[15] Objection of Frank and Watkins [Doc. 876 at 1].

Unlike here, *Amchem* and *Ortiz* were massive personal-injury "class action[s] prompted by the elephantine mass of asbestos cases" that "defie[d] customary judicial administration." *Prof'l Firefighters Ass'n of Omaha, Local 385 v. Zalewski*, 678 F.3d 640, 646-48 (8th Cir. 2012). In those cases adequacy was not sufficiently protected within a single class because claimants who suffered diverse medical conditions as a result of asbestos exposure wanted to maximize the immediate payout, whereas healthy claimants had a strong countervailing interest in preserving funds in case they became ill in the future. These vast differences between groups of claimants in *Amchem* required "caution [because] individual stakes are high and disparities among class members great." 521 U.S. at 625.

Those concerns are simply not present in this consumer case where all settlement class members suffered the same injury in terms of the compromise of their personal information: those who have already incurred out-of-pocket losses already are being reimbursed, while those who may incur such losses in the future are entitled to a future reimbursement during the extended claims period. Moreover, there is no conflict between the two groups, as in *Amchem*, because of the nature of the harm caused by the breach. Those who have already suffered losses stand just as likely to suffer future losses by the misuse of their information as those who have not suffered any losses to date. Thus, unlike in *Amchem*, everyone has an incentive

to protect against future harms. As the Eighth Circuit explained when confronted with identical objections in another data breach settlement: "Accordingly, the interests of the two subclasses here are more congruent than disparate, and there is no fundamental conflict requiring separate representation." *In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968, 976 (8th Cir. 2018); *see also In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 309-10 (N.D. Cal. 2018). The settlement provides both compensation for current losses, future losses, and protection against future losses—all of which benefit all class members.

Shiyang Huang's objection—that this fact pattern is akin to *Amchem* and *Ortiz* because some class members have presently incurred out-of-pocket costs while others have not—was thoroughly analyzed and rejected in *Target*:

> The *Amchem* and *Ortiz* global classes failed the adequacy test because the settlements in those cases disadvantaged one group of plaintiffs to the benefit of another. There is no evidence that the settlement here is similarly weighted in favor of one group to the detriment of another. Rather, the settlement accounts for all injuries suffered. Plaintiffs who can demonstrate damages, whether through unreimbursed charges on their payment cards, time spent resolving issues with their payment cards, or the purchase of credit-monitoring or identity-theft protection, are reimbursed for their actual losses, up to $10,000. Plaintiffs who have no demonstrable injury receive the benefit of Target's institutional reforms that will better protect consumers' information in the future, and will also receive a pro-rata share of any remaining settlement fund. It is a red herring to insist, as [Objector] does, that the no-injury Plaintiffs' interests are contrary to those of the demonstrable-injury Plaintiffs. All Plaintiffs are fully compensated for their injuries.

*In re Target Corp. Customer Data Sec. Breach Litig.*, 2017 WL 2178306, at *5 (D. Minn. May 17, 2017), *aff'd*, 892 F.3d at 973-76; *see generally id.* at *2-9. Further, "the interests of the various plaintiffs do not have to be identical to the interests of every class member; it is enough that they share common objectives and legal or factual positions." *Id.* at *6 (quoting *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148 (8th Cir. 1999). As in *Target*, the class representatives are adequate here because they seek essentially the same things as all class members: compensation for whatever monetary damages they suffered and reassurance that their information will be safer in Equifax's hands in the future. *Id.*[16] And, building on the *Target* and *Anthem* settlements, the extended claims period here provides for payment of claims for future out-of-pocket losses incurred by all class members, negating the objection that the settlement somehow treats a portion of the class unfairly. The Court should reject Shiyang Huang's objection to class certification.

---

[16] *See also Anthem*, 327 F.R.D. at 309-311 (analyzing and overruling same objection). This Court rejected a non-identical but similar objection in the *Home Depot* consumer track. *See Home Depot*, 2016 WL 6902351 (rejecting all objections asserted by Sam Miorelli, including objection that separate counsel was necessary to represent allegedly conflicting subclasses (No. 14-md-2583-TWT, Doc. 237 at 39-40 (objection); Doc. 245 at 21-23 (reply in support of final approval)).

Another objection, regarding differences in the damages potentially available under different state consumer statutes, is a naked attempt by objectors Frank and Watkins to end nationwide consumer class action settlements, which would disadvantage consumers, defendants seeking global peace, and judicial economy. Nationwide class settlements that treat class members uniformly (rather than attempting to calibrate state-by-state relief depending on the nuanced differences between each state's laws) are sensible and regularly approved in this Court and across all Circuits.

The *Target* court also rejected the specific objection lodged by Frank and Watkins:[17]

> The availability of potential statutory damages for members of the class from California, Rhode Island, and the District of Columbia does not, by itself, mean that the interests of these class members are antagonistic to the interests of class members from other jurisdictions. Class actions nearly always involve class members with non-identical damages. . . .
>
> [Objector's] argument in this regard ignores the substantial barriers to any individual class member actually recovering statutory damages. Class members from these three jurisdictions willingly gave up their uncertain potential recovery of statutory damages for the certain and complete recovery, whether monetary or equitable, the class settlement offered. Contrary to [Objector's] belief, this demonstrates the cohesiveness of the class and the excellent result named Plaintiffs and class counsel negotiated, not any intraclass conflict.

---

[17] The objector's counsel from *Target* also represents objectors Watkins (her brother) and Frank (her colleague in law practice) here.

2017 WL 2178306, at *6, *aff'd*, 892 F.3d 968. Simply put, "there is no structural

conflict of interest based on variations in state law, for the named representatives

include individuals from each state, and the differences in state remedies are not

sufficiently substantial so as to warrant the creation of subclasses." *Anthem*, 327

F.R.D. at 310 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir.

