# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

|  |  |
|---|---|
| In re: Equifax Inc. Customer Data Security Breach Litigation | MDL Docket No. 2800<br>No. 1:17-md-2800-TWT<br><br>CONSUMER ACTIONS<br><br>Chief Judge Thomas W. Thrash, Jr. |

## PLAINTIFFS' MOTION FOR FINAL APPROVAL
## <u>OF PROPOSED SETTLEMENT</u>

With over 6 weeks remaining in the Initial Claims Period, this Settlement has achieved historic results, with an overwhelmingly positive response from the Class. More than 15 million Class Members—over 10% of the class—have filed claims, and only 388 class members directly objected—or just .00022% of the class. Millions of Class Members have now filed claims for credit monitoring, and every Class Member submitting a valid, Out-Of-Pocket loss claim is expected to be completely reimbursed for losses fairly traceable to the breach.

Plaintiffs outlined the Settlement's historic relief in their motion to direct class notice. [*See generally* Doc. 739-1]. To recap, Equifax will pay $380.5 million into a non-reversionary fund (and up to $125 million more, if needed, for out-of-pocket claims); at least another $1 billion for improved data security and related technology; and as much as $2 billion more, depending on the number of credit monitoring claims. Class Members are eligible to claim up to $20,000 in out-of-pocket losses; ten years of credit monitoring (having a retail value of $1,920 per Class Member and $282 billion for the entire class) or modest alternative cash compensation for those who prefer their existing credit monitoring service; payment for time spent dealing with the breach; and seven years of identity restoration services to help redress the effects of identity theft—available to all Class Members without the need to file a claim.

By any measure—the size of cash fund, the minimum cost to Equifax of $1.380 billion, or the total value to the Class when considering the value of the available credit monitoring services—this Settlement is unprecedented, ***exceeding the value of all previous consumer data breach settlements combined***. Moreover, the Settlement enjoys the support of the Federal Trade Commission, the Consumer Financial Protection Bureau, and 50 State Attorneys General that entered into their own settlements with Equifax and agreed that the fund in this case can serve as the vehicle for consumer redress necessitated by the breach. These governmental bodies also had input into the Settlement's notice program and claims administration protocols.

As the Settlement meets and exceeds the requirements of Rule 23(e), Plaintiffs move for final approval of the Settlement. In support of the motion, Plaintiffs separately submit an Appendix containing the following exhibits: the supplemental declaration of Class Counsel (App. 1), the supplemental declaration of Professor Robert Klonoff (App. 2), the declaration of Professor Geoffrey Miller (App. 3), the supplemental declaration of Jennifer Keough of JND Legal Administration (App. 4), the supplemental declaration of Jim Messina of the notice provider, Signal Interactive Media (App. 5), and a declaration from the court-appointed credit monitoring service provider, Experian (App. 6). Because Plaintiffs "front-loaded"

their Motion to Direct Notice, this memorandum will refer back to the exhibits to that motion. [Doc. 739-2]. Similarly, the factual background of the case, the procedural history, and history of negotiations were extensively set forth in the Motion to Direct Notice. [*See* Doc. 739-1; *see also* Doc. 858]. Finally, Plaintiffs are simultaneously submitting an omnibus, responsive memorandum to the objections to the Settlement, and a reply brief in support of Class Counsel's request for fees, expenses, and service awards, and will refer to those briefs as appropriate.[1]

## FACTUAL BACKGROUND

### A. The Terms of the Proposed Settlement

The following are the material terms of the Settlement:

### 1. The Settlement Class

The proposed Settlement Class is defined as follows:

The approximately 147 million U.S. consumers identified by Equifax whose personal information was compromised as a result of the cyberattack and data breach announced by Equifax Inc. on September 7, 2017.

Excluded are Equifax, its affiliated entities and individuals, the Court and its staff, their immediate families, and anyone who validly opts out. [Doc. 739-2, P. 10, §

---

[1] Those briefs will also rely upon the same Appendix being filed contemporaneously. Accordingly, cites in the briefs to "App" refer to the Appendix and the following number refers to a declaration included in the Appendix. Thus, for example, "(App. 1)" is a citation to Class Counsel's supplemental declaration, which is the first document in the Appendix.

2.43].

