Page 1

1                IN THE UNITED STATES DISTRICT COURT

             FOR THE NORTHERN DISTRICT OF GEORGIA

2                         ATLANTA DIVISION

3     In re:  Equifax, Inc.     §

      Customer Data Security    §

4     Breach Litigation         §    Case No.: 1:17-md-2800-TWT

5

6

7     * * * * * * * * * * * * * * * * * * * * * * * * *

8                       ORAL DEPOSITION OF

9                          MIKELL WEST

10                   TAKEN ON DECEMBER 4, 2019

11    * * * * * * * * * * * * * * * * * * * * * * * * *

12

13        ORAL DEPOSITION of MIKELL WEST, produced as a

14    witness at the instance of the Class, and duly sworn,

15    was taken in the above-styled and numbered cause on the

16    4th day of December, 2019, from 10:08 a.m. to 12:57

17    p.m., before SYLVIA KERR, CSR, RPR, CRR, in and for the

18    State of Texas, reported by machine shorthand, at the

19    offices of Huseman Law Firm, 615 N. Upper Broadway,

20    Suite 2000, Corpus Christi, Nueces County, Texas,

21    pursuant to the Federal Rules of Civil Procedure and the

22    provisions attached hereto.

23

24

25

Page 2

1                   A P P E A R A N C E S
2
    COUNSEL FOR THE CLASS:
3         MR. JAMES J. PIZZIRUSSO
          Hausfeld
4         1700 K Street, NW, Suit 650
          Washington, D.C. 20006
5         (202) 540-7200
          jpizzirusso@hausfeld.com
6
          MR. STEVEN NATHAN
7         Hausfeld
          33 Whitehall Street, 14th Floor
8         New York, NY 10004
          (646) 357-1194
9         snathan@hausfeld.com
10
    COUNSEL FOR THE OBJECTOR:
11        MR. ERIC STEWART
          Huseman Law Firm, PLLC
12        615 N. Upper Broadway, Suite 2000
          Corpus Christi, Texas 78401
13        (361) 883-3563
          estewart@husemanfirm.com
14
          MR. ROBERT W. CLORE
15        Bandas Law Firm, P.C.
          500 N. Shoreline Boulevard, Suite 1020
16        Corpus Christi, Texas 78401
          (361) 558-3527
17        rclore@bandaslawfirm.com
18
19
20
21
22
23
24
25

Page 3

1                            INDEX
2
                                                    PAGE
3

Appearances...................................... 2
4   MIKELL WEST
        Examination by Mr. Pizzirusso.............. 5
5
6

Reporter's Certificate.......................... 109
7   Changes and Signature.......................... 112
8
9                          EXHIBITS
10  NUMBER          DESCRIPTION                    PAGE

11  Exh 1  Notice of Deposition of Mikell Alan West.... 7
12  Exh 2  Mikell West Website Bio..................... 22
13  Exh 3  Objection of Class Member Mikell West....... 30
14  Exh 4  Declaration of Class Member Mikell West..... 54
15  Exh 5  Equifax Data Breach Settlement............. 62
16  Exh 6  Description of Mr. West's Lawyers' Legal
           Background and Prior Experience in Connection
17         with Class Action Litigation................ 68
18  Exh 7  Class Action Objector Power of Attorney and
           Contingent Fee Agreement................... 71
19
    Exh 8  Cases in Which Robert Clore, Christopher Bandas
20         and/or the Bandas Law Firm, PC Have Represented
           Class Members in Filing an Objection to a Class
21         Action Settlement in the Preceding Five Years 78
22  Exh 9  Notorious 'Serial Objector' May Have Filed
           His Last Objection.......................... 79
23
    Exh 10 Clark v. Gannett Co......................... 80
24
    Exh 11 Edelson v. The Bandas Law Firm Final
25         Judgment Order.............................. 87

```
                                            Page 4
 1   NUMBER          DESCRIPTION                     PAGE
 2   Exh 12 Garber v. Office of Commissioner of Baseball   91
 3   Exh 13 In re Cathode Ray Tube Antitrust Litigation    96
 4   Exh 14 In re General Electric Company Securities
            Litigation.................................    97
 5
     Exh 15 In re Hydroxycut Marketing and Sales
 6          Practices Litigation.......................    98
 7   Exh 16 Defendant's Motion for Leave to Amend Answer
            and Withdraw Counterclaim and for Judgment
 8          on the Pleadings...........................   100
 9   Exh 17 Class Action Complaint and Demand for Jury
            Trial......................................   101
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                                    Page 5

1                        MIKELL WEST,

2      having been first duly sworn, testified as follows:

3                        EXAMINATION

4      BY MR. PIZZIRUSSO:

5           Q.  We met before.  My name is James Pizzirusso.

6      I'm with the firm of Hausfeld.  We represent the class,

7      one of the -- on the PFC in the Equifax matter.  Could

8      you state your name and spell it for the court reporter.

9           A.  Sure.  Mikell, spelled M-i-k-e-l-l, West.

10          Q.  And what's your address, Mr. West?

11          A.  5109 Goldeneye, one word.

12          Q.  And is that your home address?

13          A.  Yes, that's correct.

14          Q.  And have you ever been deposed before?

15          A.  I have never been deposed before.

16          Q.  Have you ever taken a deposition before?

17          A.  I have taken many depositions.

18          Q.  And you are an attorney, correct?

19          A.  I am an attorney.

20          Q.  About how many depositions would you estimate

21     you've taken?

22          A.  It would be hard to guess, but 100 maybe.

23          Q.  And you understand that in a deposition you're

24     under oath, correct?

25          A.  I do understand.
```

1      Q.   Okay.  Well, I'm just going to -- I'm sure you

2   understand these, but I'm going to go over some of the

3   ground rules of a deposition.  It's being recorded, so

4   obviously please speak up and give full and complete

5   answers.  Is that okay?

6      A.   That's okay.

7      Q.   And if you don't understand the question, let

8   me know; but if you answer it, I'm going to presume that

9   you understood what I was asking, okay?

10      A.   Absolutely.

11      Q.   And if you need a break, let us know.

12   Obviously we would just ask that we not take a break in

13   the middle of a pending question; is that okay?

14      A.   That's fair.

15      Q.   And if you give an answer but then later

16   remember something else that would clarify or further

17   elucidate that answer, just let us know and we can put

18   it on the record, okay?

19      A.   I can do that.

20      Q.   And you're not on any medication, drugs or

21   alcohol or sick or there isn't any reason why you

22   wouldn't be able to answer truthfully today; is that

23   correct?

24      A.   There is not anything.

25              MR. PIZZIRUSSO:  Let's mark this as Exhibit

1   No. 1.

2                   (Exhibit No. 1 was marked.)

3        Q.  (By Mr. Pizzirusso)  I'm handing you what's

4   been marked as Exhibit 1, the notice of deposition of

5   objector Mikell Alan West.  Have you seen this document

6   before?

7        A.  I have.

8        Q.  And your counsel shared it with you?

9        A.  Yes, we looked at it together.

10       Q.  And do you know if you had any objection to

11   this notice?

12       A.  I believe that giving a deposition was a

13   requirement, and I was okay with that requirement.

14       Q.  And you're here because you objected to the

15   settlement in the Equifax case; is that correct?

16       A.  I did object, yes.

17       Q.  What do you understand the settlement to be?

18       A.  Well, the settlement, I understand, consists of

19   many options or benefits to the class and a requested

20   fee award for class counsel.

21       Q.  What do you understand the benefits to the

22   class to be of the settlement?

23       A.  There's primarily an option, I understand, for

24   obtaining credit monitoring services, and there's an

25   alternative cash option, and there are options for

1   various out-of-pocket expenses or time expenses.

2       Q.  Do you know what the totals for the various

3   cash compensation are in the settlement?

4       A.  When you say the total, do you mean the total

5   benefit or the maximum available benefit?

6       Q.  Well, let's start with maximum available

7   benefit.  Do you know what that is?

8       A.  I understand from reading the notice that the

9   maximum available cash benefit was $125, but I believe

10  even in the notice I think it said it was likely to be

11  significantly lower.

12      Q.  And the $125, you think that's the total max

13  cash benefit that a class member can get for any part of

14  the settlement, or are you talking about something

15  specific?

16      A.  That's the cash option that you can choose.  I

17  know there are out-of-pocket costs and time incurred

18  benefits that are separate from that.

19      Q.  That's the cash option as the alternative for

20  credit monitoring; is that what you're referring to?

21      A.  That's my understanding.

22      Q.  Okay.  And do you know how much you can get for

23  out-of-pocket losses in the settlement?

24      A.  I believe that part of it was up to $20,000 or

25  something like that.  I may be wrong.

1      Q.  And do you know how much you can get for time

2   spent dealing with the Equifax data breach?

3      A.  I don't recall the specific of that.  I think

4   it was a total of maximum 20 hours at $25 an hour maybe.

5      Q.  And you had no out-of-pocket losses or time and

6   expense yourself; is that correct?

7      A.  I've had no out-of-pocket losses to date.  You

8   know, time and expense, I've spent time, you know,

9   reviewing credit monitoring reports with the service I

10   already have.

11      Q.  Did you make a submission for the time and

12   expense for dealing with that?

13      A.  I believe I noted it on my -- on my claim.  I

14   don't think that it was a -- you know, not nearing

15   $20,000 or whatever the limit is; but I did note that I

16   had spent time monitoring my credit reports.

17      Q.  Okay.  But let me make sure I understand.  So

18   when you say you noted it, did you actually make a claim

19   for up to ten hours that was allowed under the

20   settlement at $25 an hour for time spent monitoring your

21   credit reports?

22      A.  I did note time spent on the form when I made a

23   claim.  I don't think that the claim form mentioned a

24   rate.  I think that was just in the class notice.

25      Q.  Did you put in how much time you spent doing

Page 10

1    that?

2         A.  I believe I put in an exemplar because I spent

3    about, you know, 15 to 30 minutes reviewing my credit

4    report every month when I get my notices from Experian.

5         Q.  So just so I make sure I understand, when you

6    noted it, are you actually making a claim -- are you

7    expecting compensation for -- for that time that you

8    spent looking at your credit reports from the

9    settlement?

10        A.  Well, I'm not entirely clear on how that works

11   as far as getting that compensation, but I did note it

12   because it was information requested when I made a

13   claim.

14        Q.  Okay.  And you mentioned before you said $20 to

15   $25 an hour.  Are you aware under the settlement that

16   you're actually allowed to get up to ten hours at $25 an

17   hour without submitting any documentation for that

18   claim?

19        A.  Well, I don't recall that, the specific from

20   the class notice.  But, I mean, if that's what it says,

21   that's what it says.

22        Q.  So that could be up to $250 if you spent $10 --

23   sorry, if you spent 10 hours dealing with issues related

24   to the settlement, correct?

25        A.  If that's what the class notice says.  I don't

```
                                                   Page 11
 1    recall the specifics of what it said.
 2         Q.  Okay.  And you mentioned it earlier, but you're
 3    okay with sitting here for an objection today?  You
 4    didn't have any problem with that; is that right?
 5         A.  I understand it's required.
 6         Q.  What are you hoping to accomplish with your
 7    objection?
 8         A.  Well, I hope to improve the class settlement
 9    benefits for everybody in the class.
10         Q.  And what -- what benefits would you, in
11    particular, like to improve?
12         A.  Well, really I think that primarily the one
13    that I most focused on is the cash option is not a
14    significant compensation, especially in proportion to
15    the attorneys' fees award.
16         Q.  What do you mean by in proportion to the
17    attorneys' fee award?  Can you clarify?
18         A.  I can try.  You know, the cash option is that,
19    you know, I've already got credit monitoring services,
20    and so I don't need that portion of the proposed
21    settlement.  Really, the only thing that's left is a
22    cash option.  And, you know, reading news articles, I
23    understand that given the number of claims, that's
24    likely to be, you know, very minimal.
25         Q.  But you understand that you would be able to
```

```
                                                    Page 12
```

1    get cash for the time you've spent monitoring your

2    credit and submit that as well, right?

3         A.   Well, again, that is a -- it's a de minimis

4    type of, you know, compensation, I believe.

5         Q.   Well, if you spent ten hours dealing with

6    issues related to the settlement, that would be $250 an

7    hour that you could claim in the settlement, right?

8         A.   $250 an hour?

9         Q.   I'm sorry, $250 total.  If you spent ten hours

10   at $25 an hour, you could claim up to $250 without

11   any -- providing any documentation?

12        A.   And that's just based on evaluation of one's

13   time, I suppose.

14        Q.   Right.  And that's more than the total that you

15   would be able to claim under the alternative

16   compensation for credit monitoring, right, of $125?

17        A.   Assuming that $125 was -- was achievable even.

18        Q.   Right.  But that's -- I mean, up to $250 is

19   certainly more than potentially $125, which -- and it

20   could be less, right?

21        A.   Well, yes, $250 is more than $125.

22        Q.   Right.  And, in fact, if you could document

23   your time, you could get up to $500 because 20 times

24   250 -- I'm sorry, 20 times $25 an hour, you could get up

25   to $500 just dealing with issues related to the

                                              Page 13

1    settlement, right?

2         A.   That -- that math checks out, I believe.

3         Q.   And do you know how your current credit

4    monitoring compares to the credit monitoring being

5    offered under the settlement?

6         A.   I currently have credit monitoring through

7    Experian.

8         Q.   But do you understand -- do you believe that

9    your current credit monitoring through Experian is the

10   exact same as the credit monitoring being offered

11   through the settlement?

12        A.   I believe that it is.

13        Q.   Did you compare the benefits of the credit

14   monitoring from the settlement to the credit monitoring

15   that you currently have through Experian?

16        A.   I reviewed the -- the benefits.  And I know

17   that the monitoring that I've got through Experian, you

18   know, I get monthly notices, I get dark web monitoring,

19   I get alerts for any changes or, you know, hits on my

20   credit report.

21        Q.   Do you have identity restoration services as

22   part of your credit monitoring through Experian?

23        A.   I'm not 100 percent certain on that.

24        Q.   But if that were being offered through the

25   class settlement credit monitoring, and you were not

Page 14

1   currently receiving it, you would agree that that would

2   be an additional benefit that you could obtain under the

3   settlement; correct?

4        A.  Well, it would be something additional if I

5   don't have that.  I don't know the value of that

6   particular part of the credit monitoring.

7        Q.  Are you paying for credit monitoring from

8   Experian right now?

9        A.  Yes, I have been for years.

10       Q.  And how much do you pay a month; do you know?

11       A.  I believe it's between $20 and $25 a month.

12       Q.  And did you put in for compensation from the

13  settlement for the value that you have spent on credit

14  monitoring?

15       A.  I don't believe that that was a -- explicitly

16  an option that I can recall, to input that information.

17       Q.  And do you not think that it would be of

18  benefit to you to end your current payments of $20 to

19  $25 a month and take the free option from the Equifax

20  settlement?

21       A.  To be honest, that sounds like a logistical

22  hassle.  I'm not sure it's worth the time involved in

23  doing that.

24       Q.  But objecting to the settlement is worth the

25  logistical hassle and time involved in doing that?

1      A.  Well, it's a benefit in -- not just to myself,

2   but to everyone in the class potentially, and I think

3   that -- that benefit is of great magnitude.

4      Q.  Do you believe that the entire settlement

5   should be thrown out?

6      A.  I think that a fair settlement should be

7   reached.

8      Q.  And, in your mind, what would change in the

9   settlement to make it fair?

10      A.  Well, you know, I -- my understanding is that

11   this potential settlement was reached very early on.

12   I'm not sure what potential additional benefits, you

13   know, are available or were left on the table.  It's

14   really hard for me as a layperson in this aspect to --

15   to evaluate the details of that, and that's why I

16   retained counsel.

17      Q.  But you are an attorney yourself, correct?

18      A.  I am an attorney.

19      Q.  And when you say your understanding that the

20   case settled early on, what do you mean by that?

21      A.  That there was not a lot of significant

22   litigation.

23      Q.  Could you describe what you mean by

24   significant?

25      A.  Well, I know class-action litigation takes

1    years at times, a lot of times.  And, you know, we've

2    got a potential settlement fairly early on, my

3    understanding.

4         Q.  Do you understand that there was a motion to

5    dismiss, briefed, argued and decided?

6         A.  I am not personally familiar with the details

7    of the litigation.

8         Q.  Have you read the complaint in this litigation?

9         A.  I have not read the complaint.

10        Q.  Have you read the motion to dismiss order?

11        A.  I have not read the motion to dismiss order.

12        Q.  So what is your -- on what are you basing your

13   statement that the case was settled early on without a

14   lot of litigation?

15        A.  Well, like I said, my understanding is that the

16   timeline for class-action litigation can be extensive in

17   that with the data breach happening in 2017 and here we

18   are in 2019, that seems to me -- you know, I've got

19   cases older than that.

20        Q.  Now, you said before you're not sure what was

21   left on the table in terms of the settlement when I

22   asked you what would you do to make the settlement fair,

23   correct?

24        A.  Yes, I did say that.

25        Q.  So what's -- but you can't name anything

1  specifically that you would change in the settlement to
2  make it more fair?
3      A.  Well, I think the proportion of requested class
4  counsel fee is significant and could be reallocated to
5  provide additional benefit to the class.
6      Q.  But in terms of the actual terms of the
7  settlement, putting aside attorneys' fees, the actual
8  provisions of the settlement and the compensation and
9  the benefits, is there anything that you would change
10  under that?
11      A.  Well, the compensation and the benefits and the
12  attorneys' fees, that is the entire settlement.
13      Q.  I'm not talking about attorneys' fees.  I'm
14  just talking about the actual benefit to class members.
15      A.  Well, we're talking about a pie, and you're
16  saying ignore the largest slice of the pie, and what
17  would you change about the rest of the pie.
18      Q.  Okay.  So the only thing that you would change
19  about the settlement then is putting some of the
20  attorneys' fees back to the benefit of the class?
21      A.  Well, and there -- I'm not sure of the details,
22  what other options are available.  And this is outside
23  of my, you know, experience as an attorney.
24      Q.  Right.  Well, you're objecting to the
25  settlement because you think there are problems with it.

1   I'm trying to find out from you what you would do to

2   change it so I can see if there's some way we could fix

3   your concerns.  The only one I've heard you identify is

4   fees and that switching them -- some of the fees from

5   the attorneys to the class, you would think, would

6   change it.  I'm just trying to figure out what else, if

7   anything, would satisfy your concerns.

8       A.  I think that would improve the cash option

9   that's available to people like myself who already have

10  credit monitoring services.  I think that would

11  potentially, you know, increase the proportion of the

12  settlement available for out-of-pocket or, you know,

13  incurred time, costs.  I would not like to see the

14  settlement changed to reduce any of the benefits to the

15  class, for certain.

16      Q.  Right.  But other than that, you can't think of

17  anything else that you would change sitting here today?

18      A.  Other than --

19      Q.  Other than what you just said?

20      A.  Other than improving the benefits available to

21  the class members?

22      Q.  The monetary compensation by giving less to the

23  attorneys?

24      A.  Well, I'm not sure how it would be best to

25  achieve that because I'm not a class-action litigator,

Page 19

1    but I would like to see a -- an improved benefit for the

2    class members.  And if that's where it needs to come

3    from, you know, that's an option.

4         Q.  But an improved benefit just meaning more money

5    for the class?

6         A.  Absolutely.

7         Q.  Right.  There's nothing -- there's no other

8    improved benefit that you can think of other than more

9    money for the class?

10        A.  Well, again, the credit monitoring service

11   that's provided is something I already have.  And so I'm

12   not sure how to improve that for people who don't have

13   credit monitoring that would be potentially a benefit

14   for them.  I wouldn't want to reduce any other benefits

15   to the class, you know.  If there was more available for

16   out-of-pocket costs, I understand that that portion of

17   the fund can run out on a first-come, first-serve basis.

18   I think that the more benefits available for the class

19   either in the cash option or otherwise.

20        Q.  Is there anything else?

21        A.  I mean, I'm not sure if there's other options

22   that can be added to the -- as additional benefits.

23        Q.  Right.  But you -- sitting here today, you're

24   not aware of any other options that can be added into

25   the benefits?

Page 20

1          A.  I wouldn't have the experience or knowledge to

2     opine on that.

3          Q.  If you were successful, do you think you should

4     be paid attorneys' fees for your objection?

5          A.  I'm not acting as an attorney in this

6     objection, so I personally would not be entitled to any

7     fees.

8          Q.  Do you think your counsel should be paid if

9     your objection is successful?

10         A.  I think if the class is benefited, I think my

11    attorneys are entitled to be compensated for their time.

12         Q.  Do you think they should be paid on an hourly

13    basis for their time?

14         A.  I get paid as an attorney on an hourly basis.

15    I think that is a reasonable way to get paid.  I

16    understand there are other ways to get paid.  I'm not

17    sure how class-action litigators are commonly

18    compensated, but I understand the Court has that

19    decision.

20         Q.  Do you think they should get paid for the time

21    that they spent working on this matter for you?

22         A.  I think that they should.

23         Q.  And do you know what your attorneys charge per

24    hour?

25         A.  I know it's in the -- we had to list that in

Page 21

1    the objection.  I recall reading it.  I don't recall the

2    number.

3         Q.  And what do you charge per hour as an attorney?

4         A.  It varies, depending on the client.  You know,

5    $200 to, you know, $350 an hour or something like that.

6         Q.  If your attorneys were charging $600 to $700 an

7    hour, do you think that would be in line with Corpus

8    Christi rates for people of their experience?

9         A.  In this field of litigation, I think that that

10   is reasonable.

11        Q.  And what type of law do you practice?

12        A.  I do civil litigation doing insurance defense

13   work mostly.

14        Q.  And are you familiar with class actions?

15        A.  You know, that depends on what you mean by

16   familiar.  I know about them.  I've never participated

17   in one before.  I certainly have not represented anyone

18   in one before.

19        Q.  And when you say you've never represented

20   anyone, do you mean on the plaintiff or defense or

21   either one?

22        A.  I have not at all.

23        Q.  And I assume you're familiar with the federal

24   rules; is that right?

25        A.  Of civil procedure?

```
                                              Page 22
 1        Q.  Yes.

 2        A.  Yes, I am.

 3        Q.  And are you familiar with Rule 23?

 4        A.  If that's a class-action rule, I've probably

 5   not read it because I don't do class-action litigation.

 6        Q.  So I'm assuming you don't know, for example,

 7   the elements of Rule 23 in a class-action; is that

 8   correct?

 9        A.  I can't say that I do.

10              MR. PIZZIRUSSO:  Okay.  Let's mark this as

11   Exhibit 2.

12                  (Exhibit No. 2 marked.)

13        Q.  (By Mr. Pizzirusso)  And I've had the court

14   reporter mark as Exhibit 2 what appears to be your bio

15   from your firm's website; is that correct?

16        A.  It's page 1 of 2 of my bio.

17        Q.  Is there something on the other side?  Is it

18   printed on --

19        A.  I'm sorry.  There it is on the back, yes.

20        Q.  Okay.  And this is the bio from your firm

21   website, right?

22        A.  Yes, it is.

23        Q.  I think we went over that.  And you graduated

24   law school in 2009; is that correct?

25        A.  I did.
```

Page 23

1      Q.  And your professional associations, it says you

2   are in the insurance law section of the State Bar of

3   Texas, correct?

4      A.  That is correct.

5      Q.  And that -- I think you said that's the main

6   area that you practice in, insurance defense; is that

7   right?

8      A.  Yes, primarily insurance defense.

9      Q.  And you're a member of the Texas Association of

10   Defense Counsel; is that correct?

11      A.  Yes, I am.

12      Q.  And have you ever seen anything that they've

13   printed about class actions or been to a conference

14   where class actions were discussed?

15      A.  I've never been to a class-action conference.

16      Q.  But the Texas Association of Defense Counsel

17   doesn't talk about class actions in any of their

18   materials that you've seen?

19      A.  I couldn't tell you.  I don't recall seeing

20   one, but I've not sought out class action, you know,

21   education.

22      Q.  And you're a member of the Corpus Christi Bar

23   Association, correct?

24      A.  Yes, I am.

25      Q.  And are your counsel also members of that

Page 24

1   association, to your knowledge?

2       A.   My counsel?

3       Q.   Your attorneys?

4       A.   In my firm?

5       Q.   Your attorneys who represent you in this case?

6       A.   You'd have to ask them.  I don't -- I don't

7   know.

8       Q.   Okay.  I think you said this before, but you've

9   never served as a class representative in a case; is

10  that correct?

11      A.   That is correct.

12      Q.   And do you know what the duties of a class

13  representative are?

14      A.   I can't say that I do.

15      Q.   Have you ever participated in a class action as

16  a class member by making a claim in a case?

17      A.   I don't think -- I may have, you know, opted in

18  online for something and gotten, you know, a check for

19  $1 in the mail before; but I couldn't recall what it was

20  for.

21      Q.   Have you ever opted out of a class action?

22      A.   I have never opted out of a class action.

23      Q.   Do you know what opting out means?

24      A.   I understand that you opt out of the

25  settlement, you don't participate in the benefits and

```
                                                    Page 25
 1   you have the opportunity, if you so choose, to pursue
 2   your own claim directly against the defendant.
 3        Q.  And did you consider that in this case?
 4        A.  I have not.
 5        Q.  Why not?
 6        A.  Well, my goal hopefully is to improve the
 7   benefit of the class without -- I'm not trying to
 8   establish my own claim independently.
 9        Q.  But if you don't like the settlement, why not
10   pursue your own claim independently?
11        A.  Well, you know, I'm not sure that -- that
12   that's something I would be interested in.
13        Q.  Why?
14        A.  Well, you know, given the -- the, you know,
15   benefits that have been offered as part of the class,
16   I'm not sure what different benefits are -- would be
17   available outside the class.  I think that the best bet
18   to improve the settlement for myself and others is to
19   try to get a better settlement here.
20        Q.  And this is the first time you've ever objected
21   to a class action; is that correct?
22        A.  I have never objected to a class action before.
23        Q.  Now, on your bio under representative
24   experience, it says that you have handled hail, wind
25   damage claims; is that right?
```

```
                                                   Page 26
 1          A.   Yes, I have.
 2          Q.   And that wasn't a class action?
 3          A.   No, those are individual suits by homeowners or
 4     property owners against their insurance companies.
 5          Q.   Okay.
 6          A.   Individual actions.
 7          Q.   And you defended the insurance companies in
 8     those cases?
 9          A.   Yes, I have.
10          Q.   Okay.  Does your firm know that you're
11     objecting in the class action in this matter?
12          A.   I may have discussed it with, you know,
13     acquaintances and friends at the firm.  It's not, you
14     know, a firm-involved objection.
15          Q.   They know that you're being deposed today in
16     this case?
17          A.   I've told a few people in passing.  But, again,
18     you know, just so they know where I am to find me
19     outside of the office.  It is a workday.
20          Q.   Does your firm know who is representing you?
21          A.   I might have mentioned Rob Clore in passing.
22          Q.   If your objection is successful, are you
23     seeking to intervene as a class representative in this
24     matter?
25          A.   I'm not sure that I've, you know, considered
```

Page 27

1    that.  I don't know.

