**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| IN RE EQUIFAX, INC. CUSTOMER DATA SECURITY BREACH LITIGATION | MDL DOCKET NO. 2800 1:17-md-2800-TWT CONSUMER CASES |

**EQUIFAX'S RESPONSE IN SUPPORT OF FINAL APPROVAL OF
CONSUMER CLASS ACTION SETTLEMENT**

The unprecedented settlement before the Court arises out of over a year and a half of contentious litigation, a series of difficult settlement negotiations supervised by retired federal judge Layn Phillips, and active participation by federal agencies—the Federal Trade Commission ("FTC") and Consumer Financial Protection Bureau ("CFPB")—and a multi-state attorney general group ("MSAG") representing 48 states, Puerto Rico, and the District of Columbia. These efforts by all stakeholders have produced a carefully designed and highly calibrated settlement that provides valuable relief to the settlement class commensurate with the risks, costs, and delay of continued litigation.

This Court preliminarily approved the settlement on July 22, 2019, finding that it "provides a recovery for the class that is within the range of what could be approved as fair, reasonable, and adequate." Dkt. No. 742 at 3. In the following months, settlement class members have been notified of the proposed settlement

through a Court-approved, comprehensive notice program administered by a prominent notice provider.  Notice to the class has been overwhelmingly successful as demonstrated by the significant publicity and extraordinary claims rate.  On the other hand, objections to and opt-outs from the proposed settlement have been minimal, representing just 0.00075%[1] and 0.00188% of the settlement class, respectively.  None of the objections presents any valid reason for this Court to deny final approval of the settlement.

The Court's preliminary assessment of the settlement was correct—it is fair, reasonable, and adequate, easily satisfying the requirements of Federal Rule of Civil Procedure 23(e).  Equifax therefore supports final approval of the settlement.

## BACKGROUND

### I.    Litigation and Regulatory Activity Arising from the 2017 Data Security Incident.

Immediately following Equifax's announcement of the 2017 data security incident on September 7, 2017, plaintiffs began filing cases nationwide in state and federal courts.  In total, more than 400 cases were consolidated in this Court under

---

[1] Nearly 65% of the total objections were submitted via a "chatbot" run by Class Action Inc.  In addition to the potential issues identified by the Court-appointed settlement administrator, *see* Dkt. No. 900-4 ¶ 81, many (if not most) of these objections fail to comply with the basic requirements for objections under Fed. R. Civ. P. 23(e)(5)(A).

28 U.S.C. § 1407 for pretrial proceedings.  Outside of the MDL litigation, Equifax faced investigations by the MSAG, the FTC and CFPB, and numerous other state and federal regulators.

On May 14, 2018, the Consumer Plaintiffs filed a 559-page consolidated consumer class action complaint (Dkt. No. 374, "CCAC") naming 96 putative class representatives and asserting a host of claims under state and federal law. Equifax moved to dismiss the entire CCAC on June 27, 2018 (Dkt. No. 425), which the Court granted in part and denied in part.  *See* Dkt. No. 540. Significantly, the Court dismissed the Consumer Plaintiffs' claims under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq*., denying Plaintiffs' bid at certifying a nationwide FCRA statutory damages class.  *Id*. at 9-14.  The Court denied Equifax's motion with respect to Plaintiffs' core negligence claims, finding that, under Georgia law, Equifax "owed a legal duty to the Plaintiffs to take reasonable precautions" to safeguard their personal information.  *Id*. at 40.  As explained below, however, the Georgia Supreme Court has since held—*after* the parties reached the proposed settlement—that *Georgia law does not recognize a duty to safeguard personal information sufficient to sustain a negligence claim. See Dep't of Labor v. McConnell*, 828 S.E.2d 352, 358 (Ga. 2019).

Equifax answered the remaining claims in the CCAC on February 25, 2019.  Dkt. No. 571.  Both before and after the filing of the answer, the Consumer Plaintiffs and Equifax engaged in significant discovery efforts, including Equifax's collection and production of over 750,000 pages of documents.  Discovery was contentious up until the time of settlement, and the parties were forced to raise numerous discovery-related disputes with the Court in late 2018.

## II.    MDL Settlement Negotiations.

In September 2017, still in the early stages of the litigation, Equifax and Plaintiffs' Counsel engaged the Honorable Layn R. Phillips, a former U.S. District Court Judge, to oversee settlement discussions.  Between September 2017 and March 2019, the parties met in-person five times before Judge Phillips for what—in his own words—were "complex and highly adversarial" negotiations.  *See* Dkt. No. 739-9, Phillips Declaration ¶¶ 7-9.  As recognized by Judge Phillips, negotiations were complicated by the fact that "[m]any of the issues presented by the parties were novel and unsettled," including Equifax's position that Plaintiffs could not establish a duty of care under Georgia law to sustain a negligence claim. *Id*.  At the final March 30, 2019 negotiation—which was after the Court denied in part Equifax's Motion to Dismiss but *before* the Georgia Supreme Court answered

the duty question—the parties executed a term sheet which precipitated the settlement now before the Court.  *See* Dkt. No. 858-1 at 66-78.

Following agreement on the term sheet in the MDL litigation, Equifax engaged federal and state regulators—the FTC, CFPB, and the MSAG—in an attempt to facilitate a global settlement fund to provide restitution to all impacted U.S. consumers.  This global settlement approach was unprecedented and extraordinarily complicated as it entailed negotiations involving multiple stakeholders, all of whom were pursuing, to some extent, actions on behalf of overlapping groups of consumers.  But these efforts proved worthwhile, with all stakeholders agreeing to a global settlement structure, and the FTC, CFPB, and members of the MSAG approving of a single consumer restitution fund that would be established under the proposed MDL settlement, with the oversight of this Court, to provide consumer relief.  This global structure benefits the settlement class by allowing claims to be submitted through a universal claims process managed by the Court-appointed settlement administrator.

