**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| IN RE EQUIFAX, INC. CUSTOMER DATA SECURITY BREACH LITIGATION | MDL DOCKET NO. 2800 1:17-md-2800-TWT |
| | CONSUMER CASES |

**EQUIFAX'S RESPONSE TO THE STATE OF INDIANA AND THE COMMONWEALTH OF MASSACHUSETTS' AMICUS CURIAE BRIEFS**

After over a year and a half of contentious litigation, Equifax and the Consumer Plaintiffs reached an unprecedented settlement to resolve the consumer claims arising out of the data security incident Equifax announced on September 7, 2017. If finally approved, the settlement, which includes a substantial Consumer Restitution Fund[1] and comprehensive business practices changes, will provide valuable relief to Settlement Class Members and avoid the risks, costs, and delay of continued litigation.

Despite these benefits to the Settlement Class, non-class members the State of Indiana ("Indiana") and the Commonwealth of Massachusetts ("Massachusetts"

---

[1] *See* Dkt. 739-2, Settlement Agreement §§ 2.11, 2.43, 2.44. Unless otherwise indicated, capitalized terms have the meanings set forth in the Settlement Agreement.

and, together with Indiana, the "AGs"), through their Attorneys General and purporting to appear as "amici curiae," ask the Court to modify or wholly reject the settlement.  *See* Dkts. 898 (Indiana) & 923 (Massachusetts).

Indiana and Massachusetts are the two remaining States in active litigation with Equifax concerning the data security incident.  The settlement here (if finally approved) would settle all claims for restitution on behalf of all Settlement Class Members, including any claims for restitution on behalf of Settlement Class Members who are citizens of Massachusetts and Indiana.  Although the AGs now seek to challenge the settlement through their amicus briefs, the Court should reject their objections.

Before reaching the merits of these objections, the AGs' challenges should be rejected for two threshold reasons.  Initially, the AGs lack Article III standing to object to the settlement in the first place.  Neither AG is a member of the class, and only "class member[s] may object to" a class action settlement.  Fed. R. Civ. P. 23(e)(5)(a); *see also* Order Directing Notice ¶ 19 (permitting a "settlement class member" to "object to the settlement").  Moreover, the AGs' challenges are procedurally improper because the Federal Rules of Civil Procedure contain no provision authorizing non-class members to unilaterally file purported amicus curiae briefs as objections, and this Court should not allow the AGs to do so here.

Even if the Court decides to consider the AGs' objections, it should reject them.   First, the AGs' objections directly conflict with the interests of the Settlement Class Members, and Rule 23(e) does not permit the Court to reconcile those conflicting interests by revising the Release.   Second, there is no authority that permits a court to reject a private class action settlement for the purpose of instead maximizing a government entity's possible recovery in a related enforcement action, and the Eleventh Circuit cases on which the AGs rely are inapposite. Third, the AGs' argument that the Release would completely bar their enforcement actions—including their enforcement claims for fines and penalties that cannot be asserted by consumers—is contradicted by the plain language of the Release.   Fourth, when the settlement becomes final, Indiana and Massachusetts Settlement Class Members will have released their claims for restitution for the harms they may have suffered as a result of the data security incident in exchange for the extensive benefits offered in the settlement.   The AGs are not permitted to bring these released claims on behalf of Settlement Class Members, which effectively seeks a double recovery.   Finally, the AGs' arguments based on Equifax's settlements with other States fail—neither the terms of the Release nor the law of preclusion depends in any way on those settlements.

## BACKGROUND

The global nature of this settlement is unprecedented. It is the product of hard-fought, complex negotiations among the parties and stakeholders from the Commonwealth of Puerto Rico, the District of Columbia, and *forty-eight* States (the "MSAG"), as well as the Federal Trade Commission ("FTC") and Consumer Financial Protection Bureau ("CFPB"). The negotiations were multifaceted, as all of the regulators were, like Indiana and Massachusetts, pursuing their own investigations or independent actions against Equifax on behalf of overlapping populations of class members. They were also valuable, as the settlement now before the Court bears the approval of those regulators, who all agreed that the Consumer Restitution Fund in the MDL settlement can be the vehicle for all consumer relief relating to the Equifax data security incident.

