# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| IN RE EQUIFAX, INC. CUSTOMER DATA SECURITY BREACH LITIGATION | MDL DOCKET NO. 2800 1:17-md-2800-TWT CONSUMER CASES |

## SECOND SUPPLEMENTAL DECLARATION
## OF CLASS COUNSEL IN SUPPORT OF FINAL APPROVAL

Kenneth S. Canfield, Amy E. Keller, and Norman E. Siegel declare as follows:

1.      This Court appointed us to serve as Co-Lead Counsel for the Consumer Plaintiffs and Interim Class Counsel in the above-captioned MDL. Along with Roy E. Barnes, who serves as Co-Liaison Counsel, we have led the Plaintiffs' efforts in the consumer track since our appointment on February 9, 2018. We make this Second Supplemental Declaration in support of Plaintiffs' motion for final approval of the settlement, and in support of our response to objections to the settlement. David Berger, another Plaintiffs' Counsel, likewise provides personal information related to the allegations in Paragraph 32-38, and attests to the truthfulness of those statements.

2.      On December 5, 2019, Plaintiffs filed their motion for final approval of the settlement, a brief responding to objections, a reply in support of their fee application, and an appendix containing supporting declarations. In those filings, Plaintiffs noted that several objections in this case were filed by serial objectors with a history of improper and unethical conduct, and that the vast majority of objections were filed through an automated "chat-bot" operated by Class Action Inc. Pursuant to the Court's Order Directing Notice, Class Counsel have deposed (or attempted to depose) some of these serial objectors, and have learned of additional information relating to several of the objectors.

3.      This Declaration and the attached exhibits provide additional information regarding (1) Christopher Bandas and Robert Clore of the Bandas Law Firm who, along with Jerome Froelich, represent objector Mikell West; (2) Stephen Helfand, an attorney who filed a *pro se* objection; (3) George Cochran, another attorney who filed a *pro se* objection; (4) John Davis, also an attorney objecting on his own behalf; (5) Theodore Frank of the Hamilton Lincoln Law Institute; (6) Reuben Metcalf of Class Action Inc.; and (7) *pro se* objector Christopher Andrews. This Declaration also provides an additional chart identifying objector deficiencies by type of deficiency, and supplementary information regarding Class Counsel's lodestar and expenses incurred through this filing.

**Christopher Bandas and Robert Clore**

4.      Class Counsel recently learned that on April 5, 2019, a magistrate judge denied motions by Mr. Bandas and Mr. Clore for leave to appear *pro hac vice* in the District of New Jersey so they could represent an objector to a class action settlement, explaining:

> In light of Mr. Bandas' past behavior, the Court has substantial concerns with allowing him to appear *pro hac vice*. Although Mr. Bandas is not suspended or disbarred, several courts around the country have expressed skepticism that Mr. Bandas' objections to class settlements have been made in good faith. For example, the Southern District of New York admonished Mr. Bandas for his actions throughout the litigation of *Garber v. Office of the Comm'r of Baseball*, No. 12-cv-3704 (S.D.N.Y. Feb 27, 2017), holding, among other things, that he "orchestrated the filing of a frivolous objection in an attempt to throw a monkey wrench into the settlement process and extort a payoff." (*Garber*, Docket Entry No. 608 at 9). Additionally, the Northern District of Illinois issued a permanent injunction against Mr. Bandas and the Bandas Law Firm for objecting to a class settlement for the sole purpose of extorting attorney's fees without any benefit to the class. The Illinois Attorney & Registration Disciplinary Commission is also investigating Mr. Bandas in connection with an allegation of the unauthorized practice of law for failing to move *pro hac vice* in a matter in that state, further evidencing Mr. Bandas' indiscretions.

*Cole v. NIBCO, Inc.*, No. 3-13-cv-07871 (D. N.J. Apr. 5, 2019) (Doc. 223 at 2).

5.      The magistrate judge also noted that in filing a sworn declaration Mr. Bandas allegedly had deliberately concealed his role in representing the same objector in another class action. Mr. Bandas explained that he had made an error, not

an intentional misstatement. Without deciding the matter, the magistrate judge expressed skepticism, stating: "with a record like that associated with the Bandas Law Firm, this error is cause for concern." A copy of the order is attached as Exhibit A.

