# EXHIBIT D

Page 1

1              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF GEORGIA
2                  ATLANTA DIVISION
3
                              MDL Docket No. 2800
4                             No. 1:17-md-2800-TWT
5    In re:  Equifax, Inc. Customer Data
     Security Breach Litigation
6
                              CONSUMER ACTIONS
7
8                             Chief Judge
                              Thomas W. Thrash, Jr.
9    _____X
10
11
12
                 One East Broward Boulevard
13                     Suite 902
                  Ft. Lauderdale, Florida
14             Tuesday, December 10, 2019
                 9:20 a.m. - 11:28 a.m.
15
16
17
18            D E P O S I T I O N
19                   of
20               STEVEN HELFAND
21       Taken on behalf of the Plaintiffs
         pursuant to a notice of taking deposition
22
                        - - -
23
24
25

Page 2

1        APPEARANCES:

2              HAUSFELD

               33 Whitehall Street

3              14th Floor

               New York, NY 10004

4              Steven Nathan, Esq.

               Attorney for Plaintiffs

5

         ALSO PRESENT:

6

               Antoinette Helfand

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
1                    INDEX OF PROCEEDINGS
2
   WITNESS                 DIRECT   CROSS   REDIRECT   RECROSS
3
   STEVEN HELFAND
4
   (By Mr. Nathan)          4
5
6
                       INDEX OF EXHIBITS
7
8  EXHIBITS          DESCRIPTION                      PAGE
9  For the Plaintiffs:
10 Exhibit 1         Notice of Deposition             5
   Exhibit 2         Letter                           32
11 Exhibit 3         Settlement                       52
   Exhibit 4         Frequently Asked Questions       58
12 Exhibit 5         Motion for Final Approval        65
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                              Page 4
 1   Thereupon:
 2                    STEVEN HELFAND,
 3   was called as a witness and, having been duly sworn,
 4   was examined and testified as follows:
 5            THE WITNESS:  Yes.
 6                    DIRECT EXAMINATION
 7   BY MR. NATHAN:
 8        Q.   Good morning, Mr. Helfand.
 9        A.   Good morning.
10        Q.   My name is Steven Nathan, I'm an attorney at
11   Hausfeld.  We are one of the attorneys for the
12   consumer class in the Equifax data breach case and the
13   purpose of today is to take your deposition.
14            You determined at some point that you were
15   affected by the Equifax data breach, correct?
16        A.   Yes.
17        Q.   Okay.  And at some point recently you filed
18   an objection to the proposed settlement of the Equifax
19   data breach case, correct?
20        A.   I disagree as that's -- I am in favor of the
21   settlement and so I filed a statement or comment in
22   support of the settlement.  And to the only extent I
23   have an objection, it goes to the award of attorneys'
24   fees.  So I'd classify mine not as an objection to the
25   settlement.
```

Page 5

1        Q.    Let me phrase it slightly different and I'll

2    show you the docket.  On or about November 16, 2019,

3    you filed a document titled Equifax Data Breach Class

4    Action Settlement Administrator Attention:  Objection.

5        A.    Right.

6        Q.    Okay.  We'll come to that in a little bit, I

7    just wanted to see if you are not -- am I correct in

8    saying that you are not simply objecting to some

9    aspect, which we'll get into, of the settlement, but

10   you are also a class member?

11       A.    Yes.

12             MR. NATHAN:  Okay.  Let me just have marked

13   as Exhibit 1 the notice of Mr. Helfand's deposition.

14       [The Notice of Deposition was marked for

15   identification as Plaintiffs' Exhibit 1.]

16   BY MR. NATHAN:

17       Q.    Just to make sure that we have the

18   preliminaries correct, can you spell your name for the

19   court reporter?

20       A.    It's S-T-E-V-E-N and then it's

21   F-R-A-N-K-L-Y-N H-E-L-F, as in Frank, A-N-D.

22       Q.    What's your address?

23       A.    My present address is 1400 Southwest, which

24   is just the abbreviated S.W., 137th Avenue, Apartment

25   F as in Frank, 112, Pembroke Pines, Florida 33027.

                                        Page 6

1        Q.    Mr. Helfand, have you had your deposition

2    taken before?

3        A.    Yes.

4        Q.    Generally in what context if more than once?

5        A.    I have been deposed I believe under Brandt

6    for attorneys' fees in insurance bad faith cases in

7    California and I have been deposed in objections I

8    think a handful of times.  I'm trying to think if I've

9    been deposed in any other instance.  I was deposed a

10   very long time ago in a punitive class action that I

11   filed against Belkin Components, and I may have been

12   deposed in -- no, no, those are the totality of my

13   depositions that I've given.

14       Q.    So am I correct that the depositions that

15   you've -- the times you've been deposed it's either

16   been as a party or in making an objection?

17       A.    Yes, or as an attorney where under Brandt,

18   which is B-R-A-N-D-T.  In California if there is a

19   case against an insurance company for bad faith, the

20   insured is entitled to their attorneys' fees and the

21   reasonableness of my attorneys' fees, or the amount of

22   the attorneys' fees is allowable to be, you know,

23   inquired upon by the other side in the context of bad

24   faith litigation.  So I've had -- I've given

25   deposition testimony, I think, in one or two cases

1   where they wanted to inquire how much money was spent

2   representing the insured.

3        Q.   Okay.  Have you had your deposition taken

4   ever as a witness?

5        A.   I don't believe so.

6        Q.   Okay.  Have you taken depositions before?

7        A.   Yes.

8        Q.   Approximately how many?

9        A.   A hundred.

10        Q.   And that would be over what period of time?

11        A.   Twenty years.

12        Q.   I'm sorry?

13        A.   Over 20 years.

14        Q.   What bars are you admitted to?

15        A.   I'm no longer admitted.

16        Q.   Okay.  When you were admitted, what bars

17   were you admitted to?

18        A.   California.

19        Q.   Okay.  When were you admitted to the

20   California Bar?

21        A.   I believe it was in 2000 or 2001.

22        Q.   Okay.  Having gone through the number of

23   depositions that you've just described over a 20-year

24   period, you understand that you are under oath,

25   correct?

Page 8

1      A.    Yes.

2      Q.    And as you also understand, but I'll say it

3   just as simple ground rules, to the extent possible

4   speak up and say "yes" or "no" rather than nodding or

5   uh-huh or something like that so that the court

6   reporter can have an accurate record.

7            If you don't understand a question that I'm

8   asking, let me know, I'll be glad to repeat it or

9   rephrase it.

10           If you do answer I will take that to mean

11  you understand my question.  Okay?

12     A.    Right.

13     Q.    If we need a break, please let me know.  The

14  only thing I'd ask is that if we are in the middle of

15  me asking a question and you are giving an answer,

16  that you finish your answer before we take a break.

17  But, you know, we can take whatever breaks you feel

18  that you need.

19           If you do give an answer and you

20  subsequently remember something that you would like to

21  add to your answer, let me know and we'll, you know,

22  make sure that that makes it into the record as well.

23           Are you on any medications or is there

24  anything going on that would prevent you from giving

25  full and accurate testimony this morning?

1      A.   Well, I'll object, but I'm still going to

2  answer.   I'm going to object to the extent that I

3  would know it would be -- to the extent I wouldn't

4  know would be speculation and calls for conclusion.   I

5  have recently been the victim of what is a very large

6  insurance casualty, which occurred November 1 through

7  November 6th, where all of my personal possessions

8  have been wiped out and lost, and so the emotional

9  distress associated with that and, you know, all the

10  issues surrounding it, dealing with insurance

11  companies, you know, dealing with, you know, finding a

12  new place to live essentially, getting new personal

13  contents has been a problem.   However, I don't think

14  that it's going to impact my testimony or my ability

15  to give truthful testimony.

16           I'm here.   I'm ready.   I'll give it the best

17  I can, but I don't know if all that, you know,

18  including any medication -- I do take medication, none

19  of which should have an impact, but in case it does --

20  well, if it does I wouldn't know it.

21      Q.   Okay.   Is it fair to say that you believe

22  that despite the issues that you've just described,

23  that you are capable of giving full testimony,

24  accurate information to the extent that you have that

25  information, that the issues that you just referenced

1   you do not believe will interfere with your ability to

2   give truthful testimony?

3        A.    Correct.

4        Q.    With respect to Exhibit 1, the deposition

5   notice, you've seen that before, correct?

6        A.    Yes.

7        Q.    And that's one that our office had sent to

8   you?

9        A.    Yes.

10       Q.    Okay.  The purpose of your deposition today

11  is that you filed a letter, which we'll get to

12  momentarily, that in part objected to some aspect of

13  the settlement in the Equifax data breach case,

14  correct?

15       A.    Yes.

16       Q.    Generally speaking about the Equifax data

17  breach settlement, have you had the opportunity,

18  either recently or when you first learned that there

19  was a settlement, to review what the terms of that

20  settlement were?

21       A.    Yes.

22       Q.    Okay.  When was the first time that you

23  learned that there was a settlement of the Equifax

24  data breach case for the consumers?

25       A.    I think it was about five days before I did

1  the letter.  And it's very interesting because I was

2  actually looking up something relating to insurance

3  and I came across it and said oh, I'm a member of

4  this.  What is it about?  Because I had -- when was

5  it?  Back in June or July, I actually had a theft that

6  occurred at my residence and submitted an insurance

7  claim.  And one of the things that I had submitted a

8  claim for, which was a $500 claim, had to deal with

9  basically information that was then utilized,

10  apparently, to open up an account which led to a

11  closure of one of my accounts at CitiBank based on

12  certain fraudulent activity that they never really

13  discussed with me.

14          So I saw only the settlement about five --

15  you know, five days before I authored the letter.  So

16  I didn't even -- I didn't know about the case, period.

17  And I had no idea there was even a case.  I know that

18  those companies are the subject of litigation because

19  of data theft generally, but I had no knowledge of

20  that.

21      Q.    Okay.  To the best of your recollection,

22  where did you first learn about the Equifax data

23  breach?

24      A.    Where?  In Pembroke Pines.

25      Q.    No.  By what medium did you learn about it?

```
                                              Page 12
 1        A.    Oh, on the computer.  It came up during a
 2   search for something, nothing to do with class
 3   actions, but it came up in the context of insurance
 4   and I think rectifying, you know, an issue with --
 5   where, you know, identity theft or coverage for that
 6   sort of component of insurance claim.  And so that's
 7   when -- I think it was the very first link in the
 8   search or one of the first or second links.  I don't
 9   know if it was a sponsored link or anything like that,
10   but it brought me directly to a -- I think it was a
11   news article first and then to the website.  I think
12   it's how it -- I think it's how I came across it.
13        Q.    By the website do you mean the settlement
14   website?
15        A.    The settlement website.
16        Q.    Okay.  So when the Equifax data breach
17   originally occurred, you weren't aware of the Equifax
18   data breach.  Would that be accurate?
19        A.    That's correct.  That's fair.
20        Q.    And you became aware of it fairly recently
21   in doing some work on the computer and you came across
22   information about the data breach settlement?
23        A.    Well, I was aware that there were problems
24   with Equifax and things that were on my credit report
25   from Equifax and Experian and Transunion, I believe,
```

1   and there's another one that's relatively more new, I

2   think.  So they -- I was aware of the existence of a

3   problem, but I didn't know that the cause was probably

4   or likely attributable to the data breach, but it

5   makes sense that it was.

6        Q.   When you reviewed the information relating

7   to the Equifax data breach settlement that you came

8   across from, I believe, you said it was a link,

9   correct?

10       A.   Right.

11       Q.   Okay.  Do you recall reviewing the

12  information that was contained to find out what was

13  contained in the settlement?

14       A.   Yeah, I took a look at the notice and I

15  think that's the only thing I read at first, and it --

16  and I took a look at the website just broadly.  I was

17  interested in submitting a claim right away because,

18  you know, in dealing with my own personal insurance,

19  what I was referencing back in June, there was a cap

20  in it for $500 for -- on whatever damages so -- which

21  seemed to me to be a very, you know, minor, trivial

22  sum of money, although there was no deductible.  So I

23  was interested at that point immediately in doing the

24  claim, because the notice had referenced that you

25  could get your -- the time and expense associated with

Page 14

1    trying to rectify or deal with or address the data

2    breach.

3         Q.    Without looking at the information now, to

4    the best of your recollection, do you recall what

5    provisions were covered in the settlement agreement?

6    What kinds of things someone that was affected by the

7    Equifax data breach was entitled to according to the

8    settlement?

9         A.    I seem to recall, but it may have been

10   inaccurate, that if I did nothing but participate I

11   would get, I believe, $150.  Although that -- you

12   know, from further investigation there have been some

13   issues in some of the reporting that I think led me to

14   that conclusion.  I did read a couple of other

15   articles that may have been inaccurate reflections of

16   what the settlement actually said and would allow for.

17   But I was left with the conclusion -- I didn't delve

18   into it a great deal because I had all these other

19   issues on my plate.  But it seemed to me that the

20   settlement was providing a very lucrative benefit for

21   class members who put, you know, the time to file out

22   the claim form, which is pretty simple, and then could

23   back it up with documents, and I'm working on that.

24            I believe it said that I could get up to

25   $20,000 in compensation.  You know, of course, there

Page 15

1   are means in which that compensation gets evaluated,

2   they need to take a look at the documents and there's

3   a process for that, I'm fine with that.  So that was

4   what was -- I said okay, this seems like a great

5   thing.  Because if I was to do it through my insurance

6   I have a $500 cap.  I can only get a maximum

7   reimbursement of $500, essentially, and this is, you

8   know, providing this very large benefit and I wanted

9   to participate in it so that -- you know.

10            Now, whether or not I get that level, that's

11  for them, the claims people to evaluate, but at least

12  I wanted to have a go at it and submit my

13  documentation.  So I don't know how it's going to turn

14  out, but I was intrigued by what was offered as to the

15  class members who went through the process and I'm

16  doing the process.

17       Q.   Okay.  Aside from the financial compensation

18  for losses that you described, do you recall any

19  aspects of the settlement agreement that were not of a

20  financial nature?

21       A.   I will honestly tell you that I really -- I

22  looked at it generally and I read the notice.  I don't

23  recall all of the specific nuances as I sit here, but,

24  you know -- or really many of the issues with the

25  settlement itself.  I know I studied them and I

1   reached the conclusion I thought this was a really

2   good settlement.  And so that was the position I took.

3            And then additionally when I was going

4   through the information, I thought the website was

5   really, really good, and I thought the claims process

6   was really simple and straightforward.  And so I

7   wanted to -- because I was going to be taking the time

8   to submit the claim and go through the process of

9   getting the backup documentation, to the extent that I

10  could, I was saying to myself, I hope this isn't all

11  for nought where we submit all this stuff and, you

12  know, the settlement doesn't get approved.  So I said

13  I would do a positive, you know, comment to the Court

14  expressing my strong support for the settlement.

15       Q.   Okay.  Moving on to that positive comment,

16  and I had earlier referred to it as an objection, and

17  we'll get into that in a little bit more detail, but

18  you've been in a number of cases both as a party and

19  as an attorney where you've filed an objection to some

20  aspect of a proposed settlement.  Would that be

21  accurate?

22       A.   Yes.

23       Q.   Okay.  Do you think that the judge entering

24  an order allowing us to take depositions of parties

25  or -- of parties, whether they be attorneys that

1    represent themselves or class members who filed an

2    objection or expressed a concern, do you think that

3    was an appropriate order?

4        A.    As to taking depositions, I don't have a

5    problem with it as long as it's done, which I'm sure

6    in most cases it's done, in good faith.  So if there's

7    a legitimate factual dispute or there are questions

8    concerning the objection, I think it's totally fair

9    game.  I generally in the past I -- you know, I

10   generally in the past have always been willing to show

11   up for depositions, whether it's me or my client, to

12   the extent I had one in an objection, because I always

13   thought it was a useful forum.  It's sort of like

14   going back to Shakespeare where sometimes the attorney

15   has to be careful seated in the forum of Rome because

16   the person can start talking and who knows what the

17   heck can happen then.  So I generally don't oppose any

18   efforts to take discovery from me.  I try to

19   cooperate.

20       Q.    And you don't have an objection to sitting

21   for your deposition today?

22       A.    Of course not.

23       Q.    Okay.  Just as a general question, what are

24   you hoping to accomplish with your objection?

25       A.    I am hoping to accomplish that the

1  settlement gets approved, that the notice be approved,

2  that the claims website be approved.  My objection to

3  the fees really related to a concern that I've long

4  held in class actions especially that involve consumer

5  cases where people are, you know, ripped off or

6  involve cases where it's people on the lower end of

7  the economic spectrum, and that sweeps up a lot of

8  people in this class action, that the fees that are

9  charged not necessarily not be large, it's okay to

10  have a large fee, okay, but that the basis of the fee,

11  meaning the hourly rates of the attorneys, meet some,

12  you know, standard.

13         And I have always thought that attorneys in

14  class actions who represent the plaintiffs who come in

15  and say their rate is $1,000 an hour, to me I've

16  always -- you know, it's not the hourly rate, it's the

17  number of hours and -- but what they do when they say

18  that it's $1,000 an hour is it's totally tone deaf and

19  it turns off the entire class because there is no way

20  a person working at Walmart earning minimum wage or

21  above minimum wage is going to ever have been able to

22  hire an attorney who's really charging $1,000 an hour.

23  And I doubt that any of those attorneys, apart from

24  doing anything with class action litigation, have ever

25  had a client pay them $1,000 an hour.

1       And so they come up with a fantastic hourly

2    rate that they then use as a basis for a multiplier

3    and the rate turns into effectively $4,000 an hour or

4    more.  I've seen cases where it's $10,000 an hour.

5    And I don't -- while they might be good attorneys,

6    they are not that good.

7       And the other thing is that it fails to

8    recognize that -- you know, it's sort of like when you

9    go and buy a car, there's no question a Mercedes is a

10   great car.  If you get an S class, it's 120,000 bucks

11   or something like that for an S550.  Do you need a

12   Bugatti or do you need a Rolls Royce if you are not

13   running a race and you are just trying to get from

14   point A to point B?  If the S class can do it, which

15   all of these attorneys are great attorneys, that's why

16   I'm saying Mercedes Benz, and we are already the

17   Mercedes Benz level attorney, okay, then we don't need

18   these people hanging on clinging to $1,000 hourly

19   rates, they should be tossed over.  And so that's the

20   point that I'm making, that it turns off the class, it

21   poisons everybody in society towards class actions and

22   leads to more objections.

23       Q.   In general in respect to attorney fees, do

24   you believe that attorneys in a case like this who

25   work on a contingent fee basis should be able to

