# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

- - -

_____

IN RE:                       )
                             )
EQUIFAX, INC.,               )     CASE NO:1-17-MD-02800-TWT
CUSTOMER SECURITY            )
BREACH LITIGATION            )     **ROUGH DRAFT**
_____

- - -


        Deposition of MR. GEORGE W. COCHRAN,

    the Witness herein, called by the Plaintiffs

    upon cross-examination, pursuant to the Federal

    Rules of Civil Procedure, was taken before me,

    Donna S. Smith, a Notary Public in and for the

    State of Ohio, located at Regus, 2000 Auburn

    Drive, One Chagrin Highlands, Suite Number 200,

    in Beachwood, Ohio 44122, on Friday, December

    13, 2019, beginning at 1:27 p.m.

2

1    **APPEARANCES**:

2    ON BEHALF OF THE PLAINTIFF:
     Equifax, Inc., Customer Data
3    Security Breach Litigation

4        Mr. John Yanchunis, Esq.
         JYanchunis@forthepeople.com
5
     MORGAN & MORGAN
6    One Tampa City Center
     201 North Franklin Street, 7th Floor
7    Tampa, Florida 33602
     (813) 275-5275 - Phone
8    (850) 509-5641 - Cell
     (813) 222-4736 - Fax
9
     and
10
         Mr. Patrick A. Barthle, II., Esq.
11       PBarthle@ForThePeople.com

12   MORGAN & MORGAN
     One Tampa City Center
13   201 North Franklin Street, 7th Floor
     Tampa, Florida 33602
14   PBarthle@ForThePeople.com
     (813) 223-5505 - Office
15   (813) 229-4023 - Direct
     (813) 222-4708 - Fax
16
     **ALSO PRESENT**:
17
         Mr. Ivan Bercian, Videographer
18       Cady Reporting Services
         The Western Reserve Building
19       1468 West Ninth Street, Suite 440
         Cleveland, Ohio  44113
20

21

22

23

24

25

1                    **INDEX TO WITNESS**

2   **Witness**                        **D     C      RD      RC**

3   George W. Cochran

4        By Mr. Yanchunis, Esq.              6

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1        **INDEX TO EXHIBITS**

2    **PLAINTIFF**                          **MARKED**    **IDENTIFIED**

3    1 - Notice of Taking Videotaped           6             7
         Deposition and Subpoena
4        Relating to George W.
         Cochran.
5
     2 - Subpoena to George W. Cochran                        7
6
     3 - Letter dated 11/19/2019 to           37            38
7        Equifax from George W.Cochran

8    4 - Joseph Gregoria vs. Premier          69            69
         Nutrition Corp. - Motion for
9        Attorneys Fees

10   5 - Notice of Appeal                     78            78

11   6 - Stipulation-Gregorio vs.            79            79
         Premier Nutrition Corp.
12       vs. Dave Mager

13   7 - Anthem Inc. Customer Data           80            80
         Security Breach Litigation
14       Order-Laura Fowles vs.
         Leona Boone vs. Anthem
15

16

17

18

19

20

21

22

23

24

25

5

1                        PROCEEDINGS

2                 THE VIDEOGRAPHER:  We are on the record.

3    This is the beginning of Media 1 in the Deposition of

4    George Cochran in the matter of: In Re: Equifax, Inc.,

5    Customer Data Security Breach Litigation.  Case Number

6    1:17md-02800-TWT.

7                 Today's date is December 13th, 2019.  The

8    time is, approximately, 1:27 p.m..  My name is Ivan

9    Bercian, and I am the Videographer.  The Court Reporter

10   today is Donna Smith.  We are here with Huseby Global

11   Litigation.

12                Counsel, please introduce yourselves,

13   after which the Court Reporter will swear in the

14   witness.

15                MR. YANCHUNIS:  John Yanchunis and

16   Patrick Barthle, we both represent the plaintiffs.

17                         - - -

18                MR. GEORGE W. COCHRAN, JR.,

19                being first duly sworn, was

20                deposed and testified as

21                follows:

22                         - - -

23

24

25

6

```
 1                      CROSS-EXAMINATION
 2    BY MR. YANCHUNIS:
 3         Q.   Could you, please, state your full name and
 4    address for the record.
 5         A.   George Willard Cochran, Jr..  1385 Russell
 6    Drive, Streetsboro, Ohio 44241.
 7         Q.   And you are a lawyer licensed to practice in
 8    the State of Ohio?
 9         A.   Yes.
10         Q.   And how long have you been a lawyer?
11         A.   Since 1979.
12         Q.   And you graduated from Case Western Reserve --
13         A.   Yes.
14         Q.   -- College of Law?
15         A.   Yes.
16                            - - -
17                      Exhibit No. 1
18                 was marked for the purposes
19                      of identification
20                            - - -
21    BY MR. YANCHUNIS:
22         Q.   Let me show you a document.  I marked this for
23    the purposes of identification as Exhibit Number 1, and
24    that is the subpoena in response to which you are
25    appearing here today?
```

7

```
 1        A.    This is the Notice of Deposition.

 2        Q.    I'm sorry.  But you have --

 3        A.    I have the subpoena with me.

 4        Q.    Okay.

 5        A.    Yes.

 6        Q.    Let me show you Exhibit Number 2.  This is the

 7   true and correct copy of the subpoena.  Is it not?

 8        A.    Yes.

 9        Q.    Have you ever had your deposition taken

10   before?

11        A.    That's a good question.  I can't remember ever

12   giving my deposition.

13        Q.    Have you had an occasion, however, to take the

14   deposition of others in litigation that you've handled?

15        A.    Yes.

16        Q.    So I'll go through these because I know you

17   know them well, but in connection with your deposition

18   here today, I am here to ask you questions regarding the

19   subject matter of the case pending before Judge Thrash

20   and the objections which you filed, and, to the --

21              Although, there is a Videographer capturing

22   your visual testimony and, of course, your audio

23   testimony, we have a Court Reporter who's making a

24   transcript of everything that's being said in the room,

25   so in connection with the deposition, if you could
```

8

1   please give me audible responses -- verbal responses.

2   Excuse me, not audible, so that we have a clean record.

3        Is that agreed?

4   A.   Yes.

5   Q.   Mr. Cochran, also, in connection with your

6   deposition, if I were to ask you any question, please

7   wait for my question to finish before you answer so the

8   Court Reporter can take down both of the question and

9   the answer.  Okay?

10  A.   Okay.

11  Q.   Also, if at any time I ask a question that you

12  do not understand or you would like for me to rephrase

13  it in any way so that you can respond, say so or

14  indicate, and I will be happy to rephrase it.

15       Do you agree to that?

16  A.   Yes.

17  Q.   In connection with your appearance here today,

18  are you taking any medication or do you have any health

19  conditions which might affect your memory or your

20  ability to testify truthfully?

21  A.   No.

22  Q.   We never met before, correct?

23  A.   We have not.

24  Q.   Okay.  And you understand that you have been

25  given an Oath and that you're testifying under Oath here

1   today?

2        A.   Yes.  Yes.

3        Q.   What is the nature of your practice as a

4   lawyer?

5        A.   Currently?

6        Q.   Yes, sir.

7        A.   Part of my practice is consumer litigation,

8   especially, concentrating in Mobile Home Park Law in

9   which for years, I was Executive Director of a

10  non-profit called Mobile Justice and that has since

11  closed down, but I still devote some of my time to that.

12            I also do some personal injury.  I also engage

13  in representing class objectors.

14       Q.   By that you mean you represent individuals who

15  have objections to the settlement of class actions

16  pending around the country?

17       A.   Yes.

18       Q.   How do people come to find you as a lawyer

19  representing or willing to represent objectors?

20       A.   Well, sometimes -- it's various ways that that

21  happens.  I think the most effective way has been to

22  just to let friends know in a one way email of a

23  particular subject matter, whether it's this or any

24  other matter, and then let them respond under our Ohio

25  Ethical Rules and allow them to do that.

—10—

1    Q.   Have you ever filed a class action on behalf
2  of a plaintiff?
3    A.   Yes.
4    Q.   How many times?
5    A.   Probably dozens.
6    Q.   What kind of cases were those?
7    A.   Primarily, Mobile Home Park class actions.
8    Q.   Those were on behalf of a resident against an
9  owner of a mobile home park?
10   A.   Owner/operator.
11   Q.   Have you filed any other types of class
12 actions besides those on behalf of residents of mobile
13 home parks?
14   A.   Yes.
15   Q.   What kinds of cases do they range from?
16   A.   Some are consumer related.  I'm just from
17 memory remember one against the City.  That's all I can
18 think of right now.
19   Q.   In connection with those class actions have
20 they been in State Court or in Federal Court, or both?
21   A.   I believe -- now, most of them have been in
22 State Court.  I am remembering one as it's coming to me.
23 Forgive my memory here -- against Six Flags.  Another
24 one against, I think it was Federal Court in Illinois
25 regarding what's called the Fast Pass Turnpike System.

-11-

```
 1              Mostly, State court, though.
 2       Q.    Are you licensed to practice law in any other
 3  state besides Ohio?
 4       A.    Yes.
 5       Q.    What other states?
 6       A.    Kentucky.
 7       Q.    How long have you been licensed to practice in
 8  Kentucky?
 9       A.    Approximately, 2009.
10       Q.    Have you ever taken a class -- have you ever
11  certified a class action or had a court to certify a
12  class action that you had filed?
13       A.    Yes.
14       Q.    On how many occasions?
15       A.    I don't recall.
16       Q.    More than 10, or less than 10?
17       A.    Probably, less than 10.
18       Q.    Have you ever tried a class action that has
19  been certified by a Court?
20       A.    Yes.
21       Q.    On how many occasions?
22       A.    I can only think of one.
23       Q.    And what case was that?
24       A.    It was one of my earlier mobile home park
25  cases against a prominent mobile home park operator in
```

-12-

1  Portage County involving the issue of whether a pet fee

2  was unreasonably charged.

3      Q.   A fee charged to residents --

4      A.   For having --

5      Q.   -- for an amount that you thought was in

6  access of what the law provided?

7      A.   Well said.

8      Q.   Were you successful in that case?

9      A.   Yes.

10     Q.   What was the outcome?

11     A.   Damage award and attorney fees?

12     Q.   Was it appealed?

13     A.   No.

14     Q.   Have you ever defended a class action?

15     A.   No.

16     Q.   Have you ever represented family members as

17 named-plaintiffs in a class action?

18     A.   Yes.

19     Q.   On how many occasions?

20     A.   I can't remember.

21     Q.   Are you related to Jeffrey Cochran?

22     A.   Yes.  He's my son.

23     Q.   Would that have been the case of Jeffrey

24 Cochran versus Illinois State Toll Highway Authority?

25     A.   Yes.

-13-

1          Q.    And that was filed in the Northern District of

2     Illinois?

3          A.    Yes.

4          Q.    What was the outcome of that case?

5          A.    We lost on the merits and we appealed and

6     lost.  It was affirmed on appeal.

7          Q.    Was it class certified?  Was the certification

8     denied, or did it get that far?

9          A.    I don't think it got that far.

10         Q.    Any other cases where you've represented a

11    family member as a named-plaintiff in a class action?

12         A.    Yes.  My two daughters were the plaintiffs in

13    a class action against Six Flags.

14         Q.    What are their names?

15         A.    Sara Henry and Jennifer Cochran.

16         Q.    I assume from your discussion of the law that

17    you practice, that you have relationships with clients

18    on a contingent fee basis?

19         A.    Yes.

20         Q.    In other words to make certain we are talking

21    about the same type of relationship, it's one in which

22    payment to you for your fees is contingent upon the

23    successful outcome of the litigation for which you are

24    retained?

25         A.    Yes.

14

1      Q.    What percentages do your contracts in your

2   contingency fee arrangements typically call for?

3      A.    Typically, one-third.

4      Q.    I don't know the rules in this state, but is

5   one-third what the Bar allows, or is it just what Courts

6   in Ohio typically allow?

