1               UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF GEORGIA
2                   ATLANTA DIVISION

3

IN RE:  EQUIFAX, INC., CUSTOMER )     Case Number
4 DATA SECURITY BREACH LITIGATION )
                     )     1:17-md-2800-TWT
5                     )
                     )
6                     )     CONSUMER ACTIONS
 _____)
7

8

9

10

11  Transcript of the final settlement approval hearing before

12     The Honorable Thomas W. Thrash, Jr., Chief Judge

13           December 19, 2019; 10:02 a.m.

14              Atlanta, Georgia

15

16

17

18

19 (Appearances on page two.)

20

     Proceedings recorded by mechanical stenography,
21 transcript produced by computer.

22 _____

23

        Diane Peede, RMR, CRR, CRC
24        Federal Official Court Reporter
       75 Ted Turner Drive, SW, Suite 2194
25        Atlanta, Georgia  30303-3309

Appearances:

| | |
|---|---|
| Counsel for Plaintiffs: | Kenneth S. Canfield |
| | Amy E. Keller |
| | Norman E. Siegel |
| | Governor Roy E. Barnes |
| | David J. Worley |
| | J. Cameron Tribble |
| | Barrett J. Vahle |
| | |
| Counsel for Defendant: | David L. Balser |
| | Phyllis B. Sumner |
| | S. Stewart Haskins II |
| | Elizabeth D. Adler |
| | Robert D. Griest |
| | Michelle A. Kisloff (by phone) |
| | Adam Cooke (by phone) |
| | |
| Counsel for the United States: | Akash R. Desai |
| | |
| Counsel for the Consumer Finance Protection Bureau: | Jenelle Dennis (by phone) |
| | Richa Dasgupta (by phone) |
| | |
| Counsel for the Attorney General's Office of Indiana: | Corinne Gilchrist (by phone) |
| | Douglas Swetnam (by phone) |
| | |
| Counsel for the Attorney General's Office of Massachusetts: | Sara Cable (by phone) |
| | |
| Counsel for Objectors Frank and Watkins: | Melissa Holyoak |
| | |
| Counsel for Objector Mikell West: | Jerome Froelich, Jr. |
| | Robert Clore |

P R O C E E D I N G S

(Call to the order of the Court.)

THE COURT:  All right.  This is the case of In re:
Equifax Customer Data Security Breach Litigation, Case Number
17-md-2800.

First, let me ask counsel for the parties who
expect to participate in today's hearing for the Plaintiffs
and for the Defendant to identify yourself by name and the
parties you represent.

MR. CANFIELD:  Good morning, Your Honor.  Ken
Canfield, co-lead counsel for the Plaintiffs.

THE COURT:  Good morning, Mr. Canfield.

MS. KELLER:  Good morning, Your Honor.  Amy Keller,
also co-lead counsel on behalf of the Plaintiffs.

THE COURT:  Good morning, Ms. Keller.

MR. SIEGEL:  And good morning, Your Honor.  Norm
Siegel, co-lead counsel for the Plaintiffs as well this
morning.

THE COURT:  Good morning, Mr. Siegel.

MR. SIEGEL:  Good morning, Your Honor.

GOVERNOR BARNES:  Roy Barnes, Your Honor, for the
Plaintiffs.

THE COURT:  Good morning.

MR. DESAI:  Good morning, Your Honor.  Akash Desai
for the United States, I think as local counsel.

1          For the Bureau of Consumer Financial Protection,

2   also participating on the conference line are Jenelle Dennis

3   and Richa Dasgupta.

4          THE COURT:  Good morning.

5          MR. BALSER:  Good morning, Your Honor.  David

6   Balser on behalf of the Equifax.

7          THE COURT:  Good morning, Mr. Balser.

8          MS. SUMNER:  Good morning, Your Honor.  Phyllis

9   Sumner on behalf of Equifax.

10         THE COURT:  Good morning, Ms. Sumner.

11         MR. HASKINS:  Good morning, Your Honor.  Stewart

12   Haskins, also on behalf of Equifax.

13         THE COURT:  Good morning, Mr. Haskins.

14         MS. KISLOFF:  Your Honor, this is Michelle Kisloff

15   and Adam Cooke on the line from Hogan Lovells, also on behalf

16   of Equifax.  Thank you.

17         THE COURT:  Good morning.

18         Any other governmental officials who are on the

19   line, you can identify yourself now or you can wait until you

20   speak later in the proceedings.

21         Anyone from the Consumer Finance Protection Bureau

22   on the line?

23         MS. DENNIS:  Good morning, Your Honor.  This is

24   Jenelle Dennis and Richa Dasgupta.

25         THE COURT:  Good morning.  The Attorney General's

1    Office of Indiana?

2             MS. GILCHRIST:  Good morning, Your Honor.  Corinne

3    Gilchrist and Douglas Swetnam.

4             THE COURT:  The Attorney General's Office of

5    Massachusetts?

6             MS. CABLE:  Good morning, Your Honor.  Sara Cable

7    for Massachusetts.

8             THE COURT:  And the City of Chicago?

9             (No response.)

10            THE COURT:  All right.  It's not necessary for the

11   objectors or their attorneys to identify yourselves now.

12   We'll do that later, after I've heard from counsel for the

13   parties.

14            So my intention, Mr. Canfield, Mr. Balser, is to

15   hear from the Plaintiffs first on the two pending motions,

16   the Plaintiffs' motion for attorneys' fees, expenses and

17   service awards, and the Plaintiffs' motion for final approval

18   of the proposed settlement.

19            So I'll hear from the Plaintiffs' first, then

20   counsel for Equifax, then any of the governmental entities,

21   and then I'll hear from the objectors, and then give the

22   Plaintiffs and Equifax an opportunity to respond to the

23   objectors, if you wish to do so.

24            How does that sound?

25            MR. CANFIELD:  We were envisioning a slightly

different order of show, but the Court's preference is fine
with us.

THE COURT:  Mr. Balser.

MR. BALSER:  No objections, Your Honor.

THE COURT:  All right.

All right, Mr. Canfield.

MR. CANFIELD:  Your Honor, the parties were last
here on July 22nd of this year.  On that day, we presented
the Court with the proposed settlement, and in accordance
with the front-loading requirements of amended Rule 23, we
provided the Court with extensive briefing and sworn
declarations explaining why the settlement is fair, adequate
and reasonable and in the best interest of the Class.

After hearing from the parties, the Court
preliminarily approved the proposed settlement, preliminarily
certified the proposed Class, and approved our plan for
notifying the Class.

The Class has now been notified in accordance with
the Court's order, as attested by the declarations from both
JND, the claims administrator, and Signal Interactive, the
notice provider.

So we're here today asking that the Court finally
approve the settlement and certify the Settlement Class, and
we're also asking that the Court grant our motion for
attorneys' fees, expenses and service awards as provided

1    under the settlement.

2            The Court has before it hundreds of pages of

3    briefing and sworn declarations on this issue.  The last two

4    months have been -- or have seen a flurry of activity.

5            Since the preliminary approval hearing, we filed

6    substantial additional declarations, most recently late last

7    night.

8            Our papers demonstrate that all of the requirements

9    for final approval and Class certification have been met, and

10   that our motion for fees is well justified and reasonable and

11   appropriate under the law.

12           We don't plan to cover today all the issues that

13   are addressed in our papers.  It would take us more than

14   today, and we don't think it's necessary in light of the

15   extensive filings that will be made.

16           However, I want to be brief, but given the scope of

17   the issues, it may take me a little while to get through the

18   legal requirements that govern financial approval, Class

19   certification, and our fee application.  And I'll address the

20   objections briefly at a high level.

21           When it comes time for rebuttal, Mr. Siegel will

22   take the lead.  And then if the Court has any questions about

23   particular aspects of the settlement, I will try to address

24   them, but it may be more appropriate for Mr. Siegel or Ms.

25   Keller to respond since we've divided up areas of

responsibility in the case, and depending on how detailed the Court's questions are, it may require somebody else to answer.

Let me begin with the case for why this settlement should be finally approved.

By any measure, this settlement is historic, provides better and much more significant relief than any data breach settlement in history.

The $380.5 million cash settlement fund alone is larger than the relief obtained in all previous data breach settlements combined.

The settlement reimburses Class members for all of their out-of-pocket expenses relating to the breach, up to $20,000. So that involves things like hiring an accountant or a lawyer to help clean up with the aftermath of fraud, buying credit monitoring as a precaution against future fraud, or paying one of the credit-reporting agencies to freeze your credit.

Based on the results of the claims process so far, we're confident that all of those claims are going to be paid in full. And one of the reasons we're confident of that is that we've got an insurance fund out there that's part of the settlement. So that if the $380.5 million isn't enough to pay the out-of-pocket claims, Equifax is going to pay up to another $125 million into the fund.

The settlement also provides compensation for time that people spend dealing with the breach, up to 20 hours at $25 per hour, subject to a $38 million cap.

And dealing with the -- spending your time on the phone and with unresponsive or difficult-to-reach folks is worth some compensation, and we've tried to provide that.

The settlement offers all 147 million Class members four years of very high-quality credit monitoring but through Experian, and an additional six years of credit monitoring through Equifax that will help Class members detect if they're a victim of identity theft in the future or, alternatively, for those who, for whatever reason, don't want to take advantage of the credit-monitoring service, they have the opportunity to make a claim for modest alternative cash compensation.

The settlement also provides access to identity restoration services for people who are actually victimized by fraud or identity theft.  They can have a person assigned to their case and they can talk to that person.  They can get assistance from that person in navigating the minefield that exists when somebody has stolen your identity, and that lasts for seven years.

Another significant part of the settlement is Equifax is required to improve its cybersecurity practices. And the way in which we do that is we are going to ask the

Court to enter a consent order that contains comprehensive security standards that we negotiated with some of the finest cybersecurity experts in the country to ensure that, to the extent that it can be done, Equifax is going to not have another breach.

And these standards are not just out there in the ether.  They're subject to the Court's enforcement powers. There will be an independent monitor who will look, examine what Equifax is doing to make sure that there is compliance with the consent order; and if they're not in compliance, the issues can be brought to the Court.  So this is really an extraordinary piece of the relief that's offered by this settlement.

And on top of those commitments, Equifax is required to spend at least $1 billion on data security and related technology.

The minimum cost to Equifax of this settlement is $1.38 billion, and it could be a lot more, depending on how many people sign up for credit monitoring.

The benefit to the Class, when considering the value of all of the benefits, monetary and non-monetary, exceeds $7 billion or more.

As the Court is aware, the parties' negotiations, settlement negotiations in this case lasted over 18 months. They were overseen by retired federal Judge Layn Phillips,

who is probably the country's preeminent mediator in major
complex civil litigation, and he has mediated a number of
data breach cases, including the Anthem case, which until
this one was the largest settlement.

He's filed a declaration in the case and he says
that, based on his experience and everything that he has seen
and lived through with us for the last almost two years, that
he fully supports final approval of the settlement, and that
it is fair, reasonable and adequate for all of the Class.

The settlement has also been embraced by federal
and state regulators, including the Federal Trade Commission,
the Consumer Finance Protection Bureau, and Attorneys General
from 48 states, the District of Columbia, and Puerto Rico.
And they've incorporated the terms of this settlement into
their own consent orders with Equifax for purposes of
offering consumer restitution.  So that restitution to
consumers from all these government agencies is depending
upon how this Court deals with this settlement.

We've also heard from the Class about what they
think about the settlement, and the response has been
unprecedented and overwhelmingly positive.

The Court is aware we have a settlement website.
It's had over 130 million visits.

Over 15 million verified Class members, more than
ten percent of the Class, have already filed claims and more

1    do so every day.

2              The claims administrator, JND, is one of the

3    largest and most experienced claims administrators in the

4    country, and it says, and has filed a declaration to this

5    effect, that it's unaware of any Class action that has had

6    this kind of response or has had 15 million claims.

7              And the claims rate is unusually high.  In Anthem,

8    by way of example, there were only 1.4 million claims from a

9    Class of 80 million people.  That's a claims rate of 1.7

10   percent.  The claims rate here is roughly six times higher.

11             In contrast to the robust number of claims, only

12   388 people, Class members, have directly objected or just

13   0.0002 percent of the Class, and only 2,770 have opted out.

14   This truly is an extraordinary situation.

15             The large number of claims undoubtedly reflects the

16   enormous media interest and the first-of-its-kind Notice Plan

17   that we presented to the Court at the preliminary approval

18   hearing.  And as the Court is aware, that Notice Plan uses

19   modern techniques from the world of political and commercial

20   advertising, such as focus groups and public opinion research

21   to craft, test and target the messaging to the Class and

22   encourage their participation.

23             The digital component of the Notice Plan alone

24   reached 90 percent of the Class an average of eight times in

25   the first 60 days, and the digital outreach is continuing.

1    And the tiny percentage of objectors and optouts shows that

2    the Class as a whole strongly supports the settlement.

3            Rule 23(e) sets out the standards the Court should

4    consider in deciding whether the proposed settlement is fair,

5    reasonable and adequate.

6            The proposed settlement meets each one of them.

7    I'm not going to talk about them in great detail.  That's

8    done in our papers.  But I do want to mention each one.

9            First, the Class was adequately represented.

10   There's no fundamental inter-Class conflict, as courts in

11   other data breach cases have repeatedly held.  And the team

12   of attorneys the Court appointed to represent the Class

13   includes the leaders of every significant data breach case

14   that's ever been litigated.

15           And the Court has seen how we have conducted

16   ourselves during this litigation and can form its own opinion

17   in addition to relying on the record that we've assembled for

18   the Court.

19           The next factor is whether the proposed settlement

20   was negotiated at arm's length.  Judge Phillips attested to

21   that.  In fact, despite 18 months of negotiation, the parties

22   reached an impasse.  There wasn't going to be a settlement.

23           And late on a Saturday night, Judge Phillips

24   decided that what he would do to try to bridge the gap was to

25   make a mediator's proposal, and he said, "If both sides

accept it, you've got a settlement.  If neither one of them does, we're done."

He made his proposal and both sides accepted. That's why we're here.

The next factor under Rule 23(e) is whether the relief provided to the Class is adequate, particularly in light of the risks, cost and delay of continued litigation.

I've already talked about the historic relief provided by the settlement.  In many respects, that relief exceeds what could be achieved at trial.

When the risks, costs and delay of continued litigation are considered, the result's even more impressive.

The Court is well familiar with the McConnell case that was decided after this case settled.  It creates considerable doubt whether Equifax under Georgia law even had a legal duty to protect anyone's personal information.

The Court is also familiar with the Collins case, which held that the only people who can recover damages under Georgia law if their personal information is stolen in a data breach are those who can prove that the stolen information was actually used to commit identity theft, and that the risk that they might be exposed to in the future is not compensable under Georgia law.

The reality is that if this case does not settle, there is a serious risk that can't be disregarded that most

Class members will never receive anything, and we might all spend years and millions of dollars in expenses getting to that point.

The last factor under the Rule 23 analysis is whether Class members are treated equally.  They are.  All Class members have similar claims arising out of the same breach and are entitled to the same benefit.

Those who suffered out-of-pocket losses or spent time can recover them.  All have the opportunity to get the same credit monitoring.  All can take advantage of ID restoration services, and all benefit from the reduced risk of another data breach.

So we've met the standards for final approval, and final approval thus is appropriate.

Let me talk a bit about the objections that we've heard to final approval.  Most of the 388 direct objections are from Class members who are frustrated by the size of the recovery based on a misunderstanding of the settlement terms or because they don't appreciate the risks and limits of Class action litigation.

A much smaller number of objections are filed by serial objectors, lawyers who have either objected pro se or on behalf of a relative, a close friend or colleague, and that they have a history of doing this in many other cases, and many of whom are motivated by hope of personal gain, not

a desire to benefit the Class.

This is an incredibly small number of objectors relative to the size of the Class, not by the number of serial objectors -- they show up all the time and make the same arguments -- but by the small number of non-serial objectors, regular Class members who've objected.

It's particularly surprising, given that there were several organized efforts to gin up objections by using inflammatory language, accusing the lawyers involved of selling out the Class, and flat out misrepresenting the settlement.

The typical message that was used in these efforts was that this is a $700 million settlement -- I'm not sure where that number came from -- but that only 31 million would be used to pay benefits to Class members; and that if everybody were to file a claim, each Class member would only get 21 cents.

Some of these misrepresentations even made it into an op-ed piece in the New York Times.

