# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 11-1086 (FLW)

1

_____  :

MARNIE GLOVER, etc, et al.  :
                            :
                            :  TRANSCRIPT OF
          Plaintiffs,       :  PROCEEDINGS
                            :
     v.                     :  JULY 9, 2012
                            :
FERRERO USA, INC.,          :
                            :
          Defendant.        :
_____  :
                            :

CLARKSON S. FISHER UNITED STATES COURTHOUSE
402 EAST STATE STREET, TRENTON, NJ  08608

B E F O R E :  THE HONORABLE FREDA L. WOLFSON, USDJ

A P P E A R A N C E S :


  CARELLA BYRNE CECCHI OLSTEIN BRODY & AGNELLO, P.C.
  BY: JAMES E. CECCHI, ESQUIRE
          -and-
  SCOTT & SCOTT, LLP  (NEW YORK)
  BY:  JOSEPH P. GUGLIELMO, ESQUIRE
       ERIN GREEN COMITE, ESQUIRE
          -and-
  SEEGER WEISS, LLP  (NEW YORK)
  BY:  STEPHEN A. WEISS, ESQURE
          -and-
  DAVIS & TALIAFERRO, LLC  (ALABAMA)
  BY:  GREG L. DAVIS, ESQUIRE
  On behalf of the Plaintiffs

  WILSON SONSINI GOODRICH & ROSATI, ESQUIRES (CAL.)
  BY:  KEITH E. EGGLETON, ESQUIRE
  On behalf of the Defendant
                              (Continued.)


                   * * * * *
              VINCENT RUSSONIELLO, C.C.R.
             OFFICIAL U.S.COURT REPORTER
         138 PAXSON AVENUE, TRENTON, NEW JERSEY
                  (609)588-9516

A L S O   P R E S E N T :


BETH M. KOTRAN, ESQUIRE
GENERAL COUNSEL - FERRERO USA, INC.


ON BEHALF OF THE OBJECTORS:


LESTER LEVY, ESQUIRE
On behalf of Amy Ades


CHRISTOPHER V. LANGONE, ESQUIRE
On behalf of Agatha Bochenek,
Brandon Goodman, and Edward Hagele


DANIEL GREENBERG, ESQUIRE
Pro-Se

**C E R T I F I C A T I O N**

PURSUANT TO SECTION 753, TITLE 28, USC, THE
FOLLOWING TRANSCRIPT IS CERTIFIED TO BE AN ACCURATE
TRANSCRIPTION OF MY STENOGRAPHIC NOTES IN THE
ABOVE-ENTITLED MATTER.

S/Vincent Russoniello
VINCENT RUSSONIELLO, CCR
OFFICIAL U.S. COURT REPORTER

4

**I N D E X**

Proceedings                                                 Page


Review of Rulings from 7/6 Conference call                    7

Discussion re

    Declaration of Charlene Young                        13
        By Mr. Guglielmo                              13

    Hourly rates
        By Mr. Cecchi                                 16
        By Mr. Davis                                  18
        By Mr. Guglielmo                      18, 19, 28
        By Mr. Weiss                                  18

    Settlement Fees                                      20
        Fees from the overall monetary settlement
            By Mr. Levy                               21
            By Mr. Cecchi                             23

        Injunctive relief portion fees
            By Mr. Greenberg                          33
            By Mr. Langone                            37
            By Mr. Levy                       41, 50, 55
            By Mr. Guglielmo                          44
            By Mr. Eggleton                           57
            By Mr. Cecchi                             57


        Rulings by the Court                             63

5

```
 1              (In open court.)
 2              THE CLERK:  All rise.
 3              THE COURT:  Good morning.
 4              I'll have the appearances.  Everyone else may
 5     be seated.
 6              MR. CECCHI:  Good morning, your Honor.
 7              James Cecchi, Carella Byrne, on behalf of the
 8     Class.
 9              With me this morning is my co-counsel, Joseph
10     Guglielmo, from Scott & Scott.
11              MR. GUGLIELMO:  Good morning, your Honor.
12              THE COURT:  Good morning.
13              MR. CECCHI:  Also, plaintiffs' counsel is
14     Stephen Weiss from Seeger Weiss.
15              MR. WEISS:  Good morning, your Honor.
16              THE COURT:  Good morning.
17              MR. CECCHI:  Greg Davis and Erin Comite, also
18     from Scott & Scott.
19              MR. DAVIS:  Good morning, your Honor.
20              MS. COMITE:  Good morning, your Honor.
21              THE COURT:  Thank you.
22              MR. EGGLETON:  Good morning, your Honor.
23              Keith Eggleton for Ferrero U.S.A.
24              Along with me is my client's general counsel,
25     Beth Kotran.
```

1           MS. KOTRAN:  Good morning.

2           THE COURT:  Thank you.

3           MR. LEVY:  Good morning, your Honor.

4           Lester Levy for objector Any Ades.

5           MR. GREENBERG:  Good morning, your Honor.

6           My name is Dan Greenberg.  I'm representing

7      myself.

8           MR. LANGONE:  Good morning, your Honor.

9           Chris Langone on behalf of objectors Agatha

10     Bochenek, Brandon Goodman, and Edward Hagele.

11          THE COURT:  Thank you.  You may have a seat.

12          We are here today, obviously, for the request

13     to approve the class action settlement and fees in

14     this case, to certify the class, and grant final

15     approval.

16          The first thing, however, that I would like to

17     do is:

18          One, I'll note that I received many

19     submissions in this case:  I've received the briefing

20     from class counsel, and then I received objector

21     briefing, letters as well, and then I received the

22     responsive papers last Monday from class counsel; and

23     then Ferrero as well filed papers at that point; and

24     then there were some additional papers filed at the

25     end of the week by Mr. Greenberg with regard to the

1   declaration of Larry Johnson.  And I did convene a

2   conference call on Friday, which was not on the

3   record, but counsel participated, class counsel, as

4   well as Ferrero, and as well as Mr. Greenberg on that

5   conference call.  It was not, as I said, on the

6   record.  I indicated that I would address it formally

7   this morning, though I gave my ruling at that time.

8           Let me just, at this time, make clear what

9   that ruling was.  That was last Friday, July 6th, that

10  I indicated that I would be striking the report of

11  R. Larry Johnson who was valuing the injunctive

12  relief.

13          Mr. Greenberg had made a motion -- had made

14  several motions, actually.  One was to unseal the

15  redacted report of Mr. Johnson.  The redactions were

16  reflecting sales figures that have been produced by

17  Ferrero pursuant to a confidentiality order and an

18  order had been entered by Judge Arpert agreeing to the

19  filing of the redacted report to protect what had been

20  designated as confidential information.

21          I will note that on the conference call

22  Mr. Eggleton indicated that he would be willing --

23  because, also, Mr. Greenberg is an attorney at law --

24  that he would be willing to unseal the report to him

25  if Mr. Greenberg were willing to abide by the

8

1  confidentiality order in other respects.  However,

2  because I had already determined that the Johnson

3  report would not be used, that essentially mooted the

4  motion for sealing, and thus that was denied.

5      Let me indicate my rulings with regard to the

6  Johnson report.

7      The Johnson report values the injunctive

8  relief that was achieved in this case based on the

9  increased sales of Nutella after defendant began its

10  advertising campaign in 2008.  Based on quarterly

11  sales figures, Mr. Johnson found that there was a

12  higher average annual increase in sales now as opposed

13  to before the campaign.  He assumed some amount of

14  that increase was attributable to the allegedly

15  deceptive statements or advertising messages.  Because

16  defendant will now be prohibited from using the same

17  statements, allegedly deceptive statements, Johnson

18  argued defendant would suffer a loss.

19      He then goes on to opine that if this is only

20  even a 1 percent loss, calculated over the next three

21  years it would yield a loss of $9 million and could

22  conceivably be a loss of up to approximately

23  $41 million, depending on the figures.

24      Based on this, class counsel valued the

25  injunctive value at a significant amount and argued

Case 1:17-md-02800-TWT  Document 1998-1  Filed 02/24/20  Page 10 of 185

9

1   with regard to a fee award of $3 million being

2   appropriate.

3          I note that Mr. Johnson submitted his report

4   well after the parties had agreed to the fee being

5   requested for the injunctive relief.  My concern with

6   Mr. Johnson's report was not the timeliness of the

7   report so much as perhaps the fortuitousness of his

8   after-the-fact findings.  What he did not address in

9   his report and what I found was fatal to his findings

10  is whether any of the increased sales of Nutella were

11  truly caused by what plaintiffs claim to be the

12  allegedly deceptive advertising or marketing.

13         I found and I do find that the report is

14  speculative and based on conjecture because

15  Mr. Johnson cannot attribute with any certainty an

16  increase in sales to the allegedly deceptive

17  statements only.

18         A critical fact and what Mr. Johnson

19  apparently chose to completely ignore was that this

20  was the first major Nutella ad campaign in the United

21  States by defendant.  I note that that appears in the

22  brief that was filed by Ferrero at page 11, note 2;

23  and they say:

24         "The challenged advertising campaign was the

25  first time that Nutella had ever been advertised in

1    the United States in any meaningful away."

2          Indeed, when I questioned counsel on the

3    phone, class counsel admitted on the conference call

4    that they, as well as Mr. Johnson, were aware of this

5    fact prior to Mr. Johnson's report and while counsel

6    revealed that they had informed Mr. Johnson of this

7    fact.  It stands to reason that the advertising, even

8    without the allegedly deceptive nutritional

9    information, would cause an increase in sales since

10   the product was being exposed for the first time to a

11   wide United States market.

12         Nonetheless, Mr. Johnson failed to even note

13   this fact and, instead, provided no analysis to

14   suggest what effects an advertising campaign, without

15   the allegedly deceptive statements, -- presumably the

16   ad campaign that the defendant has now agreed to

17   undertake -- would have on the sales of Nutella.

18         Class counsel conducted no surveys and

19   provides no evidence in the record to show that

20   increased sales occurred specifically because of the

21   deceptive statements or labeling or because of an

22   advertising campaign generally.  Even if the sales

23   were increased because of the alleged deceptions,

24   there is no evidence in the record to suggest that the

25   sales will now decrease.

1      Ferrero argues it has a very loyal fan base

2  and its sales have increased despite the negative

3  publicity flowing from the consumer fraud lawsuits.

4      Because of these reasons, I am striking the

5  report.

6      Let me note in the briefing submitted by

7  plaintiffs' counsel they argued that the Court should

8  not undertake a Daubert analysis, and that Daubert

9  does not apply in a fairness hearing context, largely

10  relying on case law from the Sixth Circuit and other

11  jurisdictions.  The Third Circuit case cited by the

12  plaintiffs, which was the Warfarin case, doesn't

13  exactly say what is suggested.  Indeed, the Court in

14  Warfarin doesn't refer to Daubert.  It simply says

15  that the District Court reviewing the expert report

16  and some of the supporting materials concluded that

17  Dr. French's estimate of the range of possible damages

18  was reasonable if the case were to go to trial.

19      Yes, so what it notes is, it doesn't

20  specifically or expressly state how or if Daubert

21  could be used but implicitly indicates you do not need

22  a rigorous Daubert analysis.

23      I note that more recently the Third Circuit in

24  the Dewey case, -- and that was Dewey v. Volkswagen at

25  681 F.3d 170 -- decided May 31, 2012 -- the Third

1  Circuit in reviewing the hearing conducted by Judge

2  Schwartz noted that Judge Schwartz had done a Daubert

3  analysis in the fairness hearing, the settlement

4  fairness hearing, with regard to an expert's testimony

5  and found that she had undertaken, indeed, a

6  painstaking analysis, and they found that the Court

7  did not abuse its discretion in declining to exclude

8  testimony in its entirety.  She excluded certain

9  testimony based on her Daubert analysis.

10         Clearly, the Third Circuit did not opine its

11  opinion that engaging in a Daubert analysis was not

12  appropriate.  And while I note here that I have not

13  engaged in a painstaking Daubert analysis, I do not

14  find it would be necessary here because I find that

15  the opinion of Johnson has no core foundation to

16  support it.  His reliance on conclusions without

17  analyzing the critical fact that there had been no

18  advertising before gives his opinion no legs to stand

19  on, and it would be ill-advised by this Court,

20  therefore, to consider his opinion in any fashion.

21         So I have struck that report.  That's how we

22  begin.

23         Now, I have a couple of questions before

24  anyone wants to do presentations or present argument.

25         One is that there seems to be an error in the

Case 3:13-cv-01566-TWJ Document 999-1 Filed 02/24/20 Page 14 of 185
Case 3:13-cv-01566-FLW-DEA Document 111 Filed 03/13/12 Page 13 of 156 PageID: 2054

13

1   most recent declaration of Charlene Young from Rust,

2   and that is the following:

3       Ms. Young notes that as of May 23rd, Rust had

4   received 253,413 claims.  Then she notes the

5   additional claims that were received between that date

6   and June 29th, when the final declaration was to be

7   filed, and said there were an additional 13,629 claims

8   filed, and then she says Rust received, therefore, a

9   total of 208,248 claims.  Clearly wrong.  Less than

10  the number she had the first time.

11      MR. GUGLIELMO:  I can clarify, your Honor.

12      This is Joseph Guglielmo on behalf of

13  plaintiffs.

14      The declaration of Ms. Young is attempting to

15  describe to you the amount of claims -- both in the

16  California, which is a separate class, and the

17  nationwide class.  And I will admit it wasn't

18  articulate in that there are 208,000 nationwide claims

19  that were filed in this action and then there were the

20  additional claims the 74,000 claims that were filed in

21  the California action.  She's combining it because

22  this is a joint notice program that we enacted with

23  the attorneys in California to effectuate the

24  settlements both here and in California.

25      THE COURT:  Certainly not clear from what she

1  wrote because, in fact, in her first certification in

2  paragraph 10, she's talking about our class action

3  settlement agreement, and she talked about potential

4  settlement class members.  So it's not what I got from

5  it.

6       MR. GUGLIELMO:  Your Honor, we are more than

7  happy to have Ms. Young submit a revised declaration

8  that clarifies these numbers for you and for the

9  Court.

10       THE COURT:  I see in paragraph 10 where she's

11  trying to explain it, but it is not crystal clear, her

12  supplemental certification.  But, all right.  It

13  wasn't clear to me.

14       Let me also, just at the outset I would like

15  to discuss with counsel the manner in which your

16  rates, hourly rates, were submitted for the work done,

17  which was done only for purposes of the lodestar

18  check, because you are not actually looking for a

19  lodestar recovery but a percentage of the common fund.

20  But I have a problem.

21       I appreciate that you need not give me chapter

22  and verse of what your fees are.  But I must point out

23  that at least with the Carella firm I had codes that

24  indicated what kind of work was being done by which

25  attorneys.  I had nothing from the other attorneys as

1   to how many hours were spent on what tasks; and it,

2   one, creates grave concerns for this Court in

3   determining whether you have provided me an adequate

4   basis for determining what your real fees were for the

5   lodestar check because everyone gives the same general

6   descriptions:  You worked on motions.  You worked on

7   discovery.  You worked on the settlement.  And I've

8   got five law firms all telling me the same thing which

9   leads me to believe duplication of effort, and no one

10  has broken this down -- and also such substantial

11  number of hours that were spent where the Court can't

12  even assess in the broadest fashion whether it was

13  reasonable amounts of time being spent.

14          I start with that.  No breakdown at all even

15  in a summary fashion.

16          I also want to question each of plaintiffs'

17  counsel that has submitted a declaration with regard

18  to the hourly rates being provided to me.  I want to

19  know if what you are representing to me is that the

20  hourly rates that you have listed are the hourly rates

21  that your firm, that these lawyers in your firms --

22  whether these are the hourly rates that these

23  attorneys charge your clients generally, those who

24  actually pay hourly fees, and that is what you

25  receive, as opposed to whether these are rates that

16

1   you claim to use in class actions for which no one is

2   ever paying an hourly rate because they are taken on

3   contingent fees.

4        So I'll start with you, Mr. Cecchi.

5        Are the rates that you have listed for you

6   your partners and your associates the rates that are

7   generally charged by your firm by these lawyers for

8   work that is done by your firm?

9        MR. CECCHI:  Judge, these are the rates and

10  forms that we utilize in every contingent case that I

11  have been involved in, and my hourly practice.  And I

12  do a huge amount of hourly work.  The rates vary,

13  depending upon a particular retainer, all the way from

14  almost $500 to $650.  But the rates that are reflected

15  in my affidavit and breakdown, I've been using these

16  rates in every contingent, including private

17  contingent cases since 2007.

18       THE COURT:  That wasn't my question.  And I

19  understand, and everyone knows where I'm coming from

20  in asking these questions.

21       You can set the moon for your contingent fee

22  hourly rate, because you're never collecting an hourly

23  rate.  So I need to know when I'm doing a reasonable

24  lodestar crosscheck what is the customary hourly rate.

25       And I say this particularly, because putting

1   aside, Mr. Cecchi, you may be a very able and

2   experienced attorney, and you may actually charge $750

3   for your work, I don't believe your associates -- that

4   any client you got is paying $550 for your associates

5   for hourly work in a New Jersey firm, not that I know

6   of.

7          MR. CECCHI:  Maybe not some of them, but some

8   of my junior partners.

9          THE COURT:  I didn't say "partners."  I said

10  "associates."

11         MR. CECCHI:  You are right.  And I think I

12  stand in a somewhat unique position because we do have

13  a blended practice where we do a lot of litigation,

14  retained complex commercial, and so on.

15         But I have your Honor's point, and I think

16  that I can address it because I was going to make the

17  remarks about the fee in any event.  I think I can

18  address it at that time.

19         THE COURT:  That's fine.

20         Similarly, I've got from the attorney -- I

21  guess it's Mr. Davis from Mobile, Alabama.

22         MR. DAVIS:  Montgomery, Alabama.

23         THE COURT:  Montgomery.  I'm sorry.

24         (Continuing) -- and you tell me $700 is the

25  normal fee in Mobile.  Boy, the New Jersey lawyers are

```
 1    going down there!

 2           MR. DAVIS:  That's the fee I charge in all my

 3    contingent cases.

 4           THE COURT:  Contingent, again.

 5           What's the normal hourly rate in Montgomery

 6    for work done, legal work?

 7           MR. DAVIS:  It depends on the case, your

 8    Honor.  I charge $500 an hour for some cases.  I

 9    charge more than that for others.  But, typically,

10    around $500 an hour.

11           THE COURT:  Who else have I got?

12           You are Mr. Guglielmo.  Right?

13           MR. GUGLIELMO:  Yes, your Honor.  And these

14    are the rates that Scott & Scott charges.  We do

15    almost exclusively contingent fee work.  We have some

16    hourly rate cases, and it's my understanding that

17    these are the same rates that we use for those very,

18    very small hourly rate cases that we have, but we

19    almost have almost none.

20           THE COURT:  Okay.

21           Who else do I have that's made a fee

22    application?

23           MR. WEISS:  Your Honor, Stephen Weiss from

24    Seeger Weiss in New York City.

25           The rates that I attested to are in fact
```

Case 3:11-cv-01000-TWR Document 999-1 Filed 02/24/20 Page 20 of 185

19

1    Seeger Weiss' hourly rates.  We have a number of

2    hourly clients.  Those hourly clients pay those rates.

3    I can attest to that as well.  So I think across the

4    board, from partner to associate to paralegals, all of

5    the rates so stated in the declaration are our actual

6    hourly rates.

7              THE COURT:  Okay.

8              Now, who is that?  Scott & Scott, $635 an hour

9    for associates?

10             MR. GUGLIELMO:  Yes, your Honor.  Certain

11   associates are actually very senior in age.

12             THE COURT:  People that you don't make

13   partners, they are called "associates."  I see.

14   That's fine.

15             All right.  I think counsel appreciates what

16   I'm saying with regard to when I apply the lodestar

17   check, how I will be looking at it, because, as I

18   said, it's really not fair, I believe, that in these

19   contingent fee cases to essentially come up with a

20   number that's not your real hourly billing rate number

21   for purposes of the cross-check, and that's my view

22   because, as I said, in a contingent fee case where you

23   never intend to collect against the client or charge

24   him for that hourly rate, you can charge him $10,000

25   an hour and it would make no difference, and it's not

1  appropriate for the Court to consider that rate if

2  it's not the real rate.

3      So I'll put that aside.

4      I still have -- and we'll address this when we

5  get to the fees as well, though, and I really was left

6  at a loss by all of you submitting these kinds of, in

7  the most general fashion, other than Mr. Cecchi's

8  firm, any breakdown of how many hours you spent on a

9  task.  There wasn't that much that happened in this

10  case.  How could it be?  Hundreds upon hundreds of

11  hours each of you are spending doing the same thing?

12  I've got a problem with it.  We'll talk about it

13  later.

14      Let's at this time address the settlement.

15      What I want to address -- and I'm going to

16  consider the arguments separately, obviously -- the

17  fees from the overall monetary settlement that was

18  being achieved for the class, and it's appropriate to

19  consider whether that meets all the criteria on the

20  monetary settlement, and then consider what fees would

21  be appropriate assuming that is approved, and then

22  separately consider the injunctive relief portion and

23  the fees in that regard.

24      Now, I certainly have received substantial

25  briefing from everyone.  I have several objectors here

```
 1   -- and, frankly, most of the objections really are

 2   dealing with the fee as opposed to, I think, the

 3   fairness or reasonableness of the monetary settlement.

 4   And others, of course, take great issue with the

 5   injunctive relief.  That's another subject.

 6        I want to first deal with the monetary

 7   settlement here.  There really has not been, I think,

 8   any material or substantial objection to the monetary

 9   settlement.

10        Yes.

11        MR. LEVY:  Your Honor, --

12        THE COURT:  Come forward.

13        You have the Bochenek objectors?

14        MR. LEVY:  No.  Amy Ades, your Honor.

15        THE COURT:  Well, that's because for Ms. Ades

16   you filed a complaint for her in New York and you want

17   to carve her out of this because you want your own

18   piece of the pie.

19        MR. LEVY:  I want my own class to prosecute,

20   your Honor, yes.

21        THE COURT:  Tell me why this isn't fair.  I

22   understand you do.

23        MR. LEVY:  I'll tell you.

24        THE COURT:  I haven't seen it in your papers.

25        MR. LEVY:  All right.
```

```
 1          Less than two weeks ago, after my papers came
 2     in, the Third Circuit reversed District Court's
 3     approval of the consumer class action.  It was
 4     actually Mr. Cecchi's class action.  It was in the
 5     AT&T Mobility case.
 6          THE COURT:  I'm familiar with that.
 7          MR. LEVY:  And the Court said that the
 8     District Court did not adequately supervise the
 9     approval of that, and breached the discretion of the
10     Court in approving the settlement.
11          One of the things I think the Court should do
12     in looking at the cash component of this settlement is
13     see if the fee of the 2.5 million -- what is that
14     worth?  What percentage of damages?
15          I know in a securities class action the notice
16     has to say --
17          THE COURT:  Put aside securities class
18     actions.  That's not what this is.
19          MR. LEVY:  But the plaintiff has the burden of
20     showing the the 2.5 million, which nets to about 1.3
21     million to the class, is the appropriate amount.
22          THE COURT:  I haven't ruled on the fees yet.
23          MR. LEVY:  I'm talking about the 2.5, just
24     starting with the 2.5.
25          THE COURT:  I know.  But you said it yields
```

1    1.3 for them.  We're not there yet as to what it

2    yields.

3         MR. LEVY:  If 2.5 is 10 percent of the

4    potential damages, 5 percent of the potential damages,

5    one-eighth of 1 percent, we should know that.  The

6    Court should know that.  The class should know that.

7    If it's such a tiny portion of the potential damages,

8    it's because the case is so bad that they have to

9    settle for that, and they haven't said that.  But they

10   also haven't said what percentage of damages it is.  I

11   think the Court cannot approve a 2.5 million without

12   knowing how good the case is compared to what the

13   potential damages are.

14        THE COURT:  Well, I'll let plaintiff respond

15   first, but I have several responses to you.  But I'll

16   let them, if they would like to, argue first.

17        Who is going to be arguing that?

18        MR. CECCHI:  Judge, with the Court's

19   permission, Mr. Guglielmo and I have divided it.  He

20   has the bulk of the objections.  But since Mr. Levy

21   felt it appropriate to touch upon where I consider to

22   be somewhat of a sore subject, the Sprint Larsen

23   settlement, I just wanted to briefly address that.

24        The Sprint Larsen case was a unique case.

25   Judge Linares conducted a four- or five-day

1    preliminary approval hearing where we had witnesses on

2    the stand.  It was a conflagration of sorts.  He wrote

3    over 200 pages of opinions.  I don't want the record

4    to reflect that Court of Appeals said Judge Linares

5    did not go to great lengths to discharge his Rule 23

6    duties.  He indeed did.  It's a discrete issue

7    involving whether Sprint had to do a costly expensive

8    data dump of its data bases and what it would yield in

9    terms of notice.  It was reversed and remanded for

10   Judge Linares to do further findings.  They did

11   nothing about the fairness.

12         The fee was affirmed, your Honor, in the

13   companion case against T-Mobile, and the fee was

14   affirmed in the companion case against ATT.  Both of

15   those cases were affirmed.  So the discrete issue has

16   nothing to do with here.

17         In terms of Mr. Levy, I think your Honor's

18   initial observation is the correct one.  His case was

19   filed after we had already mediated with Judge Politan

20   and reached an agreement in principle.  We advised

21   Mr. Levy of that fact, that we had already settled in

22   principle, and we were in the process of documenting

23   the settlement when he filed his case.

24         So we think this is nothing more than someone

25   coming forward seeking something they are not entitled

Case 3:13-cv-01086-PLW-TWJ  Document 999-1  Filed 02/24/20  Page 26 of 185
Case 3:11-cv-01086-PLW-DEA  Document 111  Filed 03/13/12  Page 25 of 156  PageID: 2066

25

1   to here.  It has nothing to do with the fairness of

2   the settlement.

3           Thank you, your Honor.

4           (Pause.)

5           MR. CECCHI:  Can I make one very just

6   introductory comment, Judge?

7           THE COURT:  Yes.

8           MR. CECCHI:  I know there are a lot of

9   objectors here, and there has been a lot of press, and

10  it's my practice and I think the practice of all the

11  lawyers who've represented the plaintiffs in this case

12  to comment in court, to comment to your Honor, and to

13  comment in our papers.  We have not had an opportunity

14  to say to these objectors and to say to the press the

15  background of this case.

16          First of all, I want the Court to know we are

17  proud of what we achieved in this case, we stand

18  behind what we achieved in this case, and it's a

19  particularly bittersweet sort of situation that I find

20  myself in and these other lawyers, and I know Keith

21  feels the same way.  This is the last case any of us

22  ever did with Judge Politan.  He worked very hard on

23  this case as we all did.  This was a difficult case

24  for the plaintiffs.  It was a difficult case from the

25  perspective of damages.  All consumer cases are.  This

Case 3:11-cv-02800-TWJ Document 999-1 Filed 02/24/20 Page 27 of 185

26

1    case perhaps more so.

2            Ascertainable loss was an issue where we felt

3    we had arguments, good faith arguments, but issues

4    that would have been had they gone the other way would

5    have been fatal to a damage claim in this case, and

6    that was an issue that was explored in detail in

7    mediation with Judge Politan.

8            So we are glad we are here today.  We look

9    forward to talking about all the alleged deficiencies

10   in the settlement, which we don't think there are any,

11   but I do want to say that background is important.

12   This was supervised by the nation's leading mediator;

13   and one of the objectors, and it's really amazing,

14   said they didn't even bother having an affidavit from

15   Judge Politan about what happened.  We would have

16   liked to have had that affidavit, Judge, and I think

17   Judge Politan would have agreed with me that this was

18   a hard fought mediation, this was a difficult case for

19   us, and we reached a good deal for this class, and, as

20   I said, we do stand behind it and look forward to

21   talking about it today.

22           Thank you, Judge.

23           MR. GUGLIELMO:  Good morning, your Honor.

24   Joseph Guglielmo with Scott & Scott.

25           My question is:  Do you want me to respond to

1  Mr. Levy's comments or do you want me to go forward

2  with presenting argument to the Court of the final

3  approval?

4        THE COURT:  Well, is Mr. Levy the only one

5  that's going to be addressing the fairness of the

6  monetary settlement?

7        Mr. Greenberg, you are going to be as well?

8        MR. GREENBERG:  Yes, at some point briefly.

9        THE COURT:  Why don't you hear the objections,

10  then, before you address them.

11        Why don't I hear from you now.  This is not on

12  the fees portion; only the overall 2.5-million-dollar

13  monetary settlement.

14        Is that what you are going to address?

15        MR. GREENBERG:  Yes, your Honor.

16        THE COURT:  Come forward, Mr. Greenberg.

17        MR. GREENBERG:  Very briefly, your Honor.

18        I just would like to make one point about the

19  structure of the settlement which I think is related

20  to what you are talking about, and that's the concern

21  about reversion of the fee to defendant.

22        Our concern here is that --

23        THE COURT:  I'm talking about the monetary

24  settlement, and there is no reversion of a fee to

25  defendant.  What you are talking about is on the

Case 3:11-cv-01086-PLM-DEA Document 211 Filed 03/13/12 Page 23 of 256 PageID: 2069

```
 1    injunctive relief portion.  I'm dealing with that
 2    separately.  I'm talking about the monetary
 3    settlement.
 4          MR. GREENBERG:  I apologize, your Honor.
 5          THE COURT:  Thank you.
 6          I didn't think there was any other objection
 7    to addressing the fairness of the monetary settlement.
 8    Because, as I also understand, as some of the
 9    objectors have even put into their papers, they are
10    not even sure who wouldn't understand that this was a
11    hazelnut chocolate spread.
12          Go ahead.
13          MR. GUGLIELMO:  Joseph Guglielmo, again, on
14    behalf of the plaintiffs.
15          Your Honor, the issue with respect to what
16    Mr. Levy raises as to the fairness of the settlement,
17    it simply goes to one of the sort of overall
18    objections that he thinks it's not enough.  And there
19    are numerous cases we cited in our brief, including
20    Hall v. AT&T, which says it is not a valid objection
21    to the settlement to say:  Well, you could have gotten
22    more.  You need to look at the circumstances of the
23    case and where we were in the case.
24          We had pending motions to dismiss that would
25    be filed.  We had class certification --
```

1    THE COURT:  Actually, had been filed and then

2   were terminated.  The actions were consolidated.  In

3   fact, I never got a consolidated amended complaint in

4   this matter.

5    MR. GUGLIELMO:  We had drafted one, your

6   Honor, and we reached a settlement.  So at that point

7   it was essentially moot.

8    With respect to his specific argument, your

9   Honor, we made available to class members a fund that

10  would compensate them for over a hundred percent of

11  the purchase price for Nutella based on the claim rate

12  which has been very high.  I think that goes to show

13  you folks are very happy with the settlement.  We have

14  over 208,000 claims in the nationwide settlement.

15  Class members will receive anywhere from 37 percent of

16  the purchase price of the smaller jar and 20 percent

17  of the purchase price of the larger jar.  There are

18  two essential jars that are sold to class members

19  during the period.

20    A number of the objectors are saying:  Well,

21  you should have gotten 100 percent.  Well, the problem

22  with that is that we recognized, and as the Court

23  recognized, when you receive something in exchange for

24  what you pay for, it's very difficult to say that you

25  are entitled to the purchase price.

1        THE COURT:  You would not have been entitled

2   to the purchase price.  Let's put an end to that

3   argument.

4        MR. GUGLIELMO:  Your Honor, and we put that

5   forth in our papers.

6        So the question is what percentage of the

7   purchase price we could be required or we could obtain

8   if we were successful.

9        Your Honor, you could find as a matter of --

10  either at summary judgment or class certification --

11  that we were entitled to nothing, because Ferrero

12  would have argued that no class member was deceived.

13  They did get what they bargained for, which was a

14  tasty nut spread that kids love.  And the issue there

15  was:  Well, what percentage of damages is reasonable?

16       The percentage recovery that we were able to

17  obtain is well within this Circuit's and this

18  District's standards for appropriate recoveries.  You

19  have class settlements where folks get 5 percent, 10

20  percent of the dollar damage.  Here they are getting

21  20 to 37 percent of the purchase price, which could be

22  over 100 percent of damages, your Honor, depending on

23  how it's calculated.

24       THE COURT:  By the way, let me just put this

25  question.  I don't want to belabor this.  We have so

1    much briefing on these issues.  But one of the things

2    -- and I'll address this in the opinion that I will

3    read into the record in a bit, but we obviously

4    recognize that there were issues of one surviving

5    motion practice as to whether, indeed, first, there

6    was unlawful conduct; second, as to whether there was

7    an ascertainable loss and causation between the

8    three -- all of which must be proven in a New Jersey

9    Consumer Fraud Act case.

10          With regard to ascertainable loss, another

11   item would have been when you talk about what did the

12   consumer get and what might they have expected to get,

13   and if you compare this to what is another hazelnut

14   chocolate spread, there is no indication that, one,

15   there were such comparable products on the market at

16   this time, though I understand there are ones entering

17   the market now, and what the pricing would have been,

18   and whether the pricing of Nutella was different or

19   not than what would have been advertised as just a

20   tasty spread.

21          I do not think that, Mr. Levy, you have a

22   basis to really dispute that ascertainable loss here

23   was going to be a major, major roadblock.  I will make

24   specific findings about that in a bit, but I do not

25   need to belabor that.

Case 3:13-cv-01566-FLW-LDA Document 111 Filed 09/18/12 Page 32 of 156 PageID: 2073
Case 1:15-md-02800-TWT Document 999-1 Filed 02/24/20 Page 33 of 185

32

1          I should state on the record, because

2  Mr. Cecchi got up to make the comment, some of the

3  objectors referred to whether there was some sort of

4  collusion here between either the defendant and

5  plaintiffs' counsel and/or the mediator.  Wrong.

6  There is no evidence of that.

7          Judge Politan was a colleague of mine.  I'm

8  familiar with him and his stature, the late Judge

9  Politan -- by the way, he was not chief judge.  I

10  think you referred to him as that in your papers.

11          MR. EGGLETON:  He always felt that way to me,

12  your Honor.

13          THE COURT:  Okay.  The person who was the

14  chief probably wouldn't have been happy to have you

15  refer to him that way.

16          MR. EGGLETON:  I apologize for that.

17          THE COURT:  But he has been used as a national

18  mediator.  His credentials were impeccable.

19          And I understand what this case was about, and

20  I do not find that there was anything that was

21  produced here that would indicate collusion.  So I'm

22  putting that to rest.  I don't want to hear any

23  arguments about it.

24          MR. GUGLIELMO:  Thank you, your Honor.

25          THE COURT:  Do you want to make any comments

1   besides the pages of briefing I have as to the

2   fairness of the monetary settlement?

3          MR. GUGLIELMO:  No, I think that's succinctly

4   set forth.

5          THE COURT:  I was dividing these issues up

6   because I have objectors on different issues as well.

7          All right.  Let me hear from -- I think it's

8   you, Mr. Greenberg, who wanted to address the

9   injunctive relief aspect.

10         MR. GREENBERG:  Well, on the fact of

11  injunctive relief and the concerns about the value of

12  injunctive relief, I don't know that I have too much

13  to add to the briefing.

14         I simply want to make the point that,

15  obviously, it's not my role as an objector to bear the

16  burden of demonstrating the settlement has no value.

17  Class counsel suggests that we have some sort of

18  burden in their papers to demonstrate the settlement

19  has no value.  Obviously, they have the burden to

20  demonstrate that it has value.

21         Obviously, the first expert report avoids the

22  question of the monetary value of the injunctive

23  relief, and, obviously, the second report doesn't have

24  the standing because of your ruling last week.

25         There are some cases that they cite in their

1   response that injunctive relief has value that I

2   believe are quite inapposite.  Two of those are

3   shareholder cases and the third is a pension

4   retirement case.  In those cases there is a stronger

5   argument to the value of injunctive relief because the

6   corporation is going to be stuck with its future self

7   and the pensioners are always going to be stuck with a

8   pension.  This is different.  Even in that context,

9   the law in the Third Circuit says there are grounds

10  for skepticism about the value of the injunctive

11  relief in those cases.

12          And if you'll forgive me, I'm going to read

13  you two sentences from Bell v. Bolger, from the cases

14  they cite, and that's 2 F.3d 1304; and those sentences

15  are:

16          "The difficulty in valuing therapeutic relief

17  poses significant risks.  Parties may capitalize on

18  the valuation problem and exchange cosmetic reforms

19  for plaintiff fees."

20          Those quotes are in the opinion.

21          So it's my view that the injunctive relief is

22  essentially valueless.  I was surprised, of course, to

23  see the response from class counsel which says that

24  all I provided for my view that survey evidence is

25  necessary to demonstrate the value of injunctive

35

1    relief -- they say all I provided was naked

2    assertions.  In fact, I provided appellate case

3    citations for my view that some sort of survey

4    evidence is necessary to demonstrate the value of

5    injunctive relief.  They respond by saying survey

6    evidence is not needed.  They cite nothing for that,

7    and I would call that a naked assertion.

8          THE COURT:  Certainly, I will tell you, as I

9    made my ruling with regard to the Johnson report, if

10   they wanted to rely on specific numbers, as the

11   Johnson report did, a survey would have been

12   appropriate, but, ultimately, that's not what we are

13   doing.  Now it's more in the nature of:  Can you

14   discern some benefit from these changes in advertising

15   so that the injunctive relief has some benefit?  The

16   question of how to value, that is a very different

17   matter.

18          I have to say, Mr. Greenberg, I think you may

19   be hard-pressed to say it has no value.

20          MR. GREENBERG:  I think it's probably fair to

21   say it has very little, or I think, perhaps, an

22   appropriate phrase might be, essentially none.  I

23   think there is some question as to the value of a

24   reform that puts nutritional information on the front

25   of a package as opposed to the back of a package.  I

36

1    have a general view, I suppose, about how often people

2    look at this nutritional information.  Some people do

3    and some people don't, obviously.

4            THE COURT:  Those to whom it matters.

5            MR. GREENBERG:  Right.  It seems like the

6    number of people who are looking for nutritional

7    information -- and who will not look at the back, but,

8    instead, will look at the front -- would have to be

9    awfully small.  So I would say there is a pretty

10   strong argument the value is essentially nil from any

11   of these things.

12           THE COURT:  That's one of the items which is

13   putting the information on the front in addition to

14   the back.  The other is changing the message, the

15   wording of the message, and the way the TV commercials

16   will run, and things of that nature, which changes the

17   wording a bit.

18           MR. GREENBERG:  Yes.  And there is certainly

19   an argument that the new slogan, instead of making

20   things better, arguably makes things worse because it

21   seems to suggest a nutritious breakfast and a healthy

22   breakfast is not generally a taste breakfast.  As a

23   parent, I suppose I have a concern about that sort of

24   message being sent out to my children.

25           So I think there are fairly strong arguments,

1   actually.  I'll be happy to go through them one by one

2   if you would like, your Honor, but it's in the

3   briefing.

4           THE COURT:  I have your papers.

5           MR. GREENBERG:  Thank you, your Honor.

6           THE COURT:  Yes?  Another objector wishes to

7   be heard?

8           MR. LANGONE:  Yes, your Honor.

9           THE COURT:  Please state your name for the

10  record.

11          MR. LANGONE:  Chris Langone of the Bochenek

12  objectors.

13          On the value of the injunctive relief, I would

14  just like to make two brief points.

15          MR. CECCHI:  Judge, I don't want to interrupt

16  Mr. Langone, but we have a threshold issue about

17  Mr. Langone's standing.

18          THE COURT:  Yes.  I have that question,

19  actually, because there is nothing that indicates that

20  those who you represent are part of the class.  They

21  have not indicated that they actually purchased

22  Nutella.

23          MR. LANGONE:  They did, and I have signed

24  affidavits from all my clients that I'm prepared to

25  file if given leave.  I didn't want to just file

38

1 without leave.  That was an oversight.  My clients had

2 thought they had made that claim when they signed the

3 objection.  So there was an error.  But I do have

4 signed affidavits, and I could file them today with

5 leave, that they all bought jars of Nutella.

6         THE COURT:  I'll accept your representation

7 that they are with you and can be filed.

8         Go ahead.

9         MR. LANGONE:  Your Honor, so the two points

10 that we want to make on this is, first, we did submit

11 an affidavit from Dr. Freehof.  We are not trying to

12 submit it, obviously, given the Court's comments on

13 Daubert, as an expert, but I think that just as a

14 plain reading and as evidence the Court can take to

15 change the phrase from an example of a "tasty yet

16 balanced breakfast" and replacing it with "turning a

17 balanced breakfast into a tasty one" might have some

18 significant value to the defendant in giving a kind of

19 a judicial stamp of approval to its advertising

20 campaigns, and I think that gets to be a questionable

21 kind of --

22         THE COURT:  The Court isn't approving

23 advertising today, and I'm not being asked to approve

24 particular ads.  That wasn't made part of the

25 settlement.

Case 3:13-cv-01686-JWD Document 999-1 Filed 02/24/20 Page 40 of 185
Case 3:11-cv-01686-PLA-DEA Document 111 Filed 09/18/12 Page 39 of 156 PageID: 2080

39

1          MR. LANGONE:  If the junction is approved and,

2     arguably, if anyone tries to make a claim,

3     subsequently, that somehow that this is deceptive --

4     for instance, for the reasons Mr. Greenberg and

5     Dr. Freehof state, they would be barred presumably

6     because the defendant would point to the Court and say

7     this is pursuant to an injunction.

8          THE COURT:  All the injunction does is say

9     this is what I'm prepared to do.  It doesn't require

10    the Court to give its imprimatur and say:  I agree;

11    Oh, there is no way this is deceptive; or, It passes

12    muster.  All they are asking is approval of that.

13    They are going to agree to make certain changes.

14    That's all that it is.

15         Look, ultimately, on the injunctive relief,

16    the question isn't:  Is it the best?  Is it perfect?

17    I could have thought of lots of ways that I might have

18    done this differently, including using the agency in

19    New York that reviews advertising.  That's not what

20    they agreed to.

21         The question for settlement purposes and

22    looking at injunctive relief in these cases isn't

23    whether it's the best relief, but:  Does it provide a

24    benefit?

25         MR. LANGONE:  And the only other point I want

40

```
 1    to make on the injunctive relief is that as to the
 2    value, it's our position, following the Ninth Circuit
 3    guidance in Bluetooth, that -- obviously, we realize
 4    is not binding on this Court, but what we think the
 5    Court might be persuaded by is to look at the total
 6    package deal of all the cash the defendant is willing
 7    to pay.  So if they are willing to pay 3 million in
 8    attorneys' fees on the injunctive side and 2.5 million
 9    as a pot to go to the class, that's really a
10    5.5-million-dollar pot of money that could be going to
11    the class.  And the Ninth Circuit said that you should
12    look at it as a package deal in assessing a common
13    fund; that you shouldn't just look at the portion that
14    the parties say:  We'll call this the fund, and this
15    is the attorneys' fees -- the whole cash benefit that
16    could potentially go to the class.
17           And this brings up the issue of reverter, and
18    I don't want to get ahead of that.  But just in terms
19    of value, it's our position that the value of the
20    injunctive relief to the class is at least 3 million
21    to the extent that the class has any right to lay a
22    claim to those attorneys' fees; and under the general
23    law, under fee shifting statutes --
24           THE COURT:  That's assuming I would agree that
25    it even has a 3-million-dollar value.  I haven't
```

1    gotten there yet.

2         MR. LANGONE:  That's the only other point I

3    want to make, that we do take the position it's a

4    package deal, your Honor.

5         THE COURT:  Thank you.

6         Yes, Mr. Levy.

7         MR. LEVY:  May I address the Court?

8         THE COURT:  Yes.

9         MR. LEVY:  Thank you, your Honor.

10        I do want to point out some other problems

11   with the non-cash part of the settlement.

12        When the complaint was filed, they asked for

13   Ferrero to take the bad labels and jars off the shelf.

14   That's not part of the settlement.  We had a Campbell

15   settlement before Judge Simandle, and the defendants

16   did recall the Campbell soups with the bad labels.

17   Here they can stay on the shelf.

18        Moreover, the images of the Nutella labels, as

19   they appear on the TV ads, print ads, and websites,

20   are going to stay the same with the same deceptive

21   allegedly statements on them.

22        The commercials are being rotated off.  Now,

23   as your Honor knows, commercials get stale.  They will

24   be rotated off anyway.  Now they are going to get

25   rotated off; and in three years they could come back

1   in the present form under at the settlement.

2           So I think there are a lot of problems with

3   the non-cash element of the settlement.  I don't think

4   they are worth very much at all.

5           One more thing.

6           Your Honor appears to be willing to cut the

7   fees and treat that separately than the total

8   settlement.  That does not help the class at all, your

9   Honor.

10          THE COURT:  You are going back to whether we

11  have a fair and reasonable settlement for the class.

12  Think you made your arguments.  I'm going to rule on

13  that.

14          MR. LEVY:  On the structure, the way the whole

15  thing is structured.

16          THE COURT:  Okay.

17          MR. LEVY:  And let me say I've been doing this

18  for 40 years.  This is the First Class settlement I've

19  objected to.  There is a major issue here because

20  there is very unique leverage here.  The defendants

21  had this California case -- basically, the same facts

22  as the New Jersey case.  The motion to dismiss was

23  denied in California.  There was a class certified

24  just for the California consumers, which means they

25  would have faced, and they were facing --

Case 3:17-md-02800-TWT Document 999-1 Filed 02/24/20 Page 44 of 185

```
 1          THE COURT:  I don't want to deal with the
 2   California case.  I can't tell you what I would have
 3   decided there.  But I'm going to make some comments
 4   about the case itself and the claims and to the extent
 5   you -- I know that you wanted to be in New York.  I'm
 6   going to just talk about the New Jersey Consumer Fraud
 7   Act.  That's the only thing I have before me.
 8          MR. LEVY:  Right.  And the point I was trying
 9   to make, and I did make it in the first few pages of
10   my objection, is they were facing a federal suit in
11   Florida, a federal suit in New York, a federal suit in
12   California, a federal suit in New Jersey.  The motion
13   to dismiss in California has been denied.  The class
14   had been certified.  They were in a very tough
15   situation.
16          There is a lot of leverage on class counsel
17   here because they needed a nationwide class, and they
18   use that leverage to structure a settlement that did
19   not benefit the class as much as themselves.
20          (Continued on the next page.)
21   ///
22
23
24
25
```

Case 3:13-cv-01066-PLW-TWJ Document 111 Filed 09/18/12 Page 44 of 156 PageID: 2085
Case 3:11-cv-02800-TWJ Document 999-1 Filed 02/24/20 Page 45 of 185

44

1          THE COURT:  Thank you, Mr. Levy.

2          Mr. Guglielmo.

3          MR. GUGLIELMO:  Your Honor, I'll start off by

4     responding to Ms. Ades' counsel, Mr. Levy.

5          We reached a settlement in principle, as we

6     set forth in our papers; and, as we told Mr. Levy

7     before, the class was certified in California.  He

8     should check the dates.

9          Also, I guess he doesn't really appreciate, I

10    guess, the fact that we have -- as the Third Circuit

11    in De Beers recently recognized, you have an

12    injunction which we are asking for to prohibit Nutella

13    from utilizing the advertisements that were identified

14    in our complaint, that were identified as part of the

15    settlement agreement.  If they go back and try to air

16    those within the three-year period of the effective

17    date, any class member or counsel, which we would do,

18    would come in here and ask you to hold them in

19    contempt.  De Beers specifically recognizes that as

20    some value.

21         In fact, in Mr. Levy's Campbell's case, he

22    tried to get a temporary restraining order to prevent

23    Campbell from further airing his ads, and he was

24    unsuccessful.  But in his settlement he has the same

25    provisions we have here.  I won't get into sort of the

1   hypocrisy of his objections.

2          To respond to Mr. Greenberg, he says in his

3   objection that he did not find the statements on the

4   labels or the advertising offensive in the first

5   place.  So if it was up to him, there wouldn't be a

6   case here saying that the advertising was false and

7   misleading.

8          The Williams v. Gerber case, which we have set

9   forth --

10          THE COURT:  By the way, it wasn't quite what

11   he said.

12          MR. GUGLIELMO:  He said he didn't find them

13   offensive.  If Mr. Greenberg or Mr. Langone don't

14   think that the corrected or new advertising is somehow

15   misleading now, they could simply file a new case if

16   they like.  There is no bar order, your Honor, to

17   address that other issue prohibiting class members who

18   would be purchasers in the future, obviously, because

19   we have a defined class from 2008 to the date of

20   preliminary approval in 2012.  If the new ads come

21   out, people think they are false and misleading, we or

22   other lawyers could file another action.

23          With respect to the injunctive relief, which

24   everyone seems to -- the objectors seem to argue is

25   valueless, your Honor, I just want to point out that

46

1    we have obtained a complete cessation of the ads that

2    we identified in the complaint.  The three ads we

3    identified were aired nationwide; and based on our

4    allegations, we allege that those ads were false and

5    misleading because they imply to consumers that

6    Nutella was a healthy product when in fact all it is

7    is a tool to enable moms and dads to get their kids to

8    eat healthy foods.

9           So we have a cessation of the ads at issue.

10   They can't make the representations that were in the

11   ads.  They can't re-air those ads for three years.

12          The statements on the labels we changed.  We

13   developed the changes in conjunction with Peter

14   Wright, who was our advertising marketing expert who

15   submitted a declaration.  And, your Honor, I won't go

16   into detail what Mr. Wright sets forth in paragraphs

17   14 and 15 when he talks about the changes on the

18   labels and in the advertisement.

19          He talks about the television ads, and he says

20   that the television ads avoid making an explicit or

21   implied claim that Nutella is in and of itself

22   nutritious, a nutritious addition to a breakfast.

23   They have said:  Confine the claim to the more valid

24   representation that Nutella can be added to an

25   nutritious breakfast to make it tastier and more

1  appealing to family members.  These are part of his

2  opinions.

3       THE COURT:  I know those are his opinions.

4  I'm not making findings today about what would have

5  happened if that was the report going forward in the

6  case.  That's not the role I play.  I understand those

7  are there.  Certainly, I appreciate that when you talk

8  about what does an ad look like, is it deceptive or

9  not, we can get into a lot of discussion, and we are

10 not; and, as I made clear to the objectors, I'm not

11 ruling on whether those ads are fair or not, whether

12 they would survive a challenge.  I'm making that clear

13 to everyone today.  I'm not being asked to rule upon

14 that.

15       I think you've said it today.  If someone

16 wants to challenge those in the future because they

17 think once they make their way to the market, that

18 somehow they are violative of some statute, some rule,

19 there is no ruling today that bars anyone from doing

20 so.  Ferrero has not bought that protection through

21 this settlement.  So that's clear as well.  I put that

22 out there.

23       Look, I've already said in my comments:  Is

24 this perfect injunctive relief?  No.  Are there better

25 ways it could have been done, perhaps, as I said,

1    instead of involving plaintiff's counsel and

2    Mr. Wright?

3         I think I've done this in other cases, in

4    settling Lanham Act cases, using the -- what's that

5    advertising agency?  NAD?  Using them would be a great

6    way to go about it.  That's not what you agreed to.

7    I'm looking at what I've got today.

8         That's one of the ways of dealing with the

9    advertising and agreeing to be bound by that.  They

10   are not taking product off the shelves.

11        By the way, that goes to the cost of this as

12   well to them.  You put out their numbers, and I'll

13   address that in a little bit as well, what it's going

14   to cost Ferrero.  They don't have to remove any

15   product.  They are allowed to sell product.  As they

16   sell new product to retailers and it makes its way on

17   the shelf, when the retailers exhaust its supply of

18   inventory, that it makes its way, so that's not an

19   extra cost other than the fact they have to make up

20   new labels.  They have to make up new labels for the

21   existing language, too.

22        Commercials do get recycled.  The same

23   commercial doesn't air for two years generally.  So at

24   some point they would have been revamping commercials

25   as well.  So I will put out there -- and this will go

49

1   to the value of the injunctive relief and ultimately a

2   fee, but that certainly, as well, the cost to Ferrero

3   is not, I believe as you have represented, in the

4   millions.  Indeed, I have nothing in the record to

5   support that, and I have nothing, obviously, because I

6   have stricken the Johnson report as to the value.

7        So I am looking more at -- assuming that,

8   assuming that there was unlawful advertising or

9   labeling, assuming -- because we are not reaching a

10  determination today, is there a value to injunctive

11  relief that changes that in some fashion, that there

12  is at least an argument, makes it clearer to the

13  consumer what they are buying and what they are

14  getting?  That's where we are.

15       MR. GUGLIELMO:  Your Honor, one brief comment

16  in response to Mr. Greenberg's other arguments:  The

17  Merola v. Atlantic Ridgefield case, 515 F.2d 165,

18  basically says that when you have non-monetary types

19  of relief, the District Court must bring up an

20  informed economic judgment to bear in assessing its

21  value.  In that instance, that case, the plaintiff's

22  expert wasn't reliable in terms of calculating the

23  value of injunctive relief was, so the District Court

24  used his or her economic judgment and then valued it,

25  and the Third Circuit said that was appropriate.

 1          I think I've addressed Mr. Greenberg's and

 2   Mr. Langone's -- by the way, your Honor, one point on

 3   Mr. Langone.

 4          As Mr. Cecchi said, they didn't properly set

 5   forth they were class members.  The deadline to object

 6   has passed.  So just for preserving the record, we

 7   would say whatever submission they put forth today is

 8   still untimely.

 9          THE COURT:  All right.  Then I know there are

10   objector arguments to the fees, both the percentage of

11   the common fund as well as the fee being requested for

12   the injunctive relief.  I have papers on this.

13          Does anyone want to add anything else on the

14   record?

15          Yes, Mr. Levy.

16          MR. LEVY:  Your Honor, you apparently divided

17   up approving the 2.5 million part and then addressing

18   fees and probably reducing the fees.

19          Let me just tell you the fee reduction does

20   not help the class the way this is structured.  So I

21   am urging your Honor to reject the settlement because

22   you can't modify it so any reduction in the fees

23   benefits the class.

24          If class counsel gets 1 million instead of

25   3 million, that 2 million gets added to what the class

1   gets; and then in the new settlement they are not

2   restricted to the four jars.  They would get a better

3   benefit.

4        THE COURT:  Frankly, this class is getting a

5   good benefit.  You can say better, maybe, in some

6   hypothetical world.  But I must tell you I have

7   serious doubts whether this case would have survived

8   motion practice under my reading of the New Jersey

9   Consumer Fraud Act.  I'm sure you have looked at some

10  of the opinions I've written in this area.  Maybe you

11  haven't.  You don't practice here in New Jersey.  But

12  I do take seriously the requirements under the Act and

13  ascertainable loss and causation -- putting aside

14  whether there was an unlawful conduct here, just put

15  that aside for the moment without assessing the

16  advertising was going to be a major impediment.  I

17  never got to the motion to dismiss because this was

18  settled in the interim.  I am telling you that under

19  the New Jersey Consumer Fraud Act, and that weighs

20  heavily here.

21       MR. LEVY:  Two points, your Honor:

22       One, you appear to be saying it's such a weak

23  case the class is lucky they got anything.  If that's

24  the case, they shouldn't have brought the case and

25  they didn't deserve a fee for bringing such a bad

1    case.

2         THE COURT:  You brought one, too.

3         MR. LEVY:  And I disagree with your views of

4    the case.

5         THE COURT:  That's fine.

6         Look, I'm going to put this out there.  I'm at

7    the point now -- other than, perhaps, Mr. Greenberg

8    who's already said:  I don't want anything out of

9    this; I was a purchaser; I'm basically a pro se lawyer

10   objector here; I'm doing this on ideological grounds,

11   or whatever else he may want to get out of this, what

12   psychological goodies he wants, or in his practice --

13   but we are at the point of having other class action

14   plaintiffs' counsel come in here who want something

15   clearly for their clients as well or want an action on

16   their own.  I get that.  But I will assess this, and I

17   will do it in a reasoned opinion you will hear in a

18   few moments.  But I disagree strongly.  And today,

19   guess what?  I'm the Judge.

20        MR. LEVY:  Your Honor, you are always the

21   Judge.  Thank you.

22        THE COURT:  Okay.  Thank you.

23        Yes, Mr. Greenberg.

24        MR. GREENBERG:  I would just like to echo

25   that, your Honor.  I just say, respectfully, there are

Case 3:11-cv-02800-TWJ  Document 999-1  Filed 02/24/20  Page 54 of 185

53

1    pretty profound Rule 23 concerns about the fairness,

2    reasonableness, and adequacy of this largely because

3    of what Bluetooth calls the kicker, the way that it's

4    set up; so that even if there were a reduction in

5    attorneys' fees, it still couldn't redound to the

6    benefit of the class.  I regard that as a very serious

7    concern.

8         Of course, Bluetooth does as well.  Bluetooth

9    says that's a sign that class counsel has paid too

10   much attention to its own interests and not enough

11   attention to the interests of the class.  There are

12   other signs that are both contained in Bluetooth and

13   in the settlement that suggests class counsel paid too

14   much attention to its own interest and not enough

15   attention to the interest of the class.

16        THE COURT:  Mr. Greenberg, how do you deal

17   with the fact, though, as I will ultimately opine, --

18   I think Mr. Levy put it right out there -- that this,

19   I think -- and you really in your own papers suggested

20   as well when you say:  Who was fooled by these ads?

21   -- that this is, I believe, a weak case.

22        So while everyone would like to say, Let's not

23   put it in the pockets of the lawyers, -- and I may not

24   be putting it in the pockets of the lawyers.  You'll

25   hear in a few moments -- but saying, Let's have that

1   redound to the benefit of the class, the question

2   remains:  What is fair to the class?  And is what is

3   being suggested as the fund fair to the class based on

4   that assessment?

5           Thank you.

6           MR. GREENBERG:  Did you want me to answer that

7   or no?

8           THE COURT:  I think that was kind of

9   rhetorical on my part.

10          MR. GREENBERG:  Thank you, your Honor.

11          MR. LANGONE:  May I, briefly, your Honor?

12          THE COURT:  Yes.

13          MR. LANGONE:  I know the Court has obviously

14  stated multiple times you've read the papers.  I do

15  want to address the reply on the <u>Brytus</u> and the <u>Bogart</u>

16  cases, which is the Third Circuit precedence we cite

17  about the use of the common fund doctrine as an

18  equitable doctrine when counsel are being paid their

19  lodestar in full, and in here, actually, getting a

20  windfall on their lodestar, which is already coming in

21  at these higher than usual rates.

22          THE COURT:  I haven't ruled yet -- have I? --

23  on what they are going to get as their fee.  I

24  appreciate that's your argument if they were to get

25  everything they requested.

1        MR. LEVY:  Plaintiffs' counsel, class counsel,

2   says these Brytus and Bogart cases actually support

3   them because the agreement is not made pursuant to fee

4   shifting, although the only plausible agreement that

5   the defendant could make, other than, I guess, just

6   giving out money to plaintiffs' counsel to pay a fee,

7   would be pursuant to fee shifting.

8        So when there is fee shifting and there is a

9   fiduciary duty to the class by class counsel,

10  certainly I think it would be a breach of fiduciary

11  duty to say to a client:  I'm going to take my fee out

12  of your portion rather than petition or achieve my

13  relief under the statutory fee shifting.

14       So I don't think the Brytus and Bogart aid

15  class counsel.  I think they squarely hold that it

16  would be unjust to take the money out of the class's

17  fund when class counsel are getting paid.  If the

18  Court makes an award on the lodestar, that they would

19  be paid in full or in excess of 1.8 million pursuant

20  to the 3 million portion, then the class is not being

21  unjustly enriched at anybody's expense.  And since the

22  common fund doctrine is solely an equitable doctrine

23  to prevent unjust enrichment, it couldn't be applied

24  to reduce the 2.5 million.

25       Also, the class was, in our position, not

1  given adequate notice of the fee petition against the

2  2.5 million.  That might not apply to the fees

3  requested as part of the injunctive relief because

4  under 23(b)(2), they wouldn't necessarily need a

5  notice for that.

6       THE COURT:  The notice was adequate, and I

7  will find that.

8       MR. LEVY:  And then, finally, although the

9  Court can't modify the agreement, I know from other

10  cases courts have asked the defendant if they would

11  agree to a modification of the condition of approving

12  it, and we would ask that the Court see what the

13  defendants' position is if the Court does reduce the

14  3 million fee, if the defendant is going to insist on

15  enforcing that kicker provision or would the defendant

16  allow that money, any reduction, to go to the class

17  pot, as we believe would be proper.  And, obviously,

18  the Court can't red-line the settlement agreement but

19  has to go up or down on that portion.

20       But there are cases where the defendant would

21  agree as a condition of approval to make

22  modifications, and we would ask that the defendant

23  consider that, if that's the way the Court thinks it

24  might be appropriate in this case.

25       Thank you very much.

Case 3:17-cmd-02800-TWF Document 999-1 Filed 02/24/20 Page 58 of 185

1          THE COURT:  Mr. Eggleton, he's inviting you to

2     make a response.

3          MR. EGGLETON:  Your Honor, Keith Eggleton

4     again.

5          I'm happy to rest on the papers unless you

6     have any questions for me.

7          THE COURT:  You don't want to take up the

8     invitation to add some money to the class?

9          MR. EGGLETON:  I would put that under the

10    heading:  Everyone's got a better idea, your Honor.

11         I would like to say on the record it was a

12    privilege to me personally to know Judge Politan.  He

13    did a good job on this case as he does on all cases.

14         Other than that, your Honor, I will rest on

15    the papers.

16         THE COURT:  Thank you.

17         Mr. Cecchi, do you want to address the fees?

18         MR. CECCHI:  I do, your Honor.

19         I first want to say any class member who

20    doesn't like this settlement, they can opt out.  They

21    don't have to submit a claim.  They can just opt out

22    of the settlement; and if Mr. Langone doesn't like it,

23    he can have his clients opt out.

24         THE COURT:  I don't think she's opted out as

25    of yet.

1            MR. CECCHI:  I don't think so.  I mean, if

2     it's such a bad deal, they shouldn't take it.  They

3     should go and do whatever they want to do.

4            You've heard a lot about the fairness of the

5     monetary component.  I want to first talk about the

6     process and then ultimately what I think is the core

7     issue for your Honor to decide on this fee.

8            First, the process was -- the core of this

9     case was about the ads and the advertising, which we

10    contended to be false and misleading, those ads at

11    that point in time.

12           For better or for worse, we moved as fast as

13    we could.  We had some obstacles -- not only law, and

14    unlike some others in the courtroom, I do practice in

15    this jurisdiction.  I do practice before your Honor.

16    I am aware of your Honor's jurisprudence.  And

17    whenever you are trying to get a settlement or

18    determining whether or not you are going to take a

19    case to trial, you have to access the jurisdiction,

20    the venue, the judge.

21           I was before your colleague, Judge Chessler,

22    recently, and he said to me:  You know, you're not

23    before Judge Hochberg anymore.  And let's be candid,

24    because we're talking about fairness and we're talking

25    about money.  I passed Justice Brennan's portrait.  If

Case 3:11-cv-02890-TWJ Document 999-1 Filed 02/24/20 Page 60 of 185

59

1    you are before Justice Brennan, he's got a

2    jurisprudence that's, let's say, to the left; you can

3    assess the case differently than if you are before a

4    judge you believe is more in the middle or slightly to

5    the right.  And I say that --

6            THE COURT:  Although I take a little umbrage

7    with the notion of putting this as a philosophy,

8    Mr. Cecchi, left, right, or being liberal, about a

9    different policy or a statute.  What I think we are

10   really talking about is, I've written on the area of

11   New Jersey Consumer Fraud Act.  I've written about

12   ascertainable loss.  But I take a little umbrage with

13   the way you presented it.

14           MR. CECCHI:  No, Judge, then my analogy is not

15   a good one.  Left, right, all I'm trying to say is:  I

16   know your Honor's jurisprudence, and as did Judge

17   Politan.  We assessed that.  There are other judges in

18   the district, is a better way of putting it, who have

19   gone different ways.  The Mercedes case:  Slightly

20   different analysis of the Consumer Fraud Act.  So if

21   my comments were not appropriate because I was just

22   trying to make the point, I do know your Honor's

23   jurisprudence.

24           So let's then talk about whether or not this

25   is a good deal, a fair deal.  On the monetary

1    component, it absolutely is.  The way we negotiated

2    this deal is, we focused on the injunctive relief.

3    Your Honor came up with an idea about the NAD.  I

4    confess, we didn't think of that when we were

5    negotiating the settlement.  But we did think it was a

6    good idea to have our expert review the future

7    advertising.  Whether or not anybody agrees or

8    disagrees, that's for the future.  But we felt that

9    changing these ads was the heart and soul of this case

10   because of our awareness of the risks.  So we

11   negotiated the injunctive relief.  Then we negotiated

12   a cash settlement, which, as it turns out, is hugely

13   beneficial to the class.

14        And, again, Judge, I really do apologize for

15   making a poor analogy.  My point only was about risk.

16   You have to assess your risk when you are coming up

17   with a package.  On that point, I can't be more humble

18   than saying I didn't want to give umbrage to your

19   Honor, and I hope you accept my sincere comments about

20   it because I do feel a little emotional about this

21   case, as I know your Honor does, because we worked

22   hard on this case.

23        There were other lawyers in California who put

24   a lot of obstacles in our path.  There was an MDL

25   proceeding.  There were depositions.  We worked with

1    our experts.  So a lot of work did go into the case,

2    and that gets to the point ultimately.

3         This injunction has value.  It's a benefit to

4    this class going forward.  It has real value.  We

5    think it improved.  Our expert did think it improved.

6    Could it have been better?  Absolutely.  That's always

7    the case in a settlement.  It always can be better.

8         So, ultimately, all we ask your Honor is, even

9    going back to your comments, which we started with

10    about rates -- some of the rates are high, but you

11    know various jurisdictions rates, we don't even have

12    to focus on that.  Because what I'm going to ask your

13    Honor to do is just tell us what you think is fair for

14    what we accomplished here, and, at the end of the day,

15    we are comfortable with that.  We accept that.

16         Do I think our request reflects a fair number

17    that we negotiated after we negotiated everything else

18    under Judge Politan's supervision?  Do I think it's a

19    fair compensation?  Indeed, I do.  I wouldn't have

20    asked your Honor for it if I didn't think it was fair.

21    But if your Honor doesn't think it's fair and

22    reasonable, I respect that, I appreciate that, and we

23    are going to live with that.  But we take these cases.

24    There is always risk in these cases getting nothing.

25    And if the multiplier is two or three or 3 1/2 in the

1    cases, that's a reflection of the risk.

2         We've spent our own money on these cases, our

3    own time, and sometimes we get nothing.  I have been

4    at that Larsen case for a long time, and we are going

5    to be at this case for a long time afterward, your

6    Honor, because these objectors, we know them well.  We

7    know them all.  We know Mr. Greenberg.  We know

8    Mr. Langone.  We will be litigating in the Third

9    Circuit a year from now and even longer than that.  I

10   have been litigating the Larsen case for years, and

11   the fee that you grant today, whether it's the full

12   fee, which I hope we will get, or less, we will be

13   working on this case in a year from now, and there

14   will be no more payment to us.

15        So we achieved I think the best we could have

16   in these circumstances.  I think it's fair.  And I

17   think, ultimately, did we earn the fee that we

18   requested?  I think we did earn it.  We all worked

19   hard.  We are all professional members of the bar.  We

20   are all good at what we do.  And I do want to step

21   back and, again, say, Judge, my comments are just

22   that.  I appreciated the risks.  I knew this was a

23   difficult case.

24        Do I think I could have convinced your Honor?

25   Yes.  But I thought that in other cases before your

1    Honor, too, and I was wrong in those cases; and you

2    have to take that into consideration when you settle a

3    case.

4           So I don't think I can say anything more other

5    than I think we earned it.  I think it's fair.  I

6    think, ultimately, that's the analysis your Honor has

7    to undertake.

8           Thank you.

9           THE COURT:  Thank you.

10          It's kind of interesting, Mr. Cecchi, when you

11   said, too, We'll be litigating this a long time in the

12   Circuit, frankly, this is the first time that I have

13   had these objectors in one of my class action

14   settlements, and I've never had an appeal taken from

15   one of mine, but there is always a first, and I'm

16   ready for it.

17          MR. CECCHI:  I'm sure you are.  I'm a betting

18   man.  I'm going to think whatever you rule there is

19   going to be an appeal.

20          THE COURT:  All right.

21          I have actually prepared fairly lengthy

22   remarks, so sit back and relax.

23          Before the Court are motions by plaintiffs

24   Marnie Glover, and I'll refer to her as "Glover," and

25   Jayme Kaczmarek collectively, the "plaintiffs," to

1    certify the class and grant final approval of the

2    parties' settlement pursuant to Federal Rule of Civil

3    Procedure 23; and an application for an award of

4    attorneys' fees; reimbursement of expenses; and

5    approval of incentive awards pursuant to 23(h).

6           Defendant Ferrero USA, Inc., who I'll refer to

7    as either "defendant" or "Ferrero" in this opinion,

8    markets Nutella hazelnut spread.

9           Plaintiffs allege on behalf of themselves and

10   a putative nationwide class, with the exception of

11   those who purchased in California, that defendant

12   deceptively marketed Nutella as a healthy food.

13          Defendant has joined plaintiffs in moving for

14   final approval of the proposed settlement, and this

15   settlement would resolve all claims asserted against

16   defendant arising from plaintiffs' complaints.

17          The facts I am going to set forth now are

18   based on the allegations in plaintiffs' complaints.

19          On February 27th, 2011, Glover filed an action

20   in this district bringing claims on behalf of a

21   nationwide class under the New Jersey Consumer Fraud

22   Act: breach of contract and breach of express and

23   implied warranty.

24          Plaintiffs' cause of action arises from her

25   allegations that defendant deceptively marketed its

Nutella product as a healthy and nutritious component

of a well balanced breakfast without explicitly

stating that the true nutritional values come,

instead, from the other foods or drinks -- for

example, whole grain breads, fruit, and milk that are

advertised along with Nutella.

Grover alleged that Ferrero made such

representations in print, television, and

point-of-sale advertising as well as on the label of

the product to plaintiffs and other consumers during

the class period.

On April 11, 2011, plaintiff Glover filed a

motion with the Judicial Panel on Multidistrict

Litigation requesting centralization of this action

and a putative class action pending in California

alleging similar claims.  That was the In re Ferrero

Litigation case in the Southern District of

California.  That motion was brought under 28 U.S.C.

Section 1407 for pretrial proceedings in this district

where Ferrero was headquartered and where it conducted

the majority of the activities complained of in the

actions.  That received MDL No. 2248.

The motion for centralization was denied

following oral argument held on July 28, 2011, and the

panel found as follows -- and I'll quote from their

1　opinion at 804 F. Supp. 2d 1374:

2　　　　"The actions may share some factual questions

3　regarding the common defendants' marketing practices,

4　but these questions do not appear complicated.

5　Indeed, the parties have not convinced us that any

6　common factual questions are sufficiently complex or

7　numerous to justify Section 1407 transfer at this

8　time."

9　　　　In the interim, on May 2, 2011, the plaintiffs

10　in the Southern District of California action, Athena

11　Hohenberg and Laura Rude-Barbato, who I'll refer to as

12　"proposed intervenors," sought to intervene in the

13　Glover action for the purpose of having it dismissed.

14　Glover opposed that motion.

15　　　　Meanwhile, Ferrero filed a motion to dismiss

16　pursuant to Rule 12(b)(6).

17　　　　While those motions were pending, plaintiff

18　Kaczmarek filed her complaint on July 26, 2011,

19　asserting similar claims based upon the same conduct

20　alleged in Glover's complaint.

21　　　　On August 23, 2011, Kaczmarek sought

22　consolidation of her complaint and Glover's complaint

23　with the appointment of Scott & Scott LLP and Carella,

24　Byrne, Cecchi, Olstein, Brody and Agnello, the Carella

25　firm, as interim lead counsel.

1    On September 6, 2011, the Court granted the

2 request for consolidation under the caption: "In re

3 Nutella Marketing and Sales Practices Litigation," and

4 appointed Scott & Scott and Carella as interim lead

5 counsel. I'll refer to them as "class counsel for the

6 putative class."

7    The Court terminated defendant's motion to

8 dismiss and set deadlines for plaintiffs to file a

9 consolidated complaint and for defendant to refile its

10 motion to dismiss thereafter.

11    On September 9, 2011, proposed intervenors

12 filed a second motion to intervene for the purpose of

13 filing a motion to dismiss both the Glover and

14 Kaczmarek actions pursuant to the first-filed rule.

15    The Court denied both motions to intervene on

16 October 20, 2011.

17    During this time, the parties agreed to

18 mediate before the late Honorable Nicholas J. Politan,

19 a former United States District Court Judge in the

20 District of New Jersey. These sessions resulted in

21 the settlement which is before the Court today.

22    On January 10, 2012, plaintiffs filed a motion

23 for preliminary approval of the settlement. I granted

24 that motion and preliminarily certified the class and

25 approved notice to the class.

1          The terms of the settlement are memorialized

2     in the class action settlement agreement, and the

3     Court has reviewed those terms in full.

4          The putative class is defined as "all persons

5     throughout the United States who purchased one or more

6     of defendant's Nutella brand hazelnut spread products

7     in any state other than California at any time from

8     January 1, 2008, through the date of preliminary

9     approval, February 3, 2012, the class period, other

10    than for resale or distribution.

11         "Excluded from the settlement class members

12    are Ferrero, defense counsel, any judge presiding over

13    any of the actions that together comprise the actions

14    or related actions, or any immediate family members of

15    any such persons."

16         The settlement is divided into two parts:

17    money payment to the class for alleged past damages

18    and an injunction related to Nutella's marketing and

19    advertising to prevent alleged future harms.

20         Under the terms of the settlement, the parties

21    have agreed that defendant will pay $2,500,000 for

22    distribution to settlement class members who submit a

23    valid claim form.

24         Settlement class members can submit a claim

25    for up to $4 per jar purchased during the class period

 1   up to a maximum of five jars for a total of $20

 2   subject to pro rata reduction based on the total

 3   number of claims filed.

 4          Second, the parties have agreed to address the

 5   advertising the plaintiffs allege is deceptive.

 6   Defendants will revise its labeling and print and

 7   media advertising to reflect the changes agreed to as

 8   well as modify the content on the website for Nutella.

 9   In particular, defendant is revising Nutella's label

10   by adding more nutritional information on the front of

11   the package regarding sugar and fat content of the

12   serving.

13          It is changing its slogan from "An example of

14   a tasty yet balanced breakfast" into "Turn a balanced

15   breakfast into a tasty one."  These changes are to

16   last at least two years.

17          In addition, defendant will not use

18   potentially misleading commercials for three years and

19   has revised its commercials based on input from class

20   counsel.  Defendant has altered its website removing

21   information plaintiffs allege was potentially

22   misleading.

23          Plaintiffs submitted a declaration by Peter

24   Wright who claims to be an expert on consumer behavior

25   and marketing practices.  Mr. Wright opines that

1  Ferrero's new advertising campaign "will effectively

2  educate reasonable consumers about how to do

3  practical, balanced and nutritional breakfast planning

4  which may or may not include Nutella."  Wright

5  declaration at paragraph 13.

6       The Court appointed Rust Consulting -- I'll

7  refer to it as "Rust" -- as the claims administrator.

8  Through Rust's efforts, notice of the claim and

9  settlement were published in the following magazines:

10  Parents, the May 2012 issue; People, April 16th, 2012

11  issue; Ser Padres, May 2012 issue; and Women's Day,

12  May 2012 issue -- which were the same magazines that

13  ran defendant's allegedly deceptive advertising

14  campaign.

15       In addition, notice of the claim and

16  settlement were published on the following websites:

17  24/7 Real Media Network, Parenting Channel, and

18  Facebook.

19       Rust also established a dedicated settlement

20  website, the Settlement Website,

21  WWW.Nutellaclassactionsettlement.com, which contains

22  the settlement agreement, class notice, and

23  information relating to filing a claim on that, opting

24  out of the settlement, objecting to the settlement,

25  deadlines relating to the settlement, frequently asked

1    questions, and other information relative to the

2    settlement.  The settlement website also contains an

3    electronic claim form to allow an online submission of

4    claims as well as a claim form which can be

5    downloaded, printed, and mailed to the claims

6    administrator.  The website is in both English and

7    Spanish.

8         It also includes the declaration of James

9    Cecchi in support of counsels' motion for approval of

10   fees, which included declarations from each of

11   plaintiffs' attorneys' fees regarding the hours and

12   fees they claim to have accrued.

13        In response to the publication, the settlement

14   website has been viewed over 1 million times, the

15   internet banner notations have been viewed well over

16   10 million times, and over 200,000 individuals have

17   filed claims for 962,137 jars of Nutella.  At $4 a

18   jar, the total amount of claims filed by June 29,

19   2012, would equal well over $3 million.

20        Of the entire class, only six individuals

21   requested exclusion from the class.  A number of

22   objections have been lodged as well, which the Court

23   addresses in turn.

24        I know that at this point as well that a

25   number of the objectors had complained about the

1    cy-près provision in the settlement which would have

2    allowed any remaining funds not collected by the class

3    to be distributed to a charity.  Those objections are,

4    however, moot because its clear the class fund will be

5    exhausted due to the number of claims filed.

6          As this case has not proceeded to the class

7    certification stage, the Court has to first determine

8    whether to certify the settlement class.  The Court

9    has already conditionally certified the class.  The

10    Third Circuit in In Re Insurance Brokerage

11    Antitrust -- I'm going to leave out the actual cites;

12    I'll just give the name of the case for purposes of

13    the opinion on the record -- explained the standard

14    for class certification in a settlement context.

15          In order to approve a class settlement

16    agreement, "a district court must determine that the

17    requirements for class certification under Federal

18    Rule of Civil Procedure 23(a) and (b) are met and must

19    determine that the settlement is fair to the class

20    under Federal Rule of Civil Procedure 23(e)."  See

21    also Sullivan v. DB Investors. Inc., 2011 U.S. App.

22    Lexis 25185, at 3839 (3d Cir. February 23rd, 2012.)

23          As the Supreme Court has made clear:

24    "Confronted with a request for settlement only class

25    certification, a district court need not inquire

73

whether the case, if tried, would present intractable

management problems, for the proposal is that there be

no trial.  But other specifications of Rule 23, those

designed to protect absentees by blocking unwarranted

or overbroad class definitions, demand undiluted, even

heightened, attention in the settlement context."

Amchem Products v. Windsor.

"If a fairness inquiry under Rule 23(e)

controlled certification, eclipsing Rule 23(a) and

(b), and permitting class designation despite the

impossibility of litigation, both class counsel and

court would be disarmed."  Thus, it is important to

"apply the class certification requirements of Rule

23(a) and (b) separately from the fairness

determination under Rule 23(e)."  In re Prudential

Insurance Company of America Sales Practices

Litigation Agent Actions (3d Cir. 1998.)

"The requirements of Rule 23(a) and (b) are

designed to ensure that a proposed class has

'sufficient unity so that absent class members can

fairly be bound by decisions of class

representatives.'"  That's the Prudential case quoting

the Amchem Supreme Court case.

Under Rule 23(a), the prerequisites to class

certification are:

1    One, the class is so numerous that joinder of

2    all members is impracticable;

3    Two, there are questions of law or fact common

4    to the class;

5    Three, the claims or defenses of the

6    representative parties are typical of the claims or

7    defenses of the class; and

8    Four, the representative parties will fairly

9    and adequately protect the interests of the class.

10    Rule 23(a); and see Amchem.

11    "If all the prerequisites of Rule 23(a) are

12    satisfied, a class action may be maintained if the

13    standards set forth in Rule 23(b) are satisfied as

14    well." In re Insurance Brokerage at page 257, Rule

15    23(b).

16    Rule 23(b) requires "The Court to find that

17    the questions of law or fact common to class members

18    predominate over any questions affecting only

19    individual members and that a class action is superior

20    to other available methods for fairly and efficiently

21    adjudicating the controversy." Amchem at 618. "Among

22    current applications of Rule 23(b)(3), the 'settlement

23    only' class has become a stock device."

24    The "factual determinations necessary to make

25    Rule 23 findings must be made by a preponderance of

1   the evidence.  In other words, to certify a class, the

2   district court must find that the evidence more likely

3   than not establishes each fact necessary to meet the

4   requirements of Rule 23."  In re Insurance Brokerage

5   at 258.  Accordingly, "class certification is proper

6   only if the Court is satisfied after a rigorous

7   analysis that the prerequisites of Rule 23 are met."

8        "Even if it has satisfied the requirements for

9   certification under Rule 23, a class action cannot be

10  settled without the approval of the Court and a

11  determination that the proposed settlement is fair,

12  reasonable, and adequate."  In re: Prudential

13  Insurance Company.  See Federal Rule of Civil

14  Procedure 23(e)(2) stating that "A district court may

15  approve a proposed settlement only after a hearing and

16  finding it is fair, reasonable, and adequate."

17       In In re: Insurance Brokerage, the Third

18  Circuit affirmed the applicability of nine factors

19  establish in Girsh v. Jepson, 521 F.2d 153 (3d Cir.

20  1975), which are to be considered when determining the

21  fairness of a proposed settlement.

22       "Where settlement negotiations precede class

23  certification, and approval for settlement and

24  certification are sought simultaneously, we require

25  district courts to be even more scrupulous than usual

```
 1   when examining the fairness of the proposed

 2   settlement."  In re Warfarin Sodium Antitrust

 3   Litigation (3d Cir. 2004).

 4          As stated earlier, the parties request that

 5   the settlement class consist of all persons except

 6   those in California who purchased Nutella between

 7   January 1, 2008, and February 3, 2012.

 8          I'll address first the numerosity requirement.

 9          First I determine whether plaintiffs have

10   satisfied the prerequisites for maintaining a class

11   action as set forth in Rule 23(a).

12          With respect to numerosity, a party may not

13   precisely enumerate the class members to proceed as a

14   class action.  In re Lucent Technology, Inc.

15   Securities Litigation, 307 F.Supp.2d 633, (District of

16   New Jersey 2004).

17          "No minimum number of plaintiffs is required

18   to maintain a suit as a class action.  But, generally,

19   if the named plaintiff demonstrates that the potential

20   number of plaintiffs exceeds 40, the first prong of

21   Rule 23(a) has been met.  Stewart v. Abraham (3d Cir.

22   2001) citing Moore's Federal Practice.  Also, Leesberg

23   v. Converted Organics (D. Del 2010).

24          Here the numerosity element is easily

25   satisfied.  No one disputes that defendant sold
```

77

```
 1    perhaps millions of jars of Nutella throughout the
 2    United States during the period.  In addition, over
 3    200,000 individuals have filed claims.  Therefore,
 4    joinder of all class members is impractical.
 5           Turning to commonality.
 6           Commonality requires that "there are questions
 7    of law or fact common to the class."  The threshold
 8    for establishing commonality is straightforward.  "The
 9    commonality requirement will be satisfied if the named
10    plaintiffs share at least one question of fact or law
11    with the grievances of the prospective class."  In re
12    Schering Plough (3d Cir. 2000), quoting Baby Neal v.
13    Casey (3d Cir. 1994).
14           Indeed, as the Third Circuit pointed out, "It
15    is well established that only one question of law or
16    fact in common is necessary to satisfy the commonalty
17    requirement despite the use of the plural 'questions'
18    in the language of Rule 23(a)(2)."  In re Schering
19    Plough, note 10.  Thus, there is a low threshold for
20    satisfying this requirement.  Newton v. Merrill Lynch
21    (3d Cir. 2001) and In re Asbestos Litigation (3d Cir.
22    1986).
23           "Highlighting the threshold of commonality is
24    not high.  It is not required that all putative class
25    members share identical claims."  See Hassine v.
```

78

1   <u>Jeffes</u>, 846 F.2d 169 (3d Cir. 1988), and <u>Baby Neal</u>,

2   stating that "Factual differences among the claims of

3   the putative class members do not defeat

4   certification."

5           Here the Court finds that there are common

6   questions of law or fact shared amongst the class.

7   Importantly, all members of the class were subject to

8   either defendant's deceptive advertising campaign or

9   allegedly misleading label and purchased at least one

10  jar of Nutella.

11          All members of the class also share common

12  questions of law -- in particular, whether they were

13  exposed to allegedly deceptive or fraudulent messages

14  regarding defendant's advertising and labeling,

15  whether such deceptive messages, if any, caused them

16  to buy Nutella, and, if so, whether they were harmed.

17          A number of objectors dispute plaintiffs'

18  underlying claim that the messages, even if deceptive,

19  caused them to purchase the product or caused them any

20  harm.  This, of course, goes to the merits of the

21  claims and the damages, if any.

22          Nonetheless, the members of the class share

23  the common questions of whether the label and/or

24  advertising were unlawful.  As such, the element of

25  commonality is met.

79

1          Turning to typicality.

2          "The concepts of commonality and typicality

3    are broadly defined and tend to merge because they

4    focus on similar aspects of the alleged claims.

5    Newton v. Merrill Lynch (3d 2001).  Specifically, Rule

6    23(a)(3) requires that "the claims of the

7    representative parties be typical of the claims of the

8    class."  Rule 23(a)(3).

9          Typicality acts as a bar to class

10   certification only when "the legal theories of the

11   named representatives potentially conflict with those

12   of the absentees."  Georgine v. Amchem (3d Cir. 1986)

13   and Newton.

14         "If the claims of the named plaintiffs and

15   putative class members involve the same conduct by the

16   defendant, typicality is established regardless of

17   factual differences."  Newton at 184.

18         In other words, the typicality requirement is

19   satisfied as long as representatives and the class

20   claims arise from the same event or practice or course

21   of conduct and are based on the same legal theory.

22         As discussed above, because plaintiffs' claims

23   arise from the same course of conduct and are

24   predicated on the same legal theories as the claims of

25   all other members of the class, the allegedly

deceptive marketing and labeling of Nutella, the
typicality requirement of Rule 23(a)is satisfied.

Turning to adequacy of representation.

Class representatives must "fairly and
adequately protect the interests of the class."
23(a)(4).  This requires a determination of, one,
whether the representatives' interest conflict with
those of the class, and, two, whether the class
attorney is capable of representing the class.  Newton
at 187.

The Supreme Court has stressed that this
element "serves to uncover conflicts of interests
between named parties and the class they seek to
represent."  Amchem at 625."

"Rule 23(a)'s adequacy of representation
requirement serves to uncover conflicts of interest
between named parties and the class they seek to
represent."  In re Pet Food Products Liability
Litigation (3d Cir. December 16, 2010), quoting
Amchem.

Class representatives "must be part of the
class and possess the same interests and suffer the
same injuries as the class members."  This element
also functions as a catch-all requirement that "tends
to merge with the commonality and typicality criteria

1    of Rule 23(a)," citing to Pet Foods.

2         The named plaintiffs are adequate

3    representatives for the class.  Each has alleged that

4    she was exposed to defendant's allegedly deceptive

5    marketing and that such marketing caused her to

6    purchase Nutella and suffer an ascertainable loss.  In

7    that regard, like all members of the class, plaintiffs

8    faced the same challenged practices.

9         In addition, there is no evidence that

10   plaintiffs have any interests that are antagonistic to

11   or in conflict with the class.  As such, the absent

12   class members' interests will be protected adequately.

13   See In re Warfarin Sodium Antitrust Litigation (3d

14   Cir. 2014).  Moreover, having reviewed class counsel's

15   resume, the Court is satisfied that the Carella firm

16   and Scott are experienced in prosecuting class actions

17   on behalf of consumers.

18        Nevertheless, objector Christopher Andrews,

19   who is not present here today, argued that class

20   counsel has not adequately represented the class.

21   Indeed, to some extent, I guess, Mr. Levy made the

22   argument today as well.  But Mr. Andrews complains

23   that the settlement here is not as favorable as the

24   one reached by counsel in the California action.

25        After reviewing the proposed settlement of the

 1   California action, I find it is substantively similar

 2   to the settlement before me in this matter.  Both

 3   include a monetary payment for past harm and an

 4   injunction related to defendant's marketing and the

 5   content of the Nutella label.  The only significant

 6   difference is the amount of the payment and valuation

 7   of the injunction as that class only pertains to

 8   persons in California.  So the amounts are naturally

 9   smaller than those here, where the class is defined as

10   all persons in the United States.

11        In addition, the California settlement has

12   largely identical provisions to those before me and

13   was made a week after the settlement here.

14        Furthermore, class counsel here have indicated

15   that California counsel tried to hinder settlement in

16   this matter.

17        It has also been demonstrated to this Court

18   that Mr. Andrews has been working with California

19   counsel against class counsel here.  As will be

20   discussed later, I note here that Mr. Andrews seems to

21   have objected only for the purpose of obtaining a

22   significant payment from the fund or class counsel.

23        A number of other objectors complain regarding

24   class counsel's fees, but not necessarily the fairness

25   of the settlement itself.  These concerns are outside

1    the ambit of this factor, and I will address them in

2    turn.  I find that Andrew's objection has no merit.

3          Accordingly, the Court finds that class

4    counsel will adequately represent the interests of

5    plaintiffs and the class.

6          Turning to the superiority requirement.

7          In addition to meeting the requirements of

8    Rule 23(a), the class must also satisfy Rule 23(b)(3).

9    That requires that "a class action be superior to

10   other available methods for the fair and efficient

11   adjudication of the controversy."

12         The rule sets out several factors relevant to

13   the superiority inquiry:

14         A, the interests of members of the class in

15   individually controlling the prosecution or defense of

16   separate actions;

17         B, the extent and nature of any litigation

18   concerning the controversy already commenced by or

19   against members of the class;

20         C, the desirability or undesirability of

21   concentrating the litigation of the claims in the

22   particular forum; and

23         D, the difficulties likely to be encountered

24   in the management of a class action.

25         Essentially, the superiority requirement "asks

the Court to balance in terms of fairness and
efficiency the merits of a class action against those
of alternative available methods of adjudication."
Prudential at 316; In re Warfarin, 532, 33.

In this case, each of the factors weighs in
favor of class certification.

First, the expense of individual actions in
this consumer fraud action weighed against the
potential recovery would clearly be cost prohibitive.
Here, individual plaintiffs have alleged losses
amounting to several dollars for each Nutella jar they
purchased.  Plaintiffs' allegations represent the high
point of what they could hope to achieve individually.
This is far too small of a potential recovery for any
individual class member to be expected to pursue his
or her own claim in a separate action.

In addition, to meet the requirements of Rule
23(b)(3), named plaintiffs must show that common
questions of law or fact predominate over questions
affecting only individual class members.  The
predominance inquiry "tests whether proposed classes
are sufficiently cohesive to warrant adjudication by
representation and assesses whether a class action
would achieve economies of time, effort and expense
and promote uniformity of decision as to persons

1    similarly situated."  Sullivan, 2011 U.S. App. Lexis

2    at 41.

3         In determining whether common questions

4    predominate, courts have focused on the claims of

5    liability against defendants.  See Bogosian v. Gulf

6    Oil (3d Cir. 1997.)  Indeed, the Third Circuit

7    recently explained that "the focus of the predominance

8    inquiry is on whether the defendant's conduct was

9    common as to all of the class members and whether all

10   of the class members were harmed by the defendant's

11   conduct."  Sullivan at 44.

12        Here, as stated earlier, common legal and

13   factual questions are shared amongst the class members

14   and plaintiffs in this action.  Specifically, class

15   members and plaintiffs challenge the same alleged

16   improper consumer practices by defendant.  As such,

17   there are no significant individual fact issues.

18   Rather, the determination of the legal issues raised

19   involve a "common nucleus" of operative facts that

20   underlies all of the claims asserted in this case.

21        Accordingly, the factual and legal principles

22   to be addressed by plaintiffs in prosecuting these

23   claims are sufficiently common to the entire class,

24   thereby satisfying the predominance inquiry.  See

25   Amchem at 625.

86

1          "Predominance is a test readily met in certain

2     cases alleging consumer or securities fraud."

3          (Continued on the next page.)

4     ///

1    Having weighed all the factors and considered

2    the requirements of class certification, the Court

3    finds that it is appropriate to certify the class for

4    settlement purposes.

5    In determining whether, then, to approve the

6    class settlement, this Court is bound by Rule 23(e).

7    "Under Rule 23(e), the district court acts as a

8    fiduciary who must serve as a guardian of the rights

9    of absent class members.  The Court cannot accept a

10   settlement that the proponents have not shown to be

11   fair, reasonable and adequate."  In re GMC Pick-Up

12   Truck Fuel Tank Products Liability Litigation (3d Cir.

13   1995).

14   In general, the law encourages and favors

15   settlement of civil actions in federal courts,

16   particularly in class actions.  In re Warfarin at 535.

17   See In re General Motors (3d Cir. 1995).

18   "The law favors settlement particularly in

19   class actions and other complex cases where

20   substantial judicial resources can be conserved by

21   avoiding formal litigation."

22   Accordingly, when a settlement is reached on

23   terms agreeable to all parties, it is to be

24   encouraged.  Bell Atlantic V. Bolger (3d Cir. 1993).

25   Nevertheless, a class action settlement may

 1   not be approved under Rule 23(e) without a

 2   determination by this Court that the proposed

 3   settlement is fair, reasonable, and adequate.  See

 4   In re Cendant, 264 F.3d at 231; 23(e)(1)(A); and

 5   Amchem, 623, noting that the Rule 23(e) inquiry

 6   "protects unnamed class members from unjust or unfair

 7   settlements affecting their rights when the

 8   representatives become fainthearted before the action

 9   is adjudicated or are able to secure satisfaction of

10   their individual claims by a compromise."  And when

11   settlement negotiations precede class certification

12   and approval for settlement and certification are

13   sought simultaneously, the Third Circuit requires

14   district courts to be even "more scrupulous than

15   usual" when examining the fairness of the proposed

16   settlement.  See General Motors at 805.

17          This heightened standard is intended to ensure

18   that class counsel has engaged and sustained advocacy

19   throughout the course of the proceedings, particularly

20   in settlement negotiations, and has protected the

21   interests of all class members.  See Prudential at

22   317.

23          To ensure fairness, the Third Circuit has

24   identified nine factors to consider when determining

25   whether a proposed class action settlement is fair,

1   reasonable, and adequate; and these are, as I

2   referenced before, the Girsh factors, and they are as

3   follows:

4       One, the complexity, expense, and likely

5   duration of litigation;

6       Two, the reaction of the class to the

7   settlement;

8       Three, the stage of the proceeding and the

9   amount of discovery completed;

10      Four, the risks of establishing liability;

11      Five, the risks of establishing damages;

12      Six, the risks of maintaining the class action

13  through the trial;

14      Seven, the ability of defendants to withstand

15  greater judgment;

16      Eight, the range of reasonableness of the

17  settlement fund in light of the best possible

18  recovery; and

19      Nine, the range of reasonableness of the

20  settlement fund to a possible recovery in light of all

21  the attendant risks of litigation.

22      The Court has considerable discretion in

23  approving a proposed settlement of a class action; and

24  in light of these principles, the Court will determine

25  whether this settlement is reasonable.

1    Addressing the first factor, the complexity,

2  expense, and likely duration of the litigation.

3    The first factor involves a consideration of

4  the "probable costs in both time and money of

5  continued litigation."  In re Cendant at 233.  The

6  Court finds this factor weighs in favor of settlement.

7    It has already been determined, even by the

8  Judicial Panel on Multidistrict Litigation, that this

9  case does not involve complex issues.  Nevertheless,

10  it would involve discovery, trial preparation, and

11  addressing various legal and factual issues.

12  Therefore, this litigation, like all civil litigation,

13  has the potential to be both time consuming and

14  expensive for the parties.  Additionally, expert

15  discovery would be necessary, and there would be the

16  potential need for surveys and extensive analysis of

17  consumer conduct relating to the allegedly deceptive

18  marketing.

19    If the case were to proceed to trial, there

20  would be significant motion practice.  Defendant had

21  already filed a motion to dismiss although it was

22  terminated with leave to refile after the cases were

23  consolidated.  Because defendant has been steadfast in

24  its assertion that its message was never deceptive or

25  fraudulent, it would undoubtedly refile its motion to

Case 3:13-cv-02980-TWT  Document 999-1  Filed 02/24/20  Page 93 of 185

1    dismiss; and if the case were to proceed beyond that,

2    then it would likely file summary judgment motions as

3    well.

4          Finally, the post-trial motions and appeals

5    process would further extend the length of the

6    litigation.

7          Accordingly, a significant amount of money and

8    resources would be required to pursue this litigation

9    to a final judgment which would ultimately delay any

10   potential payout to the class.  As such, this factor

11   favors settlement although not significantly more so

12   than any other civil litigation matter.

13         Second, the reaction of class members.

14         As indicated, there are at least hundreds of

15   thousand of class members nationwide.  To date, the

16   Court has received 17 objections, although a number of

17   the objectors are related in some fashion; and

18   distilled to their essence, there are about eight

19   groups of objections.  These objections will be

20   addressed later in this opinion.  In addition, six

21   individuals have requested exclusion from the class.

22   A number of objections have been made strenuously, but

23   much of the ire is directed towards the attorneys fees

24   and not the class settlement itself.

25         For the purpose of this factor, the few

1    objections made to the underlying settlement from the

2    class members as compared to the potential number of

3    class members creates a presumption that this factor

4    weighs in favor of settlement.  In re Cendant at 235.

5         "The vast disparity between the number of

6    potential class members who received notice of the

7    settlement and the number of objectors creates a

8    strong presumption that this factor weighs in favor of

9    the settlement."  Indeed, under Girsh, such a small

10   number of negative responses favors approval of a

11   class action settlement.  See Stoetzner v. U.S. Steel

12   Corp, (3d Cir. 1990).

13        "Objections by 29 members of a class comprised

14   of 281 strongly favors settlement."  In re Prudential

15   Insurance.  "Small number of negative responses to

16   settlement favors approval."  Weiss v. Mercedes Benz.

17   100 objections out of 30,000 class members weighs in

18   favor of settlement.  Clearly our numbers here are

19   even more skewed.

20        Turning to the stage of proceedings and the

21   amount of discovery completed.

22        This factor "captures the degree of case

23   development that class counsel have accomplished prior

24   to the settlement.  Through this lens courts can

25   determine whether class counsel had an adequate

1    appreciation of the merits of this case before

2    negotiating."  In re Cendant at 235.  Even settlements

3    reached at a very early stage and prior to formal

4    discovery are appropriate when there is no evidence of

5    collusion and the settlement represents substantial

6    concessions by both parties.  Weiss, 889 F.Supp.

7    1301.

8         This case has been litigated for about a year

9    and has involved some discovery.  The parties have

10   engaged in extensive motion practice regarding

11   proposed intervenors' motion to intervene and

12   defendant's motion to dismiss.  In addition, the

13   parties have propounded document requests and

14   interrogatories, issued third-party subpoenas,

15   reviewed over 50,000 pages of documents, hired

16   experts, and taken two depositions.

17        Finally, and most importantly, the parties

18   have prepared for and partook in mediation before the

19   late Honorable Nicholas Politan in October and

20   November 2011.  Therefore, the Court finds that class

21   counsel had sufficient information to make an informed

22   decision regarding settlement.  This factor weighs in

23   favor of approval.

24        Turning to the risks in establishing liability

25   and damages.

1    The fourth and fifth factors "survey the

2    potential risks and rewards of proceeding to

3    litigation in order to weigh the likelihood of success

4    against the benefit of an immediate settlement."  In

5    re Warfarin at 537.

6    In other words, those factors attempt "to

7    measure the expected value of litigating the action

8    rather than settling it at the current time."  Cendant

9    at 237 through 239.  Both factors strongly weigh in

10   favor of approval of settlement in this case.

11   Here plaintiffs have a difficult row to hoe in

12   proving their case.  Defendant had filed a motion to

13   dismiss; and although the Court never had the

14   opportunity to rule on it, a review of the arguments

15   suggest there were significant impediments to

16   plaintiff recovering under their theories.

17   First, it is questionable whether defendant

18   did anything relating to its advertising campaign that

19   amounted to unlawful conduct, although the Court notes

20   allegations relating to defendant's labeling might

21   have presented a more colorful issue.  But even there,

22   issues were raised as to preemption and FDA labeling

23   requirements.  Moreover, even if any unlawful conduct

24   could be shown, plaintiffs still had to prove

25   defendant's conduct caused plaintiffs to purchase the

product and that plaintiffs suffered an ascertainable

loss in so doing.

Both issues presented obstacles.  Considering

the basic consumer understanding that Nutella is

essentially a hazelnut chocolate spread, even many of

the objectors note they never bought the product based

on health claims.  One must wonder how plaintiffs

would have established liability.  Further, to show an

ascertainable loss, plaintiffs would likely have to

point to a comparable product of which there were few,

if any, at the time, and take into consideration the

benefit that plaintiffs nevertheless received from

buying Nutella.

In addition, factoring into the Court's

determination is both class counsel and Ferrero's

representation, with which this Court agrees, that the

expected recovery to the class is well within the

range of reasonableness in light of the best possible

recovery, possible setoffs, and attendant risks of

litigation.

Accordingly, given the real and extensive

risks involved in this case for plaintiffs, these two

factors weigh heavily in favor of the approval of the

settlement.  See, for example, In re Suprema

Specialties.  "Approving settlement where plaintiffs

1  would have difficulty establishing liability and

2  damages."  In re Genta Securities Litigation.

3       Next, turning to the risks of maintaining the

4  class action through trial.

5       The Third Circuit has explained that this

6  factor tends to be neutral because "under Federal Rule

7  of Civil Procedure 23(a), a district court may

8  decertify or modify a class at any time during the

9  litigation if it proves to be unmanageable," and

10  proceeding to trial would always entail the risk even

11  if slight of decertification.  In re Cendant at 239.

12       Accordingly, the Court finds this factor is

13  neutral or slightly weighs in favor of the settlement.

14       Turning to the defendant's ability to

15  withstand a greater judgment.

16       This fact addresses whether defendants "could

17  withstand a judgment for an amount significantly

18  greater than the proposed settlement.  In re Cendant

19  at 240.

20       In this case, there is no real dispute that

21  Ferrero has the ability to withstand a greater

22  judgment.  However, this factor is generally neutral;

23  whereas, here the defendant's ability to pay greatly

24  exceeds the potential liability and was not a factor

25  in settlement negotiations.

1    In addition, even if a defendant could

2    withstand a greater judgment than the amount of the

3    settlement, this finding alone is insufficient to

4    reject the term of a settlement.  Cendant at 240.

5    Accordingly, the Court finds that this factor

6    stands neutral.

7    Turning to the range of reasonableness of the

8    settlement.

9    The last two factors evaluate whether the

10   settlement represents a fair and good value for a weak

11   case or a poor value for a strong case.  In re

12   Warfarin at 558.

13   "In conducting this evaluation it is

14   recognized 'settlement represents a compromise in

15   which the highest hopes for recovery are yielded in

16   exchange for certainty and resolution, and courts

17   should guard against demanding too large a settlement

18   based on the court's views of merits of the

19   litigation."  In re Safety Components and In re AT&T

20   Corporate Securities Litigation at 170.  In that case,

21   the Court found that settlement was an "excellent"

22   result in light of the risk of establishing liability

23   and damages despite the fact settlement possibly

24   represented only 4 percent of the total damages claim.

25   The Court is satisfied that in light of the

1    fact that plaintiffs have a real risk of proving their

2    claims, these two factors weigh strongly in favor of

3    approving settlement for the reasons I've already

4    described.  In particular, even if liability were

5    established and damages were provable, such damages

6    would likely represent a small fraction of the

7    purchase price.

8         A plaintiff must plead ascertainable loss

9    "with enough specificity as to give the defendant

10   notice of possible damages."  Torres-Hernandez v. CVT

11   Prepaid Solutions (D.N.J. 2008).

12        As one court in this district recently

13   explained, "What New Jersey courts require for loss to

14   be 'ascertainable' is for the consumer to quantify the

15   difference in value between the promised product and

16   the actual product received."  Your case, Mr. Levy,

17   Smajlaj v. Campbell Soup, 782 F.Supp. 2d 84 at 99

18   (D.N.J. 2011).

19        No one disputes that there is value in the

20   Nutella product, perhaps significant value, and that

21   the original price of Nutella was on the order of

22   several dollars.  The parties predict that after fees

23   and costs, claimants will likely receive approximately

24   $1.35 per jar up to five jars.  If anything, this is

25   at the high end of the expected recovery.  The measure

1    of recovery for plaintiffs and for the class, if any,

2    would be only a portion of the price paid for a jar.

3    This amount, therefore, is well in line with that

4    outcome.  Therefore, these factors weigh strongly in

5    favor of proving of the settlement.

6           Having weighed all the factors, the Court

7    finds the class settlement is fair, reasonable, and

8    adequate pursuant to Rule 23(e).

9           I will turn to adequacy of notice.

10          A number of objectors have complained about

11   the adequacy of the notice.  The reasonableness of the

12   notice is governed by Rule 23(h).  Like so many

13   aspects of the class action, the touchstone of the

14   question is "reasonableness."  In particular, Rule

15   23(h) requires "that notice of the motion of class

16   counsel for attorneys' fees and non-taxable costs must

17   be directed to class members in a reasonable manner."

18   The rule does not necessarily require such motion to

19   be served on class members but, rather, that it be

20   directed to them in a reasonable manner.

21          As I stated, the Court appointed Rust as class

22   administrator.  Rust published notices in the same

23   publications in which defendant had advertised

24   Nutella.  It published internet banners on popular

25   websites, and set up a settlement website that

Case 3:13-cv-01060-TWG-LHG Document 111-1 Filed 09/18/12 Page 100 of 156 PageID: 2141
Case 3:13-cv-01060-PLW-JEA Document 998-1 Filed 02/24/20 Page 101 of 185 PageID: 2141

100

1   provided important documents for the class,

2   information on how to file a claim or other options

3   available for a class member, such as objecting or

4   opting out of the class, providing answers to

5   frequently asked questions, and contact information

6   for additional questions.  The website received over

7   1 million hits, and the contact number received over

8   1500 calls.  Over 200,000 claims were filed for nearly

9   1 million jars of Nutella.  In addition, the cases

10  received extensive media attention.

11       Based on this, I find that the method of

12  notice was reasonable and comports with the

13  requirements of Rule 23(h).  See In Re: Ravisent

14  Technologies, Inc.: Securities Litigation, approving

15  of notice similar to that provided here over

16  objections.

17       Some objectors complained that not enough

18  information was provided detailing the hours class

19  counsel devoted to the case and the fees they

20  incurred.  While the Court agrees that there was a

21  paucity of information regarding counsel fees, which I

22  will discuss in a bit, that does not affect whether

23  the notice was reasonable.  Although perhaps presented

24  in a cursory fashion, counsel did post the same

25  declarations regarding their fees on the settlement

1   website that were provided to this Court.  McDonough

2   v. Toys-R-Us, Inc., 2011 U.S. Dist. Lexis 150851 (E.D.

3   Penn. December 20, 2011), finding that a failure to

4   post any information regarding class counsel's fees

5   was unfortunate but not fatal.  Notice is not required

6   to be perfect, only adequate.  Rule 23(a) does not

7   require that a notice contain every specific detail

8   related to the settlement.  In re Brokerage Antitrust

9   Litigation (D.N.J. March 30, 2012).

10          The notice here was reasonable and adequate

11  based on the present circumstances.

12          I'm going to turn to attorneys' fees and

13  expenses.

14          All the named plaintiffs' attorneys including

15  class counsel join in the request for an award of

16  attorneys' fees and reimbursement of expenses incurred

17  in this litigation.  The award of attorneys' fees

18  concerns two separate aspects.

19          First, plaintiffs' counsel are requesting 30

20  percent of the gross amount of the monetary settlement

21  plus reasonably incurred expenses of $78,888 to be

22  paid out of the 2.5-million-dollar award to the class.

23          Second, based on the injunctive relief

24  obtained, which plaintiffs described as significant,

25  plaintiffs are requesting an additional award of

1    $3 million.  I will address these separately because

2    each aspect is valued differently, although objectors

3    stress that in combination class counsel are seeking

4    68 percent of the total recovery paid by defendant.

5           The Court understands plaintiffs' argument,

6    that it is only seeking about 30 percent because of

7    the way it values the injunction, and that its fees

8    should be based on that putative value combined with

9    the $2.5 million monetary settlement.  Objectors point

10   out, however, that out of all money defendant is being

11   asked to pay under the settlement, and that is the

12   number, the $5.5 million, they argue which would

13   include the $3 million fee requested, class counsel

14   are seeking over $3.8 million of it, or 68 percent.

15          The Court must analyze the attorney's fee

16   provision under Rule 23(e) in much the same fashion as

17   the settlement itself.  "Attorneys' fees provisions

18   included in proposed class action settlement

19   agreements are, like every other aspect of such

20   agreements, subject to the determination whether the

21   settlement is 'fundamentally fair, adequate, and

22   reasonable.'"

23          The district court has the discretion to amend

24   or modify the award of attorneys' fees.  "The amount

25   of the award of attorneys' fees and expenses is

1    controlled by the Court and is within its sound

2    discretion."  In re Computron Software (D.N.J. 1998),

3    citing In re GMC Pick-Up Truck Litigation, out of the

4    Third Circuit.  "A district court is not bound to the

5    agreement of the parties to the amount of attorneys'

6    fees."

7            Attorneys' fees are typically assessed through

8    the percentage-of-recovery method or through the

9    lodestar method.  The percentage-of-recovery method

10   applies a certain percentage of the settlement fund.

11   See Welch & Forbes, Inc. V. Cendant (3d. 2001).

12           The lodestar method multiplies the number of

13   hours class counsel worked on a case by a reasonable

14   hourly billing rate for such services.  In re AT&T at

15   164.  In common fund cases, such as this one, the

16   percentage-of-recovery method is generally favored

17   because "it allows courts to award fees from the fund

18   'in a manner that rewards counsel for success and

19   penalizes it for failure.'"  In re Corporate

20   Securities Litigation (3d Cir. 2005), quoting In re

21   Lucent Technologies.

22           However, the Third Circuit has recommended

23   that district courts use the lodestar method to

24   cross-check the reasonableness of a percentage-of-

25   recovery fee award.  The cross-check is performed by

1  dividing the proposed fee award by the lodestar

2  calculation resulting in a lodestar multiplier.  When

3  the multiplier is too great, the Court should

4  reconsider its calculation under the percentage-of-

5  recovery method with an eye toward reducing the award.

6  The lodestar cross-check, while useful, should not

7  displace a district court's primary reliance on the

8  percentage-of-recovery method.  In re AT&T at 164.

9          When analyzing a fee award in a common fund

10  case, the Court considers several factors, many of

11  which are similar to the Girsh factors, as I

12  previously described.  See Rite Aid at Note 9.  These

13  include:

14          One, the size of the fund created and the

15  number of persons benefitted;

16          Two, the presence or absence of substantial

17  objections by members of the class to the settlement

18  terms and/or fees requested by counsel;

19          Three, the skill and efficiency of the

20  attorneys involved;

21          Four, the complexity and duration of the

22  litigation;

23          Five, the risk of non-payment;

24          Six, the amount of time devoted to the case by

25  plaintiffs' counsel; and

1          Seventh, the awards in similar cases.

2          The list is not exhaustive.

3          In _Prudential_, the Third Circuit noted three

4     other factors that may be relevant and important to

5     consider:

6          One, the value of benefits accruing to class

7     members attributable to the efforts of class counsel

8     as opposed to the efforts of other groups, such as

9     government agencies conducting investigations;

10          Two, the percentage fee that would have been

11     negotiated had the case been subject to a private

12     contingent fee agreement at the time that counsel was

13     retained; and

14          Three, any innovative terms of settlement.

15          The fee award reasonableness factors "need not

16     be applied in a formulaic way" because each case is

17     different, "and in certain cases one factor may

18     outweigh the rest."  _Rite Aid_ at 301.

19          The Court may give some of these factors less

20     weight in evaluating a fee award.  Moreover, the

21     analysis of the Gunter factors overlaps with the Girsh

22     factors used to assess the appropriateness of the

23     settlement.  In that regard, I will refer to my

24     earlier findings when reviewing this fee application.

25          Let me turn to the lodestar analysis being

1    used as a cross-check.

2           I will address counsel's submissions regarding

3    the time spent and fees spent.  These submissions have

4    been provided to aid the Court in performing a

5    lodestar calculation that is used as a cross-check to

6    confirm the reasonableness of the fee request.

7           At the outset I note that the parties have

8    been litigating this matter for less than a year, and

9    while some discovery has taken place, it does not

10   appear to have been especially extensive.  Two

11   depositions were taken.  Several third-party subpoenas

12   were issued.  Some written discovery was propounded.

13   Experts were hired.  Documents were collected and

14   reviewed.  Plaintiffs note that 53,000 pages of

15   documents were produced.  At first blush, this number

16   might sound significant.  But I must note that in the

17   modern age of electronic discovery, civil class action

18   cases can involve millions of documents, let alone

19   pages.

20          A significant amount of counsel's time was

21   also spent fighting with the proposed intervenors

22   about which venue was most convenient or most

23   appropriate.

24          In addition, the parties participated in an

25   involved mediation process which resulted in this

1  settlement.  Plaintiff's counsel submits these tasks

2  have involved nearly 3,000 hours at a cost of over

3  $1.8 million in fees and costs.

4       Five firms have submitted declarations

5  regarding the hours they have spent on this matter

6  representing plaintiffs, their billing rates, and some

7  brief explanation of their experience.  Based on the

8  declarations attached to plaintiffs' motion for

9  attorneys' fees, plaintiffs' counsel have spent 2,982

10  hours and purportedly generated $1,796,402.75 in fees

11  and $78,888 in costs.

12       Let me just stop for one moment on the costs

13  because there was also some reference there might be

14  additional costs incurred during this process.

15       MR. CECCHI:  I think, given your Honor's

16  ruling as to those costs, we would not seek

17  reimbursement of those costs.

18       THE COURT:  Because I assumed that was with

19  regard to the Johnson matter.

20       MR. CECCHI:  Correct, your Honor.

21       THE COURT:  And I was going to tell you that

22  you would not be permitted to do so.

23       Unfortunately, there is no detail provided

24  with these submissions.  Rather, counsel has submitted

25  spreadsheets showing total hours spent multiplied by

1    individual attorney rates.  The Carella firm's

2    submissions at least divide hours spent based upon the

3    type of litigation or representation, such as

4    pleadings, motion practice, discovery, et cetera, but

5    that is as much detail as is afforded to the Court.

6    None of the other firms have gone that far.

7            I have no means by which to gauge if the time

8    was reasonable, if the time was spent working on

9    successful billable matters, whether the time was

10   duplicative of other counsel's work, nor am I

11   convinced that the charged rates are all necessarily

12   reasonable.

13           I've already had this during my argument with

14   counsel.  I noted the declaration of Mr. Davis that

15   said he and his partner, Dan Taliaferro, are attorneys

16   in Alabama and charged $700 per hour, which he claims

17   to be well within the market rate.  I had questioned

18   whether that was truly the market rate in Alabama.

19   Mr. Davis noted in court today, because he has

20   provided no information that would corroborate that

21   statement about the Alabama area, but he said that

22   essentially it is what he charges in similar types of

23   contingent fee cases, but there would be a lesser

24   amount if it were at a different hourly rate.

25           I also questioned the hours.  Mr. Davis said

1  he and his partner spent 700 hours to "zealously

2  assist" in this matter by "investigating, research,

3  drafting pleadings, editing pleadings, discovery,

4  taking depositions, management of office staff."  His

5  declaration at paragraph 5.

6       While Mr. Davis assisted in filing the Glover

7  complaint and perhaps assisted in some motion

8  practice, I note that his firm was not appointed as

9  class counsel; and if, indeed, Mr. Davis spent nearly

10  700 hours on this matter doing all the activities he

11  suggests, I'm not sure how much was left over for the

12  other attorneys to do.  Yet, Scott & Scott, with whom

13  Mr. Davis worked, says it spent nearly 1,780 hours on

14  many of the same tasks, and that's the Mr. Guglielmo

15  declaration.

16       It would appear to this Court that a

17  significant number of hours are potentially

18  duplicative.  But based on the paucity of information

19  provided, I cannot determine the reasonableness of

20  these accrued fees with any sense of accuracy.  This

21  is not to say counsel are required to provide the

22  Court full details of every 10th of an hour spent on a

23  case, but here, where there are five firms and each is

24  claiming a significant amount of time has been spent

25  on a relatively straightforward matter that was

settled in less than one year after commencing the
case and before defendant had answered or had its
motion to dismiss ruled on, or even before a
consolidated amended class action complaint had been
filed, significantly more information would need to be
provided before the Court can say with any certainty
that the lodestar calculation is reasonable.

Based on that, I do not find counsel's
submissions helpful in calculating a lodestar amount
other than to set the ceiling on the fees that the
attorneys accumulated.

Now I turn to the first aspect of the
attorney's fee request, which is the reasonableness of
the request for 30 percent of the $2.5 million
monetary settlement.

Although there is no general rule, the Third
Circuit has observed that fee awards in common fund
cases range from 19 percent to 45 percent of the
settlement fund.  Generally, a third is on the high
end of what counsel is able to recover, and some
courts have found that a reasonable fee award is
generally to be around 25 percent of the fund.

Without even considering what plaintiffs are
asking for, based on the injunctive relief, a 30
percent recovery by itself is significant.  Class

1   counsel are both firms of national repute and, by all

2   measures, did an excellent job in representing their

3   clients and received a fair and reasonable settlement,

4   and perhaps even generous settlement, considering the

5   risks and merits or lack thereof of the case.  That

6   does not, however, justify the high percentage award

7   in this case for the reasons I've already discussed.

8       This was not a complex case.  The case took

9   less than a year from when it was filed to when it was

10  settled.  Only a small measure of discovery was

11  performed relative to other large-scale civil

12  litigation class actions.  Much of the time was spent

13  between class counsel in this matter and counsel in

14  the California action squabbling about where the case

15  should be brought.  The case never proceeded beyond

16  the early stages of litigation.

17      While defendant's motion for dismissal under

18  Rule 12(b)(6) was fully briefed, it was terminated

19  after the case was consolidated, and class counsel was

20  given leave to file a consolidated complaint, which

21  was never done because of settlement tasks.  Against

22  this backdrop, I will analyze the factors.

23      Starting with the size of the fund created and

24  the number of persons benefitted.

25      As the Court has already noted, claims for

1   over 900,000 jars of Nutella were filed at the end of

2   June, and the class was set to close on July 5, 2012.

3   Counsel seeks to recover 30 percent of the gross fund

4   in fees in addition to $78,888 in costs leaving, a

5   remaining balance of $1,587,000.

6         Claims for nearly a million jars had been

7   filed within a week remaining before the claim period

8   closed.

9         The parties initially agreed the class should

10  receive up to $4 per jar; yet, after counsel's fees

11  and costs, it would leave the class approximately

12  41.60 per jar.  Plaintiffs theorize that after all

13  claims are filed and additional costs and interest are

14  taken, the class will receive approximately $1.30 per

15  jar.  While this might represent a fair payout for the

16  class, based upon the allegations and the chance of

17  recovery, it is significantly less than what may have

18  been anticipated or bargained for in the settlement.

19        Furthermore, the junction purportedly protects

20  against future harms by addressing plaintiffs'

21  allegations as to misleading marketing and labeling.

22  In that sense, the number of people potentially

23  benefitted is large.  But as I will discuss in a few

24  moments, the Court is suspect about the overall

25  benefit of the injunctive relief, and it does not

1  directly redress any harm allegedly suffered by the

2  class itself.  Therefore, it does not affect the

3  number of class members benefitted.

4       Thus, I find that this factor would support a

5  reduction in the amount of fees.

6       Looking at the presence or absence of

7  objections.

8       As I've already indicated, there are a number

9  of objections.  Plaintiffs asked the Court for

10  additional pages in its briefing because of the extent

11  of the objections.  Both parties note that many of the

12  objections are directed not at the monetary settlement

13  itself but at the amount of fees the attorneys are

14  seeking.  Those same objections will be discussed by

15  this Court in a moment with regard to the injunctive

16  relief.

17       In this regard, the presence of some

18  meaningful objections is probative in determining the

19  appropriate fee.  See Rite Aid and In re AT&T.

20       Turning to the skill of class counsel.

21       To measure the quality of counsel, courts must

22  examine the result achieved, the difficulties faced,

23  and the speed and efficiency of the recovery, the

24  experience and expertise of counsel, and the

25  performance and quality of opposing counsel.  Milliron

1  v. AT&T (D.N.J. 2009).

2          In this case class counsel negotiated a

3  valuable settlement within a reasonable amount of time

4  since the start of the litigation.  Because of their

5  timely efforts, the class will benefit more.  Had this

6  case proceeded further, it would result in a greater

7  expenditure of fees and costs and perhaps an eventual

8  dismissal.

9          The Court finds that this factor weighs in

10  favor of approving a significant award of attorneys'

11  fees but not necessarily the amount that class counsel

12  seeks.

13          Turning to complexity and duration and

14  duration of litigation.

15          I analyzed that with the Girsh factors.  The

16  claims against Ferrero were not complex.  Without

17  reciting of the Court's previous findings on this

18  issue, the Court, nonetheless, finds that by

19  successfully negotiating a settlement and with

20  excellent counsel representing Ferrero, the class

21  counsel provided the class with a benefit at this

22  juncture.  But because of the circumstances already

23  discussed, such as the early stage at which the

24  litigation was settled, the relatively small amount of

25  substantive work required of and performed by counsel,

115

1  this factor weighs in favor of approving a reduced

2  amount of attorneys' fees.

3       Turning to the risk of nonpayment.

4       With regard to non-payment, there is no

5  dispute that Ferrero is in good financial standing and

6  could withstand a sizeable judgment.  Thus, that

7  factor is neutral.

8       Turning to the amount of time devoted to the

9  litigation.

10       Class counsel say that they have devoted

11  significant time to this litigation, nearly 3,000

12  hours.  As I have already commented, the Court

13  questions how so many hours could have been spent by

14  so many firms on a case that was not yet a year old

15  when it settled and had yet to proceed past the

16  nascent stages of litigation.  Still, counsel

17  undoubtedly spent a significant amount of time

18  litigating and did so on a contingency basis, and

19  without any guarantee of success or award, yet managed

20  to negotiate a very favorable settlement that will

21  benefit the class members.

22       The Court concludes that these efforts,

23  although, I think, overstated by counsel, weigh in

24  favor of a reduced but significant fee award.

25       Turning to awards in similar cases.

1    The comparison of the fees sought by class

2    counsel with fees awarded in recent class actions

3    militates in favor of reducing the requested 30

4    percent fee.  As I have discussed, courts have broad

5    discretion in reviewing attorneys' fee awards, and the

6    award of 30 percent is generally a sizeable award with

7    25 percent being a more typical result in a case such

8    as this.  Because of the factors and analysis I have

9    already undergone, the Court finds that the percentage

10   of the fund attorneys' fees should be reduced from 30

11   percent to 25 percent.

12   Based on the posture of the case, the time

13   when the case was filed to settlement, the relatively

14   few substantive issues involved, the Court exercises

15   its discretion and thus reduces the recovery from 30

16   percent of the common fund of $2.5 million of the

17   gross amount to the 25 percent which yields a fee of

18   $625,000.

19   Turning next to how I should value the

20   injunctive relief.

21   I find that it should be assessed based on the

22   common benefit it confers on the members of the class.

23   "The key consideration in determining a fee award is

24   reasonableness in light of the benefit actually

25   conferred."  The Court must be cautious in awarding

1   value to an injunction.  "Precisely because the value

2   of injunctive relief is difficult to quantify, its

3   value is also easily manipulable by overreaching

4   lawyers seeking to increase the value assigned to a

5   common fund."  McCoy v. Health Net, Inc. (D.N.J.

6   2008).

7           In McCoy, the court approved counsel's

8   valuation finding that the injunction imposed a "14.5

9   percent increase to the allowable amount paid by

10  defendant health insurance company which bestowed a

11  sizeable financial benefit."  But courts have reduced

12  or denied approved attorneys' fees where there is a

13  minimal benefit to the class because of the injunction

14  or it has dubious value.

15          In Schwartz v. Dallas Cowboys Football Club

16  out of the Eastern District of Pennsylvania, the

17  district court found that the valuation of the

18  injunctive relief was too high and the value conferred

19  was too low to either approve the settlement or the

20  high amount of attorneys' fees sought by plaintiff's

21  counsel.

22          In In re HP Inkjet, the settlement agreement

23  was valued at $1.5 million, combining the value of

24  nontransferable credits and the injunctive relief.

25  That was out of the Northern District of California, a

1  2011 case.  Counsel sought approximately $2.3 million

2  along with $600,000 in costs.  The Court reasoned that

3  "the extent to which an attorney's fee award exceeds

4  the value of the settlement to the class is

5  problematic."  The Court went on stating that "To

6  allow the award of attorneys' fees to outstrip the

7  benefit to consumers in such cases would undermine the

8  importance of focusing the efforts of class action

9  counsel on issues that most affect consumers."  The

10  Court granted a reduced fee award to class counsel in

11  that case.

12          As I ruled before, I have struck the Johnson

13  report offered by plaintiffs' counsel.  Therefore,

14  there is nothing in the record to support class

15  counsel's valuation of the injunction.  Nevertheless,

16  plaintiffs' counsel argued that the injunction is

17  worth a substantial amount because it forces defendant

18  to spend millions on redesigning their label and

19  advertising campaign.  But that is not the way to

20  measure the injunction.

21          As I said before, an injunction should be

22  valued based on what value it provides to the class

23  and not what cost it imposed on the defendant.  The

24  injunctive relief does not provide the class with as

25  substantial a benefit as class counsel suggests.  The

1   class is defined as individuals who have already

2   purchased Nutella, allegedly have been harmed by it,

3   and now know of any potential deception related to the

4   nutritional value of Nutella.  Therefore, relatively

5   little value can be derived by the class based on

6   defendant's future action.

7           Further, even if I were to consider the costs

8   to defendant, they are likely much less than

9   plaintiffs suggest.  Certainly, defendant must incur

10  costs in creating new labels, halting its ad campaign,

11  and creating new marketing.  But the changes to the

12  Nutella's marketing are generally minor, and the

13  injunctive relief does not require defendant to

14  replace products already on store shelves.

15          Therefore, there are no replacement costs to

16  factor in.  Defendant would still need to place labels

17  on future Nutella products with or without the

18  injunction, and several of the objectors have raised

19  this point as well.

20          Additionally, while it will cost defendant to

21  rework their advertising campaign, there is nothing to

22  suggest this would not have happened without the

23  injunction.  Defendant has experienced successful

24  product growth based on advertising, and it is very

25  likely that defendant would have intended to continue

120

1  advertising.  But companies continually revamp their

2  advertising, particularly television commercials, and

3  there is nothing to suggest that defendant would not

4  have incurred this cost or a similar cost but for the

5  injunction.

6      This, however, does not mean that there is no

7  value to the injunction, only that I find it has been

8  significantly overvalued by class counsel.  A number

9  of the objectors argue that even going forward, the

10  injunction does very little because individuals have

11  no more reason to be deceived now than they did

12  previously.

13      For example, defendant agreed to put

14  ingredient information, fat and sugar content,

15  et cetera, on the front of the label even if such

16  information is already on the back.  Objectors say

17  that if an individual were concerned about this

18  information, then she would have known to check the

19  label, and the injunction therefore provides little

20  practical effect.  But these arguments also go to the

21  merits of the litigation itself and whether Nutella

22  was actually marketed fraudulently or not.

23      Assuming the merits of the claims, defendant

24  has agreed to change its label, although it does not

25  have to replace products currently on the shelf.  It

121

1   has agreed to stop airing potentially misleading

2   advertisements, and to provide more information

3   regarding the product's sugar and fat content.  These

4   address the primary concerns raised by plaintiffs in

5   their complaints.

6        To the extent anyone was deceived by the

7   earlier marketing, there is less chance that will

8   occur in the future as a result of the injunction.

9        Some objectors also complain that class

10  counsel will only have advisory input into the new

11  advertising campaign.  To some extent, this objection

12  is moot as defendant and plaintiffs have agreed to the

13  language to be used.

14       Also, the class received some benefit from the

15  injunction because it goes to the harms alleged in

16  plaintiffs' complaints.  Plaintiffs not only sought

17  monetary redress but also to prevent future harm and

18  fraud.  The injunction helps to achieve that goal even

19  if the risk was slight to begin with.  Therefore, the

20  class receives some benefit although significantly

21  less that what plaintiffs estimate.

22       Because I find that the injunction has some

23  value, but that it is significantly below class

24  counsel's assessment and not ascertainable based upon

25  the submissions made, I will award a fee for the

122

1    injunctive relief but in an amount substantially less

2    than what has been requested.

3         Considering class counsel's combined two fees,

4    one based on the injunctive relief and the other from

5    the common fund, convinces me further that a

6    significant reduction in the counsel fees requested is

7    appropriate.  A recent case from the Ninth circuit is

8    instructive although not binding.  A number of

9    objectors cite to this opinion.  In In re Bluetooth

10   the court vacated the district court's approval of a

11   settlement agreement that awarded the class $100,000

12   but set aside about $800,000 for class counsel.

13        The Court shared a concern that other courts

14   have expressed, "warning that 'private agreements to

15   structure artificially separate fee and settlement

16   agreements' should not enable parties to circumvent

17   the 25 percent benchmark requirement."  That's from

18   In re Bluetooth quoting In re General Motors Corp

19   (3d Cir. 1995).

20        "Even when technically funded separate, the

21   class recovery and the agreement on attorneys' fees

22   should be viewed as a 'package deal.'"  That decision

23   focused on whether there was the appearance of

24   collusion between the parties, which I do not find is

25   an issue here, but the case is still instructive.

1        Class counsel is receiving a significant

2    amount of fees but in an amount that more accurately

3    reflects the work and time involved and the value of

4    the injunction.

5        I am going to award for the injunctive relief

6    a fee in the amount of $500,000.

7        Finally, in recognition of their services to

8    the class, each named plaintiff is entitled to a

9    payment.  $2,000 has been requested for each of those

10   named plaintiffs under of the terms of the settlement.

11   Courts routinely approve awards to compensate named

12   plaintiffs for the service they provide and risk

13   incurred during the course of the litigation.

14       Plaintiffs request $2,000, and I find the only

15   one objecting to that was Mr. Andrews, but I do find

16   it is reasonable.  I will award the $2,000.

17       I'm going to go through each of the objections

18   separately even though they have been largely

19   incorporated in my comments.

20       First addressing the Attorney General of

21   Texas.

22       Assistant Attorney General Jim B. Cloudt has

23   lodged an objection on behalf of the state of Texas

24   through the Attorney General of Texas and based on the

25   fact that the certified class includes Texas

1   residents.  Mr. Cloudt does not oppose the monetary

2   settlement itself but, rather, the efficacy of the

3   proposed injunctive relief and the size of the

4   injunctive fee award.

5          I have already dealt with those concerns in

6   this opinion and, therefore, I think I do not need to

7   make any further comment about it.

8          Mr. Greenberg raises a number of points in his

9   objection.  Sylvia Bader has joined in Mr. Greenberg's

10  objection.  Primarily, Mr. Greenberg objects on the

11  grounds that the settlement unfairly overcompensates

12  class counsel and perhaps to the detriment of the

13  class.  He argues, first, that the benefits in the

14  injunction are illusory, and counsel cannot sustain

15  its argument that should be valued at 3 million.  He

16  does not argue, unlike the other objectors, that the

17  monetary settlement did not achieve enough for the

18  class.  He is willing to forego any recovery for his

19  purchase and asserts he objects only on the principle

20  that class counsel should not receive the lion's share

21  of the recovery.

22         I had, to some extent, already agreed with

23  that and reduced both a percentage of the recovery

24  from the monetary settlement as well as significantly

25  reduced the injunctive fee award.  I do not agree with

1   Mr. Greenberg that there is no benefit to the class

2   based on the injunction, as I've already indicated.

3          Amy Ades lodged an objection through her

4   counsel.  She is a named plaintiff in another consumer

5   fraud action against Nutella out of the Southern

6   District of New York.  Mr. Levy appeared here today on

7   her behalf.  She objects:  The settlement is

8   inadequate, the notice was defective, the fee requests

9   are excessive.  And, frankly, it's only as to the last

10  point that I have had some agreement.  The settlement

11  is fair, reasonable, and adequate.

12         As I have explained, plaintiffs did not have

13  an easy case, and Ms. Ades would have likely faced

14  many of the same difficulties as her New York action.

15  It is not clear if plaintiffs could establish any of

16  the elements of the consumer fraud claim or their

17  related breach of warranty claims.  And if they had,

18  they would have only been able to recover a portion of

19  the purchase price.  This is what Ms. Ades would be

20  allowed to recover under the settlement.  She was, of

21  course, free to exclude herself from the class.

22         And I also find, as I've already stated, that

23  notice was adequate, and I will not repeat my findings

24  there.

25         Robert Falkner and Christine Streeter, through

1  their counsel, have lodged an objection.  They object

2  to the extent of the attorneys' fees and believe more

3  should have been given to the class, and, in

4  particular, object to the extent of the injunctive fee

5  award.  I have already made my findings in that regard

6  and incorporated them into my findings here as well as

7  the arguments being made with regard to combining the

8  injunctive fee with the monitor settlement award.

9         Also, there was an objection with regard to

10  the cy-près provision, which is moot.

11         The Sibley objectors -- Katie Sibley, Daniel

12  Sibley, Gary Sibley, Sherri Johnson, Janis Johnson,

13  and Jenny Iriarte -- are from Texas, and they have

14  filed very similar or really identical papers;

15  collectively, the Sibley objectors.  Gary Sibley is an

16  attorney at the Sibley firm and filed a more formal

17  objection.  These objections are being discussed as a

18  group as they appear to be related both in form and in

19  addition to some of the objectors appearing to be

20  familially related.

21         First, the objectors complained about the

22  cy-près provision.  That is moot.

23         Next, they complained about the size of the

24  monetary settlement fund and the amount of attorneys'

25  fees.  I've already dealt with those concerns as well

1   as what could have been recovered here both based on

2   the risks of liability and damages, and that only a

3   portion of the amount paid for Nutella could have been

4   recovered, and that is what has been achieved.

5        Chris Hampe objects to the settlement because

6   he believes the common fund attorneys' fees in

7   combination with the injunctive fee award is grossly

8   excessive.  I've already dealt with that.

9        The Bochenek objectors -- Agatha Bochenek,

10  Brandon Goodman, and Edward Hagele -- have lodged an

11  objection through counsel.  At the outset, I note that

12  when we entered court, none of them attested to being

13  part of the class.  A representation was made here

14  today by Mr. Langone that they now have declarations

15  stating that they are.  They would have had no

16  standing or basis to object.

17       They complained about the information provided

18  regarding the fee request or time records.  As I have

19  noted, class counsel has provided submissions with

20  little detail; and while I had concerns about that,

21  that really goes to the lodestar which is a potential

22  cross-check against reasonableness and did not have a

23  bearing on my final analysis.

24       They also complained about collusion between

25  the parties.  This settlement, as have I stated now

1  numerous times, was reached during a mediation before

2  former District Judge Politan, and there is no reason

3  to believe that any collusion occurred under the

4  careful scrutiny of that well-respected jurist.

5        They also complained of the notice of the

6  settlement and the fee request.  I've dealt with these

7  as well.  I think there is also as well, then, nothing

8  new in their objections that need to be separately

9  addressed.

10        Let me address Chris Andrews, who is not here.

11  Chris Andrews filed a 100-page objection.  The Court

12  finds Mr. Andrews, no surprise to anyone, appears to

13  be a professional objector who has extorted additional

14  fees from counsel in other cases through his

15  objections or threats to object, and has as well based

16  upon a submission made to this Court done so in this

17  case.

18        In his objections he states that he has spent

19  140 hours investigating this case and expects to be

20  paid more than $25,000 because class counsel failed to

21  perform their job.  On page 84 of his objection, he

22  states:  "If I don't get paid, I will appeal and make

23  new case law or have a new law written."

24        Mr. Andrews is certainly within his rights to

25  pursue an appeal if he is not satisfied with the

1   results.  He had an opportunity to opt out and pursue

2   his own litigation, but he is not entitled to extort

3   money.  I reviewed his entire objection and find it

4   wanting.  Large parts of his brief are plagiarized

5   from those of other objectors, such as Mr. Greenberg,

6   or appeared to be copied from websites.  The points he

7   does make are better made by other objectors, are

8   concerns the Court had without the benefit of

9   Mr. Andrews' briefing, or are entirely without merit.

10  Much of his objection involves trying to determine

11  Nutella's full sales figures from online research and

12  sifting through court documents.

13        Mr. Andrews believes he or the class is

14  entitled to a significant share of defendant's

15  revenues.

16        He also wants a 10 percent finder's fee for

17  any increase in the class fund.  There is no legal

18  basis for the argument about receiving a share of the

19  defendant's revenue.

20        Recovery, if any, would have only been a

21  portion of the price paid for the Nutella.  He stated

22  he bought one 26-ounce jar of Nutella.  The settlement

23  will allow him to recover a portion of the purchase

24  price which is precisely what he would have recovered

25  had he brought his case individually.

1              He is not entitled to the defendant's profit.

2              All his arguments are without merit.

3              That concludes my findings.

4              I'll need an order.

5              MR. CECCHI:  We will provide an order, your

6       Honor.

7              I just wanted to note, particularly on that

8       last point, although Mr. Andrews did not come today,

9       we received additional emails, which I would like to

10      make part of the record in the event that Mr. Andrews

11      brings the matter up to our brother on the Third

12      Circuit.  We got some this morning.

13             THE COURT:  Because I had one last week that

14      came to you that was provided to me.

15             MR. CECCHI:  Correct.  We got one this morning

16      that was of the same tenor.  So I would like to make

17      that part of the record.

18             The other thing I would like to say is, first,

19      I think on behalf of plaintiffs' counsel, and, I know,

20      defendant's counsel, we appreciate the effort your

21      Honor put into this matter.  There were a lot of

22      procedural motions and other filings that your Honor

23      had to deal with -- this was not today's hearing --

24      deal with, all these objections.  I know it's not

25      easy, and we wanted to thank your Honor for the effort

131

1    you put in.

2         I also wanted to note that although in some

3    aspects we had a different view, it was an excellent

4    opinion, and I'm going to get the transcript and use

5    it in the future on some of the issues your Honor

6    addressed, and so we thank you for your effort.

7         THE COURT:  Let me say, and I said it

8    throughout the opinion, because this is my last

9    opportunity to speak on this and because we do have

10   counsel for some of the objectors present here, as

11   well as one of the objectors himself, that this really

12   was an excellent result understanding what this case

13   was about.  Let there be no mistake about it.  Perhaps

14   I'll just leave it at that.

15        MR. CECCHI:  We appreciate that, your Honor,

16   because we felt the same way.

17        Thank you.

18        MR. EGGLETON:  Thank you very much, your

19   Honor.

20        THE CLERK:  All rise.

21        (Proceedings concluded.)

22   ///

23

24

25

**C E R T I F I C A T I O N**

        PURSUANT TO SECTION 753, TITLE 28, USC, THE
FOLLOWING TRANSCRIPT IS CERTIFIED TO BE AN ACCURATE
TRANSCRIPTION OF MY STENOGRAPHIC NOTES IN THE
ABOVE-ENTITLED MATTER.




                         _____
                         VINCENT RUSSONIELLO, CCR
                         OFFICIAL U.S. COURT REPORTER

133

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **C E R T I F I C A T E**

2

3      I, **Vincent Russoniello**, Official United States

4   Court Reporter and Certified Shorthand Reporter of the

5   State of New Jersey, do hereby certify that the

6   foregoing is a true and accurate transcript of the

7   proceedings as taken stenographically by and before me

8   at the time, place and on the date hereinbefore set

9   forth.

10      I do further certify that I am neither a relative

11   nor employee nor attorney nor counsel of any of the

12   parties to this action, and that I am neither a

13   relative nor employee of such attorney or counsel and

14   that I am not financially interested in this action.

15

16

17

18

19

20

21      S/Vincent Russoniello
        Vincent Russoniello, C.S.R.
22      Certificate No. 675
        Date:  July 17, 2012
23

## $

**$1,587,000** [1] - 112:5
**$1,796,402.75** [1] - 107:10
**$1.30** [1] - 112:14
**$1.35** [1] - 98:24
**$10,000** [1] - 19:24
**$100,000** [1] - 122:11
**$2,000** [3] - 123:9, 123:14, 123:16
**$2,500,000** [1] - 68:21
**$20** [1] - 69:1
**$25,000** [1] - 128:20
**$41** [1] - 8:23
**$500** [3] - 16:14, 18:8, 18:10
**$500,000** [1] - 123:6
**$550** [1] - 17:4
**$600,000** [1] - 118:2
**$625,000** [1] - 116:18
**$635** [1] - 19:8
**$650** [1] - 16:14
**$700** [2] - 17:24, 108:16
**$750** [1] - 17:2
**$78,888** [3] - 101:21, 107:11, 112:4
**$800,000** [1] - 122:12

## '

**'ascertainable'** [1] - 98:14
**'fundamentally** [1] - 102:21
**'in** [1] - 103:18
**'package** [1] - 122:22
**'private** [1] - 122:14
**'questions'** [1] - 77:17
**'settlement** [2] - 74:22, 97:14
**'sufficient** [1] - 73:20

## 0

**08608** [1] - 1:10

## 1

**1** [8] - 8:20, 23:5, 50:24, 68:8, 71:14, 76:7, 100:7, 100:9
**1,780** [1] - 109:13
**1.3** [2] - 22:20, 23:1
**1.5** [1] - 117:23
**1.8** [2] - 55:19, 107:3
**1/2** [1] - 61:25
**10** [8] - 14:2, 14:10, 23:3, 30:19, 67:22, 71:16, 77:19, 129:16
**100** [3] - 29:21, 30:22, 92:17
**100-page** [1] - 128:11
**10th** [1] - 109:22
**11** [2] - 9:22, 65:12
**11-1086** [1] - 1:2
**12(b)(6** [1] - 111:18

**12(b)(6)** [1] - 66:16
**13** [3] - 4:6, 4:6, 70:5
**13,629** [1] - 13:7
**1301** [1] - 93:7
**1304** [1] - 34:14
**1374** [1] - 66:1
**138** [1] - 1:25
**14** [1] - 46:17
**14.5** [1] - 117:8
**140** [1] - 128:19
**1407** [2] - 65:19, 66:7
**15** [1] - 46:17
**1500** [1] - 100:8
**150851** [1] - 101:2
**153** [1] - 75:19
**16** [2] - 4:8, 80:19
**164** [2] - 103:15, 104:8
**165** [1] - 49:17
**169** [1] - 78:1
**16th** [1] - 70:10
**17** [2] - 91:16, 134:22
**170** [2] - 11:25, 97:20
**18** [3] - 4:8, 4:9, 4:9
**184** [1] - 79:17
**187** [1] - 80:10
**19** [2] - 4:9, 110:18
**1975** [1] - 75:20
**1986** [1] - 79:12
**1986)** [1] - 77:22
**1988** [1] - 78:1
**1990)** [1] - 92:12
**1993)** [1] - 87:24
**1994)** [1] - 77:13
**1995)** [3] - 87:13, 87:17, 122:19
**1997** [1] - 85:6
**1998** [2] - 73:17, 103:2

## 2

**2** [4] - 9:22, 34:14, 50:25, 66:9
**2,982** [1] - 107:9
**2.3** [1] - 118:1
**2.5** [13] - 22:13, 22:20, 22:23, 22:24, 23:3, 23:11, 40:8, 50:17, 55:24, 56:2, 102:9, 110:14, 116:16
**2.5-million-dollar** [2] - 27:12, 101:22
**20** [5] - 4:10, 29:16, 30:21, 67:16, 101:3
**200** [1] - 24:3
**200,000** [3] - 71:16, 77:3, 100:8
**2000** [1] - 77:12
**2001** [2] - 76:22, 77:21
**2001)** [2] - 79:5, 103:11
**2004)** [2] - 76:3, 76:16

**2005** [1] - 103:20
**2007** [1] - 16:17
**2008** [4] - 8:10, 45:19, 68:8, 76:7
**2008)** [2] - 98:11, 117:6
**2009)** [1] - 114:1
**2010** [1] - 80:19
**2010)** [1] - 76:23
**2011** [15] - 64:19, 65:12, 65:24, 66:9, 66:18, 66:21, 67:1, 67:11, 67:16, 72:21, 85:1, 93:20, 101:2, 101:3, 118:1
**2011)** [1] - 98:18
**2012** [14] - 1:5, 11:25, 45:20, 67:22, 68:9, 70:10, 70:11, 70:12, 71:19, 72:22, 76:7, 112:2, 134:22
**2012)** [1] - 101:9
**2014)** [1] - 81:14
**208,000** [2] - 13:18, 29:14
**208,248** [1] - 13:9
**21** [1] - 4:11
**2248** [1] - 65:22
**23** [10] - 4:12, 24:5, 53:1, 64:3, 66:21, 73:3, 74:25, 75:4, 75:7, 75:9
**23(a** [12] - 72:18, 73:9, 73:14, 73:18, 73:24, 74:10, 74:11, 76:21, 81:1, 83:8, 96:7, 101:6
**23(a)** [1] - 76:11
**23(a)'s** [1] - 80:15
**23(a)(2)** [1] - 77:18
**23(a)(3** [1] - 79:6
**23(a)(3)** [1] - 79:8
**23(a)(4)** [1] - 80:6
**23(a)is** [1] - 80:2
**23(b** [2] - 74:13, 74:16
**23(b)** [1] - 74:15
**23(b)(2** [1] - 56:4
**23(b)(3** [2] - 74:22, 84:18
**23(b)(3)** [1] - 83:8
**23(e** [5] - 73:8, 87:7, 88:1, 88:5, 102:16
**23(e)** [4] - 72:20, 73:15, 87:6, 99:8
**23(e)(1)(A** [1] - 88:4
**23(e)(2** [1] - 75:14
**23(h** [1] - 99:15
**23(h)** [3] - 64:5, 99:12, 100:13
**231** [1] - 88:4
**233** [1] - 90:5
**235** [2] - 92:4, 93:2
**237** [1] - 94:9
**239** [2] - 94:9, 96:11
**23rd** [2] - 13:3, 72:22
**24/7** [1] - 70:17

**240** [2] - 96:19, 97:4
**25** [5] - 110:22, 116:7, 116:11, 116:17, 122:17
**25185** [1] - 72:22
**253,413** [1] - 13:4
**257** [1] - 74:14
**258** [1] - 75:5
**26** [1] - 66:18
**26-ounce** [1] - 129:22
**264** [1] - 88:4
**27th** [1] - 64:19
**28** [5] - 3:9, 4:9, 65:18, 65:24, 132:6
**281** [1] - 92:14
**29** [2] - 71:18, 92:13
**29th** [1] - 13:6
**2d** [2] - 66:1, 98:17

## 3

**3** [13] - 9:1, 40:7, 40:20, 50:25, 55:20, 56:14, 61:25, 68:9, 71:19, 76:7, 102:1, 102:13, 124:15
**3,000** [2] - 107:2, 115:11
**3-million-dollar** [1] - 40:25
**3.8** [1] - 102:14
**30** [10] - 101:9, 101:19, 102:6, 110:14, 110:24, 112:3, 116:3, 116:6, 116:10, 116:15
**30,000** [1] - 92:17
**301** [1] - 105:18
**307** [1] - 76:15
**31** [1] - 11:25
**316** [1] - 84:4
**317** [1] - 88:22
**33** [2] - 4:13, 84:4
**37** [3] - 4:14, 29:15, 30:21
**3839** [1] - 72:22
**3d** [2] - 72:22, 73:17, 75:19, 76:3, 76:21, 77:12, 77:13, 77:21, 78:1, 79:5, 79:12, 80:19, 81:13, 85:6, 87:12, 87:17, 87:24, 92:12, 103:11, 103:20, 122:19

## 4

**4** [4] - 68:25, 71:17, 97:24, 112:10
**40** [2] - 42:18, 76:20
**402** [1] - 1:10
**41** [2] - 4:14, 85:2
**41.60** [1] - 112:12
**44** [2] - 4:15, 85:11
**45** [1] - 110:18

## 5

**5** [4] - 23:4, 30:19, 109:5, 112:2
**5.5** [1] - 102:12
**5.5-million-dollar** [1] - 40:10
**50** [1] - 4:14
**50,000** [1] - 93:15
**515** [1] - 49:17
**521** [1] - 75:19
**53,000** [1] - 106:14
**532** [1] - 84:4
**535** [1] - 87:16
**537** [1] - 94:5
**55** [1] - 4:14
**558** [1] - 97:12
**57** [2] - 4:15, 4:16

## 6

**6** [1] - 67:1
**609)588-9516** [1] - 1:25
**618** [1] - 74:21
**623** [1] - 88:5
**625** [2] - 80:14, 85:25
**63** [1] - 4:17
**633** [1] - 76:15
**675** [1] - 134:22
**68** [2] - 102:4, 102:14
**681** [1] - 11:25
**6th** [1] - 7:9

## 7

**7** [1] - 4:4
**7/6** [1] - 4:4
**700** [2] - 109:1, 109:10
**74,000** [1] - 13:20
**753** [2] - 3:9, 132:6
**782** [1] - 98:17

## 8

**804** [1] - 66:1
**805** [1] - 88:16
**84** [2] - 98:17, 128:21
**846** [1] - 78:1
**889** [1] - 93:6

## 9

**9** [4] - 1:5, 8:21, 67:11, 104:12
**900,000** [1] - 112:1
**962,137** [1] - 71:17
**99** [1] - 98:17

## A

**abide** [1] - 7:25

**ability** [4] - 89:14, 96:14, 96:21, 96:23
**able** [5] - 17:1, 30:16, 88:9, 110:20, 125:18
**ABOVE** [2] - 3:12, 132:8
**ABOVE-ENTITLED** [2] - 3:12, 132:8
**Abraham** [1] - 76:21
**absence** [2] - 104:16, 113:6
**absent** [3] - 73:20, 81:11, 87:9
**absentees** [2] - 73:4, 79:12
**absolutely** [2] - 60:1, 61:6
**abuse** [1] - 12:7
**accept** [4] - 38:6, 60:19, 61:15, 87:9
**access** [1] - 58:19
**accomplished** [2] - 61:14, 92:23
**accordingly** [8] - 75:5, 83:3, 85:21, 87:22, 91:7, 95:21, 96:12, 97:5
**accrued** [2] - 71:12, 109:20
**accruing** [1] - 105:6
**accumulated** [1] - 110:11
**accuracy** [1] - 109:20
**accurate** [1] - 134:6
**ACCURATE** [2] - 3:10, 132:7
**accurately** [1] - 123:2
**achieve** [5] - 55:12, 84:13, 84:24, 121:18, 124:17
**achieved** [7] - 8:8, 20:18, 25:17, 25:18, 62:15, 113:22, 127:4
**Act** [9] - 31:9, 43:7, 48:4, 51:9, 51:12, 51:19, 59:11, 59:20, 64:22
**action** [52] - 6:13, 13:19, 13:21, 14:2, 22:3, 22:4, 22:15, 45:22, 52:13, 52:15, 63:13, 64:19, 64:24, 65:14, 65:15, 66:10, 66:13, 68:2, 74:12, 74:19, 75:9, 76:11, 76:14, 76:18, 81:24, 82:1, 83:9, 83:24, 84:2, 84:8, 84:16, 84:23, 85:14, 87:25, 88:8, 88:25, 89:12, 89:23, 92:11, 94:7, 96:4, 99:13, 102:18, 106:17, 110:4, 111:14, 118:8, 119:6, 125:5, 125:14, 134:12, 134:14
**ACTION** [1] - 1:2
**Actions** [1] - 73:17
**actions** [17] - 16:1, 22:18, 29:2, 65:22, 66:2, 67:14, 68:13, 68:14, 81:16, 83:16, 84:7, 87:15, 87:16, 87:19, 111:12, 116:2
**activities** [2] - 65:21, 109:10

**acts** [2] - 79:9, 87:7
**actual** [3] - 19:5, 72:11, 98:16
**ad** [4] - 9:20, 10:16, 47:8, 119:10
**add** [3] - 33:13, 50:13, 57:8
**added** [2] - 46:24, 50:25
**adding** [1] - 69:10
**addition** [17] - 36:13, 46:22, 69:17, 70:15, 77:2, 81:9, 82:11, 83:7, 84:17, 91:20, 93:12, 95:14, 97:1, 100:9, 106:24, 112:4, 126:19
**additional** [11] - 6:24, 13:5, 13:7, 13:20, 100:6, 101:25, 107:14, 112:13, 113:10, 128:13, 130:9
**additionally** [2] - 90:14, 119:20
**address** [24] - 7:6, 9:8, 17:16, 17:18, 20:14, 20:15, 23:23, 27:10, 27:14, 31:2, 33:8, 41:7, 45:17, 48:13, 54:15, 57:17, 69:4, 76:8, 83:1, 102:1, 106:2, 121:4, 128:10
**addressed** [5] - 50:1, 85:22, 91:20, 128:9, 131:6
**addresses** [2] - 71:23, 96:16
**addressing** [7] - 27:5, 28:7, 50:17, 90:1, 90:11, 112:20, 123:20
**adequacy** [5] - 53:2, 80:3, 80:15, 99:9, 99:11
**adequate** [16] - 15:3, 56:1, 56:6, 75:12, 75:16, 81:2, 87:11, 88:3, 89:1, 92:25, 99:8, 101:6, 101:10, 102:21, 125:11, 125:23
**adequately** [6] - 22:8, 74:9, 80:5, 81:12, 81:20, 83:4
**Ades** [7] - 2:10, 6:4, 21:14, 21:15, 125:3, 125:13, 125:19
**Ades'** [1] - 44:4
**adjudicated** [1] - 88:9
**adjudicating** [1] - 74:21
**adjudication** [2] - 83:11, 84:3, 84:22
**administrator** [3] - 70:7, 71:6, 99:22
**admit** [1] - 13:17
**admitted** [1] - 10:3
**ads** [18] - 38:24, 41:19, 44:23, 45:20, 46:1, 46:2, 46:4, 46:9, 46:11, 46:19, 46:20, 47:11, 53:20, 58:9, 58:10, 60:9
**advertised** [4] - 9:25, 31:19, 65:6, 99:23

**advertisement** [1] - 46:18
**advertisements** [2] - 44:13, 121:2
**advertising** [38] - 8:10, 8:15, 9:12, 9:24, 10:7, 10:14, 10:22, 12:18, 35:14, 38:19, 38:23, 39:19, 45:4, 45:6, 45:14, 46:14, 48:5, 48:9, 49:8, 51:16, 58:9, 60:7, 65:9, 68:19, 69:5, 69:7, 70:1, 70:13, 78:8, 78:14, 78:24, 94:18, 118:19, 119:21, 119:24, 120:1, 120:2, 121:11
**advised** [2] - 12:19, 24:20
**advisory** [1] - 121:10
**advocacy** [1] - 88:18
**affect** [3] - 100:22, 113:2, 118:9
**affecting** [3] - 74:18, 84:20, 88:7
**affidavit** [4] - 16:15, 26:14, 26:16, 38:11
**affidavits** [2] - 37:24, 38:4
**affirmed** [4] - 24:12, 24:14, 24:15, 75:18
**afforded** [1] - 108:5
**after-the-fact** [1] - 9:8
**Agatha** [3] - 2:12, 6:9, 127:9
**age** [2] - 19:11, 106:17
**agencies** [1] - 105:9
**agency** [2] - 39:18, 48:5
**Agent** [1] - 73:17
**Agnello** [1] - 66:24
**AGNELLO** [1] - 1:13
**ago** [1] - 22:1
**agree** [6] - 39:10, 39:13, 40:24, 56:11, 56:21, 124:25
**agreeable** [1] - 87:23
**agreed** [15] - 9:4, 10:16, 26:17, 39:20, 48:6, 67:17, 68:21, 69:4, 69:7, 112:9, 120:13, 120:24, 121:1, 121:12, 124:22
**agreeing** [2] - 7:18, 48:9
**agreement** [16] - 14:3, 24:20, 44:15, 55:3, 55:4, 56:9, 56:18, 68:2, 70:22, 72:16, 103:5, 105:12, 117:22, 122:11, 122:21, 125:10
**agreements** [3] - 102:19, 102:20, 122:14
**agreements'** [1] - 122:16
**agrees** [3] - 60:7, 95:16, 100:20
**ahead** [3] - 28:12, 38:8, 40:18
**aid** [2] - 55:14, 106:4
**Aid** [3] - 104:12, 105:18,

113:19
**air** [3] - 44:15, 46:11, 48:23
**aired** [1] - 46:3
**airing** [2] - 44:23, 121:1
**al** [1] - 1:3
**Alabama** [5] - 17:21, 17:22, 108:16, 108:18, 108:21
**ALABAMA** [1] - 1:18
**allegations** [7] - 46:4, 64:18, 64:25, 84:12, 94:20, 112:16, 112:21
**allege** [4] - 46:4, 64:9, 69:5, 69:21
**alleged** [11] - 10:23, 26:9, 65:7, 66:20, 68:17, 68:19, 79:4, 81:3, 84:10, 85:15, 121:15
**allegedly** [15] - 8:14, 8:17, 9:12, 9:16, 10:8, 10:15, 41:21, 70:13, 78:9, 78:13, 79:25, 81:4, 90:17, 113:1, 119:2
**alleging** [2] - 65:16, 86:2
**allow** [4] - 56:16, 71:3, 118:6, 129:23
**allowable** [1] - 117:9
**allowed** [3] - 48:15, 72:2, 125:20
**allows** [1] - 103:17
**almost** [4] - 16:14, 18:15, 18:19
**alone** [2] - 97:3, 106:18
**altered** [1] - 69:20
**alternative** [1] - 84:3
**amazing** [1] - 26:13
**ambit** [1] - 83:1
**Amchem** [9] - 73:7, 73:23, 74:10, 74:21, 79:12, 80:14, 80:20, 85:25, 88:5
**amend** [1] - 102:12
**amended** [2] - 29:3, 110:4
**America** [1] - 73:16
**amount** [39] - 8:13, 8:25, 13:15, 16:12, 22:21, 71:18, 82:6, 89:9, 91:7, 92:21, 96:17, 97:2, 99:3, 101:20, 102:24, 103:5, 104:24, 106:20, 108:24, 109:24, 110:9, 113:5, 113:13, 114:3, 114:11, 114:24, 115:2, 115:8, 115:17, 116:17, 117:9, 117:20, 118:17, 122:1, 123:2, 123:6, 126:24, 127:3
**amounted** [1] - 94:19
**amounting** [1] - 84:11
**amounts** [2] - 15:13, 82:8
**Amy** [3] - 2:10, 21:14, 125:3
**AN** [2] - 3:10, 132:7
**analogy** [2] - 59:14, 60:15

**analysis** [16] - 10:13, 11:8, 11:22, 12:3, 12:6, 12:9, 12:11, 12:13, 59:20, 63:6, 75:7, 90:16, 105:21, 105:25, 116:8, 127:23
**analyze** [2] - 102:15, 111:22
**analyzed** [1] - 114:15
**analyzing** [2] - 12:17, 104:9
**Andrew's** [1] - 83:2
**Andrews** [12] - 81:18, 81:22, 82:18, 82:20, 123:15, 128:10, 128:11, 128:12, 128:24, 129:13, 130:8, 130:10
**Andrews'** [1] - 129:9
**annual** [1] - 8:12
**answer** [1] - 54:6
**answered** [1] - 110:2
**answers** [1] - 100:4
**antagonistic** [1] - 81:10
**anticipated** [1] - 112:18
**Antitrust** [4] - 72:11, 76:2, 81:13, 101:8
**anyway** [1] - 41:24
**apologize** [3] - 28:4, 32:16, 60:14
**App** [2] - 72:21, 85:1
**appeal** [4] - 63:14, 63:19, 128:22, 128:25
**appealing** [1] - 47:1
**Appeals** [1] - 24:4
**appeals** [1] - 91:4
**appear** [6] - 41:19, 51:22, 66:4, 106:10, 109:16, 126:18
**appearance** [1] - 122:23
**appearances** [1] - 5:4
**appeared** [2] - 125:6, 129:6
**appearing** [1] - 126:19
**appellate** [1] - 35:2
**applicability** [1] - 75:18
**application** [3] - 18:22, 64:3, 105:24
**applications** [1] - 74:22
**applied** [2] - 55:23, 105:16
**applies** [1] - 103:10
**apply** [4] - 11:9, 19:16, 56:2, 73:13
**appointed** [4] - 67:4, 70:6, 99:21, 109:8
**appointment** [1] - 66:23
**appreciate** [7] - 14:21, 44:9, 47:7, 54:24, 61:22, 130:20, 131:15
**appreciated** [1] - 62:22
**appreciates** [1] - 19:15
**appreciation** [1] - 93:1
**appropriate** [18] - 9:2, 12:12, 20:1, 20:18, 20:21, 22:21, 23:21, 30:18, 35:12, 35:22,

49:25, 56:24, 59:21, 87:3, 93:4, 106:23, 113:19, 122:7
**appropriateness** [1] - 105:22
**approval** [24] - 6:15, 22:3, 22:9, 24:1, 27:3, 38:19, 39:12, 45:20, 56:21, 64:1, 64:5, 64:14, 67:23, 68:9, 71:9, 75:10, 75:23, 88:12, 92:10, 92:16, 93:23, 94:10, 95:23, 122:10
**approve** [6] - 6:13, 23:11, 38:23, 72:15, 75:15, 87:5, 117:19, 123:11
**approved** [6] - 20:21, 39:1, 67:25, 88:1, 117:7, 117:12
**approving** [1] - 22:10, 38:22, 50:17, 56:11, 89:23, 95:25, 98:3, 100:14, 114:10, 115:1
**April** [2] - 65:12, 70:10
**area** [3] - 51:10, 59:10, 108:21
**arguably** [2] - 36:20, 39:2
**argue** [5] - 23:16, 45:24, 102:12, 120:9, 124:16
**argued** [6] - 8:18, 8:25, 11:7, 30:12, 81:19, 118:16
**argues** [2] - 11:1, 124:13
**arguing** [1] - 23:17
**argument** [15] - 12:24, 27:2, 29:8, 30:3, 34:5, 36:10, 36:19, 49:12, 54:24, 65:24, 81:22, 102:5, 108:13, 124:15, 129:18
**arguments** [12] - 20:16, 26:3, 32:23, 36:25, 42:12, 49:16, 50:10, 94:14, 120:20, 126:7, 130:2
**arise** [2] - 79:20, 79:23
**arises** [1] - 64:24
**arising** [1] - 64:16
**Arpert** [1] - 7:18
**articulate** [1] - 13:18
**artificially** [1] - 122:15
**Asbestos** [1] - 77:21
**ascertainable** [11] - 26:2, 31:7, 31:10, 31:22, 51:13, 59:12, 81:6, 95:1, 95:9, 98:8, 121:24
**aside** [6] - 17:1, 20:3, 22:17, 51:13, 51:15, 122:12
**aspect** [4] - 33:9, 102:2, 102:19, 110:12
**aspects** [4] - 79:4, 99:13, 101:18, 131:3
**asserted** [2] - 64:15, 85:20
**asserting** [1] - 66:19
**assertion** [2] - 35:7, 90:24
**assertions** [1] - 35:2

**asserts** [1] - 124:19
**assess** [5] - 15:12, 52:16, 59:3, 60:16, 105:22
**assessed** [3] - 59:17, 103:7, 116:21
**assesses** [1] - 84:23
**assessing** [3] - 40:12, 49:20, 51:15
**assessment** [2] - 54:4, 121:24
**assigned** [1] - 117:4
**assist** [1] - 109:2
**Assistant** [1] - 123:22
**assisted** [2] - 109:6, 109:7
**associate** [1] - 19:4
**associates** [7] - 16:6, 17:3, 17:4, 17:10, 19:9, 19:11, 19:13
**assumed** [2] - 8:13, 107:18
**assuming** [6] - 20:21, 40:24, 49:7, 49:9, 49:8, 49:9, 120:23
**AT&T** [7] - 22:5, 28:20, 97:19, 103:14, 104:8, 113:19, 114:1
**Athena** [1] - 66:10
**Atlantic** [2] - 49:17, 87:24
**ATT** [1] - 24:14
**attached** [1] - 107:8
**attempt** [1] - 94:6
**attempting** [1] - 13:14
**attendant** [2] - 89:21, 95:19
**attention** [6] - 53:10, 53:11, 53:14, 53:15, 73:6, 100:10
**attest** [1] - 19:3
**attested** [2] - 18:25, 127:12
**Attorney** [3] - 123:20, 123:22, 123:24
**attorney** [8] - 7:23, 17:2, 17:20, 80:9, 108:1, 126:16, 134:11, 134:13
**attorney's** [3] - 102:15, 110:13, 118:3
**attorneys** [11] - 13:23, 14:25, 15:23, 91:23, 101:14, 104:20, 108:15, 109:12, 110:11, 113:13
**attorneys'** [27] - 40:8, 40:15, 40:22, 53:5, 64:4, 71:11, 99:16, 101:12, 101:16, 101:17, 102:17, 102:24, 102:25, 103:5, 103:7, 107:9, 114:10, 115:2, 116:5, 116:10, 117:12, 117:20, 118:6, 122:21, 126:2, 126:24, 127:6
**attributable** [2] - 8:14, 105:7
**attribute** [1] - 9:15
**August** [1] - 66:21
**available** [5] - 29:9, 74:20, 83:10, 84:3, 100:3

**AVENUE** [1] - 1:25
**average** [1] - 8:12
**avoid** [1] - 46:20
**avoiding** [1] - 87:21
**avoids** [1] - 33:21
**award** [35] - 9:1, 55:18, 64:3, 101:15, 101:17, 101:22, 101:25, 102:24, 102:25, 103:17, 103:25, 104:1, 104:5, 104:9, 105:15, 105:20, 110:21, 111:6, 114:10, 115:19, 115:24, 116:6, 116:23, 118:3, 118:6, 118:10, 121:25, 123:5, 123:16, 124:4, 124:25, 126:5, 126:8, 127:7
**awarded** [2] - 116:2, 122:11
**awarding** [1] - 116:25
**awards** [6] - 64:5, 105:1, 110:17, 115:25, 116:5, 123:11
**aware** [2] - 10:4, 58:16
**awareness** [1] - 60:10
**awfully** [1] - 36:9

**B**

**Baby** [2] - 77:12, 78:1
**backdrop** [1] - 111:22
**background** [2] - 25:15, 26:11
**bad** [5] - 23:8, 41:13, 41:16, 51:25, 58:2
**Bader** [1] - 124:9
**balance** [2] - 84:1, 112:5
**balanced** [6] - 38:16, 38:17, 65:2, 69:14, 70:3
**banner** [1] - 71:15
**banners** [1] - 99:24
**bar** [3] - 45:16, 62:19, 79:9
**Barbato** [1] - 66:11
**bargained** [2] - 30:13, 112:18
**barred** [1] - 39:5
**bars** [1] - 47:19
**base** [1] - 11:1
**based** [36] - 8:8, 8:10, 8:24, 9:14, 12:9, 29:11, 46:3, 54:3, 64:18, 66:19, 69:2, 69:19, 79:21, 95:6, 97:18, 100:11, 101:11, 101:23, 102:8, 107:7, 108:2, 109:18, 110:8, 110:24, 112:16, 116:12, 116:21, 118:22, 119:5, 119:24, 121:24, 122:4, 123:24, 125:2, 127:1, 128:15
**bases** [1] - 24:8
**basic** [1] - 95:4

**basis** [5] - 15:4, 31:22, 115:18, 127:16, 129:18
**BE** [2] - 3:10, 132:7
**bear** [2] - 33:15, 49:20
**bearing** [1] - 127:23
**become** [2] - 74:23, 88:8
**Beers** [2] - 44:11, 44:19
**began** [1] - 8:9
**begin** [2] - 12:22, 121:19
**behalf** [14] - 1:19, 1:21, 2:10, 2:12, 5:7, 6:9, 13:12, 28:14, 64:9, 64:20, 81:17, 123:23, 125:7, 130:19
**BEHALF** [1] - 2:8
**behavior** [1] - 69:24
**behind** [2] - 25:18, 26:20
**belabor** [2] - 30:25, 31:25
**believes** [2] - 127:6, 129:13
**Bell** [2] - 34:13, 87:24
**below** [1] - 121:23
**benchmark** [1] - 122:17
**beneficial** [1] - 60:13
**benefit** [26] - 35:14, 35:15, 39:24, 40:15, 43:19, 51:3, 51:5, 53:6, 54:1, 61:3, 94:4, 95:12, 112:25, 114:5, 114:21, 115:21, 116:22, 116:24, 117:11, 117:13, 118:7, 118:25, 121:14, 121:20, 125:1, 129:8
**benefits** [3] - 50:23, 105:6, 124:13
**benefitted** [4] - 104:15, 111:24, 112:23, 113:3
**Benz** [1] - 92:16
**best** [5] - 39:16, 39:23, 62:15, 89:17, 95:18
**bestowed** [1] - 117:10
**Beth** [1] - 5:25
**BETH** [1] - 2:5
**better** [10] - 36:20, 47:24, 51:2, 51:5, 57:10, 58:12, 59:18, 61:6, 61:7, 129:7
**betting** [1] - 63:17
**between** [11] - 13:5, 31:7, 32:4, 76:6, 80:13, 80:17, 92:5, 98:15, 111:13, 122:24, 127:24
**beyond** [2] - 91:1, 111:15
**billable** [1] - 108:9
**billing** [3] - 19:20, 103:14, 107:6
**binding** [2] - 40:4, 122:8
**bit** [5] - 31:3, 31:24, 36:17, 48:13, 100:22
**bittersweet** [1] - 25:19
**blended** [1] - 17:13
**blocking** [1] - 73:4
**Bluetooth** [7] - 40:3, 53:3, 53:8, 53:12, 122:9, 122:18

**blush** [1] - 106:15
**board** [1] - 19:4
**Bochenek** [6] - 2:12, 6:10, 21:13, 37:11, 127:9
**Bogart** [3] - 54:15, 55:2, 55:14
**Bogosian** [1] - 85:5
**Bolger** [2] - 34:13, 87:24
**bother** [1] - 26:14
**bought** [4] - 38:5, 47:20, 95:6, 129:22
**bound** [4] - 48:9, 73:21, 87:6, 103:4
**boy** [1] - 17:25
**brand** [1] - 68:6
**Brandon** [3] - 2:12, 6:10, 127:10
**breach** [4] - 55:10, 64:22, 125:17
**breached** [1] - 22:9
**breads** [1] - 65:5
**breakdown** [3] - 15:14, 16:15, 20:8
**breakfast** [11] - 36:21, 36:22, 38:16, 38:17, 46:22, 46:25, 65:2, 69:14, 69:15, 70:3
**Brennan** [1] - 59:1
**Brennan's** [1] - 58:25
**brief** [6] - 9:22, 28:19, 37:14, 49:15, 107:7, 129:4
**briefed** [1] - 111:18
**briefing** [6] - 6:19, 6:21, 11:6, 20:25, 31:1, 33:1, 33:13, 37:3, 113:10, 129:9
**briefly** [4] - 23:23, 27:8, 27:17, 54:11
**bring** [1] - 49:19
**bringing** [2] - 51:25, 64:20
**brings** [2] - 40:17, 130:11
**broad** [1] - 116:4
**broadest** [1] - 15:12
**broadly** [1] - 79:3
**BRODY** [1] - 1:13
**Brody** [1] - 66:24
**broken** [1] - 15:10
**Brokerage** [5] - 72:10, 74:14, 75:4, 75:17, 101:8
**brother** [1] - 130:11
**brought** [5] - 51:24, 52:2, 65:18, 111:15, 129:25
**Brytus** [3] - 54:15, 55:2, 55:14
**bulk** [1] - 23:20
**burden** [4] - 22:19, 33:16, 33:18, 33:19
**buy** [1] - 78:16
**buying** [2] - 49:13, 95:13
**BY** [5] - 1:14, 1:15, 1:17, 1:19, 1:21

**Byrne** [2] - 5:7, 66:24
**BYRNE** [1] - 1:13

**C**

**C.C.R** [1] - 1:24
**C.S.R** [1] - 134:21
**CAL** [1] - 1:20
**calculated** [2] - 8:20, 30:23
**calculating** [2] - 49:22, 110:9
**calculation** [4] - 104:2, 104:4, 106:5, 110:7
**California** [26] - 13:16, 13:21, 13:23, 13:24, 42:21, 42:23, 42:24, 43:2, 43:12, 43:13, 44:7, 60:23, 64:11, 65:15, 65:18, 66:10, 68:7, 76:6, 81:24, 82:1, 82:8, 82:11, 82:15, 82:18, 111:14, 117:25
**campaign** [15] - 8:10, 8:13, 9:20, 9:24, 10:14, 10:16, 10:22, 70:1, 70:14, 78:8, 94:18, 118:19, 119:10, 119:21, 121:11
**campaigns** [1] - 38:20
**Campbell** [4] - 41:14, 41:16, 44:23, 98:17
**Campbell's** [1] - 44:21
**candid** [1] - 58:23
**cannot** [6] - 9:15, 23:11, 75:9, 87:9, 109:19, 124:14
**capable** [1] - 80:9
**capitalize** [1] - 34:17
**caption** [1] - 67:2
**captures** [1] - 92:22
**careful** [1] - 128:4
**CARELLA** [1] - 1:13
**Carella** [7] - 5:7, 14:23, 66:23, 66:24, 67:4, 81:15, 108:1
**carve** [1] - 21:17
**case** [126] - 6:14, 6:19, 8:8, 11:10, 11:11, 11:12, 11:18, 11:24, 16:10, 18:7, 19:22, 20:10, 22:5, 23:8, 23:12, 23:24, 24:13, 24:14, 24:18, 24:23, 25:11, 25:15, 25:17, 25:18, 25:21, 25:23, 25:24, 26:1, 26:5, 26:18, 28:23, 31:9, 32:19, 34:4, 35:2, 42:21, 42:22, 43:2, 43:4, 44:21, 45:6, 45:8, 45:15, 47:6, 49:17, 49:21, 51:7, 51:23, 51:24, 52:1, 52:4, 53:21, 56:24, 57:13, 58:9, 58:19, 59:3, 59:19, 60:9, 60:21, 60:22, 61:1, 61:7, 62:4, 62:5, 62:10, 62:13, 62:23, 63:3, 65:17, 72:6,

72:12, 73:1, 73:22, 73:23, 84:5, 85:20, 90:9, 90:19, 91:1, 92:22, 93:1, 93:8, 94:10, 94:12, 95:22, 96:20, 97:11, 97:20, 98:16, 100:19, 103:13, 104:10, 104:24, 105:11, 105:16, 109:23, 110:2, 111:5, 111:7, 111:8, 111:14, 111:15, 111:19, 114:2, 114:6, 115:14, 116:7, 116:12, 116:13, 118:1, 118:11, 122:7, 122:25, 125:13, 128:17, 128:19, 128:23, 129:25, 131:12

**cases** [41] - 16:17, 18:3, 18:8, 18:16, 18:18, 19:19, 24:15, 25:25, 28:19, 33:25, 34:3, 34:4, 34:11, 34:13, 39:22, 48:3, 48:4, 54:16, 55:2, 56:10, 56:20, 57:13, 61:23, 61:24, 62:1, 62:2, 62:25, 63:1, 86:2, 87:19, 90:22, 100:9, 103:15, 105:1, 105:17, 106:18, 108:23, 110:18, 115:25, 118:7, 128:14

**Casey** [1] - 77:13

**cash** [6] - 22:12, 40:6, 40:15, 41:11, 42:3, 60:12

**catch** [1] - 80:24

**catch-all** [1] - 80:24

**causation** [2] - 31:7, 51:13

**caused** [6] - 9:11, 78:15, 78:19, 81:5, 94:25

**cautious** [1] - 116:25

**CCR** [2] - 3:16, 132:11

**CECCHI** [21] - 1:13, 1:14, 5:6, 5:13, 5:17, 16:9, 17:7, 17:11, 23:18, 25:5, 25:8, 37:15, 57:18, 58:1, 59:14, 63:17, 107:15, 107:20, 130:5, 130:15, 131:15

**Cecchi** [13] - 4:8, 4:12, 4:16, 5:7, 16:4, 17:1, 32:2, 50:4, 57:17, 59:8, 63:10, 66:24, 71:9

**Cecchi's** [2] - 20:7, 22:4

**ceiling** [1] - 110:10

**Cendant** [9] - 88:4, 90:5, 92:4, 93:2, 94:8, 96:11, 96:18, 97:4, 103:11

**centralization** [2] - 65:14, 65:23

**certain** [6] - 12:8, 19:10, 39:13, 86:1, 103:10, 105:17

**certainly** [9] - 13:25, 20:24, 35:8, 36:18, 47:7, 49:2, 55:10, 119:9, 128:24

**certainty** [3] - 9:15, 97:16, 110:6

**Certificate** [1] - 134:22

**certification** [21] - 14:1, 14:12, 28:25, 30:10, 72:7, 72:14, 72:17, 72:25, 73:9, 73:13, 73:25, 75:5, 75:9, 75:23, 75:24, 78:4, 79:10, 84:6, 87:2, 88:11, 88:12

**certified** [6] - 42:23, 43:14, 44:7, 67:24, 72:9, 123:25

**Certified** [1] - 134:4

**CERTIFIED** [2] - 3:10, 132:7

**certify** [7] - 6:14, 64:1, 72:8, 75:1, 87:3, 134:5, 134:10

**cessation** [2] - 46:1, 46:9

**cetera** [2] - 108:4, 120:15

**challenge** [3] - 47:12, 47:16, 85:15

**challenged** [2] - 9:24, 81:8

**chance** [2] - 112:16, 121:7

**change** [2] - 38:15, 120:24

**changed** [1] - 46:12

**changes** [5] - 35:14, 36:16, 39:13, 46:13, 46:17, 49:11, 69:7, 69:15, 119:11

**changing** [3] - 36:14, 60:9, 69:13

**Channel** [1] - 70:17

**chapter** [1] - 14:21

**charge** [7] - 15:23, 17:2, 18:2, 18:8, 18:9, 19:23, 19:24

**charged** [3] - 16:7, 108:11, 108:16

**charges** [2] - 18:14, 108:22

**charity** [1] - 72:3

**Charlene** [2] - 4:6, 13:1

**check** [12] - 14:18, 15:5, 19:17, 19:21, 44:8, 103:24, 103:25, 104:6, 106:1, 106:5, 120:18, 127:22

**Chessler** [1] - 58:21

**chief** [2] - 32:9, 32:14

**children** [1] - 36:24

**chocolate** [3] - 28:11, 31:14, 95:5

**chose** [1] - 9:19

**Chris** [5] - 6:9, 37:11, 127:5, 128:10, 128:11

**Christine** [1] - 125:25

**Christopher** [1] - 81:18

**CHRISTOPHER** [1] - 2:11

**Cir** [20] - 72:22, 73:17, 75:19, 76:3, 76:21, 77:12, 77:13, 77:21, 78:1, 79:12, 80:19, 81:14, 85:6, 87:12, 87:17, 87:24, 92:12, 103:20, 122:19

**Circuit** [26] - 11:10, 11:11,

11:23, 12:1, 12:10, 22:2, 34:9, 40:2, 40:11, 44:10, 49:25, 54:16, 62:9, 63:12, 72:10, 75:18, 77:14, 85:6, 88:13, 88:23, 96:5, 103:4, 103:22, 105:3, 110:17, 130:12

**circuit** [1] - 122:7

**Circuit's** [1] - 30:17

**circumstances** [4] - 28:22, 62:16, 101:11, 114:22

**circumvent** [1] - 122:16

**citations** [1] - 35:3

**cite** [5] - 33:25, 34:14, 35:6, 54:16, 122:9

**cited** [2] - 11:11, 28:19

**cites** [1] - 72:11

**citing** [3] - 76:22, 81:1, 103:3

**City** [1] - 18:24

**civil** [5] - 87:15, 90:12, 91:12, 106:17, 111:11

**Civil** [5] - 64:2, 72:18, 72:20, 75:13, 96:7

**CIVIL** [1] - 1:2

**claim** [24] - 9:11, 16:1, 26:5, 29:11, 38:2, 39:2, 40:22, 46:21, 46:23, 57:21, 68:23, 68:24, 70:8, 70:15, 70:23, 71:3, 71:4, 71:12, 78:18, 84:16, 97:24, 100:2, 112:7, 125:16

**claimants** [1] - 98:23

**claiming** [1] - 109:24

**claims** [50] - 13:4, 13:5, 13:7, 13:9, 13:15, 13:18, 13:20, 29:14, 43:4, 64:15, 64:20, 65:16, 66:19, 69:3, 69:24, 70:7, 71:4, 71:5, 71:17, 71:18, 72:5, 74:5, 74:6, 77:3, 77:25, 78:2, 78:21, 79:4, 79:6, 79:7, 79:14, 79:20, 79:22, 79:24, 83:21, 85:4, 85:20, 85:23, 88:10, 95:7, 98:2, 100:8, 108:16, 111:25, 112:6, 112:13, 114:16, 120:23, 125:17

**clarifies** [1] - 14:8

**clarify** [1] - 13:11

**CLARKSON** [1] - 1:9

**Class** [2] - 5:8, 42:18

**class** [301] - 6:13, 6:14, 6:20, 6:22, 7:3, 8:24, 10:3, 10:18, 13:16, 13:17, 14:2, 14:4, 16:1, 20:18, 21:19, 22:3, 22:4, 22:15, 22:17, 22:21, 23:6, 26:19, 28:25, 29:9, 29:15, 29:18, 30:10, 30:12, 30:19, 33:17, 34:23, 37:20, 40:9, 40:11, 40:16, 40:20, 40:21, 42:8, 42:11,

42:23, 43:13, 43:16, 43:17, 43:19, 44:7, 44:17, 45:17, 45:19, 50:5, 50:20, 50:23, 50:24, 50:25, 51:4, 51:23, 52:13, 53:6, 53:9, 53:11, 53:13, 53:15, 54:1, 54:2, 54:3, 55:1, 55:9, 55:15, 55:17, 55:20, 55:25, 56:16, 57:8, 57:19, 60:13, 61:4, 63:13, 64:1, 64:10, 64:21, 65:11, 65:15, 67:5, 67:6, 67:24, 67:25, 68:2, 68:4, 68:9, 68:11, 68:17, 68:22, 68:24, 68:25, 69:19, 70:22, 71:20, 71:21, 72:2, 72:4, 72:6, 72:8, 72:9, 72:14, 72:15, 72:17, 72:19, 72:24, 73:5, 73:10, 73:11, 73:13, 73:19, 73:20, 73:21, 73:24, 74:1, 74:4, 74:7, 74:9, 74:12, 74:17, 74:19, 74:23, 75:1, 75:5, 75:9, 75:22, 76:5, 76:10, 76:13, 76:14, 76:18, 77:4, 77:7, 77:11, 77:24, 78:3, 78:6, 78:7, 78:11, 78:22, 79:8, 79:9, 79:15, 79:19, 79:25, 80:4, 80:5, 80:8, 80:9, 80:13, 80:17, 80:21, 80:22, 80:23, 81:3, 81:7, 81:11, 81:12, 81:14, 81:16, 81:19, 81:20, 82:7, 82:9, 82:14, 82:19, 82:22, 82:24, 83:3, 83:5, 83:8, 83:9, 83:14, 83:19, 83:24, 84:2, 84:6, 84:15, 84:20, 84:23, 85:9, 85:10, 85:13, 85:14, 85:23, 87:2, 87:3, 87:6, 87:9, 87:16, 87:19, 87:25, 88:6, 88:11, 88:18, 88:21, 88:25, 89:6, 89:12, 89:23, 91:10, 91:13, 91:15, 91:21, 91:24, 92:2, 92:3, 92:6, 92:11, 92:13, 92:17, 92:23, 92:25, 93:20, 95:15, 95:17, 96:4, 96:8, 99:1, 99:7, 99:13, 99:15, 99:17, 99:19, 99:21, 100:1, 100:3, 100:4, 100:18, 101:4, 101:15, 101:22, 102:3, 102:13, 102:18, 103:13, 104:17, 105:6, 105:7, 106:17, 109:9, 110:4, 110:25, 111:12, 111:13, 111:19, 112:2, 112:9, 112:11, 112:14, 112:16, 113:2, 113:3, 113:20, 114:2, 114:5, 114:11, 114:20, 114:21, 115:10, 115:21, 116:1, 116:2, 116:22, 117:13, 118:4, 118:8, 118:10,

118:14, 118:22, 118:24, 118:25, 119:1, 119:5, 120:8, 121:9, 121:14, 121:20, 121:23, 122:3, 122:11, 122:12, 122:21, 123:1, 123:8, 123:25, 124:12, 124:13, 124:18, 124:20, 125:1, 125:21, 126:3, 127:13, 127:19, 128:20, 129:13, 129:17

**class's** [1] - 55:16

**classes** [1] - 84:21

**clear** [10] - 7:8, 13:25, 14:11, 14:13, 47:10, 47:12, 47:21, 72:4, 72:23, 125:15

**clearer** [1] - 49:12

**clearly** [5] - 12:10, 13:9, 52:15, 84:9, 92:18

**CLERK** [2] - 5:2, 131:20

**client** [3] - 17:4, 19:23, 55:11

**client's** [1] - 5:24

**clients** [8] - 15:23, 19:2, 37:24, 38:1, 52:15, 57:23, 111:3

**close** [1] - 112:2

**closed** [1] - 112:8

**Cloudt** [2] - 123:22, 124:1

**Club** [1] - 117:15

**co** [1] - 5:9

**co-counsel** [1] - 5:9

**codes** [1] - 14:23

**cohesive** [1] - 84:22

**colleague** [2] - 32:7, 58:21

**collect** [1] - 19:23

**collected** [2] - 72:2, 106:13

**collecting** [1] - 16:22

**collectively** [2] - 63:25, 126:15

**collusion** [6] - 32:4, 32:21, 93:5, 122:24, 127:24, 128:3

**colorful** [1] - 94:21

**combination** [2] - 102:3, 127:7

**combined** [2] - 102:8, 122:3

**combining** [3] - 13:21, 117:23, 126:7

**comfortable** [1] - 61:15

**coming** [4] - 16:19, 24:25, 54:20, 60:16

**Comite** [1] - 5:17

**COMITE** [2] - 1:16, 5:20

**commenced** [1] - 83:18

**commencing** [1] - 110:1

**comment** [7] - 25:6, 25:12, 25:13, 32:2, 49:15, 124:7

**commented** [1] - 115:12

**comments** [10] - 27:1, 32:25, 38:12, 43:3, 47:23, 59:21, 60:19, 61:9, 62:21, 123:19

**commercial** [2] - 17:14, 48:23

**commercials** [8] - 36:15, 41:22, 41:23, 48:22, 48:24, 69:18, 69:19, 120:2

**common** [28] - 14:19, 40:12, 50:11, 54:17, 55:22, 66:3, 66:6, 74:3, 74:17, 77:7, 77:16, 78:5, 78:11, 78:23, 84:18, 85:3, 85:9, 85:12, 85:19, 85:23, 103:15, 104:9, 110:17, 116:16, 116:22, 117:5, 122:5, 127:6

**commonality** [4] - 77:9, 78:25, 79:2, 80:25

**commonly** [5] - 77:5, 77:6, 77:8, 77:16, 77:23

**companies** [1] - 120:1

**companion** [2] - 24:13, 24:14

**Company** [2] - 73:16, 75:13

**company** [1] - 117:10

**comparable** [2] - 31:15, 95:10

**compare** [1] - 31:13

**compared** [2] - 23:12, 92:2

**comparison** [1] - 116:1

**compensate** [2] - 29:10, 123:11

**compensation** [1] - 61:19

**complain** [2] - 82:23, 121:9

**complained** [9] - 65:21, 71:25, 99:10, 100:17, 126:21, 126:23, 127:17, 127:24, 128:5

**complains** [1] - 81:22

**complaint** [13] - 21:16, 29:3, 41:12, 44:14, 46:2, 66:18, 66:20, 66:22, 67:9, 109:7, 110:4, 111:20

**complaints** [4] - 64:16, 64:18, 121:5, 121:16

**complete** [1] - 46:1

**completed** [2] - 89:9, 92:21

**completely** [1] - 9:19

**complex** [6] - 17:14, 66:6, 87:19, 90:9, 111:8, 114:16

**complexity** [4] - 89:4, 90:1, 104:21, 114:13

**complicated** [1] - 66:4

**component** [4] - 22:12, 58:5, 60:1, 65:1

**Components** [1] - 97:19

**comports** [1] - 100:12

**comprise** [1] - 68:13

**comprised** [1] - 92:13

**compromise** [2] - 88:10, 97:14

**Computron** [1] - 103:2

**conceivably** [1] - 8:22

**concentrating** [1] - 83:21

**concepts** [1] - 79:2

**concern** [6] - 9:5, 27:20, 27:22, 36:23, 53:7, 122:13

**concerned** [1] - 120:17

**concerning** [1] - 83:18

**concerns** [10] - 15:2, 33:11, 53:1, 82:25, 101:18, 121:4, 124:5, 126:25, 127:20, 129:8

**concessions** [1] - 93:6

**concluded** [2] - 11:16, 131:21

**concludes** [2] - 115:22, 130:3

**conclusions** [1] - 12:16

**condition** [2] - 56:11, 56:21

**conditionally** [1] - 72:9

**conduct** [12] - 31:6, 51:14, 66:19, 79:15, 79:21, 79:23, 85:8, 85:11, 90:17, 94:19, 94:23, 94:25

**conducted** [4] - 10:18, 12:1, 23:25, 65:20

**conducting** [2] - 97:13, 105:9

**conference** [4] - 7:2, 7:5, 7:21, 10:3

**Conference** [1] - 4:4

**conferred** [2] - 116:25, 117:18

**confers** [1] - 116:22

**confess** [1] - 60:4

**confidential** [1] - 7:20

**confidentiality** [2] - 7:17, 8:1

**confine** [1] - 46:23

**confirm** [1] - 106:6

**conflagration** [1] - 24:2

**conflict** [3] - 79:11, 80:7, 81:11

**conflicts** [2] - 80:12, 80:16

**confronted** [1] - 72:24

**conjecture** [1] - 9:14

**conjunction** [1] - 46:13

**conserved** [1] - 87:20

**consider** [11] - 12:20, 20:1, 20:16, 20:19, 20:20, 20:22, 23:21, 56:23, 88:24, 105:5, 119:7

**considerable** [1] - 89:22

**consideration** [4] - 63:2, 90:3, 95:11, 116:23

**considered** [2] - 75:20, 87:1

**considering** [4] - 95:3, 110:23, 111:4, 122:3

**considers** [1] - 104:10

**consist** [1] - 76:5

**consolidated** [7] - 29:2, 29:3, 67:9, 90:23, 110:4,

**conceivably**... 111:19, 111:20

**consolidation** [2] - 66:22, 67:2

**Consulting** [1] - 70:6

**Consumer** [7] - 31:9, 43:6, 51:9, 51:19, 59:11, 59:20, 64:21

**consumer** [14] - 11:3, 22:3, 25:25, 31:12, 49:13, 69:24, 84:8, 85:16, 86:2, 90:17, 95:4, 98:14, 125:4, 125:16

**consumers** [7] - 42:24, 46:5, 65:10, 70:2, 81:17, 118:7, 118:9

**consuming** [1] - 90:13

**contact** [2] - 100:5, 100:7

**contain** [1] - 101:7

**contained** [1] - 53:12

**contains** [2] - 70:21, 71:2

**contempt** [1] - 44:19

**contended** [1] - 58:10

**content** [5] - 69:8, 69:11, 82:5, 120:14, 121:3

**context** [4] - 11:9, 34:8, 72:14, 73:6

**contingency** [1] - 115:18

**contingent** [12] - 16:3, 16:10, 16:16, 16:17, 16:21, 18:3, 18:4, 18:15, 19:19, 19:22, 105:12, 108:23

**continually** [1] - 100:25

**continue** [1] - 119:25

**Continued** [2] - 43:20, 86:3

**continued** [2] - 1:22, 90:5

**Continuing** [1] - 17:24

**contract** [1] - 64:22

**controlled** [2] - 73:9, 103:1

**controlling** [1] - 83:15

**controversy** [3] - 74:21, 83:11, 83:18

**convene** [1] - 7:1

**convenient** [1] - 106:22

**Converted** [1] - 76:23

**convinced** [3] - 62:24, 66:5, 108:11

**convinces** [1] - 122:5

**copied** [1] - 129:6

**core** [3] - 12:15, 58:6, 58:8

**Corp** [2] - 92:12, 122:18

**Corporate** [2] - 97:20, 103:19

**corporation** [1] - 34:6

**correct** [3] - 24:18, 107:20, 130:15

**corrected** [1] - 45:14

**corroborate** [1] - 108:20

**cosmetic** [1] - 34:18

**cost** [10] - 48:11, 48:14, 48:19, 49:2, 84:9, 107:2, 118:23, 119:20, 120:4

**costly** [1] - 24:7
**costs** [17] - 90:4, 98:23, 99:16, 107:3, 107:11, 107:12, 107:14, 107:16, 107:17, 112:4, 112:11, 112:13, 114:7, 118:2, 119:7, 119:10, 119:15
**counsel** [118] - 5:9, 5:13, 5:24, 6:20, 6:22, 7:3, 8:24, 10:2, 10:3, 10:5, 10:18, 11:7, 14:15, 15:17, 19:15, 32:5, 33:17, 34:23, 43:16, 44:4, 44:17, 48:1, 50:24, 52:14, 53:9, 53:13, 54:18, 55:1, 55:6, 55:9, 55:15, 55:17, 66:25, 67:5, 68:12, 69:20, 73:11, 81:20, 81:24, 82:14, 82:15, 82:19, 82:22, 83:4, 88:18, 92:23, 92:25, 93:21, 95:15, 99:16, 100:19, 100:21, 100:24, 101:15, 101:19, 102:3, 102:13, 103:13, 103:18, 104:18, 104:25, 105:7, 105:12, 107:1, 107:9, 107:24, 108:14, 109:9, 109:21, 110:20, 111:1, 111:13, 111:19, 112:3, 113:20, 113:21, 113:24, 113:25, 114:2, 114:11, 114:20, 114:21, 114:25, 115:10, 115:16, 115:23, 116:2, 117:21, 118:1, 118:9, 118:10, 118:13, 118:16, 118:25, 120:8, 121:10, 122:6, 122:12, 123:1, 124:12, 124:14, 124:20, 125:4, 126:1, 127:11, 127:19, 128:14, 128:20, 130:19, 130:20, 131:10, 134:11, 134:13
**COUNSEL** [1] - 2:6
**counsel's** [12] - 81:14, 82:24, 101:4, 106:2, 106:20, 108:10, 110:8, 112:10, 117:7, 118:15, 121:24, 122:3
**counsels'** [1] - 71:9
**couple** [1] - 12:23
**course** [9] - 21:4, 34:22, 53:8, 78:20, 79:20, 79:23, 88:19, 123:13, 125:21
**COURT** [82] - 1:1, 3:17, 5:3, 5:12, 5:16, 5:21, 6:2, 6:11, 13:25, 14:10, 16:18, 17:9, 17:19, 17:23, 18:4, 18:11, 18:20, 19:7, 19:12, 21:12, 21:15, 21:21, 21:24, 22:6, 22:17, 22:22, 22:25, 23:14, 25:7, 27:4, 27:9, 27:16,

27:23, 28:5, 29:1, 30:1, 30:24, 32:13, 32:17, 32:25, 33:5, 35:8, 36:4, 36:12, 37:4, 37:6, 37:9, 37:18, 38:6, 38:22, 39:8, 40:24, 41:5, 41:8, 42:10, 42:16, 43:1, 44:1, 45:10, 47:3, 50:9, 51:4, 52:2, 52:5, 52:22, 53:16, 54:8, 54:12, 54:22, 56:6, 57:1, 57:7, 57:16, 57:24, 59:6, 63:9, 63:20, 107:18, 107:21, 130:13, 131:7, 132:12
**Court** [108] - 4:17, 11:7, 11:13, 11:15, 12:6, 12:19, 14:9, 15:2, 15:11, 20:1, 22:7, 22:8, 22:10, 22:11, 23:6, 23:11, 24:4, 25:16, 27:2, 29:22, 38:14, 38:22, 39:6, 39:10, 40:4, 40:5, 41:7, 49:19, 49:23, 54:13, 55:18, 56:9, 56:12, 56:13, 56:18, 56:23, 63:23, 67:1, 67:7, 67:15, 67:19, 67:21, 68:3, 70:6, 71:22, 72:7, 72:8, 72:23, 73:23, 74:16, 75:6, 75:10, 78:5, 80:11, 81:15, 82:17, 83:3, 84:1, 87:2, 87:6, 87:9, 88:2, 89:22, 89:24, 90:6, 91:16, 93:20, 94:13, 94:19, 95:16, 96:12, 97:5, 97:21, 97:25, 99:6, 99:21, 100:20, 101:1, 102:5, 102:15, 103:1, 104:3, 104:10, 105:19, 106:4, 108:5, 109:16, 109:22, 110:6, 111:25, 112:24, 113:9, 113:15, 114:9, 114:18, 115:12, 115:22, 116:9, 116:14, 116:25, 118:2, 118:5, 118:10, 122:13, 128:11, 128:16, 129:8, 134:4
**court** [18] - 5:1, 25:12, 72:16, 72:25, 73:12, 75:2, 75:14, 87:7, 96:7, 98:12, 102:23, 103:4, 108:19, 117:7, 117:17, 122:10, 127:12, 129:12
**Court's** [5] - 22:2, 23:18, 38:12, 95:14, 114:17
**court's** [3] - 97:18, 104:7, 122:10
**COURTHOUSE** [1] - 1:9
**courtroom** [1] - 58:14
**courts** [16] - 56:10, 75:25, 85:4, 87:15, 88:14, 92:24, 97:16, 98:13, 103:17, 103:23, 110:21, 113:21, 116:4, 117:11, 122:13,

123:11
**Cowboys** [1] - 117:15
**created** [2] - 104:14, 111:23
**creates** [3] - 15:2, 92:3, 92:7
**creating** [2] - 119:10, 119:11
**credentials** [1] - 32:18
**credits** [1] - 117:24
**criteria** [2] - 20:19, 80:25
**critical** [2] - 9:18, 12:17
**cross** [7] - 19:21, 103:24, 103:25, 104:6, 106:1, 106:5, 127:22
**cross-check** [7] - 19:21, 103:24, 103:25, 104:6, 106:1, 106:5, 127:22
**crosscheck** [1] - 16:24
**crystal** [1] - 14:11
**current** [2] - 74:22, 94:8
**cursory** [1] - 100:24
**customary** [1] - 16:24
**cut** [1] - 42:6
**CVT** [1] - 98:10
**cy** [3] - 72:1, 126:10, 126:22
**cy-près** [3] - 72:1, 126:10, 126:22

# D

**D.N.J** [6] - 98:11, 98:18, 101:9, 103:2, 114:1, 117:5
**dads** [1] - 46:7
**Dallas** [1] - 117:15
**damage** [2] - 26:5, 30:20
**damages** [21] - 11:17, 22:14, 23:4, 23:7, 23:10, 23:13, 25:25, 30:15, 30:22, 68:17, 78:21, 89:11, 93:25, 96:2, 97:23, 97:24, 98:5, 98:10, 127:2
**Dan** [2] - 6:6, 108:15
**DANIEL** [1] - 2:14
**Daniel** [1] - 126:11
**data** [2] - 24:8
**Date** [1] - 134:22
**date** [6] - 13:5, 44:17, 45:19, 68:8, 91:15, 134:8
**dates** [1] - 44:8
**Daubert** [10] - 11:8, 11:14, 11:20, 11:22, 12:2, 12:9, 12:11, 12:13, 38:13
**Davis** [9] - 4:8, 5:17, 17:21, 108:14, 108:19, 108:25, 109:6, 109:9, 109:13
**dAVIS** [1] - 1:18
**DAVIS** [5] - 1:19, 5:19, 17:22, 18:2, 18:7
**DB** [1] - 72:21
**De** [2] - 44:11, 44:19
**deadline** [1] - 50:5
**deadlines** [2] - 67:8, 70:25

**deal** [14] - 21:6, 26:19, 40:6, 40:12, 41:4, 43:1, 53:16, 58:2, 59:25, 60:2, 122:22, 130:23, 130:24
**dealing** [3] - 21:2, 28:1, 48:8
**dealt** [4] - 124:5, 126:25, 127:8, 128:6
**deceived** [3] - 30:12, 120:11, 121:6
**December** [2] - 80:19, 101:3
**deception** [1] - 119:3
**deceptions** [1] - 10:23
**deceptive** [21] - 8:15, 8:17, 9:12, 9:16, 10:8, 10:15, 10:21, 39:3, 39:11, 41:20, 47:8, 69:5, 70:13, 78:8, 78:13, 78:15, 78:18, 80:1, 81:4, 90:17, 90:24
**deceptively** [2] - 64:12, 64:25
**decertification** [1] - 96:11
**decertify** [1] - 96:8
**decide** [1] - 58:7
**decided** [2] - 11:25, 43:3
**decision** [3] - 84:25, 93:22, 122:22
**decisions** [1] - 73:21
**declaration** [14] - 7:1, 13:1, 13:6, 13:14, 14:7, 15:17, 19:5, 46:15, 69:23, 70:5, 71:8, 108:14, 109:5, 109:15
**Declaration** [1] - 4:6
**declarations** [5] - 71:10, 100:25, 107:4, 107:8, 127:14
**declining** [1] - 12:7
**decrease** [1] - 10:25
**dedicated** [1] - 70:19
**defeat** [1] - 78:3
**defective** [1] - 125:8
**defendant** [54] - 8:9, 8:16, 8:18, 9:21, 10:16, 27:21, 27:25, 32:4, 38:18, 39:6, 40:6, 55:5, 56:10, 56:14, 56:15, 56:20, 56:22, 64:6, 64:7, 64:11, 64:16, 64:25, 67:9, 68:21, 69:9, 69:17, 69:20, 76:25, 79:16, 85:16, 90:20, 90:23, 94:12, 94:17, 97:1, 98:9, 99:23, 102:4, 102:10, 102:2, 117:10, 118:17, 118:23, 119:8, 119:9, 119:13, 119:16, 119:20, 119:23, 119:25, 120:3, 120:13, 120:23, 121:12
**Defendant** [3] - 1:7, 1:21, 64:13
**defendant's** [20] - 67:7, 68:6,

70:13, 78:8, 78:14, 81:4, 82:4, 85:8, 85:10, 93:12, 94:20, 94:25, 96:14, 96:23, 111:17, 119:6, 129:14, 129:19, 130:1, 130:20

**defendants** [6] - 41:15, 42:20, 69:6, 85:5, 89:14, 96:16

**defendants'** [2] - 56:13, 66:3

**defense** [2] - 68:12, 83:15

**defenses** [2] - 74:5, 74:7

**deficiencies** [1] - 26:9

**defined** [5] - 45:19, 68:4, 79:3, 82:9, 119:1

**definitions** [1] - 73:5

**degree** [1] - 92:22

**Del** [1] - 76:23

**delay** [1] - 91:9

**demand** [1] - 73:5

**demanding** [1] - 97:17

**demonstrate** [4] - 33:18, 33:20, 34:25, 35:4

**demonstrated** [1] - 82:17

**demonstrates** [1] - 76:19

**demonstrating** [1] - 33:16

**denied** [6] - 8:4, 42:23, 43:13, 65:23, 67:15, 117:12

**depositions** [4] - 60:25, 93:16, 106:11, 109:4

**derived** [1] - 119:5

**describe** [1] - 13:15

**described** [3] - 98:4, 101:24, 104:12

**descriptions** [1] - 15:6

**deserve** [1] - 51:25

**designated** [1] - 7:20

**designation** [1] - 73:10

**designed** [2] - 73:4, 73:19

**desirability** [1] - 83:20

**despite** [4] - 11:2, 73:10, 77:17, 97:23

**detail** [6] - 26:6, 46:16, 101:7, 107:23, 108:5, 127:20

**detailing** [1] - 100:18

**details** [1] - 109:22

**determination** [8] - 49:10, 73:15, 75:11, 80:6, 85:18, 88:2, 95:15, 102:20

**determinations** [1] - 74:24

**determine** [8] - 72:7, 72:16, 72:19, 76:9, 89:24, 92:25, 109:19, 129:10

**determined** [2] - 8:2, 90:7

**determining** [9] - 15:3, 15:4, 58:18, 75:20, 85:3, 87:5, 88:24, 113:18, 116:23

**detriment** [1] - 124:12

**developed** [1] - 46:13

**development** [1] - 92:23

**device** [1] - 74:23

**devoted** [4] - 100:19, 104:24, 115:8, 115:10

**Dewey** [2] - 11:24

**difference** [3] - 19:25, 82:6, 98:15

**differences** [2] - 78:2, 79:17

**different** [10] - 31:18, 33:6, 34:8, 35:16, 59:9, 59:19, 59:20, 105:17, 108:24, 131:3

**differently** [3] - 39:18, 59:3, 102:2

**difficult** [7] - 25:23, 25:24, 26:18, 29:24, 62:23, 94:11, 117:2

**difficulties** [3] - 83:23, 113:22, 125:14

**difficulty** [2] - 34:16, 96:1

**directed** [4] - 91:23, 99:17, 99:20, 113:12

**directly** [1] - 113:1

**disagree** [2] - 52:3, 52:18

**disagrees** [1] - 60:8

**disarmed** [1] - 73:12

**discern** [1] - 35:14

**discharge** [1] - 24:5

**discovery** [13] - 15:7, 89:9, 90:10, 90:15, 92:21, 93:4, 93:9, 106:9, 106:12, 106:17, 108:4, 109:3, 111:10

**discrete** [2] - 24:6, 24:15

**discretion** [7] - 12:7, 22:9, 89:22, 102:23, 103:2, 116:5, 116:15

**discuss** [3] - 14:15, 100:22, 112:23

**discussed** [5] - 79:22, 82:20, 111:7, 113:14, 114:23, 116:4, 126:17

**Discussion** [1] - 4:5

**discussion** [1] - 47:9

**dismiss** [13] - 28:24, 42:22, 43:13, 51:17, 66:15, 67:8, 67:10, 67:13, 90:21, 91:1, 93:12, 94:13, 110:3

**dismissal** [2] - 111:17, 114:8

**dismissed** [1] - 66:13

**disparity** [1] - 92:5

**displace** [1] - 104:7

**dispute** [4] - 31:22, 78:17, 96:20, 115:5

**disputes** [2] - 76:25, 98:19

**Dist** [1] - 101:2

**distilled** [1] - 91:18

**distributed** [1] - 72:3

**distribution** [2] - 68:10, 68:22

**district** [18] - 59:18, 64:20, 65:19, 72:16, 72:25, 75:2, 75:14, 75:25, 87:7, 88:14, 96:7, 98:12, 102:23, 103:4, 103:23, 104:7, 117:17, 122:10

**DISTRICT** [2] - 1:1, 1:1

**District** [14] - 11:15, 22:2, 22:8, 49:19, 49:23, 65:17, 66:10, 67:19, 67:20, 76:15, 117:16, 117:25, 125:6, 128:2

**District's** [1] - 30:18

**divide** [1] - 108:2

**divided** [3] - 23:19, 50:16, 68:16

**dividing** [2] - 33:5, 104:1

**doctrine** [4] - 54:17, 54:18, 55:22

**document** [1] - 93:13

**documenting** [1] - 24:22

**documents** [6] - 93:15, 100:1, 106:13, 106:15, 106:18, 129:12

**dollar** [1] - 30:20

**dollars** [2] - 84:11, 98:22

**done** [11] - 12:2, 14:16, 14:17, 14:24, 16:8, 18:6, 39:18, 47:25, 48:3, 111:21, 128:16

**doubts** [1] - 51:7

**down** [3] - 15:10, 18:1, 56:19

**downloaded** [1] - 71:5

**Dr** [3] - 11:17, 38:11, 39:5

**drafted** [1] - 29:5

**drafting** [1] - 109:3

**drinks** [1] - 65:4

**dubious** [1] - 117:14

**due** [1] - 72:5

**dump** [1] - 24:8

**duplication** [1] - 15:9

**duplicative** [2] - 108:10, 109:18

**duration** [6] - 89:5, 90:2, 104:21, 114:13, 114:14

**during** [10] - 29:19, 65:10, 67:17, 68:25, 77:2, 96:8, 107:14, 108:13, 123:13, 128:1

**duties** [1] - 24:6

**duty** [2] - 55:9, 55:11

## E

**E.D** [1] - 101:2

**early** [3] - 93:3, 111:16, 114:23

**earn** [2] - 62:17, 62:18

**earned** [1] - 63:5

**easily** [2] - 76:24, 117:3

**EAST** [1] - 1:10

**Eastern** [1] - 117:16

**easy** [2] - 125:13, 130:25

**eat** [1] - 46:8

**echo** [1] - 52:24

**eclipsing** [1] - 73:9

**economic** [2] - 49:20, 49:24

**economies** [1] - 84:24

**editing** [1] - 109:3

**educate** [1] - 70:2

**Edward** [3] - 2:12, 6:10, 127:10

**effect** [1] - 120:20

**effective** [1] - 44:16

**effectively** [1] - 70:1

**effects** [1] - 10:14

**effectuate** [1] - 13:23

**efficacy** [1] - 124:2

**efficiency** [3] - 84:2, 104:19, 113:23

**efficient** [1] - 83:10

**efficiently** [1] - 74:20

**effort** [5] - 15:9, 84:24, 130:20, 130:25, 131:6

**efforts** [6] - 70:8, 105:7, 105:8, 114:5, 115:22, 118:8

**Eggleton** [5] - 4:15, 5:23, 7:22, 57:1, 57:3

**EGGLETON** [7] - 1:21, 5:22, 32:11, 32:16, 57:3, 57:9, 131:18

**eight** [2] - 89:16, 91:18

**eighth** [1] - 23:5

**either** [5] - 30:10, 32:4, 64:7, 78:8, 117:19

**electronic** [2] - 71:3, 106:17

**element** [5] - 42:3, 76:24, 78:24, 80:12, 80:23

**elements** [1] - 125:16

**emails** [1] - 130:9

**emotional** [1] - 60:20

**employee** [2] - 134:11, 134:13

**enable** [2] - 46:7, 122:16

**enacted** [1] - 13:22

**encountered** [1] - 83:23

**encouraged** [1] - 87:24

**encourages** [1] - 87:14

**end** [6] - 6:25, 30:2, 61:14, 98:25, 110:20, 112:1

**enforcing** [1] - 56:15

**engaged** [3] - 12:13, 88:18, 93:10

**engaging** [1] - 12:11

**English** [1] - 71:6

**enriched** [1] - 55:21

**enrichment** [1] - 55:23

**ensure** [3] - 73:19, 88:17,

88:23
**entail** [1] - 96:10
**entered** [2] - 7:18, 127:12
**entering** [1] - 31:16
**entire** [3] - 71:20, 85:23, 129:3
**entirely** [1] - 129:9
**entirety** [1] - 12:8
**entitled** [8] - 24:25, 29:25, 30:1, 30:11, 123:8, 129:2, 129:14, 130:1
**ENTITLED** [2] - 3:12, 132:8
**enumerate** [1] - 76:13
**equal** [1] - 71:19
**equitable** [2] - 54:18, 55:22
**Erin** [1] - 5:17
**ERIN** [1] - 1:16
**error** [2] - 12:25, 38:3
**especially** [1] - 106:10
**ESQUIRE** [9] - 1:14, 1:15, 1:16, 1:19, 1:21, 2:5, 2:9, 2:11, 2:14
**ESQUIRES** [1] - 1:20
**ESQURE** [1] - 1:17
**essence** [1] - 91:18
**essential** [1] - 29:18
**essentially** [9] - 8:3, 19:19, 29:7, 34:22, 35:22, 36:10, 83:25, 95:5, 108:22
**establish** [2] - 75:19, 125:15
**established** [5] - 70:19, 77:15, 79:16, 95:8, 98:5
**establishes** [1] - 75:3
**establishing** [6] - 77:8, 89:10, 89:11, 93:24, 96:1, 97:22
**estimate** [2] - 11:17, 121:21
**et** [3] - 1:3, 108:4, 120:15
**etc** [1] - 1:3
**evaluate** [1] - 97:9
**evaluating** [1] - 105:20
**evaluation** [1] - 97:13
**event** [3] - 17:17, 79:20, 130:10
**eventual** [1] - 114:7
**evidence** [11] - 10:19, 10:24, 32:6, 34:24, 35:4, 35:6, 38:14, 75:1, 75:2, 81:9, 93:4
**exactly** [1] - 11:13
**examine** [1] - 113:22
**examining** [2] - 76:1, 88:15
**example** [5] - 38:15, 65:5, 69:13, 95:24, 120:13
**exceeds** [3] - 76:20, 96:24, 118:3
**excellent** [5] - 97:21, 111:2, 114:20, 131:3, 131:12
**except** [1] - 76:5

**exception** [1] - 64:10
**excess** [1] - 55:19
**excessive** [2] - 125:9, 127:8
**exchange** [3] - 29:23, 34:18, 97:16
**exclude** [2] - 12:7, 125:21
**excluded** [2] - 12:8, 68:11
**exclusion** [2] - 71:21, 91:21
**exclusively** [1] - 18:15
**exercises** [1] - 116:14
**exhaust** [1] - 48:17
**exhausted** [1] - 72:5
**exhaustive** [1] - 105:2
**existing** [1] - 48:21
**expected** [5] - 31:12, 84:15, 94:7, 95:17, 98:25
**expects** [1] - 128:19
**expenditure** [1] - 114:7
**expense** [5] - 55:21, 84:7, 84:24, 89:4, 90:2
**expenses** [6] - 64:4, 101:13, 101:16, 101:21, 102:25
**expensive** [2] - 24:7, 90:14
**experience** [2] - 107:7, 113:24
**experienced** [2] - 17:2, 81:16, 119:23
**expert** [9] - 11:15, 33:21, 38:13, 46:14, 49:22, 60:6, 61:5, 69:24, 90:14
**expert's** [1] - 12:4
**expertise** [1] - 113:24
**experts** [3] - 61:1, 93:16, 106:13
**explain** [1] - 14:11
**explained** [5] - 72:13, 85:7, 96:5, 98:13, 125:12
**explanation** [1] - 107:7
**explicit** [1] - 46:20
**explicitly** [1] - 65:2
**explored** [1] - 26:6
**exposed** [3] - 10:10, 78:13, 81:4
**express** [1] - 64:22
**expressed** [1] - 122:14
**expressly** [1] - 11:20
**extend** [1] - 91:5
**extensive** [5] - 90:16, 93:10, 95:21, 100:10, 106:10
**extent** [11] - 40:21, 43:4, 81:21, 83:17, 113:10, 118:3, 121:6, 121:11, 124:22, 126:2, 126:4
**extort** [1] - 129:2
**extorted** [1] - 128:13
**extra** [1] - 48:19
**eye** [1] - 104:5

**F**

**F.2d** [3] - 49:17, 75:19, 78:1
**F.3d** [3] - 11:25, 34:14, 88:4
**F.Supp** [2] - 93:6, 98:17
**F.Supp.2d** [1] - 76:15
**Facebook** [1] - 70:18
**faced** [4] - 42:25, 81:8, 113:22, 125:13
**facing** [2] - 42:25, 43:10
**fact** [30] - 9:8, 9:18, 10:5, 10:7, 10:13, 12:17, 14:1, 18:25, 24:21, 29:3, 33:10, 35:2, 44:10, 44:21, 46:6, 48:19, 53:17, 74:3, 74:17, 75:3, 77:7, 77:10, 77:16, 78:6, 84:19, 85:17, 96:16, 97:23, 98:1, 123:25
**factor** [21] - 83:1, 90:1, 90:3, 90:6, 91:10, 91:25, 92:3, 92:8, 92:22, 93:22, 96:6, 96:12, 96:22, 96:24, 97:5, 105:17, 113:4, 114:9, 115:1, 115:7, 119:16
**factoring** [1] - 95:14
**factors** [24] - 75:18, 83:12, 84:5, 87:1, 88:24, 89:2, 94:1, 94:6, 94:9, 95:23, 97:9, 98:2, 99:4, 99:6, 104:10, 104:11, 105:4, 105:15, 105:19, 105:21, 105:22, 111:22, 114:15, 116:8
**facts** [3] - 42:21, 64:17, 85:19
**Factual** [1] - 78:2
**factual** [7] - 66:2, 66:6, 74:24, 79:17, 85:13, 85:21, 90:11
**failed** [2] - 10:12, 128:20
**failure** [2] - 101:3, 103:19
**fainthearted** [1] - 88:8
**fair** [28] - 19:18, 21:21, 35:20, 42:11, 47:11, 54:2, 54:3, 59:25, 61:13, 61:16, 61:19, 61:20, 61:21, 62:16, 63:5, 72:19, 75:11, 75:16, 83:10, 87:11, 88:3, 88:25, 97:10, 99:7, 102:21, 111:3, 112:15, 125:11
**fairly** [6] - 36:25, 63:21, 73:21, 74:8, 74:20, 80:4
**fairness** [11] - 11:9, 12:3, 12:4, 21:3, 24:11, 25:1, 27:5, 28:7, 28:16, 33:2, 53:1, 58:4, 58:24, 73:8, 73:14, 75:21, 76:1, 82:24, 84:1, 88:15, 88:23
**faith** [1] - 26:3
**Falkner** [1] - 125:25

**false** [4] - 45:6, 45:21, 46:4, 58:10
**familially** [1] - 126:20
**familiar** [2] - 22:6, 32:8
**family** [2] - 47:1, 68:14
**fan** [1] - 11:1
**far** [2] - 84:14, 108:6
**fashion** [8] - 12:20, 15:12, 15:15, 20:7, 49:11, 91:17, 100:24, 102:16
**fast** [1] - 58:12
**fat** [3] - 69:11, 120:14, 121:3
**fatal** [3] - 9:9, 26:5, 101:5
**favor** [15] - 84:6, 90:6, 92:4, 92:8, 92:18, 93:23, 94:10, 95:23, 96:13, 98:2, 99:5, 114:10, 115:1, 115:24, 116:3
**favorable** [2] - 81:23, 115:20
**favored** [1] - 103:16
**favors** [6] - 87:14, 87:18, 91:11, 92:10, 92:14, 92:16
**FDA** [1] - 94:22
**February** [4] - 64:19, 68:9, 72:22, 76:7
**federal** [5] - 43:10, 43:11, 43:12, 87:15
**Federal** [6] - 64:2, 72:17, 72:20, 75:13, 76:22, 96:6
**fee** [69] - 9:1, 9:4, 16:21, 17:17, 17:25, 18:2, 18:15, 18:21, 19:19, 19:22, 21:2, 22:13, 24:12, 24:13, 27:21, 27:24, 40:23, 49:2, 50:11, 50:19, 51:25, 54:23, 55:3, 55:6, 55:7, 55:8, 55:11, 55:13, 56:1, 56:14, 58:7, 62:11, 62:12, 62:17, 102:13, 102:15, 103:25, 104:1, 104:9, 105:10, 105:12, 105:15, 105:20, 105:24, 106:6, 108:23, 110:13, 110:17, 110:21, 113:19, 115:24, 116:4, 116:5, 116:17, 116:23, 118:3, 118:10, 121:25, 122:15, 123:6, 124:4, 124:25, 125:8, 126:4, 126:8, 127:7, 127:18, 128:6, 129:16
**Fees** [1] - 4:10
**fees** [75] - 4:11, 4:13, 6:13, 14:22, 15:4, 15:24, 16:3, 20:5, 20:17, 20:20, 20:23, 22:22, 27:12, 34:19, 40:8, 40:15, 40:22, 42:7, 50:10, 50:18, 50:22, 53:5, 56:2, 57:17, 64:4, 71:10, 71:11, 71:12, 82:24, 91:23, 98:22, 99:16, 100:19, 100:21,

100:25, 101:4, 101:12, 101:16, 101:17, 102:7, 102:17, 102:24, 102:25, 103:6, 103:7, 103:17, 104:18, 106:3, 107:3, 107:9, 107:10, 109:20, 110:10, 112:4, 112:10, 113:5, 113:13, 114:7, 114:11, 115:2, 116:1, 116:2, 116:10, 117:12, 117:20, 118:6, 122:3, 122:6, 122:21, 123:2, 126:2, 126:25, 127:6, 128:14

**felt** [5] - 23:21, 26:2, 32:11, 60:8, 131:16

**FERRERO** [2] - 1:6, 2:6

**Ferrero** [22] - 5:23, 6:23, 7:4, 7:17, 9:22, 11:1, 30:11, 41:13, 47:20, 48:14, 49:2, 64:6, 64:7, 65:7, 65:16, 65:20, 66:15, 68:12, 96:21, 114:16, 114:20, 115:5

**Ferrero's** [2] - 70:1, 95:15

**few** [7] - 43:9, 52:18, 53:25, 91:25, 95:10, 112:23, 116:14

**fiduciary** [3] - 55:9, 55:10, 87:8

**fifth** [1] - 94:1

**fighting** [1] - 106:21

**figures** [4] - 7:16, 8:11, 8:23, 129:11

**file** [9] - 37:25, 38:4, 45:15, 45:22, 67:8, 91:2, 100:2, 111:20

**filed** [38] - 6:23, 6:24, 9:22, 13:7, 13:8, 13:19, 13:20, 21:16, 24:19, 24:23, 28:25, 29:1, 38:7, 41:12, 64:19, 65:12, 66:15, 66:18, 67:12, 67:14, 67:22, 69:3, 71:17, 71:18, 72:5, 77:3, 90:21, 94:12, 100:8, 110:5, 111:9, 112:1, 112:7, 112:13, 116:13, 126:14, 126:16, 128:11

**filing** [4] - 7:19, 67:13, 70:23, 109:6

**filings** [1] - 130:22

**final** [7] - 6:14, 13:6, 27:2, 64:1, 64:14, 91:9, 127:23

**finally** [4] - 56:8, 91:4, 93:17, 123:7

**financial** [2] - 115:5, 117:11

**financially** [1] - 134:14

**finder's** [1] - 129:16

**findings** [12] - 9:8, 9:9, 24:10, 31:24, 47:4, 74:25, 105:24, 114:17, 125:23,

126:5, 126:6, 130:3

**fine** [3] - 17:19, 19:14, 52:5

**firm** [10] - 14:23, 15:21, 16:7, 16:8, 17:5, 20:8, 66:25, 81:15, 109:8, 126:16

**firm's** [1] - 108:1

**firms** [7] - 15:8, 15:21, 107:4, 108:6, 109:23, 111:1, 115:14

**first** [36] - 6:16, 9:20, 9:25, 10:10, 13:10, 14:1, 21:6, 23:15, 23:16, 25:16, 31:5, 33:21, 38:10, 43:9, 45:4, 57:19, 58:5, 58:8, 63:12, 63:15, 67:14, 72:7, 76:8, 76:9, 76:20, 84:7, 90:1, 90:3, 94:17, 101:19, 106:15, 110:12, 123:20, 124:13, 126:21, 130:18

**First** [1] - 42:18

**first-filed** [1] - 67:14

**FISHER** [1] - 1:9

**five** [8] - 15:8, 23:25, 69:1, 89:11, 98:24, 104:23, 107:4, 109:23

**five-day** [1] - 23:25

**Florida** [1] - 43:11

**flowing** [1] - 11:3

**FLW** [1] - 1:2

**focus** [3] - 61:12, 79:4, 85:7

**focused** [3] - 60:2, 85:4, 122:23

**focusing** [1] - 118:8

**folks** [2] - 29:13, 30:19

**FOLLOWING** [2] - 3:10, 132:7

**following** [5] - 13:2, 40:2, 65:24, 70:9, 70:16

**follows** [2] - 65:25, 89:3

**food** [1] - 64:12

**Food** [1] - 80:18

**foods** [2] - 46:8, 65:4

**Foods** [1] - 81:1

**fooled** [1] - 53:20

**Football** [1] - 117:15

**FOR** [1] - 1:1

**Forbes** [1] - 103:11

**forces** [1] - 118:17

**forego** [1] - 124:18

**foregoing** [1] - 134:6

**forgive** [1] - 34:12

**form** [5] - 42:1, 68:23, 71:3, 71:4, 126:18

**formal** [3] - 87:21, 93:3, 126:16

**formally** [1] - 7:6

**former** [2] - 67:19, 128:2

**forms** [1] - 16:10

**formulaic** [1] - 105:16

**forth** [11] - 30:5, 33:4, 44:6,

45:9, 46:16, 50:5, 50:7, 64:17, 74:13, 76:11, 134:9

**fortuitousness** [1] - 9:7

**forum** [1] - 83:22

**forward** [9] - 21:12, 24:25, 26:9, 26:20, 27:1, 27:16, 47:5, 61:4, 120:9

**fought** [1] - 26:18

**foundation** [1] - 12:15

**four** [5] - 23:25, 51:2, 74:8, 89:10, 104:21

**fourth** [1] - 94:1

**fraction** [1] - 98:6

**frankly** [4] - 21:1, 51:4, 63:12, 125:9

**Fraud** [7] - 37:3, 43:6, 51:9, 51:19, 59:11, 59:20, 64:21

**fraud** [6] - 11:3, 84:8, 86:2, 121:18, 125:5, 125:16

**fraudulent** [2] - 78:13, 90:25

**fraudulently** [1] - 120:22

**FREDA** [1] - 1:11

**free** [1] - 125:21

**Freehof** [2] - 38:11, 39:5

**French's** [1] - 11:17

**frequently** [2] - 70:25, 100:5

**Friday** [2] - 7:2, 7:9

**front** [5] - 35:24, 36:8, 36:13, 69:10, 120:15

**fruit** [1] - 65:5

**Fuel** [1] - 87:12

**full** [6] - 54:19, 55:19, 62:11, 68:3, 109:22, 129:11

**fully** [1] - 111:18

**functions** [1] - 80:24

**fund** [30] - 14:19, 29:9, 40:13, 40:14, 50:11, 54:3, 54:17, 55:17, 55:22, 72:4, 82:22, 89:17, 89:20, 103:10, 103:15, 103:17, 104:9, 104:14, 110:17, 110:19, 110:22, 111:23, 112:3, 116:10, 116:16, 117:5, 122:5, 126:24, 127:6, 129:17

**funded** [1] - 122:20

**funds** [1] - 72:2

**furthermore** [2] - 82:14, 112:19

**future** [12] - 34:6, 45:18, 47:16, 60:6, 60:8, 68:19, 112:20, 119:6, 119:17, 121:8, 121:17, 131:5

## G

**Gary** [2] - 126:12, 126:15

**gauge** [1] - 108:7

**GENERAL** [1] - 2:6

**General** [6] - 87:17, 88:16,

122:18, 123:20, 123:22, 123:24

**general** [7] - 5:24, 15:5, 20:7, 36:1, 40:22, 87:14, 110:16

**generally** [12] - 10:22, 15:23, 16:7, 36:22, 48:23, 76:18, 96:22, 103:16, 110:19, 110:22, 116:6, 119:12

**generated** [1] - 107:10

**generous** [1] - 111:4

**Genta** [1] - 96:2

**Georgine** [1] - 79:12

**Gerber** [1] - 45:8

**Girsh** [6] - 75:19, 89:2, 92:9, 104:11, 105:21, 114:15

**given** [7] - 37:25, 38:12, 56:1, 95:21, 107:15, 111:20, 126:3

**glad** [1] - 26:8

**GLOVER** [1] - 1:3

**Glover** [8] - 63:24, 64:19, 65:12, 66:13, 66:14, 67:13, 109:6

**Glover's** [2] - 66:20, 66:22

**GMC** [2] - 87:11, 103:3

**goal** [1] - 121:18

**goodies** [1] - 52:12

**Goodman** [3] - 2:12, 6:10, 127:10

**GOODRICH** [1] - 1:20

**governed** [1] - 99:12

**government** [1] - 105:9

**grain** [1] - 65:5

**grant** [3] - 6:14, 62:11, 64:1

**granted** [3] - 67:1, 67:23, 118:10

**grave** [1] - 15:2

**great** [4] - 21:4, 24:5, 48:5, 104:3

**greater** [6] - 89:15, 96:15, 96:18, 96:21, 97:2, 114:6

**greatly** [1] - 96:23

**GREEN** [1] - 1:16

**GREENBERG** [14] - 2:14, 6:5, 27:8, 27:15, 27:17, 28:4, 33:10, 35:20, 36:5, 36:18, 37:5, 52:24, 54:6, 54:10

**Greenberg** [22] - 4:13, 6:6, 6:25, 7:4, 7:13, 7:23, 7:25, 27:7, 27:16, 33:8, 35:18, 39:4, 45:2, 45:13, 52:7, 52:23, 53:16, 62:7, 124:8, 124:10, 125:1, 129:5

**Greenberg's** [3] - 49:16, 50:1, 124:9

**GREG** [1] - 1:19

**Greg** [1] - 5:17

**grievances** [1] - 77:11

**gross** [3] - 101:20, 112:3,

116:17
**grossly** [1] - 127:7
**grounds** [3] - 34:9, 52:10, 124:11
**group** [1] - 126:18
**groups** [2] - 91:19, 105:8
**Grover** [1] - 65:7
**growth** [1] - 119:24
**guarantee** [1] - 115:19
**guard** [1] - 97:17
**guardian** [1] - 87:8
**guess** [6] - 17:21, 44:9, 44:10, 52:19, 55:5, 81:21
**guglielmo** [2] - 4:6, 4:9
**GUGLIELMO** [15] - 1:15, 5:11, 13:11, 14:6, 18:13, 19:10, 26:23, 28:13, 29:5, 30:4, 32:24, 33:3, 44:3, 45:12, 49:15
**Guglielmo** [9] - 4:15, 5:10, 13:12, 18:12, 23:19, 26:24, 28:13, 44:2, 109:14
**guidance** [1] - 40:3
**Gulf** [1] - 85:5
**Gunter** [1] - 105:21

**H**

**Hagele** [2] - 2:12, 6:10, 127:10
**Hall** [1] - 28:20
**halting** [1] - 119:10
**Hampe** [1] - 127:5
**happy** [5] - 14:7, 29:13, 32:14, 37:1, 57:5
**hard** [5] - 25:22, 26:18, 35:19, 60:22, 62:19
**hard-pressed** [1] - 35:19
**harm** [4] - 78:20, 82:3, 113:1, 121:17
**harmed** [3] - 78:16, 85:10, 119:2
**harms** [3] - 68:19, 112:20, 121:15
**Hassine** [1] - 77:25
**hazelnut** [5] - 28:11, 31:13, 64:8, 68:6, 95:5
**heading** [1] - 57:10
**headquartered** [1] - 65:20
**health** [2] - 95:7, 117:10
**Health** [1] - 117:5
**healthy** [5] - 36:21, 46:6, 46:8, 64:12, 65:1
**hear** [6] - 27:9, 27:11, 32:22, 33:7, 52:17, 53:25
**heard** [2] - 37:7, 58:4
**hearing** [7] - 11:9, 12:1, 12:3, 12:4, 24:1, 75:15, 130:23
**heart** [1] - 60:9
**heavily** [1] - 51:20, 95:23

**heightened** [2] - 73:6, 88:17
**held** [1] - 65:24
**help** [2] - 42:8, 50:20
**helpful** [1] - 110:9
**helps** [1] - 121:18
**hereby** [1] - 134:5
**hereinbefore** [1] - 134:8
**Hernandez** [1] - 98:10
**herself** [1] - 125:21
**high** [5] - 29:12, 61:10, 77:24, 84:12, 98:25, 110:19, 111:6, 117:18, 117:20
**higher** [2] - 8:12, 54:21
**highest** [1] - 97:15
**Highlighting** [1] - 77:23
**himself** [1] - 131:11
**hinder** [1] - 82:15
**hired** [2] - 93:15, 106:13
**hits** [1] - 100:7
**Hochberg** [1] - 58:23
**hoe** [1] - 94:11
**Hohenberg** [1] - 66:11
**hold** [2] - 44:18, 55:15
**Honor** [80] - 5:6, 5:11, 5:15, 5:19, 5:20, 5:22, 6:3, 6:5, 6:8, 13:11, 14:6, 18:8, 18:13, 18:23, 19:10, 21:11, 21:14, 21:20, 24:12, 25:3, 25:12, 26:23, 27:15, 27:17, 28:4, 28:15, 29:6, 29:9, 30:4, 30:9, 30:22, 32:12, 32:24, 37:2, 37:5, 37:8, 38:9, 41:4, 41:9, 41:23, 42:6, 42:9, 44:3, 45:16, 45:25, 46:15, 49:15, 50:2, 50:16, 50:21, 51:21, 52:20, 52:25, 54:10, 54:11, 57:3, 57:10, 57:14, 57:18, 58:7, 58:15, 60:3, 60:19, 60:21, 61:8, 61:13, 61:20, 61:21, 62:6, 62:24, 63:1, 63:6, 107:20, 130:6, 130:21, 130:22, 130:25, 131:5, 131:15, 131:19
**Honor's** [6] - 17:15, 24:17, 58:16, 59:16, 59:22, 107:15
**HONORABLE** [1] - 1:11
**Honorable** [2] - 67:18, 93:19
**hope** [3] - 60:19, 62:12, 84:13
**hopes** [1] - 97:15
**hour** [5] - 18:8, 18:10, 19:8, 19:25, 108:16, 109:22
**Hourly** [1] - 4:7
**hourly** [24] - 14:16, 15:18, 15:20, 15:22, 15:24, 16:2, 16:11, 16:12, 16:22, 16:24, 17:5, 18:5, 18:16, 18:18,

19:1, 19:2, 19:6, 19:20, 19:24, 103:14, 108:24
**hours** [20] - 15:1, 15:11, 20:8, 20:11, 71:11, 100:18, 103:13, 107:2, 107:5, 107:10, 107:25, 108:2, 108:25, 109:1, 109:10, 109:13, 109:17, 115:12, 115:13, 128:19
**HP** [1] - 117:22
**huge** [1] - 16:12
**hugely** [1] - 60:12
**humble** [1] - 60:17
**hundred** [1] - 29:10
**hundreds** [3] - 20:10, 91:14
**hypocrisy** [1] - 45:1
**hypothetical** [1] - 51:6

**I**

**idea** [3] - 57:10, 60:3, 60:6
**identical** [3] - 77:25, 82:12, 126:14
**identified** [5] - 44:13, 44:14, 46:2, 46:3, 88:24
**ideological** [1] - 52:10
**ignore** [1] - 9:19
**ill** [1] - 12:19
**ill-advised** [1] - 12:19
**illusory** [1] - 124:14
**images** [1] - 41:18
**immediate** [2] - 68:14, 94:4
**impeccable** [1] - 32:18
**impediment** [1] - 51:16
**impediments** [1] - 94:15
**implicitly** [1] - 11:21
**implied** [2] - 46:21, 64:23
**imply** [1] - 46:5
**importance** [1] - 118:8
**important** [4] - 26:11, 73:12, 100:1, 105:4
**importantly** [2] - 78:7, 93:17
**imposed** [2] - 117:8, 118:23
**impossibility** [1] - 73:11
**impracticable** [1] - 74:2
**impractical** [1] - 77:4
**imprimatur** [1] - 39:10
**improper** [1] - 85:16
**improved** [1] - 61:5
**IN** [2] - 3:11, 132:7
**inadequate** [1] - 125:8
**inapposite** [1] - 34:2
**Inc** [7] - 64:6, 72:21, 76:14, 100:14, 101:2, 103:11, 117:5
**INC** [2] - 1:6, 2:6
**incentive** [1] - 64:5
**include** [4] - 70:4, 82:3, 102:13, 104:13
**included** [2] - 71:10, 102:18

**includes** [2] - 71:8, 123:25
**including** [4] - 16:16, 28:19, 39:18, 101:14
**incorporated** [2] - 123:19, 126:6
**increase** [7] - 8:12, 8:14, 9:16, 10:9, 117:4, 117:9, 129:17
**increased** [5] - 8:9, 9:10, 10:20, 10:23, 11:2
**incur** [1] - 119:9
**incurred** [6] - 100:20, 101:16, 101:21, 107:14, 120:4, 123:13
**indeed** [13] - 10:2, 11:13, 12:5, 24:6, 31:5, 49:4, 61:19, 66:5, 77:14, 81:21, 85:6, 92:9, 109:9
**indicate** [2] - 8:5, 32:21
**indicated** [9] - 7:6, 7:10, 7:22, 14:24, 37:21, 82:14, 91:14, 113:8, 125:2
**indicates** [2] - 11:21, 37:19
**indication** [1] - 31:14
**individual** [9] - 74:19, 84:7, 84:10, 84:15, 84:20, 85:17, 88:10, 108:1, 120:17
**individually** [2] - 83:15, 84:13, 129:25
**individuals** [6] - 71:16, 71:20, 77:3, 91:21, 119:1, 120:10
**information** [24] - 7:20, 10:9, 35:24, 36:2, 36:7, 36:13, 69:10, 69:21, 70:23, 71:1, 93:21, 100:2, 100:5, 100:18, 100:21, 101:4, 108:20, 109:18, 110:5, 120:14, 120:16, 120:18, 121:2, 127:17
**informed** [3] - 10:6, 49:20, 93:21
**ingredient** [1] - 120:14
**initial** [1] - 24:18
**injunction** [28] - 39:7, 39:8, 44:12, 61:3, 68:18, 82:4, 82:7, 102:7, 117:1, 117:8, 117:13, 118:15, 118:16, 118:20, 118:21, 119:18, 119:23, 120:5, 120:7, 120:10, 120:19, 121:8, 121:15, 121:18, 121:22, 123:4, 124:14, 125:2
**injunctive** [53] - 4:13, 7:11, 8:7, 8:25, 9:5, 20:22, 21:5, 28:1, 33:9, 33:11, 33:12, 33:22, 34:1, 34:5, 34:10, 34:21, 34:25, 35:5, 35:15, 37:13, 39:15, 39:22, 40:1, 40:8, 40:20, 45:23, 47:24,

Case 3:19-cv-01080-TWT Document 998-1 Filed 02/24/20 Page 147 of 185
Case 1:17-cv-02989-TWT Document 998-1 Filed 02/24/20 Page 147 of 185
Case 1:17-cv-02989-TWT Document 111 Filed 09/16/22 Page 146 of 156 PageID: 2187

146

49:1, 49:10, 49:23, 50:12, 56:3, 60:2, 60:11, 101:23, 110:24, 112:25, 113:15, 116:20, 117:2, 117:18, 117:24, 118:24, 119:13, 122:1, 122:4, 123:5, 124:3, 124:4, 124:25, 126:4, 126:8, 127:7

**injuries** [1] - 80:23

**Inkjet** [1] - 117:22

**innovative** [1] - 105:14

**input** [2] - 69:19, 121:10

**inquire** [1] - 72:25

**inquiry** [6] - 73:8, 83:13, 84:21, 85:8, 85:24, 88:5

**insist** [1] - 56:14

**instance** [2] - 39:4, 49:21

**instead** [6] - 10:13, 36:8, 36:19, 48:1, 50:24, 65:4

**instructive** [2] - 122:8, 122:25

**insufficient** [1] - 97:3

**Insurance** [7] - 72:10, 73:16, 74:14, 75:4, 75:13, 75:17, 92:15

**insurance** [1] - 117:10

**intend** [1] - 19:23

**intended** [2] - 88:17, 119:25

**interest** [5] - 53:14, 53:15, 80:7, 80:16, 112:13

**interested** [1] - 134:14

**interesting** [1] - 63:10

**interests** [11] - 53:10, 53:11, 74:9, 80:5, 80:12, 80:22, 81:10, 81:12, 83:4, 83:14, 88:21

**interim** [1] - 51:18, 66:9, 66:25, 67:4

**internet** [2] - 71:15, 99:24

**interrogatories** [1] - 93:14

**interrupt** [1] - 37:15

**intervene** [4] - 66:12, 67:12, 67:15, 93:11

**intervenors** [3] - 66:12, 67:11, 106:21

**intervenors'** [1] - 93:11

**intractable** [1] - 73:1

**introductory** [1] - 25:6

**inventory** [1] - 48:18

**investigating** [2] - 109:2, 128:19

**investigations** [1] - 105:9

**Investors** [1] - 72:21

**invitation** [1] - 57:8

**inviting** [1] - 57:1

**involve** [5] - 79:15, 85:19, 90:9, 90:10, 106:18

**involved** [8] - 16:11, 93:9, 95:22, 104:20, 106:25, 107:2, 116:14, 123:3

**involves** [1] - 90:3, 129:10

**involving** [2] - 24:7, 48:1

**ire** [1] - 91:23

**Iriarte** [1] - 126:13

**IS** [2] - 3:10, 132:7

**issue** [20] - 21:4, 24:6, 24:15, 26:2, 26:6, 28:15, 30:14, 37:16, 40:17, 42:19, 45:17, 46:9, 58:7, 70:10, 70:11, 70:12, 94:21, 114:18, 122:25

**issued** [2] - 93:14, 106:12

**issues** [14] - 26:3, 31:1, 31:4, 33:5, 33:6, 85:17, 85:18, 90:9, 90:11, 94:22, 95:3, 116:14, 118:9, 131:5

**item** [1] - 31:11

**items** [1] - 36:12

**itself** [6] - 43:4, 46:21, 82:25, 91:24, 102:17, 110:25, 113:2, 113:13, 120:21, 124:2

**J**

**James** [2] - 5:7, 71:8

**JAMES** [1] - 1:14

**Janis** [1] - 126:12

**January** [3] - 67:22, 68:8, 76:7

**jar** [2] - 29:16, 29:17, 68:25, 71:18, 78:10, 84:11, 98:24, 99:2, 112:10, 112:12, 112:15, 129:22

**jars** [11] - 29:18, 38:5, 41:13, 51:2, 69:1, 71:17, 77:1, 98:24, 100:9, 112:1, 112:6

**Jayme** [1] - 63:25

**Jeffes** [1] - 78:1

**Jenny** [1] - 126:13

**Jepson** [1] - 75:19

**Jersey** [15] - 17:5, 17:25, 31:8, 42:22, 43:6, 43:12, 51:8, 51:11, 51:19, 59:11, 64:21, 67:20, 76:16, 98:13, 134:5

**JERSEY** [2] - 1:1, 1:25

**Jim** [1] - 123:22

**job** [3] - 57:13, 111:2, 128:21

**Johnson** [22] - 7:1, 7:11, 7:15, 8:2, 8:6, 8:7, 8:11, 8:17, 9:3, 9:15, 9:18, 10:4, 10:6, 10:12, 12:15, 35:9, 35:11, 49:6, 107:19, 118:12, 126:12

**Johnson's** [2] - 9:6, 10:5

**join** [1] - 101:15

**joinder** [2] - 74:1, 77:4

**joined** [2] - 64:13, 124:9

**joint** [1] - 13:22

**JOSEPH** [1] - 1:15

**Joseph** [4] - 5:9, 13:12, 26:24, 28:13

**judge** [4] - 32:9, 58:20, 59:4, 68:12

**Judge** [32] - 7:18, 12:1, 12:2, 16:9, 23:18, 23:25, 24:4, 24:10, 24:19, 25:6, 25:22, 26:7, 26:15, 26:16, 26:17, 26:22, 32:7, 32:8, 37:15, 41:15, 52:19, 52:21, 57:12, 58:21, 58:23, 59:14, 59:16, 60:14, 61:18, 62:21, 67:19, 128:2

**judges** [1] - 59:17

**judgment** [11] - 30:10, 49:20, 49:24, 89:15, 91:2, 91:9, 96:15, 96:17, 96:22, 97:2, 115:6

**Judicial** [2] - 65:13, 90:8

**judicial** [2] - 38:19, 87:20

**July** [5] - 7:9, 65:24, 66:18, 112:2, 134:22

**JULY** [1] - 1:5

**junction** [2] - 39:1, 112:19

**juncture** [1] - 114:22

**June** [3] - 13:6, 71:18, 112:2

**junior** [1] - 47:19

**jurisdiction** [2] - 58:15, 58:19

**jurisdictions** [2] - 11:11, 61:11

**jurisprudence** [4] - 58:16, 59:2, 59:16, 59:23

**jurist** [1] - 128:4

**Justice** [2] - 58:25, 59:1

**justify** [2] - 66:7, 111:6

**K**

**Kaczmarek** [4] - 63:25, 66:18, 66:21, 67:14

**Katie** [1] - 126:11

**Keith** [3] - 5:23, 25:20, 57:3

**KEITH** [1] - 1:21

**key** [1] - 116:23

**kicker** [2] - 53:3, 56:15

**kids** [2] - 30:14, 46:7

**kind** [5] - 14:24, 38:18, 38:21, 54:8, 63:10

**kinds** [1] - 20:6

**knowing** [1] - 23:12

**known** [1] - 120:18

**knows** [2] - 16:19, 41:23

**Kotran** [1] - 5:25

**KOTRAN** [2] - 2:5, 6:1

**L**

**label** [9] - 65:9, 69:9, 78:9,

**JOSEPH** column continues... 

78:23, 82:5, 118:18, 120:15, 120:19, 120:24

**labeling** [8] - 10:21, 49:9, 69:6, 78:14, 80:1, 94:20, 94:22, 112:21

**labels** [10] - 41:13, 41:16, 41:18, 45:4, 46:12, 46:18, 48:20, 119:10, 119:16

**lack** [1] - 111:5

**LANGONE** [11] - 2:11, 6:8, 37:8, 37:11, 37:23, 38:9, 39:1, 39:25, 41:2, 54:11, 54:13

**Langone** [9] - 4:14, 6:9, 37:11, 37:16, 45:13, 50:3, 57:22, 62:8, 127:14

**Langone's** [2] - 37:17, 50:2

**language** [3] - 48:21, 77:18, 121:13

**Lanham** [1] - 48:4

**large** [4] - 97:17, 111:11, 112:23, 129:4

**large-scale** [1] - 111:11

**largely** [4] - 11:9, 53:2, 82:12, 123:18

**larger** [1] - 29:17

**Larry** [2] - 7:1, 7:11

**Larsen** [4] - 23:22, 23:24, 62:4, 62:10

**last** [10] - 6:22, 7:9, 25:21, 33:24, 69:16, 97:9, 125:9, 130:8, 130:13, 131:8

**late** [3] - 32:8, 67:18, 93:19

**Laura** [1] - 66:11

**law** [18] - 7:23, 11:10, 15:8, 34:9, 40:23, 58:13, 74:3, 74:17, 77:7, 77:10, 77:15, 78:6, 78:12, 84:19, 87:14, 87:18, 128:23

**lawsuits** [1] - 11:3

**lawyer** [1] - 52:9

**lawyers** [10] - 15:21, 16:7, 17:25, 25:11, 25:20, 45:22, 53:23, 53:24, 60:23, 117:4

**lay** [1] - 40:21

**lead** [2] - 66:25, 67:4

**leading** [1] - 26:12

**leads** [1] - 15:9

**least** [8] - 14:23, 40:20, 49:12, 69:16, 77:10, 78:9, 91:14, 108:2

**leave** [8] - 37:25, 38:1, 38:5, 72:11, 90:22, 111:20, 112:11, 131:14

**leaving** [1] - 112:4

**Leesberg** [1] - 76:22

**left** [5] - 20:5, 59:2, 59:8, 59:15, 109:11

**legal** [9] - 18:6, 79:10, 79:21, 79:24, 85:12, 85:18, 85:21,

90:11, 129:17
**legs** [1] - 12:18
**length** [1] - 91:5
**lengths** [1] - 24:5
**lengthy** [1] - 63:21
**lens** [1] - 92:24
**less** [12] - 13:9, 22:1, 62:12, 105:19, 106:8, 110:1, 111:9, 112:17, 119:8, 121:7, 121:21, 122:1
**lesser** [1] - 108:23
**LESTER** [1] - 2:9
**Lester** [1] - 6:4
**letters** [1] - 6:21
**leverage** [3] - 42:20, 43:16, 43:18
**Levy** [18] - 4:11, 4:14, 6:4, 23:20, 24:17, 24:21, 27:4, 28:16, 31:21, 41:6, 44:1, 44:4, 44:6, 50:15, 53:18, 81:21, 98:16, 125:6
**LEVY** [22] - 2:9, 6:3, 21:11, 21:14, 21:19, 21:23, 21:25, 22:7, 22:19, 22:23, 23:3, 41:7, 41:9, 42:14, 42:17, 43:8, 50:16, 51:21, 52:3, 52:20, 55:1, 56:8
**Levy's** [2] - 27:1, 44:21
**Lexis** [3] - 72:22, 85:1, 101:2
**liability** [9] - 85:5, 89:10, 93:24, 95:8, 96:1, 96:24, 97:22, 98:4, 127:2
**Liability** [2] - 80:18, 87:12
**liberal** [1] - 59:8
**light** [7] - 89:17, 89:20, 89:24, 95:18, 97:22, 97:25, 116:24
**likelihood** [1] - 94:3
**likely** [11] - 75:2, 83:23, 89:4, 90:2, 91:2, 95:9, 98:6, 98:23, 119:8, 119:25, 125:13
**Linares** [3] - 23:25, 24:4, 24:10
**line** [2] - 56:18, 99:3
**lion's** [1] - 124:20
**list** [1] - 105:2
**listed** [2] - 15:20, 16:5
**litigated** [1] - 93:8
**litigating** [6] - 62:8, 62:10, 63:11, 94:7, 106:8, 115:18
**Litigation** [17] - 65:14, 65:17, 67:3, 73:17, 76:3, 76:15, 77:21, 80:19, 81:13, 87:12, 90:8, 96:2, 97:20, 100:14, 101:9, 103:3, 103:20
**litigation** [32] - 17:13, 73:11, 83:17, 83:21, 87:21, 89:5, 89:21, 90:2, 90:5, 90:12, 91:6, 91:8, 91:12, 94:3,

95:20, 96:9, 97:19, 101:17, 104:22, 108:3, 111:12, 111:16, 114:4, 114:14, 114:24, 115:9, 115:11, 115:16, 120:21, 123:13, 129:2
**live** [1] - 61:23
**LLC** [1] - 1:18
**LLP** [3] - 1:15, 1:17, 66:23
**lodestar** [19] - 14:17, 14:19, 15:5, 16:24, 19:16, 54:19, 54:20, 55:18, 103:9, 103:12, 103:23, 104:1, 104:2, 104:6, 105:25, 106:5, 110:7, 110:9, 127:21
**lodged** [5] - 71:22, 123:23, 125:3, 126:1, 127:10
**look** [13] - 26:8, 26:20, 28:22, 36:2, 36:7, 36:8, 39:15, 40:5, 40:12, 40:13, 47:8, 47:23, 52:6
**looked** [1] - 51:9
**looking** [8] - 14:18, 19:17, 22:12, 36:6, 39:22, 48:7, 49:7, 113:6
**loss** [16] - 8:18, 8:20, 8:21, 8:22, 20:6, 26:2, 31:7, 31:10, 31:22, 51:13, 59:12, 81:6, 95:2, 95:9, 98:8, 98:13
**losses** [1] - 84:10
**love** [1] - 30:14
**low** [2] - 77:19, 117:19
**loyal** [1] - 11:1
**Lucent** [2] - 76:14, 103:21
**lucky** [1] - 51:23
**Lynch** [2] - 77:20, 79:5

## M

**magazines** [2] - 70:9, 70:12
**mailed** [1] - 71:5
**maintain** [1] - 76:18
**maintained** [1] - 74:12
**maintaining** [3] - 76:10, 89:12, 96:3
**major** [5] - 9:20, 31:23, 42:19, 51:16
**majority** [1] - 65:21
**man** [1] - 63:18
**managed** [1] - 115:19
**management** [2] - 73:2, 83:24, 109:4
**manipulable** [1] - 117:3
**manner** [4] - 14:15, 99:17, 99:20, 103:18
**March** [1] - 101:9
**market** [6] - 10:11, 31:15, 31:17, 47:17, 108:17,

108:18
**marketed** [3] - 64:12, 64:25, 120:22
**marketing** [14] - 9:12, 46:14, 66:3, 68:18, 69:25, 80:1, 81:5, 82:4, 90:18, 112:21, 119:11, 119:12, 121:7
**Marketing** [1] - 67:3
**markets** [1] - 64:8
**Marnie** [1] - 63:24
**MARNIE** [1] - 1:3
**material** [1] - 21:8
**materials** [1] - 11:16
**MATTER** [2] - 3:12, 132:8
**matter** [15] - 29:4, 30:9, 35:17, 82:2, 82:16, 91:12, 106:8, 107:5, 107:19, 109:2, 109:10, 109:25, 111:13, 130:11, 130:21
**matters** [2] - 36:4, 108:9
**maximum** [1] - 69:1
**McCoy** [2] - 117:5, 117:7
**McDonough** [1] - 101:1
**MDL** [2] - 60:24, 65:22
**mean** [2] - 58:1, 120:6
**meaningful** [2] - 10:1, 113:18
**means** [2] - 42:24, 108:7
**meanwhile** [1] - 66:15
**measure** [5] - 94:7, 98:25, 111:10, 113:21, 118:20
**measures** [1] - 111:2
**media** [2] - 69:7, 100:10
**Media** [1] - 70:17
**mediate** [1] - 67:18
**mediated** [1] - 24:19
**mediation** [5] - 26:7, 26:18, 93:18, 106:25, 128:1
**mediator** [3] - 26:12, 32:5, 32:18
**meet** [2] - 75:3, 84:17
**meeting** [1] - 83:7
**meets** [1] - 20:19
**member** [5] - 30:12, 44:17, 57:19, 84:15, 100:3
**members** [51] - 14:4, 29:9, 29:15, 29:18, 45:17, 47:1, 50:5, 62:19, 68:11, 68:14, 68:22, 68:24, 73:20, 74:2, 74:17, 74:19, 76:13, 77:4, 77:25, 78:3, 78:7, 78:11, 78:22, 79:15, 79:25, 80:23, 81:7, 83:14, 83:19, 84:20, 85:9, 85:10, 85:13, 85:15, 87:9, 88:6, 88:21, 91:13, 91:15, 92:2, 92:6, 92:8, 92:13, 92:17, 99:17, 99:19, 104:17, 105:7, 113:3, 115:21, 116:22
**members'** [1] - 81:12

**memorialized** [1] - 68:1
**Mercedes** [2] - 59:19, 92:16
**merge** [2] - 79:3, 80:25
**merit** [3] - 83:2, 129:9, 130:2
**merits** [7] - 78:20, 84:2, 93:1, 97:18, 111:5, 120:21, 120:23
**Merola** [1] - 49:17
**Merrill** [2] - 77:20, 79:5
**message** [4] - 36:14, 36:15, 36:24, 90:24
**messages** [4] - 8:15, 78:13, 78:15, 78:18
**met** [5] - 72:18, 75:7, 76:21, 78:25, 86:1
**method** [9] - 100:11, 103:8, 103:9, 103:12, 103:16, 103:23, 104:5, 104:8
**methods** [3] - 74:20, 83:10, 84:3
**middle** [1] - 59:4
**might** [11] - 31:12, 35:22, 38:17, 39:17, 40:5, 56:2, 56:24, 94:20, 106:16, 107:13, 112:15
**militates** [1] - 116:3
**milk** [1] - 65:5
**million** [36] - 8:21, 8:23, 9:1, 22:13, 22:20, 22:21, 23:11, 40:7, 40:8, 40:20, 50:17, 50:24, 50:25, 55:19, 55:20, 55:24, 56:2, 56:14, 71:14, 71:16, 71:19, 100:7, 100:9, 102:1, 102:9, 102:12, 102:13, 102:14, 107:3, 110:14, 112:6, 116:16, 117:23, 118:1, 124:15
**millions** [4] - 49:4, 77:1, 106:18, 118:18
**Milliron** [1] - 113:25
**mine** [2] - 32:7, 63:15
**minimal** [1] - 117:13
**minimum** [1] - 76:17
**minor** [1] - 119:12
**misleading** [10] - 45:7, 45:15, 45:21, 46:5, 58:10, 69:18, 69:22, 78:9, 112:21, 121:1
**mistake** [1] - 131:13
**Mobile** [3] - 17:21, 17:25, 24:13
**Mobility** [1] - 22:5
**modern** [1] - 106:17
**modification** [1] - 56:11
**modifications** [1] - 56:22
**modify** [5] - 50:22, 56:9, 69:8, 96:8, 102:24
**moment** [3] - 51:15, 107:12, 113:15
**moments** [3] - 52:18, 53:25,

112:24
**moms** [1] - 46:7
**Monday** [1] - 6:22
**monetary** [26] - 4:11, 20:17, 20:20, 21:3, 21:6, 21:8, 27:6, 27:13, 27:23, 28:2, 28:7, 33:2, 33:22, 49:18, 58:5, 59:25, 82:3, 101:20, 102:9, 110:15, 113:12, 121:17, 124:1, 124:17, 124:24, 126:24
**money** [12] - 40:10, 55:6, 55:16, 56:16, 57:8, 58:25, 62:2, 68:17, 90:4, 91:7, 102:10, 129:3
**monitor** [1] - 126:8
**Montgomery** [3] - 17:22, 17:23, 18:5
**moon** [1] - 16:21
**Moore's** [1] - 76:22
**moot** [5] - 29:7, 72:4, 121:12, 126:10, 126:22
**mooted** [1] - 8:3
**moreover** [4] - 41:18, 81:14, 94:23, 105:20
**morning** [18] - 5:3, 5:6, 5:9, 5:11, 5:12, 5:15, 5:16, 5:19, 5:20, 5:22, 6:1, 6:3, 6:5, 6:8, 7:7, 26:23, 130:12, 130:15
**most** [7] - 13:1, 20:7, 21:1, 93:17, 106:22, 118:9
**motion** [33] - 7:13, 8:4, 31:5, 42:22, 43:12, 51:8, 51:17, 65:13, 65:18, 65:23, 66:14, 66:15, 67:7, 67:10, 67:12, 67:13, 67:22, 67:24, 71:9, 90:20, 90:21, 90:25, 93:10, 93:11, 93:12, 94:12, 99:15, 99:18, 107:8, 108:4, 109:7, 110:3, 111:17
**motions** [9] - 7:14, 15:6, 28:24, 63:23, 66:17, 67:15, 91:2, 91:4, 130:22
**Motors** [3] - 87:17, 88:16, 122:18
**moved** [1] - 58:12
**moving** [1] - 64:13
**MR** [89] - 5:6, 5:11, 5:13, 5:15, 5:17, 5:19, 5:22, 6:3, 6:5, 6:8, 13:11, 14:6, 16:9, 17:7, 17:11, 17:22, 18:2, 18:7, 18:13, 18:23, 19:10, 21:11, 21:14, 21:19, 21:23, 21:25, 22:7, 22:19, 22:23, 23:3, 23:18, 25:5, 25:8, 26:23, 27:8, 27:15, 27:17, 28:4, 28:13, 29:5, 30:4, 32:11, 32:16, 32:24, 33:3, 33:10, 35:20, 36:5, 36:18,

37:5, 37:8, 37:11, 37:15, 37:23, 38:9, 39:1, 39:25, 41:2, 41:7, 41:9, 42:14, 42:17, 43:8, 44:3, 45:12, 49:15, 50:16, 51:21, 52:3, 52:20, 52:24, 54:6, 54:10, 54:11, 54:13, 55:1, 56:8, 57:3, 57:9, 57:18, 58:1, 59:14, 63:17, 107:15, 107:20, 130:5, 130:15, 131:15, 131:18
**MS** [2] - 5:20, 6:1
**Multidistrict** [2] - 65:13, 90:8
**multiple** [1] - 54:14
**multiplied** [1] - 107:25
**multiplier** [3] - 61:25, 104:2, 104:3
**multiplies** [1] - 103:12
**must** [21] - 14:22, 31:8, 49:19, 51:6, 72:16, 72:18, 74:25, 75:2, 80:4, 80:21, 83:8, 84:18, 87:8, 95:7, 98:8, 99:16, 102:15, 106:16, 113:21, 116:25, 119:9
**muster** [1] - 39:12
**MY** [2] - 3:11, 132:7

## N

**NAD** [2] - 48:5, 60:3
**naked** [2] - 35:1, 35:7
**name** [3] - 6:6, 37:9, 72:12
**named** [13] - 76:19, 77:9, 79:11, 79:14, 80:13, 80:17, 81:2, 84:18, 101:14, 123:8, 123:10, 123:11, 125:4
**nascent** [1] - 115:16
**nation's** [1] - 26:12
**national** [2] - 32:17, 111:1
**nationwide** [8] - 13:17, 13:18, 29:14, 43:17, 46:3, 64:10, 64:21, 91:15
**naturally** [1] - 82:8
**nature** [3] - 35:13, 36:16, 83:17
**Neal** [2] - 77:12, 78:1
**nearly** [6] - 100:8, 107:2, 109:9, 109:13, 112:6, 115:11
**necessarily** [5] - 56:4, 82:24, 99:18, 108:11, 114:11
**necessary** [7] - 12:14, 34:25, 35:4, 74:24, 75:3, 77:16, 90:15
**need** [14] - 11:21, 14:21, 16:23, 28:22, 31:25, 56:4, 72:25, 90:16, 105:15, 110:5, 119:16, 124:6, 128:8, 130:4

**needed** [2] - 35:6, 43:17
**negative** [3] - 11:2, 92:10, 92:15
**negotiate** [1] - 115:20
**negotiated** [7] - 60:1, 60:11, 61:17, 105:11, 114:2
**negotiating** [3] - 60:5, 93:2, 114:19
**negotiations** [4] - 75:22, 88:11, 88:20, 96:25
**Net** [1] - 117:5
**nets** [1] - 22:20
**Network** [1] - 70:17
**neutral** [5] - 96:6, 96:13, 96:22, 97:6, 115:7
**never** [10] - 16:22, 19:23, 29:3, 51:17, 63:14, 90:24, 94:13, 95:6, 111:15, 111:21
**nevertheless** [5] - 81:18, 87:25, 90:9, 95:12, 118:15
**new** [15] - 36:19, 45:14, 45:15, 45:20, 48:16, 48:20, 51:1, 70:1, 119:10, 119:11, 121:10, 128:8, 128:23
**NEW** [4] - 1:1, 1:15, 1:17, 1:25
**New** [22] - 17:5, 17:25, 18:24, 21:16, 31:8, 39:19, 42:22, 43:5, 43:6, 43:11, 43:12, 51:8, 51:11, 51:19, 59:11, 64:21, 67:20, 76:16, 98:13, 125:6, 125:14, 134:5
**Newton** [5] - 77:20, 79:5, 79:13, 79:17, 80:9
**next** [6] - 8:20, 43:20, 86:3, 96:3, 116:19, 126:23
**Nicholas** [2] - 67:18, 93:19
**nil** [1] - 36:10
**nine** [3] - 75:18, 88:24, 89:19
**Ninth** [3] - 40:2, 40:11, 122:7
**NJ** [1] - 1:10
**NO** [1] - 1:2
**non** [6] - 41:11, 42:3, 49:18, 99:16, 104:23, 115:4
**non-cash** [2] - 41:11, 42:3
**non-monetary** [1] - 49:18
**non-payment** [2] - 104:23, 115:4
**non-taxable** [1] - 99:16
**none** [4] - 18:19, 35:22, 108:6, 127:12
**nonetheless** [3] - 10:12, 78:22, 114:18
**nonpayment** [1] - 115:3
**nontransferable** [1] - 117:24
**normal** [2] - 17:25, 18:5
**Northern** [1] - 117:25
**notations** [1] - 71:15
**note** [20] - 6:18, 7:21, 9:3,

9:21, 9:22, 10:12, 11:6, 11:23, 12:12, 77:19, 82:20, 95:6, 106:7, 106:14, 106:16, 109:8, 113:11, 127:11, 130:7, 131:2
**Note** [1] - 104:12
**noted** [6] - 12:2, 105:3, 108:14, 108:19, 111:25, 127:19
**NOTES** [2] - 3:11, 132:7
**notes** [4] - 11:19, 13:3, 13:4, 94:19
**nothing** [16] - 14:25, 24:11, 24:16, 24:24, 25:1, 30:11, 35:6, 37:19, 49:4, 49:5, 61:24, 62:3, 118:14, 119:21, 120:3, 128:7
**notice** [25] - 13:22, 22:15, 24:9, 56:1, 56:5, 56:6, 67:25, 70:8, 70:15, 70:22, 92:6, 98:10, 99:9, 99:11, 99:12, 99:15, 100:12, 100:15, 100:23, 101:5, 101:7, 101:10, 125:8, 125:23, 128:5
**notices** [1] - 99:22
**noting** [1] - 88:5
**notion** [1] - 59:7
**November** [1] - 93:20
**nucleus** [1] - 85:19
**number** [37] - 13:10, 15:11, 19:1, 19:20, 29:20, 36:6, 61:16, 69:3, 71:21, 71:25, 72:5, 76:17, 76:20, 78:17, 82:23, 91:16, 91:22, 92:2, 92:5, 92:7, 92:10, 92:15, 99:10, 100:7, 102:12, 103:12, 104:15, 106:15, 109:17, 111:24, 112:22, 113:3, 113:8, 120:8, 122:8, 124:8
**numbers** [4] - 14:8, 35:10, 48:12, 92:18
**numerosity** [1] - 76:8, 76:12, 76:24
**numerous** [4] - 28:19, 66:7, 74:1, 128:1
**nut** [1] - 30:14
**Nutella** [46] - 8:9, 9:10, 9:20, 9:25, 10:17, 29:11, 31:18, 37:22, 38:5, 41:18, 44:12, 46:6, 46:21, 46:24, 64:8, 64:12, 65:1, 65:6, 67:3, 68:6, 69:8, 70:4, 71:17, 76:6, 77:1, 78:10, 78:16, 80:1, 81:6, 82:5, 84:11, 95:4, 95:13, 98:20, 98:21, 99:24, 100:9, 112:1, 119:2, 119:4, 119:17, 120:21, 125:5, 127:3, 129:21,

129:22
**Nutella's** [4] - 68:18, 69:9, 119:12, 129:11
**nutritional** [8] - 10:8, 35:24, 36:2, 36:6, 65:3, 69:10, 70:3, 119:4
**nutritious** [5] - 36:21, 46:22, 46:25, 65:1

### O

**object** [5] - 50:5, 126:1, 126:4, 127:16, 128:15
**objected** [2] - 42:19, 82:21
**objecting** [3] - 70:24, 100:3, 123:15
**objection** [20] - 21:8, 28:6, 28:20, 38:3, 43:10, 45:3, 83:2, 121:11, 123:23, 124:9, 124:10, 125:3, 126:1, 126:9, 126:17, 127:11, 128:11, 128:21, 129:3, 129:10
**Objections** [1] - 92:13
**objections** [27] - 21:1, 23:20, 27:9, 28:18, 45:1, 71:22, 72:3, 91:16, 91:19, 91:22, 92:1, 92:17, 100:16, 104:17, 113:7, 113:9, 113:11, 113:12, 113:14, 113:18, 123:17, 126:17, 128:8, 128:15, 128:18, 130:24
**objector** [8] - 6:4, 6:20, 33:15, 37:6, 50:10, 52:10, 81:18, 128:13
**OBJECTORS** [1] - 2:8
**objectors** [40] - 6:9, 20:25, 21:13, 25:9, 25:14, 26:13, 28:9, 29:20, 32:3, 33:6, 37:12, 45:24, 47:10, 62:6, 63:13, 71:25, 78:17, 82:23, 91:17, 92:7, 95:6, 99:10, 100:17, 102:2, 102:9, 119:18, 120:9, 120:16, 121:9, 122:9, 124:16, 126:11, 126:15, 126:19, 126:21, 127:9, 129:5, 129:7, 131:10, 131:11
**objects** [4] - 124:10, 124:19, 125:7, 127:5
**observation** [1] - 24:18
**observed** [1] - 110:17
**obstacles** [3] - 58:13, 60:24, 95:3
**obtain** [2] - 30:7, 30:17
**obtained** [2] - 46:1, 101:24
**obtaining** [1] - 82:21
**obviously** [14] - 6:12, 20:16, 31:3, 33:15, 33:19, 33:21,

33:23, 36:3, 38:12, 40:3, 45:18, 49:5, 54:13, 56:17
**occur** [1] - 121:8
**occurred** [2] - 10:20, 128:3
**October** [2] - 67:16, 93:19
**OF** [5] - 1:1, 1:4, 2:8, 3:11, 132:7
**offensive** [2] - 45:4, 45:13
**offered** [1] - 118:13
**office** [1] - 109:4
**OFFICIAL** [3] - 1:24, 3:17, 132:12
**Official** [1] - 134:3
**often** [1] - 36:1
**Oil** [1] - 85:6
**old** [1] - 115:14
**Olstein** [1] - 66:24
**OLSTEIN** [1] - 1:13
**ON** [1] - 2:8
**once** [1] - 47:17
**one** [56] - 6:18, 7:14, 12:25, 15:2, 15:9, 16:1, 22:11, 23:5, 24:18, 25:5, 26:13, 27:4, 27:18, 28:17, 29:5, 31:1, 31:4, 31:14, 36:12, 37:1, 38:17, 42:5, 48:8, 49:15, 50:2, 51:22, 52:2, 59:15, 63:13, 63:15, 68:5, 69:15, 74:1, 76:25, 77:10, 77:15, 78:9, 80:6, 81:24, 89:4, 95:7, 98:12, 98:19, 103:15, 104:14, 105:6, 105:17, 107:12, 110:1, 122:4, 123:15, 129:22, 130:13, 130:15, 131:11
**one-eighth** [1] - 23:5
**ones** [1] - 31:16
**online** [1] - 71:3, 129:11
**only'** [1] - 74:23
**open** [1] - 5:1
**operative** [1] - 85:19
**opine** [3] - 8:19, 12:10, 53:17
**opines** [1] - 69:25
**opinion** [15] - 12:11, 12:15, 12:18, 12:20, 31:2, 34:20, 52:17, 64:7, 66:1, 72:13, 91:20, 122:9, 124:6, 131:4, 131:8
**opinions** [4] - 24:3, 47:2, 47:3, 51:10
**opportunity** [4] - 25:13, 94:14, 129:1, 131:9
**oppose** [1] - 124:1
**opposed** [6] - 8:12, 15:25, 21:2, 35:25, 66:14, 105:8
**opposing** [1] - 113:25
**opt** [4] - 57:20, 57:21, 57:23, 129:1
**opted** [1] - 57:24
**opting** [2] - 70:23, 100:4

**options** [1] - 100:2
**oral** [1] - 65:24
**order** [10] - 7:17, 7:18, 8:1, 44:22, 45:16, 72:15, 94:3, 98:21, 130:4, 130:5
**Organics** [1] - 76:23
**original** [1] - 98:21
**outcome** [1] - 99:4
**outset** [3] - 14:14, 106:7, 127:11
**outside** [1] - 82:25
**outstrip** [1] - 118:6
**outweigh** [1] - 105:18
**overall** [5] - 4:11, 20:17, 27:12, 28:17, 112:24
**overbroad** [1] - 73:5
**overcompensates** [1] - 124:11
**overlaps** [1] - 105:21
**overreaching** [1] - 117:3
**oversight** [1] - 38:1
**overstated** [1] - 115:23
**overvalued** [1] - 120:8
**own** [10] - 21:17, 21:19, 52:16, 53:10, 53:14, 53:19, 62:2, 62:3, 84:16, 129:2

### P

**P.C** [1] - 1:13
**package** [7] - 35:25, 40:6, 40:12, 41:4, 60:17, 69:11
**Padres** [1] - 70:11
**page** [5] - 9:22, 43:20, 74:14, 86:3, 128:21
**Page** [1] - 4:2
**pages** [7] - 24:3, 33:1, 43:9, 93:15, 106:14, 106:19, 113:10
**paid** [13] - 53:9, 53:13, 54:18, 55:17, 55:19, 99:2, 101:22, 102:4, 117:9, 127:3, 128:20, 128:22, 129:21
**painstaking** [2] - 12:6, 12:13
**Panel** [2] - 65:13, 90:8
**panel** [1] - 65:25
**papers** [18] - 6:22, 6:23, 6:24, 21:24, 22:1, 25:13, 28:9, 30:5, 32:10, 33:18, 37:4, 44:6, 50:12, 53:19, 54:14, 57:5, 57:15, 126:14
**paragraph** [4] - 14:2, 14:10, 70:5, 109:5
**paragraphs** [1] - 46:16
**paralegals** [1] - 19:4
**parent** [1] - 36:23
**Parenting** [1] - 70:17
**parents** [1] - 70:10
**part** [13] - 37:20, 38:24, 41:11, 41:14, 44:14, 47:1,

50:17, 54:9, 56:3, 80:21, 127:13, 130:10, 130:17
**participated** [2] - 7:3, 106:24
**particular** [8] - 16:13, 38:24, 69:9, 78:12, 83:22, 98:4, 99:14, 126:4
**particularly** [7] - 16:25, 25:19, 87:16, 87:18, 88:19, 120:2, 130:7
**parties** [29] - 9:4, 34:17, 40:14, 66:5, 67:17, 68:20, 69:4, 74:6, 74:8, 76:4, 79:7, 80:13, 80:17, 87:23, 90:14, 93:6, 93:9, 93:13, 93:17, 98:22, 103:5, 106:7, 106:24, 112:9, 113:11, 122:16, 122:24, 127:25, 134:12
**parties'** [1] - 64:2
**partner** [3] - 19:4, 108:15, 109:1
**partners** [4] - 16:6, 17:8, 17:9, 19:13
**partook** [1] - 93:18
**parts** [2] - 68:16, 129:4
**party** [3] - 76:12, 93:14, 106:11
**passed** [2] - 50:6, 58:25
**passes** [1] - 39:11
**past** [3] - 68:17, 82:3, 115:15
**path** [1] - 60:24
**paucity** [2] - 100:21, 109:18
**pause** [1] - 25:4
**PAXSON** [1] - 1:25
**pay** [9] - 15:24, 19:2, 29:24, 40:7, 55:6, 68:21, 96:23, 102:11
**paying** [2] - 16:2, 17:4
**payment** [8] - 62:14, 68:17, 82:3, 82:6, 82:22, 104:23, 115:4, 123:9
**payout** [2] - 91:10, 112:15
**penalizes** [1] - 103:19
**pending** [3] - 28:24, 65:15, 66:17
**Penn** [1] - 101:3
**Pennsylvania** [1] - 117:16
**pension** [2] - 34:3, 34:8
**pensioners** [1] - 34:7
**People** [1] - 70:10
**people** [7] - 19:12, 36:1, 36:2, 36:3, 36:6, 45:21, 112:22
**per** [6] - 68:25, 98:24, 108:16, 112:10, 112:12, 112:14
**percent** [33] - 8:20, 23:3, 23:4, 23:5, 29:10, 29:15, 29:16, 29:21, 30:19, 30:20, 30:21, 30:22, 97:24,

101:20, 102:4, 102:6, 102:14, 110:14, 110:18, 110:22, 110:25, 112:3, 116:4, 116:6, 116:7, 116:11, 116:16, 116:17, 117:9, 122:17, 129:16
**percentage** [18] - 14:19, 22:14, 23:10, 30:6, 30:15, 30:16, 50:10, 103:8, 103:9, 103:10, 103:16, 103:24, 104:4, 104:8, 105:10, 111:6, 116:9, 124:23
**percentage-of** [2] - 103:24, 104:4
**percentage-of-recovery** [4] - 103:8, 103:9, 103:16, 104:8
**perfect** [3] - 39:16, 47:24, 101:6
**perform** [1] - 128:21
**performance** [1] - 113:25
**performed** [3] - 103:25, 111:11, 114:25
**performing** [1] - 106:4
**perhaps** [13] - 9:7, 26:1, 35:21, 47:25, 52:7, 77:1, 98:20, 100:23, 109:7, 111:4, 114:7, 124:12, 131:13
**period** [7] - 29:19, 44:16, 65:11, 68:9, 68:25, 77:2, 112:7
**permission** [1] - 23:19
**permitted** [1] - 107:22
**permitting** [1] - 73:10
**person** [1] - 32:13
**personally** [1] - 57:12
**persons** [8] - 68:4, 68:15, 76:5, 82:8, 82:10, 84:25, 104:15, 111:24
**perspective** [1] - 25:25
**persuaded** [1] - 40:5
**pertains** [1] - 82:7
**Pet** [2] - 80:18, 81:1
**Peter** [2] - 46:13, 69:23
**petition** [2] - 55:12, 56:1
**philosophy** [1] - 59:7
**phone** [1] - 10:3
**phrase** [2] - 35:22, 38:15
**Pick** [2] - 87:11, 103:3
**Pick-Up** [2] - 87:11, 103:3
**pie** [1] - 21:18
**piece** [1] - 21:18
**place** [4] - 45:5, 106:9, 119:16, 134:8
**plagiarized** [1] - 129:4
**plain** [1] - 38:14
**plaintiff** [10] - 22:19, 23:14, 34:19, 65:12, 66:17, 76:19, 94:16, 98:8, 123:8, 125:4

**plaintiff's** [4] - 48:1, 49:21, 107:1, 117:20
**Plaintiffs** [2] - 1:4, 1:19
**plaintiffs** [59] - 9:11, 11:12, 13:13, 25:11, 25:24, 28:14, 63:23, 63:25, 64:9, 64:13, 65:10, 66:9, 67:8, 67:22, 69:5, 69:21, 69:23, 76:9, 76:17, 76:20, 77:10, 79:14, 81:2, 81:7, 81:10, 83:5, 84:10, 84:18, 85:14, 85:15, 85:22, 94:11, 94:24, 94:25, 95:1, 95:7, 95:9, 95:12, 95:22, 95:25, 98:1, 99:1, 101:24, 101:25, 106:14, 107:6, 110:23, 112:12, 113:9, 119:9, 121:4, 121:12, 121:16, 121:21, 123:10, 123:12, 123:14, 125:12, 125:15
**plaintiffs'** [25] - 5:13, 11:7, 15:16, 32:5, 52:14, 55:1, 55:6, 64:16, 64:18, 64:24, 71:11, 78:17, 79:22, 84:12, 101:14, 101:19, 102:5, 104:25, 107:8, 107:9, 112:20, 118:13, 118:16, 121:16, 130:19
**planning** [1] - 70:3
**plausible** [1] - 55:4
**play** [1] - 47:6
**plead** [1] - 98:8
**pleadings** [3] - 108:4, 109:3
**Plough** [2] - 77:12, 77:19
**plural** [1] - 77:17
**plus** [1] - 101:21
**pockets** [2] - 53:23, 53:24
**point** [30] - 6:23, 14:22, 17:15, 27:8, 27:18, 29:6, 33:14, 39:6, 39:25, 41:2, 41:10, 43:8, 45:25, 48:24, 50:2, 52:7, 52:13, 58:11, 59:22, 60:15, 60:17, 61:2, 65:9, 71:24, 84:13, 95:10, 102:9, 119:19, 125:10, 130:8
**point-of-sale** [1] - 65:9
**pointed** [1] - 77:14
**points** [5] - 37:14, 38:9, 51:21, 124:8, 129:6
**policy** [1] - 59:9
**Politan** [12] - 24:19, 25:22, 26:7, 26:15, 26:17, 32:7, 32:9, 57:12, 59:17, 67:18, 93:19, 128:2
**Politan's** [1] - 61:18
**poor** [2] - 60:15, 97:11
**popular** [1] - 99:24
**portion** [14] - 4:13, 20:22, 23:7, 27:12, 28:1, 40:13,

55:12, 55:20, 56:19, 99:2, 125:18, 127:3, 129:21, 129:23
**portrait** [1] - 58:25
**poses** [1] - 34:17
**position** [6] - 17:12, 40:2, 40:19, 41:3, 55:25, 56:13
**possess** [1] - 80:22
**possible** [6] - 11:17, 89:17, 89:20, 95:18, 95:19, 98:10
**possibly** [1] - 97:23
**post** [3] - 91:4, 100:24, 101:4
**post-trial** [1] - 91:4
**posture** [1] - 116:12
**pot** [3] - 40:9, 40:10, 56:17
**potential** [17] - 14:3, 23:4, 23:7, 23:13, 76:19, 84:9, 84:14, 90:13, 90:16, 91:10, 92:2, 92:6, 94:2, 96:24, 119:3, 127:21
**potentially** [7] - 40:16, 69:18, 69:21, 79:11, 109:17, 112:22, 121:1
**practical** [2] - 70:3, 120:20
**Practice** [1] - 76:22
**practice** [15] - 16:11, 17:13, 25:10, 31:5, 51:8, 51:11, 52:12, 58:14, 58:15, 79:20, 90:20, 93:10, 108:4, 109:8
**practices** [4] - 66:3, 69:25, 81:8, 85:16
**Practices** [2] - 67:3, 73:16
**precede** [2] - 75:22, 88:11
**precedence** [1] - 54:16
**precisely** [3] - 76:13, 117:1, 129:24
**predicated** [1] - 79:24
**predict** [1] - 98:22
**predominance** [4] - 84:21, 85:7, 85:24, 86:1
**predominate** [3] - 74:18, 84:19, 85:4
**preemption** [1] - 94:22
**preliminarily** [1] - 67:24
**preliminary** [4] - 24:1, 45:20, 67:23, 68:8
**Prepaid** [1] - 98:11
**preparation** [1] - 90:10
**prepared** [4] - 37:24, 39:9, 63:21, 93:18
**preponderance** [1] - 74:25
**prerequisites** [4] - 73:24, 74:11, 75:7, 76:10
**presence** [3] - 104:16, 113:6, 113:17
**present** [6] - 12:24, 42:1, 73:1, 81:19, 101:11, 131:10
**presentations** [1] - 12:24
**presented** [4] - 59:13, 94:21,

95:3, 100:23
**presenting** [1] - 27:2
**preserving** [1] - 50:6
**presiding** [1] - 68:12
**press** [2] - 25:9, 25:14
**pressed** [1] - 35:19
**presumably** [2] - 10:15, 39:5
**presumption** [2] - 92:3, 92:8
**pretrial** [1] - 65:19
**pretty** [2] - 36:9, 53:1
**prevent** [4] - 44:22, 55:23, 68:19, 121:17
**previous** [1] - 114:17
**previously** [2] - 104:12, 120:12
**price** [13] - 29:11, 29:16, 29:17, 29:25, 30:2, 30:7, 30:21, 98:7, 98:21, 99:2, 125:19, 129:21, 129:24
**pricing** [2] - 31:17, 31:18
**primarily** [1] - 124:10
**primary** [2] - 104:7, 121:4
**principle** [4] - 24:20, 24:22, 44:5, 124:19
**principles** [2] - 85:21, 89:24
**print** [3] - 41:19, 65:8, 69:6
**printed** [1] - 71:5
**private** [2] - 16:16, 105:11
**privilege** [1] - 57:12
**pro** [2] - 52:9, 69:2
**Pro** [1] - 2:14
**Pro-Se** [1] - 2:14
**probable** [1] - 90:4
**probative** [1] - 113:18
**problem** [4] - 14:20, 20:12, 29:21, 34:18
**problematic** [1] - 118:5
**problems** [3] - 41:10, 42:2, 73:2
**procedural** [1] - 130:22
**Procedure** [5] - 64:3, 72:18, 72:20, 75:14, 96:7
**proceed** [4] - 76:13, 90:19, 91:1, 115:15
**proceeded** [3] - 72:6, 111:15, 114:6
**proceeding** [4] - 60:25, 89:8, 94:2, 96:10
**PROCEEDINGS** [1] - 1:4
**Proceedings** [1] - 4:2
**proceedings** [5] - 65:19, 88:19, 92:20, 131:21, 134:7
**process** [6] - 24:22, 58:6, 58:8, 91:5, 106:25, 107:14
**produced** [3] - 7:16, 32:21, 106:15
**product** [16] - 10:10, 46:6, 48:10, 48:15, 48:16, 65:1,

65:10, 78:19, 95:1, 95:6, 95:10, 98:15, 98:16, 98:20, 119:24
**product's** [1] - 121:3
**products** [5] - 31:15, 68:6, 119:14, 119:17, 120:25
**Products** [3] - 73:7, 80:18, 87:12
**professional** [2] - 62:19, 128:13
**profit** [1] - 130:1
**profound** [1] - 53:1
**program** [1] - 13:22
**prohibit** [1] - 44:12
**prohibited** [1] - 8:16
**prohibiting** [1] - 45:17
**prohibitive** [1] - 84:9
**promised** [1] - 98:15
**promote** [1] - 84:25
**prong** [1] - 76:20
**proper** [2] - 56:17, 75:5
**properly** [1] - 50:4
**proponents** [1] - 87:10
**proposal** [1] - 73:2
**proposed** [20] - 64:14, 66:12, 67:11, 73:19, 75:11, 75:15, 75:21, 76:1, 81:25, 84:21, 88:2, 88:15, 88:25, 89:23, 93:11, 96:18, 102:18, 104:1, 106:21, 124:3
**propounded** [2] - 93:13, 106:12
**prosecute** [1] - 21:19
**prosecuting** [2] - 81:16, 85:22
**prosecution** [1] - 83:15
**prospective** [1] - 77:11
**protect** [4] - 7:19, 73:4, 74:9, 80:5
**protected** [2] - 81:12, 88:20
**protection** [1] - 47:20
**protects** [2] - 88:6, 112:19
**proud** [1] - 25:17
**provable** [1] - 98:5
**prove** [1] - 94:24
**proven** [1] - 31:8
**proves** [1] - 96:9
**provide** [6] - 39:23, 109:21, 118:24, 121:2, 123:12, 130:5
**provided** [19] - 10:13, 15:3, 15:18, 34:24, 35:1, 35:2, 100:1, 100:15, 100:18, 101:1, 106:4, 107:23, 108:20, 109:19, 110:6, 114:21, 127:17, 127:19, 130:14
**provides** [3] - 10:19, 118:22, 120:19
**providing** [1] - 100:4

**proving** [3] - 94:12, 98:1, 99:5
**provision** [5] - 56:15, 72:1, 102:16, 126:10, 126:22
**provisions** [3] - 44:25, 82:12, 102:17
**Prudential** [7] - 73:15, 73:22, 75:12, 84:4, 88:21, 92:14, 105:3
**près** [3] - 72:1, 126:10, 126:22
**psychological** [1] - 52:12
**publication** [1] - 71:13
**publications** [1] - 99:23
**publicity** [1] - 11:3
**published** [4] - 70:9, 70:16, 99:22, 99:24
**purchase** [14] - 29:11, 29:16, 29:17, 29:25, 30:2, 30:7, 30:21, 78:19, 81:6, 94:25, 98:7, 124:19, 125:19, 129:23
**purchased** [8] - 37:21, 64:11, 68:5, 68:25, 76:6, 78:9, 84:12, 119:2
**purchaser** [1] - 52:9
**purchasers** [1] - 45:18
**purportedly** [2] - 107:10, 112:19
**purpose** [4] - 66:13, 67:12, 82:21, 91:25
**purposes** [5] - 14:17, 19:21, 39:21, 72:12, 87:4
**PURSUANT** [2] - 3:9, 132:6
**pursuant** [10] - 7:17, 39:7, 55:3, 55:7, 55:19, 64:2, 64:5, 66:16, 67:14, 99:8
**pursue** [4] - 84:15, 91:8, 128:25, 129:1
**put** [19] - 20:3, 22:17, 28:9, 30:2, 30:4, 30:24, 47:21, 48:12, 48:25, 50:7, 51:14, 52:6, 53:18, 53:23, 57:9, 60:23, 120:13, 130:21, 131:1
**putative** [8] - 64:10, 65:15, 67:6, 68:4, 77:24, 78:3, 79:15, 102:8
**puts** [1] - 35:24
**putting** [7] - 16:25, 32:22, 36:13, 51:13, 53:24, 59:7, 59:18

## Q

**quality** [2] - 113:21, 113:25
**quantify** [2] - 98:14, 117:2
**quarterly** [1] - 8:10
**questionable** [2] - 38:20, 94:17

**questioned** [3] - 10:2, 108:17, 108:25
**questions** [21] - 12:23, 16:20, 57:6, 66:2, 66:4, 66:6, 71:1, 74:3, 74:17, 74:18, 77:6, 78:6, 78:12, 78:23, 84:19, 85:3, 85:13, 100:5, 100:6, 115:13
**quite** [2] - 34:2, 45:10
**quote** [1] - 65:25
**quotes** [1] - 34:20
**quoting** [5] - 73:22, 77:12, 80:19, 103:20, 122:18

## R

**raised** [4] - 85:18, 94:22, 119:18, 121:4
**raises** [2] - 28:16, 124:8
**ran** [1] - 70:13
**range** [6] - 11:17, 89:16, 89:19, 95:18, 97:7, 110:18
**rata** [1] - 69:2
**rate** [16] - 16:2, 16:22, 16:23, 16:24, 18:5, 18:16, 18:18, 19:20, 19:24, 20:1, 20:2, 29:11, 103:14, 108:17, 108:18, 108:24
**rates** [28] - 4:7, 14:16, 15:18, 15:20, 15:22, 15:25, 16:5, 16:6, 16:9, 16:12, 16:14, 16:16, 18:14, 18:17, 18:25, 19:1, 19:2, 19:5, 19:6, 54:21, 61:10, 61:11, 107:6, 108:1, 108:11
**rather** [6] - 55:12, 85:18, 94:8, 99:19, 107:24, 124:2
**Ravisent** [1] - 100:13
**Re** [2] - 72:10, 100:13
**re** [45] - 4:5, 46:11, 65:16, 67:2, 73:15, 74:14, 75:4, 75:12, 75:17, 76:2, 76:14, 77:11, 77:18, 77:21, 80:18, 81:13, 84:4, 87:11, 87:16, 87:17, 88:4, 90:5, 92:4, 92:14, 93:2, 94:5, 95:24, 96:2, 96:11, 96:18, 97:11, 97:19, 101:8, 103:2, 103:3, 103:14, 103:19, 103:20, 104:8, 113:19, 117:22, 122:9, 122:18
**re-air** [1] - 46:11
**reached** [8] - 24:20, 26:19, 29:6, 44:5, 81:24, 87:22, 93:3, 128:1
**reaching** [1] - 49:9
**reaction** [2] - 89:6, 91:13
**read** [3] - 31:3, 34:12, 54:14
**readily** [1] - 86:1
**reading** [2] - 38:14, 51:8

**ready** [1] - 63:16
**Real** [1] - 70:17
**real** [7] - 15:4, 19:20, 20:2, 61:4, 95:21, 96:20, 98:1
**realize** [1] - 40:3
**really** [14] - 19:18, 20:5, 21:1, 21:7, 26:13, 31:22, 40:9, 44:9, 53:19, 59:10, 60:14, 126:14, 127:21, 131:11
**reason** [3] - 10:7, 120:11, 128:2
**reasonable** [29] - 11:18, 15:13, 16:23, 30:15, 42:11, 61:22, 70:2, 75:12, 75:16, 87:11, 88:3, 89:1, 89:25, 99:7, 99:17, 99:20, 100:12, 100:23, 101:10, 102:22, 103:13, 108:8, 108:12, 110:7, 110:21, 111:3, 114:3, 123:16, 125:11
**reasonableness** [15] - 21:3, 53:2, 89:16, 89:19, 95:18, 97:7, 99:11, 99:14, 103:24, 105:15, 106:6, 109:19, 110:13, 116:24, 127:22
**reasonably** [1] - 101:21
**reasoned** [2] - 52:17, 118:2
**reasons** [4] - 11:4, 39:4, 98:3, 111:7
**receive** [7] - 15:25, 29:15, 29:23, 98:23, 112:10, 112:14, 124:20
**received** [19] - 6:18, 6:19, 6:20, 6:21, 13:4, 13:5, 13:8, 20:24, 65:22, 91:16, 92:6, 95:12, 98:16, 100:6, 100:7, 100:10, 111:3, 121:14, 130:9
**receives** [1] - 121:20
**receiving** [2] - 123:1, 129:18
**recent** [3] - 13:1, 116:2, 122:7
**recently** [5] - 11:23, 44:11, 58:22, 85:7, 98:12
**reciting** [1] - 114:17
**recognition** [1] - 123:7
**recognize** [1] - 31:4
**recognized** [4] - 29:22, 29:23, 44:11, 97:14
**recognizes** [1] - 44:19
**recommended** [1] - 103:22
**reconsider** [1] - 104:4
**record** [16] - 7:3, 7:6, 10:19, 10:24, 24:3, 31:3, 32:1, 37:10, 49:4, 50:6, 50:14, 57:11, 72:13, 118:14, 130:10, 130:17
**records** [1] - 127:18
**recover** [5] - 110:20, 112:3, 125:18, 125:20, 129:23

Case 1:17-cv-02000-TWT  Document 111  Filed 09/18/22  Page 152 of 186 PageID: 2193

**recovered** [3] - 127:1, 127:4, 129:24

**recoveries** [1] - 30:18

**recovering** [1] - 94:16

**recovery** [27] - 14:19, 30:16, 84:9, 84:14, 89:18, 89:20, 95:17, 95:19, 97:15, 98:25, 99:1, 102:4, 103:8, 103:9, 103:16, 103:25, 104:5, 104:8, 110:25, 112:17, 113:23, 116:15, 122:21, 124:18, 124:21, 124:23, 129:20

**recycled** [1] - 48:22

**red** [1] - 56:18

**red-line** [1] - 56:18

**redacted** [2] - 7:15, 7:19

**redactions** [1] - 7:15

**redesigning** [1] - 118:18

**redound** [2] - 53:5, 54:1

**redress** [2] - 113:1, 121:17

**reduce** [2] - 55:24, 56:13

**reduced** [7] - 115:1, 115:24, 116:10, 117:11, 118:10, 124:23, 124:25

**reduces** [1] - 116:15

**reducing** [3] - 50:18, 104:5, 116:3

**reduction** [7] - 50:19, 50:22, 53:4, 56:16, 69:2, 113:5, 122:6

**refer** [8] - 11:14, 32:15, 63:24, 64:6, 66:11, 67:5, 70:7, 105:23

**reference** [1] - 107:13

**referenced** [1] - 89:2

**referred** [2] - 32:3, 32:10

**refile** [3] - 67:9, 90:22, 90:25

**reflect** [2] - 24:4, 69:7

**reflected** [1] - 16:14

**reflecting** [1] - 7:16

**reflection** [1] - 62:1

**reflects** [2] - 61:16, 123:3

**reform** [1] - 35:24

**reforms** [1] - 34:18

**regard** [19] - 6:25, 8:5, 9:1, 12:4, 15:17, 19:16, 20:23, 31:10, 35:9, 53:6, 81:7, 105:23, 107:19, 113:15, 113:17, 115:4, 126:5, 126:7, 126:9

**regarding** [14] - 66:3, 69:11, 71:11, 78:14, 82:23, 93:10, 93:22, 100:21, 100:25, 101:4, 106:2, 107:5, 121:3, 127:18

**regardless** [1] - 79:16

**reimbursement** [3] - 64:4, 101:16, 107:17

**reject** [2] - 50:21, 97:4

**related** [10] - 27:19, 68:14, 68:18, 82:4, 91:17, 101:8, 119:3, 125:17, 126:18, 126:20

**relating** [5] - 70:23, 70:25, 90:17, 94:18, 94:20

**relative** [4] - 71:1, 111:11, 134:10, 134:13

**relatively** [4] - 109:25, 114:24, 116:13, 119:4

**relax** [1] - 63:22

**relevant** [2] - 83:12, 105:4

**reliable** [1] - 49:22

**reliance** [2] - 12:16, 104:7

**relief** [50] - 4:13, 7:12, 8:8, 9:5, 20:22, 21:5, 28:1, 33:9, 33:11, 33:12, 33:23, 34:1, 34:5, 34:11, 34:16, 34:21, 35:1, 35:5, 35:15, 37:13, 39:15, 39:22, 39:23, 40:1, 40:20, 45:23, 47:24, 49:1, 49:11, 49:19, 49:23, 50:12, 55:13, 56:3, 60:2, 60:11, 101:23, 110:24, 112:25, 113:16, 116:20, 117:2, 117:18, 117:24, 118:24, 119:13, 122:1, 122:4, 123:5, 124:3

**rely** [1] - 35:10

**relying** [1] - 11:10

**remaining** [3] - 72:2, 112:5, 112:7

**remains** [1] - 54:2

**remanded** [1] - 24:9

**remarks** [2] - 17:17, 63:22

**remove** [1] - 48:14

**removing** [1] - 69:20

**repeat** [1] - 125:23

**replace** [2] - 119:14, 120:25

**replacement** [1] - 119:15

**replacing** [1] - 38:16

**reply** [1] - 54:15

**report** [12] - 7:10, 7:15, 7:19, 7:24, 8:3, 8:6, 8:7, 9:3, 9:6, 9:7, 9:9, 9:13, 10:5, 11:5, 11:15, 12:21, 33:21, 33:23, 35:9, 35:11, 47:5, 49:6, 118:13

**REPORTER** [3] - 1:24, 3:17, 132:12

**Reporter** [2] - 134:4

**represent** [7] - 37:20, 80:14, 80:18, 83:4, 84:12, 98:6, 112:15

**representation** [8] - 38:6, 46:24, 80:3, 80:15, 84:23, 95:16, 108:3, 127:13

**representations** [2] - 46:10, 65:8

**representative** [3] - 74:6, 74:8, 79:7

**representatives** [7] - 73:22, 79:11, 79:19, 80:4, 80:21, 81:3, 88:8

**representatives'** [1] - 80:7

**represented** [4] - 25:11, 49:3, 81:20, 97:24

**representing** [6] - 6:6, 15:19, 80:9, 107:6, 111:2, 114:20

**represents** [3] - 93:5, 97:10, 97:14

**repute** [1] - 111:1

**request** [12] - 6:12, 61:16, 67:2, 72:24, 76:4, 101:15, 106:6, 110:13, 110:14, 123:14, 127:18, 128:6

**requested** [3] - 9:5, 50:11, 54:25, 56:3, 62:18, 71:21, 91:21, 102:13, 104:18, 116:3, 122:2, 122:6, 123:9

**requesting** [2] - 65:14, 101:19, 101:25

**requests** [2] - 93:13, 125:8

**require** [6] - 39:9, 75:24, 98:13, 99:18, 101:7, 119:13

**required** [3] - 30:7, 76:17, 77:24, 91:8, 101:5, 109:21, 114:25

**requirement** [11] - 76:8, 77:9, 77:17, 77:20, 79:18, 80:2, 80:16, 80:24, 83:6, 83:25, 122:17

**requirements** [11] - 51:12, 72:17, 73:13, 73:18, 75:4, 75:8, 83:7, 84:17, 87:2, 94:23, 100:13

**requires** [7] - 74:16, 77:6, 79:6, 80:6, 83:9, 88:13, 99:15

**resale** [1] - 68:10

**research** [2] - 109:2, 129:11

**residents** [1] - 124:1

**resolution** [1] - 97:16

**resolve** [1] - 64:15

**resources** [2] - 87:20, 91:8

**respect** [5] - 28:15, 29:8, 45:23, 61:22, 76:12

**respected** [1] - 128:4

**respectfully** [1] - 52:25

**respects** [1] - 8:1

**respond** [4] - 23:14, 26:25, 35:5, 45:2

**responding** [1] - 44:4

**response** [5] - 34:1, 34:23, 49:16, 57:2, 71:13

**responses** [2] - 23:15, 92:10, 92:15

**responsive** [1] - 6:22

**rest** [4] - 32:22, 57:5, 57:14,

105:18

**restraining** [1] - 44:22

**restricted** [1] - 51:2

**result** [6] - 97:22, 113:22, 114:6, 116:7, 121:8, 131:12

**resulted** [2] - 67:20, 106:25

**resulting** [1] - 104:2

**results** [1] - 129:1

**resume** [1] - 81:15

**retailers** [2] - 48:16, 48:17

**retained** [2] - 17:14, 105:13

**retainer** [1] - 16:13

**retirement** [1] - 34:4

**revamp** [1] - 120:1

**revamping** [1] - 48:24

**revealed** [1] - 10:6

**revenue** [1] - 129:19

**revenues** [1] - 129:15

**reversed** [2] - 22:2, 24:9

**reversion** [2] - 27:21, 27:24

**reverter** [1] - 40:17

**Review** [1] - 4:4

**review** [2] - 60:6, 94:14

**reviewed** [5] - 68:3, 81:14, 93:15, 106:14, 129:3

**reviewing** [5] - 11:15, 12:1, 81:25, 105:24, 116:5

**reviews** [1] - 39:19

**revise** [1] - 69:6

**revised** [2] - 14:7, 69:19

**revising** [1] - 69:9

**rewards** [2] - 94:2, 103:18

**rework** [1] - 119:21

**rhetorical** [1] - 54:9

**Ridgefield** [1] - 49:17

**rights** [3] - 87:8, 88:7, 128:24

**rigorous** [2] - 11:22, 75:6

**rise** [2] - 5:2, 131:20

**risk** [11] - 60:15, 60:16, 61:24, 62:1, 96:10, 97:22, 98:1, 104:23, 115:3, 121:19, 123:12

**risks** [14] - 34:17, 60:10, 62:22, 89:10, 89:11, 89:12, 89:21, 93:24, 94:2, 95:19, 95:22, 96:3, 111:5, 127:2

**Rite** [2] - 104:12, 105:18, 113:19

**roadblock** [1] - 31:23

**Robert** [1] - 125:25

**role** [2] - 33:15, 47:6

**ROSATI** [1] - 1:20

**rotated** [3] - 41:22, 41:24, 41:25

**routinely** [1] - 123:11

**row** [1] - 94:11

**Rude** [1] - 66:11

**Rude-Barbato** [1] - 66:11

**Rule** [47] - 24:5, 53:1, 64:2, 66:16, 72:18, 72:20, 73:3, 73:8, 73:9, 73:13, 73:15, 73:18, 73:24, 74:10, 74:11, 74:13, 74:14, 74:16, 74:22, 74:25, 75:4, 75:7, 75:9, 75:13, 76:11, 76:21, 77:18, 79:5, 79:8, 80:2, 80:15, 81:1, 83:8, 84:17, 87:6, 87:7, 88:1, 88:5, 96:6, 99:8, 99:12, 99:14, 100:13, 101:6, 102:16, 111:18

**rule** [9] - 42:12, 47:13, 47:18, 63:18, 67:14, 83:12, 94:14, 99:18, 110:16

**ruled** [4] - 22:22, 54:22, 110:3, 118:12

**ruling** [7] - 7:7, 7:9, 33:24, 35:9, 47:11, 47:19, 107:16

**Rulings** [2] - 4:4, 4:17

**rulings** [1] - 8:5

**run** [1] - 36:16

**RUSSONIELLO** [3] - 1:24, 3:16, 132:11

**Russoniello** [4] - 3:16, 134:3, 134:21, 134:21

**Rust** [8] - 13:1, 13:3, 13:8, 70:6, 70:7, 70:19, 99:21, 99:22

**Rust's** [1] - 70:8

## S

**s/Vincent** [2] - 3:16, 134:21

**Safety** [1] - 97:19

**sale** [1] - 65:9

**Sales** [2] - 67:3, 73:16

**sales** [13] - 7:16, 8:9, 8:11, 8:12, 9:10, 9:16, 10:9, 10:17, 10:20, 10:22, 10:25, 11:2, 129:11

**satisfaction** [1] - 88:9

**satisfied** [12] - 74:12, 74:13, 75:6, 75:8, 76:10, 76:25, 77:9, 79:19, 80:2, 81:15, 97:25, 128:25

**satisfy** [2] - 77:16, 83:8

**satisfying** [2] - 77:20, 85:24

**scale** [1] - 111:11

**Schering** [2] - 77:12, 77:18

**Schwartz** [3] - 12:2, 117:15

**SCOTT** [2] - 1:15

**Scott** [17] - 5:10, 5:18, 18:14, 19:8, 26:24, 66:23, 67:4, 81:16, 109:12

**scrupulous** [2] - 75:25, 88:14

**scrutiny** [1] - 128:4

**Se** [1] - 2:14

**se** [1] - 52:9

**sealing** [1] - 8:4

**seat** [1] - 6:11

**seated** [1] - 5:5

**second** [6] - 31:6, 33:23, 67:12, 69:4, 91:13, 101:23

**Section** [2] - 65:19, 66:7

**SECTION** [2] - 3:9, 132:6

**secure** [1] - 88:9

**securities** [3] - 22:15, 22:17, 86:2

**Securities** [5] - 76:15, 96:2, 97:20, 100:14, 103:20

**see** [22] - 14:10, 19:13, 22:13, 34:23, 56:12, 72:20, 74:10, 75:13, 77:25, 81:13, 85:5, 85:24, 87:17, 88:3, 88:16, 88:21, 92:11, 95:24, 100:13, 103:11, 104:12, 113:19

**Seeger** [3] - 5:14, 18:24, 19:1

**SEEGER** [1] - 1:17

**seek** [3] - 80:13, 80:17, 107:16

**seeking** [6] - 24:25, 102:3, 102:6, 102:14, 113:14, 117:4

**seeks** [2] - 112:3, 114:12

**seem** [1] - 45:24

**self** [1] - 34:6

**sell** [2] - 48:15, 48:16

**senior** [1] - 19:11

**sense** [2] - 109:20, 112:22

**sent** [1] - 36:24

**sentences** [2] - 34:13, 34:14

**separate** [6] - 13:16, 83:16, 84:16, 101:18, 122:15, 122:20

**separately** [8] - 20:16, 20:22, 28:2, 42:7, 73:14, 102:1, 123:18, 128:8

**September** [2] - 67:1, 67:11

**Ser** [1] - 70:11

**serious** [2] - 51:7, 53:6

**seriously** [1] - 51:12

**serve** [1] - 87:8

**served** [1] - 99:19

**serves** [2] - 80:12, 80:16

**service** [1] - 123:12

**services** [2] - 103:14, 123:7

**serving** [1] - 69:12

**sessions** [1] - 67:20

**set** [15] - 16:21, 33:4, 44:6, 45:8, 50:4, 53:4, 64:17, 67:8, 74:13, 76:11, 99:25, 110:10, 112:2, 122:12, 134:8

**setoffs** [1] - 95:19

**sets** [2] - 46:16, 83:12

**settle** [2] - 23:9, 63:2

**settled** [7] - 24:21, 51:18,

75:10, 110:1, 111:10, 114:24, 115:15

**Settlement** [2] - 4:10, 70:20

**settlement** [193] - 4:11, 6:13, 12:3, 14:3, 14:4, 15:7, 20:14, 20:17, 20:20, 21:3, 21:7, 21:9, 22:10, 22:12, 23:23, 24:23, 25:2, 26:10, 27:6, 27:13, 27:19, 27:24, 28:3, 28:7, 28:16, 28:21, 29:6, 29:13, 29:14, 33:2, 33:16, 33:18, 38:25, 39:21, 41:11, 41:14, 41:15, 42:1, 42:3, 42:8, 42:11, 42:18, 43:18, 44:5, 44:15, 44:24, 47:21, 50:21, 51:1, 53:13, 56:18, 57:20, 57:22, 58:17, 60:5, 60:12, 61:7, 64:2, 64:14, 64:15, 67:21, 67:23, 68:1, 68:2, 68:11, 68:16, 68:20, 68:22, 68:24, 70:9, 70:16, 70:19, 70:22, 70:24, 70:25, 71:2, 71:13, 72:1, 72:8, 72:14, 72:15, 72:19, 72:24, 73:6, 75:11, 75:15, 75:21, 75:22, 75:23, 76:2, 76:5, 81:23, 81:25, 82:2, 82:11, 82:13, 82:15, 82:25, 87:4, 87:6, 87:10, 87:15, 87:18, 87:22, 87:25, 88:3, 88:11, 88:12, 88:16, 88:20, 88:25, 89:7, 89:17, 89:20, 89:23, 89:25, 90:6, 91:11, 91:24, 92:1, 92:4, 92:7, 92:9, 92:11, 92:14, 92:16, 92:18, 92:24, 93:5, 93:22, 94:4, 94:10, 95:24, 95:25, 96:13, 96:18, 96:25, 97:3, 97:4, 97:8, 97:10, 97:17, 97:21, 97:23, 98:3, 99:5, 99:7, 99:25, 100:25, 101:8, 101:20, 102:9, 102:11, 102:17, 102:18, 102:21, 103:10, 104:17, 105:14, 105:23, 107:1, 110:15, 110:19, 111:3, 111:4, 111:21, 112:18, 113:12, 114:3, 114:19, 115:20, 116:13, 117:19, 117:22, 118:4, 122:11, 122:15, 123:10, 124:2, 124:11, 124:17, 124:24, 125:7, 125:10, 125:20, 126:8, 126:24, 127:5, 127:25, 128:6, 129:22

**settlements** [5] - 13:24, 30:19, 63:14, 88:7, 93:2

**settling** [2] - 48:4, 94:8

**seven** [1] - 89:14

**seventh** [1] - 105:1

**several** [9] - 7:14, 20:25, 23:15, 83:12, 84:11, 98:22, 104:10, 106:11, 119:18

**share** [8] - 66:2, 77:10, 77:25, 78:11, 78:22, 124:20, 129:14, 129:18

**shared** [3] - 78:6, 85:13, 122:13

**shareholder** [1] - 34:3

**shelf** [4] - 41:13, 41:17, 48:17, 120:25

**shelves** [2] - 48:10, 119:14

**Sherri** [1] - 126:12

**shifting** [5] - 40:23, 55:4, 55:7, 55:8, 55:13

**Shorthand** [1] - 134:4

**show** [4] - 10:19, 29:12, 84:18, 95:8

**showing** [2] - 22:20, 107:25

**shown** [2] - 87:10, 94:24

**Sibley** [7] - 126:11, 126:12, 126:15, 126:16

**side** [1] - 40:8

**sifting** [1] - 129:12

**sign** [1] - 53:9

**signed** [3] - 37:23, 38:2, 38:4

**significant** [23] - 8:25, 34:17, 38:18, 82:5, 82:22, 85:17, 90:20, 91:7, 94:15, 98:20, 101:24, 106:16, 106:20, 109:17, 109:24, 110:25, 114:10, 115:11, 115:17, 115:24, 122:6, 123:1, 129:14

**significantly** [8] - 91:11, 96:17, 110:5, 112:17, 120:8, 121:20, 121:23, 124:24

**signs** [1] - 53:12

**Simandle** [1] - 41:15

**similar** [11] - 65:16, 66:19, 79:4, 82:1, 100:15, 104:11, 105:1, 108:22, 115:25, 120:4, 126:14

**similarly** [2] - 17:20, 85:1

**simply** [4] - 11:14, 28:17, 33:14, 45:15

**simultaneously** [2] - 75:24, 88:13

**sincere** [1] - 60:19

**sit** [1] - 63:22

**situated** [1] - 85:1

**situation** [2] - 25:19, 43:15

**six** [4] - 71:20, 89:12, 91:20, 104:24

**Sixth** [1] - 11:10

**size** [4] - 104:14, 111:23, 124:3, 126:23

**sizeable** [3] - 115:6, 116:6, 117:11

**skepticism** [1] - 34:10
**skewed** [1] - 92:19
**skill** [2] - 104:19, 113:20
**slight** [2] - 96:11, 121:19
**slightly** [3] - 59:4, 59:19, 96:13
**slogan** [2] - 36:19, 69:13
**Smajlaj** [1] - 98:17
**small** [8] - 18:18, 36:9, 84:14, 92:9, 92:15, 98:6, 111:10, 114:24
**smaller** [2] - 29:16, 82:9
**Sodium** [2] - 76:2, 81:13
**Software** [1] - 103:2
**sold** [2] - 29:18, 76:25
**solely** [1] - 55:22
**Solutions** [1] - 98:11
**someone** [2] - 24:24, 47:15
**sometimes** [1] - 62:3
**somewhat** [2] - 17:12, 23:22
**SONSINI** [1] - 1:20
**sore** [1] - 23:22
**sorry** [1] - 17:23
**sort** [7] - 25:19, 28:17, 32:3, 33:17, 35:3, 36:23, 44:25
**sorts** [1] - 24:2
**sought** [6] - 66:12, 66:21, 75:24, 88:13, 116:1, 117:20, 118:1, 121:16
**soul** [1] - 60:9
**sound** [2] - 103:1, 106:16
**Soup** [1] - 98:17
**soups** [1] - 41:16
**Southern** [3] - 65:17, 66:10, 125:5
**Spanish** [1] - 71:7
**Specialties** [1] - 95:25
**specific** [4] - 29:8, 31:24, 35:10, 101:7
**specifically** [5] - 10:20, 11:20, 44:19, 79:5, 85:14
**specifications** [1] - 73:3
**specificity** [1] - 98:9
**speculative** [1] - 9:14
**speed** [1] - 113:23
**spend** [1] - 118:18
**spending** [1] - 20:11
**spent** [22] - 15:1, 15:11, 15:13, 20:8, 62:2, 106:3, 106:21, 107:5, 107:9, 107:25, 108:2, 108:8, 109:1, 109:9, 109:13, 109:22, 109:24, 111:12, 115:13, 115:17, 128:18
**spread** [7] - 28:11, 30:14, 31:14, 31:20, 64:8, 68:6, 95:5
**spreadsheets** [1] - 107:25
**Sprint** [3] - 23:22, 23:24,

24:7
**squabbling** [1] - 111:14
**squarely** [1] - 55:15
**staff** [1] - 109:4
**stage** [5] - 72:7, 89:8, 92:20, 93:3, 114:23
**stages** [2] - 111:16, 115:16
**stale** [1] - 41:23
**stamp** [1] - 38:19
**stand** [5] - 12:18, 17:12, 24:2, 25:17, 26:20
**standard** [2] - 72:13, 88:17
**standards** [2] - 30:18, 74:13
**standing** [4] - 33:24, 37:17, 115:5, 127:16
**stands** [2] - 10:7, 97:6
**start** [4] - 15:14, 16:4, 44:3, 114:4
**started** [1] - 61:9
**starting** [2] - 22:24, 111:23
**STATE** [1] - 1:10
**State** [1] - 134:5
**state** [6] - 11:20, 32:1, 37:9, 39:5, 68:7, 123:23
**statement** [1] - 108:21
**statements** [9] - 8:15, 8:17, 9:17, 10:15, 10:21, 41:21, 45:3, 46:12
**STATES** [2] - 1:1, 1:9
**States** [8] - 9:21, 10:1, 10:11, 67:19, 68:5, 77:2, 82:10, 134:3
**states** [2] - 128:18, 128:22
**stating** [5] - 65:3, 75:14, 78:2, 118:5, 127:15
**stature** [1] - 32:8
**statute** [2] - 47:18, 59:9
**statutes** [1] - 40:23
**statutory** [1] - 55:13
**stay** [2] - 41:17, 41:20
**steadfast** [1] - 90:23
**Steel** [1] - 92:11
**STENOGRAPHIC** [2] - 3:11, 132:7
**stenographically** [1] - 134:7
**step** [1] - 62:20
**STEPHEN** [1] - 1:17
**Stephen** [2] - 5:14, 18:23
**Stewart** [1] - 76:21
**still** [7] - 20:4, 50:8, 53:5, 94:24, 115:16, 119:16, 122:25
**stock** [1] - 74:23
**Stoetzner** [1] - 92:11
**stop** [2] - 107:12, 121:1
**store** [1] - 119:14
**straightforward** [2] - 77:8, 109:25
**STREET** [1] - 1:10

**Streeter** [1] - 125:25
**strenuously** [1] - 91:22
**stress** [1] - 102:3
**stressed** [1] - 80:11
**stricken** [1] - 49:6
**striking** [2] - 7:10, 11:4
**strong** [4] - 36:10, 36:25, 92:8, 97:11
**stronger** [1] - 34:4
**strongly** [5] - 52:18, 92:14, 94:9, 98:2, 99:4
**struck** [2] - 12:21, 118:12
**structure** [4] - 27:19, 42:14, 43:18, 122:15
**structured** [2] - 42:15, 50:20
**stuck** [2] - 34:6, 34:7
**subject** [6] - 21:5, 23:22, 69:2, 78:7, 102:20, 105:11
**submission** [3] - 50:7, 71:3, 128:16
**submissions** [8] - 6:19, 106:2, 106:3, 107:24, 108:2, 110:9, 121:25, 127:19
**submit** [6] - 14:7, 38:10, 38:12, 57:21, 68:22, 68:24
**submits** [1] - 107:1
**submitted** [6] - 9:3, 11:6, 14:16, 15:17, 46:15, 69:23, 107:4, 107:24
**submitting** [1] - 20:6
**subpoenas** [2] - 93:14, 106:11
**subsequently** [1] - 39:3
**substantial** [8] - 15:10, 20:24, 21:8, 87:20, 93:5, 104:16, 118:17, 118:25
**substantially** [1] - 122:1
**substantive** [2] - 114:25, 116:14
**substantively** [1] - 82:1
**success** [4] - 94:3, 103:18, 115:19
**successful** [3] - 30:8, 108:9, 119:23
**successfully** [1] - 114:19
**succinctly** [1] - 33:3
**suffer** [3] - 8:18, 80:22, 81:6
**suffered** [2] - 95:1, 113:1
**sufficient** [1] - 93:21
**sufficiently** [3] - 66:6, 84:22, 85:23
**sugar** [3] - 69:11, 120:14, 121:3
**suggest** [7] - 10:14, 10:24, 36:21, 94:15, 119:9, 119:22, 120:3
**suggested** [3] - 11:13, 53:19, 54:3
**suggests** [4] - 33:17, 53:13,

109:11, 118:25
**suit** [5] - 43:10, 43:11, 43:12, 76:18
**Sullivan** [3] - 72:21, 85:1, 85:11
**summary** [3] - 15:15, 30:10, 91:2
**superior** [2] - 74:19, 83:9
**superiority** [3] - 83:6, 83:13, 83:25
**supervise** [1] - 22:8
**supervised** [1] - 26:12
**supervision** [1] - 61:18
**Supp** [1] - 66:1
**supplemental** [1] - 14:12
**supply** [1] - 48:17
**support** [6] - 12:16, 49:5, 55:2, 71:9, 113:4, 118:14
**supporting** [1] - 11:16
**suppose** [2] - 36:1, 36:23
**Suprema** [1] - 95:24
**Supreme** [3] - 72:23, 73:23, 80:11
**surprise** [1] - 128:12
**surprised** [1] - 34:22
**survey** [5] - 34:24, 35:3, 35:5, 35:11, 94:1
**surveys** [2] - 10:18, 90:16
**survive** [1] - 47:12
**survived** [1] - 51:7
**surviving** [1] - 31:4
**suspect** [1] - 112:24
**sustain** [1] - 124:14
**sustained** [1] - 88:18
**Sylvia** [1] - 124:9

**T**

**T-Mobile** [1] - 24:13
**TALIAFERRO** [1] - 1:18
**Taliaferro** [1] - 108:15
**talks** [2] - 46:17, 46:19
**Tank** [1] - 87:12
**task** [1] - 20:9
**tasks** [4] - 15:1, 107:1, 109:14, 111:21
**taste** [1] - 36:22
**tastier** [1] - 46:25
**tasty** [6] - 30:14, 31:20, 38:15, 38:17, 69:14, 69:15
**taxable** [1] - 99:16
**technically** [1] - 122:20
**Technologies** [2] - 100:14, 103:21
**Technology** [1] - 76:14
**television** [4] - 46:19, 46:20, 65:8, 120:2
**temporary** [1] - 44:22
**tend** [1] - 79:3

**tends** [2] - 80:24, 96:6
**tenor** [1] - 130:16
**term** [1] - 97:4
**terminated** [4] - 29:2, 67:7, 90:22, 111:18
**terms** [12] - 24:9, 24:17, 40:18, 49:22, 68:1, 68:3, 68:20, 84:1, 87:23, 104:18, 105:14, 123:10
**test** [1] - 86:1
**testimony** [3] - 12:4, 12:8, 12:9
**tests** [1] - 84:21
**Texas** [5] - 123:21, 123:23, 123:24, 123:25, 126:13
**THE** [88] - 1:1, 1:11, 2:8, 3:9, 3:11, 5:2, 5:3, 5:12, 5:16, 5:21, 6:2, 6:11, 13:25, 14:10, 16:18, 17:9, 17:19, 17:23, 18:4, 18:11, 18:20, 19:7, 19:12, 21:12, 21:15, 21:21, 21:24, 22:6, 22:17, 22:22, 22:25, 23:14, 25:7, 27:4, 27:9, 27:16, 27:23, 28:5, 29:1, 30:1, 30:24, 32:13, 32:17, 32:25, 33:5, 35:8, 36:4, 36:12, 37:4, 37:6, 37:9, 37:18, 38:6, 38:22, 39:8, 40:24, 41:5, 41:8, 42:10, 42:16, 43:1, 44:1, 45:10, 47:3, 50:9, 51:4, 52:2, 52:5, 52:22, 53:16, 54:8, 54:12, 54:22, 56:6, 57:1, 57:7, 57:16, 57:24, 59:6, 63:9, 63:20, 107:18, 107:21, 130:13, 131:7, 131:20, 132:6, 132:7
**themselves** [2] - 43:19, 64:9
**theories** [3] - 79:10, 79:24, 94:16
**theorize** [1] - 112:12
**theory** [1] - 79:21
**therapeutic** [1] - 34:16
**thereafter** [1] - 67:10
**thereby** [1] - 85:24
**therefore** [14] - 12:20, 13:8, 77:3, 90:12, 93:20, 99:3, 99:4, 113:2, 118:13, 119:4, 119:15, 120:19, 121:19, 124:6
**thereof** [1] - 111:5
**thinks** [2] - 28:18, 56:23
**third** [4] - 34:3, 93:14, 106:11, 110:19
**Third** [22] - 11:11, 11:23, 11:25, 12:10, 22:2, 34:9, 44:10, 49:25, 54:16, 62:8, 72:10, 75:17, 77:14, 85:6, 88:13, 88:23, 96:5, 103:4,

103:22, 105:3, 110:16, 130:11
**third-party** [2] - 93:14, 106:11
**thousand** [1] - 91:15
**threats** [1] - 128:15
**three** [13] - 8:20, 31:8, 41:25, 44:16, 46:2, 46:11, 61:25, 69:18, 74:5, 89:8, 104:19, 105:3, 105:14
**three-year** [1] - 44:16
**threshold** [4] - 37:16, 77:7, 77:19, 77:23
**throughout** [4] - 68:5, 77:1, 88:19, 131:8
**timeliness** [1] - 9:6
**timely** [1] - 114:5
**tiny** [1] - 23:7
**TITLE** [2] - 3:9, 132:6
**TO** [4] - 3:9, 3:10, 132:6, 132:7
**today** [21] - 6:12, 26:8, 26:21, 38:4, 38:23, 47:4, 47:13, 47:15, 47:19, 48:7, 49:10, 50:7, 52:18, 62:11, 67:21, 81:19, 81:22, 108:19, 125:6, 127:14, 130:8
**today's** [1] - 130:23
**together** [1] - 68:13
**took** [1] - 111:8
**tool** [1] - 46:7
**torres** [1] - 98:10
**torres-Hernandez** [1] - 98:10
**total** [9] - 13:9, 40:5, 42:7, 69:1, 69:2, 71:18, 97:24, 102:4, 107:25
**touch** [1] - 23:21
**touchstone** [1] - 99:13
**tough** [1] - 43:14
**toward** [1] - 104:5
**towards** [1] - 91:23
**Toys** [1] - 101:2
**Toys-R-Us** [1] - 101:2
**TRANSCRIPT** [3] - 1:4, 3:10, 132:7
**transcript** [2] - 131:4, 134:6
**TRANSCRIPTION** [2] - 3:11, 132:7
**transfer** [1] - 66:7
**treat** [1] - 42:7
**TRENTON** [2] - 1:10, 1:25
**trial** [9] - 11:18, 58:19, 73:3, 89:13, 90:10, 90:19, 91:4, 96:4, 96:10
**tried** [3] - 44:22, 73:1, 82:15
**tries** [1] - 39:2
**Truck** [2] - 87:12, 103:3
**true** [2] - 65:3, 134:6
**truly** [2] - 9:11, 108:18
**try** [1] - 44:15

**trying** [7] - 14:11, 38:11, 43:8, 58:17, 59:15, 59:22, 129:10
**turn** [6] - 71:23, 83:2, 99:9, 101:12, 105:25, 110:12
**Turn** [1] - 69:14
**turning** [16] - 38:16, 77:5, 79:1, 80:3, 83:6, 92:20, 93:24, 96:3, 96:14, 97:7, 113:20, 114:13, 115:3, 115:8, 115:25, 116:19
**turns** [1] - 60:12
**TV** [2] - 36:15, 41:19
**two** [23] - 22:1, 29:18, 34:2, 34:13, 37:14, 38:9, 48:23, 51:21, 61:25, 68:16, 69:16, 74:3, 80:8, 89:6, 93:16, 95:22, 97:9, 98:2, 101:18, 104:16, 105:10, 106:10, 122:3
**type** [1] - 108:3
**types** [2] - 49:18, 108:22
**typical** [3] - 74:6, 79:7, 116:7
**typicality** [7] - 79:1, 79:2, 79:9, 79:16, 79:18, 80:2, 80:25
**typically** [2] - 18:9, 103:7

---

## U

**U.S** [6] - 3:17, 72:21, 85:1, 92:11, 101:2, 132:12
**U.S.A** [1] - 5:23
**U.S.C** [1] - 65:18
**U.S.COURT** [1] - 1:24
**ultimately** [10] - 35:12, 39:15, 49:1, 53:17, 58:6, 61:2, 61:8, 62:17, 63:6, 91:9
**umbrage** [3] - 59:6, 59:12, 60:18
**uncover** [2] - 80:12, 80:16
**under** [32] - 40:22, 40:23, 42:1, 51:8, 51:12, 51:18, 55:13, 56:4, 57:9, 61:18, 64:21, 65:18, 67:2, 68:20, 72:17, 72:20, 73:8, 73:15, 73:24, 75:9, 87:7, 88:1, 92:9, 94:16, 96:6, 102:11, 102:16, 104:4, 111:17, 123:10, 125:20, 128:3
**undergone** [1] - 116:9
**underlies** [1] - 85:20
**underlying** [2] - 78:18, 92:1
**undermine** [1] - 118:7
**undertake** [3] - 10:17, 11:8, 63:7
**undertaken** [1] - 12:5
**undesirability** [1] - 83:20
**undiluted** [1] - 73:5

**undoubtedly** [2] - 90:25, 115:17
**unfair** [1] - 88:6
**unfairly** [1] - 124:11
**unfortunate** [1] - 101:5
**unfortunately** [1] - 107:23
**uniformity** [1] - 84:25
**unique** [3] - 17:12, 23:24, 42:20
**United** [8] - 9:20, 10:1, 10:11, 67:19, 68:5, 77:2, 82:10, 134:3
**UNITED** [2] - 1:1, 1:9
**unity** [1] - 73:20
**unjust** [3] - 55:16, 55:23, 88:6
**unjustly** [1] - 55:21
**unlawful** [4] - 31:6, 49:8, 51:14, 78:24, 94:19, 94:23
**unless** [1] - 57:5
**unlike** [2] - 58:14, 124:16
**unmanageable** [1] - 96:9
**unnamed** [1] - 88:6
**unseal** [2] - 7:14, 7:24
**unsuccessful** [1] - 44:24
**untimely** [1] - 50:8
**unwarranted** [1] - 73:4
**Up** [2] - 87:11, 103:3
**up** [21] - 8:22, 19:19, 32:2, 33:5, 40:17, 45:5, 48:19, 48:20, 49:19, 50:17, 53:4, 56:19, 57:7, 60:3, 60:16, 68:25, 69:1, 98:24, 99:25, 112:10, 130:11
**urging** [1] - 50:21
**USA** [3] - 1:6, 2:6, 64:6
**USC** [2] - 3:9, 132:6
**USDJ** [1] - 1:11
**useful** [1] - 104:6
**usual** [3] - 54:21, 75:25, 88:15
**utilize** [1] - 16:10
**utilizing** [1] - 44:13

---

## V

**vacated** [1] - 122:10
**valid** [3] - 28:20, 46:23, 68:23
**valuable** [1] - 114:3
**valuation** [5] - 34:18, 82:6, 117:8, 117:17, 118:15
**value** [52] - 8:25, 33:11, 33:16, 33:19, 33:20, 33:22, 34:1, 34:5, 34:10, 34:25, 35:4, 35:16, 35:19, 35:23, 36:10, 37:13, 38:18, 40:2, 40:19, 40:25, 44:20, 49:1, 49:6, 49:10, 49:21, 49:23, 61:3, 61:4, 94:7, 97:10,

Case 3:17-cv-01060-TWT Document 998-1 Filed 02/24/20 Page 157 of 185
Case 3:19-cv-01066-LW-BEA Document 111 Filed 09/18/22 Page 150 of 156 PageID: 2197

156

97:11, 98:15, 98:19, 98:20, 102:8, 105:6, 116:19, 117:1, 117:3, 117:4, 117:14, 117:18, 117:23, 118:4, 118:22, 119:4, 119:5, 120:7, 121:23, 123:3
**valued** [6] - 8:24, 49:24, 102:2, 117:23, 118:22, 124:15
**valueless** [2] - 34:22, 45:25
**values** [3] - 8:7, 65:3, 102:7
**valuing** [2] - 7:11, 34:16
**various** [2] - 61:11, 90:11
**vary** [1] - 16:12
**vast** [1] - 92:5
**venue** [2] - 58:20, 106:22
**verse** [1] - 14:22
**view** [6] - 19:21, 34:21, 34:24, 35:3, 36:1, 131:3
**viewed** [3] - 71:14, 71:15, 122:22
**views** [2] - 52:3, 97:18
**VINCENT** [3] - 1:24, 3:16, 132:11
**Vincent** [2] - 134:3, 134:21
**violative** [1] - 47:18
**Volkswagen** [1] - 11:24

## W

**wants** [4] - 12:24, 47:16, 52:12, 129:16
**Warfarin** [8] - 11:12, 11:14, 76:2, 81:13, 84:4, 87:16, 94:5, 97:12
**warning** [1] - 122:14
**warrant** [1] - 84:22
**warranty** [2] - 64:23, 125:17
**ways** [4] - 39:17, 47:25, 48:8, 59:19
**weak** [3] - 51:22, 53:21, 97:10
**website** [9] - 69:8, 69:20, 70:20, 71:2, 71:6, 71:14, 99:25, 100:6, 101:1
**Website** [1] - 70:20
**websites** [4] - 41:19, 70:16, 99:25, 129:6
**week** [5] - 6:25, 33:24, 82:13, 112:7, 130:13
**weeks** [1] - 22:1
**weigh** [6] - 94:3, 94:9, 95:23, 98:2, 99:4, 115:23
**weighed** [3] - 84:8, 87:1, 99:6
**weighs** [10] - 51:19, 84:5, 90:6, 92:4, 92:8, 92:17, 93:22, 96:13, 114:9, 115:1
**weight** [1] - 105:20

**Weiss** [7] - 4:9, 5:14, 18:23, 18:24, 92:16, 93:6
**WEISS** [4] - 1:17, 1:17, 5:15, 18:23
**Weiss'** [1] - 19:1
**Welch** [1] - 103:11
**well-respected** [1] - 128:4
**whereas** [1] - 96:23
**who've** [1] - 25:11
**whole** [3] - 40:15, 42:14, 65:5
**wide** [1] - 10:11
**Williams** [1] - 45:8
**willing** [7] - 7:22, 7:24, 7:25, 40:6, 40:7, 42:6, 124:18
**WILSON** [1] - 1:20
**windfall** [1] - 54:20
**Windsor** [1] - 73:7
**wishes** [1] - 37:6
**withstand** [6] - 89:14, 96:15, 96:17, 96:21, 97:2, 115:6
**witnesses** [1] - 24:1
**WOLFSON** [1] - 1:11
**Women's** [1] - 70:11
**wonder** [1] - 95:7
**wording** [2] - 36:15, 36:17
**words** [3] - 75:1, 79:18, 94:6
**world** [1] - 51:6
**worse** [2] - 36:20, 58:12
**worth** [3] - 22:14, 42:4, 118:17
**Wright** [6] - 46:14, 46:16, 48:2, 69:24, 69:25, 70:4
**written** [5] - 51:10, 59:10, 59:11, 106:12, 128:23
**wrote** [2] - 14:1, 24:2
**WWW. Nutellaclassactionsettlement .com** [1] - 70:21

## Y

**year** [8] - 44:16, 62:9, 62:13, 93:8, 106:8, 110:1, 111:9, 115:14
**years** [8] - 8:21, 41:25, 42:18, 46:11, 48:23, 62:10, 69:16, 69:18
**yield** [2] - 8:21, 24:8
**yielded** [1] - 97:15
**yields** [3] - 22:25, 23:2, 116:17
**YORK** [2] - 1:15, 1:17
**York** [7] - 18:24, 21:16, 39:19, 43:5, 43:11, 125:6, 125:14
**Young** [5] - 4:6, 13:1, 13:3, 13:14, 14:7

## Z

**zealously** [1] - 109:1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

In re Polyurethane Foam Antitrust
    Litigation

This document relates to:
ALL DIRECT PURCHASER CLASS
ACTIONS

Case No. 1:10 MD 2196

<u>ORDER GRANTING SANCTIONS</u>

JUDGE JACK ZOUHARY

       Pending before this Court is the Indirect Purchaser Class ("IPC") Motion for Sanctions (Doc. 2107).  Objector Andrews opposed (Doc. 2108) and IPC replied (Doc. 2110).  Objector Andrews also filed an unauthorized sur-reply, characterized as a supplemental response (Doc. 2111).

       While IPC's Motion was pending, the Sixth Circuit denied Andrews' petition for rehearing *en banc* (Doc. 2110-1, Ex. A).  Andrews filed a Request to Stay the Mandate (Doc. 2109) with the Sixth Circuit, noting he planned to file a petition for writ of certiorari with the United States Supreme Court.  The Sixth Circuit previously advised Andrews in its June 2016 Order dismissing his appeal that no mandate would issue (Doc. 2110-4, Ex. D).  It confirmed this fact in an October 2016 letter (attached) responding to Andrews' stay request.  This means there are no more avenues for Andrews to delay this litigation on appeal, and this Court now turns to the Motion at hand.

       Andrews failed to post an appeal bond as previously ordered by this Court (Doc. 2068), resulting in dismissal of his appeal by the Sixth Circuit (Doc. 2100).  In so doing, the Sixth Circuit noted (*id.* at 3):

Professional objectors, such as Andrews, may not disrupt the settlement process based on nothing more than unsupported suppositions. . . . [His] objections to the settlements lack merit, his appeal has the practical effect of prejudicing the IPC by delaying the disbursement of settlement funds, and he offers no proof of financial hardship that would justice his failure to post the bond.

This Court's authority to sanction Andrews is found in 28 U.S.C. § 1927, which reads as follows:

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

*See also Gitler v. Ohio*, 632 F. Supp. 2d 722, 727 (N.D. Ohio 2009) ("Although § 1927 on its face limits who may be sanctioned to an attorney or other person allowed to conduct cases, courts in the Sixth Circuit can sanction *pro se* litigants under that provision").

If there were any doubt whether to order a sanction, and there is none, one need look no further than Andrews' most recent and unauthorized "supplement" filing (Doc. 2111).  Beyond the improper filing, the substance -- or lack thereof -- once again reflects Andrews' unreasonableness: claiming as he does, without factual or legal support, that IPC counsel, not he, deserves sanctions. Quite the opposite.  Enough already with these repetitive, warmed-over, and meritless arguments.

This Court agrees with the IPC that Andrews continues his vexatious use of the judicial system and does so either to extort a pay-off from the IPC or as a delay tactic to prolong his coercion attempt.  This Court further agrees that Andrews has delayed this case far too long and has ignored both this Court's Orders and rulings from the Sixth Circuit.

While this Court declines to impose the panoply of sanctions suggested by the IPC, this Court does find favor in the request that Andrews be penalized for the amount of interest that has been lost

2

to the IPC due to his frivolous filings.  That amount, from April 2016 through October 2016, totals $15,303, with interest continuing to run until payment is made in full.

     IT IS SO ORDERED.

                                          __s/ *Jack Zouhary*____
                                          JACK ZOUHARY
                                          U. S. DISTRICT JUDGE

                                          October 24, 2016

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| IN RE: POLYURETHANE FOAM ANTITRUST | ) | MDL Docket No. 2196 |
| LITIGATION | ) | Index No. 10-MD-2196 (JZ) |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | Hon. Jack Zouhary |
| | | |
| INDIRECT PURCHASER CLASS | ) | |
| | ) | |
| | ) | |

## INDIRECT PURCHASER CLASS' MOTION FOR SANCTIONS
## AND INCORPORATED MEMORANDUM OF LAW

Indirect Purchaser Plaintiff Class ("IPP" or the "Class") moves this Court for an order imposing sanctions on Objector Christopher Andrews ("Andrews") pursuant to 28 U.S.C. §1927 as follows: (1) monetary sanctions against Andrews; and (2) to enjoin him from making any filings in this litigation without first obtaining Court approval, and in support of this motion state:

## INTRODUCTION

As more fully discussed in Section I below, as a threshold matter this Court has jurisdiction to order sanctions against Andrews, even though his *en banc* petition is pending in the Sixth Circuit Court of Appeals. *Val–Land Farms, Inc., v. Third National Bank In Knoxville*, 937 F. 2d 1110, 1117 (6th Cir. 1991). Because Andrews' repeated filings in this Court and in the Sixth Circuit have been found to be frivolous and without merit, this Court should impose sanctions on Andrews, pursuant to 28 U.S.C. §1927 for the undue delay and proliferation of this litigation and the damage he caused to the Class.

Notwithstanding this Court's approval of the parties' settlement of the case *nine months* ago, the Class has not been able to recover a single penny of their long-overdue $151,250,000 settlement monies due to a single, frivolous objector. Andrews has single-handedly prevented finality of the Settlements via his myriad of baseless motions and appeals. Moreover, he has managed to hold the Class hostage while flagrantly violating orders of this Court and the Sixth Circuit Court of Appeals with impunity. While this case is currently pending before the Sixth Circuit on Andrews' latest frivolous petition for *en banc* review, *this Court has jurisdiction to and should sanction Andrews now* to put an end to his egregious conduct.

As this Court knows, more than six months ago the Court ordered that Andrews was required to post a $145,463 appeal bond as a condition to Andrews' continuing to pursue his frivolous objections on appeal. In issuing the bond, this Court concluded that, as compared to the other handful of objectors that had engaged in vexatious conduct, "Andrews is the worst," finding that he had advanced "scurrilous, unfounded accusations" and "repeatedly made baseless accusations using inappropriate language" about Class counsel, this Court and the Sixth Circuit Court of Appeals. (Doc. # 2065) The Court further concluded that Andrews' arguments on appeal (which mirrored his frivolous objection advanced to this Court) were, "even under the most charitable view of the merits of Objectors' arguments," highly unlikely to succeed on appeal. *Id*. at 6-7*; see also id*. at 16 ("To now have Objectors file frivolous appeals in pursuit of a payoff is not simply a detriment to the settling parties—it is an insult to the judicial system.").

That bond order, and repeated subsequent orders mandating that Andrews post such bond, have simply been ignored by Andrews, as he has continued to press his frivolous objections on appeal without penalty or sanction. Instead, Andrews filed *six* separate *failed* motions or pleadings attacking the bond—three of which were filed in this Court and three in the

Sixth Circuit—all of which were based on groundless assertions that the Court had already expressly and repeatedly rejected. When the Sixth Circuit dismissed Andrews' appeal for failure to post the bond, it found that "Andrews' objections to the settlements lack merit, [and] his appeal has the practical effect of prejudicing the IPC by delaying the disbursement of settlement funds…" *IPC v. Andrews*, Case No. 16-3168, Doc. # 38-1 at 3 (6th Cir. June 20, 2016). Indeed, the Class has lost at least $13,086.30 in interest from April 2016 through September 2016, due to the delayed disbursement of funds, in addition to the costs and additional attorneys' fees (for which Class Counsel is not at this time including in this motion for sanctions) by having to respond to Andrews' incessant, meritless filings. *See* Doc. # 2042-5 at 4. The Class will seek further sanctions against Andrews if he persists in causing further delay through his frivolous filings. The calculation of lost interest for months after September 2016 are set forth in [Doc. # 2042-5 at 4]. The Class will also seek attorneys' fees for services in connection with Andrews' conduct in continuing to prosecute his frivolous appeal.

In dismissing Andrews' appeal, the Sixth Circuit allowed Andrews fourteen days from the date of that dismissal to post the required bond if he wanted to further pursue his appeal. Andrews did not do so, choosing instead, without posting a bond, to file a petition for *en banc* review with the Sixth Circuit, in which he continued to press the merits (or lack thereof) of his objections to the settlement. Andrews has essentially acknowledged that his pending *en banc* petition is meritless and unlikely to be granted as he has already threatened Class Counsel with a further certiorari appeal to the United States Supreme Court. [*See* Doc. # 2102 and Ex. A, Email from C. Andrews to M. Miller dated September 15, 2016]. And as Andrews has just recently made clear, he intends to follow through on the filing of an undeniably frivolous petition for a

writ of certiorari, and further delay the resolution of this litigation and payment of proceeds to the Class for many more months.

The Class cannot continue to suffer at the expense of this vexatious, extortionate litigant. The time is ripe for this Court to sanction Andrews monetarily, and also enjoin him from making any further court filings in the action without the Court's prior approval.

**I.      The Court Has The Authority And Jurisdiction To Impose Sanctions While the Case is Pending Appeal.**

As a threshold matter, this Court has jurisdiction to enter sanctions against Andrews, even though the case is currently pending on appeal and is subject to potential additional appeals. *See Val–Land Farms, Inc., v. Third National Bank In Knoxville,* 937 F. 2d 1110, 1117 (6th Cir. 1991) ("Our circuit has held that a district court retains jurisdiction to entertain a motion for…sanctions even after the filing of a notice of appeal"); *see also Reg'l Refuse Sys., Inc. v. Inland Reclamation Co*., 842 F.2d 150, 156 (6th Cir. 1988) ("The district court retains jurisdiction to resolve a motion for attorneys fees or sanctions even while an appeal of the merits is pending in the court of appeals.").

28 U.S.C. § 1927 provides that "any…person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  In particular, those who file  "unfounded, unmerited, and unsuccessful motions for reconsideration simply because they disagree with a ruling, decision, or order should expect to be sanctioned to the full extent permitted under…28 U.S.C. § 1927."  *Miller v. Norfolk Southern Rwy. Co.* 208 F.Supp.2d 851, 854 (N.D. Ohio 2002); *see also Great Lakes Towing Co. v. Kornmeier*, 299 F.Supp.2d 793, 794-95 (N.D. Ohio 2014) (sanctioning counsel for filing a motion for reconsideration on the basis

that "the hour I spent in reviewing the motion, my former order, and writing this order is an hour wasted for no useful purpose, and an hour taken from the several other matters awaiting my attention").

Accordingly, the Sixth Circuit and the Northern District of Ohio have imposed sanctions under §1927 on litigants that unreasonably multiplied case proceedings under circumstances far less egregious than those here.  For instance, courts in this Circuit often award fees under §1927 for *single* instances of sanctionable conduct, as compared to the *half dozen* duplicative motions filed here on a bond issue that had already been repeatedly and expressly rejected in this case. *See, e.g. Nollner v. Southern Baptist Convention, Inc*., 628 Fed.Appx. 944, 950-51 (6th Cir. 2015) (upholding sanctions of "reasonable attorneys' fees" under Section 1927 on the basis that counsel "intentionally and needlessly caused additional expense to" party by filing an "untimely and unfounded motion"); *Liberty Legal Foundation v. National Democratic Party*, 575 Fed. Appx. 662 (6th Cir. 2014) (affirming order issuing sanctions where counsel brought a single suit that was promptly dismissed and "knew or reasonably should have known that the claims in the case had no basis in law" and "were without merit"); *Thurmond v. Wayne County Sheriff Dept*. 564 Fed. Appx. 823 (6th Cir. 2014) (affirming sanctions where counsel "unreasonably and vexatiously multiplied proceedings" by  filing an "unviable and duplicate" complaint that caused the opposing party to "incur unnecessary expenses in defending against the new action by filing a motion to dismiss and a motion for sanctions, before [the] counsel finally stipulated to dismiss the complaint"); *Velocys, Inc. v. Catacel Corp*., 2011 WL 4945291 (N.D. Ohio 2011) (imposing

sanctions for statements made by a party and his counsel, during a single hearing, "without any factual basis," even though they were not "intentional misstatements").[1]

In addition to monetary sanctions, §1927 authorizes a court to enjoin a vexatious litigant where he has wasted judicial resources. "Every paper filed with the Clerk of ... Court, no matter how repetitious or frivolous, requires some portion of the [Court's] limited resources. A part of the Court's responsibility is to see that these resources are allocated in a way that promotes the interests of justice." *In re McDonald*, 489 U.S. 180, 184 (1989). "The goal of fairly dispensing justice ... is compromised when the Court is forced to devote its limited resources to the processing of repetitious and frivolous requests." *In re Sindram*, 498 U.S. 177, 179–80 (1991). Where a litigant has engaged in such waste, the court may enjoin him from submitting motions or pleadings in a case by ordering the court's clerk to not accept any such filings without the court's express prior approval. *See Walker v. Heideman*, 229 F.3d 1155, *1 (6th Cir. 2000)

---

[1] *See also Coniglio v. CBC Services*, Inc. 2013 WL 3776179 (N.D. Ohio 2013) (imposing sanctions where counsel refused to name what they knew was a necessary party to the matter and opposed that party's intervention in the matter); *Thompson v. Moore*, 2011 WL 3289728 (N.D. Ohio 2011) (imposing sanctions where party filed suit with claims that he knew "were frivolous in that he made no discovery requests and filed an untimely response to Defendant'' dispositive motion for judgment on the pleadings due to 'inadvertent oversight'"); *Steele v. City of Cleveland*, 2010 WL 2760396 (N.D. Ohio 2010) (imposing sanctions where "plaintiff "has failed to carry [her] burden by adducing evidence" and "prosecut[ed] a pointless appeal"); *Joe Solo Productions, Inc. v. Dawson*, 2009 WL 3055204 (N.D. Ohio 2009) (imposing sanctions where party filed suit in court without jurisdiction and "consciously rejected several opportunities to correct his erroneous impression"); *Dixon v. Clem*, 492 F.3d 665 (6th Cir. 2007) (affirming trial court's imposition of sanctions *sua sponte* where counsel "press[ed] specious legal claims and filings in this case which either contained inappropriate language, claims and assertions (requiring unnecessary responses) or which were inappropriate" and counsel "continued to make personal attacks" despite being warned by the Court that his actions were improper"); *Moore v. International Broth. of Elec. Workers*, Local 8, 2003 WL 22722931 (N.D. Ohio 2003) (imposing sanctions after the court dismissed plaintiff's frivolous suit and cautioned "plaintiff from continuing to pursue this litigation, either in this court or on appeal," but plaintiff failed to heed the court's warning).

(citing *Filipas v. Lemons*, 835 F.2d 1145, 1146 (6th Cir. 1987)) ("[T]he district court did not abuse its discretion in directing the clerk not to accept for filing any additional papers tendered by Walker in this action."); *Hulen v. Polyak*, 2 F.3d 1151, *1 (6th Cir. 1993) (affirming district court order "in which the court held that it would not consider any further submissions by Mrs. Polyak to relitigate any issue regarding the parties or the property involved in the partition sale."); *Polyak v. Boston*, 4 F.3d 994, *1 (6th Cir. 1993) ("The district court did not abuse its discretion by ordering that no further submissions with respect to this litigation would be considered."); *see also Hiles v. Mortgage*, 2016 WL 454895, at *4 (S.D. Oh. Feb. 5, 2016) (enjoining and prohibiting vexatious litigant "from filing any additional motions in this case without leave of Court.").[2]

Finally, the fact that Andrews is a *pro se* litigant does not excuse him from such sanctions. *See Gitler v. Ohio*, 632 F. Supp. 2d 722, 727 (N.D. Ohio 2009) ("Although §1927 on its face limits who may be sanctioned to 'an attorney or other person allowed to conduct cases,'

---

[2] *See also United States v. Brown*, 2013 WL 6827951, at *2 (W.D. Tenn. Dec. 20, 2013) (finding that Brown is a vexatious litigant who has restricted filing privileges under 28 U.S.C. § 1915(g); ordering litigant to file no further pleadings until court ruled on pending motions; warning that any violation of the order would be treated as contempt and result in sanctions; and ordering Clerk of Court to not accept any further pleadings for filing in the case until further order of the Court); *In re Atchison-Jorgan*, 2014 WL 1516218 (E.D. Mich. Apr. 17, 2014) (ordering submissions stricken from the docket as filed without legal authority and as frivolous and vexatious); *Smith v. Parks*, 2016 WL 2869776, *3 (E.D. Ky. May 17, 2016) ("Due to the high volume and repetitive, frivolous nature of his filings, it is necessary to enjoin Smith from filing any additional motions or other pleadings in this case without prior permission from the Court ... An injunction is necessary to achieve an orderly, expeditious disposition of this case. Each time Smith files a motion ... he forces both the Court and the Defendants to needlessly expend resources evaluating and dealing with this filings."); *Shaw v. Commissioner of Social Sec.*, 2013 WL 5944785, *2 (E.D. Mich. Nov. 6, 2013) (enjoining Plaintiff "from filing any more papers in this case without first obtaining leave of Court. Any future motions filed without leave will be summarily dismissed.").

courts in the Sixth Circuit can sanction *pro se* litigants under that provision."); *see also Moore v. Lafayette Life Insurance Co.*, 458 F. 3d 416, 446-447 (6th Cir. 2006) (finding district court did not abuse its discretion in holding Plaintiff's attorney and Plaintiff jointly and severally liable for defendant's attorneys' fees under §1927); *Tareco Properties, Inc. v. Morris*, 321 F. 3d 545, 550 (6th Cir. 2003) (upholding district court's order sanctioning both defendant and his attorneys for filing frivolous pleadings in contravention of §1927); *Best v. AT&T, Inc.*, 2014 WL 1923149, *3 (S.D. Oh. May 14, 2014) (noting the strain on judicial resources caused by frivolous filings and holding that the leeway given to *pro se* plaintiffs "is not without its limits and plaintiff is not entitled to file frivolous motions"; cautioning vexatious litigant that "future filings deemed frivolous will be stricken from the record and may subject him to sanctions, including revocation of electronic filing privileges").

## II. Andrews' Repeated Bad Faith and Vexatious Conduct Warrants The Imposition of Sanctions Now To Prevent Further Damage to the Class.

This Court has denied three separate meritless motions by Andrews seeking to overturn or stay the appeal bond. On April 13, 2016, this Court imposed a $145,463 appeal bond on Andrews to protect the class from the costs incurred by Andrews' frivolous pursuit of his meritless appeal. (Doc. # 2068.) Rather than post the bond, on April 27, 2016, Andrews filed a motion to stay the bond order (Doc. # 2075). Prior to obtaining a ruling on his motion, Andrews then filed, on May 4, 2016 a "Motion for Reconsideration/Stay on Bond Order under Rule 59(e)" (Doc. # 2083) and a "Supplemental Motion to Reconsider Order – Appeal Bond pursuant to FRCP 59(e)." Doc. # 2082. On May 12, 2016, this Court denied all of his motions, stating that they "are yet another misguided attempt to delay this litigation, and confirm this Court's earlier conclusion that an appeal bond is both appropriate and fully justified." Doc. # 2089 at 2.

Similarly, the Sixth Circuit has also denied Andrews' pleadings to overturn the bond order and dismissed Andrews' appeal for failing to post bond, *after* Andrews made the same argument to it regarding *Shane* that he made to this Court. On May 14, 2016, the Class moved in the Sixth Circuit to dismiss Andrews' appeal for failure to file the appeal bond. App. No. 16-3168, Doc. 28. A few days later, Andrews filed a cross-motion to stay or reverse the appeal bond. App. No. 16-3168, Doc. 30. Andrews subsequently filed two more pleadings under Fed. R. App. P. 28(j), directing the Sixth Circuit's attention to its decision in *Shane v. Blue Cross Blue Shield*, No. 15-1544, and arguing that *Shane* somehow excused him from having to comply with this Court's Order imposing the appeal bond. App. No. 16-3168, Doc. 34 and 37. On June 20, 2016, the Sixth Circuit affirmed this Court's Order imposing the bond, denied Andrews' motion for relief from the bond, and dismissed Andrews' appeal. App. No. 16-3168, Doc. 38-1. In so doing, the Sixth Circuit stated that "Andrews may move to reinstate his appeal only if he posts the full amount of the appeal bond ($145,463) no later than fourteen (14) days after this order is entered on the docket." *Id.*

Instead of posting the appeal bond, Andrews then filed, in this Court, a *fifth* motion attacking the appeal bond, entitled "2nd Motion for Reconsideration/Stay on Bond Order under Rule 59(e) Based on New Case Law Under *Shane v. Blue Cross* 15-1544" on June 23, 2016 (Doc. # 2102), in which he advanced the same arguments regarding *Shane* that he previously, and unsuccessfully advanced in the Sixth Circuit. When this Court denied this motion, Andrews filed on June 27, 2016—without posting the appeal bond—a petition for *en banc* review, in which he continued to argue the purported merits of his objections and appeal.

Knowing that there are built-in delays in the judicial process, since November 2015, Andrews has without repercussions and reprisals, gamed the judicial system, frustrated, and

9

impeded the orderly judicial progress of this complex litigation to reach finality.  He has persistently flouted this Court's Order to post an appeal bond and repeatedly expressed his intention to continue his course and delay in achieving finality of the Settlements, including threatening to file a petition for a writ certiorari in the U.S. Supreme Court.  Andrews has not heeded this Court's warnings, and has demonstrated that he will not stop filing frivolous and vexatious documents unless this Court stops him.

Those who file  "unfounded, unmerited, and unsuccessful motions for reconsideration simply because they disagree with a ruling, decision, or order should expect to be sanctioned to the full extent permitted under…28 U.S.C. § 1927."  *Miller v. Norfolk Southern Rwy. Co*. 208 F.Supp.2d 851, 854 (N.D. Ohio 2002).  As Judge Carr has cautioned:

> Nearly two years ago I published a decision in which I undertook to notify counsel that unsuccessful motions for reconsideration would be sanctioned [] *Miller v. Norfolk Southern Rwy. Co*., 208 F. Supp. 2d 851 (N.D. Ohio, 2002)…The hour I spent in reviewing the motion, my former order, and writing this order is an hour wasted for no useful purpose, and an hour taken from the several other matters awaiting my attention.  Counsel was, or certainly should have been on notice of the risk he took in filing the instant motion.

*Great Lakes Towing Co. v. Kornmeier*, 299 F.Supp.2d 793, 794-95 (N.D. Ohio 2014).

In addition, as detailed *supra*, this Court and the Sixth Circuit have repeatedly found Andrews' filings to be frivolous and vexatious. Andrews' half a dozen filings challenging the bond order were not simply meritless, they were based on the *exact same* points and authorities that this Court and the Court of Appeals had already rejected time and time again.  Nevertheless, this Court has been reluctant to impose sanctions against him in the past.

The parties and this Court have invested substantial resources to help secure one of the largest all-cash recoveries for a consumer class.  Accordingly, the Court has an obligation to protect the Class from damages as a result of pernicious serial objectors. Andrews has already

forced the Class to incur thousands of dollars in lost interest income since April, and the Class
will continue to lose thousands in monthly interest from his continued vexatious and frivolous
filings, as Defendant, Carpenter Co., is not required to pay its $43.5 million settlement into
escrow while Andrews' claims are pending. As a result, the Court should not only impose
monetary sanctions against him for the $13,086.30 in lost interest from April 2016 through
September 2016, but should also exercise its statutory power to enjoin him from making any
further filings in this case without first obtaining leave of this Court.

## CONCLUSION

Wherefore, Plaintiffs request that this Court enter sanctions against Andrews pursuant to
28 U.S.C. §1927 as follows:

a. Ordering that he pay to the Class the sum of $13,086.30 which represents
   interest already lost to the Class from April 2016 through September 2016, by
   the delay to achieve final approval of the Carpenter Settlement due to
   Andrews' frivolous and vexations filings in the District Court and in the Sixth
   Circuit; and

b. Enjoining Andrews from filing any papers in the District Court without first
   obtaining approval of the appropriate court.

Dated: September 27, 2016                Respectfully submitted,


                                         /s/ Marvin A. Miller
                                         Marvin A. Miller
                                         MILLER LAW LLC
                                         115 S. LaSalle Street, Suite 2910
                                         Chicago, IL 60603
                                         Phone: 312-332-3400
                                         Fax:    312-676-2676
                                         Email: mmiller@millerlawllc.com

*Lead Counsel for Indirect Purchaser
Plaintiff Class*

Richard M. Kerger (0015864)
**KERGER & HARTMAN, LLC**
33 S. Michigan Street, Suite 100
Toledo, OH 43604
Telephone: (419) 255-5990
Fax: (419) 255-5997
Email: rkerger@kergerlaw.com

*Executive Committee for Indirect Purchaser
Plaintiff Class*

Jay B. Shapiro
Samuel O. Patmore
Abigail G. Corbett
Maria A. Fehretdinov
**STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.**
150 West Flagler Street, Suite 2200
Miami, Florida 33130
Telephone: (305) 789-3200
Fax: (305) 789-3395
Email: jshapiro@stearnsweaver.com
        spatmore@stearnsweaver.com
        acorbett@stearnsweaver.com
        mfehretdinov@stearnsweaver.com

*Counsel for Indirect Purchaser Plaintiff Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 27, 2016, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt, pursuant to Local Rule 5.1(b)-(c) and Initial Case Management Conference Order dated January 20, 2011 (Dkt. No. 17). Parties may access this filing through the Court's system. Service via U.S. mail was made upon the following counsel and/or *pro se* parties:

Christopher Andrews
P.O. Box 530394
Livonia, MI 48153-0394

*/s/ Marvin A. Miller*
Marvin A. Miller

# EXHIBIT A

**Marvin A. Miller**

| | |
|---|---|
| **From:** | caaloa <caaloa@gmail.com> |
| **Sent:** | Thursday, September 15, 2016 4:00 PM |
| **To:** | Marvin A. Miller |
| **Subject:** | The 6th Circuit and sealing records |

Dear Counsel,

      What do you make of this as it applies to the sealing issues raised in our case (my missing damage report request) and the bond issue where none is clearly needed. Do you really think the 6th would allow the bond order to stand and have me win at the Supreme Court? Fix the issues. Chris Andrews

Since *Shane Group*, document sealing has been on the Sixth Circuit's mind. A few weeks later, the court sua sponte vacated orders to seal motions for summary judgment and accompanying exhibits. *Beauchamp v. Fed. Home Loan Mortg. Corp.*, No. 15-6067, 2016 WL 3671629, at *4-5 (6th Cir. July 11, 2016). Later, relying once again on *Shane Group*, the Sixth Circuit handed a team of BakerHostetler attorneys a victory on appeal, affirming the unsealing of an entire case. *Rudd Equip. Co., Inc. v. John Deere Constr. & Forestry Co.*, No. 16-5055, 2016 WL 4410575 (6th Cir. July 27, 2016).

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

In re Polyurethane Foam Antitrust
   Litigation

This document relates to:
ALL DIRECT PURCHASER CLASS
ACTIONS

Case No. 1:10 MD 2196

<u>ORDER OF CIVIL CONTEMPT</u>

JUDGE JACK ZOUHARY

Pending before this Court is Indirect Purchaser Plaintiffs' Motion for Finding of Civil Contempt against *pro se* Objector Christopher Andrews (Doc. 2125).  The Motion, which follows a series of filings which this Court summarizes next, is granted.

On October 24, this Court found that Andrews had engaged in a pattern and practice of the "vexatious use of the judicial system" and further found that Andrews had for some time "ignored both this Court's Orders and rulings from the Sixth Circuit" (Doc. 2113 at 2).  As a result, this Court imposed a monetary sanction of $15,303.  Andrews moved twice to reconsider and those requests were denied (Doc. 2115–17, 2123)

On November 29, class counsel served Andrews with a Notice of Deposition and Request for Production of Documents to assist in their efforts to collect on the monetary sanction.  Andrews was noticed to produce financial records by December 19 and appear for a deposition on December 20.  Andrews then moved this Court to cancel or stay the deposition (Doc. 2119) which class counsel opposed (Docs. 2120–2122).  This Court granted Andrews a one-day extension, ordering him to appear for his deposition on December 21 (Doc. 2124), with the warning that failure to appear could result in an additional sanction.

On December 14, Andrews repeated that he would not attend the December 21 deposition.  His reasons were frivolous, primarily indicating he had no time to do anything but prepare papers for a Writ of Certiorari to the United States Supreme Court on an appeal of earlier Orders from both this Court and the Sixth Circuit.  This Court denied Andrews' request for any further postponements.  *See*

letters from Andrews, attached as Exhibits A and B, which were not filed pursuant to this Court's Order (Doc. 2123).

Perhaps not surprisingly, Andrews failed to produce any documents and failed to appear for his deposition as ordered.  A phone call from class counsel to inquire as to his whereabouts went unanswered (Doc. 2126).  His disappearing act remains unexplained.

In a similar situation, in the case of *In Re TFT-LCD*, 289 F.R.D. 548, 553–54 (N.D. Cal. 2013), objectors to an antitrust class action settlement were ordered to appear for depositions, but failed to do so.  The court there found that the objectors and their counsel violated a court order requiring the appearance of the objectors for deposition.  The court further found the objectors failed to show efforts to comply with the court order, or provide sufficient justification for failing to comply, and therefore held the objectors in civil contempt, awarding monetary sanctions to compensate class counsel for fees incurred pursuing the depositions.

That same holding applies equally here.  Objector Andrews has already provided this Court with an "in your face" statement (Exhibits A and B) that under no circumstances would he attend the deposition, against a background of this Court's patient handling of his ongoing misconduct.  Andrews proclaimed he would make no effort to comply with this Court's Order, and this Court finds, by clear and convincing evidence, that Andrews be held in civil contempt.  The United States Marshals are directed to bring Andrews before this Court as soon as practicable for him to answer why he should not be required to pay an additional monetary sanction in light of his continued contumacious conduct, and his undisguised failure to follow this Court's December Orders.

IT IS SO ORDERED.

___s/ Jack Zouhary____
JACK ZOUHARY
U. S. DISTRICT JUDGE

December 29, 2016

Clerk of the Court

U.S. District Court

Northern District of Ohio

United States Courthouse

1716 Spielbusch Avenue

Toledo, OH 43604


Polyurethane Foam Antitrust Litigation,        Case No.  10-MD-2196

                                               Judge Jack Zouhary


                                               Christopher Andrews, Pro se Objector

                                               Response to Docket 2122

The request to send a check to American Deposit Management Co., Escrowee is legally invalid. Because Class Counsel failed to do their job properly, the Court failed to appoint and/or reappoint Class Counsel, the Claims Administrator and the Escrow agent making the entire approval legally invalid and reversible, the Supreme Court will accept the Writ and reverse the appeal bond order.

The defendants have no and had no legal obligation to send funds to an entity that legally does not have to follow any court orders and decrees because the court has no oversight and authority over them. There is no lost interest since the funds should not be in that institution to begin with. Counsel is at fault for not forcing defendant to pay up front, Class Counsel should absorb this interest allegedly lost. Any sanctions, collection of interest, a creditor's hearing and the demand to send a check to a nonparty in this litigation is void. What a legal quagmire Class Counsel has gotten the parties into. The creditor's hearing is a bit premature and unlawful.

I certify under penalty of perjury that all of the above is true and accurate to the best of my knowledge.

Chris Andrews, Pro se, December 08, 2016   PO Box 530394,

Livonia, MI 48153-0394, Telephone 248-635-3810 Email: caaloa@gmail.com

**Proof of Service**

I hereby certify that on December 08, 2016 I sent by USPS Priority Mail this document to the Clerk of the United States Court and sent a copy to Mr. Miller via first class mail.

Chris Andrews
PO Box 530394
Livonia, MI 48153-0394
Telephone 248-635-3810
Email: caaloa@gmail.com
**Pro se Appellant**

Clerk of the Court

U.S. District Court

Northern District of Ohio

United States Courthouse

1716 Spielbusch Avenue

Toledo, OH 43604


Polyurethane Foam Antitrust Litigation,          Case No.  10-MD-2196

                                                 Judge Jack Zouhary


                                                 Christopher Andrews, Pro se Objector

                                                 Response to Orders 2123 and 2124

Dear Mr. Miller,

          I am in receipt of the Court's latest orders. If I don't have time to attend a Preliminary Approval hearing in Detroit tomorrow, December 13, 2016, I surely don't have the time to drive 65 miles or approximately 80 minutes one way into Ohio to attend a hearing (another five-six hours shot) that is designed and absolutely does hinder my ability to finish this writ accurately and on time. I also could not attend a final approval hearing in CA on Friday December 16 2016, out of time and money.

The Court and class counsel are hindering my ability to accurately finish this Writ accurately and on time, both parties have a vested interest in causing me delay, and hope I make a mistake but the parties have everything to lose when this writ is accepted, hence this rush to depose. This objector is also unaware he can appeal the court's orders, and now that I know I don't have the time to file anything.

The court mentioned something about my time to file the writ. As a result I have just reviewed the Supreme Court guidelines and the amount of time I have left to file is not December 20, 2016 but December 27, 2016, based on the postmark date, not on the arrival date, and I will need every extra hour of it. You have now cost me 11 hours of time in the last three weeks, you will not waste any more of it, I will not be hurried.

I will be filing the writ In forma pauperis so if you wait two more weeks you will find the hearing you have scheduled and the court agreed to is waste of time. Unfortunately I will not be able to attend on Wed December 21, 2016 for all the reasons listed above and in my previous filings so please reschedule. I will not open any emails, snail mail or listen to voicemails regarding this case until the writ is in the mail. I will then send an email soon after that occurs to arrange a time to sit for your deposition. Wait until the parties see this jaw dropping writ which will get the bond reversed and eventually the approval reversed and your fee forfeited. Does the court know about the huge fraud fib in your fee petition that causes the fee award to violate and conflict with this circuit's, other circuit's and Supreme Court precedent?

You mentioned in a previous email that I had a "schedule" I had received regarding the sanctions. False, I have nothing in my possession. The Court's order is vague and ambiguous as to how this alleged damage amount is calculated and what it is based on. I will not accept responsibility for other's errors.

  Chris Andrews

## Blue Cross hearing next week

**caaloa <caaloa@gmail.com>** Dec 8 (4 days ago)
to Dan

Dear Dan,

      The writ to the Supreme Court in foam case is taking longer than expected so every hour counts. In addition to that is the fact that counsel in foam has wasted ten hours of my valuable time dealing with and responding to the deposition and documents hearing and filings being made on both sides which, as intended, has hindered the completion of the writ being completed in appropriate time tranches. I will therefore be unable to attend the hearing Tuesday, most unfortunate.

Chris Andrews

I certify under penalty of perjury that all of the above is true and accurate to the

best of my knowledge.

Chris Andrews, Pro se, December 12, 2016   PO Box 530394,

Livonia, MI 48153-0394, Telephone 248-635-3810 Email: caaloa@gmail.com

## Proof of Service

 I hereby certify that on December 12, 2016 I sent by USPS Priority Mail this

document to the Clerk of the United States Court and sent a copy to Mr. Miller via

first class mail.

Chris Andrews
PO Box 530394
Livonia, MI 48153-0394
Telephone 248-635-3810
Email: caaloa@gmail.com
 Pro se Appellant

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

In re Polyurethane Foam Antitrust       Case No. 1:10 MD 2196
    Litigation

                                     <u>O R D E R</u>

This document relates to:
ALL INDIRECT PURCHASER CLASS      JUDGE JACK ZOUHARY
ACTIONS

Pending before this Court is *pro se* Objector Christopher Andrews' Motion for Permission to Appeal *in forma pauperis* (Doc. 2156). Andrews' finances have been the subject of much debate during this litigation (*see, e.g.*, Docs. 2119, 2120, 2121, 2122, 2125, 2126, 2127, 2133, 2140, 2141). Under the circumstances, this Court requires additional documentation of Andrews' financial status to effectively evaluate his Motion. Accordingly, class counsel shall promptly file under seal the documents referenced in the January 9 and January 13 Orders (Docs. 2133, 2141), which were produced by Andrews during the limited discovery related to the October 24 Order (Doc. 2113).

      IT IS SO ORDERED.

                                  <u>s/ *Jack Zouhary*</u>
                                  JACK ZOUHARY
                                  U. S. DISTRICT JUDGE

                                  March 22, 2017