## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| In re: Equifax Inc. Customer Data Security Breach Litigation | MDL Docket No. 2800<br>No. 1:17-md-2800-TWT<br><br>CONSUMER ACTIONS<br><br>Chief Judge Thomas W. Thrash, Jr. |

## AMENDED ORDER GRANTING FINAL APPROVAL OF SETTLEMENT, CERTIFYING SETTLEMENT CLASS, AND AWARDING ATTORNEY'S FEES, EXPENSES AND SERVICE AWARDS

Consumer Plaintiffs and Defendants Equifax Inc., Equifax Information Services, LLC, and Equifax Consumer Services LLC (collectively, "Equifax"), reached a proposed class action settlement resolving claims arising from the data breach Equifax Inc. announced on September 7, 2017. On July 22, 2019, this Court directed that notice issue to the settlement class. [Doc. 742]. This matter is now before the Court on the Consumer Plaintiffs' Motion for Final Approval of Proposed Settlement [Doc. 903] and Motion for Attorneys' Fees, Expenses, and Service Awards to the Class Representatives. [Doc. 858]. For the reasons set forth below and on the record of the hearing of December 19, 2019, the Court grants both motions, issues its ruling on the pending objections and motions from various objectors that have been filed, and will separately enter a Consent Order relating to the business practice changes to which Equifax has agreed and a Final Order and Judgment.

I.    INTRODUCTION.

   A.    **Factual Background and Procedural History.**

On September 7, 2017, Equifax Inc. announced a data breach that it determined had impacted the personal information of about 147 million Americans. More than 300 class actions filed against Equifax were consolidated and transferred to this Court, which established separate tracks for the consumer and financial institution claims and appointed separate legal teams to lead each track.

In the consumer track, on May 14, 2018, plaintiffs filed a 559-page consolidated complaint, which named 96 class representatives and asserted common law and statutory claims under both state and federal law. [Doc. 374]. The complaint alleged claims including negligence, negligence per se, unjust enrichment, declaratory judgment, breach of contract (for those individuals who had provided personal information to Equifax subject to its privacy policy), and violation of the Fair Credit Reporting Act ("FCRA"), the Georgia Fair Business Practices Act ("GFBPA"), and various state consumer laws and state data breach statutes.

Equifax moved to dismiss the complaint in its entirety, arguing *inter alia* that Georgia law does not impose a legal duty to safeguard personal information, plaintiffs' alleged injuries were not legally cognizable, and no one could plausibly prove that their injuries were caused by this data breach as opposed to another

breach. The parties exhaustively briefed the motion during the summer and early fall of 2018.

After the benefit of oral argument on December 14, 2018, the Court issued an order on January 28, 2019, granting in part and denying in part the motion to dismiss. [Doc. 540]. The Court allowed the negligence and negligence per se claims to proceed under Georgia law, finding among other things that the plaintiffs alleged actual injuries sufficient to support a claim for relief (*id.* at 15-21). The Court dismissed the FCRA claim, the GFBPA claim, the contract claims, and the unjust enrichment claims of those plaintiffs who had no contract with Equifax. The Court dismissed some state statutory claims, but allowed many others to proceed. Following the Court's order on dismissal, Equifax answered on February 25, 2019 [Doc. 571]. Before and after Equifax filed its answer, the parties engaged in significant discovery efforts and raised numerous discovery-related disputes with the Court in late 2018.

On April 2, 2019, after more than 18 months of negotiations, the parties informed the Court they had reached a binding settlement that was reflected in a term sheet dated March 30, 2019, and that had been approved the following day by Equifax's board of directors. After consulting and negotiating with federal and state regulators regarding revisions to the term sheet, the parties entered into the final settlement agreement on July 19, 2019, and presented the final settlement agreement

to the Court on July 22, 2019. (App. 1, ¶¶ 17-24).[1] After a hearing on July 22, 2019, the Court entered an order directing notice of the proposed settlement ("Order Directing Notice") [Doc. 742]. In the Order Directing Notice, the Court found that it would likely approve the settlement as fair, reasonable, and adequate, and certify the settlement class.

## B.   Terms of the Settlement.

The following are the material terms of the settlement:

### 1.   The Settlement Class.

The settlement class is defined as follows:

> The approximately 147 million U.S. consumers identified by Equifax whose personal information was compromised as a result of the cyberattack and data breach announced by Equifax Inc. on September 7, 2017.

Excluded are (i) Equifax, any entity in which Equifax has a controlling interest, and Equifax's officers, directors, legal representatives, successors, subsidiaries, and assigns; (ii) any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff; and (iii) any individual who timely and validly opts out of the settlement class. [Settlement Agreement, Doc. 739-2, ¶ 2.43].

---

[1] References in this Order to "App." refer to the declarations comprising the Appendix [Doc. 900] accompanying the pending motions.

2.      **The Settlement Fund.**

Equifax will pay $380,500,000 into a fund for class benefits, attorneys' fees, expenses, service awards, and notice and administration costs; up to an additional $125,000,000 if needed to satisfy claims for certain out-of-pocket losses; and potentially $2 billion more if all 147 million class members sign up for credit monitoring. [Doc. 739-2, ¶ 7.8; Doc. 739-4, ¶ 37]. No settlement funds will revert to Equifax. [Doc. 739-2, ¶ 5.5]. The specific benefits available to class members include:

- Reimbursement of up to $20,000 for documented, out-of-pocket losses fairly traceable to the breach, such as the cost of freezing or unfreezing a credit file; buying credit monitoring services; out-of-pocket losses from identity theft or fraud, including professional fees and other remedial expenses; and 25 percent of any money paid to Equifax for credit monitoring or identity theft protection subscription products in the year before the breach. If the $380.5 million fund proves to be insufficient, Equifax will add another $125 million to pay claims for out-of-pocket losses.

- Compensation of up to 20 hours at $25 per hour (subject to a $38 million cap) for time spent taking preventative measures or dealing with identity theft. Ten hours can be self-certified, requiring no documentation.

- Four years of specially negotiated, three-bureau credit monitoring and identity protection services through Experian and an additional six years of one-bureau credit monitoring and identity protection services through Equifax. The Experian monitoring has a comparable retail value of $24.99 per month and has a number of features that are typically not available in "free" credit monitoring services offered to the public. (App. 6, ¶¶ 33-43). The one-bureau credit monitoring shall be provided separately by Equifax and not paid for from the settlement fund.

- Alternative cash compensation (subject to a $31 million cap) for class members who already have credit monitoring or protection services in place and who choose not to enroll in the enhanced credit monitoring and identity protection services offered in the settlement.

- Identity restoration services through Experian to help class members who believe they may have been victims of identity theft for seven years, including access to a U.S. based call center, assignment of a certified identity theft restoration specialist, and step by step assistance in dealing with credit bureaus, companies and government agencies.

Class members have six months to claim benefits (through January 22, 2020), but need not file a claim to access identity restoration services. (*Id.*, ¶¶ 7.2 and 8.1.1). If money remains in the fund after the initial claims period, there will be a four-year extended claims period during which class members may recover for certain out-of-pocket losses and time spent rectifying identity theft that occurs after the end of the initial claims period. (*Id.*, ¶ 8.1.2). If money remains in the fund after the extended claims period, it will be used as follows: (a) the caps for time and alternative compensation will be lifted and payments will be increased *pro rata* up to the full amount of the approved claims; (b) up to three years of additional identity restoration services will be purchased; and (c) the Experian credit monitoring services claimed by class members will be extended. (*Id.*, ¶ 5.4). Equifax will not receive any monetary or other financial consideration for any of the benefits provided by the settlement. (*Id.*, ¶ 7.3).

### 3.   **Injunctive Relief.**

Equifax has agreed to entry of a consent order requiring the company to spend a minimum of $1 billion for data security and related technology over five years and to comply with comprehensive data security requirements. Equifax's compliance will be audited by an experienced, independent assessor and subject to this Court's enforcement powers. [*See generally* Doc. 739-2, pp. 76-84; Doc. 739-4, ¶ 44]. According to cybersecurity expert Mary Frantz:

> [I]mplementation of the proposed business practice changes should substantially reduce the likelihood that Equifax will suffer another data breach in the future. These changes address serious deficiencies in Equifax's information security environment. Had they been in place on or before 2017 per industry standards, it is unlikely the Equifax data breach would ever have been successful. These measures provide a substantial benefit to the Class Members that far exceeds what has been achieved in any similar settlements.

[739-7, ¶ 66]. Equifax's binding financial commitment to spend $1 billion on data security and related technology substantially benefits the class because it ensures adequate funding for securing plaintiffs' information long after the case is resolved. (*See id.*, ¶ 56).

### 4.   **Notice And Claims Program.**

The notice plan [*see* Doc. 739-2, p. 125], was developed by class counsel and the Court-appointed notice provider (Signal Interactive Media), with input from the claims administrator (JND Legal Administration) and the regulators. (App. 1, ¶ 25). The notice plan is not designed merely to satisfy minimal constitutional

requirements, but an innovative and comprehensive program that takes advantage of contemporary commercial and political advertising techniques—such as focus groups, a public opinion survey, and micro-targeting—to inform, reach, and engage the class and motivate class members to file claims. According to the plaintiffs and Signal, the notice program is a first-of-its kind effort and is unprecedented in scope and impact. The Court finds that the notice program is a significant benefit to the class.

The notice program consists of: (1) multiple emails sent to those whose email addresses can be found with reasonable effort; (2) a digital and social media campaign using messaging continually tested and targeted for effectiveness; (3) a full-page ad in *USA Today* using plain text designed with input from experts on consumer communications at the Federal Trade Commission as well as a national radio advertising campaign to reach those who have limited online presence; (4) a settlement website on which the long-form notice and other important documents, including various pleadings and other filings from the litigation, are posted; and (5) the ability for class members to ask questions about the settlement via email and a toll-free number staffed with live operators. (App. 4, ¶¶ 43-57, 85-90; App. 5, ¶¶ 22-30). Signal will continue digital advertising during the extended claims period and until identity restoration services are no longer available, a period that will last for seven years. [Doc. 739-2, pp. 127, 138].

JND transmitted the initial email notice to 104,815,404 million class members beginning on August 7, 2019. (App. 4, ¶¶ 53-54). JND later sent a supplemental email notice to the 91,167,239 class members who had not yet opted out, filed a claim, or unsubscribed from the initial email notice. (*Id*., ¶¶ 55-56). The notice plan also provides for JND to perform two additional supplemental email notice campaigns. (*Id*., ¶ 57).

The digital component of the notice plan, according to Signal, reached 90 percent of the class an average of eight times before the notice date of September 20, 2019, approximately 60 days before the deadline for objecting and opting out. Signal's digital campaign achieved 1.12 billion impressions on social media, paid search, and advertising before the notice date, far surpassing the original target of 892 million impressions. (App. 5, ¶ 24). Signal is expected to deliver an additional 332 million impressions during the remainder of the initial claims period (*id*., ¶ 25), many more digital impressions than initially anticipated. Signal also placed a full-page notice that appeared in the September 6, 2019 issue of *USA Today*. (*Id.*, ¶ 26). The radio campaign, which ran from August 19 through September 8, 2019 in 210 markets across the country, resulted in 194,797,100 impressions overall and 63,636,800 impressions for the target age group least likely to be reached online. (*Id*., ¶¶ 27-28).

Finally, the settlement received a great deal of media coverage in virtually

every U.S. market, increasing exposure and reach to class members. The settlement was featured prominently by CNN, in the *New York Times*, and on the Today Show, among other national media outlets. (*Id.*). From July 22, 2019 through December 1, 2019, there were approximately 30,000 mentions related to the data breach or the settlement in the media. (*Id.*, ¶ 90).

As a result of the notice program and extensive media coverage, the response from the class has been unprecedented. The settlement website received 46 million visits during the first 48 hours following preliminary approval and, as of December 1, 2019, the total number of visits to the website exceeded 130 million, with nearly 40 million discrete visitors. Most significantly, with several weeks left in the initial claims period, the claims administrator has received in excess of 15 million claims from verified class members, including over 3.3 million claims for credit monitoring. (*Id.*, ¶¶ 5, 64-69). The claims rate, to date, thus exceeds 10% of the class.

These claims and others that continue to be filed are governed by a detailed claims administration protocol, which employs a variety of techniques to facilitate access, participation, and claims adjudication and resolution. (App. 4, ¶¶ 4, 71). JND has also developed specialized tools to assist in processing claims, calculating payments, and assisting class members in curing any deficient claims. (*Id.*, ¶¶ 4, 21). As a result, class members have the opportunity to file a claim easily and have that claim adjudicated fairly and efficiently.

### 5. <u>Attorneys' Fees And Expenses And Service Awards.</u>

Class counsel have applied for a percentage-based fee of $77.5 million, reimbursement of $1,404,855.35 in litigation expenses, and service awards of $2,500 for each settlement class representative totaling no more than $250,000 in the aggregate. [Doc. 858]. These amounts are in accordance with the terms of the settlement agreement and were not negotiated by the parties until after the negotiations regarding the relief to be afforded to the class had concluded. Under prevailing precedent and the circumstances of this case, these requests are reasonable, and for the reasons set forth in more detail below, the requests will be approved.

### 6. <u>Releases.</u>

In pertinent part, the class will release Equifax from claims that were or could have been asserted in this case. The releases are set forth in more detail in the settlement agreement. [Doc. 739-2, ¶¶ 2.38, 2.50, 16].

## II. FINAL APPROVAL OF PROPOSED SETTLEMENT AND CERTIFICATION OF SETTLEMENT CLASS.

The Court, having considered the Settlement Agreement and Release including all of its exhibits [Doc. 739-2]; all objections and comments received regarding the settlement; all motions and other court filings by objectors and *amici curiae*; the arguments and authorities presented by the parties and their counsel in their briefing; the arguments at the final approval hearing on December 19, 2019;

and the record in this action, and good cause appearing, hereby reaffirms its findings in the Order Directing Notice, finds the settlement is fair reasonable and adequate, and certifies the settlement class.

## A.    The Proposed Settlement Is Fair, Reasonable, And Adequate.

Before the Court may finally approve a proposed settlement, it must consider the factors listed in Rule 23(e)(2) including whether "(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2). As explained below, consideration of each of these factors supports a finding that the settlement is fair, reasonable, and adequate and should be approved.

## 1.    The Class Was Adequately Represented.

The first prong of Rule 23(e)(2) directs the Court to consider whether the class representatives and class counsel have adequately represented the class. Fed. R. Civ. P. 23(e)(2)(A). Traditionally, adequacy of representation has been considered in

12

connection with class certification. For this analysis, courts consider: "(1) whether [the class representatives] have interests antagonistic to the interests of other class members; and (2) whether the proposed class' counsel has the necessary qualifications and experience to lead the litigation." *Columbus Drywall & Insulation, Inc. v. Masco Corp.*, 258 F.R.D. 545, 555 (N.D. Ga. 2007).

The Court finds that the class representatives are adequate. They share the same interests as absent class members, assert claims stemming from the same event that are the same or substantially similar to the rest of the class, and share the same types of alleged injuries as the rest of the class. Like the rest of the class, the class representatives' personal information at issue was stolen and they all allege the same risk—that their information may be misused by criminals in the future. And, no class member has benefitted from the breach. For all these reasons, the Court finds that the interests of class members are not antagonistic and there is no intra-class conflict here.

Further, the Court finds that class counsel have adequately represented the class. The Court appointed class counsel after a comprehensive and competitive appointment process. Their experience in complex litigation generally and data breach litigation specifically has been brought to bear here, as they effectively worked to bring this case to a successful resolution. The Court has observed class counsel's diligence, ability, and experience in pleadings and motion practice; in

regularly-conducted status conferences; in their presentation of the settlement to this Court; and in their attention to matters of notice and administration after the announcement of the settlement. The excellent job class counsel have done for the class is also demonstrated in the benefits afforded by the settlement.

### 2.     The Proposed Settlement Was Negotiated At Arm's Length.

With respect to the second factor under Rule 23(e)(2), the Court readily concludes that this settlement was negotiated at arm's length, and that there was no fraud or collusion in reaching the settlement. Fed. R. Civ. P. 23(e)(2)(B). This Court has observed the zeal with which counsel for the parties have advanced their clients' interests in this case, their written work, and their oral advocacy at status conferences and the numerous other hearings that have been conducted. Further, Layn Phillips, a retired federal judge with a wealth of experience in major complex litigation and large-scale data breach cases who served as the settlement mediator, has attested to the history of the contentious negotiations, the process of reaching agreement on a binding term sheet, the level of advocacy on both sides of the case, and his opinion that the settlement represents a reasonable and fair outcome. [Doc. 739-9]. *See generally Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001) (presence of "highly experienced mediator" pointed to "absence of collusion"). Moreover, any possibility of collusion—already remote—is undercut by the fact that the settlement enjoys the support of the Federal Trade Commission, the Consumer

Financial Protection Bureau, and Attorneys General of 48 states, Puerto Rico, and the District of Columbia. These regulators entered into their own separate settlements with Equifax after the parties entered into the term sheet in this case and agreed that the settlement fund in this case can serve as the vehicle for consumer redress related to the breach.

### 3. <u>The Relief Provided To The Class Is Adequate.</u>

The third factor the Court considers under Rule 23(e)(2) is the relief provided for the class taking into account "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C).

In examining the adequacy of the relief provided to the class, the Court starts with the observation that this settlement is the largest and most comprehensive recovery in a data breach case in U.S. history by several orders of magnitude. [Doc. 739-4, pp. 40-45]. Not only does the size of the settlement fund exceed all previous data breach settlements, but the specific benefits provided to class members (both monetary and nonmonetary) that were enumerated above meet or substantially exceed those that have been obtained in other data breach cases. (*Id.*; *see also* Doc.

739-7, ¶ 66). It is also particularly significant that all valid claims for out-of-pocket losses likely will be paid in full; that 3.3 million class members have already submitted claims for credit monitoring with a collective retail value of roughly $6 billion; that all class members, whether or not they file a claim, will have access to identity restoration services to help deal with the aftermath of any identity theft for seven years; that the notice program will continue for the full seven years to remind class members of the existence of those extended services; that Equifax must spend at least $1 billion on data security and related technology; and that Equifax's compliance with comprehensive data security measures will be subject to independent verification and judicial enforcement.

The minimum cost to Equifax of the settlement is $1.38 billion and could be more, depending on the cost of complying with the injunctive relief, the number and amount of valid claims filed for out-of-pocket losses, and the number of class members who sign up for credit monitoring (as Equifax, not the settlement fund, will bear the cost if more than seven million class members sign up for three-bureau credit monitoring and Equifax, not the settlement fund, will bear the cost of providing the extended one-bureau credit monitoring under the settlement). The benefit to the class—even when only considering the value of the $380.5 million minimum settlement fund, the minimum $1 billion Equifax is required to spend on data security and related technology, and the retail value of the credit monitoring

already claimed by class members—exceeds $7 billion.

These benefits have added value by being available now, rather than after years of continued litigation, because class members can immediately take advantage of settlement benefits designed to mitigate and prevent future harm, including credit monitoring and injunctive relief. *See Anthem*, 327 F.R.D. at 318 (discussing the importance of timely providing credit monitoring to the class and implementing security enhancements in wake of a data breach). Additionally, the Court finds that much of the relief afforded by the settlement likely exceeds what could be achieved at trial (*see* Doc. 903 at 13-16), and, taken as a whole the settlement represents a result that is at the high end of the range of what could be achieved through continued litigation.

