# EXHIBIT 2

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| In re: Equifax Inc. Customer Data Security Breach Litigation | MDL No. 17-2800-TWT |
| THEODORE H. FRANK and DAVID R. WATKINS, | CONSUMER ACTIONS |
| Objectors. | Chief Judge Thomas W. Thrash, Jr. |

## DECLARATION OF THEODORE H. FRANK

I, Theodore H. Frank, declare as follows:

1.     I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

2.     I am a class member in this matter. I objected to the settlement and class counsel's fee request for the reasons stated in my objection. *See* Frank and Watkins' Objection to Settlement and to Motion for Attorneys' Fees, Dkt. 876 ("Objection").

## Appeal Bond Motion

3.     In seeking appeal bonds, plaintiffs argue that I disseminated false and misleading information. *See* Plaintiffs' Memorandum in Support of Motion for Appeal Bonds, Dkt. 1040-1 ("Mem.") at 10-14. Plaintiffs rely on the Court's findings in the Amended Final Approval Order ("Order"):

> The Court also finds that Frank **disseminated false and misleading information about this settlement** in an effort to encourage others to object in this case **and directed class members to object using the "chat-bot" created by Class Action Inc**., notwithstanding that it contained false and misleading information about the settlement. These actions are improper and further support a finding that Frank's objection is not motivated to serve the interests of the class. See Manual § 21.33 ("Objectors to a class settlement or their attorneys may not communicate misleading or inaccurate statements to class members about the terms of a settlement to induce them to file objections or to opt out.").

*See* Mem. at 11-12 (quoting Order, Dkt. 1029 at 113-114).

4.     The Order does not identify the "false and misleading information" that I purportedly disseminated. And I did not disseminate false or misleading information.

### My Objection of Settlement Administrator's Email to Class Members regarding $125 Payment

5.     In my Objection, I observed that the "email and long form notice attached to the Settlement told consumers: 'Free Credit Monitoring or $125 Cash Payment. You can get free credit monitoring services. Or, if you already have credit monitoring services, you can request a $125 cash payment.'" Objection at 16 (citing Settlement, Dkt. 739-2 at 142, 266).

6.     My Objection explained that "after the settlement website went live, millions of claims were filed for cash compensation and it became clear that claimants could receive nowhere near $125." *Id.* (citing  Dkt. 858-1 at 16). I argued that because class members would not get $125 as the notice had stated, class counsel took "corrective action [that] included attempts to throttle the number of cash claims." Objection, Dkt. 876 at 16.

7.     My Objection cited to the *New York Times* article: Charlie Warzel, *Equifax Doesn't Want You to Get Your $125. Here's What You Can Do*, N.Y. TIMES (Sept. 16, 2019) ("Warzel") (attached hereto at Exh. A). *See* Objection at 16-17 (citing Warzel). Warzel reported that the settling parties sent a follow-up email to class members regarding the $125 payment requiring class members to "verify they had credit monitoring in place by Oct. 15, 2019, or their claims would be denied." *See* Warzel.

8.     My critiques of the settlement mirrored those of prominent politicians. *See* Exh. B (Senator Elizabeth Warren, Letter to FTC Chairman Joseph J. Simons (Sep. 18, 2019)). Senator Warren complained to the FTC that "consumers who requested the $125 payment before August 2, 2019, received an email from the Settlement Administrator informing them of additional steps they would need to complete before they could receive any cash payments." *Id.* at 2. Warren complained that the settlement added "complicated new steps that appear to be clearly designed to weed out deserving claimants." *Id.*

## Class Counsel's Declaration

9.     Plaintiffs' counsel submitted a declaration in support of their response to my Objection. *See* Class Counsel's Omnibus Declaration in Support of Plaintiffs' Motion for Final Approval of Settlement and Response to Various Objections, Dkt. 900-1 ("Counsel Decl.").

10.     In class counsel's declaration, they stated that "Warzel inaccurately reported that 'Equifax earmarked only $31 million for claims, meaning that if all 147 million people affected by the breach filed a claim, everyone would get just 21 cents.'" Counsel Decl. ¶ 45. But Mr. Warzel's article was specifically about the $125 payment promised on the settlement website and class notice that came from the $31 million alternative reimbursement compensation fund—the title of his article "Equifax Doesn't Want You to Get Your **$125**. Here's What You Can Do." *See* Warzel (emphasis added).

