**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| IN RE EQUIFAX, INC. CUSTOMER DATA SECURITY BREACH LITIGATION | MDL DOCKET NO. 2800 1:17-md-2800-TWT |
| | CONSUMER CASES |

**MOTION FOR IMMEDIATE INJUNCTIVE RELIEF TO
PREVENT EVASION AND VIOLATION OF
THIS COURT'S JURISDICTION AND ORDERS
<u>WITH SUPPORTING LEGAL MEMORANDUM</u>**

From the start of this MDL, this Court expressed concern that firms not selected for a leadership position, if unrestrained, would seek compensation for work that did not benefit the class including work associated with filing serial complaints before the MDL's formation. Guided by the Court's directives, Co-Lead Counsel issued timekeeping protocols that were submitted to the Court and provided to all plaintiffs' firms, including firms that filed cases in the MDL but were not selected for leadership. The protocols made clear pre-appointment time would not be considered (except in very limited circumstances), and future work in the MDL would be limited to tasks expressly authorized by Co-Lead Counsel.

Sanford Heisler Sharp, LLP ("Sanford") was one of those firms that

unsuccessfully applied for a leadership position and was provided the billing protocol shortly after Co-Lead Counsel were appointed.  Along with 47 other non-leadership law firms that represented one or more of the 96 class representatives, Co-Lead Counsel requested that Sanford assist in a limited capacity in the MDL by working with its clients who were named as plaintiffs in the operative amended complaint, and the firm was allocated a small share of the fee for its modest efforts.

More than three years after being informed of its approved hours and lodestar and eight months after the fee award was allocated and distributed to participating firms, Sanford made the extraordinary claim that it was entitled to five percent of the entire $77.5 million award largely because the firm allegedly worked more than 3,400 hours, interviewed 12,000 potential plaintiffs, and filed 45 separate complaints *before* its leadership application was denied.  Co-Lead Counsel rejected the claim, which violated governing Court orders and protocols in this MDL, and told Sanford that, if still dissatisfied, it should seek relief with this Court, which expressly retained jurisdiction over such disputes.

Instead of requesting relief from this Court, Co-Lead Counsel have learned that on February 6, 2023 Sanford sued them in a Tennessee state court on the bizarre theory that Tennessee common law dictates it should have received a larger share of the *Equifax* fee, notwithstanding that the suit seeks compensation for thousands of

hours of time that was never authorized, reported to Co-Lead Counsel, or approved by this Court in violation of the orders and protocols that governed its work in the MDL. According to Sanford, by denying its fair share, Co-Lead Counsel committed torts and breached an implied contract, authorizing a jury to award Sanford compensatory damages exceeding $1 million and unspecified punitive damages or, alternatively, to disgorge some of the fees that Co-Lead Counsel received.

The Tennessee suit is a blatant attempt to dodge this Court's jurisdiction, evade the Court's orders restricting the role and compensation of non-leadership firms, and substitute a Tennessee jury's judgment for that of this Court regarding what time is compensable in the MDL. Co-Lead Counsel thus seek appropriate relief, namely issuance of a permanent injunction under the All-Writs Act directing Sanford and all those acting with it to dismiss the Tennessee action and take no further steps to challenge its share of *Equifax* fee in any forum except this Court. If the Tennessee action is allowed to proceed, Co-Lead Counsel will be forced to retain Tennessee counsel and incur substantial costs defending claims that logically and legally should be resolved here. Co-Lead Counsel request that, subject to its calendar, the Court schedule a hearing on this motion as soon as practicable.

## FACTUAL BACKGROUND

**A.    The Court's Leadership Order and Co-Lead Counsel's Directives Governing Non-Leadership Firms**

From the outset, this Court made clear its intent regarding the role and compensation of firms that were not appointed to leadership positions.  The issue was first discussed at the February 9, 2018 hearing during which this Court heard leadership applications, a discussion that was triggered by Judge Koh's comments in *In re Anthem, Inc. Data Breach Litig.*, No. 15-md-02617 (N.D. Cal.) about the amount of work done and sizeable lodestar sought by non-leadership firms in the *Anthem* fee application.  Mr. Canfield and this Court addressed the potential for a similar issue arising here in the following colloquy:

| | |
|---|---|
| Mr. Canfield: | … I can tell you … the surprise that Judge Koh expressed when the fee application in that case came in is not going to occur in this case. |
| The Court: | You can be sure of that. |
| Mr. Canfield: | And there's a lot of reasons why, Judge. If you recall in *Home Depot*, we had a bunch of protocols that we developed. Those protocols required that time be submitted quarterly, that any work [done] by somebody who wasn't appointed to the PSC had to be approved by lead counsel. … And, apparently, those things weren't done by Judge Koh. So … you can be assured that that's not going to happen in this case. |
| The Court: | … Mr. Canfield, you've been in front of me enough to know that I don't ever want to have something like that |

happen in front of me.

