# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| IN RE EQUIFAX, INC. CUSTOMER DATA SECURITY BREACH LITIGATION | MDL DOCKET NO. 2800 1:17-md-2800-TWT CONSUMER CASES |

## <u>DECLARATION OF CLASS COUNSEL</u>

Kenneth S. Canfield, Amy E. Keller, and Norman E. Siegel declare as follows:

1.      This Court appointed us to serve as Co-Lead Counsel for the Consumer Plaintiffs and Settlement Class Counsel in the above-captioned MDL. Along with Roy E. Barnes, who serves as Co-Liaison Counsel, we have led the Plaintiffs' efforts in the consumer track since our appointment on February 12, 2018. We make this Declaration in support of Plaintiffs' motion for immediate injunctive relief to prevent evasion and violation of the Court's jurisdiction and orders.

2.      The Court initiated this MDL by giving clear guidance on the nature of compensable work for firms that were not appointed to leadership positions.  The issue was discussed at the February 9, 2018 hearing during which this Court heard leadership applications, a discussion that was triggered by Judge Koh's comments in *In re Anthem, Inc. Data Breach Litig.*, No. 15-md-02617 (N.D. Cal.) about the

amount of work done and sizeable lodestar sought by non-leadership firms in the fee application.  Mr. Canfield and this Court addressed the potential for a similar issue arising here in the following colloquy:

| | |
|---|---|
| Mr. Canfield: | … I can tell you … the surprise that Judge Koh expressed when the fee application in that case came in is not going to occur in this case. |
| The Court: | You can be sure of that. |
| Mr. Canfield: | And there's a lot of reasons why, Judge. If you recall in *Home Depot*, we had a bunch of protocols that we developed. Those protocols required that time be submitted quarterly, that any work [done] by somebody who wasn't appointed to the PSC had to be approved by lead counsel. … And, apparently, those things weren't done by Judge Koh. So … you can be assured that that's not going to happen in this case. |
| The Court: | … Mr. Canfield, you've been in front of me enough to know that I don't ever want to have something like that happen in front of me. |
| Mr. Canfield: | You have my personal assurance that if we are appointed it never will, Judge. |

Feb. 9, 2018 Hearing Tr. at 98-99. A true and correct copy of excerpts from transcript of the February 9, 2018 hearing transcript is attached hereto as Exhibit A.

3.     To implement the Court's order, Co-Lead Counsel sent a time and billing protocol to all non-leadership firms, including Sanford Heisler Sharp, LLP ("Sanford") on February 28, 2018.  A true and correct copy of this document is

attached hereto as <u>Exhibit B</u>.  Co-Lead Counsel described the Court's concern about excessive billing and stated: "we will strictly adhere to the Court's directive."  *Id.* at 1.  To carry out that directive, Co-Lead Counsel told the non-leadership firms that they "must obtain written approval in advance from Co-Lead Counsel" before doing any work in the MDL; that simply reporting time did not ensure a firm would be paid for it; that inappropriate time would be excluded in any fee application; and that "if you have any doubts about whether your time has been … authorized, please reach out to us for clarification."  *Id.* at 1.

4.     At the time, Co-Lead Counsel were aware that some lawyers—such as Sanford—had filed dozens of repetitive complaints in federal courts, presumably in the hope that they would enhance their prospects for a leadership position, and that these repetitive complaints were of little value to the overall litigation.  Consistent with this Court's directive, Co-Lead Counsel included the following language in the protocol sent to the non-leadership firms:

> "Time and expenses incurred prior to the appointment of Co-Lead Counsel will be considered for compensation only to the extent they contribute to advancement of the litigation as a whole. ***Time investigating or filing serial complaints … should not be submitted and will not be considered compensable time***."

*Id.* at 3.  Accordingly, shortly after Co-Lead Counsel were appointed, Sanford knew that it would not be compensated for interviewing potential plaintiffs and filing

dozens of complaints around the country and that its time related to those tasks should not be included in its monthly billing reports.

5.     Sanford, as a non-leadership firm, was restricted to a narrow role in the MDL.  Co-Lead Counsel only authorized Sanford to perform certain discrete tasks relating to its seven clients who were selected to serve as class representatives in the consolidated amended complaint filed after the Court appointed leadership.  The totality of its authorized work is described below.

6.     On February 28, 2018, in preparing the amended complaint, Co-Lead Counsel made one specific request to Sanford and other non-leadership firms: to identify and provide information for their existing clients who met certain criteria and were willing to be named as class representatives in the amended complaint.  A true and correct copy of that letter request is attached hereto as Exhibit C.  Co-Lead Counsel created an on-line questionnaire for the firms to fill out and provided a script for use in talking to their clients.  Firms were told that the questionnaire should take less than one hour to complete for each client and that any time spent vetting clients who did not meet the specified criteria would not be compensated.  In response, Sanford identified seven of its clients who were selected to serve as class representatives.   From then until the litigation concluded, Sanford was only authorized to respond to limited number of discrete requests from Co-Lead Counsel

relating to its clients, such as to send out form document preservation letters drafted by leadership, assist their clients in gathering needed documents and information, and communicate with their clients regarding the progress of the case and proposed settlement terms.

7.      Throughout the litigation, Sanford submitted its time, hourly rates, and other billing information on a monthly basis, which Co-Lead Counsel included in their quarterly *in camera* filings.  As of January 31, 2022, Sanford reported spending a total of 1,213 hours on the case, having a lodestar value of $269,809.  Of this submission, only 330.1 hours with a lodestar value of $63,356 were spent after the Court appointed leadership.  Before filing the fee application, Co-Lead Counsel personally reviewed the billing records of all participating firms, including Sanford, and excluded any time that was not compensable under the governing court order and protocols.  Doc. 858-1 at ¶ 42.  Co-Lead Counsel approved nearly all of Sanford's post-appointment time, but cut much of its pre-appointment time—in particular, time spent preparing and filing repetitive complaints.  However, consistent with its treatment of other firms representing named representatives in the Consolidated Amended Complaint, pre-appointment time relating to Sanford's work with its seven clients who were selected class representatives, where discernible,

was approved as of benefit to the overall litigation.   Sanford's approved time amounted to 519.8 hours having a lodestar value of $106,274.  *See* Doc. 858-1 at 84.

8.     Sanford and other participating firms were told in writing of the specific cuts that had been made to their time and lodestar amounts on October 4, 2019. Sanford's final time and lodestar amounts (as well as those of all other participating firms) were then filed publicly in support of Plaintiffs' fee application on October 29, 2019.  Doc. 858-1 at 84.  And this Court approved that time and lodestar in its fee award.  Doc. 1029 at 103-104 (discussing overall time spent on litigation after Co-Lead Counsel reviewed all time entries).

9.     Once all objections were resolved on appeal, Co-Lead Counsel allocated the fee awarded by the Court to the participating firms based on the value each firm brought to the case, not a rote lodestar allocation.  This was the exact approach to allocation Co-Lead Counsel announced in the billing protocol sent to the leadership firms in February, 2018 and again in an October 4, 2019 letter sent to all participating firms, including Sanford:

> If we are fortunate enough to be awarded a fee in this litigation, the allocation of the fee among the participating firms will be made by Co-Lead Counsel after the fee has been awarded.  In allocating any fee, Co-Lead Counsel will be guided by the concept that each firm will be rewarded for the value it has contributed to the results obtained for our clients.  While each firm's lodestar will be a substantial factor in determining value, it will not be the only factor. Significant weight will be given to factors such as how efficiently a firm has handled its responsibilities, the nature of the work that was done, creativity,

collegiality, equity, and any other considerations that Co-Lead Counsel deem relevant or material.

October 4, 2019 letter, a true and correct copy of which is attached hereto as <u>Exhibit</u> <u>D</u>.  Using this standard, Co-Lead Counsel decided  that Sanford's lodestar—as included in the fee application and approved by the Court—was fair and reasonable compensation for the value it provided.  Many factors supported Co-Lead Counsel's decision.

10.    First, Sanford played a minor role by design, consistent with this Court's guidance on the involvement of non-leadership firms in the litigation.  The nature of Sanford's authorized work was routine, uncomplicated, and limited in scope.  The work did not require any substantial creativity or discretion and was made even easier because Co-Lead Counsel provided an online questionnaire, standard forms, and scripts for Sanford to use with its clients. *See* Ex. C.

11.    Second, there was nothing unique, critical, or indispensable about Sanford's contribution, which was akin to that of the 47 other, non-leadership firms. The 45 complaints Sanford prepared and filed pre-appointment added nothing more to the result than the hundreds of complaints filed by other firms; Sanford's complaints, for example, did not introduce any materially novel legal theories, present any materially new fact patterns, or improve plaintiffs' settlement leverage. Moreover, the litigation would have reached the same exact result without the

involvement of Sanford and its clients.  Indeed, the amended complaint named 89 other class representatives whose individual claims were sufficient to allow Plaintiffs to survive a motion to dismiss and induce Equifax to settle the litigation on favorable terms.

12.     Third, consistent with this Court's directive, Sanford was not assigned any critical work.  That work was done by the appointed leadership.  Sanford thus did none of the key work that drove the successful result for the class, such as developing strategy, drafting a brief, standing up in court, taking a deposition, working with the experts hired by Co-Lead Counsel, interacting with defense counsel or government regulators, negotiating the settlement, designing the notice and claims program, overseeing settlement administration, or coordinating the work of the firms that undertook those responsibilities.

13.     Fourth, Sanford's allocation was equitable in comparison with the contributions of other law firms. The leadership firms were unquestionably entitled to much larger allocations because of the nature, importance, and scope of the work they performed; the intensity of their efforts; and the incredible financial risks they undertook by committing such large resources to the litigation.  The value of their contributions, unlike Sanford's, vastly exceeded their approved lodestar.  Sanford

also was fairly treated in relation to the other non-leadership firms and, in fact, received the largest allocation of any of them.

14.     In short, in limiting Sanford's work and its share of the resulting fee, Co-Lead Counsel carried out the Court's instruction to restrict the role and lodestar of non-leadership firms; transparently used the allocation standard that we  said we would from the outset; based our decision on the time records and billing records that Sanford reported to us; and in accordance with the applicable billing protocol cut Sanford's time to exclude unauthorized and unhelpful work, almost all of which was pre-appointment.  Not until years later did Sanford ever complain to Co-Lead Counsel about its role, the cuts to its time, or the rates used to calculate its lodestar.

15.     In January and February 2023, after all appeals had been dismissed and Co-Lead Counsel had allocated the fee award, participating firms were asked to provide an IRS Form 1099 and transmittal instructions for payment of their share to the settlement administrator and, once that information was received, each firm's share of the fee was distributed.  Sanford has never provided the requested Form 1099 and wiring instructions.  Sanford's share of the fee remains in the hands of the settlement administrator.

16.     Between February and August 2022, Kevin Sharp, a Sanford partner, had a few sporadic and casual communications about Sanford's allocation with

9

Norman Siegel and Amy Keller, two of the appointed Co-Lead Counsel.  While expressing some disappointment with Sanford's share, Mr. Sharp was cordial and appeared to understand Co-Lead Counsel's decision.  All that changed dramatically on November 3, 2022, when Mr. Sharp sent Mr. Siegel a letter accusing Co-Lead Counsel of "fraud," "massive self-dealing," "shenanigans," "unethical conduct," "misleading the Court," and "a grotesque breach" of their duties in allocating Sanford's share of the fee. A true and correct copy of the November 3, 2022 letter is attached hereto as Exhibit E.

17.    In the letter, Mr. Sharp asserted for the first time that his firm spent more than 3,400 hours on the case having a lodestar value of $1,420,444—roughly three times the hours and five times the lodestar it had previously reported, and vastly more than the figures included in the fee application.  Mr. Sharp did not contend this newly disclosed time had been authorized by or properly reported to Co-Lead Counsel or the Court.  Nevertheless, he argued for more money because his firm allegedly "jump-started" the litigation before MDL leadership was appointed (by interviewing more than 12,000 potential plaintiffs and filing 45 separate complaints) and had added "incredible" value post-appointment (by identifying seven "critical" class representatives).  Mr. Sharp also argued that Co-Lead Counsel wrongfully induced his firm (alone among the 60 other participating firms) to use billing rates

below its usual and customary rates and to inappropriately write off much of its pre-appointment work.  Because Sanford's "true" lodestar was roughly five percent of the total collective lodestar, Mr. Sharp claimed entitlement to five percent of the total fee, *i.e.*, $3,875,000.

18.    Co-Lead Counsel rejected Mr. Sharp's claim in a letter from Mr. Siegel dated November 21, 2022, explaining that: (1) Sanford had waited too long to complain, having known about its approved lodestar and the methodology for allocating the fee for more than three years and allocations had been distributed to the other participating firms eight months earlier; (2) this Court did not order that firms be paid their lodestar plus the same multiplier, but based the fee on a percentage of the recovery and left the allocation to Co-Lead Counsel; (3) Co-Lead Counsel allocated fees based on the value each firm contributed as they had explained they would do and the value of Sanford's contribution was relatively minor; (4) Sanford's pre-appointment work interviewing 12,000 potential plaintiffs and filing repetitive complaints was unauthorized, unnecessary, and inconsistent with the governing protocol and order; and (5) the protocol Co-Lead Counsel sent to the firm at the outset unambiguously set forth the time and billing rates Sanford should be report.  Mr. Siegel's letter concluded with the following statement: "Judge Thrash maintains jurisdiction over the Settlement, and we suggest that any further

issue related to this matter be directed to him for final resolution." A true and correct copy of the November 21, 2022 letter is attached hereto as Exhibit F.

19.     Co-Lead Counsel have heard nothing from Sanford for nearly three months but learned last week from other sources that on February 6, 2023, Sanford sued them in the Chancery Court of Davidson County, Tennessee.  A copy of that complaint is attached hereto as Exhibit G and a copy of the text of the docket in that case as of February 17, 2023 is attached hereto as Exhibit H. In the suit, which as of writing this motion has not yet been served, Sanford contends Co-Lead Counsel are subject to personal jurisdiction there for our alleged misconduct under Tennessee law in allocating the fee.  Specifically, the suit avers Co-Lead Counsel violated their fiduciary duty by allocating Sanford too little; Co-Lead Counsel violated an implied contract that Sanford be compensated fairly arising from this Court's leadership appointment order; Sanford is entitled to more money under the theory of quantum meruit; and Co-Lead Counsel would be unjustly enriched if allowed to retain fees that in good conscience belong to Sanford.  The suit seeks compensatory damages in excess of $1 million and unspecified punitive damages, or, alternatively, disgorgement of co-counsel's alleged "ill-gotten gains." Sanford demands a jury trial in Tennessee state court.

We declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 20th day of February, 2023 in the United States.

