The following is the PDF of an official transcript.  Official transcripts may be filed in CM/ECF only by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days.  You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

```
 1                  UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF GEORGIA
 2                        ATLANTA DIVISION


 3
    IN RE:  EQUIFAX, INC.,      )     MDL DOCKET NO. 2800
 4  CUSTOMER DATA SECURITY      )     1:17-md-2800-TWT
    BREACH LITIGATION,          )
 5                              )     CONSUMER CASES
    _____ )
 6


 7


 8             Transcript of a motion hearing before


 9            The Honorable Thomas W. Thrash, Jr.


10                  March 8, 2023; 2:00 p.m.


11                      Atlanta, Georgia


12



13

    Appearances:
14
    For the Class:      Kenneth S. Canfield, Esq.
15                       Norman E. Siegel, Esq.
                         James Cameron Tribble, Esq.
16


17

    For Sanford
18  Heisler Sharp:      Halsey G. Knapp, Jr., Esq.


19


20

        Proceedings recorded by mechanical stenography,
21  transcript produced by computer.


22  _____


23

                    Diane Peede, RMR, CRR, CRC
24              Federal Official Court Reporter
                75 Ted Turner Drive, SW, Suite 2194
25                 Atlanta, Georgia  30303-3309
```

P R O C E E D I N G S

(Call to the order of the Court.)

THE COURT:  All right.  This is the case of In Re: Equifax, Inc., Customer Data Security Breach Litigation, Case Number 17-md-2800.

First, let me ask counsel for the parties to identify yourselves for the record and the parties you represent.

MR. CANFIELD:  Your Honor, this is Ken Canfield, and we represent ourselves as well as the Plaintiffs in our capacity as Class counsel.

THE COURT:  Good afternoon, Mr. Canfield.

MR. CANFIELD:  Good afternoon.

MR. SIEGEL:  Good afternoon, Your Honor.  Norman Siegel, co-lead counsel for the Plaintiffs.

THE COURT:  Good afternoon, Mr. Siegel.

MR. TRIBBLE:  Good afternoon, Your Honor.  Cam Tribble, on behalf of Class counsel as well.

THE COURT:  Good afternoon, Mr. Tribble.

MR. KNAPP:  Your Honor, Halsey Knapp, on behalf of the Defendants.  I have with me representing my client, Judge Sharp.

THE COURT:  Good afternoon, Mr. Knapp.

All right.  This is a hearing on the motion for immediate injunctive relief, Docket Number 1249.

1              Are you going to speak on behalf of the Plaintiffs,

2  Mr. Canfield?

3              MR. CANFIELD:  I am, Your Honor.

4              THE COURT:  All right.  It's your motion.  I'll be

5  glad to hear from you.

6              MR. CANFIELD:  Thank you.

7              And may I express for the Plaintiffs our

8  appreciation for the Court in scheduling this hearing on such

9  a quick basis.

10             From the outset of this multi-district litigation,

11  this Court made clear it wanted firms that were not selected

12  for leadership to play a minor role in the litigation, and

13  the Court restricted the work for which non-leadership firms

14  could be compensated.

15             To this end, the Court ordered that time spent by

16  non-leadership firms would not be compensable unless two

17  conditions were met:

18             The first is that the firm reported its time to

19  co-lead counsel on a monthly basis; and,

20             The second, the work for which that time related

21  had to have been authorized by co-lead counsel.

22             To carry out this directive, as we told the Court

23  we would do, co-lead counsel issued a protocol that went to

24  all the non-leadership firms.  It explained the basis for the

25  Court's concern about non-leadership firms, and it shared

with them, among other things, that time spent investigating
and filing serial complaints before the MDL was established
was of little benefit and thus would not be compensable.
And, in fact, time was of such little benefit, we instructed
the non-leadership firms they shouldn't even bill for it.

Sanford Heisler Sharp is a firm that applied for
but was not selected for leadership.

After we were appointed leadership, we invited
Sanford, along with 47 other non-leadership firms, to play a
very minor role in the case, subject to the Court's orders
and the protocol that limited its work and compensation.

Sanford agreed to get involved on those terms,
knowing that it should not bill for and would not be paid for
the time it spent investigating and filing 45 serial
complaints around the country before the MDL was created.

Fast forward four years.  After all the appeals had
been resolved and Equifax had paid the fee and in accordance
with the settlement agreement, Class counsel allocated a
share of the fee to each participating firm based on the
value of its contributions and the time that had been
submitted to us that was included in the fee application and
that was approved by this Court.  Because Sanford played a
modest role in the litigation, it was allocated a modest
share of the fee.

One year later, upset by its fee allocation,

Sanford has sued Mr. Siegel's firm, my firm, and Amy Keller's firm in a Tennessee state court, contending that we violated common law, Tennessee common law, by not crediting the firm for the work it says it did in investigating and filing its 45 Complaints before the MDL was created.

Sanford's audacity is stunning.  The Tennessee lawsuit seeks compensation for work that is expressly non-compensable under the rules and protocols that governed its participation in the MDL, which Sanford knew about before it got involved.

Sanford is making a mockery of this Court's attempt to manage this case efficiently and to ensure that non-leadership firms wouldn't do exactly what Sanford is trying to do now, bill for a bunch of bloated time that has little relevance to the case.

It might be helpful to put the enormity of what Sanford is trying to do in a little bit of perspective.

In its Tennessee lawsuit, the firm claims to have spent more than 3,900 hours on this litigation.  That is more than the total hours reported by eleven of the 13 leadership firms that this Court actually appointed to guide the case and handle the litigation.

It's a thousand hours more than all the time my firm spent from the inception of the case through the time of the fee application.  And while ultimately I have more than

3,900 hours in the case, that's because of the immense amount of time and difficulty in dealing with final approval, the objectors, and the appeals all the way to the Supreme Court.

Sanford also is seeking hours that dwarf that of any of the other non-leadership firms that participated.

Not only is Sanford defying this Court's directives, but the firm also is trying to divest this Court of its exclusive jurisdiction under the final judgment and its authority under Rule 23 to oversee fees awarded in this MDL, including how the fee was allocated.

As was explained in Newberg on class actions, quote, "It is axiomatic that the Court has the ultimate authority to determine how the aggregate fee is to be allocated among counsel.  The Court has that authority by virtue of its oversight of the class action and its assessment of a fee on the defendant or class.  Inherent in the authority to assess the fee is the authority to determine who gets the fee."

Now, the normal process that firms follow when they're dissatisfied with their share of an allocated fee is to -- after class counsel have made the allocation, is to bring the challenge to the court that oversee -- that oversaw the class action.  That would have been this Court.

By seeking to have its share determined in Tennessee, the only logical conclusion is Sanford knows this

1    Court will not abide the firm's attempt to flaunt the rules

2    that governed its participation in the MDL.

3        So it's only logical to believe Sanford figured it

4    might as well take a shot at convincing a Tennessee court and

5    a jury that the Court's directives and management orders were

6    unfair and that it deserves more money for the time it

7    allegedly spent before the MDL was created.

8        Because Sanford's suit is a blatant attempt to

9    dodge this Court's jurisdiction, evade this Court's

10   directive, and get paid for work that this Court has already

11   determined is non-compensable, we're here to ask the Court to

12   enjoin Sanford under the All Writs Act from prosecuting the

13   Tennessee action and from trying to challenge how much it got

14   in the fee in front of any forum other than this Court.

15       If Sanford thinks it was paid too little, its

16   remedy is to ask the Court for relief.

17       Now, in its opposition brief that was filed Monday

18   evening, Sanford doesn't contend that it complied with the

19   orders and protocol that governed its compensation in the

20   MDL.  Rather, Sanford largely ignores the order and protocol,

21   admitted only that, quote, "The Court's orders may have some

22   tangential relevance to its claim."