1998)); *cf. Columbus Drywall & Insulation, Inc. v. Masco Corp.*, 258 F.R.D. 545,

555 (N.D. Ga. 2007) ("The fact that the named plaintiffs may have suffered greater

damages does not indicate that named plaintiffs possess interests antagonistic to

other plaintiffs.").[18]

---

[18] *See also Hanlon*, 150 F.3d at 1022 ("In this case, although some class members may possess slightly differing remedies based on state statute or common law, the actions asserted by the class representatives are not sufficiently anomalous to deny class certification. On the contrary, to the extent distinct remedies exist, they are local variants of a generally homogenous collection of causes which include products liability, breaches of express and implied warranties, and 'lemon laws.'"); *Dickens v. GC Servs. Ltd. P'ship*, 706 F. App'x 529, 536 (11th Cir. 2017) (class representative may be adequate even where seeking only statutory damages when other class members also suffered actual damages; at most this is a "minor conflict" under *Valley Drug*); *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1307 (N.D. Fla.), *reconsideration denied*, 261 F. Supp. 3d 1212 (N.D. Fla. 2017) ("The class members' damages will differ in degree, perhaps, but not in nature."). Further, while not raised as an objection here, "the idiosyncratic differences between state consumer protection laws are not sufficiently substantive to predominate over the shared claims" for purposes of Rule 23(b)(3). *Anthem*, 327 F.R.D. at 315. Here too, "Plaintiffs' theories across these consumer-protection statutes are essentially the same." *Id.*

Given the dearth of authority in their favor, objectors Frank and Watkins grasp at straws, citing *W. Morgan-E. Lawrence Water & Sewer Auth. v. 3M Co.*, 737 Fed. Appx. 457 (11th Cir. 2018). There, consumers of allegedly contaminated water *and* the water authority that supplied the water were lumped into the same settlement class in an action against the alleged polluters. Many class members had actually filed injury claims *against* the water authority. *Id.* at 464. Because the water authority had an interest in maximizing the amount of injunctive relief obtained from the alleged polluters while *minimizing* the value of (if not undermining entirely) consumers' claims for compensatory damages, a fundamental intraclass conflict plainly existed, preventing dual representation of consumers and the water authority. *Id.* Contrary to providing support for objectors' position, the *West Morgan* decision is a perfect illustration of what the Eleventh Circuit considers a *fundamental* conflict defeating Rule 23(a)(4) adequacy; it is completely inapposite to the case and settlement class now before this Court.

No more helpful is Frank and Watkins' reliance on the Second Circuit's opinion in *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011). In that copyright case, a proposed settlement divided the class into three claimant groups, called categories A, B, and C. The settlement capped the defendants' total liability and provided that, if the claims exceeded that cap, the

compensation for category C claims would be reduced *pro rata*. *Id.* at 246. In other words, the settlement protected the category A and B claims at the expense of category C claims, providing that those claims could be reduced to zero. So unlike here, the settlement "sold out" one category of claims. *See id.* at 252. The categories of claims at issue in *Literary Works* were different *in kind* given the specific statutory scheme under which they arose. It only made sense that Category A claimants (whose claims were uniquely valuable under federal copyright law because they were registered in time to be eligible for statutory penalties) should not take all of settlement payments to the exclusion of Category C claimants (who had never registered their copyrights and thus were not eligible to claim even actual damages), at least not without independent representation.

This case is completely different. In *Literary Works*, no transaction or claim united the Category A, B, and C plaintiffs. Here, the entire settlement class brings Georgia negligence claims arising from the Equifax data breach.[19] The Frank and Watkins objectors do not—because they cannot—identify any authority holding that

_____

[19] Georgia law applies to the common law claims here. *See* Order on Motion to Dismiss [Doc. 540 at 8-9]. Frank and Watkins also fail to account for the fact that the Complaint seeks recovery of nominal damages under Georgia law, which was a live claim applicable to the entire settlement class, and potentially yields more recovery than any statutory damage amount. *See, e.g.*, *Wright v. Wilcox*, 262 Ga. App. 659, 662 (2003) (affirming award of up to $22,000 of nominal damages for trespass and noting that damages are not "restricted to a very small amount").

a class settlement under such circumstances cannot release individual claims arising from the same transaction or occurrence that are not held by all class members. That happens all the time. And unlike in *Literary Works*, the settlement here is "carefully calibrated to provide substantial benefits to all" settlement class members. *Anthem*, 327 F.R.D. at 310-11.[20]

The facts asserted by the objectors do not establish a conflict at all. And even if the objectors had identified a non-speculative conflict, "the existence of minor conflicts alone will not defeat a party's claim to class certification: the conflict must be a 'fundamental' one going to the specific issues in controversy." *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003). "A fundamental conflict exists where some party members claim to have been harmed by the same

---

[20] For the same reason, the settlement satisfies Rule 23(e)(2)(D), which requires the district court to consider whether the settlement "treats class members equitably relative to one another." Relatedly, another objector claims that there is inequitable treatment of class members who have an existing credit monitoring service. [Doc. 880 at 11]. But claimants who purchased credit monitoring on or after September 7, 2017 in response to the breach may make a claim for reimbursement of those costs, up through the date of claim submission. (Settlement Agreement ¶¶ 2.37, 6.24, 8.32). If other class members who did not pay for their existing credit monitoring declined to enroll in the (likely superior) comprehensive monitoring offered under the settlement, they are eligible for an alternative cash payment, albeit smaller than the maximum $125. Thus, those with existing credit monitoring were treated equitably.

conduct that benefitted other members of the class." *Id.* Further, the Eleventh Circuit has held that even when a fundamental conflict going to the heart of the dispute exists—an issue wholly absent here—creation of subclasses and appointment of separate counsel is unnecessary where other safeguards were in place. *Juris v. Inamed Corp.*, 685 F.3d 1294, 1324 (11th Cir. 2012) (affirming breast implant injury class with class representatives covering spectrum of manifested and unmanifested personal injuries). The involvement of a cross-section of class representatives across all states, use of a respected and experienced mediator, and extensive input from state and federal regulators all safeguarded the process leading to the settlement now before the Court. There is therefore no basis to deny class certification under Rule 23(a)(4).