## 2.    The Settlement Fund

Equifax will pay $380,500,000 into the fund for class benefits, fees, expenses, service awards, and notice and administration costs; up to an additional $125,000,000 if needed to satisfy claims for certain Out-of-Pocket losses; and potentially $2 billion more if all 147.4 million Class Members sign up for credit monitoring. [Doc. 739-2, Pp. 22-23, ¶ 7.8; Doc. 739-4 ¶ 37]. No settlement funds will revert to Equifax. [Doc. 739-2, Pp. 22-23, P. 18, ¶5.5]. The specific benefits available to Class Members include:

- Compensation of up to 20 hours at $25 per hour (subject to a $38 million cap) for time spent taking preventative measures or dealing with identity theft. Ten hours can be self-certified, requiring no documentation.

- Reimbursement of up to $20,000 for documented losses fairly traceable to the breach, such as the cost of freezing or unfreezing a credit file; buying credit monitoring services; out of pocket losses from identity theft or fraud, including professional fees and other remedial expenses; and 25 percent of any money paid to Equifax for credit monitoring or identity theft protection subscription products in the year before the breach. If the $380.5 million fund proves to be insufficient, Equifax will add another $125 million.

- Four years of specially-negotiated, three-bureau credit monitoring and identity protection services through Experian and an additional six years of one-bureau credit monitoring through Equifax.

- Alternative cash compensation (subject to a $31 million cap) for Class Members who already have credit monitoring or protection services in place.

- Identity restoration services through Experian to help Class Members who believe they may have been victims of identity theft for seven years, including access to a U.S. based call center, assignment of a certified identity theft restoration specialist, and step by step assistance in dealing with credit bureaus, companies and government agencies.

(*See generally id.*, Sections 6-7). Class Members have six months to claim benefits (through January 22, 2020), but need not file a claim to access identity restoration services. (*Id.* ¶¶ 7.2 and 8.1.1). If money remains in the fund after the initial claims period, there will be a four-year Extended Claims Period during which Class Members may recover for Out-Of-Pocket losses and time spent rectifying identity theft that occurs after the end of the Initial Claims Period. (*Id.* ¶ 8.1.2). If money remains in the fund after the extended claims period, it will be used as follows: (a) the caps for time and alternative compensation will be lifted and payments will be increased *pro rata* up to the full amount of the approved claims; (b) up to three years of additional identity restoration services will be purchased; and (c) the credit monitoring services claimed by class members will be extended. (*Id.* ¶5.4).

### 3. Proposed Injunctive Relief

Equifax has agreed to entry of a consent order requiring the company to spend a minimum of $1 billion for data security and related technology over five years and

to comply with comprehensive data security requirements. Equifax's compliance will be audited by an experienced, independent assessor and subject to this Court's enforcement powers. [*See generally* Doc. 739-2, Pp. 76-84; Doc. 739-4 ¶ 44]. According to Plaintiffs' cybersecurity expert, Mary Frantz:

> [I]mplementation of the proposed business practice changes should substantially reduce the likelihood that Equifax will suffer another data breach in the future. These changes address serious deficiencies in Equifax's information security environment. Had they been in place on or before 2017 per industry standards, it is unlikely the Equifax data breach would ever have been successful. *These measures provide a substantial benefit to the Class Members that far exceeds what has been achieved in any similar settlements.*

[739-7, ¶ 66] (emphasis added). Importantly, a binding financial commitment to spend $1 billion on cybersecurity substantially benefits the class because it ensures adequate funding for securing plaintiffs' information long after the case is resolved. (*See id.* ¶ 56).

### 4. Notice and Claims Program

The notice program [*see* Doc. 739-2, P. 125], developed by Class Counsel and Signal with input from JND and regulators, consists of: (1) multiple emails sent to those whose email addresses can be found with reasonable effort; (2) a digital and social media campaign which Signal has estimated reached 90 percent of the class an average of eight times before the Notice Date (with many more impressions reaching Class Members before the end of the Initial Claims Period); (3) and radio

advertising and a full-page ad in *USA Today* to reach those who have limited online presence. (App. 4 ¶¶ 43-57, 85-90; App. 5 ¶¶ 22-30). Signal will continue digital advertising for seven years during the Extended Claims Period and until identity restoration services are no longer available. [Doc. 739-2, Pp. 127, 138].