2         Q.  Do you know if the firm would even permit that?

3         A.  Which firm?

4         Q.  Your firm?

5         A.  My firm?

6         Q.  Right.

7         A.  I'm not sure what -- I don't know.  I couldn't

8    answer that.

9         Q.  And do you think that you could negotiate a

10   better settlement than the one that class counsel

11   appointed here have negotiated?

12        A.  Well, again, I don't practice class-action

13   litigation.  I'm here to see if the settlement can be

14   better for everybody.

15        Q.  And the way that you would make it better was

16   by taking money from the attorneys' fees and giving it

17   to the class?

18        A.  Well, I understand that there may be many

19   options available, and that's why I've, you know,

20   retained counsel that I trust to help me navigate this.

21   You know, again, it's my first time doing this.

22        Q.  And have your counsel given you any other

23   options that they think could make the settlement

24   better?

25        A.  You know, we may have -- I don't recall what

Page 28

1  specifics we have discussed, but we've discussed

2  objecting to try to improve the settlement.

3      Q.  And you do not plan to appear at the final

4  approval hearing; is that correct?

5      A.  Personally myself, no, I do not.

6      Q.  But your counsel may appear on your behalf; is

7  that right?

8      A.  I understand that they may.

9      Q.  What did you do to prepare for your deposition

10  today?

11      A.  I met with my attorneys and reviewed the

12  documents that we filed.

13      Q.  When did you meet with them?

14      A.  Yesterday.

15      Q.  And for about how long?

16      A.  Maybe a few hours.

17      Q.  Did you meet with them at all other than

18  yesterday in preparation for the deposition today?

19      A.  In preparation for this deposition, no.

20      Q.  And when you say "I met with my counsel," who

21  are you referring to specifically?

22      A.  Mr. Clore and Mr. Stewart.

23      Q.  And so Mr. Stewart is here.  He wasn't on the

24  retainer agreement or the papers, but you identify him

25  as one of your counsel in this matter as well; is that

1   correct?

2       A.   Yes.

3       Q.   Do you know what arrangement Mr. Stewart has

4   with Mr. Clore and Mr. Bandas and Mr. Froelich in terms

5   of how he is to be compensated for his time in this

6   matter?

7       A.   I'm not aware of how he will be compensated.

8       Q.   Because there was a letter or an attachment to

9   your objection that was a letter to Mr. Froelich about

10  how Mr. Froelich would be compensated, correct?  You

11  recall seeing that?

12      A.   I did see that letter, yes.

13      Q.   But you're not aware of any written arrangement

14  between Mr. Stewart and the Bandas Law Firm, correct?

15      A.   I'm sure that they have an arrangement, but

16  I -- I don't know what it is.  And I'm not -- I don't

17  have an interest necessarily to know.

18      Q.   As a client, you don't want to know how your

19  counsel are providing any potential attorneys' fees in

20  your -- in your case?

21      A.   I'm sure I could find out if I asked, but I

22  understand that, as you probably saw in the contract, I

23  won't be paying any of those fees.  And so I believe

24  it's up to them to, you know, see how things work out

25  between them.

```
                                                    Page 30
 1        Q.  And you said, I think, you reviewed the papers
 2   that you filed when you were meeting with the attorneys
 3   yesterday in preparation for the deposition today; is
 4   that correct?
 5        A.  I reviewed some documents.  I reviewed some
 6   more last night by myself.
 7        Q.  And when you say documents, were those used to
 8   refresh your recollection in preparation for today?
 9        A.  It was all stuff that I had read before, yes.
10        Q.  And was it all just your objection and the
11   attachments thereto?
12        A.  I believe I also reviewed the class notice
13   again.
14        Q.  Okay.  Anything else?
15        A.  I reviewed my contract with my attorneys.
16        Q.  Is that it?
17        A.  Other than the objection and the attachments, I
18   think that would be it.
19                   MR. PIZZIRUSSO:  Mark this as Exhibit 3.
20                   (Exhibit No. 3 was marked.)
21        Q.  (By Mr. Pizzirusso)  And is this the objection
22   you've prepared for this case?
23        A.  Well, that is the objection that my counsel
24   prepared and that I reviewed and signed.
25        Q.  When did you first hear about the Equifax data
```

```
                                                Page 31

 1    breach; do you recall?

 2         A.  I recall talking with my brother-in-law about

 3    it several months ago.

 4         Q.  So that was the first you heard about it

 5    several months ago?  Not when it happened?

 6         A.  You know, I may have seen it in the news.

 7    That's the first recollection I've got of hearing about

 8    it.

 9         Q.  And who is your brother-in-law?

10         A.  His name is Florentino Ramirez.

11         Q.  And is he an attorney?

12         A.  He is not an attorney.

13         Q.  Do you remember why you were speaking with him

14    about it?

15         A.  He's my brother-in-law.  We are -- we're close.

16    We talk a lot about lots of things.

17         Q.  So at the time the data breach occurred, you

18    didn't go onto Equifax's website to see if you were

19    impacted by the breach at that time, right?

20         A.  I don't -- I don't recall if I did or not.

21         Q.  Okay.

22         A.  I know I did it again recently.

23         Q.  And recently you mean several months ago when

24    you were speaking with your brother-in-law about it?

25         A.  I believe he sent me the link.  I don't recall
```

```
                                                Page 32
 1    if I did it at that time.
 2         Q.  He sent you the link for the settlement?
 3         A.  No, for the -- the link to check if you were
 4    a -- potentially affected.
 5         Q.  Okay.  And do you recall when you first heard
 6    about the settlement?
 7         A.  I recall seeing it in news articles online.
 8         Q.  Approximately when; do you remember?
 9         A.  Within the past several months.
10         Q.  And when did you think to engage counsel to
11    explore options with respect to objecting in the
12    settlement?
13         A.  Well, reviewing some of the articles and
14    looking at some of the minimal benefits that were
15    available and finding out that I was a class member.
16         Q.  So -- but when in the time frame would you say?
17    Like, do you recall the approximate date that that would
18    have occurred?
19         A.  Within the last couple months.
20         Q.  How did you come to engage counsel?
21         A.  How did I -- how did I, like, meet counsel?  Or
22    how did I --
23         Q.  How did you end up retaining counsel?  What
24    were the steps that occurred where you got to that point
25    that you hired an attorney?
```

Page 33

```
 1        A.   Well, I've known Rob for many years.  I know
 2   what the practice is in the class-action litigation.  I
 3   found out I was a class member, and so we -- I reached
 4   out to him.
 5        Q.   And how do you know Rob?
 6        A.   We used to work together.
 7        Q.   Where was that?
 8        A.   At my firm, Gault Nye & Quintana.
 9        Q.   So Rob used to be an attorney at your -- your
10   current firm?
11        A.   That's correct.
12        Q.   Okay.  And do you know when he left?
13        A.   I want to say within the last five years.  I
14   couldn't put a more specific date on that.  I know it's
15   been a few years.
16        Q.   And do you know if he went from there straight
17   to the Bandas Law Firm?
18        A.   I think that he did.
19        Q.   And are you -- were you familiar with the
20   Bandas Law Firm before Rob left and went there?
21        A.   I was aware of the Bandas Law Firm, yes.
22        Q.   Do you know Chris Bandas?
23        A.   I've spoken to him on the phone.  I may have
24   met him in passing at a function in person, but any
25   substantive speaking has been over the phone.
```

Page 34

1        Q.  And would you consider Mr. Bandas a friend of

2   yours as well?

3        A.  I don't know him that well.  He's an attorney

4   that I know has a good reputation in the community.

5        Q.  And how about Mr. Stewart?

6        A.  Mr. Stewart, we just met recently.

7        Q.  Okay.  So you didn't know him prior to getting

8   involved in your objection in this matter?

9        A.  I did not, no.

10       Q.  Okay.  And you said, I think, that you were

11   reviewing some articles online and you were concerned

12   about what you were reading about the settlement, and

13   that's when you reached out to Mr. Clore; is that

14   correct?

15       A.  That's correct.

16       Q.  He didn't call you; you called him?

17       A.  With regard to this, yes.  And we speak on the

18   phone and text, you know.  I don't know about often, but

19   certainly frequently.  We are friends.

20       Q.  But the first mention of your potential

21   objection in the Equifax matter was raised by you?

22       A.  Yes, I reached out to him.

23       Q.  And you knew that he had a practice

24   representing objectors in other class-action

25   settlements?

Page 35

1      A.  Yes, I do.

2      Q.  And are you aware of his successes or lack of

3   successes in similar types of objections?

4      A.  I understand that in class-action litigation

5   and class-action objection, you know, there are

6   successes and losses, just as in every area of the law.

7      Q.  But with respect to the Bandas Law Firm and

8   Mr. Clore, did you go back and look at what has happened

9   in some of the other cases that they've been involved

10  in?

11     A.  Like I said, I've known Rob for years.  And we

12  talk, you know, casually as friends.  I'm aware of their

13  involvement and their successes and not so successes in

14  other litigation.

15     Q.  When you say you're aware, I mean, have you

16  read the opinions in the cases in which they have

17  objected?

18     A.  I don't know if I read an opinion.

19     Q.  Well, what's your general awareness then of

20  their track record?

21     A.  I mean, I couldn't put a batting average on it.

22  I know that they have some success, and they have some

23  that they don't win.

24     Q.  And do you know if they've ever been criticized

25  by judges for their objections in these types of cases?

```
                                                      Page 36
 1          A.   I'm sure they have.   You don't practice law

 2     long without get criticized by somebody.

 3          Q.   And that didn't concern you as a client

 4     retaining the Bandas Law Firm?

 5          A.   I've known Rob for years personally and he's

 6     somebody I consider a friend and that I trust.

 7          Q.   What about Mr. Bandas?

 8          A.   You know, Rob works with him, and so he's got a

 9     good judge of character in that respect.   You know, like

10     I said, attorneys win and lose and, you know, everybody

11     gets criticized sometimes.

12          Q.   Did you go to the settlement website and review

13     the settlement materials before you hired counsel?

14          A.   I reviewed the class notice.   I, again, skimmed

15     through the website when I was, you know, submitting my

16     claim.

17          Q.   But that was -- was that before or after you

18     engaged counsel?

19          A.   I believe that was before.

20          Q.   So you submitted a claim before you spoke with

21     Mr. Clore?

22          A.   I can't recall if it was before we spoke or if

23     it was after we spoke and before, you know, I officially

24     retained counsel.   It was around the same area of time.

25          Q.   Did you submit your claim before you retained
```

Page 37

```
 1    counsel; do you know?
 2        A.  I know both my claim and my counsel retainer
 3    agreement were attached to the objection.  I'd have to
 4    look at the dates to give you an answer.  Does this
 5    include the exhibits?
 6        Q.  It does not.  But I have those and I'll --
 7    we'll get to them in a minute.  I'm just trying to -- I
 8    know I saw that, too, but now I can't find it.  Oh, here
 9    it is.  You're -- and we'll pull this out in a little
10    bit, but it looks like you filed a claim online on
11    November 13th, according to your declaration.  You don't
12    have any reason to dispute that, right?
13        A.  I'd have to -- to give you an answer, I'd have
14    to look at it.  I don't recall the date.
15        Q.  And your retainer agreement was signed on
16    November 15th, right?
17        A.  Again, I'd have to look at it to tell you for
18    sure.
19        Q.  Okay.
20        A.  But if that's what's on the document.
21        Q.  And do you know how -- before you signed the
22    retainer on November 15th, how many days it had been
23    before that that you spoke with Mr. Clore?
24        A.  I couldn't put a number of days on there.  Like
25    I said, we'd speak, you know, frequently.
```

```
                                                    Page 38
 1        Q.  But you don't know if it was a week, two weeks,
 2   two days?
 3        A.  What was the --
 4        Q.  How soon -- I mean, you -- you raised this
 5   issue with him.  You didn't sign a retainer agreement, I
 6   assume, at that moment.  You spoke about it.  And then
 7   eventually you signed a retainer agreement.  I'm trying
 8   to figure out the time lapse between when you first
 9   discussed this issue with Mr. Clore and the time in
10   which you filed a claim -- I'm sorry, the time in which
11   you signed a retainer.
12        A.  I believe when I spoke with Rob it may have
13   been a couple of weeks before I understand that there
14   was a quickly approaching deadline to object.
15        Q.  And were you planning to submit a claim prior
16   to the time that you spoke with Mr. Clore?
17        A.  That was something I had discussed with my
18   brother-in-law.
19        Q.  And discussed that you were planning to submit
20   the claim?
21        A.  He and I both talked about it.
22        Q.  Did he submit a claim?
23        A.  I don't know if he did or not.
24        Q.  Do you know if he was a class member?
25        A.  Odds are good that he was, but I don't know if
```

Page 39

1    he was or not.

2        Q.  He never told you, I'm a class member, too, I'm

3    going to submit a claim?

4        A.  I don't have a recollection specifically of him

5    saying that, but I don't know if he's made a claim or

6    not.

7        Q.  Did you tell him that you were going to object

8    to the settlement?

9        A.  I have not discussed objecting with him.

10       Q.  And why didn't you represent yourself pro se?

11       A.  I'm sure you've heard the phrase that a lawyer

12   who represents himself has a fool for a client.  So on

13   top of that, I don't practice class-action litigation.

14       Q.  And did you want an expert in class-action

15   litigation to represent you?

16       A.  I wanted someone who certainly knew the ropes

17   better than I did, and I know that Rob does.

18       Q.  Do you know if Rob has ever represented

19   plaintiffs in a class-action case?

20       A.  I couldn't tell you that he has or hasn't

21   represented or what side they were on.  I don't know.

22       Q.  But you know he's handled objections in class

23   actions before?

24       A.  I do know that, yes.

25       Q.  Have you ever litigated a case against Rob?

```
                                                    Page 40

 1          A.   Against Rob?

 2          Q.   Uh-huh.

 3          A.   We've never had a case against each other.

 4          Q.   You haven't had an insurance defense case where

 5     Rob was representing plaintiffs, for example?

 6          A.   No, I have not done that.

 7          Q.   Or the Bandas Law Firm?

 8          A.   I believe we might have had a case years ago

 9     with the Bandas Law Firm on the other side.  I can't

10     remember how much I personally worked on that case or an

11     associate did some of that.

12          Q.   And I believe you said before that your counsel

13     drafted your objection; is that correct?

14          A.   That is correct.

15          Q.   Did you review it?

16          A.   I did review the objection.

17          Q.   Did you offer any edits to it?

18          A.   I may have pointed out a typo here or there.

19          Q.   Did they express the concerns that they had

20     with the settlement to you?

21          A.   I know we discussed that.  We had a

22     conversation about the settlement.

23          Q.   And what did you express concerns about about

24     the settlement to them with?

25          A.   Well, I know the things that you and I
```

Page 41

1   discussed previously about the minimal compensation and

2   the, you know, nonusefulness of the credit monitoring,

3   as it's something I already have.

4        Q.  But, again, you didn't compare the benefits of

5   the credit monitoring offered in the settlement

6   line-by-line with the benefits offered by your current

7   $20 a month plan, correct?

8        A.  I guess I could have racked up another couple

9   of hours, you know, to submit if I had done that.  But

10  no, I have not.

11       Q.  Okay.  And this objection that you have -- we

12  have marked as Exhibit 3, this contains all of your --

13  all of your opinions about the settlement, correct?

14       A.  It contains the meritorious objections to the

15  settlement.

16       Q.  But there's nothing else in the settlement you

17  oppose that you didn't put into this document, correct?

18       A.  You know, if I spent some more time, I might be

19  able to find something else to complain about, but these

20  were the big things.

21       Q.  And has anything changed since you -- your

22  attorneys drafted this for you, to your knowledge, in

23  terms of your feelings about the settlement?

24       A.  In the last two weeks, no.

25       Q.  Did you review any of the other objections in

Page 42

1    this case?

2         A.   I have not reviewed other objections.

3         Q.   So you don't know whether you agree or disagree

4    with them?

5         A.   I couldn't say that I do or do not.

6         Q.   And I think we talked about this before, but

7    you have never read the underlying complaint in this

8    case, right?

9         A.   I have not read the complaint.

10        Q.   And you never read the motion to dismiss

11   decision?

12        A.   I have not read any of the pleadings in this

13   case other than my objection.

14        Q.   And you've never been to the docket and seen

15   how many docket entries there were; is that right?

16        A.   I have not reviewed the docket for this case.

17        Q.   But you have access to PACER as an attorney,

18   correct?

19        A.   I have access to PACER as an attorney, that's

20   correct.

21        Q.   And do you have any thoughts about the

22   underlying merits of the litigation?

23        A.   I'm not sure what you mean by that.

24        Q.   I mean, do you know whether or not the

25   plaintiffs had a chance at surviving summary judgment or

```
                                                    Page 43
 1    getting a class certified in the litigated disputed
 2    context?
 3         A.  Well, I understand that there's a very large
 4    class that, you know, potentially consists of half the
 5    U.S. population that had their data broached.  And I
 6    think there is certainly some liability that Equifax has
 7    for that.
 8         Q.  But this data breach is not an area of law in
 9    which you practice, correct?
10         A.  No, sir, it is not.
11         Q.  So, I mean, do you think that this would have
12    been an easy case to prevail on?
13         A.  I couldn't tell you the specifics of that one
14    way or the other.
15         Q.  Do you know how many data breach cases like
16    this have ever been certified as a class action in a
17    disputed litigation context?
18         A.  I do not know how many.
19         Q.  Would it surprise you to hear that no damages
20    class has ever been certified in a data breach case
21    where there was a disputed class certification motion?
22         A.  You know, without a context, I can't say that
23    that would be surprising or not.
24         Q.  And you think it's generally better, do you
25    not, to settle legal disputes when you can?
```

Page 44

1      A.   Well, I think when it's in everybody's interest

2   and there's an equitable settlement for everyone

3   involved, I think it can be beneficial.

4      Q.   And I know we talked about class actions.  You

5   may have said you may have submitted a claim online.

6   Are you ever aware that you submitted a claim in another

7   data breach class action?

8      A.   No, I don't believe so.

9      Q.   Now, turning to your objection on page 24, the

10   last page, is that your actual signature?

11      A.   That is my actual signature.

12      Q.   So you signed this yourself with that squiggly

13   mark?

14      A.   I did.

15      Q.   Okay.  And you didn't authorize Mr. Clore or

16   anybody else to sign it on your behalf?

17      A.   I signed it myself.

18      Q.   Okay.  And I think you said already that you

19   reviewed the document and you agreed with everything

20   that was written in it; is that correct?

21      A.   I did review and I did sign it.

22      Q.   Did you tell your attorneys what to write in

23   here or did you leave it to them?

24      A.   They're the attorneys that practice.  I

25   wouldn't want to tell them how to write a document.

Page 45

1    Q.  So is it safe to say that it's their objection

2    as well as yours?

3    A.  No, it's my objection, but they're the ones who

4    would know how to craft the appropriate legal document.

5    Q.  Turning to page 1 in your introduction, in the

6    first sentence it says, "The requested 25 percent

7    attorneys' fees from the portion of the settlement that

8    class counsel actually negotiated; i.e., $310 million is

9    grossly excessive for mega fund settlement in this

10   district."  Do you know what you meant by "actually

11   negotiated" there?

12   A.  I understand that there was an additional

13   settlement benefit that I believe was obtained by a

14   federal agency that added to the pie that was not

15   negotiated by class counsel.

16   Q.  Do you know what that additional was?

17   A.  It may be $80 million.  I could be wrong about

18   that.  That sounds right, though.

19   Q.  Do you know if there's additional compensation,

20   cash compensation, available beyond the $310 million and

21   the $80 million for an extended claims period?  Have you

22   heard about that?

23   A.  I recall reading something that said extended

24   claims period in the notice.  I don't recall the

25   specifics.

1      Q.   So do you think that the settlement value

2   negotiated by class counsel is only $310 million?

3      A.   I believe that's -- that's accurate.

4      Q.   Have you considered the value of the credit

5   monitoring that class counsel negotiated as well?

6      A.   Well, I believe that portion of that settlement

7   is included in that.  But, you know, the value to people

8   like myself who already have credit monitoring is

9   minimal.

10      Q.   And do you know that class counsel negotiated

11   additional injunctive relief as well?

12      A.   Well, I understand that there are, I guess,

13   practice changes that were negotiated.  You know, I

14   would think that that would be stuff that Equifax should

15   have already been doing or should have been doing, you

16   know, on their own.

17      Q.   But they weren't, according to the settlement?

18   They were required to do it under the settlement, right?

19      A.   Well, I think that best practices improve over

20   time for sure.

21      Q.   And do you think that's an additional benefit

22   to the class if Equifax is improving their security

23   practices in the future?

24      A.   I'm not sure how tangible of a benefit that is.

25   Again, those being things that ideally they would have

Page 47

```
 1   been doing already.
 2        Q.   But if they weren't, it would be a tangible
 3   benefit, would it not?
 4        A.   It would be an intangible benefit.
 5        Q.   Well, if they committed to spending a certain
 6   amount of money, I mean, that's at least -- you can
 7   pinpoint their expenditures on additional security,
 8   correct?
 9        A.   Well, you know, I don't know the details of
10   what they've agreed to do and how much they're going to
11   spend on it, so I couldn't speculate on that.
12        Q.   But don't you think you should include the
13   value of all of the value of the benefits in a
14   settlement when you're considering what the total value
15   is?
16        A.   We could certainly consider all the benefits,
17   yes.
18        Q.   And if the benefits in this settlement that
19   class counsel negotiated were valued at over $1 billion,
20   do you think the class counsel should get a portion of
21   the overall benefit of the settlement?
22        A.   I'm not sure how -- how that number would have
23   been calculated.
24        Q.   But hypothetically you say 10 percent of the
25   value would be reasonable for attorneys' fees, correct?
```

1      A.   I'm sorry?

2      Q.   In your objection you say that 10 percent of

3  the value of the settlement would be reasonable for

4  attorneys' fees instead of the 25 percent, right?

5      A.   I think of the cash value of settlement.

6      Q.   But if there's additional benefits beyond the

7  $310 million that you're pointing to here that were as a

8  direct result of class counsel, they should get credit

9  for that as well, shouldn't they?

10     A.   Well, I'm not sure how that would be

11  calculated.  I think that you know that's something that

12  the court is going to take up when reviewing the

13  settlement and the fee award.

14     Q.   But you have no problem with class counsel

15  getting 10 percent of the value of the settlement they

16  negotiated?

17     A.   I don't have a problem with the class counsel

18  being compensated for the work that they've done in a

19  reasonable matter.

20     Q.   And you say that should be ten percent, right?

21     A.   I think -- you know, as indicating ten percent

22  or the reasonable cash value.  Or, you know, potentially

23  the time and expense that they've spent on the case.

24     Q.   And you mentioned a mega fund in here.  Do you

25  know what constitutes a mega fund?

1          A.  I couldn't tell you an exact threshold of what

2     constitutes a mega fund.

3          Q.  In the second and third paragraphs in your

4     introduction you refer to numerous and substantial -- or

5     actually, let's see -- outrageous 14 enumerated

6     requirements.  Do you see that in the third paragraph?

7     And numerous and substantial roadblocks in the second

8     paragraph?

9          A.  Yes, I do see that.

10          Q.  And what -- what roadblocks are those that

11     you're referring to here?

12          A.  Well, I know there are a number of requirements

13     that had to be met to be able to object at all to the

14     settlement.

15          Q.  What requirements are you referring to that

16     were roadblocks?

17          A.  Well, the most -- you know, personally the most

18     difficult one is providing four dates over a two-week

19     period.  That's two weeks after the objection deadline

20     of which, you know, a week of that is lost for the

21     Thanksgiving holidays.

22          Q.  But you were able to provide dates, correct?

23          A.  Well, it was important to me, and so I made the

24     effort to do that.

25          Q.  And it didn't deter you from filing your

Page 50

1    objection, correct?

2        A.   It didn't deter me, but it most likely deterred

3    countless others, I bet.

4        Q.   Well, how do you know?  Have you spoken to

5    anybody else who it deterred?

6        A.   I have the luxury of being able to take time

7    off to come here; a lot of people don't.

8        Q.   And do you know if everybody who has objected

9    has been deposed?

10       A.   I couldn't answer that one way or the other.

11       Q.   Is that the only roadblock you're referring to

12   there?

13       A.   That's the most, you know, one that stands out.

14   I know there were all kinds of requirements that had to

15   be met.  Thankfully I was able to reach out to Rob to

16   handle most of those.

17       Q.   But what are the other ones you're referring to

18   that you think were roadblocks?

19       A.   You know, again, there were 14 things listed on

20   the class notice of what had to be done.  I know there

21   were roadblocks to potentially finding an attorney.

22   That would be more difficult that an attorney would have

23   to meet to be able to represent an objector in this

24   case.

25       Q.   Like what?

1      A.   Oh, them having to provide background

2   information for right copies of the fee agreement,

3   provide all kinds of information.  And I'm sure you've

4   got a copy of the class notice that we could look at.

5      Q.   I'm just trying to figure out why you thought

6   that those were roadblocks.

7      A.   Because they are impediments and additional

8   requirements that, you know, can stop people from

9   participating and wanting to object.

10      Q.   But how?  How is it an impediment that you've

11   got to provide background information and a fee

12   agreement?

13      A.   Well, it's hard for other people.  I'm not

14   saying myself necessarily, but it's hard for people who

15   don't have, you know, people like Rob, a friend of mine

16   who does this to help me out.

17      Q.   How would it be hard for somebody who doesn't

18   have a friend like Rob?

19      A.   Well, they're not going to have somebody who

20   can navigate all the requirements of the class notice.

21      Q.   Providing a fee agreement and background

22   information, you don't think an attorney would be able

23   to do that without it being a roadblock?  I think what

24   you said a substantial roadblock?