On July 22, 2019, the same day the Consumer Plaintiffs moved for preliminary approval, the FTC and CFPB each filed consent orders in this Court settling their claims against Equifax.  Separate settlement agreements were entered into with Puerto Rico, the District of Columbia, and the 48 states in the MSAG.

## **ARGUMENT**

To grant final approval, this Court must find that the settlement "'is fair, adequate and reasonable[,] and is not the product of collusion between the parties.'" *Greco v. Ginn Dev. Co., LLC*, 635 F. App'x 628, 632 (11th Cir. 2015) (citation omitted).   Courts in this Circuit have often applied the factors from *Bennett v. Behring Corporation*, which include: (1) the likelihood of success at trial; (2) the range of possible recoveries; (3) the point on or below the range of possible recoveries at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and degree of opposition to the settlement; and (6) the stage of the proceedings at which the settlement was achieved.   737 F.2d 982, 986 (11th Cir. 1984).   The 2018 amendments to Rule 23 now require Courts to consider "a mandatory but non-exhaustive set" of criteria "analogous" to the *Bennett* factors, including (among others) whether "the proposal was negotiated at arm's length" and whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal." *Grant v. Ocwen Loan Servicing, LLC*, No. 3:15-cv-01376-J-34-PDB, 2019 WL 367648, at *4-5 (M.D. Fla. Jan. 30, 2019).

This Court has recognized that "[s]ettlements conserve judicial resources by avoiding the expense of a complicated and protracted litigation process and are

highly favored by the law." *In re Motorsports Merch. Antitrust Litig.*, 112 F. Supp. 2d 1329, 1333 (N.D. Ga. 2000). Moreover, this Court has found that early settlement of data breach claims "benefits the [s]ettlement [c]lass immensely because they can immediately take advantage of [s]ettlement benefits designed to mitigate and prevent future harm including identity monitoring and injunctive relief." *In re Home Depot, Inc., Customer Data Sec. Breach Litig.*, No. 1:14-md-02583-TWT, 2016 WL 6902351, at *5 (N.D. Ga. Aug. 23, 2016); *see id.* (the "cutting-edge and unsettled" nature of data breach claims counsels in favor of settlement, which "removes . . . uncertainties and provides the [s]ettlement [c]lass with meaningful and immediate relief.").

Here, the Court should grant final approval of the proposed settlement, which is the product of intensive, arms-length litigation and settlement negotiations that began over two years ago. Approval of the settlement will eliminate the substantial time, costs, and risks of further litigation and will provide settlement class members with valuable relief in the near future.

## I.   The Settlement is the Result of Hard-Fought Litigation and Negotiations.

The settlement before the Court is the product of protracted, hard-fought litigation and arms-length negotiations. Over 400 consumer cases were consolidated in this MDL, where the Court appointed a team of experienced data

7

breach attorneys to represent a putative nationwide class of impacted consumers. From the appointment of Class Counsel to the signing of the settlement term sheet, the parties vigorously litigated the claims and complex legal issues raised in the CCAC, including engaging in significant, and often contentious, discovery efforts.

As described more fully below, Equifax argued and continues to maintain that the Consumer Plaintiffs' claims suffer from fatal legal deficiencies. Perhaps most significantly, Georgia law—which governs this case (*see* Dkt. No. 540 at 9 n.49)—does not recognize a common law duty to safeguard personal information. Further, Georgia law confirms that Plaintiffs' claims of "increased risk of identity theft" and costs associated with mitigating that speculative harm are insufficient to allege a legally cognizable harm, let alone to prove such harm at trial. With these and other critical defenses looming, the parties engaged in a series of difficult and protracted settlement negotiations.

Judge Phillips characterized the negotiations as "complex and highly adversarial," with "[m]any of the issues presented by the parties [being] novel and unsettled." Dkt. No. 739-9, Phillips Declaration ¶¶ 8-9. This Court previously granted final approval under similar circumstances in the *Home Depot* breach litigation, finding that the "parties were represented by informed counsel that reached agreement after months of arms-length negotiations before an experienced

mediator." *In re Home Depot*, 2016 WL 6902351, at *5.  Just recently, the Northern District of California approved the *Anthem* data breach settlement reached under the guidance of Judge Phillips.  *See In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 327 (N.D. Cal. 2018).  And the comments to the recent Rule 23 amendments confirm that the "involvement of a neutral or court-affiliated mediator or facilitator in [settlement] negotiations may bear on whether they were conducted in a manner that would protect and further the class interests."  Comment to December 2018 Amendment to Fed. R. Civ. P. 23(e)(2)(A) and (B).

Finally, the settlement reached between Class Counsel and Equifax was subjected to scrutiny, and ultimately enhanced, by the FTC, CFPB, and the MSAG.  The extensive involvement of these regulators, and their agreement that the MDL settlement fund, when final, can be the vehicle for all consumer restitution related to the data security incident, confirms that the settlement was fairly negotiated without any hint of collusion.

The Court can easily conclude that the "the parties' settlement agreement is the product of arm's-length, adversarial negotiations between experienced and knowledgeable counsel."  *Gumm v. Ford*, No. 5:15-CV-41-MTT, 2019 WL 479506, at *3 (M.D. Ga. Jan. 17, 2019) (granting preliminary approval); *see also Poertner v. Gillette Co.*, 618 F. App'x 624, 630 (11th Cir. 2015) (affirming final

approval where "the parties settled only after engaging in extensive arms-length negotiations"). Accordingly, the requirements of Rule 23(e)(2)(B) are satisfied.