In exchange for the extensive benefits offered to Settlement Class Members, Equifax secured a release that provides for a final and comprehensive resolution of all claims that were or could have been brought by Settlement Class Members arising out of the data security incident. To that end, the settlement defines Released Claims as any claims "that relate to or arise from the Data Breach or the facts alleged in the Actions." Settlement Agreement § 2.38. And, as relevant here, "all Settlement Class Members and all Settlement Class Representatives, on behalf

4

of themselves, . . . , and any other person purporting to claim on their behalf, . . .
expressly, generally, absolutely and unconditionally release and discharge any and
all Released Claims against Equifax." *Id.* § 16.1.  The Release was specifically
drafted to ensure that a Settlement Class Member's Released Claims could not be
re-litigated by a third party purporting to bring claims on the Settlement Class
Member's behalf, *i.e.*, in a representative capacity.  As explained below, the
language of the Release is typical of other class action settlements, and courts
routinely approve releases with similar scopes.  *See* Argument, Section II.B.

On July 22, 2019, the same day Consumer Plaintiffs moved for preliminary
approval of the settlement, the FTC and CFPB each filed consent orders in this
Court settling their claims against Equifax.  The Commonwealth of Puerto Rico,
the District of Columbia, and the forty-eight States in the MSAG also entered into
separate consent decrees releasing their respective claims against Equifax.[2]  These
agreements expressly incorporate and reference the Consumer Restitution Fund
provided by the MDL settlement and (with minor, irrelevant exceptions) release
any claims the regulators brought or could have brought against Equifax arising
out of the data security incident.

---

[2] With the exception of the State of Wisconsin, with whom Equifax entered into a
settlement agreement in lieu of a consent decree.  *See* https://www.doj.state.wi.us/s
ites/default/files/news-media/7.22.19_Equifax_Agreement_Filed.pdf.

Indiana and Massachusetts are the two States that did not join the MSAG and did not participate in the global settlement.  Their AGs have filed state-court actions against Equifax seeking fines and penalties for alleged violations of the Indiana Deceptive Consumers Sales Act (the "DCSA"), the Indiana Disclosure of Security Breach Act, and the Massachusetts Consumer Protection Act (the "MCPA"), respectively.[3]  Dkt. 898 at 1; Dkt. 923 at 4.  The Release in the MDL settlement does not release these claims.  However, the AGs' enforcement actions also seek restitution "*on behalf of* aggrieved [Indiana] consumers" and to redress "harm *to* Massachusetts residents."  Dkt. 898 at 1 (emphasis added); Dkt. 923-1 ¶ 10 (emphasis added).  These representative claims are encompassed in the Release, as they are asserted on behalf of consumers who are also Settlement Class Members whose claims will have been settled for valuable benefits in the MDL settlement, and who agreed to the Release.

The AGs nevertheless ask the Court to reject the settlement entirely, or to revise the Release, because it allegedly "runs contrary to Eleventh Circuit

---

[3] While the Commonwealth purports to assert stand-alone claims for violations of the Massachusetts Data Protection Law (the "MDPL"), the MDPL does not authorize an independent cause of action.  At most, it sets forth additional conduct rules that, if breached, may constitute violations of the MCPA and only authorizes the Attorney General to "bring an action" for those violations "pursuant to section 4 of chapter 93A," *i.e.*, the MCPA.  *See* Mass. G.L. 93H § 6.

Precedent" and "impedes upon the sovereignty of the state to pursue remedies for their citizens."  Dkt. 898 at 3; *see also* Dkt. 923 at 9 (arguing the Release would "contravene controlling precedent" and "improperly infringe on Massachusetts' power to vindicate its sovereign interests").

The AGs' arguments lack merit, and the Court should overrule their objections and grant final approval of the settlement.

## ARGUMENT

### I. THE AGs' CHALLENGES TO THE SETTLEMENT FAIL FOR TWO THRESHOLD REASONS.

#### A. The AGs Lack Article III Standing to Contest Final Approval of the Settlement.

Though the AGs purport to appear before the Court as amici, their briefs go much further than merely attempting to assist the Court's assessment of the settlement.  *Cf. S. Realty Mgmt., Inc. v. Aspen Specialty Ins. Co.*, 2010 WL 966426, at *5 (N.D. Ga. 2010) (explaining the purpose of an amicus is to "assist [the court] in a proceeding" (citation omitted)).  Both AGs seek *affirmative relief* from the Court—the rejection of the settlement or the modification of one of its material terms, the Release.