6.      On December 4, 2019, Plaintiffs' Counsel deposed objector Mikell West, represented by Mr. Bandas and Mr. Clore of the Bandas Law Firm along with Mr. Froelich. A copy of Mr. West's deposition transcript is attached as Exhibit B. Mr. West indicated he was a longtime friend and previous co-worker of his counsel, Mr. Clore. *See* Ex. B, West Dep. at 33:1-11, 34:10-19.

7.      Mr. West testified that his primary reasons for objecting to the attorney fees were that the case settled very early on and that the case did not involve much litigation. Under questioning, West—who is a lawyer— acknowledged that he had never read any pleadings in the case, was unfamiliar with the complaint, the dismissal motion briefing, or the order thereon. He indicated that he thought cases take many years and that was the only basis for his statement that it settled early on. *Id.* at 15:8-16:19.

8.      When asked about the reference in his objection to the class notice setting "numerous and substantial roadblocks" to objecting class members, Mr. West testified that the only "roadblocks" he recalled were (i) having to provide four dates

for his deposition; (ii) finding an attorney; and (iii) providing a copy of the fee/retainer agreement. But he acknowledged these were not roadblocks for him, did not prevent him from objecting, and did not prevent him from obtaining counsel. *Id.* at 49:10-50:3, 50:17-51:16, 51:21-52:2, 52:9-19. Upon further questioning, Mr. West acknowledged that, aside from missing work, he was able to provide dates for his deposition, acknowledged that an objector could appear *pro se* and did not need an attorney, and that providing a fee agreement is not something that Mr. West or any objector had to do, but was rather something the objector's attorney would do. *Id.* at 49:22-24, 53:8-13, 51:21-52:2. Mr. West also acknowledged that he had not spoken to any other objector and was not aware if any other objector considered these issues to be obstacles to filing an objection. He admitted his concerns were speculation. *Id.* at 52:20-24.

9.     With respect to the credit monitoring option itself, Mr. West testified that, although he has credit monitoring through Experian and pays approximately $20 to $25 per month for this, he does not know if the credit monitoring offered in the settlement is the same as what he currently has, as he did not do any comparison of the benefits of his current monitoring versus the monitoring offered pursuant to the settlement. Mr. West testified that he felt that this was not worth the hassle to change over to a new account due to "logistics". Mr. West was asked why he thought

there was anything involved other than just opting for the monitoring and cancelling his old paid service, but could not provide an answer. *Id.* at 63:16-64:24, 65:10-19, 66:15-22. Mr. West could not explain how an improvement of a minimal amount in the alternative compensation was a better benefit than the savings he would achieve in cancelling his credit monitoring and accepting the monitoring offered in the settlement. *Id.* at 65:20-66:11, 66:23-67:7.

10.    Mr. West was also questioned about the ethical issues related to Mr. Bandas and the Bandas Law Firm. He testified that, if there were questions regarding Mr. Bandas or the Bandas firm's ethics, he would be concerned. *Id.* at 77:16-78:6. Mr. West was led though a number of cases in which Bandas and/or his firm represented class action settlement objectors and Mr. Bandas' conduct was called into question by courts, as well as being referred to an ethics board. *Id.* at 80:13-81:19, 81:24-82:6, 84:25-85:3, 86:10-91:2, 91:10-96:8, 96:16-97:6, 97:8-23, 98:3-20. Mr. West was asked if he was concerned by this and answered that the language in the cases was being shown to him out of context so that West could not say whether what was written about Mr. Bandas and his firm bothered West or not. *Id.* at 81:20-23, 85:4-8, 86:25-7, 92:5-7, 93:15-17, 94:21-23, 95:17-21, 96:7-8, 97:4-6, 97:24-25, 98:21-22. This was true, even when Mr. West was shown a quote from Mr. Bandas in which Mr. Bandas acknowledged that his actions were inappropriate.

*Id.* at 99:4-100:4, 103:4-104:4.

## Stephen Helfand

11.     Class Counsel have learned that on September 24, 2018, the State Bar of California initiated disciplinary proceedings against Mr. Helfand that arose out of his involvement in objecting to a class action settlement. A fifteen-count "Notice of Disciplinary Charges" accused Mr. Helfand of dishonesty, misleading a judge, lying to opposing counsel, and other acts of moral turpitude. Copies of the Notice of Disciplinary Charges and subsequent Order Entering Default are attached as Exhibit C.