```
                                                  Page 20
1    charge a higher rate than an hourly rate?
2         A.    No.   I believe that they should charge their
3    customary rate regardless of the contingent nature.   I
4    do strongly believe that based on the contingent
5    nature they should get a multiplier or some sort of
6    upward adjustment, you know, that gives them a bonus,
7    if you will.  So I don't believe that they should be
8    allowed to come up with a phony rate.  I think that
9    the hourly rate has to be what their hourly rate is.
10   You know, you can have an exception where -- let's say
11   if you are handling a car accident case versus a
12   complex matter, there might be a reason why you might
13   charge a little bit more.  But you can't say that if
14   I'm going to be doing a personal injury case, my rate
15   is 250 an hour and because I'm doing a class action
16   I'm spending the same hour of time but what, I'm
17   working harder?  You are supposed to be working hard
18   regardless and it's a matter of time, not complexity,
19   so that's my point there.
20             I don't think the hourly rate gets changed.
21   It should be the customary hourly rate which, you
22   know, for a firm like yours is fairly high already
23   so -- but it's not -- and as your record shows, your
24   firm has a maximum that its most senior person working
25   who is a great attorney is $710 an hour and he's far
```

Page 21

1    lower than all of these other people, some of whom

2    didn't do anything in the case.

3         Q.   Let me clarify just because -- I understand

4    what you are saying and I just want to not put words

5    in your mouth but make sure we are clear.  With

6    respect to the Equifax case, to the extent that the

7    attorneys who represent the class, the consumer class

8    are charging an hourly rate, you believe that that

9    hourly rate should be their standard hourly rate,

10   correct?

11        A.   Yes, I believe it should be their customary

12   rate that they charge, which should be, you know,

13   across all class actions that they do.  So they

14   shouldn't come into Equifax and say my rate is $910,

15   but then have a different class action case at the

16   same time, you know, or same overall time span.  Now,

17   I do think that the rate should be their current rate,

18   so it's based on their current rate because -- out of

19   fairness to them, because you don't -- if the case is

20   pending for four years, I don't think that the

21   attorneys -- it's fair for them to have to go back to

22   find out what their rate was four years ago.  So I

23   think it should be their current customary hourly

24   rate.

25        Q.   And then if I understand you correctly, to

Page 22

1    take into account the contingent nature of the case,

2    you believe that from that current customary hourly

3    rate there then could be some additional multiplier to

4    take into account the fact that they may or may not

5    get paid?

6         A.   Yes, it should take into account a multitude

7    of factors that are within the Court's discretion that

8    range from the complexity of the case to, you know,

9    how much in costs they put out, what was the amount of

10   risk they faced, the extent of the obstreperousness of

11   the opposing counsel.  You know, even who was picked

12   as opposing counsel could be a factor, I think, in

13   determining the risk.  So yes, I believe that there

14   should be an enhancement of -- that goes to the net

15   load star based on the contingent nature certainly,

16   but there are also other reasons to have the

17   multiplier as well.

18        Q.   You answered this question but I want to ask

19   it just as a stand-alone question to make sure that I

20   have it correct.  If the Court decides that the

21   attorneys' fees are appropriate, do you believe that

22   the settlement should be thrown out?

23        A.   If the fees -- well, I don't think that the

24   Court would ever decide that then because it has to

25   first decide things in the order that allow it to even

                                                        Page 23

1    get to attorneys' fees.  So I don't believe a Court

2    can decide attorneys' fees in that context.  However,

3    if there was an objection that went to, let's say,

4    it's unfair because the attorneys are being paid from

5    the common fund, that goes to a structural issue with

6    the settlement.  But those -- I don't think those

7    objections are well taken generally.  But I do think

8    it needs to reach a finding first that the settlement

9    is approvable and once it then approves the settlement

10   it goes to the attorneys' fees.  So I just don't see

11   that ever being a possibility of happening in that

12   order because there would be no basis to approve

13   attorneys' fees on a settlement that didn't get

14   approved.

15        Q.   Well, do you believe that notwithstanding

16   your objection to the attorney fees in this case, that

17   the settlement should be approved?

18        A.   So are you saying should an objection to

19   attorneys' fees hold up the settlement or it -- I

20   mean, I'm having a hard -- because this is a common

21   fund case -- I think I know what you are alluding to,

22   that if there was, let's say, an appeal of the

23   attorneys' fees that could theoretically tie up the

24   settlement.

25        Q.   Okay.

```
1         A.    Okay.  I don't know how to separate that
2    out, if there is going to be that from someone else
3    or, you know, down the road.  I think that the
4    Court -- I just don't see the fees ever being -- how
5    would the Court even do what you are considering?
6    Because the Court would have to have something on
7    which to base the attorneys' fees.
8         Q.    Let me phrase it a different way.  Assuming
9    that the settlement as submitted, including the
10   requested attorney fees, is approved by the Court, is
11   that something that despite your stated concerns with
12   the attorney fees aspect of the settlement, is that
13   something that you would still be okay with?
14        A.    Well, it would be depend on what the order
15   says.  So, you know, I would also reserve the right to
16   seek whatever remedies that are appropriate if the
17   judge, and I don't think he's -- if the judge goes
18   crazy all of a sudden, there's no indication that he's
19   going to go crazy, I'm just saying that as an example
20   and does something and he says well, I'm going to
21   award them a billion dollars in attorneys' fees, okay.
22   Even though that's not your request, it's beyond your
23   request and there's no indication that's going to
24   happen, it's just, you know, an example, I would think
25   that a lot of people would take issue with that and
```

Page 25

1    take it up on appeal.

2           Now, whether or not that impacted the

3    enforceability or the commencement of the settlement

4    or even the payment of attorneys' fees is another

5    matter.  I'd have to look at the settlement agreement

6    because I would assume that if I was objecting just to

7    an award, let's say, of $20 million in excess

8    attorneys' fees, I wouldn't imagine that the

9    settlement wouldn't have allowed for the settlement to

10   go into effect and then B, for the fees that were not

11   objected to to be paid as undisputed monies.

12        Q.   Okay.  So just to clarify, to the extent

13   that you have an objection with respect to the

14   attorney fees, is it your testimony that you would not

15   want that objection to the attorney fees to hold up

16   the underlying settlement?

17        A.   Correct.

18        Q.   Okay.  If you are successful in your

19   objection, do you anticipate submitting or requesting

20   that the Court pay you any fees for your objection?

21        A.   No, because I wouldn't be entitled to them

22   because I'm representing myself.  And even if I wanted

23   to I couldn't because the case law is pretty clear

24   that I couldn't do that.  But I would say that, you

25   know, if the settlement is structured in a way --

```
 1   okay, this is going back to the prior question that I
 2   answered correct on.  If the settlement is structured
 3   in a way where under my example you couldn't somehow
 4   separate the attorneys' fees and everything got held
 5   up, then that's a structural problem with the
 6   settlement that should have been, you know,
 7   contemplated, you know, when it was put together.
 8   Because I think that most class action attorneys and
 9   defense counsel are well aware of objectors and the
10   potentiality for objections.  And so it was incumbent
11   upon them to have structured an appropriate deal that
12   would prevent that from happening, and it's possible
13   to do that.  I've seen many class action settlements
14   that, you know, they have to put in all the extra
15   verbiage, but that go into effect or take effect and
16   even will pay the attorneys, okay, almost immediately,
17   and those things have been approved or found to be,
18   you know, allowed by a lot of courts that take a look
19   at that.
20        So it was incumbent upon them to sort of
21   work those details out.  You know, if I as an
22   objector, you know, truly believed that something is
23   amiss in whatever the processed order is, I have the
24   right to take an appeal regardless of whether or not
25   it ties anything up.  It would be my hope that nothing
```

```
                                        Page 27
 1    would be tied up in this particular case because I
 2    have a pretty substantial claim and I have a vested
 3    interest, it would seem to me, in getting things, you
 4    know, approved.
 5         Q.   Moving on to another topic.  Have you ever
 6    served as a class representative?
 7         A.   As I indicated or alluded to earlier, I had
 8    a punitive class action where I was the client against
 9    Belkin Computer Components.  This was all the way back
10    I think in 2000, but it didn't go anywhere, the case.
11    It settled without ever getting a class action
12    certified or anything like that.
13         Q.   And that was a class action where you did
14    have a claim, correct?
15         A.   I believe it was a punitive class action
16    under 17200 of the business and professions code,
17    which you are probably familiar with, which got
18    challenged.
19         Q.   California?
20         A.   Yeah, California.  And so I don't recall if
21    it was a formally-styled class action or a
22    representative action.
23         Q.   Do you know generally the duties of a class
24    representative?
25         A.   Yes.
```

Page 28

1      Q.    What generally are they?

2      A.    Well, they have to monitor the proceedings.

3  They first have to be an actual class member, you

4  know, and not a person that's put up to it by the

5  attorneys to -- you know, have to be a legitimate

6  class member and they have to exercise some

7  responsibility in the case.  They are going to be

8  subjected to discovery.  They are going to be having

9  their depositions taken.  They are going to have to be

10  the ones acquiring documents, so there's a huge

11  burden, you know, that's put on them.  And especially

12  progressive class actions where they could be

13  threatened, they could face threats, they can -- you

14  know, they are going to have an enormous consumption

15  of time, perhaps.  And, you know, they have some

16  financial risk in some states, too.

17          So their duties would then be to sort of

18  oversee.  I mean, the Court oversees the attorneys,

19  but practically, you know, at least at first in the

20  start, they are going to be the ones who typically

21  are, you know, interfacing with the attorneys.  So I

22  think it's more front loaded where their work is

23  taking place.  Later on as the case develops and

24  becomes a real class action, the Court's involvement I

25  think supersedes theirs.

Page 29

1       Q.    Okay.   Now, aside from the -- it may only be

2   the punitive class action that you mentioned, so that

3   your answer to this question may be null, but have you

4   ever opted out of a class action?

5       A.    I have never opted out of a class action.

6       Q.    What does it mean to opt out of a class

7   action?

8       A.    It means that you essentially do your own

9   thing.   You are not going to participate in it.   So

10  you take your marbles, so to speak, and you play

11  another game.   And you are not impacted by the

12  judgment or the settlement bar, if there is one, that

13  the pending class action, you know, would have.   So if

14  you don't opt out you are going to necessarily be

15  included within, assuming you fit the definition of

16  the settlement class, you are going to be included

17  within it and so you'll lose your right to pursue your

18  own individual remedy.

19      Q.    If your objection is successful, are you

20  seeking to intervene as a named plaintiff in this

21  case?

22      A.    No.

23      Q.    Do you think that you could negotiate a

24  better settlement than the one the court-appointed

25  counsel did?

Page 30

```
 1        A.    No.
 2        Q.    Do you plan on appearing at the final
 3   approval hearing?
 4        A.    No.  I may request, however, the right to
 5   listen in telephonically, but even then I don't
 6   believe -- if I was to say anything, I don't think I
 7   would speak for more than two minutes because I think
 8   what I said in the objection will be considered by the
 9   Court and I don't need to read it to him again.
10        Q.    I know you had discussed some issues with
11   respect to some casualty or property --
12        A.    Yes.
13        Q.    -- issues.  Did that affect your ability to
14   prepare for today's deposition?
15        A.    Yes, it limited my ability to pull up the
16   list of, you know, cases in which I have objected in,
17   because all of my files -- and actually, the
18   computers, too, that I used were lost in the casualty.
19   And so everything they have, like this cell phone is
20   brand-new.  I just bought a new Apple computer
21   brand-new.  And I haven't been able to access all of
22   the e-mail accounts that I have, and those were the
23   ones that I primarily utilized.  But I have recalled a
24   few of the classes -- class actions that I've objected
25   to, sir.
```

Page 31

1      Q.   Okay.  Do you recall anything specific that
2    you did in preparation for this deposition?  I
3    understand given the limitations that you just
4    described.
5      A.   Well, I did make an honest effort to try and
6    find a list of objections or even the, you know, the
7    receipts that you get when you file either ECF or in
8    the state court system or in any other -- through any
9    other means that I would have recorded for my
10   attention the filing of an objection in a case.  So I
11   made an effort to do that and that research spurred my
12   recollection of a lot of -- well, a handful of the
13   most recent cases that I was involved in.
14          But most of my cases, you know, if you are
15   either venued in California, which allows anyone to
16   electronically search for them.  Florida I believe
17   there was only one objection in the Adderall case.
18   Pennsylvania in the justice class action.  And apart
19   from that everything else was in a Federal court, I
20   believe.  You know, if I've missed one or two -- there
21   might have been one in Missouri in Google but I think
22   that was outside the five-year period and even -- so
23   that would be Federal court.  So all of my objections
24   are easily findable.
25          Q.   Given the limitations that you've described

```
                                        Page 32
 1   having on your ability to gather the information that

 2   you would have liked to have reviewed and/or provided,

 3   approximately how long would you estimate that you

 4   spent in preparation for your deposition?

 5        A.   Well, I did review documents and I wanted to

 6   get sort of a flavor of what was going on.  It did

 7   take me, you know, time to review the things.  I read

 8   news articles and I read a few recent news articles,

 9   so I'd say that I spent only -- I spend about a couple

10   of hours.

11        Q.   Aside from news articles, do you recall

12   generally what else you reviewed?

13        A.   I reviewed the supplemental declaration

14   which contains a list of the hourly rates and lone

15   stars of the leadership firms and the tagalong

16   consumer cases, and it also -- it reflects a series of

17   charts, and I reviewed those.

18        Q.   Anything else?

19        A.   That is -- for the review, that's it.

20             MR. NATHAN:  Okay.  Let's have this marked

21   as Exhibit 2.

22        [The letter was marked for identification as

23   Plaintiffs' Exhibit 2.]

24   BY MR. NATHAN:

25        Q.   Mr. Helfand, Exhibit 2 is the November 16,
```

Page 33

1   2019, letter that -- I'll show it to you in a second.

2   It says "Equifax Data Breach Class Action Settlement

3   Administrator Attention:  Objection."

4          This is a letter that you wrote, correct?

5      A.   Yes.

6      Q.   And since November 16th have you had an

7   opportunity to read this again?

8      A.   I referred to it I think after I was

9   contacted by your colleague, Jamie, just to, I think,

10  refresh my recollection as to when the hearing was

11  going to be --

12     Q.   Okay.

13     A.   -- because he was asking for deposition

14  dates.

15     Q.   If I could draw your attention to -- the

16  last two words on the second page going to the top of

17  the third page.  And then before I ask you to look at

18  that, this is your signature at the bottom of the

19  page, correct?

20     A.   Yes.

21     Q.   Okay.  The last sentence that starts on the

22  second page and goes on to the third says "I may

23  revise this to support the entire award once I sift

24  over the countless pages that in fairness shows, at

25  least as to the limited materials I have reviewed,

Page 34

1    extraordinary and exemplary work.  Indeed, from what

2    appears so far, work must be rewarded and the class

3    should not be able to reap a windfall on the backs of

4    solid attorneys for outstanding results.  Any award

5    exceeding $45 million certainly strikes me as

6    excessive and fails to take into account that the

7    class could have conducted a reverse auction to obtain

8    legal counsel."

9             Did I read that correctly?

10        A.    Yes.

11        Q.    Okay.  Do you recall that you and I had a

12   telephone conversation a couple of days ago?

13        A.    Yes.

14        Q.    And part of that conversation was to

15   discuss -- I had asked whether or not you thought it

16   might be worth having a conversation about you

17   possibly withdrawing your objection or modifying your

18   objection?

19        A.    Yes.

20        Q.    Do you recall indicating that you may modify

21   your objection but that you wouldn't withdraw your

22   objection?

23        A.    Right.  I believe I said or alluded to that

24   I thought I agreed with you on about 80 percent of

25   things.  I'm trying to recollect the conversation, but

Page 35

1   that I was looking at whether or not the number -- I

2   was going to increase the number of 45 million to -- I

3   think that's what you -- we were both referring to,

4   was whether or not there would be some way of bringing

5   that number up.  And I think I said to you that I

6   thought so.  And I -- and as I tried to explain

7   earlier, I don't have a problem with the Court

8   awarding up to a multiplier of three.

9        Q.   Okay.

10       A.    And I have no problem with the Court

11  awarding hourly rates up to $750 an hour.  But capping

12  -- so capping the rates, giving everyone above $750 an

13  hour essentially a haircut, and then -- and bringing

14  them down to the maximum rate of 750, and then taking

15  that number and multiplying it by three gives them

16  effective hourly rates of still over $2,000 an hour,

17  which I think is a very generous -- you know, they may

18  not -- the guys earning the thousand dollars or trying

19  to earn the thousand dollars may not think so, but

20  also it fully -- it doesn't give everyone exactly what

21  they want, because I think you guys are seeking just

22  short of four, but it gives everyone a pretty decent

23  award.  I know, you know, a lot of people will be

24  heartbroken not to get the full amount, but the class

25  also has an interest too in -- but that's what I was

Page 36

1    saying earlier, the reverse auction going in that the

2    class could have likely hired your firm to do all of

3    the work, hired Jamie as their lead attorney, and they

4    would have spent less money.  And so that's the point

5    being raised.  I don't know necessarily that these

6    people at the higher end all did something and there's

7    no reason that they could do something that you guys

8    couldn't do.  So that's the point that I'm making.  So

9    that's the reverse auction comment and that's what I

10   mean.  So, I mean, you can do the math, you would be

11   able to do that math better than me and see what that

12   comes out to.  I would imagine the number goes up

13   pretty big.

14        Q.   And I ask it simply just to give the Court

15   the ability to understand your thinking on this.  So

16   when the initial letter that you submitted in support

17   of the settlement but with the objection to the

18   attorney fees where you stated that an award exceeding

19   45 million strikes you as excessive, since that time

20   and as you and I had discussed, your thinking on that

21   has changed slightly?

22        A.   Yes.

23        Q.   So you think a higher award would not be

24   something that you would necessarily still object to

25   if it were a multiplier of three or less?

Page 37

1      A.    If it's -- if they cap the rates at 750 and
2  award a multiplier of three or less, I don't have an
3  objection.
4      Q.    Okay.
5      A.    So the Court would have considered my
6  suggestion and done what I asked.  So how would I -- I
7  don't think I'd have a basis to object if that's what
8  I asked.
9      Q.    Okay.  Have you at any time spoken with
10  anyone else who is, to your knowledge, objecting to
11  the settlement in this case?
12      A.    No.
13      Q.    Have you at any time suggested to anyone
14  that they object to the settlement in this case?
15      A.    No.
16      Q.    And by the settlement I mean including the
17  request -- the attorneys' fees?
18      A.    I haven't spoken to -- other than my mother
19  who's sitting here assisting me and watching the
20  proceedings, you know, the only thing I said to you
21  was that oh, there's going to be a deposition here
22  today, but I haven't discussed the case other than
23  saying I think it involves Equifax.  So nobody knows
24  and I haven't inquired, other than I said I did see a
25  news article involving, I think his name is Ruben