7      A.    I think both.

8      Q.    Have you had any conversations with any of the

9   individuals who filed objections to the settlement in

10   this case?

11      A.    No.

12      Q.    Have you spoken to anyone other than your

13   spouse about the deposition here today, or the subject

14   matter of the deposition?

15      A.    When I left my house this morning to prepare

16   to come here, a couple of family members were helping

17   us.  We just bought a home.  They were helping, and I

18   said, "please pray for me.  I'm going to, you know, I

19   think my first ever deposition."  That's the only one I

20   have told.

21      Q.    Well, I won't be harsh on you.

22      A.    Appreciate that.

23      Q.    I'll commit to that.  If I am, just tell me.

24      A.    We all should undergo one at least once in our

25   careers.  It'll keep us humble.

15

1     Q.   Probably change our perspective of when we

2  take them or defend them.

3     A.   Yup.

4     Q.   When did you first become aware of the data

5  breach involving information in the position of Equifax?

6     A.   It was some time in this year.  Probably, in

7  the Fall.

8     Q.   And how did you find out about it?  How did it

9  come to your attention?

10     A.   News reports.

11     Q.   When you say, "Fall," would that have been in

12  September or October?

13     A.   I'm not sure.

14     Q.   Was the news that came to you that a case had

15  been settled or that the data breach had occurred?

16     A.   The news that had caught my attention is it

17  had been settled.

18     Q.   You had not heard about the data breach of

19  Equifax prior to that time?

20     A.   I don't recall hearing about it.  I may have,

21  but it didn't catch my attention.

22     Q.   Did you make any determination as to whether

23  or not your information was impacted in that data

24  breach?

25     A.   Not at that time.

-16-

```
 1        Q.   Have you since?

 2        A.   Yes.

 3        Q.   And how did you do that?

 4        A.   Can I just answer in a narrative at this

 5   point?

 6        Q.   Sure.

 7        A.   It might save some of the questions.

 8        Q.   Yeah.

 9        A.   Once I heard of the settlement by that time, I

10   happened to be very busy in my practice, so I made a

11   mental note to analyze that settlement, as I do any

12   other settlement.

13             By the time I had a moment to do that,

14   however, it was already in November.  That I know,

15   because when I first looked it up, I saw the deadline

16   for objections, and I thought, "oh boy.  You know, I

17   have held off too long on this."

18             And so, I believe I took several hours of one

19   day, not quite a whole day, but probably a good part of

20   the day to do what I normally do, you know, pull up

21   documents, so I'll know what to look for in analyzing a

22   settlement.

23             Then, a couple of things really jumped out at

24   me about this particular one and then I realized that

25   A: I didn't have time to fully analyze.  I never file an
```

-17-

1    objection until its fully analyzed, because I do reject

2    a lot, even though, I'm initially interested.

3              And, number two, there was no time to even get

4    the word out to see if someone had been affected by it

5    and to meet with them and, you know, all this stuff.

6              So, then, I decided, "well, 150 million class

7    members.  I think -- I bet you I'm affected.  I've lived

8    long enough."

9              So I went on the Court -- the settlement

10   website and as you know that's an online -- nice, simple

11   online claim form, and you put in, I think, your last

12   name and, maybe, the last four digits of your social

13   security number or something like that and it came out

14   that I was impacted.  I was compromised; my account and

15   my information.

16             That is when I decided, "well, I don't have

17   time to do any more analyses," just based on the two

18   concerns I had, which I categorize as initial concerns.

19   That leaves me then to go back when there's time to do a

20   full analyses.  I didn't have time to do that.

21             So I wrote a one-page letter summarizing my

22   two concerns on my own behalf, because I felt like,

23   "what the heck.  I'm a class member.  I have the same

24   right as anybody else."  So this time I won't be

25   representing somebody, I'm just gonna be a prose

-18-

1    objector.

2        Q.   Do you have any kind of credit monitoring or

3    identity theft protection service?

4        A.   No.

5        Q.   Have you ever?

6        A.   No.

7        Q.   Have you ever been affected or impacted by a

8    data breach or identity theft of any kind?

9        A.   Not to my knowledge.

10       Q.   When you found out online by going to the

11   settlement website that you were a class member, did you

12   go back and check your bank statements to see if you had

13   sustained any type of loss that you had not -- or charge

14   that you had not authorized?

15       A.   I am embarrassed to say, no, I have not.  I am

16   still just as busy today as I was then, because that

17   wasn't that long ago.  I think it was November 27.  I

18   pulled out my objection letter in preparation for today

19   and I think it was November 20 -- whatever it was.  Two

20   days before the deadline, and so it hasn't been that

21   long ago.

22            And, no, I have not.  I'll be honest with you.

23   I just haven't.

24       Q.   Have you pulled your credit report with any of

25   the three major credit bureaus to see if there are any

19

1    abnormalities or matters that come up that you're not

2    familiar with, like, opened accounts that you may not

3    have authorized?

4         A.    You're getting me nervous.  No, I have not.

5         Q.    When you found out that you had been apart of

6    the breach, did you file a police report or any report

7    with the FBI or the FTC or the Consumer Fraud Protection

8    Bureau?

9         A.    No.

10        Q.    So what you did do though is file an objection

11   to this settlement?

12        A.    Yes, because you get the benefits as you know,

13   even though, you object.

14        Q.    You filed a claim for benefits in this case?

15        A.    Yes.

16        Q.    And what did you seek in that claim?

17        A.    The three part service of -- does it go for

18   four years?  The four-year monitoring service.

19        Q.    So you elected for the credit monitoring?

20        A.    Yes.

21        Q.    That's a valuable service provided to

22   consumers?

23        A.    I wouldn't know enough to know.  It's a value

24   to me.  I definitely want that.  Sure.

25        Q.    Did you make a claim for any other benefits in

—20—

1    this settlement?

2         A.   If I recall right, I wanted to.  If I could

3    take advantage of the additional four year or not four.

4              There's an additional one provider service

5    that I couldn't figure out how to -- the claim form only

6    asked the simple question, do you want the three?  And

7    it said something, like, we'll let you know before that

8    expires.

9              Maybe, I exercised that option then.  I can't

10   remember it, but I wanted to take advantage of both for

11   reasons I'll get into here in a little bit.

12        Q.   In any of the litigation that you've handled,

13   have you ever handled a data breach case representing a

14   plaintiff?

15        A.   No.

16        Q.   Have you ever represented an individual in a

17   privacy case -- privacy violation?

18        A.   I'm not sure.

19        Q.   What's your understanding of the claims that

20   were asserted in this case on behalf of the class?

21        A.   Well, there's the Federal Fair Credit

22   Reporting Act claim, which is the primary claim.  I

23   think that was your first count.  I think your second

24   count was negligence.  Those are the two I would have

25   thought would have been the strongest.

1    Q.   Did you review the Order on the Motion to

2  Dismiss that was filed in this case by the Defendant?

3    A.   No.

4    Q.   Do you know whether or not the Fair Credit

5  Reporting Act claim survived that Motion to Dismiss?

6    A.   No.

7    Q.   Do you know what law applied to the class

8  regardless of where they lived in the United States in

9  this case?

10    A.   I believe the consumer statute of Georgia.

11    Q.   What about negligence?

12    A.   I assume that to be --

13    Q.   Whose law?  Whose State law on the issue of

14  negligence applied?

15    A.   Presumably, Georgia.  I know that you also

16  pled individual state consumer statutes, including Ohio.

17  I do remember seeing those.

18    Q.   Did you read the answer that was filed in this

19  case by Equifax?

20    A.   No.

21    Q.   Are you aware of what the Court said in its

22  Order on the Motion to Dismiss as to whose State law

23  would apply to the common law claims of all class

24  members, regardless of where they lived?

25    A.   I'm only aware that they granted the Motion in

-22-

1    part and denied the Motion in part.  That's all I'm

2    aware of.

3        Q.   So you're not aware that in the Court's order

4    on the Motion to Dismiss that the Court stated it would

5    apply Georgia law to the common law claims?

6        A.   I'm not aware from that.  I deduced that

7    logically as a lawyer.

8        Q.   Are you aware that in its order on the Motion

9    to Dismiss, the Court found that Equifax owed the

10   plaintiffs a duty of care to safeguard the personal

11   information in its custody?

12       A.   I'm not aware of anything from that order,

13   since I didn't read it.

14       Q.   Okay.  Are you aware of a case called the

15   Department of Labor versus McConnell?

16       A.   No.

17       Q.   So you're not aware if in the Department of

18   Labor versus McConnell, the case decided after Judge

19   Thrash' order on the Motion to Dismiss in this case, if

20   the Georgia Supreme Court found that there was no common

21   law negligence duty owed for the Georgia Department of

22   Labor to protect personal information including social

23   security numbers?

24       A.   No.

25       Q.   Do you see how that would put in jeopardy the

23

1    claims of the class under the common law claims --

2        A.    Yes.

3        Q.    -- if the Georgia Supreme Court had decided

4    there was no duty.  And as a Federal Judge, the Federal

5    Judge in Georgia would have to apply what the Supreme

6    Court -- what the State said about the law?

7        A.    It severely impacted the negligence count.

8        Q.    Did you assess the merits of the underlying

9    case before you filed your objection, or even at this

10   point?

11       A.    No.  I didn't have time to do any of that.

12       Q.    Do you know whether or not this was a good

13   case to bring on behalf of the plaintiffs to the extent

14   that it was both viable and winable?

15       A.    Yeah, I knew that because I think something

16   like 30 firms competed for it with lead counsel and/or

17   were literally 200 class actions.  That's what I looked

18   for.  I think there were over 100 class actions filed.

19       Q.    Do you know how many Courts in this country

20   have certified a data breach class action?

21       A.    No.

22       Q.    Would that number impact your decision as to

23   whether or not this was a good case to bring?

24       A.    I feel like you're asking me a different

25   question.  The first one was liability.  You're talking

24

1  certifiability now?

2       Q.   That's true because, obviously, if it was only

3  liability that would mean for a plaintiff you might

4  prevail, but not for the class.

5       A.   No.  I just wanted to clarify --

6       Q.   Yes, sir.

7       A.   -- because it felt like you switched gears on

8  me.  Obviously, certifiability is a critical issue.

9       Q.   All right.  Do you see in a case that if a

10  data breach occurs, there's something called Article III

11  Standing?

12       A.   Yes.

13       Q.   And what do you understand Article III

14  Standing to be?

15       A.   If I have a cognitive injury that gives me

16  standing to assert and then it depends on state

17  jurisdiction law verses federal jurisdiction law.

18       Q.   So if you get past the Motion to Dismiss, you

19  have an understanding that at trial, then you have to

20  prove that that injury that you alleged is causely

21  connected to the data breach, correct?

22       A.   Yeah, I suppose so.

23       Q.   How would you prove that?

24       A.   I'm not sure how I would prove it.  You want

25  me to think about that for a minute?

1    Q.   Well, how would you prove it for 145 and-a-

2    half billion people?

3    A.   If you're getting to the point that you had

4    these obstacles, I can see that you guys had some

5    obstacles -- serious obstacles.  I'm not denying that.

6    Q.   Okay.

7    A.   That's why you're such a good firm.

8    Q.   Would you be surprised to hear that there has

9    been no damage class certified in a data breach case

10   like this?

11   A.   Yes, I would be.

12   Q.   As a lawyer there are occasions, are there

13   not, that you believe as a lawyer it's prudent to settle

14   a legal dispute that you are handling on behalf of a

15   client?

16   A.   Yes.

17   Q.   What do you take into consideration in

18   determining whether to settle a case?

19   A.   Likelihood of prevailing on the merits.  I

20   need to ask.  It depends on what stage of the

21   litigation.

22       Are you saying immediately prior to settling?

23   Immediately prior to trial or if it's earlier than that,

24   it's likely the surviving of a dispositive Motion, and

25   how strong of an evidence I have put together.