Now, we know those misrepresentations caused many Class members to object.  The objections themselves repeat the false statements and they express outrage.  I'd be outraged, too, if there were only $31 million of benefit to the Class in this settlement.

These same misrepresentations were used by a

company called Class Action, Inc., and its C.E.O., a man named Reuben Metcalfe, who tried to solicit objections online.

Right around the objection deadline, Mr. Metcalfe sent 718 forms that allegedly had been filled out by Class members on a website he called NoThanksEquifax.com.

I got a little bit of an introduction into the electronic media world in having to deal with this case.  But his website had what's called a chat box -- a chat bot, b-o-t, named Clarence, who answered --

THE COURT:  What is a bot?

MR. CANFIELD:  Ms. Keller may be the best person on our side to explain that, Your Honor.

THE COURT:  We'll hold that --

MS. KELLER:  We'll get to that, Your Honor.

THE COURT:  I'm not familiar with that term.

MS. KELLER:  It's an automated response generator, Your Honor.

THE COURT:  Okay.

MR. CANFIELD:  That's helpful.

The Clarence falsely told people that the settlement only had $31 million to pay claims, and asked people if they wanted to object or to file a claim.

If they said they wanted to object, visitors to the website were given a number of boxes to check.  You could --

1    I'm not sure exactly how the process worked, but the forms

2    that were generated came up with one or more of the following

3    boxes checked:  That the settlement was unfair, quote,

4    "Unfair," quote, "Inadequate," quote, "Unreasonable," quote,

5    "Unduly burdensome."

6              And the people who went on this website with

7    Clarence's assistance had the opportunity to add what was

8    called a Personal Note to the Court.

9              We've been through all of these forms, including

10   the Personal Notes.  None of them raise any new objections.

11   There's nothing new in any of that.  The same objections were

12   made by other people.

13             But on their faces, the forms are invalid because

14   they weren't submitted through the process ordered by the

15   Court, and the forms don't comply with the requirements of

16   Rule 23.

17             To investigate further, we decided to depose Class

18   Action, Inc., through its C.E.O., Mr. Metcalfe.  He was

19   subpoenaed to appear for a deposition, but he didn't show.

20   He was subpoenaed to produce documents, which he several

21   times promised he would produce before the deposition, but he

22   never produced any documents.

23             However, in talking with Mr. Metcalfe, one of the

24   lawyers on our team learned that Mr. Metcalfe admitted that

25   he thought the settlement only provided $31 million to pay

claims.   He admitted he never read the Settlement Agreement, and that he had not even bothered to read the official court-approved notice before advising people online about what was in the settlement and what they should do about it.

Under these facts, we believe it's appropriate that the Court find that all of the chat box objections are invalid and strike them from the record.

We also ask that the Court find that Class Action, Inc., and Mr. Metcalfe, its C.E.O., promoted false and misleading information regarding the terms of the settlement in an effort to deceptively generate objections to the settlement.

Now, as to the merit of the objections that have been filed with regard to final approval, we've exhaustedly dealt with them in our briefing.   I'm only going to be talking about a few today.

Let me start with the issue of alternative compensation.   That's the money that -- up to $125 that some people in the settlement were eligible to claim and has generated a fair amount of publicity and, I think, is responsible at its core for a number of the objections from non-serial objectors.

These objectors challenge the adequacy of the alternative compensation remedy.   They complain that they will not receive the $125 that they believe they were

promised by the F.T.C. or that they read about in the newspaper or that they read about online because they're going to receive less than $125 as a result of the fact that the alternative compensation benefits are initially capped at $31 million.

I want to express -- or I want to respond directly to the notion that the parties and, implicitly by approval the Notice Plan, the Court misled the public by promising that all Class members were entitled to $125 in damages simply by filing a claim, or that we engaged in some sort of bait and switch to keep Class members from getting their $125.

That never happened. And I think, unfortunately, it's going to take a little bit of explanation to walk through how we got to this point.

Among Class counsel's primary goals in the settlement negotiations were to ensure that people who had actual out-of-pocket losses, who had spent money as a result of the breach were reimbursed, and we wanted to provide the opportunity for all 147 million Class members to get high-quality credit monitoring to protect themselves if they were a victim of identity theft in the future as well as high-quality ID restoration services to help people who actually were victimized in the future and needed to clean up their personal situations.

The purpose of the alternative compensation remedy was not to give everybody in the Class $125.  That was not -- it's not realistic and it never would have happened.

Its purpose was to provide a modest cash payment to a limited number of people as an alternative -- that's why it's called "Alternative Compensation" -- to signing up for the much more valuable benefit of credit monitoring.  To qualify, the alternative compensation benefit was limited to those who already had credit-monitoring services, do not want the services available under the settlement, attest that they will maintain their own service for at least six months, and provide the name of their current credit-monitoring provider. That's what the settlement provided.

The alternative compensation was capped at $31 million so that there would be enough money to pay all of the other benefits the settlement provides, including, as I've mentioned, out-of-pocket claims, credit monitoring, and ID restoration services.

As a result of this cap, claims are reduced pro rata through alternative compensation, and if there's money left over after all of those other benefits have been paid, the cap will be lifted and claimants will get more money.

The cap made sense, given our litigation goals.  It also gave -- made sense, given our knowledge of Class

litigation over data breach cases.

The 31 million number was not just pulled out of the air.  We had the benefit of knowing what happened in the Anthem settlement relatively recently.

In Anthem, Class members were offered a similar choice.  They could have two years, only two years of credit monitoring or they were eligible for an alternative cash payment if they didn't want the credit monitoring.

More of that in the Anthem case.  More than 1.2 million Class members took the credit monitoring.  Only 144,000 preferred cash.  So nine times more Class members in Anthem preferred credit monitoring to cash.

And if the same percentage that had made that choice in Anthem had made the choice in this case, we would have hit the $125 figure almost on the button.  That's what people would have gotten.

Now, the Notice Plan that we presented to the Court and that the Court approved explained all that.  It explained that the alternative compensation was limited and could be reduced.

The long-form notice told Class members that they could get up to $125, and further stated, quote, "If there are more than 31 million in claims for alternative reimbursement compensation, all payments for alternative reimbursement compensation will be lowered and distributed on

a proportional basis."

Now, unfortunately, before we had even presented the settlement to the Court and long before the official Notice Plan had even started, the media began reporting that everyone could get $125 under the settlement.  And when the website went live late on the evening of the day after final approval or preliminary approval, lots of people started to file claims.

As soon as Class counsel realized what was happening, we acted to make sure that the Class members were not disadvantaged by the misinformation about the settlement that was out there.

It was apparent to us, given the number of claims that were being made, that the $31 million cap likely would be exceeded and payments would have to be reduced.

There was no way to know and there is no way to know today how much will be paid to the alternative compensation claimants.  That depends on lots of things that we just don't know yet.

But we wanted to let the Class know that about this information, that the cap was likely to be breached, and they were going to -- they could end up getting a lot less if they chose the $125 benefit, and we wanted to give Class members who had already made their choice a chance to change their mind after they had received more information.

1     The parties worked over the weekend to develop a

2  plan and we solicited input from the regulators in that

3  process.  And on July 30, less than a week after the website

4  had gone live, we presented our plan to the Court, as the

5  Court recalls.

6     The Court approved the plan that we proposed, and

7  we implemented the plan as it was approved.

8     On August 1st, 2019, Class counsel distributed a

9  statement to the media setting the record straight and urging

10  Class members to rely only on the official court notice, not

11  what they had heard or read in the media.

12     On August 2nd, a statement was added to the home

13  page of the settlement website in a very prominent position.

14  It read, quote, "If you request or have requested a cash

15  benefit, the amount you receive may be significantly reduced

16  depending on how many valid claims are ultimately submitted

17  by other Class members.

18     "Based on the number of potentially valid claims

19  that have been submitted to date, payments for time spent and

20  alternative compensation of up to $125 likely will be

21  substantially lowered and will be distributed on a

22  proportional basis if the settlement becomes final.

23     "Depending on the number of additional claims --

24  valid claims filed, the amount you receive may be a small

25  percentage of your initial claim."

1           On August 7th, 2019, the first e-mail notice

2   started going out to Class members.  Ultimately it went to

3   over 100 million Class members.

4           That same statement that I just read was

5   prominently featured in the e-mail.  That same statement was

6   also prominently featured in the follow-up e-mail that has

7   been sent to Class members since.

8           Moreover, an e-mail was sent to all Class members

9   who had filed a claim, repeating the same message, telling

10  them about the fact that they might only receive a small

11  percentage of what they had been caused to believe they would

12  get, and that the e-mail gave them the opportunity to switch

13  their choice.  If they thought that the alternative

14  compensation wasn't enough, they could switch to credit

15  monitoring.

16          So where does that leave us?  Except for all Class

17  members who filed a claim in the week before August 2nd, the

18  Class was notified that the alternative compensation

19  claimants would likely receive only a small percentage of the

20  $125, and the ones who filed before August 2nd were given the

21  same information in a special notice and given a chance to

22  change their mind.

23          Shortly after the hearing we had with the Court,

24  the F.T.C. also posted a notice on its website telling the

25  public about the situation and urging consumers to choose

credit monitoring because it was a much more valuable

benefit.  That was widely reported in the media.  Anyone who

was paying attention knew if they filed an alternative

compensation claim, they likely would not receive anywhere

near $125.

And all of these people who have come in and

objected and said that there was a scam or a bait and switch,

they're not deceived.  They know.  Anybody who has paid any

attention knows that the alternative compensation claims are

not going to be paid at $125.

The likelihood that alternative compensation

claimants will receive substantially less than $125, however,

does not mean that the relief afforded by the settlement is

inadequate.  To the contrary, the relief afforded by the

settlement is unprecedented in scope.

The Court must evaluate the adequacy of the

settlement in terms of the entirety of the relief that's

afforded to the Class as a whole.

The other substantial benefits that I've gone over

would justify approval of the settlement as fair, reasonable

and adequate, even if the settlement did not provide any

alternative cash compensation.

Let me repeat that again because it is so

important.

This settlement is fair, reasonable and adequate

for every Class member, even if there had been no alternative

Class -- or alternative cash compensation offered to the

people who already had credit monitoring and didn't want to

choose what was being offered to them under the settlement.

This Court has already approved a data breach

settlement in which there was no alternative cash

compensation.  That was in the Home Depot data breach.  You

have to look at it all in the -- from the standpoint of the

Class as a whole.

Next, the likelihood that alternative compensation

claimants will obtain substantially less than $125 is not

unfair, nor does it render the alternative compensation

benefit itself inadequate.

All the alternative claimants are eligible for the

same relief afforded to other Class members.  They received

the same court-approved communication as the other Class

members, disclosing that they wouldn't get $125; and those

who filed their claims before receiving the Court-approved

communication were given the opportunity to change their

mind.

That some Class members chose alternative cash

compensation rather than the much more valuable credit-

monitoring services offered under the settlement reflects

their own personal choice.  I'm not saying that's a bad

choice or it's a good choice, but it is their choice and it

1   was an informed choice, and it is not unfair to all the other

2   Class members that that's the choice they made.

3        The other objection I want to address relates to

4   the value of credit monitoring.  There's a split in the

5   Class.  Many Class members say the credit monitoring is a

6   really valuable benefit, and they object because it's only

7   limited to ten years.  A lot of people want it for life.

8        Others, mostly the serial objectors, say it's

9   essentially worthless because free credit monitoring is

10  widely available.

11       We've submitted declarations attesting to the value

12  of the credit monitoring.  If a Class member wanted to buy it

13  on the open market for themselves, it would cost nearly

14  $2,000, as we've described.

15       We've cited in our briefs to the many other court

16  decisions, including decisions by this Court, that have

17  recognized the value of credit monitoring and used its retail

18  price to quantify that value.

19       To date, more than 3.3 verified Class members have

20  signed up for credit monitoring and obviously see the benefit

21  of it, and more are signing up every day.  And we expect a

22  spike in signups for credit monitoring as the claims deadline

23  approaches at the end of next month.

24       And that credit monitoring that Class members have

25  already signed up to receive valued at its retail cost is

1   collectively worth more than $6 billion.

2            The Court can read all that in our papers.

3            I'd like to share with the Court a personal

4   experience that made it clear to me just a week or so ago

5   that anyone who says credit monitoring is worthless hasn't

6   ever been the victim of identity theft.

7            While we were furiously trying to prepare our

8   briefs around the Thanksgiving holiday, I learned I was the

9   victim of identity theft.  And I was so busy, I sort of just

10  ignored it, but then I started getting calls from banks that

11  credit applications were being opened in my name and they

12  didn't seem right.

13           I realized at that point I had a problem and I

14  needed to pull myself away from the case, and I tried on the

15  websites to do something about it.  I was incredibly

16  frustrated.

17           Fortunately, I had signed up for credit monitoring

18  as a victim of the Anthem data breach case, and I had

19  received an e-mail from the credit monitor.  And the biggest

20  frustration I had in this process is I couldn't talk to

21  anybody.  You had to go online and your answers just weren't

22  there.  It was incredibly frustrating and time-consuming.

23           But when I looked at that e-mail from the credit-

24  monitoring service, it had a telephone number I could call.

25  So I called that number and the person said, "Here's what

we're going to do," and walked me through the process.  And I learned what had happened, and I was -- by going onto the credit-monitoring website, I was able to get a list of all of the fraudulent applications that had been entered in my name.

And that service put me in touch with all the people I needed to set things right, and I can't tell you how much time and frustration that service saved me.

One of the serial objectors who I expect you'll hear from today has claimed that the credit monitoring -- ten years of credit monitoring that's being provided under the settlement is worth no more than $5.  That's not $5 a month.  That's $5 for ten years.

And I'm not sure the Court is aware of all that goes into the type of credit monitoring that's being provided under the settlement.  Because it's important, I think I'll just take a moment to go through it.

And this is the very high-quality credit monitoring that will be provided by Experian to Class members who want it.  It provides daily consumer report monitoring from all three consumer-reporting agencies.  That's Equifax, Experian and TransUnion.

It shows key changes to one or more of the Settlement Class members' consumer reports, including automated alerts when the following occur:  new accounts are opened, inquiries or requests for a consumer report for the

purpose of obtaining credit, changes to the person's address,
or any negative information, including delinquency or
bankruptcies.

People get a free consumer report online that is
updated monthly.

They get updated alerts when the credit monitor
finds on the dark web that their Social Security number,
e-mail address or credit card number has shown up.  The dark
web is where the thieves go to get this kind of information.

People are given an alert when names or aliases or
addresses associated with the Class members' Social Security
number are used, when a loan or certain other unsecured
credit has been taken or opened using the Settlement Class
members' Social Security number, when a Class member's
information matches information and arrest records or
criminal court filings, when it's used for identity
identification, when a Class member's mail has been
redirected through the postal service, when banking activity
is detected relating to new deposit account applications,
opening of new deposit accounts, changes to a personal
identification on an account or new signers are added to an
account, and when a balance is reported on a credit line that
has been inactive for at least six months.

The service provides $1 million in identity theft
insurance to cover a loss related to stolen identity.

1            There's a consumer -- or a customer service center

2     to provide assistance with enrollment, website navigation,

3     monitoring alert questions, dispute assistance, fraud

4     resolution assistance, and other assistance.  That's what I

5     took advantage of, but that's not even the identification

6     restoration service that's being provided.  That's part of

7     the credit-monitoring service.

8            With regard to the restoration services, if

9     somebody has been victimized by identity theft, they can call

10    a number and they are assigned a dedicated specialist who's

11    familiar with this sort of thing, and the specialist provides

12    assistance in addressing the theft, including a step-by-step

13    process with form letters to contact companies, government

14    agencies, the other consumer-reporting agencies,

15    participating in conference calls with the affected financial

16    institution so that if your identity has been used to open up

17    a bank account at SunTrust, you can get one of these people

18    on the phone with you.

19           And for a person that's not particularly

20    sophisticated in banking matters, having an advocate on their

21    side is -- if it happens just once, it's certainly worth a

22    lot more than $5.

23           That's all I'm going to say about the objections to

24    the fairness, reasonable and adequacy of the settlement.

25           Let me just turn briefly to Class certification.

1          In preliminarily certifying the Class, the Court

2    found that the requirements of Rule 23(a) and (b)(3) had been

3    met.  Nothing has changed.