The adequacy of the relief is likewise supported by consideration of the four subparts enumerated in Rule 23(e)(2)(C)(i-iv), all of which support a finding that the relief provided by the settlement is fair, reasonable, and adequate.

a)      The Risks, Costs, and Delay of Continued Litigation.

In considering the adequacy of the settlement in light of the risks of continued litigation under Rule 23(e)(2)(C)(i), the Court finds the cost and delay of continued litigation would have been substantial. But for the settlement, the parties would likely incur tens of millions of dollars in legal fees and expenses in discovery and motion practice. Trial likely would not occur earlier than 2021 and appeals would

almost certainly delay a final resolution for a year or more after that. Moreover, had the case not settled, the plaintiffs would have faced a high level of risk. *See Anthem*, 327 F.R.D. at 322 (finding that the "significant risks" and the "delay in any potential recovery from proceeding with litigation," weighed in favor of approval). Equifax would likely renew its arguments under Georgia law that it has no legal duty to safeguard personal information, arguments that were strengthened following the Supreme Court of Georgia's decisions in *Georgia Dep't of Labor v. McConnell*, 828 S.E.2d 352 (Ga. 2019). Class certification outside of the settlement context also poses a significant challenge. *See, e.g.*, *Adkins v. Facebook, Inc.*, 2019 WL 7212315, at *9 (N.D. Cal. Nov. 26, 2019) (denying motion to certify data breach damages class under Rule 23(b)(3)); *Anthem*, 327 F.R.D. at 318 ("While there is no obvious reason to treat certification in a data-breach case differently than certification in other types of cases, the dearth of precedent makes continued litigation more risky."). And, even if plaintiffs prevail on all those legal issues, they face the risk that causation cannot be proved, discovery will not support their claims, a jury might find for Equifax, and an appellate court might reverse a plaintiffs' judgment.

Class counsel, appointed to act in the best interests of the class, cannot afford to ignore or downplay these significant risks in deciding whether to settle or continue litigating plaintiffs' claims. Similarly, the Court must take those risks into account in determining whether the proposed settlement is fair, reasonable, and adequate. In

considering these risks, the Court finds that the guaranteed and immediate recovery for the class made available by this settlement far outweighs the mere possibility of future relief after lengthy and expensive litigation. The reality is that, if the Court does not approve the settlement in this case, there is a serious risk that many if not all class members will receive nothing. That the plaintiffs achieved all the relief in the settlement in the face of the risk they face strongly weighs in favor of approving the settlement as fair, reasonable, and adequate.

### b) The Method of Distributing Relief is Effective.

Rule 23(e)(2)(C)(ii) requires the Court to next consider the effectiveness of the proposed method to distribute relief to the class, including the method for processing claims. Upon review of the declarations submitted in support of the motion to direct notice and for final approval [*see generally* Docs. 739-6 and 900-4], the Court finds that the method of distributing relief is effective. Class members can file claims through a straightforward claims process, and claims are not required for identity restoration services or to benefit from the injunctive relief agreed to by Equifax. Those claiming out-of-pocket losses must supply documentation of their losses, but such requirements are routine and likely less stringent than a plaintiff would have to present during discovery or trial. Some documentation requirements are necessary to ensure that the settlement fund is used to pay legitimate claims. Similarly, the requirement that losses be "fairly traceable" to the breach is not

onerous (and is arguably a less stringent standard than would apply at trial), and its enforcement is subject to a claims administration protocol developed with input from state and federal regulators. [Doc. 739-2, pp. 286-87, ¶ III].

The Court concludes that the requirements to make claims for other relief are also reasonable. For example, any class member is eligible to enroll in credit monitoring services without any documentation. Class members seeking alternative compensation in lieu of credit monitoring do not need to provide any documentation, but only identify and attest to their existing credit monitoring service. This is not an onerous requirement, and even those who already submitted claims and failed to provide the name of their credit monitoring service will be given another chance to do so through the deficient claims process set forth in the claims administration protocol. And, those seeking reimbursement for time spent dealing with the breach can claim up to 10 hours without any documentation.

The claims administrator, JND, is highly experienced in administering large class action settlements and judgments, and it has detailed the efforts it has made in administering the settlement, facilitating claims, and ensuring those claims are properly and efficiently handled. (App. 4, ¶¶ 4, 21; *see also* Doc. 739-6, ¶¶ 2-10). Among other things, JND has developed protocols and a database to assist in processing claims, calculating payments, and assisting class members in curing any deficient claims. (*Id*., ¶¶ 4, 21). Additionally, JND has the capacity to handle class

member inquiries and claims of this magnitude. (App. 4, ¶¶ 5, 42). This factor, therefore, supports approving the relief provided by this settlement.

>           **c)    The Terms Relating To Attorneys' Fees Are Reasonable.**

The third consideration of evaluating relief under Rule 23(e)(2)(C) is whether the attorneys' fees requested under the settlement are reasonable. Fed. R. Civ. P. 23(e)(2)(C)(iii). Here, class counsel are requesting a fee based on a percentage of the benefits available to the class. As addressed in detail below, the Court finds that the request is reasonable under prevailing precedent and the facts of this case. Further, the timing of the payment of fees does not impact the adequacy of the relief, as no fee will be paid until after Equifax fully funds the settlement fund and under no circumstance will any of the settlement funds revert to Equifax. *See* Fed. R. Civ. P. 23(e)(2)(B)(iii). As such, this factor weighs in favor of approving the settlement.

>           **d)    Agreements Required To Be Identified By Fed. R. Civ. P. 23(e)(3).**

Finally, Rule 23(e)(2)(C)(iv) directs the Court to consider the relief afforded to the class in light of any agreements required to be identified by Rule 23(e)(3). The parties previously submitted to the Court, *in camera*, the specific terms of the provision allowing Equifax to terminate the settlement if more than a certain number of class members opted out and the cap on notice spending that would create a mutual termination right. These provisions have not been triggered, and thus do not

affect the adequacy of the relief obtained here. The parties have not identified, and the Court is unaware of, any other agreements required to be identified by the Rule. Therefore, this element of Rule 23(e)(2)(C) also weighs in favor of approval.

### 4.     Class Members Are Treated Equitably Relative To Each Other.

The fourth and final factor under Rule 23(e)(2), directs the Court to consider whether class members are treated equitably relative to each other. Fed. R. Civ. P. 23(e)(2)(D). According to the advisory committee notes, this factor is closely related to the adequacy requirement of Rule 23(a). The Court expressly considers whether the settlement provides equitable "treatment of some class members vis-à-vis others," and an issue that has been raised by some objectors is whether the settlement apportions "relief among class members [that] takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways." Adv. Comm. Notes 23(e)(2) (2018).

As an initial matter, the class members all have similar claims arising from the same event: the Equifax data breach. And as all class members are eligible to claim the various benefits provided by the settlement if they meet the requirements, they all are treated equitably under the settlement.

While class members who have incurred out-of-pocket losses will be able to recover more relative to class members who have not, this allocation is fair and equitable because these class members would have had the ability to seek greater

22

damages at trial. Additionally, the settlement provides for an extended claims period of four years after the initial claims period, through January 2024. This provides the opportunity for all class members to make claims for future out-of-pocket losses resulting from the breach.

All class members, regardless of whether they incurred out-of-pocket losses, are eligible to claim credit monitoring. This also treats class members fairly. "The emphasis on this form of relief is logical because it is directly responsive to the ongoing injury resulting from the breach." *Anthem*, 327 F.R.D. at 332; *see also* App. 6, ¶ 41 (stating that "[t]he features included in the Experian services are particularly helpful for consumers concerned about identity theft, because they are designed to quickly help identify fraudulent misuse of a consumer's personal information").

Moreover, all class members—even those who do not submit claims—benefit from the various non-monetary aspects of the settlement, including access to identity restoration services and the business practice changes that Equifax will implement at a cost of at least $1 billion. (*See* App. 2, ¶ 21). By addressing the alleged injuries class members suffered and by helping to mitigate future harm—through the extended claims period, availability of credit monitoring and identity restoration services, and mandated business practice changes—the settlement is equitable to all class members.

23

Finally, class members have been treated equitably despite the fact that they reside in different states and may have been able to assert different statutory claims depending on the state in which they reside. All class members share at least one common claim for negligence under Georgia law, and as to the statutory remedies that survived the motion to dismiss, the Court does not find that those remedies are materially different such that they render the plan of apportionment inequitable. Although some statutory claims may permit a plaintiff to seek statutory damages, Georgia law permits all class members to seek nominal damages and there are additional risks associated with those statutory claims that persuade the Court they are not materially more beneficial so as to render the settlement unfair.

This final factor of Rule 23(e)(2) thus supports this Court's finding that the settlement is fair, reasonable, and adequate and should be approved.

### 5. The *Bennett* Factors Support Approving The Settlement As Fair, Reasonable, And Adequate.

In addition to the rule-based factors set forth in Rule 23, in considering whether to approve the settlement the Court is further guided by the factors set forth in *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984). These factors include: (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the range of possible recovery at which a settlement is fair, adequate, and reasonable; (4) the anticipated complexity, expense, and duration of litigation; (5) the opposition to the settlement; and (6) the stage of proceedings at which the settlement was

achieved. *Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1240 (11th Cir. 2011). Many of these considerations overlap those found in Rule 23(e)(2); all of them support final approval.

As explained above with respect to consideration of Rule 23(e)(2), the first and fourth *Bennett* factors strongly support approving the settlement. The likelihood of success at trial is uncertain at best. Equifax would have no doubt renewed its defenses at the summary judgment stage and the settlement provides relief that may not have been available had the case been tried. The case would have been extraordinarily expensive to litigate going forward and would have certainly taken years to conclude. Likewise, consideration of the second and third *Bennett* factors support the settlement as fair, reasonable, and adequate because the settlement reflects relief the Court finds is in the high range of what could have been obtained had the parties continued to litigate.

The fifth *Bennett* factor, which examines opposition to the settlement, likewise supports approval. In the Court's view, the class has reacted positively to the settlement. In contrast to the 15 million claims, including over 3.3 million claims for credit monitoring that already have been filed by verified class members, only 2,770 settlement class members asked to be excluded from the settlement and only 388 class members directly objected to the settlement—many in the wake of incomplete or misleading media coverage, or at the behest of serial class action

objectors, and often demonstrating a flawed understanding of the settlement terms. This miniscule number of objectors in comparison to the class size is entitled to significant weight in the final approval analysis. *See, e.g.*, *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1324 (S.D. Fla. 2005) ("[A] low percentage of objections points to the reasonableness of a proposed settlement and supports its approval"); *In re Home Depot, Inc. Customer Data Sec. Breach Litig.*, 2016 WL 6902351, at *4 (N.D. Ga. Aug. 23, 2016) (same).

With respect to the sixth *Bennett* factor, the Court finds that the case settled at a stage of the proceedings where class counsel had sufficient knowledge of the law and facts to fairly weigh the benefits of the settlement against the potential risk of continued litigation. (*See, e.g.*, App. 1, ¶¶ 4-15; Doc. 739-4, ¶ 36). In particular, class counsel conducted a thorough factual and legal investigation in order to prepare their comprehensive consolidated amended complaint; exhaustively researched and analyzed the applicable law; reviewed more than 500,000 pages of documents and voluminous electronic spreadsheets from Equifax [*see generally*, Doc. 900-1, ¶¶ 6-14; Doc. 739-4, ¶ 17]; consulted with various experts; had the benefit of substantial informal discovery, including meetings with Equifax and its senior employees responsible for data security [Doc. 900-1, ¶ 14; Doc. 739-4, ¶ 23]; and engaged in confirmatory discovery after the term sheet was finalized. [Doc. 739-4, ¶ 36]. Thus, the *Bennett* factors, like the Rule 23 factors, strongly support approval of the

settlement.

Finally, in evaluating whether the settlement is fair, reasonable, and adequate, the Court also gives due weight to the judgment of class counsel. *See, e.g.*, *Nelson v. Mead Johnson & Johnson Co.*, 484 F. App'x 429, 434 (11th Cir. 2012) ("Absent fraud, collusion, or the like, the district court should be hesitant to substitute its own judgment for that of counsel."); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977). Class counsel are highly experienced in significant complex litigation including large and complex data breach class actions [Doc. 187, pp. 6-7], and they strongly believe that both the economic and injunctive relief secured for the class here is extraordinary. [Doc. 739-4, ¶ 60; *see also* App. 1, ¶ 16]. Also significant is Judge Phillips's endorsement of the settlement, particularly given his experience in mediating large-scale data breach cases. [Doc. 739-9, ¶ 13]. Finally, the fact that nearly all of the applicable state and federal regulators agreed to the provision of consumer redress through the settlement fund in this action strongly demonstrates the fairness of the settlement.

In conclusion, the settlement reflects an outstanding result for the class in a case with a high level of risk. The relief provided by this settlement—both monetary and non-monetary—exceeds the relief provided in other data breach settlements and the Court finds is in the high range of possible recoveries if the case had successfully been prosecuted through trial. Moreover, the settlement resulted from hard fought,

arm's-length negotiations, not collusion. The settlement is therefore fair, reasonable, and adequate under Rule 23 and Eleventh Circuit precedent.

## B.     <u>The Court Certifies The Settlement Class.</u>

The Court must examine whether this proposed settlement class may be certified under Rule 23(a)'s prerequisites and under Rule 23(b)(3). *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 613-14 (1997). The Court previously concluded it was likely to certify the following settlement class:

> The approximately 147 million U.S. consumers identified by Equifax whose personal information was compromised as a result of the cyberattack and data breach announced by Equifax Inc. on September 7, 2017.

Excluded are (i) Equifax, any entity in which Equifax has a controlling interest, and Equifax's officers, directors, legal representatives, successors, subsidiaries, and assigns; (ii) any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff; and (iii) any individual who timely and validly opts out of the settlement class. As the Court ruled on Equifax's motion to dismiss, all of these class members state claims for negligence and negligence per se under Georgia law. [Doc. 540, at 9, 29-43]. For the reasons set forth below, the Court hereby finally certifies, for settlement purposes only, the settlement class pursuant to Fed. R. Civ. P. 23.

1.      **Fed. R. Civ. P. 23(a) Requirements Are Satisfied.**

a)      **Numerosity:**

Rule 23(a)(1) requires that a proposed settlement class be so numerous that joinder of all class members is impracticable. Fed. R. Civ. P. 23(a)(1). The settlement class consists of more than 147 million U.S. consumers, indisputably rendering individual joinder impracticable.

b)      **Commonality:**

"Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury," such that "all their claims can productively be litigated at once.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-350 (2011); *see also Sellers v. Rushmore Loan Mgmt. Servs., LLC*, 941 F.3d 1031, 1039 (11th Cir. 2019) (noting inquiry is far less demanding than Rule 23(b)(3)'s predominance requirement). All members of the class suffered the same alleged injury, exposure of their data in the Equifax data breach, stemming from the same conduct and the same event. The class members are asserting the same or substantially similar legal claims. And "[t]he extensiveness and adequacy of [defendants'] security measures lie at the heart of every claim." *Anthem*, 327 F.R.D. at 308. As the central question in all class members' claims is whether Equifax breached its duty of care through its conduct with regard to their personal information, common questions are apt to drive the resolution of the legal issues in the case. *Id.*

Courts, including this one, have previously addressed this requirement in the context of data breach class actions and found it readily satisfied. *See, e.g.*, *Home Depot*, 2016 WL 6902351, at *2 (finding that multiple common issues "all center on [the defendant's] conduct, satisfying the commonality requirement."); *Anthem*, 327 F.R.D. at 308 (noting that "the complaint contains a common contention capable of class-wide resolution—'one type of injury allegedly inflicted by one actor in violation of one legal norm.'"). The same sorts of common issues are present here, including whether Equifax had a legal duty to adequately protect class members' personal information; whether Equifax breached that legal duty; and whether Equifax knew or should have known that class members' personal information was vulnerable to attack. *See Home Depot*, 2016 WL 6902351, at *2. Commonality is satisfied.

### c)    Typicality:

Rule 23(a)(3) requires that the claims or defenses of the representative parties be typical of the claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). This prong too is readily met in settlements of nationwide data breach class actions. *See Anthem*, 327 F.R.D. at 309 ("[I]t is sufficient for typicality if the plaintiff endured a course of conduct directed against the class."). Plaintiffs' claims here arise from the same data breach and Equifax's conduct in connection with the data breach. The claims are also based on the same overarching legal theory that Equifax failed in its

30

common-law duty to protect their personal information. The typicality requirement has been met.

### d)    Adequacy of Representation:

As noted above, the adequacy requirement is satisfied here, as the class representatives do not have any interests antagonistic to other class members, and the class has been well represented by the appointed class counsel. The Court finds that the class representatives have fulfilled their responsibilities on behalf of the class. There is at least one class representative from each state, and therefore the potential interests of class members with various state law claims have been represented. The Court further finds no material differences that would render these class representatives inadequate. Likewise, the Court further finds that class counsel have prosecuted the case vigorously and in the best interests of the class, and they adequately represented each class member.

Again, the Court notes that this prong too has been readily met in nationwide data breach class action settlements. *See Home Depot*, 2016 WL 6902351, at *2. And multiple courts have found the adequacy requirement satisfied in nationwide data breach class action settlements in the face of objections to the contrary. *See Anthem*, 327 F.R.D. at 310 ("To the extent that there are slight distinctions between Settlement Class Members, the named Plaintiffs are a representative cross-section of the entire Class."); *see generally In re Target Corp. Customer Data Sec. Breach*

*Litig.*, 892 F.3d 968, 974 (8th Cir. 2018) (rejecting challenge to adequacy due to lack of "future-damages subclass"). The Court has identified no conflicts among class members here. And significantly, even the existence of minor conflicts does not defeat certification: "the conflict must be a fundamental one going to the specific issues in controversy." *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) (internal quotations and citations omitted). If any conflict exists among class members or groups of class members, that conflict certainly is not fundamental. The Court has no doubt that the class representatives and class counsel have performed their duties in the best interests of the class.

### 2.   The Settlement Class Meets the Requirements of Fed. R. Civ. P. 23(b)(3).

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members," and that class treatment is "superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* The matters pertinent to these findings include:

- the class members' interests in individually controlling the prosecution or defense of separate actions;

- the extent and nature of any litigation concerning the controversy already begun by or against class members;

- the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

- the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b); *see also Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1278 (11th Cir. 2009) ("In determining superiority, courts must consider the four factors of Rule 23(b)(3)."). One part of the superiority analysis—manageability—is irrelevant for purposes of certifying a settlement class. *Amchem*, 521 U.S. at 620.

### a)   Predominance:

The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id*. at 623. "Common issues of fact and law predominate if they have a direct impact on every class member's effort to establish liability and on every class member's entitlement to … relief." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 985 (11th Cir. 2016).

Here, as set forth above, there are numerous common questions. These common questions predominate because all claims arise out of a common course of conduct by Equifax. The focus on a defendant's security measures in a data breach class action "is the precise type of predominant question that makes class-wide adjudication worthwhile." *Anthem*, 327 F.R.D. at 312.

Even though this is a nationwide class action, variations in state law will not predominate over the common questions. The Court previously found that Georgia law applies to the negligence claims of the entire class. [Doc. 540 at 8-9].[2] Further,

---

[2] Even if Georgia law did not apply to the negligence claims of the entire class, "Plaintiffs' negligence claims would not get bogged down in the individualized

in the context of this litigation, the Court is persuaded that the presence of multiple state consumer protection laws does not defeat predominance, because "the idiosyncratic differences between state consumer protection laws are not sufficiently substantive to predominate over the shared claims" for purposes of Rule 23(b)(3). *Anthem*, 327 F.R.D. at 315. In *Anthem*, the court found it noteworthy that "Plaintiffs' theories across these consumer-protection statutes are essentially the same" thereby avoiding any pitfalls of state law variation. *Id.* (quoting *In re Mex. Money Transfer Litig.*, 267 F.3d 743, 747 (7th Cir. 2001)). Here too, the core allegations are that Equifax failed to implement and maintain reasonable security and privacy measures and failed to identify foreseeable security and privacy risks.