11.     Mr. Warzel correctly recognized that millions of people were unhappy with the settlement structure, and interviewed me about the objection process. I explained to him what the legal options were for people who were upset about the settlement, stated that class members should file claims regardless of whether they thought the claims process or the settlement unfair. I went on to note that the objection process was very burdensome, had serious downsides, and could result in intrusive discovery and violations of privacy for people who dared to come forward to object. As Class counsel stated, Warzel quoted me:

> Mr. Frank argues, if people come out in droves with formal objections, it may lessen the burden for all victims. "It's like that meme where if 10,000 people storm Area 51, the government won't shoot them all. If enough people object, they probably won't get deposed. And if they do, well, you can look at it as a once-in-a-lifetime experience."

Counsel Decl., Dkt. 900-1 ¶ 45.

12.     My statement says nothing about the settlement and nothing I say is either false or misleading. If anything, it discourages people from objecting by emphasizing the risk of discovery.  We already had many more class members contacting us seeking our help in objecting than we could represent, and I was not searching for clients.

13.     Moreover, I did not "disseminate" any information about the settlement in the story. Even if class counsel disagree with Warzel's description of the settlement, it was the *New York Times* that "disseminated"

Warzel's article, not me. I have no control over what Mr. Warzel writes or what the *New York Times* prints, and did not see the article before it was published.

14.     The only information that I could have "disseminated" were my tweets. Class counsel notes that my tweet on July 27, 2019 discusses that the settlement included funds other than the $31 million alternative compensation fund, but that I "stirred discontent" by focusing on alternative reimbursement compensation with the following tweet:



Counsel Decl., Dkt. 900-1 ¶ 48. Of course, in the above tweet, I was responding to another person's discussion of the $125 payment and was not "focusing" on any particular part of the settlement. But again, nothing I said in the above tweet was false or misleading; it is simply my opinion.

15.     The only other allegation class counsel makes is that I directed consumers to the misleading Class Action Inc.'s chatbot to encourage more objections by tweeting about the chatbot:



Counsel Decl., Dkt. 900-1 ¶ 53.

16.    On November 8, 2019, the website *The Red Tape Chronicles* printed a story by Bob Sullivan about Ruben Metcalfe's chatbot titled "Equifax hack settlement objection deadline looms November 19, but this bot will help you file." A true and correct copy of the article is attached as Exhibit C. On November 11, 2019, I learned of the article and tweeted a link to the article along with the title of the article. My tweet is not vouching for any of the information included on the chatbot; as I noted, "Not Legal Advice." I did not think people should use the chatbot; I just thought it was

an interesting article relating to a case. According to Twitter analytics, only 26 people (including me) clicked the link to the news story from my tweet as of today, April 13, 2020.

17.     On November 11, 2019, Alison Frankel emailed me about a story she was writing about the chatbot. I emailed her back the same day and told her I had not seen what sort of objections the chatbot generated, but that while the chatbot was well-intentioned, I did not think it was legally relevant or useful to the process. I concluded "a single good well-crafted objection will do more than a million people saying 'this is unfair' without giving legal reasons." A true and correct copy of this e-mail is attached as Exhibit D. Ms. Frankel did not use the quote in the story; once again, I have no control what journalists or news organizations choose to publish.

18.     Before this, Ruben Metcalfe of Class Action Inc., contacted me, seeking representation and legal advice regarding the chatbot. I informed him that neither I nor Hamilton Lincoln Law Institute could represent him. I suggested that he should not proceed on the project before retaining counsel and obtaining a legal opinion. I had no role in the design of the chatbot. I did not recommend to any individual that they use the chatbot to object.

## I Bring the Appeal in Good Faith

18.     The appeal will focus on the single legal issue of the appropriateness of national class certification and uniform recovery despite material differences in state law under Rules 23(a)(4) and 23(e)(2).

19.     Plaintiffs argue that we lost on this issue in *Target*. Dkt. 1040-1 at 4 n.2. Yes, the *Target* district court ultimately ruled against us on remand after our successful Eighth Circuit appeal in that case. But I believe in good faith that that district court ruling was legally erroneous. On appeal, the Eighth Circuit did not reach the merits of our argument, holding that because our client, Leif Olson, was from Texas, a state without statutory damages claims, he did not have standing on appeal to raise the issue. 2017 WL 2178306 (D. Minn.), *aff'd*, 892 F.3d 968 (8th Cir. 2018). But there is no standing issue in this case; both appellants were, at the time of the injury, from states with causes of action for substantial statutory damages claims that survived a motion to dismiss.