Mr. Canfield:      You have my personal assurance that if we are appointed
it never will, Judge.

Exhibit A, Feb. 9, 2018 Hrg. Tr. at 98-99.[1]

The Court took concrete steps to ensure non-leadership firms did not run amok
in its February 12, 2018 order appointing Plaintiffs' leadership.  The order required
all participating firms to keep daily time records and report their time to Co-Lead
Counsel on a monthly basis; directed Co-Lead Counsel to submit these reports to the
Court quarterly for *in camera* review; and warned that failure to maintain and submit
appropriate time records would be grounds for denying compensation.  Doc. 232 at
9-10.  Further, reflecting its intent to limit the role of non-leadership firms, the Court
specifically ordered:

> ***In order for their time and expenses to be compensable, those not
> serving in leadership positions must secure the express authorization
> of Co-Lead Counsel for any projects or work undertaken in this
> litigation.***

*Id.* (emphasis added).

To implement the Court's order, Co-Lead Counsel sent a time and billing
protocol to all non-leadership firms, including Sanford, on February 28, 2018.

---

[1] Exhibits A through H referenced in this motion are attached to the Declaration of
Class Counsel, Exhibit 1 hereto.

<u>Exhibit B</u>.  Co-Lead Counsel described the Court's concern about excessive billing by non-leadership firms and stated: "we will strictly adhere to the Court's directive." *Id.* at 1.  To carry out that directive, Co-Lead Counsel told the non-leadership firms that they "must obtain written approval in advance from Co-Lead Counsel" before doing any work in the MDL; that simply reporting time did not ensure a firm would be paid for it; that inappropriate time would be excluded in any fee application; and that "if you have any doubts about whether your time has been … authorized, please reach out to us for clarification."  *Id.* at 1.

At the time, Co-Lead Counsel were aware that some lawyers—such as Sanford—had filed dozens of repetitive complaints in federal courts, presumably in the hope that they would enhance their prospects for a leadership position, and that these repetitive complaints were of little value to the overall litigation.  Ex. 1, ¶ 4. Consistent with the Court's directive, Co-Lead Counsel thus included the following language in the protocol sent to the non-leadership firms:

> Time and expenses incurred prior to the appointment of Co-Lead Counsel will be considered for compensation only to the extent they contribute to advancement of the litigation as a whole. ***Time investigating or filing serial complaints … should not be submitted and will not be considered compensable time***.

Ex. B at 3.  Accordingly, shortly after Co-Lead Counsel were appointed, Sanford knew that it would not be compensated for having interviewed thousands of potential

plaintiffs and filed dozens of complaints around the country and that time relating to that work should not be included in its billing reports.  Ex. 1, ¶ 4.

### B.    Sanford's Authorized Work and Related Billing

Sanford, as a non-leadership firm, was restricted to a narrow role in the MDL. Co-Lead Counsel only authorized Sanford to perform certain discrete tasks relating to its clients who were selected to serve as class representatives in the consolidated amended complaint filed after the Court appointed leadership. Ex. 1, ¶ 5.  The totality of its authorized work is described below.

On February 28, 2018, in preparing the amended complaint, Co-Lead Counsel made one specific request to Sanford and other non-leadership firms: to identify and provide information for their existing clients who met certain criteria and were willing to be named as class representatives in the amended complaint. Ex. 1, ¶ 5 & Exhibit C.  Co-Lead Counsel created an on-line questionnaire for the firms to fill out and provided a script for use in talking to their clients.  Firms were told that the questionnaire should take less than one hour to complete for each client and that any time spent vetting clients who did not meet the specified criteria would not be compensated.  In response, Sanford identified seven of its clients who were selected to serve as class representatives.  From then until the litigation concluded, Sanford was only authorized to respond to a limited number of discrete requests from Co-

Lead Counsel relating to those clients, such as to send out form document preservation letters drafted by leadership, help its clients to gather needed documents and information, and communicate with its clients regarding the progress of the case and proposed settlement terms. *Id.* That was it.