/s/ Kenneth S. Canfield
Kenneth S. Canfield
Plaintiffs' Co-Lead and Class Counsel

/s/ Amy E. Keller
Amy E. Keller
Plaintiffs' Co-Lead and Class Counsel

/s/ Norman E. Siegel
Norman E. Siegel
Plaintiffs' Co-Lead and Class Counsel

# EXHIBIT A

1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT OF GEORGIA
 2                              ATLANTA DIVISION

 3

 4    IN RE: EQUIFAX, INC. CUSTOMER      )
      DATA SECURITY BREACH LITIGATION    )
 5                                        ) Case No. 1:17-MD-2800-TWT
                                          )
 6                                        ) February 9, 2018
                                          ) 10:09 a.m.
 7    _____ ) Atlanta, Georgia

 8

 9                             -   -   -

10

11              TRANSCRIPT OF THE HEARING ON APPLICATIONS FOR
                         LEADERSHIP POSITIONS
                BEFORE THE HONORABLE THOMAS W. THRASH, JR.,
12                     U.S. DISTRICT COURT JUDGE

13                             -   -   -

14

15

16

17

18

19            Proceedings recorded by mechanical stenography
                and computer-aided transcript produced by
20
                      SUSAN C. BAKER, RMR, CRR
21                      2194 U.S. COURTHOUSE
                     75 TED TURNER DRIVE, S.W.
22                      ATLANTA, GA  30303
                          (404) 215-1558
23                  susan_baker@gand.uscourts.gov

24

25
```

6

1            (Proceedings held February 9, 2018, Atlanta, Georgia,

2     10:09 a.m., in open court.)

3            THE COURT:  The fire marshal would be appalled.  I

4     tried to move this to the ceremonial courtroom where we'd have

5     more space, but they have got a naturalization service going on

6     there.  So we're stuck here.

7            All right.  This is a hearing on the applications for

8     leadership positions on the Plaintiffs' side in this case, In

9     Re: Equifax, Inc. Customer Data Security Breach Litigation,

10    Case Number 17-MD-2800.

11           When I scheduled this hearing, my hope and intention

12    was that I'd be able to hear from those who were applying for

13    leadership positions and make a decision and announce at the

14    conclusion of the hearing.  I did that expecting there would be

15    maybe 10 or 12 applications for leadership positions.  Instead,

16    I have 45.

17           So I would still like to finish this today.  That

18    will only be possible, if it is possible -- and that's a big if

19    -- everyone exercises extraordinary restraint in terms of the

20    length of your presentations.  Those of you that have practiced

21    before me know that the prize does not go to the lawyer who

22    speaks the longest or the loudest.  In fact, the ability to be

23    direct and succinct is a quality of advocacy that I think is

24    grossly undervalued but that I certainly recognize.  So we will

25    proceed.

1    cases throughout the country, including in *Volkswagon* and

2    *Anthem* and *NECC*.  Through that work, we have become great

3    friends with many of the fine lawyers in this room.  And we

4    would welcome the opportunity to work with any of them again in

5    pursuit of successful resolution of this case on behalf of the

6    consumer victims.

7              Thank you, Your Honor.

8              THE COURT:  Thank you, Mr. Gastel.

9              All right.  Next is the Barnes/Canfield group.

10             MR. CANFIELD:  Your Honor, the Court obviously has

11   before it lots of accomplished lawyers who want to lead the

12   consumer track in this litigation.  Our group has worked with

13   most of them.  Many are personal friends.  A large percentage

14   reached out to us before this litigation about working with us

15   and our group about the case.  Obviously, there are too many to

16   include everyone who's competent and qualified to appear in the

17   leadership structure of this case.

18             We believe the Court has several options available to

19   it -- there may be others -- to make its selection.  One

20   approach would be for the Court to pick and choose among the

21   various groups and applications that have been made by

22   selecting the individual applicants that the Court believes can

23   do the best job.  As other courts have recognized, there are

24   some problems with that approach.  The Court doesn't know the

25   lawyers, résumés don't necessarily tell you who a person is,

1   and personal qualities that are particularly important in

2   managing a piece of litigation like this are not readily

3   apparent.

4           The other approach, what the Manual on Complex

5   Litigation refers to as private ordering, allows the lawyers to

6   work among themselves to decide among themselves by the people

7   who best know the bar in this area to assemble for the Court's

8   consideration the best team for this particular litigation.

9   And if the Court feels that group needs to be expanded for

10  whatever reason, then additional lawyers can be added.

11          We don't propose to tell the Court which -- and we're

12  not presuming to tell the Court which of those approaches is

13  most appropriate.  Although, we believe that particularly in

14  this case with so many lawyers the Court would be better served

15  by following the private ordering approach that's endorsed by

16  the manual.

17          We believe that our group is the best suited to lead

18  this track and that the Court should appoint our group in its

19  entirety.  We will, of course, work with whoever the Court

20  decides in whatever capacity the Court determines is

21  appropriate.  And if the Court decides to break up groups, the

22  members of our group will willingly participate in any role

23  that the Court feels is appropriate.  But, as I say, we believe

24  we have the best group.  And if the Court decides to go with

25  the private ordering approach, the Court does not believe our

1   group is the best group, we would suggest that the Court

2   appoint some other group.

3          There's a reason that we are so strongly committed

4   and believe that the Barnes/Canfield group as it is and in its

5   entirety is the best to handle this case.  We deliberately

6   assembled our group from people who have -- to make up a team.

7   That was our goal.  And our team members were people who have

8   worked together in these kinds of cases in the past and each of

9   whom brings the right talents, the right data breach experience

10  and the personal qualities to most effectively prosecute this

11  case against this Defendant in this district.

12         Let me outline five reasons why we believe our group

13  is best suited.  First, I don't think that it can be questioned

14  but our group collectively has by far the most data breach

15  experience in this matter.  If the Court has looked at the

16  exhibit to our filings, it lists 54 data breach cases in which

17  group members have participated in leadership appointments.  In

18  36 of those cases, we have been appointed as sole lead or as

19  co-lead.  In many of those cases, we have both members of the

20  steering committee and lead counsel in the same case who are

21  part of our group.

22         Our group also includes lead counsel in the three

23  most recent and most significant settlements in data breach

24  cases, the two settlements that Your Honor approved in *Home*

25  *Depot* and the recent settlement in the *Anthem* case which is by

1  far the most significant settlement in any data breach case in

2  history.  No other applicant or group comes close to our

3  experience.

4        Second, this group has significantly advanced the

5  litigation to this point.  Procedurally, we filed the first

6  cases in this district.  Mr. Siegel led the effort to -- and

7  filed the petition before the JPML to ask that this litigation

8  be transferred here.  He's the one that argued in front of the

9  JPML and convinced the JPML to send the case here.

10        Once the case --

11        THE COURT:  When I heard about that, my first

12  inclination was to go out and buy two shares of Equifax stock.

13  I still think that might have been a good idea.

14        MR. CANFIELD:  Those of us in Atlanta would have been

15  very disappointed if you would have done that, Judge.

16        Once the cases were transferred here, Mr. Siegel and

17  I have worked with defense lawyers at King & Spalding on all

18  sorts of pretrial issues.  And Mr. Siegel in particular played

19  a very significant role in assisting Mr. Worley in carrying out

20  his duties as designated by CMO Number 1 and served as perhaps

21  the principal contact with the King & Spalding lawyers on that

22  matter.

23        Substantively, our group filed a new complaint in

24  November, the Allen complaint.  It is the only case that has

25  brought together individual Plaintiffs from every state, all 50

1   states.  Mr. Pizzirusso in our group and Ms. Keller took the

2   lead in vetting thousands of Plaintiffs to be able to put that

3   complaint together led by Mr. Barnes and PSC members

4   Mr. Yanchunis and Mr. Friedman.  We have also retained the key

5   database experts in this field to help us, and they have been

6   working with us actively.  They're not just retained.  They

7   have been doing a lot of work.  And it's true we didn't put

8   their names in our application, but we didn't feel it was

9   appropriate at this point in the litigation to tell the world

10   who was working with us.

11           Third, as I mentioned and I want to emphasize, we are

12   not a randomly or opportunistically assembled group.  We are a

13   collection of highly experienced lawyers with complementary

14   talents, and we have shown that by putting together and

15   ensuring the Court what our committee structure will be in this

16   litigation if we are honored enough to be selected in the lead.

17   Those assignments reflect work that's already being done, and

18   it reflects very conscious decisions to take advantage of the

19   particular talents of the people who make up our group.

20           Ariana Tadler who is on our proposed PSC will lead

21   our discovery team.  She's one of the country's authorities and

22   experts on e-discovery and has led the discovery in two of the

23   largest data breach cases in history, including *Target* and

24   *Yahoo*.  This is not a matter that is on-the-job training for

25   her.

1    Eric Gibbs who is also on our proposed committee is
2    responsible for chairing the class certification committee.
3    Mr. Gibbs is one of the few lawyers in the country who has
4    successfully gotten a consumer litigation class certified in a
5    data breach case.
6        Mr. Pizzirusso who will chair our Plaintiffs'
7    discovery committee will continue the role that he played in
8    connection with the Allen complaint in vetting any additional
9    Plaintiffs and being responsible for the discovery that's
10   directed at that.
11       Mr. Yanchunis who has worked with some of the world's
12   leading authorities in data breach areas, cases in the past
13   will serve as our expert.
14       Committee chair, Mr. Friedman, the chair of our
15   injunctive relief committee, is the architect of the *Anthem*
16   data breach.  He was the co-lead counsel in that case which is
17   by far the most comprehensive set of injunctive and data breach
18   security measures that have been adopted as part of the data
19   breach settlement.
20       Governor Barnes, in addition to his duties as liaison
21   counsel, will be responsible for coordinating with all the
22   state regulators and other governmental entities who are
23   investigating Equifax.  And he has obviously got extensive
24   political contacts across the country.
25       And in addition to serving as co-lead counsel, I'll

1    serve as chair of the law and briefing committee personally

2    doing the work just as I did in *Home Depot*.  We believe this

3    structure will work and it's efficient.

4              Fourth, our group is the most diversified slate by

5    gender, by race, geography, background and age and, thus, is

6    the only leadership group that fully satisfies the Duke

7    guidelines.  We are the only group that has a woman as a

8    proposed co-lead.  Ms. Keller is qualified in her own right but

9    obviously has diversity as a younger woman in a co-lead role.

10              We have identified Rodney Strong who is a prominent

11   African-American lawyer in Atlanta to serve as the state

12   coordinating counsel working with the judges and the litigants

13   in the Fulton County Superior Court where there are competing

14   data breach cases against Equifax pending.

15              Our slate includes several lawyers from firms that

16   have MDL experience but are not the type of repeat players that

17   some people have complained about.  We're a mix of small firms

18   and national powerhouses, and we've made a place in our slate

19   for the next generation of younger lawyers who have got a lot

20   of talent and are on their way up.  In short, the Court doesn't

21   need to appoint anyone to our group to satisfy the Duke

22   standards.

23              And, lastly, fifth, our group has longstanding

24   relationships built on trust and mutual respect with the

25   defense lawyers in this case and the specific lawyers at King &

1    Spalding.  These relationships go back decades and have come

2    about by working together on dozens of cases.  Just in the last

3    year or so members of our group have achieved a 20 million

4    dollar verdict in a wrongful death trial and settled three

5    class actions, including two data breach cases with King &

6    Spalding lawyers, including the lawyers who are here in this

7    courtroom.

8            Those relationships matter.  They matter not because

9    we can go out to lunch together.  They matter for the Court

10   because through relationships, through the ability to -- and

11   the longstanding working relationships that have evolved we can

12   prevent the kinds of issues that otherwise would end up before

13   the Court.  If we've got a discovery dispute, it's not going to

14   be here because lawyers are mad at each other or can't get

15   along.  It'll be here because there's a legitimate dispute that

16   can't be resolved without the involvement of the Court.  So

17   it's going to save a lot -- the Court a lot of time.

18           Relationships also matter in settlement.  Mr. Siegel

19   in addition to serving as co-lead counsel will chair our

20   settlement committee.  Mr. Siegel served in that role in the

21   *Home Depot* case as Your Honor knows, and he developed a very

22   good relationship with King & Spalding that will allow us to

23   engage Equifax early on in resolution discussions to deliver

24   needed financial and injunctive relief to the victims of this

25   unprecedented breach.

1        In short, the Court can be confident that if our
2   group is appointed in its entirety the litigation will be
3   zealously and professionally pursued, handled in a collegial
4   and ethical matter and conducted efficiently and effectively
5   consistent with this Court's expectations and standards which
6   we know well.

7        Let me lastly address the *Anthem* issue that's come
8   up.  I wasn't involved in the *Anthem* case.  Mr. Barnes wasn't
9   involved in the *Anthem* case either.  There were a lot of other
10  lawyers in this courtroom, by our count about 20 lawyers, not
11  necessarily in this courtroom, but applicants who participated
12  in *Anthem* in one way or another, including people from all of
13  the competing groups.  Our group has two of the four-member
14  leadership team that was specifically appointed by Judge Koh,
15  Andy Friedman who is one of two co-lead counsels -- his co-lead
16  is not seeking to participate in this case -- and Eric Gibbs
17  who was on the PSC.

18       I have read Judge Koh's order, and I have talked with
19  Mr. Friedman and Mr. Gibbs about what happened.  Apparently,
20  Judge, there were, as I said, four law firms that were
21  appointed to handle that case.  In a very short period of time
22  relatively, they took over 200 depositions, reviewed over four
23  million documents and put together the best settlement both
24  money-wise and injunctive relief-wise that's ever been achieved
25  in a data breach case.

1      Judge Koh recognizes their work and the nature of the

2   settlement in her order.  What happened was that Judge Koh was

3   apparently surprised and disappointed that there were lots of

4   other lawyers other than those four that she had named who had

5   participated.  Mr. Friedman and his co-lead thought that they

6   had been approved to use other lawyers, and so they submitted a

7   fee application.  Whether that was appropriate or not hasn't

8   been addressed by Judge Koh.  What I can tell you is that the

9   surprise that Judge Koh expressed when the fee application in

10   that case came in is not going to occur in this case.

11           THE COURT:  You can be sure of that.

12           MR. CANFIELD:  And there's a lot of reasons why,

13   Judge.

14           If you recall in *Home Depot*, we had a bunch of

15   protocols that we developed.  Those protocols required that

16   time be submitted quarterly, that any work had to be done by

17   somebody who wasn't appointed to the PSC had to be approved by

18   lead counsel.  We didn't allow the use of contract lawyers

19   without prior approval, and we didn't use any.

20           And, apparently, those things weren't done by Judge

21   Koh.  So I don't think that -- as I say, you can be assured

22   that that's not going to happen in this case.

23           THE COURT:  Well, I read that transcript of the final

24   settlement approval hearing -- I think that's what it was --

25   yesterday afternoon at a point in time where my eyes were

1    literally about to explode.  But, Mr. Canfield, you've been in

2    front of me enough to know that I don't ever want to have

3    something like that happen in front of me.

4         MR. CANFIELD:  You have my personal assurance that if

5    we are appointed it never will, Judge.

6         The way we construed this Court's order regarding

7    filing fee applications we didn't understand that members of

8    our team would be able to file individual applications as well

9    as a group application.  We thought that the Court was limiting

10   us to 25 pages and 50 pages for the entire group.

11        THE COURT:  Well, there was some confusion about

12   that; and I'm the cause of it.

13        MR. CANFIELD:  Right.  And what I was -- with the

14   Court's permission, what we would like to do is to have my two

15   other proposed co-leads stand up and very briefly introduce

16   themselves so the Court's aware of who they are; and then

17   Mr. Barnes would like a moment to address that information and

18   material that was presented to the Court yesterday by whoever

19   it was.

20        Incidentally, we did a little bit of investigation;

21   and we've found out that that Federal Express package

22   apparently started in New Jersey even though it has a return

23   address in Minneapolis, and the address in Minneapolis is a CVS

24   inside a *Target* store.  So somebody went to a lot of effort to

25   conceal their identity.

1          THE COURT:  Thank you.

2          Well, as I said, I'm not going to make a decision or

3  announce a decision right at the moment.  I'm going to think

4  about it over the weekend.  There are a couple of little

5  things, relatively small things that I need to look at again.

6  And I hope that I will make a quick decision because I

7  recognize that really nothing can be done in this case until

8  the Plaintiffs' leadership is established and put in place.

9          So I'm going to take the weekend to think about it

10  and hope to get out an order very quickly.  And thank y'all

11  again.

12          Court's in recess until further order.

13          (Proceedings adjourned at 3:38 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

139

```
1                          C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT:

4    NORTHERN DISTRICT OF GEORGIA:

5

6            I hereby certify that the foregoing pages, 1 through

7    138, are a true and correct copy of the proceedings in the case

8    aforesaid.

9            This the 11th day of February, 2018.

10

11

12

13                     /s/ Susan C. Baker

14                     Susan C. Baker, RMR, CRR
                       Official Court Reporter
15                     United States District Court

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT B

**MEMORANDUM**

TO:   Equifax Data Breach Litigation Consumer Counsel

FROM:  Ken Canfield, Amy E. Keller, Norman E. Siegel
     Co-Lead Counsel

DATE:   February 28, 2018

RE:    Time and Expense Reporting Protocol for Non-Leadership Firms
     *Equifax Data Breach Consumer Counsel*

---

Pursuant to the February 12, 2018, Order appointing Co-Lead counsel, we are implementing the time-keeping and expense-reporting requirements described below. We have also attached an Excel spreadsheet template for your use. Please review this protocol carefully. If the protocol's procedures and requirements are not followed, you may forfeit your ability to be compensated for any time if we are fortunate enough to earn a fee.

**I.**  **Overall Policies**

In his Order and at the most recent hearing on February 9, 2018, Judge Thrash addressed the role in this litigation of firms he did not appoint to leadership positions. The judge has made clear that he wants as much of the work as possible to be done by the firms he appointed to lead the litigation and that he does not want any surprises relating to billing by non-leadership firms in any fee application we may file. To this end, Judge Thrash's order specifically states:

> In order for their time and expenses to be compensable, those not serving in leadership positions must secure the express authorization of Co-Lead Counsel for any projects or work undertaken in this litigation.

ECF No. 232 at 10. We will strictly adhere to the court's directive. Accordingly, before you expend any time in this litigation for which you may seek compensation, you must obtain ***written approval in advance from Co-Lead Counsel.*** Moreover, the written approval must clearly authorize all of the time for which you seek to be compensated. If you have any doubts about whether your time has been so authorized, please reach out to us for clarification.

Simply reporting the time does not mean a firm will be paid for that time or that such time will be included in any fee application. We will not be able to include in any fee petition any time that is not expended and timely reported in accordance with this protocol. Further, Co-Lead Counsel will evaluate the propriety of all reported time to ensure that the tasks were efficiently handled and it is reasonable. Note also that we likely will adopt a standardized rate structure and in that event will not use billing rates reported by individual lawyers.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

## II.    Submission of Time

Time and expense reports will be compiled and maintained by Stueve Sigel Hanson LLP. Please transmit your monthly time and expense reports electronically in PDF and Excel format to equifaxtime@stuevesiegel.com.  If you have any questions regarding the reports, please contact Sheri Williams at Stueve Siegel Hanson, either by email (williams@stuevesiegel.com) or by telephone (816-714-7133).