23       In its responsive brief, it goes on to make a

24   totally bizarre statement.  It says its claims in Tennessee,

25   quote, "Are based on conduct occurring in 2022, arising after

this action was effectively concluded, on subject matter
having nothing to do with" the parties' dispute in the MDL
"about the Equifax data breach and not addressed in any
manner in the parties' settlement agreement or the Court's
orders."

I won't go through all the ways in which that
statement is factually and legally untrue, but I will simply
say that the fee allocation was not made in a vacuum.  It was
based on what happened during the history of the entire
litigation, the Court's directives about what time was
compensable, and the time and billing reports that Sanford
submitted over the years.

That it doesn't even believe that the statement
that I just read is true, all you have to do is go and read
their Complaint or look at the demand letter that Mr. Sharp
sent us.  It's rife with references and reliance upon events
that happened in the MDL and the orders that this Court
issued.  It simply construes those orders directly contrary
to the terms of what the Court intended.

So much as Sanford might want to hide it, that
Tennessee lawsuit is nothing more than a collateral attack on
this Court's decisions and its judgments in managing the
litigation.

Let me turn now to the -- in a little bit more
detail the Court's efforts to restrict the billing and

1    compensation of non-leadership firms and the history of

2    Sanford's involvement in this case.

3           If the Court remembers, about five years ago this

4    courtroom was overflowing with 100 or more lawyers who all

5    wanted leadership positions in this MDL.

6           THE COURT:  I think the first words out of my mouth

7    were, "The fire marshal would be appalled."

8           MR. CANFIELD:  And if the Court recalls, that

9    hearing began on a bit of a dramatic note.  Your Honor came

10   out and took the bench.  And from all these lawyers that were

11   in the courtroom, you called me up to the podium and you told

12   me the day before, some anonymous person who objected to the

13   appointment of our leadership group had sent to the Court's

14   chambers the day before a package of materials that

15   supposedly undercut our application, and the Court said,

16   "Take a look at this and address it as you will."

17          One of the materials that the Court gave me was the

18   transcript of the final approval hearing in the Anthem Data

19   Breach Litigation, which had occurred shortly before the

20   leadership hearing here.

21          While the Court was listening to all of those other

22   applicants, I read through that transcript, and I learned

23   that Judge Koh, who had the Anthem case, was surprised and

24   outraged by the size of the lodestar and the fee implication

25   -- fee application, which she suspected was bloated and the

result of incredible efficiency, and the major reason she
gave for that was that the application contained billing from
53 firms that Judge Koh had not appointed to leadership
positions, and she wondered how in the world could all those
firms be involved in this litigation without unbelievable
amounts of duplication.  And she was so outraged about it,
she said she was going to appoint a special master to
investigate.

Now, at our hearing, when it came time for me to
speak late in the day, I addressed Judge Koh's concerns in
Anthem.  And I told this Court that we were not going to have
an Anthem problem here because we intended to put in place
billing and time protocols that govern the role of
non-leadership firms.

And in the colloquy that took place, after I had
first raised that issue, the Court made it absolutely clear
that it would not tolerate non-leadership firms running amuck
and submitting bloated lodestar claims for work of little
benefit to the Class.

Our discussion on the subject ended with the
following statements:

The Court said, "Mr. Canfield, you've been in front
of me enough to know I don't ever want to have something like
this happen in front of me."

And I responded, "You have my personal assurance

1   that if we are appointed, it never will, Judge."

2           A few days later, the Court issued its order

3   appointing leadership.  The order, once again, made clear

4   that the Court wanted the case handled efficiently, without

5   duplication and unnecessary work, and it ordered that all

6   parties' participating firms keep daily time records, as I

7   told the Court we would want to have, and it had to send

8   those records to the co-leads on a monthly basis.  And in

9   turn, the co-leads were directed to submit those records to

10  the Court in camera on a quarterly basis.

11          The order said that failure to submit appropriate

12  time records would be grounds for denying compensation.

13          The Court also specifically addressed the role of

14  non-leadership firms in its leadership order.  The Court

15  said, quote, "In order for their time and expenses to be

16  compensable, those not serving in leadership positions must

17  secure the express authorization of co-lead counsel for any

18  projects or work undertaken in this litigation."

19          Now, as we said we would do, once we were

20  appointed, the co-leads quickly put together a time and

21  billing protocol, which we sent to all the non-leadership

22  firms.  We told them we would strictly adhere to the Court's

23  directive regarding their role in the case, that they had to

24  get written authorization if they wanted to do any work for

25  which they sought compensation, that simply reporting time

did not ensure that a firm would be paid for it, and that we would exclude any time that was inappropriate from our fee application.

We were aware that a number of firms, such as Sanford, had filed dozens of lawsuits around the country before the MDL was created, presumably to enhance their prospects for a leadership position.

To deal with that issue consistent with the Court's directive, we included the following language in the protocol, quote:  "Time and expenses incurred prior to the appointment of co-lead counsel will be considered for compensation only to the extent they contribute to advancement of the litigation as a whole.

"Time investigating or filing serial complaints should not be submitted and will not be considered compensable time."

We submitted that protocol to the Court shortly thereafter in connection with our first in camera appointment submission.  We explained to the Court the role that we intended non-leadership firms to pay.  And the Court relied upon that protocol in approving our fee application and determining that the time was reasonable.

Taken together, the Court's directive at the leadership appointment hearing, its leadership appointment order, and the protocol issued by co-lead counsel constituted

1   the basic rules that govern Sanford's work and compensation

2   in the MDL.

3          In accordance with the order, Sanford submitted its

4   time on a monthly basis, as we required -- as required by the

5   Court.

6          During the course of the litigation, Sanford

7   reported spending a total of 1,213 hours with a lodestar

8   value of $269,000.

9          Of that time, roughly a quarter, 330 hours were

10  spent after co-lead counsel were appointed.

11         Before we filed the fee application, in accordance

12  with what we told this Court we were going to do, we

13  determined that almost all -- or we reviewed the records of

14  Sanford and all the other firms in the case.  We determined

15  that about -- almost all of Sanford's time after the

16  appointment, when they were performing work that was

17  specifically authorized by us, was consistent with the

18  governing rules.

19         But we cut most of its pre-appointment time because

20  most of it related to filing dozens of repetitive Complaints

21  around the country.

22         Co-lead counsel approved time for Sanford of

23  roughly 520 hours, having a lodestar value of $106,000.

24         We told Sanford and all the other firms whose time

25  was cut what we had done, and when we didn't have any -- and

we gave them specific -- we sent back their time records to them with color-coded entries as to explaining what we had done.

And when nobody objected to it, we included that time in the fee application, and that time was approved by the Court.

At the end of the case, the order approving the settlement agreement granted Class counsel the responsibility for allocating the fee to the participating firms using the standards informed by the Court's directive, appointment order, and protocol.

Any firm that was dissatisfied with that decision regarding its share of the fee had the right to challenge our decision by taking the issue to the Court, which retained jurisdiction in the final judgment over all matters relating to the settlement, including disputes about the allocation.

None of the more than 60 participating law firms has filed a challenge in this court to its share of the fee.

Sanford was well aware of its ability to challenge the fee application by seeking more money from this Court, but instead, it chose this bizarre gambit of suing co-lead counsel in Tennessee.

It's obvious why Sanford chose that path.  The firm wants to do an end-around -- or an end run around this Court's orders and rules governing its role and compensation

in the MDL and get paid for work that this Court has already

determined it's not entitled to be compensated for.

Sanford is clearly seeking to flaunt this Court's

orders and jurisdiction, and that could not be more clear.

One, the Court unambiguously directed that

non-leadership firms be paid -- not be paid for bloated

lodestar of little value to the prosecution of Plaintiffs'

claim.  In Tennessee, Sanford seeks compensation for just

that.