### C. Objections Relating to the Process for Objecting.

Some objectors argue that the procedure for objecting to the settlement is overly burdensome, asserting that objectors should not be required to show they are members of the settlement class, or provide their personal contact information, signature, or dates for a potential deposition. Few objectors had difficulty meeting these criteria. And those who did not either provided no rationale as to why the

Court's order should be ignored, or were "mass" objections generated by a company that spread misinformation about the settlement.[21]

The required criteria are not only consistent with Rule 23, but also ensure that the Court has information sufficient to consider the objection and are similar to those approved by courts within this Circuit. *See Champs Sports Bar & Grill Co. v. Mercury Payment Sys., LLC*, 275 F. Supp. 3d 1350, 1353 (N.D. Ga. 2017) (striking objection for failing to comply with similar criteria);[22] *Home Depot*, Doc. 185 at ¶ 12 (N.D. Ga. March 8, 2016) (requiring objectors to provide personal contact information and signature); *Jones v. United Healthcare Servs., Inc.*, 2016 WL 8738256, at *4 (S.D. Fla. Sept. 22, 2016); *Chimeno-Buzzi v. Hollister Co.*, 2015 WL 9269266, at *5 (S.D. Fla. Dec. 18, 2015) (same); *see also In re Premera Blue Cross Customer Data Sec. Breach Litig.*, 2019 WL 3410382, at *27 (D. Or. July 29, 2019) (requiring objectors to provide personal contact information and provide signed statement that he or she is member of settlement class); *In re Anthem, Inc. Data Breach Litigation*, 2017 WL 3730912, at *3 (N.D. Cal. Aug. 25, 2017) (requiring

---

[21] Class Counsel served a subpoena on Class Action, Inc. to assess the validity of the objections it submitted and the process by which it obtained authorization to file objections, and are scheduling a Rule 30(b)(6) deposition of the company.
[22] The objector's appeal was dismissed, after certifying that he had received no payment for such dismissal. *Champs Sports Bar & Grill v. Webster*, No. 17-14361, Stipulated Voluntary Dismissal (11th Cir. Oct. 23, 2017).

written objection to contain personal contact information and signature). Accordingly, these objections are meritless and do not warrant rejection of the proposed settlement.

The requirement that objectors provide dates during which they are able to be deposed by counsel as well as any objections from prior cases is not designed to deter or discourage class members from objecting, as some objectors contend. Rather, when an objector voluntarily appears in an action by objecting to a class settlement, the basis for his or her objection as well as standing to object are put at issue and can properly be tested through discovery. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, 281 F.R.D. 531, 533 (N.D. Cal. 2012) (holding that when an objector voluntarily appears in litigation by objecting to class settlement, he or she is properly subject to discovery). Indeed, courts in this Circuit have held that it is not only appropriate, but advisable for counsel to conduct depositions of objectors to create a record regarding the objector's knowledge of the settlement terms, to ferret out frivolous objections, and to expose objections that are lawyer-driven and filed with ulterior motives. *See Montoya v. PNC Bank, N.A.*, 2016 WL 1529902, at *19 (S.D. Fla. April 13, 2016); *see also Champs Sports Bar*, 275 F. Supp. 3d at 1359 (overruling objection where objector was deposed and admitted he had no evidence or knowledge supporting objection and could not explain how settlement was

inadequate); *Morgan v. Pub. Storage*, 301 F. Supp. 3d 1237, 1259 (S.D. Fla. 2016) ("An objector's knowledge of the objection matters in crediting (or not) the objection and determining the objector's motives."). "Such depositions not only serve to inform the Court as to the true grounds and motivation for the objection, but they also help develop a full record should the objector file an appeal." *Montoya*, 2016 WL 1529902, at *19. Thus, the requirements to list prior objections and provide dates for depositions are designed to ensure that the objector is available should counsel determine that a deposition is necessary—not to discourage objections.

Finally, requiring objectors to sign their objections is of particular importance in this case, to ensure that the objection is made in the objector's personal capacity, and not at the behest of others. *Cf. In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 217 (E.D.N.Y. 2013) (ordering injunction to prevent individuals and groups from "drumming up" objections and opt-outs by establishing websites that spread false and misleading information about the settlement). While JND is continuing to assess the validity of the hundreds of objections filed by Class Action, Inc., requiring objectors to personally sign their objections decreases the likelihood that services encouraging mass objections or opt-outs file unauthorized or fictitious objections.

**D.     Objections Relating to How to Opt Out.**

The exclusion procedure is simple, affords class members a reasonable time in which to exercise their option, and follows conventions regularly approved by courts in this Circuit. *See, e.g.*, *Harrison v. Consol. Gov't. of Columbus, Georgia*, 2017 WL 6210318, at *2 (M.D. Ga. April 26, 2017) (requiring exclusion form to be mailed via regular mail); *Flaum v. Doctor's Assoc., Inc.*, 2017 WL 3635118, at *3 (S.D. Fla. March 23, 2017) (same); *Home Depot*, Doc. 185 at ¶ 11 (N.D. Ga. March 8, 2016) (same); *Jones*, 2016 WL 8738256, at *3 (same); Manual for Complex Litigation (Fourth) § 21.321 (2004) ("Typically, opt-out forms are filed with the clerk, although in large class actions the court can arrange for a special mailing address and designate an administrator retained by counsel and accountable to the court to assume responsibility for receiving, time-stamping, tabulating, and entering into a database the information from responses.").[23] The Court's Order Directing

_____

[23] Requiring each individual electing to opt out to sign their request ensures that each individual has carefully considered their options and understands that they are giving up their relief under the settlement. While technology provides an avenue for the ease of filing claim forms, it also makes it easier for third parties to file unauthorized "mass opt-outs," which are sometimes "highly indicative of a conclusion that such counsel did not spend much time evaluating the merits of whether or not to opt-out in light of the individual circumstances of each of their clients and in consultation with them." *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010*, 910 F. Supp. 2d 891, 939 (E.D. La. 2012). Here, where the technology allowing class members to object or opt out is coupled with misinformation about

Notice did not present insurmountable hurdles to the individuals who filed timely, signed exclusions.