As implemented, JND transmitted the initial email notice to 104,815,404 million Class Members beginning on August 7, 2019. (App. 4 ¶¶ 53-54). JND sent a supplemental email notice to the 91,167,239 Class Members who had not yet opted out, filed or a claim, or unsubscribed from the Initial Email Notice. (*Id*. ¶¶ 55-56). JND will perform two more email notice campaigns. (*Id*. ¶ 57).

Signal's digital campaign was even more effective than it originally anticipated. It achieved 1.12 billion impressions on social media, paid search, and advertising, far surpassing the target of 892 million impressions. (App. 5 ¶ 24). Signal is expected to deliver an additional 332 million impressions during the remainder of Initial Claims Period. (*Id*. ¶ 25). Signal also placed a full-page notice that appeared in the September 6, 2019 issue of *USA Today*. (*Id.* ¶ 26). The radio campaign, which was approved by the regulators, and was professionally planned and executed, resulted in 194,797,100 impressions overall and 63,636,8000 impressions for the target age group less likely to be reached online. (*Id*. ¶ 27-28).

Finally, the Settlement was the subject of a great deal of press coverage in

virtually every U.S. market, increasing exposure and reach to Class Members. The settlement website received over 46 million visits in the first 48 hours after preliminary approval, which was before email notice even began. (App 4 ¶ 42). The Settlement was featured prominently by CNN, in the *New York Times*, and on the Today Show, among other national media outlets. (*Id.*). From July 22, 2019 through December 1, 2019, there were approximately 30,000 mentions related to the Data Breach or the Settlement in the media. (*Id.* ¶ 90).

As a result, and with nearly over 6 weeks still left in the Initial Claims Period, the claims administrator has received in excess of 15 million claims, including over 3.3 million claims for credit monitoring. (*Id.* ¶¶ 5, 64-69).

One downside to the extensive early media coverage was that many news outlets did not rely on the facts and terms of the actual Settlement Agreement or the Court-ordered notice program, but, instead, repeatedly published the misleading claim that all Class Members would be eligible to receive an automatic $125 cash payment. The settlement website began accepting claims the day after the settlement was preliminarily approved, before the court-approved direct notice program had even started. Millions of class members filed claims for alternative monitoring in the days that followed, many of which were likely invalid and influenced by the misleading media coverage. But, it was apparent that given their number the

alternative compensation claimants likely would receive a small fraction of what they may have expected. To cure the situation, the Parties, with input from the regulators and at the direction of the Court, revised the email notice to ensure that Class Members were informed that the alternative cash compensation payments would likely be substantially less than $125. Importantly, these notices were updated with this information before the direct-notice campaign commenced. Additionally, those who filed claims before the direct-notice program began were given a chance to amend their claims. (App. 1 ¶ 44).

The claims process is governed by a detailed Claims Administration Protocol employing a variety of techniques to facilitate access and participation. (App. 4 ¶¶ 4, 71). JND has also developed protocols and a database to assist in processing claims, calculating payments, and assisting Class Members in curing any deficient claims. (*Id*. ¶ 4, 21).

### 5. Attorneys' Fees and Expenses and Service Awards

Class Counsel have applied separately for a fee to $77.5 million, reimbursement of up to $3 million in litigation expenses, and service awards totaling no more than $250,000. [Doc. 858].

### 6. Releases

The class will release Equifax from claims that were or could have been

asserted in this case and in turn Equifax will release the class from certain claims. The releases are set forth in more detail in the Settlement Agreement. [Doc. 739-2, at 36-37, ¶¶ 2.38, 2.50, 16].

## ARGUMENT

### I.     The Court Should Finally Approve the Settlement.

As a prerequisite to directing notice of a proposed settlement, the Court determined that it would likely be able to approve the Settlement and certify a settlement class. [Doc. 742, at 2]; *see* Rule 23(e)(1)(B). After inviting and receiving the Class's reaction, the Court should now readily conclude that the Settlement is fair, reasonable, and adequate. 4 *Newberg on Class Actions* § 13:10 (5th ed. 2015). A court has broad discretion over the settlement approval process. *See, e.g.*, *In re Motorsports Merch. Antitrust Litig.*, 112 F. Supp. 2d 1329, 1333 (N.D. Ga. 2000). In exercising this discretion, courts in this Circuit analyze a settlement using the so-called *Bennett* factors.[2] *See, e.g.*, *Columbus Drywall & Insulation, Inc. v. Masco Corp.*, 258 F.R.D. 545, 558-59 (N.D. Ga. 2007); *Ault v. Walt Disney World Co.*, 692 F.3d 1212, 1217 (11th Cir. 2012) (court must make findings that settlement "is not