25      A.   Well, again, I say the primary one is having to

```
 1    provide four dates of availability in essentially a
 2    six-day business day window.
 3        Q.  But, I mean, you could have asked for dates --
 4    in fact, we discussed dates with your counsel, are you
 5    aware, outside of that window?
 6        A.  I know what's in the class notice.  I'm not
 7    aware of communications you've had necessarily with my
 8    counsel.
 9        Q.  So the only substantial roadblock that you
10    think then is having to provide dates for a deposition?
11        A.  I think that is one substantial impediment.
12    I'd have to review the list to recall others.
13        Q.  And the others that you mentioned were
14    impediments to your counsel, not to you, right?
15        A.  Well, they're impediments to people like myself
16    who are trying to obtain counsel.
17        Q.  But it wasn't an impediment to your ability to
18    obtain counsel, right?
19        A.  To me, no.
20        Q.  And you don't know of anybody else who had an
21    impediment to obtaining counsel based on those 14
22    requirements that you discussed, right?
23        A.  I've not discussed, you know, the objection
24    with anybody else to get their experience with it.
25                    MR. STEWART:  Can we take a quick break?
```

```
                                                  Page 53
 1              MR. PIZZIRUSSO:  Sure, this is a good
 2    stopping point.
 3                   (A recess was taken.)
 4        Q.  (By Mr. Pizzirusso)  Before we took a break we
 5    were just talking about the impediments to obtaining
 6    counsel for the objection, right?
 7        A.  That's correct, yes.
 8        Q.  And you understand you don't have to have an
 9    attorney to file an objection in this case, correct?
10        A.  I do not need an attorney, correct.
11        Q.  And any objector wouldn't need an attorney.
12    Anybody could file without an attorney, correct?
13        A.  Yes.  Anyone could represent themselves.
14        Q.  And so even though you didn't have any
15    impediments yourself in obtaining an attorney, you think
16    the entire settlement should be thrown out?
17        A.  I think the settlement could be improved.
18        Q.  So you don't think it should be thrown out; you
19    just think it should be improved?
20        A.  Well, if it can be improved, I think it should
21    be improved.  If it can't be improved, I'm not sure what
22    the -- what the next step is.
23        Q.  But improving it, in your mind, is just putting
24    more money into the kitty for class members from the
25    attorneys' fees, right?
```

Page 54

1      A.  Either that or, you know, finding more money to

2   add to the settlement.

3              MR. PIZZIRUSSO:  Mark that as Exhibit 4.

4              (Exhibit No. 4 was marked.)

5      Q.  (By Mr. Pizzirusso)  And do you recognize this

6   as the declaration you submitted attached to your

7   objection?  I'm sorry, maybe I gave you the wrong thing.

8   Let me look at that again.  Oh, it is.  I'm sorry -- no,

9   I gave you the right thing.  The exhibit has another

10  exhibit to it, correct?

11     A.  Two exhibits to it.

12     Q.  Two exhibits.  And this is your -- your claim

13  summary and your proof of submission of a claim,

14  correct?

15     A.  One is the claim and one is the notification

16  that I'm a member of a class, of the class.

17     Q.  Right.  Did you prepare this declaration?

18     A.  I did not type it up.  I reviewed and signed

19  it.

20     Q.  Okay.  And you filed a claim online; is that

21  correct?

22     A.  I did file a claim online.

23     Q.  And it looks like, according to the last page

24  of this, that you filed your claim on November 13th,

25  correct?

```
                                                    Page 55
 1        A.   Yes, November 13th, 2019.
 2        Q.   All right.  We were talking about that earlier.
 3   Now you say explanation of time spent, and you say,
 4   "reviewing credit monitoring reports from Experian
 5   related to data compromise alerts, this has been a
 6   repeated time expenditure with the regular reports from
 7   Experian.  The October time is an estimate of the
 8   regular amount of time routinely spent."  Do you see
 9   that?
10        A.   Yes, I see that.
11        Q.   And you say 15 minutes?
12        A.   I did put 15 minutes as an estimate, yes.
13        Q.   All right.  And then you said no money lost or
14   spent, right?  And no documents selected?
15        A.   I have not had any out-of-pocket expenses to
16   date.
17        Q.   Right.  And so how do you think you were harmed
18   by this data breach?
19        A.   Well, my personal data has been compromised and
20   made available with the cyber attack to who knows what
21   types of people.
22        Q.   But you have no out-of-pocket losses related to
23   that, that you have claimed or that you're aware of,
24   correct?
25        A.   No out-of-pocket losses; that's correct.
```

Page 56

1          Q.  And so if you already have credit monitoring

2     and you don't want to take the new credit monitoring

3     from the settlement, why do you think you should be

4     entitled to a cash payment at all?

5          A.  Well, I think that as a member of the class who

6     has been harmed by the exposure of my data, I'm entitled

7     to compensation, as is every member of the class.

8          Q.  Well, there's not compensation for the mere

9     exposure of your data, correct, in the settlement?

10         A.  Well, the entire settlement is compensation for

11    the exposure of the data.

12         Q.  That's how you view the settlement?

13         A.  Well, the class-action lawsuit is, I

14    understand, based on the exposure of the data, and

15    that's why there's been litigation, and that's why

16    there's a settlement.

17         Q.  Do you think you would have an entitlement to

18    monetary compensation for the mere exposure of your

19    private data in another case?

20         A.  I'm not sure what exactly you mean by that.

21         Q.  So let's -- let's say a hypothetical.  You have

22    your data, it's given to a company, that data gets

23    stolen, but you're never harmed.  It's never used.  You

24    don't even know if anybody ever viewed it.  You just

25    know that it was stolen from the company.

```
                                                Page 57
```

 1              You think you should be entitled to

 2    compensation by the mere fact that your data was stolen

 3    from that company even if you were never the victim of

 4    any kind of identity fraud or theft?

 5         A.   I think the harm is difficult to quantify.

 6         Q.   And -- but you think you have a financial harm

 7    from that?

 8         A.   I think there is a significant potential

 9    financial harm.

10         Q.   Potential financial harm, but not an actual

11    harm?

12         A.   Well, luckily I've not had any out-of-pocket

13    losses to date.

14         Q.   Right.  And so if you don't have out-of-pocket

15    losses, you still believe you should be entitled to a

16    cash payment?

17         A.   I think every member of the class is entitled

18    to a benefit from the settlement.

19         Q.   Right.  And every member of the class is

20    getting a benefit from the settlement, correct?

21         A.   Nominally, yes.

22         Q.   And we discussed before that you could have

23    filed your own case and opted out, but you decided you

24    didn't want to do that, right?

25         A.   I did not have an interest at this time in

Page 58

1    opting out and filing my own case.

2         Q.  Did you contact the class counsel in this case

3    to ask them any questions that you might have had about

4    the settlement?

5         A.  I did not contact class counsel.  I contacted

6    my friend Rob.

7         Q.  And you didn't think to reach out to class

8    counsel first to express any concerns you had to see if

9    they could be addressed before filing an objection?

10        A.  Well, I reached out to Rob, knowing that he's

11   familiar with this type of litigation and issues.  And

12   so I started with someone that I knew and trusted.

13        Q.  And do you know if Rob reached out to class

14   counsel to ask them any questions?

15        A.  I couldn't tell you if he did or not.

16        Q.  Do you know if Rob reached out to express any

17   concerns or hurdles with the way the objection process

18   went?

19        A.  I couldn't tell you if he did or not.

20        Q.  And if additional money was provided to the

21   class from the settlement without reducing the amount

22   paid in attorneys' fees, would that satisfy your

23   concerns?

24        A.  That's a very abstract, you know, hypothetical.

25        Q.  Okay.  Well, you in specific -- the fees

Page 59

1    requested were 77 and a half million dollars.  You think

2    they should be 31 million dollars.  So if there was an

3    additional -- what's the math -- $46.5 million that went

4    into the settlement that didn't impact the amount paid

5    in to attorneys' fees, would that satisfy your concern?

6        A.  I can't speculate on that.  And I don't think

7    that that's ten percent math anyways.

8        Q.  I'm not doing the math.  I'm just asking if

9    your contention is that the attorneys' fees should be

10   reduced from 77.5 to $31 million, why do the attorneys

11   have to be harmed or get less money in order to satisfy

12   your concern that an additional $46.5 million went into

13   the settlement?

14       A.  Well, I'd have to look at the proposed terms of

15   whatever the additional $46.5 million do.  I mean, I

16   can't answer that in a hypothetical.

17       Q.  Back to your objection, I think that's Exhibit

18   3.  On page 3 you say in the second sentence, "although

19   this objection is asserted on behalf of Mr. West alone,

20   it applies equally to the class as a whole and

21   particularly to class members like him with existing

22   credit monitoring."  Do you see that?

23       A.  What page?

24       Q.  Page 3.

25       A.  I'm sorry.

```
                                                      Page 60

1          Q.   Second sentence at the top.

2          A.   Okay.  I see that.

3          Q.   Are you trying to represent a class of

4      objectors here?

5          A.   I'm only objecting on behalf of myself, but the

6      goal is to improve the settlement for everyone.

7          Q.   And you say "who are likely to receive

8      minuscule payments."  What do -- how much is minuscule,

9      in your mind?

10         A.   Well, I've seen news articles that with the

11     number of potential class claimants, that the

12     alternative option could be as little as 50 cents for a

13     class member.

14         Q.   And so 50 cents would be minuscule; is that

15     what you're referring to by that statement?

16         A.   I think that would be very minuscule.

17         Q.   And do you know how many class members would

18     have to have valid claims in order for there to be a 50

19     cent claim?  Do you remember what that article

20     mentioned?

21         A.   I don't recall a number of class members

22     required.

23         Q.   Do you know how much additional 46 and a half

24     million taken from attorneys' fees, even if it was all

25     added to the alternative compensation for credit
```

1    monitoring that you're complaining about, do you know

2    how much that would add per class member to that number?

3         A.   I couldn't do the math and tell you without

4    knowing more information.

5         Q.   Well, let's say there were 10 million claims

6    submitted there, and that would be $4.65 per class

7    member.  Do you think that would be a substantial

8    increase to that number that it would satisfy you?

9         A.   Well, that would be a tenfold increase.  But,

10   again, that's probably not the only option for improving

11   the -- there are probably several options, including

12   that, to improve the class benefits.

13        Q.   Well, that's the option that you talk about in

14   your papers.  You don't mention any other one, do you?

15        A.   That is one option.

16        Q.   Well, what other options do you mention in here

17   that you're -- you would do instead?

18        A.   I think that is the primary objection to the

19   settlement contained explicitly within the brief here,

20   but we do incorporate other objections to the adequacy

21   and reasonableness of the settlement in whole.

22        Q.   But you haven't reviewed those objections, you

23   said, correct?

24        A.   I have not reviewed those personally, no.

25        Q.   And you don't know what -- what they contain,

```
                                                    Page 62
 1   right?
 2        A.  I couldn't give you details as to what any of
 3   the pleading contains.
 4              MR. PIZZIRUSSO:  Let's mark this as Exhibit
 5   5.
 6              (Exhibit No. 5 was marked.)
 7        Q.  (By Mr. Pizzirusso)  I'm handing you a copy of
 8   the frequently asked questions from the settlement
 9   website.  I think you said you've been to the website
10   and reviewed this; is that right?
11        A.  I went to the website and I looked at several
12   pages.  I didn't study the website.
13        Q.  Now, if you go to the second page of this
14   document at No. 7 --
15        A.  The second page goes to No. 3.
16        Q.  I'm sorry.  I have a different one than you.
17   Keep going.  It should be the second page.  Yes.  Is
18   there a -- it's got a little mark on it.  Do you see
19   that?
20        A.  Yes.
21        Q.  Okay.  So this is "how will the settlement
22   compensate me for identity theft I've already suffered,
23   the money I've already paid to protect myself and my
24   time spent on those things?"  The one that I marked
25   there, the second bullet point under payment for
```

1    unreimbursed out-of-pocket losses, you see where it says

2    credit monitoring or identity theft protection costs you

3    paid on or after September 7th, 2017?

4         A.   I see that marked bullet point.

5         Q.   So that was something you could claim on the

6    claim form if you're paying Experian for credit

7    monitoring costs, correct?

8         A.   That's what it looks like.

9         Q.   And you didn't make that claim, did you?

10        A.   I have not made that claim.

11        Q.   Now, if you go -- scroll down to the next one,

12   next Point 8, "how will the settlement help me protect

13   against future identity theft and fraud?"  Do you see

14   that?  It's at the bottom of the page.

15        A.   I see that.

16        Q.   It says settlement benefit credit monitoring

17   services.  It says, "The settlement provides a way to

18   help protect yourself from unauthorized use of your

19   personal information.  Settlement class members may

20   submit a claim to enroll in at least four years of three

21   bureau credit monitoring services provided by Experian

22   at no cost.  These services include the following

23   features:  free bureau credit monitoring providing

24   notice of changes to your credit report at all three

25   national credit bureaus."  Do you know if your current

```
                                              Page 64
 1    Experian credit monitoring includes all three bureau
 2    credit monitoring?
 3         A.  I know that it provides access to all three
 4    bureaus at some interval.
 5         Q.  Do you know if it provides up to a million
 6    dollars in insurance covering costs related to identity
 7    theft or fraud?
 8         A.  Sitting here today, I couldn't tell you.
 9         Q.  Do you know if it provides real-time
10    notification of credit inquiries and other
11    notifications?
12         A.  If that means up-to-date email alerts for
13    credit inquiries, then yes.
14         Q.  Do you know if it provides on-demand online
15    access to a free copy of one bureau credit report
16    updated on a monthly basis?
17         A.  I get access to a credit report email
18    notifications every month.
19         Q.  Do you know if it provides cyber agent dark web
20    monitoring that monitors Internet activity for the
21    trading or selling of your personal information?
22         A.  I don't know if it's a cyber agent, but I do
23    receive emails -- I have received emails from Experian
24    saying that my data is on the dark web.
25         Q.  And -- but currently you're paying $20 or $25 a
```

```
                                                     Page 65
 1    month for that service, right?

 2         A.  I am paying for that service.

 3         Q.  And so what does that come out to a year, do

 4    you think?

 5         A.  Forgive my math if I'm wrong, but maybe $300 a

 6    year.

 7         Q.  And under the settlement, it would be provided

 8    for four years for free, correct?

 9         A.  That's my understanding, yes.

10         Q.  So instead of applying for the free credit

11    monitoring and the alternative compensation of $125 --

12    I'm sorry, instead of applying for the free credit

13    monitoring and saving yourself $1200 over four years,

14    you're objecting that instead you can't claim $125?

15         A.  I think that's a logistical hassle to have to

16    create a new account, disable my old account after four

17    years, lose that account and go back to my old account.

18    Everything is set up, and there's an opportunity cost in

19    having to start from scratch.

20         Q.  Is it a $1200 opportunity cost?  You'd rather

21    pay -- you'd rather lose ten times the amount you could

22    save by signing up for the free credit monitoring and

23    complaining about not getting $125 cash?

24         A.  It's a service that I already paid for that I

25    already see value in, that I already have obtained on my
```

Page 66

```
 1   own.
 2       Q.  But in six months you would save more than you
 3   pay for that service alone; and here you'd be getting it
 4   for four years, plus another six years of one bureau
 5   credit monitoring after that, so ten years potentially
 6   of credit monitoring.  And you'd rather pay that money
 7   out of cash and only get $125?
 8       A.  Well, again, it's -- it's a service I already
 9   have.  It's something that I've already -- you know,
10   there's an opportunity cost involved in taking the time
11   to do that.
12       Q.  A $1200 opportunity cost?
13       A.  I haven't done the math, but I don't know the
14   difficulty of the logistics of doing that.
15       Q.  Well, the logistics are just cancelling one and
16   signing up for a new one through the web -- through
17   claim online.  I mean, that's -- you already signed up
18   for the claim -- you already submitted a claim already.
19   It would literally just be submitting a new claim and
20   cancelling your old service.
21       A.  I couldn't answer what's involved, not having
22   done that.
23       Q.  I'm just trying to understand rationally why
24   you think adding another $4.65 to the alternative
25   compensation is a better deal than taking $1200 in free
```

Page 67

1   value from not paying $20 or $25 a month.  I just -- I

2   don't get it.  Can you explain it to me?  It's the --

3   the opportunity cost is the only thing that you -- or

4   the logistical concerns?

5       A.  It's a -- it's not insignificant.  And that's

6   assuming that, you know, $46 million from the attorneys'

7   fees is the only potential added benefit to the class.

8       Q.  That was the only benefit that -- you just read

9   through your entire -- your entire objection.  That was

10  the only benefit you mentioned in your objection, right?

11      A.  That is one benefit, but there are other

12  objections that we -- that we incorporate to the

13  reasonableness and sufficiency of the settlement in

14  whole.

15      Q.  And you could have also claimed for, as we just

16  saw, the time -- the money you've spent for your credit

17  monitoring services since September, and you didn't make

18  that claim, right?

19      A.  I think that was kind of buried in the FAQ.  I

20  did not make a claim for that, no.

21      Q.  And you didn't make a claim for the time you

22  spent monitoring your credit reports after the data

23  breach, right?

24      A.  I did include that on my -- on my claim form.

25      Q.  But then you also say you have no out-of-pocket

```
                                                        Page 68
 1    losses?
 2         A.  Well, I'm not sure of how out-of-pocket losses
 3    are being defined.
 4                   MR. PIZZIRUSSO:  Let me mark this as
 5    Exhibit 6.
 6                   (Exhibit No. 6 was marked.)
 7         Q.  (By Mr. Pizzirusso)  I've handed you what's
 8    been marked as Exhibit 6.  This was also an attachment
 9    to your declaration.  Do you recall seeing this?
10         A.  I have seen this before.
11         Q.  It says "a description of Mr. West's lawyer's
12    legal background and prior experience in connection with
13    class-action litigation," correct?
14         A.  That's what the title says, yes.
15         Q.  And if you turn to Mr. Clore, it says in his
16    description at the bottom of page 1, "He has assisted in
17    securing many victories on behalf of clients in both
18    personal injury and class-action matters."  Do you see
19    that?
20         A.  Yes, I see that.
21         Q.  And do you know -- I think we talked about this
22    earlier, but do you know if he's actually ever
23    represented plaintiffs in a class action?
24         A.  I don't know the answer to that.
25         Q.  So do you know what victories he's referring to
```

```
                                                    Page 69
 1    here?

 2         A.  I couldn't tell you what specifically he's

 3    referring to here.

 4         Q.  If you turn it over to the next page, the last

 5    sentence in Mr. Clore's description says, "Mr. Clore's

 6    experience in class-action litigation is assisting class

 7    members in objecting to unfair settlements and excessive

 8    fee requests."  Do you see that?

 9         A.  I do see that.

10         Q.  So you're not aware that he's actually ever

11    prosecuted them; he just lists here the fact that he

12    assists class members in objecting to settlements,

13    right?

14         A.  I don't know the extent of his experience in

15    litigation, but I do see that he has assisted class

16    members there.

17         Q.  And you didn't ask him the extent of his

18    experience before you retained him?

19         A.  I have not asked him for a resumé of all of the

20    cases that he's handled.

21         Q.  Don't you think having an attorney experienced

22    in prosecuting and settling class actions would be

23    helpful to knowing whether a class-action settlement was

24    good or bad?

25         A.  I think Rob has the reputable experience to
```

Page 70

1    represent me in this matter.

2        Q.  And then turning to Mr. Bandas, do you know

3    what type of law Mr. Bandas generally handles?

4        A.  I couldn't tell you the extent or breadth of

5    the kind of cases he handles.

6        Q.  Have you ever seen his ads on TV?

7        A.  To be honest, if it's not on Hulu, I haven't

8    seen any ads.

9        Q.  Do you know if he's ever litigated a

10   class-action case?

11       A.  I couldn't tell you one way or the other.

12       Q.  Do you see the third sentence here where it

13   says "though he has been criticized by some courts for

14   his representation of objecting class members," do you

15   see that?

16       A.  I see that sentence.

17       Q.  Do you know what that's referring to?

18       A.  I'm assuming that he has represented objectors

19   and had significant success in improving class

20   settlements.

21       Q.  But this says -- I mean, this is his own bio

22   that he wrote.  He says he has been criticized by some

23   courts.  Do you know what the criticizing is all about?

24       A.  I've not read a specific criticism of him, so I

25   don't know what specifically courts have said about him.

Page 71

1        Q.  And that didn't cause you concern to say, well,

2    I should go see what courts are saying about my counsel

3    in this case?

4        A.  Again, my primary contact has been through Rob,

5    who's an attorney I've known for ten years, both

6    professionally and personally.

7        Q.  But Mr. Bandas signed the retainer of you,

8    correct?

9        A.  I believe he's the principal of the firm.  That

10   would be his role.

11               MR. PIZZIRUSSO:  Let's mark this as Exhibit

12   No. 7.

13               (Exhibit No. 7 was marked.)

14       Q.  (By Mr. Pizzirusso)  This is the retainer that

15   you signed with the Bandas Law Firm, correct?

16       A.  This is the agreement, yes.

17       Q.  And on page 5, that's your handwritten

18   signature again?

19       A.  That is my handwritten signature.

20       Q.  Okay.  And if you go to 1.3 of this on the

21   first page, purpose of representation, do you see that?

22       A.  I do see that paragraph.

23       Q.  And then if you sort of scroll down to the

24   middle it says "you acknowledge that prior to the

25   execution of this agreement, you contacted me seeking

Page 72

1    legal advice about your rights and options as a class

2    member," right?

3         A.   I see that sentence.

4         Q.   And Mr. Bandas is the one who signed this

5    agreement, correct, not Mr. Clore?

6         A.   That is Chris's signature.

7         Q.   But you did not speak with Mr. Bandas?

8         A.   I did speak with Mr. Bandas.

9         Q.   So -- okay.  So you -- this is correct then,

10   that you did contact him seeking legal advice about your

11   rights and options as a class member?

12        A.   I did contact the Bandas Law Firm and I have

13   spoken to both Rob and Chris about the case.

14        Q.   And then it says, "you further acknowledge the

15   following:  1, that you were not solicited by me or any

16   other lawyer."  Do you see that?

17        A.   I do see that.

18        Q.   So neither Mr. Bandas nor Mr. Clore solicited

19   you to serve as an objector in that case; is that your

20   testimony?

21        A.   They have not solicited me to serve as an

22   objector.

23        Q.   Okay.  And then it says, No. 2, "you have not

24   been paid or promised any money incentive or any other

25   consideration to assert your rights as a class member

```
                                                    Page 73
 1   with an interest in the proposed settlement."  Do you

 2   see that?

 3        A.  I do see that.

 4        Q.  So you're not seeking any money on your own

 5   behalf as a part of your objection; is that true?

 6        A.  I understand that if the class settlement is

 7   improved that, you know, the court may award an

 8   incentive award.  But, you know, the goal is to improve

 9   the class settlement.

10        Q.  And would you waive the ability to seek such an

11   incentive award for yourself?

12        A.  I couldn't answer that question today.

13        Q.  And at 3.2 of this agreement it says, "The

14   attorneys may petition the court for a payment to you or

15   may ask class counsel or defendants to make a payment to

16   you in recognition of your service as an objector and/or

17   for other factors related to your service as an

18   objector.  This is referred to herein as an incentive

19   award or incentive payment.  You understand any

20   incentive award or payment sought will never exceed

21   $5,000."  Do you see that?

22        A.  I see that in the paragraph.

23        Q.  And did the Bandas Law Firm suggest that you

24   would get $5,000 for serving as an objector in this

25   case?
```

Page 74

```
 1        A.  They haven't made any, you know, suggestions or
 2    intimations of what I might get.
 3        Q.  Do you know how much the class representatives
 4    in the actual litigation are seeking for incentive
 5    awards to serve as class representatives in the case?
 6        A.  I do not know what they're seeking.
 7        Q.  Would it surprise you to find out that it's
 8    actually $1500 and not $5,000?
 9        A.  No, I couldn't tell you if that's normal or
10    abnormal.  That doesn't surprise me one way or the
11    other.
12        Q.  Do you think that you should get more than a
13    class representative in an incentive award for objecting
14    to a settlement?
15        A.  You know, that's not -- we have not discussed
16    an amount.  I mean, this simply sets a ceiling.
17        Q.  Would you agree that you shouldn't get more
18    than what the class representatives will get if you have
19    a successful objection?
20        A.  You know, I will cross that bridge when we get
21    there.  I'm not sure what -- what anybody is going to
22    end up getting.
23        Q.  It says, "you understand that it cannot be
24    determined with certainty in advance whether you will
25    qualify for an incentive payment or award at all."  Do
```

Page 75

```
 1    you see that?
 2          A.   I see that sentence.
 3          Q.   Do you know why that is?
 4          A.   Well, you know, it's the nature of litigation
 5    that it's uncertain.
 6          Q.   If you go to the next section, Section 3.3,
 7    attorneys' fees, do you see that?
 8          A.   I see that paragraph.
 9          Q.   If you sort of go to the middle it says, "The
10    attorneys' fees will be paid by the defendants and/or as
11    part of the attorneys' fees awarded to class counsel
12    and/or awarded by the court and never from your portion
13    of the recovery or settlement under paragraphs 3.1 or
14    3.2."  Do you see that?
15          A.   I see that sentence.
16          Q.   So you understand that if your counsel -- if
17    your objection is successful, your counsel will be
18    seeking fees from the settlement in the same way that we
19    have sought fees from the settlement, the class counsel
20    have sought fees, right?
21          A.   I understand that they will be seeking, you
22    know, compensation for their time and efforts.
23          Q.   And you have no problem with your counsel
24    getting money from the same pot or fund for fees that
25    you're criticizing class counsel for taking in this
```

```
                                            Page 76
 1   case?
 2        A.  I think they're entitled to a reasonable fee.
 3   I think class counsel is entitled to a reasonable fee.
 4        Q.  If you turn to Section 5.4 of this retainer
 5   agreement, deposition, do you see that?
 6        A.  I see that paragraph.
 7        Q.  So you knew before you even signed this
 8   retainer that you could be deposed in this litigation,
 9   correct?
10        A.  I was aware that I may be deposed.
11        Q.  And you had no concerns with signing the
12   retainer and being deposed at that time, right?
13        A.  I knew it was a requirement from the class
14   notice.
15        Q.  And you signed it anyway, right?
16        A.  I did sign it.
17        Q.  And it says in the third sentence, "The
18   attorneys taking your deposition may inquire about
19   personal matters and criticize your objection."
20             I haven't inquired about any personal
21   matters for you, have I?
22        A.  It depends on personal.  Not deeply personal,
23   no.  I mean, my employment, which isn't relevant to the
24   case, but nothing personal personal.
25        Q.  It says, "They may also have criticisms of the
```

Page 77

1    Bandas Law Firm for its prior representation of other
2    objecting class members."  Do you see that?
3         A.  I do see that.
4         Q.  And it was similar to the language that we just
5    went through from Mr. Bandas about courts have
6    criticized him, right?
7         A.  Well, they both reference criticism.
8         Q.  Right.  And you didn't ask for details when you
9    saw this in the retainer agreement either, correct?
10        A.  I didn't ask for any particular details about
11   any particular case.
12        Q.  And have you ever Googled Mr. Bandas and
13   objections or looked for information about his prior
14   objections on the Internet?
15        A.  I have not.
16        Q.  And you want to hire the most ethical law firm
17   that you can to represent you in handling an objection
18   like this, right?
19        A.  I want to hire the most competent and
20   professional and ethical attorneys that I know.
21        Q.  And do you know if Mr. -- if the court has ever
22   sanctioned the Bandas Law Firm for filing frivolous
23   objections in other cases?
24        A.  I couldn't answer that one way or the other.
25        Q.  Do you know if Mr. Bandas has ever admitted to

Page 78

1  unauthorized practice of law without a license related

2  to objections in class actions?