## II.    The Settlement is Fair, Reasonable, and Adequate.

### a.    Plaintiffs Face Major Risks in Continued Litigation.

The proposed settlement is a fair, reasonable, and adequate compromise of the parties' claims and defenses. The certain and immediate benefits to be provided in the settlement must be "weighed against the risks and costs of continued litigation," which in this case are substantial. *In re Motorsports Merch. Antitrust Litig.*, 112 F. Supp. 2d at 1334. Had the Consumer Plaintiffs continued litigating their claims, there was no promise of a better recovery and, in fact, the viability of their claims became increasingly speculative as the case progressed.

*First*, in moving to dismiss the Consumer Plaintiffs' negligence claim, Equifax relied on the Georgia Court of Appeals decision in *McConnell v. Department of Labor*, which held that a "duty of care to safeguard personal information . . . has no source in Georgia statutory law or caselaw." 814 S.E.2d 790, 799 (Ga. Ct. App. 2018), *aff'd*, 828 S.E.2d 352 (Ga. 2019). At the time the Court addressed that argument in ruling on Equifax's Motion to Dismiss, the parties in *McConnell* had appealed the decision to the Georgia Supreme Court. This Court held that "it seems very unlikely . . . that the Georgia Supreme Court

will adopt a rule of law . . . that [Equifax] has no obligation to protect [consumer's] confidential personal identifying data," and rejected Equifax's reliance on *McConnell* based on that prediction.  Dkt. No. 540 at 33–34.  Four months later, the Georgia Supreme Court instead held that *there is no general duty to safeguard personal information*.  *Dep't of Labor v. McConnell*, 828 S.E.2d 352, 358 (Ga. 2019).  This holding confirmed Equifax's position that the Consumer Plaintiffs' negligence claims fail under Georgia law.  Had the parties not reached the settlement, Equifax would have moved the Court to reconsider its ruling based on this express clarification of Georgia law.

Plaintiffs would have faced an uphill battle distinguishing this case from *McConnell*.  In its briefing to the Georgia Supreme Court, the Georgia Attorney General's Office tried to distinguish this Court's prior holdings in the *Arby's* and *Home Depot* data breach cases, which had relied on *Bradley Center v. Wessner* to find a general duty to protect personal information under Georgia law.  *See* Br. of Appellee Ga. Dep't of Labor, attached as Exhibit 1, at 14–15 & n.3.  But when the Supreme Court confirmed the lack of any common law duty to safeguard personal information, it declined to address the AGO's attempt to distinguish *McConnell* from those other cases, and it made no meaningful distinction between the facts in *McConnell* and those alleged in the CCAC here.  In sum, *McConnell* is a

formidable decision that cuts strongly in Equifax's favor. Had the Consumer Plaintiffs continued to litigate, they would have had to overcome a recent binding decision from the Georgia Supreme Court that stripped the duty element from their core negligence claim.

*Second*, under *Collins v. Athens Orthopedic Clinic*, the Consumer Plaintiffs have failed to allege a legally cognizable injury under Georgia law. Here, just as in *Collins*, the Consumer Plaintiffs contend they were injured because they spent time and money attempting to mitigate the effects of the data security incident, and because they now face an increased risk of future identity theft due to the exposure of their personal information. *See Collins*, 815 S.E.2d 639, 645 (Ga. Ct. App. 2018), *cert. granted* (Ga. 2019). In ruling on Equifax's Motion to Dismiss, the Court found that the Consumer Plaintiffs' allegations were different than those at issue in *Collins* in that the Consumer Plaintiffs "alleged that they have *already* incurred significant costs in response to the Data Breach" and "have also *already* suffered forms of identity theft." Dkt. No. 540 at 19–20 (emphasis added). But shortly after the Court entered its ruling here, the Georgia Supreme Court granted certiorari in *Collins* to address whether the Court of Appeals correctly held that the plaintiffs "failed to allege a legally compensable injury." Writ of Certiorari, attached as Exhibit 2. Thus, while the Court found that the Consumer Plaintiffs

avoided the result in *Collins* based on slight differences between their allegations and those in *Collins*, the Georgia Supreme Court will soon have the opportunity to both clarify and reinforce *Collins's* holding, which is well-grounded in a long line of Georgia tort law. *Collins*, 815 S.E.2d at 645. The Supreme Court may take the opportunity in *Collins* to make plain that a mere increased risk of identity theft and costs associated with warding off that future speculative harm—whether incurred yet or not—are not legally cognizable injuries under Georgia law. This would be consistent with *McConnell's* express rejection of a common law duty of care in the absence of legislative approval from the General Assembly. A Supreme Court holding in *Collins* to that effect would give Equifax another strong ground on which to seek reconsideration of the order on the Motion to Dismiss.

*Third*, and related to the point above, even if the Consumer Plaintiffs who claimed actual identity theft had sufficiently *alleged* an injury under Georgia law, their claims would still flat when put to their proof. There is no record evidence that *any* of the Consumer Plaintiffs' personal information impacted in the data security incident has been sold or traded by identity thieves, and numerous commentators have noted that—even after more than two years—the stolen data

has not appeared on the "dark web."[2]   Moreover, it is highly likely that the personal information of some—if not most—of the Consumer Plaintiffs has already been disseminated by other data breaches.   At summary judgment, the Consumer Plaintiffs would have faced a virtually insurmountable hurdle of proving any identity theft (or other harm) was, in fact, proximately caused by the Equifax data security incident.