But the AGs may not seek this relief unless they have Article III standing. *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650–51 (2017);

*Chapman v. Tristar Products, Inc.* ("*Chapman II*"), 940 F.3d 299, 304 (6th Cir. 2019).   Because the AGs are not members of the Settlement Class, they lack Article III standing to object to the settlement.   Under Federal Rule of Civil Procedure 23(e), only "class member[s] may object to" a proposed settlement. Fed. R. Civ. P. 23(e)(5)(A) (titled "*Class-Member* Objections" (emphasis added)). Courts therefore routinely reject attempts by State or federal officials to object to class action settlements.   *See Esslinger v. HSBC Bank Nevada, N.A.*, 2012 WL 5866074, at *7 (E.D. Pa. Nov. 20, 2012) ("[B]ecause the AGs are not Class members, they do not have standing to object to the settlement." (citing Fed. R. Civ. P. 23(e)(5))); *Chapman v. Tristar Prods., Inc.* ("*Chapman I*"), 2018 WL 4203533, at *5 n.36 (N.D. Ohio Sept. 4, 2018) ("Individuals and entities that are not members of [a] class generally lack standing to formally object to a class action settlement."); *see also Chapman II*, 940 F.3d at 307 (holding State of Arizona lacked standing to object to settlement based on its own interests); *Fidel v. Farley*, 534 F.3d 508, 515 n.5 (6th Cir. 2008) (court lacked jurisdiction to consider objections to class action settlement brought by non-class member).

Recognizing that Rule 23 does not authorize them to object to the settlement, the AGs try to rely on the Class Action Fairness Act of 2005 ("CAFA"), which requires class action defendants to notify the  "appropriate State official" of every

State in which a class member resides of the terms of a proposed class settlement. Dkt. 898 at 2; Dkt. 923 at 8 (citing 28 U.S.C. § 1715(b)).  But CAFA expressly states that it shall not "expand the authority of . . . State officials."  28 U.S.C. § 1715(f).  CAFA thus does not empower the AGs to object to the settlement.[4] Accordingly, the AGs lack standing, and the Court should not consider their objections in considering final approval of the settlement.

B. <u>The AGs May Not Appear as Amici Curiae.</u>

Neither the Federal Rules of Civil Procedure nor this Court's Local Rules confer the right on a nonparty to submit amicus curiae briefs.  *See Aspen Specialty Ins. Co.*, 2010 WL 966426, at *5 ("[T]he Federal Rules of Civil Procedure lack a . . . provision regulating amicus appearances at the trial level." (citation omitted)); *see generally* N.D. Ga. Local Rules (providing no mechanism for the submission of amicus briefs).  While this Court has the inherent discretionary authority to *allow* non-parties to submit amicus briefs, neither of the AGs sought leave to do

---

[4] While the AGs cite a Senate report for the proposition that State attorneys general "may voice concerns" about class actions settlements under CAFA, Dkt. 923 at 8 (quoting S. Rep. No. 109-14 at 5 (2005)), courts have rejected this argument as well.  *See Chapman II*, 904 F.3d at 306–07; *In re Deepwater Horizon Oil Spill*, 910 F. Supp. 2d 891, 943 (E.D. La. 2012) ("The Gulf States do not acquire standing under CAFA's notification provision[.]"); *In re Budeprion XL Mktg. & Sales Litig.*, 2012 WL 4322012, at *4 (E.D. Pa. 2012) ("CAFA . . . says nothing . . . of granting [governments] a right to be heard on . . . class action settlement[s].").

so.  The Court should not allow the AGs to submit amicus briefs challenging the settlement here because their objections do not assist the Court in deciding the relevant issues.  *Alabama v. United States*, 2016 WL 7010948, at *2 (N.D. Ala. Apr. 22, 2016) (leave to file an amicus brief should be denied where it is not "relevant to the disposition of the case" (quoting Fed. R. App. P. 29(b)(2)).  The relevant issues for purposes of granting final approval are whether the settlement is "fair, reasonable, and adequate," taking into consideration the non-exhaustive list of factors found in the Federal Rules, such that it should "bind class members." Fed. R. Civ. P. 23(e)(2)(A)–(D).  The AGs' objections to the settlement do not assist the Court in analyzing the Rule 23 factors, but rather focus only on their own "sovereign interests." *See* Dkt. 898 at 3 (arguing the Release "impedes upon the sovereignty of the states"); Dkt. 923 at 1 (objecting in order to "safeguard Massachusetts' sovereign interests").[5]  The objections are therefore not helpful to the Court in analyzing the issues presented by Plaintiffs' motion for final approval. Accordingly, the Court should decline to consider the AGs' "amicus curiae" briefs.