12.     The events that triggered the accusations began with the filing of an objection to a class action settlement by Jeanelle Branch. The objection identified Mr. Helfand as her lawyer and bore his signature. Mr. Helfand later claimed that the objection had been filed without his knowledge and that he had never represented Ms. Branch. According to the Bar, Mr. Helfand either filed the objection without Ms. Branch's authority or he intentionally misled the court about his involvement by failing to inform the court that he was not Mr. Branch's lawyer despite knowing the objection had been filed over his signature. Ex. C, Notice of Disciplinary Charges, ¶¶ 3-4.

13.     Then, after the settlement was finally approved, Mr. Helfand agreed to

represent Ms. Branch in appealing the final approval order. Shortly after filing a

notice of appeal, he reached a settlement with class counsel whereby Ms. Branch

would receive $15,000 in exchange for dismissal of the appeal. According to the

Bar, however, Ms. Helfand was not authorized to enter into the settlement by Ms.

Branch. Moreover, upon receiving the settlement proceeds, Mr. Helfand did not

place them in his trust account for distribution to his client. Instead, he

misappropriated the money. *Id.* at ¶¶ 7, 20, 22-23.

14.     Mr. Helfand did not respond to or contest the charges. On January 15,

2019, an order was entered on his default, and, as a result, Mr. Helfand is no longer

able to practice law in California. Ex. C, Order Entering Default, pp. 17-18.

15.     On December 16, 2019, Plaintiffs' Counsel deposed Mr. Helfand. A

copy of Mr. Helfand's deposition transcript is attached as Exhibit D. Mr. Helfand

testified that his filing should not be considered an objection and said "I am in favor

of the settlement and so I filed a statement or comment in support of the settlement."

*See* Exhibit D, Helfand Dep. at 4:17-25. He added that he hopes "the settlement gets

approved." *Id*. at 17:23-18:2.

16.     In expanding on the benefits of the settlement Mr. Helfand testified:

> [I]t seemed to me that the settlement was providing a very
> lucrative benefit for class members who put, you know, the time
> to file out the claim form, which is pretty simple, and then could

8

> back it up with documents, and I'm working on that. I believe it
> said that I could get up to $20,000 in compensation.

*Id*. at 14:3-25.

17.     With respect to attorneys' fees, Mr. Helfand indicated his limited

objection to the lodestar crosscheck was that hourly rates be capped at $750 an hour

and that the Court should award "up to a multiplier of three." *Id*. at 35:7-11. When

asked whether he had supported other settlements while objecting to some aspect of

the attorneys' fees, Mr. Helfand responded:

> [T]his would be the only instance that I can recall where I'm very
> enthusiastic about the settlement. I think they did a great job and
> I'm also, you know, quite frankly very enthusiastic about giving
> them a big award of fees.

*Id*. at 70:3-7.

### George Cochran

18.     On December 13, 2019, Plaintiffs' Counsel deposed Objector George

Cochran. A copy of Mr. Cochran's deposition transcript (rough copy) is attached as

Exhibit E. Mr. Cochran is an attorney, who has prosecuted some smaller class

actions in the past. He also practices personal injury law, "mobile home park law,"

and represents objectors. He testified that his typical contingency arrangement is

33%. Ex. E, Cochran Dep. at 9:7-17, 10:1-11:1, 14:1-3, 52:10-17.

19.     As illustrated by a review of his prior objections, Mr. Cochran typically

represents friends and family in his objections. He testified that he usually sends out

an email to his friends, family, and former clients inquiring whether they are class members and want to object as to particular cases. *Id.* at 9:18-25, 12:16-25, 13:10-15, 81:21-82:8, 82:15-23, 83:24-84:4, 84:22-25, 85:16-17, 87:13-19, 88:5-6, 88:16-20, 89:19-90:1, 90:13-16.

20.     In this case, however, he stated that he was too busy to find a client, and had nearly missed the objection deadline, so he objected on his own behalf. He also testified that because he was pressed for time he did not analyze this settlement in as much depth as he normally does. *Id.* at 16:9-18:1.