```
                                           Page 38
```

1  Metcalf or something like that.

2      Q.   The November 16th, 2019, letter, Exhibit 2,

3  you wrote this yourself, correct?

4      A.   Yes.

5      Q.   Okay.  If you go to the first page, the last

6  sentence in the first paragraph, you wrote "By the

7  same token, prior proposed settlements were not

8  designed to be consumer friendly and the claim's

9  process has been made so difficult to comprehend much

10  less complete, most class members simply took a pass."

11         And I believe that earlier in your

12  deposition you said one of the things that was

13  attractive to you as a class member in looking at the

14  proposed settlement, was that, and I'm paraphrasing

15  your words, that you thought that it was a fairly

16  straightforward process?

17      A.   Yes.  Yes.

18      Q.   Okay.

19      A.   And I also like that -- you know, there was

20  one class action, I forget -- or proposed class

21  action, I don't even know what happened to it, but I

22  think it involved Experian, where you needed to have

23  all of your forms that moment that you were doing the

24  claims and you couldn't -- you know, they made it

25  really complicated.  The website didn't work, and

Page 39

1    there were myriad issues, and I thought that this was
2    really well crafted.
3        Q.   Okay.
4        A.   So I was alluding to a particular, a very
5    specific instance involving a proposed class action,
6    or it might have even been approved for all I know,
7    but I didn't get anything from it, but I was a class
8    member and just -- they made it so difficult to submit
9    a claim, much less understand what the benefit was or
10   the benefit of even submitting a claim and going
11   through all the hoops.  I just thought this one did a
12   very nice job in explaining what was going on and how
13   to participate in it.
14       Q.   And as an attorney and also as a class
15   member in a consumer class action like this, those are
16   factors that were very important in you being overall
17   supportive of the merits of the proposed settlement,
18   correct?
19       A.   Right and -- absolutely.
20       Q.   Okay.  In other material that you may have
21   reviewed, not necessarily in preparation for the
22   deposition, but just in general having learned about
23   the Equifax data breach, did you review the underlying
24   complaint in the case?
25       A.   I believe I did.

```
                                         Page 40
 1        Q.    Okay.  Did you review any of the pleadings
 2    relating to Equifax's motion to dismiss and/or the
 3    Court's ruling on that?
 4        A.    I took a look at the motion to dismiss and I
 5    believe I took a look at the one -- the paperwork
 6    around the motion to dismiss that's on the website,
 7    for example.  I may have gone further in and looked at
 8    some other paperwork as well.
 9        Q.    Okay.  Do you think that this was an easy
10    case?
11        A.    No.
12        Q.    Do you know how many data breach cases like
13    this have ever been certified as a class action in a
14    disputed litigation context?
15        A.    That I wouldn't know.
16        Q.    Would it surprise you to hear that no
17    damages class action has ever been certified in a data
18    breach case like this?
19        A.    No, it wouldn't surprise me.  I know this is
20    a complicated case and they did a great job in
21    shepherding it through.
22        Q.    Okay.  Do you know generally what the
23    benchmark for fees in the 11th Circuit is?
24        A.    You know, I -- the benchmark for fees, I
25    might be confusing it with the 9th, but I think the
```

```
                                              Page 41
```

1   benchmark is 25 percent.  But I might be mistaken as

2   it applied to the 11th Circuit versus the 9th.

3       Q.   Okay.  It is 25 percent.

4       A.   Oh, okay.

5       Q.   Would it surprise you to learn the total

6   value of the settlement is over $1 billion?

7       A.   Yes, and I think I've seen, yeah, up to

8   three and a half billion.

9       Q.   I had asked would it surprise you, I guess

10  your answer is no?

11      A.   It hasn't surprised me but...

12      Q.   And attorneys here aren't requesting 250

13  million, are they?

14      A.   No.

15      Q.   Okay.  Which would be 25 percent?

16      A.   Right.  But, you know, in fairness to the

17  class, everyone knows that not all the claims -- not

18  all the class members are going to participate.  And,

19  you know, the counter argument I'm sure that some

20  would say, although I'm not saying it, is well,

21  they've only -- you know, they are really funding it

22  with a 115 and 120 million dollar insurance payout and

23  so the value would be, you know, low.  I think there

24  is real value, however, in this case.  And I do think

25  that, you know, the case where the claim's process is

Page 42

```
1   easy, I think there is a powerful argument that it's
2   over a billion dollars.
3        Q.   I'm trying to take into account the issue
4   that you -- that we've discussed regarding the
5   casualty that had interfered with your ability to
6   garner some of the materials you would have liked to
7   have had, so bear with me as I go through this.
8             You filed your claim online, correct?
9        A.   Yes.
10       Q.   Did you have any out-of-pocket damages
11  associated with this breach?
12       A.   Yes.
13       Q.   Do you believe that your credit was stolen?
14       A.   Yes.
15       Q.   Do you believe that you suffered ID fraud?
16       A.   Yes.
17       Q.   Did you have occasion to freeze your credit?
18       A.   Did I have occasion to freeze my credit?
19  No, I never had occasion to freeze my credit.
20  Although, I think my credit got frozen.
21       Q.   By someone other than you?
22       A.   Yes.
23       Q.   With your consent or without?
24       A.   Without.
25       Q.   Okay.  As part of --
```

1      A.    As part of the data theft.

2      Q.    Okay.  To the extent that you can give some

3  specific examples, can you give some examples of

4  suspected data breaches that occurred that affected

5  you?

6      A.    Yes.  There was one, for example, that

7  affected me involving CitiBank and there was one that

8  affected me involving Bank of America.  And also

9  throughout, you know, I've applied because of the

10  identity theft and people, you know, opening accounts.

11  I think someone opened an account that they took money

12  off of it but then they didn't pay it back, you know,

13  so they got the credit card I think issued in my name

14  and just totally cleaned out the card.  And the card

15  is now just sitting out there and -- but they've sort

16  of found me but they can't find the person who

17  actually used it, okay.  So that would be a cause and

18  effect I think attributable to the data breach because

19  if my personal information got out, then it's really

20  super easy for someone to use that very personal

21  information to apply for credit, especially if you

22  have things that are online, you know.

23          I've done plenty of objections, people

24  look -- people's names can be found out.  You know, my

25  office address, all of these things are not, you know,

Page 44

1  big state secrets, at least at the time my office
2  address, and even my residence address.  And, you
3  know, depending on the data they were able to review,
4  it's very easy to then steal someone's identity or
5  even just intercept a credit card or -- I believe
6  there was one instance where my mail -- where there
7  was a phony change of address put in through the U.S.
8  mail so that my mail was being redirected.  And in one
9  instance that someone was actually keeping my mail as
10  a result of that.  So that was something that was a
11  concern.  I attribute it to this but -- this case, the
12  data breach, but frankly, you know, I'm just making an
13  assessment based on -- you know, I don't have any
14  first-hand knowledge, obviously, but I do believe that
15  the claim fits into the contours of the settlement.
16      Q.   Right.  Did you have at the time of the
17  Equifax data breach either paid or free credit
18  monitoring for yourself?
19      A.   I believe I -- in fact, I think I have it
20  like five times over because I've been involved in a
21  variety -- where I've been the class member, I didn't
22  do objections or anything like that, but being
23  familiar with these cases where you get free credit
24  monitoring as a part of my benefit.  And I actually
25  signed up for it in one case, and I think it was still

Page 45

```
1    in effect at the time.  But I honestly hadn't been
2    utilizing it because I found it was -- just it didn't
3    do anything.  And I was being bombarded all the time
4    with things for free credit reports -- supposedly free
5    credit reports that you have to pay for.  So I just
6    found that it was really a marketing tool or a
7    gimmick.  And I didn't find any use out of it because
8    it didn't help me in any way.  And so I generally --
9    but I think I have been -- I have paid for it in the
10   past.  I think I paid for it with Life Lock once and
11   Experian once.  And then I've been the recipient of it
12   once that I recall where I signed up through a
13   settlement, and a lot of the other ones just
14   overlapped the same.  So there was no point in signing
15   up again.  It's the same benefit from the same company
16   for a different class action.
17        Q.   So I may have misunderstood an answer that
18   you gave earlier when I had asked if you had been a
19   member of any class actions in the past, and I thought
20   that you had referenced one that you were a punitive
21   class member.
22        A.   Yes.
23        Q.   And if I understand your answer correctly
24   now, you are indicating that there were cases in which
25   you were a member of a class that, as a consequence of
```

Page 46

1   being a member of that class, you were able to obtain

2   as a remedy for what occurred credit monitoring.  Were

3   those cases other than the one that you described

4   earlier?

5        A.   Correct.  Yes, that is precisely right.

6        Q.   So which cases were those?

7        A.   There was a Target -- there was Target, I

8   believe it was.  There was also -- this is going back

9   like four years.  I think there was one related to

10  Experian and -- I know the benefit has popped up I

11  believe in a BOA case.  And I know there were at least

12  two or three more, the names don't come across, but

13  it's where I was a class member, I didn't object, so I

14  was entitled to the benefit.  But there was just no

15  point, you know, to doing the benefit because I

16  already had the benefit in place.

17       Q.   Okay.  Now, in the Equifax case where you

18  referenced the two issues, one with CitiBank and one

19  with Bank of America --

20       A.   Uh-huh.

21       Q.   -- in either of those instances did the

22  financial institutions put back whatever funds were

23  taken out of your account or is that still money that

24  you are out of pocket?

25       A.    I'm still in the dispute with CitiBank over

Page 47

```
 1   that.  They put some of the money back, not all of it.
 2   And with CitiBank, this was over a span of about six
 3   months.  There were a series of charges that the
 4   charges -- it came right out of my debit, you know, my
 5   checking account, and it totalled I think the first
 6   time like 3,000 or $4,000 of phony debits.  And what
 7   happened is they put back nearly all of the money, but
 8   not all of the money because they didn't put back
 9   where in one instance the phony debits brought my
10   account into a negative situation, they didn't add
11   back the fees that they then hit me with like $35 each
12   shot.  They did -- after considerable back and forth I
13   still felt, though, that I was out over $1,000 because
14   they didn't catch all of the fraud and didn't add it
15   all back in.  And then the very same entity, very same
16   entity, this is two months later after all that money
17   had been -- and everything had been worked out, the
18   very same entity started doing the exact same thing
19   and they took out, you know, the same increments in
20   the same pattern of fraud.  So in the second time we
21   were able to catch it, the bank caught it fairly
22   promptly, but then closed the -- so they refunded the
23   money into the account and then told me that they were
24   going to close my account because there was too much
25   fraud involving me and my account.  So I -- they
```

Page 48

1   refused to do business with me.  That's another thing,
2   they shut down my account and said that they were
3   going to close my account because there was just too
4   much fraud that was happening by this other entity.
5   That they agreed with me it was not my fault, but they
6   didn't want to have anything to do with me anymore
7   because they kept losing -- they lost, I guess, so
8   much money on it.
9       Q.   Would it be fair to say, you've described in
10  Exhibit 2 and in your testimony today, that this
11  settlement, in your opinion, is consumer friendly?
12  It's part of what forms that belief, the fact that
13  when you go through the form to file your claim, to
14  the extent that you have this issue with a financial
15  institution as you've described, you are able to make
16  a claim for any of the funds up to $20,000 that you've
17  not been reimbursed?
18      A.   Yes, yes, and also that they are -- there's
19  some component, and I don't know, I haven't explored
20  it, but where they actually provided compensation for
21  a person's time, which I think is very valuable too,
22  because you go through all this aggravation and, you
23  know, if you spend a hundred hours and you are arguing
24  even over $300 or $500, you know, you are ultimately
25  proven right but you've devoted a hundred hours of

Page 49

1   time, you know, it's very hard to justify.  So what I

2   felt is that it gave people a tool to fight, and I

3   like that.  I thought that it's perfectly fair and

4   reasonable that they do pay for the time and expense

5   if a person has to order copies of their documents

6   from financial institutions that they get made whole

7   on those things.

8        Q.   Going back to the attorney fee concept part

9   of this that we are here dealing with.  If the

10  settlement provided additional money to the class

11  without reducing money in fees, would that satisfy

12  your objection?

13       A.   If it provided additional money to the

14  class?

15       Q.   Without reducing the money in the fees.

16       A.   Without reducing the money in the fees?

17       Q.   Would that satisfy?

18       A.   I'd have to certainly take a look at it.  So

19  if the pot of money or the amount of money which was

20  going to go out, it could conceivably impact my

21  objection.  I think I would still have the same

22  objection, though, as to the hourly rates.  I would --

23  if more money came in, obviously I would look at it as

24  it might alter how I would view the multiplier,

25  because I might say okay, a bigger multiplier might be

Page 50

1    justified then.

2          Q.    Okay.

3          A.    But it wouldn't change my objection as to

4    anything over $750.

5          Q.    Right.  So even if, and correct me if I'm

6    misstating it, even if the class as a whole were

7    getting more money, your objection isn't necessarily

8    to the amount of money available to the class, it is

9    to the multiplier that is being applied to the hourly

10   rate or an hourly rate that may be higher than you

11   think is appropriate?

12         A.    Right.  And I probably -- if there was a lot

13   more money in it, I probably wouldn't have much of a

14   problem, you know, going from 3 to 3.5 or something,

15   you know.  So that -- it would depend on the

16   circumstance and depend on how much money and quite

17   honestly when and, you know, the timing of how this

18   develops, so that if it's at this end stage and where

19   everything is here and all of a sudden the defendant

20   says hey, we are going to sweeten the pot by another

21   $500 million and for whatever reason -- you know, how

22   much work went into that, that needs to be analyzed

23   because I would want to see was there -- were there

24   negotiations, how extensive were those negotiations,

25   how big an impact it had on the amount of time that

1   the attorneys consumed.  If it was a lot of time I

2   think they -- it would be a factor justifying more, if

3   it was a tiny microscopic amount of time, you know, I

4   would probably say figure out what their load star is

5   based on that and maybe do a more modest adjustment of

6   the multiplier, you know, because I think you can

7   argue for a big multiplier when you have less time.

8       Q.   Okay.  You answered previously that if you

9   were successful in your objection you wouldn't seek

10  attorney fees and you offered several reasons you

11  didn't think it would be permitted and also you just

12  out of general principal would not?

13      A.   Right, and plus, yeah, I don't have enough

14  time -- it would seem petty, okay.  And, you know, I'm

15  not doing it from the motivation of getting paid for

16  writing a letter, although I do think some of the

17  tagalong attorneys should, because I saw some of them

18  had really submitted incremental amounts of time,

19  which I just found really just disappointing that some

20  of these firms that are big major class action firms

21  handling securities litigation would even, you know,

22  purport to offer, like, eight hours of time they are

23  seeking compensation for.  I just think it's

24  ridiculous.  But that's just an aside, it's not an

25  objection.  I'm just speaking, I'm just saying I think