—26—

1     Q.   How about the proving that the data breach led

2   to injury to the class?

3     A.   That I can't comment, because that's not in my

4   area of law.

5     Q.   That would be something that you would have to

6   take into consideration or the lawyers would have to

7   take into consideration as whether to settle this case,

8   correct?

9     A.   Well, as I said, I don't know enough about

10   that area of law.  I can say in my area of law, I would

11   have to take it into consideration.  That's the extent

12   of the -- I think you're asking for a professional

13   opinion here.  I think I have -- that's the limit of my

14   own knowledge, is my areas of practice.

15     Q.   But as a lawyer you have to take into

16   consideration whether or not what you allege you can

17   prove at trial, correct?

18     A.   Of course.  What I allege, right.

19     Q.   In light of the McConnell Decision where the

20   Supreme Court eventually found that there was no duty --

21   common law duty owed to the class to protect information

22   in that case, doesn't that reflect that it was prudent

23   to settle this case?

24     A.   I'd have to read the opinion as to the

25   rationale.

—27—

```
1          Q.   Do you have any problems with the fact that

2     the case was settled or is it your problem that the

3     relief isn't good enough?

4          A.   The relief isn't good enough.

5          Q.   Okay.  So you don't have any problems that the

6     case was settled, because it might have been lost at

7     trial?

8          A.   I don't have any problems with the case being

9     settled, based on what I understood.

10         Q.   And you understand that in connection with

11    risk assessment, that in settling a case, lawyers

12    sometimes advise their clients that if I can't get 100

13    percent, but I can get part of the relief I might

14    otherwise have gotten at trial?

15         A.   I can see that.  Yes.

16         Q.   What is your understanding of what the

17    settlement in this case provides to the class?

18         A.   Certain monetary relief and certain

19    non-monetary relief.

20         Q.   What is the size of the Settlement Fund?

21         A.   The private MDL Settlement that we're talking

22    about?

23         Q.   Yes, sir.

24         A.   As opposed to the -- I know the State's got a

25    settlement.  Am I correct?
```

-28-

1       Q.   Well, we're talking about the settlement in

2   the case where you filed an objection.

3       A.   The $380 million dollars?  I forgot what the

4   question was.

5       Q.   Yes, the size of the Settlement Fund.

6       A.   Well, there's $310 million on your own and

7   then at the urging of whatever governmental entity that

8   was, the federal agency, there was an additional $70

9   million.

10          I think there's the possibility of adding $125

11  million.  It gets very complicated, but as to -- if

12  you're asking how much of that ends up in the hands of

13  class members than not, I'd say most of it doesn't.

14      Q.   Where does it go?  Where does most of it go?

15      A.   Paying for services, I believe.

16          In other words, there are caps on actual

17  losses, you know, pecuniary losses whether it's damages

18  incurred from a breach, expenses relating to a possible

19  breach, or time lost dedicated to it.

20          Those are smaller figures, as I recall.  Like,

21  in the $30 million dollar range.  They have caps on

22  them.

23      Q.   So you were referring to the out-of-pocket

24  losses that consumers would --

25      A.   There's also an alternate.  Like, if I already

1    have a service, the $125.00 -- the infamous $125.00

2    payment, I think that's a $31 million dollar cap,

3    something like that.

4        Q.   But what's the cap on the out-of-pocket

5    lawsuit before we move into the --

6        A.   I don't recall right now.  I can't remember.

7        Q.   So where does most of the $380.5 million

8    dollars go?  Because you talked about caps on an

9    individual claim is what I think you are referring to,

10   correct?

11       A.   Uh-huh.

12       Q.   You used a non-verbal response.  Does that

13   mean, yes?

14       A.   Yes.

15       Q.   Yes, so where does most --

16       A.   I'd have to look at the settlement again.  I

17   already forgot.  I looked at it this morning, because I

18   have terrible memory and I already -- if I could look at

19   the settlement agreement, I can go through it real quick

20   for you.

21       Q.   You are aware, though, that there is another

22   $125 million dollars potentially available for

23   out-of-pocket claims?

24       A.   Yes.

25       Q.   Are you aware of the other data breach

1    settlements that have been reached in the United States

2    in other class actions?

3        A.   Not all of them.  No.

4        Q.   Is there a settlement that comes anywhere near

5    the amount of money that's been put aside to pay claims

6    in this case?

7        A.   I read that this is the largest.

8        Q.   Do you know if any other settlement comes

9    close in terms of numbers?

10       A.   I'm not aware of it.

11       Q.   So you're aware that there's a cap --

12   individual caps for individual consumers that's capped

13   at $20 million dollars per claim?

14       A.   Yes, I remember that.

15       Q.   Are you aware of what other caps are in other

16   data breach settlements and how this cap compares with

17   those?

18       A.   No.

19       Q.   You are aware that time spent dealing with the

20   repercussions of the breach are compensable under the

21   settlement, correct?

22       A.   Yes.

23       Q.   Do you know how many hours or at what rate

24   people can?

25       A.   For some reason 25 hours at $20.00 an hour, or

-31-

1   vice versa, or something like that.

2       Q.   20 hours of time at $20.00 per hour for

3   documented losses.  And, then, are you aware of the

4   self-certified no documentation required?

5       A.   I am aware of it.

6       Q.   Do you know how those amounts compare to what

7   other data breach settlements reach around the country?

8       A.   Not really.

9       Q.   I think you testified that you knew that

10  credit monitoring was provided by the settlement and

11  that you, yourself, made a claim for the four years of

12  three Bureau credit monitoring, correct?

13      A.   Yes.

14      Q.   And you are aware that there's an additional

15  six years of one Bureau monitoring provided by Equifax?

16      A.   I couldn't remember what the numbers was, but

17  yes, more or less.

18      Q.   Are you aware of how this compares with other

19  prior settlements in other data breach cases?

20      A.   No.

21      Q.   Are you aware what the retail value of that

22  credit monitoring is?

23      A.   I believe it was reported that it's something

24  over a $1,000 dollars a year or something.

25      Q.   How about $1,200 for four years?

32

1    A.   Oh, okay.

2    Q.   And then six years?

3    A.   I did read that.  Yeah.

4    Q.   Okay.  And then, six years of one Bureau at,

5    approximately, $720.00?

6    A.   I understand that's what it's reported as,

7    yeah.

8    Q.   That's what a consumer would have to pay you,

9    you understand to get the same type of benefits?

10   A.   Well, I don't know that myself.  I read that

11   was reported as such.

12   Q.   So you have not made a determination one way

13   or the other whether that's accurate?

14   A.   No.

15   Q.   Are you familiar with what Identity

16   Restoration Services are?

17   A.   Not as well as I would like to be.

18   Q.   What do you understand about them -- that

19   service?

20   A.   The concept of -- if you're -- if it's

21   damaged, then there's some action that happens to

22   restore it, but I don't have any idea of the specifics.

23   Q.   Do you believe that to be a valuable benefit

24   for members of the class?

25   A.   It depends on the, you know, the -- and the

-33-

1    details.  You know, I don't know what exactly is

2    considered in restoration.  I'd have to read that.

3         Q.   Okay.  And you have not done that prior to

4    today?

5         A.   No.

6         Q.   And you didn't do that prior to filing your

7    objection?

8         A.   No.

9         Q.   Are you familiar with the concept of

10   Alternative Cash Compensation?

11        A.   Yes.

12        Q.   And what is that?

13        A.   As I said earlier, if a class member already

14   has -- is paying for a credit monitoring service, then

15   they can apply for cash, a one time payment up to

16   $125.00, depending on how much -- how many claims are

17   made.

18        Q.   Do you know how many other settlements of data

19   breach cases have provided that benefit?

20        A.   No.

21        Q.   Do you know as to what extent that any have?

22   Do you know what the monetary benefit was in those

23   cases?

24        A.   No.

25        Q.   Are you aware whether or not the settlement

—34—

1    here provides any injunctive relief or business practice

2    changes that will be made a part of the Court's final

3    judgment?

4        A.   Yes.

5        Q.   Do you know if the settlement requires Equifax

6    to spend a certain amount on information security?

7        A.   I wasn't aware that they were required to

8    spend a certain amount.  My recollection is estimates of

9    what they were going to dedicate to achieve that result.

10       Q.   So you'd be surprise to learn then that

11   Equifax would spend a million of a billion dollars on

12   data security in related technology?  That would

13   surprise you?

14       A.   You said a billion, right?

15       Q.   A billion.

16       A.   Okay.  It would not surprise me because of the

17   size of their databases.  This is by-far the largest

18   consumer database in history as well; 150 million

19   customers, you know, or people.

20       Q.   What was lost in the data breach?

21       A.   What was lost?

22       Q.   Yes.

23       A.   I can tell you my biggest concern --

24       Q.   Well, no --

25       A.   -- when I wrote my letter.

—35—

1      Q.   Well, what were the bits of information taken?

2      A.   I'm not technical enough to know.

3      Q.   Okay.  But you were able to make comparisons

4  about the size of this breach to other breaches and I'm

5  trying to discern how you know that.

6           At first it would involve what you know about

7  this breach, so that we can talk about other breaches?

8      A.   I, unfortunately, am limited to what is

9  reported to me as a class member and in your own

10  complaint it's -- I think you identify it as 150 million

11  people affected, and in terms of what was taken, and in

12  plain English, my big concern was my Social Security

13  number.

14      Q.   Do you know what else was taken?

15      A.   No, I'm not sure.  That one is the one that

16  made me stop and want to write the objection.

17      Q.   Do you know of any other settlement that has

18  required the amount being required here to spend on data

19  security in related technology?

20      A.   No, I am not aware.

21      Q.   Do you know of whether this company will be --

22  whether the injunctive relief or its data security in

23  related technology will be monitored by an independent

24  third party?

25      A.   If you're referring to -- what is it called?

1    Experian, or -- I read somewhere in there that -- I'm

2    not sure if I'm saying the name right.  Experian, I

3    think may have that kindof a function.

4         Q.   Do you know what other settlements of data

5    breach cases had as a component independent monitoring

6    by a third party?

7         A.   I'm not aware.

8         Q.   Do you think that's a good benefit for the

9    class?

10        A.   Of course, it's a benefit.  Yeah.

11        Q.   Isn't it there an amount in access of a

12   billion dollars that you believe should be spent by

13   Equifax to maintain data security and related

14   technology?

15        A.   I don't know enough to know how much it would

16   take to do an adequate job.

17        Q.   Do you know one way or the other whether the

18   lawyers representing the plaintiffs in this case -- in

19   the class had an expert to make that evaluation?

20        A.   I don't know, but I would assume he would.

21        Q.   Are you familiar with the claims period in

22   this settlement?

23        A.   Generally, I think there's two claims period.

24   There's the initial claims period from the date of the

25   Court order approving notice to the class through

37

1    January 20th, 2020.

2             Then, there's the subsequent claims period,

3    and I'm not sure exactly how long that is.  Four years,

4    maybe, or longer.  I am not sure how long it is.

5        Q.   Do you think that's a favorable benefit to the

6    class, an extended claims period?

7        A.   Yes.

8        Q.   Are you familiar with the concept of reversion

9    in a class action settlement?

10       A.   Yes.

11       Q.   What is that?

12       A.   Any residual of an actual settlement pull in a

13   class action that's left over after claims.  How the

14   claims are paid and expenses and fees goes back to

15   the defendant.

16       Q.   Is there a reversion in this case?

17       A.   I believe not.

18                        - - -

19                  Exhibit No. 3

20               was marked for the purposes

21                  of identification.

22                        - - -

23   BY MR. YANCHUNIS:

24       Q.   Let me show you a document which I have marked

25   for purposes of identification to your deposition as

-38-

1    Exhibit 3.  It proports to be a letter on this

2    stationary of George W. Cochran, dated November 19,

3    1999.