4          Settlement Classes in other data breach cases are

5    routinely certified, as this Court did in Home Depot, as

6    Judge Ray did in Arby's, as was done in Anthem and Target.

7    The Court should do the same thing here that it did in Home

8    Depot for the same reasons.  That's all I'm going to say on

9    Class certification.

10          Let me turn to our motion for fees, expenses and

11    service awards.

12          We have provided the Court with extensive

13    declarations and other evidentiary support that show that our

14    requested fee, expenses and service awards are reasonable and

15    well justified.

16          As the Court is aware, under Eleventh Circuit

17    precedent, the fee must be calculated using the percentage

18    approach because this is a common fund case.

19          And under Eleventh Circuit precedent in Camden I,

20    the typical range is 20 percent to 30 percent with a

21    benchmark of 25 percent.

22          The fee we've requested is 20.36 percent of the

23    minimum $380.5 million cash fund.  That percentage is at the

24    very low end of the approved range, but that percentage is

25    not a true measure of the fee.  That's because the settlement

fund of 380.5 million is not the only settlement benefit.

There are other valuable benefits, both non-monetary and monetary, and the Eleventh Circuit has instructed that those other benefits also need to be considered in the fee calculation.  And when those other benefits are considered, the requested fee is much less than 20.36 percent.

The requested fee is 15.3 percent of the $380.5 million cash fund and the additional 125 million that's available to pay out-of-pocket claims if needed.

The requested fee is only five percent of those amounts plus the $1 billion that Equifax is required to spend for data security and other related technology.

And the requested fee is far less than one percent of the benefit when the retail value of the credit-monitoring services available to the Class under the settlement are included, including specifically the $6 billion of credit monitoring that's already been claimed by Class members.

Now, I'm going to be talking today and using the 20.36 percent figure, not because we concede that's the appropriate percentage that we're asking for, but because if that percentage is justified, as it is under the applicable precedent, there can be no question about the reasonableness of what we're requesting.

Again, as the Court is well aware, the Eleventh

1   Circuit has instructed trial courts to use the Johnson

2   factors in evaluating the reasonableness of a proposed

3   percentage.

4           All of those Johnson factors, the ones that are

5   relevant, support a fee of at least the 25 percent benchmark,

6   and more appropriately a fee at the top end of the approved

7   range.

8           I'm not going to talk about all of them.  I only

9   want to talk briefly about two.

10          One is risk.  That is a substantial factor in the

11  fee analysis.  The more risky the case, the higher the

12  percentage.

13          This case was enormously risky, and our willingness

14  to invest over 30,000 hours of our time, more than a million

15  dollars of our expenses in the face of this risk would

16  support a fee much higher than what we are asking for.

17          The only other factor I'm going to mention is the

18  factor for awards in other cases.  If you look at other major

19  data breach cases and the percentages that have been used in

20  calculating the fees in those cases, our percentage is well

21  below any other case.

22          In Arby's, it was just under 30 percent.

23          In Home Depot, this Court's case, it was 28

24  percent.

25          In Target, it was 29 percent.

1     And in Anthem, that was awarded, I believe, last

2  year, it was 27 percent.

3     In contrast, we're asking for essentially 20

4  percent.

5     THE COURT:  Well, Mr. Canfield, it struck me as odd

6  that you would be requesting a figure of 20.36 percent until

7  I understood that the $77.5 million requested fee was 25

8  percent of the original Term Sheet cash fund of $310 million.

9     MR. CANFIELD:  That's correct.

10     THE COURT:  That was 25 percent, right?

11     MR. CANFIELD:  When we negotiated the Term Sheet,

12  we agreed that we would only seek 25 percent of the

13  $310 million.

14     When the -- as we've described in our papers, there

15  was an additional $70.5 million that ultimately was added to

16  the settlement fund.  That did not result exclusively from

17  our efforts.  It was -- the catalyst, the suggestion for it

18  were federal regulators.

19     And when Equifax and the federal regulators and

20  state regulators, after our Term Sheet was executed, took the

21  terms of the Term Sheet and were afforded an opportunity to

22  make suggestions that were not -- we were not required to

23  take, but if they wanted to suggest that we improve the

24  settlement in some way, we were fine with that.

25     We were presented with a package of proposed

changes that Equifax and the regulators had negotiated on our own.  We didn't have anything to do with that.

When we saw the package of changes, one of the changes involved increasing the amount of the fund by $70.5 million.  We supported that wholeheartedly.

The problem was, as part of this package, there were a lot of things in there that we did not believe were in the interest of the Class and that were likely to draw objections that might trigger approval problems, and under certain claims scenarios, would result in a number of Class members getting less with the additional money than they would have received under our original terms.

Once we got those changes, it turned into one of the more difficult negotiations I've ever been through in my life.  It went on for months, and we spent thousands of hours trying to redo the proposal that Equifax had negotiated with the regulators to ensure that it would not make any of our Class members worse off under any circumstances.

And when that happened, we agreed that -- once it was cleared, nobody would be made worse off, we agreed with Equifax that we would modify the Term Sheet that we had negotiated to include these provisions.

As part of that process, we agreed that we would not seek any additional fees for all of that work, at least by putting -- you know, we wouldn't seek more than the

$77.5 million.

Even after we negotiated the terms of our settlement, Equifax wouldn't sign it, and the reason was that Equifax wanted to be able to announce as part of a global deal settlements with us and settlements with all the regulators, and the regulators and Equifax were far apart.

We strongly believe that the only reason that all of this came together is that we were facing a deadline under the Term Sheet to file our preliminary approval papers with this Court, and we agreed to extend it once to allow Equifax and the regulators to reach their own agreements, but we said we're not extending it any more, and we set a deadline.

And we said we're either going to have a signed Settlement Agreement by Equifax that reflects all of these additional changes or we are going to move to enforce the original deal, the Term Sheet deal that we had negotiated.

On the literal eve, I mean late at night on that deadline, Equifax and the regulators reached an agreement, and that cleared the way for Equifax to sign our Settlement Agreement and file it with the Court a few days later.

So the notion that some of the objectors have put forward that, you know, the government told Equifax to pay $70.5 million extra and Class counsel are trying to get their hands on some of that, that's not what happened.

And it's a very unusual situation, but we've cited

to the Court one case in which there were some similar kind
of things.  And the -- I don't remember which circuit, but
one of the circuits said that under these circumstances,
Class counsel should not be penalized by the involvement of
the regulators.

So that's the history of that, how it came about.

The other point to be made is that even if you
decide, you know, the thousands -- that we shouldn't be
compensated for these thousands of hours that we've spent or
ensuring that the extra money could be included in the
settlement without hurting Class members or ensuring that the
$77.5 million could be added by forcing the government and
Equifax to reach their own agreements, if you set all that
aside, 25 percent -- a 25 percent fee is reasonable and it's
less than what's been awarded in these various other cases.

So that's all I've got to say on that, Your Honor,
unless you have some questions.

I've talked about the percentage analysis.  The
Court -- the fee is also justified under a lodestar cross-
check.  It's not necessary for the Court to do a lodestar
cross-check.  Even the objectors agree that that's the case.

There are good reasons not to do it.  As one of the
judges in the Southern District of Florida wrote, The
lodestar cross-check shouldn't be used to bring in through
the back door all the bad things about the lodestar approach

1   that caused the Eleventh Circuit to reject it in favor of

2   basing fees on a percentage.

3        Nevertheless, if the Court does a lodestar

4   cross-check, that cross-check supports the reasonableness of

5   our request.

6        Last night we filed a declaration that updated our

7   lodestar through Tuesday, December 17th, and all of that time

8   was submitted last night to the Court for an in camera review

9   as part of the case management protocol that's governed this

10   case from the beginning.

11        Our most recent lodestar figures show that we have

12   spent 33,590.7 hours on the litigation.  That represents a

13   lodestar, including our estimated future time, of 29,584,135

14   calculated or reported hourly rates.  And there's substantial

15   evidence in the record that those rates are reasonable, and

16   that evidence is uncontroverted.

17        This Court is aware in a lodestar cross-check, a

18   multiplier is used to reflect risk and other factors.

19   Applying a -- if you do the calculation, the multiplier we're

20   requesting is 2.62.  That's well within the range that other

21   courts, including this one, have used.

22        Let me turn to the objections to the fee.  There

23   are only 38 objections to the fee.  The objectors are all

24   over the board about what they believe is appropriate.  Some

25   say Class counsel should get nothing.  Others believe that

1    40 million or more is appropriate.

2           Most of the objections aren't substantive.  They

3    just express frustration that the lawyers are getting so much

4    while individual Class members are not, although the Court --

5    as the Court is aware, the proper comparison is not between

6    what the lawyers get and what any individual Class member

7    gets.  The purpose of a Class action is to aggregate people's

8    claims, making it economically viable to bring the

9    litigation.

10          So the appropriate comparison is between what the

11   Class as a whole gets in terms of determining whether a fee

12   is reasonable.

13          A lot of other non-serial Class members object

14   because they say the lawyers should get no more than the

15   $31 million that should be -- that is going to be used to pay

16   claims.  As we've talked about, that $31 million is just

17   wrong.

18          The more substantial objections are the ones made

19   by the serial objectors.  They make them all the time and

20   they're routinely rejected.

21          I understand this is the third Class action in the

22   last four years in which Mr. Bandas and Mr. Froelich have

23   teamed up to take on a fee in a Class action in the Northern

24   District of Georgia.  Their objections were unsuccessful in

25   the first two cases, and they've made some of the same

objections here.

Mr. Bandas and Mr. Frank and Mr. Watkins say we're not entitled to much of a fee because we faced little risk, we didn't do much work, and the settlement provides little benefit to the Class.

They're just wrong about the facts.  We faced substantial risk.  We face substantial risk if this settlement isn't approved.

Some of the people who are objecting face the risk that they would get nothing if there's no -- if the settlement is not approved and Equifax decides to test whether the McConnell case and the Collins case have a direct impact on this case.

THE COURT:  Well, anyone that says there was no litigation risk ought to talk to the lawyers for the financial institutions.

MR. CANFIELD:  These objectors also materially misstate what the monetary relief that the settlement offers and they discount almost entirely the non-monetary benefits.

Mr. Frank has a history in this circuit of distorting the monetary benefit offered by a settlement and disregarding its monetary relief.  He made a similar objection in the Portner case that was roundly rejected.

And in affirming the lower court's decision, the Eleventh Circuit explained its reasoning as follows, and I

quote, "Frank claims the settlement is unfair because Class counsel's slice of the settlement pie is too large, i.e., the fees and cost award is unreasonable.  But this objection is based on Frank's flawed valuation of the settlement pie, limiting the monetary value to the amount of Gillette," which was the defendant's, "actual payments to the Class, along with excluding the substantial non-monetary benefits."

The Court could use the exact same language in rejecting Mr. Frank's objection in this case.

The serial objectors also claim that the Court should award no more than a ten percent fee because this case involves a mega fund settlement of more than $100 million.

When all of the settlement benefits are properly included, as we've discussed, the value of the settlement is in the billions of dollars, meaning the requested fee is less than ten percent that these objectors contend is appropriate in a mega fund case.

In arguing otherwise, they just -- they discount all the settlement benefits except the $380.5 million fund, including specifically all the settlement's non-monetary benefits.

And even if the fee is calculated using only the $380.5 million fund, the requested fee is still justified, notwithstanding the settlement size.

There is no per se rule that a reduced fee must be

1    used when the settlement exceeds ten percent or exceeds more

2    than $100 million.

3         Plaintiffs have cited more than 40 mega fund

4    settlements where fees of 25 percent or more have been

5    awarded, including many in this circuit.

6         And courts are increasingly critical of the

7    practice of awarding a reduced fee in mega fund settlements

8    on the theory that it defeats the purpose of the percentage

9    method, which is to align the interests of the Class and the

10   lawyers.

11        The objectors also focus -- overly focus,

12   overemphasize the importance of a settlement size in the fee

13   calculation.

14        Under Camden I, this Court has to base its fee on

15   an analysis of all the Johnson factors, not just the factors

16   involving awards in other cases.

17        And the Court's evaluation of those factors would

18   support using a percentage higher than the 25 percent

19   benchmark and certainly higher than the 20.36 percent

20   requested here.

21        As I said, in the other data breach cases cited --

22   that we've cited, the lowest fee was 27 percent, and that

23   more than balances out any reduction that might be

24   appropriate because of the settlement size.

25        They're also wrong about the impact of the size of

1   this settlement.

2         The amount of the fees that we are requesting

3   already reflects the settlement size.  If this were not a

4   $380.5 million common fund, if this were a lot smaller

5   settlement, we'd be asking for 30 or 33 percent, certainly

6   what's typical of what's been awarded in other data breach

7   cases.  And it would unfairly penalize Class counsel to cut

8   the percentage even further to account for a factor that's

9   already been taken into account in the amount of our request.

10        The objectors are also simply wrong that ten

11  percent is typically awarded in mega fund cases.

12        In Anthem, which involved a $115 million settlement

13  fund, the Court surveyed awards in other large settlements

14  and concluded -- and this was last year -- the following, and

15  I quote, "A percentage of 27 percent appears to be in line

16  with the vast majority of mega fund settlements."

17        We're not even asking for 27 percent.  Whether it's

18  20.36 percent or 25 percent, it's less than what Judge Koh

19  determined is appropriate in a mega fund case.

20        These objectors cite Anthem for other reasons, but

21  they ignore Judge Koh's analysis of what is appropriate in a

22  mega fund case.  Instead, they rely on three authorities that

23  they cite.  They're of little help to their argument.

24        The first thing they do is rely on an empirical

25  study of Class action fee awards that was co-authored by

Professor Jeffrey Miller of NYU Law School.

After we got that objection, we asked Professor Miller to look at it and give us his analysis, and we've submitted a declaration from Professor Miller.  And based on his analysis, he reached a number of conclusions:

First, he believes the requested fee is reasonable, based on his experience and expertise as a fee expert and based on other empirical studies, including one he authored in 2017, which is the -- has the most recent data on Class action settlement fees in federal courts.

Second, he said that the ten percent figure cited by the objectors is distorted and shouldn't be used in the way they used it because the data set included a lot of much, much larger settlements, billion dollar-plus settlements in which the percentages are much less, and that brought down the average range considerably.

To account for that distortion, he reran the data, focusing only on the settlements that were in a range comparable to our case.  We looked at settlements between 325 and $425 million, and he found that the average award in those cases was 19.7 percent, a percentage that is remarkably close to the percentage that we're requesting here.

They also rely on Judge Shoob's opinion in In re: Domestic Air, from more than 25 years ago, and Judge Shoob explained in that opinion that he relied on pre-1991 research

1    of fees in other cases.  We don't need to rely on that data.

2    We have much more recent data.

3         And, finally, they rely upon Judge Hunt's decision

4    in the Carpenter Health and Welfare case.  But I don't quite

5    see how that case is helpful to them, because after reviewing

6    the cases -- mega fund cases he was able to find, Judge Hunt

7    awarded 21 percent of a $137.5 million fund, and that 21

8    percent is more than what we're asking here.

9         So I've taken a while, Your Honor, but let me

10   conclude by saying that all of the legal requirements have

11   been met.  We ask the Court to finally approve the

12   settlement, certify the Settlement Class, enter the consent

13   order provided by the settlement to govern the injunctive

14   relief to which Equifax will be subjected, and grant our

15   request for fees, expenses and service awards in full.

16        Thank you.

17        THE COURT:  All right, Mr. Canfield.

18        Let's take a ten-minute break and then I'll hear

19   from you, Mr. Balser.

20        MR. BALSER:  Thank you, Your Honor.

21        (Recess taken from 11:19 a.m. until 11:32 a.m.)

22        THE COURT:  Mr. Balser.

23        MR. BALSER:  Good morning, Your Honor.  David

24   Balser of King and Spalding, on behalf of Equifax.

25        In order to put this matter to rest, Equifax has

1   agreed to and supports this settlement.

2          As Mr. Canfield mentioned, Equifax is providing

3   unprecedented relief to the Class here.  Under this

4   settlement, Equifax will pay $380.5 million into a

5   non-reversionary fund and up to an additional $125 million

6   for out-of-pocket claims.

7          Equifax is offering ten years of credit monitoring

8   for every Class member on top of the two years of such

9   services that Equifax has already provided to anyone who

10  signed up.

11         Equifax has agreed to spend $1 billion for improved

12  data security and technology.  Equifax has agreed to provide

13  seven years of identity restoration services for any Class

14  member who suffers identity theft as a result of the data

15  breach.