Perhaps the only significant individual issues here involve damages, but these issues do not predominate over the common issues in this case. *See, e.g.*, *Home Depot*, 2016 WL 6902351, at *2; *Anthem*, 327 F.R.D. at 311-16; *see also Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1239 (11th Cir. 2016) (individualized damages generally do not defeat predominance). Further minimizing any risk of individual damages predominating over common issues, the consolidated amended complaint seeks nominal damages on behalf of all class members, which may be available under Georgia law even where no evidence is given of any particular

---

causation issues that sometimes plague products-defect cases. … [because] the same actions by a single actor wrought the same injury on all Settlement Class Members together." *Anthem*, 327 F.R.D. at 314.

amount of loss. *See, e.g.*, *Georgia Power Co. v. Womble*, 150 Ga. App. 28, 32 (1979); *Land v. Boone*, 265 Ga. App. 551, 554 (2004).

> **b)** **Superiority:**

"The inquiry into whether the class action is the superior method for a particular case focuses on increased efficiency." *Agan v. Katzman & Korr, P.A.*, 222 F.R.D. 692, 700 (S.D. Fla. 2004) (internal quotation omitted). "The focus of this analysis is on the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1183-84 (11th Cir. 2010) (internal quotation omitted). That a class member may not receive a large award in a settlement does not scuttle superiority; the opposite tends to be true. *See Dickens v. GC Servs. Ltd. P'ship*, 706 F. App'x 529, 538 (11th Cir. 2017) (describing "the ways in which the high likelihood of a low per-class-member recovery militates in favor of class adjudication").

Here, it is inconceivable that the vast majority of class members would be interested in controlling the prosecution of their own actions. The cost of doing so, especially for class members who do not claim out-of-pocket losses, would dwarf even a full recovery at trial. A major thrust of Equifax's motion to dismiss was that the plaintiffs did not suffer any damages, let alone the "relatively paltry potential recoveries" that class actions serve to vindicate. *See Sacred Heart*, 601 F.3d at 1184.

35

Given the technical nature of the facts, the volume of data and documents at issue, and the unsettled area of the law, it would not take long for an individual plaintiff's case to be hopelessly submerged financially. On the other hand, the presence of such pertinent predominant questions makes certification here appropriate. *Compare Anthem*, 327 F.R.D. at 312 (data breach dealt with "the precise type of predominant question that makes class-wide adjudication worthwhile") with *Sacred Heart*, 601 F.3d at 1184 ("[T]he predominance analysis has a tremendous impact on the superiority analysis[.]") (internal quotation marks omitted).

As to the extent and nature of litigation already commenced, the settlement agreement identifies 390 consumer cases related to this multidistrict litigation, and there are more than 147 million class members. As the Judicial Panel on Multidistrict Litigation stated, "[c]entralization will eliminate duplicative discovery, prevent inconsistent pretrial rulings on class certification and other issues, and conserve the resources of the parties, their counsel, and the judiciary." *In re: Equifax, Inc., Customer Data Sec. Breach Litig.*, 289 F. Supp. 3d 1322, 1325 (JPML 2017). The settlement furthers those goals. Similarly, it is desirable to concentrate the litigation of the claims here, which was selected as the transferee district because, among other reasons, Equifax is headquartered in this district, the vast majority of the plaintiffs supported this district, and "far more actions [were] pending in this district than in any other court in the nation." *Id.* at 1326.

36

Because the requirements of Rule 23(a) and (b)(3) have been satisfied, the Court certifies the settlement class.

## III.   THE COURT OVERRULES ALL OBJECTIONS TO THE SETTLEMENT.

The Court now addresses objections to the settlement. The objections fail to establish the settlement is anything other than fair, reasonable, and adequate.

Out of the approximately 147 million class members, only 388 directly objected—or just 0.0002 percent of the class—despite organized efforts to solicit objections using inflammatory language and based on false and misleading statements about the settlement, such as that only $31 million is available to pay claims and that if all 147 million class members filed claims everyone would get 21 cents.[3] Many objections repeat these false and misleading assertions as fact and challenge the settlement on that basis. Further, on the eve of the objection deadline, an additional 718 form "objections," which allegedly had been filled out online by class members, were submitted *en masse* by Class Action Inc., a class action claims aggregator that created a website (www.NoThanksEquifax.com) with a "chat-bot" that encouraged individuals to object based on that same erroneous information.[4]

---

[3] Charlie Warzel, *Equifax Doesn't Want You to Get Your $125. Here's What You Can Do*, THE NEW YORK TIMES (Sept. 16, 2019), https://www.nytimes.com/2019/09/16/opinion/equifax-settlement.html.

[4] Reuben Metcalfe, *You have the right to object to the Equifax settlement. Here's how.*, MEDIUM (Nov. 8, 2019), https://medium.com/@reubenmetcalfe/you-have-

(App. 1, ¶¶ 49-59). These form "objections" are procedurally invalid for the reasons set forth later in this Order.

The Court has considered and hereby rejects all of the objections on their merits, whether or not the objections are procedurally valid or whatever may have motivated their filing. All of the objections are in the record, having been filed publicly on the Court's docket with the declaration of the claims administrator. [Doc. 899]. By way of example only, this Order references some of the objectors by name. The Court groups the objections as follows: (1) objections to the value of the settlement and benefits conferred on the class; (2) objections relating to the alternative compensation benefit; (3) objections relating to class certification; (4) objections relating to the process for objecting; (5) objections relating to the process for opting-out; (6) objections to the notice plan; and (7) objections to the claims process.[5]

In addition to the briefing from class counsel and Equifax's counsel, and the Court's own independent review and analysis, the Court reviewed and found helpful to this process the supplemental declaration of Professor Robert Klonoff (App. 2).

---

the-right-to-object-to-the-equifax-settlement-heres-how-4dfdb6cca663.          As demonstrated in the record, Mr. Metcalfe represented to class counsel that he had not even read the settlement agreement or notice materials. [Doc. 939-1, ¶ 36].

[5] For the sake of organization, objections to attorneys' fees, expenses, and service awards are addressed separately below. The Court's consideration of attorneys' fees, and relating objections, are an integral part of the determination to finally approve the settlement under the criteria of Rule 23.

Professor Klonoff's declaration was particularly helpful to the Court in the organization and consideration of the objections, but the Court's decisions regarding the objections are not dependent upon his declaration or the declarations plaintiffs submitted from two other lawyers, Professor Geoffrey Miller and Harold Daniel. To the contrary, the Court has exercised its own independent judgment in deciding to reject all of the objections that have been filed.

### A.   Objections To The Value Of The Settlement And Benefits Conferred On The Class.

A majority of the objectors express frustration with Equifax's business practices and want Equifax and its senior management to be punished. The Court is well aware of the intense public anger about the breach, which, in the Court's view, reflects the sentiment that consumers generally do not voluntarily give their personal information directly to Equifax, yet Equifax collects and profits from this information and allegedly failed to take reasonable measures to protect it.

While understandable, the public anger does not alter the Court's role, which is not to change Equifax's business model or administer punishment. Under the law, the Court is only charged with the task of determining whether the proposed settlement is fair, reasonable, and adequate.[6] And, with regard to that task, no one

---

[6] *See Ressler v. Jacobson*, 822 F. Supp. 1551, 1552-53 (M.D. Fla. 1992) (judicial evaluation of a proposed settlement "involves a limited inquiry into whether the possible rewards of continued litigation with its risks and costs are outweighed by

can credibly deny that this is a historically significant data breach settlement that provides substantial relief to class members now and for years into the future. Or, that if the Court does not approve the settlement, the plaintiffs' claims may ultimately be unsuccessful and class members may be left with nothing at all.

Objections that the settlement fund is too small for the class size, or that Equifax should be required to pay more, do not take into account the risks and realities of litigation, and are not a basis for rejecting the settlement. "Data-breach litigation is in its infancy with threshold issues still playing out in the courts." *Anthem*, 327 F.R.D. at 317. In light of the material risks involved and the possibility that any of several adverse legal rulings would have left the class with nothing, class counsel would have been justified in settling for much less. *See Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1998), *aff'd*, 899 F.2d 21 (11th Cir. 1990); *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) ("[T]he very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes.") (internal quotation omitted). As it stands, in many respects the settlement provides relief beyond what the class members could have

---

the benefits of the settlement"); *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1326 (S.D. Fla. 2007) (a court's role is not to "engage in a claim-by-claim, dollar-by-dollar evaluation, but rather, to evaluate the proposed settlement in its totality."); *Carter v. Forjas Taurus, S.A.*, 701 F. App'x 759, 766 (11th Cir. 2017) ("settlements are compromises, providing the class members with benefits but not full compensation.").

obtained at trial.

Many objectors also ask the Court to rewrite the settlement, but that is beyond the Court's power.[7] For example, objectors demand that the settlement should include: a long-term fund for "significant inflation-adjusted cash compensation from Equifax should they leak my data again any time within the next 20 years"[8]; "lifetime" credit and identity protection[9]; a minimum cash payment for every class member (proposed amounts include $10,000, $5,000, or $1,200)[10]; and a separate cash option for class members who freeze their credit.[11] In most cases, these objectors do not contend that the monetary relief is inadequate to compensate class members for any harm caused by Equifax's alleged wrongs, making it hard to see how they are aggrieved. *See Brown v. Hain Celestial Grp., Inc.*, 2016 WL 631880, at *10 (N.D. Cal. Feb. 17, 2016) (citing *In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.*, 33 F.3d 29 (9th Cir. 1994)).[12] Regardless, the Court readily

---

[7] *Cotton*, 559 F.2d at 1331; *Howard v. McLucas*, 597 F. Supp. 1504, 1506 (M.D. Ga. 1984) ("[T]he court's responsibility to approve or disapprove does *not* give this court the power to force the parties to agree to terms they oppose." (emphasis in original)), *rev'd in part on other grounds*, 782 F.2d 956 (11th Cir. 1986).

[8] Objection of Tristan Wagner.

[9] *E.g.*, Objections of Francis J. Dixon III and Linda J. Moore.

[10] *E.g.*, Objections of Emma Britton, Norma Kline, and Vijay Srikrishna Bhat.

[11] *E.g.*, Objections of Gary Brainin and Sybille Hamilton. These objections ignore, however, that class members could request out-of-pocket losses if they paid to freeze their credit.

[12] Those class members who were unsatisfied with the relief made available had the opportunity to opt out, weighing in favor of finding the settlement fair, reasonable,

concludes that the settlement provides fair and adequate relief under all of the circumstances.

Other settlement terms proposed by objectors are of a regulatory or legislative nature, well beyond the power of the civil justice system. For example, according to some objectors, "[a]ny settlement is inadequate if it allows Equifax to continue using my personal data without my express written consent"[13]; the board and officers should disgorge their salaries and serve prison time[14]; or Equifax should be forced out of business.[15] These "suggestions constitute little more than a 'wish list' which would be impossible to grant and [are] hardly in the best interests of the class." *In re Domestic Air Trans. Antitrust Litig.*, 148 F.R.D. 297, 305 (N.D. Ga. 1993). No objector explains how this type of relief could be achieved at trial.

A number of objectors take issue with the credit monitoring services made available under the settlement. Some object that credit monitoring is very valuable, and thus the settlement should pay for more monitoring extended beyond ten years. Others object that credit monitoring is not valuable at all, that free credit monitoring and credit freezes are already available to everyone, that the value of the offered

---

and adequate. *See, e.g.*, *In re Oil Spill By Oil Rig Deepwater Horizon on April 20, 2010*, 295 F.R.D. 112, 156 (E.D. La. 2013) ("Those objectors who are unhappy with their anticipated settlement compensation could have opted out and pursued additional remedies through individual litigation.").

[13] Objection of Susan S. Hanis.

[14] *E.g.*, Objections of Christie Biehl, Jeffrey Biehl, George Bruno, and Patrick Frank.

[15] *E.g.*, Objections of David Goering, Christie Biehl, and Jeffrey Biehl.

monitoring is inflated to justify an inadequate settlement, and that the actual cost to provide credit monitoring services is *de minimis*.

This Court, like others before it, finds that credit monitoring is a valuable settlement benefit, particularly so the credit monitoring offered to class members in this case for such a lengthy period of time.[16] The credit monitoring provider has explained how the product offered in the settlement is better than the "free" monitoring products typically available to the public, and how the services seek to both prevent and address identity theft concerns. *See* App. 6, ¶¶ 33-43 (summarizing the advantages of the Experian credit monitoring and identity protection service negotiated as part of this settlement over other services available). Its comparable retail value is $24.99 per month. *Id.* It provides for $1 million in identity theft insurance and identity restoration services—features designed to address identity theft. And as reported by the claims administrator, millions of class members have chosen to make a claim for the services, further demonstrating their value.

This Court has repeatedly lauded high-quality credit monitoring services as providing valuable class-member relief that would likely not otherwise be

---

[16] *See Target* and *Anthem*, *supra*; *see also Home Depot*, 2016 WL 6902351, at *4 (overruling objections and finding that 18 months of credit monitoring and injunctive components of settlement are valuable class benefits); *Hillis v. Equifax Consumer Servs. Inc.*, 2007 WL 1953464, at *5 (N.D. Ga. June 12, 2007) (credit monitoring as part of settlement has substantial value).

recoverable at trial, as have other courts in connection with other data breach settlements.[17] Finally, if class members do not wish to claim the credit monitoring option, they can elect alternative cash compensation—which is a form of relief that would not even be recoverable at trial—or opt out of the settlement.[18] After careful consideration of the objections, the size and scope of relief secured by this settlement remains unprecedented and strongly supports final approval.

### B.   Objections Relating To The Alternative Compensation Benefit.

Many objectors challenge the adequacy of the alternative compensation benefit, complaining that they will not receive a $125 payment that they believe they were promised. Objectors also suggest that the parties and, implicitly by approving the notice plan, the Court, misled the public by stating that all class members were entitled to $125 simply by filing a claim or that the parties engaged in some sort of "bait and switch" to keep class members from getting $125. While the Court appreciates the vehemence with which some of these objections are expressed, the

---

[17] At the fairness hearing, class counsel summarized the benefits available in the credit monitoring and identity protection plan that was specifically negotiated as part of the settlement. The Court has had the opportunity to review the benefits provided, as well as the estimation of the value of those benefits, and this information has informed the Court of its decision to approve the settlement.

[18] *See, e.g.*, *Greco v. Ginn Dev. Co., LLC*, 635 F. App'x 628, 635-36 (11th Cir. 2015) ("If [objector] was displeased with the consideration provided to him under the settlement . . . he was free . . . to opt out of the settlement."); *Faught*, 668 F.3d at 1242 (to the same effect); *Lee v. Ocwen Loan Servicing, LLC*, No. 14-cv-60649, 2015 WL 5449813, at *13 (S.D. Fla. Sept. 14, 2015) (to the same effect).

reality is that the objections are misguided, ignore the limits of litigation, and are based upon a misunderstanding of the settlement.

Class counsel have explained that among their primary goals in the settlement negotiations were to ensure that consumers with out-of-pocket losses from dealing with identity theft that had already occurred or by taking precautionary measures would be reimbursed, that all 147 million class members would have the opportunity to get high quality credit monitoring to detect and defend against future identity theft, and that all class members would have access to identity restoration services if they learn they have been victimized by identity theft. The structure of the settlement reflects those goals, which the Court finds were appropriate and reasonable.

Contrary to the impression held by many objectors who are critical of the settlement, the purpose of the alternative compensation remedy was not to provide every class member with the opportunity to claim $125 simply because their data was impacted by the breach (and those who object provide no statutory support that they would be entitled to such an automatic payment at trial). Rather, its purpose was to provide a modest cash payment as an "alternative" benefit for those who, for whatever reason, have existing credit monitoring services and do not wish to make a claim for the credit monitoring offered under the settlement. Thus, under the settlement, alternative compensation is expressly limited to those who already have credit monitoring services, do not want the credit monitoring services available

under the settlement, attest they will maintain their own service for at least six months, and provide the name of their current credit monitoring service. Moreover, those individuals who paid for their own credit monitoring service after the breach are able to file a claim to recoup what they paid for those credit monitoring services as out-of-pocket losses in addition to making a claim for the alternative reimbursement compensation available under the settlement.

The Court finds that the parties' decision to settle on terms that did not provide a cash payment to every class member was reasonable; indeed, settlement likely would not have been possible otherwise. The Court is skeptical that, even if it had the financial ability to do so, Equifax would ever willingly pay (or even expose itself to the risk of paying) the billions of dollars that providing a substantial cash payment to all class members would cost. The Court also finds that limiting the availability of the alternative compensation benefit in the way that is done under the settlement was reasonable, and the settlement would have easily been approved had there been no alternative compensation benefit at all.

The alternative compensation remedy was capped at $31 million as a result of arm's length negotiations. As compared to the settlement fund amounts earmarked for out-of-pocket losses, the Court finds this apportionment to be entirely equitable. Class members who incurred out-of-pocket losses—*including* paying for credit monitoring or credit freezes after announcement of the breach—have stronger claims

for damages, and those who do not are also entitled to claim credit monitoring and identity restoration services going forward, which provides protection and assistance to class members who are subject to identity theft during the term of the settlement. It appears that the distribution plan will successfully achieve its goals. According to the settlement administrator, even after paying the costs of credit monitoring and identity restoration services, the settlement fund (as supplemented with an additional $125 million if needed) likely will have sufficient money to pay class members with demonstrable out-of-pocket losses the entire amount of their approved claims. And, any money remaining in the fund after the extended claims period will be used to lift the cap on alternative compensation, allowing alternative compensation claimants to receive an additional, pro rata payment—which many objectors ignore.[19]

The notice plan the Court approved in its Order Directing Notice explained that the amount available to pay alternative compensation claims was capped and that individual class members might receive less than $125. The long form notice (which was posted on the settlement website as of July 24, 2019—the same date that class members could start making claims), for example, told class members that they could get "up to" $125 in alternative compensation and further stated: "If there are more than $31 million in claims for Alternative Reimbursement Compensation, all

---

[19] Objections have also been made to the $38 million cap on claims for time. For the same reasons, the Court rejects these objections.

payments for Alternative Reimbursement Compensation will be lowered and distributed on a proportional basis." [Doc. 739-2 at 266].

On the same day that the proposed settlement was first presented to this Court and well before the Court-approved email notices were sent to class members, regulators announced their own settlements with Equifax that incorporated the proposed settlement's consumer restitution terms in this case, including the alternative compensation benefit. In covering the regulators' announcements, media outlets began reporting that consumers could get $125 under the settlement without describing the limited purpose of and the eligibility requirements for the alternative compensation benefit. The ability to receive $125 under the settlement was also touted on social media, adding to the public misperception. (App. 1, ¶¶ 30-37).

The settlement website began accepting claims on July 24, 2019, shortly after the settlement was preliminarily approved. In the ensuing days, millions of claims for alternative compensation were filed. Because of the claims volume and the $31 million cap, it quickly became apparent to class counsel that alternative compensation claimants likely would receive a small fraction of what they may have expected based upon media reports, although the specific amount they would receive was unknown. (The specific amount alternative compensation claimants will be paid is unknowable until after the total number of valid alternative compensation claims is determined following the end of the initial claims period and, even then, their

payments may be supplemented following the extended claims period if additional money remains after claims for out-of-pocket losses have been satisfied.) (App.1, ¶¶ 43-44).