20.     My non-profit has had success arguing this exact issue in other cases. In 2019, I argued in the Ninth Circuit in *In re Lithium Ion Batteries Antitrust Litigation*. We argued that the settlement and nationwide class certification in that case inappropriately treated class members from "repealer states" the same as class members from "non-repealer states" who faced an affirmative defense of federal Supreme Court precedent regarding indirect purchasers. Class counsel in that case thought the appeal meritorious enough that a name partner, Elizabeth Cabraser, one of the leading class-action attorneys in the nation, argued for appellees. Nevertheless, we prevailed. 777 Fed. Appx. 221 (9th Cir. 2019). On remand, the settlement allocation improved for repealer-state class members by over $10 million.

21.     I also won a Rule 23(a)(4) appeal that I argued in the Third Circuit. *Dewey v. Volkswagen AG*, 681 F.3d 170 (3d Cir. 2012). I have never lost an appeal on Rule 23(a)(4) issues that I have argued.

22.     The Court cited *Poertner v Gillette* as an example of a case I lost. The Court described it as a case where the Eleventh Circuit found my objection "improper." This is a mischaracterization of the case, which simply found that the district court did not abuse its discretion, and never asserted that my objection was wrongful. In the course of so doing, the Eleventh Circuit created a circuit split with the Third, Seventh, and Eighth Circuits, where I had won multiple appeals on similar issues. *E.g.*, *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014). The prominent Supreme Court practitioner Thomas Goldstein represented me *pro bono* in a petition for *certiorari* to the Supreme Court; we believe *certiorari* would have been granted had Justice Alito not recused from the case because of his stock ownership. Moreover, in 2018, the Supreme Court granted certiorari on one of the issues that I lost on in *Poertner* in *Frank v. Gaos*, which I went on to argue later that year. That I lost in *Poertner* is not evidence that my objection or this appeal is in bad faith.

23.     Plaintiffs' brief refers to the Federal Judicial Center's warning against "canned objections from professional objectors who seek out class actions to extract a fee by lodging generic, unhelpful protests." But we do not seek to "extract a fee by lodging generic, unhelpful protests" and our objection was not "canned." The Federal Judicial Center was not referring to me, and I

know this, because I've repeatedly engaged in discussions with them, and been invited to roundtables with Federal Judicial Center attorneys, over the years about the problems of bad-faith professional objectors. I was invited by the Federal Rules Committee to comment at a roundtable on potential amendments to Rule 23 to address these and other issues, and my non-profit has taken a leading role in litigating against bad-faith objectors. *E.g., Pearson v. Target Corp.*, 893 F.3d 980 (7th Cir. 2018). My non-profit has never settled an appeal in exchange for payment. If the Court nevertheless has any concern that I might use this case to attempt to extort class counsel for the first time in my career, I am happy to stipulate to an injunction forbidding payment to me or my non-profit without court approval.

24.    It is true that I have not won every single objection I've brought in the last ten years. Very very few attorneys go undefeated. But I have won the majority of appeals I have argued, including seven consecutive appeals in the Seventh Circuit. My non-profit has won over $225 million for class members challenging unfair class action settlements and unreasonable attorney-fee requests. We are thus not the sort of objectors who "contribute nothing to the class" as *Cardinal Health* and similar cases criticized.

25.    My objection and appeal is motivated to serve the interests of class members in states that have passed laws giving them additional protection in data breach cases.

26.    I have unsuccessfully requested multiple other appellants to dismiss their appeals in this case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 13, 2020, in Houston, Texas.

Theodore H. Frank

# EXHIBIT A

≡    *The New York Times*    [ Log in ]

# Equifax Doesn't Want You to Get Your $125. Here's What You Can Do.

Consumers have a few options for dealing with the data breach settlement.

 **By Charlie Warzel**
Mr. Warzel is an Opinion writer at large.

Sept. 16, 2019

Equifax had one job — keep its vast trove of personal financial information on millions of Americans secure. In 2017, the company failed spectacularly at that job when a hack compromised the information of more than 147 million people.

This July, Equifax settled a lawsuit with the Federal Trade Commission in response to that failure for up to $700 million. A settlement website was created to allow those who had their information exposed by Equifax to file a claim to receive either free three-bureau credit monitoring for up to 10 years or up to $125 (if you already had credit monitoring, no documentation necessary).