Throughout the litigation, Sanford submitted its time and hourly rates on a monthly basis to the co-leads, who included the information in their quarterly *in camera* filings. As of January 31, 2022, Sanford reported spending a total of 1,213 hours on the case, with a lodestar value of $269,809. Of that time, only 330.1 hours with a lodestar value of $63,356 were spent after Co-Lead Counsel were appointed. Ex. 1, ¶ 7. Before filing the fee application, Co-Lead Counsel personally reviewed the billing records of all participating firms, including Sanford, and excluded time that was not compensable under the governing court order and protocols. Doc. 858-1, ¶ 42. Co-Lead Counsel approved nearly all of Sanford's post-appointment time but cut much of its pre-appointment time—in particular, pre-appointment time spent preparing and filing repetitive complaints. However, consistent with its treatment of other non-leadership firms, pre-appointment time relating to Sanford's work with its seven clients, where discernible, was approved as of benefit to the overall litigation. Sanford's approved time amounted to 519.8 hours having a lodestar value of $106,274. *See* Doc. 858-1 at 84; Ex. 1, ¶ 7.

Sanford and other participating firms were told in writing of the specific cuts that had been made to their time and lodestar amounts on October 4, 2019. Ex. 1, ¶ 8. Sanford's final time and lodestar amounts (as well as those of all other participating firms) were then filed publicly with the fee application on October 29, 2019. Doc. 858-1 at 84. And this Court approved that time and lodestar in its fee award. Doc. 1029 at 103-104 (discussing overall time spent on litigation after Co-Lead Counsel reviewed all time entries).

### C.   Determining Sanford's Share of the Fee

Once all objections were resolved on appeal, Co-Lead Counsel allocated this Court's fee award to the participating firms based on the value each firm brought to the case, not a rote lodestar allocation. Ex. 1, ¶ 9. This was the exact allocation methodology Co-Lead Counsel announced they would use in a billing protocol sent to the leadership firms in February, 2018 and again in an October 4, 2019 letter sent to all participating firms, including Sanford:

> If we are fortunate enough to be awarded a fee in this litigation, the allocation of fee among the participating firms will be made by Co-Lead Counsel after the fee has been awarded. In allocating any fee, Co-Lead Counsel will be guided by the concept that each firm will be rewarded for the value it has contributed to the results obtained for our clients. While each firm's lodestar will be a substantial factor in determining value, it will not be the only factor. Significant weight will be given to factors such as how efficiently a firm has handled its responsibilities, the nature of the work that was done, creativity,

collegiality, equity, and any other considerations that Co-Lead Counsel deem relevant or material.

Exhibit D.  Using this standard, Co-Lead Counsel decided that Sanford's lodestar—as included in the fee application and approved by the Court—was fair and reasonable compensation for the value it provided.  Many factors supported Co-Lead Counsel's decision. Ex. 1, ¶ 9.

First, Sanford played a minor role by design, consistent with this Court's guidance on the involvement of non-leadership firms.  The nature of Sanford's authorized work was routine, uncomplicated, and limited in scope.  The work did not require any substantial creativity or discretion and was made even easier because Co-Lead Counsel provided an online questionnaire, standard forms, and scripts for Sanford to use.  *Id.*, ¶ 10.

Second, there was nothing unique, critical, or indispensable about Sanford's contribution, which was akin to the contributions of the 47 other non-leadership firms. The 45 complaints Sanford prepared and filed pre-appointment added nothing more to the result than the hundreds of complaints filed by other firms; Sanford's complaints, for example, did not introduce any materially novel legal theories, present any materially new fact patterns, or improve plaintiffs' settlement leverage.  Moreover, the litigation would have reached the same exact result without the involvement of Sanford and its clients.  The amended complaint named 89 other

class representatives whose individual claims were sufficient to allow Plaintiffs to survive a motion to dismiss and induce Equifax to settle the litigation on favorable terms. *Id.*, ¶ 11.