Each monthly time and expense submission must include the Time and Expense Reports in both a single Microsoft Excel workbook format (.xls) and PDF (.pdf) format. This means that each monthly submission email will consist of *one* PDF file and *one* Excel file, within which there will be three tabs: Monthly Expense Report; Monthly Time Report; and Monthly Time Report Summary. **Submissions must be made using the attached Time and Expense Reports. Time and expenses not submitted using these Reports will not be considered.**

The first time and expense reports are due on **March 15, 2018,** and should include all qualified time and expenses incurred through February 28, 2018. Time and expense reports thereafter are to be submitted by the 15th of each month (or the first business day thereafter) for the preceding month (i.e., the April 16, 2018, time and expense reports should include all time and expenses from March 2018).  *If not submitted in a timely manner, your time and expenses will not be considered for compensation absent good cause to the contrary.*

You must maintain the underlying time and expense records that support your monthly submissions, including original receipts.   Time and expense reports shall be created and submitted pursuant to the protocol set forth herein.

## III.    Verification

All Time and Expense Reports must be certified by an attorney with authority in each firm attesting to the accuracy of the submissions.  This requirement may be satisfied by including such a certification along with each submission, either as a separate attachment to the email containing the submissions, or, if the submission email is sent directly by the certifying attorney, then in the body of the email containing the submissions.

## IV.    Time Reporting Details

The Court's February 12, 2018 Order provided that "[f]ailure to maintain and submit records with sufficient descriptions of time spent and expenses incurred may be grounds for denying attorneys' fees and/or expenses, for the period that relates to the missing or inadequate submissions."  ECF No. 232 at 10.

So that there are no issues with time reporting, in keeping with the Court's February 12 Order, please observe the following protocols:

- Time submissions must be based on contemporaneously kept records.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

- Time reporting is to be recorded in segments of 1/10th of an hour.

- Time reported must include a detailed description of the work performed.  Vague task descriptions, such as "performed legal research" or "reviewed documents" are not sufficient.

- Do not bill for leaving a voicemail or communication with administrative staff (except for very lengthy substantive conversations, such as training staff on document review protocols).

- Time reported must be reasonable and necessary and shall not exceed the fair value of the services performed.  Unnecessarily duplicative work by multiple lawyers in the same firm will not be accepted.

- Time and expenses incurred prior to the appointment of Co-Lead Counsel will be considered for compensation only to the extent they contribute to advancement of the litigation as a whole. Time investigating or filing serial complaints, contesting the motion to transfer before the JPML, and seeking to lead the litigation should not be submitted and will not be considered compensable time.

- General review of MDL filings, orders, transcripts, emails, or other documents not directly related to work assigned by Co-Lead Counsel will not be considered compensable time.

- Time spent reviewing or drafting emails should be the actual time spent, just like time spent on every other authorized activity.

- If you receive advance authorization from Co-Lead Counsel to work on this case, you shall provide to us in advance of the work being done a list of the proposed attorneys/paralegals who will bill time on this case and their customary and usual court-approved hourly rates. For each attorney, you must also specify whether the attorney is a partner or associate (including of counsel or other designations), and the year of law school graduation. After receipt of these hourly rates, we reserve the right to harmonize these rates.

## V.    Expense Report Details

The Court was also very specific in its February 12, 2018 Order that expense reports must be maintained contemporaneously and with specificity.  ECF No. 232 at 9-10.  Accordingly, please observe the following protocols:

- Counsel are reminded that only reasonable and appropriate expenses incurred while performing work to advance the litigation will be eligible for consideration as compensable expenses.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

- Receipts for all expenses must be maintained by the submitting counsel and shall be provided to Co-Lead Counsel upon request.

- Co-Lead Counsel have established a litigation fund managed by Stueve Sigel Hanson LLP. The litigation fund that we have established will be used to pay common expenses, which include filing and service costs; deposition and court reporter fees; the cost of creating and operating a document depository; administrative expenses, such as the expenses associated with PSC meetings and conference calls; expert and consultant fees and expenses; fees for e-discovery, copying, and coding (done outside a firm); witness expenses; fees for independent investigators; bank charges; and such other common expenses approved by Co-Lead Counsel. Bills for common expenses should be sent for payment to Stueve Siegel. Requests for payment of common expenses will not be honored unless, before the expense is incurred, written approval is obtained from Co-Lead Counsel.

- You should report non-common expenses for which you may seek reimbursement on a monthly basis consistent with the policy set forth below all. Non-common expenses should be reported at cost without any markups. The following expenses are not reimbursable and should not be reported: fax charges; postage; long distance telephone charges; postage; in-house photocopying; computerized legal research; and secretarial or clerical overtime. Any exceptions to this policy must be approved in writing by Co-Lead Counsel.

- Although counsel should submit all expenses incurred in a certain month in the submission made on the last calendar day of the next month, some third party billing and credit card statement schedules may make such quick expense submission difficult in some circumstances. In such circumstances, counsel may include expenses incurred in the previous two months that—because of circumstances outside the submitting counsel's control—could not have been submitted by the deadline. Counsel must include an explanation for such submission in the "Explanation" column in the Expense Report.

- Any expenses submitted more than two months in arrears will not be considered or included in any compilation of compensable expenses and will be disallowed, except for good cause shown and with approval of Co-Lead Counsel.

- Expense Reports must be submitted using the attached form and must be reported using the following category codes:

    1. **Federal Express / Local Courier, etc.**

    2. **Hotels**

    3. **Meals**

    4. **Mileage** (any request for mileage expenses must include the total number

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

of miles, which will be multiplied by the IRS Standard Business Mileage Rate for the period in which the mileage was driven)

5. **Air Travel** (counsel shall use best efforts to obtain reasonably-priced plane tickets; First-Class airfare shall not be reimbursed)

6. **Deposition Costs** (for all court reporter and videographer costs)

7. **Bloomberg/Pacer**

8. **Witness and Expert Expenses**

9. **Court Fees**

10. **Service of Process Fees**

11. **Hearing and Trial Transcripts** (for all non-deposition transcripts; deposition transcript expenses should be recorded using Code 11)

12. **Ground Transportation** (*i.e.*, rental car, taxi)

13. **Miscellaneous** (this code should be used rarely, if at all, and must include a specific explanation of the nature of the expense)

- Every expense needs to be detailed and specific. Descriptions such as "Deposition Services" or "Plane Ticket" are insufficient.

- No entry should contain more than one category of expense and no entry should have more than one expense category code assigned. If, on the same day, one person incurs two expenses, there should be two separate entries for that person for that date. If multiple timekeepers incur the same expense for the same category, then there should be a separate entry for each person.

* * *

Time and expense reports will be reported to the Court *in camera* every quarter, beginning on April 30, 2018, and thereafter on the last business day of each July, October, January, and April. ECF No. 232 at 10. To ensure that we remain current with our obligations pursuant to the Court's February 12, 2018 Order, it is imperative that you follow the instructions above.

We look forward to litigating this case with you.

# EXHIBIT C

| | |
|---|---|
| **From:** | Anna Galloway <agalloway@hausfeld.com> |
| **Sent:** | Wednesday, February 28, 2018 2:10 PM |
| **To:** | Anna Galloway |
| **Cc:** | James J. Pizzirusso |
| **Subject:** | In re: Equifax, Inc., Customer Data Security Breach Litigation - Consumer Plaintiff Consolidated Amended Complaint |
| **Attachments:** | Equifax - Introduction Letter (2.28.18 Final).pdf; Equifax - Plaintiff Vetting Questionnaire (2.28.18 Final)'.pdf; Equifax - Questionnaire Script for Clients (2.28.18 Final).pdf |

**CONFIDENTIAL - ATTORNEY CLIENT PRIVILEGED/WORK PRODUCT**

To All Counsel Representing Consumer Plaintiffs in the Equifax MDL:

If you are not counsel representing consumer Plaintiffs in the Equifax MDL and/or no longer wish to receive such communications, please delete this email and attachments and confirm that you should be removed from this distribution list. Otherwise, on behalf of James Pizzirusso, one of the court-appointed members of the Consumer Plaintiffs' Steering Committee, please review the attachments for important information about vetting and the potential inclusion of your clients in the Consolidated Amended Complaint.  Responses are needed by **March 12, 2018**.

Sincerely,

Anna Galloway on behalf of James Pizzirusso

**James J. Pizzirusso**
Partner
jpizzirusso@hausfeld.com



1700 K Street, NW
Suite 650
Washington, DC 20006
202-540-7200 Main
202-540-7201 Fax
**www.hausfeld.com**



This electronic mail transmission from Hausfeld LLP may contain confidential or privileged information. If you believe you have received this message in error, please notify the sender by reply transmission and delete the message without copying or disclosing it.



JAMES PIZZIRUSSO
Partner

1700 K Street, NW
Suite 650
Washington, DC 20006

202-540-7200 Main
202-540-7201 Fax

jpizzirusso@hausfeld.com

February 28, 2018

<u>**Confidential Work Product - Privileged Communication - DO NOT SHARE**</u>

<u>**Response Required by March 12, 2018**</u>

<u>**VIA ELECTRONIC MAIL**</u>

**Website –** https://equifaxdatalawsuit.com/submit/
**Password –** d7L72!8Z2F5d

Re:     *In re: Equifax, Inc., Customer Data Security Breach Litigation*, Case No. 17-
          MD-2800-TWT

Dear Counsel:

At the direction of Consumer Plaintiffs' Co-Lead Counsel and as one of the members of the Plaintiffs' Steering Committee, my firm has been tasked with overseeing the vetting of plaintiffs for potential inclusion in the Consolidated Amended Complaint ("CAC") to be filed on April 13, 2018. As part of the vetting process and selection of named plaintiffs for the CAC, we are collecting relevant information about your clients through an online questionnaire. We need this information for all plaintiffs who would like to be considered for inclusion in the CAC.

Starting on Wednesday, February 28th, you will be able to access the online questionnaire at: https://equifaxdatalawsuit.com/submit/. We have attached a hard copy of the questions that correspond to this online questionnaire, as well. We ask that you **only fill out the online questionnaire for clients that are willing to serve as a class representative, have been advised of and have preserved all relevant documents, and fall into one of the following categories**:

- ***Identity Theft or Fraud***: The client's (i) personal information was compromised by the Equifax breach; (ii) he/she suffered a demonstrable out-of-pocket loss after the first indications that the Equifax breach occurred (March 2017) such as ID theft or fraudulent credit/loan charges; and (iii) objective indicia of proof of the client's loss are available; and/or



PAGE 2
February 28, 2018

- **Mitigation Measures:** The client's (i) personal information was compromised by the Equifax breach; and (ii) he/she purchased mitigation products such as credit monitoring and credit freezes after learning of the breach; and/or

- **Unauthorized Charges on Payment Card Provided to Equifax:** The client's (i) personal information was compromised by the Equifax breach; and (ii) he/she purchased products and services from Equifax using a debit or credit card prior to the breach; and (iii) he/she experienced unauthorized charges on SAME payment card provided to Equifax post-breach; and/or

- **Purchased Equifax Products Pre-Breach Announcement:** The client's (i) personal information was compromised by the Equifax breach; and (ii) he/she purchased protective products or services from Equifax before the breach was announced in September 2017.

We are focused, in particular, on a few lesser populated states where the Court-appointed leadership may not currently represent plaintiffs meeting these criteria (*e.g.*, Arkansas; Washington, DC; Hawaii; Idaho; Kentucky; Maryland; New Hampshire; Oregon; Utah; Virginia; and Wyoming). Thus, if you have clients in those states, please be sure to input their information, although clients meeting the criteria in other states should be included, as well.

If your clients do not meet the criteria above or they have no interest in serving as class representatives, please do not fill out the questionnaire for them. We will not consider for reimbursement time spent on vetting clients who do <u>not</u> meet these criteria. We expect the entire questionnaire to take less than one hour to complete per client and we encourage you to contact your clients immediately to schedule a time in the next 7-10 days to complete the process. Due to the short time frame by which we have to consider client submissions, **all client questionnaires must be submitted by Monday, March 12, 2018 in order to receive consideration for inclusion in the CAC**.

The questionnaire is designed to be filled out by **attorneys only** (not legal support staff or clients themselves) on behalf of their retained clients. The questionnaire will be available after the attorney enters the password listed at the top of the letter. The website permits unlimited questionnaires for firms that have been retained by multiple clients, but once questionnaires are submitted, you will no longer be able to access them online. Given the Court's admonition about efficiency, we must reiterate that any time spent on this process should be done with that goal in mind. If you have multiple clients, please only submit the top candidates for consideration that would make the best class representatives. In addition, please coordinate with your co-counsel so each client is only entered into the



PAGE 3
February 28, 2018

system once. After submitting the questionnaire, you will receive an email confirmation with a hard copy of the submitted questionnaire. If you have any changes or additions to the questionnaire responses at that time, you can submit them by email to Steven Nathan or Samantha Derksen (contact information below).

Please encourage your clients to have documents ready to refer to while answering questions including any documentation relevant to their claims (e.g., documentation of the purchase of any Equifax products or services, all correspondence they have received regarding the Equifax breach, and any documents that will assist them in providing details of any fraud they may have experienced). Moreover, you should take the steps to gather such documents from your clients if you have not already.

To assist in completing the questionnaire, we have attached a simple script to consider using with clients to orient them both to the status of the litigation and the nature of the questionnaire. The script also contains suggested responses to frequently asked questions related to this litigation and service as a class representative.

We look forward to working with you on this case. If you have any questions regarding this matter please contact me or one of my colleagues listed below.

Sincerely,

/S/ James J. Pizzirusso
James J. Pizzirusso

CONTACTS:

- Technical inquiries or help with the website:
    - Glenn Crocker: support@equifaxdatawsuit.com (913.451.7785)
    - Austin Moore: moore@stuevesiegel.com (816.714.7105)

- Substantive questions related to the questionnaire:
    - Steven Nathan: snathan@hausfeld.com (646.357.1100)
    - Samantha Derksen: sderksen@hausfeld.com (202.540.7200)

cc:     Equifax Consumer Plaintiffs' Co-Lead Counsel, Co-Liaison Counsel, and Plaintiffs' Steering Committee

**<u>Confidential Work Product - Privileged Communication - DO NOT SHARE</u>**

**<u>Response Required by March 12, 2018</u>**

**Website –** <u>https://equifaxdatalawsuit.com/submit/</u>
**Password –** d7L72!8Z2F5d

**<u>Equifax Plaintiff Vetting Questionnaire</u>**

**REPRESENTING ATTORNEY INFORMATION**

1.      Attorney representing client (on retainer)*:

2.      Attorney filling out form (if different):

3.      Attorney Firm*:

4.      Attorney e-mail*:

5.      Attorney phone:

6.      Is there a signed attorney/client representation agreement with the client: Yes ☐ No ☐

7.      List all firms on the client representation agreement:

8.      Were written document preservation instructions delivered to client: Yes ☐ No ☐

9.      I authorize members of the court-appointed Equifax Leadership Committee to contact this client directly (no initial contact will be made without informing counsel)*: Yes ☐ No ☐

**CLIENT INFORMATION**

10.     First Name:

11.     Middle Name:

12.     Last Name:

13.     Date of Birth:

14.     Sex: Male ☐ Female ☐

**CONTACT INFORMATION**

15.  Client preferred telephone number*:

16.  Secondary telephone number (if applicable):

17.  Email address:

18.  Name and phone number of someone who will always know how to find client if we have problems reaching him/her:

**CURRENT HOME ADDRESS**

19.  Street address*:

20.  City*:

21.  State*:

22.  Zip Code*:

23.  How long has client resided at this address?

24.  Has client moved from another state in the last three years? Yes ☐ No ☐

   a.  If yes, prior address:

25.  If client has a different mailing address, please provide:

**QUESTIONS FOR RETAINED CLIENTS**

26.  Is the client willing to serve as a class representative in this litigation? (attorneys: refer to client script for summary of class representative duties and responsibilities and ensure client agrees) Yes ☐ No ☐

   a.  If no, no need to finish the questionnaire.

27.  Has the client been promised anything of value in exchange for serving as a class representative? Yes ☐ No ☐

   a.  If yes, please describe what has been exchanged:

28.  Has the attorney or firm represented the client in any other matters: Yes ☐ No ☐

   a.  If yes, please describe all prior or current representation:

29.  If client is related to or has a prior relationship with any attorney at any law firm on the retainer agreement or referral counsel, please describe the relation and/or nature of any relationship:

30.    How did the client find and come to retain his or her counsel?

31.    Is the client a named plaintiff in an underlying lawsuit against Equifax: Yes ☐ No ☐  If yes:

     a.    Please list the caption, docket number, and court:

     b.    Did the client have an opportunity to review and approve the complaint prior to filing? Yes ☐ No ☐

**CURRENT EMPLOYMENT**

32.    Client's current employer:

33.    How long employed there:

34.    Current job title/occupation:

**NOTIFICATION OF EQUIFAX BREACH**

35.    How was the client first informed of the Equifax breach (Equifax, media, family, friends, etc.)?

36.    Identify how, if at all, client received notice that his/her information was compromised in Equifax data breach? (check all that apply)

     a.    ☐ Verification through Equifax's data breach website

         i.   When did client verify through Equifax's data breach website?

         ii.  Did the website indicate the client's information was compromised? Yes ☐ No ☐

     b.    ☐ Email notice from Equifax

         i.    Who was the email notification from?

         ii.   When did client receive email notification?

         iii.  Does the client still have a copy of email notification? Yes ☐ No ☐

*If yes, please hold on to it, and provide us a copy.*

     c.    ☐ Mail notice from Equifax

         i.    Who was the mailed notification from?

         ii.   When did client receive mailed notification?

       iii.  Does the client still have a copy of mailed notification? Yes ☐ No ☐

*If yes, please hold on to it, and provide us a copy.*

d.     ☐ No notice

       i.  If client did not receive a letter or notification, and the Equifax data breach website did not indicate that the client's information was compromised or the client did not check it, please explain why you think the client was impacted?

e.     ☐ Other

       i.  If other, how did client receive notice?