Two, as I mentioned, the Court order that firms

submit their time each month to the co-leads and they

wouldn't be compensated if they didn't comply with that

order.  Sanford submitted 1200 hours of compensable time to

the co-leads.  In contrast, in Tennessee, it seeks to be paid

for more than 3,900 hours, as I mentioned, 2,700 hours more

than it reported to the co-leads.

Neither we nor the Court have ever seen the time

relating -- the records relating to that -- those 27,000 --

or 2,700 hours.

Three, the Court ordered that all the time

submitted to the co-leads be submitted for in camera review

so the Court could keep tabs on a realtime basis about what

was happening and could intervene, if necessary, to prevent

the case from running off the tracks.

In Tennessee, however, Sanford seeks compensation

for work that it never submitted to this Court or to co-lead counsel.

Four, the Court ordered that the non-leadership firms could be compensated only if they obtained authorization for their work from co-lead counsel.

Sanford, however, seeks compensation in Tennessee for work that there's no -- we didn't authorize it.  We never would have authorized it.  In fact, we told them in advance, before they got involved, it wasn't going to be authorized.

Five, the protocol that we put together and shared with the Court specifically provided the time spent investigating and filing serial complaints would not be compensable.

Sanford says in Tennessee that that protocol, the same protocol that was adopted pursuant to this Court's directive and that this Court relied upon in approving the fee application, is meaningless.  They don't even mention it.

Six, the settlement agreement approved by the Court provided that the fee for work performed by Class counsel and other lawyers working at our direction are to be, quote, "distributed as determined by Class counsel."

In Tennessee, Sanford wants its fee to be determined by a jury that had nothing to do with this litigation.

Lastly, in the final judgment, this Court retained

jurisdiction over the implementation of the settlement
agreement, including the distribution of attorneys' fees, and
it kept and retained jurisdiction over all the lawyers that
participated in the MDL, including Sanford and Mr. Sharp.

In Tennessee, this court seeks to avoid the Court's
jurisdiction.

Allowing the Tennessee lawsuit to proceed under
these circumstances will not only frustrate this Court's
order, but it will also render meaningless this Court's
efforts to manage the MDL and subject co-lead counsel to
potential liability for doing exactly what the Court ordered
us to do, and we assured the Court that we would in fact do.

And the impact is going to be felt not just in this
MDL, but in future MDLs as well.  Just consider a few
examples.  How can an MDL court efficiently manage the
litigation and oversee the work of the participating lawyers
if those lawyers can ignore the court's management orders by
seeking compensation for their efforts in another forum under
the guise that they want damages from the lawyers who are
actually appointed to leadership positions by the court?

Firms looking to -- in the early stages of
litigation, firms looking to bolster their product --
prospects for a leadership position, such as Sanford, would
be incentivized to investigate and file as many federal court
lawsuits as possible, notwithstanding that the lawsuits are

1    of little, if any, benefit to the litigation and simply clog

2    the dockets of the federal courts.

3           Firms may figure if they don't get what they want

4    in the MDL, all they have to do is try to convince a jury

5    that their efforts were worthwhile and deserving of

6    compensation by avoiding the MDL entirely.

7           The lawyers who are actually appointed the

8    leadership positions by the court would be put in an

9    untenable position.  We're bound to comply with this Court's

10   orders, as are other lead counsel in other MDLs, regarding

11   the work and the compensation of the lawyers we directed.

12          But if Sanford's approach is permitted, our

13   decisions, even if in strict compliance with the Court's

14   orders, may subject us to personal liability under the laws

15   of every state in which one of the lawyers participated in

16   the MDL resides.  And not just compensatory damages, but they

17   want punitive damages against us for carrying out the

18   directives of this Court.

19          The absurdity of Sanford's approach to resolving

20   this dispute is made even more apparent when the Tennessee

21   lawsuit is not considered in isolation.

22          There are 47 other leadership firms that

23   participate -- non-leadership firms that participated in the

24   MDL.  If all of them had decided they wanted to be paid for

25   pre-appointment work, notwithstanding this Court's order to

the contrary, we would be facing 48 separate state lawsuits
seeking to apply the common law of dozens of different
states, all challenging this Court's orders and our efforts
to effectuate them.  Surely the law does not leave the Court
powerless to prevent that from happening.

Now, let me turn now to the specifics of the
Tennessee lawsuit and show how those demonstrate the fact
that the lawsuit undermines this Court's jurisdiction and
frustrates its orders.

The entire Tennessee Complaint and the demand
letter that Mr. Sharp sent to us before he filed it is
premised on the construct that this Court got it wrong when
it determined that all work must be done at the direction of
co- -- Class counsel, that all time must be submitted to
Class counsel and the Court, and that prepayment time for
those filing serial complaints, like the Sanford firm, should
not be considered compensable.

The factual allegations in the Complaint are not
divorced from the history of the litigation, as Sanford wants
to argue here.  All of the facts in its Complaint are
grounded in this Court's leadership appointment order,
Sanford's conduct predating the MDL and this MDL, and Class
counsel's conduct in carrying out this Court's orders.  They
just want to misconstrue what those orders say.

And if they want to litigate in Tennessee what this

Court intended with regard to non-leadership firms and whether we complied with our obligations as Class counsel in the way we allocated the fee, I'm sorry to say, Judge, but I think you would be perhaps our first witness that we would want to call in that litigation, which just demonstrates the absurdity of the approach that they're following.

Now let's look specifically at the counts of the Complaint.

Count One asserts that there was a confidential relationship between Sanford and co-lead counsel as a result of a, quote, "extreme power imbalance," close quote, created by this Court's leadership appointment order; that this alleged confidential relationship gave rise to a fiduciary duty under Tennessee law, and that the co-leads breached that fiduciary duty by not crediting Sanford in the fee allocation for over 1,000 hours of time that it never reported to Class counsel or this Court.

And it wants compensatory damages of more than $1 million in an amount to be determined at trial, plus punitive damages.

For this claim to fly, Sanford obviously has to convince a Tennessee jury or a judge that by issuing the leadership appointment order, this Court intended that co-lead counsel had a duty to compensate Sanford for its pre-appointment time that was not reported to or authorized

1     by us.  That is exactly the opposite of what this Court

2     ordered.

3           The second count is for breach of an implied

4     contract.  Sanford says that it is, quote, "the beneficiary

5     of an implied or constructive contract from this Court's MDL

6     order," close quote, and that we breached that implied

7     contract by not crediting it in the fee allocation for time

8     relating to the 45 serial Complaints that it filed.

9           The Complaint then goes on to say, quote, "Because

10    defendants" -- that's co-lead counsel -- "have abandoned

11    their obligations under the implied contract, it falls upon

12    the court in this action," the Tennessee Court, "to determine

13    what a fair and reasonable fee for Sanford's services to the

14    Class (out of the $77.5 million attorneys' fee award) should

15    be."

16          Again, Sanford is asking a Tennessee court or jury

17    to determine what this Court meant in its leadership

18    appointment order, and Sanford can prevail by convincing that

19    court or jury that this -- only if it convinces them that

20    this court meant something directly contrary to what this

21    Court intended.

22          And it is the responsibility of this Court to

23    interpret its own orders, and that's why the Court retained

24    jurisdiction over the MDL.

25          Count Three is for quantum meruit.

Sanford claims that it provided valuable services that were critical in the outcome of the litigation; that co-lead counsel improperly failed to credit it for more than 1,000 hours of its work; and that consequently, the Tennessee court should award Sanford the reasonable value -- this is a quote, "the reasonable value of its legal services in light of all the relevant circumstances."