Several class members object that there should be a renewed opportunity to opt out of the settlement after the Fairness Hearing is conducted. The Notice Plan, however, affords class members ample time to evaluate and, if desired, exclude themselves from the settlement. "Courts have consistently held that 30 to 60 days between the mailing (or other dissemination) of class notice and the last date to object or opt out, coupled with a few more weeks between the close of objections and the settlement hearing, affords class members an adequate opportunity to evaluate and, if desired, take action concerning a proposed settlement." *Greco v. Ginn Dev. Co., LLC*, 635 Fed. Appx. 628, 634 (11th Cir. 2015) (noting that courts have consistently approved 30 to 60 days to opt out, quoting 2 McLaughlin on Class Actions § 6:18 (11th ed.)); Manual for Complex Litigation (Fourth) § 21.321 (2004) ("Courts usually establish a period of thirty to sixty days . . . following mailing or publication of the notice for class members to opt out."). Here, class members were given at least 60 days from the Notice Date to file objections or opt out of the settlement. [Doc. 742 at 15]. And 2,770 class members were able to opt-out in

what the settlement actually provides, the dangers of accepting mass, unsigned objections or opt-out requests are even more acute.

advance of the Court's deadline. App. 4, ¶ 76. The length of the opt-out period provides class members a reasonable opportunity to exclude themselves.

E.     **Objections to the Notice Plan.**

A group of objections can be categorized as relating to the Court-approved Notice Plan. Specifically, objectors argue that: (1) the content of the Notice is inadequate; (2) the supplemental e-mail notice to early claimants was inadequate or improper; (3) the Notice Plan is too reliant on e-mail and social media; (4) the Notice Plan is inadequate for those without computers or access to news; and (5) the Notice Plan is unclear as to the amount of fees requested. As set forth in detail below, however, the proposed settlement utilizes a state-of-the-art, Court-approved Notice Plan that was developed in conjunction with federal and state regulators, constitutes the best notice practicable under the circumstances, and provides class members with information reasonably necessary to evaluate their options. *See* Fed. R. Civ. P. 23(e)(1)(B); *see also Greco*, 635 Fed. Appx. at 633 (11th Cir. 2015).

The Notice Plan here clearly and concisely explains the nature of the action and the rights of class members thereby satisfying the requirements of Rule 23 and due process, and directs class members to the full notice detailing every aspect of the settlement. While the notice does not contain every material fact pertaining to the settlement, that is both unnecessary and potentially confusing and off-putting to

class members. *See* Manual for Complex Litigation (Fourth) § 21.312 (notice is not required to include "every material fact" or be "overly detailed."); *Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1239 (11th Cir. 2011) (an overly-detailed notice has the potential to confuse class members and impermissibly encumber their right to benefit from the action).

Some objectors argue that the Notice Plan does not adequately convey what class members are giving up and how much Class Counsel is seeking in fees. But the Short Form Notice, developed with both federal and state regulators, and approved by the Court, sets forth a clear and concise summary of the case and the proposed settlement. It further clearly directs, in large, bold typeface, class members to visit the settlement website[24] or call the toll-free phone number for more information. *See Meyer v. Citizens and S. Nat. Bank*, 677 F. Supp. 1196, 1211 (M.D.

---

[24] The "Frequently Asked Questions" ("FAQ") page of the settlement website contains a section entitled "Legal Rights Resolved Through The Settlement" and provides an answer to the question: "What am I giving up to stay in the settlement class?" The answer clearly provides that, by staying in the settlement class, class members are releasing their "legal claims relating to the Data Breach against Equifax when the settlement becomes final." *See* Settlement Website FAQ 20. Additionally, the settlement website's FAQ page contains a section titled "The Lawyers Representing You" and provides an answer to the question: "How will these lawyers be paid?" The answer clearly states that Class Counsel is seeking attorneys' fees of up to $77,500,000 and reimbursement for costs and expenses up to $3,000,000 to be paid from the Consumer Restitution Fund. *See* Settlement Website FAQ 22.

Ga. 1988) (rejecting objection that notice was unclear and misleading where district court reviewed and approved notice before it was sent); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1342-44 (S.D. Fla. 2011) (approving notice where information was referenced in short form notice and more information was readily available in full on settlement website).

Some objectors complain that the Notice Plan failed to adequately explain that the alternative reimbursement compensation could be reduced depending on how many valid claims were submitted. But the misconception that each class member would automatically receive alternative reimbursement compensation of $125 arose, not from the Notice Plan (nor could it, since direct notice to the class had not yet been sent), but from misleading media coverage that began even before the proposed settlement was presented to the Court. *See* App. 1, ¶¶ 27-37. The Court-approved Short Form Notice that was sent to class members clearly and conspicuously disclosed that there would be a "proportional reduction of benefits" based upon the number of valid claims filed for that specific type of relief. App. 4, ¶ 53 & Ex. A. And, although the landing page of the settlement website initially provided a more abbreviated version of the type of relief available, the Settlement Notice posted on the website always clearly stated that "if there are more than $31 million claims for alternative reimbursement compensation, all payments for Alternative

Reimbursement Compensation will be lowered and distributed on a proportional basis." Settlement Website FAQ 10.[25]