---

[2] The *Bennett* factors include: (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the range of possible recovery at which a settlement is fair, adequate, and reasonable; (4) the anticipated complexity, expense, and duration of litigation; (5) the opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

the product of collusion" and "that it is fair, reasonable and adequate").

The 2018 amendments to Rule 23 similarly make clear that the court should "[focus] on the primary procedural considerations and substantive qualities that should always matter to the decision whether to approve the proposal." *See* Fed. R. Civ. P. 23(e)(2), 2018 Advisory Comm. Notes. The specific considerations include whether (1) the class was adequately represented; (2) the settlement was negotiated at arm's length; (3) the relief is adequate, taking into account the costs, risks, and delay of trial and appeal, how the relief will be distributed, the terms governing attorney's fees; and any side agreements; and (4) whether Class Members are treated equitably relative to each other. Fed. R. Civ. P. 23(e).[3]

Immediately below, Plaintiffs analyze the new Rule 23(e)(2) factors and rely on case law interpreting the *Bennett* factors, which are substantially similar.[4] Regardless of which factors are used, final approval of this Settlement is warranted.

### A.     The Class Was Adequately Represented.

Adequacy of representation is an issue traditionally considered in connection

---

[3] This framework tracks the traditional approach, and since the 2018 amendments, courts in this Circuit have continued to weigh the *Bennett* factors. *See, e.g., Berman v. General Motors, LLC*, 2019 WL 6163798, at *3 (S.D. Fla. Nov. 18, 2019); *Gumm v. Ford*, 2019 WL 2017497, at *2 (M.D. Ga. May 7, 2019).

[4] Professor Klonoff undertakes a similar detailed analysis in his supplemental declaration. (App. 3, Pp. 4-18).

with class certification and involves two questions: "(1) whether the class representatives have interests antagonistic to the interests of other class members; and (2) whether the proposed class' counsel has the necessary qualifications and experience to lead the litigation." *Columbus Drywall & Insulation, Inc.*, 258 F.R.D. at 555. The Class Representatives are adequate because they share the same interests as absent Class Members, assert the same claims stemming from the same event, and share the same injuries. While some objectors argue there is an intra-class conflict because Class Members' damages purportedly differ and they live in states with varying consumer protection statutes, Plaintiffs demonstrate elsewhere that these objections lack merit. (Objection Response Brief, at 10-19). As other courts have found in similar cases, no fundamental conflict exists here.[5] Further, the Court has already recognized Class Counsel's experience and qualifications in appointing them to lead the consumer track, and the record shows that Class Counsel worked diligently to bring this case to resolution. (*See generally* App 1 ¶; Doc. 739-4).

---

[5] *See generally In re Target Corp. Customer Data Sec. Breach Litig.*, 2017 WL 2178306, at *5-6 (D. Minn. May 17, 2017) (calling objection a "red herring"), *aff'd*, 892 F.3d 968 (8th Cir. 2018); *see also In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 309-311, 314, 322 (N.D. Cal. 2018) (overruling same objections and noting that finding that "unifying theory of damages" from common law claims acceptable even where recovery of certain state statutory remedies "may theoretically have been possible").

**B.    The Proposed Settlement Was Negotiated at Arm's Length.**

The Court can easily conclude this Settlement was negotiated at arm's length, without collusion, based on the terms of the Settlement itself; the length and difficulty of the negotiations; Judge Phillips's oversight; and the regulators' review and involvement. *See generally Ingram v. The Coca-Cola Co.,* 200 F.R.D. 685, 693 (N.D. Ga. 2001) (presence of "highly experienced mediator" pointed to "absence of collusion").