3        A.   I've not seen anything that documents that.

4        Q.   Would that concern you if that were the case?

5        A.   Well, out of context.  I'd have to know the

6  context.

7                  MR. PIZZIRUSSO:  And let's mark this as

8  Exhibit 8.

9                  (Exhibit No. 8 was marked.)

10       Q.   (By Mr. Pizzirusso)  This is also an attachment

11  to your objection, cases in which Mr. Clore, Mr. Bandas,

12  and/or the Bandas Law Firm have represented class

13  members in filing an objection to a class-action

14  settlement in the preceding five years.  Do you see

15  that?

16       A.   I see that title, yes.

17       Q.   And I think you said you haven't looked at any

18  of their objections or rulings in any of these cases

19  listed here; is that right?

20       A.   I have not researched any of these cases.

21       Q.   But you know they objected in at least 44 other

22  cases that they listed right here, correct, in the last

23  five years?

24       A.   That's the number listed here, yes.

25                  (Exhibit No. 9 was marked.)

1      Q.   (By Mr. Pizzirusso)  Okay.  Let's mark this as

2   Exhibit 9.  I'm handing you an article from Class Action

3   News titled Notorious Serial Objector May Have Filed His

4   Last Objection.  Do you see that?

5      A.   I see the title, yes.

6      Q.   And have you ever seen this article before?

7      A.   I have not seen this article before.

8      Q.   And Mr. Bandas didn't provide this to you, I

9   assume, then?

10      A.   I have not seen it before.

11      Q.   So the first paragraph says, "Texas attorney,

12   Christopher Bandas, has made a name for himself in the

13   legal community and not in a good way.  Regarded as the

14   most prolific serial objector in the country, Bandas

15   routinely objects to class-action settlements hoping to

16   leverage a payment from the settling attorney to simply

17   go away."  Do you see that?

18      A.   I see the first paragraph.

19      Q.   It says, "The business model seen as a form of

20   legal extortion among critics has paid Banda handsomely

21   over the years, but two recent court rulings and

22   revisions to the Rules of Civil Procedure may signal an

23   end to this much maligned practice.  The first whiff of

24   trouble for Bandas came on November 20th last year" --

25   this was written in 2019, so that would be November

```
                                                          Page 80
```

1    20th, 2018 -- "when an Illinois appellate court found

2    Bandas had engaged in an unethical pattern of rent

3    seeking behavior.  The appeals court judges also found

4    Bandas had engaged in a fraud on the court, worthy of

5    discipline by the state."  Do you see that?

6         A.  I see that paragraph.

7         Q.  And this is the first time you've ever heard

8    about that?

9         A.  This is the first time I've seen this article.

10        Q.  All right.  Well, let's look at that decision

11   that is being referenced here.

12              (Exhibit No. 10 was marked.)

13        Q.  (By Mr. Pizzirusso)  And I've handed you a copy

14   of the decision in Clark v. Gannett, 2018 IL App (1st),

15   172041.  And I think you said you've never seen this

16   decision, right?

17        A.  That's correct.

18        Q.  All right.  If you turn to paragraph 11 of

19   this, paragraphs 70 and 71, and it's talking about the

20   objection brought in this case.  But if you scroll down

21   in the middle of this paragraph or actually the third

22   sentence, it says, "As noted in Judge Pallmeyer's ruling

23   in Edelson PC, courts nationwide have denounced

24   defendant's behavior, specifically Bandas, Thut,

25   T-h-u-t, and Stewart.  The Gannett case was cited as one

Page 81

1    of 15 lawsuits since 2009 in which Bandas, Thut and

2    Stewart have repeated the same basic pattern,

3    frivolously object, appeal its denial, settle out of

4    court and withdraw."  Do you see that?

5        A.  I see that sentence.

6        Q.  It says, "One federal judge found that Bandas

7    routinely represents objectors purporting to challenge

8    class-action settlements and does not do so to

9    effectuate changes to settlements, but does so for his

10   own personal financial gain and has been excoriated by

11   courts for this conduct," cites a case.

12             Another federal judge described Mr. Bandas

13   as "a known vexatious appellant who has been repeatedly

14   admonished for pursuing frivolous appeals of objections

15   to class-action settlements."  Cites some cases.

16             Then in paragraph 71, "the same pattern of

17   rent seeking behavior expressed in Edelson PC exists

18   here."  Do you see that?

19       A.  I see that sentence.

20       Q.  And that was the quote from the article we just

21   read.  Does that concern you at all?

22       A.  Well, I've read everything out of context.  I

23   can't tell you one way or the other.

24       Q.  Okay.  And if you go to the bottom of paragraph

25   71, it says, "Therefore, we vacate the order denying the

Page 82

1    motion for Rule 137 sanctions, remand the matter to

2    trial court.  We direct the Court to conduct a new

3    hearing with admission of evidence of similar conduct in

4    other cases to determine whether the objection was

5    indeed filed for improper purpose."  Do you see that?

6         A.  I see that sentence.

7         Q.  If you turn back to -- I don't know what

8    exhibit it was, but the exhibit with the list of cases

9    Mr. Bandas and Mr. Clore have been involved in.

10        A.  (Witness complies.)

11        Q.  Do you have that in front of you?  Turn to No.

12   32.  That's the Clark v. Gannett case that we just read

13   about, right?

14        A.  It's the same name, yes.

15        Q.  Yeah.  And under the description of that case,

16   it says, "Objections struck as contempt for objector

17   failing to appear for hearing.  Appeal dismissed for

18   lack of jurisdiction."  Do you see that?

19        A.  I see that.

20        Q.  In reading what I just read to you, how they're

21   vacating the order denying sanctions, remanding for a

22   new hearing to allow evidence of other similar conduct

23   in other cases, does this appear to you to be an appeal

24   dismissed for lack of jurisdiction?

25        A.  Well, it's remanded, so I don't know what --

Page 83

1   what was the ultimate conclusion of this case.  I've

2   just been read a couple of sentences out of two

3   paragraphs.

4        Q.  Well, if you want to read the whole case, we

5   can go off the record and do that.  That would be fine

6   with me.  I'm just trying to understand if you think

7   that remanding for an additional Rule 137 sanctions

8   hearing to allow more evidence means an appeal was

9   dismissed for lack of jurisdiction in your knowledge as

10  a lawyer?

11       A.  I'm sorry?

12       Q.  As an attorney, do you think that it is an

13  accurate description to say an appeal was dismissed for

14  lack of jurisdiction when in realty it says that they're

15  vacating the order, denying sanctions, remanding to the

16  trial court to allow new hearing with admission of

17  evidence of similar conduct in other cases to determine

18  whether the objection was filed for an improper purpose.

19  Do you think that's an accurate description?

20       A.  Well, it sounds like the Court hasn't ruled on

21  the merits of the objection in this -- in this order.

22       Q.  Let's refer you to number -- paragraph 85 in

23  the same decision.  It says, "Bandas and Thut and

24  Stewart, by extension, have taken advantage of a

25  situation described as mirky and with unpredictable or

```
                                                    Page 84
 1     sporadic enforcement with a vastly uncertain scope of
 2     jurisdictional restrictions in various states."  There's
 3     a cite.
 4                  Paragraph 86:  "We reverse the judgment of
 5     the circuit court of Cook County, remand for further
 6     proceedings consistent with this opinion.  The clerk of
 7     our court is directed to forward a copy of this order to
 8     the ARDC to determine whether disciplinary action should
 9     be taken against Bandas and Thut."  Do you see that?
10          A.  I see that paragraph.
11          Q.  Again, does that sound like a dismissal of an
12     appeal for lack of jurisdiction?
13          A.  Again, I haven't read this opinion.  I don't
14     know if it addresses the merits of the objection.
15          Q.  But it didn't say appeal is dismissed for lack
16     of jurisdiction, correct?
17          A.  Well, it doesn't address the merits of the
18     objection at all.
19          Q.  But it doesn't -- it doesn't dismiss the appeal
20     for lack of jurisdiction?  Do you see that anywhere?
21          A.  Well, again, I don't know what -- is it an
22     appeal of the objection or -- or this is an appeal of
23     a -- of a denial of a sanctions award?  I don't know if
24     those are the same thing.
25          Q.  Okay.  And then the one sentence I missed
```

Page 85

1     unfortunately in paragraph 85:  "Both attorneys have

2     engaged in a fraud on the court."  Do you see that?

3          A.  I see that sentence.

4          Q.  Does it concern you that your counsel has been

5     found by an appellate court in Illinois to engage in a

6     fraud on the court?

7          A.  Again, you know, this is out of context, and

8     Rob is an attorney that I know and trust.

9          Q.  But Rob didn't sign your retainer agreement;

10    Mr. Bandas did, correct?

11         A.  My understanding is that Chris is a principal

12    of the firm.

13         Q.  And you didn't know that Mr. Bandas had been

14    described as having been engaged in a fraud on the court

15    before you retained him, correct?

16         A.  I have not seen this order before.

17         Q.  As an attorney, do you think it's acceptable to

18    retain counsel that has been engaged in fraud for filing

19    frivolous objections?

20         A.  I think that attorneys are routinely -- you

21    know, lose cases, and that can happen in a various

22    number of ways.

23         Q.  Has any court ever said that you've engaged in

24    a fraud on the court?

25         A.  I have not had that order, no.

1      Q.  And back to the article that we were referring

2  to earlier, it says -- if you go down to the second

3  paragraph from the bottom, do you see it?

4      A.  What page?

5      Q.  I'm sorry, page 1.

6      A.  Which paragraph?

7      Q.  The second paragraph from the bottom.  "And on

8  January 17th" -- do you see that?

9      A.  I see that.

10      Q.  It says, "On January 17th, District Court Judge

11  Rebecca Pallmeyer" -- P-a-l-l-m-e-y-e-r -- "issued an

12  attention getting order finding that Bandas had engaged

13  in the unauthorized practice of law.  The order

14  responded to Bandas' own admission of responsibility in

15  a lawsuit in federal court in Chicago that alleged

16  professional misconduct.  The lawsuit followed the fact

17  pattern in the Gannett case but portrayed it as a single

18  chapter in an illegal racketeering scheme being

19  replicated in jurisdictions across the country.

20          Pallmeyer also issued a permanent

21  injunction that placed new limits on Bandas' ability to

22  object in any state or federal jurisdiction in the

23  country."  Were you aware of that ruling?

24      A.  I have not seen this order.

25      Q.  And does the fact that a federal judge in

Page 87

1    Chicago issued an injunction on the Bandas Law Firm's

2    ability to file objections in any other court in the

3    country concern you at all?  Don't you think as an

4    objector your counsel should have let you know that

5    there's an order, an injunction about how they can file

6    objections in cases in this country?

7         A.  I think that I don't have any context for this.

8         Q.  Okay.  Well, let's give you some.

9              (Exhibit No. 11 was marked.)

10        Q.  (By Mr. Pizzirusso)  I'm handing you what's

11   been marked as Exhibit 11.  This is the final judgment

12   and order in Edelson PC versus the Bandas Law Firm.  And

13   it's -- if you turn to page 4, you can see it's signed

14   by Judge Pallmeyer on January 17, 2019, the order we

15   were just referring to in that article.  Do you see

16   that?

17        A.  I see signed by the same judge.

18        Q.  And the same date as that referred to in the

19   article?

20        A.  Okay.

21        Q.  Now, if you turn to page 2 of this order, Acts

22   Restrained Or Required, do you see that?

23        A.  I see that heading.

24        Q.  And it says, "Defendants, the Bandas Law Firm

25   PC and Christopher A. Bandas, are hereby restrained and

Page 88

```
 1   permanently enjoined from engaging in the following
 2   actions."  Do you see that?
 3        A.  I see that paragraph.
 4        Q.  So this refers not to just Christopher Bandas;
 5   it refers to his law firm, correct?
 6        A.  I see that both are referenced, yes.
 7        Q.  And Mr. Clore works for the Bandas Law Firm,
 8   correct?
 9        A.  He does work for the Bandas Law Firm.
10        Q.  So, by extension, this would apply to him as
11   well if it applies to his firm?
12        A.  It would apply to the Bandas Law Firm, yes.
13        Q.  And No. 3 in this says "paying or offering to
14   pay or to loan any client any monies in connection with
15   any class-action objection, unless such payment is
16   awarded or expressly approved by a court."  Do you see
17   that?
18        A.  I see that paragraph.
19        Q.  And you agree it would be inappropriate for
20   them to offer you money or payment in connection with
21   your objection unless it's awarded or expressly approved
22   by a court?
23        A.  And they have not paid or offered to pay
24   anything.
25        Q.  But you would agree that would be improper?
```

Page 89

1          A.   That would violate the order.

2          Q.   And it says, No. 4, "Seeking admission pro hac

3     vice or otherwise to practice in any state or federal

4     court without fully and truthfully responding to all

5     questions on the application without attaching a copy of

6     this judgment."  Do you see that?

7          A.   I see that paragraph.

8          Q.   Do you know if they attached a copy of this

9     judgment in seeking to practice in filing your objection

10    in the Equifax matter?

11         A.   I have not seen any application or anything

12    like that.

13         Q.   And you, in fact, have never seen this before,

14    correct?

15         A.   I have not seen this order.

16         Q.   And it wasn't attached to your objection, was

17    it?

18         A.   It was not attached to my objection.

19         Q.   Do you think they should have attached this to

20    your objection if they were seeking to practice and

21    represent you with your objection in this case?

22         A.   I couldn't answer that question.  I haven't

23    seen a pro hac vice motion or anything like that.

24         Q.   Well, even if they didn't file a pro hac vice,

25    don't you think if they're seeking to practice and file

Page 90

1    an objection in a court, that they should have attached

2    this to those papers?

3        A.  I see where it says they should have attached

4    it to a pro hac vice or seeking admission.

5        Q.  Seeking admission pro hac vice or otherwise?

6        A.  That's correct.

7        Q.  Right.  And then it says under 5, "Defendant

8    shall not file or cause to be filed any objection to any

9    proposed class action in any state or federal court

10   unless, A, such objection states whether it only applies

11   to the objector, to a specific subset of the class, or

12   to the entire class, and also states with specificity

13   the grounds for the objection; and, B, any payment in

14   connection with the objection as disclosed and approved

15   by the Court; and unless approved by the court after a

16   hearing, no payment or other consideration is provided

17   in connection with foregoing or withdrawing the

18   objection or foregoing, dismissing, or abandoning an

19   appeal from a judgment approving the proposal."  Do you

20   see that?

21       A.  I see those paragraphs.

22       Q.  Also, if you look at paragraph 4 -- or, I'm

23   sorry, Roman Numeral IV, costs, do you see that?

24       A.  I do see that.

25       Q.  It says, "The defendant shall pay plaintiff's

```
                                                    Page 91
 1    costs in the amount of $5,447.65"?
 2         A.  I see that paragraph.
 3         Q.  Do you know if a similar cost order was
 4    entered -- if a similar cost order were entered here
 5    with respect to your objection that you would -- whether
 6    you or the Bandas Law Firm would pay those costs?
 7         A.  Per my contract, I would not be responsible for
 8    any costs.
 9              (Exhibit No. 12 was marked.)
10         Q.  (By Mr. Pizzirusso)  Let's go to another case.
11    This is Exhibit 12.  This case is Garber v. Office of
12    the Commissioner of Baseball, 2017 Westlaw 752183.  I'm
13    assuming this is another one that you've never seen; is
14    that correct?
15         A.  I don't believe I've seen this opinion before.
16         Q.  If you turn to page 3 of the document, the
17    third page, do you see where it starts discussion?
18         A.  I see that paragraph.
19         Q.  If you move over to the second column, the last
20    paragraph in that, it says, "Throughout this proceeding
21    Bandas' behavior has been at best unprofessional and at
22    worst an unseemly effort to extract fees from class
23    counsel in exchange for the withdrawal of a meritless
24    objection to the proposed class settlement."  Do you see
25    that?
```

Page 92

1        A.   I see that sentence.

2        Q.   Were you aware of that holding from a court

3   before?

4        A.   I have not seen this order before.

5        Q.   Does it concern you?

6        A.   You know, it's out of context.  I couldn't tell

7   you.

8        Q.   If you turn to the next page, page 4, the first

9   full paragraph it starts at star 5, "Bandas' failure to

10  provide any legitimate support for the whole objection

11  would be enough to cause this court concern, but Bandas'

12  behavior throughout this proceeding has been unfitting

13  for any member of the legal profession.

14              Even though Bandas was substantially

15  involved in all stages of the Hall objection, he drafted

16  the Hall objection, and substantial portions of Hall's

17  opposition brief, and he assisted in the preparation of

18  Hall's pro se letter regarding sanctions, Bandas refused

19  to enter a notice of appearance in this case, and he

20  refused to sign any of the filings that he himself

21  drafted.

22              Instead, Bandas orchestrated other

23  attorneys, Stein and Turkish, to appear on the very

24  filings that Bandas drafted or prepared behind the

25  scenes.  Bandas' machinations were designed to avoid his

Page 93

1   professional responsibilities to the court and were

2   explicit with respect to Turkish.  Turkish required as a

3   term of his engagement that Bandas would prepare the

4   substantive filings, including motions, and required

5   Bandas to agree to indemnify him if he were sanctioned

6   for his role in this case.

7              The sanctions indemnity provision in the

8   engagement agreement between Turkish and Bandas appears

9   to be up to the court to be an improper attempt by

10  Turkish to avoid any financial repercussions or

11  sanctional behavior and a way for Bandas to avoid any

12  collateral consequences to himself if his conduct

13  results in sanctions being imposed."  Do you see that?

14       A.  I see that paragraph.

15       Q.  Does that concern you?

16       A.  Again, it's out of context.  I can't answer

17  that question.

18       Q.  And if you scroll down to the bottom, the next

19  paragraph, starting in the middle, "Bandas' preparation

20  of a meritless objection to the proposed settlement, his

21  refusal to appear in the case despite his substantial

22  involvement in preparing the Hall objection that exposed

23  two of his local counsels to potential sanctions and his

24  failure to affix his name to any of the litigation

25  papers that he himself drafted and prepared belie his

Page 94

1   specious assertion that his conduct was entirely

2   innocent.  Numerous courts throughout the country have

3   publicly excoriated Bandas for the frivolous objections

4   that he has penned and injected into class-action

5   settlements.  A district court in California, for

6   example, wrote:  Bandas routinely represents objectors

7   purporting to challenge class-action settlements and

8   does not do so to effectuate changes to settlements, but

9   does so for his own personal, financial gain."  There's

10  a case cited.

11          "Similarly, a court in Illinois found

12  Bandas is a professional objector who is improperly

13  attempting to highjack the settlement of this case from

14  deserving class members and dedicated hard-working

15  counsel solely to coerce ill-gotten, inappropriate, and

16  unspecified legal fees.  Bandas has filed virtually

17  identical frivolous objections in South Carolina, Iowa,

18  Missouri and Florida in settlements of similar class

19  actions."  Again, citing another case.  Do you see that?

20      A.  I see that paragraph.

21      Q.  Does that concern you?

22      A.  Without context, I can't comment on the merits

23  of the objection.

24      Q.  Do you know if he prepared the papers in your

25  objection?

Page 95

1          A.   If he typed it up and wrote it?

2          Q.   Yeah.

3          A.   I couldn't answer that question.

4          Q.   And then if you go down to the next paragraph,

5     "This court joins other courts throughout the country in

6     finding that Bandas has orchestrated the filing of a

7     frivolous objection in an attempt to throw a monkey

8     wrench into the settlement process and to extort a

9     payoff.  His plan was thwarted when the Court permitted

10    discovery to proceed on the sanctions motion, which

11    ultimately apparently created more risks for Bandas than

12    he was prepared to endure.

13                    Hall testified that in Bandas' numerous

14    representations of him in objections to class-action

15    settlement, Hall has never received funds from the

16    settlement of any of his objections, whereas Bandas

17    has."  Do you see that?

18         A.   I see that paragraph.

19         Q.   Does that concern you?

20         A.   Again, without -- without context, I can't tell

21    you.

22         Q.   And then if you go to the next paragraph on the

23    next page -- or, I'm sorry, it's still part of the same

24    paragraph.  But it says, "That testimony, if true, is

25    gravely concerning.  It indicates that Bandas'

Page 96

```
1    settlement of objections has been without any benefit to

2    his client Hall or to the class, according the

3    conclusion that many, if not most, of the objections

4    being raised by Bandas are not being pursued in good

5    faith.  Ultimately, Bandas wasted a substantial amount

6    of judicial time and effort without any benefit to Hall

7    or to the class."  Does that concern you?

8         A.   It doesn't provide any context.

9              MR. PIZZIRUSSO:  Let's mark this as Exhibit

10    13.

11              (Exhibit 13 was marked.)

12              THE WITNESS:  Can we take a break real

13    quick?

14              MR. PIZZIRUSSO:  Sure.

15               (A recess was taken.)

16         Q.   (By Mr. Pizzirusso)  I've handed you Exhibit

17    13, another case.  I think we actually cited the

18    language from this case.  I just want to turn you to --

19    your attention to the page where it's cited on.  It's

20    the third page, 533, at the top.  The left-hand column,

21    second full paragraph in the middle of that it says,

22    "Bandas routinely represents objectors purporting to

23    challenge class-action settlements and does not do so to

24    effectuate changes to settlements, but does so for his

25    own personal gain.  He has been excoriated by courts for
```

```
                                                        Page 97
```

1    this conduct."

2              There's an appendix attached thereto and a

3    footnote citing the Brown v. Walmart case, which I think

4    we talked about, too.  Again, this is another one.  Does

5    that concern you?

6         A.  I don't have any context to consider.

7              (Exhibit No. 14 was marked.)

8         Q.  (By Mr. Pizzirusso)  Okay.  Exhibit 14, the In

9    re General Electric Company's Securities Litigation,

10   998, F.Supp. 2nd, 145 (SDNY 2014).  And if you turn to

11   page 156, second to the last page on this opinion, and

12   if you look at the first full paragraph, it says,

13   "Moreover, while Hampe is appearing pro se before this

14   Court, he admits he's represented in this matter by

15   Attorney Christopher A. Bandas, who has been previously

16   admonished for pursuing frivolous appeals of objections

17   to class-action settlements."

18              And then if you skip down to the last part

19   of this paragraph, same paragraph, it says, "Hampe's

20   relationship with Bandas, a known vexatious appellant,

21   further supports a finding that Hampe brings this appeal

22   in bad faith."  Do you see that?

23        A.  I see that paragraph.

24        Q.  Does that concern you?

25        A.  I don't have any context to evaluate that.

```
                                                    Page 98

 1        Q.  I'll give you one more.

 2             (Exhibit No. 15 was marked.)

 3        Q.  (By Mr. Pizzirusso)  And this is Exhibit 15, In

 4   re Hydroxycut Marketing and Sales Practice Litigation,

 5   2013 Westlaw 5275618.  And if you turn to page 4 of this

 6   document, the right-hand column top of the page, it

 7   says, "In light of Mr. Bandas' scheme, the court finds

 8   that Ms. McBean's objections were filed for the improper

 9   purpose of obtaining a cash settlement in exchange for

10   withdrawing the objections.  Although the bad motive

11   does not necessarily mean that the objections themselves

12   are invalid, the motive does bear on the credibility of

13   Mrs. McBean.

14             The bad motive provides a reason, i.e.,

15   financial gain for Ms. McBean to insert herself into

16   this litigation and lie about her class membership and

17   reinforces the court's belief that she was not telling

18   the truth when testifying about her purchase and use of

19   Hydroxycut."  Do you see that?

20        A.  I see that paragraph.

21        Q.  Does that concern you?

22        A.  I don't have any context to evaluate it.

23        Q.  Let's go back to the article that we started

24   all this with.  If you'd turn to page 3 of that article,

25   do you see that?  And then if you move to the middle
```

Page 99

1   there it says "a personal epiphany, question mark."  See

2   that?

3        A.  I see that heading.

4        Q.  It says, "Bandas declined to be interviewed for

5   this story, but he acknowledged unethical, improper, and

6   misleading conduct in filing or causing to be filed

7   objections to proposed class-action settlements in the

8   brief triggering Judge Pallmeyer's order."  That's the

9   one we looked at before.

10            "He further acknowledged his reputation in

11  courts across the country has been gravely but

12  justifiably tarnished."  Do you see that?

13       A.  I see that paragraph.

14       Q.  Does that cause you any concern?

15       A.  I don't have any context outside of this

16  article.

17       Q.  But do you need context when your attorney

18  admits to unethical, improper, and misleading conduct in

19  filing or causing to be filing objections to proposed

20  class-action settlements?

21       A.  No, I don't have any details on those specifics

22  and what's -- what's involved or what that -- what that

23  means.

24       Q.  You need specifics to know more about whether

25  you should be concerned about your counsel admitting to

```
                                            Page 100
```

1    unethical and improper and misleading conduct in a

2    federal court?

3         A.  Well, I'd like to -- to know what the specifics

4    are before I make a judgment.

5                   (Exhibit No. 16 was marked.)