*Finally*, the Consumer Plaintiffs would have faced serious impediments at the class certification stage.   The presence of "particularized issues"—most notably questions of causation and damages specific to each class member—"diminishes the manageability of any class litigation and would result in a series of essentially separate lawsuits."   *Reid v. Lockheed Martin Aeronautics Co.*, 205 F.R.D. 655, 686 (N.D. Ga. 2001).   Even assuming Plaintiffs could get past *McConnell* and *Collins*—which is unlikely—each Plaintiff would have to establish his or her

---

[2] Josh Fruhlinger, Equifax data breach FAQ: What happened, who was affected, what was the impact?, CSO Online (Oct. 14, 2019) (reporting that infosec experts began monitoring the dark web as soon as the incident was announced to look for the stolen data "but the data never appeared"), available at https://www.csoonline.com/article/3444488/equifax-data-breach-faq-what-happened-who-was-affected-what-was-the-impact.html; Jesse Pound, *Equifax CEO says company still faces cyberattacks everyday*, CNBC Online (July 22, 2019) (reporting July 22, 2019 statement by Equifax CEO that there was still no evidence that any of the data "ha[d] been sold on the dark web"), available at https://www.cnbc.com/2019/07/22/equifax-ceo-says-company-still-faces-cyberattacks-every-day.html.

specific harms allegedly resulting from the data security incident, creating a situation where individualized inquiries could vastly outweigh any common questions susceptible to class treatment under Rule 23. *See* Order, *Adkins v. Facebook, Inc.*, No. 3:18-cv-05982-WHA, Dkt. No. 261 at 13 (N.D. Cal. Nov. 26, 2019) (denying certification of Rule 23(b)(3) damages class in data breach class action, and also finding Rule 23(c)(4) issue certification inappropriate where "[d]uty and breach would be tried on a common basis" but "[c]ausation and damages would be tried individually").

In sum, "proceeding to class certification and trial comes with inherent risk," while "'settlement creates a certainty of some recovery, and eliminates doubt, meaning the possibility of no recovery after long and expensive litigation.'" *Hapka v. CareCentrix, Inc.*, No. 2:16-CV-02372-KGG, 2018 WL 1871449, at *4 (D. Kan. Feb. 15, 2018) (citation omitted). The significant benefits provided in the settlement are unquestionably fair, adequate, and reasonable, especially when viewed against the substantial risks faced by Plaintiffs in litigation.

b. <u>The Settlement Provides Class Members with Valuable Relief.</u>

The relief provided in the settlement is meaningful and substantial. Over the 18 months of negotiations that took place under the oversight of Judge Phillips, Plaintiffs' Counsel and Equifax heavily negotiated the core settlement benefits.

After Equifax and Plaintiffs' Counsel agreed to a term sheet, the parties and the FTC, CFPB, and MSAG negotiated additional relief for the settlement class. These negotiations collectively produced a settlement offering an unprecedented package of benefits tailored to address the harms alleged in the CCAC. The fact that the federal regulators and members of the MSAG agreed to the relief provided through this settlement underscores its essential fairness and reasonableness.

### i. Reimbursement for Out-of-Pocket Losses and Time Spent.

Settlement class members will be able to submit claims for reimbursement of up to $20,000 for out-of-pocket losses fairly traceable to the data security incident, as well as compensation for up to 20 hours at $25 per hour for time spent taking preventative measures or dealing with identity theft.[3]  Dkt. No. 739-2, Settlement Agreement § 6.  Courts routinely emphasize the value of these benefits in data breach settlements.  *See, e.g.*, *In re Anthem*, 327 F.R.D. at 310–11 (deeming reimbursement of up to $10,000 in out-of-pocket losses a "substantial benefit[ ]"); *Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, No. CV JKB-16-3025, 2019

---

[3] Claims for most categories of out-of-pocket losses can be made throughout a four-year "Extended Claims Period," which is considerably longer than claims periods in many other major data breach settlements.  *See, e.g.*, *In re Anthem*, 327 F.R.D. at 310 (limiting claims period for out-of-pocket losses to *one year* following final approval); Order, *In re Home Depot*, No. 1:14-md-02583-TWT, Dkt. No. 185 at 15-16 (limiting claims period to *180 days* after notice deadline).

WL 3183651, at *6 (D. Md. July 15, 2019) (finding reimbursement for "time spent" to be "highly beneficial to data breach victims"). Finally, if the $380.5 million "Consumer Restitution Fund" is exhausted, Equifax will pay up to an additional $125 million for valid claims for out-of-pocket losses. *See* Dkt. No. 739-2, Settlement Agreement § 3.2.

## ii. *Credit Monitoring and Identity Protection Services.*

As a preventative measure, settlement class members will be able to take advantage of a *full decade* of credit monitoring and identity protection services. The settlement will first offer four years of Experian credit monitoring and identity protection services, which include a package of features specifically negotiated in light of the harms alleged in the CCAC. *See* Dkt. No. 739-2, Settlement Agreement, Exhibit 4; Dkt. No. 900-6, Ross Declaration ¶¶ 11-26. Additionally, all settlement class members—regardless of whether they submit a claim—will be able to use Experian's identity restoration services for seven years, including assignment of a dedicated identity theft restoration specialist, if they experience an identity theft event. Dkt. No. 739-2, Settlement Agreement, Exhibit 4. Experian is one of the largest providers of credit monitoring and identity protection services and has provided such services in response to data breaches for well over a decade, including some of the largest data breaches to date. Dkt. No. 900-6, Ross

Declaration ¶ 33.   Significantly, the suite of features included in the services provided in the settlement is among the most comprehensive set of features ever offered in an Experian breach product.[4]  *Id*. ¶ 34.