---

[5] Indeed, neither Massachusetts nor Indiana meaningfully contest that the settlement is, on the whole, fair, adequate, or reasonable for the Settlement Class Members.  Neither of the AGs gives more than a passing mention to the relief provided by the settlement or the interests of the Settlement Class Members.  Their objections are focused entirely on their own abilities to preserve their litigating posture in collateral litigation.  That is no basis to reject the settlement under Federal Rule of Civil Procedure 23.

## II.   THE AGs' OBJECTIONS SHOULD BE OVERRULED ON THE MERITS.

Should the Court nevertheless decide to address the AGs' objections, they should be overruled for several reasons.

### A. The AGs' Objections Directly Conflict with the Interests of the Settlement Class.

The AGs' arguments that the settlement should be rejected or modified to protect Indiana's "interest in pursuing the claims in its own pending action," Dkt. 898 at 7, and Massachusetts's "claims in its Enforcement Action," Dkt. 923 at 12, should be overruled.   The AGs' request to reject this historic nationwide settlement because it could preclude them from prosecuting restitution claims on behalf of the fraction of Settlement Class Members who reside in Indiana and Massachusetts conflicts with the interests of the Settlement Class as a whole.

The Settlement Class Members, through the notice and opt-out process, have conclusively demonstrated that they would prefer to forego the risks of continued litigation and obtain the relief provided for in the settlement.   Of the approximately 6.9 million Indiana and Massachusetts class members, only *138* have requested exclusion from the settlement.   *See* J. Keough Suppl. Decl. Ex. D, Dkt. 900-4 at 55–127.   Further, only thirty-one and forty-two residents of Indiana and Massachusetts (some of whom may not even be Settlement Class Members),

11

respectively, have objected to the settlement, and none of them have objected to the language of the Release.  *See* J. Keough Decl. Ex. A, Dkt. 899-2.  Indiana and Massachusetts objectors represent just 6.6% of all objectors.  The over 147 million Settlement Class Members should not be denied the timely relief provided for in the settlement based on the AGs' desire to preserve their abilities to prosecute duplicative restitution claims on behalf of a small number of Settlement Class Members.

Other courts have rejected similar arguments made by States in other cases. In *Chapman I*, the district court overruled Arizona's purported objection to a release in a class action settlement because "[d]espite opportunity, none of [the] Arizona [class members] objected to the settlement."  2018 WL 4203533, at *4. Here, while a small number of Indiana and Massachusetts Settlement Class Members have objected to the settlement, ***none has done so because of the Release***.  The AGs' objections thus exalt their own interests over the interests of the Settlement Class Members (including those in Massachusetts and Indiana). And the Court cannot revise the Release to accommodate the AGs.  *See Valley Drug Co. v. Geneva Pharms., Inc.*, 262 F. App'x 215, 217 (11th Cir. 2008) ("Courts are not free to modify or delete terms of the parties' negotiated settlement.").  The Court should therefore overrule the AGs' objections.

B. Eleventh Circuit Precedent Does Not Support the AG's Arguments.

The AGs' contention that the Release "should be rejected" based on Eleventh Circuit precedent is incorrect.  The Eleventh Circuit cases on which they rely do not support the proposition that the Court should reject the settlement on the basis that it would preclude restitution claims brought by the AGs.  In two of the cited cases, the question was whether a class action settlement, *that was previously approved*, precluded the federal government from bringing enforcement actions against the settling defendants for the same underlying conduct.  *See Herman v. South Carolina Nat. Bank*, 140 F.3d 1413, 1422 (11th Cir. 1998) ("The [defendants] next contend that the *Knop* private settlement bars the [Secretary of Labor]'s [ERISA] action against them."); *FTC v. Hornbeam Special Situations, LLC*, 308 F. Supp. 3d 1280, 1291 (N.D. Ga. 2018) ("The EDP Parties now contend that the instant action by the FTC is at least partially precluded by the classwide settlement.").  Unlike here, the final approval of a class action settlement was not at issue in *Herman* or *Hornbeam*, and whatever the courts in those cases say about principles of preclusion, they are inapplicable to the issues before the Court, which are whether the settlement is fair, adequate, and reasonable.[6]  If anything, those

---

[6] *EEOC v. Pemco Aeroplex, Inc.,* 383 F.3d 1280 (11th Cir. 2004), cited by Massachusetts, did not involve a settlement at all—the question was whether a

cases show that the Court can approve the settlement notwithstanding the AGs' objection.  The potential preclusive effect of a class action settlement is not even a ripe issue until, at the earliest, the settlement receives final approval.