21.     He has not been informed that he was impacted by any prior data breach; but he has also done nothing to ascertain if he has been impacted, including not checking his bank records or credit report to confirm whether he has endured any identity theft. In fact, he has done nothing to protect himself from the misuse of his identity. *Id.* at 18:2-19:9.

22.     In his claim form, he testified that he sought only credit monitoring and that he has no out-of-pocket losses. *Id.* at 19:16-20, 19:25-20:11, 41:24-42:3.

23.     He did not review the Court's Order on the Motion to Dismiss. He presumed the FCRA claim was the best count. He was unaware of the *McConnell* case and what impact it might have here. Once explained to him, he agreed it could greatly impact this case, especially the negligence count. He was surprised to learn

no damages class has even been certified in a contested data breach setting. He was not aware of the settlement funds in other data breaches or the applicable caps in other cases. *Id.* at 20:19-21:3, 22:14-23:7, 25:8-11, 29:25-30:18.

24.    Ultimately, the crux of his concern with the settlement is he believes the credit monitoring should extend longer; and, ideally, forever. He is worried about his wife being stuck with fraud in the future related to his social security number. He seemed confused about how losses going forward worked with credit monitoring in place. *Id.* at 38:22-39:23, 40:14-23; 43:7-44:3.

25.    He was not aware the settlement mandated $1 billion in security spending (he just assumed that was an estimate) or that there would be third-party oversight of compliance. He believes the full $1 billion in security spending should not factor into the attorneys' fee award because Equifax would have had to spend that amount even absent counsel's efforts to show consumers and shareholders that "they were serious about learning from [the data breach.]" *Id.* at 34:5-9, 35:21-36:3, 74:9-75:7, 45:15-21.

26.    When asked about his many prior objections, and appeals and dismissals thereof, he refused to answer whether he was compensated in any of those cases because in situations where he has been paid the agreement has always included a confidentiality provision that prevents him from talking about such

11

settlements. *Id.* at 69:1-6, 81:1-8, 82:9-14, 83:3-6, 84:10-15, 85:7-11, 86:7-23, 87:22-88:1; 89:14-18, 90:5-12.

### John Davis

27.     Plaintiffs' Counsel sought to depose John Davis as expressly permitted by the Notice Order. Rather than appear for his deposition, Mr. Davis filed a "motion to quash" the deposition. In the process of communicating to Plaintiffs' Counsel, Mr. Davis included the claim that Plaintiffs' Counsel violated the Fair Credit Reporting Act:

> **From:** "John W. Davis" <john@johnwdavis.com>
> **Date:** December 13, 2019 at 3:25:10 PM EST
> **To:** Patrick Barthle x2219 <PBarthle@forthepeople.com>
> **Cc:** John Yanchunis x2191 <jyanchunis@forthepeople.com>
> **Subject:RE: *EXT* In re Equifax**
>
> Mr. Barthle:
>
> As I advised both you and your colleague, Mr. Yanchunis, on December 10, 2019, I will not be appearing for a deposition at your office on Monday. I have moved to quash your subpoena.
>
> Additionally, I have reason to believe that your firm may have violated the Fair Credit Reporting Act in its efforts to serve me with the subpoena (without, by the way, of offering the courteous option of waiving service). However, that will be the subject of a separate meet and confer.
>
> Sincerely,
>
> John W. Davis

**Theodore Frank and Hamilton Lincoln Law Institute**

28.    In their response to the objections of Theodore Frank, Class Counsel pointed out that Mr. Frank repeatedly used Twitter to mischaracterize the settlement in an effort to stir discontent about the settlement and drive objections to Class Action Inc. [Doc. 900-1 at 28-33].

29.    After Plaintiffs filed their response to the objections, Mr. Frank returned to Twitter, where he continued to spread misinformation about the settlement. For example, on December 9, 2019, Mr. Frank copied and pasted one page from Class Counsel's declaration [Doc. 900-1] and tweeted directly and publicly to Congresswoman Ocasio-Cortez with the false statement that Class Counsel "are trying to blame you for their screwed up settlement and notice program," followed with the taunt: "Are you going to stand for that?"