```
                                              Page 52
 1    it is ridiculous.
 2         Q.   I understand.  If you were successful in
 3    your objection, would you be seeking or requesting
 4    that the Court award you any sort of incentive award?
 5         A.   No.
 6              MR. NATHAN:  Okay.  Now would be a good time
 7    to take a short five-minute break.
 8              THE WITNESS:  Sure.
 9         (A recess was taken in the deposition, after
10    which the deposition continued as follows:)
11    BY MR. NATHAN:
12         Q.   Mr. Helfand, do you recall at any time
13    reading the notice of the Equifax data breach class
14    action settlement?
15         A.   Yes.
16              MR. NATHAN:  Could I have this marked as
17    Exhibit 3, please?
18         [The Settlement was marked for identification as
19    Plaintiffs' Exhibit 3.]
20    BY MR. NATHAN:
21         Q.   Is this a document that you read that you
22    had ever printed out or you read it online?
23         A.   Yes, I didn't print it, but I did read it
24    online.
25         Q.   Okay.  Do you recall generally or
```

Page 53

1    approximately when you last read it or if it was only

2    once when you --

3         A.   I think I read it really only once.  I may

4    have skimmed it, you know, briefly again.  I

5    definitely would have skimmed it again just to find

6    out, you know, the address information as to where to

7    send the letter.  So I would have read it first and

8    then skimmed it again just to take out pieces of

9    information.

10        Q.   If I can just draw your attention to

11   Page 11.  I'm sorry, it's page -- yes, Page 11,

12   Item 15 on that page.  Do you see it says "What

13   happens if there are leftover settlement funds?"

14        A.   Yes.

15        Q.   Do you recall reading that?

16        A.   I did read it.  If you are going to ask me

17   questions, I'll read it again if there's anything...

18        Q.   Well, sticking with the idea that you had

19   earlier expressed about the settlement being, as you

20   described, consumer friendly, does the idea that if

21   all of the settlement funds that are paid out -- if

22   after all of the settlement funds are paid out and

23   there were still funds left that -- on the second

24   bullet point under this it says if settlement funds

25   remain, that for those who select an alternative

Page 54

1    reimbursement compensation, in other words, for those

2    who decide that they just want some money for the

3    credit monitoring that they have on their own instead

4    of having the credit monitoring that's being provided,

5    that payments will be increased proportionally up to

6    the full amount of approved claims for time spent and

7    alternative reimbursement compensation?

8              Prior to that it says "If there are still

9    settlement funds, valid claims made during the

10   extended period will be paid on first-come-first-serve

11   basis."

12             Is it your understanding that the initial

13   claims period, the time within which someone like

14   yourself needs to make a claim, is January 22nd of

15   2020?

16        A.   Right.

17        Q.   Okay.  And so in this first bullet point

18   it's saying that if after everyone has made a claim

19   and there's been a determination of the validity and

20   the amount of that and all of the payments are made

21   and there's money left over, this section deals with

22   what to do with that leftover money, is that --

23        A.   That's how I understood it.

24        Q.   Okay.  And the first thing that happens is

25   essentially the claims period gets extended into what

1   is called an extended claims period where people would

2   be able to either file additional claims for damages

3   that they suffered after they had filed their initial

4   claim or perhaps even folks who later realized that

5   they had damages that may be attributed to the data

6   breach, if there might be funds that they would be

7   reimbursed for, do you consider that consumer

8   friendly?

9       A.   I do.

10      Q.   Okay.  How important to you -- on the last

11  bullet point in that one, it says "If any settlement

12  funds still remain, then those remaining funds will be

13  distributed by the Court for consumer restitution and

14  redress, but no money will be returned to Equifax."

15           How important to you is it that all of the

16  funds that are part of the settlement agreement, no

17  matter whether there's money left over or not, that no

18  funds are returned to Equifax?

19      A.   I think it's very, very important because --

20  for a lot of different reasons, but it's essentially a

21  side prey or a side prey component, but everyone has

22  at that point, who has, you know, done what's needed

23  to be done, presumably has gotten compensated.  Yes,

24  Equifax should not get a benefit of what it's saying

25  it's paying out just as a policy level.  As a fairness

```
                                           Page 56
 1   level it should go somewhere else.  And I think use of
 2   a side prey is a well established mechanism and the
 3   Court, you know, with the assistance of all the
 4   parties, gets to, you know, select or designate
 5   appropriate entities then there's no issue with that.
 6   I think it's a well-established procedure.
 7        Q.   Okay.  If you look on Page 13 under
 8   Section 22, it discusses "How will these lawyers be
 9   paid?"
10        A.   On Section 22.
11        Q.   Page 13, Section 22.  And in the third line
12   it says "Accordingly, class counsel will ask the Court
13   to award them attorneys' fees of up to $77,500,000 in
14   reimbursement for costs and expenses."
15             You see that?
16        A.   Yes.
17        Q.   And under the next section, 23, it
18   references will the class -- titled "Will the class
19   representatives receive any additional money?"
20             In the second sentence it says "Class
21   counsel will ask the Court to award these individuals
22   'service awards' of $2,500 each for the time that they
23   spent, and the risks they undertook, in bringing this
24   lawsuit on behalf of the class."
25             Do you support an award of $2,500 as a
```

Page 57

1    service award to the class representative?

2         A.    I have generally in the past supported an

3    award greater than $2,500, so I would support up to

4    5,000 each because I'm not so sure that $2,500 is

5    reasonable.  It might be too low.  So that would be my

6    feeling on that.  I think they are probably entitled

7    to at least $5,000, but I don't have an objection on

8    that.

9         Q.    Okay.  Turn to Page 15.  At some point you

10   read about objecting or commenting on the settlement,

11   I assume?

12        A.    Right.

13        Q.    Okay.

14        A.    Yeah.

15        Q.    So Section 25 says "How do I tell the Court

16   that I like or don't like the settlement?"  And it

17   lists a number of items including things that you

18   include in your letter, correct?

19        A.    Yes.  Apart from -- I don't think I included

20   the list of objections, but I think I have a reason

21   that's just that, you know, allows for justification

22   of not doing.

23        Q.    In terms of putting together your letter,

24   Exhibit 2, the components that are in here, was this

25   what you looked at in determining what you needed to

1  put in your letter?

2      A.   Yeah.  I mean -- but again, I have

3  experience in doing objections.  I did look at the

4  list, so I tried to incorporate all of that.  I

5  included the -- I definitely looked at it because I

6  put in the reference to the deposition.  And I think

7  when I sent out the objection itself, I e-mailed it as

8  well to everyone inviting them to set the deposition I

9  think within those dates, but we ultimately agreed to

10  a different set of dates.

11      Q.   You can put that aside.

12          MR. NATHAN:  Mark that as Exhibit 4.

13      [The Frequently Asked Questions were marked for

14  identification as Plaintiffs' Exhibit 4.]

15  BY MR. NATHAN:

16      Q.   Do you recall when you were at the

17  settlement website looking at Exhibit 4, which is

18  Frequently Asked Questions?

19      A.   Yes.

20      Q.   Did you think that the -- going back again

21  to what you described as consumer friendly.  As a

22  class member and as a consumer yourself, did you find

23  these frequently asked questions something that you

24  think were -- that were helpful to you and that you

25  think would have been helpful to other class members?

```
                                        Page 59
 1        A.    Yes.
 2        Q.    Have you seen frequently asked questions
 3   like this in many of the other cases that you've
 4   either objected to settlements in or been involved in?
 5        A.    I think these were more thorough, quite
 6   honestly, because a lot of times the FAQs offer very
 7   simplistic, if not erroneous information.  I thought
 8   these were thorough.  And so I liked them because you
 9   can identify -- if you had a specific question, you'd
10   zone in on the question that you have in mind and you
11   get, you know, the reference as opposed to having,
12   especially if you are a lay person, to read through a
13   notice or settlement agreement.  This, you know,
14   brings you exactly where you need to be if you have a
15   question on a specific topic.
16        Q.    Okay.  I just have one or two questions on
17   here.  If you can look on the second page, the sixth
18   question that says "What does the settlement provide?"
19             Do you see that?
20        A.    Yes.
21        Q.    Do you recall reading this section?
22        A.    I recall reading the FAQ.  As I sit here
23   right now I don't recall reading the specific section,
24   but I definitely read it.
25        Q.    After the bullet points that are under
```

Page 60

1    Number 6, there's one sentence that says "If the
2    consumer restitution fund is used up, Equifax will pay
3    up to an additional $125,000,000 to pay out-of-pocket
4    losses."
5                Do you recall reading that?
6        A.    Yes.
7        Q.    Okay.  So although the Equifax settlement,
8    and I think you even -- it's referenced in a number of
9    places --
10       A.    You know what, as to the last sentence in
11   that specific FAQ, you know, because I want to be --
12   it is a deposition under oath, I don't specifically
13   recall reading that sentence, so I don't -- you know,
14   I recall some reference somewhere to that, whether it
15   was in the FAQ or somewhere else or an article that I
16   recently read, that would be my answer.  I don't
17   specifically recall -- as I sit here today remember in
18   reading that when I was going through FAQs.
19       Q.    Okay.  But to be fair, and I not asking it
20   out of nowhere, when I was asking you questions
21   earlier as to the value of the settlement --
22       A.    Right.
23       Q.    -- there have been varying reports.  You may
24   have seen some that value the financial part of the
25   settlement at certain numbers and oftentimes that

Page 61

1    380,500,000 is the number that is referred to, and I

2    assume that's the number that you've seen reported?

3         A.   I've seen that number, I've also seen other

4    numbers.  So I've seen the imputed value of the

5    settlement range from, you know, basically the most

6    paltry of sums, which doesn't make any sense because

7    obviously it's going to be at least a minimum that's

8    set forth, and then going up to as high as 3.5

9    billion, I think.

10        Q.   Okay.  And then on Page 3, the top section

11   that's in bold which says "Settlement benefit:

12   Payment for unreimbursed out-of-pocket losses," am I

13   correct that's the portion that you were discussing

14   when you referenced to the reimbursement of up to

15   $20,000, correct?

16        A.   I believe so, yes.  Yes.

17        Q.   And when you talked about CitiBank and

18   another financial institution and that you believed

19   that those losses were related to the Equifax data

20   breach, the language in here says "If you spend money

21   to deal with fraud or identity theft that was fairly

22   traceable to the data breach or to protect yourself

23   from future harm, then you can submit a claim for

24   reimbursement up to $20,000."

25             I forgot the exact word that you used in

1    terms of describing your losses from funds being taken

2    out of CitiBank, but would that be the same generally

3    as what's described here, fairly traceable?

4         A.   Yes, I believe that it is traceable to it

5    and -- because it will fit into the chronology.  And

6    it seems that the settlement terms are broad enough to

7    allow people to submit these claims, you know.  And I

8    think people should take advantage of the opportunity.

9         Q.   And then the last portion that I'd like you

10   to look at for a second, it's on Page 7.  Question 22

11   asks "How will these lawyers be paid?"

12            Putting aside for a moment your thoughts on

13   the amount and/or the load star that's being paid, do

14   you believe this is an accurate description of how the

15   lawyers will be paid?

16        A.   Yes, I have no reason to question the

17   accuracy of the materials, the information, yes.

18        Q.   And I had asked you earlier a question about

19   this, but the last sentence begins "The Court will

20   decide the amount of fees and costs and expenses to be

21   paid."  I'm sorry, the third to last sentence.  "You

22   will not have to separately pay any portion of these

23   fees yourself.  Class counsel's request for attorneys'

24   fees and costs (which must be approved by the Court)

25   was filed on 10/29/2019 and is available to view

```
                                            Page 63
 1   here."

 2            Did you indicate earlier that you had viewed

 3   the -- I don't know if you viewed the submission of

 4   the fees or if you had said that you had viewed one of

 5   the exhibits to -- on the actual docket?

 6        A.   I read on the settlement agreement -- I read

 7   the settlement agreement.  I read all the materials on

 8   the website, the pdfs or the links.  I don't recall

 9   looking at the docket entries specific to those.  I

10   don't recall referring to any docket entries as

11   relates to the fees because I presumed that the

12   submittals that were available on the website

13   reflected, you know, pertinent information for the

14   fees.  And my objection as to fees, you know, goes to

15   this very narrow, you know, item which is really the

16   hourly rate.

17        Q.   Right.

18        A.   So I don't know that, you know, it would be

19   terribly useful for me to delve into other subjects

20   which I thought, you know, could be interesting, but

21   quite frankly I didn't have a problem with any other

22   really aspects of the fee.  It was -- I just, you

23   know, have that issue.

24        Q.   Okay.  Have you had the opportunity to read

25   plaintiffs' motion for final approval of the proposed
```

Page 64

1  settlement?

2        A.    I did go through that.  I did go through --

3  I think it was styled as the motion for final

4  approval.  And again, whatever it was that was on the

5  website and the discussing, you know, the benefits

6  of the -- yes, I did read that.

7        Q.    Do you recall reading in there the number of

8  class members who had filed objections to some aspect

9  of the settlement including obviously --

10       A.    As I sit here today, I don't recall.

11       Q.    Let me just finish my question.

12       A.    Oh, go ahead.

13       Q.    And any aspect of the settlement including

14  the attorney fee request portion of it?

15       A.    How many?  I think I read somewhere -- I

16  don't know if it was in the paperwork that there may

17  have been 13 actual documents addressed to the judge

18  that were properly styled as either an objection or a

19  comment or something like that, or pleadings, or

20  whatever.  And then there were about 3- or 4,000

21  objections, supposed objections or purported

22  objections, but a lot of them were derived from an

23  autobot program it seems.  So someone was, you know,

24  basically having people object without even knowing

25  what the case was about or knowing anything about

Page 65

1    anything and they, you know, click on a button and

2    they generated an objection.  But it -- without any

3    real factual basis, is the way I understood it.  But I

4    don't know if I saw it in there or in some other

5    document.

6        Q.   From what you recall and based on your

7    experience with class actions, were the number of

8    objections that you recall being aware of with respect

9    to this case on par, higher, or lower with the amount

10   of objections that you generally would see in cases

11   that you've been involved in?

12       A.   Well, on a case like this where the class is

13   huge, I would say the number of objections are

14   microscopic.  I mean, tiny.

15       Q.   So let's just take a quick look at this.

16       [The Motion for Final Approval was marked for

17   identification as Plaintiffs' Exhibit 5.]

18   BY MR. NATHAN:

19       Q.   And if you just look I'm just going to spend

20   just a moment on this, just on the first page.  The

21   first paragraph says "With over six weeks remaining in

22   the initial claims period, this settlement has

23   achieved historic results, within an overwhelmingly

24   positive response from the class.  More than 15

25   million class members, over 10 percent of the class,

```
                                                 Page 66
 1    have filed claims, and only 388 class members directly

 2    objected or just .00022 percent of the class."

 3              From your experience and from your

 4    recollection of what you reviewed in this case, does

 5    this seem like a high average or low number?

 6         A.   Low number.

 7         Q.   Okay.  Extremely low number?

 8         A.   Yes, based on the magnitude of the class I'd

 9    say is extremely low.

10         Q.   So 15 million and 388 objections?

11         A.   It's tiny, the amount of objections.

12         Q.   And although there's nothing in here, and I

13    understand the point that you were making about

14    autobot objections and things of that nature, I'm not

15    going to get into the --

16         A.   You have that.  I don't have any first-hand

17    knowledge.

18         Q.   Right.  Right.

19         A.   It was just what I read in an article

20    basically I think on Bloomberg.

21         Q.   Right.  And then if you just turn for a

22    second to the second page.  At the very top it says

23    "By any measure, the size of the cash fund, the

24    minimum cost to Equifax of $1.380 billion, or the

25    total value to the class when considering the value of
```

```
 1   the available credit monitoring services, this
 2   settlement is unprecedented, exceeding the value of
 3   all previous consumer data breach settlements
 4   combined.  Moreover, the settlement enjoys the support
 5   of the Federal Trade Commission, the Consumer
 6   Financial Protection Bureau, and 50 State Attorneys
 7   General that entered into their own settlements with
 8   Equifax and agreed that the fund in this case can
 9   serve as the vehicle for consumer redress necessitated
10   by the breach.  These governmental bodies also had
11   input into the settlement's notice program and claims
12   administration protocol."
13           Do you recall reading something similar to
14   this previously?
15       A.   Yes, something similar.
16       Q.   Okay.  And this generally goes to support
17   what you were stating before both in terms of where
18   this fits in terms of giving the consumers a class
19   action that you feel is consumer friendly and
20   providing them with a real, not illusory, I don't want
21   to put words in your mouth, but a real as opposed to
22   an illusory benefit of a settlement?
23       A.   I agree.  I agree.
24       Q.   Okay.
25       A.   And I think I referenced in my objections or
```

Page 68

1  in my letter that I thought in the past there have

2  been illusory, you know, proposals or proposed

3  settlements and that's why I liked this one.

4       Q.   You can put that aside.  Have there been

5  cases that you have been involved in where either the

6  press, opposing counsel, litigants, a judge have

7  referred to you as a serial objector or similar term?

8       A.   I might have been lumped in and I think I've

9  been referred to as a professional objector.  I would

10  just refer everyone to Judge Kramer, though, who says

11  that he doesn't even know what a professional objector

12  is because of course they are going to be

13  professional, they comply with all the rules of the

14  court.  So I know it's a derogatory term to describe

15  or pejorative term.  I have seen judges, not many, but

16  I have been described as a serial objector I think in

17  one case.  I sent to -- though, I think it's a

18  particularly nasty word, though, in the context of

19  these things.  So I think they misspelled, I think it

20  should have been spelled C-E-R-E-A-L, not serial.

21  But, you know, I think that would have had to be in a

22  Kellogg's case.

23       Q.   Regardless of your feelings about the -- and

24  I think I asked you this before -- the term serial

25  with an S --

Page 69

1        A.    Right.

2        Q.    -- or professional objector, which you would

3   agree sometimes those are used interchangeably,

4   whether that's correct or not?

5        A.    Yes.

6        Q.    Has there been a case where -- prior to

7   Equifax, where the only aspect of the proposed

8   settlement that you had an objection to was based on

9   some portion of either the hourly rate of the

10  attorneys or the load star that was being sought?  In

11  other words, was there a case where you objected to

12  the underlying settlement -- was there a case where

13  you supported the underlying settlement and your only

14  objection was to the compensation for the attorneys?

15       A.    Or I presume to the class rep.  Would that

16  include the class rep?  Because I can think of a case.

17       Q.    Can we go off the record for a second?

18       A.    Sure.

19       [Discussion off the record.]

20  BY MR. NATHAN:

21       Q.    Strike my last question.  Mr. Helfand, in

22  the times that you've objected to a class action

23  settlement, had there ever been a class action

24  settlement that you've been effusive about the

25  settlement itself and only had an issue with some

Page 70

1   aspect of the attorney fees coming out of that

2   settlement?

3       A.   And the answer is no, this would be the only

4   instance that I can recall where I'm very enthusiastic

5   about the settlement.  I think they did a great job

6   and I also, you know, quite frankly very

7   enthusiastic about giving them a big award of fees.

8   And I filed the comment that I did -- I don't view it

9   necessarily as an objection, okay, although -- but

10  even as to the fees the statement that I'm just saying

11  is that the Court should take a look at, you know,

12  some of these hourly rates, but only above $750 an

13  hour.  So, you know, presumably, you know, within the

14  contours of my objection.  I have no problem with the

15  consumption of time or anything that is claimed.  I'm

16  just -- I have it just very narrow because I filed the

17  document with the Court.  It is a little bone that has

18  been -- that was gnawing at me.  I was going to file a

19  letter regardless of whether I decided to include the

20  objection as I indicated as to the fees, because

21  frankly, you know, I didn't necessarily need to do

22  that.  I wanted to voice my support of the settlement

23  and so I hope the Court doesn't get distracted that

24  I'm quibbling over the 750 versus a 1,000 issue and

25  discount that because he thinks there's some other