4              Are you familiar with this document?

5    A.    2019.

6    Q.    2019.  Excuse me.

7    A.    Yes.  I'm old, but not that old.

8    Q.    And this is a letter that you prepared?

9    A.    Yes.

10   Q.    And that's your signature at the bottom?

11   A.    It is.

12   Q.    How did you reach the conclusion that the

13   amount of the settlement is grossly inadequate to

14   compensate for the potential loss that may be sustained

15   by the class?

16   A.    My answer also incorporates Point 2 of this,

17   but I'll explain.

18             As I said earlier, I read about the

19   information that was not at risk that had been

20   compromised, and when I saw a social security number,

21   that jumped out at me, because I am 66.

22             This monitoring by my calculation has to run

23   out within 10 years, I believe, which puts me at 76, and

24   if I'm still here or not, my fear was that my wife could

25   inherit a very serious identity theft problem and I did

39

 1    not want to leave her as a widow with that kind of --

 2    she has no idea of anything about what's going on with

 3    this, so I if I may, I would like to incorporate Point 2

 4    with that answer.

 5              "Studies show that hackers uses the

 6    compromised information years after the damages claims

 7    under the settlement has expired."

 8              The day that I dedicated to looking at this in

 9    November, I did some Internet research, because I wanted

10    to learn more about it and several sources stated that

11    this could be inadequate, even though, it sounds like a

12    long period of time, but hackers have been known to hold

13    onto this information for years and years and then they

14    use it at the right time when it's all settled down.

15              And since it's a social security number, as

16    you said in your own complaints, social security numbers

17    are permanent.

18              I mean, I think you can't even change it if

19    you wanted to, unless, you qualify under government

20    regulations or something.

21              Even then, they can tie the old number to the

22    new number if you have the same address, and so I got

23    really fearful for my wife.

24              I didn't tell her this, but I quietly said,

25    "oh, no.  My gosh."

1        But whether that's accurate or not, I don't

2   know enough to say, but that got my attention.

3        I particularly remember one of the Attorney

4   Generals.  He might have been from Maryland who is

5   quoted as being very concerned about it at this point.

6        And so, if that happens, if that worse case

7   scenario happens, then, you know, there's no protection.

8   That's it.

9        We are giving, as you know, like a permanent

10  and complete release that even satisfies California

11  stringent.  I've dealt with cases with the California

12  Release Provision that includes unknown claims.  This is

13  it.

14  Q.   So what would be the settlement that you would

15  want to see to protect that liability that you say would

16  be out there for years, and, maybe, even after your

17  death?

18  A.   I think the nature of the problem tells you

19  the nature of the solution.  I hate to tell them, but if

20  a Jury saw this, they might have said, you will have to

21  continue being responsible perhaps for the lifetime of

22  the current of those social security numbers that are

23  now in effect.

24       Now, as to whether what would actually -- to

25  the extent that it would actually happen, I have no way

41

1    of knowing, but I would have felt a lot better about the

2    fairness of the settlement if that was at least provided

3    for since everyone recognizes that is a real

4    possibility.  The experts says that's a real possibility

5    here.

6         Q.   But how would you settle that?

7         A.   I don't know.

8         Q.   How would you come up with --

9         A.   I'm not sure you can settle it.  You know, you

10   may have gone to trial on that and that's a tough call

11   and I have no -- you know, I don't want to do your job.

12   I have no way near the information you have to be able

13   to analyze them.

14        Q.   Well, how would you try it if you didn't

15   settle it?  How would you try the factual scenario for

16   145 and-a-half million people?

17        A.   Well, as a class action.  You mean, for

18   representing the plaintiff?

19        Q.   Yes.  How would you try that?

20        A.   I'm glad you think that highly of me.

21        Q.   Well, you think about the settlement, and I am

22   trying to figure out why you think it's inadequate?

23        A.   Because I care about my wife.

24        Q.   So why not opt out of the settlement and sue

25   Equifax yourself?

-42-

1     A.   Well, as you well know the damages

2  individually, there are no damage yet for that, first of

3  all.

4          And, secondly, I cannot even if I had the

5  money, there's no way that I could just find the experts

6  that you all guys have that would get their attention,

7  and so forth.

8          I mean, this clearly has to be a class action.

9  That's the given.

10         As a class member, I have a right to -- I

11  won't even use the word "objection", voice my concerns.

12  It's a concern that I have.

13     Q.   But you understand that in connection with

14  what you articulate, you have to take into consideration

15  in settlement, the fact that if you took a case and lost

16  class certification, you would have no ability to settle

17  that as a class.  You know that, don't you?

18     A.   Say that again.  My memory is --

19     Q.   You understand that if you lost the ability of

20  certifying a class --

21     A.   Yes.

22     Q.   -- that you would end up with just the

23  individuals who filed the case?

24     A.   Yes.

25     Q.   And then the class would not get any relief on

-43-

1    that.

2        A.   You're absolutely right.  I think as I am

3    trying to think about it here, perhaps, robbing Paul to

4    pay Peter, you may want to have less money dedicated to

5    preventative measures and more to actual damaged

6    claimants for a longer period of time.  I don't know.

7        Q.   Well, it seems to me that you are talking

8    about credit monitoring, like, and not money; isn't that

9    true?

10       A.   Well, that's one thing that I'm, actually,

11   unclear about.  I thought about it this morning as I --

12   am I -- what I'm really concerned about is some hacker

13   waiting and then using my social security number to

14   cause harm to my wife down the road and then afterwards,

15   I got a released claim.

16            Is the monitoring future bad acts or what does

17   it do about these guys who already have these numbers?

18   I know it's unusual, but maybe you can help clarify the

19   question by answering my question.

20       Q.   You are not aware that the credit monitoring

21   that you signed up for as a claimant provides for

22   monitoring of future activity that might occur in

23   connection with the use of information lost in the

24   breach?

25       A.   Yes.  My question is: Let's say that find

44

1   something, so what happens then?  If it's already -- say

2   they take all of my wife's accounts.  You report that to

3   me or to her, so what do I do about it?

4        Q.   Well, let me ask you this:  How do you know it

5   was taken by the cyber criminals that took it in this

6   case?

7        A.   You would not.

8        Q.   So doesn't that kind of present a proof issue?

9        A.   Yes.

10       Q.   So you can understand that the lawyers in this

11  case has the measure in taking into consideration, not

12  only the risk of certification, but the McConnell

13  Decision that was before the Supreme Court in Georgia,

14  and also establishing causation between something

15  happening years from now and the breach that occurred

16  here.

17       A.   Well --

18       Q.   Not easy, correct?

19       A.   Well, I would change that hypothetical a

20  little bit by saying from the defendants viewpoint, they

21  would probably be unwilling to accept that risk --

22  business risk, unless, it was traceable.

23  As they say in the settlement language, fairly

24  traceable, I think.  I thought was a interesting way to

25  put that, fairly traceable, I think, or to this

45

1    causation.

2              I mean, yeah.  I doubt that it would be much

3    of a challenge for them to be willing to settle for

4    something that they would see as a blank check for any

5    bad guy out there.

6              What I'm saying is, it makes it more difficult

7    to settle and it may have been very difficult to win a

8    trial, but that is my answer to your question of why I

9    wrote number one.

10        Q.   But your focus here is really about the length

11   of credit monitoring.  Not about the amount of money

12   that has been set aside to pay claims?

13        A.   Well, like I say in my hypothetical, if my

14   wife lost all of her savings -- you know, because if we

15   could prove it was caused by this breach way back in

16   2017, or whenever it was, then I would, you know, wish

17   to get some portion of that money back, but that isn't

18   gonna happen.  That's not the way it's structured.

19        Q.   And you understand that that would be a

20   significant challenge?

21        A.   Yeah, I do.  And I'm not making light of it at

22   all.  And I'm not saying this is necessarily a deal

23   breaker.  I'm just exercising my rights to say this is

24   why it caught my attention, and I'm just one guy.

25             Maybe a lot of seniors over 65 would be

—46—

1    concerned about this, but actually getting redress would

2    be quite a challenge.  I mean, it's unfortunate that

3    it's already happened.

4        Q.   So, let me ask you this question:  Why after

5    finding out about this Breach didn't you go out and get

6    protection for this concern and to check your bank

7    statements and look at your credit reports to see if, in

8    fact, your information had been used if this is a

9    concern?

10       A.   Well, it may sound stupid today, but I was

11   thinking this settlement is going to provide me some of

12   that protection, and like I said, I had been so busy,

13   that, you know, since that day that I wrote this, this

14   is the first day that I actually thought much about this

15   again, because I had been so busy and I knew for my

16   deposition, I had to get out and look at some of these

17   papers and look at them.  I think your making a great

18   point, but just don't tell my wife you're making that

19   point.

20       Q.   Well, but Mr. Cochran on the 19th, you

21   actually made an assessment that the settlement was not

22   adequate, because hackers could use this information

23   years from now, but you did nothing to check to see if

24   it had happened to you already.

25       A.   Yeah, I guess that makes me human.

47

1      Q.   And you're an educated man, aren't you?

2      A.   Yes, I am.  I think that I will do it now, now

3   that you have brought it to my attention, but it is a

4   true statement and I am giving you a true answer as to

5   why I wrote Number 1, and as it relates to Number 2 as

6   well.  Those were the concerns that I had.  And then

7   there is, of course, the third concern.

8      Q.   So these studies that you refer to, what

9   studies are you talking about?

10      A.   I don't remember referring to studies?

11      Q.   You say in Paragraph 2 that "studies show that

12   hackers often use the compromised information years

13   after the damages claims period under the settlement has

14   expired."  Did I read that correctly?

15      A.   Yes, you did.  I thought you meant that I

16   testified just now to that.  What I am referring to is

17   the Internet search that I dedicated myself to that day

18   in finding various articles.

19           A couple of them were by expert security --

20   cyber security experts who found that hackers tend to

21   hold information like this for periods longer than

22   10 years, particularly, if it involves social security

23   numbers, which is a very viable piece of information.

24           I may have -- I can check my computer.

25   Sometimes, what I'll do is I'll download an article.  I

-48-

1    don't know if I did or not, but I'll be glad to check to

2    see if I had downloaded any information.

3         Q.   So you can identify by name the studies or the

4    authors here today?

5         A.   Let me think.  I'll try to remember.

6              Like, I say, and for some reason, I remember

7    Maryland, the Attorney General.  I can't remember if he

8    was referring to a study himself, but he was quoted in

9    conjunction with this settlement as being very concerned

10   about this.

11             The best I can do today is to say, I would be

12   happy to look to see if I have downloaded any of that

13   and provide it for you.

14        Q.   Are you aware whether or not the credit

15   monitoring provided here provides an insurance policy?

16        A.   Yes, I think it's a million dollar policy.

17        Q.   And what does the million dollars guard

18   against?

19        A.   And where would that be?  Oh, that would be

20   part of the recovery.  Then, you're right.  I wasn't

21   thinking of that.

22        Q.   Yes.  For people who sign up for credit

23   monitoring like you, you get a million dollar coverage.

24   You'd agree that's pretty good relief, isn't it?

25        A.   Yes.  I just don't know the specifics of how

-49-

1    that works.  I'd have to live long enough to --

2                    THE WITNESS:  Did you have to help him

3    with that?  I'm just kidding.  Good job.

4                    MR. YANCHUNIS:  Well, that's why

5    Mr. Barthle is here.

6                    MR. BARTHLE:  I'm used to that.

7                    THE WITNESS:  That was excellent.

8    BY MR. YANCHUNIS:

9       A.   But anyway, I just forgot about that.  You're

10   right, a million dollars.  That's how you get paid, but

11   will that coverage expire, you know, with the 10 year

12   monitoring period?  Presummably.  Hey, how about just

13   adding another -- extending the coverage of that million

14   dollar policy?  I don't know how much that would cost

15   then, but then again how would you prove that it's

16   traceable back to this particular incident?

17      Q.   Had you read the policy?

18      A.   No.

19      Q.   You state in your next paragraph that

20   "proposed attorneys fees are excessive because most of

21   the pretrial activity in the brief life span of this

22   case was spent on settlement negotiations and

23   confirmatory discovery.