16         The scope and breadth of the relief offered by

17  Equifax far exceeds any settlement in any data breach case in

18  history.

19         The settlement was the product of intensive,

20  difficult settlement negotiations over an 18-month period,

21  with many fits and starts.  And the settlement is carefully

22  integrated with the settlements that Equifax has reached with

23  the C.F.P.B., the F.T.C., 48 states, the District of

24  Columbia, and Puerto Rico.  That point bears emphasis.

25         This settlement is unprecedented in that it

provides for a single fund to be administered under this

Court's supervision to be available to provide redress sought

by the Plaintiffs, the C.F.P.B. and the F.T.C. and every

state in the union except for two.

This structure, this one-fund structure is of

substantial benefit to consumers who can avail themselves of

a single process to obtain relief.

I want to touch very briefly, Your Honor, at a high

level on the objections that have been filed.  There is a

false premise in each objection to the settlement.

The objectors to the settlement incorrectly assume

that there's no risk to the Plaintiffs' claim if the Court

were to reject this settlement and the parties were to return

to litigation.

First, let me say that this settlement reflects the

maximum that Equifax is willing to do to resolve these

claims.  It took 18 months of negotiations to get to an

agreement; and if this Court were to reject the settlement,

the parties would be back to litigation.

The assumption that there is no risk to the

Plaintiffs' claim is simply wrong.  There's substantial risk,

and we need to look no further than the McConnell case to

substantiate that point.

The central claim in this case upon which

Plaintiffs rely is the claim that Equifax was negligent in

failing to safeguard the Plaintiffs' personally identifiable information.

In order for there to be a negligence claim, there must be a duty owed by a defendant to the Plaintiffs.  After this Court denied Equifax's motion to dismiss and after the Term Sheet was signed in this case, the Georgia Supreme Court ruled in the McConnell case that Georgia law does not recognize a common law duty to safeguard personal information.

Were we to return to litigation, this ruling would create a substantial risk for the Plaintiffs on their key claim in the case.

THE COURT:  I'm not sure I agree with you that they went that far, Mr. Balser.  But there is no doubt that the Plaintiffs' job to defend their case would have been harder after the Supreme Court's ruling in McConnell, because my recollection is that I expressly relied upon the Bradley Center case in reaching the conclusion that there was a duty, and they did expressly overrule the Bradley Center case.

Now, they didn't say where they would go after that or whether they would go as far as you say they did.  But no doubt about it, it would have been a significant issue.

MR. BALSER:  Well, you and I spent a lot of time discussing that case on the motion to dismiss argument.  And the point here really is -- I think Your Honor has put your

finger right on it -- the point is that the assumption that

if the Court rejects the settlement, that the Plaintiffs

could just simply get a better result than this settlement

offers ignores the roadblocks and hurdles and obstacles that

subsequent decisions, including McConnell, may raise.  And I

think we're all in agreement on that point.

That's really the point of my discussion of

McConnell, is that there is a risk now that did not -- wasn't

as manifest as when the motion to dismiss was argued and

resolved.

And in addition, since the Settlement Agreement was

reached, the Georgia Supreme Court granted certiorari in the

Collins versus Athens Orthopaedic Clinic case.  And in that

case, the court is going to decide whether time spent

mitigating effects of a data breach and whether an increased

risk of future identity theft constitute legally cognizable

injuries under Georgia law.

These are the very injuries that Plaintiffs have

alleged here, and those are the very injuries that Equifax

has agreed in the settlement to compensate the Plaintiffs

for.

Based on the Supreme Court's decision in McConnell,

there's a very real risk to the Plaintiffs that the Georgia

Supreme Court will hold that time and increased risk of

identity theft are not cognizable injuries in a data breach

case under Georgia law.  And if the Court were to reject this historic settlement and send the parties back to litigate, the Plaintiffs face a substantial risk that the Georgia Supreme Court will issue another decision that would gut the Plaintiffs' damages claims in this case.

As I mentioned before, Your Honor, only two states have elected not to participate in the historic M.S.A.G. settlement -- Massachusetts and Indiana -- both of which are currently in litigation with Equifax.

Each of those states has filed what they have termed an amicus brief, asking the Court to alter the release language in the Settlement Agreement that Plaintiffs and Equifax agreed to, and failing that, to reject the settlement that's before the Court.

As an initial matter, Indiana and Massachusetts are not Class members and do not have standing to object to the settlement.  That presumably is why they have styled their filings as amicus briefs rather than objections.  Because they lack standing, the Court should not entertain their complaints about the release language.  But even if the Court were to entertain their arguments, the Court should reject them.

First, their arguments do not go to the issue that the Court is tasked with deciding today, which is whether the settlement that's before the Court is fair, adequate and

reasonable.  In fact, they don't even attempt to make that showing.

Furthermore, their argument that the Court should reject the settlement to further their own litigation positions is not in the best interest of the Class members, including the best interest of the citizens of Indiana and Massachusetts, who will receive the substantial benefits from this settlement if it's proved.

Essentially what Indiana and Massachusetts are asking this Court to do is to redraft the release language, which the Court cannot do, or failing that, to blow up the entire settlement so that they can seek recovery from Equifax on behalf of their state's Class members, which is the exact relief that Equifax is compensating the citizens of Indiana and Massachusetts for under this Settlement Agreement.

The Court should reject the efforts of Indiana and Massachusetts to blow this settlement up so that they can pursue their own litigation.

In conclusion, Your Honor, this has been a hard-fought case with highly skilled and tenacious counsel on the other side.  After five full-day mediation sessions with the leading mediator in the country, Layn Phillips, and countless hours of negotiations with Class counsel, many hours of which I think my colleagues on the other side would agree were excruciating, a compromise has been reached that provides

1    unprecedented relief and takes into account the risk and

2    delays attendant to protracted litigation in this matter.

3            The settlement is historic.  It provides meaningful

4    benefits to the Class, and easily meets the fair, adequate

5    and reasonable standard.

6            Accordingly, Equifax joins the Plaintiffs' request

7    that the settlement be approved.

8            THE COURT:  Thank you, Mr. Balser.

9            So is there anyone from the F.T.C. that wishes to

10   be heard on this?

11           (No response.)

12           THE COURT:  Is there anyone from the Consumer

13   Financial Protection Bureau that wishes to be heard?

14           MS. DENNIS:  Thank you, Your Honor.  This is

15   Jenelle Dennis on behalf of the Consumer Financial Protection

16   Bureau.

17           On the motion for final approval, the C.F.P.B. does

18   not object to the provisions in the proposed settlement in

19   the Class action litigation that are consistent with the

20   provisions contained in the stipulated order signed by Your

21   Honor on July 23rd in the Bureau's action against Equifax

22   filed in this court.

23           The Bureau takes no position with respect to any

24   provisions contained in the Class action settlement that are

25   not contemplated by the Bureau's stipulated order with

1   Equifax.

2   To be clear, we don't view any of the provisions in

3   the contemplated final order in the Class action as

4   inconsistent with our order, just some things are a little

5   bit different.

6   And as Mr. Canfield stated earlier as well as Mr.

7   Balser, the regulators engaged in lengthy, protracted and

8   extremely difficult negotiations to endeavor to craft each of

9   our orders so as not to conflict with one another.

10   Thank you.

11   THE COURT:  Does anyone wish to be heard from the

12   Attorney General's Office of Indiana?

13   MS. GILCHRIST:  Thank you, Your Honor.  This is

14   Corinne Gilchrist from the Indiana Attorney General's Office.

15   And we appreciate the opportunity to participate by phone

16   today.

17   Indiana has filed its Amicus Curiae brief to

18   present information to the Court regarding the question of

19   whether the settlement as proposed is fair, reasonable and

20   adequate.

21   And Indiana's position is that the settlement as

22   proposed is not fair, reasonable and adequate for Indiana

23   citizens because of the relief language, as mentioned in our

24   brief, that purports to release claims by any other person on

25   Class members' behalf.

Because the State of Indiana has a pathway to pursue restitution for money unlawfully received on behalf of consumers under Indiana's Deceptive Consumer Sales Act, the release language as drafted inappropriately seeks to act as a restraint on Indiana's action.

And Indiana and Massachusetts did reach out to the parties and requested modification of the relief, but the parties refused to modify the relief.

I'd like to highlight the types of claims that Indiana has brought in our Defective Consumer Sales Act counts against the Defendant in our pending case.

Our claims are not only premised on Deceptive Consumer Sales Acts related to the failure to secure data in the 2017 briefs, but also misrepresentation to Indiana consumers related to Equifax's information, security and transactions conducted with consumers in Indiana, and as a third category, misrepresentations about Equifax's payment card industry standard compliance.

So the relief for restitution for unlawful -- money unlawfully received on behalf of the consumers in Indiana, in the Indiana state court action is broader in category than what was sought in the Class Plaintiffs' Complaint here.

Defendants note the rest that they see in the Class Plaintiffs' continued claims, as I've mentioned, going back to litigation, but this highlights the distinction between

the negotiated relief in this case and the unresolved claims

that are held by the State of Indiana on behalf of Indiana

citizens.  And that question is relevant to this Court

because Indiana citizens are members of the Class and their

claims are being treated unequally.

We -- Indiana does not seek to double recover for

impact to consumers.  It seeks the ability to separately

pursue the full remedies as determined in our state court

action.  Again, as I mentioned, our claims are premised on

three different categories of deceptive acts that are

actionable under Indiana law.

And the parties made it clear in their filings of

yesterday evening that Equifax does intend to use this

settlement's approval in an effort to bar Indiana's ability

to pursue those claims, and it is that action that is clearly

prohibited in the Eleventh Circuit under Herman versus South

Carolina National Bank, as we cited in our brief.

Your Honor, I -- we've reviewed the parties'

submissions of yesterday evening, and we would like to

provide a supplemental response in writing if the Court would

permit it.  And I can answer any other questions that you

have about Indiana's position.

THE COURT:  Thank you, Ms. Gilchrist.

Is anyone on the phone that wants to speak on

behalf of the Massachusetts Attorney General's Office?

1          MS. CABLE:  Yes.  Thank you, Your Honor.  This is

2     Sara Cable for the Massachusetts Attorney General's Office.

3          And, again, thank you for the opportunity to appear

4     today by phone.

5          And really I'll just briefly mirror a lot of what

6     my -- of what Ms. Gilchrist just stated.  And as we put forth

7     in our amicus brief, Massachusetts had a pending case against

8     Equifax that we filed, I think, just under two weeks after

9     learning of the breach in September of 2017.

10         And just a bit of quick context, this breach had an

11    unprecedented impact on the Commonwealth, affecting three

12    million of our residents, and that's nearly half of our adult

13    population.

14         We took action here through a civil enforcement

15    action under our Consumer Protection Act and our Data

16    Protection Act to protect consumers and to enforce our laws

17    in the public interest.

18         And what we have alleged in our Complaint, briefly,

19    is that Defendant violated in numerous ways core requirements

20    of Massachusetts law that, unlike what I understand is now

21    the current state of play in Georgia, imposes a clear duty on

22    Equifax to protect consumers' personal information.

23         And we're seeking through our case to pursue all of

24    the remedies that we're entitled by statute to pursue and

25    which are exclusively reserved by statute to the Attorney

General.  And this includes civil penalties; restitution,
equitable or otherwise; and injunctive relief.  And this is
part of an effort to vindicate our laws, penalize Equifax's
non-compliance, and deter future conduct by Equifax or
others.

Just to know, our case has withstood in all
respects a motion to dismiss by Equifax and a motion to stay
pending formation of this M.D.L. and resolution of the other
regulatory actions.  And so we are now in the midst of fact
discovery and deposition practice.

We, like Indiana, filed an amicus brief before this
Court on really a narrow issue, but we think it's a very
important issue that goes directly to the question of whether
the settlement is fair, reasonable and adequate as to all
Class members, and that is the scope of the relief.

We similarly believe that it is overly broad, and
as made clear by Equifax's filing late last night, it appears
to be an intentional effort to infringe or restrict
Massachusetts' ability to seek the full panoply of relief
that we're entitled to seek in our own state court
enforcement action.

And as Ms. Gilchrist noted, applied in the fashion
that Equifax appears to intend to apply it, it would conflict
with Eleventh Circuit precedent, which makes it clear that a
government law enforcement agency is not bound by a release

1    negotiated by private litigants.

2         And it would also conflict with this Court's recent

3    decision in F.D.C. v. Hornbeam, where the Northern District

4    of Georgia directly considered and rejected the argument that

5    Equifax appears to be making, which is a private settlement

6    could bar the F.T.C. from obtaining consumer restitution in

7    its enforcement action.

8         In terms of the question of how Massachusetts

9    residents would be treated differently, we heard today of the

10   importance of the -- or the prominence of the multistate

11   settlement that Equifax reached with 48 other states and D.C.

12   and Puerto Rico.  And we heard -- I believe it was Class

13   counsel today who discussed how those negotiations and the

14   substance of those negotiations really materially impacted

15   the negotiations in this Class action settlement.

16        In those settlements, Equifax separately resolved

17   the claims of the states, which, like Massachusetts, my

18   understanding, they had claims under their own Consumer

19   Protection Acts relating to Equifax's failure to safeguard

20   consumers' information from breach, and they negotiated

21   through a separate resolution with separate consideration a

22   separate relief for those claims.

23        And here, Massachusetts is not a part of this Class

24   action.  Massachusetts was not part of the multistate

25   settlement, and yet what Equifax has now admitted it intends

1   to do is to take the relief here and seek to apply it against

2   Massachusetts, going down the road in our enforcement action.

3   And we think treating us differently than Equifax has treated

4   other states is manifestly unfair to our citizens.

5          And I just want to finish to just -- contrary to

6   what I take to be Mr. Balser's view, we are not seeking to

7   blow up the settlement here.  We're simply looking to protect

8   our own sovereign interests and avoid unnecessary future

9   litigation.

10         And we think we've offered the Court a simple,

11  narrow fix that should not negatively impact the interests of

12  the Class, and that is to order the parties to make the

13  modification to the relief that we set out in our brief so

14  that it conforms with Eleventh Circuit precedent.

15         And with that, unless the Court has other

16  questions, I'll rest on our brief.

17         THE COURT:  All right, Ms. Cable.

18         All right.  I have a list of individuals who I was

19  told might be here and who would want to speak or raise

20  objections to the settlement.

21         So let me just ask, is Christopher Andrews here?

22         MR. ANDREWS:  Here (hand raised).

23         THE COURT:  Mr. Andrews, do you wish to be heard on

24  the approval of the settlement?

25         MR. ANDREWS:  Yes.

1        THE COURT:  If you will, come up to the podium,

2    please.

3        Mr. Andrews, if you will, start by telling me your

4    name and where you live, not your street address, but the

5    place where you live.

6        MR. ANDREWS:  My name is Christopher Andrews.  I

7    live in Michigan.  And this is one of the issues I wanted to

8    raise in my presentation.

9        Before I begin the presentation, the Court

10   provisionally granted my request that my street address be

11   sealed, which I appreciate.

12       The Plaintiffs' counsel intentionally has placed it

13   on the docket in the filing they made.  I saw it on the

14   docket yesterday.

15       So my motion to seal is on there along with the

16   sealed document.

17       I request the Court take it off and sanction them.

18   They did it on purpose because they don't like what I wrote

19   about them.

20       So I can tell you I live in -- I live in Michigan,

21   if that's good enough.

22       I don't think I should be subjected -- no one in

23   here had to give their home address.

24       THE COURT:  I didn't ask for your home address.

25       MR. ANDREWS:  I understand.  So I am a resident of

 1    the state of Michigan.

 2              THE COURT:  All right.

 3              MR. ANDREWS:  I thank the Court for allowing me to

 4    speak today.

 5              In my objection, I requested ten minutes of time.

 6    I'm requesting ten minutes and 45 seconds, if possible.  The

 7    45 seconds is to address the presentation made by the first

 8    lawyer and also the second lawyer, from Equifax.

 9              I have a copy of the remarks for the Court, if it

10    would like a copy.  If not, I can just do the verbal

11    presentation if that would be okay.

12              THE COURT:  That's fine.

13              MR. ANDREWS:  Okay.  Good morning, Judge

14    Thrash, Jr.  My name is Christopher Andrews.

15              I'm a pro se objector.  I'm not an attorney.  My

16    remarks will take ten minutes and 30 seconds.