Class counsel acted immediately to ensure that class members were not disadvantaged by the misleading media reports and the widespread public misperception about the alternative compensation benefit. They proposed a plan to Equifax and, after receiving input from regulators, presented the plan to the Court at a hearing held on July 30, 2019. The essence of the plan entailed notifying class members that, because of the claims volume, alternative compensation claimants likely would receive much less than $125 so that, going forward, class members would have that information in making a choice between credit monitoring and alternative compensation. The plan also afforded those who had already filed a claim a renewed opportunity to choose credit monitoring rather than alternative compensation. The Court approved the plan at the hearing and directed the parties to implement its terms. They did so. (App.1, ¶¶ 43-44).

On August 1, 2019, class counsel distributed a statement to the media explaining the limitations of the alternative compensation benefit and urging class members to rely only on the official court notice, not what they heard or read in the media. On August 2, 2019, a statement was placed in a prominent position on the home page of the settlement website that read:

> If you request or have requested a cash benefit, the amount you receive may be significantly reduced depending on how many valid claims are ultimately submitted by other class members. Based on the number of potentially valid claims that have been submitted to date, payments for time spent and alternative compensation of up to $125 likely will be substantially lowered and will be distributed on a proportional basis if the settlement becomes final. Depending on the number of additional valid claims filed, the amount you receive may be a small percentage of your initial claim.

On August 7, 2019, the direct email notice campaign that the Court approved in its July 22, 2019 Order Directing Notice commenced. The first email notice, which was sent to more than 100 million class members, prominently featured the same statement that had been added to the settlement website.[20] The same statement also was featured in a follow up email to the class. Moreover, a separate email was sent to all class members who had filed a claim for alternative compensation before August 2, 2019, repeating the same message and giving them the opportunity to choose credit monitoring if they wanted to switch their claim from alternative reimbursement. Also around this time, the FTC publicly announced that the alternative compensation claim would be less than $125, recommended that class members select credit monitoring, and included the statement that any class member who already made a claim for alternative compensation could switch to claim credit

---

[20] This statement was also included in the publication notice, which appeared as a full-page advertisement in *USA Today* on September 6, 2019.

monitoring.[21]

So, beginning August 2, 2019, all class members who went to the website to file a claim were put on notice that alternative compensation claimants in all likelihood would only receive a small percentage of $125.[22] Beginning August 7, 2019, class members were given the same information as part of the Court-approved direct email notice program. And, all class members who filed an alternative compensation claim before August 2, 2019, were separately told of the situation and given an opportunity to amend their claim to choose credit monitoring instead of the cash payment if they wanted to do so. The Court thus finds that the notice plan approved by the Court on July 22, 2019, coupled with the supplemental plan approved at the July 30, 2019 hearing, provided reasonable and adequate notice to the class about the limits of the alternative compensation benefit and that class members had sufficient information and opportunity to make an informed choice between that benefit and credit monitoring.

The likelihood that alternative compensation claimants will receive

---

[21] FTC Encourages Consumers to Opt for Free Credit Monitoring, as part of Equifax Settlement, FTC (July 31, 2019), *available at* https://www.ftc.gov/news-events/press-releases/2019/07/ftc-encourages-consumers-opt-free-credit-monitoring-part-equifax.

[22] The online claim form was also amended as of August 2, 2019 to advise that payments for the alternative compensation benefit may be less than $125 depending on the number and amount of claims filed.

substantially less than $125 does not mean that the relief afforded by the settlement is inadequate. To the contrary, as described above, the relief offered by the settlement is unprecedented in scope. The Court must evaluate the adequacy of the settlement in terms of the entirety of the relief afforded to the class. The other substantial benefits—including payment of out-of-pocket losses, credit monitoring, identity restoration services, and the reduction in the risk of another breach—would justify approval of the settlement as fair, reasonable, and adequate even if the settlement did not provide an alternative compensation benefit at all. Indeed, this Court has previously approved settlements that provided no alternative compensation benefit in the *Home Depot* and *Arby's* data breach cases.

Moreover, the likelihood that alternative compensation claimants will receive substantially less than $125 is not unfair, and does not render the alternative compensation benefit itself inadequate. All of the alternative compensation claimants are eligible for the same relief made available to other class members, they received the same Court-approved communications as other class members disclosing that payments for alternative compensation claims would be a small percentage of $125, and those who filed their claims before the above enhancements to the settlement website were implemented were given the opportunity to change their minds. That class members, armed with this information, chose alternative compensation rather than the more valuable credit monitoring services offered by

the settlement reflects their own personal decision, not a failing of the settlement or inadequate representation by class counsel. Moreover, the alternative compensation claimants retain the right to take advantage of all the other settlement benefits except credit monitoring.

It is unfortunate that inaccurate media reports and social media posts created a widespread belief that all class members, simply by filing a claim, would receive $125. But the parties are not responsible for those reports and class counsel acted appropriately, diligently, and in the best interests of the class by taking corrective action when they learned of the erroneous reporting. Moreover, any class member who chose alternative compensation rather than credit monitoring has had ample opportunity to make a new choice. Accordingly, objections to the adequacy of the settlement based on the fact that alternative compensation claimants will not receive $125; the manner in which class members were informed about the alternative compensation benefit; or the notion that class members were misled into choosing alternative compensation are overruled.

## C.   **Objections Relating To Class Certification.**

Objectors to class certification assert that the class representatives and counsel are not "adequate" for purposes of Rule 23(a)(4) because: (1) the interests of class members who have already incurred out-of-pocket losses conflict with those who

have incurred only a risk of future losses,[23] or (2) some state consumer protection laws implicate statutory penalties while others do not.[24] Thus, according to the objections, "fundamental" intra-class conflicts between subgroups exist, requiring numerous subclasses with separate counsel for each. *See, e.g.*, *Amchem*, 521 U.S. at 591; *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999). These objections are wholly without merit as there simply are no fatal intra-class conflicts, fundamental or otherwise.

For the reasons set forth below, subclasses were not required here and, much more likely, would have been detrimental to the interests of the entire class. The practical effect of creating numerous subclasses represented by competing teams of lawyers would have decreased the overall leverage of the class in settlement discussions and rendered productive negotiations difficult if not impossible.[25] Further, if the case had not settled, the additional subclasses and lawyers likely would have made the litigation process, particularly discovery and trial, much harder to manage and caused needless duplication of effort, inefficiency, and jury

---

[23] Objection of Shiyang Huang [Doc. 813 at 5-7].
[24] Objection of Frank and Watkins [Doc. 876 at 1].
[25] *See In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010*, 910 F. Supp. 2d 891, 919 (E.D. La. 2012), *aff'd sub nom. In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014) (district court wary of "[s]uch rigid formalism" of requiring subclasses, "which would produce enormous obstacles to negotiating a class settlement with no apparent benefit[.]").

confusion.[26]

The Eleventh Circuit has provided the contours necessary for an objector to establish a fundamental conflict that may necessitate subclasses: "A fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefitted other members of the class." *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d at 1189. "[T]he existence of minor conflicts alone will not defeat a party's claim to class certification: the conflict must be a 'fundamental' one going to the specific issues in controversy." *Id.* There is simply is no evidence of a fundamental intra-class conflict in this case. No class members were made better off by the data breach such that their interests in the outcome of the litigation are adverse to other class members. Similarly, all class members benefit from the proposed settlement, while none are harmed by it. In arguing otherwise, the objectors focus on minor differences within the class that are immaterial in the context of this case

---

[26] Frank and Watkins contend that residents of each jurisdiction with statutory claims that survived the motion to dismiss should be served by separate counsel. (*See* Final Approval Hearing Tr., at 78-79). They also acknowledge that claims under consumer protection statutes from 33 jurisdictions survived. [Doc. 876, at 6]. The objectors' approach thus would require at least 34 separate teams of lawyers (appointed class counsel plus lawyers for each jurisdiction), which would needlessly cause the scope of these proceedings to explode. The selection and appointment process alone would be incredibly time consuming and the duplication of effort involved in ensuring each legal team was adequately versed in the law and facts to assess the relative worth of their clients' claims would be staggering. Ironically, the same objectors criticize the requested attorneys' fees in this case on the basis that class counsel's hours are inflated because too many lawyers worked on it. [Doc. 876, at 24].

and, in any event, do not defeat class certification.

Shiyang Huang's objection—that this fact pattern is akin to *Amchem* and *Ortiz* because some class members have presently incurred out-of-pocket costs while others have not—was thoroughly analyzed and rejected in *Target*:

> The *Amchem* and *Ortiz* global classes failed the adequacy test because the settlements in those cases disadvantaged one group of plaintiffs to the benefit of another. There is no evidence that the settlement here is similarly weighted in favor of one group to the detriment of another. Rather, the settlement accounts for all injuries suffered. Plaintiffs who can demonstrate damages, whether through unreimbursed charges on their payment cards, time spent resolving issues with their payment cards, or the purchase of credit-monitoring or identity-theft protection, are reimbursed for their actual losses, up to $10,000. Plaintiffs who have no demonstrable injury receive the benefit of Target's institutional reforms that will better protect consumers' information in the future, and will also receive a pro-rata share of any remaining settlement fund. It is a red herring to insist, as [Objector] does, that the no-injury Plaintiffs' interests are contrary to those of the demonstrable-injury Plaintiffs. All Plaintiffs are fully compensated for their injuries.

*Target*, 2017 WL 2178306, at *5, *aff'd*, 892 F.3d at 973-76; *see generally id.* at *2-9. Further, "the interests of the various plaintiffs do not have to be identical to the interests of every class member; it is enough that they share common objectives and legal or factual positions." *Id.* at *6 (quoting *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148 (8th Cir. 1999)). As in *Target*, the class representatives are adequate here because they seek essentially the same things as all class members: compensation for whatever monetary damages they suffered and reassurance that their information

will be safer in Equifax's hands in the future. *Id.*[27]

Unlike here, *Amchem* and *Ortiz* were massive personal injury "class action[s] prompted by the elephantine mass of asbestos cases" that "defie[d] customary judicial administration." *Prof'l Firefighters Ass'n of Omaha, Local 385 v. Zalewski*, 678 F.3d 640, 646 (8th Cir. 2012). In those cases adequacy was not sufficiently protected within a single class because claimants who suffered diverse medical conditions as a result of asbestos exposure wanted to maximize the immediate payout, whereas healthy claimants had a strong countervailing interest in preserving funds in case they became ill in the future. These vast differences between groups of claimants in *Amchem* required "caution [because] individual stakes are high and disparities among class members great." *Amchem*, 521 U.S. at 625. Those concerns are simply not present in this consumer case where all class members allege the same injury from the compromise of their personal information. *See Anthem*, 327 F.R.D. at 314 (dispelling analogies to *Amchem* in the data beach context because "the same actions by a single actor wrought the same injury on all Settlement Class Members together").

---

[27] *See also Anthem*, 327 F.R.D. at 309-11 (analyzing and overruling same objection). This Court rejected a similar objection in the *Home Depot* consumer track. *See* 2016 WL 6902351 (rejecting all objections asserted by Sam Miorelli, including an objection that separate counsel was necessary to represent allegedly conflicting subclasses (No. 14-md-2583-TWT, Doc. 237 at 39-40) (objection); Doc. 245 at 21-23 (reply in support of final approval)).

Further, Mr. Huang's argument is particularly weak given the structure of the settlement in this case and the nature of the alleged harm to the class. While those who have already incurred out-of-pocket losses are being reimbursed now, those who incur out-of-pocket losses in the future are not left without a monetary remedy. Class members will have an opportunity to be reimbursed for out-of-pocket losses relating to future identity theft during the extended claims period. Moreover, there is no conflict because of the nature of the harm caused by the breach. Those who have already suffered losses stand just as likely to suffer future losses as those who have not suffered any losses to date and thus all class members have an incentive to protect against future harm. *See Target*, 892 F.3d at 976 (future injury "is just as likely to happen to a member of the subclass with documented losses").

Accordingly, the interests of the proposed subclasses here "are more congruent than disparate, and there is no fundamental conflict requiring separate representation." *Target*, 892 F.3d at 976; *see also Anthem*, 327 F.R.D. at 309-10. The settlement benefits all class members equally by compensating both current and future losses as well as protecting against and providing assistance in dealing with any future losses or misuse of their information. The Court therefore rejects Shiyang Huang's objection to class certification.

Objectors Frank and Watkins insist that the adequacy of representation requirement can only be satisfied with subclasses, with separate counsel, to account

for differences in the damages potentially available under different state consumer statutes. The Court is not persuaded, as this case seems well-suited to resolution via a nationwide class settlement. Frank and Watkins have not demonstrated how separate representation for state-specific subclasses would benefit anyone, let alone the class as a whole, or that the state statutes as a practical matter provide any class members with a substantial remedy under the facts presented. To the contrary, the Court finds that it is unlikely that any individual class members would have benefitted in any material way from state statutory remedies under the circumstances of this case or from separate representation for the purpose of advocating the alleged value of those remedies.

To begin with, the court in *Target* rejected this specific objection explaining:[28]

> The availability of potential statutory damages for members of the class from California, Rhode Island, and the District of Columbia does not, by itself, mean that the interests of these class members are antagonistic to the interests of class members from other jurisdictions. Class actions nearly always involve class members with non-identical damages. . . .

> [Objector's] argument in this regard ignores the substantial barriers to any individual class member actually recovering statutory damages. Class members from these three jurisdictions willingly gave up their uncertain potential recovery of statutory damages for the certain and complete recovery, whether monetary or equitable, the class settlement offered. Contrary to [Objector's] belief, this demonstrates

---

[28] Frank, the objector here, is a lawyer who represented the unsuccessful objector in *Target*. His co-counsel in *Target*, Melissa Holyoak, represents Frank and Watkins (her brother) in this case. While their roles may be different, Frank and Holyoak are making the same argument that failed in *Target*.

> the cohesiveness of the class and the excellent result named Plaintiffs
> and class counsel negotiated, not any intraclass conflict.

2017 WL 2178306, at *6. Similarly, the trial court in *Anthem* found that, as in this case, "there is no structural conflict of interest based on variations in state law, for the named representatives include individuals from each state, and the differences in state remedies are not sufficiently substantial so as to warrant the creation of subclasses." *Anthem*, 327 F.R.D. at 310 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir. 1998)); *cf. Columbus Drywall*, 258 F.R.D. at 555 ("The fact that the named plaintiffs may have suffered greater damages does not indicate that named plaintiffs possess interests antagonistic to other plaintiffs.").[29]

Those cases are more analogous here than the authority objectors cite. In *W. Morgan-E. Lawrence Water & Sewer Auth. v. 3M Co.*, 737 F. App'x 457 (11th Cir. 2018), consumers of allegedly contaminated water *and* the water authority that supplied the water were lumped into the same settlement class in an action against

---

[29] *See also Hanlon*, 150 F.3d at 1022 ("although some class members may possess slightly differing remedies based on state statute or common law, the actions asserted by the class representatives are not sufficiently anomalous to deny class certification. On the contrary, to the extent distinct remedies exist, they are local variants of a generally homogenous collection of causes which include products liability, breaches of express and implied warranties, and 'lemon laws.'"); *Dickens v. GC Servs. Ltd. P'ship*, 706 F. App'x 529, 536 (11th Cir. 2017) (class representative may be adequate even where seeking only statutory damages when other class members also suffered actual damages; at most this is a "minor conflict" under *Valley Drug*); *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1307 (N.D. Fla.), *reconsideration denied*, 261 F. Supp. 3d 1212 (N.D. Fla. 2017) ("The class members' damages will differ in degree, perhaps, but not in nature.").

the alleged polluters, even though many class members had actually filed injury claims *against* the water authority. *Id.* at 464. Because the water authority had an interest in maximizing the injunctive relief obtained from the alleged polluters while *minimizing* the value of (if not undermining entirely) consumers' claims for compensatory damages, a fundamental intra-class conflict plainly existed, precluding dual representation of consumers and the water authority. *Id.* No such fundamental conflict exists here.

Frank and Watkins also rely on the Second Circuit's opinion in *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011). They claim the case is "directly on point," but it is not. [Doc. 876 at 7]. *Literary Works* was a copyright case in which the proposed settlement divided the class into three claimant groups, called Categories A, B, and C. Unlike here, no single transaction or claim united the Category A, B, and C plaintiffs. The settlement capped the defendants' total liability and provided that, if the claims exceeded that cap, the Category C claims would be reduced *pro rata*. *Id.* at 246. In other words, the settlement protected the Category A and B claims at the sole expense of the Category C claims and could have resulted in Category C claimants receiving nothing. So, unlike here, the *Literary Works* settlement "sold out" one category of claims. *See id.* at 252.

The three claims categories in *Literary Works* were different in kind given the statutory scheme under which they arose. Category A claimants (whose claims were

61

uniquely valuable under federal copyright law because they were registered in time to be eligible for statutory penalties) had stronger claims than Category C claimants (who had never registered their copyrights and thus were not eligible to claim even actual damages). But, according to the court, that did not mean Category A claimants could take all the settlement's benefits, at least not without independent representation for the Category C claimants. In contrast, the proposed settlement in this case provides all class members with benefits and, unlike in the proposed settlement in *Literary Works*, is "carefully calibrated" to do so. *Anthem*, 327 F.R.D. at 310-11.[30]

Further, unlike in *Literary Works*, the entire class in this case brings the same common law claim for negligence stemming from the same event and arising under one state's law. This shared claim—involving the uniform applicability of Georgia law to a single set of facts—binds the interests of all class members, no matter where

---

[30] For the same reason, the Court overrules the Frank and Watkins objection that the settlement treats class members inequitably. The Court finds that due to the calibration of benefits, the settlement satisfies Rule 23(e)(2)(D). Further, the Court does not agree that Frank and Watkins's approach would lead to a more equitable result and finds instead that it could disadvantage the entire class. Due to the large number of class members, at best, the approach might allow residents of a handful of states to receive potentially larger (but still quite small) statutory damages. But predicting such a result is mere speculation, particularly because the two objectors have not demonstrated that the statutory claims to which they point are even viable. More likely, their approach would lead to no settlement (and possibly no recovery at all).

they reside, and overcomes any theoretical differences that arise from potential state statutory remedies. That is particularly true in this case because there is substantial doubt as to whether the plaintiffs can satisfy conditions the state statutes require to prove liability on an individual or class wide basis, (Utah's statute for example, requires each plaintiff to establish a "loss" and may not even be available in a class action),[31] and the complaint seeks nominal damages under Georgia law on behalf of all class members, which could yield more than the statutory damages for which Frank and Watkins argue. *See, e.g.*, *Wright v. Wilcox*, 262 Ga. App. 659, 662 (2003) (noting that damages are not "restricted to a very small amount"). Thus, Frank and Watkins's claim that no one "press[ed] their most compelling case" is without merit. [Doc. 876, at 11].

So too is the objectors' implication that their recovery is inadequate in relation to a possible award at trial. The Court has already noted that the settlement is at the high end of the range of likely recoveries and that many of the specific benefits of the settlement likely would not be attainable at trial, such as the fact that all class members are eligible for credit monitoring. Over a four-year period, the retail value of the credit monitoring approximates or exceeds the purported value of Frank and Watkins's statutory damages claims. Accordingly, Frank and Watkins likely are

---

[31] *See* U.C.A. § 13-11-19 ("A consumer who suffers loss as a result of a violation of this chapter may recover, *but not in a class action*, actual damages or $2,000, whichever is greater, plus court costs.") (emphasis added).

economically better off under the settlement than they would be even in the unlikely event that their state statutory claims were successfully litigated through trial. In short, the reality is that any conflicts between class members based upon their states of residence are doubtful and speculative, and even if any such conflicts exist, they are minimal.