News spread. Millions listened and inundated the claim site. A week later, I reported on some fine print in the settlement suggesting that Equifax earmarked only $31 million for claims, meaning that if all 147 million people affected by the breach filed a claim, everyone would get just 21 cents. Two days later, the F.T.C. admitted this and urged victims instead to take the free credit monitoring. Activists and politicians, including Elizabeth Warren, excoriated the F.T.C., calling the initial settlement "misleading."

Last weekend, victims looking for their $125 faced yet another indignity in the form of an email from the Equifax settlement team. The email — which looked so spammy the F.T.C. had to assure readers on its website that it was legitimate — said that people looking for a cash reward must verify they had credit monitoring in place by Oct. 15, 2019, or their claims would be denied.

To recap: Equifax exposed personal financial information, was sued by the government and settled. The government publicly touted a cash reward alternative of up to $125 to victims without ensuring enough money had been set aside to guarantee the max amount for every possible person affected; the government backtracked on its statement; eventually, the Equifax settlement team sent a mid-weekend email adding a new hurdle for victims to claim their money. And the cash settlement? "Forget about the $125 alternative," the Los Angeles Times columnist Michael Hiltzik wrote. "It doesn't really exist in the real world."

As one of the 147 million who had their personal information exposed (my weekend email was helpfully buried in the purgatory of Gmail's "Promotions" tab), the settlement high jinks are enraging to me — an example of financial restitution in the form of a news release only. Worse yet, the bungled payouts may have long-term repercussions for the way Americans think about privacy.

"This deal makes me sick," Jay Edelson, a class-action lawyer who specializes in privacy cases, told me last week. "This is going to be most Americans' experience with privacy class-action suits. And their view is going to be, I assume, 'We were promised a lot and we're going to get nothing and that's how it'll always be.'"

*[If you're online — and, well, you are — chances are someone is using your information. We'll tell you what you can do about it. Sign up for our limited-run newsletter.]*

Fortunately, experts say there are still things you can do if you feel frustrated and misled.

## Respond to that Equifax settlement email

This may seem obvious but the best thing you can do, especially if you have credit monitoring protections active, is make sure you find, open and respond to the Equifax email the settlement team sent out. Theodore H. Frank, a lawyer who specializes in class-action suits, told me this week that only 3 percent of the people who get class-action emails actually respond. But responding is important, because it shows real consumer interest in restitution.

Of course, you'll need to show proof that you have credit monitoring to be eligible for a cash settlement. But there's a chance you might have credit monitoring active even if you weren't previously aware. Many major credit cards actually provide a form of credit monitoring — it's worth checking with your credit card company to see if you have some form of monitoring in place. If you do, it's a

loophole that might allow you to receive your piece of the settlement.

Granted, this requires some legwork — more than many people may be willing to put in. But giving up is exactly what the settlement team is hoping for when they send out a suspect-looking email, Mr. Frank argued. "Boycotting this unfair settlement isn't doing anything. The settlement attorneys will still get paid, even if you don't," he said.



## Write a letter to the court

Before anyone can get their money, the court — specifically, the United States District Court for the Northern District of Georgia — has to approve the settlement. This, two class-action lawyers told me, is where victims have some real power to exert some influence. According to one lawyer familiar with the settlement, one of the factors the court looks at are the responses from those who write letters.

These objections can come in many forms — you can find information on how to object here under FAQ section 25 — and you can simply write a standard one-page letter. No legalese or lawyers necessary. "Courts actually read all the objections," one attorney said. Because most people are too intimidated to write in, a small percentage can go a long way. "Even if it's just 1,000 or 2,000 people, that can send a big message." The letter should be brief and outline the process, stressing that you feel deceived by the terms of the settlement — if you do.

Another option is to write your state attorney general to complain about the settlement. Multiple class-action lawyers I spoke with noted that a number of state attorneys general were part of this settlement and that inundating them with letters could ratchet up the pressure to push back on the settlement.

The difficulty is that people usually don't realize a settlement is unfair right away. Often, it's not until years later, when a check for a few cents arrives, that they'll realize they've been baited and switched. But then it's too late.



## File a formal, legal objection

Then there's the heavy-lift option, which involves class-action lawyers like Mr. Frank. This process is likely to take time, as the objection will cite case law and make a formal argument to the settlement judge. Once these formal objections are filed, other victims can join them without needing to do as much legwork.