Third, consistent with this Court's directive, Sanford was not assigned any critical work. That work was done by the appointed leadership. Sanford simply had nothing to do with the key tasks that drove the successful result for the class, such as developing strategy, drafting a brief, standing up in court, taking a deposition, working with the experts hired by Co-Lead Counsel, interacting with defense counsel or government regulators, negotiating the settlement, designing the notice and claims program, overseeing settlement administration, or coordinating the work of the firms that undertook those responsibilities. *Id.*, ¶ 12.

Fourth, Sanford's allocation was equitable in comparison with the contributions of other law firms. The leadership firms were unquestionably entitled to much larger allocations because of the nature, importance, and scope of the work they performed; the intensity of their efforts; and the incredible financial risks they undertook by committing such large resources to the litigation. The value of their contributions, unlike Sanford's, vastly exceeded their approved lodestar. Sanford also was fairly treated in relation to the other non-leadership firms and, in fact, received the largest allocation of any of them. *Id.*, ¶ 13.

In short, in limiting Sanford's work and its share of the resulting fee, Co-Lead Counsel carried out the Court's instruction to restrict the role and lodestar of non-leadership firms; transparently used the allocation standard that they said they would from the outset; based their decision on the time records and billing records that Sanford reported to them; and in accordance with the applicable billing protocol cut Sanford's time to exclude unauthorized and unhelpful work, almost all of which was pre-appointment.   Not until years later did Sanford ever complain to Co-Lead Counsel about its role, the cuts to its time, or the rates used to calculate its lodestar. *Id.*, ¶ 14.

### D.    Sanford's Delayed Response to its Fee Allocation

In January and February 2023, after all appeals had been dismissed and Co-Lead Counsel had allocated the fee award, participating firms were asked to provide an IRS Form 1099 and transmittal instructions for payment of their share.  Once that information was received, each firm's share of the fee was distributed.  Sanford has never provided the requested Form 1099 and wiring instructions.  So, its share of the fee remains in the hands of the settlement administrator.  *Id.*, ¶ 15.

Between February and August 2022, Kevin Sharp, a Sanford partner, had a few sporadic and casual communications about Sanford's allocation with Norm Siegel and Amy Keller, two of the appointed Co-Lead Counsel.  While expressing

some disappointment with Sanford's share, Mr. Sharp was cordial and appeared to understand Co-Lead Counsel's decision.  All that changed dramatically on November 3, 2022, when Mr. Sharp sent Mr. Siegel a letter accusing Co-Lead Counsel of "fraud," "massive self-dealing," "shenanigans," "unethical conduct," "misleading the Court," and "a grotesque breach" of their duties in allocating Sanford's share of the fee. *Id.*, ¶ 16 & Exhibit E.

In the letter, Mr. Sharp asserted for the first time that his firm spent more than 3,400 hours on the case having a lodestar value of $1,420,444—roughly three times the hours and five times the lodestar it had previously reported, and vastly more than its figures included in the fee application.  Mr. Sharp did not contend this newly disclosed time had been authorized by or properly reported to Co-Lead Counsel and the Court.  Nevertheless, he argued for more money because his firm allegedly "jump-started" the litigation before MDL leadership was appointed (by interviewing more than 12,000 potential plaintiffs and filing 45 separate complaints) and had added "incredible" value post-appointment (by identifying seven class representatives).  Mr. Sharp also argued that Co-Lead Counsel wrongfully induced his firm (alone among the 60 other participating firms) to report billing rates below its usual and customary rates and to inappropriately write off much of its pre-appointment work.  Because Sanford's "true" lodestar was roughly five percent of

the total collective lodestar, Mr. Sharp claimed entitlement to five percent of the total fee, *i.e.* $3,875,000.  Ex. 1, ¶ 17 & Exhibit E.