**TAX FRAUD**

37.    Has someone filed or attempted to file a false tax return in client's name, or falsely claimed entitlement to client's federal or state income tax refund since the Equifax breach? Yes ☐ No ☐ If yes:

a.     Please give dates and explain in detail:

b.     Does the client have any reason to think that Equifax was NOT the source of the tax fraud? Yes ☐ No ☐

       i.  If yes, please explain:

c.     Has the client ever used a service or software to file his/her tax returns? Yes ☐ No ☐

       i.  If yes, which one(s) (e.g., Turbo Tax, Tax Cut, etc.)? Please list all:

d.     If a tax return was fraudulently filed in client's name, does client know the name of the service or software used to file the fraudulent return (e.g., Turbo Tax, Tax Cut)? Yes ☐ No ☐

       i.  If yes, please provide name:

e.     If a tax return was fraudulently filed in client's name, has client requested a copy of the fraudulent return? Yes ☐ No ☐

*If yes, please hold on to it and provide us a copy.*

f.     Does client have any other documentation regarding the tax fraud (like emails, correspondence, etc.)? Yes ☐ No ☐ If yes:

       i.  Please describe what documents client has:

*Please hold on to it and provide us a copy.*

    g.    Did client preserve any reference numbers? Yes ☐ No ☐

        *If yes, please hold on to them and provide them to us.*

    h.    Was client expecting a tax refund from the IRS or his/her state? Yes ☐ No ☐ If yes:

       i.  How much was it for?

      ii.  Was it delayed? Yes ☐ No ☐

          1.  If yes, for how long?

    i.    Have client's issues been resolved? Please explain:

    j.    What did client do to resolve the situation?

    k.    How much time/money did client expend resolving the situation?

38.    Did client pay for any form of protection against the fraudulent filing of tax returns after learning of the Equifax breach (e.g., Tax Identity Shield) (including for a subscription that client had prior to the Equifax breach)? Yes ☐ No ☐ If yes:

    a.    What type of protection?

    b.    Which company did client use?

    c.    What type of subscription does client have (monthly/annual)?

    d.    How much does client pay for the service (monthly/annually)?

**IDENTITY THEFT**

39.    Has client experienced any identity theft since the Equifax breach (e.g., have any unauthorized loans, credit cards, or bank accounts been opened in client's name)? Yes ☐ No ☐ If yes:

    a.    Please give dates and explain in detail:

    b.    Does client have any reason to think that Equifax was NOT the source of the identity theft? Yes ☐ No ☐

       i.  If yes, please explain:

    c.    Does client have any documentation regarding the identify theft? Yes ☐ No ☐ If yes:

       i.  Please describe what documents client has:

         *Please hold on to it and provide us a copy.*

    d.    Have client's issues been resolved? Please explain:

    e.    What did client do to resolve the situation?

     f.     How much time/money did client expend resolving the situation?

     g.     Has client's credit score dropped as a result of any fraudulent activity since the Equifax data breach? Yes ☐ No ☐  If yes:

       i.   Please explain in detail:

      ii.   Does client have reason to think that Equifax was NOT the source of the fraudulent activity? Yes ☐ No ☐

          1.   If yes, please explain:

     iii.   Does client have any records of the decrease in credit score? Yes ☐ No ☐  If yes:

          1.   Please describe what documents client has:

              *Please hold on to it and provide us a copy.*

      iv.   Has client's credit score recovered? Please explain:

       v.   How has this decreased credit score affected client (e.g., by making it impossible to get a certain loan)? Please explain:

          1.   Does client have any documentation of the effects of the decreased credit score? Yes ☐ No ☐  If yes:

              a.   Please describe what documents client has:

                  *Please hold on to it and provide us a copy.*

          2.   Have the resulting issues been resolved? Please explain:

          3.   What did client do to resolve the situation?

          4.   How much time/money did client expend resolving the situation?

**PRIOR RELATIONSHIP WITH EQUIFAX AND UNAUTHORIZED CHARGES**

40.     Did client purchase products and services from Equifax prior to learning of the data breach? Yes ☐ No ☐  If yes:

     a.     Did client provide Equifax with a debit or credit card number? Yes ☐ No ☐

     b.     If yes, has client experienced unauthorized charges on SAME debit or credit card provided to Equifax? Yes ☐ No ☐  If yes:

       i.   Please explain in detail (dates, amounts, type of purchase, place of purchase, etc.):

    ii.   Does client have reason to think that Equifax was NOT the source of the unauthorized charges? Yes ☐ No ☐

        1.   If yes, please explain:

    iii.   Does client have any documentation regarding the unauthorized charges? Yes ☐ No ☐ If yes:

        1.   Please describe what documents client has:

           *Please hold on to it and provide us a copy.*

    iv.   Have the unauthorized charges been cancelled or reimbursed? Please explain:

    v.   What did client do to resolve the situation?

    vi.   How much time/money did client expend resolving the situation?

41.    Did client ever request a credit report from Equifax before the breach? Yes ☐ No ☐ If yes:

    a.    How often and when?

    b.    How much did client pay, if any, for each credit report?

42.    Did client ever have an online account with Equifax before the breach? Yes ☐ No ☐ If yes:

    a.    What information did client have to provide to enroll in online account?

    b.    How much did client pay, if any, for online account?

43.    Did client ever freeze his/her credit with Equifax before the breach? Yes ☐ No ☐ If yes:

    a.    How often and when?

    b.    How much did client pay, if any, for each credit freeze?

44.    Did client ever purchase any other product or services from Equifax before the breach? Yes ☐ No ☐ If yes:

    a.    Please explain:

    b.    How much did client pay, if any, for these products and services?

    c.    Would client have purchased these products and services had he/she been aware of Equifax's data security failures? Yes ☐ No ☐

**OTHER HARM**

45.    Has client experienced any other type of fraud or suspicious activity he or she believes may be related to the Equifax data breach? Yes ☐ No ☐

    a.      If yes, please describe in detail, as well as any potential losses associated with such harm:

## CREDIT MONITORING AND CREDIT FREEZES

46.    Was client made aware of Equifax's offer of free credit monitoring services through TrustedID? Yes ☐ No ☐ If yes:

    a.      How did client first learn about it?

    b.      Did client accept this free offer? Yes ☐ No ☐ If yes:

        i.   Did client have any difficulties signing up?

        ii.  Has it notified client of any suspicious activity?

        iii.  Has it made or denied any claims of identity theft?

47.    Did client pay for credit monitoring after learning of the Equifax breach (including for a subscription that client had prior to the Equifax breach)? Yes ☐ No ☐ If yes:

    a.      Which company did client use?

    b.      What type of subscription did client have (monthly/annual)?

    c.      How much did client pay for the service (monthly/annually)?

48.    Did client pay for a credit freeze after learning of the Equifax breach? Yes ☐ No ☐ If yes:

    a.      With which company or companies did client freeze his/her credit?

    b.      How much did client pay for the freeze(s)?

    c.      Did client ever unlock his/her credit after these freeze(s)? Yes ☐ No ☐ If yes:

        i.   With which company did client unlock his/her credit?

        ii.  How much did client have to pay for this unlocking?

## TIME AND EFFORT

49.    Did client spend time and expense searching for fraudulent activity? Yes ☐ No ☐ If yes:

    a.      Please estimate time spent:

    b.      Please describe and estimate any expenses incurred:

50.    Did client take trips to the bank and/or spend time on the phone with the bank attempting to sort out issues related to the Equifax breach? Yes ☐ No ☐

      a.      If yes, please explain and estimate the time spent:

51.     Did client spend time on the phone with Equifax or TrustedID trying to learn about the breach, signing up for credit monitoring, or dealing with suspicious activity? Yes ☐ No ☐

      a.      If yes, please explain and estimate the time spent:

52.     Did client spend time filing police reports as a result of fraudulent activity related to the breach? Yes ☐ No ☐

      a.      If yes, please explain and estimate the time spent:

53.     Did client experience any other general nuisance or annoyance resulting from the Equifax data breach? Yes ☐ No ☐

      a.      If yes, please explain:

**PRIOR HISTORY OF DATA BREACHES (OTHER THAN EQUIFAX)**

54.     Has the client received notification from any other company that his/her personal information may have been exposed? Yes ☐ No ☐

      a.      If yes, which company? (check all that apply)

            ☐ Wendy's

            ☐ Arby's

            ☐ Kmart/Sears

            ☐ Chipotle

            ☐ Eddie Bauer

            ☐ Forever 21

            ☐ InterContinental Hotels

            ☐ Saks Fifth Avenue

            ☐ Gmail

            ☐ Yahoo!

            ☐ Brooks Brothers

            ☐ Anthem

            ☐ University of Oklahoma

            ☐ Washington State University

            ☐ Verizon

☐ Sonic

☐ Whole Foods Market

☐ Hyatt Hotels

☐ Uber

☐ If other, please describe:

55.     Did the client suffer any harm as a result of these non-Equifax breaches? Yes ☐ No ☐

   a.     If yes, explain in detail:

56.     Other than harm described in response to Question 55, has client ever experienced any other type of identity theft or fraud prior to the Equifax data breach? Yes ☐ No ☐

   a.     If yes, please describe in detail all prior instances of identity theft and fraud, including dates that fraud occurred and source of fraud, if known:

## MEDIA AND SOCIAL MEDIA

57.     Has the client, client's spouse, or client's counsel spoken with any media members about the Equifax breach? Yes ☐ No ☐ If yes, please provide:

   a.     Media outlet spoken to:

   b.     Summary of the conversation:

   c.     Date of the conversation:

   d.     Was the conversation published in any medium? Yes ☐ No ☐ If yes:

       i.   Where and when?

       ii.  Do you have the link to or a copy of the publication?

58.     What social media accounts does client maintain?

59.     Has client ever posted about the Equifax breach? Yes ☐ No ☐ If yes:

   a.     Date of post(s):

   b.     Account name

   c.     Content of post(s):

   d.     Privacy settings at time of post(s):

   e.     Current privacy settings:

   f.     Is the post still accessible? Yes ☐ No ☐

**DOCUMENTS**

60.   Does client have paper documents in his/her possession relating to the Equifax breach? Yes ☐ No ☐ If yes:

    a.   Please describe what documents client has:

        *Please hold on to them and be prepared to provide us a copy.*

61.   Does client have any electronic files relating to the Equifax breach? Yes ☐ No ☐ If yes:

    a.   Please describe what documents clients has:

        *Please hold on to them and be prepared to provide us a copy.*

    b.   On what device(s) are the files stored (home desktop/laptop, work computer, shared computer, tablet, smartphone)?

62.   Is client aware of any potentially relevant documents, electronic or otherwise, that are no longer accessible by client? Yes ☐ No ☐ If yes:

    a.   Please describe them in detail:

    b.   Why are they no longer accessible?

    c.   If client discarded certain documents, when did client do so?

**PERSONAL HISTORY**

63.   Is client or client's spouse currently involved in bankruptcy proceedings? Yes ☐ No ☐

    a.   If yes, please explain:

64.   Does client or client's spouse plan to or anticipate declaring bankruptcy in the next 12 months? Yes ☐ No ☐

65.   Has client been involved in any prior litigation? Yes ☐ No ☐ If yes, please provide:

    a.   Case name and number:

    b.   Date:

    c.   Nature of litigation:

    d.   Attorney name, firm, number:

    e.   Was client deposed? Yes ☐ No ☐

        i.   If yes, does client have access to a copy of deposition transcript? Yes ☐ No ☐

      f.     Did client testify at trial? Yes ☐ No ☐

          i.   If yes, does client have access to a copy of any trial testimony? Yes ☐ No ☐

66.    Other than this case, has client or client's spouse ever served as a class-action representative? Yes ☐ No ☐ If yes, please provide:

    a.     Case name and number:

    b.     Date:

    c.     Nature of litigation:

    d.     Attorney name, firm, phone number:

67.    Has client or client spouse ever been arrested or had any criminal charges filed against him/her? Yes ☐ No ☐ If yes, please provide:

    a.     Name of case:

    b.     Type of case/charges:

    c.     Case number if known:

    d.     Court:

    e.     Case result/sentence:

68.    Have client or client's spouse ever been convicted of or pleaded guilty to a felony? Yes ☐ No ☐ If yes, please provide:

    a.     Name of case:

    b.     Type of case/charges:

    c.     Case number if known:

    d.     Court:

    e.     Case result/sentence:

69.    Has client or client's spouse ever been accused of fraud/forgery/ misrepresentation? Yes ☐ No ☐ If yes, please provide:

    f.     Name of case:

    g.     Type of case/charges:

    h.     Case number if known:

    i.     Court:

    j.     Case result/sentence:

70.     Has client or client's spouse ever had any tax warrants or liens? Yes ☐ No ☐ If yes, please provide:

   a.     Agency:

   b.     Tax period:

   c.     Amount:

   d.     Court:

   e.     Result / tax still owed:

**INTERVIEWER NOTES**

71.     Overall thoughts regarding potential class representative, speaking ability, responsiveness, knowledge of case, willingness to help, ability to focus? Please give detailed rationale for determination:

*In re: Equifax, Inc., Customer Data Security Breach Litigation*
**Case No. 17-MD-2800-TWT**

**CONFIDENTIAL ATTORNEY WORK PRODUCT**

**QUESTIONNAIRE SCRIPT TO USE WITH POTENTIAL CLASS REPRESENTATIVES**

Dear [**CLIENT NAME**],

I am calling to discuss the Equifax matter. You have previously retained [**FIRM NAME**] to represent you in a data breach class action lawsuit against Equifax. The Equifax cases filed all around the country have now been consolidated in Atlanta where lawyers are working on preparing a consolidated class action lawsuit that will join together some of the plaintiffs from the hundreds of cases filed around the country. As you may recall, this suit centers around Equifax's failure to protect the personal information of millions of US residents, that was first announced in September 2017. I have been asked to contact my clients and go over a questionnaire with them to see if they would be interested in and capable of serving as class representatives in the consolidated case in Georgia. Not all clients will be selected.

If you are interested in being a class action representative for the consolidated lawsuit, I need to take down some of your personal information and ask you some straightforward questions about your experience with the Equifax breach. Many of the questions will simply require "yes or no" answers but some will require more detail.

Because you may potentially serve as a class action representative in the case, it is important you answer honestly, but carefully according to these instructions:

1. Make sure you understand each question fully before answering it. If you don't understand the question, let me know and I will repeat it;

2. For each answer, be truthful and complete, but do not speculate or guess in your responses;

3. If you don't know or are unsure of the answer to a question simply say "I don't know;"

4. Lastly, as a client anything you tell me regarding the facts of your case is protected by the attorney-client privilege. As such, we will keep your information confidential and only share it with other attorneys representing individuals who were affected by the Equifax data breach in this case. It is also important that you do not discuss this case or our conversations with anyone else.

[**COMPLETE QUESTIONNAIRE**]

**CONCLUSION**: Thank you for taking the time to answer these questions. After we review the questionnaires, we or other attorneys may call you again to ask a few follow-up questions. If you have any other questions regarding the lawsuit please do not hesitate to contact us.

**FAQs**: If the client has questions about the role of class representatives or class action litigation generally, please note the following responses:

- <u>What is a class action</u>? A class action is a type of lawsuit in which one or several persons sue on behalf of a larger group of similarly-situated persons and represent their interests.

- <u>What is a class representative?</u> Class representatives are plaintiffs named in the lawsuit who assert the claims of the entire class so that everyone with the same claim or injury does not have to file his or her own separate lawsuit.

- <u>What are the duties of class representative</u>? A plaintiff must meet certain basic requirements in order to be certified by the court as a class representative. The representative's situation must be typical of the situation in which other class members find themselves and the representative must be generally familiar with the litigation. A class representative must cooperate in the preparation of the case, and be present on reasonable notice for any necessary appearances. In addition, a class representative may be asked to produce documents and/or give deposition testimony during the litigation process. A class representative needs to be willing to represent all of the individuals harmed in the Equifax data breach, putting the interests of the entire group ahead of his or her own individual interests. Moreover, a class representative must be willing to take the time gather materials, be available for a deposition, and be interested in representing others.