Again, under the orders and protocols governing its role in the litigation, Sanford was not entitled to credit for that time in the allocation.  And arguing to the contrary, Sanford is simply trying to convince the Tennessee court that this Court's directive that non-leadership firms not be compensated for that time is wrong.

In Count Four, Sanford wants to be compensated for its thousands of hours of work under an unjust enrichment theory.  That count suffers from the same flaws as the other counts.

It's not unjust that Stanford -- that Sanford was not paid for filing those 45 Complaints.  Sanford was told that it wouldn't be filing -- or getting paid for those Complaints when it decided to enter into the litigation, and it just has no entitlement to be paid for that time under the orders of this Court.

The All Writs Act was made for situations like this one, where an injunction is necessary or appropriate to

prevent this court's jurisdiction from conduct that has the potential to undercut the Court's orders.

As the Supreme Court noted in the New York Telephone case, quote, "This Court has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of the orders it has previously issued."

It does not matter that this MDL was -- has been closed or that, as Sanford claims, an injunction is unnecessary, because the Tennessee action allegedly involves a, quote, "peripheral post-litigation issue of whether defendants violated Tennessee law when they assigned Sanford a share of the fee."

The reality is that this Court retained jurisdiction over this matter, and Sanford is seeking compensation in Tennessee that violates the rules that govern its participation.

As the Eleventh Circuit explained in the Clay case that we cited in our brief and that it reaffirmed in the Burr case upon which Sanford relies, the All Writs Act allows courts to protect, quote, "not only ongoing proceedings, but potential future proceedings as well as already-issued orders and judgments."  That's the exact situation that we have here.

1          The next issue raised by our motion for relief is

2    whether the Anti-Injunction Act precludes the Court from

3    issuing an injunction to stop a state court proceeding.

4          The Anti-Injunction Act has three exceptions, two

5    of which are applied -- apply here.

6          As the Supreme Court stated in the Atlantic

7    Coastline Railroad case, these two exceptions allow federal

8    injunctive relief against state court proceedings where it

9    is, quote, "necessary to prevent a state court from so

10   interfering with a federal court's consideration or

11   disposition of a case as to seriously impair the federal

12   court's flexibility and authority to decide the case."

13         The first of the two exceptions under the

14   Anti-Injunction Act upon which we rely is where the -- an

15   injunction of a state court proceeding is necessary in aid of

16   the federal court's jurisdiction.

17         Now, historically, that exception only applied to

18   in rem proceedings involving a race.  But as the Eleventh

19   Circuit and other courts have recognized, the exception also

20   extends to contexts that are not true in rem proceedings but

21   are roughly analogous to proceedings in rem.  That's the

22   situation before this Court.

23         There is an analogous race before this Court that

24   justifies action under the All Writs and Anti-Injunction Act,

25   and that's for two reasons.

1            First, whereas here, there's an attorneys' fee

2    award the Class counsel are charged with allocating among all

3    the firms that participate in the action, the aggregate fee,

4    this Court's fee award is the equivalent of a race.  It's

5    essentially a limited fund, and that's because there's a

6    limited amount of money to be allocated.  And if the share of

7    one of the participating firms is increased, the share of

8    other firms that are participating would have to decrease.

9    There's only a limited amount of money.

10           And so the Tennessee court cannot give Sanford a

11   larger share of the fee without the affecting -- affecting

12   the rights of the other participating firms which are not

13   before this Court.  Only this Court has jurisdiction of all

14   the lawyers that participated in the -- in the litigation.

15           The second circumstance under which there's an

16   analogous -- something analogous to a race before this Court

17   is the litigation itself, the MDL proceeding.

18           As the -- as the Burr case the defendants rely upon

19   acknowledges by quoting a prior Eleventh Circuit decision, a

20   lengthy and complicated case -- or class action suit is the

21   equivalent -- is the equivalent -- is the virtual equivalent

22   of a race to be administered.  And that's led to what the

23   courts have called the multi-litigation exception to the

24   Anti-Injunction Act.

25           And under that exception, a federal court can

enjoin a state court proceeding where the federal court and
the parties have invested considerable resources in a complex
matter, the federal court has retained jurisdiction over
disputes relating to the matter, and the state court
proceeding threatens to frustrate and disrupt the orderly
management of the MDL.

That's the exact same thing that could happen here
if the Tennessee court is not enjoined.  The Court's orders
regarding the role or compensation of non-leadership firms
could be rendered meaningless.  The Court's efforts to manage
the MDL as it sees fit, not just in this but other MDLs,
would be upset.  The Court's discretion under Rule 23 to
oversee the compensation received by participating firms in
the Class action would be undercut.  And if other
non-leadership firms had chosen to follow Sanford's example
by filing their own state court cases, the resolution of
those cases would turn into a chaotic mess that would
threaten the very purpose of the MDL.

Now, separate and apart from the innate
jurisdiction exception to the Anti-Injunction Act, the Act
also allows a federal court to issue an injunction to, quote,
"protect or effectuate its judgments," and as courts have
later said, "and its orders."

This is often referred to as the non-relitigation
-- or the relitigation exception, and it's designed to

prevent issues that have already been resolved in the federal court from being relitigated in state court.

Again, that's exactly what's going on here.  The Court has already decided that Sanford is only entitled to certain compensation.  Sanford is seeking payment for thousands of hours that this Court has already determined it shouldn't be compensated.  Therefore, Sanford can only prevail in its Tennessee action if it convinces the court or jury that the Court's orders were erroneous.

Sanford is also seeking to relitigate this Court's fee award, which considered and approved as reasonable the 500 hours that Sanford reported and co-lead counsel authorized.

In Tennessee, Sanford contends that, in fact, it reasonably spent more than 3,900 hours.  But the reasonableness of its time and the balance of what can be treated as compensable has already been decided by this Court.

When you apply the principles of res judicata and issue preclusion to this situation, they clearly bar relitigation of the -- those issues in the case, Sanford in Florida and Tennessee.  An injunction thus is justified to protect the Court's decisions from collateral attack.

Now, a number of other courts around the country, federal courts have faced similar situations and have

exercised their authority to stop a participating law firm in a federal class action from challenging in state court its allocated share of an aggregate fee resulting from the class action settlement.  We cited those cases in our brief.  I don't want to spend any time going over them.

But I do want to respond and address specifically Sanford's reliance on the Burr case from the Eleventh Circuit.  That case is not, as Sanford contends, binding authority requiring that our motion for injunctive relief be denied.

To the contrary, the case supports our motion. That is because Burr held, as Sanford acknowledges on page 14 of its brief, that a state court proceeding may be enjoined if the state action directly attacks the substance of a federal court's earlier ruling.

That's exactly what's happening here.  They're attacking all of those Court's management decisions and decisions about what was compensable and about what work Sanford can do in the MDL.

Beyond supporting our -- our motion, the facts and analysis by the Eleventh Circuit in Burr is really of little relevance.  The case involved very different circumstances and considerations.

Unlike in this case, Burr did not involve the allocation of a class action fee by co-counsel among the

participating firms, nor did the state court action in Burr

interfere with the federal court's exclusive jurisdiction to

resolve questions arising out of the implementation of a

settlement agreement.

Further, in Burr, there was no federal court order

regarding how the two plaintiffs who brought the case that

was enjoined, Blair and Trussell, were to keep and report

their time or orders deciding what portion of their work was

compensable.

Blair and Trussell never even appeared in the

federal case.  They were not subject to the federal court's

oversight, and their claim to a share of the fee did not

arise under the settlement agreement.  Rather, Blair and

Trussell claimed that they had a separate letter agreement

that was entered into seven years before the settlement, and

that that letter agreement entitled them to a portion of fees

the class counsel -- and there was only one -- had received

in the federal court case.

In contrast, in this case, Sanford appeared and

participated in the MDL, its work and compensation was

subject to the Court's orders, and its claim to a fee

directly rises under the settlement agreement and this

Court's orders, not some sort of a separate agreement that

can be enforced in a state court without frustrating the

federal proceeding.