Because some class members filed claims before Court-approved direct notice was sent, Class Counsel wanted to ensure that any misconceptions they might have had about the settlement were addressed, and provide them with an opportunity to amend their claims. Accordingly, a Court-approved email was sent to every individual who filed a claim for alternative reimbursement compensation before direct notice issued allowing those class members to amend their claims to choose credit monitoring instead or validate their claims by providing the name of their

---

[25] Class Counsel also took a number of steps to alert the media about inaccurate reporting concerning the settlement. *See, e.g.*, Statement of Class Counsel in the Equifax Data Breach Consumer Class Action (Aug. 1, 2019) [Doc. 858-1 at 80-81].

existing credit monitoring service.[26] The email also contained a link, in bold, to the website where class members could easily click to validate or amend their claim.[27]

Some objectors argue that the Notice Plan was too reliant upon newer technologies to deliver notice of the settlement to the class. But courts have increasingly utilized e-mail to notify class members of proposed settlements, and such notice is appropriate under Rule 23. *See, e.g.*, *Home Depot*, 2016 WL 6902351, at *5 (holding notice reaching 75 percent of class through email and internet advertising satisfied Rule 23 and due process); *Morgan v. Public Storage*, 301 F. Supp. 3d at 1262-63 ("Courts consistently approve notice programs where notice is

---

[26] Reports that class members could automatically get $125 as part of the settlement (even without existing credit monitoring) prompted the inclusion of the validation process by the claims administrator as well as a space on the Claim Form to indicate the credit monitoring service that each claimant had in place. Such a requirement was in the settlement from the outset. Thus, claims that did not identify the claimant's existing service were incomplete and, if the claimant did not have an existing service, invalid. [Doc. 858-1 ¶¶ 20-25]. In amending the claims form, the parties (with the Court's approval) acted to forestall the inadvertent filing of invalid claims and reduce the need for the Claims Administrator to contact claimants to obtain the identity of their existing service, which would been particularly burdensome in light of the number of claims being filed.

[27] Although not an objection to the Notice Plan, itself, another group of objectors argue that the supplemental email should have been sent via a notarized letter to all early claimants. But each claimant provided their email address as part of the claims filing process, and was informed that subsequent correspondence would be received via email. *See* App. 4, ¶¶ 60-62. Here, the objectors present no evidence that a substantial number of class members did not receive the supplemental e-mail notice. *See Nelson v. Mead Johnson & Johnson Co.*, 484 F. App'x 429, 434-35 (11th Cir. 2012) (affirming district court's decision overruling conclusory objections).

provided primarily through email because email is an inexpensive and appropriate means of delivering notice to class members."). The ultimate focus is on whether the notice methods will reach a high percentage of the class. *See* Federal Judicial Center, "*Judge's Class Action Notice and Claims Process Checklist and Plain Language Guide*" (2010) (available at www.fjc.gov); R. Klonoff, *Class Actions in the Year 2026: A Prognosis*, 65 Emory L. J. 1569, 1650 & n. 479 (2016) ("Courts have increasingly utilized social media . . . to notify class members of certification, settlement, or other developments.").

The Court-approved Notice Plan was vetted by the parties, JND Legal Administration, LLC (an expert in providing class action notice), Signal Interactive Media, LLC (an expert in mass media and data analytics), and experts on consumer communications and redress at the FTC and CFPB. *See Carter v. Forjas Taurus S.A.*, 2016 WL 3982489, at *6 (S.D. Fla. Jul. 22, 2016) (finding adequate notice where notice plan "used peer-accepted national research methods to identify the optimal traditional, online, mobile and social media platforms to reach the Settlement Class Members"). The digital aspects of the Notice Plan, alone, reached 90 percent or more of the class. App. 5, ¶¶ 22-24. *See* Federal Judicial Center, "Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide" (2010) (recognizing the effectiveness of notice that reaches between 70 and 95 percent of

the class). The objectors provide no evidence that the e-mail notice and social media notice campaign were not effective in reaching class members. *See Nelson*, 484 F. App'x at 434-35 (affirming district court's decision overruling conclusory objections). Therefore, based upon the high percentage of the class that has been reached by email and digital notice, the Notice Plan's use of email and social media is effective.

Other objectors argue that the notice program is inadequate for those without access to computers or access to news. The Constitution does not require that each individual member receive actual notice of a proposed settlement. *See Juris*, 685 F.3d at 1318. Notice by publication is appropriate where it is not reasonably possible or practicable to give direct notice. Courts have held that direct notice is impracticable when a class consists of millions of residents from different states. *See Edwards v. Nat'l Milk Producers Fed'n*, 2017 WL 3623734, at * 4 (N.D. Cal. June 26, 2017) ("In view of the millions of members of the class, notice to class members by individual postal mail, email or radio or television advertisements, is neither necessary nor appropriate.") (quoting *In re MetLife Demutualization Litig.*, 262 F.R.D. 205, 208 (E.D.N.Y. 2009)). In such cases, it is appropriate to use alternative

methods of notice such as publication notice and media notice.[28] Rather than spend a significant portion of the settlement fund sending direct mail notice to 147 million people across the United States and its territories, the parties developed a plan to provide the best notice practicable using a variety of means—including direct notice by email supplemented by radio and via *USA Today* for those class members without access to the Internet. App. 5, ¶¶ 26-28.