**C.    The Relief is Fair, Reasonable, and Adequate**

The Settlement is the largest and most comprehensive recovery in a data breach case in U.S. history by several orders of magnitude. [Doc. 739-4, Pp. 40-45]. Not only does the size of the settlement fund dwarf all previous data breach settlements, but the specific benefits provided to Class Members (both monetary and nonmonetary), meet or substantially exceed those that have been obtained in other data breach cases. (*Id.*; *see also* Doc. 739-7, ¶ 66). The parties anticipate that those with valid out-of-pocket claims will be fully reimbursed; $69 million will be available to be paid in cash to those who claim time and alternative compensation and that amount will be even larger if money remains after out-of-pocket claims are

satisfied; and all Class Members may claim high quality credit monitoring[6] and are eligible for identity restoration services, regardless of whether or not they suffered out-of-pocket damages. The Settlement also provides extraordinary injunctive relief, far beyond that obtained in any other similar case, and benefits all Class Members by reducing the risk that their data will be compromised in another data breach.[7] [Doc. 739-7, ¶ 66]. This relief approximates, in fact exceeds, what could be achieved at trial. (*See* App. 3 ¶ 15; Doc. 858-2 ¶ 73).

Plaintiffs' counsel who collectively have led every major data breach class action in the last decade [Doc. 187, at 6-7], strongly believe the relief is fair, reasonable, and adequate. [Doc. 739-4 ¶ 60; *see also* App. 1 ¶ 16]. The Court may rely upon such experienced counsel's judgment. *See, e.g.*, *Nelson v. Mead Johnson & Johnson Co.*, 484 F. App'x 429, 434 (11th Cir. 2012) ("Absent fraud, collusion, or the like, the district court should be hesitant to substitute its own judgment for that of counsel."). The Court should also consider Judge Phillips's endorsement of

---

[6] As described in the Declaration of the Court-Appointed Provider of Credit Monitoring and Restoration Services, the product offered in the Settlement is far superior to "free" one-bureau credit monitoring options referred to by objectors. (App. 6 ¶¶ 33-43).

[7] *See, e.g.*, *In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968, 974, n.6 (8th Cir. 2018); *Poertner v. Gillette Co.*, 618 Fed. Appx. 624, 630 (11th Cir. 2015) (noting that objector's valuation of settlement based on monetary benefits alone was "flawed," by excluding nonmonetary benefits).

the Settlement [Doc. 739-9, P. 8, ¶13], and the fact that nearly all of the applicable state and federal regulators agreed to the provision of consumer redress through the settlement fund in this Action.

The Class has embraced the Settlement. To date, the claims administrator has received in excess of 15 million claims from verified Class Members, including over 3.3 million claims for credit monitoring. In contrast, only 2,770 Settlement Class Members have asked to be excluded from the Settlement. (App. 4 ¶ 76). And only 388 class members have directly objected to the Settlement—many in the wake of misleading media coverage and at the behest of serial class action objectors—with another 718 purported objections submitted through a chat-bot claims aggregator. (App. 1 ¶ 45-58). This miniscule number of objectors in comparison to the class size is entitled to significant weight. *See Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1324 (S.D. Fla. 2005) ("[A] low percentage of objections points to the reasonableness of a proposed settlement and supports its approval"); *In re Home Depot, Inc. Customer Data Sec. Breach Litig.*, 2016 WL 6902351, at *4 (N.D. Ga. Aug. 23, 2016) (same). Some objectors expressed frustration with the size of the settlement fund and the relief made available. However, as described more fully in Plaintiffs' brief responding to the objections (*see* Brief, at 4-10), those arguments do not justify rejecting the Settlement. *See Lunsford v. Woodforest Nat'l Bank*, 2014

WL 12740375, at *8 (N.D. Ga. May 19, 2014) ("A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery."). This is particularly true when the relief far exceeds that obtained in other data breach cases, and over 50 state and federal regulators incorporated that relief into their own consent orders with Equifax.

That the relief is fair, reasonable and adequate is further confirmed by considering four specific factors enumerated in new Rule 23(e)(2):

### (1) The Risks, Costs, and Delay of Continued Litigation

At the time of the Settlement, Class Counsel had conducted a thorough factual and legal investigation, gone through the motion to dismiss stage, reviewed over 500,000 documents, and benefitted from substantial informal discovery, including meetings with Equifax and its employees responsible for data security. In addition, after the Term Sheet was signed, Class Counsel deposed several Equifax witnesses and engaged in other confirmatory discovery. As a result, Class Counsel were armed with sufficient knowledge of the law and facts to fairly weigh the benefits of the Settlement against the potential of continued litigation. (*See, e.g.*, App. 1 ¶¶ 4-15; Doc. 739-4 ¶ 36).