6         Q.  (By Mr. Pizzirusso)  I'm handing you what's

7    been marked Exhibit 16.  Here's the motion where that

8    language came from.  So I don't know if you want to read

9    the whole thing, but I would direct your attention to

10   page 2.  And it comes from a case, Edelson PC versus the

11   Bandas Law Firm.  It's defendant's motion for leave to

12   amend answer and withdraw counterclaim and for judgment

13   on the pleading.  So this is the Bandas Law Firm and

14   Christopher Bandas, the defendants, amending their

15   answer to withdraw their counterclaim and allowing for

16   judgment on the pleadings.

17                   And on the second page it says -- you want

18   to -- are you reading it?  I don't want to interrupt you

19   if you --

20        A.  I'm reading page 1.

21        Q.  Okay.  Do you now have further context about

22   what we were just discussing?

23        A.  Well, there's no -- no details.  There's no

24   factual information.

25                   (Exhibit No. 17 was marked.)

1        Q.  (By Mr. Pizzirusso)  Let's mark this as 17.  So

2    this is the complaint from the case in which this order

3    came.  I don't expect you to sit here and read that

4    entire complaint, but just so you understand, Edelson PC

5    is a class-action law firm who sued the Bandas Law Firm

6    and Christopher Bandas for engaging in a RICO enterprise

7    and other violations of law in objecting to settlements

8    to extract fees and not for the purposes of bettering

9    those settlements.  So this order came as a result of

10   the complaint that they filed.

11            Now, some of those claims were dismissed;

12   some survived.  I think the RICO -- it says in actually

13   Footnote 1, "The court dismissed the following claims,

14   RICO claims, the claim for permanent injunction or the

15   All Writs Act and abuse of process claim, but some

16   claims were allowed."

17            So eventually the Bandas Law Firm filed a

18   counterclaim.  They withdrew it and actually asked for

19   judgment to be entered on the pleadings.  The judgment

20   entered on that complaint.

21            And here's what the specific portion of

22   this document that the Bandas Law Firm admitted to or,

23   you know, its counsel filed on its behalf:  "Defendants

24   wish to amend their pleading to admit that they have

25   engaged in the unauthorized practice of law in Illinois

Page 102

1    as described in the first amended complaint, that they

2    have violated the unauthorized practice provision of the

3    Illinois Attorney Act, 705 ILCS 205/1, and that

4    plaintiff is entitled to a permanent injunction the

5    defendant shall not engage in the practice of law in the

6    State of Illinois unless and until they obtain

7    authorization from the Supreme Court of Illinois to do

8    so.

9              Additionally, informed by this Court's

10   opinions and the opinion of Justice Hyman in Clark v.

11   Gannett, 2018 Illinois App 1st 172401" -- that's the

12   decision we read earlier -- "regarding defendant's

13   unethical, improper and misleading conduct in filing or

14   causing to be filed objections to proposed class-action

15   settlements, defendants also agree that plaintiff is

16   entitled to a permanent injunction.  The defendant shall

17   not file or cause to be filed any objection to proposed

18   class-action settlements in any state or federal court

19   unless such objection satisfies the following criteria."

20   And they go through the two that we read from the order.

21              It says, "In sum, defendants propose to

22   amend their answer, withdraw their counterclaim in order

23   to agree that plaintiff is entitled to entry of the

24   permanent injunction it has expressly sought under the

25   Illinois Attorney Act and also granting the additional

Page 103

1   relief relating to any future class-action objections by

2   defendants as proposed herein.  This relief is entirely

3   justified under the circumstances."

4           This is the Bandas Law Firm and Christopher

5   Bandas' own counsel saying this on his behalf and the

6   firm's behalf.  "Defendants understand and recognize the

7   disservice to the legal profession and the reputation of

8   attorneys generally that necessarily attends the court's

9   finding that yet another member of the bar and law firm

10  has placed self-interest and financial considerations

11  above ethical obligations.

12          The orders of this court are a matter of

13  public record.  Defendants acknowledge that their

14  reputations before the courts of this jurisdiction and

15  across the country have been gravely but justifiably

16  tarnished.  Undoubtedly, should defendants continue to

17  practice class litigation, they will carry the tattoo of

18  these orders with them, and they greatly regret these

19  circumstances that bring them before the court."  Do you

20  see that?

21      A.  I see that paragraph.

22      Q.  And does that cause you any concern?

23      A.  You know, I -- it's, again, without context of

24  what's actually involved.

25      Q.  What additional context would you need to find

1   out?

2        A.   Well, I don't know what is the allegation of

3   unauthorized practice because it seems like everything

4   else was dismissed.

5        Q.   Well, do you intend on discussing these issues

6   with your counsel to get more context about all the

7   various decisions that we've gone over today?

8        A.   You know, I'd have to address that with him.  I

9   can't answer that question.

10        Q.   Do you know if there are disciplinary

11   proceedings pending in front of the Texas state bar with

12   respect to Mr. Bandas or his firm?

13        A.   I'm not aware of anything.

14        Q.   Would it concern you if there were?

15        A.   Depending on the details and the context.

16        Q.   Well, the details and the context of -- in

17   particular an order or finding that he engaged in fraud

18   on the court.  I mean, that the Gannett -- Clark v.

19   Gannett was referred to the -- sorry -- the disciplinary

20   board in Illinois.  We saw that in the order itself,

21   right?

22        A.   It may be in there.  I didn't read through it

23   all.

24        Q.   Well, I think we went over it, but -- we quoted

25   it and read it to you.  But is your understanding that

1    if an attorney who is pro hoc vice in another state

2    has -- is being investigated for ethical violations in

3    that state, that would probably also go to his home

4    state where he's barred, and they would look at that as

5    well?

6         A.  That's not something I'm aware of the

7    procedures.

8         Q.  You never had a court accuse you of fraud on a

9    court; is that right?

10        A.  I have not been accused of fraud.

11        Q.  Never been accused of unauthorized practice of

12   law?

13        A.  I have not been accused of an unauthorized

14   practice of law.

15        Q.  Yet, you have no concern that counsel who you

16   have retained have been accused of those things and, in

17   fact, have admitted to at least some of them?

18        A.  You know, again, I've known Rob for ten years

19   and I trust him as an attorney.  And I know that I can

20   trust him.

21        Q.  What about Mr. Bandas?

22        A.  Well, I -- again, my primary contact has been

23   through Rob.  And I understand that both he and Chris

24   have had a mixed bag of success.

25        Q.  Would you refer to those numerous cases that we

1    just went through as a mixed bag of success?

2        A.  Well, there were, again, 44 class actions that

3    they've been involved in.  I think we've been through

4    just a handful.  I don't know how representative these

5    are of their history.

6        Q.  But as an attorney, you have no problem being

7    associated with counsel who have been accused of those

8    things and similar objections?

9        A.  Again, I can't answer that without, you know,

10   the detailed context of what's involved.

11       Q.  Do you think your choice of counsel reflects on

12   you as an attorney?

13       A.  I think I chose my counsel based on my history

14   and personal knowledge of working with and being friends

15   with Rob.

16       Q.  I believe you also said at one point that you

17   understood Mr. Bandas had an excellent reputation as

18   well; is that correct?

19       A.  He has a good reputation in the community as a

20   plaintiff's attorney.

21       Q.  And do you think that that's reflected by those

22   decisions that we just went through?

23       A.  Again, I don't know the context of what's

24   involved.

25       Q.  But you think his reputation is still excellent

1    based on what you've already read in the context you do

2    know?

3         A.  I think that he's earned his reputation in the

4    community.  And I can't speak to, you know, other cases

5    that I don't know anything about.

6         Q.  But you don't know about his reputation in the

7    objector community; is that correct?

8         A.  Again, this is my first ever objection.  I

9    don't have any other information about any other cases.

10        Q.  Do you think activities of your counsel in past

11   objections are something that you wish to be associated

12   with?

13        A.  You know, I can't speak to what any of their

14   activities are.

15        Q.  Do you think your partners would want you

16   associated with counsel who have been accused of those

17   activities?

18        A.  I couldn't answer that question.

19        Q.  If your objection is overruled, do you plan to

20   appeal?

21        A.  You know, I'll have to cross that bridge when

22   we get there.

23             MR. PIZZIRUSSO:  All right.  Let's take a

24   quick break.  We might be done, but I just want a second

25   to chat with my colleague, if that's okay.

```
 1                    (A recess was taken.)
 2                    MR. PIZZIRUSSO:  I have no more questions,
 3      Mr. West.  I would just encourage you to re-review the
 4      settlement materials to look at the value you could
 5      actually obtain from claiming the credit monitoring
 6      itself as opposed to the alternative cash compensation.
 7                    You could still maintain your objection.
 8      But as a class counsel in this case and as a class
 9      member, I think you will retain much more value from
10      taking the credit monitoring in this case.  So I would
11      encourage you to look at that with your counsel or
12      without.  And with that, we would pass the witness.
13                    MR. STEWART:  I don't have any questions.
14
15                         *  *  *  *  *  *  *
16
17
18
19
20
21
22
23
24
25
```

Page 109

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF GEORGIA
 2                        ATLANTA DIVISION
 3     In re:  Equifax, Inc.      §
       Customer Data Security      §
 4     Breach Litigation           §   Case No.: 1:17-md-2800-TWT
                                    §
 5                                  §
 6                  REPORTER'S CERTIFICATION
                  ORAL DEPOSITION OF MIKELL WEST
 7                      DECEMBER 4, 2019
 8          I, SYLVIA KERR, Certified Shorthand Reporter in and
 9     for the State of Texas, hereby certify to the following:
10          That the witness, MIKELL WEST, was duly sworn by
11     the officer and that the transcript of the oral
12     deposition is a true record of the testimony given by
13     the witness;
14          That the original deposition was delivered to
15     MR. JAMES J. PIZZIRUSSO;
16          That a copy of this certificate was served on all
17     parties and/or the witness shown herein on_____.
18          I further certify that pursuant to FRCP Rule
19     301(f)(i) that signature of the deponent:
20          _XXX_ was requested by the deponent or a party
21     before the completion of the deposition and that the
22     signature is to be before any notary public and returned
23     within 30 days from date of receipt of the transcript.
24     If returned, the attached Changes and Signature Page
25     contains any changes and the reasons therefore:
```

Page 110

1  _____ was not requested by the deponent or a party

2  before the completion of the deposition.

3      I further certify that I am neither counsel for,

4  related to, nor employed by any of the parties or

5  attorneys in the action in which this proceeding was

6  taken, and further that I am not financially or

7  otherwise interested in the outcome of the action.

8      Certified to by me this 6th day of December, 2019.

9

10

11      SYLVIA KERR, Texas CSR #4776

        Date of Expiration: 10/31/2021

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 111

1    ROBERT W. CLORE, ESQ.

2    rclore@bandaslawfirm.com

3                       December 9, 2019

4    RE: Equifax Inc. Customer Data Security Breach Litigation

5        12/4/2019, Mikell West (#3798551)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-ny@veritext.com.

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