In addition to four years of the Experian services, the settlement will also provide one-bureau credit monitoring and identity protection services by Equifax for six years—together with the Experian services providing a total of *ten years* of coverage.[5]  Dkt. No. 739-2, Settlement Agreement § 7.  Both the Experian and the Equifax services include, in addition to credit monitoring, alerts using certain available public and proprietary data sources when data elements submitted for monitoring, such as Social Security numbers, email addresses, or credit card numbers, appear on suspicious websites, including the "dark web."  *Id*., Exhibit 4.

---

[4] Settlement class members who already have credit monitoring services (including Experian services) can still enroll in the Experian services provided in the settlement, which may offer additional features the settlement class members may not have with their other services.  Dkt. No. 900-6, Ross Declaration ¶ 25.

[5] In 2017, Equifax took the unprecedented step of offering the TrustedID Premier credit monitoring and identity protection product for free to *all* U.S. consumers for twelve months, regardless of whether they were impacted in the data security incident.  In late 2018, Equifax provided impacted consumers who had enrolled in TrustedID Premier a twelve-month continuation of services through Experian's IDnotify product, which Equifax paid for outside of the settlement's Consumer Restitution Fund.  *See* Dkt. No. 739-2, Settlement Agreement § 4.3.  Thus, a settlement class member who enrolled in TrustedID Premier and IDnotify and who enrolls in the full slate of services in the settlement may receive up to *twelve years* of coverage.

This Court has previously found that credit monitoring and identity protection services that are—like here—"tailored to address the type of harm alleged to be at issue in th[e] breach" provide settlement class members with "an added layer of protection against possible future harm." *In re Home Depot*, 2016 WL 6902351 at \*4. Moreover, the settlement's provision of these services for a *full decade* is unprecedented. The initial four-year period of Experian services is, standing alone, the longest guaranteed term of credit monitoring services offered in connection with a major class action data breach settlement to date, and when paired with the additional six-year period of Equifax services, the proposed settlement provides guaranteed coverage for more than twice as long as any other class action data breach settlement Equifax has identified.[6]

---

[6] *See In re Home Depot*, 2016 WL 6902351 at \*4 (granting final approval and finding *18 months* of identity monitoring services to be a "substantial benefit"); *In re Anthem*, 327 F.R.D. at 310–11, 319 (granting final approval and finding a minimum of *two years* of credit monitoring to be a "substantial benefit"); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-02752-LHK, Dkt. No. 390 (N.D. Cal. July 20, 2019) (granting preliminary approval of settlement providing a minimum of *two years* of services); *Hutton*, No. CV JKB-16-3025, 2019 WL 3183651, at \*6 (granting final approval of settlement providing *three years* of services); *see generally In re Target Corp. Customer Data Sec. Breach Litig.*, MDL No. 14-2522 (PAM/JJK) (D. Minn. 2015) (no credit monitoring offered).

### iii.  Alternative Compensation.

The primary goals of the settlement were to compensate class members who claim to have suffered a loss over an extended period of time and to provide protection against future losses through the robust credit monitoring and identity protection services, which include many enhanced features that consumers may not have with free services or services offered in other data breach settlements.  *See* Dkt. No. 900-6, Ross Declaration ¶¶ 35-40.  Nevertheless, as an additional benefit, the Settlement Agreement allows settlement class members who already have some level of credit monitoring services (including free services), and who choose to forgo the enhanced package of features discussed above, to submit a claim for "alternative compensation"—specifically, a cash payment of up to $125, subject to a $31 million total cap.  Dkt. No. 739-2, Settlement Agreement § 7.5.  This "alternative compensation" structure, which was recently approved in the *Anthem* data breach settlement, *see In re Anthem*, 327 F.R.D. at 311, is intended to provide some compensation to settlement class members who have credit monitoring services and who do not elect to enroll in the services offered in the settlement.

Importantly, the "alternative compensation" benefit is not a form of relief the Consumer Plaintiffs could have recovered in litigation, because it does not reflect any actual loss to class members.  Through the settlement, class members

can claim "alternative compensation" if they have credit monitoring services for *any* reason (for example, they may have received services under another data breach settlement); the "alternative compensation" benefit is not tied to services obtained in response to the data security incident or the harms alleged in the CCAC. *See In re Anthem*, 327 F.R.D. at 324 (noting that while "credit monitoring services are *closely linked to and curative of the injury suffered*" by the settlement class members, alternative compensation cash payments "serve as an *alternative* for Settlement Class Members who already have credit monitoring") (emphasis added).  In contrast, settlement class members who incurred out-of-pocket costs from purchasing services *in response to* the data security incident can submit claims for those costs under the settlement as out-of-pocket losses.  *See* Dkt. No. 739-2, Settlement Agreement § 6.2.4.  The "alternative compensation" benefit is, in essence, an additional benefit that enhances the overall settlement package beyond what has typically been offered in the vast majority of major data breach settlements approved to date.  *See*, *e.g.*, *In re Home Depot*, 2016 WL 6902351 at *4 (approving settlement offering credit monitoring services but no "alternative compensation" benefit); *see generally In re Target Corp. Customer Data Sec. Breach Litig.*, MDL No. 14-2522 (PAM/JJK) (D. Minn. 2015) (no credit monitoring or "alternative compensation").

The total amount available for "alternative compensation" claims is capped under the settlement at $31 million in order to preserve funds for the categories of benefits at the core of the settlement—i.e., reimbursement for out-of-pocket losses relating to the data security incident and the suite of credit monitoring and identity protection services offered for an extended time frame.  In short, the "alternative compensation" is just that—an alternative benefit designed to provide some compensation to settlement class members who have existing services and who elect not to enroll in the enhanced services being offered.