Courts routinely approve class action settlements with similarly broad, and even broader, releases than the Release the AGs challenge here.  *See, e.g., Markos v. Wells Fargo Bank, NA*, 2017 WL 416425, at \*2 (N.D. Ga. Jan. 30, 2017) (approving settlement in which release extended to "every Settlement Class Member, and any person actually or purportedly acting on behalf of any Settlement Class Member(s)"); *Hillis v. Equifax Consumer Servs., Inc.*, 2007 WL 1953464, at \*12–13 (N.D. Ga. June 12, 2007) (overruling objections that release that extended to claims asserted by the plaintiffs "and/or anyone acting or purporting to act on their behalf" was overbroad and approving settlement); *see also New Mexico ex rel. King v. Capital One Bank (USA) N.A.*, 980 F. Supp. 2d 1346, 1349 (D.N.M. 2013) (analyzing class action release that extended to class members and "all those who claim through them or who assert claims on their behalf (including the government in its capacity as *parens patriae*)"); *In re Am. Investors Life Ins. Co.*

defense verdict in a suit brought by twenty-two of the defendant's employees precluded the EEOC from bringing a subsequent suit.  *See id.* at 1285 (stating "issue in this case" was whether the EEC could "be bound by the judgment" in the prior case).

*Annuity Mktg. & Sales Pracs. Litig.*, 2013 WL 3463503, at *1 (E.D. Pa. July 10, 2013) (court previously approved release of claims brought "on a representative basis" and "including . . . actions brought on behalf of the Named Plaintiffs and/or Class Members by any state or federal government official or agencies" over objections by State AGs).

      C. <u>The Release Does Not Impact The AGs' Exclusive Enforcement Claims.</u>

      The AGs also contend that "[the Release] cannot impede a separate action by government actors acting in an enforcement capacity."  Dkt. 898 at 5; *see* Dkt. 923 at 12 (arguing *Herman*, *Hornbeam*, and *Pemco* prohibit the release from precluding claims that could only have been brought "in the name of Massachusetts").  On this point, Indiana cites to Indiana Code § 24-5-0.5-8, which states that "the attorney general, acting in the name of the state, has the exclusive right" to seek fines for violations of the DCSA.  Dkt. 898 at 6.  Similarly, Massachusetts argues that "only the Attorney General may obtain civil penalties for violations of the [MCPA] and the [MDPL]."  Dkt. 923 at 13.

      These arguments are red-herrings, as the Release does not preclude these States from seeking fines or penalties from Equifax in their enforcement actions. The Release only precludes claims brought by Settlement Class Members "and any other person purporting to claim *on their behalf*."  Settlement Agreement §§ 2.38,

16.1 (emphasis added).   Neither the DCSA nor the MCPA permit private consumers to assert enforcement claims for fines or penalties.  *See* Ind. Code § 24-5-0.5-4(a), (b); Mass. G.L. 93A § 9.  Because none of the Indiana or Massachusetts Settlement Class Members could assert these enforcement claims, the preclusive effect of the Release does not extend to them.  *See Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1187 (11th Cir. 2003).  Thus, the Release does not release or bar the AGs' claims for fines and penalties under the cited statutes.

D. The Release Only Precludes the AGs From Seeking Double Recovery.

Because the Release plainly does not extend to the AGs' enforcement claims for fines and penalties, the only real issue the AGs have with the Release is that, once finally approved, it will preclude them from seeking restitution on behalf of non-excluded Indiana and Massachusetts Settlement Class Members.  *See* Dkt. 898 at 3, 7 (arguing that the settlement does not "provide complete restitution" to the Indiana class members and that Indiana should be able to "obtain[] full relief" for the Indiana class members in its enforcement action); Dkt. 923 at 16 (stating Massachusetts "may pursue restitution . . notwithstanding the release").  This purported concern is not a valid basis to object to the Settlement.