30.     On December 11, 2019, Mr. Frank again tweeted the false claim that Class Counsel were casting "blame" on Congresswoman Ocasio-Cortez for misinformation about the settlement, this time hoping for attention from Senator Elizabeth Warren.



31.     On December 15, 2019, Mr. Frank posted the following tweet, again promoting the false narrative that "class counsel . . . pulled a bait and switch with their settlement:"



**Reuben Metcalfe and Class Action Inc.**

32.     As part of their December 5, 2019, submission, Class Counsel explained why the objections submitted through Class Action Inc. should be rejected

both because the objections were based on misinformation about the settlement terms and because the objections submitted through Class Action Inc. on behalf of class members did not comport with Rule 23(e)(5).

33.    In an effort to probe the process by which Class Action Inc. induced these objections, Plaintiffs' Counsel sought to depose the Class Action, Inc., through its Chief Executive Officer, Reuben Metcalfe, and requested related documents.

34.    After repeated attempts at service, on December 4, 2019 Mr. Metcalfe finally accepted service of the subpoenas. Metcalfe called Plaintiffs' Counsel David Berger and agreed to produce the documents responsive to the subpoena on Friday, December 6, 2019. Mr. Berger followed up on December 5 and 6, 2019, and Mr. Metcalfe confirmed he intended to make the promised production. Metcalfe failed to make a production on December 6.

35.    On Monday, December 9, 2019, Mr. Berger again communicated with Mr. Metcalfe, who said Class Action, Inc. was attempting to retain pro bono counsel. Plaintiffs' Counsel extended the return date for the document subpoena to December 10, 2019, and the deposition date to December 11, 2019.

36.    On December 10, 2019, Mr. Metcalfe called Mr. Berger and explained he was still seeking pro bono counsel. Plaintiffs' Counsel agreed to a final extension of the return date to December 11, 2019, and a deposition date of December 13,

2019. During a subsequent conversation on December 11, 2019, Mr. Metcalfe conceded that he was not aware the settlement provided more than $31 million in cash payments to consumers. Mr. Berger explained to Mr. Metcalfe the different types and amounts of cash payments that would be available to consumers and that the Class Notice and Settlement Agreement were available on the Settlement Website. Mr. Metcalfe then admitted that he had not reviewed those documents.

37.    On December 11, 2019, Mr. Metcalfe did not produce responsive documents as promised. On December 12, 2019, Metcalfe called Mr. Berger and indicated he had retained counsel that morning. Later that day, Mr. Stephen Gardner, an Oregon lawyer not licensed in California or Georgia emailed Mr. Berger claiming to represent Mr. Metcalfe and indicated Mr. Metcalfe would not produce documents or sit for a deposition. When questioned about his license status in California, Mr. Gardner responded that he intended to associate with California counsel. Mr. Berger responded that he would not agree to postpone the deposition, which would go ahead as planned.

38.    On December 13, 2019, Mr. Berger for Plaintiffs and Robert Griest, counsel for Equifax (by telephone), appeared at the designated location for the deposition of Mr. Metcalfe and Class Action Inc. Mr. Metcalfe failed to appear. The transcript of that attempted deposition is attached hereto as Exhibit F.

### Christopher Andrews

39.    Although Class Counsel has explained that objector Christopher Andrews' objections are without merit [Doc. 902 at 41-42], he made subsequent claims regarding JND's operation of the settlement website. [Docs. 916, 917]. After conferring with JND and making an independent assessment of the claims, Class Counsel can report the following:

a.   There is a link to JND's privacy policy located at the bottom of each page of the settlement website for the Equifax Data Breach Settlement, including the home page, which discloses the types of information collected by JND, how JND may use that information, with whom it is shared, what choices individuals have regarding JND's use of the information, and how the individuals may access the information provided to JND.

b.  JND discloses that it may gather general non-personal statistical information, including information about the use of the website, such as how many visitors visit a specific page, how long they remain on that page, and the hyperlinks, if any, on which they "click." JND also discloses that it uses "IP addresses" and "cookies" in the process of collecting this information. JND's collection of this information occurs while an individual is visiting the

settlement website site. JND does not track browsing activity outside of the settlement website.