```
                                                    Page 71
 1   thing going on.  I'm very happy with the settlement,
 2   as I said earlier.  A lot of times people don't ever
 3   write in to say here is a good deal, approve it.  They
 4   only write in and say everything stinks.  So because
 5   I'm interested in the settlement and had been trying
 6   to do the claim and I'm enthusiastic about it, I
 7   wanted to voice my support.
 8        Q.   Okay.  If you'll give me two minutes I think
 9   we may be done.
10        A.   Okay.
11             MR. NATHAN:  So let's go off the record.
12        [Discussion off the record.]
13             MR. NATHAN:  Mr. Helfand, I don't have any
14   more questions for you.  I thank you for your time
15   this morning.
16             THE WITNESS:  Thank you very much.  Thank
17   you.
18             THE COURT REPORTER:  Read or waive?
19             THE WITNESS:  Waive.
20             [The witness waived the reading and signing
21   of the deposition and the taking of the deposition
22   was concluded at 11:28 a.m.]
23
24
25
```

Page 72

```
 1                        - - -
 2                     CERTIFICATE
 3
 4   STATE OF FLORIDA        )
 5   COUNTY OF MIAMI-DADE    )
 6
 7           I, Pearlyck Martin, a Notary Public in and
     for the State of Florida at Large, do hereby certify
 8   that, pursuant to a Notice of Taking Deposition in
     the above-entitled cause, STEVEN HELFAND was by me
 9   first duly cautioned and sworn to testify the whole
     truth, and upon being carefully examined testified as
10   is hereinabove shown, and the testimony of said
     witness was reduced to typewriting under my personal
11   supervision and that the said deposition constitutes
     a true record of the testimony given by the witness.
12
             I further certify that the said deposition
13   was taken at the time and place specified hereinabove
     and that I am neither of counsel nor solicitor to
14   either of the parties in said suit nor interested in
     the event of the cause.
15
             WITNESS my hand and official seal in the
16   City of Miami, County of Miami-Dade, State of
     Florida, this 11th day of December, 2019.
17
18
19
             Pearlyck Martin
20           PEARLYCK MARTIN
             COMMISSION# GG 174369
21           EXPIRES:  JAN 30, 2022
22
23
24
25
```

**[00022 - additionally]**                                    Page 1

| 0 |
| --- |

**00022**   66:2

| 1 |
| --- |

**1**   3:10 5:13,15 9:6
  10:4 41:6
**1,000**   18:15,18,22
  18:25 19:18 47:13
  70:24
**1.380**   66:24
**10**   1:14 65:25
**10,000**   19:4
**10/29/2019**   62:25
**10004**   2:3
**11**   53:11,11
**112**   5:25
**115**   41:22
**11:28**   1:14 71:22
**11th**   40:23 41:2
  72:16
**120**   41:22
**120,000**   19:10
**125,000,000**   60:3
**13**   56:7,11 64:17
**137th**   5:24
**1400**   5:23
**14th**   2:3
**15**   53:12 57:9
  65:24 66:10
**150**   14:11
**16**   5:2 32:25
**16th**   33:6 38:2
**17200**   27:16
**17345**   72:19
**174369**   72:20
**1:17**   1:4

| 2 |
| --- |

**2**   3:10 32:21,23,25
  38:2 48:10 57:24
**2,000**   35:16

| 2,500 |
| --- |

**2,500**   56:22,25
  57:3,4
**20**   7:13,23 25:7
**20,000**   14:25 48:16
  61:15,24
**2000**   7:21 27:10
**2001**   7:21
**2019**   1:14 5:2 33:1
  38:2 72:16
**2020**   54:15
**2022**   72:21
**22**   56:8,10,11
  62:10
**22nd**   54:14
**23**   56:17
**25**   41:1,3,15 57:15
**250**   20:15 41:12
**2800**   1:3,4

| 3 |
| --- |

**3**   3:11 50:14 52:17
  52:19 61:10 64:20
**3,000**   47:6
**3.5**   50:14 61:8
**30**   72:21
**300**   48:24
**32**   3:10
**33**   2:2
**33027**   5:25
**35**   47:11
**380,500,000**   61:1
**388**   66:1,10

| 4 |
| --- |

**4**   3:4,11 58:12,14
  58:17
**4,000**   19:3 47:6
  64:20
**45**   34:5 35:2 36:19

| 5 |
| --- |

**5**   3:10,12 65:17
**5,000**   57:4,7
**50**   67:6
**500**   11:8 13:20
  15:6,7 48:24
  50:21
**52**   3:11
**58**   3:11

| 6 |
| --- |

**6**   60:1
**65**   3:12
**6th**   9:7

| 7 |
| --- |

**7**   62:10
**710**   20:25
**750**   35:11,12,14
  37:1 50:4 70:12
  70:24
**77,500,000**   56:13

| 8 |
| --- |

**80**   34:24

| 9 |
| --- |

**902**   1:13
**910**   21:14
**9:20**   1:14
**9th**   40:25 41:2

| a |
| --- |

**a.m.**   1:14,14 71:22
**abbreviated**   5:24
**ability**   9:14 10:1
  30:13,15 32:1
  36:15 42:5
**able**   18:21 19:25
  30:21 34:3 36:11
  44:3 46:1 47:21
  48:15 55:2
**absolutely**   39:19

**access**   30:21
**accident**   20:11
**accomplish**   17:24
  17:25
**account**   11:10
  22:1,4,6 34:6 42:3
  43:11 46:23 47:5
  47:10,23,24,25
  48:2,3
**accounts**   11:11
  30:22 43:10
**accuracy**   62:17
**accurate**   8:6,25
  9:24 12:18 16:21
  62:14
**achieved**   65:23
**acquiring**   28:10
**action**   5:4 6:10
  18:8,24 20:15
  21:15 26:8,13
  27:8,11,13,15,21
  27:22 28:24 29:2
  29:4,5,7,13 31:18
  33:2 38:20,21
  39:5,15 40:13,17
  45:16 51:20 52:14
  67:19 69:22,23
**actions**   1:6 12:3
  18:4,14 19:21
  21:13 28:12 30:24
  45:19 65:7
**activity**   11:12
**actual**   28:3 63:5
  64:17
**add**   8:21 47:10,14
**adderall**   31:17
**additional**   22:3
  49:10,13 55:2
  56:19 60:3
**additionally**   16:3

**address** 5:22,23
14:1 43:25 44:2,2
44:7 53:6
**addressed** 64:17
**adjustment** 20:6
51:5
**administration**
67:12
**administrator** 5:4
33:3
**admitted** 7:14,15
7:16,17,19
**advantage** 62:8
**affect** 30:13
**aggravation** 48:22
**ago** 6:10 21:22
34:12
**agree** 67:23,23
69:3
**agreed** 34:24 48:5
58:9 67:8
**agreement** 14:5
15:19 25:5 55:16
59:13 63:6,7
**ahead** 64:12
**allow** 14:16 22:25
62:7
**allowable** 6:22
**allowed** 20:8 25:9
26:18
**allowing** 16:24
**allows** 31:15 57:21
**alluded** 27:7 34:23
**alluding** 23:21
39:4
**alter** 49:24
**alternative** 53:25
54:7
**america** 43:8
46:19

**amiss** 26:23
**amount** 6:21 22:9
35:24 49:19 50:8
50:25 51:3 54:6
54:20 62:13,20
65:9 66:11
**amounts** 51:18
**analyzed** 50:22
**answer** 8:10,15,16
8:19,21 9:2 29:3
41:10 45:17,23
60:16 70:3
**answered** 22:18
26:2 51:8
**anticipate** 25:19
**antoinette** 2:6
**anymore** 48:6
**apart** 18:23 31:18
57:19
**apartment** 5:24
**apparently** 11:10
**appeal** 23:22 25:1
26:24
**appearances** 2:1
**appearing** 30:2
**appears** 34:2
**apple** 30:20
**applied** 41:2 43:9
50:9
**apply** 43:21
**appointed** 29:24
**appropriate** 17:3
22:21 24:16 26:11
50:11 56:5
**approvable** 23:9
**approval** 3:12
30:3 63:25 64:4
65:16
**approve** 23:12
71:3

**approved** 16:12
18:1,1,2 23:14,17
24:10 26:17 27:4
39:6 54:6 62:24
**approves** 23:9
**approximately** 7:8
32:3 53:1
**argue** 51:7
**arguing** 48:23
**argument** 41:19
42:1
**article** 12:11 37:25
60:15 66:19
**articles** 14:15 32:8
32:8,11
**aside** 15:17 29:1
32:11 51:24 58:11
62:12 68:4
**asked** 3:11 34:15
37:6,8 41:9 45:18
58:13,18,23 59:2
62:18 68:24
**asking** 8:8,15
33:13 60:19,20
**asks** 62:11
**aspect** 5:9 10:12
16:20 24:12 64:8
64:13 69:7 70:1
**aspects** 15:19
63:22
**assessment** 44:13
**assistance** 56:3
**assisting** 37:19
**associated** 9:9
13:25 42:11
**assume** 25:6 57:11
61:2
**assuming** 24:8
29:15
**atlanta** 1:2

**attention** 5:4
31:10 33:3,15
53:10
**attorney** 2:4 4:10
6:17 16:19 17:14
18:22 19:17,23
20:25 23:16 24:10
24:12 25:14,15
36:3,18 39:14
49:8 51:10 64:14
70:1
**attorneys** 4:11,23
6:6,20,21,22 16:25
18:11,13,23 19:15
19:15,15,24 21:7
21:21 22:21 23:1
23:2,4,10,13,19,23
24:7,21 25:4,8
26:4,8,16 28:5,18
28:21 34:4 37:17
41:12 51:1,17
56:13 62:23 67:6
69:10,14
**attractive** 38:13
**attributable** 13:4
43:18
**attribute** 44:11
**attributed** 55:5
**auction** 34:7 36:1
36:9
**authored** 11:15
**autobot** 64:23
66:14
**available** 50:8
62:25 63:12 67:1
**avenue** 5:24
**average** 66:5
**award** 4:23 24:21
25:7 33:23 34:4
35:23 36:18,23
37:2 52:4,4 56:13

56:21,25 57:1,3
70:7
**awarding**  35:8,11
**awards**  56:22
**aware**  12:17,20,23
13:2 26:9 65:8

**b**

**b**  6:18 19:14 25:10
**back**  11:5 13:19
14:23 17:14 21:21
26:1 27:9 43:12
46:8,22 47:1,7,8
47:11,12,15 49:8
58:20
**backs**  34:3
**backup**  16:9
**bad**  6:6,19,23
**bank**  43:8 46:19
47:21
**bar**  7:20 29:12
**bars**  7:14,16
**base**  24:7
**based**  11:11 20:4
21:18 22:15 44:13
51:5 65:6 66:8
69:8
**basically**  11:9 61:5
64:24 66:20
**basis**  18:10 19:2
19:25 23:12 37:7
54:11 65:3
**bear**  42:7
**begins**  62:19
**behalf**  1:21 56:24
**belief**  48:12
**believe**  6:5 7:5,21
9:21 10:1 12:25
13:8 14:11,24
19:24 20:2,4,7
21:8,11 22:2,13,21
23:1,15 27:15

30:6 31:16,20
34:23 38:11 39:25
40:5 42:13,15
44:5,14,19 46:8,11
61:16 62:4,14
**believed**  26:22
61:18
**belkin**  6:11 27:9
**benchmark**  40:23
40:24 41:1
**benefit**  14:20 15:8
39:9,10 44:24
45:15 46:10,14,15
46:16 55:24 61:11
67:22
**benefits**  64:5
**benz**  19:16,17
**best**  9:16 11:21
14:4
**better**  29:24 36:11
**beyond**  24:22
**big**  36:13 44:1
50:25 51:7,20
70:7
**bigger**  49:25
**billion**  24:21 41:6
41:8 42:2 61:9
66:24
**bit**  5:6 16:17 20:13
**bloomberg**  66:20
**boa**  46:11
**bodies**  67:10
**bold**  61:11
**bombarded**  45:3
**bone**  70:17
**bonus**  20:6
**bottom**  33:18
**bought**  30:20
**boulevard**  1:12
**brand**  30:20,21

**brandt**  6:5,17
**breach**  1:5 4:12,15
4:19 5:3 10:13,17
10:24 11:23 12:16
12:18,22 13:4,7
14:2,7 33:2 39:23
40:12,18 42:11
43:18 44:12,17
52:13 55:6 61:20
61:22 67:3,10
**breaches**  43:4
**break**  8:13,16 52:7
**breaks**  8:17
**briefly**  53:4
**bringing**  35:4,13
56:23
**brings**  59:14
**broad**  62:6
**broadly**  13:16
**brought**  12:10
47:9
**broward**  1:12
**bucks**  19:10
**bugatti**  19:12
**bullet**  53:24 54:17
55:11 59:25
**burden**  28:11
**bureau**  67:6
**business**  27:16
48:1
**button**  65:1
**buy**  19:9

**c**

**c**  68:20
**california**  6:7,18
7:18,20 27:19,20
31:15
**called**  4:3 55:1
**calls**  9:4
**cap**  13:19 15:6
37:1

**capable**  9:23
**capping**  35:11,12
**car**  19:9,10 20:11
**card**  43:13,14,14
44:5
**careful**  17:15
**carefully**  72:9
**case**  4:12,19 6:19
9:19 10:13,24
11:16,17 19:24
20:11,14 21:2,6,15
21:19 22:1,8
23:16,21 25:23
27:1,10 28:7,23
29:21 31:10,17
37:11,14,22 39:24
40:10,18,20 41:24
41:25 44:11,25
46:11,17 64:25
65:9,12 66:4 67:8
68:17,22 69:6,11
69:12,16
**cases**  6:6,25 16:18
17:6 18:5,6 19:4
30:16 31:13,14
32:16 40:12 44:23
45:24 46:3,6 59:3
65:10 68:5
**cash**  66:23
**casualty**  9:6 30:11
30:18 42:5
**catch**  47:14,21
**caught**  47:21
**cause**  13:3 43:17
72:8,14
**cautioned**  72:9
**cell**  30:19
**certain**  11:12
60:25
**certainly**  22:15
34:5 49:18

certificate 72:2
certified 27:12
  40:13,17
certify 72:7,12
challenged 27:18
change 44:7 50:3
changed 20:20
  36:21
charge 20:1,2,13
  21:12
charged 18:9
charges 47:3,4
charging 18:22
  21:8
charts 32:17
checking 47:5
chief 1:8
chronology 62:5
circuit 40:23 41:2
circumstance
  50:16
citibank 11:11
  43:7 46:18,25
  47:2 61:17 62:2
city 72:16
claim 11:7,8,8
  12:6 13:17,24
  14:22 16:8 27:2
  27:14 39:9,10
  42:8 44:15 48:13
  48:16 54:14,18
  55:4 61:23 71:6
claim's 38:8 41:25
claimed 70:15
claims 15:11 16:5
  18:2 38:24 41:17
  54:6,9,13,25 55:1
  55:2 62:7 65:22
  66:1 67:11
clarify 21:3 25:12

class 4:12 5:3,10
  6:10 12:2 14:21
  15:15 17:1 18:4,8
  18:14,19,24 19:10
  19:14,20,21 20:15
  21:7,7,13,15 26:8
  26:13 27:6,8,11,13
  27:15,21,23 28:3,6
  28:12,24 29:2,4,5
  29:6,13,16 30:24
  31:18 33:2 34:2,7
  35:24 36:2 38:10
  38:13,20,20 39:5,7
  39:14,15 40:13,17
  41:17,18 44:21
  45:16,19,21,25
  46:1,13 49:10,14
  50:6,8 51:20
  52:13 56:12,18,18
  56:20,24 57:1
  58:22,25 62:23
  64:8 65:7,12,24,25
  65:25 66:1,2,8,25
  67:18 69:15,16,22
  69:23
classes 30:24
classify 4:24
cleaned 43:14
clear 21:5 25:23
click 65:1
client 17:11 18:25
  27:8
clinging 19:18
close 47:24 48:3
closed 47:22
closure 11:11
code 27:16
colleague 33:9
combined 67:4
come 5:6 18:14
  19:1 20:8 21:14

46:12 54:10
comes 36:12
coming 70:1
commencement
  25:3
comment 4:21
  16:13,15 36:9
  64:19 70:8