24                    Consequently, I do not believe the Court

25   should add a multiplier to class action's Lodestar."

-50-

```
 1        A.    Right.

 2        Q.    Did I read that correctly?

 3        A.    Well, to "class counsel's Lodestar."

 4        Q.    Oh, "class counsel's Lodestar."  I stand

 5   corrected.  And that is your position here today?

 6        A.    Yes.

 7        Q.    Okay.  But you don't quibble with the fact

 8   that the lawyers that achieved this result should be

 9   paid for their services?

10        A.    Not at all.

11        Q.    And you understood that the lawyers in this

12   case, which I am one, took the case on a contingent

13   basis?

14        A.    Yes.

15        Q.    And you further understand that lawyers in

16   contingency base cases, the lawyers have to advance the

17   costs to pay the experts that are required?

18        A.    Yes.

19        Q.    And you know that was done in this case?

20        A.    Yes.

21        Q.    What are the attorney fees sought by the

22   lawyers in this case?

23        A.    As I recall in the initial settlement, class

24   Counsel agreed to seek 25 percent of the $310 million

25   initial settlement, which is now presented as slightly
```

1    over 20 percent, because of the 70 million that was,

2    subsequently, added and that is of the financial

3    benefits.

4        Q.   Do you know if this case is pending in the

5    11th Circuit Court of Appeals?

6        A.   Yes.

7        Q.   Do you know what the 11th Circuit decision or

8    authority is on Attorneys fees in consumer class

9    actions?

10       A.   I read it this morning.  It follows Johnson,

11   but I forget the name of the case.  It adopts the

12   Johnson factors.

13       Q.   You're referring to Johnson verses Georgia

14   Highway Express?

15       A.   Yes.

16       Q.   Are you also familiar with Camden?

17       A.   That's it.  I'm not familiar with it.  I read

18   it this morning.  It's 11th Circuit law adopting Johnson

19   as Camden.

20       Q.   Are you familiar with whether or not the 11th

21   Circuit finds presumably reasonable a certain percentage

22   of the results achieved in a class action settlement?

23       A.   Yes.

24       Q.   And what is that?

25       A.   25 percent of the pull.

1          Q.   And how much is the percentage being sought in

2    this case?

3          A.   25 percent of the pull.

4          Q.   So you just don't like what the 11th Circuit

5    has said?

6          A.   Well, no.  Since this is part of what I do

7    also.  As you know, that is the starting point of the

8    analysis.  It can be adjusted up or down, depending on a

9    lot of factors.

10         Q.   In the class case that you tried, the Malone

11   case --

12         A.   Yeah.

13         Q.   -- of which was not appealed, what was your

14   fee in that case?

15         A.   It was one-third.

16         Q.   That was fair compensation for you?

17         A.   Well, it's a very small class action.  Yeah.

18         Q.   Okay.

19         A.   I don't know how much over my Lodestar it was.

20   My bigger concern here is the Lodestar.

21         Q.   What's the basis for your statement that most

22   of the pretrial activity in the brief life span of this

23   case was spent on settlement negotiations and

24   confirmatory discovery?"

25         A.   I think it was your Motion for Preliminary

-53-

1    Approval that said that the announcement came from

2    Equifax in September of 2017.

3              In a few pages down they say, we've -- is what

4    I call an early settlement proposal, that once in a

5    while you'll have defense counsel who analyses it and

6    sees that this is a strong case and approaches or

7    initiates early settlement discussions, and as a matter

8    of fact, the same month, September of 2017.

9              So from my experience that told me a lot and

10   there were like five or six settlement conferences.  I

11   think, a lot of them were headed by a very well-

12   respected retired Judge, and there was a term sheet that

13   was eventually signed and the government had to get

14   involved and then there was the finalized settlement

15   agreement, but that's why I say that a lot of that time

16   spent, and I will grant you this, you guys survived the

17   Motion to Dismiss.  I do want to give you credit for

18   that.  That was a huge step.

19        Q.   How about selecting the representative-

20   plaintiffs in the claims?  How big of an undertaking and

21   how much time did that take?

22        A.   I have no idea.

23        Q.   The lawyers should be compensated for that,

24   shouldn't they?

25        A.   Yes.

```
 1        Q.   It's important to pick the right
 2   representative-plaintiffs to make certain they're
 3   adequate, correct?
 4        A.   Yes.
 5        Q.   You understand the context of adequacy under
 6   Rule 23?
 7        A.   Yes.
 8        Q.   And you understand that the company vigorously
 9   contested the viability of that complaint by filing a
10   Motion to Dismiss, correct?
11        A.   I know they filed a Motion to Dismiss.  I'm
12   sure that's a well-known firm.  I'm sure everything they
13   do is vigorous.
14        Q.   King and Spaulding Law Firm?
15        A.   Yes.  Yes.
16        Q.   That's one of the largest firms in the
17   country?
18        A.   I believe so.
19        Q.   Yeah, the FBI Director.  Were you aware that
20   he was a former partner at that law firm?
21        A.   No, I didn't know that.
22        Q.   But that was not a laid down Motion to
23   Dismiss, was it?
24        A.   I guess.
25        Q.   Let me ask you this:  Did you read the Briefs
```

1    that were --

2         A.   No.  I didn't have time to read.  I would like

3    to just for entertainment and to learn things, but I

4    didn't have time.

5         Q.   Did you read the response that was filed by

6    the lawyers for the plaintiffs in the punitive class?

7         A.   You mean, the reply Brief?

8         Q.   Well, the response Brief.  But, yes.

9         A.   I'm sorry, response.  No, I didn't read any of

10   the Briefs in the Motion to Dismiss.

11        Q.   Do you know how many hours was spent in that

12   endeavor?

13        A.   No.

14        Q.   Do you know how many experts the plaintiffs

15   lawyers engaged to advance the interests of the class in

16   this case?

17        A.   No.

18        Q.   Do you know how much money was spent on those

19   experts?

20        A.   I'm trying to think if I ever read something

21   that alluded to that.  I don't know why.  A million?

22   No, I don't know.  I can't remember anyway.

23        Q.   Do you know whether or not those experts were

24   involved in any way and to what extent in the case, or

25   whether the prosecution or the settlement or drafting a

-56-

 1    relief?

 2         A.   No, I don't.

 3         Q.   Are you aware of how many hours the lawyers in

 4    this case spent on behalf of the plaintiffs and the

 5    class?

 6         A.   I read it, but I can't remember it.  I know

 7    that their Lodestar is around $20 million.

 8         Q.   Would 31,000 hours --

 9         A.   Yes.

10         Q.   -- refresh your recollection?

11         A.   Yes.  Plus, they anticipate 10,000 future

12    hours.

13         Q.   Do you know whether or not there was any

14    billing protocol in place?

15         A.   I believe there was.

16         Q.   And you understand the purpose of a billing

17    protocol?

18         A.   Yes.

19         Q.   What is that?

20         A.   So the Court can evaluate whether there's --

21    what is reasonable and document it and whether there's

22    double billing or overlapping.

23              We sometimes look for that, the amount, the

24    billable rates, and are they within the customary range

25    of that area for that specialty.  Both, the senior

57

1    associates and paralegals, and all of that.

2         Q.   You're aware of also that a billing protocol

3    is also used by leadership to ensure that lawyers

4    engaged in working in the case are working appropriately

5    on behalf of the class?

6         A.   Yes.

7         Q.   And you are aware that no lawyer working on

8    behalf of the plaintiffs in the class have received any

9    compensation up until this point?

10        A.   I'm aware of that.

11        Q.   And you're aware that since those lawyers are

12   getting paid on a periodic basis, there's no reason to

13   work more than they need to work inorder to get the job

14   done?

15        A.   I'm not sure.  Could you rephrase the

16   question?

17        Q.   Yes.  As a contingent lawyer, you're not

18   compensated for the time that you spend on a client's

19   endeavor of the case, unless you prevail, correct?

20        A.   Can I answer it in my own way?

21        Q.   Answer it the way that --

22        A.   Okay.

23        Q.   Please.

24        A.   Okay.  When your fee has to be approved by a

25   Court as to reasonableness, the chances of approval --

-58-

1    the hours that you expend are irrelevant in the Court's

2    consideration.

3        Q.   What I'm trying to say is as a contingent

4    lawyer, you try to be efficient, right?

5        A.   Yes.  Just say forget class actions for a

6    minute.  Yeah, contingent lawyer.  Yeah, you try to be

7    efficient.

8        Q.   And you don't have any reason to believe that

9    the lawyers in this case weren't trying to be efficient

10   since there was no certainty that we would get paid if

11   we didn't win?

12       A.   I'm not comfortable speculating on that.  I

13   will say that there is an issue of what you're devoting

14   your time to.  You know, pre-litigation activity is

15   worth more and it requires more skill than certain other

16   things.

17       Q.   And that's true in class litigation?

18       A.   Yes.

19       Q.   How many class cases have been tried in any

20   calendar year since Rule 23 came into existence in the

21   Federal Rules of Procedure?

22       A.   Wow, I flunked that one.  I have no idea.

23       Q.   Not many.  Would that surprise you?

24       A.   What is your question again?

25       Q.   How many class cases have gone to trial?

1      A.   Oh, to trial.  I know that there's probably

2  under five percent.

3      Q.   You understand that it's hard in this legal

4  environment to certify a class case, correct?

5      A.   It's gotten harder in recent years.

6      Q.   Were you aware of what the rule is in the

7  Northern District of Georgia about Discovery when a

8  Motion to Dismiss is pending?

9      A.   No.

10      Q.   So would it surprise you that you can't take

11  Discovery while a Motion to Dismiss is pending?

12      A.   No, it wouldn't surprise me.

13      Q.   Do you know what work was being done by

14  investigators or the lawyers that employed them to

15  develop the facts despite formal discovery?

16      A.   No.

17      Q.   Do you know how many FBI Agents and former FBI

18  Agents I have in my law firm?

19      A.   No.

20      Q.   Do you know what work they did in this case?

21      A.   No.

22      Q.   In the 11th Circuit, are you aware of how

23  Courts can calculate the percentage of the Attorneys

24  fees sought or to be sought?

25      A.   Could you rephrase the question?

1    Q.   Yes.  Do you know if in the 11th Circuit, how

2    the percentage of the fee to the common or the

3    settlement, how that's calculated?

4    A.   Generally speaking.

5    Q.   And what is that?

6    A.   If I understand the question, you look

7    primarily at the financials.  You know, at the

8    settlement pool, and there's a question on whether you

9    have to deduct expenses first.

10        I'm not sure what their position is on that

11   and I'm also a little unclear as to whether and to what

12   extent, if any, they give credit for.  You know, for the

13   non-economic factors.

14   Q.   Like, the billion dollars that Equifax is

15   obligated to spend on information and security and

16   technology?

17   A.   Yeah.  It's been my experience that rarely

18   does any Court that I've been in with these national

19   class actions, go that far.  They tend to be a little

20   more conservative.

21   Q.   Do you know what the law in the 11th Circuit

22   is?

23   A.   I am going to say, no.

24   Q.   How about the value of the credit monitoring?

25   Do you know what the value of that is?

1      A.   I probably read it at one point, but I forget.

2      Q.   Now, this objection contains all of your

3 opinions about the settlement, correct?

4      A.   All that I am allowed to present.  Yes.

5      Q.   Having gone through the Deposition at this

6 point, are there any objections that you've raised here

7 that you would like to rescind or withdraw?

8      A.   No.

9      Q.   What's your ultimate goal with your objection?

10     A.   This is very unusual, because Number 1, I'm a

11 class member not representing someone else.  Number 2, I

12 was mainly focused on my wife's situation in Items 1 and

13 2, apart from the fee issue.  I'm not going to the

14 Fairness Hearing.  I'm not represented by Counsel.  I

15 really just wanted to voice my concern to the District

16 Court and I'm very curious to see.

17          I understand there's been a couple of other

18 well-known objector lawyers that have filed extensive

19 briefing, which I haven't had time to read, but I assume

20 that they are going to be looking at the fee issue as

21 well, and other issues with the settlement.