17              Before I begin, there's a couple of issues which

18    I've already raised relating to the sealing of my record.  So

19    if that could be taken care of before we leave or after I

20    leave, I would appreciate it.

21              I had some exhibits to give out today, but I'm not

22    going to give them out, unless the Court needs to see them.

23    They're already on the docket.

24              My first thought after reading, going through all

25    the documents of the JND website after you gave approval, I

1 read through all of them along with a lot of other documents

2 that I had to purchase on PACER.

3          My initial response, having filed about ten

4 objections and four or five appeals in various parts of the

5 country, the thought was, Hold up.  Wait a minute.

6 Something's not right.

7          The lawyers here are claiming there's nothing wrong

8 with this settlement.

9          It is horrid.  It is a disservice to the Class.  I

10 wrote about it in my brief.  I've never seen a worse one in

11 250 settlements in a decade.  It is that bad.  Okay.

12          Maybe this is the first time a well-documented

13 objection has been filed, and many times the lawyers never

14 see one until someone like myself or other attorneys who are

15 more qualified than me put them together.

16          What the lawyers have not done at this point, they

17 have claimed in their response that my objection was filed on

18 November 20th.  That's a day late and a dollar short.

19          That document, when it was sent to JND, was

20 e-mailed over to Class counsel and Equifax's counsel.  They

21 had two weeks or three weeks to verify that it was on the

22 19th.  I sent information in on a duplicate submission.  It's

23 on the docket.  And they're still trying to get my objection

24 rejected or not considered by the Court.

25          I request that they be ordered to correct their

error, which was intentional.  It was November 19th.  The documents are all there.

They didn't address the cookiegate issue.  JND legal administration put six to seven cookies on each section of that website.  Everybody who went to that website, tens of millions of people, were or are currently being tracked. There was no reason to have Facebook's cookie on there, two of them, I believe, and two of Twitter.

We get -- Equifax has caused us major issues in the future.  There's nothing on the dark net that any of this information got out.

Somebody's got it.  The Russians, the Chinese, somebody's got it.  They're going to use it against somebody somewhere, probably in a blackmail scheme.  Okay.

I'm extremely angry.  I think JND should be held accountable for the placing of the cookies on the website.

Next, there's a huge due process issue here that no one is addressing.

According to the filings, there's been 104 e-mails sent out to the Class.  Out of 147.9 million, I'll round it to 148 million, that leaves 43 million people who have not been noticed directly.

The lawyers are claiming that the couple of radio ads and one print ad in U.S.A. Today noticed the balance of 43 million people.  Absolutely impossible.  Can never happen.

The impressions number that was quoted in their filings does not mean a set of eyeballs or ears or a set of ears heard the messages.  They're all botcher of them, which they can respond what botcher is.

Something pops up on a screen for half a second, that's counted as someone viewing it.

Had I had more than 25 pages, I could have added on another 75 and addressed all of these issues, including the overinflated lodestar.

The 43 million people who were not noticed knew nothing of the litigation, they cannot file a claim, and, more importantly, they cannot opt out.  It violates due process.  Eleventh Circuit, Supreme Court precedent, I can give you five pages of cases.

Those 43 million absent Class members must be noticed by mail, either first class or postage.

The parties intentionally chose not to mail out to those people because of the cost.  The cost to send out a postage, let's assume it's 70 cents per postcard.  Seventy times 40 million, we'll figure it's going to run $28 million.

The Class technically should pay for that, but because of what they've done in this case, which is not do their job, they should be forced to pay for the notice out of their funds, not the Class.  It's not our fault they've intentionally tried to rush this thing through to get

1    $77 million.  It's totally rushed through.  It's been 18

2    months.  It's not a lot of time.

3              Next, the 14 million claims that were submitted out

4    of 147.9 million shows an epic failure of the notice program.

5    It's ten percent.  Who in this country out of 140 -- 137

6    million people would want to be the victim of identity theft?

7    Nobody.

8              Why wouldn't someone file?  Because no one has

9    explained to them the ramifications of what can occur.

10             I can pick out and go through 20 examples of

11   different types of identity theft.

12             The credit monitoring doesn't protect against a lot

13   of which I wrote about in my objection.  One of them, for

14   example, you give somebody who's up to Social Security

15   benefits age.  Someone could steal their identity, put

16   together a new address, file for Social Security benefits,

17   receive those benefits monthly for years electronically, and

18   then when the person actually decides to get Social Security

19   when they're 67 instead of 62 or '3 or '4, now they're not

20   getting anything because now they have to go back, and like

21   the lawyer from the Plaintiffs said, you're not getting your

22   money and it could take years to resolve it.

23             That's not covered by credit monitoring.  You need

24   identity theft monitoring realtime, and I went through that

25   in my objection.

1          Next -- I'm going to skip that part.

2          Next, I and 147.9 million other Class members did

3     not give Experian permission to give an outside party, JND

4     Legal Administration, our e-mail addresses for their use to

5     e-mail us, unless the Court gave them permission.  We're

6     sharing confidential information like it's no big deal.

7          The 147.9 million members did not give Equifax

8     permission to give JND Legal Administration the last six

9     digits of our Social Security numbers for their use.

10         In this country, a business can be successfully

11    sued for printing the last six digits of a 16-digit credit

12    card number.  Equifax gave JND Legal 66 percent of our Social

13    Security number, which is -- the Social Security Number

14    Notice Program was not needed because direct mail was always

15    available.  It was done to make JND Legal a fortune at our

16    expense.  They could have simply put together 147 million

17    postcards and mailed them out.

18         Next, it looks like there was no value assigned to

19    the theft of the individual data itself and an aggregate that

20    was stolen.

21         The $31 million restitution fund component appears

22    to be for those who purchase credit monitoring, any time up

23    to and including today, which means no amount was set aside

24    for the theft of the data itself.

25         Today, here's an example of how the fund can be

scammed as of today.  And I'm sure I'm not the only one who's figured it out.  Maybe the lawyers have figured it out too late and no one is saying anything.

Today, what I could have done in my claim is I could have signed up for credit monitoring for free.  AAA, Credit Karma, a lot of credit card companies offer it for free.

So I have credit monitoring.  Now what I basically do is I fill out the form on the claim website and I can get cash for nothing.  That's not the way -- that's not what this fund is designed for is to give people something for nothing.

I would have gotten credit monitoring for nothing and then at this point gotten $2.50.  Not 125 but $2.50.

They need to rework that because they messed up.  No one should be able to get money for nothing.

Without knowing the total damages compared to the amount settled for, it's impossible for anyone on this planet to determine if the settlement is fair, reasonable and adequate.  You have to have both numbers.

Next, the up to $20,000 per person for reimbursement for those who suffered identity theft is based on proving a link to the information stolen from Equifax, which we all know can't be proven.  So that part of the deal, Equifax is within their rights to deny every single claim legally per the Settlement Agreement.  I don't know if

1    they're going to, but they can.

2              Paying unjustified claims takes money out of

3    everyone's pockets because the separate $125 million

4    component could have been put into the measly $31 million

5    component.

6              Paying claims for those who can't prove a link

7    between Equifax and the identity theft loss is fraud on the

8    entire Class and is really fraud on the Class and the fund.

9              Next, the lawyers have talked about this $1 billion

10   in computer improvements.  That does not help 148 million

11   victims, because our data was stolen and it can't be

12   replaced.  We can't replace the Social Security number.  We

13   can't replace the driver's license, the date of birth.  We're

14   all stuck.

15             Now, I guess if they could come in and change it,

16   the government comes in and gives everyone an ID number

17   different than Social Security, then we can say, yeah, if

18   they steal it again, so what?

19             There's like thousands of data breaches that have

20   occurred in the last ten years.  Our data has been stolen 15,

21   20 different times.  So I don't think that should be counted

22   as far as the value of the settlement.

23             Next, I would like to know on rebuttal does Equifax

24   have any business relationship with Experian?  Why did all of

25   the credit monitoring go to them instead of TransUnion, and

1    why wasn't it split evenly?

2            Next, the following clauses in the Settlement

3    Agreement void the entire document based on the misconduct

4    engaged by the parties, which I've written about extensively

5    and filed a couple of motions on.

6            14.2, the parties' Class counsel and defense

7    counsel shall not have any liability whatsoever with respect

8    to any act, omission or determination of the settlement

9    administrator, et cetera.

10           14.3, the settlement administrator shall indemnify

11   and hold harmless the parties, Class counsel and defense

12   counsel for any act, omission or determination of the

13   settlement administrator or any of the settlement

14   administrator's designees.

15           If any of the Class wants to sue JND Legal, along

16   with the lawyers because the lawyers made JND their agent,

17   they should have that right to do so.  We can't do that if

18   this Settlement Agreement gets approved because everyone is

19   washing their hands and saying, We're not responsible.

20           That's not good enough.

21           They are attempting to limit their liability for

22   errors that they both intentionally and unintentionally have

23   committed to try and rush through this scheme of an approval.

24   Those two clauses should be ruled invalid due to the

25   shenanigans that have taken place.

1        I'm almost done.

2        With response to the presentation made by the

3    Plaintiffs' lawyer and also Equifax, they mention there was

4    130 million visits to the website.  That seems like a lot,

5    but it's really not 100 percent accurate.  We're leaving out

6    a lot of detail.

7        I've been on the website probably 30 times, putting

8    together my presentation, et cetera, et cetera.  So they

9    haven't said how many unique visits.  A hundred and thirty

10   could mean 30 million people visited multiple times.  So it's

11   misleading.

12       They bring up the fact that 0.002 percent have

13   filed objections.  It's not about the total.  It's not about

14   quantity.  It's about the quality.

15       If we take out Plaintiffs' lawyers and defense

16   lawyers out of the equation, there's no more than twelve

17   people in this country that can put together an objection

18   that can make a difference, myself included and I'm not a

19   lawyer.  So I don't think that has any weight whatsoever.

20       Most people are too busy in their lives to learn

21   everything they need to know.  It's taken me eight years to

22   get to this point.  I couldn't have put this together even

23   three years ago.  So I'm getting really good at it.

24       As far as alleging that I'm a serial objector, not

25   a chance.  The lawyers behind me, they've filed and settled

dozens of them.  That would make them serial Class action filers.

When they start throwing mud, they know they're in trouble.  I knew it immediately as soon as I saw it.  Okay.  Plus, the e-mail they sent over, that was done intentionally also to try to get it on the docket here, for a reason I'm not going to go into.

So I request when they talk about non-serial objectors, when you look that information up on Google, it talks about an attorney who files two- and three-page objections with the sole intent of holding up an appeal and getting paid off.

If the lawyers are good, they would simply file a motion for summary affirmance up in the appeals court.  The appeals court would simply say, yep, they've got nothing on it, and they dismiss it, but they don't.  They pay objectors because they know they're going to lose.  It's just a cost of doing business.

The statement was made that there was no way to know the amount of the alternative compensation out of a $31 million fund.  That's totally false.  There's been, like -- I don't know -- twelve million people who have filed for cash and three million for credit monitoring.

Well, take the twelve million into the 30 million or 31.  You've got $2.50.  So all of my information was

1   stolen for $2.50.

2          Facebook paid five billion.  That information was

3   not the type of serious sensitive information that got stolen

4   here.  It worked out to about $25 a person for just the

5   aggregate -- for just aggregating the information off the

6   Internet, because they all had files on us.  Everything we've

7   ever written, typed or talked about, it's in a database some

8   place.

9          We have -- I have a solution to some of the -- to

10  many of the issues that I've raised today in my objection and

11  also in my remarks to you, Judge.  Okay.

12         The first, we don't have to nuke the settlement

13  today.  According to the Settlement Agreement, you can give

14  them 60 days to go back and try and address and fix the

15  issues I, along with any other objectors, have raised.  Okay.

16  At the end of 60 days, they can post any revisions and we can

17  go from there.

18         So it's not like this is like do or die today.

19  They are trying to make this do or die.  It's not.

20  Everyone's trying to rush, rush, rush.  Mistakes are made

21  when people rush things.

22         Summary.  I request that Equifax admit liability

23  for this action only, that Class counsel and the steering

24  committee and the named Plaintiffs be removed for what's

25  taken place.

1    I volunteer to be a named Plaintiff, kick the 93 or

2    '6 of them off because they haven't done a good job.

3    At this point, I will challenge standing for the

4    named Plaintiffs.  The burden is on them to prove they've got

5    standing.  I haven't seen anything in the record that they've

6    got standing to represent the Class.

7    I'm challenging it now.  It's in the record.

8    I also have a solution.  There's $260 million that

9    was given to the 48 state Attorney Generals and the C.F.- --

10   Consumer Protection Bureau, whatever it is.  It's not clear

11   from my research where that money is or has it been given out

12   yet.

13   If it's not been given out, I would request the

14   $260 million be put into the $31 million restitution fund.

15   That would raise the check from $2.50 right now to about $75.

16   I don't know if that's fair or not, but it's better than what

17   we've got now, after they fix the issue of being able to get

18   cash out of that fund for nothing.

19   Last, if the Court approves this deal, I will

20   appeal it in forma pauperis.  I was given that designation

21   last week in the Eastern District of Michigan.  I have it at

22   the Ninth Circuit in California in four different cases.  I

23   have one and a half now.  I'm waiting for three more to --

24   two more to come down any day.

25   I'm not going to allow the people behind me to

1  throw up a six-figure bond to the Court and the Court

2  approves it, they bury all the issues that I've raised that

3  they can't and won't respond to, and we'll go away.  Not

4  going to happen.  Okay.

5          I sincerely -- I believe that I am correct.  If I

6  was wrong, I wouldn't be here, with all the time and money

7  I've invested, for $2.50 or four years' worth of monitoring.

8          If the Court doesn't have any questions, my

9  presentation is complete.

10         THE COURT:  All right, Mr. Andrews.

11         James Burnes, is he here?

12         (No response.)

13         THE COURT:  Raymond Koscue?

14         (No response.)

15         THE COURT:  Theodore Frank or his attorney, Melissa

16  Holyoak?

17         MS. HOLYOAK:  I'm here, Your Honor.

18         THE COURT:  All right.  Ms. Holyoak, if you will,

19  come up to the podium.

20         Are you representing Mr. Frank and Mr. Watkins?

21         MS. HOLYOAK:  Correct.

22         THE COURT:  All right.

23         MS. HOLYOAK:  Thank you, Your Honor.  I just have a

24  few points I'd like to make today.

25         My name is Melissa Holyoak.  I represent Ted Frank

1    and David Watkins.

2            I'd like to start by just saying that the Court has

3    an independent and continuing obligation to ensure that the

4    Class should be certified.  This includes Rule 23(a)(4),

5    adequacy of representation.

6            Here, we have a problem with adequacy of

7    representation because there are inter-Class conflicts.  And

8    in Class counsel's response to objections, they've argued

9    that there are no inter-Class conflicts or they're minor,

10   relying on the Target case and some other cases.

11           The Target case, the district court case, the

12   question on inter-Class conflicts based on statutory claims

13   never reached the Eighth Circuit.  So the Eighth Circuit

14   never determined that because of issues of standing which are

15   not at issue here.

16           So the case that really is on point here is the

17   Second Circuit case of Literary Works.  And in that case,

18   there were three subgroups.  All had different statutory

19   claims.  And there, the court decided that those three

20   groups, because they had different statutory claims, required

21   separate representation.  And they based it on the Supreme

22   Court's decision in Ortiz, where the court found that when

23   you have these categories of different claims with different

24   settlement values, then independent representation is

25   required to satisfy Rule 23(a)(4).

1          In the response to the objections, Plaintiffs tried

2     to distinguish Literary Works, and they argue that in

3     Literary Works, those three groups were not united in a

4     claim.  But that's just not correct, Your Honor.

5          In that claim -- in that case, the Class

6     representatives were each part of those three categories.  So

7     they were united to get -- to maximize their collective

8     recovery.  But the Second Circuit said that wasn't enough,

9     because even though they were united to maximize their

10    collective recovery, when it came to distributing that

11    recovery to those different subgroups, that's where the

12    conflict exists.

13         And they were following the Supreme Court's

14    decision in Ortiz, who also said that the common interest in

15    maximizing that recovery is not sufficient, and that's at 527

16    U.S. at 857.

17         Here, the fact that there are more statutory claims

18    that are involved in the Second Circuit makes no difference,

19    Your Honor, and it's not a reason to ignore Rule 23(a)(4) and

20    the protections that it provides.