Finally, Frank and Watkins do not identify any authority holding that a class settlement cannot release individual claims arising from the same transaction or occurrence that are not held by all class members. That happens all the time, in all manner of class judgments, and the Court has considered and found equitable under Rule 23(e) the scope of the release here. Under Frank and Watkins's theory, every multi-state class action settlement involving state law claims would risk invalidity without subclasses (with separate representatives and counsel) for each state. Many class settlements that have been approved and upheld on appeal would be invalid as a matter of law under such a rule, including *NFL Concussion*,[32] *Chrysler-Dodge-Jeep Ecodiesel*,[33] and *Volkswagen "Clean Diesel*."[34]

---

[32] *In re Nat'l Football League Players Concussion Injury Litig.*, 307 F.R.D. 351 (E.D. Pa. 2015), *aff'd*, 821 F.3d 410 (3d Cir. 2016).

[33] *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prods. Liab. Litig.*, 2019 WL 2554232 (N.D. Cal. May 3, 2019).

[34] *In re: Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2016 WL 6248426 (N.D. Cal. Oct. 25, 2016), *aff'd*, 895 F.3d 597 (9th Cir. 2018), *and aff'd*, 741 F. App'x 367 (9th Cir. 2018) (2.0-liter settlement); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods.*

The facts asserted by the objectors thus do not establish a conflict. And even if the objectors had identified a non-speculative conflict, which they have not, the conflict is minor and does not go to the heart of the claims asserted in the litigation. Moreover, the involvement of a cross-section of class representatives across all states, use of a respected and experienced mediator, and extensive input from state and federal regulators all safeguarded the process leading to the settlement. Indeed, the Attorneys General of both jurisdictions in which Frank and Watkins reside—Utah and the District of Columbia—incorporated this settlement as the mechanism for providing relief to their citizens in their own settlements with Equifax.

For all these reasons, the objections related to other consumer protection statutes do not present a problem with adequacy. In that regard, the Court also finds it relevant that Rule 23(e) was recently amended to require consideration of how settlement benefits are apportioned among class members as part of the fairness, reasonableness, and adequacy requirement. That, in and of itself, suggests that the adequacy requirement does not require that every class member share identical and overlapping claims. The Court has found here that the benefits are being equitably apportioned, and that the class is adequately represented without fundamental conflicts. There is therefore no basis to deny class certification under Rule 23(a)(4).

--------

*Liab. Litig.*, No. MDL 2672 CRB (JSC), 2017 WL 2212783 (N.D. Cal. May 17, 2017) (3.0-liter settlement).

Another objector claims that class members who have an existing credit monitoring service are treated inequitably. [Doc. 880 at 11]. But claimants who purchased credit monitoring on or after September 7, 2017, in response to the breach may make a claim for full reimbursement of the costs, up through the date they submit a claim. [Doc. 739-2, ¶¶ 2.37, 6.2.4, 8.3.2]. These class members also have the opportunity to cancel their existing credit monitoring service and sign up for the (likely superior) comprehensive credit monitoring offered under the settlement, obtaining the same benefits available to every other class member. Or, they are eligible for alternative cash compensation, albeit smaller than the maximum $125, and remain eligible for all of the other settlement benefits. Accordingly, the Court finds that those class members with existing credit monitoring are treated equitably under the settlement.

### D.   Objections Relating To The Process For Objecting.

The Court finds that the process for objecting is reasonable. Some objectors argue that the procedure for objecting is overly burdensome, asserting that objectors should not be required to show they are members of the settlement class, or provide their personal contact information, signature, or dates for a potential deposition. This argument is at odds with the number of objections received, and few objectors had difficulty meeting these criteria. Nevertheless, the requirements imposed on objectors are consistent with Rule 23, are common features of class action

settlements,[35] and were informed by the Court's previous experience dealing with objectors in connection with the *Home Depot* data breach settlement.

Some objectors protest the possibility of being subjected to a deposition, but objectors who voluntarily appear in an action place their standing and basis for objecting at issue for discovery. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, 281 F.R.D. 531, 533 (N.D. Cal. 2012) (holding that when an objector voluntarily appears in litigation by objecting to a class settlement, he or she is properly subject to discovery). Courts in this Circuit have found it advisable to discover the objector's knowledge of the settlement terms, to ferret out frivolous objections, and to expose objections that are lawyer-driven and filed with ulterior motives.[36] Moreover, Rule

---

[35] *See Champs Sports Bar & Grill Co. v. Mercury Payment Sys., LLC*, 275 F. Supp. 3d 1350, 1353 (N.D. Ga. 2017) (striking objection for failing to comply with similar criteria); *Home Depot*, Doc. 185 at ¶ 12 (N.D. Ga. March 8, 2016) (requiring objectors to provide personal contact information and signature); *Jones v. United Healthcare Servs., Inc.*, 2016 WL 8738256, at *4 (S.D. Fla. Sept. 22, 2016); *Chimeno-Buzzi v. Hollister Co.*, 2015 WL 9269266, at *5 (S.D. Fla. Dec. 18, 2015) (same); *see also In re Premera Blue Cross Customer Data Sec. Breach Litig.*, 2019 WL 3410382, at *27 (D. Or. July 29, 2019) (requiring objectors to provide personal contact information and provide signed statement that he or she is member of settlement class); *In re Anthem, Inc. Data Breach Litig.*, 2017 WL 3730912, at *3 (N.D. Cal. Aug. 25, 2017) (requiring written objection to contain personal contact information and signature).

[36] *See Montoya v. PNC Bank, N.A.*, 2016 WL 1529902, at *19 (S.D. Fla. April 13, 2016); *see also Champs Sports*, 275 F. Supp. 3d at 1359 (overruling the objection in a case where the objector was deposed, admitted he had no evidence or knowledge supporting objection, and could not explain how the settlement was inadequate); *Morgan v. Pub. Storage*, 301 F. Supp. 3d 1237, 1259 (S.D. Fla. 2016) ("An objector's knowledge of the objection matters in crediting (or not) the objection and

23 has recently been amended to address these sorts of concerns. *See generally* Fed. R. Civ. P. 23(e)(5).[37] The objection requirements serve to further appropriate lines of inquiry, and are not meant to discourage objections. "Such depositions not only serve to inform the Court as to the true grounds and motivation for the objection, but they also help develop a full record should the objector file an appeal." *Montoya*, 2016 WL 1529902, at *19.

Finally, the personal signature requirement is not burdensome, and is of particular importance in this case, to ensure that the objection is made in the objector's personal capacity, and not at the behest of others. And, the personal signature requirement decreases the likelihood that services encouraging mass objections or opt-outs file unauthorized or fictitious objections. These objections are overruled.

---

determining the objector's motives."); c*f. Greco v. Ginn Dev. Co.*, 635 F. App'x 628, 633 (11th Cir. 2015) (district court may properly consider whether those voicing opposition to settlement have ulterior motives).

[37] The accompanying 2018 Advisory Committee Notes explain that the Rule has been amended because "some objectors may be seeking only personal gain, and using objections to obtain benefits for themselves rather than assisting in the settlement-review process. At least in some instances, it seems that objectors—or their counsel—have sought to obtain consideration for withdrawing their objections or dismissing appeals from judgments approving class settlements."

E.      **Objections Relating To How To Opt Out.**

The Court overrules all objections related to the procedures for how to opt out. The exclusion procedure is simple, affords class members a reasonable time in which to exercise their option, and is conventional.[38] The individual signature requirement on opt-out requests is not burdensome at all. Moreover, it ensures that each individual has carefully considered his options and understands that he is giving up his right to relief under the settlement. While technology provides an avenue for filing claim forms more easily, it also makes it easier for third parties and their counsel to file unauthorized "mass opt-outs," which are sometimes "highly indicative of a conclusion that such counsel did not spend much time evaluating the merits of whether or not to opt-out in light of the individual circumstances of each of their clients and in consultation with them."[39] The Court's Order Directing Notice clearly did not present insurmountable hurdles to opting out of the settlement class.

_____

[38] *See, e.g.*, *Harrison v. Consol. Gov't. of Columbus, Georgia*, 2017 WL 6210318, at *2 (M.D. Ga. April 26, 2017) (requiring exclusion form to be mailed via regular mail); *Flaum v. Doctor's Assoc., Inc.*, 2017 WL 3635118, at *3 (S.D. Fla. March 23, 2017) (same); *Home Depot*, Doc. 185 at ¶ 11 (N.D. Ga. March 8, 2016) (same); *Jones*, 2016 WL 8738256, at *3 (same); Manual for Complex Litigation (Fourth) § 21.321 (2004) (hereinafter, "*Manual*") ("Typically, opt-out forms are filed with the clerk, although in large class actions the court can arrange for a special mailing address and designate an administrator retained by counsel and accountable to the court to assume responsibility for receiving, time-stamping, tabulating, and entering into a database the information from responses.").

[39] *In re Oil Spill by Oil Rig Deepwater Horizon*, 910 F. Supp. 2d at 939. Here, where the technology allowing class members to object or opt out is coupled with

Several class members object that there should be a renewed opportunity to opt out of the settlement after the final approval hearing. But class members already had at least 60 days from the notice date [Doc. 742 at 15] and 120 days after the order directing notice to evaluate the settlement and request exclusion. The length of the opt-out period provided class members a reasonable opportunity to exclude themselves.[40] And, because the Court is approving the settlement without any changes, the final approval hearing did not create any new grounds for a class member to opt out.

### F.    Objections To The Notice Plan.

Objections to the notice plan include that: (1) the content of the notice is inadequate; (2) the supplemental e-mail notice to early claimants was inadequate or improper; (3) the notice plan is too reliant on email and social media; (4) the notice plan is inadequate for those without computers or access to news; and (5) the notice plan is unclear as to the amount of fees requested. The Court rejects and overrules each of these objections. The parties implemented the Court-approved notice plan that was developed in conjunction with federal and state regulators, which

---

misinformation about what the settlement actually provides, the dangers of accepting mass, unsigned objections or opt-out requests are even more acute.

[40] "Courts have consistently held that 30 to 60 days between the mailing (or other dissemination) of class notice and the last date to object or opt out, coupled with a few more weeks between the close of objections and the settlement hearing, affords class members an adequate opportunity to evaluate and, if desired, take action concerning a proposed settlement." *Greco*, 635 F. App'x at 634.

constitutes the best notice practicable under the circumstances, and provides class members with information reasonably necessary to evaluate their options. *See* Fed. R. Civ. P. 23(e)(1)(B); *see also Greco*, 635 F. App'x at 633.

The notice plan here clearly and concisely explains the nature of the action and the rights of class members, thereby satisfying the requirements of Rule 23 and due process. The short form notice, developed with both federal and state regulators, and approved by this Court, sets forth a clear and concise summary of the case and the proposed settlement and, in large, bold typeface, directs class members to visit the settlement website[41] or call the toll-free phone number for more information. *See In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1342-44 (S.D. Fla. 2011) (approving notice where information was referenced in short form notice and more information was readily available in full on settlement website). And the long form notice on the settlement website contains a comprehensive explanation of the

---

[41] The long-form notice and the "Frequently Asked Questions" ("FAQ") page of the settlement website contain a section entitled "Legal Rights Resolved Through The Settlement" and provide an answer to the question: "What am I giving up to stay in the settlement class?" The answer clearly provides that, by staying in the settlement class, class members are releasing their "legal claims relating to the Data Breach against Equifax when the settlement becomes final." *See* Doc. 739-2 at 269 & Settlement Website FAQ 20. Additionally, these notice materials contain a section titled "The Lawyers Representing You" and provide an answer to the question: "How will these lawyers be paid?" The answer clearly states that class counsel are seeking attorneys' fees of up to $77,500,000 and reimbursement for costs and expenses up to $3,000,000 to be paid from the Consumer Restitution Fund. *See* Doc. 739-2 at 270-71 & Settlement Website FAQ 22.

settlement and related matters. While the long form notice does not contain every fact or piece of information a class member might find to be material, that is legally unnecessary, potentially confusing, and off-putting to class members.[42]

Some objectors complain the notice plan failed to adequately explain that the alternative compensation benefit could be reduced depending on how many valid claims were submitted. But, as discussed above, the misconception that each class member would automatically receive alternative reimbursement compensation of $125 arose not from the notice plan (nor could it, since direct email notice to the class had not yet been sent when the misconception arose), but from misleading media coverage that began even before the proposed settlement was presented to the Court. *See* App. 1, ¶¶ 27-37. Further, as discussed above, the notice plan, particularly when coupled with the additional steps the Court approved on July 30, 2019, ensured that class members had adequate information about the alternative compensation benefit—including information that alternative compensation claimants likely would receive a "small percentage" of $125—before making a choice between that benefit and credit monitoring.[43] And, for those who made the choice before the

---

[42] *See Faught*, 668 F.3d at 1239 (an overly-detailed notice has the potential to confuse class members and impermissibly encumber their right to benefit from the action).

[43] Some objectors also erroneously assert that the Court approved a change to the claims form (requiring alternative claimants to provide the name of their existing credit monitoring service) to deter class members from claiming $125. This

enhancements to the settlement website were implemented, they were sent an email giving them an opportunity to change their minds and amend their claim.[44]

Some objectors argue that the notice plan was too reliant upon newer technologies to deliver notice of the settlement to the class. But courts have increasingly approved utilizing email to notify class members of proposed class settlements, and such notice was appropriate in this case. *See, e.g.*, *Home Depot*, 2016 WL 6902351, at *5 (holding notice reaching 75 percent of class through email and internet advertising satisfied Rule 23 and due process); *Morgan*, 301 F. Supp. 3d at 1262 ("Courts consistently approve notice programs where notice is provided primarily through email because email is an inexpensive and appropriate means of delivering notice to class members."). The ultimate focus is on whether the notice methods reach a high percentage of the class. *See* Federal Judicial Center, "*Judge's Class Action Notice and Claims Process Checklist and Plain Language*

---

requirement was a component of the settlement from the outset. Changing the form helped ensure that only those eligible for alternative compensation would file a claim and saved the claims administrator from the necessity of having to go back to claimants and ask for that information in the claims vetting process from the millions of people who were filing claims.

[44] Other objectors argue that all early claimants should have been notified by notarized letter, rather than email. But each claimant provided his email address as part of the claims filing process, and was informed that subsequent correspondence would be received via email. *See* App. 4, ¶¶ 60-62. Moreover, the objectors present no evidence that a substantial number of class members did not receive the supplemental email notice. *See Nelson*, 484 F. App'x at 434-35 (affirming district court's decision overruling conclusory objections).

*Guide*" (2010) (available at www.fjc.gov); R. Klonoff, *Class Actions in the Year 2026: A Prognosis*, 65 Emory L.J. 1569, 1650 & n. 479 (2016) ("Courts have increasingly utilized social media . . . to notify class members of certification, settlement, or other developments.").

The Court-approved notice plan, which as noted above was designed by experienced counsel for the parties, JND (an expert in providing class action notice), Signal (an expert in mass media and data analytics), and experts on consumer communications at the Federal Trade Commission and the Consumer Financial Protection Bureau, effectively reached and engaged the class. *See Carter v. Forjas Taurus S.A.*, 2016 WL 3982489, at *5 (S.D. Fla. Jul. 22, 2016) (notice plan that "used peer-accepted national research methods to identify the optimal traditional, online, mobile and social media platforms to reach the Settlement Class Members" was sufficient). Direct email notice was sent to the more than 104 million class members whose email addresses could be found with reasonable effort. The digital aspects of the notice plan, alone, reached 90 percent or more of the class an average of eight times. App. 5, ¶¶ 22-24. *See* Federal Judicial Center, "Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide" (2010)[45] (recognizing the effectiveness of notice that reaches between 70 and 95 percent of the class). And, the unprecedented claims rate in a case of this magnitude not only

---

[45] *Available at* https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf.

further demonstrates that the notice plan's use of email and social media satisfied minimum standards, but also has been more effective than other notice methods.

The Court also overrules objections that the notice program is inadequate for those without ready access to computers or the internet. The Constitution does not require that each individual member receive actual notice of a proposed settlement. *See Juris v. Inamed Corp.*, 685 F.3d 1294, 1318 (11th Cir. 2012). Publication and media notice are appropriate where direct notice is not reasonable or practicable, such as when a class consists of millions of residents from different states. *See Edwards v. Nat'l Milk Producers Fed'n*, 2017 WL 3623734, at * 4 (N.D. Cal. June 26, 2017) ("In view of the millions of members of the class, notice to class members by individual postal mail, email or radio or television advertisements, is neither necessary nor appropriate.") (quoting *In re MetLife Demutualization Litig.*, 262 F.R.D. 205, 208 (E.D.N.Y. 2009)). It was particularly appropriate here, where so much effort was spent in quantitative and qualitative research (including the use of focus groups and a public opinion survey) to specifically identify and target those who lack ready access to the internet and to design a national radio advertising campaign to reach them.[46]

---

[46] *See, e.g.*, *Kumar v. Salov N. Am. Corp.*, 2017 WL 2902898, at *3 (N.D. Cal. July 7, 2017) (approving of notice campaign consisting of media notice, publication notice, and advertisements on various websites); *In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, 314 F.R.D. 580, 602-03 (N.D. Ill. 2016)

In the Court's estimation, it would have been extremely wasteful to spend a significant portion of the settlement fund sending direct mail notice to 147 million class members across the United States and its territories or even to a substantial subset of the class. That would have needlessly reduced the money available to pay for the benefits to the class. The plan developed by the parties, notice experts, and federal and state regulators, and approved by the Court, was sufficient, particularly in light of the pervasive media coverage and the efforts of state and federal regulators to inform consumers about the potential relief available to the class under the settlement. Indeed, few, if any, other class actions of which the Court is aware have received the widespread public attention that the settlement in this case has received or, as noted above, triggered such a substantial number of claims.

Some objectors argue that the notice plan does not identify the exact amount of fees sought by class counsel and thus precisely how much money will be left in the settlement fund after the fees have been paid. But because this Court has broad

---

(approving indirect notice for class members who could not be given direct notice including print publication, settlement class website, press release, and social media); *In re Optical Disk Drive Prods. Antitrust Litig.*, 2016 WL 7364803, at *3 (N.D. Cal. Dec. 19, 2016) (approving notice consisting of email, settlement website, toll-free number, publication notice, press release, text link advertising, banner advertising, and advertising on Facebook and Twitter); *Manual* § 21.312 ("Posting notices and other information, on the Internet, publishing short, attention-getting notices in newspapers and magazines, and issuing public service announcements may be viable substitutes for . . . individual notice if that is not reasonably practicable.").

discretion over the amount of fees to be awarded, *see Piambino v. Bailey*, 757 F.2d 1112, 1139-42 (11th Cir. 1985); *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1329 (S.D. Fla. 2001), the class notice could not with certainty disclose the amount of fees that would ultimately be awarded or the amount that would remain in the fund after those fees are paid. Identifying a maximum amount of fees to be requested is sufficient, and that is what happened here. *See* Doc. 739-2 at 270 & Settlement Website FAQ 22; *see also Carter*, 2016 WL 3982489, at *7 (approving notice where it informed class members that class counsel would be seeking "up to $9 million in fees"). Moreover, class counsel's motion for fees was posted on the settlement website when it was filed on October 29, 2019, giving class members the ability to learn exactly what class counsel requested well before the deadline to opt out or object.