There are some serious downsides to filing a formal objection, according to Mr. Frank. Those who do could face long, aggressive depositions from Equifax's lawyers. Their financial records could be subpoenaed as well. "The lawyers take these objections very personally," he said. "They have $80 million in fees at stake. It's going to be really ironic when the lawyers who were fighting for the privacy of the class will harass them and invade their privacy to keep their money."

But, Mr. Frank argues, if people come out in droves with formal objections, it may lessen the burden for all victims. "It's like that meme where if 10,000 people storm Area 51, the government won't shoot them all. If enough people object, they probably won't get deposed. And if they do, well, you can look at it as a once-in-a-lifetime experience."

## Why should I do this?

If all of this sounds elaborate, it is. But if you care about the future of privacy, the impact could be meaningful. As Mr. Frank notes, this is ultimately about sending a message on behalf of millions of victims that protecting privacy does matter and that those who expose entrusted personal information owe victims real compensation. Not some bait-and-switch news release.

*Like other media companies, The Times collects data on its visitors when they read stories like this one. For more detail please see our privacy policy and our publisher's description of The Times's practices and continued steps to increase transparency and protections.*

*Follow @privacyproject on Twitter and The New York Times Opinion Section on Facebook and Instagram.*

# EXHIBIT B

ELIZABETH WARREN
MASSACHUSETTS

COMMITTEES:
BANKING, HOUSING, AND URBAN AFFAIRS

HEALTH, EDUCATION, LABOR, AND PENSIONS

ARMED SERVICES

SPECIAL COMMITTEE ON AGING

**United States Senate**

UNITED STATES SENATE
WASHINGTON, DC 20510–2105
P: 202–224–4543

2400 JFK FEDERAL BUILDING
15 NEW SUDBURY STREET
BOSTON, MA 02203
P: 617–565–3170

1550 MAIN STREET
SUITE 406
SPRINGFIELD, MA 01103
P: 413–788–2690

www.warren.senate.gov

September 18, 2019

The Honorable Joseph J. Simons
Chairman
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C. 20580

Dear Chairman Simons:

I am writing to raise serious concern and request additional information regarding what appears to be the latest attempt to "throttle cash awards" promised to victims of the Equifax data breach.[1] Last month, I requested the Federal Trade Commission (FTC) Inspector General launch an investigation into your agency's handling of the settlement payout process after questions were raised about the FTC's role in misleading the American public about the terms of the settlement and their ability to obtain the full reimbursement.[2] And now new reports indicate that the Settlement Administrator is employing questionable tactics using suspicious-sounding emails to reduce the final number of claimants likely to receive payments.[3]

In 2017, Equifax Inc. – one of the nation's largest credit reporting agencies – failed to adequately protect its computer systems and consequently compromised data belonging to approximately 147 million Americans to criminal hackers. Investigations of this breach by my staff and others, one of the most significant data security lapses in history, uncovered how Equifax employed inadequate cybersecurity measures, failed to notify and assist affected consumers in a timely and appropriate fashion, and later attempted to profit from its errors.[4]

Almost two years after the breach, on July 22, 2019, Equifax reached a settlement with the FTC, the Consumer Financial Protection Bureau, and 50 U.S. states and territories, agreeing to pay between $575 and $700 million.[5]  The settlement offered affected consumers the option to choose four years of credit monitoring or a cash award of up to $125. However, the settlement

---

[1] The American Prospect, "Another Equifax Settlement Bait and Switch," David Dayen, September 9, 2019, https://prospect.org/article/another-equifax-settlement-bait-and-switch.
[2] Letter from Senator Elizabeth Warren to FTC Inspector General Katsaros, August 13, 2019, https://www.warren.senate.gov/imo/media/doc/2019.08.13%20Letter%20to%20FTC%20IG%20on%20Equifax%20settlement.pdf.
[3] The American Prospect, "Another Equifax Settlement Bait and Switch," David Dayen, September 9, 2019, https://prospect.org/article/another-equifax-settlement-bait-and-switch.
[4] Office of Senator Elizabeth Warren, "Bad Credit: Uncovering Equifax's Failure to Protect American's Personal Information," February 2018, https://www.warren.senate.gov/files/documents/2018_2_7_%20Equifax_Report.pdf.
[5] Federal Trade Commission, "Equifax to Pay $575 Million as Part of Settlement with FTC, CFPB, and States Related to 2017 Data Breach," press release, July 22, 2019, https://www.ftc.gov/news-events/press-releases/2019/07/equifax-pay-575-million-part-settlement-ftc-cfpb-states-related.