Co-Lead Counsel rejected Mr. Sharp's claim in a letter from Mr. Siegel dated November 21, 2022, explaining that: (1) Sanford had waited too long to complain because it had known but never complained about its approved lodestar and the methodology for allocating the fee for more than three years and allocations to the other participating firms had been distributed eight months earlier; (2) this Court did not order that firms be paid their lodestar plus the same multiplier, but based the fee on a percentage of the recovery and left the allocation to Co-Lead Counsel; (3) Co-Lead Counsel allocated fees based on the value each firm contributed as they had explained they would do and the value of Sanford's contribution was relatively minor;[2] (4) Sanford's pre-appointment work interviewing 12,000 potential plaintiffs and filing repetitive complaints was unauthorized, unnecessary, and inconsistent with the governing protocol and order; and (5) the protocol Co-Lead Counsel sent

---

[2] Mr. Sharp argued in his letter that Sanford's contribution was "indispensable" because the firm provided seven plaintiffs for the amended complaint and the claims of two of those plaintiffs were critical to the prosecution of the case—Brenda King who allegedly filled a "key" need for an Arkansas plaintiff and Alexander Hepburn whose credit score fell after the breach. Exhibit E at 2.  Neither plaintiff, however, added anything that other plaintiffs did not.  The amended complaint named another Arkansas plaintiff with the same claims, Doc. 374 at ¶ 19, and many other named plaintiffs also averred decreased credit scores.  *Id.*, ¶¶ 32, 38, 79, 86, 101, 106.

to the firm at the outset unambiguously set forth the time and billing rates Sanford should report.  Mr. Siegel's letter concluded with the following statement: "Judge Thrash maintains jurisdiction over the Settlement, and we suggest that any further issue related to this matter be directed to him for final resolution."  Ex. 1,  ¶ 17 & Exhibit F.

Co-Lead Counsel have heard nothing from Sanford for nearly three months but learned last week from other sources that Sanford sued them in the Chancery Court of Davidson County, Tennessee on February 6, 2023.  Ex. 1,  ¶ 19 & Exhibit G, Exhibit H. In the suit, which as of writing this motion has not yet been served, Sanford contends Co-Lead Counsel are subject to personal jurisdiction there for alleged misconduct under Tennessee law in allocating the fee.  Specifically, the suit avers Co-Lead Counsel violated their fiduciary duty by allocating Sanford too little; Co-Lead Counsel violated a contract implied from this Court's leadership appointment order that Sanford be compensated fairly for its pre-appointment time; Sanford is entitled to more money under the theory of quantum meruit; and Co-Lead Counsel would be unjustly enriched if allowed to retain fees that in good conscience belong to Sanford.  The suit seeks compensatory damages in excess of $1 million and unspecified punitive damages, or, alternatively, disgorgement of co-counsel's alleged "ill-gotten gains." Sanford demands a jury trial in Tennessee state court.

## **LEGAL ARGUMENT**

Setting aside the tenuous jurisdictional basis for hauling Co-Lead Counsel in this federal MDL before a state court in Tennessee, Sanford's extensive factual misrepresentations, and the lack of merit underlying its claims, the suit is little more than an unabashed attempt to strip this Court of the power to oversee the MDL and enforce its own orders restricting the work and compensation of non-leadership firms, and, instead, to substitute a jury's judgment for that of this Court regarding the compensability of Sanford's pre-appointment time—an issue this Court has already decided.  Sanford's lawsuit thus flies in the face of the MDL process, longstanding class action jurisprudence, and the Final Judgment and Order in which this Court explicitly retained jurisdiction over this action and the participating attorneys for "all matters relating" to the MDL and the settlement.  Doc. 957 at 10. The Tennessee suit thus must not be allowed to proceed.

### A.   **The Court Exercised its Discretion to Oversee All Participating Counsel and their Compensation and Retains Exclusive Jurisdiction to Do So**

Multidistrict litigation proceedings aim "to promote the just and efficient resolution of related civil actions." *In re Checking Acct. Overdraft Litig.*, 307 F.R.D. 630, 654 (S.D. Fla. 2015) (internal citations omitted).  A transferee court has broad power to manage and promote the efficient resolution of the type of complex, class

action litigation at issue in an MDL by virtue of its designation by the Judicial Panel on Multi-District Litigation, inherent authority, and the Federal Rules of Civil Procedure.  That power authorizes a court to oversee and direct the participating lawyers through a variety of techniques, including appointing plaintiffs' leadership charged with managing other lawyers under their direction, issuing management orders governing the lawyers' work and compensation, and approving settlement agreements and fee awards.  *See generally, e.g.*, *Id.*; *Center for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 432 (5th Cir. 2013); *Manual for Complex Litigation (Fourth)* §§ 10.22, 14.21-215, 1414.211; C. Wright and A. Miller, *Federal Practice and Procedure* § 4221; Fed. R. Civ. Proc. 23(d)(A), (g) and (h).