- <u>Are class representatives entitled to additional compensation</u>? If a class action is successful in winning relief for the class, some courts will provide class representatives with "service awards" and some will not. Judges are typically given broad discretion in deciding whether these awards are appropriate and in setting the amounts of the awards. In deciding how much, if anything, to award to the class representatives, courts look at factors such as the amount of involvement of the class representative and the size of the recovery for the class but they are usually minimal. We recognize that the duties of class representatives, such as preparing documents or sitting for deposition, may require an effort deserving of a service premium in addition to any recovery the representative may obtain by virtue of his or her membership in the class. Therefore, the attorneys may attempt to recover an appropriate amount for the class representative's service, but we can make no promise or guaranty that the attorneys will seek a service award or that the Court will award any service premium. You should not seek to serve as a class representative simply because you may be able to recover a service award.

- <u>What are the costs to me</u>? Our law firms work on a contingency-fee basis. This means that, to the extent provided by law, you do not pay any costs or expenses of litigation upfront, and we do not collect any fees from you unless our firms obtain a recovery on your behalf. In general, because this is a class action lawsuit, the court will set the amount of fees and costs to be paid to plaintiffs' attorneys, either separately by the defendant, or out of any lump sum recovered from the defendant, whether by settlement or judgment at the end of the case.

# EXHIBIT D



**CONFIDENTIAL MEMORANDUM – ATTORNEY WORK PRODUCT**

**TO:**          **All Consumer Counsel Timekeepers**

**DATE:**        **October 4, 2019**

**RE:**          **Final Time and Expense Review**

**ACTION REQUIRED BY: October 11, 2019**

_____

      As part of the fee-request process, consumer Co-Lead Counsel are preparing final time and expense entries for potential review by the Court. Only time and expenses that have already been submitted to the leads will be considered for submission. Before any time or expense entries will be provided in connection with a fee application and final approval, they must be reviewed to ensure compliance with directives provided by the Court, consumer Co-Lead Counsel (see February 2018 timekeeping protocol), and the generally accepted timekeeping practice in the Northern District of Georgia.

**<u>Leadership Review</u>**

      Attorneys from the lead firms met recently and hand-reviewed all 21,308 time entries and 3,174 expense entries. No attorney reviewed any submissions from their own firm.

**<u>Next Steps</u>**

      Along with this memo, you received a spreadsheet of time/expense entries submitted by your firm through August 31, 2019. These entries have been marked-up based on the lead review, using the following color-coded key.

- <u>Red Shading</u> = Entry was not accepted by leads
  - No action required
- <u>Blue Shading</u> = Entry edited by the leads, detailed in "Review Notes" column
  - No action required
- <u>Yellow Shading</u> = Entry flagged by leads for additional information, detailed in "Review Notes" column
  - Action required by you per instructions provided in "Review Notes" column

Either you or a representative from your firm must provide the additional information requested **no later than October 11, 2019** in order for your yellow-flagged entries to be included for fee-calculation purposes. To do so, please use the spreadsheet e-mailed to you and observe the following guidelines.

- **The only two fields you should edit are the "Description" and "Attorney Notes" fields.** If you make edits to any other field in your spreadsheet, they will not be seen by the leads and will not be incorporated.
- **All yellow-flagged entries require additional information for the "Description" field.** To provide this information, simply type over the current description text with a new description following the direction provided by the leads in the "Review Notes" field.
- Should you need to edit another field for a specific time/expense entry, or should you wish to provide the leads with additional information, please include that in the "Attorney Notes" field.
- Please leave the current highlighting in the spreadsheet with your edits so that we can quickly locate all flagged entries.

Please note: A methodology for allocation of pre-appointment time (prior to February 12, 2018) has not yet been determined; therefore, counsel should not presume that entries will be fully or partially compensated. Entries that do not satisfy the February 2018 timekeeping protocol have not been accepted. Pre-appointment time spent on developing client relationships and information for potential use in a consolidated complaint generally has been accepted.

Once you have made sufficient changes to your yellow-shaded entries, please send your spreadsheet via e-mail to equifaxtime@stuevesiegel.com. After time and expense records are finalized, each reporting firm will be asked to certify that its recorded time and expenses are reasonable and accurate. Should you have any questions, please direct them to Barrett Vahle at Stueve Siegel Hanson LLP via equifaxtime@stuevesiegel.com or at 816-714-7132.

One last point needs to be emphasized. Simply because you have submitted lodestar that has been accepted does not mean that you will be compensated for that time. If we are fortunate enough to be awarded a fee in this litigation, the allocation of the fee among the participating firms will be made by Co-Lead Counsel after the fee has been awarded. In allocating any fee, Co-Lead Counsel will be guided by the concept that each firm will be rewarded for the value it has contributed to the results obtained for our clients. While each firm's lodestar will be a substantial factor in determining value, it will not be the only factor. Significant weight will be given to factors such as how efficiently and effectively a firm has handled its responsibilities, the nature of the work that was done, creativity, collegiality, equity, and any other considerations that Co-Lead Counsel deem relevant or material.

# EXHIBIT E



**Sanford Heisler Sharp, LLP**
611 Commerce Street, Suite 3100
Nashville, TN 37203
Telephone: (615) 434-7000
Fax: (615) 434-7020
www.sanfordheisler.com

*Kevin Sharp*, Co-Vice Chairman and Public Interest Litigation Practice Group Co-Chair
(615) 434-7001
ksharp@sanfordheisler.com       New York | Washington, DC | San Francisco | Palo Alto | Atlanta | Baltimore | Nashville | San Diego

---

CONFIDENTIAL SETTLEMENT COMMUNICATION SUBJECT TO FRE 408

November 3, 2022

**VIA EMAIL**
Norman E. Siegel
siegel@stuevesiegel.com

Re:   **Equifax Fee Allotment**

Norm:

During the years of investigation and litigation in the *In re Equifax, Inc. Data Breach Customer Litigation*, my firm, Sanford Heisler Sharp, LLP ("Firm") interviewed more than 12,000 individuals; drafted and filed 45 class complaints in 44 states and the District of Columbia; provided to the Co-Lead Counsel, Co-Liaison Counsel, and the other members of the Equifax Steering Committee ("Leadership Counsel" or "Committee") with 7 clients in 7 states who were subsequently included in the MDL Consolidated Class Complaint; and, expended over 3,400 hours with a total lodestar of $1,420,444 (approximately 5% of the total lodestar) and $24,093 in expenses.

The nationwide settlement yielded up to $380,500,000 for class members, $77.5 million for attorney fees, and $1.4 million for expenses. Out of this $78.9 million in fees and expenses, Leadership Counsel offered my Firm approximately $106,000.00 in fees (plus expenses), which is about 0.14% of the fee award and results in a negative multiplier of over 92 percent. Leadership Counsel, by contrast, helped themselves to a multiplier of nearly 3.0, or 200%.

To add insult to injury, the Leadership Counsel allocated the fees in disregard of the Court Order, which authorized an across-the-board multiplier of 2.62 on Plaintiffs' Counsel's fees. Instead of applying a 2.62 multiplier to each firm's share of the fee award, you took the entire dollar value of the multiplier and kept it for Leadership Counsel, denying us a rightful multiplier.

But there is more: Leadership Counsel drastically cut the time entries and hourly rates of non-Leadership firms while, at the same time, enriching themselves by not applying similar cuts to themselves. In fact, Leadership Counsel fraudulently induced our Firm to significantly scale back our hours and rates in our fee submissions, representing that the Court would never accept them and that all firms would be acting accordingly. Then, Leadership Counsel went ahead and used rates similar to our original rates and declined to make any corresponding reductions to their

own hours and lodestar.

All of this, detailed below, constitutes a grotesque breach of your obligations as class counsel and is a lesson in what not to do as fiduciaries of the class and as stewards of the Court. You violated your obligations to counsel throughout the United States, misled the Court, and misled counsel—all while engaging in massive self-dealing. In doing so, you have violated your ethical duties—as described below—as well as the inherent obligation of court-appointed leadership counsel "to act fairly, efficiently, and economically in the interests of all parties and parties' counsel." Manual for Complex Litigation (Fourth) § 10.225 p. 33 (2018).

Although we have spoken about much of this by telephone over the past few months, I think it important that this now be memorialized and shared with Leadership Counsel. It is my hope that we can reach an amicable and fair resolution to what we consider a grossly-inadequate allocation of fees to my Firm in connection with this litigation.

### SANFORD HEISLER SHARP'S WORK ON THE CASE

As you know, Sanford Heisler Sharp's work in this case was significant— both in terms of quantity and importance. In particular, our Firm helped jumpstart the litigation by exhaustively investigating the claims, interviewing more than 12,000 individuals, and drafting and filing complaints (for 95 client plaintiffs) in 44 states and the District of Columbia. We spent many hundreds of hours vetting potential clients and scouring the country for ideal plaintiffs. A number of our Complaints were the first or only ones filed in the respective jurisdictions.

My Firm's efforts turned out to be indispensable.  Seven of our clients—in seven different states—were included as named plaintiffs in the MDL complaint, accounting for 7 of the 96 class representatives in the MDL (or 7.2%). To our knowledge, no other single firm produced as many class representatives.  Presumably, Leadership Counsel preferred not to use the clients of other firms as class representatives, but ours were plainly needed to fill key holes in the Consolidated Class Complaint and to back up the representation made to the Court at the initial MDL hearing in February 2018 that your group had every state adequately covered.[1]

Nevertheless, on February 28, 2018, James Pizzirusso of Hausfeld sent a letter indicating the Steering Committee's need for plaintiffs from underrepresented jurisdictions, including Arkansas. We responded by delivering Arkansas plaintiff Brenda King, who replaced your "dropped" Arkansas plaintiff. In addition, our Firm provided Plaintiff Alexander Hepburn from Minnesota—who was unable to secure a mortgage for his lease-to-own residence because of a reduction in his credit score resulting from the data breach. This particularized, concrete injury exemplified the damage done to plaintiffs and the class, which was critical to the effective prosecution of the case.

Our contributions did not end there. All seven of our clients assented to the settlement on a timely basis. Further, our team was well-organized, which ensured that the Committee received

---

[1] DE #230, pp. 92-93.

Norman E. Siegel                              CONFIDENTIAL SETTLEMENT COMMUNICATION
November 2, 2022                                              SUBJECT TO FRE 408
Page 3 of 6

all the information and documents it requested in a systematic and timely fashion. We responded promptly to all requests that came from the Committee and facilitated timely, seamless communication with our plaintiffs when needed. Accordingly, Steven Nathan of Hausfeld specifically commented on our collegiality and the ease of working with our Firm.

To get ourselves, and ultimately Leadership Counsel, in this favorable position required a significant investment of time by my Firm. We expended over 3,400 hours in the litigation and a total of $1,420,444.75 in lodestar and $24,093.38 in expenses. The Court approved the settlement on January 13, 2020 and, in so doing, approved $77.5 million in attorneys' fees and over $1.4 million in expenses.

### LEADERSHIP COUNSEL'S GROSSLY UNFAIR OFFER

Consequently, while Sanford Heisler Sharp contributed approximately 5% of the collective lodestar—even with an aggressive assumption of post-approval work to be performed by the Committee—it received less than 0.14% of the fee award ($106,274). We received a negative multiplier of over 92% while the Leadership firms received positive multipliers of nearly 3.0, or 200% (and that includes all of the work that the Steering Committee directed to itself post settlement). In contrast with our meager fee award, Leadership Counsel were rewarded with rich multipliers and fee awards ranging into the eight figures. Based on the available information, we estimate that your firm, Stueve Siegel, alone is receiving approximately $15 million in fees.

### LEADERSHIP COUNSEL MISLED MY FIRM INTO SLASHING OUR HOURS AND RATES

Additionally, it appears that we were actively misled into slashing our hours and rates. In early 2018, Sanford Heisler Sharp was instructed to provide time records—summaries of its hours, rates, and lodestar—to the Committee for submission to the Court. The Committee advised us via email that the Court would not accept our full time and rates and that to comply with its expectations and guidelines, we needed to use modest rates and omit most of our hours. The Committee further indicated that all of the firms in the litigation would be acting in concert in reducing their lodestar and rates, Leadership Counsel would likely "harmonize these rates," and that the fee distribution would all work out fairly in the end.

Consequently, to comply with the Court's directives and the instructions of Leadership Counsel, we significantly reduced the Firm's hours and rates. Our submitted lodestar through February 2018 was $205,425.25, representing 876.95 hours, a small fraction of the Firm's actual lodestar. Based on your representations, we provided modified rates that were approximately 50% of our regular and customary rates at the time—using, for example, rates of $600 for firm Chairman David Sanford, $500 for named Partner Kevin Sharp, and $475 for senior Partner Edward Chapin, a member of the bar since 1972. Accompanying each time submission was correspondence notifying you of this 50% rate reduction.

Thereafter, applying the same principles and deep reductions, we submitted monthly lodestar reports from March 2018 through January 2021, equaling another $64,690 in lodestar.

Norman E. Siegel                                    CONFIDENTIAL SETTLEMENT COMMUNICATION
November 2, 2022                                                      SUBJECT TO FRE 408
Page 4 of 6

Following these reductions, our final requested lodestar was $270,115.25—again a small fraction of the fair value of the time Sanford Heisler Sharp expended.

But your representations turned out to be a ruse designed to induce us to drop our lodestar and thereby reallocate our rightful fee to the Leadership Counsel firms. The Committee's assurances that all of the firms would be trimming their timesheets and lodestars in comparable fashion were false—intended to induce our Firm to unwittingly cede the bulk of its fee to Leadership Counsel under false pretenses.

## LEADERSHIP COUNSEL DID NOT FOLLOW THE COURT ORDER AND ENRICHED THEMSELVES IN THE PROCESS

After inducing Sanford Heisler Sharp to reduce its lodestar based on misleading representations, Leadership Counsel was able to pocket more of our lodestar to pad their own fees. It appears that the Committee members made no corresponding effort to reduce their hours and rates. In fact, in its January 2020 Order, contrary to your representations regarding the Court's expectations vis-à-vis rates, the Court specifically endorsed rates for senior lawyers in line with Sanford Heisler's usual and customary rates at the time we submitted our fee and expense reports—including rates of $1,050, $1,000, and $935 per hour. The Court expressly rejected an objector's bid to cap attorney rates at $500 per hour. Your efforts in submitting and going to bat for these rates for yourselves belie your representations to us that you could not support them before the Court.

Unbeknownst to us, Leadership Counsel apparently did not materially reduce their own hours and rates even after imploring us to do so. Moreover, Leadership Counsel, knowing that it had already falsely sought to reduce our fees, then attempted to carve up our lodestar even more, by over 60%, to a sum total of $106,274. There was no rationale for its unilateral determination nor any meaningful opportunity to challenge or contest the calculation.

Not only was the process the Committee used to reach Sanford Heisler's fee award opaque and misleading, Leadership Counsel did not include Sanford Heisler in the lodestar multiplier endorsed by the Court, diverting our share into the fee awards of the Leadership firms and thereby increasing the 2.62 multiplier that the Court deemed reasonable under the circumstances. This is particularly egregious given that Leadership Counsel calculated and justified its multiplier to the Court based on the total submitted lodestar for all firms, not just those of the Committee.[2]

We do not question that Leadership Counsel firms are entitled to reasonably-enhanced consideration for their roles in driving the litigation and settlement. But, we were entitled in turn to an honest, transparent, and above-board process for setting the fee distribution. For example, the Manual for Complex Litigation states: "Counsel designated by the court also assume a responsibility to the court and an obligation to act fairly, efficiently, and economically in the interests of all parties and parties' counsel." Manual for Complex Litigation (Fourth) § 10.225 at

---

[2] DE # 858-1, ¶ 49.

Norman E. Siegel                                    CONFIDENTIAL SETTLEMENT COMMUNICATION
November 2, 2022                                              SUBJECT TO FRE 408
Page 5 of 6

p. 33 (2018).[3]  More generally, the ABA Model Rules of Professional Conduct prohibit lawyers from "knowingly mak[ing] a false statement of material fact or law to a third person" (Rule 4.1(a)) and deem it "professional misconduct for a lawyer to: engage in conduct involving dishonesty, fraud, deceit or misrepresentation" (Rule 8.4(c)). You have utterly failed in these basic obligations.

### MY FIRM FIRST LEARNED OF ITS ALLOTTED SHARE AND OF LEADERSHIP COUNSEL'S SHENANIGANS IN 2022

I have spoken to you several times over the last few months to protest this treatment and seek a corresponding increase in our fee award. Your only response has been to point out that Sanford Heisler Sharp is receiving the highest award out of any non-Leadership Counsel firm and to repeatedly reiterate that nothing can be done.

This response is disingenuous. The September 2019 spreadsheet shows that, even after deep cuts to our hours and lodestar, we still put in more than three times the number of hours of any other non-Leadership Counsel firm. Indeed, a firm with less than one-third of our hours was assigned a lodestar nearly as high ($106,274 to $93,295)—or a blended rate of $585.29, as opposed to our artificially-deflated blended rate of $204.45 for the time actually counted.

A comparison with the pre-multiplier blended rates of Leadership Counsel firms makes things even worse: they range up to $1,000 per hour,[4] with an average (mean) rate of $691.20. Assuming a 2.62 multiplier, the average billing rate for these firms—based on the September 2019 submission—is $1,810.94 and the high rate is $2,751.00.[5]  Even Leadership Counsel paralegals are receiving post-multiplier rates of up to more than $850 an hour; again, the highest rate you allowed for us, despite our vast contributions to the case, is $212.50. This is truly, glaringly arbitrary. Sanford Heisler Sharp is receiving pennies on the dollar for its work, while Leadership firms are being enriched with handsome multipliers, resulting in fee allotments ranging well into the eight figures.