Further, the underlying federal action in Burr was not a class action or an MDL.  It was a mass action.  As a result, the federal court has no authority under Rule 23 to oversee the fee at issue or to ensure that the lawyers' time was fair and reasonable.

And the plaintiffs, the state court plaintiffs in Burr, Blair and Trussell, did not argue in that case that the federal action was analogous to a race.  They claimed that the race was the money in the qualified settlement fund that had not been distributed.  And the logic of the multi-district litigation exception to the Anti-Injunction Act doesn't apply.

Moreover, and this is perhaps most important to the decision in Burr, the federal court in Burr had no jurisdiction, no subject matter jurisdiction over the claims that the dissatisfied counsel asserted.  That is because -- and it's a strange set of procedural events -- when the two plaintiffs initially filed suit in state court, the federal counsel removed the court -- the case to federal court.

Judge Clemon granted a motion to remand the case, and then everything else that happened that was at issue in Burr occurred after that remand.

The Eleventh Circuit held that once Judge Clemon had remanded the case, he lost subject matter jurisdiction and he couldn't get it back, either as supplemental

1  jurisdiction or for any other reason.

2      THE COURT:  And as I recall in that case, that was

3  the only thing that all three judges on the panel agreed to.

4      MR. CANFIELD:  That was my exact next point, Judge.

5  There were three judges.  The two concurrences said --

6      THE COURT:  It was a very strange situation, where

7  the opinion of the court was only agreed to by one judge and

8  the other two expressly say, "We're only concurring in the

9  judgment that the district judge had no jurisdiction, and the

10  rest of it we don't join."

11      MR. CANFIELD:  So I think that Burr is essentially

12  -- I mean, except for that, all dicta.

13      THE COURT:  Some of which helps.

14      MR. CANFIELD:  And most of it is irrelevant.  It

15  just doesn't deal with our situation.

16      You know, in contrast to the situation in Burr,

17  there's no question that this Court has jurisdiction over

18  both Sanford and its claims pursuant to its retained

19  jurisdiction in the final judgment.

20      And for all the reasons I've discussed -- I mean,

21  essentially what the two concurrent opinions said in Sanford

22  (sic) is there's no reason to issue an injunction to protect

23  the Court's jurisdiction if it doesn't have any jurisdiction

24  to begin with.  That's what Burr stands for.

25      And our situation, obviously, is very different.

And as I said, for all the reasons I've discussed at some length today, the state court proceeding directly attacks -- the Tennessee action directly attacks this Court's orders governing Sanford's compensation.

So let me conclude by saying that we ask that the Court, for the reasons I've talked about today, enjoin Sanford from pursuing any claim relating to its share of the Equifax fee in any forum other than this Court, and that includes the forum in Tennessee.

And, lastly, I would say, Judge, that Sanford's opposition brief was just filed Monday night.  We've gone through it as best we can.  If the Court has some concerns about anything that's raised in that brief or its ability to issue an injunction under these circumstances, we would request a brief opportunity to file a reply brief and to more specifically respond to the points that they made.

Thank you, Judge.

THE COURT:  Mr. Canfield.

Mr. Knapp, let's take a ten-minute break and then I'll hear from you.

MR. KNAPP:  That's fine, Your Honor.

THE COURT:  The Court's in recess for ten minutes.

(Recess taken from 2:54 p.m. until 3:03 p.m.)

THE COURT:  Mr. Knapp.

MR. KNAPP:  Thank you.  May we proceed?

1    THE COURT:  Yes.

2    MR. KNAPP:  I'd like to start with a reference to

3    the protocol that was mentioned by movant's counsel, and an

4    important part of that protocol was not brought to the

5    Court's attention.  So let me read it to the Court.

6        "Time and expenses incurred prior to the

7    appointment of co-lead counsel will be considered for

8    compensation only to the extent they contribute to the

9    advancement of the litigation as a whole."

10       I'm quoting from document 1249 at page 6 of the

11   submission made by the movants.

12       Then it goes on to say, "Time investigating or

13   filing serial complaints shall not be submitted and will not

14   be considered compensable time."

15       Time on such investigating or filing of serial

16   complaints is not what my client is seeking, either in

17   Tennessee or here today, for that matter.

18       What they are seeking is a determination of the

19   value of their contributions, in particular, of providing

20   seven class representatives who were deemed to be a part of

21   the group of 50 that was represented to the Court as being

22   under the control of co-lead counsel.

23       The Tennessee action, if you would take the time to

24   read the Complaint, is not one seeking to add hours to the

25   lodestar.  There was a tremendous amount of emphasis on, Oh,

1  there's so many more hours, and they're trying to add hours

2  that were -- predated the appointment of counsel.

3        That's not what's going on.  There's no effort to

4  add to the lodestar going on here.  That's a red herring.

5        Rather, in the perspective of roughly $77 million

6  of attorneys' fees, roughly $20 million went to everybody but

7  the co-lead counsel.

8        And the question fundamentally that my client has

9  is its contribution not only of the seven class

10  representatives, but its contribution proportional to the

11  returns of the co-lead counsel.  And that's a legitimate

12  question, and there clearly has to be a forum somewhere where

13  that question can be answered.

14        Now, let's talk about this a little bit.

15        If you look at -- this is -- Docket 1249-1 is a

16  copy of the Tennessee Complaint.

17        And in its prayer for relief, it makes clear in B

18  that they're seeking an award of compensatory damages for the

19  value of SHS's legal services to the Equifax Class in

20  relation to the overall $77.5 million fee award or,

21  alternatively, disgorgement of benefits unjustly retained by

22  defendants.

23        So I believe that the statements made to suggest

24  that somehow that my client is trying to enhance its lodestar

25  is misleading and not true.

1          Now, also from that same document, at paragraph 21

2    of the Complaint, although 77.5 million fee award was not

3    based on lodestar, the Court made clear that it was not

4    awarding fees based on a lodestar method, which invites

5    disputes over matters such as billing rates.

6          Defendants demanded rigid application of an

7    artificially deflated lodestar calculation when assessing the

8    share of the fee award that would be allocated to my client.

9    That is the crux of their Complaint.

10         Now, Ben, bring up slide 21.

11         When I got involved with this, and it's not even a

12   week old yet, I asked to see what was the language of the

13   settlement agreement and what was the precise language of the

14   Court's order dismissing and making a final award in this

15   action?

16         I was directed to Section 11.1 of the settlement

17   agreement.  Plaintiffs, through Class counsel, will request

18   up to 77 and a half million dollars of the consumer

19   restitution fund, representing 25 percent of the settlement

20   fund, negotiated as part of the March 30, 2019, term sheet,

21   to pay reasonable attorneys' fees for work performed by Class

22   counsel or other counsel working at the direction in

23   connection with this litigation, to be distributed as

24   determined by Class counsel, not the Court but Class counsel.

25         This side note does not make allocation of the fee

award an obligation that is a requisite part of the
settlement implementation, which is complete when the award
was paid, nor does it set out any criteria or methods for
apportionment of the Class fee.

The next slide, Ben, please.

Let's go to the Court's final order.  This is at
Docket 957, paragraph 21.

The settling parties are ordered to implement each
and every obligation set forth in the settlement agreement in
accordance with the terms and provisions of the settlement
agreement.

The Court retains jurisdiction over this action and
the settling parties, settlement Class members, attorneys,
and other appointed entities for all matters relating to this
action, including, without limitation, the administration,
interpretation, effectuation, or enforcement of the
settlement agreement and this final order and judgment.