Some objectors argue that the Notice Plan does not identify the exact amount of fees sought by Class Counsel and how much money will be left in the Consumer Restitution Fund for the benefit of class members. Any proposed class settlement and award of attorneys' fees, however, requires court approval and the court is vested with broad discretion to determine the amount of fees to award. *See Piambino v.*

---

[28] *See, e.g.*, *Kumar v. Salov N. Am. Corp.*, 2017 WL 2902898, at *3 (N.D. Cal. July 7, 2017) (approving of notice campaign consisting of media notice, publication notice, and advertisements on various websites); *In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, 314 F.R.D. 580, 602-03 (N.D. Ill. 2016) (approving indirect notice for class members who could not be given direct notice including print publication, settlement class website, press release, and social media); *In re Optical Disk Drive Prods. Antitrust Litig.*, 2016 WL 7364803, at *3 (N.D. Cal. Dec. 19, 2016) (approving notice consisting of email, settlement website, toll-free number, publication notice, press release, text link advertising, banner advertising, and advertising on Facebook and Twitter); Manual for Complex Litigation (Fourth) § 21.312 (2004) ("Posting notices and other information, on the Internet, publishing short, attention-getting notices in newspapers and magazines, and issuing public service announcements may be viable substitutes for . . . individual notice if that is not reasonably practicable.").

*Bailey*, 757 F.2d 1112, 1139-42 (11th Cir. 1985); *In re Sunbeam Sec. Litig.*, 176 F.

Supp. 2d 1323, 1329 (S.D. Fla. 2001). Therefore, while the Notice Plan does not—

and could not—tell class members the exact amount of attorneys' fees that will be

awarded, the settlement website clearly provides that Class Counsel are seeking an

award of attorneys' fees up to $77,500,000 and expenses up to $3,000,000. *See*

Settlement Website FAQ 22; *see also Carter*, 2016 WL 3982489, at *7 (approving

notice where it informed class members that class counsel would be seeking "up to

$9 million in fees"). It further provides that the exact amount of fees and expenses

will be decided by the Court. Moreover, Class Counsel's motion for fees was posted

on the settlement website when it was filed on October 29, 2019. So, class members

had the ability to learn exactly what Class Counsel are seeking well before the

deadline to opt out or object.

### F. Objections to the Claims Procedures.

Some objectors make a number of arguments about the fairness of the claims

submission process, contending that: (1) the claims procedure for claiming the

alternative reimbursement compensation is confusing and unfair; (2) the requirement

that time spent and actual out-of-pocket losses be "fairly traceable" to the data breach

will disallow valid claims; (3) the call center was unhelpful and inadequately staffed

early in the claims period; and (4) the claims procedure presents "too many hoops to

jump through" to submit a claim. As discussed below, these objections are meritless and do not warrant rejection of the proposed settlement.

Some objectors argue that the claims process improperly "channels" class members toward electing credit monitoring as the only form of relief because too many class members have elected alternative reimbursement compensation. These objectors misunderstand the proposed settlement and the total scope of relief.[29] Credit monitoring or alternative reimbursement compensation is not the only available relief. Class members may claim out-of-pocket damages (including the price of credit monitoring and credit freezes) up to $20,000, have access to identity restoration services, and can make claims for time spent preventing or mitigating damage as a result of the data breach. And, class members are not told the form of relief that they must choose.

---

[29] This misunderstanding comes as little surprise in light of misleading media stories that only $31 million is available for cash compensation. *See, e.g.*, Charlie Warzel, *One Man Can Bring Equifax to Justice (and Get You Your Money)*, THE NEW YORK TIMES (Nov. 26, 2019), https://www.nytimes.com/2019/11/26/opinion/equifax-breach.html ("If the settlement is approved, the $31 million pool earmarked for claims will be paid out to some victims. Others will get free credit monitoring (because the cash reward set aside for victims was so small, if all 147 million people affected by the breach filed a claim, everyone would get just 21 cents).") (last visited Dec. 4, 2019). *See* App. 1, ¶¶ 45-48; *see also generally id.*, ¶¶ 30-37.

As referenced previously, a number of objectors were dissatisfied with the effort to correct misinformation about alternative reimbursement compensation—specifically, sending a Court-approved email to each class member who filed a claim for such compensation before Court-approved direct notice issued. Some objectors argue that they did not receive the supplemental email,[30] but that is no reason to upend the settlement—especially where those class members will have an opportunity to address any claims deficiencies as part of the agreed-upon claims review process.[31] *See, e.g,, Home Depot*, 2016 WL 6902351, at *5 (rejecting objections from class members who claimed they did not receive subsequent email

---

[30] Some objectors argue that the supplemental email was inadequate because it looked like spam or was caught in their spam filters. However, these class members do not contend that *they* did not receive the e-mail notice and they were able to timely object. *See Morgan*, 301 F. Supp. 3d at 1263 (rejecting objection that email notice was caught in spam filter where objector received e-mail and timely objected). Industry standard best practices were followed to ensure that the email notice was not caught in class members' spam filters. *See* App. 4, ¶¶ 47-49; *Morgan*, 301 F. Supp. 3d at 1263, 1265 (approving e-mail notice where third-party vendor followed industry-standard best practices to ensure that e-mail was not captured by spam filters, and where objector provided no evidence that emails getting caught in spam filters were a widespread problem among the class); *Family Med. Pharmacy, LLC v. Trxade Group, Inc.*, 2016 WL 6573981, at *9 (S.D. Ala. Nov. 4, 2016) (approving e-mail notice where JND utilized practices and procedures to prevent failed deliveries).

[31] Importantly, any claimants who did not respond to the supplemental email notice or otherwise take action will be routed through the regular deficiency process for claims validation, which provides them an opportunity to address any deficiencies with their claims. *See* Settlement Agreement § 8.5.

notice); *Carter*, 2016 WL 3982489, at *6 (approving supplemental notice that used same methodologies as initial notice).