The cost and delay of continued litigation are obviously substantial. This is one of the largest and most complex consumer actions pending in the federal courts.

But for the Settlement, the parties would incur tens of millions of dollars in legal fees and expenses in discovery and motion practice. Trial likely would not occur earlier than 2021 and appeals would almost certainly delay a final resolution for years after that.

The risks are also substantial. If the Settlement is not approved, Equifax will surely renew its arguments under Georgia law that it has no legal duty to safeguard personal information, particularly after the Georgia Supreme Court's recent decision in *Georgia Dep't of Labor v. McConnell*, 828 S.E.2d 352, 358 (Ga. 2019), which held, under different facts, that no such duty exists. Equifax will also likely argue that plaintiffs have not suffered compensable injuries. *See Collins v. Athens Orthopedic Clinic*, 347 Ga. App. 13, 16 (2018), *cert. granted* (April 29, 2019) (holding that a data breach victim cannot recover certain damages without proof of actual identity theft). Class certification outside of the settlement context also poses a significant challenge. *See, e.g.*, *Adkins v. Facebook, Inc.*, No. C 18-05982-WHA, Doc. 261 (N.D. Cal. Nov. 26, 2019) (denying motion to certify data breach damages class under Rule 23(b)(3))[8]. And, even if Plaintiffs prevail on all those legal issues, they face the risks that causation cannot be proved, discovery will not support their

---

[8] The slip opinion is attached as Ex. 12 to Class Counsel's Supplemental Declaration. (App. 1, Ex.12).

factual allegations, a jury might find for Equifax, and an appellate court might reverse a Plaintiffs' judgment.

### (2)    The Method of Distributing Relief is Effective

The distribution process is efficient and effective. As described above and in the declarations supporting preliminary approval, Class Members can easily file claims, and claims are not even required for identity restoration services. Those claiming out-of-pocket losses must supply documentation of the loss, but such requirements are routine.[9] The requirement that losses be "fairly traceable" to the breach is not onerous (and indeed is a significantly more modest standard that would apply at trial) and its enforcement is subject to a claims administration protocol developed with input from regulators. [Doc. 739-2, Pp. 286-87, ¶ III]. Requirements for other claims are also reasonable. Objections to the contrary are without merit, as addressed in Plaintiffs' separate brief addressing those objections. (*See generally*, Br., at 33-40). Furthermore, JND, the claims administrator, is highly-regarded and vast experience in handling millions of claims in large class cases. Jennifer Keough, JND's CEO, details in a comprehensive declaration the impressive efforts it has made in administering the settlement, facilitating claims, and ensuring those claims are properly and efficiently handled. (App. 4 ¶ 4, 21; *see also* Doc. 739-6, Pp. 2-8,

---

[9] *See* Brief Responding to Objections, at 38.

¶¶ 2-10). One simple example demonstrates JND's competence. The settlement website it created worked seamlessly although it had over 46 million visits in the four days after the Settlement was announced. (App. 4. ¶¶ 5, 42).

### (3) The Terms Relating to Attorneys' Fees are Reasonable.

As described in their fee application and further discussed in their reply responding to objectors, Class Counsel are requesting a percentage-based fee in accordance with Eleventh Circuit precedent that is below the benchmark, is well-justified under the facts and law, and at or below awards in similar cases. The request to is thus eminently reasonable and should be approved.

### (4) Agreements Required to be Identified By Rule 23(e)(3).

The parties previously submitted to the Court, *in camera*, the specific terms of the provision allowing Equifax to terminate the Settlement if more than a certain number of Class Members opted out and the cap on notice spending that would create a mutual termination right. These provisions have not been triggered, and thus do not affect the adequacy of the relief obtained here.