```
                                              Page 112
1    Equifax Inc. Customer Data Security Breach Litigation
2    Mikell West (#3798551)
3                    E R R A T A   S H E E T
4    PAGE_____ LINE_____ CHANGE_____
5    _____
6    REASON_____
7    PAGE_____ LINE_____ CHANGE_____
8    _____
9    REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____   _____
24   Mikell West                    Date
25
```

Page 113

1    Equifax Inc. Customer Data Security Breach Litigation

2    Mikell West (#3798551)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Mikell West, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____ _____

12   Mikell West                      Date

13   *If notary is required

14                        SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                        _____ DAY OF _____, 20___.

16

17

18                        _____

19                        NOTARY PUBLIC

20

21

22

23

24

25

**&**

**&**   33:8

**1**

**1**   3:11 7:1,2,4
  22:16 24:19 45:5
  47:19 68:16 72:15
  86:5 100:20
  101:13
**1.3**   71:20
**10**   3:23 10:22,23
  47:24 48:2,15
  61:5 80:12
**10/31/2021**   110:11
**100**   4:8 5:22 13:23
**10004**   2:8
**101**   4:9
**1020**   2:15
**109**   3:6
**10:08**   1:16
**11**   3:24 80:18 87:9
  87:11
**112**   3:7
**12**   4:2 91:9,11
**12/4/2019**   111:5
**1200**   65:13,20
  66:12,25
**125**   8:9,12 12:16
  12:17,19,21 65:11
  65:14,23 66:7
**13**   4:3 96:10,11,17
**137**   82:1 83:7
**13th**   37:11 54:24
  55:1
**14**   4:4 49:5 50:19
  52:21 97:7,8
**145**   97:10
**14th**   2:7
**15**   4:5 10:3 55:11
  55:12 81:1 98:2,3

**1500**   74:8
**156**   97:11
**15th**   37:16,22
**16**   4:7 100:5,7
**1687**   110:10
**17**   4:9 87:14
  100:25 101:1
**1700**   2:4
**172041**   80:15
**172401**   102:11
**17th**   86:8,10
**1:17**   1:4 109:4
**1st**   80:14 102:11

**2**

**2**   3:3,12 22:11,12
  22:14,16 72:23
  87:21 100:10
**20**   9:4 10:14 12:23
  12:24 14:11,18
  41:7 64:25 67:1
  113:15
**20,000**   8:24 9:15
**200**   21:5
**2000**   1:20 2:12
**20006**   2:4
**2009**   22:24 81:1
**2013**   98:5
**2014**   97:10
**2017**   16:17 63:3
  91:12
**2018**   80:1,14
  102:11
**2019**   1:10,16 16:18
  55:1 79:25 87:14
  109:7 110:8 111:3
**202**   2:5
**205/1**   102:3
**20th**   79:24 80:1
**22**   3:12
**23**   22:3,7

**24**   44:9
**25**   9:4,20 10:15,16
  12:10,24 14:11,19
  45:6 48:4 64:25
  67:1
**250**   10:22 12:6,8,9
  12:10,18,21,24
**2800**   1:4 109:4
**2nd**   97:10

**3**

**3**   3:13 30:19,20
  41:12 59:18,18,24
  62:15 88:13 91:16
  98:24
**3.1**   75:13
**3.2**   73:13
**3.2.**   75:14
**3.3**   75:6
**30**   3:13 10:3
  109:23 111:17
**300**   65:5
**301**   109:19
**31**   59:2,10
**310**   45:8,20 46:2
  48:7
**32**   82:12
**33**   2:7
**350**   21:5
**357-1194**   2:8
**361**   2:13,16
**3798551**   111:5
  112:2 113:2

**4**

**4**   1:10 3:14 54:3,4
  87:13 89:2 90:22
  92:8 98:5 109:7
**4.65**   61:6 66:24
**44**   78:21 106:2
**46**   60:23 67:6

**46.5**   59:3,12,15
**4776**   110:11
**4th**   1:16

**5**

**5**   3:4,15 62:5,6
  71:17 90:7 92:9
**5,000**   73:21,24
  74:8
**5,447.65**   91:1
**5.4**   76:4
**50**   60:12,14,18
**500**   2:15 12:23,25
**5109**   5:11
**5275618**   98:5
**533**   96:20
**54**   3:14
**540-7200**   2:5
**558-3527**   2:16

**6**

**6**   3:16 68:5,6,8
**600**   21:6
**615**   1:19 2:12
**62**   3:15
**646**   2:8
**650**   2:4
**68**   3:17
**6th**   110:8

**7**

**7**   3:11,18 62:14
  71:12,13
**70**   80:19
**700**   21:6
**705**   102:3
**71**   3:18 80:19
  81:16,25
**752183**   91:12
**77**   59:1
**77.5**   59:10
**78**   3:21

**78401** 2:12,16
**79** 3:22
**7th** 63:3

**8**

**8** 3:19 63:12 78:8
  78:9
**80** 3:23 45:17,21
**85** 83:22 85:1
**86** 84:4
**87** 3:25
**883-3563** 2:13

**9**

**9** 3:22 78:25 79:2
  111:3
**91** 4:2
**96** 4:3
**97** 4:4
**98** 4:6
**998** 97:10

**a**

**a.m.** 1:16
**abandoning** 90:18
**ability** 52:17 73:10
  86:21 87:2
**able** 6:22 11:25
  12:15 41:19 49:13
  49:22 50:6,15,23
  51:22
**abnormal** 74:10
**absolutely** 6:10
  19:6
**abstract** 58:24
**abuse** 101:15
**acceptable** 85:17
**access** 42:17,19
  64:3,15,17
**accomplish** 11:6
**account** 65:16,16
  65:17,17

**accuracy** 111:9
**accurate** 46:3
  83:13,19
**accuse** 105:8
**accused** 105:10,11
  105:13,16 106:7
  107:16
**achievable** 12:17
**achieve** 18:25
**acknowledge**
  71:24 72:14
  103:13
**acknowledged**
  99:5,10
**acknowledgement**
  113:3
**acknowledgment**
  111:12
**acquaintances**
  26:13
**act** 101:15 102:3
  102:25
**acting** 20:5
**action** 3:17,18,21
  4:9 15:25 16:16
  18:25 20:17 22:4
  22:5,7 23:15,20
  24:15,21,22 25:21
  25:22 26:2,11
  27:12 33:2 34:24
  35:4,5 39:13,14,19
  43:16 44:7 56:13
  68:13,18,23 69:6
  69:23 70:10 78:13
  79:2,15 81:8,15
  84:8 88:15 90:9
  94:4,7 95:14
  96:23 97:17 99:7
  99:20 101:5
  102:14,18 103:1
  110:5,7

**actions** 21:14
  23:13,14,17 26:6
  39:23 44:4 69:22
  78:2 88:2 94:19
  106:2
**activities** 107:10
  107:14,17
**activity** 64:20
**acts** 87:21
**actual** 17:6,7,14
  44:10,11 57:10
  74:4
**add** 54:2 61:2
**added** 19:22,24
  45:14 60:25 67:7
**adding** 66:24
**additional** 14:2,4
  15:12 17:5 19:22
  45:12,16,19 46:11
  46:21 47:7 48:6
  51:7 58:20 59:3
  59:12,15 60:23
  83:7 102:25
  103:25
**additionally** 102:9
**additions** 113:6
**address** 5:10,12
  84:17 104:8
**addressed** 58:9
**addresses** 84:14
**adequacy** 61:20
**admission** 82:3
  83:16 86:14 89:2
  90:4,5
**admit** 101:24
**admits** 97:14
  99:18
**admitted** 77:25
  101:22 105:17
**admitting** 99:25

**admonished** 81:14
  97:16
**ads** 70:6,8
**advance** 74:24
**advantage** 83:24
**advice** 72:1,10
**affix** 93:24
**agency** 45:14
**agent** 64:19,22
**ago** 31:3,5,23 40:8
**agree** 14:1 42:3
  74:17 88:19,25
  93:5 102:15,23
**agreed** 44:19
  47:10
**agreement** 3:18
  28:24 37:3,15
  38:5,7 51:2,12,21
  71:16,25 72:5
  73:13 76:5 77:9
  85:9 93:8
**alan** 3:11 7:5
**alcohol** 6:21
**alerts** 13:19 55:5
  64:12
**allegation** 104:2
**alleged** 86:15
**allotted** 111:20
**allow** 82:22 83:8
  83:16
**allowed** 9:19
  10:16 101:16
**allowing** 100:15
**alternative** 7:25
  8:19 12:15 60:12
  60:25 65:11 66:24
  108:6
**amend** 4:7 100:12
  101:24 102:22
**amended** 102:1

amending 100:14
amount 47:6 55:8
58:21 59:4 65:21
74:16 91:1 96:5
answer 4:7 6:8,15
6:17,22 27:8 37:4
37:13 50:10 59:16
66:21 68:24 73:12
77:24 89:22 93:16
95:3 100:12,15
102:22 104:9
106:9 107:18
answers 6:5
antitrust 4:3
anybody 44:16
50:5 52:20,24
53:12 56:24 74:21
anyway 76:15
anyways 59:7
app 80:14 102:11
apparently 95:11
appeal 81:3 82:17
82:23 83:8,13
84:12,15,19,22,22
90:19 97:21
107:20
appeals 80:3 81:14
97:16
appear 28:3,6
82:17,23 92:23
93:21
appearance 92:19
appearances 3:3
appearing 97:13
appears 22:14
93:8
appellant 81:13
97:20
appellate 80:1
85:5

appended 113:7
appendix 97:2
applicable 111:8
application 89:5
89:11
applies 59:20
88:11 90:10
apply 88:10,12
applying 65:10,12
appointed 27:11
approaching
38:14
appropriate 45:4
approval 28:4
approved 88:16
88:21 90:14,15
approving 90:19
approximate
32:17
approximately
32:8
ardc 84:8
area 23:6 35:6
36:24 43:8
argued 16:5
arrangement 29:3
29:13,15
article 60:19 79:2
79:6,7 80:9 81:20
86:1 87:15,19
98:23,24 99:16
articles 11:22 32:7
32:13 34:11 60:10
aside 17:7
asked 16:22 29:21
52:3 62:8 69:19
101:18
asking 6:9 59:8
aspect 15:14
assert 72:25

asserted 59:19
assertion 94:1
assisted 68:16
69:15 92:17
assisting 69:6
assists 69:12
associate 40:11
associated 106:7
107:11,16
association 23:9
23:16,23 24:1
associations 23:1
assume 21:23 38:6
79:9
assuming 12:17
22:6 67:6 70:18
91:13
atlanta 1:2 109:2
attached 1:22 37:3
54:6 89:8,16,18,19
90:1,3 97:2
109:24 111:11
attaching 89:5
attachment 29:8
68:8 78:10
attachments 30:11
30:17
attack 55:20
attempt 93:9 95:7
attempting 94:13
attends 103:8
attention 86:12
96:19 100:9
attorney 3:18 5:18
5:19 15:17,18
17:23 20:5,14
21:3 31:11,12
32:25 33:9 34:3
42:17,19 50:21,22
51:22 53:9,10,11
53:12,15 69:21

71:5 79:11,16
83:12 85:8,17
97:15 99:17 102:3
102:25 105:1,19
106:6,12,20
111:13
attorneys 11:15,17
17:7,12,13,20 18:5
18:23 20:4,11,23
21:6 24:3,5 27:16
28:11 29:19 30:2
30:15 36:10 41:22
44:22,24 45:7
47:25 48:4 53:25
58:22 59:5,9,10
60:24 67:6 73:14
75:7,10,11 76:18
77:20 85:1,20
92:23 103:8 110:5
authorization
102:7
authorize 44:15
availability 52:1
available 8:5,6,9
15:13 17:22 18:9
18:12,20 19:15,18
25:17 27:19 32:15
45:20 55:20 111:6
average 35:21
avoid 92:25 93:10
93:11
award 7:20 11:15
11:17 48:13 73:7
73:8,11,19,20
74:13,25 84:23
awarded 75:11,12
88:16,21
awards 74:5
aware 10:15 19:24
29:7,13 33:21
35:2,12,15 44:6

52:5,7 55:23
69:10 76:10 86:23
92:2 104:13 105:6
**awareness** 35:19

**b**

**b** 90:13
**back** 17:20 22:19
35:8 59:17 65:17
82:7 86:1 98:23
**background** 3:16
51:1,11,21 68:12
**bad** 69:24 97:22
98:10,14
**bag** 105:24 106:1
**banda** 79:20
**bandas** 2:15 3:19
3:20,24 29:4,14
33:17,20,21,22
34:1 35:7 36:4,7
40:7,9 70:2,3 71:7
71:15 72:4,7,8,12
72:18 73:23 77:1
77:5,12,22,25
78:11,12 79:8,12
79:14,24 80:2,4,24
81:1,6,12 82:9
83:23 84:9 85:10
85:13 86:12,14,21
87:1,12,24,25 88:4
88:7,9,12 91:6,21
92:9,11,14,18,22
92:24,25 93:3,5,8
93:11,19 94:3,6,12
94:16 95:6,11,13
95:16,25 96:4,5,22
97:15,20 98:7
99:4 100:11,13,14
101:5,6,17,22
103:4,5 104:12
105:21 106:17

**bandaslawfirm.c...**
2:17 111:2
**bar** 23:2,22 103:9
104:11
**barred** 105:4
**baseball** 4:2 91:12
**based** 12:12 52:21
56:14 106:13
107:1
**basic** 81:2
**basing** 16:12
**basis** 19:17 20:13
20:14 64:16
**batting** 35:21
**bear** 98:12
**behalf** 28:6 44:16
59:19 60:5 68:17
73:5 101:23 103:5
103:6
**behavior** 80:3,24
81:17 91:21 92:12
93:11
**belie** 93:25
**belief** 98:17
**believe** 7:12 8:9,24
9:13 10:2 12:4
13:2,8,12 14:11,15
15:4 29:23 30:12
31:25 36:19 38:12
40:8,12 44:8
45:13 46:3,6
57:15 71:9 91:15
106:16
**beneficial** 44:3
**benefit** 8:5,5,7,9
8:13 14:2,18 15:1
15:3 17:5,14,20
19:1,4,8,13 25:7
45:13 46:21,24
47:3,4,21 57:18,20
63:16 67:7,8,10,11

96:1,6
**benefited** 20:10
**benefits** 7:19,21
8:18 11:9,10
13:13,16 15:12
17:9,11 18:14,20
19:14,18,22,25
24:25 25:15,16
32:14 41:4,6
47:13,16,18 48:6
61:12
**best** 18:24 25:17
46:19 91:21
**bet** 25:17 50:3
**better** 25:19 27:10
27:14,15,24 39:17
43:24 66:25
**bettering** 101:8
**beyond** 45:20 48:6
**big** 41:20
**billion** 47:19
**bio** 3:12 22:14,16
22:20 25:23 70:21
**bit** 37:10
**board** 104:20
**bottom** 63:14
68:16 81:24 86:3
86:7 93:18
**boulevard** 2:15
**breach** 1:4 3:15
9:2 16:17 31:1,17
31:19 43:8,15,20
44:7 55:18 67:23
109:4 111:4 112:1
113:1
**breadth** 70:4
**break** 6:11,12
52:25 53:4 96:12
107:24
**bridge** 74:20
107:21

**brief** 61:19 92:17
99:8
**briefed** 16:5
**bring** 103:19
**brings** 97:21
**broached** 43:5
**broadway** 1:19
2:12
**brother** 31:2,9,15
31:24 38:18
**brought** 80:20
**brown** 97:3
**bullet** 62:25 63:4
**bureau** 63:21,23
64:1,15 66:4
**bureaus** 63:25
64:4
**buried** 67:19
**business** 52:2
79:19

**c**

**c** 2:1
**calculated** 47:23
48:11
**california** 94:5
**call** 34:16
**called** 34:16
**cancelling** 66:15
66:20
**carolina** 94:17
**carry** 103:17
**case** 1:4 7:15
15:20 16:13 24:5
24:9,16 25:3
26:16 29:20 30:22
39:19,25 40:3,4,8
40:10 42:1,8,13,16
43:12,20 48:23
50:24 53:9 56:19
57:23 58:1,2
70:10 71:3 72:13

72:19 73:25 74:5
76:1,24 77:11
78:4 80:20,25
81:11 82:12,15
83:1,4 86:17
89:21 91:10,11
92:19 93:6,21
94:10,13,19 96:17
96:18 97:3 100:10
101:2 108:8,10
109:4
**cases**  3:19 16:19
26:8 35:9,16,25
43:15 69:20 70:5
77:23 78:11,18,20
78:22 81:15 82:4
82:8,23 83:17
85:21 87:6 105:25
107:4,9
**cash**  7:25 8:3,9,13
8:16,19 11:13,18
11:22 12:1 18:8
19:19 45:20 48:5
48:22 56:4 57:16
65:23 66:7 98:9
108:6
**casually**  35:12
**cathode**  4:3
**cause**  1:15 71:1
90:8 92:11 99:14
102:17 103:22
**causing**  99:6,19
102:14
**ceiling**  74:16
**cent**  60:19
**cents**  60:12,14
**certain**  13:23
18:15 47:5
**certainly**  12:19
21:17 34:19 39:16
43:6 47:16

**certainty**  74:24
**certificate**  3:6
109:16
**certification**  43:21
109:6
**certified**  43:1,16
43:20 109:8 110:8
**certify**  109:9,18
110:3
**challenge**  81:7
94:7 96:23
**chance**  42:25
**change**  15:8 17:1,9
17:17,18 18:2,6,17
112:4,7,10,13,16
112:19
**changed**  18:14
41:21
**changes**  3:7 13:19
46:13 63:24 81:9
94:8 96:24 109:24
109:25 111:10
113:6
**chapter**  86:18
**character**  36:9
**charge**  20:23 21:3
**charging**  21:6
**chat**  107:25
**check**  24:18 32:3
**checks**  13:2
**chicago**  86:15 87:1
**choice**  106:11
**choose**  8:16 25:1
**chose**  106:13
**chris**  33:22 72:13
85:11 105:23
**chris's**  72:6
**christi**  1:20 2:12
2:16 21:8 23:22
**christopher**  3:19
79:12 87:25 88:4

97:15 100:14
101:6 103:4
**circuit**  84:5
**circumstances**
103:3,19
**cite**  84:3
**cited**  80:25 94:10
96:17,19
**cites**  81:11,15
**citing**  94:19 97:3
**civil**  1:21 21:12,25
79:22
**claim**  9:13,18,23
9:23 10:6,13,18
12:7,10,15 24:16
25:2,8,10 36:16,20
36:25 37:2,10
38:10,15,20,22
39:3,5 44:5,6
54:12,13,15,20,22
54:24 60:19 63:5
63:6,9,10,20 65:14
66:17,18,18,19
67:18,20,21,24
101:14,15
**claimants**  60:11
**claimed**  55:23
67:15
**claiming**  108:5
**claims**  11:23 25:25
45:21,24 60:18
61:5 101:11,13,14
101:16
**clarify**  6:16 11:17
**clark**  3:23 80:14
82:12 102:10
104:18
**class**  1:14 2:2 3:13
3:14,17,18,20,20
4:9 5:6 7:19,20,22
8:13 9:24 10:20

10:25 11:8,9
13:25 15:2,25
16:16 17:3,5,14,20
18:5,15,21,25 19:2
19:5,9,15,18 20:10
20:17 21:14 22:4
22:5,7 23:13,14,15
23:17,20 24:9,12
24:15,16,21,22
25:7,15,17,21,22
26:2,11,23 27:10
27:12,17 30:12
32:15 33:2,3
34:24 35:4,5
36:14 38:24 39:2
39:13,14,19,22
43:1,4,16,20,21
44:4,7 45:8,15
46:2,5,10,22 47:19
47:20 48:8,14,17
50:20 51:4,20
52:6 53:24 54:16
54:16 56:5,7,13
57:17,19 58:2,5,7
58:13,21 59:20,21
60:3,11,13,17,21
61:2,6,12 63:19
67:7 68:13,18,23
69:6,6,12,15,22,23
70:10,14,19 72:1
72:11,25 73:6,9,15
74:3,5,13,18 75:11
75:19,25 76:3,13
77:2 78:2,12,13
79:2,15 81:8,15
88:15 90:9,11,12
91:22,24 94:4,7,14
94:18 95:14 96:2
96:7,23 97:17
98:16 99:7,20
101:5 102:14,18

103:1,17 106:2
108:8,8
clear 10:10
clerk 84:6
client 21:4 29:18
36:3 39:12 88:14
96:2
clients 68:17
clore 2:14 3:19
26:21 28:22 29:4
34:13 35:8 36:21
37:23 38:9,16
44:15 68:15 72:5
72:18 78:11 82:9
88:7 111:1
clore's 69:5,5
close 31:15
coerce 94:15
collateral 93:12
colleague 107:25
column 91:19
96:20 98:6
come 19:2,17
32:20 50:7 65:3
comes 100:10
comment 94:22
commissioner 4:2
91:12
committed 47:5
commonly 20:17
communications
52:7
community 34:4
79:13 106:19
107:4,7
companies 26:4,7
company 4:4
56:22,25 57:3
company's 97:9
compare 13:13
41:4

compares 13:4
compensate 62:22
compensated
20:11,18 29:5,7,10
48:18
compensation 8:3
10:7,11 11:14
12:4,16 14:12
17:8,11 18:22
41:1 45:19,20
56:7,8,10,18 57:2
60:25 65:11 66:25
75:22 108:6
competent 77:19
complain 41:19
complaining 61:1
65:23
complaint 4:9
16:8,9 42:7,9
101:2,4,10,20
102:1
complete 6:4
113:8
completed 111:17
completion 109:21
110:2
complies 82:10
compromise 55:5
compromised
55:19
concern 36:3 59:5
59:12 71:1 78:4
81:21 85:4 87:3
92:5,11 93:15
94:21 95:19 96:7
97:5,24 98:21
99:14 103:22
104:14 105:15
concerned 34:11
99:25

concerning 95:25
concerns 18:3,7
40:19,23 58:8,17
58:23 67:4 76:11
conclusion 83:1
96:3
conduct 81:11
82:2,3,22 83:17
93:12 94:1 97:1
99:6,18 100:1
102:13
conference 23:13
23:15
connection 3:16
68:12 88:14,20
90:14,17
consequences
93:12
consider 25:3 34:1
36:6 47:16 97:6
consideration
72:25 90:16
considerations
103:10
considered 26:25
46:4
considering 47:14
consistent 84:6
consists 7:18 43:4
constitutes 48:25
49:2
contact 58:2,5
71:4 72:10,12
105:22
contacted 58:5
71:25
contain 61:25
contained 61:19
contains 41:12,14
62:3 109:25

contempt 82:16
contention 59:9
context 43:2,17,22
78:5,6 81:22 85:7
87:7 92:6 93:16
94:22 95:20 96:8
97:6,25 98:22
99:15,17 100:21
103:23,25 104:6
104:15,16 106:10
106:23 107:1
contingent 3:18
continue 103:16
contract 29:22
30:15 91:7
conversation
40:22
cook 84:5
copies 51:2 111:14
copy 51:4 62:7
64:15 80:13 84:7
89:5,8 109:16
corpus 1:20 2:12
2:16 21:7 23:22
correct 5:13,18,24
6:23 7:15 9:6
10:24 14:3 15:17
16:23 22:8,15,24
23:3,4,10,23 24:10
24:11 25:21 28:4
29:1,10,14 30:4
33:11 34:14,15
40:13,14 41:7,13
41:17 42:18,20
43:9 44:20 47:8
47:25 49:22 50:1
53:7,9,10,12 54:10
54:14,21,25 55:24
55:25 56:9 57:20
61:23 63:7 65:8
68:13 71:8,15

72:5,9 76:9 77:9
78:22 80:17 84:16
85:10,15 88:5,8
89:14 90:6 91:14
106:18 107:7
113:8
**corrections** 113:6
**cost** 63:22 65:18
65:20 66:10,12
67:3 91:3,4
**costs** 8:17 18:13
19:16 63:2,7 64:6
90:23 91:1,6,8
**counsel** 2:2,10 7:8
7:20 15:16 17:4
20:8 23:10,16,25
24:2 27:10,20,22
28:6,20,25 29:19
30:23 32:10,20,21
32:23 36:13,18,24
37:1,2 40:12 45:8
45:15 46:2,5,10
47:19,20 48:8,14
48:17 52:4,8,14,16
52:18,21 53:6
58:2,5,8,14 71:2
73:15 75:11,16,17
75:19,23,25 76:3
85:4,18 87:4
91:23 94:15 99:25
101:23 103:5
104:6 105:15
106:7,11,13
107:10,16 108:8
108:11 110:3
111:14
**counsels** 93:23
**counterclaim** 4:7
100:12,15 101:18
102:22

**countless** 50:3
**country** 79:14
86:19,23 87:3,6
94:2 95:5 99:11
103:15
**county** 1:20 84:5
**couple** 32:19
38:13 41:8 83:2
**court** 1:1 5:8
20:18 22:13 48:12
73:7,14 75:12
77:21 79:21 80:1
80:3,4 81:4 82:2,2
83:16,20 84:5,7
85:2,5,6,14,23,24
86:10,15 87:2
88:16,22 89:4
90:1,9,15,15 92:2
92:11 93:1,9 94:5
94:11 95:5,9
97:14 98:7 100:2
101:13 102:7,18
103:12,19 104:18
105:8,9 109:1
**court's** 98:17
102:9 103:8
**courts** 70:13,23,25
71:2 77:5 80:23
81:11 94:2 95:5
96:25 99:11
103:14
**covering** 64:6
**craft** 45:4
**create** 65:16
**created** 95:11
**credibility** 98:12
**credit** 7:24 8:20
9:9,16,21 10:3,8
11:19 12:2,16
13:3,4,6,9,10,13
13:14,20,22,25

14:6,7,13 18:10
19:10,13 41:2,5
46:4,8 48:8 55:4
56:1,2 59:22
60:25 63:2,6,16,21
63:23,24,25 64:1,2
64:10,13,15,17
65:10,12,22 66:5,6
67:16,22 108:5,10
**criteria** 102:19
**criticism** 70:24
77:7
**criticisms** 76:25
**criticize** 76:19
**criticized** 35:24
36:2,11 70:13,22
77:6
**criticizing** 70:23
75:25
**critics** 79:20
**cross** 74:20 107:21
**crr** 1:17
**cs** 111:15
**csr** 1:17 110:11
**current** 13:3,9
14:18 33:10 41:6
63:25
**currently** 13:6,15
14:1 64:25
**customer** 1:3
109:3 111:4 112:1
113:1
**cyber** 55:20 64:19
64:22

**d**

**d.c.** 2:4
**damage** 25:25
**damages** 43:19
**dark** 13:18 64:19
64:24

**data** 1:3 3:15 9:2
16:17 30:25 31:17
43:5,8,15,20 44:7
55:5,18,19 56:6,9
56:11,14,19,22,22
57:2 64:24 67:22
109:3 111:4 112:1
113:1
**date** 9:7 32:17
33:14 37:14 55:16
57:13 64:12 87:18
109:23 110:11
112:24 113:12
**dates** 37:4 49:18
49:22 52:1,3,4,10
**day** 1:16 52:2,2
110:8 113:15
**days** 37:22,24 38:2
109:23 111:17
**de** 12:3
**deadline** 38:14
49:19
**deal** 66:25
**dealing** 9:2,12
10:23 12:5,25
**december** 1:10,16
109:7 110:8 111:3
**decided** 16:5
57:23
**decision** 20:19
42:11 80:10,14,16
83:23 102:12
**decisions** 104:7
106:22
**declaration** 3:14
37:11 54:6,17
68:9
**declare** 113:4
**declined** 99:4
**dedicated** 94:14

| | | | |
|---|---|---|---|
| **deemed** 113:6 | **describe** 15:23 | 74:15 | **drugs** 6:20 |
| **deeply** 76:22 | **described** 81:12 | **discussing** 100:22 | **duly** 1:14 5:2 |
| **defendant** 25:2 | 83:25 85:14 102:1 | 104:5 | 109:10 |
| 90:7,25 102:5,16 | **description** 3:10 | **discussion** 91:17 | **duties** 24:12 |
| **defendant's** 4:7 | 3:16 4:1 68:11,16 | **dismiss** 16:5,10,11 | **e** |
| 80:24 100:11 | 69:5 82:15 83:13 | 42:10 84:19 | **e** 2:1,1 5:9 86:11 |
| 102:12 | 83:19 | **dismissal** 84:11 | 86:11 112:3,3,3 |
| **defendants** 73:15 | **deserving** 94:14 | **dismissed** 82:17 | **earlier** 11:2 55:2 |
| 75:10 87:24 | **designed** 92:25 | 82:24 83:9,13 | 68:22 86:2 102:12 |
| 100:14 101:23 | **despite** 93:21 | 84:15 101:11,13 | **early** 15:11,20 |
| 102:15,21 103:2,6 | **detailed** 106:10 | 104:4 | 16:2,13 |
| 103:13,16 | **details** 15:15 16:6 | **dismissing** 90:18 | **earned** 107:3 |
| **defended** 26:7 | 17:21 47:9 62:2 | **dispute** 37:12 | **easy** 43:12 |
| **defense** 21:12,20 | 77:8,10 99:21 | **disputed** 43:1,17 | **edelson** 3:24 80:23 |
| 23:6,8,10,16 40:4 | 100:23 104:15,16 | 43:21 | 81:17 87:12 |
| **defined** 68:3 | **deter** 49:25 50:2 | **disputes** 43:25 | 100:10 101:4 |
| **delivered** 109:14 | **determine** 82:4 | **disservice** 103:7 | **edits** 40:17 |
| **demand** 4:9 64:14 | 83:17 84:8 | **district** 1:1,1 | **education** 23:21 |
| **denial** 81:3 84:23 | **determined** 74:24 | 45:10 86:10 94:5 | **effectuate** 81:9 |
| **denounced** 80:23 | **deterred** 50:2,5 | 109:1,1 | 94:8 96:24 |
| **denying** 81:25 | **different** 25:16 | **division** 1:2 109:2 | **effort** 49:24 91:22 |
| 82:21 83:15 | 62:16 | **docket** 42:14,15 | 96:6 |
| **depending** 21:4 | **difficult** 49:18 | 42:16 | **efforts** 75:22 |
| 104:15 | 50:22 57:5 | **document** 7:5 | **either** 19:19 21:21 |
| **depends** 21:15 | **difficulty** 66:14 | 12:22 37:20 41:17 | 54:1 77:9 |
| 76:22 | **direct** 48:8 82:2 | 44:19,25 45:4 | **electric** 4:4 97:9 |
| **deponent** 109:19 | 100:9 | 62:14 91:16 98:6 | **elements** 22:7 |
| 109:20 110:1 | **directed** 84:7 | 101:22 | **elucidate** 6:17 |
| 111:13 113:3 | **directly** 25:2 | **documentation** | **email** 64:12,17 |
| **deposed** 5:14,15 | **disable** 65:16 | 10:17 12:11 | **emails** 64:23,23 |
| 26:15 50:9 76:8 | **disagree** 42:3 | **documents** 28:12 | **employed** 110:4 |
| 76:10,12 | **disciplinary** 84:8 | 30:5,7 55:14 78:3 | **employment** 76:23 |