### iv.  Business Practice Changes.

Finally, all settlement class members will benefit from a comprehensive set of business practice changes agreed to by Equifax and enforceable under the settlement, including a requirement that Equifax spend a minimum of $1 billion on data security and related technology over five years.  Dkt. No. 739-2, Settlement Agreement, Exhibit 2.  Courts find such injunctive relief to be beneficial to class members in data breach settlements, including those who do not submit claims. *See In re Anthem*, 327 F.R.D. at 319.[7]

---

[7] The business practice changes required under the proposed settlement are more comprehensive than the injunctive relief this Court and other courts have approved in prior class action data breach settlements.  *Compare In re Home Depot*, No. 1:14-MD-02583-TWT, Dkt. No. 181-2 at 8 (N.D. Ga. Mar. 7, 2016); *In re Target*

\*       \*       \*

All of these benefits are even more valuable when weighed against the palpable risks of continued litigation, which could result in lesser or no relief at all for the settlement class.  Moreover, approval of the settlement now "benefits the [s]ettlement [c]lass because they can immediately take advantage of [s]ettlement benefits designed to mitigate and prevent future harm," as well as to immediately claim payments for out-of-pocket losses and time.  *Hapka v. CareCentrix, Inc.*, No. 2:16-CV-02372-KGG, 2018 WL 1871449, at \*4 (D. Kan. Feb. 15, 2018).

      c.   <u>None of the Objections Undermine the Valuable Relief Provided by the Settlement.</u>

No objector has voiced a concern that justifies denying final approval of this historic settlement.  The bulk of the objections submitted relate to the credit monitoring and identity protection services provided in the settlement.  Many of these objections complain (incorrectly) that the services are generally of no value to class members.  *See*, *e.g.*, J. Boggan Objection; D. Simon Objection; G. Brainin Objection.  Another common topic in the objections is the "alternative compensation" benefit.  Most of these objections complain that either the amount of "alternative compensation" will be too low given the number of claims

---

*Corp. Customer Data Sec. Breach Litig.*, No. 14-md-02522-PAM, Dkt. No. 358-1 at 17-18 (D. Minn. Mar. 18, 2015).

submitted (*see*, *e.g.*, D. Talero Objection), or that they were misled as to the amount of "alternative compensation" they would actually receive (*see*, *e.g.*, J. Bauer Objection).  Finally, a handful of objectors assert misguided attacks on Equifax, and in some limited instances Experian, regarding matters outside the purview of the settlement.  *See*, *e.g.*, S. Hanis Objection; R. LeBlanc Objection; A. Manter Objection.  All of these objections are meritless, and they ignore both the significant risks of continued litigation and the indisputable value of the benefits offered in this unprecedented settlement.

### i. *Objections Relating to the Value of the Services.*

The objectors who suggest the credit monitoring and identity protection services are of minimal value because they already have such services fail to recognize both the extraordinary scope and length of the services being offered. While the term "credit monitoring" is often used colloquially to reference a broad range of services, these services are not created equal, and the specific features included in a service determine its particular value.  The Experian services were specifically negotiated for this settlement, and the features included are among the most comprehensive ever offered in an Experian breach product.  Dkt. No. 900-6, Ross Declaration ¶ 34.  Moreover, while some settlement class members may already have free services offered through a bank or free credit score product, those

services are typically not nearly as robust as the Experian services offered here, which include state-of-the-art monitoring of public and proprietary databases to identify potential misuse of an individual's personal information, as well as $1 million in identity theft insurance. *Id*. ¶¶ 35-40. And settlement class members who already have services can still enroll in the services offered in the settlement, which may include features they may not have with those other services. *Id*. ¶ 25. Finally, the ten years of combined Experian and Equifax services may provide coverage far longer than a settlement class member's current services.

Further, the notion that the settlement's credit monitoring and identity protection services are valueless to those who freeze and/or manually monitor their credit files ignores important aspects of the services being offered. Even assuming a consumer could manually monitor her credit report on a daily basis, the Experian and Equifax services include monitoring of non-credit report information, and can alert a consumer when her personal information is identified on the "dark web." *See* Dkt. No. 739-2, Settlement Agreement, Exhibit 4. The Experian services also include a number of non-consumer report-related alerts such as financial account takeover notifications, change of address notifications, court records notifications, and payday loan notifications. Dkt. No. 900-6, Ross Declaration ¶ 16.

Likewise, freezing one's credit file does not render the credit monitoring and identity protection services valueless.  While a freeze allows a consumer to restrict access to their credit report, making it difficult for identity thieves to open new accounts with creditors, this type of credit fraud is only one form of identity theft. As noted above, Experian's credit monitoring and identity protection services monitor other sources to help consumers with spotting other types fraud so that they may take steps to protect themselves—including bank account fraud, payday loan fraud, and e-mail account credentials being compromised on the "dark web." *See* Dkt. No. 900-6, Ross Declaration ¶ 39.  Once alerted to such fraud, settlement class members can use the Experian identity restoration services to help stop the fraud and remove fraudulent information where it may exist.  Finally, the Experian services also include $1 million in identity theft insurance, which is beneficial to settlement class members regardless of whether they monitor or freeze their credit files.