Even though the Court need not consider the impact of the Release on the AGs' claims in ruling on final approval, there is ample authority for the principle

16

that a private settlement may preclude government officials from asserting claims on behalf of settling class members (or otherwise limit the relief that such officials may seek).  The Supreme Court's statement in *EEOC v. Waffle House* illustrates this point:

> It is true . . . that [a private plaintiff's] conduct may have the effect of limiting the relief that the EEOC may obtain in court.  If, for example, he had failed to mitigate his damages, or had accepted a monetary settlement, any recovery by the EEOC would be limited accordingly.  As we have noted, it goes without saying that the courts can and should preclude double recovery by an individual.

534 U.S. 279, 296–97 (2008) (citations omitted).  In their respective enforcement actions, the AGs seek consumer restitution "on behalf of" Settlement Class Members in their respective States.  *See* Dkt. 898 at 1 (stating the Indiana AG seeks a recovery "*on behalf of* aggrieved *consumers* in its pending state court litigation"); Dkt. 923 at 15 (arguing the Massachusetts AG is "authorized to pursue [consumer restitution] *on behalf of* groups of *consumers*").  But these Settlement Class Members, represented here by Court-appointed class counsel, have "accepted a monetary settlement" for their restitution claims and have agreed to the Release, which bars them or "anyone purporting to claim on their behalf" from reasserting those claims for restitution and seeking that duplicative relief.  The AGs' claims are therefore "limited accordingly."  *Waffle House*, 534 U.S. at 296.

A key factor here is privity, and a government official stands in privity with members of a prior class action settlement when the official sues "for the same relief that '[the class] [has] already pursued.'" *California v. IntelliGender*, LLC, 771 F.3d 1169, 1179 (9th Cir. 2014) (quoting *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 961 (9th Cir. 2006)); *In re Am. Investors*, 2013 WL 3463503, at *9 (holding prior class action barred AG's claims for restitution).   As explained below, such privity exists here because the AGs' claims for restitution are the very same claims that the Settlement Class Members pursued, and in pursuing these claims, the AGs are seeking to enforce the Settlement Class Members' private interests.[7]

    *i.*    *The AGs stand in privity with Settlement Class Members with respect to the AGs' claims for restitution.*

The Consumer Plaintiffs pursued the same claims for restitution that the AGs assert in their enforcement actions.   *See* CCC ¶¶ 678–700, 841–53.   Because

---

[7] Numerous courts have held that a class action settlement can operate to preclude or limit a government's restitution claims in a subsequent enforcement action in this way.   *See IntelliGender, LLC*, 771 F.3d at 1179–82 (enjoining State from pursuing claims for restitution on behalf of members of prior class action settlement); *In re Am. Investors*, 2013 WL 3463503, at *9 (finding class action settlement prohibited Pennsylvania from seeking restitution and other monetary relief on behalf of Pennsylvania consumers in settlement class); *New Mexico*, 980 F. Supp. 2d at 1356 (holding New Mexico's claims for restitution on behalf of New Mexico settlement class members were precluded); *see also HSBC Bank Nevada, N.A.*, 2012 WL 5866074, at *7 n.2 (noting in dicta State's claims for restitution or other make-whole relief on behalf of the class would be barred under principle prohibiting a double recovery).

the AGs' restitution claims are brought on behalf of, and for the benefit of, individual consumers, the AGs represent the consumers' private interests. Therefore, the AGs stand in privity with Settlement Class Members with respect to their restitution claims.

First, Indiana Code § 24-5-0.5-4(d) ("section 4(d)"), authorizes an award of restitution in any DCSA action, including those brought by an individual consumer, by a consumer acting in a representative capacity on behalf of a class, or by the Indiana Attorney General.  And while the DCSA specifically states that the Attorney General has the "exclusive right" to bring DCSA claims for fines and that he asserts such claims and recover such fines "in the name of the state" and "on behalf of the state," *id.* §§ 24-5-0.5-4(f), (g), (h), (l), (m), 24-5-0.5-8, section 4(d) only authorizes a court to "order restitution to be paid *to aggrieved consumers*," no matter the nominal plaintiff, *id.* § 24-5-0.5-4(d) (emphasis added).  Thus, the Attorney General's right to seek restitution for DCSA violations under section 4(d) is the same very same right afforded to consumers and consumers acting as class representatives to seek restitution, and any such award is to be paid "to aggrieved consumers."  Because the Attorney General and Indiana consumers enjoy the same right to seek restitution, and represent the same interest in doing so, the Indiana

Settlement Class Members' release of their restitution claims will act as a bar to subsequent claims for the same relief.