c.  JND further discloses that it may compile the statistical information in order to describe the use of its settlement websites to its clients, the courts, the government, or in response to a valid legal request. The compiled data does not identify any individuals, including visitors to the website. Additionally, user-submitted information, such as name, address, phone, email, and other claims related data, is not stored in cookies, combined with the collected statistical information, or transferred to any other site or party associated with the process of collecting non-personal statistical information.

d.  JND's privacy policy informs individuals that they can prevent the collection of information about their visit to JND's settlement websites by turning off cookies in the preference settings of their web browser.

e.  The cookies used to gather and compile statistical information are used by most organizations, are commonplace on the vast majority of websites, and are not classified as spyware or malware. Furthermore, the settlement website is now, and has been since site launch, free from malware and spyware.

f.  With respect to providing the last 6 digits of a class member's social security number, this was not a requirement to file a claim. This was done

solely to assist class members in attempting to determine whether they would be eligible settlement class members. Additionally, JND does not, and has never, stored in cookies or elsewhere the last 6 digits of a social security number entered by an individual attempting to determine their eligibility.

### Fees and Expenses Supplement

40.    Since submission of Plaintiffs' motion for final approval and reply in support of attorneys' fees, Class Counsel have continued to collect and review time and expense records pursuant to the standard protocol and the review process described in our previous declaration [Doc. 858-1 ¶¶ 40-49]. Since December 1, 2019, and after review by Class Counsel for billing judgment, Plaintiffs' counsel have incurred an additional 978.20 hours of time and $724,743.30 in lodestar through December 17, primarily on work related to final approval and responding to objections and pending motions, and overseeing the notice program and administration of the settlement. This time is summarized by firm in Exhibit G hereto, and detail thereof will be submitted to the Court *in camera* pursuant to the February 12, 2018 Order.

41.    When combined with the time submitted through November 30, 2019 (32,612.5 hours and $22,092,191.70 lodestar), the time and lodestar reasonably incurred on behalf of the class and submitted in support of Plaintiffs' fee

application—to the extent the Court considers lodestar in this common-fund settlement—is 33,590.70 hours and $22,816,935.00 lodestar. This time is reasonable and justified in view of the issues, the complexity and importance of the case, the manner in which the case was defended, and the quality of the result.

42.    Plaintiffs' lodestar of $22,816,935.00 as of December 17, 2019, results in a multiplier of 3.4. The multiplier is even lower if Class Counsel's estimated future hours are included in the cross-check calculation. When considering the additional 10,000 hours and $6,767,200 in lodestar Class Counsel conservatively estimate will be expended after final approval, the lodestar for current and future time is $29,584,135.00, reducing the total multiplier to 2.62.

43.    Class Counsel previously reported on December 5, 2019 that they had reasonably and necessarily incurred $1,290,036.16 in expenses for such items as court reporter fees; document and database reproduction and analysis; e-discovery costs; expert witness fees; travel for meetings and hearings; paying the mediator; and other customary expenditures. Since filing the motion for final approval and reply in support of attorneys' fees, Class Counsel have reasonably and necessarily incurred an additional $114,849.19 in expenses, bringing the total requested expenses as of this filing to $1,404,855.35. Supporting detail for each of these current expenses has been reviewed by Class Counsel. A chart summarizing these

expenses by category is attached hereto as Exhibit H, and detail of these expenses will be submitted to the Court in camera pursuant to the February 12, 2018 Order.

### Further Supplemental Information

44.     Attached as Exhibit I is a summary chart prepared by Class Counsel identifying by type objectors' deficiencies in complying with the requirements of Rule 23 or the Court's Order Directing Notice.

45.     On October 29, 2019, Class Counsel's Motion for Attorneys' Fees, Expenses, and Service Awards to the Settlement Class Representatives was posted to the settlement website and has been available continuously on the website since that date.

We declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 18th day of December, 2019.

/s/ Kenneth S. Canfield
Kenneth S. Canfield
Plaintiffs' Co-Lead and Class Counsel

/s/ Amy E. Keller
Amy E. Keller
Plaintiffs' Co-Lead and Class Counsel

/s/ Norman E. Siegel
Norman E. Siegel
Plaintiffs' Co-Lead and Class Counsel

/s/ David M. Berger
David M. Berger
Plaintiffs' Counsel