commenting 57:10
commission 67:5
  72:20
common 23:5,20
companies 9:11
  11:18
company 6:19
  45:15
compensated
  55:23
compensation
  14:25 15:1,17
  48:20 51:23 54:1
  54:7 69:14
complaint 39:24
complete 38:10
complex 20:12
complexity 20:18
  22:8
complicated 38:25
  40:20
comply 68:13
component 12:6
  48:19 55:21
components 6:11
  27:9 57:24
comprehend 38:9
computer 12:1,21
  27:9 30:20
computers 30:18
conceivably 49:20
concept 49:8

concern 17:2 18:3
  44:11
concerning 17:8
concerns 24:11
concluded 71:22
conclusion 9:4
  14:14,17 16:1
conducted 34:7
confusing 40:25
consent 42:23
consequence
  45:25
consider 55:7
considerable
  47:12
considered 30:8
  37:5
considering 24:5
  66:25
constitutes 72:11
consumed 51:1
consumer 1:6 4:12
  18:4 21:7 32:16
  38:8 39:15 48:11
  53:20 55:7,13
  58:21,22 60:2
  67:3,5,9,19
consumers 10:24
  67:18
consumption
  28:14 70:15
contacted 33:9
contained 13:12
  13:13
contains 32:14
contemplated 26:7
contents 9:13
context 6:4,23
  12:3 23:2 40:14
  68:18

**contingent** 19:25
20:3,4 22:1,15
**continued** 52:10
**contours** 44:15
70:14
**conversation**
34:12,14,16,25
**cooperate** 17:19
**copies** 49:5
**correct** 4:15,19
5:7,18 6:14 7:25
10:3,5,14 12:19
13:9 21:10 22:20
25:17 26:2 27:14
33:4,19 38:3
39:18 42:8 46:5
50:5 57:18 61:13
61:15 69:4
**correctly** 21:25
34:9 45:23
**cost** 66:24
**costs** 22:9 56:14
62:20,24
**counsel** 22:11,12
26:9 29:25 34:8
56:12,21 68:6
72:13
**counsel's** 62:23
**counter** 41:19
**countless** 33:24
**county** 72:5,16
**couple** 14:14 32:9
34:12
**course** 14:25
17:22 68:12
**court** 1:1 5:19 8:5
16:13 22:20,24
23:1 24:4,5,6,10
25:20 28:18 29:24
30:9 31:8,19,23
35:7,10 36:14

37:5 52:4 55:13
56:3,12,21 57:15
62:19,24 68:14
70:11,17,23 71:18
**court's** 22:7 28:24
40:3
**courts** 26:18
**coverage** 12:5
**covered** 14:5
**crafted** 39:2
**crazy** 24:18,19
**credit** 12:24 42:13
42:17,18,19,20
43:13,21 44:5,17
44:23 45:4,5 46:2
54:3,4 67:1
**cross** 3:2
**current** 21:17,18
21:23 22:2
**customary** 20:3,21
21:11,23 22:2
**customer** 1:5

### d

**d** 1:18 5:21 6:18
**dade** 72:5,16
**damages** 13:20
40:17 42:10 55:2
55:5
**data** 1:5 4:12,15
4:19 5:3 10:13,16
10:24 11:19,22
12:16,18,22 13:4,7
14:1,7 33:2 39:23
40:12,17 43:1,4,18
44:3,12,17 52:13
55:5 61:19,22
67:3
**dates** 33:14 58:9
58:10
**day** 72:16

**days** 10:25 11:15
34:12
**deaf** 18:18
**deal** 11:8 14:1,18
26:11 61:21 71:3
**dealing** 9:10,11
13:18 49:9
**deals** 54:21
**debit** 47:4
**debits** 47:6,9
**december** 1:14
72:16
**decent** 35:22
**decide** 22:24,25
23:2 54:2 62:20
**decided** 70:19
**decides** 22:20
**declaration** 32:13
**deductible** 13:22
**defendant** 50:19
**defense** 26:9
**definitely** 53:5
58:5 59:24
**definition** 29:15
**delve** 14:17 63:19
**depend** 24:14
50:15,16
**depending** 44:3
**deposed** 6:5,7,9,9
6:12,15
**deposition** 1:21
3:10 4:13 5:13,14
6:1,25 7:3 10:4,10
17:21 30:14 31:2
32:4 33:13 37:21
38:12 39:22 52:9
52:10 58:6,8
60:12 71:21,21
72:8,11,12
**depositions** 6:13
6:14 7:6,23 16:24

17:4,11 28:9
**derived** 64:22
**derogatory** 68:14
**describe** 68:14
**described** 7:23
9:22 15:18 31:4
31:25 46:3 48:9
48:15 53:20 58:21
62:3 68:16
**describing** 62:1
**description** 3:8
62:14
**designate** 56:4
**designed** 38:8
**despite** 9:22 24:11
**detail** 16:17
**details** 26:21
**determination**
54:19
**determined** 4:14
**determining** 22:13
57:25
**develops** 28:23
50:18
**devoted** 48:25
**different** 5:1 21:15
24:8 45:16 55:20
58:10
**difficult** 38:9 39:8
**direct** 3:2 4:6
**directly** 12:10
66:1
**disagree** 4:20
**disappointing**
51:19
**discount** 70:25
**discovery** 17:18
28:8
**discretion** 22:7
**discuss** 34:15

discussed 11:13 30:10 36:20 37:22 42:4
discusses 56:8
discussing 61:13 64:5
discussion 69:19 71:12
dismiss 40:2,4,6
dispute 17:7 46:25
disputed 40:14
distracted 70:23
distress 9:9
distributed 55:13
district 1:1,1
division 1:2
docket 1:3 5:2 63:5,9,10
document 5:3 52:21 65:5 70:17
documentation 15:13 16:9
documents 14:23 15:2 28:10 32:5 49:5 64:17
doing 12:21 13:23 15:16 18:24 20:14 20:15 38:23 46:15 47:18 51:15 57:22 58:3
dollar 41:22
dollars 24:21 35:18,19 42:2
doubt 18:23
draw 33:15 53:10
duly 4:3 72:9
duties 27:23 28:17

**e**

e 1:18 5:20,20,21 30:22 58:7 68:20 68:20

earlier 16:16 27:7 35:7 36:1 38:11 45:18 46:4 53:19 60:21 62:18 63:2 71:2
earn 35:19
earning 18:20 35:18
easily 31:24
east 1:12
easy 40:9 42:1 43:20 44:4
ecf 31:7
economic 18:7
effect 25:10 26:15 26:15 43:18 45:1
effective 35:16
effectively 19:3
effort 31:5,11
efforts 17:18
effusive 69:24
eight 51:22
either 6:15 10:18 31:7,15 44:17 46:21 55:2 59:4 64:18 68:5 69:9 72:14
electronically 31:16
emotional 9:8
enforceability 25:3
enhancement 22:14
enjoys 67:4
enormous 28:14
entered 67:7
entering 16:23
enthusiastic 70:4 70:7 71:6

entire 18:19 33:23
entities 56:5
entitled 6:20 14:7 25:21 46:14 57:6 72:8
entity 47:15,16,18 48:4
entries 63:9,10
equifax 1:5 4:12 4:15,18 5:3 10:13 10:16,23 11:22 12:16,17,24,25 13:7 14:7 21:6,14 33:2 37:23 39:23 44:17 46:17 52:13 55:14,18,24 60:2,7 61:19 66:24 67:8 69:7
equifax's 40:2
erroneous 59:7
especially 18:4 28:11 43:21 59:12
esq 2:4
essentially 9:12 15:7 29:8 35:13 54:25 55:20
established 56:2,6
estimate 32:3
evaluate 15:11
evaluated 15:1
event 72:14
everybody 19:21
exact 47:18 61:25
exactly 35:20 59:14
examination 4:6
examined 4:4 72:9
example 24:19,24 26:3 40:7 43:6
examples 43:3,3

exceeding 34:5 36:18 67:2
exception 20:10
excess 25:7
excessive 34:6 36:19
exemplary 34:1
exercise 28:6
exhibit 3:10,10,11 3:11,12 5:13,15 10:4 32:21,23,25 38:2 48:10 52:17 52:19 57:24 58:12 58:14,17 65:17
exhibits 3:6,8 63:5
existence 13:2
expense 13:25 49:4
expenses 56:14 62:20
experian 12:25 38:22 45:11 46:10
experience 58:3 65:7 66:3
expires 72:21
explain 35:6
explaining 39:12
explored 48:19
expressed 17:2 53:19
expressing 16:14
extended 54:10,25 55:1
extensive 50:24
extent 4:22 8:3 9:2 9:3,24 16:9 17:12 21:6 22:10 25:12 43:2 48:14
extra 26:14
extraordinary 34:1

**extremely**  66:7,9

**f**

**f**  5:21,21,25
**face**  28:13
**faced**  22:10
**fact**  22:4 44:19
  48:12
**factor**  22:12 51:2
**factors**  22:7 39:16
**factual**  17:7 65:3
**fails**  19:7 34:6
**fair**  9:21 12:19
  17:8 21:21 48:9
  49:3 60:19
**fairly**  12:20 20:22
  38:15 47:21 61:21
  62:3
**fairness**  21:19
  33:24 41:16 55:25
**faith**  6:6,19,24
  17:6
**familiar**  27:17
  44:23
**fantastic**  19:1
**faq**  59:22 60:11,15
**faqs**  59:6 60:18
**far**  20:25 34:2
**fault**  48:5
**favor**  4:20
**federal**  31:19,23
  67:5
**fee**  18:10,10 19:25
  49:8 63:22 64:14
**feel**  8:17 67:19
**feeling**  57:6
**feelings**  68:23
**fees**  4:24 6:6,20,21
  6:22 18:3,8 19:23
  22:21,23 23:1,2,10
  23:13,16,19,23
  24:4,7,10,12,21

25:4,8,10,14,15,20
26:4 36:18 37:17
40:23,24 47:11
49:11,15,16 51:10
56:13 62:20,23,24
63:4,11,14,14 70:1
70:7,10,20
**felt**  47:13 49:2
**fight**  49:2
**figure**  51:4
**file**  14:21 31:7
  48:13 55:2 70:18
**filed**  4:17,21 5:3
  6:11 10:11 16:19
  17:1 42:8 55:3
  62:25 64:8 66:1
  70:8,16
**files**  30:17
**filing**  31:10
**final**  3:12 30:2
  63:25 64:3 65:16
**financial**  15:17,20
  28:16 46:22 48:14
  49:6 60:24 61:18
  67:6
**find**  13:12 21:22
  31:6 43:16 45:7
  53:5 58:22
**findable**  31:24
**finding**  9:11 23:8
**fine**  15:3
**finish**  8:16 64:11
**firm**  20:22,24 36:2
**firms**  32:15 51:20
  51:20
**first**  10:18,22
  11:22 12:7,8,11
  13:15 22:25 23:8
  28:3,19 38:5,6
  44:14 47:5 53:7
  54:10,10,17,24

65:20,21 66:16
72:9
**fit**  29:15 62:5
**fits**  44:15 67:18
**five**  10:25 11:14
  11:15 31:22 44:20
  52:7
**flavor**  32:6
**floor**  2:3
**florida**  1:13 5:25
  31:16 72:4,7,16
**folks**  55:4
**follows**  4:4 52:10
**forget**  38:20
**forgot**  61:25
**form**  14:22 48:13
**formally**  27:21
**forms**  38:23 48:12
**forth**  47:12 61:8
**forum**  17:13,15
**found**  26:17 43:16
  43:24 45:2,6
  51:19
**four**  21:20,22
  35:22 46:9
**frank**  5:21,25
**frankly**  44:12
  63:21 70:6,21
**fraud**  42:15 47:14
  47:20,25 48:4
  61:21
**fraudulent**  11:12
**free**  44:17,23 45:4
  45:4
**freeze**  42:17,18,19
**frequently**  3:11
  58:13,18,23 59:2
**friendly**  38:8
  48:11 53:20 55:8
  58:21 67:19

**front**  28:22
**frozen**  42:20
**ft**  1:13
**full**  8:25 9:23
  35:24 54:6
**fully**  35:20
**fund**  23:5,21 60:2
  66:23 67:8
**funding**  41:21
**funds**  46:22 48:16
  53:13,21,22,23,24
  54:9 55:6,12,12,16
  55:18 62:1
**further**  14:12 40:7
  72:12
**future**  61:23

**g**

**game**  17:9 29:11
**garner**  42:6
**gather**  32:1
**general**  17:23
  19:23 39:22 51:12
  67:7
**generally**  6:4
  10:16 11:19 15:22
  17:9,10,17 23:7
  27:23 28:1 32:12
  40:22 45:8 52:25
  57:2 62:2 65:10
  67:16
**generated**  65:2
**generous**  35:17
**georgia**  1:1
**getting**  9:12 16:9
  27:3,11 50:7
  51:15
**gg**  72:20
**gimmick**  45:7
**give**  8:19 9:15,16
  10:2 35:20 36:14
  43:2,3 71:8

**given** 6:13,24 31:3
  31:25 72:11
**gives** 20:6 35:15
  35:22
**giving** 8:15,24
  9:23 35:12 67:18
  70:7
**glad** 8:8
**gnawing** 70:18
**go** 15:12 16:8 19:9
  21:21 24:19 25:10
  26:15 27:10 38:5
  42:7 48:13,22
  49:20 56:1 64:2,2
  64:12 69:17 71:11
**goes** 4:23 22:14
  23:5,10 24:17
  33:22 36:12 63:14
  67:16
**going** 8:24 9:1,2
  9:14 15:13 16:3,7
  17:14 18:21 20:14
  24:2,19,20,23 26:1
  28:7,8,9,14,20
  29:9,14,16 32:6
  33:11,16 35:2
  36:1 37:21 39:10
  39:12 41:18 46:8
  47:24 48:3 49:8
  49:20 50:14,20
  53:16 58:20 60:18
  61:7,8 65:19
  66:15 68:12 70:18
  71:1
**good** 4:8,9 16:2,5
  17:6 19:5,6 52:6
  71:3
**google** 31:21
**gotten** 55:23
**governmental**
  67:10

**great** 14:18 15:4
  19:10,15 20:25
  40:20 70:5
**greater** 57:3
**ground** 8:3
**guess** 41:9 48:7
**guys** 35:18,21 36:7

**h**

**h** 5:21
**haircut** 35:13
**half** 41:8
**hand** 44:14 66:16
  72:15
**handful** 6:8 31:12
**handling** 20:11
  51:21
**hanging** 19:18
**happen** 17:17
  24:24
**happened** 38:21
  47:7
**happening** 23:11
  26:12 48:4
**happens** 53:13
  54:24
**happy** 71:1
**hard** 20:17 23:20
  49:1
**harder** 20:17
**harm** 61:23
**hausfeld** 2:2 4:11
**hear** 40:16
**hearing** 30:3
  33:10
**heartbroken**
  35:24
**heck** 17:17
**held** 18:4 26:4
**helfand** 1:20 2:6
  3:3 4:2,8 6:1
  32:25 52:12 69:21

**71:13 72:8
**helfand's** 5:13
**help** 45:8
**helpful** 58:24,25
**hereinabove** 72:10
  72:13
**hey** 50:20
**high** 20:22 61:8
  66:5
**higher** 20:1 36:6
  36:23 50:10 65:9
**hire** 18:22
**hired** 36:2,3
**historic** 65:23
**hit** 47:11
**hold** 23:19 25:15
**honest** 31:5
**honestly** 15:21
  45:1 50:17 59:6
**hoops** 39:11
**hope** 16:10 26:25
  70:23
**hoping** 17:24,25
**hour** 18:15,18,22
  18:25 19:3,4
  20:15,16,25 35:11
  35:13,16 70:13
**hourly** 18:11,16
  19:1,18 20:1,9,9
  20:20,21 21:8,9,9
  21:23 22:2 32:14
  35:11,16 49:22
  50:9,10 63:16
  69:9 70:12
**hours** 18:17 32:10
  48:23,25 51:22
**huge** 28:10 65:13
**huh** 8:5 46:20
**hundred** 7:9 48:23
  48:25

**i**

**idea** 11:17 53:18
  53:20
**identification** 5:15
  32:22 52:18 58:14
  65:17
**identify** 59:9
**identity** 12:5
  43:10 44:4 61:21
**illusory** 67:20,22
  68:2
**imagine** 25:8
  36:12
**immediately** 13:23
  26:16
**impact** 9:14,19
  49:20 50:25
**impacted** 25:2
  29:11
**important** 39:16
  55:10,15,19
**imputed** 61:4
**inaccurate** 14:10
  14:15
**incentive** 52:4
**include** 57:18
  69:16 70:19
**included** 29:15,16
  57:19 58:5
**including** 9:18
  24:9 37:16 57:17
  64:9,13
**incorporate** 58:4
**increase** 35:2
**increased** 54:5
**incremental** 51:18
**increments** 47:19
**incumbent** 26:10
  26:20
**index** 3:1,6

**indicate**  63:2
**indicated**  27:7
  70:20
**indicating**  34:20
  45:24
**indication**  24:18
  24:23
**individual**  29:18
**individuals**  56:21
**information**  9:24
  9:25 11:9 12:22
  13:6,12 14:3 16:4
  32:1 43:19,21
  53:6,9 59:7 62:17
  63:13
**initial**  36:16 54:12
  55:3 65:22
**injury**  20:14
**input**  67:11
**inquire**  7:1
**inquired**  6:23
  37:24