22          So I see no reason to be any more involved

23 really.  I think I would just sit back and watch to see

24 what the District Court's opinion is.

25     Q.   You want the settlement not to be approved and

62

1    to fail?

2         A.   No, I'd like it to be improved.

3              Now, I realize that the Court cannot change

4    one term of the settlement.  It would mean back to the

5    drawing board.  So, no, I'm not --  I'm looking for,

6    maybe, a better success.

7         Q.   You understand the concept and the compromise,

8    don't you?

9         A.   Yeah.

10        Q.   In litigation?

11        A.   Yes.

12        Q.   And in compromise you have to weigh the risks

13   of getting nothing for getting something, correct?

14        A.   Of course.

15        Q.   And you don't know of any bigger settlement of

16   a data breach case, other than this one?  I think we

17   talked about that.

18        A.   But I don't know a bigger or larger class

19   that's been effected either.

20        Q.   So what would you want to see improved here?

21        A.   Some fee reduction.  I'm asking for no

22   multipliers.  You know, if the Court just reduced

23   something, not all the way to no multiplier, but reduce

24   the multipliers.

25             I think it's latest is 3.5 or so of the money.

1    I might be happy with that, but I would have to see an

2    analysis.

3        Q.   So if the 11th Circuit says it's presumably

4    reasonable that lawyers should get 25 percent, forget

5    about the multiplier?

6            On the common fund you're entitled to a

7    percentage.  If it's under 125 percent or 25 percent, do

8    you have any problems with that?

9        A.   As I said earlier that begins the analysis and

10   then the burden shifts to show why it should be adjusted

11   upward or downward.  All that is, like you say, it is a

12   rebuttable presumption, not irrebuttable presumption.

13       Q.   Okay.  But we are not talking about a

14   multiplier here at this point.  We are talking about a

15   percentage.

16       A.   I know.  In fact, I'll even go so far as to

17   not concede, but I seem to remember whether it's

18   recently or back on this date that the 11th Circuit

19   doesn't use Lodestar as a cross-check all that

20   rigorously.

21           It might be one of those Circuits that doesn't

22   use it, but I think that, particularly, of course, you

23   have got to add the Mega Fund principle to this too, but

24   that's only one factor.

25           Some of these guys try to say that's the only

64

1   factor that matters.  No.  It's not that simple.  It's

2   all kinds of factors, but I do think when you combine

3   the fact that this was a case that was going to get

4   resolved for something from the beginning in a

5   relatively short time and that, you know, that the

6   Lodestar is so high.

7           Obviously, you need to get paid for every

8   single hour you guys did for everything and it should be

9   a reasonable hourly rate and everything.  I am just

10  waiting to see what the District Court does with that.

11          They might just affirm it as is or it may

12  reduce.  Now, that they can, they can reduce that

13  because that as you know is separate from the settlement

14  agreement.  It has two different lives to it.

15          As to the settlement itself, I expect that the

16  Court is going to almost laugh at my Number 1.

17          That is sincerely how I felt the day that I

18  wrote this, because of my wife's situation.

19          And not a lot of other people are saying this,

20  I don't think.  I know that there are at least hundreds

21  of other objectors.  I don't know.  What the heck!

22          Was Ted Frank responsible for that somehow.

23  He got them all to write this mass campaign or

24  something?

25      Q.   I don't know.

—65—

1    A.   I just think that's how I was -- but anyway,

2    I'm rambling at this point.

3    Q.   Where was the McConnell Decision during the

4    settlement negotiations?

5    A.   I didn't even know about McConnell until you

6    told me.

7    Q.   So if, eventually, the Supreme Court said

8    there's no common law duty to maintain the privacy of

9    information, would that indicate to you that it was a

10   given and this case would be settled from the day we

11   filed it?

12   A.   Well, the day you filed it is different from

13   the day that McConnell came out.  You know, you look at

14   the risks.  The risks factors are at the beginning when

15   you take on the case.

16   Q.   But you don't know whether McConnell --

17   A.   It changes.  Then, it changes, obviously.  It

18   changes dramatically.  And, apparently -- unfortunately,

19   he had a settlement before that decision, right?  Is

20   that what you're telling me.

21   Q.   The Supreme Court Decision had not yet come

22   out.  Do you know whether if the Appellate Court

23   decision had come out?

24   A.   I wasn't familiar with the case to be honest

25   with you.

66

```
 1        Q.   So, other than, the Attorneys fees being

 2   lowered, what else would you like to see happen in

 3   connection with this case?

 4        A.   For the settlement to re-think -- for the

 5   parties to rethink about -- actually, you've helped me

 6   to solidify it today.  Maybe, extending the term of the

 7   insurance policy.

 8        Q.   Okay.

 9        A.   You know, the free service cuts off.

10             Maybe the free service is even shorter or

11   whatever, but put more of the money into the insurance

12   premium.

13        Q.   And how do you think that McConnell now

14   decided by the Georgia Supreme Court would affect that

15   discussion about the reading of this?

16        A.   I would have to read the case.  Not to speak

17   out of turn, but it sounds like you are implying that

18   the Fair Credit Reporting Act failed.

19        Q.   It failed.

20        A.   That does surprise me.

21        Q.   Are you aware of the Fair Credit Reporting Act

22   ever surviving a Motion to Dismiss in a data breach

23   case?

24        A.   I don't know one way or the other.  I know

25   that this is an emerging area of law.  There's a lot of
```

67

1    data breaches.

2           In fact, we just had a CLA Conference  last

3    year in Kentucky, but I just read quickly the ACT; the

4    pertinent language of the Act itself.  It seemed like it

5    applied, but I have been wrong before.

6       Q.   Do you know if whether or not any lawyer who

7    has asserted has been able to get it past a Motion to

8    Dismiss?

9       A.   No, but I know you wouldn't have included it,

10   unless, you had a good faith basis for doing it.  I

11   don't know.

12      Q.   Okay.  We already talked about the fact that

13   you decided not to opt out because of the difficulty in

14   handling this case on your own.

15      A.   Correct.

16      Q.   It was very costly for any consumer, because

17   of the experts?

18      A.   Yes.

19      Q.   And, of course, what would you personally be

20   able to get with your case if you had not sustained any

21   loss or damage?

22      A.   I would be seeking -- I wouldn't do it, but I

23   would be seeking reporting.  Like, in one case that I

24   have where it's a mold case in the City of Louisville,

25   it was going to be difficult.  They couldn't get an

68

1    expert on the causation of mold exposure as to some

2    physical symptoms of a police officer that I had

3    represented, so instead we went for medical monitoring.

4         Q.    In that period of years -- in that case, you

5    had a police officer who had an injury, though, correct?

6         A.    Symptoms consistent with mold exposure.

7         Q.    In your case in your individual situation, you

8    don't have any damage or a --

9         A.    No.

10        Q.    -- sustainable injury, correct?

11        A.    No.  As you well-pointed out, I don't even

12   know, because I didn't even bother to check, but I will

13   check.  But no, I think it would have shown up in some

14   other way by now.

15        Q.    How many class actions have you objected to

16   individually or personally?

17        A.    I think it's -- I thought about this.  I think

18   it's the first one, but I could be wrong.

19        Q.    You state in your objection that "to the best

20   of my recollection, I have not objected to another class

21   action settlement to which I am a class member during

22   the last five years."

23             Is that still your best recollection?

24        A.    Yes.  I don't recall ever doing it, but the

25   notice covers the last five years.

69

```
 1          Q.   You've represented other individuals in

 2    connection with their objections to class action

 3    settlements, though, however, correct?

 4          A.   Yes.

 5          Q.   How many times?

 6          A.   Probably, a couple of dozen.

 7          Q.   And what span of time does that cover, "a

 8    couple of dozen objections?"

 9          A.   Probably 10 years.  It looks like you are

10    saving some admonition for the end here.

11                         - - -

12                    Exhibit No. 4

13                 was marked for the purposes

14                     of identification.

15                         - - -

16    MR. YANCHUNIS:

17          Q.   Let me show you a document which I will mark

18    for the purposes of identification as Exhibit Number 4,

19    and it proports to be an Objection to Class Counsel's

20    Motion for Attorney's Fees filed in the case of Joseph

21    Gregorio versus Premier Nutrition Corporation filed in

22    the United States District Court for the Southern

23    District of New York.

24               Are you familiar with this document?

25          A.   Yes.
```

—70—

```
 1          Q.   Is this an objection that you filed on behalf
 2     of a Dave Mager?
 3          A.   Mager?  Yes.
 4          Q.   Is Mr. Mager kin to you?
 5          A.   No.
 6          Q.   Did you know him before you filed this
 7     Objection on his behalf?
 8          A.   Yes.
 9          Q.   And how do you know him?
10          A.   He's been a life-long friend and a former
11     client.
12          Q.   And in this case you took the position that
13     the class counsel should receive a fee of no more than
14     1.8 million or 20 percent of the total cash value of
15     this settlement; correct?
16          A.   It appears so.
17          Q.   And the request in that case was that the
18     lawyers wanted a third?
19          A.   Yes.
20          Q.   And again in this case the lawyers are seeking
21     20 percent of the minimum settlement fund cash value?
22          A.   Yes.
23          Q.   Okay.  So had the lawyers in that case sought
24     20 percent, you wouldn't have a problem with it?  You
25     had a problem with the fact that they wanted a third?
```

1        A.    Every case has distinct facts.  I don't think

2    we can compare two cases.

3        Q.    Why not?

4        A.    Because every case has distinct facts.

5        Q.    Yes.  The data breach litigation is a very

6    distinct area of the law of the practice; isn't that

7    true?

8        A.    As far as I know, yes.

9        Q.    And you know of no case in which Plaintiff's

10    lawyers have certified a damage class in a damage data

11    breach, correct?

12        A.    I think I already said, "I wasn't aware."

13        Q.    So that would make this a high risk case,

14    correct?

15        A.    I'm not comfortable conjecturing about that.

16        Q.    Well, you would agree with me that if there

17    were other class cases where plaintiff's lawyers in a

18    data breach class case had certified a damage class,

19    that would make this case perhaps less risky with that

20    kind of history out there?

21        A.    Yes.  I'm going to correct something also, if

22    I could also?  You said, "20 percent," but my position

23    is you should go by the 310 million.  I see.  It's 25

24    percent.

25        Q.    I'm sorry?

72

1      A.   My position is that you guys are requesting 25

2   percent as stated in your initial settlement of the 310

3   million, not 20 percent of the 380.

4      Q.   And why should the lawyers not get the benefit

5   of the 380.5 million cash fund?

6      A.   Because it was at the involvement of the

7   government entity.

8      Q.   In what way?

9      A.   There was already a settlement for 310

10   million, and, then, I think the settlement was subject

11   then to getting the government on board and I know you

12   guys were involved in that.

13          I know you didn't just go home and -- I know

14   that there was some involvement in that, but you cannot

15   take full credit.  They won't let us go that far.

16      Q.   Do you know what the level of involvement was

17   to the point of the plaintiffs lawyers in this case, in

18   connection with increasing the settlement amount to

19   380.5 million?

20      A.   I recall reading something today.  I can't

21   remember what it was.  It might have been a declaration,

22   or whatever, stating that, but for your involvement, it

23   would not have happened, and particularly about setting

24   a deadline and that they would not have moved, but for

25   the deadline.