21         And this Court dismissed several dozen of the

22    consumer protection statutes in your order on the motion to

23    dismiss, but many more -- but several also survived; and

24    those statutory claims that survived the motion to dismiss

25    here, they deserve independent counsel to represent them at

the negotiating table.

Class counsel, in their response to objections, further argued that independent counsel is not required under the Eleventh Circuit decision in Juris, which is at 685 F.3d at 1324.  But that's the opposite of what that case holds. That case found that there was no formal subclass required because -- only because the court had appointed separate qualified and independent counsel to those subgroups and rejected the idea that an experienced mediator could solve that problem.

So, too, here an experienced mediator is not going to solve the problem with subgroups with conflicting claims because he cannot sit at the negotiating table and argue for those subgroups who don't have a voice at the negotiating table.

Just two more points, Your Honor.

Last night at 11:00 p.m., Class counsel filed an additional declaration and attached to that was an exhibit, Exhibit I, which included a chart of deficient objections.

Under this Court's order, their response to objections was due on December 5th, and they filed a response but they did not include this chart.

This chart should be stricken, but in addition, my clients, Mr. Frank and Mr. Watkins, are included on that chart, and at a minimum, to the extent that this Court takes

any action based on that chart, we would request an ability to respond.

And then just finally, Your Honor, to end, my clients have filed motions to strike the declarations of Professor Klonoff.  Class counsel has responded to our motions to strike and in that, they argue that my clients' motion to strike was late and should have been included in the objection.

But the motion to strike was an affirmative request for relief and under local rule, required a motion and accompanying memorandum of law in support.

I will rest on the papers on the motion -- on our motions and anything else, unless the Court has any further questions.

THE COURT:  All right, Ms. Holyoak.

All right.  Let me try to figure out who we have left.

Michael Steel?

(No response.)

THE COURT:  Mikell West.

MR. CLORE:  Robert Clore, Your Honor, for Mikell West.

MR. FROELICH:  And Jerry Froelich, Your Honor.

THE COURT:  All right.  How long do you think your presentation is going to take, Mr. Clore?

1        MR. CLORE:  I would say five minutes.

2        THE COURT:  All right.

3        Does anyone else wish to be heard in objection to

4   the settlement?

5            (No response.)

6        THE COURT:  What's your pleasure, Mr. Canfield, Mr.

7   Balser?  I'll hear from Mr. Clore.  Do we take a lunch break?

8   Do we try to plow on through?

9        MR. SIEGEL:  Your Honor, if it pleases the Court

10  and the court reporter, we'd just as soon plow through.

11       I think my responses to what I've heard so far will

12  be brief.

13       I know Ms. Keller will respond to anything related

14  to the Klonoff issue.

15       A brief response to -- we haven't spoken on the

16  states, Massachusetts and Indiana.  But I would hope we would

17  condense that all in a 20- to 30-minute block and be done.

18       MR. CANFIELD:  Governor Barnes plans to speak as

19  well, Your Honor.

20       MR. SIEGEL:  I did not account for the Governor,

21  Your Honor.

22       THE COURT:  If he says five, he's going to talk for

23  15, at least.

24           (Courtroom laughter.)

25       MR. SIEGEL:  We're here.  We're happy to plow

1   through or break, at the Court's pleasure.

2            THE COURT:  What do you think, Mr. Balser?

3            MR. BALSER:  We would prefer to continue if the

4   Court and the Court's staff is amenable to that.

5            THE COURT:  Well, let me hear from Mr. Clore, and

6   then we're going to have to take a short break, and then

7   we'll just keep going.

8            MR. SIEGEL:  Thank you, Your Honor.

9            MS. KELLER:  Thank you, Your Honor.

10           MR. CLORE:  Thank you, Judge.  Robert Clore for Mr.

11  West.

12           I want to get to the last hour of supplemental

13  declaration that was filed at midnight -- around midnight

14  last night.

15           But if I can, let me start briefly with fees, which

16  under Rule 23(e) now impacts the consideration of adequacy of

17  Class relief.

18           Class counsel are conflating -- considering

19  non-monetary relief with including it in calculating fees.

20  It's not to be included in the sum.  The number should be 25

21  percent of 310 million.

22           In fact, as you noted, Section 11.1 of the

23  settlement expressly promises that that's the calculation

24  from which they take their fees.

25           They didn't amend the settlement, so they should be

1    held to that promise under the agreement.

2            I heard the words "simply wrong" and "serial

3    objector" a lot, but not a lot of analysis on the cases that

4    touch on fees.

5            The Anthem data breach case did award a 27 percent

6    fee, but with virtually no lodestar multiplier.  And in the

7    Ninth Circuit, they placed particular emphasis on lodestar

8    for mega fund settlements.  So that percentage would not have

9    been allowed if there were a comparable 3.7 multiplier that

10    we have here.

11            The other cases, like Home Depot, that were before

12    this Court were not mega fund settlements.

13            And so Carpenters and Domestic Air indicate that 25

14    percent of 310 million is unreasonable.  Carpenters did award

15    21 percent of 130 million, but a sliding scale would never

16    allow that same 21 percent for 310 million, especially with a

17    3.7 multiplier.

18            The economies of scale recognize that this is the

19    largest data breach settlement, at least in part, because

20    it's an unprecedented data breach, which involves 147 million

21    Americans.

22            Let me briefly address the second supplemental

23    declaration, which I only had a chance to review this

24    morning.  So, unfortunately, I couldn't compare the

25    representations about Mr. West's deposition with the

1    transcript.  I know, just from looking at it briefly, I could

2    see multiple inaccuracies.

3         First of all, there's an intimation that Mr. West

4    was solicited.  He was not solicited.  He's a colleague of

5    mine, a friend and a colleague of mine.  He reached out to me

6    and not vice versa.  That's very clear in the transcript.  I

7    can't give you a page number, but I promise you it's in

8    there, and they know that.

9         He did not say that the only reason he was

10   objecting to fees is the case settled early.  That's a gross

11   misstatement of his testimony.

12        He did discuss the fact that it was an early

13   settlement and that that was relevant to both settlement

14   approval and fees; but he also discussed the mega fund issue,

15   which is a central theme of the objection and the reply in

16   support of it.

17        Class counsel cite a District of New Jersey opinion

18   involving a company called NIBCO.  That case required

19   objectors to list every objection ever filed by their

20   counsel.  And, unfortunately, we did miss one case and,

21   obviously, the judge didn't like it.  But, respectfully, that

22   omission shouldn't impact Mr. West's objection here.

23        There's nothing that would show ill motive here,

24   and amended Rule 23(e) specifically weeds it out by requiring

25   Court approval of any objector settlements.

1        And like Ms. Holyoak, I also request the

2   opportunity to respond to the chart attached as an exhibit

3   last night, to the extent it addresses Mr. West.

4        Otherwise, I'm happy to answer any questions by the

5   Court.

6        THE COURT:  All right, Mr. Clore.  Thank you.

7        MR. CLORE:  Thank you.

8        THE COURT:  All right.  Let's take a ten-minute

9   break and then we will continue.

10        (Recess taken from 12:28 p.m. until 12:40 p.m.)

11        THE COURT:  All right.  Let me ask again, does

12   anyone else wish to be heard objecting to the proposed

13   settlement?

14        (No response.)

15        THE COURT:  All right.  Mr. Siegel, Ms. Keller.

16        MR. SIEGEL:  Thank you, Your Honor.  Norman Siegel,

17   co-lead counsel for the Plaintiffs.

18        And I think I would just like to start from a

19   10,000-foot level on objections in general response to what

20   we heard today, but also what was in the papers.

21        Obviously, Your Honor has a substantial amount of

22   paper before it, and I will effort not to repeat what's

23   there, but I do think some matters of importance should be

24   raised in this final approval hearing.

25        Part of what the manual for complex litigation

imposes on the Court and the parties at final approval is to evaluate the nature of these objections, of course.

Some can be helpful.  Objections from everyday folks, like we've seen in this case, that are angry with Equifax because they didn't even know Equifax had their data, they want legislative change, they believe that there should be substantially more money, all are appropriate, legitimate objections that I think Rule 23 encourages to allow both the parties and the Court to test the settlement.

And we certainly have those here and believe that through that rigorous process, the settlement looks great. As Mr. Canfield explained, the largest of its kind in history that delivers exactly the kind of relief that we set out to accomplish when we started the case.

But the manual also cautions against a different type of objector.  In Section 21.643, the manual says that objections may be motivated by self-interest rather than a desire to win significant improvements in the Class settlement.  A challenge for the judge is to distinguish between meritorious objections and those advanced for improper purposes.

And we are imposing on the Court a bit here to try to make that determination with respect to some objectors, and the reason that -- the reason that's important is because we think it's important both for this Court to come to some

conclusion about the folks we've identified in our papers,
but also for any appeal.

You've heard today that some of the folks we've
identified as serial objectors that are present with improper
motives are intending to appeal if we are successful and the
Court orders that this settlement be approved.

And so we have tried to build a record that allows
the Court to make that determination, and if the Court
pleases, include it in its order approving the settlement.

THE COURT:  Well, let me interrupt you for just a
second, Mr. Siegel.

MR. SIEGEL:  Please.

THE COURT:  I know there were some objections to
the requirements that were imposed in the Settlement
Agreement and in the order of preliminary approval about
information that objectors had to provide before the
objections would be considered.

And you correct me if I get any of the facts wrong,
but my reason for approving those procedures was -- I believe
it happened in Home Depot, where we had an objector just come
in out of the blue and file hundreds of pages worth of
objections and replies and responses, and the lawyers were
scrambling as late as the day of the final approval hearing
to find out some of the information that you thought and
eventually I thought was relevant to consideration of the

1  objector, and it was a really chaotic process.

2          So I said never again.  And that was my reason for

3  approving those requirements in that process in this

4  settlement.

5          Am I wrong?  Did I get that basically right?

6          MR. SIEGEL:  You did get it basically right.  It

7  allows for the Court to have an orderly process for

8  objections.

9          THE COURT:  To have the information before the day

10 of the hearing?

11         MR. SIEGEL:  Exactly.  And it also provides a basis

12 to allow the parties and ultimately the Court to consider,

13 okay, what is going on outside of the narrow objection that's

14 put before me that may inform what I just read out of the

15 manual, which is, Are the intent of these folks to help the

16 Class or are they motivated by something else?

17         And so that process is entirely consistent with

18 Rule 23.  It's consistent with this question the manual poses

19 to courts, which is not easy, in terms of the divining the

20 intent of some of these objectors.

21         But the process has allowed us to identify some

22 objectors that we believe presented objections for improper

23 purposes and make that record, which is why we filed our

24 supplemental declaration, why we filed the declaration last

25 night, because we do think it helps inform that.

And I don't want to go through all of that in granular detail, but I do think it helps to point out the folks we identified -- Mr. Clore, Mr. Bandas -- who represent Mr. West.  We've obviously provided an in depth record regarding their use of the objection process to try to hold up settlements and seek fees on appeal.

We identified Mr. Helfand, the subject of a disciplinary action for misleading a judge about an objection.  When we deposed Mr. Helfand, he indicated now having read the settlement, he's a fan of it and hopes that the Court, in fact, approves it.

Mr. Cochran, an attorney, he typically objects to Class action settlements, seeks out friends and families to act as the client.  He was unable to do that, so he's representing himself.

He was uninformed about key issues of the settlement in his deposition, and, again, we think that's the kind of thing that informs whether those objections are for the benefit of the Class or for another purpose.

We have John Davis we included because he is a serial objector who just failed to appear for his deposition.

Mr. Andrews you've heard from today.  He, too, has a record of holding up settlements for financial gain.  We've made our record on that.  As the Shane versus Blue Cross Court found, he is known as a professional objector who has

extorted additional fees from counsel in other cases.

And his objections here we just think are factually wrong.  We are happy to work with him if there is something on the docket personally that he thinks shouldn't be there. But I think his objection came after what we filed.  But in any event, we will reach out to him to make sure we've addressed that issue.

And so these objectors, I think, have a -- do have this documented history that now the Court has that helps inform this.  And, again, it is our view that the Court should consider identifying and making findings regarding those handful of folks in considering their objections.

And obviously consider the substance of the objections, but I think in considering the substance of the objections, it's appropriate to consider whether these folks are professionals as well.

And then the other individual we identified was Mr. Frank, who is the partner in the non-profit with Ms. Holyoak. The other objector Ms. Holyoak is representing is her brother.

They have a fig leaf of legitimacy in their objection, which I'll go through in a minute, but that's sort of an entirely different thing where they may not necessarily be looking to extract fees to hold up an appeal but very much made clear from their conduct that they are not acting in the

1    best interest of the Class.  And, again, that is, as the

2    manual says, an important consideration.

3            And so how did we explore that and what do we put

4    in the record with respect to Mr. Frank?

5            First is the continued public statements that there

6    was only $31 million in the settlement.

7            As the Court is aware and Mr. Canfield explained,

8    those misstatements, which got off the ground before we even

9    appeared in July, we sought to correct immediately.  But

10   there were others out there, including Mr. Frank, who were

11   perpetuating this idea that there was only $31 million

12   available in the settlement, and that was compounded by the

13   fact that we had Mr. Metcalfe.  And Mr. Canfield talked

14   briefly about Mr. Metcalfe and Class Action, Inc., and then I

15   think there was a communication breakdown on what a chat bot

16   is.

17           But the chat bot that Mr. Metcalfe created on Class

18   Action, Inc., was essentially -- and this is included in the

19   record as an attachment to our declaration at Document 900.

20   I'm looking at page 66, for example.  It is just simply an

21   automated process by which people go to a web page and they

22   click through boxes, and the information that's being

23   provided to them are simple statements that we say are highly

24   misleading about the settlement.

25           For example, there are two kinds of claims.  You

can apply for free credit monitoring or a cash settlement.

The cash settlement is then referred to as between $1.30 and $25 per person.  There's no mention of up to $20,000 that we expect to be fully reimbursed.  There's no mention of all the other economic and non-economic benefits of the settlement.

And so the way this is set up, it is, we believe, intentionally misleading people to ultimately select Tell Me About Other Options.

Well, you can object, and you can object by clicking another box.

I want to object because I don't like the settlement.  There should be more money.

We have in the record every screen that would pop up.

And so that is what Class Action, Inc., did.  And we believe both through Mr. Metcalfe's public statements about the settlement, including newspaper articles that suggested there was only $31 million available, and then his admission that we've included in our supplemental declaration, that that's what he believed.  He believed the settlement only included $31 million and that the -- he never read the Settlement Agreement to have any understanding about any of the other benefits, significant benefits, valuable benefits to Class members, and yet was hosting this automated

process to object to this settlement.  And that's why we've
asked that these objections be denied and struck, because we
believe they were secured by improper means.

But turning back to Mr. Frank, Mr. Frank was
promoting Class Action, Inc., after knowing good and well --
he's a smart guy -- that there was more than $31 million.

He has one Tweet.  We've put in the record where he
says -- late, that he says, "Not legal advice.  Go object
here," linking to Mr. Metcalfe's Class Action, Inc., chat
bot.

Well, it's not legal advice.  It's bad legal advice
to direct people to a site that at that point he knows is
providing misleading information about the settlement.

So that, we believe, is a significant piece of
information in how the Court considers making any finding
goes with respect to, again, whether these objections are
made in the best interest of the Class.

One other quick example on Mr. Frank and Ms.
Holyoak referenced in passing is the Target case, another
data breach case that I was involved in, Your Honor, a
settlement that was nowhere near what we have here,
of course.  But they appealed that case as well.  They were
objecting in Target.  They appealed to the Eighth Circuit.

In that case, the same claim was made, that there
were conflicts among Class members and therefore the Court

1   shouldn't approve it.

2          The Eighth Circuit did send it back down to the

3   trial court for a more in-depth opinion, which was written.

4   They appealed that, and it was affirmed.

5          And what did that accomplish?  That accomplished a

6   two-year delay in the final payments from the Target

7   settlement.  The Settlement Agreement was never changed.  The

8   fees were never modified.

9          And if you look at what Mr. Frank and Ms. Holyoak

10  submitted in their prior cases and whether they've had

11  success or not, they count that as a win.  I looked it up

12  this morning on their website to make sure I didn't have it

13  wrong.  They count it as a win, the Target appeal.