### G.      Objections To The Claims Procedures.

The Court overrules the objections regarding claims procedures, specifically those objections stating that: (1) the procedure for claiming the alternative reimbursement compensation is confusing and unfair; (2) the requirement that time spent and actual out-of-pocket losses be "fairly traceable" to the data breach will disallow valid claims; (3) the call center was unhelpful and inadequately staffed early in the claims period; and (4) the claims procedure presents "too many hoops to jump through" to submit a claim.

Some objectors argue that the claims process improperly "channels" class members toward electing credit monitoring as the only form of relief because too many class members have elected alternative compensation. Perhaps because of the inaccurate public reporting suggesting that only $31 million is available to pay claims, these objectors misunderstand the settlement. Credit monitoring or alternative reimbursement compensation is not the only available relief. Further, class members are not told the form of relief that they must choose, but are given adequate and appropriate information so they can make up their own minds. That class members were told alternative compensation claimants likely would receive a small percentage of $125 is accurate. To keep that information from class members would not have been appropriate.

Some objectors argue that they did not receive the supplemental email providing enhanced information about the alternative compensation benefit, but that is no reason to upend the settlement—especially where those class members will have an opportunity to address any claims deficiencies as part of the agreed-upon claims review process.[47] *See, e.g., Home Depot*, 2016 WL 6902351, at *5 (rejecting objections from class members who claimed they did not receive subsequent email

---

[47] According to class counsel and the claims administrator, any claimants who did not respond to the supplemental email notice or otherwise take action will be routed through the regular deficiency process for claims validation, which provides them an opportunity to address any deficiencies with their claims. *See* Settlement Agreement § 8.5.

notice). Further, this information was on the settlement website, which was available to all class members.

Other objectors argue that requiring class members to provide the name of their current credit monitoring provider to claim alternative compensation is unfair. But the settlement agreement clearly and unambiguously requires class members claiming that benefit to "identify the monitoring service" that they have in place to ensure they are eligible for that benefit. *See* Settlement Agreement § 7.5. And, there is nothing unfair about requiring a claimant to meet the eligibility requirements for a particular benefit. *See Manual* § 21.66 ("Class members must usually file claims forms providing details about their claims and other information needed to administer the settlement.").

Other objectors argue that the settlement's "fairly traceable" requirement for reimbursement of out-of-pocket losses and time spent on the data breach will work to disallow valid claims. But to pursue a claim in court, a plaintiff must demonstrate that his or her injuries are "fairly traceable" to the challenged conduct of the defendant. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Settlement is no different; thus courts in other data breach cases have upheld similar requirements. *See, e.g.*, *Premera*, 2019 WL 3410382, at *22 (providing reimbursement for "proven out-of-pocket damages that can plausibly be traced to the Data Breach"); *Home Depot*, 2016 WL 6902351, at *4 (requiring "Documented

Claims" to claim monetary relief).

Some objectors argue that the call center was unhelpful early in the claims period. But the settlement provides reasonable procedures and allocates sufficient funds to ensure that the call center was adequately staffed (indeed, more than one hundred operators were on call at times early in the claims period) and the staff is trained to help class members with questions relating to the proposed settlement. *See* App. 4, ¶¶ 37-41. Beyond that, class counsel were available to respond to class member inquiries and routinely responded to class member emails and phone calls. *See* App. 1, ¶ 69. While frustration with a call center is familiar to most people who exist in the modern world, the Court sees no indication of a pervasive problem here that in any way affects the fairness of the settlement or the claims procedure. That so few class members made this objection despite the massive number of calls that the call center has handled is further testament that any problems were not material.

Several objectors also claim that there are "too many hoops to jump through" in order to submit a claim. But completion and documentation of the claim form are no more burdensome than necessary and similar claims procedures are routinely required in other settlements. *See, e.g.*, *Jackson's Rocky Ridge Pharmacy, Inc. v. Argus Health Sys., Inc.*, 2007 WL 9711416, at *2 (N.D. Ala. June 14, 2007) ("[E]ach class member who seeks damages from the settlement fund must file and substantiate its claim. This requirement is no more onerous than that to which each of the class

members would have been subjected had they filed a separate lawsuit against the defendant and prevailed on the substantive claim."); *Manual* § 21.66 ("Class members must usually file claims forms providing details about their claims and other information needed to administer the settlement. . . . Verification of claims forms by oath or affirmation . . . may be required, and it may be appropriate to require substantiation of the claims. . . ."). The robust number of claims is further evidence that the process was not unduly burdensome.

Some objectors are dissatisfied with the claims period and argue that it is too short to provide relief for potential future harms. The Court concludes that the length of the claims period is reasonable and comparable to, if not longer than, claims periods in other data breach cases. *See, e.g.*, *Home Depot*, 2016 WL 6902351 (approving settlement with initial claims period of 150 days); *Premera*, 2019 WL 3410382, at *26 (ordering initial claims period of 150 days); *Anthem*, 327 F.R.D. at 325 (overruling objections that a one-year claims period was too short because there is a risk of proving harm that has not yet occurred at trial and because settlement provided protections against future identity fraud). The proposed settlement provides class members with six months to claim benefits for losses already sustained and does not require claims to be filed to access identity restoration services. If money remains in the fund after the initial claims period, class members can file claims in the extended claims period, which provides an additional four years to recover for

losses that have not yet occurred. Beyond that, credit monitoring and identity restoration services will allow class members to monitor and help safeguard their information for several more years. The Court views these periods as entirely fair and reasonable and calculated to equitably deliver relief to members of the settlement class.

## IV.   PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS TO THE CLASS REPRESENTATIVES.

Plaintiffs request that the Court award a $77.5 million fee as provided in the settlement agreement. The Court finds that the requested fee is reasonable under the percentage approach, which is the exclusive method in this Circuit for calculating fees in a common fund case such as this one. A lodestar crosscheck, though not required, also supports the requested fee.

### A.      The Requested Fee Is Reasonable Under The Percentage Method.

The controlling authority in the Eleventh Circuit is *Camden I Condominium Association, Inc. v. Dunkle*, 946 F.2d 768, 774-75 (11th Cir. 1991), which holds that fees in common fund cases must be calculated using the percentage approach. *Camden I* does not require any particular percentage. *See id.* ("There is no hard and fast rule … because the amount of any fee must be determined upon the facts of each case."); *see also, e.g.*, *Waters v. Int'l. Precious Metals Corp.*, 190 F.3d 1291, 1294 (1999). Typically, awards range from 20% to 30%, and 25% is considered the "benchmark" percentage. *Camden I*, 946 F.2d at 775. The Eleventh Circuit has

instructed that, to determine the appropriate percentage to apply in a particular case, a district court should analyze the *Johnson* factors derived from *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), as well any other pertinent considerations. *Camden I*, 946 F.2d at 775.

The $77.5 million requested fee is 20.36% of the $380.5 million *minimum* settlement fund. Under the controlling authority cited above, the requested fee is reasonable as a percentage of the non-reversionary fund alone. However, the minimum amount of the settlement fund is not the true measure of all the benefits, monetary and non-monetary, available to the class under the settlement. The class benefit also includes: (1) an additional $125 million that Equifax will pay if needed to satisfy claims for out-of-pocket losses; (2) the consent order requiring Equifax to pay at least $1 billion for cybersecurity and related technology and comply with comprehensive standards to mitigate the risk of another data breach involving class members' personal data; (3) the value of the opportunity to receive ten years of free credit monitoring for all class members (which would cost each class member $1,920 to buy at its retail price); (4) the value of seven years of identity restoration services available to all class members; and (5) the value of a ban on the use by Equifax of arbitration clauses in some circumstances.[48] In assessing a fee request,

---

[48] In addition to these benefits provided under the settlement, certain settlement class members also benefited from an additional year of credit monitoring services, known

the Court may also consider all of these benefits. *See, e.g., Camden*, 946 F.2d at 775; *Poertner v. Gillette Co.*, 618 F. App'x 624, 629 (11th Cir. 2015), *cert. denied sub nom. Frank v. Poertner*, 136 S. Ct. 1453 (2016) (district court did not abuse its discretion by "including the value of the nonmonetary relief … as part of the settlement pie").

When these other benefits are considered, the percentage of the class benefit the requested fee represents is much less than 20.36%.[49] For example, the requested fee is 15.3% of the $380.5 million fund plus the additional $125 million available to pay out-of-pocket claims. The requested fee is only 5% of those amounts plus the $1 billion that Equifax is required to spend for cybersecurity and related technology and it is less than 1% when the retail value of the credit monitoring services already claimed by class members is included. These figures demonstrate that using 20.36% in the calculation of a percentage-based fee is conservative as it does not account for all of the settlement's benefits, but that percentage nonetheless will be the focus of the Court's analysis because if a 20.36% award is reasonable, as it is, then there can

---

as IDnotify, provided to class members who previously enrolled in the TrustedID Premier services offered by Equifax following the data breach. *See* Settlement Agreement § 4.3.

[49] For the same reasons, even if the Court calculated the percentage of the fund based upon the size of the fund specified in the term sheet rather than the ultimate settlement (25% of $310 million), that percentage would be reasonable, and the presence of all the other ingredients in the "settlement pie" drive the requested fee well below the benchmark.

be no question that a smaller percentage is also reasonable.

The percentage of the class benefit represented by the requested fee is supported by the factors that the Eleventh Circuit has directed be used in assessing the reasonableness of a fee request, including the *Johnson* factors. There are twelve *Johnson* factors:

> (1) the time and labor required; (2) the novelty and difficulty of the relevant questions; (3) the skill required to properly carry out the legal services; (4) the preclusion of other employment by the attorney as a result of his acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the clients or the circumstances; (8) the results obtained, including the amount recovered for the clients; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and the length of the professional relationship with the clients; and (12) fee awards in similar cases.

*George v. Academy Mortgage Corp. (UT)*, 369 F. Supp. 3d 1356, 1376 (N.D. Ga. 2019). Other relevant factors include the number of objections from class members, the risks undertaken by class counsel, and the economics of handling class actions. *Champs Sports*, 275 F. Supp. 3d at 1356; *Camden I*, 946 F.2d at 775. The Court does not analyze two of the *Johnson* factors, the undesirability of the case and the nature of the attorney-client relationship, due to their limited applicability here. The Court addresses the other factors below.

(1)    *The Time and Labor Involved*

The Court has observed the intensive amount of time and labor required to prosecute the claims in this case. Class counsel and those under their direction have

spent over 33,000 hours prosecuting this action. The vast majority of the work was done by class counsel and other firms the Court appointed to the plaintiffs' steering committee. The work was allocated to those able to do the work most efficiently. Class counsel also estimate they will spend at least another 10,000 hours over the next seven years in connection with final approval, managing the claims process, and administering the settlement. The Court finds that the work that class counsel have done and estimate they will do is reasonable and justified in view of the issues, the complexity and importance of the case, the manner in which the case was defended, the quality and sophistication of Equifax's counsel, the result, the magnitude of the settlement and the number of claims. Moreover, the amount of work devoted to this case by class counsel likely was a principal reason that they were able to obtain such a favorable settlement at a relatively early stage. This factor weighs in favor of approval of the requested fee.

(2)   *The Novelty and Difficulty of the Questions*

Although many of the plaintiffs' claims were able to survive a motion to dismiss, their path forward remained difficult. The law in data breach litigation remains uncertain and the applicable legal principles have continued to evolve, particularly in the State of Georgia, where protracted appellate litigation in two other data breach cases while this case has been pending demonstrate the unsettled state of the law. *See McConnell*, 828 S.E.2d at 352; *Collins v. Athens Orthopedic Clinic*,

815 S.E.2d 639 (Ga. Ct. App. 2018), *rev'd* ___ Ga. ___ (Dec. 23, 2019). As a result, this case involved many novel and difficult legal questions, such as the threshold issue of whether Equifax had a duty to protect plaintiffs' personal data, whether plaintiffs' alleged injuries are legally cognizable and were proximately caused by the Equifax breach, the applicability of the FCRA to a data breach at a major credit reporting agency, the meaning of various state consumer protection statues, and other issues briefed by the parties in connection with Equifax's motion to dismiss. These would be recurring issues throughout the litigation if the settlement is not approved.

Other novel and difficult questions in this case resulted from the sheer size of the litigation, the number of Americans impacted by the breach, and the highly technical nature of the facts. Determining and proving the cause of the breach and developing cybersecurity measures to prevent a recurrence were particularly challenging. The plaintiffs' lawyers also confronted unusual circumstances and a dearth of legal guidance or governing precedent when they engaged in extensive negotiations with federal and state regulators after reaching a binding term sheet with Equifax. This factor strongly weighs in favor of the requested fee request.

(3)   *The Skill Requisite to Perform the Legal Services Properly and the Experience, Reputation, and Ability of the Lawyers*

This case required the highest level of experience and skill. Plaintiffs' legal team includes lawyers from some of the most experienced and skilled class action

law firms in the country who have collectively handled more than 50 data breach cases, including all of the most significant ones. Their experience and skill was needed given the scope of the case and the quality of the opposition. The lawyers who represented Equifax are highly skilled and come from several of the nation's largest corporate defense firms. Moreover, Judge Phillips has noted that "the settlement is the direct result of all counsel's experience, reputation, and ability in complex class actions including the evolving field of privacy and data breach class actions." [Doc. 739-9, ¶ 15]. The Court can also attest to the high level of zealous, diligent advocacy demonstrated throughout this case. These factors weigh in favor of the requested fee.

(4)     *The Preclusion of Other Employment*

Given the demand for their services attributable to their high level of skill and expertise, but for the time and effort they spent on this case the plaintiffs' lawyers would have spent significant time on other matters. Further, by necessity given its nature, the bulk of the work was done by a relatively small number of senior lawyers, and demanded their full attention. As described above, their focus on this case likely served as the principal reason that the case was able to settle favorably, further weighing in support of the requested fee.

(5)     *The Customary Fee*

The percentage used to calculate the requested fee is substantially below the

88

percentages that are typically charged by lawyers who handle complex civil litigation on a contingent fee basis, which customarily range from 33.3% to 40% of the recovery.

      (6)    *Whether the Fee is Fixed or Contingent*

"A contingency fee arrangement often justifies an increase in the award of attorneys' fees." *Behrens*, 118 F.R.D. at 548. A larger award is justified because if the case is lost a lawyer realizes no return for investing time and money in the case. *See In re Friedman's, Inc. Sec. Litig.*, 2009 WL 1456698, at *3 (N.D. Ga. May 22, 2009). As discussed above, the novel and difficult questions present in this case heightened this concern here. This action was prosecuted on a contingent basis and thus a larger fee is justified.

      (7)    *Time Limitations Imposed by the Client or the Circumstances*

Priority work done under significant time pressure is entitled to additional compensation and justifies a larger percentage of the recovery. *See, e.g.*, *Johnson*, 488 F.2d at 718; *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1215 (S.D. Fla. 2006). At various times during this litigation, class counsel were forced to work under significant time pressure, such as when they had to vet thousands of potential class representatives in a short period to meet the Court's deadline for filing a consolidated amended complaint and during the several months they spent negotiating with Equifax and federal and state regulators leading up to finalizing the

settlement. During critical periods, class counsel spent as much as 2,000 hours a month or more. This factor thus supports an increased award.

(8)   *The Amount Involved and the Results Obtained*

This is the largest data breach settlement in history. The $380.5 million fund alone is more than the total recovered in all consumer data breach settlements in the last ten years.[50] Further, class members are eligible for an unprecedented package of benefits, including but not limited to cash compensation for out-of-pocket losses fairly traceable to the breach of up to $20,000 per class member, reimbursement for time spent as a result of the breach, and 25% of the amount paid to Equifax by class members for identity protection services in the year prior to the breach; ten years of high quality credit monitoring services having a retail value of $1,920 per class member; and seven years of identity restoration services without the need to file a claim.

In addition, Equifax has agreed to a consent order requiring it to comply with comprehensive cybersecurity standards, spend at least $1 billion on data security and related technology, and have its compliance audited by independent experts. Violations of the consent order are subject to this Court's enforcement power. This

---

[50] Contrary to the arguments of some objectors, the size of the settlement fund is not just a matter of scale. For instance, the settlement is larger on a per capita basis than the *Anthem* settlement, which resulted in a $115 million fund for a class of 80 million individuals.

injunctive relief provides a substantial benefit to all class members, and exceeds what has been achieved in other data breach settlements.

Finally, as noted, class counsel negotiated an innovative notice program to effectively inform and engage class members, and a robust claims process to facilitate and increase class member participation. The notice program and claims process are both a direct benefit to the class.

In short, the results obtained—which are in the high range of potential recoveries and in some instances may exceed what could be achieved at trial—weigh strongly in favor of the requested fee.

(9)   *Awards in Similar Cases*

The requested fee is in line with—if not substantially lower than—awards in other class actions that have resulted in similarly impressive settlements. Even if the fee is based only on the cash fund, ignoring all other monetary and non-monetary benefits, the 20.36% that the requested fee represents is below the 25% benchmark recognized in *Camden I* and substantially less than has been awarded in similar cases, including specifically other data breach cases. *See, e.g.*, *In re Arby's Rest. Grp., Inc. Data Sec. Litig.*, 2019 WL 2720818, at *4 (N.D. Ga. June 6, 2019) (awarding a fee of approximately 30% and noting that "[a]wards of up to 33% of the common fund are not uncommon in the Eleventh Circuit, and especially in cases where Class Counsel assumed substantial risk by taking complex cases on a

contingency basis."); *Home Depot*, 2016 WL 11299474, at *2 (awarding a fee in the consumer track of "about 28% of the monetary benefit conferred on the Class."); *Home Depot*, No. 1:14-MD-02583-TWT (Doc. 345 at 4) (using one-third of the benefit in percentage-based calculation in the financial institution track); *Target*, 2015 WL 7253765, at *3, *rev'd and remanded on other grounds*, 847 F.3d 608 (awarding 29% of the monetary payout).

Empirical studies also show that fees in other class action settlements are substantially higher than the requested fee. *See, e.g.*, Theodore Eisenberg, Geoffrey Miller & Roy Germano, *Attorneys' Fees in Class Actions: 2009–2013*, 92 N.Y.U. L. Rev. 937, 947, 951 (2017) (finding that in the Eleventh Circuit the average fee was 30% and median fee was 33% from 2009 through 2013); Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Stud. 811, 836 (2010) (finding, in the Eleventh Circuit for 2006–2007 period of the study, the average fee was 28.1% and the median fee was 30%).

(10)   *The Number of Objections*

Only 38 of the 147 million class members objected to the requested fee. This number represents 0.000026 percent of the class or just 1 of every 3.9 million class members. The extremely small number of objectors is further evidence of the reasonableness of the requested fee. *See, e.g.*, *Home Depot*, 2016 WL 6902351, at *4 (objections from an "infinitesimal percentage" of the class "indicates strong

support" for the settlement).

    (11)   *The Risk Undertaken by Class Counsel*

The plaintiffs' lawyers undertook extraordinary litigation risk in pursuing this case and investing as much time and effort as they did. The Court is familiar with data breach litigation and appreciates that this was undeniably a risky case when it was filed. It is even riskier today, as demonstrated by recent authority. *See, e.g.*, *McConnell*, 828 S.E.2d at 352 (Ga. 2019); *Adkins v. Facebook*, 2019 WL 7212315, at \*9 (N.D. Cal. Nov. 26, 2019) (granting motion to certify injunctive-only class but denying motion to certify damages class and issues class in data breach case).