only allotted $31 million to this cash award fund and stipulated that payments "shall be reduced on a *pro rata* basis"[6] – information that was not provided in an appropriate fashion to consumers until after they had signed up for the payments. Following the settlement, the FTC released statements informing consumers of their ability to receive a $125 cash payment – excluding any information that the cash payment was subject to and in fact, was very likely to be, severely reduced. Ultimately, the FTC altered its recommendation and advised consumers to select the credit monitoring option because it "provides a much better value."[7]

But on September 7, 2019, consumers who requested the $125 payment before August 2, 2019, received an email from the Settlement Administrator informing them of additional steps they would need to complete before they could receive any cash payments. The email informed them that unless they "provide the name of [the] credit monitoring service" they had before filing their claim or "amend [their] claim to request free credit monitoring" instead of the cash award, their claim for $125 "will be denied."[8]  The Settlement Administrator never explicitly shared this verification step with consumers in the initial stages of the claims process.

The specific content and design of this email is even more troubling. It contains a suspicious subject line presumably designed to discourage many victims from opening the email or to push it into spam folders. When clicked on, the email sends users to a website that requires claimants to enter a long claim number and, at least in some cases, long Captcha strings.[9] The website does not allow users to correct errors when they report their credit monitoring service, and contains alarming legalistic language implying that they may be breaking the law by providing inaccurate information. Moreover, the email does not make clear what precisely qualifies as credit monitoring, or what is sufficient for naming an individual's credit monitoring service – an additional deterrent to individuals seeking cash payments under the settlements.

In order to help me understand the flaws in the FTC settlement that first resulted in misleading consumers about their potential award, and then added complicated new steps that appear to be clearly designed to weed out deserving claimants, and the agency's awareness of these flaws, I ask that you provide answers to the following questions no later than October 2, 2019.

1. When did Equifax, the Settlement Administrator or the FTC decide to communicate with consumers about additional steps they need to take in order to receive their benefits – as described in the September 7, 2019 email from the Settlement Administrator to consumers who filed a claim before August 2, 2019?
    a. Was this step an original part of the payout plan?
    b. Is this step consistent with the intent of the payout plan?
    c. Is this step consistent with the legal requirements of the payout plan?

---

[6] Federal Trade Commission, Proposed Equifax Settlement Agreement, July 19, 2019, https://www.ftc.gov/system/files/documents/cases/172_3203_equifax_proposed_order_7-22-19.pdf.
[7] Federal Trade Commission, "Equifax Data Breach Settlement," September 2019, https://www.ftc.gov/enforcement/cases-proceedings/refunds/equifax-data-breach-settlement#FAQ5.
[8] The American Prospect, "Another Equifax Settlement Bait and Switch," David Dayen, September 9, 2019, https://prospect.org/article/another-equifax-settlement-bait-and-switch.
[9] *Id.*

2. Was the FTC aware of the decision to ask consumers who filed a claim before August 2, 2019 to complete additional steps before they could receive their benefits?
   a. Who informed the FTC and how?
   b. If so, please provide electronic copies of all emails or other communications between the FTC and Equifax, the Settlement Administrator or other government agencies related to the addition of these steps.

3. Does the FTC, under the settlement plan or under statutory law, have the authority to act to require Equifax or the Settlement Administrator to modify its practices under the settlement, such as requiring that they eliminate this email step or use a less "scammy" email format to contact consumers?

4. Is the FTC aware of any additional steps that consumers will have to take before they can receive the $125 cash payment?

5. At this time, how many individuals are currently expected to receive cash payments under the settlement?  How many consumers who completed the initial settlement process requesting cash payments will now not be receiving them because they failed to reply to or provided incorrect answers to the September 7, 2019 email?

6. How is the FTC monitoring Equifax's compliance with the settlement, including whether the company is establishing new and inappropriate procedures to reduce the number of claimants receiving cash awards?

Thank you for your attention to this matter.

Sincerely,

Elizabeth Warren
United States Senator

CC:
FTC Commissioners: Noah Joshua Phillips, Rohit Chopra, Rebecca Kelly Slaughter, and Christine S. Wilson

Inspector General Andrew Katsaros
Federal Trade Commission
Office of Inspector General
600 Pennsylvania Avenue, NW
Washington, D.C. 20580

# EXHIBIT C

# BOBSULLIVAN.NET

THE RED TAPE CHRONICLES

**CONSUMER AND CYBERCRIME NEWS**

Technology has hidden side effects -- we reveal them here

ABOUT       'SO…BOB?' PODCAST       GOTCHAS / CONSUMER       CYBERCRIME / PRIVACY

THE RESTLESS PROJECT       COGNITIVE BIAS ESSAYS

THE BARSTOOL MBA NOW ON SALE

HOME  ›  GOTCHAS / CONSUMER  ›  Equifax hack settlement objection deadline looms Nov. 19, but this bot will help you file



My new book. Click to listen now.