Ever since the Equifax MDL was created in December, 2017, this Court has vigorously exercised its management authority to successfully steer to conclusion one of the most complex MDLs in history—one involving 148 million class members and more than 60 participating law firms.  In so doing, the Court has kept a tight rein on plaintiffs' counsel and limited the role of non-leadership firms to avoid any issues akin to those that concerned Judge Koh in *Anthem,* by among other things holding regular status conferences, ordering that no work be done by non-leadership firms unless authorized by Co-Lead Counsel, and reviewing plaintiffs' detailed billing report each quarter to keep tabs on exactly what was being done.

The Court also assessed the value and quantity of the work that was done for the benefit of the class in reviewing Plaintiffs' fee application.  After this review, the Court issued a lengthy opinion approving the application that, *inter alia*, determined the time reported in the application was reasonable and of benefit to the class and rejected objections the application suffered from an *Anthem* problem, namely inflated time for unhelpful work by non-leadership firms.  Doc. 876 at 21-22; Doc. 880 at 22.  In so doing, the Court relied in part on the audit done by Co-Lead Counsel to ensure that all submitted time was appropriate.  See Doc. 1029 at 103 (noting that Co-Lead Counsel excluded time entries that were "inconsistent with the billing protocol that they established at the outset of the litigation.")

In accordance with the Settlement Agreement, the Court left the responsibility for allocating the fee award to Co-Lead Counsel.  *See* Doc. 739-1, § 11.1 (fees for "work performed by Class Counsel or other counsel working at their direction" are to be "distributed as determined by Class Counsel").  At the same time, the Court retained jurisdiction in the Final Judgment and Order to resolve any disputes regarding the allocation.  Doc. 957 ¶¶ 19, 21 (retaining jurisdiction over parties and attorneys "for all matters relating to this action, including (without limitation) the administration, interpretation, effectuation or enforcement of the Settlement Agreement"); *see Giercyk v. National Union Fire Ins. Co. of Pittsburgh*, 2018 WL

1469048, at *2 (D.N.J. Mar. 26, 2018) (retention of jurisdiction over the implementation of a settlement necessarily includes jurisdiction to resolve objections to the fee allocation).  The Court's approach also was consistent with the way fee allocations are routinely handled.  *See, e.g.*, *In re Vitamins Antitrust Litig.*, 308 F. Supp. 2d 209, 222 (D.D.C. 2005) (under the settlement, "Co–Lead Counsel had broad authority to make the initial allocation of the fee. Once [a firm] objected, however, Co–Lead Counsel's decisions became subject to court review to determine whether Co–Lead Counsel abused their discretion in apportioning the fees in the manner they did.")

Sanford, accordingly, was required to bring any challenge to its fee allocation to this Court, not another forum.  The Court's retained jurisdiction over all matters relating to the settlement is not "shared" with a Tennessee state court; it is "exclusive." *See, e.g.*, *Giercyk*, 2018 WL 1469048, at *2; *Flanagan v. Arnaiz*, 143 F.3d 540, 545 (9th Cir. 1998); *United States v. Am. Soc. Of Composers, Authors, and Publishers*, 442 F.2d 601, 603 (2d Cir. 1971). As the Ninth Circuit explained: "it would make no sense for the district court to retain jurisdiction to interpret and apply its own judgment … yet have a state court construing what the federal court meant in the judgment." *Flanagan*, at 545.

Sanford's Tennessee gambit tries to turn the entire MDL process on its head,

usurps this Court's authority, and flies in the face of the Final Judgment in which the Court retained exclusive jurisdiction over the fee allocation. Sanford's conduct is particularly outrageous considering this Court's explicit efforts to prevent non-leadership firms from submitting or receiving compensation for bloated time of relatively little value—precisely what Sanford is seeking in Tennessee. The only logical conclusion is that Sanford intentionally filed suit in Tennessee because it knows this Court would not tolerate such blatant violation of its orders and the rules that governed Sanford's role and compensation in this MDL. While Sanford may or may not see the irony, Co-Lead Counsel certainly appreciate that Sanford has accused them of breaching their fiduciary duty under Tennessee law by doing exactly what this Court wanted and Mr. Canfield "personally assured" the Court they would do.