While Sanford Heisler Sharp performed thousands of hours of legal work, providing valuable and important services to the class, it is has been rewarded with less than 0.14% of the $77.5 million dollar fee—representing less than 8% of its actual lodestar.

### ONE FINAL ATTEMPT TO REACH RESOLUTION SHORT OF LITIGATION

---

[3] *See also id*. § 10.222 at p. 34 ("Counsel in leadership positions should keep the other attorneys advised of the progress of the litigation and consult them about decisions significantly affecting their clients… too little [communication] may prejudice the interests of the parties.")

[4] One Steering Committee firm, Doffermyre, billed 100% of its time (nearly 3,000 hours) to experienced partners with $1,000 rates. But Sanford Heisler Sharp was not even allowed to have a single attorney timekeeper with a rate above $212.50.

[5] Even if the 2.62 multiplier is accurate and not an underestimate (based on a possible overestimate of future work), the actual rates are higher because the Steering Committee members appropriated non-Committee members' portions of the multiplier.

Norman E. Siegel                                      CONFIDENTIAL SETTLEMENT COMMUNICATION
November 2, 2022                                                      SUBJECT TO FRE 408
Page 6 of 6

     As a compromise, we request that Sanford Heisler Sharp receive the following:

     5% of the $77.5 million fee = $3,875,000.00
     $24,093 in reimbursement of expenses paid
     Total = $3,899,093.00
     20 percent discount = $3,119,274.40

     Norm, it is imperative that we sit down and revisit my Firm's fees in light of the facts set forth above. Our contributions were obviously significant, and we should be considered in line with the value we brought to the table and the true lodestar expended. To be treated this way creates claims of unjust enrichment and fraud, and unquestionably raises ethical issues related to candor with the Court and dishonest behavior. Please let me know by close of business Friday, November 11, 2022, if you would like to connect and discuss a fair resolution.

                      Sincerely,

                      Kevin Sharp

CC:
Barrett J. Vahle                                        David J. Worley
vahle@stuevesiegel.com                                  david@ewlawllc.com

J. Austin Moore                                         Rodney K. Strong
moore@stuevesiegel.com                                  rodney@gspclaw.com

Kenneth S. Canfield
kcanfield@dsckd.com

Amy E. Keller
akeller@dlcfirm.com

Adam J. Levitt
alevitt@dlcfirm.com

Roy E. Barnes
roy@barneslawgroup.com

John R. Bevis
bevis@barneslawgroup.com

J. Cameron Tribble
ctribble@barneslawgroup.com

# EXHIBIT F

# ⧄⧄⧄ STUEVE SIEGEL HANSON

November 21, 2022

VIA EMAIL
Kevin Sharp
Sanford Heisler Sharp, LLP
ksharp@sanfordheisler.com

**Re: Your letter of November 3, 2022 regarding Equifax Fee Allotment**

Dear Counsel:

I write on behalf of Court-appointed Settlement Class Counsel ("Lead Counsel") in the *Equifax Data Breach* MDL. We are in receipt of your letter of November 3, 2022, in which, among other things, you accuse us of "fraud", "massive self-dealing", "shenanigans", "unethical conduct", "misleading the Court", and "a grotesque breach of [our] obligations as class counsel." This rhetoric is disappointing given our prior communications with you months ago where we explained (and you professed to understand) how fees were considered and distributed. Your newest allegations are absurd and completely baseless, and not deserving of a substantive response. Regardless, your complaints are wrong for numerous reasons, a few of which are addressed here.

*First*, it is far too late to raise these issues. We submitted Sanford Heisler's time and expense records, as you provided them to us, to Judge Thrash *in camera* throughout the litigation. On October 4, 2019, we returned your firm's records as edited by Lead Counsel under a standard protocol, so you have known the specific time entries Lead Counsel credited or cut for more than three years. Sanford Heisler's final hours and lodestar were filed publicly in support of the motion for fees on October 29, 2019 (Doc. 858-1). After we prevailed on the objector appeals and the Supreme Court denied certiorari, the settlement became effective and fee payments were distributed by the Court-appointed administrator in February and March 2022. You contacted Norman Siegel on June 24, 2022, to discuss your complaint that Sanford Heisler was "not compensated at all for attorney time." Mr. Siegel responded by email: "I did look through your firm's time back in March and confirmed that we treated your firm consistently with other firms representing named representatives, including counting time associated with working with these reps." Then, after *years* of knowing your firm's lodestar considered in connection with the motion for fees, and *eight months* after payment of fees and expenses, you chose to write the screed to which we now respond. Your complaints are no longer, if they ever were, ripe for discussion.

*Second*, you assert that Co-Lead Counsel "allocated the fees in disregard of the Court Order, which authorized an across-the-board multiplier of 2.62 on Plaintiffs' Counsel's fees," and that Sanford Heisler has an entitlement to the same "rightful multiplier." You are incorrect.

⫽⫽⫽ **STUEVE SIEGEL HANSON**

November 21, 2022
Page 2

Judge Thrash did not award a lodestar-based fee and order that all firms receive the same multiplier. To the contrary, the Court expressly rejected the concept that consideration of lodestar is required at all. *See Equifax Inc. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800-TWT, 2020 WL 256132, at *39 (N.D. Ga. Mar. 17, 2020) ("In this case, the Court does not believe a lodestar cross-check is necessary or even beneficial."), *aff'd in part, rev'd in part and remanded*, 999 F.3d 1247 (11th Cir. 2021), *cert. denied sub nom. Huang v. Spector*, 142 S. Ct. 431, 211 L. Ed. 2d 254 (2021), and *cert. denied sub nom. Watkins v. Spector*, 142 S. Ct. 765, 211 L. Ed. 2d 479 (2022). The Court of Appeals affirmed this ruling, holding: "The percentage method therefore remains the proper method to apply when awarding attorney's fees in common fund settlement cases." *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1279 (11th Cir. 2021), *cert. denied sub nom. Huang v. Spector*, 142 S. Ct. 431, 211 L. Ed. 2d 254 (2021), and *cert. denied sub nom. Watkins v. Spector*, 142 S. Ct. 765, 211 L. Ed. 2d 479 (2022). Your claimed entitlement to a particular lodestar multiplier is specious.

*Third*, fees were allocated by Lead Counsel based on the value each firm brought to the case, not a rote lodestar allocation. We emphasized this in our letter to you of October 4, 2019, regarding the final time and expense review for the fee motion: "In allocating any fee, Co-Lead Counsel will be guided by the concept that each firm will be rewarded for the value it has contributed to the results obtained for our clients. While each firm's lodestar will be a substantial factor in determining value, it will not be the only factor. Significant weight will be given to factors such as how efficiently and effectively a firm has handled its responsibilities, the nature of the work that was done, creativity, collegiality, equity, and any other considerations that Co-Lead Counsel deem relevant or material."

Our four co-lead firms did—and are still doing—the vast majority of all work in the case, primarily assisted by the 10 additional firms Judge Thrash appointed to the leadership. A total of 48 other firms—yours among them—also reported some amount of time spent on this matter, mostly for work performed before appointment of Lead Counsel, including preparing and filing the hundreds of underlying complaints, motion practice before the JPML, and motions for appointment to Plaintiffs' leadership. From among those 48 non-leadership firms, Sanford Heisler received the largest fee because of your work with class representatives.

But your letter grossly overstates the value of your firm's contribution to the result we achieved for the Settlement Class. For example, there was absolutely no reason for your firm to "interview[] more than 12,000 individuals" and "draft[] and file[] 45 class complaints in 44 states and the District of Columbia." Co-Lead Counsel did not ask for any of that work, and we assign a *de minimis* value to it under the totality of circumstances. Your firm was not appointed to a leadership position and did not participate in any of the major tasks or risks of the litigation. Although very minor in the scheme of things, the value Sanford Heisler did provide through identifying and handling seven of the 96 class representatives was recognized. Your firm was paid for the value of its work, and reimbursed for all of its reported expenses ($24,093).

**STUEVE SIEGEL HANSON**

November 21, 2022
Page 3

*Fourth*, you were treated fairly in Lead Counsel's review of Sanford Heisler's time records. In fact, nearly all of your firm's time incurred after the appointment of Lead Counsel was credited and submitted to the Court with the motion for fees—the exception being time spent preparing your own time and expense reports. Your pre-appointment time spent preparing and filing dozens of complaints around the country was rightly cut, but where discernable we credited the work you did relating to your class representatives. The February 28, 2018 timekeeping protocol is clear in this regard: "Time and expenses incurred prior to the appointment of Co-Lead Counsel will be considered for compensation only to the extent they contribute to advancement of the litigation as a whole. Time investigating or filing serial complaints . . . should not be submitted and will not be considered compensable time." This is consistent with what Lead Counsel told the Court: that time entries which were "duplicative, unauthorized, of insufficient benefit, or inconsistent with the billing protocol" were excluded from the lodestar calculation. (Doc. 858 at 23).

*Finally*, your claim that Sanford Heisler expended over 3,400 hours and $1,420,444.75 in lodestar on the litigation is surprising, and wholly unsupported by your submitted records. You and four other individuals in your firm received the timekeeping protocol—which we submitted to the Court—by at least March 28, 2018. Pursuant to that protocol you submitted monthly time and expense reports. As you know, we made quarterly *in camera* submissions of fees and expenses to Judge Thrash. The last submission on January 31, 2022, reported your firm's total unedited lodestar submitted to Lead Counsel of $269,809 for 1,212.3 hours of reported work, with 330.1 hours and $63,356 in lodestar post-appointment of Lead Counsel. Apparently, you chose to reduce your rates and write off most of your firm's time, time for which we have never seen any record. Contrary to your false and scurrilous allegations, Lead Counsel did not mislead you or fraudulently induce you to cut your time and rates. You wholly fail to identify any false or misleading statement made by any Lead Counsel, much less when and by whom such statement was written or uttered. We reported Sanford Heisler's time to Judge Thrash as it was submitted to us, just as we did for all other firms, and we relied on your time submissions made pursuant to the timekeeping protocol.

Your claims of "fraud" and the like are frivolous and made in bad faith. Your firm's demand for more than $3,000,000 is equally absurd. You were paid fairly based on the value of Sanford Heisler's contribution many months ago.

Judge Thrash maintains jurisdiction over the Settlement, and we suggest that any further issue related to this matter be directed to him for final resolution.

Sincerely,

Norman E. Siegel

# EXHIBIT G

**E-FILED**
**2/6/2023 9:02 PM**
**CLERK & MASTER**
**DAVIDSON CO. CHANCERY CT.**

## IN THE CHANCERY COURT FOR DAVIDSON COUNTY TENNESSEE

| | | |
|---|---|---|
| SANFORD HEISLER SHARP, LLP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.: 23-_____ |
| | ) | |
| STUEVE SIEGEL HANSON, LLP; | ) | **JURY DEMAND** |
| DICELLO LEVITT GUTZLER, LLC; | ) | |
| AND | ) | |
| DOFFERMYRE SHIELDS CANFIELD & | ) | |
| KNOWLES, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT FOR DAMAGES AND RESTITUTION

_____

Plaintiff Sanford Heisler Sharp, LLP (SHS) brings this suit against Defendants Stueve Siegel Hanson, LLP; Doffermyre Shields Canfield & Knowles, LLC; and DiCello Levitt Gutzler, LLC (formerly Dicello Levitt & Casey LLC). As set forth below, Plaintiff pursues claims of (i) breach of fiduciary duty, (ii) breach of contract/breach of the covenant of good faith and fair dealing, (iii) quantum meruit, and (iv) unjust enrichment.

### PRELIMINARY STATEMENT

1.      Defendant law firms were court-appointed Co-Lead Counsel in *In re Equifax, Inc. Customer Data Breach Litigation*, 1:17-md-02800 (N.D. Ga). Plaintiff SHS was co-counsel.

2.      Out of a $77.5 million attorney's fee award in the Equifax MDL litigation, Defendants allocated fees of only $106,274 to SHS, despite SHS's vast contributions of time and effort to the matter and critical role in its success. When tasked with allocating the lump-sum fee award awarded to all counsel, Defendants insisted that SHS receive an award consisting of only a

1

dramatically reduced "lodestar" amount that Defendants arbitrarily calculated behind closed doors. In contrast, Defendants applied a completely different standard when distributing fees to themselves. Rather than using the artificially deflated lodestar method employed for SHS, Defendants kept the bulk of the total $77.5 million award for themselves; this resulted in fee awards ranging into the eight figures, several times Defendants' own lodestars.

3.      In making this grossly-disproportionate allocation, Defendants violated their ethical and fiduciary duties as Co-Lead counsel, breached the covenant of good faith and fair dealing, and unjustly enriched themselves at the expense of SHS.  Accordingly, Plaintiff seeks appropriate damages and/or restitution.

## PARTIES, JURISDICTION, AND VENUE

4.      Plaintiff Sanford Heisler Sharp, LLP is a national civil rights and public interest law firm. SHS has offices in Nashville, TN; New York, NY; Washington, DC; Baltimore, MD; Atlanta, GA; and San Diego, San Francisco, and Palo Alto, CA. At all times in question, SHS conducted its efforts in the Equifax matter primarily out of its office in Nashville, Tennessee—led by Kevin Sharp, the Firm's Co-Vice Chair and equity partner/co-owner.

5.      Defendant Stueve Siegel Hanson, LLP is a law firm located in Kansas City, Missouri. Stueve Siegel was appointed one of the Consumer Plaintiffs' Co-Lead Counsel in the Equifax matter.

6.      Defendant DiCello Levitt Gutzler, LLC is a law firm with offices in New York, NY;  Washington DC; Birmingham, AL; Chicago, IL; and Cleveland, OH; DiCello was appointed one of the Consumer Plaintiffs' Co-Lead Counsel in the Equifax matter.

7.      Defendant Doffermyre Shields Canfield & Knowles, LLC is a law firm located in Atlanta, Georgia. Doffermyre was appointed one of the Consumer Plaintiffs' Co-Lead Counsel in

the *Equifax* matter.

8.     This Court has jurisdiction over the claims asserted in this action because they are contract and tort claims arising under Tennessee law. Chancery jurisdiction is appropriate under Tenn. Stat. §§ 16-11-101 and 16-11-102. Defendants' conduct as set forth below occurred in this State and Judicial District as it was directed towards Plaintiff in this County.

9.     During the Equifax matter, each Defendant deliberately availed itself of a presence in this State and this Judicial District and engaged in significant activities in this District. In particular, Defendants worked with and were in regular communication with Plaintiff and specifically with Mr. Sharp—located in this County—about the litigation and relevant fee issues. All relevant communications were directed to Mr. Sharp. Over the course of those communications, Defendants committed the wrongful acts alleged here. They directed their conduct toward Plaintiff in this District and Plaintiff suffered the effects in this District.

10.     Jurisdiction is appropriate under Tennessee's long-arm statute, Tenn. Stat. § 20-2-214, because the claims arise from the transaction of business within this State, a tortious act or omission within this State, and/or an implied contract entered with a party in this State to be performed in this State. Accordingly, this Court is entitled to exercise personal jurisdiction over each Defendant.

11.     Tennessee is the State where Plaintiff's injury occurred and where the conduct causing the injury was directed. For relevant purposes, Plaintiff is located in Tennessee and the parties' relationship is centered in Tennessee. As a Limited Liability Partnership (LLP), Plaintiff is considered a citizen of Tennessee because one of its members (Mr. Sharp) resides in Tennessee. There is no other State with a more significant relationship to the parties and to the occurrences at issue. Accordingly, to the extent that there is a conflict between Tennessee law and the laws of

other states, Tennessee law should apply.

12.     Upon information and belief, there is not complete diversity for purposes of federal diversity jurisdiction because at least one member of the Defendant law firms is a resident of the same state as at least one member of Plaintiff SHS. Under applicable law, the citizenship of a partnership or LLC is the citizenship of *each* of its members. Here, Jeremy Heisler, a member of SHS, is a resident of New York State, and publicly-available information indicates that several Partners of Defendant DiCello are also residents of New York State.

13.     Venue is proper in this Court because Defendants' conduct and the relevant injury and harm occurred in Davidson County.

## FACTUAL ALLEGATIONS

### Summary of the Relevant Facts and Circumstances

14.     During the course of the Equifax investigation and litigation, SHS interviewed more than 12,000 individuals and drafted and filed 45 class complaints in 44 states and the District of Columbia. The Firm invested over 3,900 hours in attorney and staff time and more than $1.4 million in lodestar in the *Equifax* action. Its contributions to the litigation were significant and critical to the success of the *Equifax* litigation. Nevertheless, due to Defendants' self-dealing, SHS is designated to receive an attorney's fee of only $106,274—approximately one-tenth of one percent of the total fee award of $77.5 million.