As the Burr and Forman case has been discussed --
and I would agree with the Court.  It is a Judge Tjoflat
decision, and it is a little bit hard to follow, but I
believe it is clear in the Tjoflat opinion that a provision
that is this general and does not specifically say that it
retains the right to deal with the apportionment of
attorneys' fees after in the settlement agreement delegating
that responsibility to class counsel, that the actions of our

1   client seeking the determination of what Class counsel did is

2   a matter that has already been decided and foreclosed by this

3   Court.

4           The next slide, please.

5           Docket 1957, paragraph 19, the settlement Class

6   representatives, settlement Class members, and defendants are

7   hereby permanently barred and enjoined from commencing,

8   pursuing, maintaining, enforcing, or prosecuting, either

9   directly or indirectly, any released claims in any

10  administrative, judicial, arbitral, or other forum.

11          The permanent bar and injunction is necessary to

12  protect and effectuate the settlement agreement, the final

13  order and judgment, and the Court's authority to effectuate

14  the settlement agreement, and is ordered in aid of this

15  Court's jurisdiction and to protect its judgments.  Nothing

16  in this final order and judgment shall preclude any action to

17  enforce the terms of the settlement agreement.

18          This does not say that it is necessary -- and

19  remember what happened when this final order was entered.

20  Payment was made.  There's been a -- let's start at the very

21  beginning, Ben, if you would, and let's go through the

22  chronology of events here.

23          The next slide, please.

24          We had the event which gave rise to the suit in

25  2017.

1          There's the MDL order, which you're aware of, and

2     the consolidation of suits.

3          In February 2018, the appointment of defendants as

4     co-lead counsel.  The protocol we talked about was in this

5     time frame.

6          It was necessary to file an Amended Consolidated

7     Complaint, and it was important for the Class representatives

8     to in fact be identified and be part of that Amended

9     Consolidated Complaint, the ones provided by my client.

10         In July of 2019, there was a Consumer Class

11    settlement, and then there was final approval of that

12    settlement in 2020.

13         It appears there were a series of appeals that went

14    on, all relating to the Equifax settlement.

15         The next slide, please.

16         Then in February of 2022 -- because one of the

17    first questions that struck me as I read all this is, why did

18    it take so long for Sanford to complain about this?  Why is

19    it not only coming up here in 2022 and 2023?

20         Well, they didn't know what the distributions were

21    going to be until they were -- and they were informed about

22    it in an unusual set of circumstances.  They were contacted

23    to provide a 1099 so that the distribution could be delivered

24    with a 1099, and not being told what the distribution was.

25         And so they placed a phone call to say, Well, what

1  is our settlement share?  It was not announced in any

2  fashion, and it was not shared what others were getting at

3  the time either.

4           And so it was necessary, after finding out what the

5  distribution amount was, to consider whether that was a valid

6  share for the work they had done.  And they engaged counsel,

7  co-lead counsel to see if we could have a discussion as to

8  whether or not that was a proper measure of value.

9           Within a month or two, this action was terminated

10 and the Court's final order entered.

11          As I said, for the next probably ten months my

12 client has attempted to resolve this dispute with lead

13 counsel without filing claims, and those efforts were

14 unsuccessful, and they filed the suit in Tennessee Chancery

15 Court.

16          The next slide, please.

17          The All Writs Act, which has been invoked here by

18 the movants, is an extraordinary remedy.  It is used

19 sparingly and only in the most critical and exigent

20 circumstances.  The Supreme Court case is cited here.

21          The next slide, please.

22          Relief may be granted under the All Writs Act only

23 when necessary or appropriate in aid of the court's

24 jurisdiction and the legal rights at issue are indisputably

25 clear.

1    The Court's action, at least from my client's

2    perspective, is that its activity is closed when the suit and

3    the dismissal was filed and the final order entered.  The

4    Court --

5    THE COURT:  I wouldn't spend a lot of time on that

6    argument, Mr. Knapp.  The law is so clear that I have the

7    right to protect my judgments.  I have the right to take

8    action under the All Writs Act, whether the case is open or

9    closed.

10   MR. KNAPP:  I will move on beyond that issue.

11   How is your settlement jeopardized or impaired by

12   questioning whether or not the attorneys' fees, which has

13   been determined to be $77.5 million, impaired?  How is that

14   hurt?

15   The settlement amount is what it was.  The amount

16   that the lawyers have to share has been determined was made

17   in the final order.  How is that impaired when someone

18   questions how that's allocated?

19   I'll move on from that argument as well.

20   The next slide, please.

21   As you know, the All Writs Act is controlled by --

22   or "tempered" might be a better way to say it, by the Anti-

23   Injunction statute.

24   The next slide, please, Ben.

25   The next slide, please.

1          The Anti-Injunction Act serves as an absolute

2     prohibition against enjoining state court proceedings unless

3     the injunction falls within one of three specifically defined

4     exceptions, and the movants have cited to two.

5          Move on, if we would, please, Ben.

6          Those exceptions are narrowly and strictly

7     construed, citing to the Eleventh Circuit authority here.

8          The next one, Ben.

9          "Any doubts as to the propriety of a federal

10    injunction against state court proceedings should be resolved

11    in favor of permitting the state courts to proceed in an

12    orderly fashion to finally determine the controversy."

13    Again, a U.S. Supreme Court case.

14          The next item.

15          This is the first exception that is cited by the

16    movants.  "The necessary in the aid of jurisdiction exception

17    is a narrow one and should be invoked only where federal

18    injunctive relief is necessary to prevent a state court from

19    so interfering with a federal court's consideration or

20    disposition of a case as to seriously impair the federal

21    court's flexibility and authority to decide that case."

22          It's our client's position the case has already

23    been decided as of the final order that was entered, and thus

24    that this exception does not apply.

25          Next.

1           The Anti-Injunction Act relitigation exception.

2   This is -- and principles analogous to res judicata being

3   applied in the context of whether or not an injunction should

4   issue, and it prevents a losing party from skirting a federal

5   court's decision by refiling the same case in the same -- in

6   the state court.

7           So the question becomes:  Is -- the suit that was

8   filed in Tennessee, does it involve, first of all, a decision

9   made by the federal court?  And, secondly, is it the same

10  case?

11          This exception is entitled Every Benefit of the

12  Doubt, regarding whether the requirements of res judicata

13  have been met, and it goes towards the state court.  "An

14  injunction can issue only if preclusion is clear beyond

15  peradventure."

16          The next slide.

17          Here is a comparison trying to analyze whether or

18  not this is the same issue that you decided when entering

19  your final order in the multi-district litigation.

20          The parties in the Equifax case are known.  The

21  parties in the Tennessee case are known, and they're

22  different.

23          The claims are different in the federal court in

24  the MDL case.  The claims are different in the state court

25  case.

1        The nucleus of facts are different, though,

2  somewhat related and somewhat not related.  They arose at

3  different times and different dates, and the award and the

4  orders and the relief sought differ.

5        On that basis, we would argue that the relitigation

6  exception does not apply here.

7        The next slide.

8        Burr and Forman.  Burr and Forman was a class

9  action, and there's some suggestion that that's

10 distinguishable from the current action because it was not a

11 multi-district piece of litigation.  I would suggest to you

12 that that distinction may or may not be legitimate as applied

13 here.

14       In Burr and Forman, they were dealing with a

15 somewhat similar situation, which was what fees would be paid

16 from a settlement fund in the federal case.

17       But there, the federal court tried to take up the

18 very issue of whether or not -- how the fees should be

19 divided.

20       The federal court enjoined the state court action,

21 but the Eleventh Circuit reversed, concluding that it lacked

22 the power to do so under the Anti-Injunction Act.

23       Next, please.

24       The Anti-Injunction Act's animus is clearly rooted

25 in federalism concerns, a desire to avoid tension and

1    preserve comity between the federal and state courts, because

2    it is grounded in the constitutional guarantees of

3    independence between each of those systems.