Some objectors argue that requiring class members to provide the name of their current credit monitoring provider to claim alternative reimbursement compensation is unfair. But the Settlement Agreement clearly and unambiguously requires class members claiming that benefit to "identify the monitoring service" that they have in place to ensure they are eligible for that benefit. *See* Settlement Agreement § 7.5. The obvious and reasonable intent of the provision is to limit "alternative" compensation to those who did not want the credit monitoring under the settlement because they were satisfied with their existing service. And, there is nothing unfair about requiring a claimant to meet the eligibility requirements for a particular benefit. *See* Manual for Complex Litigation (Fourth) § 21.66 (2004) ("Class members must usually file claims forms providing details about their claims and other information needed to administer the settlement.").[32]

---

[32] Some objectors who have frozen their credit and order regular credit reports argue that they should be entitled to alternative reimbursement compensation even if they do not have a credit monitoring service in place. But these class members would be entitled to other relief—including out-of-pocket claims for money that they may have spent on credit reports and freezes, as well as time spent in monitoring their own credit. Those objectors need not identify a credit monitoring service to receive compensation.

Some objectors argue that the settlement's "fairly traceable" requirement for reimbursement of out-of-pocket losses and time spent on the data breach will work to disallow valid claims. This threshold should not be surprising, because for class members to have standing, their injuries must be "fairly traceable" to the challenged conduct of the defendant. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Courts in other data breach cases have upheld similar requirements. *See, e.g.*, *Premera*, 2019 WL 3410382, at *22 (providing reimbursement for "proven out-of-pocket damages that can plausibly be traced to the Data Breach"); *Anthem*, 327 F.R.D. at 325 (overruling objections that similar claims procedure was grounds for rejection of settlement finding this "mode of substantiation is significantly less than what Class Members would have had to produce at trial"); *Home Depot*, 2016 WL 6902351, at *4 (requiring "Documented Claims" to claim monetary relief); *Target*, 2017 WL 2178306, at *2 (limiting reimbursement to "documented losses from the Target data breach"). Furthermore, class members are given specific examples of the type of out-of-pocket damages that are fairly traceable to the breach, benefit from the opportunity to cure any deficiencies, and have a robust appeals process if their claims are denied. And, in fact, many people have submitted claims for out-of-pocket losses that meet the requirement and will be receiving significant monetary compensation. *See* App. 4, ¶ 65.

Some objectors argue that the call center was unhelpful early in the claims period. But the settlement provides for reasonable procedures to ensure that the call center is adequately staffed and the staff is able to help class members with questions relating to the proposed settlement. *See* App. 4, ¶¶ 37-41. Beyond that, Class Counsel were available to respond to class member inquiries, and routinely responded to class member emails and phone calls. *See* App. 1, ¶ 69.

Some objectors claimed that there are "too many hoops to jump through" in order to submit a claim. But completion and documentation of the claims forms is no more burdensome than necessary and similar claims procedures are routinely required in other settlements. *See, e.g.*, *Jackson's Rocky Ridge Pharmacy, Inc. v. Argus Health Sys., Inc.*, 2007 WL 9711416, at *2 (N.D. Ala. June 14, 2007) ("[E]ach class member who seeks damages from the settlement fund must file and substantiate its claim. This requirement is no more onerous than that to which each of the class members would have been subjected had they filed a separate lawsuit against the defendant and prevailed on the substantive claim."); *Anthem*, 327 F.R.D. at 325 (overruling objections that similar claims procedure was overly burdensome); Manual for Complex Litigation (Fourth) § 21.66 (2004) ("Class members must usually file claims forms providing details about their claims and other information needed to administer the settlement. . . . Verification of claims forms by oath or

affirmation . . . may be required, and it may be appropriate to require substantiation of the claims. . . .").

Here, the online claims forms were designed to make it easy to file claims electronically and are optimized for use on any device—including mobile devices. Documentation requirements are not onerous, and documentation is not even required for many benefits. Indeed, no documentation is required for the first 10 hours of time spent on the data breach, alternative reimbursement compensation, or credit monitoring, and no claim at all is required to receive identity restoration services. For those that sustained out-of-pocket losses and additional time spent on the data breach, the online claims process also allows class members to easily upload documentation (either at the time of filing a claim or later).

Some objectors are dissatisfied with the claims period, and argue that it is too short to provide relief for potential future harms. The length of the claims period, however, is reasonable and comparable to claims periods in other data breach cases. *See, e.g.*, *Home Depot*, 2016 WL 6902351 (approving settlement with initial claims period of 150 days); *Premera*, 2019 WL 3410382, at *26 (ordering initial claims period of 150 days); *Anthem*, 327 F.R.D. at 325 (overruling objections that a one-year claims period was too short because there is a risk of proving harm that has not yet occurred at trial and because settlement provided protections against future

identity fraud). The proposed settlement provides class members with six months to claim benefits for *losses already sustained* and does not require claims to be filed to access identity restoration services. If money remains in the fund after the initial claims period, class members can file claims in the extended claims period, which provides *an additional four years* to recover for losses that have not yet occurred. Beyond that, credit monitoring and identity restoration services will allow class members to monitor and help safeguard their information for several more years.

### G.     Serial Objectors.

As discussed in greater detail in the Declaration of Class Counsel, a small number of objectors in this case have objected in a number of other class action settlements and, while most of their arguments have been addressed, unique circumstances related to one objector's counsel, and two objectors, in particular, bear mentioning in this brief.

Christopher Bandas, who represents objector Mikell West,[33] is recognized by federal courts across the country as a "serial objector," who "routinely represents objectors purporting to challenge class action settlements, and does not do so to effectuate changes to settlements, but does so for his own personal financial gain; he

---

[33] Class Counsel were recently able to take the deposition of Mr. West, and note that his testimony appears to demonstrate that even he does not agree with many of the arguments made in his objection. *See* App. 1, ¶ 63.

has been excoriated by Courts for this conduct." *CRT*, 281 F.R.D. at 533. *See also, e.g.*, *Clark v. Gannett Co.*, 122 N.E. 3d 376, 380 (Ill. Ct. App. 2018) (Bandas has "earned condemnation of [his] antics from courts around the country. Yet, [his] obstructionism continues."). Most recently, Mr. Bandas and his law firm, The Bandas Law Firm, P.C. ("Bandas Law"), admitted that they engaged in the unauthorized practice of law by representing a "*pro se*" objector in another action, without filing an appearance, and agreed to withdraw that objection in exchange for attorneys' fees. *See* App. 1, ¶ 62. As part of the final judgment in a subsequent action, Mr. Bandas and Bandas Law were ordered not to seek *pro hac vice* admission without attaching that judgment. *Id.*