### D. Class Members Are Treated Equitably Relative to Each Other.

The Class Members are treated equitably because they all have similar claims arising from the same data breach, and they all are treated the same under the Settlement. All Class Members are eligible to claim the various benefits provided by

the Settlement if they meet the requirements, including compensation for out-of-pocket losses, compensation for time spent responding to the breach, and free credit monitoring and identity theft insurance. Moreover, all Class Members—even those who do not submit claims—benefit from the various non-monetary aspects of the Settlement, including major changes in business practices that Equifax will implement at a cost of at least $1 billion. (*See* App. 2 ¶ 21).[10]

## II. The Court Should Certify the Proposed Settlement Class

Settlement classes are routinely certified in consumer data breach cases.[11] There is nothing unique about this case which would counsel otherwise. This Court has already found that it likely would certify the class when it preliminarily approved the settlement. As demonstrated below, that decision should be made final.

### A. The Rule 23(a) Requirements are Satisfied.

*Numerosity:* The proposed Class consists of more than 147.4 million U.S. consumers, indisputably rendering individually joinder impracticable.

*Commonality:* "Commonality requires the plaintiff to demonstrate that the

---

[10] Plaintiffs address objections to this requirement in their separate brief responding to objections. (*See* Br., at 18, n. 20).

[11] *See, e.g.*, *Home Depot*, 2016 WL 6902351; *Anthem*, 327 F.R.D. 299; *Target*, 892 F.3d 968 (affirming certification of settlement class); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F.Supp.2d 1040 (S.D. Tex. 2012).

class members 'have suffered the same injury," such that "all their claims can productively be litigated at once." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-350 (2011). All members of the Class suffered the same injury from the same conduct – exposure of their personal data in the Equifax breach – and are asserting the same legal claims. For instance, all Class Members are asserting claims for negligence and negligence per se under Georgia law. [Doc. 540, at 9]. Accordingly, common questions of law and fact abound. *See, e.g.*, *Home Depot*, 2016 WL 6902351, at *2; *Anthem*, 327 F.R.D. at 309.

*Typicality:* This requirement is readily satisfied in data breach cases. The Class Representatives' claims are typical of other Class Members because they arise from the same data breach and involve the same legal theories. *See, e.g.*, *id.*; *Home Depot*, 2016 WL 6902351, at *2.

***Adequacy of Representation*:** As noted above and in their brief responding to objections, Plaintiffs do not have any interests antagonistic to other Class Members and have retained lawyers who the Court has already recognized are abundantly qualified and experienced, thus satisfying the adequacy requirement.

## B.  The Requirements of Rule 23(b)(3) Are Satisfied

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members," and

that class treatment is "superior to other available methods for fairly and efficiently adjudicating the controversy." One part of the superiority analysis – manageability – is irrelevant for purposes of certifying a settlement class. *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 620 (1997).

**Predominance:** The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* at 623. "Common issues of fact and law predominate if they have a direct impact on every class member's effort to establish liability and on every class member's entitlement to … relief." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 985 (11th Cir. 2016).

Here, as in other data breach cases, common questions predominate because all claims arise out of a common course of conduct by Equifax and the only significant individual issues involve damages, which rarely present predominance problems. *See, e.g.*, *Home Depot,* 2016 WL 6902351, at *2; *Anthem*, 327 F.R.D. at 311-16; *see also Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1239 (11th Cir. 2016) (individualized damages generally do not defeat predominance). Further, the fact that multiple state laws are implicated in this case does not defeat predominance: "[T]he idiosyncratic differences between state consumer protection laws are not sufficiently substantive to predominate over the shared claims" for

purposes of Rule 23(b)(3). *Anthem*, 327 F.R.D. at 315. Here too, "Plaintiffs' theories across these consumer-protection statutes are essentially the same." *Id.*

**Superiority:** "The inquiry into whether the class action is the superior method for a particular case focuses on increased efficiency." *Agan v. Katzman & Korr, P.A.*, 222 F.R.D. 692, 700 (S.D. Fla. 2004) (internal quotation omitted). Litigating the same claims of millions of Americans through individual litigation would obviously be inefficient. The superiority requirement thus is satisfied.[12]

## III. Notice to the Settlement Class Complied with Due Process and Rule 23

The Court previously approved the first-of-its-kind notice plan proposed in this case and found it satisfied all requirements of due process and Rule 23. The notice plan has now been successfully implemented and reached 90 percent or more of the Class by the notice date, which was several months before the objection and opt out deadlines. (App. 5 ¶¶ 2, 8, 22, 29-30; *see also* App. 4 85-89). Extensive press coverage magnified public awareness of the Settlement. (App. 4 ¶ 90). And, as predicted, the successful implementation of the notice plan has resulted in an unprecedented and unusually robust claims rate. (App. 4 ¶ 5). The Court should thus find that the Class received the best notice practicable under the circumstances in compliance with Rule 23 and the Due Process Clause. *See, e.g.*, *Phillips Petroleum*

---

[12] *See Anthem*, 327 F.R.D. at 315-16; *Home Depot*, 2016 WL 6902351, at *3.