| **deposing** 111:13 | 104:10,19 | **doing** 9:25 14:23 | **encourage** 108:3 |
| **deposition** 1:8,13 | **discipline** 80:5 | 14:25 21:12 27:21 | 108:11 |
| 3:11 5:16,23 6:3 | **disclosed** 90:14 | 46:15,15 47:1 | **endure** 95:12 |
| 7:4,12 28:9,18,19 | **discovery** 95:10 | 59:8 66:14 | **enforcement** 84:1 |
| 30:3 52:10 76:5 | **discussed** 23:14 | **dollars** 59:1,2 64:6 | **engage** 32:10,20 |
| 76:18 109:6,12,14 | 26:12 28:1,1 38:9 | **drafted** 40:13 | 85:5 102:5 |
| 109:21 110:2 | 38:17,19 39:9 | 41:22 92:15,21,24 | **engaged** 36:18 |
| **depositions** 5:17 | 40:21 41:1 52:4 | 93:25 | 80:2,4 85:2,14,18 |
| 5:20 | 52:22,23 57:22 | | 85:23 86:12 |

101:25 104:17
**engagement** 93:3
93:8
**engaging** 88:1
101:6
**enjoined** 88:1
**enroll** 63:20
**enter** 92:19
**entered** 91:4,4
101:19,20
**enterprise** 101:6
**entire** 15:4 17:12
53:16 56:10 67:9
67:9 90:12 101:4
**entirely** 10:10
94:1 103:2
**entitled** 20:6,11
56:4,6 57:1,15,17
76:2,3 102:4,16,23
**entitlement** 56:17
**entries** 42:15
**entry** 102:23
**enumerated** 49:5
**epiphany** 99:1
**equally** 59:20
**equifax** 1:3 3:15
5:7 7:15 9:2 14:19
30:25 34:21 43:6
46:14,22 89:10
109:3 111:4 112:1
113:1
**equifax's** 31:18
**equitable** 44:2
**eric** 2:11
**errata** 111:11,13
111:17
**especially** 11:14
**esq** 111:1
**essentially** 52:1
**establish** 25:8

**estewart** 2:13
**estimate** 5:20 55:7
55:12
**ethical** 77:16,20
103:11 105:2
**evaluate** 15:15
97:25 98:22
**evaluation** 12:12
**eventually** 38:7
101:17
**everybody** 11:9
27:14 36:10 50:8
**everybody's** 44:1
**evidence** 82:3,22
83:8,17
**exact** 13:10 49:1
**exactly** 56:20
**examination** 3:4
5:3
**example** 22:6 40:5
94:6
**exceed** 73:20
**excellent** 106:17
106:25
**excessive** 45:9
69:7
**exchange** 91:23
98:9
**excoriated** 81:10
94:3 96:25
**execution** 71:25
**exemplar** 10:2
**exh** 3:11,12,13,14
3:15,16,18,19,22
3:23,24 4:2,3,4,5,7
4:9
**exhibit** 6:25 7:2,4
22:11,12,14 30:19
30:20 41:12 54:3
54:4,9,10 59:17
62:4,6 68:5,6,8

71:11,13 78:8,9,25
79:2 80:12 82:8,8
87:9,11 91:9,11
96:9,11,16 97:7,8
98:2,3 100:5,7,25
**exhibits** 3:9 37:5
54:11,12
**existing** 59:21
**exists** 81:17
**expect** 101:3
**expecting** 10:7
**expenditure** 55:6
**expenditures** 47:7
**expense** 9:6,8,12
48:23
**expenses** 8:1,1
55:15
**experian** 10:4 13:7
13:9,15,17,22 14:8
55:4,7 63:6,21
64:1,23
**experience** 3:16
17:23 20:1 21:8
25:24 52:24 68:12
69:6,14,18,25
**experienced** 69:21
**expert** 39:14
**expiration** 110:11
**explain** 67:2
**explanation** 55:3
**explicit** 93:2
**explicitly** 14:15
61:19
**explore** 32:11
**exposed** 93:22
**exposure** 56:6,9
56:11,14,18
**express** 40:19,23
58:8,16
**expressed** 81:17

**expressly** 88:16,21
102:24
**extended** 45:21,23
**extension** 83:24
88:10
**extensive** 16:16
**extent** 69:14,17
70:4
**extort** 95:8
**extortion** 79:20
**extract** 91:22
101:8

**f**

**f** 109:19
**f.supp.** 97:10
**fact** 12:22 52:4
57:2 69:11 86:16
86:25 89:13
105:17
**factors** 73:17
**factual** 100:24
**failing** 82:17
**fails** 111:19
**failure** 92:9 93:24
**fair** 6:14 15:6,9
16:22 17:2
**fairly** 16:2
**faith** 96:5 97:22
**familiar** 16:6
21:14,16,23 22:3
33:19 58:11
**faq** 67:19
**far** 10:11
**features** 63:23
**federal** 1:21 21:23
45:14 81:6,12
86:15,22,25 89:3
90:9 100:2 102:18
**fee** 3:18 7:20 11:17
17:4 48:13 51:2
51:11,21 69:8

76:2,3
**feelings** 41:23
**fees** 11:15 17:7,12
  17:13,20 18:4,4
  20:4,7 27:16
  29:19,23 45:7
  47:25 48:4 53:25
  58:22,25 59:5,9
  60:24 67:7 75:7
  75:10,11,18,19,20
  75:24 91:22 94:16
  101:8
**field** 21:9
**figure** 18:6 38:8
  51:5
**file** 53:9,12 54:22
  87:2,5 89:24,25
  90:8 102:17
**filed** 3:22 28:12
  30:2 37:10 38:10
  54:20,24 57:23
  79:3 82:5 83:18
  90:8 94:16 98:8
  99:6 101:10,17,23
  102:14,17
**filing** 3:20 49:25
  58:1,9 77:22
  78:13 85:18 89:9
  95:6 99:6,19,19
  102:13
**filings** 92:20,24
  93:4
**final** 3:24 28:3
  87:11
**financial** 57:6,9,10
  81:10 93:10 94:9
  98:15 103:10
**financially** 110:6
**find** 18:1 26:18
  29:21 37:8 41:19
  74:7 103:25

**finding** 32:15
  50:21 54:1 86:12
  95:6 97:21 103:9
  104:17
**finds** 98:7
**fine** 83:5
**firm** 1:19 2:11,15
  3:20,24 5:6 22:20
  24:4 26:10,13,14
  26:20 27:2,3,4,5
  29:14 33:8,10,17
  33:20,21 35:7
  36:4 40:7,9 71:9
  71:15 72:12 73:23
  77:1,16,22 78:12
  85:12 87:12,24
  88:5,7,9,11,12
  91:6 100:11,13
  101:5,5,17,22
  103:4,9 104:12
**firm's** 22:15 87:1
  103:6
**first** 5:2 19:17,17
  25:20 27:21 30:25
  31:4,7 32:5 34:20
  38:8 45:6 58:8
  71:21 79:11,18,23
  80:7,9 92:8 97:12
  102:1 107:8
**five** 3:21 33:13
  78:14,23
**fix** 18:2
**floor** 2:7
**florentino** 31:10
**florida** 94:18
**focused** 11:13
**followed** 86:16
**following** 63:22
  72:15 88:1 101:13
  102:19 109:9

**follows** 5:2
**fool** 39:12
**footnote** 97:3
  101:13
**foregoing** 90:17
  90:18 113:5
**forgive** 65:5
**form** 9:22,23 63:6
  67:24 79:19
**forward** 84:7
**found** 33:3 80:1,3
  81:6 85:5 94:11
**four** 49:18 52:1
  63:20 65:8,13,16
  66:4
**frame** 32:16
**fraud** 57:4 63:13
  64:7 80:4 85:2,6
  85:14,18,24
  104:17 105:8,10
**frcp** 109:18
**free** 14:19 63:23
  64:15 65:8,10,12
  65:22 66:25
**frequently** 34:19
  37:25 62:8
**friend** 34:1 36:6
  51:15,18 58:6
**friends** 26:13
  34:19 35:12
  106:14
**frivolous** 77:22
  81:14 85:19 94:3
  94:17 95:7 97:16
**frivolously** 81:3
**froelich** 29:4,9,10
**front** 82:11 104:11
**full** 6:4 92:9 96:21
  97:12
**fully** 89:4

**function** 33:24
**fund** 19:17 45:9
  48:24,25 49:2
  75:24
**funds** 95:15
**further** 6:16 72:14
  84:5 97:21 99:10
  100:21 109:18
  110:3,6
**future** 46:23 63:13
  103:1

**g**

**gain** 81:10 94:9
  96:25 98:15
**gannett** 3:23 80:14
  80:25 82:12 86:17
  102:11 104:18,19
**garber** 4:2 91:11
**gault** 33:8
**general** 4:4 35:19
  97:9
**generally** 43:24
  70:3 103:8
**georgia** 1:1 109:1
**getting** 10:11 34:7
  43:1 48:15 57:20
  65:23 66:3 74:22
  75:24 86:12
**give** 6:4,15 37:4,13
  62:2 87:8 98:1
**given** 11:23 25:14
  27:22 56:22
  109:12 113:9
**giving** 7:12 18:22
  27:16
**go** 6:2 31:18 35:8
  36:12 62:13 63:11
  65:17 71:2,20
  75:6,9 79:17
  81:24 83:5 86:2
  91:10 95:4,22

98:23 102:20
105:3
**goal** 25:6 60:6
73:8
**goes** 62:15
**going** 6:1,2,8 39:3
39:7 47:10 48:12
51:19 62:17 74:21
**goldeneye** 5:11
**good** 34:4 36:9
38:25 53:1 69:24
79:13 96:4 106:19
**googled** 77:12
**gotten** 24:18 94:15
**graduated** 22:23
**granting** 102:25
**gravely** 95:25
99:11 103:15
**great** 15:3
**greatly** 103:18
**grossly** 45:9
**ground** 6:3
**grounds** 90:13
**guess** 5:22 41:8
46:12

**h**

**h** 80:25 112:3
**hac** 89:2,23,24
90:4,5
**hail** 25:24
**half** 43:4 59:1
60:23
**hall** 92:15,16
93:22 95:13,15
96:2,6
**hall's** 92:16,18
**hampe** 97:13,21
**hampe's** 97:19
**hand** 96:20 98:6
**handed** 68:7 80:13
96:16

**handful** 106:4
**handing** 7:3 62:7
79:2 87:10 100:6
**handle** 50:16
**handled** 25:24
39:22 69:20
**handles** 70:3,5
**handling** 77:17
**handsomely** 79:20
**handwritten**
71:17,19
**happen** 85:21
**happened** 31:5
35:8
**happening** 16:17
**hard** 5:22 15:14
51:13,14,17 94:14
**harm** 57:5,6,9,10
57:11
**harmed** 55:17
56:6,23 59:11
**hassle** 14:22,25
65:15
**hausfeld** 2:3,7 5:6
**hausfeld.com** 2:5
2:9
**heading** 87:23
99:3
**hear** 30:25 43:19
**heard** 18:3 31:4
32:5 39:11 45:22
80:7
**hearing** 28:4 31:7
82:3,17,22 83:8,16
90:16
**help** 27:20 51:16
63:12,18
**helpful** 69:23
**hereto** 1:22 113:7
**highjack** 94:13

**hire** 77:16,19
**hired** 32:25 36:13
**history** 106:5,13
**hits** 13:19
**hoc** 105:1
**holding** 92:2
**holidays** 49:21
**home** 5:12 105:3
**homeowners** 26:3
**honest** 14:21 70:7
**hope** 11:8
**hopefully** 25:6
**hoping** 11:6 79:15
**hour** 9:4,20 10:15
10:17 12:7,8,10,24
20:24 21:3,5,7
**hourly** 20:12,14
**hours** 9:4,19 10:16
10:23 12:5,9
28:16 41:9
**huh** 40:2
**hulu** 70:7
**hurdles** 58:17
**huseman** 1:19
2:11
**husemanfirm.com**
2:13
**hydroxycut** 4:5
98:4,19
**hyman** 102:10
**hypothetical**
56:21 58:24 59:16
**hypothetically**
47:24

**i**

**i.e.** 45:8 98:14
**ideally** 46:25
**identical** 94:17
**identify** 18:3
28:24

**identity** 13:21
57:4 62:22 63:2
63:13 64:6
**ignore** 17:16
**il** 80:14
**ilcs** 102:3
**illegal** 86:18
**illinois** 80:1 85:5
94:11 101:25
102:3,6,7,11,25
104:20
**impact** 59:4
**impacted** 31:19
**impediment** 51:10
52:11,17,21
**impediments** 51:7
52:14,15 53:5,15
**important** 49:23
**imposed** 93:13
**improper** 82:5
83:18 88:25 93:9
98:8 99:5,18
100:1 102:13
**improperly** 94:12
**improve** 11:8,11
18:8 19:12 25:6
25:18 28:2 46:19
60:6 61:12 73:8
**improved** 19:1,4,8
53:17,19,20,21,21
73:7
**improving** 18:20
46:22 53:23 61:10
70:19
**inappropriate**
88:19 94:15
**incentive** 72:24
73:8,11,18,19,20
74:4,13,25
**include** 37:5 47:12
63:22 67:24

**included** 46:7
**includes** 64:1
**including** 61:11
  93:4
**incorporate** 61:20
  67:12
**increase** 18:11
  61:8,9
**incurred** 8:17
  18:13
**indemnify** 93:5
**indemnity** 93:7
**independently**
  25:8,10
**index** 3:1
**indicates** 95:25
**indicating** 48:21
**individual** 26:3,6
**information** 10:12
  14:16 51:2,3,11,22
  61:4 63:19 64:21
  77:13 100:24
  107:9
**informed** 102:9
**injected** 94:4
**injunction** 86:21
  87:1,5 101:14
  102:4,16,24
**injunctive** 46:11
**injury** 68:18
**innocent** 94:2
**input** 14:16
**inquire** 76:18
**inquired** 76:20
**inquiries** 64:10,13
**insert** 98:15
**insignificant** 67:5
**instance** 1:14
**insurance** 21:12
  23:2,6,8 26:4,7
  40:4 64:6

**intangible** 47:4
**intend** 104:5
**interest** 29:17 44:1
  57:25 73:1 103:10
**interested** 25:12
  110:7
**internet** 64:20
  77:14
**interrupt** 100:18
**interval** 64:4
**intervene** 26:23
**interviewed** 99:4
**intimations** 74:2
**introduction** 45:5
  49:4
**invalid** 98:12
**investigated** 105:2
**involved** 14:22,25
  26:14 34:8 35:9
  44:3 66:10,21
  82:9 92:15 99:22
  103:24 106:3,10
  106:24
**involvement** 35:13
  93:22
**iowa** 94:17
**issue** 38:5,9
**issued** 86:11,20
  87:1
**issues** 10:23 12:6
  12:25 58:11 104:5
**iv** 90:23

**j**

**j** 2:3 109:15
**james** 2:3 5:5
  109:15
**january** 86:8,10
  87:14
**joins** 95:5
**jpizzirusso** 2:5

**judge** 36:9 80:22
  81:6,12 86:10,25
  87:14,17 99:8
**judges** 35:25 80:3
**judgment** 3:25 4:7
  42:25 84:4 87:11
  89:6,9 90:19
  100:4,12,16
  101:19,19
**judicial** 96:6
**jurisdiction** 82:18
  82:24 83:9,14
  84:12,16,20 86:22
  103:14
**jurisdictional** 84:2
**jurisdictions**
  86:19
**jury** 4:9
**justice** 102:10
**justifiably** 99:12
  103:15
**justified** 103:3

**k**

**k** 2:4 5:9
**keep** 62:17
**kerr** 1:17 109:8
  110:11
**kind** 57:4 67:19
  70:5
**kinds** 50:14 51:3
**kitty** 53:24
**knew** 34:23 39:16
  58:12 76:7,13
**know** 6:8,11,17
  7:10 8:2,7,17,22
  9:1,8,8,14 10:3
  11:18,19,22,24
  12:4 13:3,16,18,19
  14:5,10 15:10,13
  15:25 16:1,18
  17:23 18:11,12

19:3,15 20:23,25
21:4,5,15,16 22:6
23:20 24:7,12,17
24:18,23 25:11,14
25:14 26:10,12,14
26:15,18,18,20,25
27:1,2,7,19,21,25
29:3,16,17,18,24
31:6,22 33:1,5,12
33:14,16,22 34:3,4
34:7,18,18 35:5,12
35:18,22,24 36:8,9
36:10,15,23 37:1,2
37:8,21,25 38:1,23
38:24,25 39:5,17
39:18,21,22,24
40:21,25 41:2,9,18
42:3,24 43:4,15,18
43:22 44:4 45:4
45:10,16,19 46:7
46:10,13,16 47:9,9
48:11,21,22,25
49:12,17,20 50:4,8
50:13,14,19,20
51:8,15 52:6,20,23
54:1 56:24,25
58:13,16,24 60:17
60:23 61:1,25
63:25 64:3,5,9,14
64:19,22 66:9,13
67:6 68:21,22,24
68:25 69:14 70:2
70:9,17,23,25 73:7
73:8 74:1,3,6,15
74:20 75:3,4,22
77:20,21,25 78:5
78:21 82:7,25
84:14,21,23 85:7,8
85:13,21 87:4
89:8 91:3 92:6
94:24 99:24 100:3

100:8 101:23
103:23 104:2,8,10
105:18,19 106:4,9
106:23 107:2,4,5,6
107:13,21
**knowing** 58:10
61:4 69:23
**knowledge** 20:1
24:1 41:22 83:9
106:14
**known** 33:1 35:11
36:5 71:5 81:13
97:20 105:18
**knows** 55:20

**l**

**l** 5:9,9 86:11,11
**lack** 35:2 82:18,24
83:9,14 84:12,15
84:20
**language** 77:4
96:18 100:8
**lapse** 38:8
**large** 43:3
**largest** 17:16
**law** 1:19 2:11,15
3:20,24 21:11
22:24 23:2 29:14
31:2,9,15,24 33:17
33:20,21 35:6,7
36:1,4 38:18 40:7
40:9 43:8 70:3
71:15 72:12 73:23
77:1,16,22 78:1,12
86:13 87:1,12,24
88:5,7,9,12 91:6
100:11,13 101:5,5
101:7,17,22,25
102:5 103:4,9
105:12,14
**lawsuit** 56:13
86:15,16

**lawsuits** 81:1
**lawyer** 39:11
72:16 83:10
**lawyer's** 68:11
**lawyers** 3:16
**layperson** 15:14
**leave** 4:7 44:23
100:11
**left** 11:21 15:13
16:21 33:12,20
96:20
**legal** 3:16 43:25
45:4 68:12 72:1
72:10 79:13,20
92:13 94:16 103:7
111:23
**legitimate** 92:10
**letter** 29:8,9,12
92:18
**leverage** 79:16
**liability** 43:6
**license** 78:1
**lie** 98:16
**light** 98:7
**limit** 9:15
**limits** 86:21
**line** 21:7 41:6,6
112:4,7,10,13,16
112:19
**link** 31:25 32:2,3
**list** 20:25 52:12
82:8
**listed** 50:19 78:19
78:22,24
**lists** 69:11
**literally** 66:19
**litigated** 39:25
43:1 70:9
**litigation** 1:4 3:17
4:3,4,6 15:22,25
16:7,8,14,16 21:9

21:12 22:5 27:13
33:2 35:4,14
39:13,15 42:22
43:17 56:15 58:11
68:13 69:6,15
74:4 75:4 76:8
93:24 97:9 98:4
98:16 103:17
109:4 111:4 112:1
113:1
**litigator** 18:25
**litigators** 20:17
**little** 37:9 60:12
62:18
**loan** 88:14
**local** 93:23
**logistical** 14:21,25
65:15 67:4
**logistics** 66:14,15
**long** 28:15 36:2
**look** 35:8 37:4,14
37:17 51:4 54:8
59:14 80:10 90:22
97:12 105:4 108:4
108:11
**looked** 7:9 62:11
77:13 78:17 99:9
**looking** 10:8 32:14
**looks** 37:10 54:23
63:8
**lose** 36:10 65:17
65:21 85:21
**losses** 8:23 9:5,7
35:6 55:22,25
57:13,15 63:1
68:1,2
**lost** 49:20 55:13
**lot** 15:21 16:1,14
31:16 50:7
**lots** 31:16

**lower** 8:11
**luckily** 57:12
**luxury** 50:6

**m**

**m** 5:9 86:11
**machinations**
92:25
**machine** 1:18
**magnitude** 15:3
**mail** 24:19
**main** 23:5
**maintain** 108:7
**making** 10:6 24:16
**maligned** 79:23
**mark** 6:25 22:10
22:14 30:19 44:13
54:3 62:4,18 68:4
71:11 78:7 79:1
96:9 99:1 101:1
**marked** 7:2,4
22:12 30:20 41:12
54:4 62:6,24 63:4
68:6,8 71:13 78:9
78:25 80:12 87:9
87:11 91:9 96:11
97:7 98:2 100:5,7
100:25
**marketing** 4:5
98:4
**materials** 23:18
36:13 108:4
**math** 13:2 59:3,7,8
61:3 65:5 66:13
**matter** 5:7 20:21
26:11,24 28:25
29:6 34:8,21
48:19 70:1 82:1
89:10 97:14
103:12
**matters** 68:18
76:19,21

max  8:12
maximum  8:5,6,9
  9:4
mcbean  98:13,15
mcbean's  98:8
md  1:4 109:4
mean  8:4 10:20
  11:16 12:18 15:20
  15:23 19:21 21:15
  21:20 31:23 35:15
  35:21 38:4 42:23
  42:24 43:11 47:6
  52:3 56:20 59:15
  66:17 70:21 74:16
  76:23 98:11
  104:18
meaning  19:4
means  24:23 64:12
  83:8 99:23
meant  45:10
medication  6:20
meet  28:13,17
  32:21 50:23
meeting  30:2
mega  45:9 48:24
  48:25 49:2
member  3:13,14
  8:13 23:9,22
  24:16 32:15 33:3
  38:24 39:2 54:16
  56:5,7 57:17,19
  60:13 61:2,7 72:2
  72:11,25 92:13
  103:9 108:9
members  3:20
  17:14 18:21 19:2
  23:25 53:24 59:21
  60:17,21 63:19
  69:7,12,16 70:14
  77:2 78:13 94:14

membership
  98:16
mention  34:20
  61:14,16
mentioned  9:23
  10:14 11:2 26:21
  48:24 52:13 60:20
  67:10
mere  56:8,18 57:2
meritless  91:23
  93:20
meritorious  41:14
merits  42:22 83:21
  84:14,17 94:22
met  5:5 28:11,20
  33:24 34:6 49:13
  50:15
middle  6:13 71:24
  75:9 80:21 93:19
  96:21 98:25
mikell  1:9,13 3:4
  3:11,12,13,14 5:1
  5:9 7:5 109:6,10
  111:5 112:2,24
  113:2,4,12
million  45:8,17,20
  45:21 46:2 48:7
  59:1,2,3,10,12,15
  60:24 61:5 64:5
  67:6
mind  15:8 53:23
  60:9
mine  51:15
minimal  11:24
  32:14 41:1 46:9
minimis  12:3
minuscule  60:8,8
  60:14,16
minute  37:7
minutes  10:3
  55:11,12

mirky  83:25
misconduct  86:16
misleading  99:6
  99:18 100:1
  102:13
missed  84:25
missouri  94:18
mixed  105:24
  106:1
model  79:19
moment  38:6
monetary  18:22
  56:18
money  19:4,9
  27:16 47:6 53:24
  54:1 55:13 58:20
  59:11 62:23 66:6
  67:16 72:24 73:4
  75:24 88:20
monies  88:14
monitoring  7:24
  8:20 9:9,16,20
  11:19 12:1,16
  13:4,4,6,9,10,14
  13:14,17,18,22,25
  14:6,7,14 18:10
  19:10,13 41:2,5
  46:5,8 55:4 56:1,2
  59:22 61:1 63:2,7
  63:16,21,23 64:1,2
  64:20 65:11,13,22
  66:5,6 67:17,22
  108:5,10
monitors  64:20
monkey  95:7
month  10:4 14:10
  14:11,19 41:7
  64:18 65:1 67:1
monthly  13:18
  64:16

months  31:3,5,23
  32:9,19 66:2
motion  4:7 16:4,10
  16:11 42:10 43:21
  82:1 89:23 95:10
  100:7,11
motions  93:4
motive  98:10,12
  98:14
move  91:19 98:25

n

n  1:19 2:1,12,15
name  5:5,8 16:25
  31:10 79:12 82:14
  93:24
nathan  2:6
national  63:25
nationwide  80:23
nature  75:4
navigate  27:20
  51:20
nearing  9:14
necessarily  29:17
  51:14 52:7 98:11
  103:8
necessary  113:6
need  6:11 11:20
  53:10,11 99:17,24
  103:25
needs  19:2
negotiate  27:9
negotiated  27:11
  45:8,11,15 46:2,5
  46:10,13 47:19
  48:16
neither  72:18
  110:3
never  5:15 21:16
  21:19 23:15 24:9
  24:22 25:22 39:2
  40:3 42:7,10,14

56:23,23 57:3
73:20 75:12 80:15
89:13 91:13 95:15
105:8,11
**new** 2:8 56:2
65:16 66:16,19
82:2,22 83:16
86:21
**news** 11:22 31:6
32:7 60:10 79:3
**night** 30:6
**nominally** 57:21
**nonusefulness**
41:2
**normal** 74:9
**northern** 1:1
109:1
**notary** 109:22
113:13,19
**note** 9:15,22 10:11
111:10
**noted** 9:13,18 10:6
80:22 113:7
**notice** 3:11 7:4,11
8:8,10 9:24 10:20
10:25 30:12 36:14
45:24 50:20 51:4
51:20 52:6 63:24
76:14 92:19
**notices** 10:4 13:18
**notification** 54:15
64:10
**notifications** 64:11
64:18
**notorious** 3:22
79:3
**november** 37:11
37:16,22 54:24
55:1 79:24,25
**nueces** 1:20

**number** 3:10 4:1
11:23 21:2 37:24
47:22 49:12 60:11
60:21 61:2,8
78:24 83:22 85:22
**numbered** 1:15
**numeral** 90:23
**numerous** 49:4,7
94:2 95:13 105:25
**nw** 2:4
**ny** 2:8 111:15
**nye** 33:8

---

**o**

**oath** 5:24
**object** 7:16 38:14
39:7 49:13 51:9
81:3 86:22
**objected** 7:14
25:20,22 35:17
50:8 78:21
**objecting** 14:24
17:24 26:11 28:2
32:11 39:9 60:5
65:14 69:7,12
70:14 74:13 77:2
101:7
**objection** 3:13,20
3:22 7:10 11:3,7
20:4,6,9 21:1
26:14,22 29:9
30:10,17,21,23
34:8,21 35:5 37:3
40:13,16 41:11
42:13 44:9 45:1,3
48:2 49:19 50:1
52:23 53:6,9 54:7
58:9,17 59:17,19
61:18 67:9,10
73:5 74:19 75:17
76:19 77:17 78:11
78:13 79:4 80:20

82:4 83:18,21
84:14,18,22 88:15
88:21 89:9,16,18
89:20,21 90:1,8,10
90:13,14,18 91:5
91:24 92:10,15,16
93:20,22 94:23,25
95:7 102:17,19
107:8,19 108:7
**objections** 35:3,25
39:22 41:14,25
42:2 61:20,22
67:12 77:13,14,23
78:2,18 81:14
82:16 85:19 87:2
87:6 94:3,17
95:14,16 96:1,3
97:16 98:8,10,11
99:7,19 102:14
103:1 106:8
107:11
**objector** 2:10 3:18
3:22 7:5 50:23
53:11 72:19,22
73:16,18,24 79:3
79:14 82:16 87:4
90:11 94:12 107:7
**objectors** 34:24
60:4 70:18 81:7
94:6 96:22
**objects** 79:15
**obligations** 103:11
**obtain** 14:2 52:16
52:18 102:6 108:5
**obtained** 45:13
65:25
**obtaining** 7:24
52:21 53:5,15
98:9
**obviously** 6:4,12

**occurred** 31:17
32:18,24
**october** 55:7
**odds** 38:25
**offer** 40:17 88:20
**offered** 13:5,10,24
25:15 41:5,6
88:23
**offering** 88:13
**office** 4:2 26:19
91:11
**officer** 109:11
**offices** 1:19
**officially** 36:23
**oh** 37:8 51:1 54:8
**okay** 6:1,5,6,9,13
6:18 7:13 8:22
9:17 10:14 11:2,3
17:18 22:10,20
24:8 26:5,10
30:14 31:21 32:5
33:12 34:7,10
37:19 41:11 44:15
44:18 54:20 58:25
60:2 62:21 71:20
72:9,23 79:1
81:24 84:25 87:8
87:20 97:8 100:21
107:25
**old** 65:16,17 66:20
**older** 16:19
**one's** 12:12
**ones** 45:3 50:17
**online** 24:18 32:7
34:11 37:10 44:5
54:20,22 64:14
66:17
**opine** 20:2
**opinion** 35:18 84:6
84:13 91:15 97:11
102:10

**opinions** 35:16
  41:13 102:10
**opportunity** 25:1
  65:18,20 66:10,12
  67:3
**oppose** 41:17
**opposed** 108:6
**opposition** 92:17
**opt** 24:24
**opted** 24:17,21,22
  57:23
**opting** 24:23 58:1
**option** 7:23,25
  8:16,19 11:13,18
  11:22 14:16,19
  18:8 19:3,19
  60:12 61:10,13,15
**options** 7:19,25
  17:22 19:21,24
  27:19,23 32:11
  61:11,16 72:1,11
**oral** 1:8,13 109:6
  109:11
**orchestrated**
  92:22 95:6
**order** 3:25 16:10
  16:11 59:11 60:18
  81:25 82:21 83:15
  83:21 84:7 85:16
  85:25 86:12,13,24
  87:5,12,14,21 89:1
  89:15 91:3,4 92:4
  99:8 101:2,9
  102:20,22 104:17
  104:20
**orders** 103:12,18
**original** 109:14
**outcome** 110:7
**outrageous** 49:5
**outside** 17:22
  25:17 26:19 52:5

  99:15
**overall** 47:21
**overruled** 107:19
**owners** 26:4

**p**

**p** 2:1,1 86:11
**p.c.** 2:15
**p.m.** 1:17
**pacer** 42:17,19
**page** 3:2,10 4:1
  22:16 44:9,10
  45:5 54:23 59:18
  59:23,24 62:13,15
  62:17 63:14 68:16
  69:4 71:17,21
  86:4,5 87:13,21
  91:16,17 92:8,8
  95:23 96:19,20
  97:11,11 98:5,6,24
  100:10,17,20
  109:24 112:4,7,10
  112:13,16,19
**pages** 62:12
**paid** 20:4,8,12,14
  20:15,16,20 58:22
  59:4 62:23 63:3
  65:24 72:24 75:10
  79:20 88:23
**pallmeyer** 86:11
  86:20 87:14
**pallmeyer's** 80:22
  99:8
**papers** 28:24 30:1
  61:14 90:2 93:25
  94:24
**paragraph** 49:6,8
  71:22 73:22 75:8
  76:6 79:11,18
  80:6,18,21 81:16
  81:24 83:22 84:4
  84:10 85:1 86:3,6

  86:7 88:3,18 89:7
  90:22 91:2,18,20
  92:9 93:14,19
  94:20 95:4,18,22
  95:24 96:21 97:12
  97:19,19,23 98:20
  99:13 103:21
**paragraphs** 49:3
  75:13 80:19 83:3
  90:21
**part** 8:13,24 13:22
  14:6 25:15 73:5
  75:11 95:23 97:18
**participate** 24:25
**participated** 21:16
  24:15
**participating** 51:9
**particular** 11:11
  14:6 77:10,11
  104:17
**particularly** 59:21
**parties** 109:17
  110:4
**partners** 107:15
**party** 109:20
  110:1
**pass** 108:12
**passing** 26:17,21
  33:24
**pattern** 80:2 81:2
  81:16 86:17
**pay** 14:10 65:21
  66:3,6 88:14,23
  90:25 91:6
**paying** 14:7 29:23
  63:6 64:25 65:2
  67:1 88:13