## ii. *Objections Relating to "Alternative Compensation."*

A number of objectors complain about the "alternative compensation" benefit, mostly expressing disappointment that they will not collect $125 in "alternative compensation," or that they were misled about the conditions applying to this benefit.  The objectors who generally protest that the settlement does not

provide enough money for "alternative compensation" fail to recognize the fundamental goals of the settlement.  The parties' primary focus in structuring the settlement was to address the most common categories of purported harms alleged in the CCAC: (1) *out-of-pocket losses* incurred by class members who allege they were victims of identity theft, or who took steps to protect themselves following the data security incident; and (2) the *"substantial and imminent risk of identity theft and fraud"* purportedly suffered by all settlement class members.  Dkt. No. 374, CCAC ¶ 5 (emphasis added).  The settlement addresses these two core categories of alleged harms by (1) compensating class members for out-of-pocket losses and (2) offering a suite of credit monitoring and identity protection services providing comprehensive coverage for an extended time frame.

    In contrast, as discussed above, the "alternative compensation" benefit is a supplementary component of the settlement intended to provide some compensation to those who already have services and who do not wish to choose the credit monitoring and identity protection benefits under the settlement. Critically, "alternative compensation" provides a benefit that could not be obtained in this litigation; it is untethered to any recoverable damages associated with the

Consumer Plaintiffs' claims.[8]  That some settlement class members simply wish more funds were available for this relatively small, added benefit under the settlement does not undermine the adequacy of the settlement as a whole.  *See Braynen v. Nationstar Mortg., LLC*, No. 14-CV-20726, 2015 WL 6872519, at *12 (S.D. Fla. Nov. 9, 2015) ("A generic desire to receive 'more' money . . . is not a proper objection.").[9]  In any event, this additional "alternative compensation" benefit has not even been offered in most major data breach settlements approved to date, further undermining objections aimed at the amount of "alternative compensation" settlement class members will receive.

The objections contending that the "alternative compensation" benefit was misrepresented fare no better.   These objections were largely generated by widespread media reports incorrectly stating that all settlement class members

---

[8] Again, costs incurred to purchase credit monitoring *because of* the Equifax data security incident can be submitted as a claim for out-of-pocket losses.  *See* Dkt. No. 739-2, Settlement Agreement § 6.2.4.

[9] Similarly, the objections contending it is inadequate to reimburse only 25% of what some settlement class members paid for Equifax credit or identity monitoring subscriptions fail to appreciate that the Court already dismissed the Consumer Plaintiffs' contract claims.  *See* Dkt. No. 540 at 49-54.

were entitled to a full $125 cash payment.[10]  To the contrary, the Court-approved notice documents plainly state that "alternative compensation" claims will be "*up to* $125" and that if more than $31 million worth of such claims are submitted, "*all* payments . . . will be *lowered and distributed on a proportional basis*."  Dkt. No. 739-2, Settlement Agreement, Exhibit 7-A (emphasis added).  This information (along with the Settlement Agreement itself) was available on the official settlement website beginning on July 24, 2019, when the full site was launched and online claims could first be made.  Thus, these objections were based on a misunderstanding that was caused not by information included in the Court-approved notice plan, but by media sources inaccurately describing the settlement before the Court-approved email notices were even sent to settlement class members—and despite the fact that the Court-approved notice and Settlement Agreement were publicly available on the settlement website.

To address potential confusion created by inaccurate reporting about the "alternative compensation" benefit and to further underscore that—due to the significant volume of early claims—the amounts available for "alternative

---

[10] *See*, *e.g.*, Nathan Bomey, *What does Equifax's $700M settlement over its data breach mean for you?*, *available at* https://www.usatoday.com/story/money/2019/07/22/ftc-equifax-settlement/1793029001/ (July 22, 2019) ("you can receive $125 if you already have a credit monitoring service and won't enroll in the free one").

compensation" could be substantially reduced, the settlement website was promptly adjusted on August 2, 2019. *See* Dkt. No. 900-4, Keough Declaration ¶ 58. Specifically, a conspicuous statement was added to the main page of the settlement website and the online claim form advising that the amount ultimately received for "alternative compensation" claims *"may be significantly reduced"* based on the number of claims submitted. Email notices, which the Court-approved settlement administrator began sending to the class on August 7, 2019, also included similar conspicuous language regarding the "alternative compensation" benefit. *See* Initial Email Notice, Dkt. No. 900-4, Exhibit A.

In addition to the above, the claim form was also adjusted on August 2 to include a space for settlement class members to identify the name of their existing credit monitoring services. This adjustment was fully consistent with the terms of the settlement, which requires settlement class members electing "alternative compensation" to "identify the[ir existing] monitoring service." *See* Dkt. No. 739-2, Settlement Agreement § 7.5. Further, each settlement class member who submits a claim expressly affirms they "understand that [they] may be asked to provide more information by the claims administrator before [their] claim is complete." *Id*., Exhibit 8. Thus, the adjustment to the claim form did not impose an additional requirement beyond what was called for in the Settlement

Agreement.  This change was implemented to ensure, up front, that "alternative compensation" claims would be submitted in accordance with the Settlement Agreement given the inaccurate statements in the media.

Lastly, the settlement class members who had submitted "alternative compensation" claims before August 2, 2019—when the online claim form and settlement website were updated—were given the opportunity to amend their claim to choose the credit monitoring and identity protection services instead.  These settlement class members were separately notified via email, beginning on September 5, that "[b]ased on the number of potentially valid claims that ha[d] been submitted to date, payments of these benefits likely will be substantially lowered and will be distributed on a proportional basis if the settlement becomes final."  *See* Amend/Verify Email, Dkt. No. 900-4, Exhibit C.  The email also advised these settlement class members that they could either amend or verify their "alternative compensation" claim—i.e., change their election to enroll in the credit monitoring and identity protection services offered in the settlement, or verify their claim by providing the name of their existing credit monitoring service.  Dkt. No. 900-4, Keough Declaration ¶ 59-62.