Second, like the DCSA, the MCPA is enforceable by both private plaintiffs and the Massachusetts Attorney General.  *See* Mass. G.L. 93A §§ 4, 9(1).  And, like the DCSA, the MCPA allows a consumer to bring an action in a representative capacity.  *Id.* § 9(2).  Similarly, although the ability to recover fines and penalties is reserved to actions brought by the Attorney General "in the name of the commonwealth," *id.* § 4, the Attorney General and individual consumers have "concurrent authority" to seek restitution, Dkt. 923 at 15 (citing Mass. G.L. 93A §§ 4, 9(1)).  Importantly, while the Attorney General may maintain an action for restitution "in the name of the commonwealth," it does so "to restore *to any person who has suffered any ascertainable loss* . . . any moneys or property," Mass. G.L. 93A § 4, and here, those persons are Settlement Class Members.[8]

Significantly, this Court has already rejected Equifax's argument that individual consumers could not seek restitution under the MDPL, finding it is "privately enforceable" through the MCPA.  *See* Dkt. 540 at 65.  Under this

---

[8] To the extent Massachusetts relies on cases from Massachusetts courts, it bears noting that "[t]he preclusive effect of a federal-court judgment is determined by federal common law."  *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008).

Court's holding, the Consumer Plaintiffs had the same "concurrent authority" with the Attorney General to seek restitution for violations of the MDPL as they did for other violations of the MCPA. Importantly, when the Attorney General seeks restitution, it does so for the express purpose of "restor[ing] . . . [the injured] person." Mass. G.L. 93A § 4. Thus, the Consumer Plaintiffs and the Attorney General had concurrent authority to enforce the same private interest in seeking restitution for aggrieved Massachusetts consumers. Consequently, the Attorney General's right to recover restitution is, at a minimum, "limited" to those Massachusetts class members who are excluded from the settlement. "[I]t goes without saying that the courts can and should preclude double recovery by an individual." *Waffle House*, 534 U.S. at 297.

ii.    *Eleventh Circuit Precedent does not support double recovery.*

The Eleventh Circuit cases cited in the AGs' objections do not support their attempt to seek a double recovery on behalf of their resident-class members. For example, *Herman* turned in large part on the fact that the statutory provision the Secretary of Labor sought to enforce in the subsequent action was *only enforceable* by the Secretary. *See Herman*, 140 F.3d at 1424 n.18 ("In contrast, ERISA separates the Secretary's right to sue for ERISA violations in § 502(a)(5) from the participant's, beneficiary's, and fiduciary's right to sue for ERISA violations in

§ 502(a)(3).").   Similarly, in *Hornbeam*, this Court held that the class members "did not adequately represent, nor were they charged with representing, the broader national interests" advanced by the FTC in enforcing the FTC Act.  308 F. Supp. 3d at 1292.  But, as in *Herman*, the class members could not have represented the FTC's interests in enforcing the FTC Act because the FTC Act cannot be enforced by private plaintiffs.

Here, in contrast, the Court held that the Consumer Plaintiffs could enforce the DCSA, the MCPA, and the MDPL, and the right to seek restitution given to the Attorneys General and to those private plaintiffs was, in the case of Indiana, identical, and in the case of Massachusetts, at least "concurrent."  As explained in *Waffle House*, where, as here, a private plaintiff and government official may both seek the same relief for violations of a statute, the private plaintiff's settlement limits the official's recovery under basic principles prohibiting double recovery.[9]

---

[9] As noted above, *Pemco* had nothing to do with the preclusive effect of a settlement on a subsequent government action for restitution.  Regardless, it conflicts with the prior panel precedent in *Truvillion v. King's Daughters Hospital*, which held that the EEOC "may not bring a second suit [under Title VII] based on the transactions that were the subject of a prior suit by a private plaintiff, unless the EEOC seeks relief different from that sought by the individual."  614 F.2d 520, 525 (5th Cir. 1980); *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (Fifth Circuit decisions handed down before September 30, 1981 adopted as binding precedent in the Eleventh Circuit).  As the earlier case, *Truvillion* controls. *United States v. Gillis*, 938 F.3d 1181, 1198 (11th Cir. 2019).

iii.     The "complete restitution" sought by the Indiana is an impermissible
        double recovery.