**instance**  6:9 39:5
  44:6,9 47:9 70:4
**instances**  46:21
**institution**  48:15
  61:18
**institutions**  46:22
  49:6
**insurance**  6:6,19
  9:6,10 11:2,6 12:3
  12:6 13:18 15:5
  41:22
**insured**  6:20 7:2
**intercept**  44:5
**interchangeably**
  69:3
**interest**  27:3 35:25
**interested**  13:17
  13:23 71:5 72:14

**interesting**  11:1
  63:20
**interfacing**  28:21
**interfere**  10:1
**interfered**  42:5
**intervene**  29:20
**intrigued**  15:14
**investigation**
  14:12
**inviting**  58:8
**involve**  18:4,6
**involved**  31:13
  38:22 44:20 59:4
  65:11 68:5
**involvement**  28:24
**involves**  37:23
**involving**  37:25
  39:5 43:7,8 47:25
**issue**  12:4 23:5
  24:25 42:3 48:14
  56:5 63:23 69:25
  70:24
**issued**  43:13
**issues**  9:10,22,25
  14:13,19 15:24
  30:10,13 39:1
  46:18
**item**  53:12 63:15
**items**  57:17

**j**

**jamie**  33:9 36:3
**jan**  72:21
**january**  54:14
**job**  39:12 40:20
  70:5
**jr**  1:8
**judge**  1:8 16:23
  24:17,17 64:17
  68:6,10
**judges**  68:15

**judgment**  29:12
**july**  11:5
**june**  11:5 13:19
**justice**  31:18
**justification**  57:21
**justified**  50:1
**justify**  49:1
**justifying**  51:2

**k**

**k**  5:21
**keeping**  44:9
**kellogg's**  68:22
**kept**  48:7
**kinds**  14:6
**know**  6:22 8:8,13
  8:17,21,21 9:3,4,9
  9:11,11,17,17,20
  11:15,16,17 12:4,5
  12:9 13:3,18,21
  14:12,21,25 15:8,9
  15:13,24,25 16:12
  16:13 17:9 18:5
  18:12,16 19:8
  20:6,10,22 21:12
  21:16 22:8,11
  23:21 24:1,3,15,24
  25:25 26:6,7,14,18
  26:21,22 27:4,23
  28:4,5,11,14,15,19
  28:21 29:13 30:10
  30:16 31:6,14,20
  32:7 35:17,23,23
  36:5 37:20 38:19
  38:21,24 39:6
  40:12,15,19,22,24
  41:16,19,21,23,25
  43:9,10,12,22,24
  43:25 44:3,12,13
  46:10,11,15 47:4
  47:19 48:19,23,24
  49:1 50:14,15,17

**50**:21 51:3,6,14,21
  53:4,6 55:22 56:3
  56:4 57:21 59:11
  59:13 60:10,11,13
  61:5 62:7 63:3,13
  63:14,15,18,18,20
  63:23 64:5,16,23
  65:1,4 68:2,11,14
  68:21 70:6,11,13
  70:13,21
**knowing**  64:24,25
**knowledge**  11:19
  37:10 44:14 66:17
**knows**  17:16 37:23
  41:17
**kramer**  68:10

**l**

**l**  5:21,21 68:20
**language**  61:20
**large**  9:5 15:8 18:9
  18:10 72:7
**lauderdale**  1:13
**law**  25:23
**lawsuit**  56:24
**lawyers**  56:8
  62:11,15
**lay**  59:12
**lead**  36:3
**leadership**  32:15
**leads**  19:22
**learn**  11:22,25
  41:5
**learned**  10:18,23
  39:22
**led**  11:10 14:13
**left**  14:17 53:23
  54:21 55:17
**leftover**  53:13
  54:22
**legal**  34:8

**legitimate** 17:7
28:5
**letter** 3:10 10:11
11:1,15 32:22
33:1,4 36:16 38:2
51:16 53:7 57:18
57:23 58:1 68:1
70:19
**level** 15:10 19:17
55:25 56:1
**life** 45:10
**liked** 32:2 42:6
59:8 68:3
**limitations** 31:3
31:25
**limited** 30:15
33:25
**line** 56:11
**link** 12:7,9 13:8
**links** 12:8 63:8
**list** 30:16 31:6
32:14 57:20 58:4
**listen** 30:5
**lists** 57:17
**litigants** 68:6
**litigation** 1:5 6:24
11:18 18:24 40:14
51:21
**little** 5:6 16:17
20:13 70:17
**live** 9:12
**load** 22:15 51:4
62:13 69:10
**loaded** 28:22
**lock** 45:10
**lone** 32:14
**long** 6:10 17:5
18:3 32:3
**longer** 7:15
**look** 13:14,16 15:2
25:5 26:18 33:17

40:4,5 43:24
49:18,23 56:7
58:3 59:17 62:10
65:15,19 70:11
**looked** 15:22 40:7
57:25 58:5
**looking** 11:2 14:3
35:1 38:13 58:17
63:9
**lose** 29:17
**losing** 48:7
**losses** 15:18 60:4
61:12,19 62:1
**lost** 9:8 30:18 48:7
**lot** 18:7 24:25
26:18 31:12 35:23
45:13 50:12 51:1
55:20 59:6 64:22
71:2
**low** 41:23 57:5
66:5,6,7,9
**lower** 18:6 21:1
65:9
**lucrative** 14:20
**lumped** 68:8

**m**

**magnitude** 66:8
**mail** 30:22 44:6,8
44:8,9
**mailed** 58:7
**major** 51:20
**making** 6:16 19:20
36:8 44:12 66:13
**marbles** 29:10
**mark** 58:12
**marked** 5:12,14
32:20,22 52:16,18
58:13 65:16
**marketing** 45:6
**martin** 72:7,19,20

**material** 39:20
**materials** 33:25
42:6 62:17 63:7
**math** 36:10,11
**matter** 20:12,18
25:5 55:17
**maximum** 15:6
20:24 35:14
**md** 1:4
**mdl** 1:3
**mean** 8:10 12:13
23:20 28:18 29:6
36:10,10 37:16
58:2 65:14
**meaning** 18:11
**means** 15:1 29:8
31:9
**measure** 66:23
**mechanism** 56:2
**medication** 9:18
9:18
**medications** 8:23
**medium** 11:25
**meet** 18:11
**member** 5:10 11:3
28:3,6 38:13 39:8
39:15 44:21 45:19
45:21,25 46:1,13
58:22
**members** 14:21
15:15 17:1 38:10
41:18 58:25 64:8
65:25 66:1
**mentioned** 29:2
**mercedes** 19:9,16
19:17
**merits** 39:17
**metcalf** 38:1
**miami** 72:5,16,16
**microscopic** 51:3
65:14

**middle** 8:14
**million** 25:7 34:5
35:2 36:19 41:13
41:22 50:21 65:25
66:10
**mind** 59:10
**mine** 4:24
**minimum** 18:20
18:21 61:7 66:24
**minor** 13:21
**minute** 52:7
**minutes** 30:7 71:8
**missed** 31:20
**missouri** 31:21
**misspelled** 68:19
**misstating** 50:6
**mistaken** 41:1
**misunderstood**
45:17
**modest** 51:5
**modify** 34:20
**modifying** 34:17
**moment** 38:23
62:12 65:20
**momentarily**
10:12
**money** 7:1 13:22
36:4 43:11 46:23
47:1,7,8,16,23
48:8 49:10,11,13
49:15,16,19,19,23
50:7,8,13,16 54:2
54:21,22 55:14,17
56:19 61:20
**monies** 25:11
**monitor** 28:2
**monitoring** 44:18
44:24 46:2 54:3,4
67:1
**months** 47:3,16

**morning** 4:8,9
8:25 71:15
**mother** 37:18
**motion** 3:12 40:2,4
40:6 63:25 64:3
65:16
**motivation** 51:15
**mouth** 21:5 67:21
**moving** 16:15 27:5
**multiplier** 19:2
20:5 22:3,17 35:8
36:25 37:2 49:24
49:25 50:9 51:6,7
**multiplying** 35:15
**multitude** 22:6
**myriad** 39:1

**n**

**n** 1:18 5:20,21,21
5:21 6:18
**name** 4:10 5:18
37:25 43:13
**named** 29:20
**names** 43:24 46:12
**narrow** 63:15
**narrowy** 70:16
**nasty** 68:18
**nathan** 2:4 3:4 4:7
4:10 5:12,16
32:20,24 52:6,11
52:16,20 58:12,15
65:18 69:20 71:11
71:13
**nature** 15:20 20:3
20:5 22:1,15
66:14
**nearly** 47:7
**necessarily** 18:9
29:14 36:5,24
39:21 50:7 70:9
70:21

**necessitated** 67:9
**need** 8:13,18 15:2
19:11,12,17 30:9
59:14 70:21
**needed** 38:22
55:22 57:25
**needs** 23:8 50:22
54:14
**negative** 47:10
**negotiate** 29:23
**negotiations** 50:24
50:24
**neither** 72:13
**net** 22:14
**never** 11:12 29:5
42:19
**new** 2:3 9:12,12
13:1 30:20,20,21
**news** 12:11 32:8,8
32:11 37:25
**nice** 39:12
**nodding** 8:4
**northern** 1:1
**notary** 72:7
**notice** 1:21 3:10
5:13,14 10:5
13:14,24 15:22
18:1 52:13 59:13
67:11 72:8
**notwithstanding**
23:15
**nought** 16:11
**november** 5:2 9:6
9:7 32:25 33:6
38:2
**nuances** 15:23
**null** 29:3
**number** 7:22
16:18 18:17 35:1
35:2,5,15 36:12
57:17 60:1,8 61:1

61:2,3 64:7 65:7
65:13 66:5,6,7
**numbers** 60:25
61:4
**ny** 2:3

**o**

**o** 1:18,18
**oath** 7:24 60:12
**object** 9:1,2 36:24
37:7,14 46:13
64:24
**objected** 10:12
25:11 30:16,24
59:4 66:2 69:11
69:22
**objecting** 5:8 25:6
37:10 57:10
**objection** 4:18,23
4:24 5:4 6:16
16:16,19 17:2,8,12
17:20,24 18:2
23:3,16,18 25:13
25:15,19,20 29:19
30:8 31:10,17
33:3 34:17,18,21
34:22 36:17 37:3
49:12,21,22 50:3,7
51:9,25 52:3 57:7
58:7 63:14 64:18
65:2 69:8,14 70:9
70:14,20
**objections** 6:7
19:22 23:7 26:10
31:6,23 43:23
44:22 57:20 58:3
64:8,21,21,22 65:8
65:10,13 66:10,11
66:14 67:25
**objector** 26:22
68:7,9,11,16 69:2

**objectors** 26:9
**obstreperousness**
22:10
**obtain** 34:7 46:1
**obviously** 44:14
49:23 61:7 64:9
**occasion** 42:17,18
42:19
**occurred** 9:6 11:6
12:17 43:4 46:2
**offer** 51:22 59:6
**offered** 15:14
51:10
**office** 10:7 43:25
44:1
**official** 72:15
**oftentimes** 60:25
**oh** 11:3 12:1 37:21
41:4 64:12
**okay** 4:17 5:6,12
7:3,6,16,19,22
8:11 9:21 10:10
10:22 11:21 12:16
13:11 15:4,17
16:15,23 17:23
18:9,10 19:17
23:25 24:1,13,21
25:12,18 26:1,16
29:1 31:1 32:20
33:12,21 34:11
35:9 37:4,9 38:5
38:18 39:3,20
40:1,9,22 41:3,4
41:15 42:25 43:2
43:17 46:17 49:25
50:2 51:8,14 52:6
52:25 54:17,24
55:10 56:7 57:9
57:13 59:16 60:7
60:19 61:10 63:24
66:7 67:16,24

70:9 71:8,10
**once** 6:4 23:9
  33:23 45:10,11,12
  53:2,3
**ones** 28:10,20
  30:23 45:13
**online** 42:8 43:22
  52:22,24
**open** 11:10
**opened** 43:11
**opening** 43:10
**opinion** 48:11
**opportunity** 10:17
  33:7 62:8 63:24
**oppose** 17:17
**opposed** 59:11
  67:21
**opposing** 22:11,12
  68:6
**opt** 29:6,14
**opted** 29:4,5
**order** 16:24 17:3
  22:25 23:12 24:14
  26:23 49:5
**originally** 12:17
**outside** 31:22
**outstanding** 34:4
**overall** 21:16
  39:16
**overlapped** 45:14
**oversee** 28:18
**oversees** 28:18
**overwhelmingly**
  65:23

**p**

**p** 1:18
**page** 3:8 33:16,17
  33:19,22 38:5
  53:11,11,11,12
  56:7,11 57:9
  59:17 61:10 62:10

65:20 66:22
**pages** 33:24
**paid** 22:5 23:4
  25:11 44:17 45:9
  45:10 51:15 53:21
  53:22 54:10 56:9
  62:11,13,15,21
**paltry** 61:6
**paperwork** 40:5,8
  64:16
**par** 65:9
**paragraph** 38:6
  65:21
**paraphrasing**
  38:14
**part** 10:12 34:14
  42:25 43:1 44:24
  48:12 49:8 55:16
  60:24
**participate** 14:10
  15:9 29:9 39:13
  41:18
**particular** 27:1
  39:4
**particularly** 68:18
**parties** 16:24,25
  56:4 72:14
**party** 6:16 16:18
**pass** 38:10
**pattern** 47:20
**pay** 18:25 25:20
  26:16 43:12 45:5
  49:4 60:2,3 62:22
**paying** 55:25
**payment** 25:4
  61:12
**payments** 54:5,20
**payout** 41:22
**pdfs** 63:8
**pearlyck** 72:7,19
  72:20

**pejorative** 68:15
**pembroke** 5:25
  11:24
**pending** 21:20
  29:13
**pennsylvania**
  31:18
**people** 15:11 18:5
  18:6,8 19:18 21:1
  24:25 35:23 36:6
  43:10,23 49:2
  55:1 62:7,8 64:24
  71:2
**people's** 43:24
**percent** 34:24 41:1
  41:3,15 65:25
  66:2
**perfectly** 49:3
**period** 7:10,24
  11:16 31:22 54:10
  54:13,25 55:1
  65:22
**permitted** 51:11
**person** 17:16
  18:20 20:24 28:4
  43:16 49:5 59:12
**person's** 48:21
**personal** 9:7,12
  13:18 20:14 43:19
  43:20 72:10
**pertinent** 63:13
**petty** 51:14
**phone** 30:19
**phony** 20:8 44:7
  47:6,9
**phrase** 5:1 24:8
**picked** 22:11
**pieces** 53:8
**pines** 5:25 11:24
**place** 9:12 28:23
  46:16 72:13

**places** 60:9
**plaintiff** 29:20
**plaintiffs** 1:21 2:4
  3:9 5:15 18:14
  32:23 52:19 58:14
  63:25 65:17
**plan** 30:2
**plate** 14:19
**play** 29:10
**pleadings** 40:1
  64:19
**please** 8:13 52:17
**plenty** 43:23
**plus** 51:13
**pocket** 42:10
  46:24 60:3 61:12
**point** 4:14,17
  13:23 19:14,14,20
  20:19 36:4,8
  45:14 46:15 53:24
  54:17 55:11,22
  57:9 66:13
**points** 59:25
**poisons** 19:21
**policy** 55:25
**popped** 46:10
**portion** 61:13 62:9
  62:22 64:14 69:9
**position** 16:2
**positive** 16:13,15
  65:24
**possessions** 9:7
**possibility** 23:11
**possible** 8:3 26:12
**possibly** 34:17
**pot** 49:19 50:20
**potentiality** 26:10
**powerful** 42:1
**practically** 28:19
**precisely** 46:5

preliminaries 5:18
preparation 31:2
  32:4 39:21
prepare 30:14
present 2:5 5:23
press 68:6
presumably 55:23
  70:13
presume 69:15
presumed 63:11
pretty 14:22 25:23
  27:2 35:22 36:13
prevent 8:24
  26:12
previous 67:3
previously 51:8
  67:14
prey 55:21,21 56:2
primarily 30:23
principal 51:12
print 52:23
printed 52:22
prior 26:1 38:7
  54:8 69:6
probably 13:3
  27:17 50:12,13
  51:4 57:6
problem 9:13 13:3
  17:5 26:5 35:7,10
  50:14 63:21 70:14
problems 12:23
procedure 56:6
proceedings 3:1
  28:2 37:20
process 15:3,15,16
  16:5,8 38:9,16
  41:25
processed 26:23
professional 68:9
  68:11,13 69:2

professions 27:16
program 64:23
  67:11
progressive 28:12
promptly 47:22
properly 64:18
property 30:11
proportionally
  54:5
proposals 68:2
proposed 4:18
  16:20 38:7,14,20
  39:5,17 63:25
  68:2 69:7
protect 61:22
protection 67:6
protocol 67:12
proven 48:25
provide 59:18
provided 32:2
  48:20 49:10,13
  54:4
providing 14:20
  15:8 67:20
provisions 14:5
public 72:7
pull 30:15
punitive 6:10 27:8
  27:15 29:2 45:20
purport 51:22
purported 64:21
purpose 4:13
  10:10
pursuant 1:21
  72:8
pursue 29:17
put 14:21 21:4
  22:9 26:7,14 28:4
  28:11 44:7 46:22
  47:1,7,8 58:1,6,11
  67:21 68:4

putting 57:23
  62:12

## q

question 8:7,11,15
  17:23 19:9 22:18
  22:19 26:1 29:3
  59:9,10,15,18
  62:10,16,18 64:11
  69:21
questions 3:11
  17:7 53:17 58:13
  58:18,23 59:2,16
  60:20 71:14
quibbling 70:24
quick 65:15