73

```
 1              I appreciate the way it was stated in the
 2    Brief.
 3         Q.   And you have no reason to challenge the
 4    voracity of the statement in there?
 5         A.   I have no reason to.
 6         Q.   Okay.  What about the credit for the $125
 7    million dollars that is potentially available to pay
 8    out-of-pocket claims?  Should the lawyers for the
 9    plaintiffs get credit for that?
10         A.   This is where it gets muddy because of
11    Class-Action Law and how to apply a percentage, you
12    know, since it's not guaranteed and it's not in the
13    present tense.
14              It clearly has to be discounted as to whether
15    it should be zero percent, 50 percent or valued.  I
16    don't know.
17         Q.   Why isn't it guaranteed?
18         A.   It may not be needed for one thing.
19         Q.   Okay.  But if it's needed, it's there to pay
20    the claims, correct?
21         A.   Yeah.  I'm not sure that it goes into the
22    pockets of the consumers or if it pays for services.
23    That I cannot remember.
24         Q.   So you are not aware that the $125 million
25    dollars is available to pay additional out-of-pocket
```

74

1    claims of consumers who have claims?

2         A.    I cannot remember how it's written.

3         Q.    So if that is the case, should the lawyers --

4    should the percentage factor that into consideration?

5         A.    If it is the case, it should be factored in at

6    some reduced value.

7         Q.    Which is what?

8         A.    That is beyond my pay grade to decide.

9         Q.    Should any value be assigned to the minimum

10   cash commitment by Equifax in connection with the

11   information security in related technology expend?

12        A.    It's my opinion that given the catastrophe

13   that resulted from this data breach and how ridiculous

14   it was that one employee had failed to implement a

15   patch, and how long it took to discover that, and then

16   to even report it to the Board.

17             For their survival, they had to do this

18   whether there was a lawsuit or not.

19             In my opinion they would have had to spend

20   that money to show both so that it doesn't happen, and

21   to minimize it happening again, and to show the stock

22   orders and the rest of the market that they were serious

23   about learning from this.

24        Q.    So it's your position that lawyers and the

25   experts that the lawyers employed with that expertise in

75

1    cyber-security had no role into getting this component

2    of the settlement?  It would have happened without them

3    or without us?

4         A.   I won't go that far.  I would say that some

5    form of program and the corresponding expense would have

6    had to have happened.  To say how much and when and the

7    detail specifics, that's more of conjecture.

8              What I am saying is it would be difficult to

9    value that.  Number A, it's already harder when it's

10   non-monetary.  You know, it's more of a cost for a

11   program, rather than a settlement pool, because the law

12   favors when it comes to Attorneys fees, the known factor

13   of the settlement pool.  And then, secondly, it's more

14   of in the future, I guess.

15        Q.   Well, we know that they have to pay a billion

16   dollars -- over a billion dollars.  That's known, isn't

17   it?

18        A.   You brought that up earlier and I did not.  I

19   said that they are duty bound under the agreement to

20   dedicate that.  I thought it was an estimate of what it

21   was going to cost.

22             Yeah, that's worth something.  I don't know

23   how to evaluate that.  I'm not sure how the Court's

24   going to.  I guess, we'll know soon enough.

25             Like, I say, I'm just really interested and

76

1    fascinated by the case too.  I look forward to reading

2    his final order.

3         Q.   In your objection, you note that there was

4    less than four months passed between the filing and

5    settlement.

6         A.   I remember writing that.  Yeah.

7         Q.   What do you base that on?

8         A.   I thought you were looking at this one.

9         Q.   Oh, yeah.  This one.  I'm looking at your --

10        A.   This one?

11        Q.   Yes.

12        A.   Exhibit four?

13        Q.   Yes.

14        A.   What page is that on?

15        Q.   Let me see.  Page 3.  It right's there in the

16   first paragraph.

17        A.   Sure.  "Instead, shortly after filing suit,

18   the parties agree to retain a private mediator as a

19   result less than four months passed between filing and

20   settlement."  I'm looking at the docket.

21        Q.   And how long had this case been pending?

22        A.   Between what two events?

23        Q.   The filing of the case and its settlement?

24        A.   The initial settlement?

25        Q.   There's been more than one settlement?

77

1      A.   Well, there was the final settlement

2  agreement, but then there's the term sheet, which I

3  can't remember when that was.

4           Was it, maybe, two years between the filing

5  and the -- but my point is that much of that was

6  dedicated to -- think of it in terms of how we spend our

7  attorney time.

8           Much of it was dedicated to working out and

9  I'm not even making light of that.  There's a lot of

10  work that went into it and it's very, very complexed.

11  One of the more complexed settlement agreements.

12      Q.   How many hours of the 31,000 hours went into

13  the settlement?

14      A.   I don't know.

15      Q.   How many hours were spent by the lawyers

16  representing the plaintiffs for any particular component

17  of the case?  Putting together the complaint, then the

18  plaintiffs, and then the Discovery?

19      A.   I don't think I've seen the itemized fee

20  statements.

21      Q.   Now, you as I understand it, your objection in

22  the Gregorio case was overruled?

23      A.   I can't even remember.  I believe so.

24      Q.   And you filed an appeal of the final judgment

25  in this case?

78

```
 1        A.   I can't even remember.  Do you have something

 2   that helps me?

 3        Q.   I do.

 4             MR. YANCHUNIS:  Are we up to five?

 5             MR. BARTHLE:  (Agreed in the

 6   affirmative.)

 7   BY MR. YANCHUNIS:

 8        A.   It shouldn't be that hard to remember.  This

 9   is 2018?

10                    - - -

11                 Exhibit No. 5

12                 was marked for the

13                 purposes of identification.

14                    - - -

15   BY MR. YANCHUNIS:

16        Q.   Let me show you a document that I have marked

17   for purposes of identification as Exhibit 5.  Do you

18   recognize that as a Notice of Appeal that you filed?

19        A.   Yes.

20        Q.   Okay.  And what was the date that was filed

21   on?

22        A.   February 2, 2019.

23        Q.   Okay.  And what was the disposition of that?

24        A.   Why don't you tell me.

25        Q.   You don't remember?
```

79

1     A.    Because I can't remember.

2     Q.    Okay.

3     A.    It's embarrassing.  That's this year.  That

4     might help me to see it.

5                          - - -

6                    Exhibit No. 6

7              was marked for the purposes

8                    of identification

9                          - - -

10    BY MR. YANCHUNIS:

11    Q.    Okay.  Let me show you a document that's been

12    marked as Exhibit 6.  This is a stipulation that you

13    signed along with Bursor and Fisher in that case?

14    A.    Yes.

15    Q.    Okay.  And did this case -- your appeal was

16    dismissed without any payment of cost and attorneys

17    fees, correct?

18    A.    It appears so.

19    Q.    So you got paid nothing?  You didn't get paid

20    anything?

21    A.    According to this, I can't remember.

22    According to this, no.

23    Q.    Now, you filed an objection in the Anthem case

24    on behalf of a Leona Boone, correct?

25    A.    I vaguely remember that.

```
 1          Q.    Who's Leona Boone?

 2          A.    My sister-in-law.

 3          Q.    And you voluntarily dismissed the appeal of

 4   the final judgment in that case, correct?

 5          A.    As I recall.

 6          Q.    And do you recall that your basic objection in

 7   that case is that the attorneys fees were too high?

 8          A.    I don't recall.

 9          Q.    What was the outcome of your appeal?

10          A.    Can you tell me what year that was?

11          Q.    You dismissed your appeal.

12                            - - -

13                      Exhibit No. 7

14               was marked for the purposes

15                    of identification.

16                            - - -

17   BY MR. YANCHUNIS:

18               MR. YANCHUNIS:  Well, let's go ahead and

19   get the document in here.  I have marked for

20   identification purposes an Order entered in connection

21   with your appeal, correct?

22          A.    Yup.

23          Q.    And this Order indicates that your appeal was

24   voluntarily dismissed?

25          A.    Yes.
```

-81-

1      Q.   Were you compensated in any way for your

2   decision to dismiss this appeal?

3      A.   If it was dismissed voluntarily, it was likely

4   a settlement agreement in which all of my settlement

5   signed agreements have a confidentiality provision, so

6   I'm not allowed to discuss that.

7      Q.   So you were paid?

8      A.   I'm not allowed to answer that question.

9      Q.   Well, I'm not asking you the amount.

10      A.   In my opinion that would possibly be violating

11   the terms of the confidentiality clause, so I

12   respectfully decline to answer that question.

13      Q.   So I need to get Judge Thrash to order you to

14   answer that?

15      A.   If you would like.  Then, at least I'll have a

16   court Order.

17      Q.   Okay.  Are you familiar with the case

18   called --

19      A.   I could possibly save you time.  I'm not going

20   to discuss any settlement agreement.

21      Q.   Are you familiar with an individual by the

22   name of Barbara Cochran?

23      A.   That's my sister.

24      Q.   And you have filed an objection on her behalf

25   before?

1        A.    Yes.

2        Q.    And was that a case called Morrow versus ANN

3   Inc.?

4        A.    I don't even remember that one.

5        Q.    How many objections to settlements have you

6   filed on behalf of your sister, Barbara?

7        A.    Oh, more than one.  Two or three, something

8   like that.

9        Q.    Have you ever been paid to withdraw your

10   objection or any appeal to a final judgment in any of

11   the cases in which you represented Barbara Cochran?

12        A.    I, respectfully, decline to answer that

13   because I believe it would violate the confidentiality

14   provision.

15        Q.    Do you know a Vicky Mager?

16        A.    Yes.

17        Q.    Is she the wife of your long-time friend, Dave

18   Mager?

19        A.    No.  She's his sister-in-law.

20        Q.    Do you know a Melissa Schultz?

21        A.    Yes.  I believe that's Vicky's daughter.

22        Q.    Okay.  And you represented them as objectors

23   in a case called Mohegan versus Ascena Retail Group?

24        A.    Yeah.

25        Q.    And you, eventually, appealed the final

—83—

1    judgment, but dismissed that appeal, correct?

2         A.    As I recall.

3         Q.    Were you paid to dismiss the appeal?

4         A.    Again, I respectfully decline to answer, as I

5    believe it would violate the confidentiality provision

6    of the settlement agreement.

7         Q.    One of the cases that you represented your

8    daughter Barbara Cochran in was --

9         A.    You mean, my sister.

10        Q.    Your sister.  I'm sorry.

11        A.    Yes.

12        Q.    Jabbari versus Wells Fargo?

13        A.    It sounds familiar.

14        Q.    Do you recall that your sister filed a prose

15   objection and later you entered an appearance on her

16   behalf?

17        A.    Yeah.  That also sounds familiar.

18        Q.    Has that matter been resolved or is it still

19   pending?

20        A.    I believe that's still pending.

21        Q.    Are you familiar with a case called Perkins

22   versus LinkIn Corporation?

23        A.    Yes.

24        Q.    And in that case you represented a lawyer by

25   the name of Olen York?

84

1      A.    Yes.

2      Q.    How do you know Mr. York?

3      A.    He was a colleague of mine in my Louisville

4   office in Louisville, Kentucky.

5      Q.    And you took an appeal to the 9th Circuit?  A

6   final judgment entered in that case too, correct?

7      A.    As I recall.

8      Q.    And that appeal was dismissed, correct?

9      A.    I believe so.

10      Q.    Were you compensated to withdraw your appeal

11   or compensated in any way?

12      A.    I can't even remember on that one.

13      Q.    But you wouldn't tell me if you were, correct?

14      A.    That's correct.  I'm trying to save you some

15   work.

16      Q.    That's all right.  It's my passion and my

17   purpose.  There's a case called Stericycle Inc.

18   Stericycle or Sterisafe?  Stericycle.

19      A.    Stericycle, yeah.

20      Q.    You are familiar with that case?

21      A.    Yes.

22      Q.    And you represented Lee Morrow?

23      A.    Yes.

24      Q.    How do you know Mister or Lee Morrow?

25      A.    He's a long-time friend and a former client.

85

1      Q.   In that case you objected to the fees that

2  were being sought by the plaintiffs lawyers?

3      A.   I believe so.

4      Q.   And in that case did you take an appeal from

5  the final judgment?

6      A.   I'm not sure.

7      Q.   Do you know if you were paid in that case to

8  not file an appeal or to dismiss it if you did?