14         And so that is another point of reference for the

15  Court that we would like the Court to consider, that an

16  objection by a serial objector in a very similar case in

17  which they make the same objections they're making here that

18  results in nothing more than a two-year delay is considered a

19  win, and how that squares with being in the best interest of

20  the Class.

21         And we think that record is, again, sufficient for

22  the Court to readily conclude here that those objections,

23  including that of Ms. Holyoak's clients, in the words of the

24  manual, are not acting in the best interest of the Class.

25         Let me turn quickly to the specific objections that

we heard from today.  I think we responded to all of them in our papers.

Mr. Andrews raised several, most of which were just factually incorrect.

JND never got Social Security numbers.  That was a system approved by the Court.  Equifax always had the data. It was simply a mechanism to confirm Class membership.

The use of Social Security numbers was used to define the Class, of course.

The fact that there's an erroneous claim that Equifax is the entity deciding what is fairly traceable to the breach, that's not true.  That is the claims administrator, JND.

As Exhibit 9 to our Settlement Agreement lays out, there's a rather extensive process by which the claims administrator must consider claims as to whether they are fairly traceable, including the time of the alleged loss being after the breach is presumptively fairly traceable to the breach.

The -- there is no business relationship between Equifax and Experian, of course.

There's an express term in the settlement that Equifax can get no financial benefit from anything related to the monitoring services provided here.

We also provided in our response to the declaration

1   -- our supplemental declaration last night a response to this

2   claim that somehow JND is capturing information that it

3   shouldn't.

4            Finally, the $5 billion in Facebook, of course, was

5   a fine that went to the government, not to members of the

6   public.

7            I think with respect to Mr. Clore's statements

8   today, I will rely on the papers, and I actually think Mr.

9   Canfield addressed all of those preemptively.

10           And then Ms. Holyoak.  And I think the core

11  objection there is the objection that there is some sort of

12  conflict; and there's a related objection from Mr. Huang at

13  Document 813, at five through seven.  The Frank and Watkins

14  objection is 876.

15           This is the idea that Amchem and Ortiz creates some

16  sort of -- or mandate that there needs to be massive subclass

17  go here.

18           We think, again, briefed extensively, but those

19  obviously were complicated personal injury cases, asbestos

20  cases, where you had people who had no injuries, people who

21  were concerned about manifesting injuries in the future.

22           And in the Eleventh Circuit, a fundamental conflict

23  exists only where someone in the Class claims to have been

24  harmed by the same conduct that benefited other members of

25  the Class.  That is a fundamental conflict, and we don't have

that here, obviously.  There are no conflicts, let alone any
that should be considered fundamental.

I'll rely on our papers with respect to Mr. Huang's
objections with respect to current and future injuries.

And just quickly to respond to Ms. Holyoak's
comments, this was rejected in Target, expressly considered
by the trial court and affirmed, where the court held that
the availability of potential statutory damages for members
of the Class from, in that case, California, Rhode Island and
the District of Columbia does not mean that the interests of
these Class members are antagonistic to the interest of Class
members from other jurisdictions.

Class actions nearly always involve Class members
with non-identical damages.  Objectors' argument in this
regard -- and this is, again, Ms. Holyoak and Mr. Frank --
ignores the substantial barriers to any individual Class
member actually recovering statutory damages.

Here, Utah, for example, requires establishment of
a loss.  The presumption that there's an automatic payment is
just simply wrong.

The Court went on to say Class members from there,
California, Rhode Island, and D.C. willingly gave up their
uncertain potential recovery of statutory damages for certain
and complete recovery, whether monetary or equitable the
Class settlement offered.

1          Contrary to objectors' belief, this demonstrates

2     the cohesiveness of the Class and the excellent result named

3     Plaintiffs and Class counsel negotiated, not any inter-Class

4     conflict.  That was Judge Magnuson in St. Paul, in

5     considering the same objection made today.

6          Anthem had a similar conclusion.  Judge Koh

7     addressed this very issue and found that there was no

8     conflict based on variations in state law.

9          The named representatives include individuals from

10    each state, as Your Honor knows is the case here, and

11    differences in state remedies are not sufficiently

12    substantial as to warrant the creation of subclasses.

13         Literary Works is completely different.  We briefed

14    it extensively.

15         Suffice it to say for now, every member of the

16    Class here shares the same or similar claims and has suffered

17    the same injury resulting from the same event, the theft of

18    their personal information.

19         And touching on Mr. Huang's claim just a bit, the

20    concept of harmed now, potentially harmed later is exactly

21    what we addressed in the settlement.  People can make cash

22    claims now.  There's an extended claims period for four years

23    to make out-of-pocket claims if somebody has a fraud or other

24    injury where they would be reimbursed for out of pocket.

25    Again, you can tap into that extra 125 million.

1          We've provided for extended credit monitoring that

2     can last up to ten years for those who select it.  And,

3     of course, restoration services if somebody does have a fraud

4     without ever making a claim for at least seven years.

5          And then, of course, what we hope will have the

6     most long-term effect is the very, very difficult process

7     that generated the business practice changes.  And those, as

8     we've explained in our front-loaded efforts at preliminary

9     approval, are substantial, backed by this billion dollar

10    commitment to spend.

11         So there's no conflict, and I think it also at

12    least should help the Court that given the fact we have a

13    cross-section of representatives from across all states, we

14    had the use of a respected mediator here in Judge Phillips,

15    we had Utah and D.C. signing off on this settlement, which is

16    not insubstantial, given the claims by Ms. Holyoak and her

17    clients, and extensive input from those states, the Court

18    should have little trouble rejecting any claim that there's a

19    conflict under Rule 23(a)(4).

20         That does it for the objections.  Just a couple of

21    other points to hopefully close this out.

22         We don't have additional remarks on the Klonoff

23    motion that was mentioned by Ms. Holyoak.  Unless the Court

24    has questions, we would rely on our papers.

25         I did want to respond very quickly, since we

haven't had the opportunity, to the comments from the State of Indiana and the Commonwealth of Massachusetts.

To be clear, we do not claim, have never claimed to represent those states here.  And, of course, that would be beyond our appointment to represent individuals victimized by the breach.

We negotiated a release that we think is appropriate, given the tremendous relief afforded under the settlement, again, with the benefit, input and signoff of state and federal regulators.

But procedurally, we think this issue should be litigated in those states.  It sounded like from the arguments being made today on the phone, those states are essentially saying that release, if you sign it as part of a final approval order, will not be enforceable in Indiana and Massachusetts.  And that may or may not be true, but that should be litigated in Indiana and Massachusetts.

We think that's the appropriate place to litigate those issues, and would leave the argument there on that, unless the Court has further questions.

Finally, Your Honor, I'd like to close with this. I think the Court is aware that my firm and I have been involved in probably the most data breach cases that have been brought to date.  I don't know if that's a good thing or a bad thing at this point.

1           But cases large and small we've litigated on behalf

2     of Class members from around the country involving all matter

3     of data breaches:   The National Board of Examiners in

4     Optometry; Anthem; Target; Home Depot, of course; the Office

5     of Personnel Management, a government agency.

6           And we talked to all these clients, and in the wake

7     of a data breach what people repeatedly say that they want

8     after a data breach is they want to make sure that they're

9     reimbursed if they come out of pocket.  They want to know

10    that there's some monitoring available to them to -- so they

11    can make sure if the data does get out or has gotten out,

12    there's a way of easy detection and protection.

13          They want to make sure that if something happens --

14    and I think I mentioned this at preliminary approval -- they

15    want to be able to pick up the phone and talk to somebody

16    that knows what they're talking about about how to help them

17    fix it.  And those credit restoration services are always

18    near the top of the list.

19          And, finally, they want the confidence that

20    everything is going to be done to bring changes to the entity

21    so it does not happen again.

22          And all of that experience in those other cases

23    inform the settlement here, along with my colleagues, who are

24    also incredibly experienced in this field, informed how we

25    approached this case, and we accomplished our goal.  We

accomplished our goal with this settlement that delivered that relief.

It's also a relief that most likely is unavailable at trial.  And we know we would have had a long road legally getting to trial, as Mr. Balser summarized.  But even at trial, what we've achieved in this settlement was likely unavailable.

And so my firm and I have been litigating these cases but also trying other Class action cases.  We've handled scores of Class actions and have tried three of them in the last six or seven years, and so we're not afraid of a trial.  We're not afraid to take a case from Class certification and stand in front of a jury and ask for relief.

But, again, that informs why we thought that this settlement at this time with these elements, given the historic nature of the relief we were able to obtain, is appropriate; and we believe the Court should have little trouble finding it fair, reasonable and adequate for the benefit of the Class.

If the Court has no other questions, I'll leave it there.

THE COURT:  All right, Mr. Siegel.

Ms. Keller.

MS. KELLER:  Thank you, Your Honor.  Thankfully,

1    you don't need to hear from me today as the issues that I was

2    going to cover were not brought up.

3              But I just want to reiterate what my colleagues

4    have said and thank you for the opportunity.

5              THE COURT:  All right.

6              GOVERNOR BARNES:  She's yielded her time, Your

7    Honor.

8              (Courtroom laughter.)

9              MS. KELLER:  Your Honor, I object to that.

10             THE COURT:  Governor Barnes.

11             GOVERNOR BARNES:  I just have a few remarks I want

12   to make, kindly, in summary.

13             When Ken Canfield and I started talking about this

14   case early, one of the things that we recognized is that it

15   could be an absolute disaster to manage with as many lawyers

16   and we knew there was going to be a lot of dissension that

17   occurred during the case as happens when both sides

18   vigorously represent their clients.

19             And I think I speak on behalf of all of us.

20   Regardless of what you do, you have done a remarkable job in

21   keeping a very complex case manageable.

22             And I think one of the reasons that we haven't had

23   this hearing at the civic auditorium with objectors is that

24   you have managed it well.  And I wanted to say that, and I'm

25   sure that's on behalf of all of us.

Now, let me talk to you just a little bit about the objection.  Now that's what I'm going to talk about most.

Where were all of these folks when we were baking this cake, when we had to put in $1,400,000 out of our own pocket to see if we could have the recipe of a broad settlement that would take care of the most people without putting the folks out of business?  Where were they?  Were they saying, "Here, here's $100,000.  We know that you're going to have to hire experts.  Here's another $50,000"?

No.  They wait until the end and then they come up here and say, "We don't like the ingredients you put in that cake.  And, in fact, we don't like it so much, we want to either be paid or we want the case not to be approved for settlement."

Now, I've been trying cases a long time and I was very concerned, as Mr. Balser has talked about and Mr. Canfield has talked about, about two cases I saw coming down the pike over at the court of appeals and the Supreme Court, and one was McConnell and the other -- of course, the one they have right now is Collins.

And I became even more concerned when I watched the oral arguments and, in fact, I became so concerned, we went -- I went back -- Mr. Canfield and I went back to all of our folks and said, "We'd better file an amicus in McConnell," and we did, which I think was much better than the original

1   case of the plaintiff, the brief of the plaintiff.

2          But there is substantial risk in this case, and I

3   think everybody recognizes that.  We don't know what the

4   contours of what the Supreme Court is finally going to do

5   after McConnell.  But I thought that hopefully that McConnell

6   would be decided on sovereign immunity grounds that said,

7   Listen.  This Department of Labor at the State of Georgia,

8   we've said that the king can do no wrong, and therefore,

9   whether I agree with it or not, it would be a narrow holding.

10          That is not what the Supreme Court did.  What the

11   Supreme Court did is they said, Oh, no, there's not any

12   sovereign immunity, but there's no duty, and explicitly

13   overruled Bradley, the suicide case that came out of Bradley

14   down in Columbus.

15          And so what is the risk here?  The risk is great.

16   As you mentioned in one of your comments to counsel, if you

17   don't think there's risk, just look at the financial folks.

18   And there is risk.

19          And I was -- all of us were very concerned about

20   McConnell.  I'm very concerned about Collins.

21          And I will say this to my distinguished folks on

22   the other side.  When McConnell came down, we had a Term

23   Sheet.  We did not have a definitive agreement.

24          And as soon as I saw the McConnell decision, that

25   morning, I said, "Equifax is going to try to squish out of

this, is going to try to see if they can squirm out of it."

        And I wasn't there, of course, to hear the discussions that occurred between the lawyers for Equifax and their client, but I will give credit to the lawyers for Equifax.  I'm sure that even if it were suggested, they told the folks-to-be at Equifax that a deal is a deal.

        And I think only by, really, the accident of timing and the fact that we had lawyers on the other side that stuck to their word is the only reason this settlement is here, because the exposure after McConnell, in my view, I think you can still sustain a case, but I think it's going to have one hand -- a data breach case, but I think you're going to have one hand tied behind you after McConnell.

        Now, I want to talk a little bit of what I call the balance in this case, and I think this is the thing that plaintiffs' lawyers miss a lot of times.

        One is, you know, we seem to be in our society and our politics right now that there is no balance or moderation.  Everybody's on one extreme or another.

        Johnny Isakson and I were talking about the other day and he had an interesting remark.  He says, "Do you realize that if either one of us were starting politics today, neither one of us could get nominated in the party that we got elected from?"

        I said, "I don't think I could be nominated in

1    either one."

2         He says, "Well, I know I couldn't be nominated for

3    the Democrats, and I have serious doubts about the

4    Republicans."

5         The point is we have forgotten and lawyers have

6    forgotten they have a duty to their clients that's paramount.

7         But let me tell you from having been in cases over

8    the years, the worst thing that you can do is force the

9    opposing side into bankruptcy, because if you think that

10   these fees are healthy, we're nothing compared to those

11   bankruptcy lawyers.

12        We're in one right now where a defendant, Emrys, in

13   the Tout cases filed for reorganization and bankruptcy.  I

14   think they finally liquidated.  But the legal fees have been

15   over $5 million a month, and there's going to be nothing left

16   in Emrys.

17        Now, what would have happened here if there hadn't

18   be lawyers in good faith on both sides trying to work

19   something out that extracts the most that it can, the most

20   that can be paid without putting them into bankruptcy, where

21   nobody wins except bankruptcy lawyers?

22        Now, I believe in lawyers getting paid and I'm a

23   big believer in it, and I'm in favor of lawyers getting paid

24   well.  But it does not help your client when they go into

25   bankruptcy, and that was a consideration I don't think has

1    been talked about today.

2            What is the balance to get the most without putting

3    them out of existence, where they can pay nothing?  And I

4    think that that balance has been met here, and the balance is

5    this -- and let me tell you one other thing, too.  What

6    happens if Equifax goes bankrupt and goes out of business?

7            You only have three major credit bureaus, credit-

8    reporting bureaus, and so you're going to increase the

9    monopoly of the two that's left.

10           Lawyers have to have common sense in balancing

11   something like that, and I think that we've accomplished that

12   in this case.

13           Now, you've had some objectors.  Mr. Siegel has

14   talked about this a little bit.

15           Objectors really are of two types:  They are the

16   professional that have a mercenary bent; and then there are

17   the idealogical that, you know, just don't like Class

18   actions.

19           I put Mr. Frank in that, represented by Ms.

20   Holyoak.

21           Most of the others I put in -- I won't characterize

22   some of the ones that have appeared before you today, but

23   most of them I see before you are mercenaries.

24           And nothing that I have heard today or I have read

25   in any of the papers, in my view, contradicts the fact that

in the overall balance of things, this is the best settlement
that can be reached and applied for and made applicable to
the greatest number.

Now, I wish my colleagues, my distinguished
opponents from Massachusetts and Indiana were still on the
phone.  I wish they had come down.  I was going to tell them
we don't make everybody eat grits that comes from up north,
that Waffle House even has hash browns now.

But, unfortunately, what we've got here -- and you
know this, too -- the competition between governments on who
gets the credit can be a destructive thing.  I've seen it in
government and I know you have, too.

It kind of reminds me of factions in the Baptist
Church that are running off the preacher.  You know, "I want
credit for that.  I found out he was going with the -- with
one of the choir members."

And the other one says, "Oh, no, no, no."  Says,
"You know, I found out he was nipping on the side."

It's who gets credit for running off the preacher,
and that's what they're trying to do.  And if they want to
pursue their actions on behalf of Massachusetts and Indiana,
go to it.  But they're not -- I will tell you that they will
not be able to accomplish more than what is done in this
Settlement Agreement.

And what they really want to do is they are looking

for the news conference.  "I did it, and I need to be
re-elected, by the way."  And I don't believe that that is
the basic reason to reject this settlement.