Based on these factors, the Court finds the award of attorneys' fees in the amount of $77.5 million is appropriate under the percentage of the fund approach. The Court has considered and hereby overrules all of the objections to the requested fees as described below.

*First,* most of the objections to the motion for fees are conclusory, do not provide any legal support for why a lower fee should be awarded, or are based on a misunderstanding about the terms of the settlement. These objections can be summarily rejected. *See, e.g.*, *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 909 F. Supp. 2d 259, 264 n.3 (S.D.N.Y. 2012).

*Second,* one objector, John Davis, argues that the fee must be calculated using the lodestar method because he disagrees with *Camden I* and claims that the case is

no longer good law in light of *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542 (2010). (Doc. 879-1 at 8-10). This argument is frivolous. *Camden I* is binding precedent. And, *Perdue*, which construes a fee-shifting statute, does not apply in a common fund case such as this one. *See In re Home Depot, Inc. Customer Data Sec. Breach Litig.*, 931 F.3d 1065, 1084-85 (11th Cir. 2019).

*Third,* several class members do not object to the fee amount, but to its payment from the settlement fund. According to these objectors, the Court should punish Equifax by ordering the company to pay the fees separately. But this Court cannot order Equifax to pay more. *See, e.g.*, *Howard v. McLucas*, 597 F. Supp. 1504, 1506 (M.D. Ga. 1984) ("[T]he court's responsibility to approve or disapprove does *not* give this court the power to force the parties to agree to terms they oppose") (emphasis in original). And, having created a common fund, class counsel are entitled to be paid from the fund.

*Fourth,* two other objections—one by Mikell West and the other by Frank and Watkins—contend that the fee should be no more than 10% of the class benefit because class counsel allegedly faced little risk, the case settled within two years, and awards in cases involving "megafund" settlements do not justify a higher percentage. As stated above, the Court disagrees with the assertion that plaintiffs had little risk. To the contrary, class counsel faced extraordinary risk, which the objectors unreasonably and erroneously discount. Further, penalizing class counsel for

94

achieving a settlement within two years would work against the interests of the class and undercut the judicial policy favoring early settlement. *See, e.g.*, *Markos v. Wells Fargo Bank, N.A.*, 2017 WL 416425, at *4 (N.D. Ga. Jan. 30, 2017); *In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d at 1362.

Their argument that the requested fee is too large because this case involves a megafund settlement—often defined as a settlement in excess of $100 million—also is unpersuasive. When all of the settlement benefits are properly included the value of the settlement is in the several billions of dollars, meaning the requested fee *is* less than the 10% that the two objectors contend is appropriate. In arguing otherwise, the objectors improperly discount all of the settlement benefits except the $380.5 million fund, including specifically all of the settlement's non-monetary benefits.[51] *See Poertner*, 618 F. App'x at 630 (rejecting an objection by Frank that the requested fee was too large because he improperly limited the monetary value of the settlement and disregarded the settlement's substantial non-monetary benefits, which he

---

[51] Under the percentage approach, "courts compensate class counsel for their work in extracting non-cash relief from the defendant in a variety of ways." *In re Checking*, 2013 WL 11319244, at *12. If the non-monetary relief can be reliably valued, courts can include such relief in the fund and award counsel a percentage of the total. *Id.*; *George*, 369 F. Supp. 3d at 1379-80; *see also Poertner*, 618 F. App'x at 628-29. If it cannot be reliably valued, such relief is a factor in selecting the right percentage. *See, e.g.*, *Camden I*, 946 F.2d at 774-775. Accordingly, in this case, even if the non-monetary benefits to the class could not be valued with precision, those benefits—which are undeniably substantial—would certainly justify awarding class counsel 20.36% of the cash fund.

wrongly claimed were illusory).

Even if calculated only as a percentage of the $380.5 million fund, the requested fee of 20.36% is justified notwithstanding the size of the settlement. Likewise, even if the Court considered only the $310 million fund created under the parties' term sheet, a 25% fee would be justified. The Court is unaware of any *per se* rule that a reduced percentage must be used in a "megafund" case and declines to create one now. Additionally, other courts have criticized the use of a reduced percentage in such a case because, among other things, the practice undercuts a major purpose of the percentage approach in aligning the interests of the class and its lawyers in maximizing the recovery. Such a rule might also discourage early settlements, and it fails to appreciate the immense risk presented by large, complex cases. *See, e.g.*, *In re Cendant Corp. Litig.*, 264 F.3d 201, 284 n.55 (3d Cir. 2001); *Allapattah*, 454 F. Supp. 2d at 1213; *In re Checking*, 830 F. Supp. 2d at 1367; *Syngenta*, 357 F. Supp. 3d at 1114.

Regardless, the objectors overemphasize the importance of the settlement's size. Under *Camden I*, this Court must base its award on an evaluation of all of the *Johnson* factors, not just the factor involving awards in other cases. The Court's evaluation of those factors in light of the particular facts and circumstances of this case, as discussed above, would support using a percentage higher than the 25% benchmark and certainly higher than the 20.36% requested here. Indeed, the lowest

fee awarded in the other data breach cases cited above was 27%. That class counsel are not requesting a much higher fee here akin to that awarded in other cases suggests that they have already accounted for the settlement's size by agreeing to accept a reduced percentage.

The objectors, furthermore, are simply wrong in asserting that no more than 10% is typically awarded in megafund cases.[52] In *Anthem*, which involved a $115 million settlement fund, the court surveyed awards in other large settlements and concluded: "a percentage of 27% appears to be in line with the vast majority of megafund settlements." *Anthem*, 2018 WL 3960068, at *15. Further, none of the three authorities relied upon by the objectors justify the conclusion that no more than a 10% fee is appropriate here. The empirical study the objectors cite does not support that conclusion, according to Professor Geoffrey Miller, one of its co-authors.[53] To the contrary, the study's data set shows that, in cases with settlements between $325 million and $425 million (the range in which the cash portion of this case falls), the mean percentage was 19.7%—remarkably close to the percentage requested here.

---

[52] Class counsel have cited at least 40 cases involving settlements in excess of $100 million in which a fee of more than 25% has been awarded, including several such cases in this Circuit. *See, e.g.*, *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) (31.33% of a $1.06 billion fund); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330 (S.D. Fla. 2011) (30% of a $410 million fund); *In re Sunbeam*, 176 F. Supp. 2d 1323 (25% of a $110 million fund).

[53] Theodore Eisenberg and Geoffrey Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 Journal of Empirical Legal Studies 248 (2010).

(Doc. 900-3, ¶¶ 16-17). In *Carpenters Health & Welfare Fund v. The Coca-Cola Co.*, 587 F. Supp. 2d. 1266 (N.D. Ga. 2008), the court awarded a 21% fee. And, in *In re Domestic Air*, 148 F.R.D. at 350-51, the court relied upon pre-1991 research, which conflicts with the findings of more recent studies.

*Fifth,* objectors West, Frank and Watkins argue that the $70.5 million added to the settlement fund at the request of federal and state regulators did not result from class counsel's efforts and thus class counsel are not entitled to receive a percentage of the additional amount. This argument fails as a factual matter because it assigns no credit to class counsel's efforts and their agreement to integrate the additional money into the settlement they negotiated. While regulators may have been the initial catalyst for the extra funds, the money would not have been added to the settlement fund but for class counsel's efforts. Class counsel spent months negotiating with Equifax on the proposed changes so that the additional funds could be incorporated without having any potential adverse impact to the class.

Thus, without minimizing the role played by the regulators, class counsel were ultimately responsible for integrating the increased funds into the settlement they negotiated and are entitled to compensation for their efforts. The Court also notes that class counsel have not sought any increased fees relative to what they agreed to request in the term sheet, so they are not attempting to use the extra money as a basis for an additional fee request. Basing the percentage off the $380.5 million rather

than $310 million simply recognizes the reality of the size of the non-reversionary fund to which the parties ultimately agreed. Treating the calculation differently would penalize class counsel after they spent thousands of hours in the negotiations with Equifax and regulators to integrate the $70.5 million into the settlement without adverse consequences for the class.

*Sixth,* objectors Frank and Watkins argue that the notice and administration costs to be paid out of the settlement fund should be excluded from the class benefit for fee purposes. The Court disagrees. It has long been the practice in this Court to use the gross amount of a common fund in calculating a percentage-based fee award without deducting the costs of notice or administration. *See, e.g.*, *George*, 369 F. Supp. 3d at 1375; *Champs Sports*, 275 F. Supp. 3d at 1356; *In re Domestic Air*, 148 F.R.D. at 354; *see also Arby's*, 2019 WL 2720818, at *2 (including notice and administration claims in the class benefit even though paid separately by the defendant). That is because notice and administration costs inure to the benefit of the class. *Id*. Similar arguments have been rejected before. *See, e.g.*, *In re Domestic Air*, 148 F.R.D. at 354; *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 953 (9th Cir. 2015); *Caliguiri v. Symantec Corp.*, 855 F.3d 860, 865 (8th Cir. 2017); *Anthem*, 2018 WL 3960068, at *8-9.[54] And, there is a particularly good reason for

---

[54] The main case on which Frank and Watkins rely, *Redman v. RadioShack Corp.*, 768 F.3d 622, 630 (7th Cir. 2014), is readily distinguishable. *Redman* involved a

rejecting the argument here. Because an additional $125 million is available to pay out-of-pocket claims, notice and administration costs will not diminish the fund except in the unlikely event that both the fund and the extra $125 million are exhausted.

*Seventh,* objectors West, Frank and Watkins improperly discount the value of the credit monitoring offered under the settlement for purposes of calculating a fee. West does not recognize it has any value beyond the cost to be paid from the fund for the first seven million claims. Frank and Watkins argue it is not even worth that, asserting its true value is only $15 million ($5 per class member multiplied by the roughly three million claims they assert have been made to date) because free credit monitoring is widely available and class members allegedly prefer alternative compensation. The objectors also discount the value of the injunctive relief class counsel obtained. The Court disagrees.

---

coupon settlement, the proposed fee could be justified only by including notice and administration in the class benefit, and the court was concerned that class counsel thus would have a "perverse" incentive to increase those costs to justify a larger fee. This settlement does not include coupons, costs will be paid from a non-reversionary fund, there is an additional $125 million to pay out-of-pocket claims if the fund is exhausted, and class counsel selected the providers after a competitive bidding process. Moreover, adopting the *Redman* approach on these facts would incentivize counsel to cut corners on notice and administration, hurting the class by lowering its awareness and participation and hindering the claims process. Unsurprisingly, other courts have declined to follow *Redman. See, e.g., Keil v. Lopez*, 862 F.3d 685, 704 (8th Cir. 2017); *McDonough v. ToysRUs, Inc.*, 80 F. Supp. 3d 626, 654 n.27 (E.D Pa. 2015).

As discussed earlier, the record shows that the high-quality credit monitoring offered here is more valuable than the free or low-cost services typically available. Moreover, courts have often recognized the benefit of credit monitoring, use its retail cost as evidence of value, and consider that value in awarding fees. *See, e.g.*, *Chakejian v. Equifax Info. Servs., LLC*, 275 F.R.D. 201, 218 (E.D. Pa. 2011) (overruling an objection that the settlement offered "worthless credit monitoring services that no one wants" and valuing the services at their retail price in awarding a fee); *In re TJX Companies Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395, 409 (D. Mass. 2008) (the class-wide, $177 million retail value of the credit monitoring was "a benchmark against which to measure the award of attorneys' fees"); *Home Depot*, 2016 WL 6902351, at *4; *Hutton v. Nat'l. Bd. of Exam'rs in Optometry, Inc.*, 2019 WL 3183651, at *7 (D. Md. Jul. 15, 2019); *Hillis v. Equifax Consumer Servs., Inc.*, 2007 WL 1953464, at *4 (N.D. Ga. June 12, 2007); *Anthem*, 2018 WL 3960068, at *11.[55]

The Court also disagrees with the objectors' contention that there is no value

---

[55] Even assuming that the credit monitoring offered is worth less to class members than its retail price, the credit monitoring is certainly worth more than its discounted, wholesale cost to Equifax. *See Anthem*, 2018 WL 3960068, at *7. And even valued at that cost, the credit monitoring available to the entire class under the settlement would far exceed what the objectors claim it is worth. Indeed, that cost alone (several billion dollars at a minimum) would more than justify the requested fee. *See generally Waters*, 190 F.3d at 1297 (class counsel are entitled to a reasonable fee based on the funds potentially available to be claimed, regardless of the amount actually claimed); *see also Poertner*, 618 F. App'x at 629-30, n.2.

for fee purposes in the comprehensive injunctive relief provided under the settlement, including the requirement that Equifax spend a minimum of $1 billion on data security and related technology. Courts routinely consider the presence of similar business practice changes to be a factor in the fee analysis. *See, e.g.*, *Anthem*, 2018 WL 3960068, at *28 (mandatory minimum expenditure for cybersecurity was "properly considered in determining an appropriate attorneys' fees award"); *Ingram*, 200 F.R.D. at 689-90 (programmatic changes to reduce racial discrimination supported an upward adjustment from the benchmark); *see generally Home Depot*, 2016 WL 6902351, at *4 (two years of enhanced cybersecurity measures was a valuable class benefit).

The Court specifically finds that the injunctive relief class counsel obtained here is a valuable benefit to the class because it reduces the risk that their personal data will be compromised in a future breach. That Equifax may also benefit makes no difference. Similarly, that Equifax agreed to the injunctive relief to avoid litigation risk does not mean class counsel have no entitlement to a fee; rather, Equifax's motivation is what triggers class counsel's entitlement. *See Poertner*, 618 F. App'x at 629 (rejecting a similar objection by Frank and holding that the defendant's business practice changes were a settlement benefit because the changes were "motivated by the present litigation").

In short, the requested fee is well-justified under the percentage method, and

the objections to the fee are overruled.

**B.   A Lodestar Cross-Check, If Done, Supports The Requested Fee.**

The Eleventh Circuit has authorized courts to use the lodestar method as a cross-check on the reasonableness of a percentage-based fee, but such a cross-check is not required. *See, e.g.*, *Waters*, 190 F. 3d at 1298. In fact, a cross-check can re-introduce the same undesirable incentives the percentage method is meant to avoid and for that reason courts regularly award fees without discussing lodestar at all. *In re Checking*, 830 F. Supp. 2d at 1362; *Champs Sports*, 275 F. Supp. 3d at 1350.

In this case, the Court does not believe that a lodestar cross-check is necessary or even beneficial. Nonetheless, the requested fee easily passes muster if a cross-check is done.

As of December 17, 2019, plaintiffs' counsel spent 33,590.7 hours on this litigation. Class counsel documented the time expended in detailed records filed *in camera* with the Court, and they personally reviewed more than 21,000 time entries and excluded 3,272.9 hours as duplicative, unauthorized, of insufficient benefit, or inconsistent with the billing protocol that they established at the outset of the litigation. Plaintiffs' counsel's lodestar up to the final approval hearing, including the reviewed time, amounts to $22,816,935. In addition to time spent through final approval, class counsel estimate they will spend 10,000 hours over the next seven years to implement and administer the settlement. This time has an expected value

of $6,767,200. The Court finds that this estimate is reasonable. Class counsel's current and future lodestar thus totals $29,584,135.

When the lodestar approach is used in common fund cases, courts typically apply a multiplier to reward counsel for their risk, the contingent nature of the fee, and the result obtained. Here, the requested fee represents class counsel's lodestar (including future time) plus a multiplier of roughly 2.62, which is consistent with multipliers approved in other cases. *See, e.g.*, *Columbus Drywall*, *2*012 WL 12540344, at *5 & n.4 (noting a multiplier of 4 times the lodestar is "well within" the accepted range and citing examples); *Ingram*, 200 F.R.D. at 696 (noting courts apply multipliers ranging from less than two to more than five); *Pinto v. Princess Cruise Lines Ltd.*, 513 F. Supp. 2d 1334, 1344 (S.D. Fla. 2007) (multipliers "'in large and complicated class actions' range from 2.26 to 4.5, while three appears to be the average") (internal quotations omitted).

No objector argues that a lodestar cross-check is mandated, or even explains why this case warrants a cross-check given the reasonableness of the percentage fee being sought. Several objectors, however, dispute various aspects of the cross-check analysis. None of these objections have any merit.

One objector contends hourly rates should be capped at $500 because most ordinary people earn minimum wage or less than $20 an hour. The proper comparison, though, is to the prevailing rates in the legal community. By that

standard, class counsel's rates are reasonable. Class counsel supplied substantial evidence that the prevailing rates for complex litigation in Atlanta and around the country are commensurate with or even in excess of the rates applied here and none of the objectors have presented any evidence to the contrary. The Court therefore finds class counsel's rates are reasonable and well supported, including specifically the hourly rates charged by Mr. Barnes ($1050); Mr. Canfield ($1000); Ms. Keller ($750), and Mr. Siegel ($935).

Several objectors challenge class counsel's time, claiming it is inflated and duplicative, and demand that the Court closely examine the time records and order them to be produced for review by the class. A lodestar cross-check, however, does not require that time records be scrutinized or even reviewed. *See, e.g.*, *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000) ("[U]sed as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court. Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case.") (internal citations omitted); *In re Checking*, 2013 WL 11319244, at *14 (declining to review billing records). Nevertheless, based on its *in camera* review of a sampling of class counsel's records, its familiarity with the litigation, class counsel's declarations regarding their line-by-line review of all entries to remove duplicative and unnecessary time, and other factors, the Court finds that class counsel's time was reasonable and appropriately spent. The Court

also finds that ordering the records be made public would needlessly require the voluminous records to be reviewed and redacted for privileged and confidential material and serve no useful purpose, particularly given the fact that a lodestar cross-check is not required and litigation over specific time entries would be a waste of resources for both the Court and the parties.

One objector claims that estimated future time cannot be considered. Yet, other courts have included future time in lodestar calculations, including this Court in the financial institutions track of the *Home Depot* data breach case. *See Home Depot*, 2017 WL 9605207, *1 (N.D. Ga. Oct. 11, 2017), *aff'd in part and rev'd in part on other grounds*, 931 F.3d 1065, 1082 (11th Cir. 2019). Using a reasonable estimate also is appropriate. A cross-check is not intended to involve "mathematical precision." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306 (3d Cir. 2005). And, if the fee was lodestar-based, class counsel would be entitled to file supplemental applications for future time. *See Cassese v. Washington Mut., Inc.*, 27 F. Supp. 3d 335, 339 (E.D.N.Y. 2014). Excluding such time thus would misapply the lodestar methodology and needlessly penalize class counsel.

Finally, several objectors argue the proposed multiplier is too high and one claims *Perdue* bars the use of any multiplier. But class counsel have demonstrated that the multiplier is reasonable and within the typical range, and *Perdue* is irrelevant in a common fund fee analysis. *See Home Depot*, 931 F.3d at 1084-85.

106

In sum, a lodestar analysis is not required, but a consideration of the lodestar here only confirms that the requested fee is reasonable.

### C.   Reimbursement Of Class Counsel's Expenses.

The settlement agreement authorizes reimbursement of up to $3 million in expenses that class counsel reasonably incurred on behalf of the class. Class counsel have incurred $1,404,855.35 in expenses through December 17, 2019, for such items as court reporter fees; document and database reproduction and analysis; e-discovery costs; expert witness fees; travel for meetings and hearings; paying the mediator; and other customary expenditures. The Court finds that these expenses are reasonable and were necessarily incurred on behalf of the class. Class counsel are thus entitled to be reimbursed for these expenses. *See, e.g.*, *Columbus Drywall*, 2012 WL 12540344, at *7-8.