# Equifax hack settlement objection deadline looms Nov. 19, but this bot will help you file

⊘ November 8, 2019   👤 Bob Sullivan   🗀 Gotchas / Consumer, Red Tape Wire Service   💬 1

SITE CATEGORIES



Select Category ▼

## Biggest Transfer Of Wealth In U.S. History Has Begun

SEARCH

SEARCH ...



ax.com

he news that victims of the Equifax hack might get $125 from a class action settlement, only to hear later the real amount would probably be a few pennies?  And getting those pennies required a bunch more paperwork steps?  And the lawyers who negotiated the settlement were going to get millions of dollars? ($77 million actually, and they just asked for more).

Consumers do have the right to object to all this, but that deadline is fast approaching — it's November 19.

Objecting isn't' hard: It's as simple as sending a letter to the Equifax Data Breach Class Action Settlement Administrator. Instructions are available at the Equifax Breach Settlement website on its FAQ page. Look for item No. 25.

Privacy might be really ill.
We might have to give it some kind of
**EXTREME TREATMENT...**

but if we give up on the idea,
I think we give up on the very
SENSE OF OUR HUMANITY

## Breach podcast, the conclusion: 'Privacy died but it can be reborn'

Today concludes the Equifax hack podcast. But the story of the Equifax hack is much bigger than a tale of lost Social Security numbers. It's about corporate greed.  Exploitation of a natural resource (us) for gross profit margins.  It's about control. Epidsode 6 zooms out and returns to the ... Continue reading

 **bobsullivan.net**                                          1

But Reuben Metcalfe, founder of Class Action Inc., has made it even easier. He recently launched a website named NoThanksEquifax.com which has a bot that semi-automates the objection letter-writing process. Be warned: The bot, dubbed Clarence, also has a sense of humor. He cheers you on as you walk through the steps of filing an objection. Metcalfe's first working name for the service was as an "Equifax F.U. Button."

The site is no joke, however.  The judge overseeing the case must legally consider all objections at a fairness hearing scheduled for Dec. 19.  Objections do not remove consumers from the class; if the settlement is approved, they can still receive payment or credit monitoring services offered to other class members. The NoThanksEquifax bot also helps consumers opt-out, or file a claim, for free.

Metcalfe, who runs a service that helps consumers file for class action payments in exchange for a percentage, says he created the site because he thinks the terms of the Equifax settlement are unfair. He also thinks most consumers are unaware that they have rights at this stage of the settlement process, and he hopes the site will call attention to the objection option. He thinks massive objections or opt-outs would force negotiations to come up with a better deal for consumers.

"I believe a mass opt-out campaign for the Equifax settlement could result in an additional $2 to $3 billion in... consequences," he told me.

If this story sounds a bit familiar, that's because it is. Lawyers and regulators have spent the better part of a decade trying to figure out what are fair consequences for companies involved in data breaches.  There's no easy answer. Generally, victims who win lawsuits are compensated based on the amount of identifiable harm they can prove. Usually, the formulas are specific — "This injury forced me out of work and I lost $40,000 in wages." But with data hacks, it's harder to identify current harm, and basically impossible to predict future harms.  The Equifax settlement, and other cases, have included provisions that compensate victims when they can prove fraud or expenses that resulted directly from a hack.  They generally also offer free credit monitoring for a year or two. That's often a token gesture — at this point, after so many breaches, many consumers have multiple overlapping offers of credit monitoring.

Two recent data breach class action settlements have followed this familiar pattern.  In October, lawyers announced settlement of the massive Yahoo data breach. Consumers can file for a $100 cash payout, but the check that comes might be much smaller, depending on how many consumers file — similar to the Equifax case.

At about the same time, a settlement in the seemingly ancient Zappos hack case also announced.  Criminals took

less important data in that case, but the settlement is still not very consumer friendly. Customers received a 10% off coupon from the site. Lawyers are set to receive $1.6 million.

Anything that calls continued attention to the Equifax case is worthwhile. The court filing that saw plaintiff's lawyers up their request for compensation also revealed that, while nearly about 150 million Americans were impacted by the massive data heist, only 3 million consumers have so far signed up for the offer of free credit monitoring the firm is giving out as part of the settlement. Consumers have until January 22 to file a claim.

## Like what I'm doing? Help fund my work.



**Share this:**

Twitter   Facebook   Reddit   Email

**Like this:**

Like

Be the first to like this.

When consumers get hacked, what's the harm? Judge tells Equifax he wants to find out, OK's lawsuit
February 1, 2019
In "Cybercrime / Privacy"

Want your Equifax hack settlement bucks? There's more red tape now
September 9, 2019
In "Gotchas / Consumer"

The Equifax hack, 1 year later: What have we lost? What cost has Equifax paid?
September 6, 2018
In "Cybercrime / Privacy"

**About Bob Sullivan** › 1408 Articles



BOB SULLIVAN is a veteran journalist and the author of four books, including the 2008 New York Times Best-Seller, Gotcha Capitalism, and the 2010 New York Times Best Seller, Stop Getting Ripped Off! His latest, The Plateau Effect, was published in 2013, and as a paperback, called Getting Unstuck in 2014.

He has won the Society of Professional Journalists prestigious Public Service award, a Peabody award, and The Consumer Federation of America Betty Furness award, and been given Consumer Action's Consumer Excellence Award.



---



**« PREVIOUS**
Zelle fraud emergency kit and FAQ

**NEXT »**
To VPN, or not to VPN: That's the So, Bob question



---

**1 TRACKBACK / PINGBACK**

🔗OBJECT TO THE EQUIFAX SETTLEMENT BY NOVEMBER 19TH — Prevent ID Theft

# Leave a Reply

Your email address will not be published.

Comment

Name *

Email *

Website

☐ Notify me of follow-up comments by email.

POST COMMENT

This site uses Akismet to reduce spam. Learn how your comment data is processed.

Bob Sullivan

# EXHIBIT D



Theodore Frank <ted.frank@hlli.org>

---

## Equifax objection?

**Theodore Frank** <ted.frank@hlli.org>                                                    Mon, Nov 11, 2019 at 4:10 PM
To: "Frankel, Alison L. (Reuters)" <Alison.Frankel@thomsonreuters.com>
Cc: Melissa Holyoak <melissa.holyoak@hlli.org>

I wish him the best of luck. The objections require a "personal signature," so unless his technology has  a means to do
that, I imagine plaintiffs' lawyers will try to throw out all the objections, and possibly engage in other retaliation. I'd have to
see what the software generates before I could comment further: The recent Rule 23(e) amendments have added some
trivial hurdles that accomplish nothing material other than tripping up people without lawyers.

Problem is that even if he gets a million people to sign up and the software can hurdle the hoops imposed on the
objection process, the plaintiffs will say "What about the 100 million who didn't object"? If a judge is savvy enough to
understand that that's a bogus response to objections, then a single good well-crafted objection will do more than a
million people saying "this is unfair" without giving legal reasons.

We're going to try to file early, maybe even tomorrow night. Then people can object pro se and purport to join our
objection without us formally representing them, but, again, only one objection is needed.

On Mon, Nov 11, 2019 at 9:13 AM Frankel, Alison L. (Reuters) <Alison.Frankel@thomsonreuters.com> wrote:

> Hey Ted. I'm doing a story today on a new campaign to amass objections to the Equifax settlement. It's run by Reuben
> Metcalfe of Class Action Inc. He's using an automated system, via a website called NothanksEquifax.com, to sign
> people up as objectors. He explains why in this Medium post. I don't know how much you know about Metcalfe and
> Class Action Inc. – which I never heard of until Friday – but after talking with him, I think he's a true visionary whose
> company has the potential to shift leverage in class actions to consumers themselves, rather than their lawyers.
>
>
> Anyway, I heard you might be filing an Equifax objection so wanted to ask about that and also for your thoughts on
> whether Metcalfe's campaign ultimately will help class members.
>
>
> I'm at 516-674-0728.
>
>
> Thanks,
>
> Alison
>
>
> _____
>
> Alison Frankel
>
> Editor, On The Case
>
>
> Office: 646-223-6491
>
> Home Office: 516-674-0728
>
> Mobile: 917-848-7493
>
>
> E-mail: alison.frankel@thomsonreuters.com<mailto:alison.frankel@thomsonreuters.com>

Follow me on Twitter: @AlisonFrankel