If Sanford is permitted to seek more money in a state court under the guise that it is entitled to compensatory and punitive damages from Co-Lead Counsel, the potential for chaos in this and future MDLs is obvious. Court orders designed to make an MDL more efficient and ensure that attorneys are compensated reasonably essentially would be rendered meaningless. Firms aiming for MDL leadership positions would be incentivized to do as much pre-appointment work as possible, regardless of its lack of utility and the added burden placed on federal court dockets,

knowing that even if they do not get what they want in the MDL they can later sue appointed leadership in state court for compensation.  And appointed leadership would face the prospect of hiring counsel to defend themselves in state courts around the country and potentially paying damages out of their own pockets if they properly reject extortionate threats from firms inappropriately demanding more money.

**B.    The Court May Enjoin Sanford's Conduct Pursuant to the All Writs Act.**

The All Writs Act, 28 U.S.C. § 1651(a), authorizes federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  The Act affords a court broad power to protect its existing jurisdiction and prevent frustration of its orders and judgments.  *United States v. N.Y. Tel. Co.*, 434 U.S. 159 (1977); *Rohe v. Wells Fargo Bank, N.A.*, 988 F.3d 1256, 1263 (11th Cir. 2021); *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1099 (11th Cir. 2004).   A court may enjoin almost any conduct that, if left unchecked, would dimmish its power over pending litigation.  *See, e.g.*, *Klay* at 1102; *Love v. Blue Cross and Blue Shield Association*, 2021 WL 949940, at *1 (S.D. Fla. Mar. 12, 2021) (under the All Writs Act, a court may issue an order necessary to enforce a settlement agreement over which the court has retained jurisdiction). The traditional four requirements needed to issue an injunction do not apply.  *Klay* at 1100-01.

Where a pending state court proceeding is at issue, a court's discretion under the All Writs Act is constrained by the Anti-Injunction Act. 28 U.S.C. § 2283. However, the Anti-Injunction Act does not bar relief here because the Act explicitly allows a federal court to enjoin a state court proceeding "where necessary in aid of its jurisdiction" and "to protect or effectuate its judgments." *See, e.g.*, *In re Bayshore Ford Truck Sales, Inc.*, 471 F.3d 1233, 1249 (11th Cir. 2006); *Klay* at 1104 ("Proceedings in other courts that involve the same facts as already issued judgments and orders, or that could result in the issuance of an inconsistent judgment, threaten the jurisdiction of the district court enough to warrant an injunction"); *Am. Soc. Of Composers, Authors, and Publishers*, 442 F.2d at 603 (affirming an injunction stopping a state court proceeding that might interference with distribution of a federal settlement fund). In fact, in this MDL, the Court has already exercised jurisdiction under the All Writs Act to enjoin the prosecution of multiple state lawsuits by class members who improperly opted out of the settlement. (Doc. 1180)

The Eleventh Circuit, furthermore, recognizes a "complex multi-state litigation exception" to the Anti-Injunction Act where, as in this case, a state court proceeding could interfere with a federal court's handling of complicated litigation over a period of years and the federal court has retained jurisdiction in its final judgment. *See, e.g.*, *In re Bayshore* at 1251-52; *Battle v. Liberty National Life*

*Insurance Co.*, 877 F.2d 877 (11th Cir.1989); *Wesch v. Folsom*, 6 F.3d 1465, 1469 (11th Cir. 1993).  Other circuits have reached the same conclusion.  *See, e.g.*, *In re American Honda Motor Company, Inc.*, 315 F.3d 417 (4th Cir.), *cert. denied*, 540 U.S. 816 (2003); *In re Diet Drugs*, 282 F.3d 220, 235 (3d Cir. 2002).

Some courts, moreover, have specifically used their authority under the All Writs Act to put a stop to efforts like Sanford's to use a state court action to seek a larger share of a federal fee award.  For example, in *Kaplan v. Reed Smith, LLP*, 919 F.3d 154, 159 (2d Cir. 2019), a law firm filed a state lawsuit for tortious interference and unjust enrichment claiming its co-counsel in a federal class action failed to pay it an agreed-upon share of the fee.  The Second Circuit upheld an injunction against the suit, noting the firm was attempting an "end run" around the district court's orders governing the fee.  Similarly, in *In re Linerboard Antitrust Litig.*, 361 Fed. Appx. 392, 394-96 (3d Cir. 2010), the Third Circuit upheld an MDL court's authority to enjoin lawyers from challenging their share of a fee allocation in a state forum because the MDL court retained jurisdiction over such challenges.  And, in *Giercyk v. National Union Fire Ins. Co. of Pittsburgh*, 2018 WL 1469048, at *1-3, a New Jersey federal court enjoined a Florida state lawsuit filed by a lawyer who wanted a larger share of a class action fee, finding that the lawsuit "directly implicates an unresolved matter over which this Court has exclusive jurisdiction,

and threatens to frustrate the orderly allocation of attorneys' fees."

For the same reasons, this Court should exercise its authority under the All Writs Act to enjoin Sanford from pursuing the Tennessee action and precluding Sanford from attempting to litigate to its share of the Equifax fee in any forum other than this MDL.

## CONCLUSION

Co-Lead Counsel respectfully request that the Court schedule an immediate hearing on this motion and, after the hearing, grant their request to permanently enjoin Sanford from seeking to avoid this Court's jurisdiction over the allocation of the *Equifax* fee award.  Co-Lead Counsel do not now seek an award of fees and expenses from Sanford.  However, if Sanford serves the Tennessee complaint, forcing Co-Lead Counsel to obtain representation in Nashville, or if Sanford pursues its frivolous claim for more money in this Court, Co-Lead Counsel reserve the right to ask this Court to compensate them for their time and any resulting out of pocket costs from Sanford's share of the *Equifax* fee that has not yet been distributed.

Dated: February 20, 2023.                    Respectfully submitted,

/s/ Kenneth S. Canfield
Kenneth S. Canfield
Ga Bar No. 107744
**DOFFERMYRE SHIELDS**
**CANFIELD & KNOWLES, LLC**
1355 Peachtree Street, N.E.

Suite 1725
Atlanta, Georgia 30309
Tel. 404.881.8900
kcanfield@dsckd.com

*/s/ Amy E. Keller*
Amy E. Keller
**DICELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street
Eleventh Floor
Chicago, Illinois 60602
Tel. 312.214.7900
akeller@dicellolevitt.com

*/s/ Norman E. Siegel*
Norman E. Siegel
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Tel. 816.714.7100
siegel@stuevesiegel.com

***Consumer Plaintiffs' Co-Lead Counsel***

*/s/ Roy E. Barnes*
Roy E. Barnes
Ga. Bar No. 039000
**BARNES LAW GROUP, LLC**
31 Atlanta Street
Marietta, Georgia 30060
Tel. 770.227.6375
roy@barneslawgroup.com

***Consumer Plaintiffs' Co-Liaison Counsel***

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), the undersigned counsel hereby certifies that this filing complies with the type-volume limitations set forth in Rule 5.1 of the Local Rules of the United States District Court for the Northern District of Georgia. Counsel hereby states that this filing has been typed in Times New Roman 14 font.

Respectfully submitted, this 20th day of February, 2023.

**THE BARNES LAW GROUP, LLC**

*/s/ Roy E. Barnes*
Roy E. Barnes
Georgia Bar No. 039000
***Consumer Plaintiffs' Co-Liaison Counsel***

31 Atlanta Street
Marietta, GA 30060
Telephone: 770-227-6375
Facsimile: 770-227-6373
Email: roy@barneslawgroup.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date I caused a copy of the foregoing document, **MOTION FOR IMMEDIATE INJUNCTIVE RELIEF TO PREVENT EVASION AND VIOLATION OF THIS COURT'S JURISDICTION AND ORDERS WITH SUPPORTING LEGAL MEMORANDUM** to be served via the Court's CM/ECF system, which will automatically send notice of such filing to all attorneys of record.

Respectfully submitted, this 20th day of February, 2023.

**THE BARNES LAW GROUP, LLC**

*/s/ Roy E. Barnes*
Roy E. Barnes
Georgia Bar No. 039000
***Consumer Plaintiffs' Co-Liaison***
***Counsel***

31 Atlanta Street
Marietta, GA 30060
Telephone: 770-227-6375
Facsimile: 770-227-6373
Email: roy@barneslawgroup.com