15.     Defendants unilaterally claimed for themselves and the other members of the court-appointed Leadership group over $76.47 million—or 98.7%—of the total $77.5 million fee awarded to all plaintiffs' counsel by the Equifax MDL court, leaving just $1,028,467.50 to be divided among the 46 non-Leadership firms who worked on the case.

16.     On information and belief, the three Defendants reserved most of this $76.47

4

million amount for themselves.

17.     As part of the adopted process for attorney time and expense submissions, SHS submitted their hours worked on the litigation to Defendants each month, so that Defendants could review for appropriateness and submit to the court for *in camera* review. From the start of the litigation through September 30, 2019—the time-period used by Defendants in assessing SHS's award allocation—SHS submitted 1,188.4 hours of compensable time.

18.     At no point from the inception of the litigation through September 30, 2019 did any Defendant claim that any of the time submitted by SHS was inappropriate or would not be credited. Only after entering a settlement agreement in the *Equifax* litigation with a provision for $77.5 million in attorneys' fees did Defendants take action to cut SHS's reported hours by more than half, to 519.8 hours. Defendants included this amount as part of a lodestar compilation incorporated into their application for approval of the settlement and an award of fees.

19.     Indeed, as part of the petition for approval of the $77.5 million fee award, Defendants bolstered their claim that the award was fair by pointing to the amount of hours expended on the case even after they made significant discretionary cuts to the total number of hours. Yet Defendants used this submission to set up their eventual bid to increase their shares of the fee at SHS's expense—more than 20% of the total hours cut by Defendants were from SHS's reported time. Upon information and belief, Defendants made large, unilateral cuts to the hours of SHS and other non-Leadership firms while making minimal, if any, reductions to their own hours.

20.     After cutting SHS's hours by more than half, Defendants went further and on or after February 8, 2022 disclosed to SHS that it would be receiving a fee of just $106,274 for the 519.8 hours Defendants credited to SHS.

21.     Although the $77.5 million fee award was not based on lodestar, and the court made

clear that it was not awarding fees based on a lodestar method, which invites disputes over matters such as billing rates, Defendants demanded rigid application of an artificially deflated lodestar calculation when assessing the share of the fee award that would be allocated to SHS.

22.    For themselves, however, Defendants applied an entirely different method of allocating fees. After enforcing their one-sided insistence on using an arbitrarily reduced "lodestar" calculation for SHS and other non-Leadership firms, Defendants awarded themselves their own lodestars plus the remainder of the total $77.5 million fee. In other words, when $76.47 million was left over after doling out the non-Leadership firms' respective lodestars—which Defendants had unilaterally adjusted downward—Defendants took the entire remaining amount for themselves rather than distributing it proportionally or in an equitable manner.

23.    Ultimately, Defendants insisted on holding SHS to one standard when allocating its share of fees (Defendants' black-box calculation of lodestar), while using an entirely different standard for themselves (one which allowed Defendants to recoup upwards of three times their submitted lodestars, resulting in millions of dollars in additional fees).

24.    Even when using Defendants' staggeringly reduced designation of hours for SHS, SHS accounted for approximately 1.7% of the total hours billed by the 60 law firms on the *Equifax* litigation. Rather than award SHS an  approximate *pro rata* share of the fee awarded to all counsel, Defendants awarded SHS roughly one-tenth of one percent of the total $77.5 million fee award.

25.    As a result, Plaintiff SHS pursues common law claims of breach of fiduciary duty, breach of contract/good faith and fair dealing, quantum meruit, and unjust enrichment. The relative value of Plaintiff SHS's services to the Equifax class far exceeds the $106,274 fee assigned by Defendants. Yet, Defendants appropriated the bulk of SHS's rightful share of the fee recovery to line their own pockets. SHS is entitled to an appropriate measure of damages and/or disgorgement

of Defendants' ill-gotten gains.

**Initial Filing of the Equifax Lawsuits and SHS's Extensive Work on the Matter**

26.     On or about September 7, 2017, Equifax announced that it had been subject to one of the largest data breaches in U.S. history. Almost immediately, thousands of consumer victims began contacting SHS seeking legal advice and representation. During its investigation, SHS interviewed more than 12,000 individuals nationwide. It then filed 45 complaints (representing 97 client plaintiffs) in 44 states and the District of Columbia. It is SHS's understanding that several of these complaints were the first or only ones filed in the respective jurisdictions.

27.     SHS invested extensive amounts of time and resources in investigating and prosecuting the action. In particular, SHS expended more than 3,900 hours of attorney and staff time and accrued over $1.4 million in attorneys' fees between 2017 and January 2021—plus $24,496.38  in out-of-pocket expenses. The vast bulk of SHS's time and money expended was critical to the success of the litigation.

28.     Concurrent with SHS's actions, other firms around the country filed parallel Equifax data breach litigation in various jurisdictions. On or about December 6, 2017, the cases were consolidated and transferred to the Northern District of Georgia as part of a Multi-District Litigation, 1:17-MDL-2800-TWT, now closed.

**Appointment of Defendants as Co-Lead Counsel, With Power to Control the Litigation and Act as a Clearinghouse for Fees**

29.     On February 9, 2018, the MDL court held a hearing to determine which firms from among the various plaintiffs' counsel would be appointed to leadership positions. A group of firms that included the three Defendants made a joint bid to be named as the leadership group. Their pitch stressed in significant part that they were the only team with consumer plaintiffs in all 50 states and the District of Columbia.

30.     In an Order dated February 12, 2018, the MDL court appointed Defendants as Co-Lead Counsel in the Equifax litigation. The court's order gave Co-Lead Counsel Doffermyre, DiCello, and Stueve Siegel the authority to (a) direct and manage pretrial proceedings, including briefing and discovery; (b) delegate work among Plaintiffs' counsel and ensure the economical use of time and resources; (c) consult with and employ consultants and experts as necessary; (d) coordinate with the other members of the court-appointed Steering Committee in managing the litigation and funding litigation costs; (e) coordinate settlement discussions or other dispute resolution efforts; (f) enter into stipulations with other parties as necessary for the conduct of the litigation; (g) prepare and distribute periodic status reports; (h) maintain adequate time and disbursement records covering services as appointed counsel; and (i) perform other such duties as incidental to proper coordination with the Steering Committee with regard to plaintiffs' pretrial activities or as authorized by further Order of the Court.

31.     The MDL court further directed that all plaintiffs' counsel keep a daily record of their time and expenses and report their expenses and hours worked to Co-Lead Counsel on a monthly basis. The court itself required reports from Co-Lead Counsel on a quarterly basis regarding all time that had been submitted.

### Defendants Request that SHS and Other Plaintiffs' Firms in the Action Provide their Clients as MDL Plaintiffs and SHS Delivers

32.     On or about February 28, 2018, shortly after informing the MDL court that they represented plaintiffs from all 50 states and D.C. (and accordingly being appointed to control the action), Defendants indicated a desperate need for class representatives from certain states in which SHS represented clients in order to shore up their litigation position in an amended consolidated complaint. Defendants also sought out other plaintiffs who met the eligibility criteria.

33.     SHS promptly responded by providing Defendants with class representatives from

key states where Defendants lacked adequate representatives as well as other plaintiffs who suffered particularly demonstrable harm.  The particularized, concrete injuries suffered by the clients that SHS represented was key to exemplifying the damage done to plaintiffs and the class. Especially given the difficulties that can arise in articulating the harm done by data breaches, plaintiffs with identifiable harm were critical to the effective prosecution of the case.

34.     After working with Defendants to identify the particular needs of the litigation, SHS then worked with their clients to collect additional information and evidence.  All told, seven of SHS's clients were included as named plaintiffs and proposed class representatives in the consolidated MDL action.

### Filing of the Consolidated MDL Complaint and SHS's Further Contributions to the Action

35.     On May 14, 2018, Defendants filed a consolidated complaint in the *Equifax* MDL. The MDL complaint included seven SHS clients from seven different jurisdictions as named plaintiffs and proposed class representatives. These plaintiffs were crucial to the success of the litigation. It is Plaintiff's understanding that SHS furnished at least as many MDL plaintiffs as any other single firm. SHS's massive efforts in investigating the matter, interviewing injured consumers, and developing the claims paid off in considerable dividends to the *Equifax* class.

36.     SHS's contributions did not end there. All seven of the Firm's client named plaintiffs assented to the settlement on a timely basis. Further, the SHS team was well-organized, which ensured that Co-Lead Counsel received all of the information and documents it requested in a systematic and timely fashion. SHS responded promptly to all requests from Defendants and facilitated timely, seamless communication with its plaintiffs.

### Defendants Gather SHS's Time and Expense Reports While Failing to Inform SHS that it Is the Only Firm Which Is Reducing its Rates to Comport With N.D. Ga. Standards

37.     On or about April 2, 2018, SHS submitted its time and expense report for work performed through February 2018. Thereafter, SHS submitted monthly reports for work performed through January 2021. Defendants vetted and exercised control over these lodestar reports and ultimately submitted them to the court on behalf of all plaintiffs' counsel in the MDL action.

38.     SHS submitted these time and billing reports after Defendants indicated that they were likely to disregard each firm's actual reported billing rates in favor of a standardized rate structure. To attempt to comply with Defendants' instructions and expectations regarding time and expense reporting, SHS excluded most of its time entries from its billing reports and cut all of its attorney and staff rates by approximately 50%. However, Defendants did not harmonize rates and instead treated SHS significantly worse than other firms. Defendants charged their full rates, which were comparable to SHS's customary rates and substantially exceeded SHS's reduced rates.

39.     In the time reports submitted to Defendants, SHS expressly disclosed that the billing rates used were reduced by 50% from the SHS standard billing rates. Defendants did not inform SHS that it should instead use its actual billing rates, or inform SHS that other firms were not following suit and were charging full rates which were in line with SHS's original, standard billing rates. Had Defendants done so, Plaintiff could have submitted revised reports. Instead, Defendants submitted rates for SHS that were significantly lower than any other firm, knowing that these were not SHS's usual and customary rates but highly-discounted ones.

40.     Plaintiff had no reason to suspect that Defendants would abuse the position of trust vested in them by virtue of their position as Co-Lead Counsel or that they would violate the ethical duty of candor embodied in the ABA Model Rules of Professional Conduct. Similarly, SHS reasonably expected Defendants to abide by their essential obligations as set forth in the Manual for Complex Litigation—in relevant part, to act "fairly" "in the interests of all parties and parties'

counsel." Manual for Complex Litigation (Fourth) § 10.225 p. 33 (2018).

### Defendants Applied Vastly Different Standards and Rates to Themselves and to SHS and Enriched Themselves at SHS's Expense

41.     In October 2019, Defendants assembled final time and expense reports for submission to the MDL court as part of the motion seeking approval of the $77.5 million attorneys' fee award. Defendants emphasized that allocation of the attorneys' fee award among the various firms would not be based on a strict application of the lodestar accepted and approved by Co-Lead Counsel, but would instead reflect the value that each firm contributed to the successful result, including: how efficiently and effectively a firm handled its responsibilities, the nature of the work that was done, creativity, collegiality, equity, and other relevant considerations.

42.     This communication not only reinforced Defendants' apparent control over the fee allocation but reassured SHS and other non-Leadership firms that they would be treated fairly in the final distribution and would not prejudiced by Defendants' lodestar cuts or by factors such as geographic differences in billing rates.

43.     But Defendants did not honor this expectation. In fact, after the $77.5 million fee was distributed to Defendants in 2022, Defendants set SHS's fee at the drastically reduced lodestar amount that they calculated  for the Firm through September 30, 2019— despite the fact that SHS continued to perform significant work on the matter after September 2019, despite SHS's substantial contributions to the success of the litigation, and despite the fact that the MDL court awarded a fee representing a lodestar multiplier of approximately 3.0.

44.     In October 2019, Defendants submitted a supposed breakdown of the total lodestar by firm in connection with their motion for settlement approval. Their exhibits purported to show a total combined lodestar of $19,957,890.30 for the 14 firms comprising Leadership Counsel and a total combined lodestar of $1,028,467.50 for the 46 non-Leadership firms. The Leadership firms

used rates of up to $1,050 per hour. Indeed, the Leadership firms' blended rates ranged up to $1,000 per hour (Defendant Doffermyre billed 100% of its time, nearly 3,000 hours, to experienced partners with $1,000 rates) with an average (mean) rate of $691.20. Notably, the Leadership firms billed for their paralegals at rates of up to $325 per hour.

45.     Rather than consider the actual value added by SHS, or even true-up SHS's rates to its standard billing rates to treat SHS consistently with other firms, Defendants took a hatchet to SHS's hours and rates. Although SHS had already submitted substantially reduced hours at 50% of its standard billing rate, Defendants cut SHS's total lodestar by well more than half—from $270,150.25 (already a small fraction of SHS's actual lodestar) to $106,274.

**Defendants Assign their Own Paralegals Substantially Higher Hourly Rates than SHS's Associate, a Yale Law Graduate**

46.     Defendants used artificially and disproportionally low rates for SHS attorneys and staff. For one SHS Associate (a 2017 Yale Law graduate), Defendants utilized a rate of $212.50 per hour. In contrast, Leadership firms used rates of up to $325 for their paralegals. In turn, Associates from Leadership Counsel firms with a comparable or lesser level experience to SHS's Associate (law school graduation years 2017-2019) were designated rates of $350-$400. This was far from a "standardized" rate structure.

47.     The collective adjusted lodestar submitted to the MDL court as of October 2019 was $20,986,357.80. As a result, the $77.5 million fee request would result in a highly robust multiplier of 3.69. In accordance with an October 2019 communication to SHS and other plaintiff's firms, Defendants' motion papers were used to support and justify the $77.5 million fee request, not to represent what the division of a total award among the firms would be.

48.     SHS reasonably believed that, with an award that was almost four times the amount of fees invested in the case by all plaintiffs' counsel, plenty of money would be available to fairly

compensate SHS for its time and value. SHS reasonably anticipated that issues regarding the final allocation—including hours, rates, and multipliers—would be worked out for purposes of payment. This is exactly what Defendants indicated—that lodestar was only one point of consideration in assessing the total value that a firm contributed to the litigation.

49.    By the time of final settlement approval in January 2020, Defendants represented that they had accrued another almost $2 million in lodestar, for a total of $22,816,935. They also generously projected that they would expend another 10,000 future hours in connection with the litigation, with an estimated lodestar value of $6,767,200. This resulted in a total accrued and projected lodestar of $29,584,135. In fact, in contrast to Defendants' $6,767,200 projection, it is estimated that they have accrued only $2 million or less in lodestar since final approval. This results in an actual total lodestar for all counsel of approximately $25 million.

### Unaware of Defendants' Intent to Manipulate the Fee Award to the Detriment of their Co-Counsel, the Court Grants Final Approval of the Equifax Settlement

50.    In an Order dated January 13, 2020, the MDL court granted final approval of the settlement and awarded a total attorney's fee of $77.5 million, plus an additional $1,404,855.35 in expenses. As a lodestar crosscheck, the court noted that the fee would result in a multiplier of 2.62, which the court deemed reasonable and acceptable under the circumstances.

51.    Further, the MDL court rejected an objection that attorneys' hourly rates should be capped at $500. Instead, the court specifically approved rates of $1,050, $1,000, and $935 for Leadership Counsel attorneys. These rates are similar to SHS's original, customary rates for attorneys with similar titles and experience.

### Defendants Enrich Themselves at Co-Counsel's Expense by Absorbing the Entirety of the Cross-Check Multiplier Endorsed by the Court and Making Other Improper Assumptions and Adjustments in their Own Favor

52.    Following the Order, non-Leadership firms such as SHS had every reason to expect

that the 2.62 multiplier endorsed by the court would generally be applied across the board to each firm's share of the fee award—or, put otherwise, that the fee would be distributed at least in proportion to lodestar, with due attention given to other relevant factors assessing the firms' respective contributions to the litigation along with considerations of fairness and equity.

53.      Yet Defendants allocated the fee award in such a way that only Leadership Counsel received any multiplier. Defendants hoarded for themselves and other Leadership firms all fees beyond the lodestar they assigned to non-Leadership firms such as SHS. This maneuver alone resulted in the unjust and unwarranted transfer of millions of dollars in fees from the 46 non-Leadership firms to Defendants. And, on information and belief, it resulted in Defendants paying themselves approximately four times the amount of fees that they each had incurred in the case.

54.      This also results in some striking disparities. While Defendants designated SHS fees with a blended rate of just $204.45 per hour, information about the allocation of fees suggests that Defendants' blended rates range up to approximately $4,000—factoring in the multipliers they received. This information suggests that even some of Defendants' paralegals were slated at post-multiplier rates well above $1,000 per hour, several times more than the  rate Defendants allocated to the SHS firm.

55.      In addition, while projecting a large—and ultimately grossly excessive—dispensation of post-approval time for themselves, Defendants did not count any of SHS's actual time accrued after the October 2019 submission. Plaintiff continued to submit timesheets through 2021 but were not credited for any of their time in the final fee calculation.

**<u>Defendants Wait Until 2022 to Discuss the Fee Allocation and then Assign SHS a Paltry Fee Award with No Opportunity to Negotiate or Seek an Adjustment</u>**

56.      On or about February 8, 2022, Defendants informed SHS that the Equifax matter was finalized, with all appeals exhausted, and that the settlement funds would be coming in. They

asked SHS to provide wiring instructions.

57.    Defendants first informed SHS of its actual share of the fee award in the subsequent days—after February 8, 2022. Not until February 2022 or later did Defendants notify SHS of Defendants decision with respect to SHS's designated share of the fees and costs awarded by the court, advising SHS that it would be receiving its expenses and an attorney's fee of only $106,274.

58.    Defendants used one method of calculation for SHS—the greatly-reduced lodestar submitted to the court in October 2019, not a penny more—and another for themselves, dividing up the rest of the spoils. SHS was blindsided and left without recourse.

59.    SHS told Defendants that it objected to this allocation in light of its lodestar and substantial contributions to the case as well as the overall fee award of $77.5 million. Defendants, as Co-Lead Counsel, responded that the amount represented the highest amount given to any non-Leadership firm. Defendants further responded that SHS could take it or leave it. Following several follow-up discussions over a course of several months, Defendants refused to budge.

60.    Ultimately, despite the fact that SHS (i) put in, at minimum, approximately 1.7% of the total collective hours, even after SHS making vast cuts from the more than 3,900 hours it actually expended, and Defendants cutting the submitted hours by more than half; and (ii) contributed seven critical MDL class representatives, Defendants have designated SHS to receive only 0.14% of the $77.5 million fee—or $106,274. This fee is grossly disproportionate to SHS's efforts and contributions to the case.

61.    In sum, Defendants have enriched themselves at SHS's expense by being opaque about the fee allocation and distribution process and by engaging in self-dealing in order to slash SHS's fee award and enhance their own respective shares of the fee. This violates Defendants' fiduciary and contractual duties to SHS as well as the covenant of good faith and fair dealing and

constitutes unjust enrichment.

**Defendants' Unlawful Course of Action Was Not Complete and Did Not Give Rise to a Cause of Action until Defendants Set the Final Fee Allocation in 2022**

62.     Defendants' breach of their duties to SHS was inchoate and not complete until they conclusively determined its final share of the fee award and conveyed that amount to SHS after February 8, 2022. Until that point, SHS reasonably believed that Defendants would honor their obligations and provide it with a fair and equitable share of the overall fee award.

63.     Under Tennessee law, a cause of action does not accrue until a judicial remedy is available. In accordance with the discovery rule, a cause of action accrues when the plaintiff knows or in the exercise of reasonable care and diligence should know that an injury has been sustained as a result of wrongful or tortious conduct by the defendant. Here, there was no certain and specific injury or harm until Defendants set SHS's share of the fee award, notified SHS of that amount, and refused to consider SHS's reasons for why an adjustment was warranted.

**CAUSES OF ACTION**

**COUNT ONE**

**Breach of Fiduciary Duty**

(a) *Defendants Owed SHS a Fiduciary Duty*

64.     Plaintiff realleges and incorporates by reference all allegations set forth in prior paragraphs.

65.     Defendants owed a fiduciary duty to SHS under the circumstances. A fiduciary duty can arise from a relationship of trust and dependence—i.e., a confidential relationship. As the weaker party in the co-counseling relationship, SHS placed its confidence in Defendants—a stronger party in a position to influence and exercise dominion and control over SHS.

66.     The *Equifax* MDL court's order appointing Defendants as Co-Lead Counsel created

16

an extreme power imbalance of the type that comes well within Tennessee law on confidential relationships. Defendants' status as Co-Lead Counsel with full rights and authority to determine the course of the litigation placed them in a position of exercising controlling influence over SHS. SHS could not do anything without Defendants' say-so and was entirely at Defendants' mercy. This included Defendants' prerogative to direct the work, vet the parties' hours and lodestar, and set the fee allocation.

67.      In turn, it was incumbent upon Defendants to act in accordance with basic principles of good faith and fair dealing, treat SHS in an above-board manner, and not simply wield raw power to whittle down SHS's fee for their own benefit.

68.      Defendants have asserted this power imbalance by dictating the amount to be paid to SHS, and, when SHS objected, advising that there was nothing SHS could do.

69.      As distilled in the Manual *for Complex Litigation*, counsel designated by the court to take on a leadership role in complex class or multi-party litigation "*assume a responsibility to the court and an obligation to act fairly, efficiently, and economically* **in the interests of all parties and parties' counsel**." Manual for Complex Litigation (Fourth) § 10.225 p. 33 (2018).

70.      SHS placed its trust and confidence in Defendants. SHS provided Defendants with its timesheets and lodestar and relied on them to make all fee submissions to the Equifax MDL court and to exercise a substantial degree of control over the final fee distribution. SHS further entrusted Defendants with the firm's clients—to be included as MDL plaintiffs to advance the *Equifax* litigation and settlement. Defendants used these confidences to obtain an advantage over SHS by manipulating the fee allocation in its favor and to SHS's detriment. These facts establish a confidential relationship giving rise to a fiduciary duty.

(b) *Defendants Breached their Fiduciary Duty to SHS*

71.     A fiduciary relationship involves a condition of superiority held by one of the parties over the other. A presumption of invalidity extends to all transactions between the parties to the fiduciary relationship in which the dominant party obtains a benefit from the weaker party. To overcome the presumption, the dominant party must affirmatively prove its compliance with all equitable requisites. Here, Defendants, as the dominant party, acted inequitably to enrich themselves at SHS's expense.

72.     Defendants breached their fiduciary duty when they abused their position as Co-Lead Counsel to appropriate the bulk of SHS's rightful fee and distribute it among themselves.

73.     Defendants knowingly pocketed SHS's rate reductions while failing to inform SHS that the other firms were charging rates comparable to its original rates. Then, after SHS cut its rates in half and its lodestar by 80% from over $1.4 million to just $270,150.25, Defendants arbitrarily slashed SHS's lodestar by another 60% to $106,274.

74.     When the MDL court granted a $77.5 million fee award, endorsing an across-the-board 2.62 multiplier, Defendants unilaterally determined to keep non-Leadership firms' shares of the multiplier for themselves and to take a disproportionate share of the fee. Defendants insisted on holding SHS to the lodestar method of fee allocation, after implementing significant reductions to SHS's lodestar calculations, while employing a separate method for awarding themselves fees. Defendants' dual methods of fee allocation operated to their own benefit while operating to the financial detriment of SHS.

75.     Finally, Defendants did not inform SHS of the fee that they had allocated to the Firm until well into 2022, when the funds had already been distributed to Leadership Counsel. By then, they claimed that the deed had been done and that it was too late to go back. Defendants did

this so that they could keep the money for themselves. Despite SHS's objections to being shortchanged, Defendants provided only disingenuous excuses and refused to make any adjustments.

76.     In short, instead of acting as fiduciaries to ensure that SHS's interests were properly and fairly considered at all times, Defendants engaged in a course of self-serving conduct to deny SHS a reasonable fee for its efforts. Defendants acted in direct opposition to SHS's interests by appropriating the bulk of what a reasonable and adequate fee would have been and spreading it between themselves. As the dominant party, Defendants wrested a benefit from SHS without adhering to any basic requisites of fairness and equity. This is a clear breach of fiduciary duty. At minimum, Defendants cannot overcome the presumption of invalidity attached to their engagement in a transaction with SHS, the subservient party, to obtain benefits at its expense.

(c)   *SHS Suffered Injury from the Breach and Defendants in Turn Gained a Benefit*

77.     As a proximate result of Defendants conduct, SHS has suffered considerable damages. SHS reasonably expended over one thousand hours of time on materially advancing the litigation that was never credited by Defendants in the fee award allocation, resulting in damages well over $1 million, with the final amount to be determined at trial.

78.     In consequence, Plaintiff SHS is entitled to compensatory damages for the harm it has suffered. This Court should also award punitive damages for Defendants' breach of fiduciary duty under Tenn. Stat. § 29-39-104.

## COUNT TWO

### Breach of Contract/Covenant of Good Faith and Fair Dealing

79.     Plaintiff realleges and incorporates by reference all allegations set forth in prior paragraphs.

80.     Additionally, and in the alternative, Plaintiff SHS is the beneficiary of an implied or constructive contract arising from the *Equifax* MDL court's order—appointing Defendants as Co-Lead Counsel with extensive authority to control the conduct of the litigation and to vet and filter each firm's time and costs submissions to the court—along with the parties' course of conduct.

81.     After being divested of control over the 45 actions that it filed and placed in a subservient position of performing services at Defendants' behest, SHS had a reasonable expectation of being fairly compensated for its efforts. Under the circumstances, the Court should infer the parties' intent to assume mutual obligations and promises—under which Defendants would control the conduct of the action, use SHS's clients as MDL plaintiffs, and make all key litigation decisions in exchange for treating SHS and its clients reasonably and in equitable fashion.

82.     In any contractual relationship, we are not to assume that one party is placed at the mercy of the other. Courts imply promises when justice, good faith, or fairness so demand. Further, a duty of good faith and fair dealing is implied in all contractual relationships. The covenant honors the reasonable expectations of the parties and protects their rights to receive the benefits of the agreement. Even where one party exercises contractual discretion, such as to set price, it must do so in a reasonable, good faith manner consistent with the expectations of the parties.

83.     The implied duty of good faith and fair dealing requires that a party exercise good faith and honest judgment even where the contract gives that party discretion over a matter. The concept of good faith encompasses basic notions of fairness and commercial reasonableness. A decision that is made for arbitrary or capricious reasons, is based on an improper pecuniary motive, or is predicated on dishonesty or illegality is not made in good faith. Furthermore, a decision can be so baseless or erroneous that it creates an inference of bad faith and dishonest judgment.

84.     Here, Defendants did not set SHS's fee in a fair and reasonable manner. Rather, they acted arbitrarily and in bad faith to take as much of SHS's fee for themselves as possible.

85.     Because Defendant have abandoned their obligations under the implied covenant, it falls upon the Court in this action to determine what a fair and reasonable fee for SHS's services to the class (out of the total $77.5 million attorney's fee award) should be.

86.      Further, Defendants' fraudulent, bad faith conduct warrants an award of punitive damages under Tenn. Stat. § 29-39-104.

## COUNT THREE

## Quantum Meruit

87.     Plaintiff realleges and incorporates by reference all allegations set forth in prior paragraphs.

88.     In the alternative to the contractual claim, SHS is entitled to recover the reasonable value of its services under a *quantum meruit* theory. This Count is posed strictly in the alternative to Count Two and assumes the lack of an enforceable contract.

89.     SHS performed legal services that were valuable not only to the Equifax class but to Defendants themselves. For example, SHS's extensive case development efforts paid dividends when Defendants needed named plaintiffs and class representatives to fill critical gaps in the consolidated MDL complaint. Leadership Counsel put out the call, and SHS delivered. Ultimately, seven of SHS's clients were included as MDL plaintiffs. Without them, the suit would not have been as successful it was—resulting in a settlement that included a $380,500,000 cash fund, an additional $125,000,000 to satisfy claims for out-of-pocket losses, and potentially $2 billion worth of credit monitoring. Nor would there have been an attorney's fee award of $77.5 million, of which Defendants garnered more than $76.47 million for Leadership Counsel.

90.     Defendants received the benefit of SHS's services. Defendants put out a call seeking plaintiffs in certain jurisdictions and with certain fact patterns or injuries. SHS answered that call and delivered seven plaintiffs that were named in the consolidated MDL action. Further, SHS submitted monthly time sheets to Defendants from early 2018 through January 2021.

91.     The parties fully understood that SHS performed its services with the expectation of being fairly compensated out of any settlement recovery. Defendants provided assurances that all firms would be treated equitably as part of a final fee allocation. Their fees would be based factors reflecting their respective contributions to the case and not a strict application of lodestar.

92.     Failure to adequately compensate SHS for its services would be unjust. SHS reasonably expended over one thousand hours of time on materially advancing the litigation that was never credited by Defendants in the fee award allocation, resulting in damages well over $1 million, with the final amount to be determined at trial.

93.     But, based on self-dealing, Defendants have offered SHS fees of only a paltry $106,274. In contrast, the 14 Leadership Counsel firms will receive over $76.47 million in fees, with Defendants' awards ranging to approximately $15 million or more. They will receive several times their lodestar while SHS is being given only a small fraction of its lodestar.

94.     SHS's relative contributions to the case also support a far higher award. For example, SHS provided a critical mass of class representatives that no other firm was able to bring to the litigation. SHS's proportionate contributions significantly exceeded 0.14% of the total effort, both in terms of hours expended and qualitative value added, and SHS is entitled to a reasonably commensurate fee but is receiving only 0.14% of the fee under Defendants' self-serving and grossly-disproportionate allocation.

95.     Consequently, the Court should award SHS the reasonable value of its legal

services in light of all relevant circumstances.

## COUNT FOUR

## Unjust Enrichment

96.     The doctrine of unjust enrichment applies where there has been a benefit conferred which would result in an unjust enrichment unless compensated—e.g., a party cannot receive and retain the benefit of another party's labor without paying for the reasonable value of such work.

97.     Plaintiff's unjust enrichment claim assumes—in the alternative to Counts Two and Three—that there is no enforceable contract or quasi-contract governing the allocation of fees in the *Equifax* litigation. Instead, Defendants abused their position as Co-Lead Counsel—engaging in self-serving conduct to appropriate the value of what a reasonable fee would be for SHS. It would be unjust to allow Defendants to retain this benefit and they should be ordered to disgorge the monetary value of the fees that they wrested from SHS in such an inequitable manner.

98.     SHS conferred a valuable benefit on Defendants—performing vast amounts of legal work on the *Equifax* matter and delivering seven of its clients as MDL plaintiffs.

99.     Defendants appreciated the benefit. SHS's efforts and contributions helped bring about a mega-fund settlement and the resulting $77.5 million attorney's fee.

100.     Defendants accepted the benefit by using SHS's clients as MDL plaintiffs and class representatives. It is improper for Defendants to request and receive the benefit of these clients while writing off most of the time and work that SHS expended in developing their claims. Moreover, Defendants accepted many additional hours of labor performed by SHS after they were appointed as Co-Lead Counsel. It would be inequitable to permit Defendants to obtain the benefit of SHS's services without paying their value in the form of a reasonable share of the $77.5 million fee. Through their inequitable conduct, Defendants appropriated outsized portions of the fee award

while relegating a negligible amount to SHS. SHS must be fairly compensated for its thousands of hours of work.

<u>**PRAYER FOR RELIEF**</u>

Accordingly, Plaintiff respectfully requests the following relief:

A.      Judgment in Plaintiff's favor;

B.      An award of compensatory damages for the value of SHS's legal services to the *Equifax* class in relation to the overall $77.5 million attorney's fee award, or, alternatively, disgorgement of benefits unjustly retained by Defendants;

C.      An award of punitive damages pursuant to Tenn. Stat. § 29-39-104 for Defendants' malicious, intentional, and/or reckless misconduct; and

D.      Such other and further relief as the Court may deem just and proper.

Respectfully Submitted,

<u>Dan E. Huffstutter</u>
Dan E. Huffstutter     BPR# 5154
1211 16th Ave. S.
Nashville, TN 37212
Ph: 615-242-2000
Fx: 615-242-2001
Email: dhuffstutter@comcast.net

# EXHIBIT H

**Case Summary**
**Case No. 23-0169-I**

| | | | |
|---|---|---|---|
| **Sanford Heisler Sharp, LLP vs. Stueve Siegel** | § | Case Type: | **Damages/Torts** |
| **Hanson, LLP et al** | § | Date Filed: | **02/06/2023** |
| | § | Location: | **- Part I** |
| | § | Judicial Officer: | **Moskal, Patricia Head** |
| | § | | |
| | § | | |

---

**Party Information**

| | | **Lead Attorneys** |
|---|---|---|
| **Defendant** | **Dicello Levitt Gutzler, LLC** | |
| **Defendant** | **Doffermyre Sheilds Canfield & Knowles, LLC** | |
| **Defendant** | **Stueve Siegel Hanson, LLP** | |
| **Plaintiff** | **Sanford Heisler Sharp, LLP** | **Dan E. Huffstutter**<br>*Retained*<br>615-242-2000(W) |

---

**Events & Orders of the Court**

| | |
|---|---|
| | **OTHER EVENTS AND HEARINGS** |
| 02/06/2023 | **Complaint/Petition** |
| 02/07/2023 | **Jury Demand** |
| | *(6)* |
| 02/07/2023 | **Miscellaneous** |
| | *issued to: DICELLO LEVITT GUTZLER, LLC c/o RA: Adam Levitt, 10 N Dearborn St. , 11th Fl., Chicago, IL - Private Process Server* |
| 02/07/2023 | **Miscellaneous** |
| | *issued to: DOFFERMYRE SHEILDS CANFIELD & KNOWLES, LLC c/o RA: Everette L. Doffermyre, 1355 Peachtree St., Suite 1725, Atlanta, GA - Private Process Server* |
| 02/16/2023 | **Designation to Business Court** |
| | *Request for Designation to the Business Court Docket* |
| 02/17/2023 | **Chancellor's Order** |
| | *Notification of Proof of Service Process and Service of Request* |

**Unofficial Record**