4         The next item.

5         The simple fact is that -- and this is the Eleventh

6    Circuit speaking -- that the district court in the present

7    case entered a judgment implementing a settlement and

8    retained jurisdiction over the settlement fund, but did not,

9    standing alone, render the injunction necessary in aid of its

10   jurisdiction.

11        So that's the decision you have to make.  You have

12   to decide does the order that you entered in fact encompass

13   the very issues that we're talking about?

14        For an injunction properly to issue, the matter in

15   controversy in the federal court proceeding must be the

16   virtual equivalent of a controversy over a disputed race in

17   an in rem proceeding, and the state court proceedings must

18   constitute a threat to the federal court's resolution of that

19   controversy.

20        Next.

21        The Eleventh Circuit in Judge Tjoflat's opinion

22   didn't -- concluded that the lawyers' efforts did not attack

23   the substance of the Tolbert judgment, and that the judgment

24   on the attorneys' fee question would not threaten the

25   entitlement of the plaintiffs in the Tolbert action to the

1    judgment or settlement that they had obtained in that class

2    action.

3            It is for that reason we believe that in fact Burr

4    and Forman is controlling here, and it is an Eleventh Circuit

5    case.

6            I did find it interesting to hear a reference to

7    complex -- the complex case exception, and I think it was

8    reiterated as the multi-district exception.  I don't think

9    I've heard it referred to in that fashion.

10           There is an exception if the cases are complex.  I

11   believe it's a complexity standard.

12           The next one, Ben, if we would.

13           And in the -- and I think in particular the case

14   that raises this issue is the Flanagan case out of the Ninth

15   Circuit, and there, the issue was that the judgment which had

16   been entered by the district court was one that required that

17   defendant to be disengaged from a bank, and not only was

18   there an award of compensatory damages, but that there had to

19   be a disgorgement of their interest in the bank and there had

20   to be -- and because of the bank's requirements about net

21   worth, they could not necessarily retire their equity

22   interest without impairing the collateral of the bank.  And

23   in that circumstance, it felt that that would necessarily

24   interfere with the court's prior judgment.

25           The other cases they cite, I believe, have no

1    direct factual similarities to what we have here.

2            Finally -- and then I'll confer with counsel before

3    I sit down, if I may -- it's important that Class

4    representatives and obtaining qualified and who have

5    meaningful involvement in a case in a class action.

6            It was just today I came across a story in the ABA

7    Journal, Lack of Standing Undoes Class Settlement.  Standing

8    to recover in one circuit does not support a nationwide

9    settlement.  A settlement that is made when, in fact, there

10   isn't a class representative from each state can, in fact,

11   fail.

12           And so we believe that the value of the

13   contributions made by our client have been undervalued in

14   this case and that they have a remedy in Tennessee court.

15           Now, if I may, may I confer with my colleague?

16   Thank you.

17           (Discussion off the record.)

18           MR. KNAPP:  One last point, if I may.

19           Referring again to the Tennessee Complaint,

20   Document 1249-1, at page 82, reading from paragraph 41, in

21   October of 2019, defendants assembled final time and expense

22   reports for a submission to the MDL court as part of the

23   motion seeking approval of the 77.5 million fee award.

24           Defendants emphasized that allocation of the

25   attorneys' fees award among the various firms would not be

1 based on a strict application of the lodestar accepted and

2 approved by the co-lead counsel, but would instead reflect

3 the value that each firm contributed to the successful

4 result, including how effectively and efficiently a firm

5 handled its responsibilities, the nature of the work that was

6 done, creatively, collegially, equity, and other relevant

7 considerations.

8    Does the Court have any questions for me, Your

9 Honor?

10    THE COURT:  No, sir.

11    MR. KNAPP:  Thank you very much.  Thank you.

12 Appreciate your attention.

13    THE COURT:  Mr. Knapp.

14    Mr. Canfield, it's your motion.  I'll give you the

15 last word.

16    MR. CANFIELD:  Your Honor, I'm going to try to

17 be -- avoid being sarcastic, which I don't think is ever an

18 effective argument, but some of what I just heard is -- I

19 mean, it defies belief.

20    Mr. Knapp stood up and said surely there has to be

21 a forum in which we can litigate these claims to get a larger

22 share of the fee, suggesting that because if there's some,

23 you know, confusion about what forum is available, it had to

24 go to Tennessee and file this lawsuit.

25    The reality is that this Court has exclusive

jurisdiction.  There was no question about it.  We told

Sanford that, when the issue arose, if they were

dissatisfied, they should come to this Court.  They didn't do

it.  There's no question about some -- or confusion about

where to go.

The -- and just the absurdity of choosing Tennessee

is obvious by what would have happened if Sanford argues to

the jury that they're entitled to 20 percent of the fee based

on this contributions to the settlement?

And then what if ten other firms came in and said,

"We're entitled to 20 percent of the fee."

Well, you've already got more than 200 percent of

the fee that's being allocated in these other jurisdictions,

which is, obviously, incredibly bizarre.  And that is why

this Court has the exclusive jurisdiction.  It's the Court

that's in the position to deal with allocations.

The second thing that Mr. Knapp said that I found

surprising is that they're not -- Sanford's not seeking to

recover for the work that it did filing all of these

Complaints or for work that wasn't submitted to this Court.

It's not trying to increase its lodestar.  It's just looking

to get the value of its contributions.

But why then does it have the following paragraph

in the Complaint?  "During the course of the Equifax

investigation and litigation, Sanford interviewed more than

12,000 individuals and drafted and filed 45 Class Complaints in 44 states and the District of Columbia.  The firm invested over 3,900 hours in attorney and staff time and more than $1.4 million in lodestar.  Its contributions to the litigation were significant and critical to the success of the Equifax litigation."

Obviously, if it's allowed to go forward in Tennessee, Stanford (sic) is going to be talking in front of a Tennessee jury about the 3,900 hours that it put into the case, and it's going to -- the idea that they would go to the Tennessee jury and say the only issues -- the only lodestar that's at issue here is the 500 hours that we were allowed in the fee application.  That defies logic, and it also defies the terms of their Complaint.

Count One, when it talks about how it's been damaged, says Sanford has suffered damage because it reasonably expended over 1,000 hours of time that materially advanced the litigation but it was never credited for by co-lead counsel in the fee application.

So it's clear, there's no question but that the amount of its lodestar is going to be an issue in the Tennessee case.

Lastly, the only thing I would point out is that nowhere in Mr. Knapp's presentation did he address the orders of this Court that they're seeking to collaterally attack in

Tennessee.  He didn't talk about the compensation orders.  He didn't talk about the leadership order.  He didn't talk about the meeting of the protocol.

He wants to talk about the final judgment as if the only thing that happened in this case is that the claims of the Equifax data breach victims were settled and everything else that relates to what happened here is just irrelevant.

That is, obviously, crazy.  It is seeking before a Tennessee court specific amounts of time and money to enhance its supposed contribution and in direct violation of all of the directives that this Court established at the beginning of the MDL.

And they are suing us for a breach of our fiduciary duties for misleading the Court and all that stuff that was in Mr. Sharp's demand letter about how we committed fraud, and various other things that may surface in Tennessee.  It is outrageous.

We faithfully executed the directives of this Court.  We prided ourselves on doing that.  We did everything possible to comply with what this Court told us to do.  And because we did that, this law firm seeks to have us held responsible for over $1 million in compensatory damages and punitive damages that are unspecified in the Complaint.  That is inappropriate.  It's not logical.  It's not legal, and this Court should enjoin it.

1          Thank you, Your Honor.

2          THE COURT:  All right.  I'm going to grant the

3     motion to enjoin the litigation that has been filed by the

4     Sanford Heisler Sharp law firm in the Chancery Court of

5     Nashville, Tennessee, for the following reasons:

6          Number one, I think I'm authorized to do so under

7     the All Writs Act.  The lawsuit that the Sanford firm has

8     filed in Tennessee is an attempt to directly undermine my

9     management of the Equifax MDL and to subvert the orders that

10    I issued in this case governing the award of attorneys' fees

11    in this case.

12         And it's also my judgment that I'm entitled to do

13    that under the exceptions to the Anti-Injunction Act.

14         I believe that the controlling Eleventh Circuit

15    authority in this case is not the Burr and Forman case but,

16    rather, the Wesch case at Wesch versus Folsom at 6 F.3d 1465,

17    where the Eleventh Circuit discussed the two exceptions to

18    the Anti-Injunction Act that are relevant here, one being

19    what it called the in aid of jurisdiction exception, and it

20    said this:  The United States Supreme Court recognizes that a

21    federal court injunction of state court proceedings is

22    necessary in aid of jurisdiction when necessary to prevent a

23    state court from interfering with a federal court's

24    consideration or disposition of a case as to seriously impair

25    the federal court's flexibility and authority to decide that

1   case.

2           That is exactly what is happening here.

3           In my final order and judgment, I expressly said in

4   paragraph 21 that the settling parties are ordered to

5   implement each and every obligation set forth in the

6   settlement agreement in accordance with the terms and

7   provisions of the settlement agreement.

8           The Court retains jurisdiction over this action and

9   the settling parties, settlement Class members, attorneys,

10  and other appointed entities for all matters relating to this

11  action, including, without limitation, the administration,

12  interpretation, effectuation, or enforcement of the

13  settlement agreement and this final order and judgment.

14          I don't know how that could be any more broadly

15  stated.  And what is happening here is an attempt by the

16  Sanford firm to usurp the jurisdiction that I retained and

17  hand it over to a state court in Tennessee and a state court

18  jury.  This is precisely the type of situation where that

19  exception to the Anti-Injunction Act applies.

20          In the Wesch case, it went on to say in Battle v.

21  Liberty National Life Insurance, "We held that a federal

22  district court which entered a final judgment in a complex

23  antitrust class action suit could enjoin in aid of its

24  jurisdiction a later state court suit in which class members

25  brought substantially similar claims.

1          "In reaching our decision, we held that the

2    necessary in aid of jurisdiction exception is applicable both

3    after the entry of a final judgment in federal court and to

4    proceedings that are not in rem.

5          "Moreover, we reasoned that a lengthy and

6    complicated class action suit is the virtual equivalent of a

7    res to be administered."

8          And that's precisely the situation we have here.  I

9    retained jurisdiction over this case.  I retained

10   jurisdiction over the implementation of the settlement

11   agreement, and an integral part of that was the award of

12   attorneys' fees.  And the Tennessee lawsuit is attempting to

13   undermine and interfere with my jurisdiction over this case.

14         The Eleventh Circuit in Wesch went on to say that,

15   "The 'protect or effectuate its judgments' exception to the

16   Anti-Injunction Act, also known as the 'relitigation

17   exception,' is essentially a res judicata concept designed to

18   prevent issues that have already been tried in federal court

19   from being relitigated in state court."

20         That is precisely what the Sanford firm is trying

21   to do in this case.

22         In the settlement agreement itself, in Section 11.1

23   under Attorneys' Fees and Expenses, it said that Class

24   counsel will request a percentage of the settlement fund "to

25   pay reasonable attorneys' fees for work performed by Class

counsel or other counsel working at their direction in connection with this litigation, to be distributed as determined by Class counsel."

And in my final order and judgment, I expressly approved the settlement agreement and adopted it as part of that judgment.

The Sanford firm, if it was unhappy with that procedure for allocating counsel fees, could have objected. They didn't.  But now it's trying to relitigate that in a state court.

In the application for attorneys' fees, Class counsel explicitly pointed out the number of total hours that leadership counsel had performed and how much of the total lodestar leadership counsel had performed.

If the Sanford firm had wanted to object to leadership counsel receiving an award commensurate with those hours and that proportion of the lodestar, they could have objected.  They didn't.  They're trying to relitigate that now.

In the application for fees, Class counsel explicitly said that they would limit potentially compensable time in the case, in paragraph 44 of their application.

If the Sanford firm had objected to that, said that was unfair, that was treating them unfairly or unreasonably or not recognizing their contribution to the case, they could

have objected.  They didn't.  Now they want to relitigate that in state court.

Attached to the application for attorneys' fees was a chart showing the hours worked by a firm and the lodestar for those by every firm that was involved in the case.  The chart has the Sanford Heisler Sharp firm in it.  It shows the total of 519.8 hours with a lodestar of $106,274.

If the Sanford Heisler Sharp firm had objected to that, either the hours allocated to them or the lodestar, they could have done so.  It didn't.  Now it's trying to relitigate that.

So for all of those reasons, I think that the injunction should issue in this case.

To address the bigger picture, I totally agree with Mr. Canfield that to allow disgruntled attorneys in an MDL class action settlement who aren't happy with their share of the attorneys' fees to then go to state court and try to relitigate their entitlement to fees in state court, that has no knowledge of the case, no understanding of what I was trying to prevent, which is exactly what's happening here, in all the orders that I issued appointing class counsel, approving the protocols for the award of attorneys' fees, reviewing on a quarterly basis every submission of hours by leadership and non-leadership counsel to avoid the situation that Judge Koh found herself in in the Anthem case, and to

have an orderly disposition of the attorneys' fees award, all
of that would be totally undermined if I allowed this to
occur.

A year or two ago there was an article that came
out that said that Judge Chuck Briar and I were tied, until
the time the article came out, for the living judges that had
handled the most MDL cases.

Well, that doesn't mean my judgment is perfect, but
it does mean that for over -- for almost 25 years I've been
going to the annual MDL conferences at The Breakers, and
every year we have one or more breakout sessions about the
award of attorneys' fees.

If I had raised my hand and said, "I think that we
ought to allow the apportionment of attorneys' fees in MDL
class action settlements to be decided in state court based
on individual lawsuits filed by counsel participating in the
MDL," the response would have been, "You're crazy.  Have you
lost your mind?"  And they would have been right.

So I'm granting the motion.  I enjoin the Sanford
Heisler Sharp firm and all of those in concert with them from
proceeding with the lawsuit against Class counsel in the
Chancery Court in Nashville, Tennessee, and order them to
dismiss the lawsuit.

And I'll get out a written order as soon as
possible, hopefully by next week, but I'm not making any

```
 1   promises on that.

 2            Do you have anything further?

 3            MR. CANFIELD:  Not from our standpoint, Your Honor.

 4   Thank you very much.

 5            THE COURT:  Mr. Knapp?

 6            Oh, one thing I meant to add and forgot.

 7            Mr. Knapp, in response to your statement there has

 8   to be a forum for your client's claim to be heard, it's right

 9   here.  It's this case.  It's me.

10            And if your client wants to dispute, litigate its

11   allocation of the fee, it can file a motion in front of me.

12   It could have done that earlier.  It can still do it, but

13   this is a forum for that matter to be heard.

14            MR. KNAPP:  Thank you.

15            THE COURT:  Do you have anything else?

16            MR. KNAPP:  No, Your Honor.  Thank you for your

17   time.

18            THE COURT:  Thank you very much, gentlemen.

19            Court's in recess until further order.

20            (Proceedings concluded at 3:47 p.m.)

21                  - - - - - - - -

22                Reporter's Certification
     I certify that the foregoing is a correct transcript from the
23   record of proceedings in the above-entitled matter.
                         s/Diane Peede, RMR, CRR, CRC
24                       Official Court Reporter
                         United States District Court
25   Date:  March 10, 2023   Northern District of Georgia
```