Objector Christopher Andrews, who also filed an objection in another class action, *Shane v. Blue Cross*, No. 10-cv-14360 (E.D. Mich.), has made a number of accusations against Class Counsel in his objection here.[34] Notably, in the *Shane* litigation, the United States District Court for the Eastern District of Michigan found that "many of [Mr. Andrews'] submissions are not warranted by the law and facts of the case, were not filed in good faith and were filed to harass Class Counsel." App. 1, ¶ 65 & Ex. 7. That court also noted that Mr. Andrews "is known to be a

---

[34] Mr. Andrews' objection was postmarked after the deadline and can be rejected on that basis alone.

'professional objector who has extorted additional fees from counsel in other cases[.]'" *Id.* And based upon an email that Mr. Andrews sent to counsel in the *Shane* action on November 27, this case appears to be no exception to his overall scheme to extort fees. *Id.*, ¶ 65 & Ex. 8.

Another objector—Troy Scheffler—filed what essentially amounts to a racist rant under the guise of objecting to the settlement. [Doc. 884 at 20-22]. Mr. Scheffler has objected to a number of class actions; however, a court has previously found that similar objections to the ones he made here "have no factual or legal merit." No. 13-cv-24583-PAS, Doc. 197 at 25 (S.D. Fla. July 22, 2016), *aff'd* No. 16-15277 (11th Cir. July 31, 2017). In another objection, Mr. Scheffler agreed to a payout to drop his objection. *In re Experian Data Breach Litig.*, No. 15-cv-01592, Doc. 335 (C.D. Cal. July 3, 2019) (approving payment of $10,000 to Mr. Scheffler and his counsel to drop the objection).

Class Counsel's efforts to depose serial objectors and their counsel continue, and they will update the Court about those efforts in advance of the final approval hearing.

## CONCLUSION

For the reasons set forth herein and in Plaintiffs' motion for final approval, and after full consideration of the submitted class member objections, the Court should finally approve the settlement, certify the settlement class, and enter final judgment.

Dated: December 5, 2019    Respectfully submitted,

           */s/ Kenneth S. Canfield*
           Kenneth S. Canfield
           Ga Bar No. 107744
           **DOFFERMYRE SHIELDS**
           **CANFIELD & KNOWLES, LLC**
           1355 Peachtree Street, N.E.
           Suite 1725
           Atlanta, Georgia 30309
           Tel. 404.881.8900
           kcanfield@dsckd.com

           */s/ Amy E. Keller*
           Amy E. Keller
           **DICELLO LEVITT GUTZLER LLC**
           Ten North Dearborn Street
           Eleventh Floor
           Chicago, Illinois 60602
           Tel. 312.214.7900
           akeller@dicellolevitt.com

*/s/ Norman E. Siegel*
Norman E. Siegel
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Tel. 816.714.7100
siegel@stuevesiegel.com

*Consumer Plaintiffs' Co-Lead Counsel*

*/s/ Roy E. Barnes*
Roy E. Barnes
Ga. Bar No. 039000
**BARNES LAW GROUP, LLC**
31 Atlanta Street
Marietta, Georgia 30060
Tel. 770.227.6375
roy@barneslawgroup.com

David J. Worley
Ga. Bar No. 776665
**EVANGELISTA WORLEY LLC**
8100A Roswell Road Suite 100
Atlanta, Georgia 30350
Tel. 404.205.8400
david@ewlawllc.com

*Consumer Plaintiffs' Co-Liaison Counsel*

Andrew N. Friedman
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Avenue, NW
Suite 500
Washington, D.C. 20005
Tel. 202.408.4600
afriedman@cohenmilstein.com

Eric H. Gibbs
**GIRARD GIBBS LLP**
505 14th Street
Suite 1110
Oakland, California 94612
Tel. 510.350.9700
ehg@classlawgroup.com

James Pizzirusso
**HAUSFELD LLP**
1700 K Street NW Suite 650
Washington, D.C. 20006
Tel. 202.540.7200
jpizzirusso@hausfeld.com

Ariana J. Tadler
**TADLER LAW LLP**
One Penn Plaza, 36th Floor
New York, New York 10119
Tel. 212.946.9453
atadler@tadlerlaw.com

John A. Yanchunis
**MORGAN & MORGAN COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Tel. 813.223.5505
jyanchunis@forthepeople.com

William H. Murphy III
**MURPHY, FALCON & MURPHY**
1 South Street, 23rd Floor
Baltimore, Maryland 21224
Tel. 410.539.6500
hassan.murphy@murphyfalcon.com

Jason R. Doss
Ga. Bar No. 227117
**THE DOSS FIRM, LLC**
36 Trammell Street, Suite 101
Marietta, Georgia 30064
Tel. 770.578.1314
jasondoss@dossfirm.com

*Consumer Plaintiffs' Steering Committee*

Rodney K. Strong
**GRIFFIN & STRONG P.C.**
235 Peachtree Street NE, Suite 400
Atlanta, Georgia 30303
Tel. 404.584.9777
rodney@gspclaw.com

*Consumer Plaintiffs' State Court Coordinating Counsel*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this response has been prepared in compliance with Local

Rules 5.1 and 7.1.

*/s/ Roy E. Barnes*

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was filed with this Court via its

CM/ECF service, which will send notification of such filing to all counsel of record.

This 5th day of December, 2019.

/s/ Roy E. Barnes
**BARNES LAW GROUP, LLC**
31 Atlanta Street
Marietta, Georgia 30060
Tel.770.227.6375
roy@barneslawgroup.com