*Co. v. Shutts*, 472 U.S. 797, 811-12 (1985); *Home Depot*, 2016 WL 6902351, at *3.[13]

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs request the Court finally approve the Settlement, certify the Settlement Class, and enter judgment accordingly.

---

[13] Plaintiffs address objections to the notice program in in their separate brief responding to objections. (*See* Br., at 25-33).

Dated: December 5, 2019                    Respectfully submitted,


*/s/ Kenneth S. Canfield*
Kenneth S. Canfield
Ga Bar No. 107744
**DOFFERMYRE SHIELDS
CANFIELD & KNOWLES, LLC**
1355 Peachtree Street, N.E., Ste. 1725
Atlanta, Georgia 30309
Tel. 404.881.8900
kcanfield@dsckd.com


*/s/ Amy E. Keller*
Amy E. Keller
**DiCELLO LEVITT GUTZLER
LLC**
Ten North Dearborn Street
Eleventh Floor
Chicago, Illinois 60602
Tel. 312.214.7900
akeller@dicellolevitt.com


*/s/ Norman E. Siegel*
Norman E. Siegel
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Tel. 816.714.7100
siegel@stuevesiegel.com


***Consumer Plaintiffs' Co-Lead
Counsel***

*/s/ Roy E. Barnes*
Roy E. Barnes
Ga. Bar No. 039000
**BARNES LAW GROUP, LLC**
31 Atlanta Street
Marietta, Georgia 30060
Tel. 770.227.6375
roy@barneslawgroup.com

David J. Worley
Ga. Bar No. 776665
**EVANGELISTA WORLEY LLC**
8100A Roswell Road Suite 100
Atlanta, Georgia 30350
Tel. 404.205.8400
david@ewlawllc.com

*Consumer Plaintiffs' Co-Liaison Counsel*

Andrew N. Friedman
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Avenue, NW
Suite 500
Washington, D.C. 20005
Tel. 202.408.4600
afriedman@cohenmilstein.com

Eric H. Gibbs
**GIRARD GIBBS LLP**
505 14th Street
Suite 1110
Oakland, California 94612
Tel. 510.350.9700
ehg@classlawgroup.com

James Pizzirusso
**HAUSFELD LLP**
1700 K Street NW Suite 650
Washington, D.C. 20006
Tel. 202.540.7200
jpizzirusso@hausfeld.com

Ariana J. Tadler
**TADLER LAW LLP**
One Penn Plaza, 36th Floor
New York, New York 10119
Tel. 212.946.9453
atadler@tadlerlaw.com

John A. Yanchunis
**MORGAN & MORGAN
COMPLEX
LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Tel. 813.223.5505
jyanchunis@forthepeople.com

William H. Murphy III
**MURPHY, FALCON & MURPHY**
1 South Street, 23rd Floor
Baltimore, Maryland 21224
Tel. 410.539.6500
hassan.murphy@murphyfalcon.com
Jason R. Doss
Ga. Bar No. 227117

**THE DOSS FIRM, LLC**
36 Trammell Street, Suite 101
Marietta, Georgia 30064
Tel. 770.578.1314
jasondoss@dossfirm.com

*Consumer Plaintiffs' Steering Committee*

Rodney K. Strong
**GRIFFIN & STRONG P.C.**
235 Peachtree Street NE, Suite 400
Atlanta, Georgia 30303
Tel. 404.584.9777
rodney@gspclaw.com

*Consumer Plaintiffs' State Court Coordinating Counsel*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this motion has been prepared in compliance with Local Rules 5.1 and 7.1.

*/s/ Roy E. Barnes*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed with this Court via its CM/ECF service, which will send notification of such filing to all counsel of record this 5th day of December, 2019.

*/s/ Roy E. Barnes*