**payment** 56:4
  57:16 62:25 73:14
  73:15,19,20 74:25
  79:16 88:15,20

  90:13,16
**payments** 14:18
  60:8
**payoff** 95:9
**pc** 3:20 80:23
  81:17 87:12,25
  100:10 101:4
**pending** 6:13
  104:11
**penned** 94:4
**people** 18:9 19:12
  21:8 26:17 46:7
  50:7 51:8,13,14,15
  52:15 55:21
**percent** 13:23 45:6
  47:24 48:2,4,15,20
  48:21 59:7
**period** 45:21,24
  49:19
**permanent** 86:20
  101:14 102:4,16
  102:24
**permanently** 88:1
**permit** 27:2
**permitted** 95:9
**person** 33:24
**personal** 55:19
  63:19 64:21 68:18
  76:19,20,22,22,24
  76:24 81:10 94:9
  96:25 99:1 106:14
**personally** 16:6
  20:6 28:5 36:5
  40:10 49:17 61:24
  71:6
**petition** 73:14
**pfc** 5:7
**phone** 33:23,25
  34:18
**phrase** 39:11

**pie**  17:15,16,17
  45:14
**pinpoint**  47:7
**pizzirusso**  2:3 3:4
  5:4,5 6:25 7:3
  22:10,13 30:19,21
  53:1,4 54:3,5 62:4
  62:7 68:4,7 71:11
  71:14 78:7,10
  79:1 80:13 87:10
  91:10 96:9,14,16
  97:8 98:3 100:6
  101:1 107:23
  108:2 109:15
**placed**  86:21
  103:10
**plaintiff**  21:20
  102:4,15,23
**plaintiff's**  90:25
  106:20
**plaintiffs**  39:19
  40:5 42:25 68:23
**plan**  28:3 41:7
  95:9 107:19
**planning**  38:15,19
**pleading**  62:3
  100:13 101:24
**pleadings**  4:8
  42:12 100:16
  101:19
**please**  6:4
**pllc**  2:11
**plus**  66:4
**pocket**  8:1,17,23
  9:5,7 18:12 19:16
  55:15,22,25 57:12
  57:14 63:1 67:25
  68:2
**point**  32:24 53:2
  62:25 63:4,12
  106:16

**pointed**  40:18
**pointing**  48:7
**population**  43:5
**portion**  11:20
  19:16 45:7 46:6
  47:20 75:12
  101:21
**portions**  92:16
**portrayed**  86:17
**pot**  75:24
**potential**  15:11,12
  16:2 29:19 34:20
  57:8,10 60:11
  67:7 93:23
**potentially**  12:19
  15:2 18:11 19:13
  32:4 43:4 48:22
  50:21 66:5
**power**  3:18
**practice**  21:11
  23:6 27:12 33:2
  34:23 36:1 39:13
  43:9 44:24 46:13
  78:1 79:23 86:13
  89:3,9,20,25 98:4
  101:25 102:2,5
  103:17 104:3
  105:11,14
**practices**  4:6
  46:19,23
**preceding**  3:21
  78:14
**preparation**  28:18
  28:19 30:3,8
  92:17 93:19
**prepare**  28:9
  54:17 93:3
**prepared**  30:22,24
  92:24 93:25 94:24
  95:12

**preparing**  93:22
**presume**  6:8
**prevail**  43:12
**previously**  41:1
  97:15
**primarily**  7:23
  11:12 23:8
**primary**  51:25
  61:18 71:4 105:22
**principal**  71:9
  85:11
**printed**  22:18
  23:13
**prior**  3:16 34:7
  38:15 68:12 71:24
  77:1,13
**private**  56:19
**pro**  39:10 89:2,23
  89:24 90:4,5
  92:18 97:13 105:1
**probably**  22:4
  29:22 61:10,11
  105:3
**problem**  11:4
  48:14,17 75:23
  106:6
**problems**  17:25
**procedure**  1:21
  21:25 79:22
**procedures**  105:7
**proceed**  95:10
**proceeding**  91:20
  92:12 110:5
**proceedings**  84:6
  104:11
**process**  58:17 95:8
  101:15
**produced**  1:13
**profession**  92:13
  103:7

**professional**  23:1
  77:20 86:16 93:1
  94:12
**professionally**
  71:6
**prolific**  79:14
**promised**  72:24
**proof**  54:13
**property**  26:4
**proportion**  11:14
  11:16 17:3 18:11
**proposal**  90:19
**propose**  102:21
**proposed**  11:20
  59:14 73:1 90:9
  91:24 93:20 99:7
  99:19 102:14,17
  103:2
**prosecuted**  69:11
**prosecuting**  69:22
**protect**  62:23
  63:12,18
**protection**  63:2
**provide**  17:5
  49:22 51:1,3,11
  52:1,10 79:8
  92:10 96:8
**provided**  19:11
  58:20 63:21 65:7
  90:16
**provides**  63:17
  64:3,5,9,14,19
  98:14
**providing**  12:11
  29:19 49:18 51:21
  63:23
**provision**  93:7
  102:2
**provisions**  1:22
  17:8

[public - replicated]                                                        Page 18

**public**  103:13
  109:22 113:19
**publicly**  94:3
**pull**  37:9
**purchase**  98:18
**purporting**  81:7
  94:7 96:22
**purpose**  71:21
  82:5 83:18 98:9
**purposes**  101:8
**pursuant**  1:21
  109:18
**pursue**  25:1,10
**pursued**  96:4
**pursuing**  81:14
  97:16
**put**  6:17 9:25 10:2
  14:12 33:14 35:21
  37:24 41:17 55:12
**putting**  17:7,19
  53:23

**q**

**qualify**  74:25
**quantify**  57:5
**question**  6:7,13
  73:12 89:22 93:17
  95:3 99:1 104:9
  107:18
**questions**  58:3,14
  62:8 89:5 108:2
  108:13
**quick**  52:25 96:13
  107:24
**quickly**  38:14
**quintana**  33:8
**quote**  81:20
**quoted**  104:24

**r**

**r**  2:1 86:11 112:3,3

**racked**  41:8
**racketeering**
  86:18
**raised**  34:21 38:4
  96:4
**ramirez**  31:10
**rate**  9:24
**rates**  21:8
**rationally**  66:23
**ray**  4:3
**rclore**  2:17 111:2
**reach**  50:15 58:7
**reached**  15:7,11
  33:3 34:13,22
  58:10,13,16
**read**  16:8,9,10,11
  22:5 30:9 35:16
  35:18 42:7,9,10,12
  67:8 70:24 81:21
  81:22 82:12,20
  83:2,4 84:13
  100:8 101:3
  102:12,20 104:22
  104:25 107:1
  111:9 113:5
**reading**  8:8 11:22
  21:1 34:12 45:23
  82:20 100:18,20
**real**  64:9 96:12
**reallocated**  17:4
**really**  11:12,21
  15:14
**realty**  83:14
**reason**  6:21 37:12
  98:14 111:11
  112:6,9,12,15,18
  112:21
**reasonable**  20:15
  21:10 47:25 48:3
  48:19,22 76:2,3

**reasonableness**
  61:21 67:13
**reasons**  109:25
**rebecca**  86:11
**recall**  9:3 10:19
  11:1 14:16 21:1,1
  23:19 24:19 27:25
  29:11 31:1,2,20,25
  32:5,7,17 36:22
  37:14 45:23,24
  52:12 60:21 68:9
**receipt**  109:23
  111:18
**receive**  60:7 64:23
**received**  64:23
  95:15
**receiving**  14:1
**recess**  53:3 96:15
  108:1
**recognition**  73:16
**recognize**  54:5
  53:6
**recollection**  30:8
  31:7 39:4
**record**  6:18 35:20
  83:5 103:13
  109:12
**recorded**  6:3
**recovery**  75:13
**reduce**  18:14
  19:14
**reduced**  59:10
**reducing**  58:21
**refer**  49:4 83:22
  105:25
**reference**  77:7
**referenced**  80:11
  88:6 111:6
**referred**  73:18
  87:18 104:19

**referring**  8:20
  28:21 49:11,15
  50:11,17 60:15
  68:25 69:3 70:17
  86:1 87:15
**refers**  88:4,5
**reflected**  106:21
**reflects**  106:11
**refresh**  30:8
**refusal**  93:21
**refused**  92:18,20
**regard**  34:17
**regarded**  79:13
**regarding**  92:18
  102:12
**regret**  103:18
**regular**  55:6,8
**reinforces**  98:17
**related**  10:23 12:6
  12:25 55:5,22
  64:6 73:17 78:1
  110:4
**relating**  103:1
**relationship**  97:20
**relevant**  76:23
**relief**  46:11 103:1
  103:2
**remand**  82:1 84:5
**remanded**  82:25
**remanding**  82:21
  83:7,15
**remember**  6:16
  31:13 32:8 40:10
  60:19
**rent**  80:2 81:17
**repeated**  55:6 81:2
**repeatedly**  81:13
**repercussions**
  93:10
**replicated**  86:19

**report** 10:4 13:20 63:24 64:15,17
**reported** 1:18
**reporter** 5:8 22:14 109:8
**reporter's** 3:6 109:6
**reports** 9:9,16,21 10:8 55:4,6 67:22
**represent** 5:6 24:5 39:10,15 50:23 53:13 60:3 70:1 77:17 89:21
**representation** 70:14 71:21 77:1
**representations** 95:14
**representative** 24:9,13 25:23 26:23 74:13 106:4
**representatives** 74:3,5,18
**represented** 3:20 21:17,19 39:18,21 68:23 70:18 78:12 97:14
**representing** 26:20 34:24 40:5
**represents** 39:12 81:7 94:6 96:22
**reputable** 69:25
**reputation** 34:4 99:10 103:7 106:17,19,25 107:3,6
**reputations** 103:14
**requested** 7:19 10:12 17:3 45:6 59:1 109:20 110:1

**requests** 69:8
**required** 11:5 46:18 60:22 87:22 93:2,4 113:13
**requirement** 7:13 7:13 76:13
**requirements** 49:6 49:12,15 50:14 51:8,20 52:22
**researched** 78:20
**respect** 32:11 35:7 36:9 91:5 93:2 104:12
**responded** 86:14
**responding** 89:4
**responsibilities** 93:1
**responsibility** 86:14
**responsible** 91:7
**rest** 17:17
**restoration** 13:21
**restrained** 87:22 87:25
**restrictions** 84:2
**result** 48:8 101:9
**results** 93:13
**resumé** 69:19
**retain** 85:18 108:9
**retained** 15:16 27:20 36:24,25 69:18 85:15 105:16
**retainer** 28:24 37:2,15,22 38:5,7 38:11 71:7,14 76:4,8,12 77:9 85:9
**retaining** 32:23 36:4

**return** 111:13,17
**returned** 109:22 109:24
**reverse** 84:4
**review** 36:12 40:15,16 41:25 44:21 52:12 108:3 111:7
**reviewed** 13:16 28:11 30:1,5,5,12 30:15,24 36:14 42:2,16 44:19 54:18 61:22,24 62:10
**reviewing** 9:9 10:3 32:13 34:11 48:12 55:4
**revisions** 79:22
**rico** 101:6,12,14
**right** 11:4 12:2,7 12:14,16,18,20,22 13:1 14:8 17:24 18:16 19:7,23 21:24 22:21 23:7 25:25 27:6 28:7 31:19 37:12,16 42:8,15 45:18 46:18 48:4,20 51:2 52:14,18,22 53:6,25 54:9,17 55:2,13,14,17 57:14,19,24 62:1 62:10 65:1 67:10 67:18,23 69:13 72:2 75:20 76:12 76:15 77:6,8,18 78:19,22 80:10,16 80:18 82:13 90:7 98:6 104:21 105:9 107:23

**rights** 72:1,11,25
**risks** 95:11
**roadblock** 50:11 51:23,24 52:9
**roadblocks** 49:7 49:10,16 50:18,21 51:6
**rob** 26:21 33:1,5,9 33:20 35:11 36:5 36:8 38:12 39:17 39:18,25 40:1,5 50:15 51:15,18 58:6,10,13,16 69:25 71:4 72:13 85:8,9 105:18,23 106:15
**robert** 2:14 3:19 111:1
**role** 71:10 93:6
**roman** 90:23
**ropes** 39:16
**routinely** 55:8 79:15 81:7 85:20 94:6 96:22
**rpr** 1:17
**rule** 22:3,4,7 82:1 83:7 109:18
**ruled** 83:20
**rules** 1:21 6:3 21:24 79:22
**ruling** 80:22 86:23
**rulings** 78:18 79:21
**run** 19:17

|   |   |
|---|---|
|   | **s** |

**s** 2:1 112:3
**safe** 45:1
**sales** 4:5 98:4
**sanctional** 93:11
**sanctioned** 77:22 93:5

sanctions 82:1,21
83:7,15 84:23
92:18 93:7,13,23
95:10
satisfies 102:19
satisfy 18:7 58:22
59:5,11 61:8
save 65:22 66:2
saving 65:13
saw 29:22 37:8
67:16 77:9 104:20
saying 17:16 39:5
51:14 64:24 71:2
103:5
says 10:20,21,25
23:1 25:24 45:6
63:1,16,17 68:11
68:14,15 69:5
70:13,21,22 71:24
72:14,23 73:13
74:23 75:9 76:17
76:25 79:11,19
80:22 81:6,25
82:16 83:14,23
86:2,10 87:24
88:13 89:2 90:3,7
90:25 91:20 95:24
96:21 97:12,19
98:7 99:1,4
100:17 101:12
102:21
scenes 92:25
scheme 86:18 98:7
school 22:24
scope 84:1
scratch 65:19
scroll 63:11 71:23
80:20 93:18
sdny 97:10
se 39:10 92:18
97:13

second 49:3,7
59:18 60:1 62:13
62:15,17,25 86:2,7
91:19 96:21 97:11
100:17 107:24
section 23:2 75:6,6
76:4
securing 68:17
securities 4:4 97:9
security 1:3 46:22
47:7 109:3 111:4
112:1 113:1
see 18:2,13 19:1
27:13 29:12,24
31:18 49:5,6,9
55:8,10 58:8
59:22 60:2 62:18
63:1,4,13,15 65:25
68:18,20 69:8,9,15
70:12,15,16 71:2
71:21,22 72:3,16
72:17 73:2,3,21,22
75:1,2,7,8,14,15
76:5,6 77:2,3
78:14,16 79:4,5,17
79:18 80:5,6 81:4
81:5,18,19 82:5,6
82:18,19 84:9,10
84:20 85:2,3 86:3
86:8,9 87:13,15,17
87:22,23 88:2,3,6
88:16,18 89:6,7
90:3,20,21,23,24
91:2,17,18,24 92:1
93:13,14 94:19,20
95:17,18 97:22,23
98:19,20,25 99:1,3
99:12,13 103:20
103:21
seeing 23:19 29:11
32:7 68:9

seek 73:10
seeking 26:23
71:25 72:10 73:4
74:4,6 75:18,21
80:3 81:17 89:2,9
89:20,25 90:4,5
seen 7:5 23:12,18
31:6 42:14 60:10
68:10 70:6,8 78:3
79:6,7,10,19 80:9
80:15 85:16 86:24
89:11,13,15,23
91:13,15 92:4
selected 55:14
self 103:10
selling 64:21
sent 31:25 32:2
111:14
sentence 45:6
59:18 60:1 69:5
70:12,16 72:3
75:2,15 76:17
80:22 81:5,19
82:6 84:25 85:3
92:1
sentences 83:2
separate 8:18
september 63:3
67:17
serial 3:22 79:3,14
serve 19:17 72:19
72:21 74:5
served 24:9
109:16
service 9:9 19:10
65:1,2,24 66:3,8
66:20 73:16,17
services 7:24
11:19 13:21 18:10
63:17,21,22 67:17

serving 73:24
set 65:18
sets 74:16
settle 43:25 81:3
settled 15:20
16:13
settlement 3:15,21
7:15,17,18,22 8:3
8:14,23 9:20 10:9
10:15,24 11:8,21
12:6,7 13:1,5,11
13:14,25 14:3,13
14:20,24 15:4,6,9
15:11 16:2,21,22
17:1,7,8,12,19,25
18:12,14 24:25
25:9,18,19 27:10
27:13,23 28:2
32:2,6,12 34:12
36:12,13 39:8
40:20,22,24 41:5
41:13,15,16,23
44:2 45:7,9,13
46:1,6,17,18 47:14
47:18,21 48:3,5,13
48:15 49:14 53:16
53:17 54:2 56:3,9
56:10,12,16 57:18
57:20 58:4,21
59:4,13 60:6
61:19,21 62:8,21
63:12,16,17,19
65:7 67:13 69:23
73:1,6,9 74:14
75:13,18,19 78:14
91:24 93:20 94:13
95:8,15,16 96:1
98:9 108:4
settlements 34:25
69:7,12 70:20
79:15 81:8,9,15

94:5,7,8,18 96:23
96:24 97:17 99:7
99:20 101:7,9
102:15,18
**settling** 69:22
79:16
**shared** 7:8
**sheet** 111:11
**shoreline** 2:15
**shorthand** 1:18
109:8
**shown** 109:17
**sick** 6:21
**side** 22:17 39:21
40:9
**sign** 38:5 44:16,21
76:16 85:9 92:20
111:12
**signal** 79:22
**signature** 3:7
44:10,11 71:18,19
72:6 109:19,22,24
110:10
**signed** 30:24 37:15
37:21 38:7,11
44:12,17 54:18
66:17 71:7,15
72:4 76:7,15
87:13,17 111:20
**significant** 11:14
15:21,24 17:4
57:8 70:19
**significantly** 8:11
**signing** 65:22
66:16 76:11
**similar** 35:3 77:4
82:3,22 83:17
91:3,4 94:18
106:8
**similarly** 94:11

**simply** 74:16
79:16
**single** 86:17
**sir** 43:10
**sit** 101:3
**sitting** 11:3 18:17
19:23 64:8
**situation** 83:25
**six** 52:2 66:2,4
**skimmed** 36:14
**skip** 97:18
**slice** 17:16
**snathan** 2:9
**solely** 94:15
**solicited** 72:15,18
72:21
**solutions** 111:23
**somebody** 36:2,6
51:17,19
**soon** 38:4
**sorry** 10:23 12:9
12:24 22:19 38:10
48:1 54:7,8 59:25
62:16 65:12 83:11
86:5 90:23 95:23
104:19
**sort** 71:23 75:9
**sought** 23:20
73:20 75:19,20
102:24
**sound** 84:11
**sounds** 14:21
45:18 83:20
**south** 94:17
**speak** 6:4 34:17
37:25 72:7,8
107:4,13
**speaking** 31:13,24
33:25
**specific** 8:15 9:3
10:19 33:14 58:25

70:24 90:11
101:21
**specifically** 17:1
28:21 39:4 69:2
70:25 80:24
**specificity** 90:12
**specifics** 11:1 28:1
43:13 45:25 99:21
99:24 100:3
**specious** 94:1
**speculate** 47:11
59:6
**spell** 5:8
**spelled** 5:9
**spend** 47:11
**spending** 47:5
**spent** 9:2,8,16,20
9:22,25 10:2,8,22
10:23 12:1,5,9
14:13 20:21 41:18
48:23 55:3,8,14
62:24 67:16,22
**spoke** 36:20,22,23
37:23 38:6,12,16
**spoken** 33:23 50:4
72:13
**sporadic** 84:1
**squiggly** 44:12
**stages** 92:15
**stands** 50:13
**star** 92:9
**start** 8:6 65:19
**started** 58:12
98:23
**starting** 93:19
**starts** 91:17 92:9
**state** 1:18 5:8 23:2
80:5 86:22 89:3
90:9 102:6,18
104:11 105:1,3,4
109:9

**statement** 16:13
60:15
**states** 1:1 84:2
90:10,12 109:1
**stein** 92:23
**step** 53:22
**steps** 32:24
**steven** 2:6
**stewart** 2:11 28:22
28:23 29:3,14
34:5,6 52:25
80:25 81:2 83:24
108:13
**stolen** 56:23,25
57:2
**stop** 51:8
**stopping** 53:2
**story** 99:5
**straight** 33:16
**street** 2:4,7
**struck** 82:16
**study** 62:12
**stuff** 30:9 46:14
**styled** 1:15
**submission** 9:11
54:13
**submit** 12:2 36:25
38:15,19,22 39:3
41:9 63:20
**submitted** 36:20
44:5,6 54:6 61:6
66:18
**submitting** 10:17
36:15 66:19
**subscribed** 113:14
**subset** 90:11
**substantial** 49:4,7
51:24 52:9,11
61:7 92:16 93:21
96:5

**substantially**
92:14
**substantive** 33:25
93:4
**success** 35:22
70:19 105:24
106:1
**successes** 35:2,3,6
35:13,13
**successful** 20:3,9
26:22 74:19 75:17
**sued** 101:5
**suffered** 62:22
**sufficiency** 67:13
**suggest** 73:23
**suggestions** 74:1
**suit** 2:4
**suite** 1:20 2:12,15
**suits** 26:3
**sum** 102:21
**summary** 42:25
54:13
**support** 92:10
**supports** 97:21
**suppose** 12:13
**supreme** 102:7
**sure** 5:9 6:1 9:17
10:5 14:22 15:12
16:20 17:21 18:24
19:12,21 20:17
25:11,16 26:25
27:7 29:15,21
36:1 37:18 39:11
42:23 46:20,24
47:22 48:10 51:3
53:1,21 56:20
68:2 74:21 96:14
**surprise** 43:19
74:7,10
**surprising** 43:23

**survived** 101:12
**surviving** 42:25
**switching** 18:4
**sworn** 1:14 5:2
109:10 113:14
**sylvia** 1:17 109:8
110:11

**t**

**t** 80:25,25 112:3,3
**table** 15:13 16:21
**take** 6:12 14:19
48:12 50:6 52:25
56:2 96:12 107:23
**taken** 1:10,15 5:16
5:17,21 53:3
60:24 83:24 84:9
96:15 108:1 110:6
**takes** 15:25
**talk** 23:17 31:16
35:12 61:13
**talked** 38:21 42:6
44:4 68:21 97:4
**talking** 8:14 17:13
17:14,15 31:2
53:5 55:2 80:19
**tangible** 46:24
47:2
**tarnished** 99:12
103:16
**tattoo** 103:17
**tell** 23:19 37:17
39:7,20 43:13
44:22,25 49:1
58:15,19 61:3
64:8 69:2 70:4,11
74:9 81:23 92:6
95:20
**telling** 98:17
**ten** 9:19 10:16
12:5,9 48:20,21
59:7 65:21 66:5

71:5 105:18
**tenfold** 61:9
**term** 93:3
**terms** 16:21 17:6,6
29:4 41:23 59:14
**testified** 5:2 95:13
**testifying** 98:18
**testimony** 72:20
95:24 109:12
111:9,18 113:8
**texas** 1:18,20 2:12
2:16 23:3,9,16
79:11 104:11
109:9 110:11
**text** 34:18
**thankfully** 50:15
**thanksgiving**
49:21
**theft** 57:4 62:22
63:2,13 64:7
**thereto** 30:11 97:2
**thing** 11:21 17:18
54:7,9 67:3 84:24
100:9
**things** 29:24 31:16
40:25 41:20 46:25
50:19 62:24
105:16 106:8
**think** 8:10,12 9:3
9:14,23,24 11:12
14:17 15:2,6 17:3
17:25 18:5,8,10,16
19:8,18 20:3,8,10
20:10,12,15,20,22
21:7,9 22:23 23:5
24:8,17 25:17
27:9,23 30:1,18
32:10 33:18 34:10
42:6 43:6,11,24
44:1,3,18 46:1,14
46:19,21 47:12,20

48:5,11,21 50:18
51:22,23 52:10,11
53:15,17,18,19,20
55:17 56:3,5,17
57:1,5,6,8,17 58:7
59:1,6,17 60:16
61:7,18 62:9 65:4
65:15 66:24 67:19
68:21 69:21,25
74:12 76:2,3
78:17 80:15 83:6
83:12,19 85:17,20
87:3,7 89:19,25
96:17 97:3 101:12
104:24 106:3,11
106:13,21,25
107:3,10,15 108:9
**third** 49:3,6 70:12
76:17 80:21 91:17
96:20
**thought** 51:5
**thoughts** 42:21
**three** 63:20,24
64:1,3
**threshold** 49:1
**throw** 95:7
**thrown** 15:5 53:16
53:18
**thut** 80:24 81:1
83:23 84:9
**thwarted** 95:9
**time** 8:1,17 9:1,5,8
9:8,11,16,20,22,25
10:7 12:1,13,23
14:22,25 18:13
20:11,13,20 25:20
27:21 29:5 31:17
31:19 32:1,16
36:24 38:8,9,10,16
41:18 46:20 48:23
50:6 55:3,6,7,8

57:25 62:24 64:9
66:10 67:16,21
75:22 76:12 80:7
80:9 96:6 111:19
**timeframe** 111:8
**timeline** 16:16
**times** 12:23,24
16:1,1 65:21
**title** 68:14 78:16
79:5
**titled** 79:3
**today** 6:22 11:3
18:17 19:23 26:15
28:10,18 30:3,8
64:8 73:12 104:7
**told** 26:17 39:2
**top** 39:13 60:1
96:20 98:6
**total** 8:4,4,12 9:4
12:9,14 47:14
**totals** 8:2
**track** 35:20
**trading** 64:21
**transcript** 109:11
109:23 111:6,20
113:5,8
**trial** 4:9 82:2
83:16
**triggering** 99:8
**trouble** 79:24
**true** 73:5 95:24
109:12 113:8
**trust** 27:20 36:6
85:8 105:19,20
**trusted** 58:12
**truth** 98:18
**truthfully** 6:22
89:4
**try** 11:18 25:19
28:2

**trying** 18:1,6 25:7
37:7 38:7 51:5
52:16 60:3 66:23
83:6
**tube** 4:3
**turkish** 92:23 93:2
93:2,8,10
**turn** 68:15 69:4
76:4 80:18 82:7
82:11 87:13,21
91:16 92:8 96:18
97:10 98:5,24
**turning** 44:9 45:5
70:2
**tv** 70:6
**two** 38:1,2 41:24
49:18,19 54:11,12
79:21 83:2 93:23
102:20
**twt** 1:4 109:4
**type** 12:4 21:11
54:18 58:11 70:3
**typed** 95:1
**types** 35:3,25
55:21
**typo** 40:18

**u**

**u** 80:25
**u.s.** 43:5
**uh** 40:2
**ultimate** 83:1
**ultimately** 95:11
96:5
**unauthorized**
63:18 78:1 86:13
101:25 102:2
104:3 105:11,13
**uncertain** 75:5
84:1
**underlying** 42:7
42:22

**understand** 5:23
5:25 6:2,7 7:17,18
7:21,23 8:8 9:17
10:5 11:5,23,25
13:8 16:4 19:16
20:16,18 24:24
27:18 28:8 29:22
35:4 38:13 43:3
45:12 46:12 53:8
56:14 66:23 73:6
73:19 74:23 75:16
75:21 83:6 101:4
103:6 105:23
**understanding**
8:21 15:10,19
16:3,15 65:9
85:11 104:25
**understood** 6:9
106:17
**undoubtedly**
103:16
**unethical** 80:2
99:5,18 100:1
102:13
**unfair** 69:7
**unfitting** 92:12
**unfortunately**
85:1
**united** 1:1 109:1
**unpredictable**
83:25
**unprofessional**
91:21
**unreimbursed**
63:1
**unseemly** 91:22
**unspecified** 94:16
**updated** 64:16
**upper** 1:19 2:12
**use** 63:18 98:18

**v**

**v** 3:23,24 4:2
80:14 82:12 91:11
97:3 102:10
104:18
**vacate** 81:25
**vacating** 82:21
83:15
**valid** 60:18
**value** 14:5,13 46:1
46:4,7 47:13,13,14
47:25 48:3,5,15,22
65:25 67:1 108:4
108:9
**valued** 47:19
**varies** 21:4
**various** 8:1,2 84:2
85:21 104:7
**vastly** 84:1
**verify** 111:9
**veritext** 111:14,23
**veritext.com.**
111:15
**versus** 87:12
100:10
**vexatious** 81:13
97:20
**vice** 89:3,23,24
90:4,5 105:1
**victim** 57:3
**victories** 68:17,25
**view** 56:12
**viewed** 56:24
**violate** 89:1
**violated** 102:2
**violations** 101:7
105:2
**virtually** 94:16

| w |
| --- |
| **w**   2:14 111:1 |
| **waive**   73:10 |
| **walmart**   97:3 |
| **want**   19:14 29:18 |
| 33:13 39:14 44:25 |
| 56:2 57:24 77:16 |
| 77:19 83:4 96:18 |
| 100:8,17,18 |
| 107:15,24 |
| **wanted**   39:16 |
| **wanting**   51:9 |
| **washington**   2:4 |
| **wasted**   96:5 |
| **way**   18:2 20:15 |
| 27:15 43:14 50:10 |
| 58:17 63:17 70:11 |
| 74:10 75:18 77:24 |
| 79:13 81:23 93:11 |
| **ways**   20:16 85:22 |
| **we've**   16:1 28:1 |
| 40:3 104:7 106:3 |
| **web**   13:18 64:19 |
| 64:24 66:16 |
| **website**   3:12 22:15 |
| 22:21 31:18 36:12 |
| 36:15 62:9,9,11,12 |
| **week**   38:1 49:18 |
| 49:20 |
| **weeks**   38:1,13 |
| 41:24 49:19 |
| **went**   22:23 33:16 |
| 33:20 58:18 59:3 |
| 59:12 62:11 77:5 |
| 104:24 106:1,22 |
| **west**   1:9,13 3:4,11 |
| 3:12,13,14 5:1,9 |
| 5:10 7:5 59:19 |
| 108:3 109:6,10 |
| 111:5 112:2,24 |
| 113:2,4,12 |

| **west's**   3:16 68:11 |
| **westlaw**   91:12 |
| 98:5 |
| **whiff**   79:23 |
| **whitehall**   2:7 |
| **win**   35:23 36:10 |
| **wind**   25:24 |
| **window**   52:2,5 |
| **wish**   101:24 |
| 107:11 |
| **withdraw**   4:7 81:4 |
| 100:12,15 102:22 |
| **withdrawal**   91:23 |
| **withdrawing** |
| 90:17 98:10 |
| **withdrew**   101:18 |
| **witness**   1:14 82:10 |
| 96:12 108:12 |
| 109:10,13,17 |
| 111:8,10,12,19 |
| **word**   5:11 |
| **work**   21:13 29:24 |
| 33:6 48:18 88:9 |
| **workday**   26:19 |
| **worked**   40:10 |
| **working**   20:21 |
| 94:14 106:14 |
| **works**   10:10 36:8 |
| 88:7 |
| **worst**   91:22 |
| **worth**   14:22,24 |
| **worthy**   80:4 |
| **wrench**   95:8 |
| **write**   44:22,25 |
| **writs**   101:15 |
| **written**   29:13 |
| 44:20 79:25 |
| **wrong**   8:25 45:17 |
| 54:7 65:5 |
| **wrote**   70:22 94:6 |
| 95:1 |

| x |
| --- |
| **xxx**   109:20 |

| y |
| --- |
| **y**   86:11 |
| **yeah**   82:15 95:2 |
| **year**   65:3,6 79:24 |
| **years**   3:21 14:9 |
| 16:1 33:1,13,15 |
| 35:11 36:5 40:8 |
| 63:20 65:8,13,17 |
| 66:4,4,5 71:5 |
| 78:14,23 79:21 |
| 105:18 |
| **yesterday**   28:14 |
| 28:18 30:3 |
| **york**   2:8 |

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.