The process described above allowed settlement class members who had made early claims to decide, based on additional information about the amount

available for "alternative compensation," whether they wanted to confirm and verify their election of "alternative compensation" or instead opt for the services offered in the settlement.  It also gave settlement class members who may have claimed the "alternative compensation" even though they did not have the required existing credit monitoring services an opportunity to correct their claim and elect the services provided in the settlement.  Finally, as discussed above, the Settlement Agreement expressly requires settlement class members claiming "alternative compensation" to identify their existing service.  Even if the claim form had not been amended in this regard, the Court-appointed settlement administrator could have required all "alternative compensation" claimants to submit information identifying their service.  Accordingly, any suggestion that the adjustment to the claim form or the process for early "alternative compensation" claimants to verify (or amend) their claim was done to "throttle" claims is meritless.[11]

In sum, any confusion about the "alternative compensation" benefit was precipitated by inaccurate media reports that did not reflect the key conditions applicable to "alternative compensation" claims under the settlement.  And once the parties became aware of the erroneous information in the media, steps were promptly taken to underscore the conditions for "alternative compensation" and

---

[11] *See*, *e.g.*, T. Frank and D. Watkins Objection; A. Dickey Objection.

also to allow those settlement class members who already elected it to amend or verify their claims in accordance with the requirements of the Settlement Agreement.  Accordingly, objections based on what settlement class members may have incorrectly *thought* they were entitled to—for just a short period of time—do not undermine the overall value of the comprehensive settlement to the class.

### iii.   Objections Relating to Experian and Equifax.

Any suggestion that Experian or Equifax will use their position as service providers to engage in deceptive or untoward marketing or other similar conduct is unfounded.  As expressly stated in the Court-approved claim form, settlement class members who enroll in the Experian and Equifax credit monitoring and identity protection services "won't be 'upsold' any services . . . or otherwise asked to submit any payment for the[ ] services now or in the future."  Dkt. No. 739-2, Settlement Agreement, Exhibit 8 at 3.  Similarly, the misguided suggestion that Equifax will somehow "profit" from either the Experian or Equifax offerings has no merit.  The Settlement Agreement expressly states that "Equifax will not receive any monetary or other financial consideration for the [Experian services]" (Settlement Agreement § 7.3), and Equifax's provision of its own services *for free* to settlement class members will obviously be a cost for the company, not a source of revenue.

33

Some other objectors suggest it is unreasonable to require settlement class members to entrust their information with Experian or Equifax to enroll in the respective credit monitoring and identity protection services.  But these services necessarily require a consumer's personal information in order to authenticate the consumer and monitor his or her credit file and other data sources for indicators of fraudulent activity.  Moreover, Experian is one of the largest providers of such services, and it has successfully serviced breach-related products for impacted consumers for well over a decade.  Experian operates within a strict security and risk management framework, including policies, processes, and controls on data use as well as continuous monitoring and testing.  Dkt. No. 900-6, Ross Declaration ¶ 42.  And Equifax's significant commitments to data privacy and cyber security were negotiated with experienced Plaintiffs' Counsel, and are plainly set out in the terms of the Settlement Agreement.  These safeguards help protect the personal information that settlement class members may share with Experian and Equifax in connection with their enrollment and use of the services.

Finally, some objectors attempt to criticize the settlement as inadequate because it does not impose enough financial burden on Equifax or enjoin Equifax from maintaining consumer information going forward.  These "'wish list'" requests are "impossible [for the Court] to grant and [are] hardly in the best

interests of the class." *In re Domestic Air Transp. Antitrust. Litig.*, 148 F.R.D. 297, 305 (N.D. Ga. 1993). Moreover, courts routinely dismiss objections premised on the argument that a settlement fails to sufficiently "punish" a defendant. *See, e.g., In re Anthem*, 327 F.R.D. at 322 ("A settlement does not need to provide for all possible recoverable damages to deter wrongdoing."). Finally, objections aimed at the U.S. consumer reporting industry as a whole are improper and not within the scope of this litigation or the proposed settlement. Equifax's consumer reporting arm operates within a highly regulated regime pursuant to federal legislation and under the oversight of the FTC and CFPB, and generalized complaints about consumer reporting are not properly before the Court. In short, none of these objections aimed at Equifax, Experian, or the consumer reporting industry as a whole have anything to do with ensuring appropriate relief is obtained for the settlement class, and the Court should not consider them in evaluating whether the settlement is fair, reasonable, and adequate.

## CONCLUSION

For these reasons, Equifax respectfully requests that the Court grant final approval of the Consumer Class Action Settlement.

Respectfully submitted this 16th day of December, 2019.

/s/ S. Stewart Haskins II
**KING & SPALDING LLP**
David L. Balser
Georgia Bar No. 035835
Phyllis B. Sumner
Georgia Bar No. 692165
S. Stewart Haskins II
Georgia Bar No. 336104
Elizabeth D. Adler
Georgia Bar No. 558185
John C. Toro
Georgia Bar No. 175145
Robert D. Griest
Georgia Bar No. 294216
1180 Peachtree Street, N.E.
Atlanta, Georgia  30309
Tel.:  (404) 572-4600
Fax:  (404) 572-5140
dbalser@kslaw.com
psumner@kslaw.com
shaskins@kslaw.com
eadler@kslaw.com
jtoro@kslaw.com
rgriest@kslaw.com

*Counsel for Equifax Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to L.R. 7.1D, the undersigned certifies that the foregoing complies with the font and point selections permitted by L.R. 5.1B.  This Response was prepared on a computer using the Times New Roman font (14 point).

Respectfully submitted, this 16th day of December, 2019.


*/s/ S. Stewart Haskins II*
**KING & SPALDING LLP**

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 16, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

*/s/ S. Stewart Haskins II*
S. Stewart Haskins II