Indiana's argument that the settlement does not "provide complete restitution" to the Indiana class members and that Indiana can "obtain[] full relief" for the Indiana class members in its enforcement action, Dkt. 898 at 3, 7, also lacks merit.   The settlement will likely provide reimbursement of any out-of-pocket losses at 100 cents on the dollar (*i.e.*, "complete restitution"), Dkt. 900-4 ¶ 65, and will provide substantial benefits for class members who arguably suffered no damages at all, R. Klonoff Suppl. Decl. ¶ 15, Dkt. No. 900-2.   Moreover, the settlement provides relief that "most likely would not have been available" even if the Indiana class members' claims could be proven at trial.   *Id.*   The Indiana Settlement Class Members have agreed to compromise their claims for restitution in exchange for the settlement benefits, which will likely provide *more than* "complete restitution."   Accordingly, if Indiana were permitted to obtain additional restitution on behalf of "aggrieved consumer[s]" who are Settlement Class Members receiving the same benefits as the rest of the Settlement Class, those class members would plainly be awarded an improper double recovery.

E. <u>Equifax's Agreements with the Forty-Eight Other States Are Not Pertinent to the Analysis.</u>

Both of the AGs argue that Equifax's consent decrees with members of the MSAG indicate that the settlement and Release are ineffective to preclude their claims for restitution because those decrees "included release language for those parties' claims for consumer restitution that were negotiated and resolved" separately.   Dkt. 898 at 4; *see also* Dkt. 923 at 17 (same).   That is incorrect. Whether the Release will bar the AGs' claims for consumer restitution is determined under the terms of the Release and principles of claim preclusion. Language in separate agreements that Equifax entered into with members of the MSAG have no bearing on that analysis.   *See Carey v. Houston Oral Surgeons, LLC*, 595 S.E.2d 633, 637 (Ga. Ct. App. 2004) ("[W]here the terms of a written release are clear and unambiguous, the court will look to *the release alone* to find the intention of the parties." (emphasis added)); *Sturgell*, 553 U.S. at 891 (preclusive effect of a federal judgment determined by federal law).

In any event, that Equifax's agreements with the MSAG members include broad releases for all civil claims, including those for fines, penalties, and restitution, proves nothing.   It certainly does not support the AGs' strained point— that those releases somehow reflect a concession by Equifax that, absent the consent decrees, the MSAG members *would have* been able to pursue claims for

24

consumer restitution even if the consumer class action settled.[10]   There is, of course, nothing remarkable about a party obtaining a release broad enough to cover any and all claims—regardless of whether they have merit or not or regardless of whether they may be precluded or not.  Defendants enter into settlements to buy global peace and do not carve out claims they believe to be precluded from the scope of the releases they negotiate.

In short, Equifax's settlements with the 50 members of the MSAG have no bearing on whether the proposed settlement is fair, reasonable, and adequate for the Settlement Class as a whole.

## CONCLUSION

Equifax respectfully requests that the Court overrule the objections of Indiana and Massachusetts and approve the Consumer Class Action Settlement.

---

[10] Of course, at the time the MSAG consent decrees were entered, a final approval hearing on the MDL settlement had not even been scheduled, and it would not occur until months later.

Respectfully submitted this 18th day of December, 2019.

/s/ S. Stewart Haskins II
**KING & SPALDING LLP**
David L. Balser
Georgia Bar No. 035835
Phyllis B. Sumner
Georgia Bar No. 692165
S. Stewart Haskins II
Georgia Bar No. 336104
Elizabeth D. Adler
Georgia Bar No. 558185
John C. Toro
Georgia Bar No. 175145
1180 Peachtree Street, N.E.
Atlanta, Georgia  30309
Tel.:  (404) 572-4600
Fax:  (404) 572-5140
dbalser@kslaw.com
psumner@kslaw.com
shaskins@kslaw.com
eadler@kslaw.com
jtoro@kslaw.com

*Counsel for Equifax Defendants*

## **<u>CERTIFICATE OF COMPLIANCE</u>**

Pursuant to L.R. 7.1D, the undersigned certifies that the foregoing complies with the font and point selections permitted by L.R. 5.1B. This Response was prepared on a computer using the Times New Roman font (14 point).

Respectfully submitted, this 18th day of December, 2019.

*/s/ S. Stewart Haskins II*
**KING & SPALDING LLP**

## CERTIFICATE OF SERVICE

I hereby certify that on December 18, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

_/s/ S. Stewart Haskins II_
S. Stewart Haskins II