quite 50:16 59:5
  63:21 70:6

## r

r 5:21 6:18 68:20
race 19:13
raised 36:5
range 22:8 61:5
rate 18:15,16 19:2
  19:3 20:1,1,3,8,9,9
  20:14,20,21 21:8,9
  21:9,12,14,17,17
  21:18,22,24 22:3
  35:14 50:10,10
  63:16 69:9
rates 18:11 19:19
  32:14 35:11,12,16
  37:1 49:22 70:12
reach 23:8
reached 16:1
read 13:15 14:14
  15:22 30:9 32:7,8
  33:7 34:9 52:21
  52:22,23 53:1,3,7
  53:16,17 57:10
  59:12,24 60:16

63:6,6,7,24 64:6
  64:15 66:19 71:18
reading 52:13
  53:15 59:21,22,23
  60:5,13,18 64:7
  67:13 71:20
ready 9:16
real 28:24 41:24
  65:3 67:20,21
realized 55:4
really 11:12 15:21
  15:24 16:1,5,5,6
  18:3,22 38:25
  39:2 41:21 43:19
  45:6 51:18,19
  53:3 63:15,22
reap 34:3
reason 20:12 36:7
  50:21 57:20 62:16
reasonable 49:4
  57:5
reasonableness
  6:21
reasons 22:16
  51:10 55:20
recall 13:11 14:4,9
  15:18,23 27:20
  31:1 32:11 34:11
  34:20 45:12 52:12
  52:25 53:15 58:16
  59:21,22,23 60:5
  60:13,14,17 63:8
  63:10 64:7,10
  65:6,8 67:13 70:4
recalled 30:23
receipts 31:7
receive 56:19
recess 52:9
recipient 45:11
recognize 19:8

recollect  34:25
recollection  11:21
  14:4 31:12 33:10
  66:4
record  8:6,22
  20:23 69:17,19
  71:11,12 72:11
recorded  31:9
recross  3:2
rectify  14:1
rectifying  12:4
redirect  3:2
redirected  44:8
redress  55:14 67:9
reduced  72:10
reducing  49:11,15
  49:16
refer  68:10
reference  58:6
  59:11 60:14
referenced  9:25
  13:24 45:20 46:18
  60:8 61:14 67:25
references  56:18
referencing  13:19
referred  16:16
  33:8 61:1 68:7,9
referring  35:3
  63:10
reflected  63:13
reflections  14:15
reflects  32:16
refresh  33:10
refunded  47:22
refused  48:1
regarding  42:4
regardless  20:3,18
  26:24 68:23 70:19
reimbursed  48:17
  55:7

reimbursement
  15:7 54:1,7 56:14
  61:14,24
related  18:3 46:9
  61:19
relates  63:11
relating  11:2 13:6
  40:2
relatively  13:1
remain  53:25
  55:12
remaining  55:12
  65:21
remedies  24:16
remedy  29:18 46:2
remember  8:20
  60:17
rep  69:15,16
repeat  8:8
rephrase  8:9
report  12:24
reported  61:2
reporter  5:19 8:6
  71:18
reporting  14:13
reports  45:4,5
  60:23
represent  17:1
  18:14 21:7
representative
  27:6,22,24 57:1
representatives
  56:19
representing  7:2
  25:22
request  24:22,23
  30:4 37:17 62:23
  64:14
requested  24:10
requesting  25:19
  41:12 52:3

research  31:11
reserve  24:15
residence  11:6
  44:2
respect  10:4 19:23
  21:6 25:13 30:11
  65:8
response  65:24
responsibility
  28:7
restitution  55:13
  60:2
result  44:10
results  34:4 65:23
returned  55:14,18
reverse  34:7 36:1
  36:9
review  10:19 32:5
  32:7,19 39:23
  40:1 44:3
reviewed  13:6
  32:2,12,13,17
  33:25 39:21 66:4
reviewing  13:11
revise  33:23
rewarded  34:2
ridiculous  51:24
  52:1
right  5:5 8:12
  13:10,17 24:15
  26:24 29:17 30:4
  34:23 39:19 41:16
  44:16 46:5 47:4
  48:25 50:5,12
  51:13 54:16 57:12
  59:23 60:22 63:17
  66:18,18,21 69:1
ripped  18:5
risk  22:10,13
  28:16

risks  56:23
road  24:3
rolls  19:12
rome  17:15
royce  19:12
ruben  37:25
rules  8:3 68:13
ruling  40:3
running  19:13

s

s  1:18 5:20 19:10
  19:14 68:25
s.w.  5:24
s550  19:11
satisfy  49:11,17
saw  11:14 51:17
  65:4
saying  5:8 16:10
  19:16 21:4 23:18
  24:19 36:1 37:23
  41:20 51:25 54:18
  55:24 70:10
says  24:15,20 33:2
  33:22 50:20 53:12
  53:24 54:8 55:11
  56:12,20 57:15
  59:18 60:1 61:11
  61:20 65:21 66:22
  68:10
seal  72:15
search  12:2,8
  31:16
seated  17:15
second  12:8 33:1
  33:16,22 47:20
  53:23 56:20 59:17
  62:10 66:22,22
  69:17
secrets  44:1
section  54:21 56:8
  56:10,11,17 57:15

59:21,23 61:10
**securities** 51:21
**security** 1:5
**see** 5:7 23:10 24:4
  36:11 37:24 50:23
  53:12 56:15 59:19
  65:10
**seek** 24:16 51:9
**seeking** 29:20
  35:21 51:23 52:3
**seen** 10:5 19:4
  26:13 41:7 59:2
  60:24 61:2,3,3,4
  68:15
**select** 53:25 56:4
**send** 53:7
**senior** 20:24
**sense** 13:5 61:6
**sent** 10:7 58:7
  68:17
**sentence** 33:21
  38:6 56:20 60:1
  60:10,13 62:19,21
**separate** 24:1 26:4
**separately** 62:22
**serial** 68:7,16,20
  68:24
**series** 32:16 47:3
**serve** 54:10 67:9
**served** 27:6
**service** 56:22 57:1
**services** 67:1
**set** 58:8,10 61:8
**settled** 27:11
**settlement** 3:11
  4:18,21,22,25 5:4
  5:9 10:13,17,19,20
  10:23 11:14 12:13
  12:15,22 13:7,13
  14:5,8,16,20 15:19
  15:25 16:2,12,14

16:20 18:1 22:22
  23:6,8,9,13,17,19
  23:24 24:9,12
  25:3,5,9,9,16,25
  26:2,6 29:12,16,24
  33:2 36:17 37:11
  37:14,16 38:14
  39:17 41:6 44:15
  45:13 48:11 49:10
  52:14,18 53:13,19
  53:21,22,24 54:9
  55:11,16 57:10,16
  58:17 59:13,18
  60:7,21,25 61:5,11
  62:6 63:6,7 64:1,9
  64:13 65:22 67:2
  67:4,22 69:8,12,13
  69:23,24,25 70:2,5
  70:22 71:1,5
**settlement's** 67:11
**settlements** 26:13
  38:7 59:4 67:3,7
  68:3
**shakespeare** 17:14
**shepherding** 40:21
**short** 35:22 52:7
**shot** 47:12
**show** 5:2 17:10
  33:1
**shown** 72:10
**shows** 20:23 33:24
**shut** 48:2
**side** 6:23 55:21,21
  56:2
**sift** 33:23
**signature** 33:18
  72:19
**signed** 44:25 45:12
**signing** 45:14
  71:20

**similar** 67:13,15
  68:7
**simple** 8:3 14:22
  16:6
**simplistic** 59:7
**simply** 5:8 36:14
  38:10
**sir** 30:25
**sit** 15:23 59:22
  60:17 64:10
**sitting** 17:20 37:19
  43:15
**situation** 47:10
**six** 47:2 65:21
**sixth** 59:17
**size** 66:23
**skimmed** 53:4,5,8
**slightly** 5:1 36:21
**society** 19:21
**solicitor** 72:13
**solid** 34:4
**someone's** 44:4
**sorry** 7:12 53:11
  62:21
**sort** 12:6 17:13
  19:8 20:5 26:20
  28:17 32:6 43:15
  52:4
**sought** 69:10
**southwest** 5:23
**span** 21:16 47:2
**speak** 8:4 29:10
  30:7
**speaking** 10:16
  51:25
**specific** 15:23 31:1
  39:5 43:3 59:9,15
  59:23 60:11 63:9
**specifically** 60:12
  60:17

**specified** 72:13
**spectrum** 18:7
**speculation** 9:4
**spell** 5:18
**spelled** 68:20
**spend** 32:9 48:23
  61:20 65:19
**spending** 20:16
**spent** 7:1 32:4,9
  36:4 54:6 56:23
**spoken** 37:9,18
**sponsored** 12:9
**spurred** 31:11
**stage** 50:18
**stand** 22:19
**standard** 18:12
  21:9
**star** 22:15 51:4
  62:13 69:10
**stars** 32:15
**start** 17:16 28:20
  47:18
**started** 47:18
**starts** 33:21
**state** 31:8 44:1
  67:6 72:4,7,16
**stated** 24:11 36:18
**statement** 4:21
  70:10
**states** 1:1 28:16
**stating** 67:17
**steal** 44:4
**steven** 1:20 2:4 3:3
  4:2,10 72:8
**sticking** 53:18
**stinks** 71:4
**stolen** 42:13
**straightforward**
  16:6 38:16
**street** 2:2
**strike** 69:21

strikes 34:5 36:19
strong 16:14
strongly 20:4
structural 23:5
  26:5
structured 25:25
  26:2,11
studied 15:25
stuff 16:11
styled 27:21 64:3
  64:18
subject 11:18
subjected 28:8
subjects 63:19
submission 63:3
submit 15:12 16:8
  16:11 39:8 61:23
  62:7
submittals 63:12
submitted 11:6,7
  24:9 36:16 51:18
submitting 13:17
  25:19 39:10
subsequently 8:20
substantial 27:2
successful 25:18
  29:19 51:9 52:2
sudden 24:18
  50:19
suffered 42:15
  55:3
suggested 37:13
suggestion 37:6
suit 72:14
suite 1:13
sum 13:22
sums 61:6
super 43:20
supersedes 28:25
supervision 72:11

supplemental
  32:13
support 4:22
  16:14 33:23 36:16
  56:25 57:3 67:4
  67:16 70:22 71:7
supported 57:2
  69:13
supportive 39:17
supposed 20:17
  64:21
supposedly 45:4
sure 5:17 8:22
  17:5 21:5 22:19
  41:19 52:8 57:4
  69:18
surprise 40:16,19
  41:5,9
surprised 41:11
surrounding 9:10
suspected 43:4
sweeps 18:7
sweeten 50:20
sworn 4:3 72:9
system 31:8

**t**

t 1:18 5:20 6:18
tagalong 32:15
  51:17
take 4:13 8:10,16
  8:17 9:18 15:2
  16:24 17:18 22:1
  22:4,6 24:25 25:1
  26:15,18,24 29:10
  32:7 34:6 42:3
  49:18 52:7 53:8
  62:8 65:15 70:11
taken 1:21 6:2 7:3
  7:6 23:7 28:9
  46:23 52:9 62:1
  72:13

talked 61:17
talking 17:16
target 46:7,7
telephone 34:12
telephonically
  30:5
tell 15:21 57:15
term 68:7,14,15
  68:24
terms 10:19 57:23
  62:1,6 67:17,18
terribly 63:19
testified 4:4 72:9
testify 72:9
testimony 6:25
  8:25 9:14,15,23
  10:2 25:14 48:10
  72:10,11
thank 71:14,16,16
theft 11:5,19 12:5
  43:1,10 61:21
theirs 28:25
theoretically
  23:23
thing 8:14 13:15
  15:5 19:7 29:9
  37:20 47:18 48:1
  54:24 71:1
things 11:7 12:24
  14:6 22:25 26:17
  27:3 32:7 34:25
  38:12 43:22,25
  45:4 49:7 57:17
  66:14 68:19
think 6:8,8,25
  9:13 10:25 12:4,7
  12:10,11,12 13:2
  13:15 14:13 16:23
  17:2,8 20:8,20
  21:17,20,23 22:12
  22:23 23:6,7,21

24:3,17,24 26:8
  27:10 28:22,25
  29:23 30:6,7
  31:21 33:8,9 35:3
  35:5,17,19,21
  36:23 37:7,23,25
  38:22 40:9,25
  41:7,23,24 42:1,20
  43:11,13,18 44:19
  44:25 45:9,10
  46:9 47:5 48:21
  49:21 50:11 51:2
  51:6,11,16,23,25
  53:3 55:19 56:1,6
  57:6,19,20 58:6,9
  58:20,24,25 59:5
  60:8 61:9 62:8
  64:3,15 66:20
  67:25 68:8,16,17
  68:19,19,21,24
  69:16 70:5 71:8
thinking 36:15,20
thinks 70:25
third 33:17,22
  56:11 62:21
thomas 1:8
thorough 59:5,8
thought 16:1,4,5
  17:13 18:13 34:15
  34:24 35:6 38:15
  39:1,11 45:19
  49:3 59:7 63:20
  68:1
thoughts 62:12
thousand 35:18,19
thrash 1:8
threatened 28:13
threats 28:13
three 35:8,15
  36:25 37:2 41:8
  46:12

thrown 22:22
tie 23:23
tied 27:1
ties 26:25
time 6:10 7:10
    10:22 13:25 14:21
    16:7 20:16,18
    21:16,16 28:15
    32:7 36:19 37:9
    37:13 44:1,16
    45:1,3 47:6,20
    48:21 49:1,4
    50:25 51:1,3,7,14
    51:18,22 52:6,12
    54:6,13 56:22
    70:15 71:14 72:13
times 6:8,15 44:20
    59:6 69:22 71:2
timing 50:17
tiny 51:3 65:14
    66:11
titled 5:3 56:18
today 4:13 10:10
    17:21 37:22 48:10
    60:17 64:10
today's 30:14
token 38:7
told 47:23
tone 18:18
tool 45:6 49:2
top 33:16 61:10
    66:22
topic 27:5 59:15
tossed 19:19
total 41:5 66:25
totality 6:12
totalled 47:5
totally 17:8 18:18
    43:14
traceable 61:22
    62:3,4

trade 67:5
transunion 12:25
tried 35:6 58:4
trivial 13:21
true 72:11
truly 26:22
truth 72:9
truthful 9:15 10:2
try 17:18 31:5
trying 6:8 14:1
    19:13 34:25 35:18
    42:3 71:5
tuesday 1:14
turn 15:13 57:9
    66:21
turns 18:19 19:3
    19:20
twenty 7:11
two 6:25 30:7
    31:20 33:16 46:12
    46:18 47:16 59:16
    71:8
twt 1:4
typewriting 72:10
typically 28:20

**u**

u.s. 44:7
uh 8:5 46:20
ultimately 48:24
    58:9
underlying 25:16
    39:23 69:12,13
understand 7:24
    8:2,7,11 21:3,25
    31:3 36:15 39:9
    45:23 52:2 66:13
understanding
    54:12
understood 54:23
    65:3

undertook 56:23
undisputed 25:11
unfair 23:4
united 1:1
unprecedented
    67:2
unreimbursed
    61:12
upward 20:6
use 19:2 43:20
    45:7 56:1
useful 17:13 63:19
utilized 11:9 30:23
utilizing 45:2

**v**

v 5:20
valid 54:9
validity 54:19
valuable 48:21
value 41:6,23,24
    60:21,24 61:4
    66:25,25 67:2
variety 44:21
varying 60:23
vehicle 67:9
venued 31:15
verbiage 26:15
versus 20:11 41:2
    70:24
vested 27:2
victim 9:5
view 49:24 62:25
    70:8
viewed 63:2,3,4
voice 70:22 71:7

**w**

w 1:8
wage 18:20,21
waive 71:18,19

waived 71:20
walmart 18:20
want 21:4 22:18
    25:15 35:21 48:6
    50:23 54:2 60:11
    67:20
wanted 5:7 7:1
    15:8,12 16:7
    25:22 32:5 70:22
    71:7
watching 37:19
way 18:19 24:8
    25:25 26:3 27:9
    35:4 45:8 65:3
we've 42:4
website 12:11,13
    12:14,15 13:16
    16:4 18:2 38:25
    40:6 58:17 63:8
    63:12 64:5
weeks 65:21
went 15:15 23:3
    50:22
whitehall 2:2
willing 17:10
windfall 34:3
wiped 9:8
withdraw 34:21
withdrawing
    34:17
witness 3:2 4:3,5
    7:4 52:8 71:16,19
    71:20 72:10,11,15
word 61:25 68:18
words 21:4 33:16
    38:15 54:1 67:21
    69:11
work 12:21 19:25
    26:21 28:22 34:1
    34:2 36:3 38:25
    50:22

**[worked - zone]**                                      Page 18

| |
|---|
| **worked**  47:17 |
| **working**  14:23 |
|    18:20 20:17,17,24 |
| **worth**  34:16 |
| **write**  71:3,4 |
| **writing**  51:16 |
| **wrote**  33:4 38:3,6 |
| **x** |
| **x**  1:9 |
| **y** |
| **y**  5:21 |
| **yeah**  13:14 27:20 |
|    41:7 51:13 57:14 |
|    58:2 |
| **year**  7:23 31:22 |
| **years**  7:11,13 |
|    21:20,22 46:9 |
| **york**  2:3 |
| **z** |
| **zone**  59:10 |

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

### VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.