9      A.   I respectfully decline to answer because I

10  believe it would violate the confidentiality provision

11  of the settlement agreement.

12      Q.   There's a case called Golloher vs. Todd

13  Christopher International.  Are you familiar with that

14  case?

15      A.   Not really.

16      Q.   You represented class member Jennifer Cochran?

17      A.   That's my daughter.

18      Q.   And you do recall that case now?

19      A.   I recall representing her in a case, but I

20  don't recall the case right now.

21      Q.   And in that case, you also took an appeal from

22  a final judgment.  Would that refresh your recollection?

23      A.   No, but I believe you.

24      Q.   You filed a Motion to Dismiss the appeal which

25  was granted in or around September of 2015.

86

1           Do you recall that?

2      A.    Not really.

3      Q.    Do you know why the appeal was dismissed?

4      A.    No, I am not sure, but something tells me that

5  we just dismissed it without a settlement agreement, but

6  I'm not sure about that.

7      Q.    If you file objections to final judgments

8  approving settlements, why do you dismiss them if you

9  get paid?

10     A.    I haven't said that I get paid.

11     Q.    I'm asking the question assuming that you did.

12     A.    Well, then rephrase the question.

13     Q.    Yes.  Why do you keep on dismissing appeals

14  that you file from final judgments approving

15  settlements?

16     A.    I think now I have to object, because you are

17  talking attorney work-product and privileged

18  information.

19     Q.    Not because you got paid to do that, but you

20  objected on that basis?

21     A.    I respectfully decline to answer that question

22  on the grounds that it might violate a confidentiality

23  provision.

24     Q.    There's a case called, In Re: National

25  Football League Players Concussion case.  Are you

87

1    familiar with that case?

2         A.   Yes.

3         Q.   And you represented Curtis Anderson?

4         A.   Yes.

5         Q.   Who is Mr. Anderson?

6         A.   He is a former NFL player.

7         Q.   Any relation to you or is he a friend?

8         A.   No.  He responded to some kind of, you know,

9    one way communication that was sent to, I think, Ohio

10   NFL players, and then he called me.

11        Q.   Did you object to the fees in that case?

12        A.   Yes.

13        Q.   In the Automotive Parts Antitrust litigation,

14   you represented Olen York, Amy York and Nancy York?

15        A.   Yes.  And Olen is the same colleague from the

16   Louisville office, and wife, and mother, I believe.

17        Q.   Amy would be his wife and Nancy would be his

18   mother?

19        A.   Yes, I think.

20        Q.   Are you still objecting in that case?

21        A.   No.

22        Q.   Were you paid any sum of money to withdraw

23   your position as an objector in that case?

24        A.   I respectfully decline to answer on the

25   grounds that it might violate a confidentiality

-88-

1    provision of the settlement agreement.

2         Q.    A case called Pappas versus Naked Juice

3    Company of Glendora Inc.  Do you remember that case?

4         A.    I remember the name Pappas, that's all.

5         Q.    You represented a Bradley and Sara Henry?

6         A.    That's my daughter and son-in-law.

7         Q.    The basis of that objection was the attorneys

8    fees; is that correct?

9         A.    I can't remember.

10        Q.    You paid to withdraw your objection or your

11   appeal in that case?

12        A.    That's the Pappas case?

13        Q.    Yes, sir.

14        A.    I honestly can't even remember what became of

15   that case.

16        Q.    There's a case called Volz, V-o-l-z versus

17   Coka Cola.  You represented Bradley Henry and Wanda

18   Cochran.

19        A.    Wanda's my wife and Brad's my son-in-law, and

20   I don't remember anything about that case.  I'm sorry.

21        Q.    So you don't recall objecting to that on the

22   basis of the attorneys fees?

23        A.    No, I can't recall.

24        Q.    So you had a Toyota Motor Corporation

25   Unintended Acceleration.  Do you recall representing an

1   Amelia Ranieri and a Hassan Hein?

2        A.    Yes.

3        Q.    Friends of yours again?

4        A.    No.  If you're asking me how I --

5        Q.    How did you come to know them?

6        A.    It had to be some kind of a one way

7   communication.  That's the only way that I would do it.

8   I just don't remember how right now.

9        Q.    And you objected to the fees in that case,

10  correct?

11       A.    I wish I had a better memory, but I believe

12  you, if that is what you are saying.  I can't recall

13  specifically.

14       Q.    When you withdrew your objection, was that in

15  exchange for compensation?

16       A.    I, respectfully, decline to answer on the

17  grounds that it may violate a confidentiality provision

18  in the settlement agreement.

19       Q.    In the In Re: TFT LCD Antitrust Litigation,

20  you represented a Maria Marshall, a Wayne Marshall and a

21  Jerry Marshall.

22       A.    Yes.

23       Q.    Who are the Marshalls to you?

24       A.    Jerry is my sister Barbara's one of her

25  life-time friends, and I think her two -- one or both of

90

1    them are her daughters.

2        Q.   And in that case you also objected to the

3    attorneys fees?

4        A.   I believe so.

5        Q.   And you, subsequently, withdrew your

6    objection?  Was that because you got paid?

7        A.   Did I withdraw an objection or dismiss an

8    appeal?

9        Q.   Well, I'll say that it's one in the same.  You

10   dismissed an appeal.

11       A.   Okay.  I decline to answer that question on

12   the grounds that I stated before.

13       Q.   Demmick vs. Cellco Partnership.  Wanda Cochran

14   was a class member who objected to the settlement.

15   You're related to Wanda, aren't you?

16       A.   My wife.

17       Q.   What was the basis for the objection in that

18   case?

19       A.   I wish I could remember.

20       Q.   That appeal was dismissed, was it not?

21       A.   I don't remember.

22       Q.   You appealed the final judgment?

23       A.   Well, it was dismissed.  Yeah.

24       Q.   Were you paid for withdrawing the dismissal of

25   the appeal?

-91-

1      A.    I can't remember that case at all to be

2    honest.

3      Q.    How do you arrive at the percentages of what

4    you believe to be fair compensation for lawyers in class

5    action settlements?

6      A.    The facts of the case.

7      Q.    What facts?   How hard it is to litigate?

8      A.    Well, I would say all of the factors that are

9    considered by that jurisdiction.

10     Q.    Complexity?  Risk Assessment?

11     A.    Yeah, the 10 factors.  Whatever, you know.

12     Q.    And then time spent and outcome?

13     A.    Sure.

14     Q.    So if the fee is based upon the factor of

15   whether it would be Johnson versus Georgia Highway

16   Express, Camden 1 or Camden 2, then you're fine with the

17   outcome?

18     A.    You need to say that one again.  I'm getting

19   tired.

20     Q.    If the attorneys fees that are awarded by a

21   Court --

22     A.    Uh-huh.

23     Q.    Well, let me say this:  If the attorneys fees

24   sought by the lawyers are based upon the factors in that

25   Circuit -- in the 11th Circuit here, Johnson versus

1  Georgia Highway Express, or Camden 1 or Camden 2, that

2  would be an appropriate amount?

3       A.   Not necessarily.  Where the battle is or the

4  issue is, you might claim that they meet all of the

5  factors, and then at least an objector may say, "no, you

6  don't and here's why."  So it's all a matter of the

7  proof, it's in the pudding like.  Just because you're

8  citing a factor does no mean you are satisfying the

9  factor.

10      Q.   So if a Judge decides based upon his

11  assessment as a neutral and according to the factors of

12  that jurisdiction in this case, Johnson versus Georgia

13  Highway Express or the Camden decisions that, that fee

14  sought is reasonable, you don't have any problem with

15  that, correct?

16      A.   Of course, I could have a problem with it.

17  That's what I'm looking to see what the opinion is.  If

18  I disagree -- if in some way he abuses discretion

19  according to the legal standards, then, of course, I

20  would have a problem with it.

21      Q.   Abuse of discretion is a pretty high standard,

22  isn't it?

23      A.   Yes.  It's a high hurdle.

24      Q.   And you have some doubt that Judge Thrash is

25  going to abuse his discretion in this case?

```
 1        A.   I am a neutral observer.  I don't know.  I

 2   don't have an opinion one way or the other.  I'm just

 3   eager to see his decision.

 4        Q.   Well, he's a Chief Judge over the Municipal in

 5   Georgia?

 6        A.   Uh-huh.

 7        Q.   Do you know anything about his reputation or

 8   legal acumen?

 9        A.   No.

10        Q.   Do you know anything about his education?

11        A.   No.  But the way you're looking at me, it's

12   just so effective.  You have this look, like your eyes

13   are burning at me.

14        Q.   Well, I don't mean to do that.

15        A.   No.  You're just good at it.

16        Q.   Well, when you have been up since 1:00 o'clock

17   in the morning --

18        A.   Oh, geez.

19        Q.   -- that's what you end up with.

20        A.   Oh, my.  I'm sorry to hear that.  No, I mean

21   you have been very professional.

22        Q.   Thank you.

23        A.   Very, very good.

24        Q.   So were you aware that he went to Harvard Law

25   school?
```

94

```
1        A.   No.

2        Q.   I don't know even if I could get on campus.

3        A.   My brother went to Harvard.

4        Q.   Good for him.  Is your brother name Edward.

5        A.   Yes.  Can we not bring up Edward?

6        Q.   He's a lawyer here in Ohio, isn't he?

7        A.   Yes.

8        Q.   You don't have a good relationship with him?

9        A.   No, I love Ed.

10       Q.   Okay.  Well, I'm not going to take it to him.

11   He's an objector in other class settlements, isn't he?

12       A.   I don't know if he still does or not.  There

13   was a time that he was active.

14       Q.   Is he your older brother?

15       A.   Yeah.

16       Q.   You look younger than he does.

17       A.   Well, he's 70.  So I think he's winding down.

18            MR. YANCHUNIS:  Why don't we take a break.

19            THE VIDEOGRAPHER:  Okay.  The time now is

20   3:20.

21            THE WITNESS:  About five minutes?

22            MR. YANCHUNIS:  Yes, sure.

23            (Whereupon, a recess was taken.)

24            THE VIDEOGRAPHER:  We are back on the record

25   and the time now is 3:38.
```

95

1           MR. YANCHUNIS:  Mr. Cochran, I don't have any

2    further questions.  I appreciate you coming here today.

3           THE WITNESS:  Wow, that was a pleasant

4    surprise.

5           MR. YANCHUNIS:  You have the right to review

6    and sign your deposition in the event it's transcribed.

7           Do you want to reserve that right or waive?

8           THE WITNESS:  I prefer to reserve the right,

9    but I feel now that you have no little time pressure

10   here, I didn't know if you wanted to use any of it for

11   the Fairness hearing or not.  Doesn't that come up real

12   soon?

13          MR. YANCHUNIS:  No.  Let's go off the record.

14          THE VIDEOGRAPHER:  We have been off the

15   record.

16      (Whereupon, the deposition concluded at 3:40 p.m.)

17

18

19

20

21

22

23

24

25                    C E R T I F I C A T E

96

```
 1        The State of Ohio,        )
                                    )  SS:
 2        County of Cuyahoga.       )

 3            I, Donna S. Smith, Court Reporter, hereby

 4        certify that the transcript in the above-captioned

 5        proceedings was taken by me by means of machine

 6        shorthand and reduced to writing by computer-aided

 7        transcription under my direction.

 8            I further certify that the foregoing

 9        proceedings is a true and accurate transcript of

10        the proceedings, that I am neither a relative to

11        any of the parties associated with the case, nor

12        am I interested in the events or outcome of these

13        proceedings.

14            IN WITNESS WHEREOF, I have hereunto set my

15        hand and seal of office in Warrensville Heights,

16        Ohio 44128, this, 15th day of December, 2019.

17

18                              _____
                                Donna S. Smith,
19                              Court Reporter and
                                Notary Public, for the
20                              State of Ohio

21                              My Commission Expires:
                                9-27-2021
22

23

24

25
```