Now, the overall issue still comes back to what I
said earlier.  In balance, given the financial condition of
Equifax, given the fact that this is a large breach, given
the fact that some have suffered damages that others have
not, that need to be protected for the future, what is the
best balance?  And I think that it is found here.

You're never going to satisfy everybody.  It is
impossible to satisfy everybody, but this satisfies the great
number.  And if they don't like it, opt out.  Go to it.
Gather up your million four hundred thousand dollars and pay
experts and go to it.

But overall, I think the Plaintiffs in this case
have represented this Class well.

Now, this will get me -- the one thing that I take
particular offense to -- I generally don't take offense to
anything.  My hide is about as thick as a rhinoceros, but I
particularly take offense of what I've read in the papers,
and what I've heard today is, "You gave in to King and
Spalding and Equifax.  You just folded."

Now, let me tell you something.  King and Spalding
is on the other side of a lot of cases we have, and it's a
major league sport to fight them.  But don't think that I'm

1   going to give into.  They're honorable folks.

2         But I'm not -- to the idea that that Ken Canfield

3   and all of us got in the back room and says, "We're afraid of

4   King and Spalding.  We just can't take that pressure," and

5   that we cooked up some deal that hurt somebody that we were

6   representing, I resent that.  And anybody that makes such an

7   allegation of that should not be believed.

8         Now, let me just say this.  Let me just say this in

9   closing to it.  I've talked a little bit about attorneys'

10  fees.

11        Yes, the attorneys' fees, I think, are reasonable.

12  There's a lot of long division in this case, as you probably

13  have seen in everything else.  There's no lawyer going to get

14  $77 million.

15        However, you don't take into consideration that we

16  don't get paid in cases where we, in fact, lose or they just

17  strike out.

18        I remember what Big Bobby Flournoy said one time.

19  He asked me this before he became a judge.  He said, "Have

20  you discovered that monster in your office?"  I was young.

21  He says, "Have you discovered that monster in your office?"

22        I said, "What are you talking about, Bob?"

23        He says, "Well, there's a leviathan that lives in

24  your office and it grows during the month, and at the end of

25  the month it knocks on your door and you open the door and

1    you throw barrels of money into its mouth to pay the

2    overhead, and then it recedes for another month and you have

3    to do it all over again."

4            This case was -- I've tried -- I don't know how

5    many cases I've tried.  I've been in about 300 appeals.  So I

6    guess you could -- I hate to think that I had to appeal that

7    many losses.  Sometimes I was the appellee in the case.  But

8    I've tried a lot of cases and I've been in a lot of cases.

9            This is by far the most complex and the most

10   difficult case that I've been in because it had so many

11   weighing of the factors, as I've tried to put into it.

12   Whether you look at it as 20 or 25 percent really doesn't

13   matter.

14           And you know there's going to be an appeal.  We're

15   going to have an appeal in this case that's going to be

16   another two years.

17           It's kind of like -- I had a lawyer that was

18   arguing with me the other day about he wanted to put -- we

19   got about 20 or 30 of the cases, and he said, "We just need

20   to try one of these a year."  He says, "They're so big."

21           And I said, "Let me tell you something.  I'll be 72

22   years old."  I said, "You've got greater faith in my

23   longevity than I do."

24           And that's where we are in this case.  These

25   lawyers -- and Judge Phillips, I became -- I thought he was

1   high when at first we were having to front some money, but he

2   was good.  And I think that it would have taken a former

3   federal judge that had broad experience in large cases and

4   difficult cases, as this one was, to be able to resolve this

5   case.

6          So in summary, I tell you this.  We baked this cake

7   and I think we baked a pretty good cake.

8          And all these other folks that are here throwing

9   rocks, find your own case and decide how to do it and see how

10   difficult it is.

11          I ask you to approve the settlement and the fee

12   award that's requested.  Thank you, Your Honor.

13          MR. FROELICH:  Your Honor, excuse me.  May I be

14   heard for a minute?

15          THE COURT:  No, sir.

16          No, Mr. Andrews.

17          Mr. Balser, do you want to say anything else?

18          MR. BALSER:  Nothing further on behalf of Equifax,

19   Your Honor.

20          THE COURT:  All right.

21          In order for me to do what I think I need to do in

22   this case, I need to take a five-minute break.  So we're in

23   recess for five minutes.

24          (Recess taken from 1:26 p.m. until 1:35 p.m.)

25          THE COURT:  So I don't think there's any

disagreement about the fact that this is an historically significant data breach settlement, and I don't think anyone can credibly argue that it doesn't provide substantial relief that benefits the Class members now and in the future.

Equifax is going to contribute $380 million to a fund for which benefits, fees, expenses, administration of the Class will be paid, and an additional $125 million for certain out-of-pocket expenses.

Class members can claim up to $20,000 for actual documented losses.  They get four years of three-bureau credit monitoring, worth approximately $1,200, and an additional six years of one-bureau credit monitoring through Equifax that's worth up to $720; identity restoration services through Experian, subject to a $38 million cap; cash compensation for time spent; and cash payment as an alternative to the credit-monitoring services.

And significantly to me, Equifax is undertaking to spend $1 billion to upgrade its data security and related technology over a period of five years.

So the settlement, if it's approved by me, is going to cost Equifax anywhere from $1.38 billion to approximately $1.5 billion.

So let me talk first about the objections to the settlement, and, of course, there's no way in the next few minutes I'm going to be able to address all of them.  But let

me say this.  There's been a degree of public anger about what happened in the Equifax data breach that is unprecedented.  I've seen it in the dozens and dozens of letters that have come directly to me.  I've never seen anything like it in any other consumer case that I've handled.  I certainly never saw that in the Home Depot case.

And I think this is the reason for that:  You choose to go to Home Depot.  You choose whether or not to use a credit card.  You choose whether or not you use cash. Nobody chooses to give their personal information to Equifax. Equifax gets that information from the merchants and banks and landlords and employers and other people that all of us have to deal with in our daily lives, and then Equifax makes money off that, giving that information back to the merchants and banks and landlords and employers.

And I think that is what accounts for some of the extreme anger about what happened when Equifax failed to take reasonable measures to protect that information that nobody gave them voluntarily to begin with.  And I get that.  I understand that.  But that public anger doesn't change what my role in considering this settlement is.

When a settlement results from hard-fought litigation and arm's-length negotiations, objections that the settlement doesn't do enough is not a reason to reject a settlement if I find that the settlement is fair, reasonable

and adequate.

In a similar vein, objections that the settlement is too small or that Equifax should be made to pay more to punish it to deter bad behavior simply don't take into account the risks and the realities of litigation that are not a basis for rejecting the settlement.

And as a Judge being asked to consider approving the settlement, I have to take into account the fact that the Plaintiffs, if they had continued to litigate the case, would end up with nothing.

Other objectors asked me to rewrite the Settlement Agreement, and I can't do that either. That's not my role in this case.

As I said, I can't address every single objection; but let me say that I did find Professor Klonoff's responses to the objections to be, generally speaking, meritorious and appropriate. As he points out in paragraph 29 of his affidavit, the number of objectors is small in light of the 149 million people who are members of the Class.

The settlement was reached only after the litigation had been advanced beyond the motion-to-dismiss stage. It was the product of the work of an experienced and able mediator, and that fact also supports approval of the settlement.

And I agree with Professor Klonoff's statement that

it's not the function of a private settlement to remove
Equifax officials from their jobs, to see that they're
criminally prosecuted, to force Equifax to cease its
operations, or strip Equifax officials of their personal
assets.  My job is to determine whether the settlement is
fair, reasonable and adequate.

As Professor Klonoff states, many of the objections
are based on relief that Class counsel could never get, even
if the case was litigated through trial.

As in any settlement, there were elements of
compromise.  There had to be a process of give and take, and
that means you don't ever get everything that you want.  And
anyone who is dissatisfied with the settlement certainly
under Rule 23 can always opt out.

And for the reasons stated by Mr. Siegel, it's my
judgment that most of the objections that were voiced here
today did not take into consideration the best interest of
the Class itself.

So I think that the settlement should not be
disapproved for any of the reasons given by the objectors.

So that then leads to the question of whether the
settlement should be approved under the factors set forth in
Rule 23(e) and controlling Eleventh Circuit case law, and I
believe that it should, and I'm going to just briefly discuss
those factors.

1      Rule 23(e)(2) requires a finding as to whether the

2  Class representative, the Class counsel have adequately

3  represented the Class.  In my opinion, they have.  They have

4  vigorously prosecuted this case.  They've devoted, I believe,

5  approximately 33,000 hours of time to achieve the settlement.

6  They defeated Equifax's motion to dismiss.  As Judge Phillips

7  noted, the arguments and positions asserted by all of the

8  Plaintiffs' counsel were the product of much hard work.  They

9  were complex and highly adversarial.

10      The next factor is the adequacy of relief provided

11  to the Class.

12      I've already outlined the benefits to be provided

13  by the settlement, which I think are substantial and, as I

14  said, will cost Equifax anywhere from $1.38 billion to

15  $1.5 billion.

16      The next factor is the risk, cost and delay of

17  trial and appeal.

18      In my opinion, Plaintiffs' counsel took a serious

19  risk that this litigation would terminate in Equifax's favor.

20  And the discussion about the McConnell and Collins cases that

21  we've had here today reinforce my opinion about that, and

22  that that is a factor that must be considered by me in

23  deciding whether or not to approve the settlement.

24      I think that the relief provided for the Class is

25  adequate, taking into consideration the effectiveness and

1   proposed method of distributing relief to the Class.

2          And I'll discuss the terms of the proposed award of

3   attorneys' fees in just a minute.

4          Finally, I think under Rule 23(e)(2), I believe the

5   proposal treats Class members equitably relative to each

6   other.

7          So for all of those reasons, I think that the

8   settlement should be approved and also approved considering

9   the Bennett versus Behring Corporation factors adopted by the

10  Eleventh Circuit in 1984.

11         I've already touched on most of those already,

12  including the likelihood of success at trial; the range of

13  possible recoveries, which in my opinion in this case the

14  settlement is in the high range; the complexity, expense and

15  duration of the litigation; the substance and relatively lack

16  of opposition to the settlement; and the stage of the

17  proceedings at which the settlement was achieved.

18         So, again, I grant the motion to approve the

19  proposed settlement.

20         I'm also going to grant the Plaintiffs' motion for

21  an award of attorneys' fees, expenses and service awards.

22         And I'm going to award the Plaintiffs' attorneys

23  $77.5 million in fees, $1,248,033.46 in expenses, and $2,500

24  service awards for the Class representatives.

25         Again, I believe that the objections to the

attorneys' fees are generally unwarranted.  I think many of
the objections were based upon erroneous press accounts of
what benefits the Class would receive as opposed to the
actual benefits that I outlined at the first part of my
remarks.

I think I'm required to award attorneys' fees in
this case based upon a percentage, and I believe that a
25-percent percentage of the original cash fund of
$310 million is reasonable.  And if you consider that amounts
to basically a 20-percent percentage of the ultimate $380
million cash fund, it's even more reasonable.

I believe that a 25-percent percentage or a 20
percent, depending upon how you consider it, is a fair and
reasonable one, considering the appropriate factors.

Again, Class counsel faced substantial risk that
the case would result in Equifax's favor.

I reject the idea that the non-monetary benefits
can't be considered in determining the percentage in this
case, which makes the percentage that I'm awarding even less
when you consider the $1 billion that Equifax is committing
to improve its cybersecurity.

I think the objections fail to adequately count for
the value of the credit monitoring provided as a part of the
settlement.

I think the percentage in this case is comparable

to other attorneys' fee awards in comparable data breach

cases, such as Anthem and Target and Home Depot.

I don't believe that the percentage should be

reduced because it's a so-called mega fund case.

I believe Class counsel's expenses should be

reimbursed in the amount I indicated, and that the service

awards are appropriate.

So for those reasons, I'm granting the Plaintiffs'

motion for attorneys' fees, expenses and service awards.

I think that the result that has been achieved in

this case is exceptional and justifies approving the award as

requested.

Getting back to the objections to the settlement

itself, let me address two that I failed to address.

Number one is the objection that subclasses should

have been created in this case.  I believe that objection is

totally without merit.  It's highly unlikely that any

individuals would have benefited in any way from state

statutory remedies that might be available, and if they

thought they would, they could opt out.  So for the same

reasons given in Target and others, I don't think that is a

valid objection to the proposed settlement.

And then, second, let me address the objections by

the Attorney Generals of Indiana and Massachusetts.  I don't

think that their objections are valid.  Number one, I don't

1    think they have standing to state objections to the

2    settlement because they're not members of the Class.

3            Number two, there's nothing in this settlement that

4    prevents the Attorney Generals of Indiana and Massachusetts

5    from pursuing their enforcement actions in state court.

6    They're doing that and nothing in the Settlement Agreement is

7    going to stop them from doing that.

8            And any litigation about the effect of any releases

9    in this case, in my opinion, is more appropriately addressed

10   in the state courts in Indiana and Massachusetts rather than

11   by me.  So I'm not commenting on that one way or the other.

12   And any request by them for me to rule on that would be a

13   request for an advisory opinion, which I'm not going to give.

14           So those are my rulings on the two motions.

15           And, Mr. Canfield, if you will prepare a written

16   order that summarizes my rulings on the motions and my

17   adoption basically of the arguments that have been made by

18   the Plaintiffs and by Equifax in the hearing today, get Mr.

19   Balser's approval as to form, and present it to me, I'll

20   consider signing it.

21           MR. CANFIELD:  We will do that, Your Honor.  In

22   fact, we've been collectively working on a proposed order,

23   and we will modify it as appropriate, in light of the Court's

24   comments today, and submit that.

25           We will need to get a copy of the transcript before

1    we do that, and with the holidays, it may be -- take us a

2    little bit longer than it otherwise would, but we will do it

3    as expeditiously as possible.

4           One question I had in listening to the Court's

5    ruling.  I had a little difficulty hearing the amount of

6    expenses that you awarded.  However, I don't think that it

7    was the expense amount that reflected the updated figures

8    that we've submitted at almost midnight last night.  So it's

9    not surprising the Court wouldn't have had the benefit of

10   that.

11          But our total expenses, including the amounts that

12   have been incurred in the last month or so, is $1,404,855.35.

13   And we would urge the Court to include all of the most recent

14   expenses in its expense award.

15          THE COURT:  I think that's appropriate, Mr.

16   Canfield.

17          So notwithstanding what I said, the award of

18   expenses is $1,404,855.35.

19          MR. CANFIELD:  Thank you, Your Honor.  What the

20   parties have been discussing would actually involve the entry

21   of three separate orders by the Court.  One is the consent

22   order that deals with the injunctive relief that would apply

23   to Equifax going forward.

24          One is the opinion that reflects what the Court has

25   ruled on today.

1          And a third document, which we think is a good

2     idea, would be to have a separate final judgment that would

3     contain the typical provisions that are used in a Class

4     action when it gets wrapped up.

5          And what we would propose to do is submit to Your

6     Honor all three of those documents at the same time.

7          THE COURT:  That'll be fine.

8          As far as the transcript is concerned, if you'll

9     talk to Ms. Peede, I think you'll find that it's going to be

10    available tomorrow.

11         MR. CANFIELD:  That makes our job a lot easier.

12         THE COURT:  Well, yes and no, because you then

13    don't have an excuse not to work through Christmas.

14         (Courtroom laughter.)

15         THE COURT:  But the transcript will be available,

16    and I understand that you have your own lives to live and I'm

17    not expecting it on Christmas Eve or the day after Christmas,

18    Mr. Canfield.

19         MR. CANFIELD:  Hopefully, we can get it before

20    Christmas; but if we can't, we appreciate the Court's

21    indulgence.

22         THE COURT:  Is there anything else?

23         MR. CANFIELD:  Nothing from the Plaintiffs, Your

24    Honor.

25         THE COURT:  Mr. Balser?

1          MR. BALSER:  Nothing further for Equifax, Your

2   Honor.

3          THE COURT:  All right.

4          Court's in recess until further order.

5          (Proceedings concluded at 2:00 p.m.)

6                  - - - - - - - -

7                  Reporter's Certification

8   I certify that the foregoing is a correct transcript from the

9   record of proceedings in the above-entitled matter.

10                          <u>s/Diane Peede, RMR, CRR, CRC</u>
                            Official Court Reporter
11                          United States District Court
    Date:   December 20, 2019   Northern District of Georgia

12