Two objectors challenge class counsel's expenses. One says the total is simply "too much." The other speculates that some computerized research charges might be overbilled and complains that the "miscellaneous" expense category is not further itemized. Such vague assertions and speculation do not overcome the substantial evidence in the record that all of the expenses were reasonable. Moreover, the expenses are detailed in class counsel's *in camera* submissions to the Court.

### D.   The Service Awards Are Appropriate.

Courts routinely approve service awards to compensate class representatives

for the services they provide and the risks they incur on behalf of the class. *See, e.g.*, *Ingram*, 200 F.R.D. at 695-96; *Allapattah Servs.*, 454 F. Supp. 2d at 1218; *In re Checking*, 2014 WL 11370115, at *12-13. The settlement agreement provides for a modest service award of $2,500 to each class representative, who devoted substantial time and effort to this litigation working with their lawyers to prosecute the claims, assembling the evidence supporting their claims, and responding to discovery requests. Simply put, the class representatives were instrumental in achieving a settlement benefitting the entire class. But for their efforts, other class members would be receiving nothing. The Court therefore finds that the service awards are deserved and approves them for payment.

Objector Davis contends the longstanding practice of compensating class representatives for their service is prohibited by two Supreme Court cases from the 1800s. The argument previously has been rejected out of hand because the cases were decided before Rule 23 and involve different facts and circumstances. *See, e.g.*, *Merlito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 96 (2d Cir. 2019). Davis also suggests that each class member be required to document the specific amount of time spent on the litigation, but he provides no basis to believe the class representatives did not perform the services described and the amount of time needed for such tasks is necessarily substantial. Further evidence of the class representatives' service thus is unnecessary, particularly given the modest sums involved. *See, e.g.*, *Home Depot*,

2016 WL 11299474, at *1 (N.D. Ga. Aug. 23, 2016) (awarding modest service awards to 88 class representatives based on a similar description of their service by their counsel).

## V.   FINDINGS REGARDING SERIAL OBJECTORS.

"Objectors can play a useful role in the court's evaluation of the proposed settlement terms. They might, however, have interests and motivations vastly different from other attorneys and parties." *Manual* § 21.643. The *Manual* goes on to explain:

> Some objections, however, are made for improper purposes, and benefit only the objectors and their attorneys (*e.g.*, by seeking additional compensation to withdraw even ill-founded objections). An objection, even of little merit, can be costly and significantly delay implementation of a class settlement. Even a weak objection may have more influence than its merits justify in light of the inherent difficulties that surround review and approval of a class settlement. Objections may be motivated by self-interest rather than a desire to win significant improvements in the class settlement. A challenge for the judge is to distinguish between meritorious objections and those advanced for improper purposes.

*Manual* § 21.643.

The *Manual*'s guidance has been instructive in evaluating the objections received in this case. To be clear, the Court has considered in full the merits of all objections, regardless of whether the objector is a repeat player, and found them to be without merit. "The fact that the objections are asserted by a serial or 'professional' objector, however, may be relevant in determining the weight to

accord the objection, as an objection carries more credibility if asserted to benefit the class and not merely to enrich the objector or her attorney." *In re Syngenta AG MIR 162 Corn Litig.*, 357 F. Supp. 3d 1094, 1104 (D. Kan. 2018) (referring, in part, to objectors and objectors' counsel here George Cochran and Christopher Bandas). There is sufficient evidence to conclude that certain objectors here are of the "serial" variety.

This Court therefore finds, based on information in the record and otherwise publicly available, that the individuals identified below are serial objectors, that they have unsuccessfully asserted many of the same or similar objections in other class action settlements, that their objections are not in the best interests of the class, that there is no substantial likelihood their objections will be successful on appeal, and that the class would be best served by final resolution of their objections as soon as practicable so that class members can begin to benefit from the settlement:

- Objector George Cochran, an attorney who objects on his own behalf, "is a serial objector to class action settlements, with a history of attempting to extract payment for the withdrawal of objections." *Syngenta*, 357 F. Supp. 3d at 1104.

- Christopher Bandas, an attorney who represents objector Mikell West, is recognized by federal courts across the country as a "serial objector" who "routinely represents objectors purporting to challenge class action

settlements, and does not do so to effectuate changes to settlements, but does so for his own personal financial gain; he has been excoriated by Courts for this conduct." *CRT*, 281 F.R.D. at 533; *see also, e.g.*, *Clark v. Gannett Co.*, 122 N.E. 3d 376, 380 (Ill. Ct. App. 2018) (Bandas has "earn[ed] condemnation for [his] antics from courts around the country. Yet, [his] obstructionism continues."). Moreover, Bandas and his law firm are subject to a permanent injunction issued by a federal judge governing their ability to object in class actions. *Edelson P.C. v. The Bandas Law Firm*, 2019 WL 272812 (N.D. Ill. Jan. 17, 2019).

- Objector Christopher Andrews, although not an attorney, by his own admission at the final approval hearing has filed objections in about ten class actions. In *Shane v. Blue Cross*, No. 10-cv-14360 (E.D. Mich.), the court found that "many of [Mr. Andrews'] submissions are not warranted by the law and facts of the case, were not filed in good faith and were filed to harass Class Counsel." App. 1, ¶ 65 & Ex. 7. That court also noted that Mr. Andrews "is known to be a 'professional objector who has extorted additional fees from counsel in other cases[.]'" *Id.* Additionally, class counsel have submitted an email from Mr. Andrews that calls into question his motivation for objecting in this case. [Doc. 900-1, Ex. 8].

- Objector Troy Scheffler has previously objected to a number of class actions and at least one court has previously found that similar objections to the ones he makes here "have no factual or legal merit." *Carter*, 2016 WL 3982489, at \*13. He also has been paid to withdraw an objection in a similar case. *In re Experian Data Breach Litig.*, No. 15-cv-01592, Doc. 335 (C.D. Cal. July 3, 2019) (approving payment of $10,000 to Mr. Scheffler and his counsel to drop objection).

- John Davis has a history of objecting in class actions and his involvement as an objector and class representative has been criticized by other courts. In *Muransky v. Godiva Chocalatier*, 2016 WL 11601079, at \*3 (S.D. Fla. Sept. 16, 2016), a federal magistrate judge denied an objection similar to the one filed here by Mr. Davis and, in so doing, labeled Davis and others as "professional objectors who threaten to delay resolution of class action cases unless they receive extra compensation." *See also Davis v. Apple Computer, Inc.*, 2005 WL 1926621, at \*2 (Cal. Ct. App. Aug. 12, 2005) (noting that Davis and Steven Helfand, another serial objector who objected here, previously had "confidentially settled or attempted to confidentially settle putative class actions in return for payment of fees and other consideration directly to them" in apparent violation of court rules.)

- Steven Helfand has a history of improper conduct in class action litigation. *Id.* In 2018, he was accused by the State Bar of California of, among other things, filing an objection in the name of a class member without being authorized by the class member to do so, misleading a court and opposing counsel, settling an objection on appeal without the client's authorization, misappropriating the settlement proceeds, and other acts of moral turpitude. Notice of Disciplinary Charges, *In the Matter of Steven Franklyn Helfand*, Case No. 17-O-00411 and 17-O-00412 (State Bar Court of California; filed Sept. 24, 2018). Helfand did not contest the charges and a default was entered against him. *Id.*, Order Entering Default (Jan. 15, 2019).

- Theodore Frank, a lawyer and director of the Hamilton Lincoln Law Institute, is in the business of objecting to class action settlements and has previously and unsuccessfully made some of the same or similar objections that he has made here. *See Target*, 2017 WL 2178306, at *6 (rejecting objection that an allegedly fundamental intra-class conflict existed in a data breach case because class members could assert claims under various state statutes); *Poertner*, 618 F. Appx at 628-29 (rejecting objection that the proposed fee was unfair, finding Frank had improperly limited the monetary benefits to the class and excluded the substantial non-monetary benefits of the settlement). The Court also finds that Frank disseminated false and misleading information

about this settlement in an effort to encourage others to object in this case and directed class members to object using the "chat-bot" created by Class Action Inc., notwithstanding that it contained false and misleading information about the settlement. These actions are improper and further support a finding that Frank's objection is not motivated to serve the interests of the class. *See Manual* § 21.33 ("Objectors to a class settlement or their attorneys may not communicate misleading or inaccurate statements to class members about the terms of a settlement to induce them to file objections or to opt out.").

Finally, the Court addresses the 718 "chat-bot" generated forms submitted by Class Action Inc. on which class members simply checked one or more of several boxes indicating that the settlement was "unfair," "inadequate," "unreasonable," or "unduly burdensome" and had the opportunity to add a "personal note" to the Court. The Court has considered the substance of these objections (which are repeats of objections addressed above) and rejects them in their entirety. Separately, the Court rejects these objections as procedurally defective. The objections were not submitted through the process ordered by the Court and do not comply with the requirement under Rule 23 that an objection "state whether it applies only to the objector, to a specific subset of the class, or to the entire class and also state with specificity the grounds for the objection." *See* Fed. R. Civ. P. 23(e)(5)(A).

Moreover, class counsel submitted information that Class Action Inc. failed to accurately describe the settlement both on its website and in promotions of the chat-bot elsewhere, which may have prompted users of the site to object based on inaccurate and incomplete information about the benefits available under the settlement. The Court notes that class counsel subpoenaed Reuben Metcalfe, the CEO of Class Action Inc., for a deposition, but Mr. Metcalfe failed to appear. The Court also notes that Mr. Metcalfe represented to class counsel that he had not even read the settlement agreement or notice materials before falsely telling class members that the settlement provided only $31 million to pay claims. [Doc. 939-1, ¶ 36]. Therefore, based on the uncontested record, the Court accepts the facts as presented by class counsel on this point, and finds that Class Action Inc. and Mr. Metcalfe promoted false and misleading information regarding the terms of the settlement in an effort to deceptively generate objections to the settlement.

## VI.   THE COURT'S TREATMENT OF OTHER PENDING MATTERS.

### A.   <u>Motions To Strike Declarations Of Robert Klonoff, Geoffrey Miller And Harold Daniel.</u>

Several objectors moved to "strike" [Docs. 872, 890, 909, 918] the Declarations of Robert Klonoff [Docs. 858-2, 900-2], Geoffrey Miller [Doc. 900-3], and Harold Daniel [858-3] submitted by class counsel. Plaintiffs oppose these motions [Docs. 887, 932, 946]. While the Court has found the declarations helpful, as noted above, the Court has exercised its own independent judgment in resolving

the matters addressed in the declarations, rendering the challenges to the declarations moot. Regardless, the motions lack merit. All three of the proposed experts are well-qualified, *Daubert* does not govern at the final approval stage, and, even if it did, each of the declarations passes muster under *Daubert*.[56]

Professor Klonoff is a prominent law professor and teacher of civil procedure; former Assistant to the U.S. Solicitor General; the author of relevant academic publications and the leading casebooks on class actions and multi-district litigation; was the Associate Reporter for the American Law Institute's class action project; and was appointed by Chief Justice Roberts for two three-year terms as the sole academic member to the Advisory Committee on the Rules of Civil Procedure, a position in which he took the lead on the proposed amendments to Rule 23 that became effective on December 1, 2018. [Doc. 858-2, ¶¶ 4-12]. Because of his expertise, other courts have specifically accepted and relied extensively upon Professor Klonoff's opinions regarding proposed attorneys' fee awards and other class action issues. *See, e.g.*, *Syngenta*, 357 F. Supp. 3d at 1115; *In re AT&T Mobility*

---

[56] Similar motions to strike at the final approval stage filed by Frank's organization have also been rejected in other pending class actions. *See Briseño v. Conagra Foods, Inc.*, No. 11-cv-05379-CJC-AGR, Doc. 695 (C.D. Cal. Oct. 8, 2019); *In re Samsung Top-Load Washing Machine Marketing, Sales Practices and Prods. Liab. Litig.*, No. 17-ml-2792-D, Doc. 208 (W.D. Okla. Nov. 18, 2019). *See also Target*, 2015 WL 7253765, at *4 ("even if the affidavit contained impermissible legal conclusions, the Court is capable of separating those conclusions from Magistrate Judge Boylan's helpful and insightful factual descriptions of the settlement process in this case.").

*Wireless Data Services Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1032 n.3, 1034-35, 1037-38, 1040, 1042 (N.D. Ill. 2011); the *National Football League Players Concussion Injury* MDL; the *Chinese-Manufactured Drywall* MDL; and the *Deepwater Horizon* MDL. (*See* Doc. 858-2, ¶ 10) (listing cases).

Professor Miller is the co-author of several leading empirical studies of attorneys' fees in class action litigation and a frequent expert witness on issues relating to class actions and attorneys' fees. [Doc. 900-3, ¶ 1]. One objector cites to a study that he authored. [Doc. 880 at 12-15, Doc. 876 at 18-19]. Professor Miller is the Stuyvesant Comfort Professor of Law at NYU Law School, and a member of the advisory committee for the American Law Institute's Principles of the Law project on Aggregate Litigation, which, among other topics, addressed questions of attorneys' fees in class actions and related types of cases. [Doc. 900-3 ¶¶ 2-3]. His research articles on class action cases, especially in the area of attorneys' fees, have been cited as authority by many state and federal courts. [Doc. 900-3 ¶¶ 4-6].

Harold Daniel served as the President of the State Bar of Georgia and the Lawyers Club of Atlanta. [Doc. 858-3, ¶ 2]. He was a member Standing Committee of the Federal Judiciary of the American Bar Association. [*Id.*]. He also has been qualified and has served as an expert witness on the issue of attorneys' fees in numerous courts, including this Court. [*Id.*, ¶ 10].

At the final approval stage, the weight of authority from the circuits makes clear that district courts have discretion to use "whatever is necessary . . . in reaching an informed, just and reasoned decision." *Mars Steel Corp. v. Cont'l Bank N.A.*, 880 F.2d 928, 938 (7th Cir. 1989). Final approval is not a trial on the merits, and the Court need not be a gatekeeper of evidence for itself. Further, the issues on which the experts opine are both relevant and inherently factual in nature, not disputed legal principles, and the declarations are helpful as to these matters. Moreover, the methodology the experts used—applying their expertise gained through years of experience to questions of fairness and reasonableness—is more than sufficient to satisfy Rule 702 and *Daubert. See, e.g.*, *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (recognizing that a district court has "broad latitude" to allow an expert whose testimony is based on "professional studies or personal experience"); *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 561-63 (5th Cir. 2004) (affirming admission of testimony from a fee expert, stating the "fair and reasonable compensation for the professional services of a lawyer can certainly be ascertained by the opinion of members of the bar who have become familiar through experience and practice with the character of such services"); *Freed by Freed v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 2005 WL 8156040, at *2-3 (S.D. Fla. Aug. 2, 2005) (rejecting *Daubert* challenge to an expert who testified as to the reasonableness of an attorneys' fee based on his experience as a litigator,

finding the methodology was reliable); *Yowell v. Seneca Specialty Ins. Co.*, 117 F. Supp. 3d 904, 910-11 (E.D. Tex. 2015) (declining to strike affidavit from fee expert because it satisfied *Daubert* requirements).

Finally, the Court again emphasizes that, with regard to all of the matters addressed in this Order it has performed its own independent legal research and analysis and made up its own mind. The pending motions to strike [Docs. 890, 909, 918] are therefore denied. The Court previously denied [Doc. 951] objector Shiyang Huang's motion to strike [Doc. 872].

**B.**   **Oppositions To The Scope Of The Release By Proposed *Amicus Curiae* The State Of Indiana And The Commonwealth Of Massachusetts.**

The State of Indiana, through the Indiana Attorney General, submitted a self-styled *amicus curiae* brief, requesting that the Court modify the release in the settlement in several respects, purportedly to "safeguard its sovereign and exclusive authorities to enforce Indiana law." [Doc. 898]. The Commonwealth of Massachusetts makes a similar request. [Doc. 923]. The gist of these requests is that the two states believe the release cannot be used as a bar to claims they are pursuing in separate enforcement actions against Equifax in Indiana and Massachusetts state courts. Indiana cites several cases in apparent support for its position that a class action "cannot impede a separate action by government actors acting in an enforcement capacity." [Doc. 898, at 5]. Massachusetts says its claims were not and

could not have been asserted by any class plaintiffs in this case. The states' requests are denied for the following reasons.

First, the Court concludes that Indiana and Massachusetts lack standing to object to the settlement because they are not members of the settlement class. Second, nothing in the settlement prevents Indiana or Massachusetts from pursuing enforcement actions in state court, which they both already are doing. Third, the Court does not have the power to grant the primary relief the states seek, which is a modification of the settlement, *see Cotton*, 559 F.2d at 1331, and any suggestion by Indiana or Massachusetts that the Court reject the settlement altogether is not in the best interests of the 147 million class members. It would make no sense for this Court to reject this historic settlement—one that provides substantial relief to a nationwide class and is supported by the Federal Trade Commission, Consumer Financial Protection Bureau, and 50 other Attorneys General—and subject all class members to the risks of further litigation simply because two states seek the opportunity to obtain additional relief for their own residents.

To the extent they move for specific relief from this Court, request that the Court issue an advisory opinion, or request that the Court refuse to approve the settlement, the requests by Indiana [Doc. 898] and Massachusetts [Doc. 923] are hereby denied.

120

C.    **Miscellaneous Pending Motions.**

The Court has carefully considered all timely filed objections. As a housekeeping matter, and for clarity of the record, the Court addresses several motions filed by objectors. The Court previously denied [Doc. 851] the Motion to Reject Settlement by Susan Judkins [Doc. 824], and the Motion to Reject Settlement by John Judkins [Doc. 825]. The Court also denied [Doc. 853] the Motion to Enforce Settlement by Lawrence Jacobson [Doc. 837], and Motion to Deny the Settlement by Beth Moscato [Doc. 841]. And the Court denied [Doc. 873] the Motion to Telephonically Appear at Fairness Hearing by Shiyang Huang [Doc. 852]. These motions were primarily further objections to the settlement couched as "motions" and, again, the Court has considered all timely filed objections. For similar reasons, the Court hereby denies the Motion for Court Order Setting Deadline to Pay Settlement Fee to Petitioning Parties by Peter J. LaBreck, Elizabeth M. Simons, Gregory A. Simons, Joshua D. Simons [Doc. 789]; the Motion to Remove Class Counsel, the Steering Committee, and Legal Administration, the Named Plaintiffs and Defense Counsel by Christopher Andrews [Doc. 916]; the Motion to Remove Class Counsel, the Steering Committee, and Legal Administration, the Named Plaintiffs and Defense Counsel for Misconduct by Christopher Andrews [Doc. 917]; the Motion to Strike Response to Doc. 903 [Doc. 935]; the Motion to Strike Equifax's Response to Doc. 903 [Doc. 936]; and the Motion to Strike Plaintiffs'

Untimely Filings [Doc. 949]. Any other motions and requests for specific relief asserted by objectors are also denied.

For the reasons set forth herein, the Court hereby (1) **GRANTS** final approval of the settlement; (2) **CERTIFIES** the settlement class pursuant to Federal Rules of Civil Procedure 23(a), (b)(3) and (e); (3) **GRANTS** in full Plaintiffs' request for attorneys' fees of $77.5 million, reimbursement of expenses of $1,404,855.35, and service awards of $2,500 each to the class representatives; and (4) otherwise rules as specified herein.

SO ORDERED, this 17 day of March, 2020.

/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge